IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>Q'MAX SOLUTIONS INC.,<br><br>Debtor in a Foreign Proceeding. | § <br> § Chapter 15 <br> § <br> § <br> § Case No. 20-34791 (MI) <br> § <br> § <br> § |

**DECLARATION OF RECEIVER IN SUPPORT OF (A) VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE, AND (B) RECEIVER'S EMERGENCY EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND RELIEF PURSUANT TO SECTIONS 105(A) AND 1519 OF THE BANKRUPTCY CODE**

I, Anamika Gadia, do hereby declare as follows:

1. I am over the age of 18, and I am authorized to submit this declaration (the "Declaration") on behalf of the Receiver (as defined below).

2. I am a Senior Vice President at KPMG Inc. ("KPMG"). I hold a Bachelor of Commerce (Honours) from Queen's University. I have more than 15 years of experience in corporate restructuring, turnaround consulting, and cost reduction, and I have worked on a wide range of assignments across various industries, including a number of high-profile mandates. I lead the Restructuring and Turnaround group at KPMG in Canada, am a member of the Canadian Association of Insolvency and Restructuring Professionals and International Women's Insolvency & Restructuring Confederation, a board member of the Turnaround Management Association ("TMA"), Toronto Chapter, and serve or have served on committees of the TMA. My office is located at Bay Adelaide Centre; 333 Bay Street, Suite 4600; Toronto, ON M5H 2S5.

3. KPMG is the court-appointed receiver and manager ("Receiver") of Q'Max Solutions Inc. ("QSI" or the "Debtor") pursuant to the *Consent Receivership Order* dated May 28, 2020 (the "Receivership Order"), entered by the Court of Queen's Bench of Alberta in Judicial Centre of Calgary, Alberta, Canada, Court File No. 2001-06722 (the "Canadian Court" and the "Canadian Proceeding") under Canada's Bankruptcy and Insolvency Act ("BIA").  Also pursuant to the Receivership Order, KPMG is the Receiver of certain other affiliated debtors, as described below.

4. I am the Senior Vice President in charge at KPMG in connection with its role as Receiver, and I am authorized to provide this Declaration by and on behalf of the Receiver.

5. Acting on behalf of the Receiver, I have investigated the business and affairs of the Debtor to the best of my ability since my engagement on this matter, and make this Declaration based on that investigation.  All facts set forth in this Declaration are based upon my personal knowledge; my review of relevant documents; information provided to me by employees of KPMG working under my direction or supervision; my discussions with current or former representatives and/or agents of the Debtor, the other Canadian Debtors, or other entities in the Q'Max Group (each as defined herein); and/or my opinions based upon my experience concerning the Debtor's operations and financial condition.  If called to testify, I could and would testify competently as stated herein.

6. I submit this Declaration in support of the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Verified Petition"),[1] and the *Emergency Ex Parte*

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Verified Petition.

4845-3212-1547v.2

*Application for Temporary Restraining Order and Relief Pursuant to Sections 105(A) and 1519 of the Bankruptcy Code* (the "TRO Application"), filed contemporaneously herewith.

7. I have reviewed the Verified Petition and the TRO Application, and believe the factual assertions therein are true and correct, and to the best of my knowledge the relief requested therein is appropriate and necessary for the Receiver to fully and efficiently perform its duties under the Receivership Order. I further declare as follows:

## I. BACKGROUND

**A.   QSI's Business and Corporate Structure**

8. QSI is a British Columbia corporation that is extra-provincially registered in Alberta, Canada. Prior to recent events, the Debtor, by and through the Q'Max Group, provided oilfield services focused on onshore and offshore drilling fluids, solids control, and waste management solutions in the upstream oil and gas drilling and producing industry. The Q'Max Group's customers include(d) national oil companies, major international energy companies and independent exploration and production companies in Canada, the United States, Mexico, Colombia, the Middle East and Africa.

9. The Debtor is 100% owned by Fluid Holding Corp. ("Fluid Holding"), which is also a British Columbia corporation that is extra-provincially registered in Alberta, Canada. The Debtor is the primary parent entity to the currently or formerly operating and non-operating regional companies in the Q'Max Group, holding direct or indirect ownership interests in the Q'Max Group of companies, owning intellectual property licensed by certain of the Q'Max Group entities, and entering into guarantees and other shared services agreements to the benefit of the Q'Max Group. QSI's ownership interests in each of the entities in the Q'Max Group is set forth on the *Corporate Ownership Structure and Control Chart*, attached as **Exhibit A**. The direct or indirect subsidiary entities relevant to this proceeding are as follows:

4845-3212-1547v.2

- With Fluid Holding and QSI, the "Canadian Debtors":

    o **Q'Max Canada Operations Inc.** ("QCO"), is a British Columbia corporation with a registered office in British Columbia and being extra-provincially registered in Alberta, Canada, conducting its business in Canada;

    o **1356760 Alberta Ltd.** ("135 Alberta") and **Q'Max Solutions Holdings Inc.** ("QSH") are Alberta, Canada corporations with registered offices in Calgary, Canada, conducting their business in Canada;

- The non-debtor "Global Operating Companies": **Central Procurement Inc.** ("CPI"); **Q'Max Mexico, S.A. de C.V.** ("Q'Max Mexico"); **Environmental Solutions for Petroleum Services – Free Zone – S.A.E.** ("Environmental Solutions"); **International Drilling Fluids & Engineering Services Co. (IDEC) Ltd.** ("IDEC"); **United QMax Drilling Fluids Company Co.** ("Kuwait JV"); and **QMax Arabian Oil & Gas Services Co.** ("Saudi JV"); and

- The "U.S. Debtors": **Q'Max America Inc.** ("QAI") and **Anchor Drilling USA, LLC** ("Anchor") are Delaware corporations conducting business in the United States, including Texas.[2]

10. When operational, the Debtor maintained a Canadian headquarters at Suite 1700 – 407 2nd Street SW, Calgary, Alberta. Its business and registered offices were located in Canada. Prior to the terminations/resignations immediately preceding the U.S. Debtors' filing for chapter 7 bankruptcy relief, QSI's directors and officers resided in the United States and were, with one exception,[3] employed by QSI in those respective capacities. Since entry of the Receivership Order, the Receiver has exercised complete control of the Debtor. QSI does not presently employ any officers, directors, or employees. All services required by QSI are provided by the Receiver or third parties employed by the Receiver.

---

[2] For clarity, the "Q'Max Group" collectively refers to the Canadian Debtors, the Global Operating Companies, and the U.S. Debtors.
[3] QSI's former Vice President of U.S. Operations was employed by Anchor.

4845-3212-1547v.2

11. In recent months, the business of the Q'Max Group was negatively impacted by depressed oil and natural gas pricing and a corresponding reduction in rig and drilling activity. Such negative impacts were exacerbated by public health restrictions in response to the COVID-19 pandemic. Demand for the Q'Max Group's products and services thus declined to the detriment of the Q'Max Group's earnings.

12. As of this filing, the Receiver has determined that QSI and the other Canadian Debtors will not be sold as going concern businesses. Accordingly, all of QSI's executives and other employees have been terminated. QSI's continued function, by and through the Receiver, is limited to liquidation of its interests in the Canadian Debtors, sale of the Global Operating Companies as going concern businesses, to the extent commercially feasible, and liquidation of any remaining QSI assets for the benefit of QSI's creditors pursuant to the Receivership Order and operative law.[4]

## B. The Q'Max Group Credit Agreement

13. QSI, QCO, and QAI, as borrowers (the "Borrowers"); and HSBC Bank Canada, as administrative agent ("HSBC" or "Agent") for certain Lenders,[5] entered into a credit agreement in May 2014, which has been amended and restated and supplemented by various amending agreements (collectively, the "Credit Agreement"). Thereunder, the Agent alleges that, as of May 5, 2020, the total indebtedness of the Borrowers to the Lenders, inclusive of interest, was approximately (a) USD $145,381,623.21 plus CAD $1,228,668.47; (b) outstanding letters of credit in the amounts of USD $3,916,296.42 and CAD $1,161,408.79; and (c) other outstanding credit

---

[4] The U.S. Debtors, as explained below, are chapter 7 debtors and thus undergoing a liquidation process separate from the Canadian Proceeding.

[5] The Agent acts on behalf of a syndicate of predominantly Canadian based lenders, currently comprised of HSBC, Bank of Montreal, Business Development Bank of Canada, Export Development Canada and HSBC Bank USA (collectively, and in such capacity, the "Lenders"). The Borrowers and Lenders are collectively referred to as the "Loan Parties".

card balances, plus accrued and accruing costs and disbursements, and interest continuing to accrue per diem (collectively, the "Indebtedness").

14. Each of QSI, QSH, 135 Alberta, QCO, QAI, and Anchor have executed unlimited guarantees of the Indebtedness. Fluid Holding has granted a limited recourse guarantee in favor of the Agent. Further guarantees of the Indebtedness have been granted by other non-Canadian and non-U.S. members of the Q'Max Group.

15. Among other security and collateralization, general security agreements (the "GSAs") were granted to secure amounts advanced under the Credit Agreement by QSI, QSH, 135 Alberta, QCO, QAI, and Anchor, which provide first-priority security interests on all or substantially all of the grantors' assets.

16. Furthermore, a separate credit agreement (the "U.S. Credit Agreement") was entered between QAI, as holding company, and Anchor, as borrower; and Encina Business Credit, LLC ("Encina"), as administrative agent on behalf of certain lenders. Pursuant thereto, Encina asserted that the U.S. Debtors defaulted under the U.S. Credit Agreement and owed in excess of USD $23,884,000. On September 6, 2019, the Agent and Encina, as ABL agent, entered into that certain *Intercreditor Agreement* (the "Intercreditor Agreement"), the purpose and effect of which was to subordinate a portion of the Agent's security to security held by Encina in respect of funds owing under the U.S. Credit Agreement by the U.S. Debtors. Notably, there is no overlap between the lenders to the U.S. Credit Agreement and the Lenders to the Credit Agreement.

C. **The Canadian Receivership Proceeding**

17. On May 12, 2020, following approximately two years of extensive unsuccessful restructuring negotiations, the Agent, on behalf of the Lenders, issued to the Borrowers a demand letter that included notices of intention to enforce security under section 244(1) of the BIA and to accelerate the Indebtedness under the Credit Agreement. On May 27, 2020, as expressly permitted

by the GSAs, the Agent filed an *Application for Appointment of a Receiver* seeking the appointment of KPMG as receiver under section 243(1) of the Bankruptcy and Insolvency Act, R.S.C. 1985, c, B-3, section 13(2) of the Judicature Act, R.S.A. 2000 c J-2 (the "Judicature Act"), and 65(7) of the Personal Property Security Act, R.S.A. 2000, c P-7.

18. On May 28, 2020, the Honorable Justice Grosse for the Canadian Court entered the Receivership Order pursuant to section 243 of the BIA and section 13(2) of the Judicature Act.

19. The Receivership Order appointed the Receiver over the estates of the Canadian Debtors. The Receivership Order specifically authorizes the Receiver to act "as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada." (Receivership Order ¶ 31). It empowers and authorizes the Receiver to take numerous steps involving the property of the entities subject to the Canadian Proceeding. (Receivership Order ¶ 3). The Receivership Order grants the Receiver access to all of the Debtors' books, records, contracts, securities, and information. (Receivership Order ¶¶ 4-6). Additionally, the Receivership Order imposes a stay of initiation or continuation of proceedings against the Receiver, the Debtor, and/or the other Canadian Debtors and their respective estates. (Receivership Order ¶¶ 7-11).

20. The Receivership Order also grants the Receiver a charge (the "Receiver's Charge") on all of the Canadian Debtors' current and future assets, undertakings, and properties of every nature or kind whatsoever, and wherever located, including all proceeds thereof (collectively, the "Property") to secure payment of the reasonable fees and expenses of the Receiver and its counsel, not to exceed CAD $1,000,000 (or such greater amount as the Canadian Court may by further order authorize). (Receivership Order ¶ 18). The Receiver's Charge has the priority set forth in paragraph 18 of the Receivership Order.

21. The Receivership Order further authorizes the Receiver to borrow, by way of a revolving credit or otherwise, such monies from time to time as it may consider necessary or desirable, provided that the outstanding principal amount does not exceed CAD $8,000,000 (or such greater amount as the Canadian Court may by further order authorize) on the terms authorized therein. (Receivership Order ¶ 21). The Canadian Court granted a charge (the "Receiver's Borrowings Charge") on the Property to secure payment of the monies borrowed, together with interest and charges thereon, by the Receiver pursuant to the Receivership Order.

22. Consistent with section 14.06(1.2) of the BIA, the Receivership Order provides that "[t]he Receiver shall not be liable for any employee-related liabilities, including any successor employer liabilities . . . , other than such amounts as the Receiver may specifically agree in writing to pay, or in respect of its obligations under sections 81.4(5) or 81.6(3) of the BIA or under the *Wage Earner Protection Program Act* . . . ." (the "Receiver's Protections"). (Receivership Order ¶ 14).[6]

23. The Receivership Order includes a request by the Canadian Court for "aid and recognition of any court . . . having jurisdiction in Canada or in any foreign jurisdiction . . . , to give effect to [the Receivership Order] and to assist the Receiver and its agents in carrying out the terms of [the Receivership Order]." (Receivership Order ¶ 30).

24. KPMG, in its capacity as Receiver, is a Court officer and thus its fiduciary duties extend to the entire body of the Debtor's stakeholders, not to any one stakeholder.

---

[6] Section 14.06(1.2) of the BIA provides:
   Despite anything in federal or provincial law, if a trustee, in that position, carries on the business of a debtor or continues the employment of a debtor's employees, the trustee is not by reason of that fact personally liable in respect of a liability, including one as a successor employer,
   (a) that is in respect of the employees or former employees of the debtor or a predecessor of the debtor or in respect of a pension plan for the benefit of those employees; and
   (b) that exists before the trustee is appointed or that is calculated by reference to a period before the appointment.

**D.    U.S. Debtors' Chapter 7 Proceeding**

25.    On May 24, 2020, the U.S. Debtors—QAI and Anchor—filed voluntary petitions for relief under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division (the "Court"), jointly pending at Case No. 20-60030-CML (the "Chapter 7 Proceeding").

26.    On May 24, 2020, the United States Trustee appointed Christopher R. Murray, as the chapter 7 trustee (the "Trustee").  On June 3, 2020, the Trustee filed a motion to, *inter alia*, approve a stalking horse bidder sale agreement and bid procedures [Dkt. No. 74].

27.    On July 1, 2020, the Court entered an order approving the sale of a portion of the U.S. Debtors' assets, principally including operations in the Northeast United States, to Paragon Integrated Services Group LLC ("Paragon") for the sum of USD $7,200,000, plus assumption of the remaining Encina debt.  As described in the July 23, 2020 *Trustee's Status Report*, the Trustee anticipates that the remainder of the U.S. Debtors' assets will be liquidated by December, 2020. *See* Case No. 20-60030, Dkt. No. 273.

**E.    Pending U.S. Civil Actions**

**(1)    *Intellectual Property Dispute***

28.    On April 6, 2018, M-I L.L.C. d/b/a M-I Swaco ("M-I") filed in the United States District Court for the Southern District of Texas an action against QSI, QAI, and Sanjit Roy ("Roy"; and collectively with QSI and QAI, the "Defendants") alleging copyright infringement, misappropriation of trade secrets, and conversion against all Defendants (and additional causes against former employee Roy) based on M-I's assertion that the Defendants infringed on M-I's intellectual property rights through QSI's creation and ownership of a product named MAXSITE Hydraulics ("MAXSITE").  *See* Civ. A. No. 18-cv-01099 (S.D. Tex. 2018) (S. Lake) (the "MAXSITE Action").  M-I argues that Roy, upon leaving his employ at M-I, unlawfully

4845-3212-1547v.2

maintained copies of the source code for Virtual Hydraulics and Presspro RT (the "M-I Software"), software that M-I developed for oil and gas drilling, and, upon joining QAI in April, 2015, used the M-I Software to design MAXSITE.

29. In relevant part, on November 18, 2019, the Defendants filed their motion for summary judgment, seeking summary relief with respect to M-I's copyright infringement claim [Dkt No. 128] ("Defendants' MSJ").

30. On August 6, 2020, Judge Sim Lake entered his *Memorandum Opinion and Order* (the "MSJ Order"), which, among other things, granted the Defendants' motion for summary judgment and dismissed with prejudice M-I's copyright claim against QSI and QAI. The MSJ Order held that M-I failed to identify any protectable non-literal elements of its copyrighted work and failed to show evidence that protectable portions of the source code were important enough to M-I's overall program to render MAXSITE substantially similar to them. *See* MSJ Order, Case No. 18-cv-01099, Dkt. No. 146.

31. The MSJ Order also dismissed without prejudice QAI as defendant on account of the Chapter 7 Proceeding and operation of the automatic stay. The MAXSITE Action continues based on the remaining counts against QSI and Roy.

32. The Receiver has approached M-I, by and through counsel, and M-I has been unwilling to recognize the stay set forth in the Receivership Order.

**(2)** ***The Guarantor Action***

33. On September 17, 2020, plaintiff Atlas Energy Tower LLC ("Atlas") filed its *Plaintiff's Original Complaint* against defendant QSI in the District Court of Harris County, Texas, seeking an award of damages against QSI based on QSI's alleged breach of a *Guaranty Agreement* executed by QSI relating to tenant QAI's occupancy of Level 2 of the office building known as

Energy Tower I (the "Guarantor Action"). *See* Cause No. 2020-57316. Atlas seeks judgment in the amount of more than USD $3 million, plus interest, attorney's fees and expenses.

F. **Receivership Status and Pending Sales Processes**

34. Since its appointment approximately four (4) months ago, the Receiver has spent significant time analyzing the books and records of the Canadian Debtors, the Global Operating Companies, and many additional non-operating QSI subsidiary entities to assess the assets and liabilities of the Q'Max Group. In connection therewith, the Receiver has engaged in a comprehensive marketing and sale process in Canada and in the relevant regional markets in order to maximize value for the respective creditors and stakeholders.

35. To date, the Receiver has determined that it is not commercially feasible to sell QSI and/or the other Canadian Debtors as going-concern businesses. Accordingly, a liquidation process is underway.

36. Conversely, the Receiver believes that one or more of the Global Operating Companies should be sold as an operating business or businesses, and the Receiver continues to facilitate operations—by and through parent company QSI—and market the entities accordingly. Moreover, for various business reasons, the Receiver has determined that any sale of the Global Operating Companies must be conducted as a sale of the respective entities' equity interests, which are held in whole or in significant part by QSI. Therefore, any sale of QSI's equity interests in the Global Operating Companies, by operation of Canadian law, will be completed with full notice to QSI creditors and must be approved by the Canadian Court. It is contemplated that the MAXSITE intellectual property will be licensed as part of any going concern sale, to the extent allowed by the Canadian Court and operative law. The Receiver believes that the rights to MAXSITE are owned by, and only by, QSI, except as licensed to various affiliated and/or third parties.

37. Although the Receiver has and will continue to take steps to maximize value to the fullest extent possible in connection with fulfilling its fiduciary obligations under the Receivership Order and Canadian law, it does not project under the current and foreseeable market conditions that the Q'Max Group will return amounts sufficient to make a distribution to unsecured creditors.

**G.     The Chapter 15 Case and Support for Recognition**

38. Contemporaneously herewith, as foreign representative, the Receiver has caused to be filed Official Form 401 Chapter 15 petition for the Debtor in the above referenced case. As foreign representative for the Debtor in this chapter 15 case, the Receiver seeks recognition of the Canadian Proceeding as the foreign main proceedings for the Debtor, or, in the alternative, as a foreign nonmain proceeding.

39. Pursuant to the Receivership Order, the Receiver is the foreign representative of QSI and is specifically authorized to act as QSI's representative for the purpose of having the Canadian Proceeding recognized in a jurisdiction outside of Canada, including the United States.

40. To the best of my knowledge and for the reasons stated in the Verified Petition, I believe that the Canadian Proceeding is a foreign main proceeding as defined under section 1502(4) of the Bankruptcy Code, or, in the alternative, a foreign nonmain proceeding as defined under section 1502(5) of the Bankruptcy Code.

41. The Debtor is a liquidating enterprise that is organized in Canada, is controlled by the Receiver (located in Canada), and does not have any executives or other employees (thus having no present management outside of Canada). As of the Petition filing, the Debtor has been in receivership for approximately four (4) months and is in the midst of an advanced sale and liquidation process in the Canadian Proceeding. The Debtor's headquarters is best described as of this filing as the office of the Receiver in Canada; and the Debtor's prior headquarters and its address for service of process were located in Alberta and British Columbia, respectively. The

Debtor's principal assets and liabilities are also located in Canada, including its (a) ownership interest in the equity of the Q'Max Group, which includes Canadian, U.S. and other international entities; (b) contractual rights, most of which were executed in Canada and are subject to Canadian law; (c) rights to the MAXSITE and certain other intellectual property; and (d) its obligations under the Credit Agreement and to other Canadian creditors, among others.  With respect to the last point, amounts owed under the Credit Agreement represent the vast majority of the Debtor's outstanding obligations.  The Credit Agreement is governed by the laws of the Province of Alberta and the federal Laws of Canada; the Agent is a Canadian financial institution with offices in Alberta, including branch offices in Calgary; and all but one of the present Lenders in the syndicate are Canadian entities.[7]

### H.     Support for the Application and Injunctive Relief

42.     Pending recognition of the Canadian Proceedings, the Receiver requests provisional relief pursuant to section 1519 of the Bankruptcy Code to, among other things, enjoin collection efforts against the assets of the Debtors and to frustrate the sales processes and efforts to maximize value by the Receiver.  To the best of my knowledge, I understand that relief granted pursuant to section 1519 requires satisfaction of the standards for injunctive relief, which, as shown below, are satisfied.

   **(1)     *A substantial likelihood of success on the merits***

43.     For the reasons set forth above, in the Verified Petition and in the TRO Application, the Receiver submits that it is likely to prevail in obtaining recognition of the Canadian Proceeding. The Canadian Proceeding is a valid proceeding pending pursuant to the BIA and Judicature Act that should be recognized pursuant to chapter 15 of the Bankruptcy Code.  As I understand the

---

[7] Canadian-organized Lenders are owed nearly 91% of the amounts outstanding under the Credit Agreement.

4845-3212-1547v.2

concept, the center of main interests ("COMI") of the Debtor is located in Canada for the reasons discussed above.  The Receiver has been performing its duties for approximately four (4) months, and has made substantial progress in its assessment, marketing, and sale efforts for the benefit of the Debotr's entire creditor body.  The Receiver has replaced all pre-receivership, decision-makers (who have each resigned or were dismissed) for QSI.  Further, the Receiver respectfully submits that the Debtor's COMI would have been Canada prior to entry of the Receivership Order, irrespective of the fact that QSI's pre-liquidation officers and directors resided in the United States, because QSI employed the directors and officers and conducted business as a Canadian entity; QSI's immediate parent company, Fluid Holding, is a Canadian entity; and QSI controlled one or more Canadian operating entities that actively conducted business in Canada.

44.     Accordingly, there is a substantial likelihood that the Canadian Proceeding and, specifically, the Receivership Order will be recognized pursuant to chapter 15 of the Bankruptcy Code; and, respectfully, should be recognized as a foreign main proceeding based on my understanding of chapter 15 and similar recognitions of receivership actions pending under the BIA and the Judicature Act.

45.     If the Court does not find that the Canadian Proceeding is a foreign main proceedings, the Receiver submits that the facts underlying this chapter 15 proceeding support a finding that the Debtor has an establishment in Canada within the meaning of section 1502(2) of the Bankruptcy Code, and thus there is a substantial likelihood that the Court will recognize the Canadian Proceedings as foreign nonmain proceedings.  In the event the Canadian Proceeding is recognized as a foreign nonmain proceeding, the Receiver also submits that there is a substantial likelihood that the Court will determine that the relief requested is necessary to effectuate the

purpose of chapter 15 and to protect the assets of the Debtor or the interests of the Debtor's creditors pursuant to sections 1519(a) and 1521(a) of the Bankruptcy Code.

### (2) *A substantial threat of irreparable injury if the injunction is not issued*

46. To the extent necessary to effectuate liquidation of the Canadian Debtors, sale of the Global Operating Companies, and to otherwise complete its duties set forth in the Receivership Order, the Receiver continues to operate QSI and/or oversee operations of the Q'Max Group through QSI. Without injunctive relief recognizing the Receiver's authority in the United States per the Receivership Order, including the staying of the MAXSITE Action and the Guarantor Action, the Receiver will be frustrated from performing its duties, and the value of the Debtor's assets could be jeopardized.

47. To permit the Receiver to fulfill its obligations to the Canadian Debtors' estates, the Receivership Order provides for substantially similar powers and protections pursuant to Canadian law as those afforded to a chapter 7 trustee under the Bankruptcy Code. Among others, the Receiver's Charge, the Receiver's Borrowings Charge, the Receiver's Protections, the stay of all collection activities akin to 11 U.S.C. § 362, and the grant of specific authority for the Receiver to seek international recognition of the Receivership Order provides the Receiver with vital powers to maximize value for all rightful creditors.

48. Without recognition and enforcement of the Receivership Order to the fullest extent permitted by chapter 15, the Receiver will be unable to fully discharge its duties to all creditors, specifically including direct negative impact to the Receiver's ability to sell QSI's equity interests in the Global Operating Companies for maximum value and causing the Receiver to expend finite

resources to defend actions that are intended to be stayed by the Receivership Order and by operation of Canadian law.[8]

### (3) *That the threatened injury to the movant outweighs any damage the injunction might cause to the opponent*

49.  I believe that any threatened injury to the Debtor outweighs any damage the injunction might cause to opponents. The requested relief, if granted, would benefit the Debtor's creditors, as a whole, by facilitating the Receiver's efforts to maximum value for the assets—namely QSI's equity interests in the Q'Max Group—and an orderly distribution of that value by and through the Canadian Proceeding.

### (4) *That the injunction will not disserve the public interest*

50.  Finally, the requested relief will not disserve the public interest. To the contrary, granting the relief serves the public interest because it sets to facilitate a cross-border reorganization that will provide a benefit to all rightful creditors of the Debtor.

51.  For the above stated reasons and to the best of my knowledge, I respectfully submit that the relief sought is necessary and appropriate, in the interest of the public and international comity, and will not cause any hardship to any party in interest that is not outweighed by the benefits of granting the requested relief. In the event that the Court finds that the Canadian Proceeding is a foreign nonmain proceedings, the relief requested is still appropriate because the relief may be—and should be—granted in the discretion of the Court.

---

[8] Notably, the Receiver attempted to avoid the costs associated with seeking chapter 15 relief, but files at this time based on various recent circumstances, including but not limited to the ruling in favor of QSI and QAI via the MSJ Order, the related dismissal of QAI, the subsequent insistence by M-I to continue with the suit against QSI, and the filing of the Guarantor Action.

4845-3212-1547v.2

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted this 30th day of September, 2020,

**KPMG INC.,** *solely in its capacity as court-appointed receiver and manager of Q'Max Solutions Inc.*

By: *Anamika Gadia*
Anamika Gadia
Senior Vice President

# EXHIBIT A

# QMAX CORPORATE OWNERSHIP STRUCTURE AND CONTROL CHART

as of 10.2.19

**PRIVILEGED AND CONFIDENTIAL FOR INTERNAL PURPOSES ONLY**

## Legend

- Joint Venture
- Dissolving
- Ultimate Shareholders
- Branch

## Ultimate Shareholders

(1) Wael Elessawy: 10% Seedat Ahmed: 5%
(2) Adb Touahi: 7% Adlane Daoudi: 14% Naela Madani: 30%
(3) United Oil Projects Company (K.S.C.C.) 51%
(4) Cimbar Performance Minerals WV, LLC: 50%
(5) Ahmad Samir Albinali Company: 49%

## Owners & Officers

- Marcus A. Rodriguez
- David Perez
- Kevin L. Reymond
- Erik A. Scott
- Luis Zaldivar
- Eugenie M. Cesar-Fabian

## Directors

- Adam Sheblatz
- David Perez
- Daniel Ilundain

## Entities

**Palladium Equity Partners IV, LLC**
Registered as Relying Advisor via affiliate Palladium Equity Partners Advisor, LLC (SEC CRD #159106)

**Palladium Equity Partners IV, L.P.**

Manages and Controls / Affiliated

**Fluid Global G.P. Corp**
BC Corp No. BC0999926
Inc. April 10, 2014

**PEP Fluid G.P., L.P.**
Cayman
Inc. April 16, 2014

**PEP Fluid L.P.**
Cayman

**PEP Fluid Co-Invest L.P.**
Cayman

**Calumet Specialty Products Partners, L.P.**

**Fluid Holding Corp**
BC Corp No. BC0999796
Inc. April 16, 2014

**QM Holding Corp**
BC Corp No. BC1206277
Inc. April 25, 2019

**Q'Max Solutions Inc.**
BC Corp. No. BC1003177
Inc. Sept 16 1993

**1356760 Alberta Ltd.**
AB Corp. No. 2013567603
Inc. Oct 17, 2017

**QMax do Brasil Solucoes do Petroleo Ltda**
Brasil NIRE 33201400687
Feb 9, 2009

**International Drilling Fluids & Engineering Services Co. (IDEC) LTD.**
BVI FZ-LLC No. 1056071
Inc. Feb 20, 2012

**South Sudan Branch**
Reg. No. 195
Reg. Sept. 14, 2012

**Iraq Branch**
Kurdistan Reg. No. 20635
Reg. July 21, 2014

**Dubai Branch**
DMCC License No. DMCC-32478
Reg. Sept 6, 2012

**QMax Canada Operations Inc.**
BC Corp. No. BC1003533
Inc. in AB on May 9, 2012

**Central Procurement Inc.**
Delaware File No. 5962714
Inc. March 18, 2016

**QMax America Inc.**
Delaware File No. 3391010
Inc. May 16, 2001

**Anchor Drillings Fluids USA, LLC**
Delaware File No. 5923444
Formed Dec 31, 2015

**C&A Grinding, L.L.C.**
Georgia File No. 11082240
Formed Nov 3, 2011 — 50%[4]

**QMax Financial Holdings Inc.**
BC Corp. No. BC2126278
Inc. April 25, 2019

**Tanzania Branch**
Registration No. 113868
Reg. Nov 24, 2015

**Kenya Branch**
Permit No. 1419355
Reg. Dec 17, 2014

**Central Procurement Inc.**
Barbados Corp. No. 15133
Inc. March 19, 1998

**Colombia Branch**
Reg. No. 810095062
Reg. Oct 12, 2001

**QMax Middle East FZE**
JAFZA Reg. No. 160435
Inc. May 17, 2016

**QMax Solutions Singapore Pte. Ltd.**
Singapore Corp. No. 201506359E
Inc. March 10, 2015

**India Project Office**
Reg. No. 20080049
Reg. June 22, 2008

**Uganda Branch**
Co. No. 80100000141707
Reg. March 15, 2017

**United QMax Drilling Fluids Company Co.**
Inc. July 9, 2017 — 49%[3]

**Chad Branch**
Reg. No. RCCM/TC/N01/1793584
Reg. Nov 21, 2017

**Q'Max Arabia for Oil & Gas Services Limited Company**
Inc. Sept 18, 2018 — 51%[5]

**Tri-Max Solutions Limited**
Trinidad & Tobago
Co. No. C2017042103834
Inc. April 13, 2017

**QMax Ecuador S.A.**
Ecuador RUC No. 1791359757001
Reg. April 15 1998

**QMax Peru S.A.C.**
Peru RUC No. 20503312052
Inc. Nov 23 2001

**QMax Solutions Holdings Inc.**
AB Corp. No. 2012853491
Inc. Dec 4, 2006

**QMax Mexico, S.A. de C.V.**
Mexico RFC QME000242081
Inc. April 7, 2000

**QMax Servicios Tecnicos S.A. de C.V.**
Mexico RFC QST1201209J8
Inc. Jan 19, 2012

**Environmental Solutions for Petroleum Services – Free Zone – S.A.E.**
Egypt Reg. No. 1533
Inc. April 29, 2017

**SARL Environmental Solutions Algeria**
Algeria Reg. No. 16/00-0958267/B15 — 49%[2]
Inc. Dec 20, 2016

**QMax Servicios de Ingeniería S.A. de C.V.**
Mexico RFC QSI1201209VO
Inc. Jan 19, 2012

**QMax Servicios Administrativos S.A. de C.V.**
Mexico RFC QSA1201207U03
Inc. Jan 19, 2012

## Ownership Percentages (selected)

- Palladium Equity Partners IV, L.P. → Fluid Global G.P. Corp: General Partner
- Fluid Global G.P. Corp → PEP Fluid G.P., L.P.: General Partner
- PEP Fluid G.P., L.P. → PEP Fluid L.P. / PEP Fluid Co-Invest L.P.: General Partner
- PEP Fluid L.P. & PEP Fluid Co-Invest L.P. → Fluid Holding Corp
- Fluid Holding Corp → QM Holding Corp: 100%
- QM Holding Corp → Q'Max Solutions Inc.: 100%
- Q'Max Solutions Inc. → 1356760 Alberta Ltd.: 100%
- 1356760 Alberta Ltd. → QMax do Brasil: 99.9% / .07%
- Q'Max Solutions Inc. → International Drilling Fluids (IDEC): 95%[1]
- IDEC → South Sudan Branch: 100%
- IDEC → Iraq Branch: 100%
- IDEC → Dubai Branch: 100%
- Q'Max Solutions Inc. → QMax Canada Operations Inc.: 100%
- QMax Canada Operations → QMax Financial Holdings Inc.: 100%
- Q'Max Solutions Inc. → Central Procurement Inc. (Barbados): 100%
- Central Procurement (Barbados) → Colombia Branch: 100%
- Central Procurement (Delaware) → QMax America Inc.: 100%
- QMax America Inc. → Anchor Drillings Fluids USA, LLC: 100%
- Anchor Drillings Fluids USA → C&A Grinding, L.L.C.: 50%[4]
- Q'Max Solutions Inc. → QMax Middle East FZE: 100%
- QMax Middle East FZE → Tanzania Branch: 100%
- QMax Middle East FZE → Kenya Branch: 100%
- Q'Max Solutions Inc. → QMax Solutions Singapore Pte. Ltd.: 100%
- QMax Solutions Singapore → India Project Office: 100%
- QMax Solutions Singapore → Uganda Branch: 100%
- QMax Solutions Singapore → United QMax Drilling Fluids Company Co.: 49%[3]
- QMax Solutions Singapore → Q'Max Arabia for Oil & Gas Services: 51%[5]
- Q'Max Arabia → Chad Branch: 100%
- Q'Max Solutions Inc. → Tri-Max Solutions Limited: 100%
- Q'Max Solutions Inc. → QMax Ecuador S.A.: 99.9%
- Q'Max Solutions Inc. → QMax Peru S.A.C.: 99.9% / .01% / .06%
- Q'Max Solutions Inc. → QMax Solutions Holdings Inc.: 99.9%
- QMax Solutions Holdings → QMax Mexico S.A. de C.V.: 100%
- QMax Mexico → QMax Servicios Tecnicos: 99.9%
- QMax Mexico → QMax Servicios Administrativos: 99.5%
- QMax Solutions Holdings → Environmental Solutions for Petroleum Services – Free Zone – S.A.E.: 99.98%
- Environmental Solutions → SARL Environmental Solutions Algeria: 49%[2]
- Environmental Solutions → QMax Servicios de Ingeniería S.A. de C.V.: 99.9%