# EXHIBIT B

Form 49
[Rule 13-19]

Clerk's stamp

**FILED**

**May 27, 2020**
*LD*

**by Email**

JUDICIAL CENTRE OF CALGARY
CLERK OF THE COURT

| | |
|---|---|
| COURT FILE NUMBER | 2001–06722 |
| COURT | COURT OF QUEEN'S BENCH OF ALBERTA |
| JUDICIAL CENTRE | CALGARY |
| PLAINTIFF | HSBC BANK CANADA, AS AGENT |
| DEFENDANTS | Q'MAX SOLUTIONS INC., FLUID HOLDING CORP., Q'MAX SOLUTIONS HOLDINGS INC., 1356760 ALBERTA LTD., QMAX CANADA OPERATIONS INC., CENTRAL PROCUREMENT INC., Q'MAX AMERICA INC., ANCHOR DRILLING FLUIDS USA, LLC, QMAX MEXICO S.A. de C.V., ENVIRONMENTAL SOLUTIONS FOR PETROLEUM SERVICES – FREE ZONE – S.A.E AND QMAX ECUADOR S.A. |

INV# 54108
COM
MME JUSTICE GROSSE
MAY 28 2020
1:30

| | |
|---|---|
| DOCUMENT | **AFFIDAVIT** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | Norton Rose Fulbright Canada LLP 400 3rd Avenue SW, Suite 3700 Calgary, Alberta  T2P 4H2  CANADA  Howard A. Gorman, Q.C. and D. Aaron Stephenson howard.gorman@nortonrosefulbright.com aaron.stephenson@nortonrosefulbright.com Tel: +1 403.267.8222 Fax: +1 403.264.5973  Lawyers for HSBC Bank Canada, as Agent File no.: 1001115678 |

<div align="center">

**AFFIDAVIT OF CAMERON BAILEY**

**Sworn on May 26, 2020.**

</div>

I, Cameron Bailey, of the City of Calgary, in the Province of Alberta, SWEAR AND SAY THAT:

**INTRODUCTION**

1.  I am an Assistant Vice President, Loan Management Unit with HSBC Bank Canada (**HSBC** or the **Agent**).  I have been directly involved with the accounts of Q'Max Solutions Inc., Q'Max America Inc. and QMax Canada Operations Inc. (**Borrowers**) and have overseen the management of their syndicated secured Credit Facilities (as defined below) on behalf of HSBC for many months.  Additionally, I have reviewed the books and records maintained by and in the possession of HSBC in the ordinary course of

business.  Based on the aforementioned, I have personal knowledge of the facts and matters hereinafter deposed to except where stated to be based on information and belief and where so stated, I verily believe the same to be true.

2.      HSBC acts in its capacity as administrative agent (**Agent**) for and on behalf of a syndicate of predominantly Canadian based lenders, currently comprised of HSBC, Bank of Montreal, Business Development Bank of Canada, Export Development Canada and HSBC Bank USA (**Lenders**).

3.      I am authorized to make this affidavit on behalf of the Agent (on behalf of the Lenders) in support of an application to appoint a receiver and manager over the assets, undertakings and properties of Q'Max Solutions Inc. (**QSI**), Fluid Holding Corp. (**Fluid Holding**), Q'Max Solutions Holdings Inc. (**QSH**), 1356760 Alberta Ltd. (**135 Alberta**) and QMax Canada Operations Inc. (**QCO**) (collectively, the **Respondents**), being the Canadian corporations within the Q'Max group (**Q'Max Group**) who are Loan Parties (as defined below).

4.      Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Credit Agreement (as defined below).

**THE BUSINESS AND BUSINESS STRUCTURE OF THE Q'MAX GROUP**

5.      The Q'Max Group carries on business as an oilfield services provider, focused on onshore and offshore drilling fluids, solids control, and waste management solutions in the upstream oil and gas drilling and producing industry. The clients of the Q'Max Group include national oil companies, major international energy companies and independent exploration and production companies in Canada, the United States, Mexico, Colombia, the Middle East and Africa.

6.      The financial affairs of the Q'Max Group are managed on an integrated basis.

7.      Fluid Holding is the direct 100% owner of QSI.  QSI, which is extra-provincially registered in Alberta, is the direct or indirect owner of all or substantially all of the other Loan Parties, including all of the Respondents.  Among the Respondents are 135 Alberta and QSH (both  Alberta corporations with their registered offices in Calgary) and QCO (a British Columbia corporation with its head office in Vancouver). The Q'Max Group has previously advised that QCO employs approximately 30 persons in Canada, predominantly in Calgary but also elsewhere.

8.      All of the Respondents are Loan Parties (as defined below); however, there are additional, non-Respondent Loan Parties who are Q'Max corporations in countries other than Canada.

9.      A chart depicting the organizational structure of the Q'Max Group is attached as **Exhibit 1**. Corporate search results for Fluid Holding, QSI, 135 Alberta, QSH and QCO are attached as **Exhibit 2**.

10.     In recent months, the business of the Q'Max Group were negatively impacted by depressed oil and natural gas pricing and a corresponding reduction in rig and drilling activity. Such negative impacts were exacerbated by public health restrictions in response to the COVID-19 pandemic. Demand for the Q'Max Group's products and services thus declined to the detriment of the Q'Max Group's earnings.

**CREDIT AGREEMENT**

11.     Fluid Acquisition Corp. (now QSI) and Q'Max America Inc. (**QAI**), as borrowers, HSBC Bank Canada, as Agent, and certain lenders (including HSBC Bank Canada) entered into a credit agreement dated May 23, 2014, which was thereafter amended and restated from time to time, as discussed below (as so amended and restated, the **Credit Agreement**).

12.     The Credit Agreement was amended and restated under an amended and restated credit agreement dated January 30, 2015. It was then amended by a series of amending agreements made effective as at September 3, 2015, March 30, 2016, November 2, 2016, April 21, 2017, and November 21, 2017.

13.     The Borrowers (QSI, QAI and QCO, as defined above), HSBC Bank Canada, as Agent, and certain lenders (including HSBC Bank Canada) amended and restated the Credit Agreement under a second amended and restated credit agreement dated July 31, 2018 (**Second ARCA**), which was further amended by a series of four amending agreements made effective as at May 13, 2019, July 22, 2019, September 6, 2019 and March 31, 2020. The Credit Agreement is thus now comprised of the Second ARCA and the four subsequent amending agreements. Copies of the Second ARCA and the subsequent four amending agreements are attached hereto as **Exhibits 3** to **7**.

14.     Under the Credit Agreement, the Lenders agreed to provide the Borrower with the following credit facilities (**Credit Facilities**):

(a)     Canadian operating facility in the maximum amount of the lesser of (i) the Canadian Operating Facility Commitment (U.S. $109,681,471), and (ii) the sum of the Borrowing Base less the then outstanding Advances under the Term Facility and the U.S. Operating Facility;

(b)     Term facility in the maximum amount of $13,656,250; and

(c)     U.S. operating facility in the maximum amount of the lesser of (i) the U.S. Operating Facility Commitment (U.S. $15,000,000), and (ii) the sum of the Borrowing Base less the then outstanding Advances under the Term Facility and the Canadian Operating Facility,

15.     The terms of the Second ARCA, as amended, include:

(a)     interest on the Credit Facilities (i) in respect of Canadian Dollar Prime Rate Loans, U.S. Dollar Base Rate Loans and LIBOR Loans is payable monthly at the Canadian Prime Rate, the U.S. Base Rate, or the U.S. Dollar LIBOR Rate, respectively, plus the Applicable Margin; (ii) in respect of Bankers' Acceptances and BA Equivalent Loans is payable at a stamping fee (calculated by referenced to the Applicable Margin); and (iii) upon certain other terms more fully described in the Second ARCA, including at Sections 2.6, 3.6 and 4.6;

(b)     a Default Rate of interest applies when an Event of Default exists, whereby the interest rate and fees comprising the Applicable Margin each increase by 2.0% per annum;

(c)     financial covenants, including requiring the Borrowers to maintain a prescribed Net Leverage Ratio and Fixed Charge Coverage Ratio;

(d)     reporting obligations pursuant to which the Borrowers must provide regular reporting to the Agent, including annual, quarterly and monthly financial statements;

(e)     that, upon the occurrence of an Event of Default and expiration of any applicable cure period, the Agent may declare all amounts advanced under the Credit Agreement immediately due and payable;

(f)     Events of Default that include, *inter alia*, an Insolvency Event, non-performance of obligations in relation to Funded Debt, ceasing to continue a material portion of the business, and any Material Adverse Change; and

(g)     a Maturity Date of May 22, 2021.

**GUARANTEES**

16.     Unlimited guarantees of all indebtedness, liabilities and obligations under the Credit Agreement and related loan documents were granted in favour of the Agent, as follows:

(a)     on May 23, 2014, by QSI, QSH and 135 Alberta; and

(b)     on September 1, 2016, by QCO.

Attached hereto and marked as **Exhibit 8 to 11** are copies of the unlimited guarantees from QSI, QSH, 135 Alberta, and QCO.

17.     On May 23, 2014, Fluid Holding granted a limited recourse guarantee (**Limited Recourse Guarantee**) in favour of the Agent whereby the Agent's recourse was limited to the collateral granted by

Fluid Holding under a Securities Pledge Agreement dated May 23, 2014 (as described below).  Attached as **Exhibit 12** is a copy of the Limited Recourse Guarantee from Fluid Holding.

18.      Other guarantees of the Borrowers' indebtedness, liabilities and obligations to the Lenders were granted by other Q'Max Group corporations from outside of Canada and the United States (the Borrowers and all guarantors, wherever located, are the **Loan Parties**).

**LENDERS' SECURITY**

19.      General security agreements (**GSAs**) were granted to secure the amounts advanced by the Lenders under the Credit Agreement, as follows:

    (a)          on or about May 23, 2014, by QSI, QSH and 135 Alberta; and

    (b)          on or about September 1, 2016, by QCO.

20.      Subject to prescribed exceptions, each GSA grants, *inter alia*, a first priority security interest over all present and after-acquired personal property of each grantor to the Agent.  Attached as **Exhibits 13** to **16** are copies of the GSAs.

21.      Each GSA provides that the Agent may seek the appointment of a receiver or receiver and manager in the event of a default under the Credit Agreement or related loan documents.

22.      Additionally, on May 23, 2014:

    (a)          Fluid Holding granted a Securities Pledge Agreement in favour of the Agent pursuant to which it pledged its shares in Fluid Acquisition Corp. (which amalgamated to become QSI); and

    (b)          QSI granted two Securities Pledge Agreements in favour of the Agent pursuant to which it pledged its shares in QAI, QSH, 135 Alberta and QCO.

All such shares were pledged as collateral security for the repayment and performance of the obligations of the Borrowers to the Lenders.  Attached hereto as **Exhibits 17** to **20** are copies of these Securities Pledge Agreements and an amendment to one of QSI's Securities Pledge Agreements.

23.      Security in respect of the Borrowers' indebtedness to the Lenders was also granted by other Loan Parties (Q'Max Group corporations) from outside of Canada and the United States.

**INTERCREDITOR AGREEMENT**

24.     An Intercreditor Agreement dated September 6, 2019 was entered into between Encina Business Credit, LLC (**Encina**), as ABL agent, and HSBC, as parent facility agent.  The purpose and effect of the Intercreditor Agreement was to subordinate a portion of the Agent's security to security held by Encina in respect of funds, in excess of U.S. $23,884,000 as at January 31, 2020, owing under a credit agreement between QAI, as holdco, Anchor Drilling Fluids USA, LLC (**Anchor**), as borrower, Encina, as administrative agent, and certain lenders (not being the Lenders under the HSBC-administered Credit Agreement).  QAI and Anchor are United States-based Loan Parties under the Credit Agreement, but they are not Respondents.  A copy of the Intercreditor Agreement is attached as **Exhibit 21**.

25.     Under the Intercreditor Agreement, I verily believe that Encina has priority over the ABL Priority Collateral (as defined in the Intercreditor Agreement), consisting of Anchor's receivables (including any insurance payments in respect of same), Anchor's shares (which are 100% owned by QAI) and certain other intangible assets of Anchor.  The Agent has priority in respect of all of its other security, including, without limitation, all property of Anchor that is not ABL Priority Collateral such as Anchor's real property, equipment, and inventory.

**FOURTH AMENDMENT TO THE CREDIT FACILITY**

26.     In order to provide the Borrowers with financial relief in the face of known and ongoing liquidity issues, the Agent and the Lenders most recently entered into the Waiver and Fourth Amending Agreement with the Borrowers dated March 31, 2020 (**Fourth Amendment**).  The Fourth Amendment included waivers of specified terms of the Credit Agreement in order to defer certain payment obligations, and waive the Borrowers' compliance with certain financial covenants and liquidity thresholds.  The Fourth Amendment also suspended certain borrowing options under the Credit Agreement, lowered cash hoarding limits, imposed certain additional financial and business reporting covenants.  The Fourth Amendment did not waive, *inter alia*, the Agent's authority to rely on Events of Defaults arising from non-performance of obligations relating to Funded Debt, any Insolvency Event, any failure by the Loan Parties to continue a material portion of the business, or any Material Adverse Change (all as defined in the Second ARCA).

**DEFAULTS OF LOAN PARTIES**

27.     I verily believe that beginning by not later than June 2018, the Borrowers and other Loan Parties began to encounter financial difficulties and, from then onward, started defaulting under the Credit Agreement.  Such defaults included failing to (a) maintain financial covenant ratios for the fiscal quarters ending December 31, 2019 and March 31, 2020, (b) meet interest, fee and principal payment obligations due on, at the very least, March 31 and April 30, 2020, and (c) maintain minimum liquidity requirements for, at the very least, March 31 and April 30, 2020.

28.     While certain defaults were waived by the Agent pursuant to amendments to the Credit Agreement, others were not.  In particular, but without limitation, I verily believe there is a current and persisting Event of Default under the Credit Agreement because of an Insolvency Event.  Such Insolvency Event arose from the insolvency of the Borrowers and other Loan Parties within the meaning of the Credit Agreement and BIA, at least on a cash flow basis, and perhaps also on a balance sheet basis.

29.     With respect to such insolvency, I note that, on or about February 12, 2020, the Q'Max Group made a presentation to the Agent about its illiquidity and its failed efforts to raise capital over the past twelve months.  The Q'Max Group reported about the following:

(a)     difficulties the Q'Max Group was having with the collection of receivables in Mexico and the contemplated wind-down of the Q'Max Group's operations there;

(b)     a failed bond offering in spring 2019;

(c)     the hiring of various accounting firms and sales agents, *inter alia*, to implement a vendor management program, cost savings program, and to market certain assets and operations for sale;

(d)     a failed preferred equity offering in September 2019;

(e)     failed efforts to sell the Q'Max Group's operations in Colombia and the Middle East; and

(f)     the "very limited" opportunity to pursue "capital raises, refinancings and M&A".

30.     In light of the challenging financial circumstances, the Q'Max Group approached the Agent and the Q'Max Group's primary equity holder, Palladium Equity Partners, LLC (**Palladium**), about advancing the additional sum of U.S. $70,000,000 in aggregate.  The Q'Max Group proposed a split of such additional sum between the Lenders (increasing the limit under the Credit Facility by U.S. $63,000,000) and Palladium ($7,000,000 in new equity).  The Q'Max Group also asked the lenders to eliminate all repayments under the Credit Facility through to the Maturity Date.  A copy of a presentation from the Q'Max Group dated February 2020 is attached as **Exhibit 22**.

31.     The Lenders and Palladium both declined to advance any additional sums.

32.     To assist the Q'Max Group with navigating its illiquidity and financial challenges, the Fourth Amendment was entered on March 31, 2020.  However, the Q'Max Group's financial reporting to the Agent immediately thereafter, throughout April 2020, revealed ongoing negative cash flows and included "asks" for further credit from the Agent and Lenders to maintain cash flow neutrality.  Such reporting included Global Liquidity Summaries, which were provided by the Q'Max Group weekly.  The Global Liquidity

Summaries received by the Agent on April 15, April 22 and April 29, 2020 are attached as **Exhibits 23** to **25**, respectively.

33.     The Q'Max Group contemplated filing an application under the *Companies' Creditors Arrangement Act* (**CCAA**) for creditor protection to address illiquidity and related financial challenges.  Hearing dates were tentatively booked with the Court, and a draft (unsworn) affidavit and an unfiled originating application were delivered to the Court by counsel for Q'Max Group, which admitted the Q'Max Group's insolvency.

34.     Ultimately, an initial application under the CCAA was not made because the Q'Max Group, Encina and the Agent were unable to negotiate interim financing on mutually agreeable terms.

35.     Further, Anchor failed to perform obligations to Encina that prompted Encina to deliver the Encina Notice (as defined below) on May 22, 2020.  The Encina Notice was delivered by Encina to enforce against certain security (all as described below).  I verily believe that such non-performance by Anchor constitutes an Event of Default under the Credit Agreement.

36.     Further, I verily believe that the occurrence of Events of Default under the Credit Agreement (as described above) caused the immediate termination of the waivers of payment obligations, financial covenants and liquidity thresholders under the Fourth Amendment, thus resulting in additional Events of Default.

**ENCINA**

37.     On May 22, 2020, the Agent received a letter in which Encina's general counsel asserted the Demand and Notices (as defined below) were delivered by the Agent in contravention of the Intercreditor Agreement.  A copy of this letter from Encina is attached as **Exhibit 26**.

38.     Also on May 22, 2020, the Agent's counsel was copied with a letter from Encina's general counsel pursuant to which Encina purported to give notice to QAI of Encina's enforcement under a Pledge Agreement (**Encina Notice**).  Encina further purported to, *inter alia*, appoint CR3 Partners, LLC (**CR3**) as the interim manager of Anchor, terminate various senior officers of Anchor, and ratify an Engagement Agreement between Encinca, QAI and CR3 from the previous day (May 21, 2020) appointing a representative of CR3 as the Chief Restructuring Officer (**CRO**) of Anchor.  The Encina Notice states: "CR3 has and shall have sole and exclusive authority over the management of the business and assets of the Borrower."  A copy of this letter from Encina is attached as **Exhibit 27**.

39.     Counsel for the Agent sent a responding letter to Encina's general counsel and others, also on May 22, 2020, explaining why HSBC had not contravened the Intercreditor Agreement by delivering the Demand and Notices.  It was instead Encina who had contravened the Intercreditor Agreement through the Encina Notice by purporting to, *inter alia*, appoint a CRO for Anchor unilaterally and granting such CRO sole and

exclusive authority over assets that included the Agent's priority collateral. The Agent's counsel also requested a copy of the Engagement Agreement for the CRO. A copy of this letter from the Agent's counsel is attached as **Exhibit 28**.

40.     I am advised by the Agent's counsel and verily believe that, to date, he has not received a copy of the Engagement Agreement for the CRO in response to his request, or otherwise.

41.     Subsequent to the delivery of the letter from the Agent's counsel, described in paragraph 39 above, but also on May 22, 2020, the Agent's counsel was copied with a further letter from Encina's general counsel to QAI. Therein, Encina's general counsel purported to suspend the Encina Notice through Sunday, May 24, 2020 at 11:59 p.m. (prevailing eastern time), at which time the Encina Notice would again become effective if Anchor had not made a voluntary Chapter 7 bankruptcy filing in the United States Bankruptcy Court. A copy of this letter from Encina's general counsel is attached as **Exhibit 29**.

**CHAPTER 7 FILING BY QAI AND ANCHOR**

42.     In the early evening on May 24, 2020, counsel for the Agent was advised by the Q'Max Group that the directors of QAI and Anchor had voted to file Chapter 7 bankruptcy under the United States Bankruptcy Code. Such filings were made immediately afterwards, on the same day. Copies of the Bankruptcy Petitions and Corporate Ownership Statements for QAI and Anchor are attached as **Exhibits 30** to **33**.

43.     The Bankruptcy Petitions for QAI and Anchor disclose that QAI and Anchor had resolved to enter into an Asset Purchase Agreement to sell the assets for the Q'Max Group's operations in the northeastern United States and Permian basin, including assets which I verily believe constitute the Agent's priority collateral. A form of Asset Purchase Agreement is attached to both Bankruptcy Petitions.

44.     I verily believe such Chapter 7 filings by QAI and Anchor constitute new and additional Events of Default under the Credit Agreement because they are Insolvency Events and constitute the non-performance of obligations relating to Funded Debt, and perhaps also because they represent a Material Adverse Change and an intention by the Loan Parties to discontinue a material portion of the business.

**DEMAND**

45.     On May 12, 2020, counsel to the Agent (on behalf of the Lenders) issued to the Loan Parties, by email to counsel, a demand letter that included notices of intention to enforce security under section 244(1) of the BIA (**Demand** and **Notices**). The Demand constitutes an acceleration notice under the Credit Agreement. Receipt and acceptance of the Demand and Notices was acknowledged by reply email from counsel for the Q'Max Group. Copies of the Demand and Notices and the related email exchange among counsel are attached as **Exhibit 34**.

46.     The Demand and Notices were also sent in respect of Loan Parties who are not Respondents, being Q'Max Group corporations from outside of Canada and the United States.

47.     Despite extensive negotiations over a considerable period of time, since not later than June 2018, the Loan Parties have not put forward a restructuring proposal acceptable to the Agent, while their indebtedness to the Lenders continues to grow.

**INDEBTEDNESS**

48.     As at May 5, 2020, the amounts outstanding and owing to the Agent (on behalf of the Lenders) under and in connection with the Credit Agreement, inclusive of interest, was approximately USD $145,381,623.21 plus CDN $1,228,668.47 as well as outstanding letters of credit in the amounts of USD $3,916,296.42 and CDN $1,161,408.79 and outstanding credit card balances, plus accrued and accruing costs and disbursements, and interest continuing to accrue per diem.

**RECEIVER AND MANAGER**

49.     By the terms of the Credit Agreement and GSAs, in the event of a default by the Loan Parties, or any of them, the Agent may seek the appointment of a receiver and manager over the assets, undertakings and properties of the Loan Parties.

50.     In all of the circumstances, I verily believe that the appointment of a receiver and manager over the assets, undertakings and properties of the Respondents is necessary and appropriate to protect the interests of the Lenders, and to preserve and realize upon the Lenders' security.

51.     I verily believe that KPMG Inc. (**KPMG**) is a Licensed Insolvency Trustee and is competent and prepared to act as receiver and manager over the assets, undertakings and properties of the Respondents. KPMG has advised me that it will provide an executed consent to act prior to the hearing of the Agent's receivership application.

**CONCLUSION**

52.     I am authorized to swear this Affidavit on behalf of HSBC, as Agent.

53.     I make this Affidavit for no improper purpose.

54.     I make this Affidavit in support of an application to appoint KPMG as receiver and manager over the assets, undertakings and property of the Respondents.

SWORN BEFORE ME at the City of Calgary, Alberta, this 26th day of May 2020.

_____
(Commissioner for Oaths in and for the Province of Alberta)

**Jonathan Tomm**
**Barrister and Solicitor**

Name:
Expiry: N/A
_____

_____
(Signature)

_____
Cameron Bailey

THIS IS EXHIBIT " *1* "
referred to in the Affidavit of

*Cameron Bailey*

Sworn before me this *26th*

day of *May* A.D. 20 *20*

Jonathan Tomm
Barrister and Solicitor



QMAX
CORPORATE OWNERSHIP
STRUCTURE AND CONTROL
CHART

as of 10.2.19
PRIVILEGED AND CONFIDENTIAL
FOR INTERNAL PURPOSES ONLY

THIS IS EXHIBIT " 2 "
referred to in the Affidavit of
Cameron Bailey

Sworn before me this 26 th

day of May A.D. 20 20

**Jonathan Tomm**
**Barrister and Solicitor**

# Corporation/Non-Profit Search

**Government of Alberta ■**

## Corporate Registration System

| | |
|---|---|
| Date of Search: | 2020/05/25 |
| Time of Search: | 07:07 AM |
| Search provided by: | NORTON ROSE FULBRIGHT CANADA LLP |
| Service Request Number: | 33483623 |
| Customer Reference Number: | C.Hickey/104190 |

**Corporate Access Number:** 2119805816
**Business Number:**
**Legal Entity Name:**          QMAX CANADA OPERATIONS INC.

| | |
|---|---|
| **Legal Entity Status:** | Active |
| **Extra-Provincial Type:** | Other Prov/Territory Corps |
| **Registration Date:** | 2016/07/08 YYYY/MM/DD |
| **Date Of Formation in Home Jurisdiction:** | 2016/01/01 YYYY/MM/DD |
| **Home Jurisdiction:** | BRITISH COLUMBIA |
| **Home Jurisdiction CAN:** | C1060333 |

**Primary Attorney:**

| Last Name | First Name | Middle Name | Firm Name | Street | City | Province | Postal Code |
|---|---|---|---|---|---|---|---|
| FORD | KELLY | R. | BENNETT JONES LLP | 4500 BANKERS HALL EAST, 855 - 2ND STREET S.W. | CALGARY | ALBERTA | T2P4K7 |

**Head Office Address:**

| | |
|---|---|
| **Street:** | SUITE 2500 - 666 BURRARD STREET |
| **City:** | VANCOUVER |
| **Province:** | BRITISH COLUMBIA |
| **Postal Code:** | V6C2X8 |
| **Country:** | CANADA |
| **Email Address:** | SIDDIQUII@BENNETTJONES.COM |

**Other Information:**

**Filing History:**

| List Date (YYYY/MM/DD) | Type of Filing |
|---|---|
| 2016/07/08 | Register Extra-Provincial Profit / Non-Profit Corporation |

| 2019/03/11 | Change Address | |

The Registrar of Corporations certifies that, as of the date of this search, the above information is an accurate reproduction of data contained in the official public records of Corporate Registry.



# Government of Alberta ■

# Corporation/Non-Profit Search
## Corporate Registration System

Date of Search:            2020/05/25
Time of Search:            07:11 AM
Search provided by:        NORTON ROSE FULBRIGHT CANADA LLP

Service Request Number:    33483631
Customer Reference Number: C.Hickey/104190

**Corporate Access Number:** 2013567603
**Business Number:**         830204756
**Legal Entity Name:**       1356760 ALBERTA LTD.

**Name History:**

| Previous Legal Entity Name | Date of Name Change (YYYY/MM/DD) |
|---|---|
| 1356760 ALBERTA INC. | 2010/02/02 |

**Legal Entity Status:**       Active
**Alberta Corporation Type:**  Numbered Alberta Corporation
**Registration Date:**         2007/10/17 YYYY/MM/DD
**Date of Last Status Change:** 2015/01/28 YYYY/MM/DD

**Registered Office:**
**Street:**        4000, 421 - 7TH AVENUE SW
**City:**          CALGARY
**Province:**      ALBERTA
**Postal Code:**   T2P4K9
**Records Address:**
**Street:**        4000, 421 - 7TH AVENUE SW
**City:**          CALGARY
**Province:**      ALBERTA
**Postal Code:**   T2P4K9

**Email Address:** CAL-ANNUAL-DOCS@MCCARTHY.CA

**Directors:**

**Last Name:**        DIAZ-GRANADOS
**First Name:**       RAFAEL
**Street/Box Number:** 11700 KATY FREEWAY, SUITE 200
**City:**             HOUSTON
**Province:**         TEXAS
**Postal Code:**      77079

**Last Name:**           KOSTIUK
**First Name:**          CHRISTOPHER
**Street/Box Number:** 1210, 585 - 8TH AVENUE S.W.
**City:**                CALGARY
**Province:**          ALBERTA
**Postal Code:**        T2P1G1

**Voting Shareholders:**

**Legal Entity Name:**       Q'MAX SOLUTIONS INC.
**Corporate Access Number:** 2118274907
**Street:**                1700, 407 - 2ND STREET S.W.
**City:**                CALGARY
**Province:**          ALBERTA
**Postal Code:**        T2P2Y3
**Percent Of Voting Shares:** 100

## Details From Current Articles:

**The information in this legal entity table supersedes equivalent electronic attachments**

**Share Structure:**             SEE ATTACHED SCHEDULE "A"
**Share Transfers Restrictions:** SEE SHARE TRANSFERS RESTRICTIONS ELECTRONIC ATTACHMENT.
**Min Number Of Directors:**   1
**Max Number Of Directors:**  5
**Business Restricted To:**     NO RESTRICTIONS
**Business Restricted From:**   NO RESTRICTIONS
**Other Provisions:**            SEE ATTACHED SCHEDULE "B"

## Other Information:

**Last Annual Return Filed:**

| File Year | Date Filed (YYYY/MM/DD) |
|-----------|-------------------------|
| 2018 | 2018/12/13 |

**Outstanding Returns:**

Annual returns are outstanding for the 2019 file year(s).

**Filing History:**

| List Date (YYYY/MM/DD) | Type of Filing |
|------------------------|----------------|
| 2007/10/17 | Incorporate Alberta Corporation |

| | |
|---|---|
| 2010/02/02 | Name Change Alberta Corporation |
| 2014/12/02 | Status Changed to Start for Failure to File Annual Returns |
| 2018/12/13 | Enter Annual Returns for Alberta and Extra-Provincial Corp. |
| 2019/10/08 | Change Address |
| 2020/02/19 | Update BN |
| 2020/05/04 | Change Director / Shareholder |

**Attachments:**

| Attachment Type | Microfilm Bar Code | Date Recorded (YYYY/MM/DD) |
|---|---|---|
| Share Structure | ELECTRONIC | 2007/10/17 |
| Restrictions on Share Transfers | ELECTRONIC | 2007/10/17 |
| Other Rules or Provisions | ELECTRONIC | 2007/10/17 |

The Registrar of Corporations certifies that, as of the date of this search, the above information is an accurate reproduction of data contained in the official public records of Corporate Registry.



# Government of Alberta ■

# Corporation/Non-Profit Search
## Corporate Registration System

Date of Search:         2020/05/25
Time of Search:         07:08 AM
Search provided by:     NORTON ROSE FULBRIGHT CANADA LLP

Service Request Number:    33483624
Customer Reference Number: C.Hickey/104190

**Corporate Access Number:** 2012853491
**Business Number:**        832402762
**Legal Entity Name:**      Q'MAX SOLUTIONS HOLDINGS INC.

**Legal Entity Status:**     Active
**Alberta Corporation Type:** Named Alberta Corporation
**Registration Date:**       2006/12/04 YYYY/MM/DD

**Registered Office:**
**Street:**        4000, 421 - 7TH AVENUE SW
**City:**          CALGARY
**Province:**      ALBERTA
**Postal Code:**   T2P4K9

**Records Address:**
**Street:**        4000, 421 - 7TH AVENUE SW
**City:**          CALGARY
**Province:**      ALBERTA
**Postal Code:**   T2P4K9

**Email Address:** CAL-ANNUAL-DOCS@MCCARTHY.CA

**Directors:**

**Last Name:**        DIAZ-GRANADOS
**First Name:**       RAFAEL
**Street/Box Number:** 11700 KATY FREEWAY, SUITE 200
**City:**             HOUSTON
**Province:**         TEXAS
**Postal Code:**      77079

**Last Name:**        KOSTIUK
**First Name:**       CHRISTOPHER
**Street/Box Number:** 1210, 585 - 8TH AVENUE S.W.
**City:**             CALGARY
**Province:**         ALBERTA

**Postal Code:**        T2P1G1

**Voting Shareholders:**

| | |
|---|---|
| **Legal Entity Name:** | Q'MAX SOLUTIONS INC. |
| **Corporate Access Number:** | 2118274907 |
| **Street:** | 2200, 1055 WEST HASTINGS STREET |
| **City:** | VANCOUVER |
| **Province:** | BRITISH COLUMBIA |
| **Postal Code:** | V6E2E9 |
| **Percent Of Voting Shares:** | 100 |

## Details From Current Articles:

**The information in this legal entity table supersedes equivalent electronic attachments**

| | |
|---|---|
| **Share Structure:** | SEE ATTACHED SCHEDULE "A" |
| **Share Transfers Restrictions:** | SEE SHARE TRANSFERS RESTRICTIONS ELECTRONIC ATTACHMENT. |
| **Min Number Of Directors:** | 1 |
| **Max Number Of Directors:** | 5 |
| **Business Restricted To:** | NO RESTRICTIONS |
| **Business Restricted From:** | NO RESTRICTIONS |
| **Other Provisions:** | SEE ATTACHED SCHEDULE "B" |

## Other Information:

**Last Annual Return Filed:**

| File Year | Date Filed (YYYY/MM/DD) |
|---|---|
| 2018 | 2019/01/16 |

**Outstanding Returns:**

Annual returns are outstanding for the 2019 file year(s).

**Filing History:**

| List Date (YYYY/MM/DD) | Type of Filing |
|---|---|
| 2006/12/04 | Incorporate Alberta Corporation |
| 2019/01/16 | Enter Annual Returns for Alberta and Extra-Provincial Corp. |
| 2019/10/08 | Change Address |
| 2020/02/19 | Update BN |
| 2020/05/04 | Change Director / Shareholder |

**Attachments:**

| Attachment Type | Microfilm Bar Code | Date Recorded (YYYY/MM/DD) |
|---|---|---|
| Restrictions on Share Transfers | ELECTRONIC | 2006/12/04 |
| Other Rules or Provisions | ELECTRONIC | 2006/12/04 |
| Share Structure | ELECTRONIC | 2006/12/04 |

The Registrar of Corporations certifies that, as of the date of this search, the above information is an accurate reproduction of data contained in the official public records of Corporate Registry.



# Government of Alberta ■

# Corporation/Non-Profit Search
## Corporate Registration System

| | |
|---|---|
| Date of Search: | 2020/05/25 |
| Time of Search: | 07:09 AM |
| Search provided by: | NORTON ROSE FULBRIGHT CANADA LLP |
| Service Request Number: | 33483628 |
| Customer Reference Number: | C.Hickey/104190 |

**Corporate Access Number:** 2118274907
**Business Number:**
**Legal Entity Name:**          Q'MAX SOLUTIONS INC.

| | |
|---|---|
| **Legal Entity Status:** | Active |
| **Extra-Provincial Type:** | Other Prov/Territory Corps |
| **Registration Date:** | 2014/06/06 YYYY/MM/DD |
| **Date Of Formation in Home Jurisdiction:** | 2014/05/23 YYYY/MM/DD |
| **Home Jurisdiction:** | BRITISH COLUMBIA |
| **Home Jurisdiction CAN:** | BC1003177 |

**Primary Attorney:**

| Last Name | First Name | Middle Name | Firm Name | Street | City | Province | Postal Code |
|---|---|---|---|---|---|---|---|
| FORD | KELLY | R. | BENNETT JONES LLP | 4500 BANKERS HALL EAST, 855 - 2ND STREET SW | CALGARY | ALBERTA | T2P4K7 |

**Head Office Address:**

| | |
|---|---|
| **Street:** | SUITE 2500 - 666 BURRARD STREET |
| **City:** | VANCOUVER |
| **Province:** | BRITISH COLUMBIA |
| **Postal Code:** | V6C2X8 |
| **Country:** | CANADA |
| **Email Address:** | SIDDIQUII@BENNETTJONES.COM |

**Holding Shares In:**

| Legal Entity Name |
|---|
| Q'MAX SOLUTIONS HOLDINGS INC. |
| 1356760 ALBERTA LTD. |

**Other Information:**

**Filing History:**

| List Date (YYYY/MM/DD) | Type of Filing |
|---|---|
| 2014/06/06 | Register Extra-Provincial Profit / Non-Profit Corporation |
| 2015/02/11 | Change Attorney |
| 2019/03/11 | Change Address |

The Registrar of Corporations certifies that, as of the date of this search, the above information is an accurate reproduction of data contained in the official public records of Corporate Registry.





Mailing Address:
PO Box 9431 Stn Prov Govt
Victoria BC V8W 9V3
www.corporateonline.gov.bc.ca

Location:
2nd Floor - 940 Blanshard Street
Victoria BC
1 877 526-1526

# BC Company Summary
For
**FLUID HOLDING CORP.**

| | |
|---|---|
| **Date and Time of Search:** | **May 25, 2020 06:15 AM Pacific Time** |
| **Currency Date:** | February 28, 2020 |

## ACTIVE

| | | | |
|---|---|---|---|
| **Incorporation Number:** | BC0999796 | | |
| **Name of Company:** | FLUID HOLDING CORP. | | |
| **Recognition Date and Time:** | Incorporated on April 16, 2014 03:00 PM Pacific Time | **In Liquidation:** | No |
| **Last Annual Report Filed:** | April 16, 2019 | **Receiver:** | No |

## REGISTERED OFFICE INFORMATION

**Mailing Address:**
SUITE 2400, 745 THURLOW STREET
VANCOUVER BC V6E 0C5
CANADA

**Delivery Address:**
SUITE 2400, 745 THURLOW STREET
VANCOUVER BC V6E 0C5
CANADA

## RECORDS OFFICE INFORMATION

**Mailing Address:**
SUITE 2400, 745 THURLOW STREET
VANCOUVER BC V6E 0C5
CANADA

**Delivery Address:**
SUITE 2400, 745 THURLOW STREET
VANCOUVER BC V6E 0C5
CANADA

## DIRECTOR INFORMATION

**Last Name, First Name, Middle Name:**
Clark, Caleb

**Mailing Address:**
1270 AVENUE OF THE AMERICAS
SUITE 2200
NEW YORK NY 10020
UNITED STATES

**Delivery Address:**
1270 AVENUE OF THE AMERICAS
SUITE 2200
NEW YORK NY 10020
UNITED STATES

**Last Name, First Name, Middle Name:**
Diaz-Granados, Rafael

| **Mailing Address:** | **Delivery Address:** |
|---|---|
| 11700 KATY FREEWAY | 11700 KATY FREEWAY |
| SUITE 200 | SUITE 200 |
| HOUSTON TX 77079 | HOUSTON TX 77079 |
| UNITED STATES | UNITED STATES |

**Last Name, First Name, Middle Name:**
Kirschner, Scott

| **Mailing Address:** | **Delivery Address:** |
|---|---|
| 1270 AVENUE OF THE AMERICAS | 1270 AVENUE OF THE AMERICAS |
| SUITE 2200 | SUITE 2200 |
| NEW YORK NY 10020 | NEW YORK NY 10020 |
| UNITED STATES | UNITED STATES |

**Last Name, First Name, Middle Name:**
Lyon, Grant

| **Mailing Address:** | **Delivery Address:** |
|---|---|
| 60 WEST 66TH STREET, 33EF | 60 WEST 66TH STREET, 33EF |
| NEW YORK NY 10023 | NEW YORK NY 10023 |
| UNITED STATES | UNITED STATES |

**Last Name, First Name, Middle Name:**
McNulty, Michael  J.

| **Mailing Address:** | **Delivery Address:** |
|---|---|
| 303, 407 - 8TH AVENUE SW | 303, 407 - 8TH AVENUE SW |
| CALGARY AB T2P 1E5 | CALGARY AB T2P 1E5 |
| CANADA | CANADA |

**Last Name, First Name, Middle Name:**
Rivers, Christopher

| **Mailing Address:** | **Delivery Address:** |
|---|---|
| 11700 KATY FREEWAY | 11700 KATY FREEWAY |
| SUITE 200 | SUITE 200 |
| HOUSTON TX 77079 | HOUSTON TX 77079 |
| UNITED STATES | UNITED STATES |

NO OFFICER INFORMATION FILED AS AT April 16, 2019.

THIS IS EXHIBIT " _3_ "
referred to in the Affidavit of
_Cameron Bailey_
Sworn before me this _26 th_
day of _May_ A.D. 20 _20_

Jonathan Tomm
Barrister and Solicitor

*Execution Version*

# SECOND AMENDED AND RESTATED
# CREDIT AGREEMENT

Among

## Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC.
as Borrowers

and

## QMAX CANADA OPERATIONS INC.
as Specified Canadian Swingline Borrower

and

## THE PERSONS PARTY HERETO FROM TIME TO TIME
## IN THEIR CAPACITIES AS LENDERS
as Lenders

and

## HSBC BANK CANADA
as Administrative Agent

and with

## HSBC BANK CANADA
as Sole Lead Arranger, Bookrunner, Syndication Agent
and Documentation Agent

## Dated as of July 31, 2018

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 INTERPRETATION** ................................................................................. 2

    1.1    Definitions ..................................................................................................... 2
    1.2    Accounting Principles ................................................................................. 61
    1.3    Currency References ................................................................................... 61
    1.4    References to Statutes ................................................................................. 61
    1.5    Extended Meanings ..................................................................................... 62
    1.6    Headings ...................................................................................................... 62
    1.7    Subdivisions ................................................................................................ 62
    1.8    Number ........................................................................................................ 62
    1.9    Time ............................................................................................................ 62
    1.10   Amendments ................................................................................................ 62
    1.11   No Waiver .................................................................................................... 62
    1.12   Inconsistency ............................................................................................... 63
    1.13   Pro Forma Adjustments .............................................................................. 63
    1.14   Joint and Several Liability of Borrowers ................................................... 63
    1.15   Deemed Action by all Borrowers ............................................................... 64
    1.16   Amendment and Restatement ..................................................................... 64
    1.17   Exhibits and Schedules ............................................................................... 64
    1.18   Covenant Relief Period .............................................................................. 65

**ARTICLE 2 CANADIAN OPERATING FACILITY** ........................................... 66

    2.1    Establishment of Canadian Operating Facility ......................................... 66
    2.2    Purpose ........................................................................................................ 66
    2.3    Revolving Nature ........................................................................................ 66
    2.4    Repayment ................................................................................................... 66
    2.5    Availment Options ...................................................................................... 66
    2.6    Interest and Fees ......................................................................................... 67
    2.7    Swingline .................................................................................................... 69

**ARTICLE 3 TERM FACILITY** ............................................................................... 73

    3.1    Establishment of the Term Facility ........................................................... 73
    3.2    Purpose ........................................................................................................ 73
    3.3    Nature .......................................................................................................... 74
    3.4    Repayment ................................................................................................... 74
    3.5    Availment Options ...................................................................................... 74
    3.6    Interest and Fees ......................................................................................... 75

**ARTICLE 4 U.S. OPERATING FACILITY** ........................................................... 76

    4.1    Establishment of U.S. Operating Facility ................................................. 76
    4.2    Purpose ........................................................................................................ 76
    4.3    Revolving Nature ........................................................................................ 76
    4.4    Repayment ................................................................................................... 76
    4.5    Availment Options ...................................................................................... 76

**TABLE OF CONTENTS**
**(continued)**

                                                                                        **Page**

4.6     Interest and Fees ......................................................................... 77
4.7     Letters of Credit ......................................................................... 78

**ARTICLE 5 GENERAL CONDITIONS .................................................... 80**

5.1     Matters relating to Interest and Fees ........................................ 80
5.2     Voluntary Prepayments ............................................................. 82
5.3     Mandatory Prepayments ........................................................... 83
5.4     Notice Periods .......................................................................... 86
5.5     Minimum Amounts, Multiples and Procedures re Advances, Conversions
        and Repayments ....................................................................... 87
5.6     Place of Advances and Repayments .......................................... 88
5.7     Evidence of Obligations (Noteless Advances) .......................... 88
5.8     Determination of Equivalent Amounts ..................................... 88
5.9     Commitment to Purchase Bankers' Acceptances and BA Equivalent Loans ...... 89
5.10    Special Provisions Regarding Bankers' Acceptances ................ 89
5.11    Escrowed Funds ....................................................................... 91
5.12    Special Provisions regarding BA Equivalent Loans ................. 92
5.13    Special Provisions Regarding LIBOR Loans ........................... 93
5.14    Breakage Costs ........................................................................ 93
5.15    Inability to Make LIBOR Loans .............................................. 94
5.16    Special Provisions Regarding Letters of Credit ....................... 95
5.17    Eligible Approved Contracts .................................................... 98

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES .......................... 99**

6.1     Representations and Warranties ................................................ 99
6.2     Acknowledgement and Deemed Repetition ............................. 106
6.3     Survival of Representations and Warranties ............................ 106

**ARTICLE 7 COVENANTS ...................................................................... 107**

7.1     Positive Covenants ................................................................. 107
7.2     Negative Covenants ................................................................ 111
7.3     Financial Covenants ............................................................... 118
7.4     Reporting Requirements ......................................................... 120
7.5     Designation of Unrestricted Subsidiaries ............................... 122
7.6     Securitization SPE ................................................................. 123

**ARTICLE 8 SECURITY ......................................................................... 124**

8.1     Security .................................................................................. 124
8.2     General Provisions re Security; Registration .......................... 125
8.3     Opinions re Security ............................................................... 126
8.4     After-Acquired Property, Further Assurances ......................... 126
8.5     Security for Swap Documents with Former Lenders ............... 126
8.6     Insurance Proceeds ................................................................ 127

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 8.7 | Qualified ECP Guarantor Keepwell | 127 |
| 8.8 | Additional Release by Lender | 127 |
| 8.9 | Security Principles Affecting Certain Subsidiaries | 128 |

**ARTICLE 9 CONDITIONS PRECEDENT** ........ **128**

| | | |
|---|---|---|
| 9.1 | Conditions Precedent to Agreement | 128 |
| 9.2 | Conditions Precedent to all Advances | 130 |

**ARTICLE 10 DEFAULT AND REMEDIES** ........ **131**

| | | |
|---|---|---|
| 10.1 | Events of Default | 131 |
| 10.2 | Acceleration; Additional Interest | 134 |
| 10.3 | Acceleration of Certain Contingent Obligations | 134 |
| 10.4 | Combining Accounts, Set-Off | 134 |
| 10.5 | Attorney in Fact | 135 |
| 10.6 | Appropriation of Monies | 135 |
| 10.7 | No Further Advances | 135 |
| 10.8 | Remedies Cumulative | 136 |
| 10.9 | Performance of Covenants by Agent | 136 |
| 10.10 | Purchase of Participation Following Acceleration | 136 |

**ARTICLE 11 ADMINISTRATION OF THE FACILITIES** ........ **137**

| | | |
|---|---|---|
| 11.1 | Authorization and Action | 137 |
| 11.2 | Decision-Making | 137 |
| 11.3 | Procedure for Making Advances | 139 |
| 11.4 | Failure to Fund | 139 |
| 11.5 | Defaulting Lenders and Replacement of Lenders | 140 |
| 11.6 | Security and Exercise of Remedies | 142 |
| 11.7 | Application of Proceeds of Realization | 143 |
| 11.8 | Payments by Agent | 144 |
| 11.9 | Redistribution of Payment | 145 |
| 11.10 | Protection of Agent | 146 |
| 11.11 | Duties of Agent | 148 |
| 11.12 | Lenders' Obligations Several; No Partnership | 149 |
| 11.13 | Reliance Upon Agent | 149 |
| 11.14 | No Liability of Agent | 149 |
| 11.15 | Agent and Agent Authority | 149 |
| 11.16 | Lenders' Credit Decisions | 150 |
| 11.17 | Indemnification | 150 |
| 11.18 | Successor Agent | 150 |
| 11.19 | Sharing of Information | 151 |
| 11.20 | Acknowledgement by Borrowers | 151 |
| 11.21 | Amendments to Article 11 | 151 |
| 11.22 | Deliveries, etc. | 151 |

25877170.9

**TABLE OF CONTENTS**
**(continued)**

Page

11.23 Agency Fee ....................................................................................... 152

**ARTICLE 12 INCREASED COSTS**........................................................... **152**

12.1 Changes in Law............................................................................... 152
12.2 Changes in Circumstances .............................................................. 153
12.3 Application of Sections 12.1 and 12.2 ........................................... 153
12.4 Taxes ............................................................................................... 154

**ARTICLE 13 GENERAL**........................................................................... **157**

13.1 Non-Disclosure .............................................................................. 157
13.2 Waiver ............................................................................................ 158
13.3 Governing Law ............................................................................... 158
13.4 Judgment Currency ........................................................................ 158
13.5 Expenses of Agent and Lenders ..................................................... 158
13.6 Assignment .................................................................................... 159
13.7 General Indemnity .......................................................................... 161
13.8 Environmental Indemnity ............................................................... 162
13.9 Survival of Certain Obligations despite Termination of Agreement ................. 162
13.10 Interest on Unpaid Costs and Expenses ......................................... 163
13.11 Notice ............................................................................................. 163
13.12 Telephone Instructions ................................................................... 164
13.13 Severability .................................................................................... 164
13.14 Further Assurances.......................................................................... 164
13.15 Tombstone Marketing ..................................................................... 164
13.16 Entire Agreement ........................................................................... 165
13.17 Anti-Money Laundering Legislation .............................................. 165
13.18 Binding Effect ................................................................................ 166
13.19 Execution by Electronic Means and Counterparts.......................... 166
13.20 Intercreditor Agreement ................................................................. 166
13.21 Release of Liens and Guarantees. ................................................... 166

25877170.9

## SECOND AMENDED AND RESTATED CREDIT AGREEMENT

This Agreement is dated as of July 31, 2018,

AMONG:

### Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC.
as Borrowers

– and –

### QMAX CANADA OPERATIONS INC.
as Specified Canadian Swingline Borrower

– and –

### THE PERSONS PARTY HERETO FROM TIME TO TIME
### IN THEIR CAPACITIES AS LENDERS
as Lenders

– and –

### HSBC BANK CANADA,
as Administrative Agent

– with –

### HSBC BANK CANADA,
as Sole Lead Arranger, Bookrunner, Syndication Agent
and Documentation Agent

**PREAMBLE:**

A.    The Borrowers have requested and the Lenders have agreed to further amend and restate the credit facilities under the Existing Credit Agreement and to continue to provide certain credit facilities on the terms and conditions and for the purposes set out in this Agreement.

B.    HSBC has agreed to continue to act as administrative agent for the Lenders under the Facilities on the terms and conditions and for the purposes set out in this Agreement.

**AGREEMENT:**

In consideration of the covenants and agreements between the Parties contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

25877170.9

# ARTICLE 1
# INTERPRETATION

**1.1** **Definitions**

In this Agreement, the following words and phrases shall have the respective meanings set forth below:

1.1.1 "**Acceleration Date**" means the earlier of:

(a) the occurrence of an Insolvency Event in respect of any Credit Party; and

(b) the delivery by the Agent to the Borrower of a written notice that the Obligations are immediately due and payable, following the occurrence and during the continuation of an Event of Default other than an Insolvency Event.

1.1.2 "**Acceptable Account Debtors**" means those account debtors in respect of Eligible Receivables who have Investment Grade long term unsecured debt ratings or are otherwise acceptable to the Required Lenders, in their Permitted Discretion.

1.1.3 "**Account Receivable Insurance**" means one or more credit insurance policies issued by (a) Export Development Canada, (b) Export-Import Bank of the United States, or (c) such other governmental entity of Canada or the U.S. or a private insurer, in either case, with, and only for so long as such other insurer maintains, a credit rating of at least A by Standard & Poor's Ratings Services (or an equivalent rating issued by another rating agency acceptable to the Required Lenders, acting reasonably) that is reasonably acceptable to the Required Lenders, in each case, together with all endorsements and agreements related thereto (including a tripartite agreement among the insured, the insurer and the Agent), and on terms and in amounts reasonably acceptable to Agent and which provides for the payment of claims thereunder directly to Agent.

1.1.4 "**Acquired Business**" means the entity or assets acquired by a Credit Party in an Acquisition consummated after the date hereof.

1.1.5 "**Acquisition**" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of a controlling interest in the capital stock, partnership interests, membership interests or equity of any Person (other than a Person that is a Subsidiary or the formation of a Subsidiary solely to facilitate a Permitted Acquisition), or (c) a merger, amalgamation, consolidation or any other combination with another Person (other than a Person that is a Credit Party); provided, that the Borrower or a Person that is or will become a Credit Party is the surviving entity.

1.1.6 "**Advance**" means an extension of credit by one or more of the Lenders to a Borrower pursuant to this Agreement (including by way of issuance of a Letter of Credit or by way of any other Loan permitted by Section 2.7.2 under the Swingline), but does not include any Conversion or Rollover.

1.1.7     "**Advisory Services Agreement**" means the management and advisory service agreement dated as of May 23, 2014 between the Canadian Borrower and Palladium, as the same may be amended restated or supplemented from time to time permitted hereunder.

1.1.8     "**Affiliate**" means with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

1.1.9     "**Agent**" means HSBC in its capacity as administrative agent hereunder and any successors in such capacity appointed as agent pursuant to Section 11.18.

1.1.10     "**Agreement**" means this amended and restated credit agreement (including the exhibits and schedules) as it may be amended, replaced or restated from time to time.

1.1.11     "**Amendment and Restatement Date**" means the date of this Agreement or such later Business Day upon which each condition in Section 9.1 shall be satisfied or waived in a manner acceptable to the Required Lenders in their discretion.

1.1.12     "**Anchor**" means Anchor Drilling Fluids USA, LLC.

1.1.13     "**Anchor Acquisition Agreement**" means the Membership Interest Purchase Agreement, dated as of November 21, 2017, by and among Anchor Drilling Fluids USA, LLC, a Delaware limited liability company, Calumet Operating, LLC, a Delaware limited liability company, Q'Max Solutions Inc., a British Columbia corporation, and Q'Max America Inc., a Delaware corporation.

1.1.14     "**Anchor Sale and Leaseback Transaction**" means any arrangement, whether in one transaction or in a series of transactions, with any Person whereby Anchor sells or transfers all or some portion of its truck fleet or similar motor vehicles, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rents or leases such property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

1.1.15     "**Annual Management Fee Cap**" means U.S. $2,500,000 in the aggregate in any Fiscal Year.

1.1.16     "**Applicable Law**" means, in respect of any Person, property, transaction or event, all Laws applicable thereto.

1.1.17     "**Applicable Margin**" means, in respect of any Fiscal Quarter and in respect of any Availment Option or standby fee, the percentage in the column relating to such Availment Option or standby fee in the following table which corresponds to the Net Leverage Ratio in respect of such Fiscal Quarter described in the first column; subject to adjustment from time to time in accordance with Section 5.1.4:

| Level* | Net Leverage Ratio | Canadian Dollar Prime Based Loans, U.S. Dollar Base Rate Loans and U.S. Dollar Prime Rate Loans | BA Fee, LIBOR Loans and Financial Letter of Credit Fee** | Standby Fee (For Canadian Operating Facility and U.S. Operating Facility only) |
|---|---|---|---|---|
| I | < 1.50:1 | 100 bps | 200 bps | 45.000 bps |
| II | ≥ 1.50:1 < 2.00:1 | 125 bps | 225 bps | 50.625 bps |
| III | ≥ 2.00:1 < 2.50:1 | 175 bps | 275 bps | 61.875 bps |
| IV | ≥ 2.50:1 < 3.00:1 | 200 bps | 300 bps | 67.500 bps |
| V | ≥ 3.00:1 < 3.50:1 | 275 bps | 375 bps | 84.375 bps |
| VI | ≥ 3.50:1 < 4.00:1 | 325 bps | 425 bps | 95.625 bps |
| VII | ≥ 4.00:1 | 375 bps | 475 bps | 106.875 bps |

\* On the Amendment and Restatement Date, the Applicable Margin shall be deemed to be at Level VII and shall remain at Level VII at all times during the Covenant Relief Period.

\*\*Non-Financial Letters of Credit will be issued at 66⅔% of the pricing quoted above for Financial Letters of Credit.

1.1.18   "**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

1.1.19   "**Assignment**" means an agreement whereby a financial institution becomes a Lender substantially in the form of Exhibit "G", with the blanks completed.

1.1.20   "**Availment Option**" means a method of borrowing which is available to the Borrower as provided herein and in respect of each Facility, means those particular methods of borrowing which are specifically identified as being available thereunder (in the case of the Canadian Operating Facility under Section 2.5.1, in the case of the Facility under Section 3.5.1 and in the case of the U.S. Operating Facility under Section 4.5.1).

1.1.21   "**BA Equivalent Loan**" means an Advance in Canadian Dollars made by a Non-BA Lender pursuant to Section 5.10.2.

1.1.22   "**BA Lender**" means a Lender identified in Exhibit "A" attached hereto as a Lender which will accept Bankers' Acceptances hereunder.

1.1.23   "**Bankers' Acceptance**" means a bill of exchange or a blank non-interest bearing depository bill as defined in the *Depository Bills and Notes Act* (Canada) drawn by the Borrower and accepted by a BA Lender in respect of which the Borrower becomes obligated to pay the face amount thereof to the holder (which may be a third party or such BA Lender) upon maturity.

1.1.24   "**Banking Service Agreements**" means agreements made between a Borrower or any other Credit Party and the Agent or any Lender or any of their respective Affiliates in respect of payment cards, credit cards, cash management, payroll, pooling, netting, or other

- 4 -

banking services; and "**Banking Service Agreement**" means any one of them as required by the context.

1.1.25 "**Banking Services Liabilities**" mean, collectively, any and all direct and indirect, contingent and absolute obligations and liabilities of each Borrower and each other Credit Party to the Agent, any Lender or any of their respective Affiliates in respect of any Banking Service Agreement as the Credit Parties may from time to time enter into with the Agent, any Lender or any of their respective Affiliates; provided, that a liability shall constitute a "**Banking Service Liability**" if the agreement under which it arose was entered into with the Person who was an Agent, Lender or the Affiliate of a Person who was an Agent or Lender, at the time such agreement was entered into, regardless of whether such Agent or Lender ceased to be the Agent or a Lender hereunder.

1.1.26 "**BCBCA**" means the *Business Corporations Act* (British Columbia), as amended from time to time.

1.1.27 "**BIA**" means the *Bankruptcy and Insolvency Act* (Canada), as amended from time to time.

1.1.28 "**Borrowers**" means, collectively, the Canadian Borrower, the Specified Canadian Swingline Borrower and the U.S. Borrower and "**Borrower**", means any one of them; provided, that "Borrower", in the context of provision hereunder relating to:

(a)     the Term Facility and the Canadian Operating Facility, and Loans thereunder, shall mean the Canadian Borrower and its successors and assigns;

(b)     the U.S. Operating Facility, and Loans thereunder, shall mean the U.S. Borrower and its successors and assigns; and

(c)     the Swingline, and Loans thereunder, shall mean the applicable Swingline Borrower and its successors and assigns.

1.1.29 "**Borrowing Base**" means the amount in U.S. Dollars calculated by the Borrower and approved by the Agent, in its sole discretion, as set out in the most recent Borrowing Base Certificate, being the aggregate amount of (without duplication):

(a)     Marginable Receivables; *plus*

(b)     Marginable Inventory; *plus*

(c)     Marginable Cash; *plus*

(d)     Marginable Capital Assets; *minus*

(e)     Priority Claims; *minus*

(f)     $150,000 (but only until such time as the Agent and HSBC US have received an environmental report or other information from or on behalf of Anchor which is

- 5 -

satisfactory to each of them (acting reasonably) related to the Norge, Oklahoma and Roosevelt, Utah properties owned by the Credit Parties, and the Agent and HSBC US agree to no longer require the reserve set out in this clause (f)), provided such reserve shall only apply to the extent such properties form part of the Borrowing Base, *minus*

(g)     the amount in U.S. Dollars of unrealized losses resulting from mark to market accounting for hedging activities calculated in accordance with GAAP, *minus*

(h)     the amount in U.S. Dollars of any deductible payable in respect of the Account Receivable Insurance (other than in respect of Anchor, Terra and their respective Subsidiaries), *minus*

(i)     any amount that is payable to the insurer under the Account Receivable Insurance (other than in respect of Anchor, Terra and their respective Subsidiaries).

1.1.30   "**Borrowing Base Certificate**" means a certificate of the Canadian Borrower, substantially in the form of Exhibit "H".

1.1.31   "**Borrowing Base Shortfall**" is defined under Section 5.3.5.

1.1.32   "**Business Day**" means:

(a)     for the purpose of giving any communication pursuant to Section 13.11 and in the context of U.S. Dollar Base Rate Loans and U.S. Dollar Prime Rate Loans, a day on which the main branches of the Agent or any of its Affiliates in Toronto, Calgary, Montreal, Quebec and New York are open for normal banking business;

(b)     for purposes of LIBOR Loans, also must be a LIBOR Business Day; and

(c)     for all other purposes, a day on which the main branch of the Agent in Calgary, Alberta, Montreal, Quebec and Toronto, Ontario is open for normal banking business,

but in any event not including a Saturday or Sunday or other day on which banks in Calgary or Toronto are authorized or required by law to close.

1.1.33   "**Calumet**" means Calumet Operating, LLC and its successors and permitted assigns.

1.1.34   "**Canadian Borrower**" means Q'Max Solutions Inc., a corporation amalgamated pursuant to the BCBCA, and its successors and permitted assigns.

1.1.35   "**Canadian Dollar Prime Rate Loan**" means a loan made by a Lender to the Canadian Borrower in Canadian Dollars in respect of which interest is determined by reference to the Canadian Prime Rate, but excluding Advances in the form of Overdrafts and BA Equivalent Loans.

1.1.36   "**Canadian Dollars**" or "**Cdn. $**" means the lawful money of Canada.

1.1.37   "**Canadian Operating Facility**" is defined in Section 2.1.

1.1.38   "**Canadian Operating Facility Commitment**" means, as the context requires, (a) as of the Amendment and Restatement Date, collectively with respect to all Canadian Operating Lenders, in the aggregate, U.S. $109,681,471 or the Equivalent Amount in Cdn. $ (or any combination thereof), as otherwise increased or decreased pursuant to this Agreement and (b) means, with respect to each individual Canadian Operating Lender, the individual commitment amount of such Lender in the maximum principal amount indicated opposite such Canadian Operating Lender's name in Exhibit "A" under the heading "**Canadian Operating Facility Commitments**", as amended from time to time.

1.1.39   "**Canadian Operating Facility Limit**" means the lesser of (a) the Canadian Operating Facility Commitment, and (b) the sum of the Borrowing Base less the then outstanding Advances under the Term Facility and the U.S. Operating Facility.

1.1.40   "**Canadian Operating Lenders**" means the Lenders who have provided a Commitment under the Canadian Operating Facility as set forth in Exhibit "A".

1.1.41   "**Canadian Prime Rate**" means the greater of the following:

(a)     the rate of interest announced from time to time by the Agent as its reference rate then in effect for determining rates of interest on Canadian dollar loans to its customers in Canada and designated as its prime rate; and

(b)     the 30-day CDOR Rate plus 1% per annum;

provided that if the Canadian Prime Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.42   "**Capital Adequacy Requirements**" means the Guideline dated January 2017, entitled "Capital Adequacy Requirements (CAR)" issued by OSFI and all other guidelines or requirements relating to capital adequacy issued by OSFI or any other Governmental Authority regulating or having jurisdiction with respect to any Lender, as amended, modified, supplemented, reissued or replaced from time to time.

1.1.43   "**Capital Expenditures**" means, with respect to any Person for any period, without duplication, the aggregate amount of all expenditures (whether paid in cash or accrued as a liability) by such Person during that period for investments in other Persons and the acquisition or leasing (pursuant to a Capital Lease) of fixed or capital assets or additions to property, plant, or equipment (including replacements, capitalized repairs, and improvements), in each case, which are required to be capitalized on the balance sheet of such Person in accordance with GAAP; provided, however, that Capital Expenditures shall not include:

(a)     expenditures with proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets,

equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of a Borrower and its Subsidiaries within one year of receipt of such proceeds (or, if not made within such one year period, are committed to be made during such period, but if not so made, such amount will not be excluded in the next applicable period);

(b)     interest capitalized during such period;

(c)     expenditures that are accounted for as Capital Expenditures of such Person and that actually are paid for by a third party (excluding a Borrower or any Subsidiary thereof) and for which neither any Borrower nor any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other Person (whether before, during or after such period);

(d)     the purchase price of equipment (i) that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time, (ii) to the extent the consideration therefor consists of any combination of (A) used or surplus equipment traded in at the time of such purchase and (B) the proceeds of a substantially concurrent sale of used or surplus equipment, in each case in the ordinary course of business; provided that only such credit value of such traded equipment will be excluded for this purpose;

(e)     for purposes of Section 7.2.10 only, expenditures that constitute Permitted Acquisitions and Permitted Investments;

(f)     the book value of any asset owned to the extent such book value is included as a capital expenditure as a result of reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period;

(g)     expenditures of leasehold improvements for which such Person is reimbursed in cash or receives a credit; and

(h)     any non-cash amounts reflected as additions to property, plant or equipment on such Person's consolidated balance sheet.

1.1.44    "**Capital Lease**" means any lease, license or similar transaction determined as a capital lease in accordance with GAAP as in effect on the Amendment and Restatement Date, or any sale and lease back transaction or any other lease (whether a synthetic lease or otherwise).

1.1.45    "**Cash Equivalent**s" means, as of the date of any determination thereof, the following:

- 8 -

(a)     marketable direct obligations issued or unconditionally guaranteed by the Government of Canada, the U.S., or any agency or instrumentality thereof, a government of a province of Canada or of a state of the U.S. or, in each case, any agency thereof, maturing no more than one year after the date of acquisition thereof;

(b)     commercial paper maturing no more than one year after the date of acquisition thereof and having, at the time of acquisition, a rating of at least A1 by Standard & Poor's Ratings Services or at least Prime 1 by Moody's Investors Service, Inc. or at least R1 (low) by Dominion Bond Rating Service Inc.;

(c)     certificates of deposit, deposit notes, term deposit receipts, or time deposits or bankers' acceptances, maturing no more than one year after the date of acquisition thereof, issued by the Lender or by commercial banks incorporated under the laws of Canada or the U.S. or a state thereof, each having a rating of at least A1 by Standard & Poor's Ratings Services or at least Prime 1 by Moody's Investors Service, Inc. or at least R1 (low) by Dominion Bond Rating Service Inc.;

(d)     such local currencies in those countries in which the Borrowers and their Subsidiaries transact business from time to time in the ordinary course of business;

(e)     investments of comparable tenor and credit quality to those described in the foregoing clauses (a) through (c) or otherwise customarily utilized in countries in which the Borrowers and their Subsidiaries operate for short term cash management purposes; and

(f)     investments in any investment company, money market or fund which invests substantially all of their assets in Cash Equivalents of a kind described in (a) through (c) of this definition.

1.1.46     "**Cash Taxes**" means, in respect of any Person for any applicable period, the amount of all income taxes (including federal and provincial income taxes) paid or payable by such Person on its net taxable income for such period (which for greater certainty, does not include future income taxes).

1.1.47     "**Catch Up Management Fee Payments**" is defined in Section 1.1.201(a).

1.1.48     "**CDOR Rate**" means on any day the annual rate of interest which is the rate determined as being the arithmetic average of the quotations of all institutions listed in respect of the rate for Canadian Dollar denominated bankers' acceptances for the relevant period displayed and identified as such on the "**Reuters Screen CDOR Page**" (as defined in the International Swaps and Derivatives Association, Inc. definitions, as modified and amended from time to time) as of 10:00 a.m. Toronto, Ontario local time on such day and, if such day is not a Business Day, then on the immediately preceding Business Day (as adjusted by the Agent after 10:00 a.m. Toronto, Ontario local time to reflect any error in a posted rate of interest or in the posted average annual rate of interest with notice of such adjustment in reasonable detail evidencing the basis for such determination being concurrently provided to the Borrower). If such rates are not available on the Reuters Screen CDOR Page on any particular day, then the CDOR Rate on that day shall be

calculated as the arithmetic mean of the rates applicable to Canadian Dollar denominated bankers' acceptances for the relevant period publicly quoted for customers in Canada by those Lenders which are banks listed in Schedule I of the *Bank Act* (Canada) as of 10:00 a.m. Toronto, Ontario local time on such day; or if such day is not a Business Day, then on the immediately preceding Business Day; provided that if the CDOR Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.49    "**Change of Control**" means in respect of the Canadian Borrower or Holdco, the occurrence of any of the following events:

(a)    prior to any initial public offering of the Canadian Borrower or Holdco, as applicable, when Permitted Holders do not beneficially own, collectively, directly or indirectly, shares in the Canadian Borrower or Holdco, as applicable, representing more than 50% of the Voting Securities of the Canadian Borrower or Holdco; and

(b)    after any initial public offering of the Canadian Borrower or Holdco, as applicable, when a Person or Group (other than any employee benefit plan and/or Person acting as the trustee, agent or other fiduciary or administrator) acquires shares in the Canadian Borrower or Holdco, as applicable, representing more than the greater of (i) 35% of the aggregate outstanding Voting Securities of the Canadian Borrower or Holdco, as applicable and (ii) the percentage of then outstanding Voting Securities of the Canadian Borrower or Holdco, as applicable, directly or indirectly, owned by Permitted Holders.

1.1.50    "**Code**" means the United States Internal Revenue Code of 1986, and any successor statute and any regulations thereunder.

1.1.51    "**Collateral**" means, collectively, all property, assets and undertaking of the Credit Parties encumbered by the Liens granted pursuant to the Security in support of the Obligations, and all property, assets and undertaking encumbered by the Liens granted pursuant to the Security in support of the Guarantees, together with all proceeds of the foregoing. For the avoidance of doubt, Collateral shall not include (a) capital assets or inventory of any Credit Party organized outside of the U.S. or Canada, (b) pending United States "intent-to-use" trademark applications for which a verified statement of use or an amendment to allege use has not been filed with and accepted by the United States Patent and Trademark Office, (c) Securitization Assets but only once transferred to a Securitization SPE and (d) any of the "**Excluded Property**" (as defined in the general security agreement from the U.S. Borrower as described in Section 8.1(a)).

1.1.52    "**Collection Rights**" means, in respect of any Eligible Approved Contracts between a Pemex Entity, on the one hand, and QMax Mexico, on the other hand, the collection or credit rights granted to QMax Mexico by such Pemex Entity pursuant to such Eligible Approved Contract.

1.1.53   "**Colombian Free Cash Flow**" means, for any fiscal period, all EBITDA attributable to all Colombian operations of the Canadian Borrower and its Material Subsidiaries determined in accordance with the definition of EBITDA, minus Cash Taxes, Interest Expense and Unfunded Capital Expenditures, in each case, attributable to such Colombian Subsidiaries and operations.

1.1.54   "**Commitment**" means, in respect of any Lender, such Lender's commitment to make Advances to the Borrowers (or any one of them) under all Facilities or under any Facility, as the context requires as set forth in Exhibit "A".

1.1.55   "**Common Shares**" means the common shares in the capital of a Borrower.

1.1.56   "**Compliance Certificate**" means a certificate delivered by the Canadian Borrower to the Agent in the form of Exhibit "F".

1.1.57   "**Consolidated Net Income**" shall mean, for any period, the net income (loss) of any Person and its Subsidiaries determined on a consolidated basis on the basis of GAAP; provided, however, that any net income (loss) of any Person (excluding any Securitization SPE) (i) who is not during such period a Material Subsidiary or (ii) whose net income is accounted for by the equity method of accounting, shall in each case be included in the calculation of Consolidated Net Income for all purposes of this Agreement only to the extent of the amount of any Distributions of such Person paid in cash (or to the extent converted into cash) to the Canadian Borrower or a Material Subsidiary, and "**Consolidated Net Income**" for such period shall include any ordinary course dividends in cash received by the Canadian Borrower or any of its Material Subsidiaries in excess of the amounts included in the foregoing item (i).

1.1.58   "**Consolidated Net Tangible Assets**" means, as at any date of determination, all consolidated assets of the any Person as shown in the most recent consolidated balance sheet of such Person, less the aggregate of the following amounts reflected upon such balance sheet:

(a)     all goodwill, deferred assets, trademarks, copyrights and other similar intangible assets; and

(b)     to the extent not already deducted in computing such assets and without duplication, depreciation, depletion, amortization, reserves and any other account which reflects a decrease in the value of an asset or a periodic allocation of the cost of an asset; provided, that no deduction will be made under this paragraph (b) to the extent that such account reflects a decrease in value or periodic allocation of the cost of any asset referred in the paragraph (a) of this definition,

all as determined in accordance with GAAP.

1.1.59   "**Contributing Lenders**" is defined in Section 11.4.2.

1.1.60   "**control**" means, in respect of any Person, the power to direct or cause the direction of management and policies of such Person, directly or indirectly, through the

ownership of Voting Securities, contract or otherwise; and "**controlled**" has a corresponding meaning.

1.1.61    "**Conversion**" means the substitution of one Availment Option for another, and, for certainty, does not constitute a fresh or new Advance (and "**Convert**" shall have a corresponding meaning).

1.1.62    "**Conversion Notice**" means a notice substantially in the form of Exhibit "D" given by a Borrower to the Agent for the purposes of requesting a Conversion.

1.1.63    "**Covenant Relief Period**" means the period from the Amendment and Restatement Date, up to and including December 31, 2019, subject to the Borrowers' right to elect a shorter period pursuant to Section 1.18.

1.1.64    "**Credit Documents**" means this Agreement, the Security and all other agreements, documents, instruments and certificates required or contemplated herein to be provided by the Credit Parties and other Persons to the Agent and the Lenders.

1.1.65    "**Credit Parties**" means, collectively, the Borrowers and any Guarantor; and "**Credit Party**" means any one of them as the context requires. Notwithstanding any provision in this Agreement or any other Credit Document, in no event shall any Securitization SPE be deemed a Credit Party.

1.1.66    "**Currency Hedging Agreement**" means any swap, hedge or other agreement that does not contravene Section 7.2.12 entered into between a Credit Party and a counterparty, from time to time for the purpose of mitigating or hedging currency risk, including foreign exchange forward contracts.

1.1.67    "**Default**" means an event which has occurred and is continuing, and which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

1.1.68    "**Default Rate**" means, while an Event of Default exists, the interest rates and fess comprising the Applicable Margin will each increase by 2.0% per annum.

1.1.69    "**Defaulting Lender**" means any Lender or, in the case of paragraph (e) below, a Lender's parent (being any Person that directly or indirectly controls a Lender where control has the same meaning as in the definition of Affiliate):

(a)      that has failed to fund any payment or its portion of any Advances required to be made by it hereunder, including as a result of being a Non-Paying Lender, within two Business Days of the date such Advances were required to be funded hereunder unless such Lender notifies the Agent and the Canadian Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied;

(b)      that has failed to pay the Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due;

(c)      that has notified a Borrower (in writing) that it does not intend to or is unable to comply with any of its funding obligations under this Agreement or has made a public statement to that effect (unless such written notice or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such written notice of public statement) cannot be satisfied);

(d)      that has failed, within three Business Days after request by a Borrower, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Advances; or

(e)      that becomes insolvent, has been deemed insolvent by a court of competent jurisdiction, or becomes the subject of bankruptcy or insolvency proceeding.

1.1.70   "**Departing Lenders**" is defined in Section 11.5.2.

1.1.71   "**Deposit Account Control Agreement**" means the deposit account control agreement dated December 29, 2014 between the Agent, Wells Fargo and the U.S. Borrower, as the same may be amended from time to time.

1.1.72   "**Designated Financial Covenants**" is defined in Section 7.3.2

1.1.73   "**Distribution**" means:

(a)      any declaration or payment of dividends or returns of capital, including advisory fees and management fees, of any kind or nature directly or indirectly to any holder of shares of any Credit Party or to any Affiliate or Related Party of such holder and including any similar payments paid by any Credit Party to Palladium or its Affiliates, whether pursuant to the Advisory Services Agreement or any other similar agreement now or hereafter in effect between any one or more Credit Party and any one or more of Palladium or its Affiliates;

(b)      any repurchase, retraction or redemption of shares of any Credit Party for cash or other property; and

(c)      any payment, repayment or prepayment by a Person in cash of any amount of any principal, interest, fees or other amounts in respect of any Subordinated Debt.

For certainty, Distributions shall not include the reimbursement of reasonable out-of-pocket expenses incurred by Palladium or the directors of the Credit Parties in the ordinary cause of business in rendering advisory or management services to the Credit Parties or performing a director's obligations to the applicable Credit Party, as the case may be.

1.1.74   "**Drawdown Request**" means a notice in the form of Exhibit "B" given by the Borrower to the Agent for the purpose of requesting an Advance.

1.1.75   "**Earnout Payments**" means, in respect of any Acquisition, the requirement for any Credit Party, as purchaser, to pay to the vendor under such Acquisition (or any nominee thereof) contingent payments of the purchase price thereof after the closing thereof which are payable when specified targets (including related to revenue or earnings), are satisfied within specified periods.

1.1.76   "**EBITDA**" means, for any fiscal period, Consolidated Net Income of the Canadian Borrower and the Subsidiaries determined on a consolidated basis in accordance with GAAP and measured on a trailing four Fiscal Quarter basis for such period, *plus* all amounts deducted in the calculation thereof on account of (without duplication irrespective if any expense, loss or gain would fall into one or more of the foregoing categories):

(a)   interest expense calculated in accordance with GAAP, including (i) the amortization of debt discounts, (ii) the amortization of all fees (including fees with respect to Hedging Agreements) payable in connection with the incurrence of Funded Debt to the extent included in interest expense, (iii) deferred financing fees and expenses, and (iv) the portion of any payments or accruals with respect to Capital Lease Obligations allocable to interest expense and the capitalized interest of such Person;

(b)   any provision for or payment of taxes based on income, profits or capital gains, calculated in accordance with GAAP, including, without limitation, state, provincial, franchise, property and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) and any deferred/future taxes;

(c)   depreciation and amortization expense, calculated in accordance with GAAP, including amortization of intangible assets, unrecognized prior service costs and actuarial non-cash losses related to pensions and other post-employment benefits, of such;

(d)   Permitted Management Fees (but for certainty, in an amount not exceeding the Annual Management Fee Cap in any Fiscal Year) and the reasonable out-of-pocket expenses related thereto which have been reimbursed by a Credit Party, and any payments permitted under clause (j) of Section 7.2.6, to the extent paid by a Credit Party to a non-Credit Party;

(e)   all non-cash expenses and losses calculated in accordance with GAAP related to: (i) extraordinary and nonrecurring losses to the extent not otherwise dealt with in this definition, (ii) all non-recurring deferred financing costs written off and premiums paid or other expenses incurred directly in connection with any early extinguishment of Funded Debt and any net loss attributable to any write-off or forgiveness of Funded Debt, (iii) any non-cash expense or loss arising from the application of purchase accounting adjustments as a result of any Permitted

- 14 -

Acquisition, and (iv) other non-cash expenses and charges to the extent not otherwise dealt with in this definition (in each case, calculated on a *pro forma* basis as though realized on the first day of such period) reducing Consolidated Net Income for such period including resulting from impairment charges and including losses against book value on the disposal or write-off of any business or assets (including pursuant to any sale/leaseback transaction);

(f)      [reserved];

(g)      unrealized losses resulting from mark to market accounting for hedging activities calculated in accordance with GAAP;

(h)      any unrealized foreign currency translation or transaction losses in respect of (i) Funded Debt denominated in a currency other than the functional currency of the relevant Person and (ii) any unrealized foreign exchange losses relating to translation of assets and liabilities denominated in foreign currencies;

(i)      charges, expenses or losses reasonably related to (i) fees and expense in connection with Permitted Acquisitions, Permitted Investments, Permitted Dispositions, the incurrence of Permitted Funded Debt (but only to the extent not already included in clause (a) above), amendments and other modifications to the Credit Documents, the offering or issuance of equity interests and other activities permitted hereunder (in each case, whether or not successful) and (ii) business optimization expenses and restructuring charges, reserves or expenses, (including losses from disposed, abandoned, transferred, closed or discontinued operations) in each case as documented by evidence provided by the Canadian Borrower and acceptable to the Agent (acting reasonably and responding to requests for approval within five (5) Business Days); provided, that all of the foregoing may not exceed a maximum aggregate amount of $5,500,000 for each applicable measurement period of four consecutive Fiscal Quarters, or such higher amount as the Required Lenders may consent to from time, acting reasonably;

(j)      non-cash expenses incurred in connection with any equity based compensation provided pursuant to any management or employee equity based compensation plan (in each case, calculated on a *pro forma* basis as though realized on the first day of such period), and including (i) costs or expenses realized in connection with or resulting from stock appreciation or similar rights, stock options or other rights of officers, directors and employees, in each case of such Person or any such Subsidiary, and (ii) non-cash losses attributable to deferred compensation plans or trusts;

(k)      third party audit, advisory and consulting fees and related out-of-pocket expenses of the Canadian Borrower or any of its Subsidiaries incurred in connection with audits, inspections and reviews conducted in connection with this Agreement at the direction of the Agent or any Lender (but which for certainty does not include audit fees related to the preparation of the financial statements required hereunder);

- 15 -

(l)     fees, costs and expenses in connection with the Anchor Acquisition not to exceed U.S. $11,000,000;

(m)     discounts on sales of receivables and related assets in connection with any Permitted Securitization Financing;

*minus*, in each case to the extent added in the calculation thereof (without duplication irrespective if any expense, loss or gain would fall into one or more of the foregoing categories):

(n)     income tax credits calculated in accordance with GAAP;

(o)     all cash payments during such period relating to non-cash charges which were added back in determining EBITDA in any prior period;

(p)     other non-cash and non-recurring items increasing Consolidated Net Income that are not otherwise dealt with in this definition (but excluding any such non-cash items to the extent that it will result in the receipt of cash payments in any future period), including gains against book value on the disposal of any business or assets;

(q)     unrealized gains resulting from mark to market accounting for hedging activities calculated in accordance with GAAP;

(r)     any unrealized foreign currency translation or transaction gains in respect of Funded Debt denominated in a currency other than the functional currency of the relevant Person and any unrealized foreign exchange gains relating to translation of assets and liabilities denominated in foreign currencies;

(s)     any net gain attributable to any write-off or forgiveness of Funded Debt;

(t)     net gains on the disposal, abandonment, transfer, closing or discontinuance of operations;

(u)     non-cash gains attributable of deferred compensation plans and trusts;

(v)     any non-cash gains arising from the application of purchase accounting adjustments as a result of any Permitted Acquisition or other Acquisitions approved by the Lenders; and

(w)     Consolidated Net Income attributable to or generated from any minority interest in a Person owned directly or indirectly by the Canadian Borrower, except for cash Distributions received by a Credit Party therefrom;

provided, that if any of the events described in Section 1.13 occurs during the relevant period, the calculation of EBITDA will be adjusted as set forth in Section 1.13.

Notwithstanding the foregoing, the Borrowers may elect to calculate EBITDA on the following annualized basis (as opposed to a trailing four Fiscal Quarter basis) for the periods specified below: (i) for the Fiscal Quarter ending March 31, 2018, by calculating EBITDA for the six month period ending as of March 31, 2018 and multiplied by two, and (ii) for the Fiscal Quarter ending June 30, 2018, by calculating EBITDA for the nine month period ending as of June 30, 2018, and multiplied by four-thirds, but only if such alternative calculation would result in a greater value for EBITDA for such period.

In addition, if EBITDA is calculated on the basis described in the immediately preceding paragraph, then the amounts described in paragraph (i) above (the "**Prescribed Amounts**") shall be limited to, the lesser of (x) the Prescribed Amounts actually paid during such period and (y) $5,325,000.

1.1.77    "**Economic Sanctions**" means the restrictions with respect to funding operations, or financing investments, in any country, or making payments to, or receiving payments or property from, any country or Person, then prohibited by:

(a)    any sanctions or requirements imposed by, or based upon the obligations or authorities set forth in the *Executive Order*, the *U.S. Money Laundering Control Act of 1986* (18 U.S.C. §§ 1956 et seq.), the *PATRIOT Act*, the *U.S. International Emergency Economic Powers Act* (50 U.S.C. §§ 1701 et seq.), the *U.S. Trading with the Enemy Act* (50 U.S.C. App. §§ 1 et seq.), the *U.S. United Nations Participation Act*, the *U.S. Syria Accountability and Lebanese Sovereignty Act*, the *U.S. Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010* or the *Iran Sanctions Act*, all as amended, or any of the foreign assets control regulations of the U.S. Department of the Treasury (including but not limited to 31 CFR, Subtitle B, Chapter V, as amended) or any other law or executive order relating thereto or regulation administered by the US State Department or the United States Treasury Department's Office of Foreign Assets Control, in each case, to the extent applicable; and

(b)    any of the economic sanctions of Canada, including those provided for pursuant to the *Special Economic Measures Act* (Canada) or the *United Nations Act* (Canada), in each case, to the extent applicable.

1.1.78    "**Eligible Approved Contracts**" means a contract or other agreement of a Credit Party to provide goods or perform services: (a) that is listed on Schedule 6.1.33; (b) or designated by the Agent as an Eligible Approved Contract pursuant to Section 5.17.

1.1.79    "**Eligible Capital Assets**" means, at any time, the capital assets of the Credit Parties; provided, that, in any event, no capital asset shall be deemed to be a Eligible Capital Asset unless each of the following statements is accurate and complete (and by including such capital asset in any computation of the Borrowing Base, the Borrowers will be deemed to made each of these statements in respect thereof):

(a)    such capital asset is located in Canada or the U.S.;

- 17 -

(b)     such capital asset is in good condition, merchantable, meets all standards imposed by any Governmental Authority having regulatory authority over it or its use and/or sale and is not obsolete and is either currently usable or currently saleable in the normal course of business of the applicable Credit Party;

(c)     the Agent, on behalf of the Lenders, has a First-Ranking Security Interest covering such capital asset;

(d)     such capital asset is, and at all times will be, free and clear of all Liens other than Permitted Liens and unregistered Liens in respect of Priority Claims that are not yet due and payable;

(e)     such capital asset does not constitute Hazardous Materials;

(f)     such capital asset is covered by all applicable insurance as required by Section 7.1.9; and

(g)     the Agent has not determined in its Permitted Discretion that it may not sell or otherwise dispose of such capital asset in accordance with the terms of the applicable Credit Documents without infringing upon the rights of another Person or violating any contract with any other Person.

1.1.80    "**Eligible Cash**" means, as of the date of determination, the aggregate U.S. Dollar amount of the unrestricted cash (determined in accordance with GAAP) and Cash Equivalents of Credit Parties (other than with respect to Anchor and its Subsidiaries until such time as the Encina ABL Loan Agreement is terminated and the obligations thereunder have been repaid in full) that:

(a)     the Agent on behalf of the Lenders, has a first priority perfected Lien covering such unrestricted cash or Cash Equivalent, and such unrestricted cash or Cash Equivalent is, and at all times will be, free and clear of all Liens other than Permitted Liens and unregistered Liens in respect of Priority Claims that are not yet due and payable;

(b)     are held in collateral accounts located in Canada, the U.S., Mexico or another OECD member country; provided, such collateral accounts may be located in non-OECD member countries to the extent maintained by HSBC or an affiliate thereof (or such other bank deemed reasonable in the sole discretion of the Agent);

(c)     subject to the proviso at the end of Section 8.1(i), are held in collateral accounts in the name of the Agent or an agent thereof (or, with the consent of the Agent, the applicable Credit Party), in each case maintained with (i) the Agent or (ii) an Affiliate of the Agent, another Lender, an Affiliate of another Lender or another depositary that has entered into a control agreement (in form and substance reasonably acceptable to the Agent) with the Agent and the applicable Credit Party, and, in each case, with respect to which the Agent retains exclusive control to direct the transfer of funds therefrom during the continuation of an Event of Default (with withdrawals by the applicable Credit Party to be permitted upon notice to the Agent

- 18 -

so long as the Agent has not delivered a notice of exclusive control upon the occurrence and during the continuation of an Event of Default);

(d)     subject to clause (ii) above, is otherwise available for use by a Credit Party, without condition or restriction; and

(e)     upon a reasonable request therefor by the Agent, for which Agent shall have received evidence, in form and substance reasonably satisfactory to Agent, of the amount thereof as of the applicable date of calculation,

provided, that such unrestricted cash and Cash Equivalents shall be reduced by an amount equal to, as reasonably estimated by the Borrowers, the withholding tax payable on any cash and Cash Equivalents that are to be remitted by any Credit Party to a foreign jurisdiction; and further provided, that to the extent that any debit balances (or overdrawn amounts) of any accounts of such Credit Parties are deducted from the calculation of unrestricted cash and Cash Equivalents above, they shall be increased by an amount equal to the such debit balances (or overdrawn amounts) solely to the extent that availability under the Operating Facilities is reduced by the amount of any Letters of Credits (or any portion thereof) issued and outstanding under the Operating Facilities to backstop such deficit amounts.

1.1.81     "**Eligible Inventory**" means, at any time, all inventory of the Credit Parties valued in U.S. Dollars on a lower of cost (excluding any component of cost representing intercompany profit in the case of inventory acquired from an Affiliate) or market basis in accordance with GAAP, with detailed calculations of lower of cost or market; provided that, in any event, no inventory shall be deemed Eligible Inventory unless each of the following statements is accurate and complete (unless all of the Lenders in their sole discretion elect to otherwise include such inventory) (and by including such inventory in any computation of the applicable Borrowing Base the Borrowers will be deemed to have made each of these statements in respect thereof):

(a)     such inventory is in good condition, merchantable, meets all material standards imposed by any Governmental Authority having regulatory authority over it or its use and/or sale and is not obsolete and is either currently usable or currently saleable in the normal course of business of the applicable Credit Party;

(b)     with respect to any such inventory in excess of $250,000 per location, such inventory is:

(i)     in possession of a Credit Party and (1) located on real property owned or leased by a Credit Party, and (2) within the U.S. or Canada; provided, that if such inventory is located on real property leased by a Credit Party and if so requested by the Agent, the landlord of such real property shall have executed and delivered to the Agent a Landlord Agreement or at the request of a Borrower or in lieu of such an agreement, the Lenders may take a reserve against Eligible Inventory equal to three month's rent;

- 19 -

(ii) in the possession of a bailee and such bailee shall have executed and delivered to the Agent, a bailee letter in form and substance satisfactory to the Agent or at the request of a Borrower, the Lenders shall be permitted to take a reasonable reserve against Eligible Inventory related to the applicable Credit Party's economic exposure to such bailee;

(iii) in the case of inventory located in the U.S., is placed on consignment with a consignee and such consignee shall have executed a valid consignment agreement in form and substance satisfactory to Agent and the applicable Borrower has filed (when applicable) appropriate UCC (or comparable) filings to perfect its interest in such inventory; or

(iv) in transit in Canada or the U.S. (provided, that the jurisdictions through which such inventory is in transit are jurisdictions where the Liens in such inventory under the Security are validly perfected first priority Liens as required by Applicable Law) and between owned or leased locations of the Credit Parties, and upon arrival at its destination, will comply with either clause (i) or (ii) above;

(c) the Agent on behalf of the Lenders, has a first priority perfected Lien covering such inventory, and such inventory is, and at all times will be, free and clear of all Liens other than Permitted Liens and unregistered Liens in respect of Priority Claims that are not yet due and payable;

(d) such inventory does not include goods (i) that are not owned by a Credit Party, (ii) that are held by a Credit Party pursuant to a consignment agreement, or (iii) which have been sold by a Credit Party on a bill and hold basis;

(e) such inventory is not subject to repossession on account of the "30 day goods" rule under section 81.1 of the *Bankruptcy and Insolvency Act* (Canada) or similar Laws except to the extent the applicable vendor has entered into an agreement with the Agent, in form and substance satisfactory to the Agent, waiving its right to repossession;

(f) such inventory does not consist of work in process, store room materials, samples, prototypes, or packing and shipping materials not considered for sale by the Credit Parties in the ordinary course of business;

(g) such inventory does not consist of goods that are returned (as defective or not fit for purpose) or used goods taken in trade;

(h) any portion of the value of such inventory which results from a profit or gain resulting from an inter-company sale or other disposition of such inventory shall be excluded;

(i) any "seconds" or scrap inventory shall be valued at scrap value;

(j)     such inventory is not evidenced by negotiable documents of title unless delivered to the Agent with endorsements;

(k)     such inventory does not constitute Hazardous Materials;

(l)     such inventory is covered by casualty insurance; and

(m)     the Agent has not determined in its Permitted Discretion that it may not sell or otherwise dispose of such inventory in accordance with the terms of the applicable Credit Documents without infringing upon the rights of another Person or violating any contract with any other Person.

1.1.82   **"Eligible Line of Business"** means any business engaged in as of the date of this Agreement by any of the Credit Parties, and any business reasonably related thereto.

1.1.83   **"Eligible Receivables"** means, at the time of determination, the Receivables of the Credit Parties then existing (other than with respect to Anchor, Terra and their respective Subsidiaries), minus any Receivable to which any of the criteria set forth below applies (unless all of the Lenders in their sole discretion elect to otherwise include such Receivables):

(a)     is not then subject to the applicable duly perfected Liens created by the Security;

(b)     is subject to any Lien or deemed trust (other than a Permitted Lien which does not rank in priority to the Liens created by the Security);

(c)     is outstanding more than (i) 120 days, in the case of Acceptable Account Debtors or (ii) 90 days, in the case of all other account debtors, in either case after the date of shipment of inventory or the provision of the service that created such Receivable;

(d)     is subject to any offset or counterclaim by the applicable account debtor (but only to the extent of such offset);

(e)     is owed by any Person whose principal place of business is located outside Canada or the U.S. unless the sale is on letter of credit, guarantee or some other terms acceptable to the Agent, acting reasonably;

(f)     is payable in a currency other than Canadian Dollars or U.S. Dollars;

(g)     is owed by an Affiliate of the Borrower or any employee, agent or representative of the Borrower or of any such Affiliate;

(h)     with respect to which a cheque, note, draft or other payment instrument has not been honoured in accordance with its terms;

(i)     is owed by any Person that is subject to an Insolvency Event; provided that the Receivables from insolvent account debtors shall be Eligible Receivables if and to

- 21 -

the extent that such Receivables are fully covered by credit insurance, letters of credit or other sufficient third-party credit support, or are otherwise deemed by the Agent not to pose an unreasonable risk of non-collectability;

(j)    is subject to a holdback, but only to the extent of the amount of such holdback;

(k)    is in dispute, but only to the extent of the amount thereof in dispute, or is subject to a claim regarding rescission, cancellation or avoidance, whether by operation of law or otherwise;

(l)    to the extent such Receivable is evidenced by a judgment, provided that such Receivables shall be Eligible Receivables if and to the extent that such Receivables are fully covered by credit insurance, letters of credit or other sufficient third-party credit support, or are otherwise deemed by the Agent not to pose an unreasonable risk of non-collectability; and

(m)    is owed by a Governmental Authority where Applicable Law imposes any requirement (including any requirement of notice, acceptance or acknowledgment by the Governmental Authority) to constitute a valid assignment as against such Governmental Authority, unless the applicable Credit Party has assigned its rights to payment of such Receivable to the Agent pursuant to, in the case of a U.S. federal Governmental Authority, the Assignment of Claims Act of 1940, as amended, or complied with such requirement pursuant to Applicable Law in the case of any other Governmental Authority.

(n)    is or has been sold, contributed, financed or otherwise conveyed or pledged pursuant to either of a Permitted Factoring Transaction or a Permitted Securitization Financing.

For certainty, if any Receivable that is otherwise an Eligible Receivable is sold, contributed, financed or otherwise conveyed or pledged pursuant to a Permitted Securitization Financing it shall immediately cease to be an Eligible Receivable.

1.1.84    "**Encina**" means Encina Business Credit, LLC and its successors and permitted assigns.

1.1.85    "**Encina ABL Loan Agreement**" means the credit agreement dated as the November 21, 2017 by and among Anchor, the U.S. Borrower, each Person joined thereto as a borrower form time to time, the lenders from time to time party thereto and Encina as agent on behalf of such lenders, as may be amended, restated, replaced or otherwise modified from time to time to the extent permitted by the Encina Intercreditor Agreement.

1.1.86    "**Encina Intercreditor Agreement**" means the intercreditor agreement dated as of the November 21, 2017 among Encina, the Agent, Anchor and the U.S. Borrower, as may be amended, restated, replaced or otherwise modified from time to time.

1.1.87    "**Equity Cure**" is defined in Section 7.3.2.

1.1.88   "**Equity Cure Repayment**" is defined in Section 7.3.2.

1.1.89   "**Equivalent Amount**" means, in relation to an amount in one currency, the amount in another currency that could be purchased by the amount in the first currency determined by reference to the applicable Exchange Rate at the time of such determination.

1.1.90   "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any applicable regulation promulgated thereunder.

1.1.91   "**ERISA Affiliate**" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of any Credit Party, or under common control with any Credit Party, within the meaning of Section 414 of the Code.

1.1.92   "**ERISA Event**" means (i) the occurrence of a reportable event, as defined in Section 4043 of ERISA, with respect to any Plan unless the 30 day notice requirement with respect to such event has been waived by the PBGC; (ii) the application for a minimum funding waiver pursuant to Section 412(c) of the Code or Section 302(c) of ERISA with respect to a Plan; (iii) the receipt by any Credit Party from the administrator of any Plan of a notice pursuant to Section 4041(a)(2) of ERISA of intent to terminate such Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the cessation of operations at a facility of any Credit Party or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (v) the withdrawal by any Credit Party or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (vi) the conditions for imposition of a Lien under Section 303 of ERISA shall have been met with respect to any Plan; or (vii) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042(a) of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, such Plan.

1.1.93   "**Exchange Rate**" means, on the date of determination of any amount of one currency to be converted into another currency pursuant to this Agreement for any reason, or vice-versa, the spot rate of exchange for converting Canadian Dollars into such other currency or vice-versa, as the case may be, established by the Bank of Canada at approximately 4:30 p.m. (Toronto time) on the Business Day immediately preceding the date of determination, and if no such rate is quoted, the spot rate of exchange for wholesale transactions by the Agent in Toronto, Ontario in accordance with its normal practice;.

1.1.94   "**Excluded Account**" means (a) any deposit account used solely for: (i) funding payroll or segregating payroll taxes or funding other employee wage or benefit payments in the ordinary course of business or (ii) segregating 401k contributions or contributions to an employee stock purchase plan and other health and benefit plan, in each case for payment in accordance with any Applicable Laws, (iii) any zero-balance disbursement accounts, or (iv) disbursements to pay independent contractors, (b) any deposit account the funds in which consist solely of funds held by Holdco or any Subsidiary on behalf of or in trust for the benefit of any third party that is not an Affiliate of Holdco, any Subsidiary or any Investor, (c) any deposit account the funds in which consist solely of cash earnest

- 23 -

money deposits or funds deposited under escrow or similar arrangements in connection with any letter of intent or purchase agreement for a Permitted Acquisition or any other transaction permitted under this Agreement, and (d) any deposit account the funds in which consist solely of funds held by Anchor and its Subsidiaries until such time as the Encina ABL Loan Agreement is terminated and the obligations thereunder have been repaid in full;

1.1.95   "**Excluded Hedging Obligation**" means, with respect to any Credit Party, any Hedging Liabilities if, and to the extent that, all or a portion of the Financial Assistance of such Credit Party of, or the grant by such Credit Party of a security interest to secure, such Hedging Liabilities (or any Financial Assistance in respect thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Credit Party's failure for any reason to constitute an Qualified ECP Guarantor at the time the Financial Assistance of such Credit Party, or a grant by such Credit Party of a security interest, becomes effective with respect to such Hedging Liabilities. If a Hedging Liability arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Hedging Liabilities that is attributable to swaps for which such Financial Assistance or security interest is or becomes excluded in accordance with the first sentence of this definition.

1.1.96   "**Executive Order**" means the Executive Order No. 13224 of 23 September 2001, entitled "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism".

1.1.97   "**Existing Credit Agreement**" means the Amended and Restated Credit Agreement, dated January 30, 2015 (as amended, supplemented or otherwise modified from time to time prior to the Amendment and Restatement Date), among the Canadian Borrower, the U.S. Borrower, HSBC, as administrative agent thereunder and the financial institutions from time to time party thereto as lenders.

1.1.98   "**Facilities**" means, collectively, the Term Facility, the Canadian Operating Facility and the U.S. Operating Facility; and "**Facility**" means any of them as the context requires.

1.1.99   "**Facilities Maturity Date**" means, in respect of each Facility, May 22, 2021.

1.1.100   "**FATCA**" means Section 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current and future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

1.1.101   "**Federal Funds Rate**" means, for any day, the rate of interest per annum set forth in the weekly statistical release designated as H.15(519), or any successor publication, published by the Federal Reserve Board (including any such successor, the "**H.15(519)**") for such day opposite the caption "*Federal Funds (Effective)*". If on any relevant day such

- 24 -

rate is not yet published in H.15(519), the rate for such day will be the rate of interest per annum set forth in the daily statistical release designated as the Composite 3:30 p.m. Quotations for U.S. Government Securities, or any successor publication, published by the Federal Reserve Bank of New York (including any successor, the "**Composite 3:30 p.m. Quotations**") for such day under the caption "*Federal Funds Effective Rate*". If on any relevant day the appropriate rate per annum for such day is not yet published in either H.15(519) or the Composite 3:30 p.m. Quotations, the rate for such day will be the arithmetic mean of the rates per annum for the last transaction in overnight Federal funds arranged prior to 9:00 a.m. (New York time) on that day by each of three major brokers of Federal funds transactions in New York City, selected by the Agent in its sole discretion, acting reasonably; provided that if the Federal Funds Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.102  "**Fee Agreement**" means the agreement between the Borrowers and the Agent delivered on or before the Amendment and Restatement Date under Section 9.1(n).

1.1.103  "**Financial Assistance**" means with respect of any Person and without duplication, any loan, guarantee, indemnity, assurance, acceptance, extension of credit, loan purchase, share purchase, equity or capital contribution, investment or other form of direct or indirect financial assistance or support of any other Person or any obligation (contingent or otherwise) primarily for the purpose of enabling another Person to incur or pay any indebtedness or to comply with agreements relating thereto or otherwise to assure or protect creditors of the other Person against loss in respect of indebtedness of the other Person and includes any guarantee of or indemnity in respect of the indebtedness of the other Person and any absolute or contingent obligation to (directly or indirectly):

(a)     advance or supply funds for the payment or purchase of any indebtedness of any other Person;

(b)     purchase, sell or lease (as lessee or lessor) any property, assets, goods, services, materials or supplies primarily for the purpose of enabling any Person to make payment of Funded Debt or to assure the holder thereof against loss;

(c)     guarantee, indemnify, hold harmless or otherwise become liable to any creditor of any other Person from or against any losses, liabilities or damages in respect of Funded Debt;

(d)     make a payment to another for goods, property or services regardless of the non-delivery or non-furnishing thereof to a Person; or

(e)     make an advance, loan or other extension of credit to or to make any subscription for equity, equity or capital contribution, or investment in or to maintain the capital, working capital, solvency or general financial condition of another Person;

provided, however, that the term "Financial Assistance" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Amendment and Restatement Date or

- 25 -

entered into in connection with any acquisition or disposition of assets permitted by this Agreement.

The amount of any Financial Assistance is the amount of any loan or direct or indirect financial assistance or support, without duplication, given, or all indebtedness of the obligor to which the Financial Assistance relates, unless the Financial Assistance is limited to a determinable amount, in which case the amount of the Financial Assistance is the determinable amount.

1.1.104  "**Financial Letter of Credit**" means a standby Letter of Credit if it serves as a payment guarantee of a Credit Party's financial obligations and is treated as a direct credit substitute for purposes of the Capital Adequacy Guidelines in the Swingline Lender's or Issuing Bank's, as applicable, reasonable opinion.

1.1.105  "**First-Ranking Security Interest**" in respect of any Collateral means a Lien in such Collateral which is registered where necessary or desirable to record and perfect the charges contained therein and which ranks in priority to all other Liens in such Collateral except for any Permitted Liens which have priority thereto in accordance with Applicable Law or as otherwise agreed in writing by the Lenders.

1.1.106  "**Fiscal Quarter**" means the three (3) month period commencing on the first day of each Fiscal Year and each successive three (3) month period thereafter during such Fiscal Year.

1.1.107  "**Fiscal Year**" means the fiscal year of the Borrowers and their Subsidiaries commencing on January 1 of each year and ending on December 31 of each year.

1.1.108  "**Fixed Charge Coverage Ratio**" means, in respect of the Credit Parties on a combined basis for any applicable period, the ratio of:

(a)      (i) EBITDA for such period, plus, to the extent not included in EBITDA, the aggregate amount of all unencumbered cash (except pursuant to the Security) received by any Credit Party as payment of unbilled Receivables outstanding as of December 31, 2015 that were outstanding for more than 720 days from any of the Pemex Entities, in respect of contract number 423023821 dated August 6, 2013, between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V., and contract number 423023813 dated July 25, 2013, between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V. (in each case, as may be amended or otherwise modified from time to time), in an amount not to exceed $13,500,000, *minus* (ii) Earnout Payments made during such period (but only to the extent not directly funded by the cash proceeds from the sale of equity interests of the Canadian Borrower and, to the extent contributed to the capital of the Canadian Borrower, equity interests of any of the Canadian Borrower's direct or indirect parent companies), *minus* (iii) Unfunded Capital Expenditures made during such period, *minus* (iv) all Cash Taxes during such period, *minus* (v) Permitted Management Fees and Catch Up Management Fee Payments, if any, paid during such period, *minus* (vi) any payments made during such period pursuant to clauses

- 26 -

7.2.6(l), *minus* (vii) all other Distributions to Persons that are not Credit Parties paid during such period, *minus* (viii) the fees and expenses described in clause (k) of the definition of EBITDA; <u>provided</u> that, any deferred purchase price payments made in accordance with the terms of the Anchor Acquisition Agreement shall not be deducted from EBITDA for the purposes of calculating the Fixed Charge Coverage Ratio;

*divided by*

(b)    the sum total of:

    (i)    all Interest Expense paid or payable in cash for such period;

    (ii)    the scheduled principal component of all Capital Lease payments for such period; and

    (iii)    all scheduled principal repayments under the Term Facility pursuant to Section 3.4.2 or under any other Funded Debt paid during such period;

all determined on a consolidated basis in accordance with GAAP and tested on a trailing 12 month basis at the end of each Fiscal Quarter.

1.1.109  "**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

1.1.110  "**Funded Debt**" means, with respect to any Person, all indebtedness, liabilities and obligations which would in accordance with GAAP be classified in the consolidated balance sheet of such Person as indebtedness for borrowed money and including without duplication:

(a)    money borrowed by way of overdraft;

(b)    indebtedness represented by bonds, debentures or notes payable and drafts accepted representing extensions of credit;

(c)    bankers' acceptances and similar instruments;

(d)    letters of credit, letters of guarantee and surety bonds issued at the request of such Person (to the extent not cash collateralized), but excluding Non-Financial Letters of Credit;

(e)    actual amounts owed under Hedging Agreements upon termination of such Hedging Agreements, including net settlement amounts payable upon maturity and termination payments payable upon termination or early termination, which are not paid when due;

(f)     indebtedness secured by any Lien existing on property of such Person, whether or not the indebtedness secured thereby shall have been assumed;

(g)     all obligations (whether or not with respect to the borrowing of money) that are evidenced by bonds, debentures, notes or other similar instruments, or that are not so evidenced but that would be considered by GAAP to be indebtedness for borrowed money;

(h)     all redemption obligations and mandatory dividend obligations of such Person with respect to any shares issued by such Person and which are by their terms or pursuant to any contract, agreement or arrangement:

     (i)     redeemable, retractable, payable or required to be purchased or otherwise retired or extinguished, or convertible into debt of such Person (A) at a fixed or determinable date, (B) at the option of any holder thereof, or (C) upon the occurrence of a condition not solely within the control and discretion of such Person; or

     (ii)     convertible into any other shares described in clause (i) above;

in any case under this clause (h), except as a result of an initial public offering, change of control or asset sale (so long as the Obligations have otherwise been paid in full prior to any such payment being required to be made under clause (i) above).

(i)     all obligations as lessee under Capital Leases;

(j)     all obligations under or in connection with any (i) Permitted Factoring Transaction and (ii) Permitted Securitization Financing (to the extent included in the consolidated balance sheet of such Person), which shall in each case be deemed to be equal to the net proceeds received thereunder;

(k)     all obligations of such Person secured by Purchase-Money Security Interests; and

(l)     any guarantee or indemnity (other than by endorsement of negotiable instruments for collection or deposit in the ordinary course of business) in any manner of any part or all of an obligation of another Person of the type included in items (a) through (k) above;

but excluding for greater certainty, deferred income taxes and normal course trade payables.

1.1.111  "**GAAP**" means generally accepted accounting principles in Canada or the United States as approved by the Canadian Institute of Chartered Accountants or American Institute of Certified Public Accountants, respectively, in effect from time to time, and as of the Amendment and Restatement Date, includes Canadian or United States generally accepted accounting principles for private enterprises.

1.1.112  "**Governmental Authority**" means any:

(a)     national, federal, provincial, state, municipal, local or other governmental or public department, central bank, court, commission, board, bureau, agency or instrumentality, domestic or foreign;

(b)     any subdivision or authority of any of the foregoing; or

(c)     any quasi-governmental, judicial or administrative body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing.

1.1.113   "**Group**" means any "**group**" such term as used in Sections 13(d) and 14(d) of the *United States Securities Exchange Act* of 1934, as amended, other than the Permitted Holders.

1.1.114   "**Guarantee**" means any agreement by which any Person assumes, guarantees, indemnifies, endorses, contingently agrees to purchase or provide funds for the payment of, or otherwise becomes liable upon, the obligation of any other Person, or agrees to maintain the net worth or working capital or other financial condition of any other Person or otherwise assures any creditor of such Person against loss, and shall include any contingent liability under any letter of credit or similar document or instrument.

1.1.115   "**Guarantors**" means Holdco and all current and future direct and indirect Material Subsidiaries of the Canadian Borrower.

1.1.116   "**Hazardous Materials**" means any contaminant, pollutant, waste or substance that is likely to cause immediately or at some future time harm or degradation to the surrounding environment or risk to human health; and without restricting the generality of the foregoing, including any pollutant, contaminant, waste, hazardous waste or dangerous goods that is regulated by any Requirements of Environmental Law or that is designated, classified, listed or defined as hazardous, toxic, radioactive or dangerous or as a contaminant, pollutant or waste by any Requirements of Environmental Law.

1.1.117   "**Hedge Provider**" means any Lender or any Affiliate thereof that enters into a Hedging Agreement with a Credit Party prior to such Lender ceasing to be a Lender under this Agreement. For certainty, any Person who enters into a Hedging Agreement after such Person ceases to be a Lender hereunder is not a Hedge Provider for purposes such Hedging Agreement.

1.1.118   "**Hedging Agreements**" means Interest Rate Hedging Agreements and Currency Hedging Agreements.

1.1.119   "**Hedging Liability**" means the actual indebtedness or obligations of any Credit Party to a counterparty who enters into a Hedging Agreement with such Credit Party under or pursuant to such Hedging Agreement.

1.1.120   "**Holdco**" means Fluid Holding Corp., a corporation incorporated under the BCBCA, and its successors and permitted assigns.

- 29 -

1.1.121 "**Hostile Acquisition**" means an acquisition, which is required to be reported to applicable securities regulatory authorities, of shares of a corporation where the board of directors of that corporation has not approved such acquisition nor recommended to the shareholders of the corporation that they sell their shares pursuant to the proposed acquisition or of units of a trust where the trustee or manager or administrator of that trust has not approved such acquisition nor recommended to the unitholders of the trust that they sell their units pursuant to the proposed acquisition or of units of a partnership where the board of directors of the general partner(s) thereof has not approved such acquisition nor recommended to the partners of the partnership that they sell their units pursuant to the proposed acquisition.

1.1.122 "**HSBC**" means HSBC Bank Canada and its successors and permitted assigns.

1.1.123 "**HSBC Mexico**" means HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC.

1.1.124 "**HSBC US**" means HSBC Bank USA, National Association and its successors and permitted assigns.

1.1.125 "**Impositions**" is defined in Section 12.4.1.

1.1.126 "**Indemnitees**" means the Lenders, the Agent and their respective successors and permitted assignees, any agent of any of them (specifically including a receiver or receiver-manager) and the respective officers, directors and employees of the foregoing.

1.1.127 "**Insolvency Event**" means, in respect of any Person:

(a)     such Person commits an act of bankruptcy or becomes insolvent (as such terms are used in the BIA); or makes an assignment for the benefit of creditors, files a petition in bankruptcy, makes a proposal or commences a proceeding under Insolvency Legislation; or petitions or applies to any tribunal for, or consents to, the appointment of any receiver, trustee or similar liquidator in respect of all or a substantial part of its property; or admits the material allegations of a petition or application filed with respect to it in any proceeding commenced in respect of it under Insolvency Legislation; or takes any board action for specifically authorizing any of the foregoing actions; or

(b)     any proceeding or filing is commenced against such Person seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment or composition of it or its debts under any Insolvency Legislation, or seeking appointment of a receiver, trustee, custodian or other similar official for it or any of its property or assets; unless:

(i)     such Person is diligently defending such proceeding in good faith and on reasonable grounds as determined by the Required Lenders acting reasonably and the same shall continue undismissed, or unstayed and in effect, for any period of 60 consecutive days; and

- 30 -

(ii)     such proceeding does not in the reasonable opinion of the Required Lenders materially adversely affect the ability of such Person to carry on its business and to perform and satisfy all of its obligations.

1.1.128   "**Insolvency Legislation**" means legislation in any applicable jurisdiction relating to reorganization, arrangement, compromise or re-adjustment of debt, dissolution or winding-up, or any similar legislation, and specifically includes the BIA, the *Companies' Creditors Arrangement Act* (Canada), the *Winding-Up and Restructuring Act* (Canada) and the *Bankruptcy Code* (United States) and any similar legislation under Applicable Law.

1.1.129   "**Insurance Proceeds**" is defined in Section 5.3.1(c).

1.1.130   "**Insured Receivables**" means Receivables of the Credit Parties owing from account debtors that:

(a)     solely in respect of Insured Receivables that do not derive from and are not governed by the laws of Canada or the United States of America or any political subdivision thereof, no less than 80% of such Receivables arise from Eligible Approved Contracts; *provided* that if the revenue derived from any such single contract exceeds 10% of the Canadian Borrower's annual revenue as set out in the then most recent income statement of the Canadian Borrower that was delivered to the Lenders hereunder, such contract must be an Eligible Approved Contract;

(b)     does not arise under an "excluded contract" or any similar term as provided in the Account Receivable Insurance, are within the approved credit, sovereign, country, single obligor and other limits under the Account Receivable Insurance and are otherwise covered under the Account Receivable Insurance which is in full force and effect;

(c)     the Credit Parties have complied with the credit policy provided for in the Account Receivable Insurance with respect to such Receivables, including the issuance of invoices, *pro forma* invoices and final invoices within the required time periods thereunder;

(d)     there are no events, facts or circumstances which would reasonably be expected to result in the insurer under the Account Receivable Insurance denying (or withholding or delaying) payment of a claim in respect of such Receivables or asserting any defense, dispute or counterclaim with respect to such Receivables;

(e)     the insurer under the Account Receivable Insurance has not denied all or any portion of a claim in respect of such Receivable, and has not asserted any defense, dispute or counterclaim with respect to such Receivable;

(f)     the Credit Parties have not suffered any loss with respect to such Receivables, unless such loss is covered by the Account Receivable Insurance;

(g)     are not in dispute and are valid and enforceable obligations of the account debtor under Applicable Law;

- 31 -

(h)     if Credit Parties have suffered a loss in respect of such Receivable covered by the Account Receivable Insurance, they have submitted a claim for such loss in accordance with the terms of the Account Receivable Insurance and have otherwise complied with all provisions of the Account Receivable Insurance on a timely basis in order to be entitled to have such claim paid by the insurer under the Account Receivable Insurance;

(i)     the Credit Parties have paid any required deductibles under the Account Receivable Insurance in respect of such Receivables; and

(j)     in any case, are due within the time period, including any "waiting period", from the date of billing required under the Account Receivable Insurance in respect of such Receivable.

1.1.131 "**Intercreditor Agreement**" means that certain intercreditor and priority agreement between the Agent, HSBC Mexico, and the Borrower or QMax Mexico, as amended, modified, supplemented or restated from time to time, with respect to any Permitted Factoring Transaction with HSBC Mexico.

1.1.132 "**Interest**" means interest on loans, stamping fees in respect of bankers' acceptances, the difference between the proceeds received by the issuers of bankers' acceptances and the amounts payable upon the maturity thereof, issuance fees in respect of letters of credit, and any other charges or fees in connection with the extension of credit which are determined by reference to the amount of credit extended, plus standby fees in respect of the unutilized portion of any credit facility; but for greater certainty "Interest" shall not include agency fees, arrangement fees, structuring fees, fees relating to the granting of consents, waivers, amendments, extensions or restructurings, the reimbursement of costs and expenses, and any similar amounts which may be charged from time to time in connection with the establishment, administration or enforcement of the credit facilities.

1.1.133 "**Interest Expense**" means, with respect to any Person for any period, the sum of (without duplication) (a) interest expense of such Person for such period on a consolidated basis, including (i) the amortization of debt discounts, (ii) all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances, (iii) standby fees in respect of undrawn debt, (iv) discounts applied to the proceeds of any Permitted Factoring Transaction or Permitted Securitization Financing, and (v) the portion of any payments or accruals with respect to Capital Lease obligations allocable to interest expense (but excluding (A) non-cash interest expense attributable to the movement of mark-to-market hedging obligations or other derivative instruments pursuant to GAAP (B) penalties and interest related to taxes, amortization of debt financing fees, debt issuance costs, commissions, fees and expenses and the expensing of any commitment and other financing fee in each case, to the extent constituting interest expense under GAAP), and (b) capitalized interest of such Person. For purposes of the foregoing, cash interest expense shall be determined after giving effect to any net payments made or received and costs incurred by the Borrower and the Subsidiaries with respect to Interest Rate Hedging Agreements, and interest on a Capital Lease obligation shall be deemed to accrue at an

- 32 -

interest rate reasonably determined by the Borrower to be the rate of interest implicit in such Capital Lease obligation in accordance with GAAP.

1.1.134 "**Interest Rate Hedging Agreement**" means any agreement that does not contravene Section 7.2.13 entered into between the Borrower and a counterparty from time to time for the purpose of hedging interest rate risk, including interest rate exchange agreements (commonly known as "**interest rate swaps**") and forward rate agreements; and for greater certainty, including interest rate exchange agreements in U.S. Dollars (commonly known as "**cross-currency swaps**").

1.1.135 "**Interim Financial Statements**" in respect of any Fiscal Quarter means, in respect of any Person, the unaudited financial statements of such Person on a consolidated basis in respect of such Fiscal Quarter (and also on a year-to-date basis in respect of such Fiscal Quarter and all previous Fiscal Quarters in the same Fiscal Year).

1.1.136 "**Investment Grade**" means, with respect to the long term unsecured debt ratings of a Person, of the rating agencies on the date hereof, Baa3 or higher for Moody's Investors Services, Inc. or BBB- or higher for Standard & Poor's Rating Services, a division of The McGraw Hill Companies, Inc. (or in either case, their respective successors).

1.1.137 "**Investments**" has the meaning given to it in Section 7.2.3.

1.1.138 "**Investors**" means Pep Fluid Co-Invest L.P., PEP Fluid L.P. and any other investors from time to time who are approved in writing by the Agent on behalf of the Required Lenders.

1.1.139 "**ISDA**" means the International Swaps and Derivatives Association and its successors and assigns.

1.1.140 "**ISP98**" means the International Standby Practices ISP98, as published by the International Chamber of Commerce and in effect from time to time.

1.1.141 "**Issuing Bank**" means the Swingline Lender under the Canadian Operating Facility and HSBC US under the U.S. Operating Facility, as applicable.

1.1.142 "**Land**" means real property (including a leasehold interest in land) and all buildings, improvements, fixtures and plant situated thereon.

1.1.143 "**Landlord Agreement**" means an agreement between the Agent, the applicable Credit Party and the landlord of a Leased Property in form and substance reasonably satisfactory to the Agent, which shall include the following provisions (except to the extent otherwise agreed by the Agent in its discretion): such landlord consents to the granting of a security interest in the lease applicable to such Leased Property by a Credit Party which is a tenant thereunder in favour of the Agent, agrees to give written notice to the Agent in respect of and a reasonable opportunity to cure any default before terminating the lease, and agrees to waive (or subordinate and defer the enforcement of) its rights and remedies and any security it may hold in respect of any assets owned by the applicable Credit Party located on or affixed to such Leased Property.

- 33 -

1.1.144 "**Laws**" means all laws, statutes, codes, ordinances, decrees, rules, regulations, municipal by-laws, judicial or arbitral or administrative or ministerial or departmental or regulatory judgments, orders, decisions, rulings or awards, or any provisions of such laws, including general principles of common and civil law and equity or policies or guidelines, to the extent such policies or guidelines have the force of law, binding on the Person referred to in the context in which such word is used; and "**Law**" means any of the foregoing.

1.1.145 "**LC Payment**" is defined in Section 2.7.9.

1.1.146 "**Leased Properties**" means all Land leased by any Credit Party as tenant from time to time, specifically including as at the date of this Agreement the Land described in Schedule 6.1.10; and "**Leased Property**" means any of the Leased Properties as the context requires.

1.1.147 "**Lenders**" means the lenders identified in Exhibit "A" attached hereto and any other Persons which may from time to time become lenders pursuant to this Agreement; and their respective successors and permitted assigns; and "**Lender**" means any of them as the context requires.

1.1.148 "**Lending Office**" in respect of any Lender means the office of such Lender designated by it from time to time as the office from which it will make Advances hereunder.

1.1.149 "**Letter of Credit**" means a stand-by letter of credit or a letter of guarantee or documentary letter of credit issued, at the request of and on behalf of the Borrower, by the applicable Issuing Bank.

1.1.150 "**Level**" means the applicable level as set forth in the table set forth in the definition of Applicable Margin.

1.1.151 "**LIBOR Business Day**" means a day on which the main branches of the Agent and commercial banks generally are open for international business (including dealings in U.S. Dollar deposits in the London interbank market) in London, England and New York, New York.

1.1.152 "**LIBOR Interest Period**" means, with respect to each LIBOR Loan, the initial period (subject to availability) of approximately one, two, three, six or twelve months or such other periods as selected by the Borrower and notified in writing to the Agent commencing on and including the date of any Advance, Conversion or Rollover, as the case may be, applicable to such LIBOR Loan and ending on and including the last day of such initial period, and thereafter, each successive period (subject to availability) of approximately one, two, three, six or twelve months or such other periods as selected by the Borrower and notified to the Agent in writing commencing on and including the last day of the prior LIBOR Interest Period; provided, however, that:

(a)     in the case of a Rollover, the last day of each LIBOR Interest Period shall also be the first day of the next LIBOR Interest Period;

- 34 -

(b)     the last day of each LIBOR Interest Period shall be a LIBOR Business Day and if not, the Borrower shall be deemed to have selected a LIBOR Interest Period the last day of which is the first LIBOR Business Day following the last day of the LIBOR Interest Period selected by the Borrower;

(c)     if the Borrower selects a LIBOR Interest Period for a period longer than three months, the last day of such LIBOR Interest Period shall be the date falling three months after the beginning of such LIBOR Interest Period and the next LIBOR Interest Period shall begin on such date; and

(d)     notwithstanding any of the foregoing, the last day of each LIBOR Interest Period shall be on or before the maturity date of the applicable Facility.

1.1.153 "**LIBOR Loan**" means an Advance made by a Lender to a Borrower in U.S. Dollars in accordance with the provisions hereof, bearing interest by reference to the U.S. Dollar LIBOR Rate.

1.1.154 "**LIBOR Market**" means the London Interbank Eurodollar offering market.

1.1.155 "**LIBOR Period**" means, in respect of a LIBOR Loan, the period commencing on the date of the Advance of such LIBOR Loan and ending on the scheduled maturity date of such LIBOR Loan.

1.1.156 "**LIBOR Rate**" means, with respect to each LIBOR Interest Period pertaining to any LIBOR Loan, the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other successor thereto which takes over administration of such rate) appearing on Bloomberg Page BBAM1 screen (or on any successor or substitute page of such Bloomberg screen providing rate quotations comparable to those currently provided on such page of such Bloomberg screen, as determined by the Agent from time to time for purposes of providing quotations of interest rates applicable to U.S. Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two LIBOR Business Days prior to the making a LIBOR Loan, as the rate for the offering of U.S. Dollar deposits with a maturity comparable to the LIBOR Interest Period of such LIBOR Loan; provided, however, that if the said page is not available for any reason, the term "**LIBOR Rate**" shall mean the rate per annum at which deposits in U.S. Dollars for the applicable interest period and amount are offered to the Agent in the LIBOR Market; provided that if the LIBOR Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.157 "**Lien**" means:

(a)     a lien, charge, mortgage, deed of trust, pledge, security interest or conditional sale or title retention agreement in the nature of security which secures payment or performance of an obligation;

(b)     an assignment, lease, consignment, deposits, trust or deemed trust that secures payment or performance of an obligation;

- 35 -

(c)     a garnishment; and

(d)     any other encumbrance of any kind in the nature of security which secures payment or performance of an obligation (including any garantía prioritaria por adquisición under law 1676 of 2013 Colombia).

1.1.158   "**Loan**" means a Canadian Dollar Prime Rate Loan, U.S. Dollar Base Rate Loan, U.S. Dollar Prime Rate Loan, LIBOR Loan, Bankers' Acceptance, BA Equivalent Loan or Letter of Credit outstanding hereunder, or in the case of the Swingline, Overdraft borrowings and such other Advances permitted under Section 2.7.2.

1.1.159   "**Management Shareholders**" means each of the employees of the Canadian Borrower who hold Common Shares of the Canadian Borrower or options in respect of the same on the Amendment and Restatement Date and such other holders thereof from time to time who are approved in writing by the Agent on behalf of the Required Lenders, and "**Management Shareholder**" means any one of them.

1.1.160   "**Marginable Capital Assets**" means 60% of the net book value of Eligible Capital Assets at the time of determination, up to a maximum amount of U.S. $50,000,000 less the amount of each completed Anchor Sale and Leaseback Transaction; provided that, reductions resulting from Anchor Sale and Leaseback Transactions shall not reduce the amount available below U.S. $30,000,000.

1.1.161   "**Marginable Cash**" means 100% of Eligible Cash up to a maximum amount of U.S. $15,000,000 at any time.

1.1.162   "**Marginable Inventory**" means 50% of Eligible Inventory at the time of determination, up to U.S. $35,000,000.

1.1.163   "**Marginable Receivables**" means the sum of the following (without duplication):

(a)     90% of Insured Receivables (or such lower percentage as is covered by the applicable Account Receivable Insurance) up to a maximum amount of U.S. $175,000,000;

(b)     85% of Eligible Receivables owed to a Credit Party by Acceptable Account Debtors;

(c)     75% of all other Eligible Receivables; and

(d)     90% of Insured Receivables from Pemex outstanding more than 300 days, but not more than 540 days, in respect of contract numbers 423023819 and 423023813 between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V., dated April 22, 2014 and July 17, 2013, respectively, and contract number 423023813, dated July 25, 2013, between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V. (in each case, as may be amended or otherwise modified from time to time).

- 36 -

1.1.164  "**Material Adverse Change**" or "**Material Adverse Effect**" means any matter, event or circumstance that individually or in the aggregate could, in the opinion of the Required Lenders, acting reasonably, be expected to result in a material adverse change to or have a material adverse effect on:

(a)     the business, financial condition, prospects, operations, or property, of the Canadian Borrower and its Subsidiaries (excluding any Securitization SPE), taken as a whole;

(b)     the ability of any Credit Party to pay and perform its obligations in accordance with this Agreement or any of the other Credit Documents; or

(c)     the validity or enforceability of this Agreement or any other Credit Document.

1.1.165  "**Material Agreement**" means, in respect of the Credit Parties, an agreement made between the applicable Credit Party or its predecessors and another Person (a) pursuant to which such Credit Party is reasonably expected to incur obligations or liabilities in excess of $10,000,000 in any Fiscal Year (other than any agreement related to the purchase of equipment, software or utility services) and (b) which if terminated (other than at its scheduled maturity) would, unless replaced with a substantially similar agreement, result, or would have a reasonable likelihood of resulting, in a Default, an Event of Default or a Material Adverse Change, specifically including, as at the Amendment and Restatement Date, each agreement listed in Schedule 6.1.13; <u>provided</u>, in each case, in no event shall the Wells Fargo Credit Agreement or any agreement in connection with a Permitted Securitization Financing be considered a Material Agreement.

1.1.166  "**Material Permit**" means, in respect of the Credit Parties, a licence, permit, approval, registration or qualification granted to or held by the applicable Credit Party which if terminated and not replaced would result, or would have a reasonable likelihood of resulting, in a Default, an Event of Default or a Material Adverse Change; specifically including, as at the date of this Agreement, each licence, permit, approval, registration or qualification listed in Schedule 6.1.8.

1.1.167  "**Material Subsidiary**" means (a) any wholly-owned Subsidiary of the Canadian Borrower which:

(i)     has Consolidated Net Tangible Assets owned directly by it on an unconsolidated basis equal or greater than 5% of the Canadian Borrower's Consolidated Net Tangible Assets as at the end of the Fiscal Quarter immediately prior to the date of such determination;

(ii)    has EBITDA generated by it on an unconsolidated basis equal or greater than 5% of the Canadian Borrower's consolidated EBITDA as at the end of the Fiscal Quarter immediately prior to the date of such determination; or

(iii)   any Subsidiary of the Canadian Borrower that has been designated as a "Material Subsidiary" by the Borrower,

and (b) any Subsidiary which owns, directly or indirectly, any equity or other ownership interest in a Material Subsidiary.

1.1.168  "**Minimum Liquidity**" means the sum of (A) the amount of unrestricted cash (determined in accordance with GAAP) and Cash Equivalents of the Credit Parties held in accounts with any of the Lenders, Encina (or any other lenders party to the Encina ABL Loan Agreement) and Wells Fargo (or any other lenders party to the Wells Fargo Credit Agreement), plus (B) the Minimum Margin Availability and undrawn available amount under the Encina ABL Loan Agreement or the Wells Fargo Credit Agreement, as applicable, plus (C) undrawn and available amounts under other facilities constituting Permitted Funded Debt plus (D) non-Marginable Cash.

1.1.169  "**Minimum Margin Availability**" means the undrawn available amount under the Operating Facilities up to the Borrowing Base (as at the time of determination).

1.1.170  "**Minor Title Defects**" in respect of any parcel of Land means encroachments, restrictions, easements, rights-of-way, servitudes and defects or irregularities in the title to such Land which are of a minor nature and which, in the aggregate, will not materially impair the use of such Land for the purposes for which such Land is held by the owner thereof.

1.1.171  "**Multiemployer Plan**" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Credit Party or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

1.1.172  "**Multiple Employer Plan**" means a plan that is described in Section 210 of ERISA and subject to Title IV of ERISA, and (i) is maintained for employees of any Credit Party or any ERISA Affiliate and (ii) in respect of which any Credit Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

1.1.173  "**Net Leverage Ratio**" means, in respect of any Fiscal Quarter, the ratio of Total Net Debt at the end of such Fiscal Quarter to EBITDA in the fiscal period comprised of such Fiscal Quarter and the immediately preceding three Fiscal Quarters.

1.1.174  "**New Rules**" is defined in Section 12.1.3.

1.1.175  "**Non-BA Lender**" means a Lender identified in Exhibit "A" attached hereto as a Lender which will make BA Equivalent Loans instead of accepting Bankers' Acceptances hereunder.

1.1.176  "**Non-Consenting Lender**" is defined in Section 11.5.2.

1.1.177  "**Non-Financial Letter of Credit**" means a Letter of Credit that is not a Financial Letter of Credit.

1.1.178   "**Non-OECD Guarantor**" means any Guarantor whose governing jurisdiction is located in a country which not a member of OECD, excluding Colombia.

1.1.179   "**Non-Paying Lender**" is defined in Section 11.4.2.

1.1.180   "**Obligations**" means, at any time all direct and indirect, contingent and absolute obligations and liabilities of the Borrower and the other Credit Parties to the Agent and the Lenders under or in connection with this Agreement and the Security (specifically including for greater certainty all Guarantees provided hereunder) at such time, specifically including the Outstanding Advances, all accrued and unpaid interest thereon, all Secured Hedging Liabilities and all Banking Service Liabilities, all indemnity obligations arising under, any other Credit Document, any Banking Service Agreement or any Hedging Agreement with a Hedge Provider, all fees payable in connection with prepayments, all breakage fees payable pursuant to Section 5.15 and all other fees, expenses and other amounts payable pursuant to this Agreement and the Security (specifically including fees relating to the Facilities as may be agreed in writing from time to time between a Borrower and any Lender); except that if otherwise specified or required by the context, "Obligations" shall mean any portion of the foregoing. Notwithstanding anything herein to the contrary, the "Obligations" shall exclude any Excluded Hedging Obligations.

1.1.181   "**OECD**" means The Organisation for Economic Co-operation and Development.

1.1.182   "**OECD Credit Party**" means any Credit Party whose governing jurisdiction is in a country which is an OECD member or which has a sovereign currency credit rating at an Investment Grade level.

1.1.183   "**OFAC**" means the U.S. Treasury Department Office of Foreign Assets Control.

1.1.184   "**Operating Facilities**" means, collectively, the Canadian Operating Facility and the U.S. Operating Facility, and "**Operating Facility**" means any of them as the context requires.

1.1.185   "**Other Taxes**" is defined in Section 12.4.2.

1.1.186   "**Outstanding Advances**" means, at any time, the aggregate of all obligations of the Borrowers to the Lenders (or if the context requires, to any Lender) in respect of all Advances made under the Facilities (or if the context requires, under any Facility) which have not been repaid or satisfied at such time, determined as follows:

(a)      in the case of Canadian Dollar Prime Rate Loans and Overdrafts in Canadian Dollars, the principal amount thereof;

(b)      in the case of Bankers' Acceptances and BA Equivalent Loans and Letters of Credit, the face amount thereof;

(c)      in the case of Letter of Credit, the undrawn amount thereof (to the extent not cash collateralized, backstopped or otherwise provided for in a manner acceptable to the Issuing Bank, in its discretion, in respect thereof); and

- 39 -

(d)     in the case of U.S. Dollar Base Rate Loans, Overdrafts in U.S. Dollars and LIBOR Loans the Equivalent Amount of the principal amount thereof expressed in Canadian Dollars.

1.1.187  "**Overdraft**" means indebtedness of the Canadian Borrower to the Swingline Lender arising under the Swingline in connection with all amounts debited to all overdraft accounts established by the Canadian Borrower with the Swingline Lender (in Canadian Dollars or U.S. Dollars, as the case may be), including without limitation all cheques, transfers, withdrawals, interest, costs, charges and fees debited to such accounts.

1.1.188  "**Palladium**" means Palladium Capital Management IV LLC.

1.1.189  "**Palladium Equity Line**" means the Loan Agreement, dated as of October 18, 2017, by and between Holdco, as borrower, and PEP Fluid L.P., as lender (together with the revolving demand note related thereto), and any related loan agreement and revolving demand note with PEP Fluid Co-Invest LP and/or Calumet, in an aggregate principal amount of up to $5,000,000, as may be amended, restated, replaced or otherwise modified from time to time.

1.1.190  "**Participant**" is defined in Section 13.6.4.

1.1.191  "**Participant Register**" is defined in Section 13.6.4

1.1.192  "**Parties**" means the Borrowers, the Agent and the Lenders and their respective successors and permitted assigns.

1.1.193  "**PATRIOT Act**" means *The Uniting and Strengthening America by Providing Adequate Tools Required to Intercept and Obstruct Terrorism Act* of 2001 (Title III of Pub. L. No. *107-56 (signed into law October 26, 2001)*).

1.1.194  "**PBGC**" means the Pension Benefit Guaranty Corporation (or any successor).

1.1.195  "**Pemex Entities**" means, collectively, Petroleos Mexicanos, Pemex Exploracion y Produccion and Pemex Perforacion y Servicios.

1.1.196  "**Pension Plan**" means:

(a)     a "pension plan" or "plan" which is subject to the funding requirements of applicable pension benefits legislation in any jurisdiction of Canada and is applicable to employees of a Credit Party resident in Canada; or

(b)     any pension benefit plan or similar arrangement (other than Plans or Multiemployer Plans) applicable to employees of a Credit Party.

1.1.197  "**Permitted Acquisition**" means any Acquisition with respect to which all of the following conditions shall have been satisfied:

(a)     the Acquired Business has positive EBITDA calculated on a trailing twelve month basis (determined using the definition thereof set for herein as if the Acquired Business was the Canadian Borrower for such purpose);

(b)     the Acquired Business is in an Eligible Line of Business in Canada or the U.S.;

(c)     the Acquisition shall not be a Hostile Acquisition and, if the Acquisition involves a merger involving a Credit Party, the surviving entity is or becomes a Credit Party concurrently with the completion of such merger;

(d)     the aggregate purchase price of all such Acquisitions shall not exceed the sum of $50,000,000 in any Fiscal Year;

(e)     if the consideration payable at the closing of the acquisition of the Acquired Business in cash, shares or other tangible assets (but for certainty excluding Earnout Payments), plus the Permitted Funded Debt of the Acquired Business assumed as part of such acquisition, is greater than $15,000,000, then (i) the Net Leverage Ratio on a *pro forma* basis (including the EBITDA and, if applicable, Permitted Funded Debt of the Acquired Business) as of the end of and for the most recently completed four Fiscal Quarter period occurring prior to the closing of the Acquisition in question for which financial statements are available does not exceed the maximum Net Leverage Ratio permitted for such four Fiscal Quarter period under Section 7.3.1(a) *minus* 0.25 to 1, (ii) after giving effect to the funding of the Acquisition in question the sum of: (A) unrestricted cash on hand of the Credit Parties, *plus* (B) undrawn and available amounts under the Operating Facilities, *plus* (C) undrawn and available amounts permitted under operating facilities provided under clauses (c) and (d) of the definition of Permitted Funded Debt (<u>provided</u>, that the stated maturity date of any such facility, if any, is not within 90 days after the date of such Acquisition), is no less than $25,000,000; and (iii) at least 10 Business Days prior to the date that the Acquisition is to close, the Lenders shall have received financial statements and quarterly earnings reports in respect of the Acquired Business which shall be satisfactory to the Required Lenders, acting reasonably, together with any other information in respect of the Acquired Business which the Agent may reasonably request (and in the case of (i) and (ii) above, the resident and/or chief financial officer of the Canadian Borrower will deliver to the Agent an officer's certificate confirming such items, together with detailed calculations thereof);

(f)     if the Acquisition relates to the purchase of shares or other equity of a Person, it must be for 100% of the issued and outstanding shares of such Person;

(g)     if a new Material Subsidiary is formed or acquired as a result of or in connection with the Acquisition, the Borrower shall have complied with the requirements of Article 8 in connection therewith, subject to the last sentence of Section 8.2;

(h)     any existing indebtedness of the Acquired Business will be repaid and, if applicable, cancelled, unless otherwise constituting Permitted Funded Debt; and

(i)     after giving effect to the Acquisition and any Advance in connection therewith, and subject to clause (j) below with respect to the representations and warranties in this Agreement, no Default or Event of Default shall exist, including with respect to the financial covenants contained in Section 7.3 on a *pro forma* basis as of the end of and for the most recently completed four Fiscal Quarter period occurring prior to the closing of the Acquisition for which financial statements are available; and

(j)     all representations and warranties set forth herein (other than those which are specified to be given as of specific date) shall be repeated as of the date of the Acquisition (after giving effect to the Acquisition and any Advance in connection therewith) and must be true in all material respects;

provided that, notwithstanding anything herein to the contrary, the Terra Acquisition shall constitute a Permitted Acquisition if the following conditions shall have been satisfied:

(i)     the Terra Acquisition shall not be funded in whole or in part with the proceeds of any Advance hereunder;

(ii)     on the date hereof, all amounts outstanding under the Palladium Equity Line shall be repaid in full and, immediately following such repayment, Palladium shall make an equity contribution to the Canadian Borrower in an amount not less than $7,000,000; and

(iii)     prior to or substantially concurrently with the closing of the Terra Acquisition, the Permitted Securitization Financing among ADF SPV, LLC, as borrower, Anchor, as servicer, and Wells Fargo Bank, National Association, as lender and agent shall also be consummated or the Credit Parties shall have otherwise arranged sufficient funding to fund such acquisition in a manner that is acceptable to the Required Lenders, acting reasonably.

1.1.198  "**Permitted Contest**" means action taken by or on behalf of a Credit Party in good faith by appropriate proceedings diligently pursued to contest a tax, claim or Lien; provided, that:

(a)     the Person to which the tax, claim or Lien being contested is relevant (and, in the case of a Subsidiary of the Canadian Borrower, the Canadian Borrower on a consolidated basis) has established reasonable reserves therefor if and to the extent required by GAAP;

(b)     proceeding with such contest does not have, and would not reasonably be expected to result in, a Material Adverse Change; and

(c)     proceeding with such contest will not create a material risk of sale, forfeiture or loss of, or interference with the use or operation of, a material part of the assets of the Credit Parties, taken as a whole.

1.1.199 "**Permitted Discretion**" shall mean the Agent's or any Required Lender's discretion, as the context requires, exercising its reasonable credit judgment in accordance with customary business practices for comparable asset-based lending transactions and, as it relates to the adjustment or imposition of exclusionary criteria, shall require that, (a) such establishment, increase, adjustment or imposition after the Amendment and Restatement Date be based on the analysis of facts or events first occurring, first discovered or quantified by the Agent, or the applicable Required Lender, after the Amendment and Restatement Date or that are materially different from facts or events occurring or known to the Agent, or the Required Lender, on the Amendment and Restatement Date, (b) the contributing factors to such change shall not duplicate the exclusionary criteria set forth in the definitions of "Eligible Capital Assets", "Eligible Inventory" and "Eligible Receivables" as applicable (and vice versa), and (c) the effect of any adjustment or imposition of exclusionary criteria shall be a quantification of the incremental reduction of the Borrowing Base attributable to such contributing factors which is reasonable in light of reasonable credit judgment exercised in senior secured asset-based revolving credit facilities with comparable companies of similar size, industries, businesses and business practices, including, without limitation, leverage profile and projected free cash flow, in the applicable market.

1.1.200 "**Permitted Dispositions**" is defined in Section 7.2.4.

1.1.201 "**Permitted Distribution**" means:

(a)     the Permitted Management Fees; provided, that no such Distribution is permitted if a Default or an Event of Default exists at such time or would result therefrom; and further provided, that any such payments that were not able to be made during the occurrence of a Default or an Event of Default may be "caught up" when such Default or Event of Default no longer exists (regardless of the Annual Management Fee Cap) (with any such catch up payments in excess of the Annual Management Fee Cap in any Fiscal Year being referred to herein as the "**Catch Up Management Fee Payments**");

(b)     any Distribution from one Credit Party to another Credit Party;

(c)     any other Distribution payable to the shareholders of the Canadian Borrower by any Credit Party if at the time such Distribution is made (i) no Default or Event of Default exists at such time or would result therefrom, (ii) on a *pro forma* basis after giving effect to such Distribution, the Net Leverage Ratio would not exceed 2.50 to 1, as evidenced by the Canadian Borrower providing an officer's certificate to the Agent confirming same, and (iii) no Borrowing Base Shortfall has occurred and is continuing or would result from any such Distribution on a *pro forma* basis as if such Distribution had been made as of the end of the last Fiscal Quarter;

(d)     any dividend payments or other Distributions payable by Holdco or any of its Subsidiaries solely in the equity interests of such Person;

(e)     any Distribution permitted under Section 7.2.6(l);

- 43 -

(f)     non-cash repurchases by Holdco or its Subsidiaries of equity interests deemed to occur upon exercise of stock options or similar equity incentive awards if such equity interests represents a portion of the exercise price of such options or similar equity incentive awards;

(g)     cash dividends to Holdco (and by Holdco to its parent companies) by any Credit Party not to exceed an amount necessary to permit Holdco and its parent companies to pay for normal, reasonable and documented over-head and administrative costs and expenses of Holdco and its parent companies and franchise fees or similar taxes and fees required to maintain its corporate existence and to reimburse out-of-pocket expenses actually incurred by Holdco and its parent companies for the benefit of the Canadian Borrower, and other Distributions for customary directors' fees to any board members and the reimbursement of out-of-pocket expenses incurred by any board members in such capacity, provided that no Default or Event of Default exists at such time or would result therefrom; and

(h)     Distributions made (i) to Holdco to permit Holdco to, and Holdco may, redeem or repurchase equity interests of Holdco from officers, employees, consultants, managers and directors of the Canadian Borrower or any of its Subsidiaries in connection with the termination of employment or engagement of any such Person or (ii) pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or other agreement or arrangement (including, but not limited to, employment, compensation, severance agreements or arrangements or stockholders agreements), provided that no Default or Event of Default exists at such time or would result therefrom; and

(i)     prior to the closing of the Terra Acquisition, Distributions to Palladium or its Affiliates in repayment of the Palladium Equity Line; provided in the event the Palladium Equity Line is not repaid as contemplated in clause (ii) of the proviso set forth in the definition of "Permitted Acquisition", (x) the Canadian Borrower and its Subsidiaries shall, on a *pro forma* basis, have a Minimum Liquidity of not less than U.S. $15,000,000 immediately after such repayment,  and (y) the principal in respect of the Palladium Equity Line will not be repaid prior to October 31, 2018, unless (A) such prepayment is made in the manner prescribed by clause (ii) of the proviso set forth in the definition of "Permitted Acquisition" and the subsequent equity contribution described in such clause is also effected, or (B) the Required Lenders consent to such earlier prepayment in their Permitted Discretion;

provided that the aggregate of all Distributions made under clauses (g) and (h) above do not in any Fiscal Year exceed $2,000,000 (with unusual amounts in any Fiscal Year being carried over to succeeding Fiscal Years), other than to the extent such Distributions are funded by the cash proceeds from the sale of equity interests of the Canadian Borrower and, to the extent contributed to the capital of the Canadian Borrower, equity interests of any of the Canadian Borrower's direct or indirect parent companies.

- 44 -

1.1.202 "**Permitted Factoring Debtors**" means, collectively, the Pemex Entities, Petroamazones EP, Operaciones Río Napo CEM and any other Person agreed to in advance by the Agent, acting reasonably.

1.1.203 "**Permitted Factoring Transaction**" means: at the Borrower's option,

(a)     the financing of certain Collection Rights by HSBC Mexico; *provided* that (i) such transaction is non-recourse to the Borrowers and their Material Subsidiaries, except for any Liens granted solely over the Collection Rights and the proceeds thereof, (ii) such transaction shall be and remain subject to the terms and conditions of the Intercreditor Agreement, (iii) QMax Mexico may remain responsible for the legitimacy and existence of the Collection Rights financed by such transaction at the time of execution of the relevant factoring transaction and (iv) QMax Mexico will no longer be liable for the payment of the Collection Rights to HSBC Mexico or any permitted assignee but may remain liable for the decrease in value of the Collection Rights; and/or

(b)     the financing by the Borrowers or one or more of their Material Subsidiaries of any Receivables (other than as described in paragraph (a) above); *provided* that (i) such transaction results in a legal "true sale" of Receivables, (ii) such transaction is non-recourse to the Borrowers and their Material Subsidiaries, except for any Liens granted solely over such Receivables and the proceeds thereof, and (iii) such transaction shall only involve the sale of Receivables either (x) owing by any of the Permitted Factoring Debtors to a Credit Party or (y) not constituting Eligible Receivables; provided that, the aggregate principal, stated or investment amount of all outstanding loans made to the Credit Parties in respect of all Permitted Factoring Transactions shall not exceed $25,000,000 at any time outstanding; provided, such amount shall be increased to an amount specified by the Borrowers at any time if the Borrowers or one or more Material Subsidiaries provides notice to the Agent of such an increase, and the Agent (on the instruction of Required Lenders) has not objected within three Business Days following receipt of notice thereof. For certainty, if any Eligible Receivable is sold, contributed, financed or otherwise conveyed or pledged pursuant to a Permitted Factoring Transaction it shall immediately cease to be an Eligible Receivable.

1.1.204 "**Permitted Funded Debt**" means, without duplication:

(a)     the Obligations under the Facilities and, to the extent constituting Funded Debt, obligations in respect of Banking Services Agreements of the Canadian Borrower and its Subsidiaries owing to the Agent and the Lenders (and their Affiliates);

(b)     Funded Debt up to Cdn. $10,000,000 under a bilateral letter of credit facility with HSBC and insured by Export Development Canada;

(c)     Funded Debt of any Credit Party whose governing jurisdiction is Mexico or Colombia which is unsecured or, if secured, which is secured solely by capital

assets and/or inventory located in Mexico or Colombia and which are not subject to the Security (subject to the proviso at the end of this definition);

(d)     Funded Debt under the Surviving Colombian Credit Agreements and any Permitted Refinancing Indebtedness in respect thereof from time to time (subject to the proviso at the end of this definition);

(e)     Funded Debt secured by Permitted Purchase Money Security Interests and Funded Debt incurred in conjunction with any Anchor Sale and Leaseback Transaction (in each case subject to the proviso at the end of this definition);

(f)     Permitted Hedging Liabilities;

(g)     Permitted Intercompany Loans;

(h)     Subordinated Debt;

(i)     Funded Debt as set out in Schedule 1.1.204 hereto and any Permitted Refinancing Indebtedness thereof;

(j)     Funded Debt under a corporate credit card facility with a Lender and other cash management liabilities, up to a maximum aggregate amount of $2,000,000;

(k)     Funded Debt (other than a revolving credit facility) of a Subsidiary acquired or assumed pursuant to a Permitted Acquisition after the Amendment and Restatement Date and any Permitted Refinancing Indebtedness in respect thereof (subject to the proviso at the end of this definition); provided, that such Funded Debt shall not be incurred in anticipation of such Permitted Acquisition;

(l)     obligations in respect of Guarantees or Financial Assistance not prohibited under Section 7.2.3;

(m)     other Funded Debt of the Credit Parties and Permitted Refinancing Indebtedness in respect thereof (subject to the proviso at the end of this definition);

(n)     Funded Debt under a Permitted Factoring Transaction;

(o)     Funded Debt consented to by the Required Lenders, in their discretion, prior to the incurrence or assumption thereof;

(p)     Funded Debt up to an aggregate principal amount of U.S. $75,000,000 under the Encina ABL Loan Agreement and any Permitted Refinancing Indebtedness in respect thereof, provided that all such Funded Debt is and remains subject to the terms of the Encina Intercreditor Agreement;

(q)     after, or concurrently with, the repayment of all Funded Debt incurred under, and the cancellation of, the Encina ABL Loan Agreement, Funded Debt up to an aggregate principal amount of U.S. $90,000,000 in connection with all Permitted

- 46 -

Securitization Financing and any Permitted Refinancing Indebtedness in respect thereof; and

(r)    Funded Debt in respect of one or more promissory notes issued by the U.S. Borrower to Calumet, by the U.S. Borrower to the Canadian Borrower and by the Canadian Borrower to Holdco, in each case, substantially contemporaneously with the Anchor Acquisition (the "**Anchor Acquisition Promissory Notes**"),

provided that the outstanding principal amount of Funded Debt under clauses (c), (d), (e), (k) and (m) above does not exceed in the aggregate $45,700,000 during the Covenant Relief Period and $75,000,000 at any time after the Covenant Relief Period.

1.1.205  "**Permitted Hedging Liability**" means a Hedging Liability permitted by the provisions of Sections 7.2.11 and 7.2.13.

1.1.206  "**Permitted Holders**" means (a) Palladium, the Investors, Management Shareholders and (b) any Person with which Palladium and the Management Shareholders form a Group as long as, in the case of clause (b), Palladium and its Affiliates beneficially own more than 50% of the relevant stock beneficially owned by that Group.

1.1.207  "**Permitted Intercompany Loan**" means a loan made by any Credit Party to another Credit Party, provided that the Agent holds a First Ranking Security Interest in all property and assets of both such Credit Parties to the extent required under the terms of the Credit Documents.

1.1.208  "**Permitted Investments**" is defined in Section 7.2.3.

1.1.209  "**Permitted Liens**" means:

(a)    Statutory Liens in respect of any amount which is not at the time overdue;

(b)    Statutory Liens in respect of any amount which may be overdue but the validity of which is subject to a Permitted Contest;

(c)    the reservations, limitations, provisos and conditions, if any, expressed in any original grant from the Crown of any Land or any interest therein;

(d)    servicing agreements, development agreements, site plan agreements and other agreements with Governmental Authorities pertaining to the use or development of any Land, provided same are complied with in all material respects;

(e)    applicable municipal and other governmental restrictions, including municipal by-laws and regulations, affecting the use of Land or the nature of any structures which may be erected thereon, provided such restrictions have been complied with in all material respects;

25877170.9

(f)     Liens or rights of distress reserved in or exercisable under any lease for rent not at the time overdue or for compliance with the terms of such lease not at the time in default;

(g)     Liens or rights reserved to or exercisable by or any obligations or duties affecting any Land due to any public utility or to any Governmental Authority, under or with respect to any franchise, temporary grant, licence or permit in good standing and any defects in title to structures or other facilities arising solely from the fact that such structures or facilities are constructed or installed on Land under government permits, leases or other grants in good standing; provided such facilities, temporary grants, licences and permits have been complied with in all material respects and are in good standing and such Liens, rights, obligations, duties and defects in the aggregate do not materially impair the use of such property, structures or facilities for the purpose for which they are held;

(h)     Liens incurred or deposits made in connection with contracts, bids, tenders or expropriation proceedings, surety or appeal bonds, costs of litigation when required by law, public and statutory obligations, and warehousemen's, storers', repairers', carriers' and other similar Liens and deposits;

(i)     security given to a public utility or any Governmental Authority to secure obligations incurred to such utility, municipality, government or other authority in the ordinary course of business and not at the time overdue;

(j)     Liens and privileges arising out of judgments or awards in respect of which: an appeal or proceeding for review has been commenced; a stay of execution pending such appeal or proceedings for review has been obtained; and reserves have been established as reasonably required by the Required Lenders;

(k)     any Lien arising in connection with the construction or improvement of any Land or arising out of the furnishing of materials or supplies therefor, provided that such Lien secures moneys not at the time overdue (or if overdue, the validity of which is subject to a Permitted Contest), notice of such Lien has not been given to the Agent or any Lender and such Lien has not been registered against title to such Land;

(l)     licenses (including licences of intellectual property), leases or subleases granted to third parties or Credit Parties in the ordinary course of business which, individually or in the aggregate, do not materially interfere with the ordinary course of business of the Borrower or any of its Subsidiaries;

(m)     the filing of UCC or PPSA financing statements (or equivalents thereto in other jurisdictions) solely as a precautionary measure in connection with operating leases and consignment arrangements;

(n)     Liens in favor of customs and revenue authorities arising as a matter of law and in the ordinary course of business to secure payment of customs duties in connection with the importation of goods;

- 48 -

(o) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Credit Party in the ordinary course of business;

(p) Liens (i) on deposits of cash or Cash Equivalents in favor of the seller of any property to be acquired in any Permitted Investment to be applied against the purchase price for such Permitted Investment, (ii) consisting of an agreement to dispose of any property in a Permitted Disposition and (iii) earnest money deposits of cash or Cash Equivalents made by any Credit Party in connection with any letter of intent or purchase agreement permitted hereunder;

(q) rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions or upon securities in favor of securities intermediaries, solely to the extent incurred in connection with the maintenance of deposit accounts or securities accounts in the ordinary course of business;

(r) Minor Title Defects;

(s) the Permitted Purchase-Money Security Interests;

(t) Liens which are secured solely by assets which are located outside of Canada and the U.S. and which are not subject to the Security; provided that the aggregate principal amount of Funded Debt or other obligations secured thereby constitutes Permitted Funded Debt;

(u) Liens as set out in Schedule 1.1.209 and any extension, renewal or replacement (or successive extensions, renewals or replacements), as a whole or in part, of thereof, so long as any such extension, renewal or replacement of such Lien is limited to all or any part of the same property that secured the Lien extended, renewed or replaced (plus improvements on such property) and the Funded Debt secured thereby is not increased and constitutes Permitted Funded Debt;

(v) any Lien from time to time which is consented in writing to by the Required Lenders;

(w) the Security or any other Liens securing the Obligations;

(x) Liens which secure obligations owing under Permitted Funded Debt described in clause (c), (d) or (m) of the definition thereof; provided that in the case of such clause (m), such Lien does not apply to any of the Collateral; subject to the limitation set forth in the proviso at the end of the definition of Permitted Funded Debt;

(y) Liens securing Funded Debt permitted by clause (k) of the definition of Permitted Funded Debt, subject to the limitation set forth in the proviso at the end of the definition of Permitted Funded Debt, and existing on any property or asset prior to the acquisition thereof by any Credit Party or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the date hereof prior

to the time such Person becomes a Subsidiary; <u>provided</u>, that (i) such Liens do not apply to all of the assets of the acquired Subsidiary generally or to any other property or assets of any Credit Party not securing such Funded Debt prior to the acquisition of such property or asset and (ii) such Lien shall secure only those obligations which it secured on the date of acquisition and extensions, renewals and replacements thereof permitted hereunder that do not increase the outstanding principal amount thereof; provided further, with respect to Liens in connection with Funded Debt that is assumed in connection with an acquisition of assets or equity interests, no such Lien extends to or covers any other assets (other than the proceeds or products thereof, accessions or additions thereto and improvements thereon) or was created in contemplation of, or in connection with, the applicable acquisition of assets or equity interests (except to the extent the same is otherwise Permitted Funded Debt);

(z)     Liens which secure Subordinated Debt permitted hereunder;

(aa)    Liens arising under a Permitted Factoring Transaction but only to the extent that any such Lien relates to the applicable Receivables sold, contributed, financed or otherwise conveyed or pledged pursuant to such transaction;

(bb)    Liens arising under the Encina ABL Loan Agreement but only to the extent that any such Lien is and remains subject to the terms of the Encina Intercreditor Agreement;

(cc)    Liens arising under any Anchor Sale and Leaseback Transaction;

(dd)    Liens on the Receivables of a Securitization SPE sold pursuant to a Permitted Securitization Financing (together with any and all related security and ancillary rights related thereto which are customary for transactions of such nature) to the extent incurred pursuant to a Permitted Securitization Financing; and

(ee)    any other Liens; provided, that the aggregate principal amount of Funded Debt or other obligations secured thereby does not exceed U.S. $3,000,000;

<u>provided</u>, that the use of the term "Permitted Liens" to describe the foregoing Liens shall mean that such Liens are permitted to exist (whether in priority to or subsequent in priority to the Security, as determined by Applicable Law); and for greater certainty such Liens shall not be entitled to priority over the Security by virtue of being described in this Agreement as "Permitted Liens".

1.1.210   "**Permitted Management Fees**" means advisory or management fees payable by the Credit Parties to Palladium and Calumet in an aggregate amount not to exceed the Annual Management Fee Cap in any Fiscal Year.

1.1.211   "**Permitted Purchase-Money Security Interests**" means Purchase-Money Security Interests incurred or assumed in connection with the purchase, leasing or acquisition of capital equipment in the ordinary course of business; <u>provided</u>, that the

- 50 -

obligations secured thereby are permitted under clause (e) of the definition of Permitted Funded Debt.

1.1.212   "**Permitted Refinancing Indebtedness**" shall mean any Funded Debt issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "**Refinance**"), the Permitted Funded Debt being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Indebtedness); <u>provided</u>, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Permitted Funded Debt so Refinanced (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions and expenses), (b) if the Permitted Funded Debt being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing Indebtedness shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Permitted Funded Debt being Refinanced, (c) no Permitted Refinancing Indebtedness shall have different obligors, or greater guarantees or security, than the Permitted Funded Debt being Refinanced, unless such new obligors are Credit Parties and (d) if the Permitted Funded Debt being Refinanced is secured by any collateral (whether equally and ratably with, or junior to, the Lenders or otherwise), such Permitted Refinancing Indebtedness may be secured by such collateral (including pursuant to after acquired property clauses to the extent such type collateral secured the Funded Debt being Refinanced) on terms not materially less favorable to the Lenders than those contained in the documentation governing the Permitted Funded Debt being so Refinanced.

1.1.213   "**Permitted Securitization Financing**" shall mean one or more transactions pursuant to which (i) Securitization Assets or interests therein are sold or transferred to or financed by one or more Securitization SPE, and (ii) such Securitization SPE finance (or refinance) their acquisition of such Securitization Assets or interests therein, or the financing thereof, by selling or borrowing against Securitization Assets (including conduit and warehouse financings) and any Hedging Agreements entered into in connection with such Securitization Assets; <u>provided</u>, that recourse to the Borrowers or any Subsidiary (other than the Securitization SPE) in connection with such transactions shall be limited to the extent customary (as determined by the Agent and the Canadian Borrower each acting reasonably and in good faith and acceptable to the Agent acting reasonably) for similar transactions in the applicable jurisdictions (including, to the extent applicable, in a manner consistent with the delivery of a "true sale"/"absolute transfer" opinion with respect to any transfer by the Borrowers or any Subsidiary (other than a Securitization SPE)).

1.1.214 "**Person**" includes an individual, corporation, partnership, trust, union, unincorporated association, Governmental Authority or any combination of the above.

1.1.215   "**Plan**" means a Single Employer Plan or a Multiple Employer Plan.

1.1.216   "**Priority Claims**" means, with respect to any Person, any amount payable or accrued by such Person which ranks or is capable of ranking prior to or *pari passu* with the Liens created by the Security in respect of any Collateral, including amounts owing for

wages, vacation pay, severance pay, employee deductions, sales tax, excise tax, tax payable pursuant to Part IX of the *Excise Tax Act* (Canada) (net of GST input credits), income tax, employment insurance, unemployment insurance, workers compensation, government royalties, pension fund obligations or deficiencies, overdue rents or taxes, and other statutory or other claims, deemed trusts or Liens that have or may have priority over, or rank *pari passu* with, the Liens created by the Security. For the avoidance of doubt, no Banking Services Liabilities shall be deemed Priority Claims due to their *pari passu* ranking with the Obligations.

1.1.217 "**Proceeds of Realization**", in respect of the Security or any portion thereof, means all amounts received by the Agent and any Lender in connection with:

(a)     any realization thereof, whether occurring as a result of enforcement or otherwise;

(b)     any sale, expropriation, loss or damage or other disposition of the Collateral or any portion thereof; and

(c)     the dissolution, liquidation, bankruptcy or winding-up of a Credit Party or any other distribution of its assets to creditors,

and all other amounts which are expressly deemed to constitute "Proceeds of Realization" in this Agreement.

1.1.218 "**Project Desert**" means the acquisition by the Borrowers or any Material Subsidiary of Environmental Solutions for Petroleum Services, an oilfield services company with operations in Algeria and Egypt on substantially the same terms and conditions set forth in the letter of intent dated as of December 11, 2016, as amended, between the Canadian Borrower and Project Desert Egypt.

1.1.219 "**Project Desert Algeria**" means Environmental Solutions Algeria S.A.R.L., an Algerian company.

1.1.220 "**Project Desert Egypt**" means Environmental Solutions for Petroleum Services (S.A.E.), an Egyptian company.

1.1.221 "**Project Desert Subsidiaries**" means each of Project Desert Egypt and Project Desert Algeria.

1.1.222 "**Proportionate Share**" means:

(a)     in the context of any Lender's obligation to make Advances under all Facilities, such Lender's Commitment to make Advances under all Facilities divided by the aggregate amount of all Lenders' Commitments to make Advances under all Facilities;

(b)     in the context of any Lender's obligation to make Advances under a Facility, such Lender's Commitment (excluding, as the case may be, the applicable Swingline Limit in the case of the Canadian Operating Facility) to make Advances under such

Facility divided by the aggregate amount of all Lenders' Commitments (excluding, as the case may be, the applicable Swingline Limit in the case of Canadian Operating Facility) to make Advances under such Facility;

(c)    in the context of any Lender's entitlement to receive a portion of the standby fee in respect of Canadian Operating Facility or the U.S. Operating Facility payable pursuant to Section 2.6.1(h) or Section 4.6.1(d), as applicable, such Lender's Commitment (excluding, as the case may be, the applicable Swingline Limit) under the applicable Facility to make Advances under Canadian Operating Facility or the U.S. Operating Facility divided by the aggregate amount of all such Lenders' Commitments (excluding, as the case may be, the applicable Swingline Limit) to make Advances under Canadian Operating Facility or the U.S. Operating Facility, as applicable;

(d)    in the context of any Lender's entitlement to receive payments of principal, interest or fees under all Facilities (other than a portion of the standby fee under Canadian Operating Facility or the U.S. Operating Facility), the Outstanding Advances due to such Lender under all Facilities divided by the aggregate amount of the Outstanding Advances due to all Lenders under all Facilities; and

(e)    in the context of any Lender's entitlement to receive payments of principal, interest or fees under a Facility (other than a portion of the standby fee under Canadian Operating Facility or the U.S. Operating Facility), the Outstanding Advances due to such Lender under such Facility divided by the aggregate amount of the Outstanding Advances due to all Lenders under such Facility.

1.1.223  "**Purchase-Money Security Interest**" means:

(a)    a Capital Lease; or

(b)    a Lien on any property or asset which is created, issued or assumed to secure the unpaid purchase price thereof, provided that such Lien is restricted to such property or asset and secures an amount not in excess of the purchase price thereof and any interest and fees payable in respect thereof.

1.1.224  "**QMax Mexico**" means QMax Mexico, S.A. de C.V.

1.1.225  "**Qualified ECP Guarantor**" means, in respect of any Hedging Agreement, each Credit Party that has total assets exceeding $10,000,000 at the time of the grant of the relevant Security of such Credit Party to such Hedging Agreement or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keep well under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

1.1.226  "**Receivables**" means and includes, as to the Credit Parties, all of Credit Parties' accounts, contract rights, payment intangibles, instruments (other than those evidencing indebtedness owed to a Credit Party), documents, chattel paper (including electronic chattel

- 53 -

paper), general intangibles relating to accounts, drafts and acceptances, and all other forms of obligations owing to a Credit Party arising out of or in connection with the sale or lease of inventory or for services rendered (including, in the case of Insured Receivables, amounts owed with respect to work in progress that are covered by Account Receivable Insurance), all supporting obligations, guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to the Agent hereunder.

1.1.227  "**Register**" is defined in Section 13.6.5.

1.1.228  "**Regulation T**" means Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and all official rulings and interpretations thereunder or thereof.

1.1.229  "**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and all official rulings and interpretations thereunder or thereof.

1.1.230  "**Regulation X**" means Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and all official rulings and interpretations thereunder or thereof.

1.1.231  "**Related Party**" means, with respect to any Person, an Affiliate of such Person, a shareholder of such Person (if applicable), or a Person related to or not at arm's length to such Person or holder of shares of such Person, and with respect to the Borrower and its Subsidiaries, includes Palladium, the Management Shareholders, the Investors and any company or entity controlled directly or indirectly by any one or more of such Persons.

1.1.232  "**Repayment**" means a repayment by the Borrower on account of the Outstanding Advances under all Facilities or a Facility, as the context requires, other than the reduction of an Overdraft (and "**Repay**" shall have a corresponding meaning).

1.1.233  "**Repayment Notice**" means a notice delivered by the Borrower to the Agent committing it to make a Repayment, in the form of Exhibit "E".

1.1.234  "**Required Lenders**" means, with the exception of those matters set out in Section 11.2 which require the agreement of all Lenders, (a) if there are two or less Lenders, all Lenders, (b) if there are three or more Lenders, Lenders holding, in aggregate, at least 66⅔% of the Commitments, or (c) during the continuance of an Event of Default, Lenders holding at least 66⅔% of the Outstanding Advances under the Facilities. The Advances and Commitments of any Defaulting Lender shall be disregarded in determining Required Lenders at any time in accordance with Section 11.5.1(b).

1.1.235  "**Requirements of Environmental Law**" means:

(a)      obligations under common law;

(b)     requirements imposed by or pursuant to statutes, regulations and by-laws whether presently or hereafter in force;

(c)     directives, policies and guidelines issued or relied upon by any Governmental Authority to the extent such directives policies or guidelines have the force of law;

(d)     permits, licenses, certificates and approvals issued by Governmental Authorities which are required in connection with air emissions, discharges to surface or groundwater, noise emissions, solid or liquid waste disposal, the use, generation, storage, transportation or disposal of Hazardous Materials; and

(e)     requirements imposed under any clean-up, compliance or other order made by a Governmental Authority pursuant to any of the foregoing,

in each and every case relating to environmental, health or safety matters including all such obligations and requirements which relate to:

(i)     solid, gaseous or liquid waste generation, handling, treatment, storage, disposal or transportation; and

(ii)    exposure to Hazardous Materials.

1.1.236 "**Resignation Notice**" is defined in Section 11.18.

1.1.237 "**Rollover**" means the renewal of an Availment Option upon its maturity in the same form.

1.1.238 "**Rollover Notice**" means a notice substantially in the form of Exhibit "C" given by the Borrower to the Agent for the purpose of requesting a Rollover.

1.1.239 "**Sales Proceeds**" is defined in Section 5.3.1(b).

1.1.240 "**Secured Hedging Liability**" means any Hedging Liability under a Hedging Agreement entered into between the Canadian Borrower and a Hedge Provider permitted by the provisions of Sections 7.2.12 and 7.2.13 and, provided that if a Hedge Provider does not have actual knowledge that such Hedging Liability was not permitted under such Sections at the time the applicable Hedging Agreement was entered into by such Hedge Provider, then such Hedging Liability will be deemed to be a Secured Hedging Liability for purposes of Section 8.5.

1.1.241 "**Securitization Assets**" shall mean any of the following assets (or interests therein) from time to time originated, acquired or otherwise owned by the Borrowers or any Subsidiary or in which the Borrowers or any Subsidiary has any rights or interests, in each case, without regard to where such assets or interests are located: (a) Receivables, (b) franchise fees, royalties and other similar payments made related to the use of trade names and other intellectual property, business support, training and other services, (c) revenues related to distribution and merchandising of the products of the Borrower and its Subsidiaries, (d) any equipment, contractual rights with unaffiliated third parties, website

- 55 -

domains and associated property and rights necessary for a Securitization SPE to operate in accordance with its stated purposes, and (e) other assets and property (or proceeds of such assets or property) to the extent customarily included in securitization transactions of the relevant type in the applicable jurisdictions (as determined by the Agent and the Canadian Borrower each acting reasonably and in good faith).

1.1.242  "**Securitization SPE**" means (i) a direct or indirect Subsidiary of any Borrower established in connection with a Permitted Securitization Financing for the acquisition of Securitization Assets or interests therein, and which is organized in a manner (as determined by the Canadian Borrower in good faith) intended to reduce the likelihood that it would be substantially consolidated with Holdings, the Borrowers or any of the Subsidiaries (other than Securitization SPE) in the event Holdings, the Borrowers or any such Subsidiary becomes subject to a proceeding under the U.S. Bankruptcy Code (or other insolvency law) and (ii) any subsidiary of a Securitization SPE.

1.1.243  "**Security**" means all Guarantees, security agreements, mortgages, control agreements, pledge agreements, debentures and other documents required to be provided to the Agent or the Lenders pursuant to Article 8 and all other documents and agreements delivered by the Borrower and other Persons to the Agent for the benefit of the Lenders from time to time as security for the payment and performance of the Obligations, and the security interests, assignments and Liens constituted by the foregoing.

1.1.244  "**Shareholders' Equity**" means, at any time, the shareholders' equity as shown on the consolidated balance sheet of the Canadian Borrower.

1.1.245  "**Single Employer Plan**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that is subject to Title IV of ERISA, and (i) is maintained for employees of any Credit Party or any ERISA Affiliate and no Person other than the Credit Parties and the ERISA Affiliates or (ii) was so maintained and in respect of which any Credit Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

1.1.246  "**Specified Canadian Swingline Borrower**" means (i) QMax Canada Operations Inc. or (ii) any other Material Subsidiary of the Canadian Borrower that has been formed under the laws of Canada or any province thereof as agreed to in writing by the Canadian Borrower, the Swingline Lender and the Agent, in their sole and absolute discretion.

1.1.247  "**Specified Equity Contribution**" is defined in Section 7.3.2.

1.1.248  "**Statutory Lien**" means a Lien in respect of any property or assets of a Credit Party created by or arising pursuant to any applicable legislation in favour of any Person (such as but not limited to a Governmental Authority), including a Lien for the purpose of securing such Credit Party's obligation to deduct and remit employee source deductions and goods and services tax pursuant to the *Income Tax Act* (Canada), the *Excise Tax Act* (Canada), the *Canada Pension Plan* (Canada), the *Employment Insurance Act* (Canada) and any legislation in any jurisdiction similar to or enacted in replacement of the foregoing from time to time.

- 56 -

1.1.249   "**Subordinated Debt**" means any indebtedness of any Credit Party to any Person, in respect of which the holder thereof has entered into a subordination and postponement agreement in favour of the Agent on behalf of itself and the Lenders, substantially in the form of Exhibit "J" for any indebtedness which is governed by Applicable Laws of Canada or the U.S., or for any indebtedness governed by other Applicable Laws, such other agreement as is reasonably satisfactory to the Required Lenders (each, a "**Subordination Agreement**") and, to the extent necessary or desirable under Applicable Law, registered in all places where necessary or desirable to protect the priority of the Security, which shall provide (among other things) that:

(a)      upon notice of the occurrence and continuance of an Event of Default hereunder, the holder of such indebtedness may not receive payments on account of principal or interest thereon;

(b)      any security held in respect of such indebtedness is subordinated to the Security; and

(c)      the holder of such indebtedness may not take any enforcement action in respect of any such security without the prior written consent of the Agent (except to the extent, if any, expressly permitted therein).

1.1.250   "**Subordination Agreement**" is defined in the definition of Subordinated Debt.

1.1.251   "**Subsidiary**" means any Person of which more than 50% of the outstanding Voting Securities are owned, directly or indirectly by or for a Credit Party, provided that the ownership of such securities confers the right to elect at least a majority of the board of directors of such Person, or a majority of Persons serving similar roles, and includes any legal entity in like relationship to a Subsidiary.

1.1.252   "**Surviving Colombian Credit Agreements**" means the following agreements by and between QMAX Solutions Colombia, as borrower: (i) revolving credit agreement with Helm Bank, as lender, dated as of October 6, 2009; (ii) common terms agreement for the execution of derivatives with Banco Corpobanca Colombia S.A., as lender, dated as of April 19, 2013; and (iii) common terms agreement for the execution of derivatives with Banco de Bogotá S.A., as lender, dated as of May 5, 2009; (iv) line of credit agreement with BBVA Colombia, as lender, dated as of December 3, 2012; and (v) line of credit agreement with Bancolombia dated January 20, 2010; in each case up to the respective maximum facility amounts set forth in Schedule 1.1.252 (each as amended, restated, supplemented, waived, replaced, (whether or not upon termination, and whether with the original agents, lenders, or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time, including any agreement refinancing, replacing or otherwise restructuring all or any portion of the indebtedness thereunder or increasing the amount loaned thereunder or altering the maturity thereof), subject to clause (d) of the definition of Permitted Funded Debt.

1.1.253   "**Swingline**" is defined in Section 2.7.1.

1.1.254   "**Swingline Borrower**" is defined in Section 2.7.1.

- 57 -

1.1.255  "**Swingline Lender**" means HSBC.

1.1.256  "**Swingline Limit**" means $10,000,000 or the Equivalent Amount in Cdn. $, or any combination thereof.

1.1.257  "**Swingline Loan**" means any Advance made available to the Borrower by the Swingline Lender outstanding from time to time under the Swingline.

1.1.258  "**Syndicated Advance**" means any Advance under the Canadian Operating Facility that is not a Swingline Loan.

1.1.259  "**Taxes**" is defined in Section 12.4.1.

1.1.260  "**Term Facility**" is defined in Section 3.1.

1.1.261  "**Term Facility Commitment**" means, as the context requires, (a) collectively with respect to all Term Lenders, in the aggregate as of the Amendment and Restatement Date, U.S. $13,656,250, as otherwise increased or decreased pursuant to this Agreement and (b) means, with respect to each individual Term Lender, the individual commitment amount of such Lender in the maximum principal amount indicated opposite such Term Lender's name in Exhibit "A" under the heading "**Term Facility Commitments**", as amended from time to time.

1.1.262  "**Term Lenders**" means the Lenders who have provided a Commitment under the Term Facility as set forth in Exhibit "A".

1.1.263  "**Terra**" means Terra Oilfield Solutions, LLC, a Delaware limited liability company.

1.1.264  "**Terra Acquisition**" means the purchase of all of the membership interests of Terra pursuant to the Terra Purchase Agreement.

1.1.265  "**Terra Purchase Agreement**" means the Membership Interest Purchase Agreement dated July 15, 2018 by and between Q'Max America Inc., as purchaser, and OFS Commander LLC, a Delaware limited liability company, as seller, as the same may be amended, restated or otherwise modified from time to time.

1.1.266  "**Total Net Debt**" means, in respect of the Credit Parties and determined on a combined basis and without duplication, all interest bearing indebtedness for borrowed money, Capital Leases, the drawn and unreimbursed amount outstanding under all letters of credit, letters of guarantee and surety bonds to the extent not cash collateralized (excluding performance bonds provided by insurers), mark to market liabilities on Hedging Agreements, bankers' acceptances and similar instruments, indebtedness secured by a Lien, redemption and mandatory dividend obligations with respect to a Credit Party's shares that are redeemable or convertible into debt at a fixed time at the option of the holder thereof or upon the occurrence of a condition within the control of such Person, obligations evidenced by bonds, debentures, notes or similar instruments and any guarantees or indemnity in any manner in respect of any part or all of an obligations of any other Person

- 58 -

of the type included above, *less* the aggregate amount of cash and Cash Equivalents of the Credit Parties which are held with the Agent or an Affiliate thereof in Canada, the United States or Mexico which is unencumbered (except pursuant to the Security) and the use of which is otherwise unrestricted up to an aggregate principal amount of U.S. $20,000,000.

1.1.267  "**Unadjusted EBITDA**" means, as at the date of determination, EBITDA, less any items that were added back in calculation thereof pursuant to paragraphs (d) (other than to the extent such amounts are made by payment-in-kind), (h) and (j) of the definition thereof.

1.1.268  "**Unfunded Capital Expenditures**" means for any applicable period, Capital Expenditures of the Credit Parties that are not financed with Funded Debt, or from the proceeds of the issuance of any new equity by the Credit Parties, any Sales Proceeds or any Insurance Proceeds in that period, but excluding therefrom any Capital Expenditures for which any Credit Party has received any reimbursement in the form of cash or Cash Equivalents from any Person other than another Credit Party in connection with such Capital Expenditure, but only to the extent of such reimbursement.

1.1.269  "**Uniform Customs**" means the Uniform Customs and Practice for Documentary Credits, published as International Chamber of Commerce publication no. 600 and all subsequent amendments to same, in each case, as are current at the time of issuance of the applicable Letter of Credit.

1.1.270  "**Unrestricted Subsidiary**" means any Subsidiary of the Borrower that is not a Material Subsidiary.

1.1.271  "**U.S.**" means the United States of America.

1.1.272  "**U.S. Base Rate**" means the greater of the following:

(a)     the rate of interest announced from time to time by the Agent as its reference rate then in effect for determining rates of interest on U.S. dollar loans to its customers in Canada and designated as its U.S. base rate;

(b)     the Federal Funds Rate plus three-quarters of one percent (0.75%) per annum; and

(c)     sum of (i) the LIBOR Rate and (ii) one percent (1.00%) per annum.

1.1.273  "**U.S. Borrower**" means Q'Max America Inc., a corporation incorporated pursuant to the Laws of the state of Delaware, and its successors and permitted assigns.

1.1.274  "**U.S. Dollar Base Rate Loan**" means an Advance made by a Lender in Canada to the Borrower by way of a direct loan in U.S. Dollars, but excluding Advances in the form of a LIBOR Loan.

1.1.275  "**U.S. Dollar LIBOR Rate**" means, at any time, the LIBOR Rate applicable to LIBOR Loans denominated in U.S. Dollars determined at such time.

1.1.276  "**U.S. Dollar Prime Rate Loan**" means an Advance in U.S. Dollars bearing interest at a fluctuating rate determined by reference to the U.S. Prime Rate.

1.1.277  "**U.S. Dollars**" or "**U.S. $**" means the lawful money of the U.S.

1.1.278  "**U.S. Operating Facility**" is defined in Section 4.1.

1.1.279  "**U.S. Operating Facility Commitment**" means, as the context requires, (a) collectively with respect to all U.S. Operating Lenders, in the aggregate as of the Amendment and Restatement Date, U.S. $15,000,000, as otherwise increased or decreased pursuant to this Agreement and (b) means, with respect to each individual U.S. Operating Lender, the individual commitment amount of such Lender in the maximum principal amount indicated opposite such U.S. Operating Lender's name in Exhibit "A" under the heading "U.S. Operating Facility Commitments", as amended from time to time.

1.1.280  "**U.S. Operating Facility Limit**" means the lesser of (a) the U.S. Operating Facility Commitment, and (b) the sum of the Borrowing Base less the then outstanding Advances under the Term Facility and the Canadian Operating Facility.

1.1.281  "**U.S. Operating Lenders**" means the Lenders who have provided a Commitment under the U.S. Operating Facility as set forth in Exhibit "A".

1.1.282  "**U.S. Prime Rate**" means, for any day, the rate per annum from time to time announced by HSBC US as its prime rate in effect at its principal office in New York City. The U.S. Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  HSBC US may make commercial loans or other loans at rates of interest at, above or below the U.S. Prime Rate.  Any change in the U.S. Prime Rate shall take effect at the opening of business on the day specified in the public announcement of such change.

1.1.283  "**Voting Securities**" means securities of capital stock of any class of any corporation, partnership units in the case of a partnership, trust units in the case of a trust, or other evidence of ownership serving similar purposes, carrying voting rights under all circumstances, provided that, for the purposes of this definition, shares which only carry the right to vote conditionally on the happening of an event will not be considered Voting Securities, whether or not such event will have occurred, nor will any securities be deemed to cease to be Voting Securities solely by reason of a right to vote accruing to securities of another class or classes by reason of the happening of such event.

1.1.284  "**Wells Fargo**" means Wells Fargo Bank, National Association.

1.1.285  "**Wells Fargo Credit Agreement**" means the Credit and Security Agreement to be dated on or after the Amendment and Restatement Date, by and among ADF SPV, LLC, as the borrower, Anchor, as the servicer, and Wells Fargo, as lender and collateral agent, as may be amended, restated, supplemented, replaced or otherwise modified from time to time.

- 60 -

1.1.286  "**Wells Fargo Letter**" means that certain letter to be dated as of the date of the Wells Fargo Credit Agreement between HSBC, as administrative agent, and Wells Fargo, as lender and collateral agent (to be in form and substance satisfactory to the Agent, acting reasonably), as the same may be amended, restated or otherwise modified from time to time.

1.1.287  "**Withdrawal Liability**" has the meaning specified in Part I of Subtitle E of Title IV of ERISA.

1.1.288  "**Year-end Financial Statements**" in respect of any Person means the audited consolidated financial statements of such Person prepared in accordance with GAAP, including the notes thereto, in respect of its most recently completed Fiscal Year.

## 1.2     Accounting Principles

Except as otherwise expressly provided herein, all accounting terms, principles and calculations applicable to the Facilities and this Agreement will be interpreted, applied and calculated, as the case may be, in accordance with GAAP. If, after the date of this Agreement, there shall occur any change in GAAP or change in the accounting method under GAAP that are different from those used in the historical preparation of the financial statements, including any change by reason of any change in the rules, regulations, pronouncements, opinions or other requirements of the Canadian Institute of Chartered Accountants (or any successor thereto or agency with similar function), including the adoption of International Financial Reporting Standards, that are different from those used in the preparation of the financial statements delivered pursuant to Section 7.4 and such change shall result in a change in the method of calculation of any financial covenant, ratio, standard or term found in this Agreement, including the treatment of operating and capital leases, either the Canadian Borrower or the Required Lenders may by notice to the Agent and the Canadian Borrower, respectively, require that the Lenders and the Canadian Borrower negotiate in good faith to amend such covenants, ratios, standards, and terms so as equitably to reflect such change in accounting principles, with the desired result being that the criteria for evaluating the financial condition of the Canadian Borrower and its Subsidiaries shall be the same as if such change had not been made. No delay by the Canadian Borrower or the Required Lenders in requiring such negotiation shall limit their right to so require such a negotiation at any time after such a change in accounting principles. Until any such covenant, ratio, standard or term is amended in accordance with this Section 1.2, financial covenants shall be computed and determined in accordance with GAAP in effect prior to such change in accounting principles.

## 1.3     Currency References

All amounts referred to in this Agreement are in U.S. Dollars unless otherwise noted.

## 1.4     References to Statutes

Whenever in this Agreement reference is made to a statute or regulations made pursuant to a statute, such reference shall, unless otherwise specified, be deemed to include all amendments to such statute or regulations from time to time and all statutes or regulations which may come into effect from time to time substantially in replacement for the said statutes or regulations.

1.5     **Extended Meanings**

Terms defined in the singular have the same meaning when used in the plural, and vice-versa. When used in the context of a general statement followed by a reference to one or more specific items or matters, the term "including" shall mean "including, without limitation", and the term "includes" shall mean "includes, without limitation". Any reference herein to the exercise of discretion by the Agent or the Lenders (including phrases such as "in the discretion of", "in the opinion of", "to the satisfaction of" and similar phrases) shall mean that such discretion is absolute and unfettered and shall not imply any obligation to act reasonably, unless otherwise expressly stated herein.

1.6     **Headings**

Headings, subheadings and the table of contents contained in the Credit Documents are inserted for convenience of reference only, and will not affect the construction or interpretation of the Credit Documents.

1.7     **Subdivisions**

Unless otherwise stated, reference herein to a Schedule or to an Article, Section, paragraph or other subdivision is a reference to such Schedule to this Agreement or such Article, Section, paragraph or other subdivision of this Agreement. Unless specified otherwise, reference in Schedule "A" to a Schedule or to an Article, Section, paragraph or other subdivision is a reference to such Schedule or Article, Section, paragraph or other subdivision of this Agreement.

1.8     **Number**

Wherever the context in the Credit Documents so requires, a term used herein importing the singular will also include the plural and vice versa.

1.9     **Time**

Time will be of the essence of the Credit Documents.

1.10    **Amendments**

No Credit Document may be amended orally and, subject to Sections 1.11(a) and 11.2, any amendment may only be made by way of an instrument in writing signed by the Parties.

1.11    **No Waiver**

(a)     No waiver by a Party of any provision or of the breach of any provision of the Credit Documents will be effective unless it is contained in a written instrument duly executed by an authorized officer or representative of such Party. Such written waiver will affect only the matter specifically identified in the instrument granting the waiver and will not extend to any other matter, provision or breach.

- 62 -

(b)     The failure of a Party to take any steps in exercising any right in respect of the breach or non fulfilment of any provision of the Credit Documents will not operate as a waiver of that right, breach or provision, nor will any single or partial exercise of any right preclude any other or future exercise of that right or the exercise of any other right, whether in Law or otherwise.

(c)     Acceptance of payment by a Party after a breach or non fulfilment of any provision of the Credit Documents requiring a payment to such Party will constitute a waiver of such provision if cured by such payment, but will not constitute a waiver or cure of any other provision of the Credit Documents.

## 1.12    Inconsistency

To the extent that there is any inconsistency or ambiguity between the provisions of this Agreement and any other Credit Document, the provisions of this Agreement will govern to the extent necessary to eliminate such inconsistency or ambiguity. For greater certainty, a provision of this Agreement and a provision of another Credit Document shall be considered to be inconsistent if both relate to the same subject-matter and the provision in one such document imposes more onerous obligations or restrictions than the corresponding provision in the other.

## 1.13    Pro Forma Adjustments

For purposes of making computations of the Net Leverage Ratio and the Fixed Charge Coverage Ratio herein, if any applicable Person or makes any Permitted Acquisitions, mergers, amalgamations, consolidations, dispositions of assets or divisions or the Canadian Borrower makes any adjustments to the Capital Expenditure budget (each a "**relevant transaction**") during the reference period applicable to such computation shall be calculated on a *pro forma* basis assuming that all such relevant transactions (and the change in EBITDA resulting therefrom) had occurred on the first day of such reference period. If since the beginning of such reference period any Person that subsequently became a Subsidiary or was merged with or into the Borrower or any of its Subsidiaries since the beginning of such period shall have consummated any relevant transactions that would have required adjustment pursuant to this definition, then the Net Leverage Ratio shall be calculated giving pro forma effect thereto for such reference period as if such relevant transaction had occurred at the beginning of the applicable reference period.

For purposes of this Section 1.13, whenever *pro forma* effect is to be given to a transaction, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Canadian Borrower and may include, without duplication, cost savings, operating expense reductions, restructuring charges and expenses and cost-saving synergies resulting from such acquisition or other relevant transaction, in each case in a manner acceptable to the Required Lenders, acting reasonably.

## 1.14    Joint and Several Liability of Borrowers

Notwithstanding anything else set forth in the Credit Documents to the contrary, each of the Borrowers agrees and confirms to the Agent and Lenders that the liabilities and obligations of the Borrowers under this Agreement and the other Credit Documents are joint and several as between each Borrower.

### 1.15    Deemed Action by all Borrowers

All consents, waivers, notices and other action required, made, given to or received by the Borrowers under this Agreement or any of the other Credit Documents will be deemed to be required, made, given or received by all of the Borrowers if required, made, given or received by one or more of the Borrowers. If a representation, certification or other statement under this Agreement or any of the other Credit Documents is made by one Borrower, or to the knowledge of one Borrower, it will be deemed to be made by all Borrowers, or the knowledge of all Borrowers, as applicable.

### 1.16    Amendment and Restatement

The Borrowers, the Agent and the Lenders agree that effective on the Amendment and Restatement Date, this Agreement is an amendment and restatement of the Existing Credit Agreement and is not a novation of the Existing Credit Agreement. As a consequence, the obligations, indebtedness and liabilities outstanding under the Existing Credit Agreement (including any existing letters of credit thereunder which will be deemed to be Letters of Credit issued by the applicable Issuing Bank under the corresponding Facility hereunder) shall constitute obligations, indebtedness and liabilities hereunder governed by the terms hereof and shall continue to be secured by the Security. Such obligations, indebtedness and liabilities shall be continuing in all respects, and this Agreement shall not be deemed to evidence or result in a novation of such obligations, indebtedness and liabilities or a repayment and reborrowing of such obligations, indebtedness and liabilities. The Existing Credit Agreement has been amended and restated solely for the purposes of reflecting amendments to the Existing Credit Agreement which the Lenders, the Agent and the Borrowers have agreed upon. All references to the "Credit Agreement" contained in the Credit Documents delivered prior to the effectiveness of this Agreement shall be references to this Agreement without further amendment to those Credit Documents. The Borrowers confirm that each of the Credit Documents otherwise remains in full force and effect. All deliverables made under the Existing Credit Agreement shall be deemed to have been delivered under this Agreement. Each Lender authorizes the Agent to take all actions and make such adjustments as are reasonably necessary to give effect to the foregoing. Notwithstanding the foregoing or any other term hereof, all of the applicable continuing covenants, representations and warranties on the part of the Borrowers under the Existing Credit Agreement and all of the claims and causes of action arising against the Borrowers in connection therewith, in respect of all matters, events, circumstances and obligations arising or existing prior to the Amendment and Restatement Date shall continue, survive and shall not be merged in the execution of this Agreement or any other Credit Documents or any advance or provision of any Loan hereunder.

### 1.17    Exhibits and Schedules

The following exhibits and schedules are attached to this Agreement and incorporated herein by reference:

|  |  |  |
|---|---|---|
| Exhibit "A" | – | Lenders and Lenders' Commitments |
| Exhibit "B" | – | Form of Drawdown Request |
| Exhibit "C" | – | Form of Rollover Notice |

Exhibit "D"          –     Form of Conversion Notice
Exhibit "E"          –     Form of Repayment Notice
Exhibit "F"          –     Form of Compliance Certificate
Exhibit "G"          –     Form of Assignment Agreement
Exhibit "H"          –     Form of Borrowing Base Certificate
Exhibit "I"          –     Form of Designation Notice
Exhibit "J"          –     Form of Subordination Agreement
Schedule 1.1.204     –     Existing Permitted Funded Debt
Schedule 1.1.209     –     Existing Permitted Liens
Schedule 1.1.252     –     Surviving Colombian Credit Agreements
Schedule 6.1.2       –     Corporate Information
Schedule 6.1.3       –     Subsidiaries
Schedule 6.1.5       –     Consents and Approvals Required
Schedule 6.1.8       –     Material Permits
Schedule 6.1.10      –     Leased Properties
Schedule 6.1.11      –     Intellectual Property
Schedule 6.1.12      –     Insurance Policies
Schedule 6.1.13      –     Material Agreements
Schedule 6.1.14      –     Labour Matters
Schedule 6.1.15      –     Environmental Matters
Schedule 6.1.16      –     Litigation
Schedule 6.1.17      –     Pension Plans
Schedule 6.1.23      –     Taxes
Schedule 6.1.33      –     Eligible Approved Contracts
Schedule 7.2.3       –     Investments
Schedule 7.2.6       –     Transactions with Affiliates
Schedule 9.1         –     Post-Closing Schedule

## 1.18    Covenant Relief Period

The Borrowers may, by providing an irrevocable written notice to the Agent, terminate the Covenant Relief Period, which notice shall specify the date on which the Covenant Relief Period is to end; provided that, such termination date shall not be retroactive to a date that precedes such notice.

- 65 -

## ARTICLE 2
## CANADIAN OPERATING FACILITY

**2.1**     **Establishment of Canadian Operating Facility**

Subject to the terms and conditions in this Agreement, each Canadian Operating Lender hereby establishes a committed, revolving credit facility in favour of the Canadian Borrower in the maximum principal amount indicated opposite such Canadian Operating Lender's name in Exhibit "A" under the heading "Canadian Operating Facility Commitments". Such credit facility in the maximum aggregate principal amount of the Canadian Operating Facility Limit are established by the Canadian Operating Lenders severally and not jointly, and are hereinafter collectively referred to as "**Canadian Operating Facility**". Each Advance by a Canadian Operating Lender under the Canadian Operating Facility shall be made by such Canadian Operating Lender in its Proportionate Share of the Canadian Operating Facility. If the Canadian Operating Facility Limit is at any time less than the Canadian Operating Facility Commitment, then each Canadian Operating Lender's obligation to provide Advances under the Canadian Operating Facility will be reduced accordingly on a *pro rata* basis.

**2.2**     **Purpose**

Advances under the Canadian Operating Facility shall be used by the Canadian Borrower to fund working capital needs and for general corporate purposes, including Permitted Acquisitions (other than a Hostile Acquisition and the Terra Acquisition).

**2.3**     **Revolving Nature**

The Canadian Operating Facility shall be a revolving facility. For greater certainty, the Borrower shall, subject to the terms of this Agreement, be entitled to obtain Advances under the Canadian Operating Facility from time to time and repay all or any portion of the Outstanding Advances under the Canadian Operating Facility from time to time; provided, that the Outstanding Advances under the Canadian Operating Facility at any time shall not exceed the Canadian Operating Facility Limit in effect at such time. If at any time and for whatever reason the Outstanding Advances under the Canadian Operating Facility exceed the Canadian Operating Facility Limit then in effect, the Canadian Borrower shall, within two Business Days of receipt of a written notice from the Agent, pay to the Agent the principal amount required to reduce the Outstanding Advances under the Canadian Operating Facility to an amount not greater than the Canadian Operating Facility Limit then in effect.

**2.4**     **Repayment**

The Obligations under the Canadian Operating Facility shall become due and payable on the earlier of: (i) the Acceleration Date; and (ii) the Facilities Maturity Date.

**2.5**     **Availment Options**

2.5.1     Subject to the restrictions contained in this Section 2.5 and elsewhere in this Agreement (and in particular, Sections 5.4 and 5.5), the Canadian Borrower may receive Advances under the Canadian Operating Facility by any one or more of the following

- 66 -

Availment Options (or any combination thereof) in minimum amounts and multiples as provided in Section 5.5:

(a)    Overdrafts in Canadian Dollars or U.S. Dollars (but only under the Swingline);

(b)    Letters of Credit in Canadian Dollars or U.S. Dollars (but only under the Swingline);

(c)    Canadian Dollar Prime Rate Loans;

(d)    U.S. Dollar Base Rate Loans;

(e)    Bankers' Acceptances from the BA Lenders in Canadian Dollars only with a maturity of 30, 60, 90 or 180 days, subject to availability;

(f)    BA Equivalent Loans from the Non-BA Lenders in Canadian Dollars only with a maturity of 30, 60, 90 or 180 days, subject to availability; or

(g)    LIBOR Loans in U.S. Dollars, with a LIBOR Period of 30, 60, 90 or 180 days, subject to availability.

2.5.2    Bankers' Acceptances, BA Equivalent Loans and LIBOR Loans under the Canadian Operating Facility will not be issued with a maturity date later than the Facilities Maturity Date.

2.5.3    The Canadian Borrower may Convert Outstanding Advances under the Canadian Operating Facility in the form of any above Availment Option applicable to it into another form of Availment Option in the same currency, subject to and in accordance with the terms and conditions of this Agreement (but for greater certainty, Bankers' Acceptances, BA Equivalent Loans, LIBOR Loans and Letters of Credit may not be converted into another Availment Option prior to the maturity thereof, except in the case of unexpired Letter of Credits by the return of the original thereof to the Swingline Lender for cancellation).

## 2.6    Interest and Fees

2.6.1    In respect of Advances under the Canadian Operating Facility, the Canadian Borrower agrees to pay the following:

(a)    interest on Overdrafts in Canadian Dollars and interest on Canadian Dollar Prime Rate Loans at the Canadian Prime Rate plus the Applicable Margin per annum, payable monthly in arrears on the last Business Day of such month;

(b)    in respect of each Letter of Credit issued under the Canadian Operating Facility:

(i)    to the Swingline Lender in respect of the period from the date of issuance of such Letter of Credit to the date of expiry of such Letter of Credit (including the first day but excluding the last day) and divided by 365 or

- 67 -

366 days, as the case may be, a fee equal to the Applicable Margin in effect at the time of issuance multiplied by the face amount of such Letter of Credit multiplied by the number of days in such period and divided by 365 or 366 days, as the case may be, payable on the date of issuance of such Letter of Credit; and

(ii)    in respect of each Letter of Credit, in addition to the fees referred to in clause (i) immediately above, fees generally applicable to Letters of Credit from time to time (such as issuance, drawing, registration, amendment, communication and other processing and out of pocket fees) at the Swingline Lender's usual rates, payable to the Swingline Lender for its own account,

and each fee referred to in this Section in respect of a Letter of Credit shall be paid in the same currency as the currency of such Letter of Credit;

(c)    in respect of each Bankers' Acceptance, a stamping fee equal to the Applicable Margin multiplied by the face amount of the Bankers' Acceptance with the product thereof further multiplied by the number of days to maturity of the Bankers' Acceptance and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such Bankers' Acceptance will be less than the face amount payable to the holder of such Bankers' Acceptance on the maturity thereof, as more particularly provided in Section 5.10);

(d)    in respect of each BA Equivalent Loan, a stamping fee equal to the Applicable Margin multiplied by the face amount of the BA Equivalent Loan with the product thereof further multiplied by the number of days to maturity of the BA Equivalent Loan and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such BA Equivalent Loan will be less than the principal amount of such BA Equivalent Loan on the maturity thereof, as more particularly provided in Section 5.12);

(e)    interest on Overdrafts in U.S. Dollars and interest on U.S. Dollar Base Rate Loans at the U.S. Base Rate plus the Applicable Margin per annum, payable monthly in arrears on the last day of each and every month (provided, that if the last day of any month is not a Business Day, interest shall be payable on the next Business Day thereafter);

(f)    interest on LIBOR Loans in U.S. Dollars at the U.S. Dollar LIBOR Rate plus the Applicable Margin per annum calculated on the basis of a year of 360 days, payable in the manner set out in Section 5.13.2;

(g)     a standby fee with respect to the unused portion of the Canadian Operating Facility (other than the Swingline), calculated in U.S. Dollars on a daily basis as being the difference between (i) the Canadian Operating Facility Commitment less the Swingline Limit and (ii) the Outstanding Advances under that portion of the Canadian Operating Facility other than the Swingline, multiplied by the Applicable Margin and divided by 365 or 366 days, as the case may be, which standby fee shall be payable quarterly in arrears on the last day of each Fiscal Quarter;

(h)     a standby fee with respect to the Swingline payable to the Agent for the account of the Swingline Lender, calculated in U.S. Dollars on a daily basis as being the difference between (i) the Swingline Limit and (ii) the Outstanding Advances under the Swingline, multiplied by the Applicable Margin and divided by 365 or 366 days, as the case may be, which standby fee shall be payable quarterly in arrears on the last day of each Fiscal Quarter; and

(i)     such fees payable to the Agent as may be agreed in writing from time to time between the Canadian Borrower and the Agent relating to any Banking Services Agreements and related services which may be provided by the Agent for the Canadian Borrower from time to time.

2.6.2     With respect to any Availment Option under the Canadian Operating Facility, "Applicable Margin" means, in respect of any Fiscal Quarter, the percentage in the column relating to such Availment Option which corresponds to the Net Leverage Ratio as determined pursuant to Section 5.1.4.

**2.7     Swingline**

2.7.1     A portion of the Canadian Operating Facility in the maximum amount of the Swingline Limit is hereby designated as the "**Swingline**" and shall be subject to the terms and conditions in this Section 2.7 (in addition to any other applicable terms and conditions contained in this Agreement). The Swingline shall be available to each of the Canadian Borrower and the Specified Canadian Swingline Borrower (collectively the "**Swingline Borrowers**").

2.7.2     The Swingline shall be established and maintained by the Swingline Lender only. Either Swingline Borrower may only receive Advances under the Swingline by way of Overdrafts, LIBOR Loans, Bankers' Acceptances or the issuance of Letters of Credit, in each case (other than with respect to Bankers' Acceptances), in Canadian Dollars or U.S. Dollars. The aggregate amount owing under the Swingline may at no time exceed the Swingline Limit and the aggregate principal amount outstanding under the Swingline plus the other Outstanding Advances under the Canadian Operating Facility shall at no time exceed the Canadian Operating Facility Limit. The total number of Bankers' Acceptances and LIBOR Loans outstanding under the Swingline shall not exceed fifteen at any time.

2.7.3     The Swingline shall form a part of the Canadian Operating Facility and, except for the purpose of calculating the Canadian Operating Facility standby fee, any Swingline

Loan shall reduce availability under the Canadian Operating Facility on a dollar for dollar basis.

2.7.4     The Swingline Lender will make Advances to the Swingline Borrowers under the Swingline by way of (a) Canadian Dollar Overdraft into Canadian Dollar accounts, or U.S. Dollar Overdraft into U.S. Dollar accounts, in each case held at a branch of the Agent and as designated by either Swingline Borrower from time to time as required in order to honour cheques drawn by either Swingline Borrower on such accounts which are presented to the Swingline Lender for payment, (b) the issuance of Letters of Credit in Canadian Dollars or U.S. Dollars or (c) LIBOR Loans or Bankers' Acceptances. Other than in respect of Letters of Credit, LIBOR Loans or Bankers' Acceptances, no Drawdown Request or minimum amount shall be required in connection therewith and each Swingline Loan shall be on a dollar for dollar basis (i.e. not subject to multiples). As deposits are made into such accounts by the applicable Swingline Borrower, the Swingline Lender shall withdraw funds from such accounts from time to time and apply such funds as Repayments under the Swingline; provided, that the foregoing shall not apply to any Swingline Loans made by way of issuance of a Letter of Credit, LIBOR Loan or Bankers' Acceptance. No notice of repayment shall be required to be given by the Canadian Borrower in respect of any such repayment of any Swingline Loan (other than in respect of LIBOR Loans or Bankers' Acceptances). The Swingline Borrowers authorize and direct the Swingline Lender, in its discretion, to automatically debit, by mechanical, electronic or manual means, the bank accounts of the Swingline Borrowers maintained by it for any amounts (including principal, interest or fees) that are due and payable under this Section 2.7.

2.7.5     Letters of Credit may be issued under the Swingline in Canadian Dollars or U.S. Dollars (or such other currencies as may be agreed to by the Swingline Lender); provided, that the Equivalent Amount expressed in U.S. Dollars (or such other currency, if applicable) of the aggregate face amount of all Letters of Credit outstanding under the Swingline at any time may not exceed U.S. $10,000,000. Each Letter of Credit shall have an expiry date not exceeding the earlier of (a) one year from the date of issuance thereof (subject to any customary auto-renewal terms contained in such Letter of Credit; provided, that such auto-renewal provisions do not provide for a renewal in the singular instance in excess of one year from the date of such renewal), and (b) five Business Days prior to the Facilities Maturity Date. Letters of Credit will not be issued for the purpose of guaranteeing obligations of any Person other than a Credit Party. On the date of issue, the Swingline Lender will complete and issue one or more Letters of Credit in favour of the beneficiary as specified by the applicable Swingline Borrower in its Drawdown Request. No Letter of Credit shall require payment against a conforming draft to be made thereunder on the same Business Day upon which such draft is presented, if such presentation is made after 11:00 a.m. (Toronto time) on such Business Day. Prior to the issue date, the applicable Swingline Borrower shall specify a precise description of the documents and the verbatim text of any certificate to be presented by the beneficiary prior to payment under the Letter of Credit. The Swingline Lender may require changes in any such documents or certificate, acting reasonably. In determining whether to pay under a Letter of Credit, the Swingline Lender shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit. Sections 4.7.2, 4.7.3, 4.7.4 and

- 70 -

4.7.6 shall apply to Letters of Credit issued under the Swingline *mutatis mutandis* as if the Swingline Lender was the Issuing Bank.

2.7.6    If the Canadian Borrower requests a Syndicated Advance and the Swingline Lender's Proportionate Share of such Syndicated Advance would cause its Proportionate Share of all Syndicated Advances under the Canadian Operating Facility then outstanding together with the aggregate outstanding principal amount of all Swingline Loans to exceed the Swingline Lender's Commitment under the Canadian Operating Facility, then the Canadian Borrower shall be required to repay such Swingline Loans (or to convert the same into a Syndicated Advance in accordance with Section 2.7.7) to the extent of such excess on or before the requested date of such Syndicated Advance; provided, that the foregoing shall not apply to any Swingline Loans made by way of issuance of a Letter of Credit.

2.7.7    Notwithstanding anything to the contrary herein contained, the Canadian Borrower may at any time give notice to the Swingline Lender and the Agent, which notice shall direct a Conversion of any outstanding Swingline Loan into a Syndicated Advance (other than by way of issuance of a Letter of Credit) and shall specify the particulars of such Swingline Loans, and the Agent shall forthwith provide a copy of such notice to the Canadian Operating Lenders and, effective on the effective date of such notice, the Canadian Borrower shall be deemed to have requested a Conversion of such Swingline Loan into a Syndicated Advance (whether or not it was the actual borrower under such Swingline Loan) and in an amount sufficient to repay the relevant Swingline Loan and accrued and unpaid interest in respect thereof. Subject to the same notice period set out in Section 5.4, each Canadian Operating Lender shall disburse to the Agent for payment to the Swingline Lender its respective Proportionate Share of such amounts and such amounts shall thereupon be deemed to have been advanced by such other Canadian Operating Lenders to the Canadian Borrower and to constitute Syndicated Advances by way of Canadian Dollar Prime Rate Loans or U.S. Dollar Base Rate Loans, as applicable. Such Syndicated Advances shall be deemed to be comprised of principal and accrued and unpaid interest in the same proportions as the corresponding Swingline Loans.

2.7.8    Upon the occurrence and any time during the continuance of an Event of Default, the Canadian Operating Lenders shall make such adjusting payments amongst themselves in any manner as may be required to ensure their respective participations in outstanding Advances under the Canadian Operating Facility reflect their respective Proportionate Share under the Canadian Operating Facility. If any Swingline Loans (other than by way of Letters of Credit) are outstanding, the Swingline Lender may at any time in its sole and absolute discretion, on behalf of either Swingline Borrower (which hereby irrevocably directs and authorizes the Swingline Lender to make such request on its behalf), request that each Canadian Operating Lender, through the Agent, make a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable, to the Canadian Borrower (whether or not it was the actual borrower under such Swingline Loan) in an amount equal to the Lender's Proportionate Share of the principal amount of such Swingline Loan outstanding on the date such notice is given (in this Section, the "**Refunded Swingline Loans**"), provided that the provisions of this clause shall not affect the applicable Swingline Borrower's obligation to repay the Swingline Loans to the extent they remain

outstanding. Each Canadian Operating Lender will make the proceeds of any such Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable, available to the Swingline Lender on the Business Day next following the date such notice is given in immediately available funds. The proceeds of such a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan shall be applied by the Swingline Lender to the payment in full of the Refunded Swingline Loans.

2.7.9    In the event of any request for a drawing under any Letter of Credit, the Swingline Lender may notify the applicable Swingline Borrower (with a copy of the notice to the Agent) on or before the date on which it intends to honour such drawing. The applicable Swingline Borrower (whether or not such notice is given) shall reimburse the Swingline Lender within two Business Days of demand by the Swingline Lender, in the relevant currency, an amount, in same day funds, equal to the amount of such drawing (in this Section, an "**LC Payment**"). The applicable Swingline Borrower shall pay to the Swingline Lender interest on the amount of any such drawn Letter of Credit as if such drawn amount was a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable, from the date such Letter of Credit is drawn upon until such time as the applicable Swingline Borrower reimburses the Swingline Lender for the drawn amount of such Letter of Credit. If the applicable Swingline Borrower does not reimburse the Swingline Lender within such two Business Days, the Canadian Operating Lenders shall, on the third Business Day following the date of such initial demand on the applicable Swingline Borrower by the Swingline Lender, at the request of the Swingline Lender, provide its Proportionate Share of the amount drawn under any such Letter of Credit and the Agent shall apply the proceeds thereof to the reimbursement of the Swingline Lender for the amount of such drawing. The applicable Swingline Borrower shall pay to Canadian Operating Lenders interest on the amount of any such drawn Letter of Credit from the date the Swingline Lender requests payment from each of Canadian Operating Lenders in respect of such drawn Letter of Credit until such time as the Canadian Borrower reimburses the Swingline Lender and each of Canadian Operating Lenders for the drawn amount of such Letter of Credit which has been drawn upon as if such drawn amount was a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable. Each Canadian Operating Lender acknowledges and agrees that its obligation to acquire participations in each Letter of Credit issued by the Swingline Lender and its obligation to make the payments specified herein, and the right of the Swingline Lender to receive the same, in the manner specified herein, are absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or Event of Default hereunder, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

2.7.10    The obligations of each Canadian Operating Lender under Sections 2.7.8 and 2.7.9 are unconditional, shall not be subject to any qualification or exception whatsoever and shall be performed in accordance with the terms and conditions of this Agreement under all circumstances including:

(a)    any lack of validity or enforceability of the applicable Swingline Borrower's obligations under this Section 2.7;

(b)    the occurrence of any Default or Event of Default or the exercise of any rights by the Agent under the Credit Documents;

(c)    whether the Borrower under a Swingline loan was the Canadian Borrower or the Specified Canadian Swingline Borrower; and

(d)    the absence of any demand for payment being made, any proof of claim being filed, any proceeding being commenced or any judgment being obtained by any Lender against any Credit Party.

2.7.11    For certainty, it is hereby acknowledged and agreed that the Canadian Operating Lenders shall be obligated to disburse to the Agent for payment to the Swingline Lender their respective Proportionate Shares of any Syndicated Advances contemplated in this Section 2.7 regardless of:

(a)    whether a Default or Event of Default has occurred or is then continuing or whether any other condition in Section 9.2 is met;

(b)    whether or not the Canadian Borrower has, in fact, actually requested such Conversion; and

(c)    whether or not a Person was a Canadian Operating Lender at the time the applicable Swingline Loan was made.

2.7.12    Notwithstanding any other terms of this Section 2.7, this Agreement or any other Loan Document, the Canadian Borrower shall be jointly and severally liable with the Specified Canadian Swingline Borrower for all obligations and indebtedness arising out of any Swingline Loan advanced by the Swingline Lender to the Specified Canadian Swingline Borrower.

<div align="center">

**ARTICLE 3**
**TERM FACILITY**

</div>

**3.1**    **Establishment of the Term Facility**

Subject to the terms and conditions in this Agreement, each Term Lender hereby establishes a committed non-revolving reducing term credit facility in favour of the Canadian Borrower in the maximum principal amount indicated opposite such Term Lender's name in Exhibit "A" under the heading "Term Facility Commitments". Such credit facility in the maximum aggregate principal amount of the Term Facility Commitment is established by the Term Lenders severally and not jointly, and is hereinafter referred to as the "**Term Facility**". Each Advance by a Term Lender under the Term Facility shall be made by such Term Lender in its Proportionate Share of the Term Facility.

**3.2**    **Purpose**

Advances to partially finance the purchase price of certain Acquisitions.

**3.3     Nature**

The Term Facility shall be a non-revolving facility, and any Repayment under the Term Facility may not be re-borrowed. As of the Amendment and Restatement Date, no new Advances are available under the Term Facility.

**3.4     Repayment**

3.4.1     The Obligations under the Term Facility shall become due and payable on the earlier of: (a) the Acceleration Date; and (b) the Facilities Maturity Date.

3.4.2     The Canadian Borrower shall make Repayments under the Term Facility in quarterly installments on the last day of each Fiscal Quarter (and if the last day of a Fiscal Quarter is not a Business Day, such payment shall be due on the next Business Day) of U.S. $1,195,000 in each case, payable on the last Business Day of each such Fiscal Quarter.

3.4.3     Each Repayment under the Term Facility shall be applied to the Term Lenders holding such Loans *pro rata* based upon their Proportionate Share thereof and the Term Facility Commitment shall be reduced by the amount of each such Repayment.

**3.5     Availment Options**

3.5.1     Subject to the restrictions contained in this Section 3.5, the Canadian Borrower may receive Advances under the Term Facility by way of (and may convert Outstanding Advances under the Term Facility into) any one or more of the following Availment Options (or any combination thereof) in minimum amounts and multiples as provided in Section 5.5:

(a)     Canadian Dollar Prime Rate Loans;

(b)     Bankers' Acceptances from the BA Lenders in Canadian Dollars only with a maturity date of 30, 60, 90 or 180 days, subject to availability;

(c)     BA Equivalent Loans from the Non-BA Lenders in Canadian Dollars only with a maturity date of 30, 60, 90 or 180 days, subject to availability;

(d)     U.S. Dollar Base Rate Loans; or

(e)     LIBOR Loans in U.S. Dollars only with a LIBOR Period of 30, 60, 90 or 180 days, subject to availability.

3.5.2     Bankers' Acceptances, BA Equivalent Loans and LIBOR Loans under the Term Facility may not be converted into another Availment Option prior to the maturity thereof, and may not be issued with a maturity date later than the Facilities Maturity Date.

**3.6     Interest and Fees**

3.6.1     In respect of Advances under the Term Facility, the Canadian Borrower agrees to pay the following:

(a)     interest on Canadian Dollar Prime Rate Loans at the Canadian Prime Rate plus the Applicable Margin per annum, payable monthly in arrears on the first Business Day of the next month;

(b)     in respect of each Bankers' Acceptance, a stamping fee equal to the Applicable Margin multiplied by the face amount of the Bankers' Acceptance with the product thereof further multiplied by the number of days to maturity of the Bankers' Acceptance and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such Bankers' Acceptance will be less than the face amount payable to the holder of such Bankers' Acceptance on the maturity thereof, as more particularly provided in Section 5.10);

(c)     in respect of each BA Equivalent Loan, a stamping fee equal to the Applicable Margin multiplied by the face amount of the BA Equivalent Loan with the product thereof further multiplied by the number of days to maturity of the BA Equivalent Loan and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such BA Equivalent Loan will be less than the principal amount of such BA Equivalent Loan on the maturity thereof, as more particularly provided in Section 5.12);

(d)     interest on U.S. Dollar Base Rate Loans at the U.S. Base Rate plus the Applicable Margin per annum, payable monthly in arrears on the first Business Day of the next month; and

(e)     interest on LIBOR Loans in U.S. Dollars at the U.S. Dollar LIBOR Rate plus the Applicable Margin per annum calculated on the basis of a year of 360 days, payable in the manner set out in Section 5.13.2.

3.6.2     With respect to any Availment Option under the Term Facility, "Applicable Margin" means, in respect of any Fiscal Quarter, the percentage in the column relating to such Availment Option which corresponds to the Net Leverage Ratio as determined pursuant to Section 5.1.4.

- 75 -

# ARTICLE 4
## U.S. OPERATING FACILITY

### 4.1    Establishment of U.S. Operating Facility

Subject to the terms and conditions in this Agreement, each U.S. Operating Lender hereby establishes a committed, revolving credit facility in favour of the U.S. Borrower in the maximum principal amount indicated opposite such U.S. Operating Lender's name in Exhibit "A" under the heading "U.S. Operating Facility Commitments". Such credit facility in the maximum aggregate principal amount of the U.S. Operating Facility Limit are established by the U.S. Operating Lenders severally and not jointly, and are hereinafter collectively referred to as the "**U.S. Operating Facility**". Each Advance by a U.S. Operating Lender under the U.S. Operating Facility shall be made by such U.S. Operating Lender in its Proportionate Share of the U.S. Operating Facility.

### 4.2    Purpose

Advances under the U.S. Operating Facility shall be used by the U.S. Borrower to fund working capital needs and for general corporate purposes including the Permitted Acquisitions (other than a Hostile Acquisition and the Terra Acquisition).

### 4.3    Revolving Nature

The U.S. Operating Facility shall be a revolving facility. For greater certainty, the U.S. Borrower shall, subject to the terms of this Agreement, be entitled to obtain Advances by way of U.S. Dollar Prime Rate Loans, LIBOR Loans or Letters of Credit in U.S. Dollars under the U.S. Operating Facility from time to time and repay all or any portion of the Outstanding Advances under the U.S. Operating Facility from time to time; provided, that the Outstanding Advances under the U.S. Operating Facility at any time shall not exceed the U.S. Operating Facility Commitment in effect at such time. If at any time and for whatever reason the Outstanding Advances under the U.S. Operating Facility exceed the U.S. Operating Facility Commitment then in effect, the U.S. Borrower shall, within two Business Days of receipt of a written notice from the Agent, pay to the Agent the principal amount required to reduce the Outstanding Advances under the U.S. Operating Facility to an amount not greater than the U.S. Operating Facility Commitment then in effect.

### 4.4    Repayment

The Obligations under the U.S. Operating Facility shall become due and payable on the earlier of: (i) the Acceleration Date; and (ii) the Facilities Maturity Date.

### 4.5    Availment Options

4.5.1    Subject to the restrictions contained in this Section 4.5 and elsewhere in this Agreement (and in particular, Sections 5.4 and 5.5), the U.S. Borrower may receive Advances under the U.S. Operating Facility by any one or more of the following Availment Options (or any combination thereof) in minimum amounts and multiples as provided in Section 5.5:

- 76 -

(a)     Letters of Credit in U.S. Dollars;

(b)     U.S. Dollar Prime Rate Loans; or

(c)     LIBOR Loans in U.S. Dollars, with a LIBOR Period of 30, 60, 90 or 180 days, subject to availability.

4.5.2     LIBOR Loans under the U.S. Operating Facility will not be issued with a maturity date later than the Facilities Maturity Date.

4.5.3     The U.S. Borrower may convert Outstanding Advances under the U.S. Operating Facility in the form of any above Availment Option applicable to it into another form of Availment Option in the same currency, subject to and in accordance with the terms and conditions of this Agreement (but for greater certainty, LIBOR Loans and Letters of Credit may not be converted into another Availment Option prior to the maturity thereof, except in the case of unexpired Letter of Credits by the return of the original thereof to the Issuing Bank for cancellation).

## 4.6     Interest and Fees

4.6.1     In respect of Advances under the U.S. Operating Facility, the U.S. Borrower agrees to pay the following:

(a)     interest on U.S. Dollar Prime Rate Loans in U.S. Dollars at the U.S. Prime Rate plus the Applicable Margin per annum, payable monthly in arrears on the last day of each and every month (underlined_provided, that if such day is not a Business Day, interest shall be payable on the next Business Day thereafter);

(b)     interest on LIBOR Loans in U.S. Dollars at the U.S. Dollar LIBOR Rate plus the Applicable Margin per annum calculated on the basis of a year of 360 days, payable in the manner set out in Section 5.13.2;

(c)     in respect of each Letter of Credit issued under the U.S. Operating Facility:

(i)     to the Agent for the account of the U.S. Operating Lenders in respect of the period from the date of issuance of such Letter of Credit to the date of expiry of such Letter of Credit (including the first day but excluding the last day) and divided by 360 days, a fee equal to the Applicable Margin in effect at the time of issuance multiplied by the face amount of such Letter of Credit multiplied by the number of days in such period and divided by 360 days, payable on the date of issuance of such Letter of Credit; and

(ii)     in respect of each Letter of Credit, in addition to the fees referred to in Section 4.6.1(c), fees generally applicable to Letters of Credit from time to time (such as issuance, drawing, registration, amendment, communication and other processing and out of pocket fees) at the Issuing Bank's usual rates, payable to the Issuing Bank for its own account.

- 77 -

Each fee referred to in this Section in respect of a Letter of Credit shall be paid in U.S. Dollars; and

(d) an unused commitment fee with respect to the unused portion of the U.S. Operating Facility calculated in U.S. Dollars on a daily basis as being the difference between (i) the U.S. Operating Facility Commitment and (ii) the Outstanding Advances under the U.S. Operating Facility, multiplied by the Applicable Margin and divided by 360 days which standby fee shall be payable quarterly in arrears on the last day of each Fiscal Quarter.

4.6.2   With respect to any Availment Option under the U.S. Operating Facility, "Applicable Margin" means, in respect of any Fiscal Quarter, the percentage in the column relating to such Availment Option which corresponds to the Net Leverage Ratio as determined pursuant to Section 5.1.4.

## 4.7   Letters of Credit

4.7.1   Letters of Credit may be issued under the U.S. Operating Facility in U.S. Dollars (or such other currencies as may be agreed to by the Agent and by the applicable Issuing Bank); provided, that the Equivalent Amount expressed in U.S. Dollars of the aggregate face amount of all Letters of Credit outstanding under the U.S. Operating Facility at any time may not exceed U.S. $5,000,000. Each Letter of Credit shall have an expiry date not exceeding the earlier of (a) one year from the date of issuance thereof (subject to any customary auto-renewal terms contained in such Letter of Credit; provided, that such auto-renewal provisions do not provide for a renewal in the singular instance in excess of one year from the date of such renewal), and (b) five Business Days prior to the Facilities Maturity Date.

4.7.2   Each request for the issuance of a Letter of Credit shall be delivered by the U.S. Borrower to the Issuing Bank (with a copy to the Agent) in accordance with the notice requirements set out in Section 5.4 herein, together with Issuing Bank's customary form of application and indemnity agreement completed to its satisfaction and the proposed form of the Letter of Credit (which shall be satisfactory to the Issuing Bank) and such other certificates, documents and other papers and information as the Issuing Bank may reasonably request.

4.7.3   On the date of issue, the Issuing Bank will complete and issue one or more Letters of Credit in favour of the beneficiary as specified by the U.S. Borrower in its Drawdown Request. No Letter of Credit shall require payment against a conforming draft to be made thereunder on the same Business Day upon which such draft is presented, if such presentation is made after 11:00 a.m. (New York time) on such Business Day. Prior to the issue date, the U.S. Borrower shall specify a precise description of the documents and the verbatim text of any certificate to be presented by the beneficiary prior to payment under the Letter of Credit. The Issuing Bank may require changes in any such documents or certificate, acting reasonably. In determining whether to pay under a Letter of Credit, the Issuing Bank shall be responsible only to determine that the documents and certificates

required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit.

4.7.4     In the event of any request for a drawing under any Letter of Credit, the Issuing Bank may notify the U.S. Borrower (with a copy of the notice to the Agent) on or before the date on which it intends to honour such drawing. The U.S. Borrower (whether or not such notice is given) shall reimburse the Issuing Bank within one Business Day of demand by the Issuing Bank, an amount, in same day funds, equal to the amount of such drawing. The U.S. Borrower shall pay to the Issuing Bank interest on the amount of any such drawn Letter of Credit as if such drawn amount was a U.S. Dollar Prime Rate Loan from the date such Letter of Credit is drawn upon until such time as the U.S. Borrower reimburses the Issuing Bank for the drawn amount of such Letter of Credit. If the U.S. Borrower does not reimburse the Issuing Bank within such two Business Days, U.S. Operating Lenders shall, on the third Business Day following the date of such initial demand on the U.S. Borrower by the Issuing Bank, at the request of the Issuing Bank, provide its Proportionate Share of the amount drawn under any such Letter of Credit and the Agent shall apply the proceeds thereof to the reimbursement of the Issuing Bank for the amount of such drawing. The U.S. Borrower shall pay to U.S. Operating Lenders interest on the amount of any such drawn Letter of Credit from the date the Issuing Bank requests payment from each of U.S. Operating Lenders in respect of such drawn Letter of Credit until such time as the U.S. Borrower reimburses the Issuing Bank and each of U.S. Operating Lenders for the drawn amount of such Letter of Credit which has been drawn upon as if such drawn amount was a U.S. Dollar Base Rate Loan. Each U.S. Operating Lender acknowledges and agrees that its obligation to acquire participations in each Letter of Credit issued by the Issuing Bank and its obligation to make the payments specified herein, and the right of the Issuing Bank to receive the same, in the manner specified herein, are absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or Event of Default hereunder, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

4.7.5     The Issuing Bank shall notify each the Agent of the principal amount, the number, and the expiration date of each Letter of Credit and upon receipt of such information, the Agent shall notify each U.S. Operating Lender of the amount of such U.S. Operating Lender's participation therein. The Issuing Bank shall review each draft and any accompanying documents presented under a Letter of Credit and shall notify the Agent of any such presentment and upon receipt of such information, the Agent shall notify each U.S. Operating Lender of such presentment.

4.7.6     The Issuing Bank shall not be obligated to issue any Letter of Credit (i) in violation of any Applicable Law or policy of such Issuing Bank or any Lender or (ii) if any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Bank from issuing such Letter of Credit. The Issuing Bank shall not at any time be obligated to issue any Letter of Credit if such issuance would conflict with, or cause the Issuing Bank to exceed any limits imposed by, this Agreement or any applicable requirements of Applicable Law or any regulatory or internal limit.

# ARTICLE 5
# GENERAL CONDITIONS

**5.1    Matters relating to Interest and Fees**

5.1.1    Unless otherwise indicated, Interest on any outstanding principal amount hereunder shall be calculated daily and shall be payable monthly in arrears on the last day of each and every month. If the last day of a month is not a Business Day, the Interest payment due on such day shall be made on the next Business Day, and Interest shall continue to accrue on the said principal amount and shall also be paid on such next Business Day. Interest shall accrue from and including the day upon which an Advance is made or is deemed to have been made, and ending on but excluding the day on which such Advance is repaid or satisfied. Any change in the Canadian Prime Rate shall cause an immediate adjustment of the interest rate applicable to Canadian Dollar Prime Rate Loans and Overdrafts in Canadian Dollars and any change in the U.S. Base Rate shall cause an immediate adjustment of the interest rate applicable to U.S. Dollar Base Rate Loans and Overdrafts in U.S. Dollars, in each case without the necessity of any notice to any Borrower.

5.1.2    Unless otherwise stated, in this Agreement if reference is made to a rate of Interest, fee or other amount "per annum" or a similar expression is used, such interest, fee or other amount shall be calculated on the basis of a year of 365 or 366 days (or 360 days in the case of Loans or Letters of Credit denominated in U.S. Dollars), as the case may be. If the amount of any Interest, fee or other amount is determined or expressed on the basis of a period of less than one year of 365 days or 366 days (or 360 days in the case of Loans denominated in U.S. Dollars), as the case may be, the equivalent yearly rate is equal to the rate so determined or expressed, divided by the number of days in the said period, and multiplied by the actual number of days in that calendar year.

5.1.3    Notwithstanding any other provisions of this Agreement:

(a)    the Borrowers and the Lenders intend to strictly comply with all Applicable Laws, including applicable usury laws (or the usury laws of any jurisdiction whose usury laws are deemed to apply to this Agreement and the other Credit Documents despite the intention and desire of the parties to apply the usury laws of the Province of Alberta and the federal laws applicable therein);

(b)    in no event shall any Borrower or any other Person be obligated to pay, or any Lender have any right or privilege to reserve, receive or retain, (a) any interest in excess of the maximum amount of nonusurious interest permitted under the laws of the Province of Alberta the federal laws of Canada applicable therein, or the Applicable Laws of any other jurisdiction, or (b) total interest in excess of the amount which such Lender could lawfully have contracted for, reserved, received, retained or charged had the interest been calculated for the full term of the applicable Loan; and

(c)      if the amount of any interest, premium, fees or other monies or any rate of interest stipulated for, taken, reserved or extracted under the Credit Documents would otherwise contravene the provisions of Section 347 of the *Criminal Code* (Canada), Section 8 of the *Interest Act* (Canada) or any successor or similar legislation (including any usury law in the U.S.), or would exceed the amounts which any Lender is legally entitled to charge and receive under any law to which such compensation is subject, then such amount or rate of interest shall be reduced to such maximum amount as would not contravene such provision; and to the extent that any excess has been charged or received such Lender shall apply such excess against the Outstanding Advances and refund any further excess amount to the applicable Borrower.

As used in this Section 5.1.3, the term "interest" includes the aggregate of all charges, fees, benefits or other compensation which constitute interest under Applicable Law; <u>provided</u>, that, to the maximum extent permitted by Applicable Law, (a) any non-principal payment shall be characterized as an expense or as compensation for something other than the use, forbearance or detention of money and not as interest, and (b) all interest at any time contracted for, reserved, charged or received shall be amortized, prorated, allocated and spread, using the actuarial method, during the full term of the Facilities. The daily interest rates to be used in calculating interest for the purposes of this Section 5.1.3 shall be determined by dividing the applicable interest rate per annum by the number of days in the calendar year for which such calculation is being made. None of the terms and provisions contained in this Agreement or in any other Credit Document which directly or indirectly relate to interest shall ever be construed without reference to this Section 5.1.3, or be construed to create a contract to pay for the use, forbearance or detention of money at any interest rate in excess of the amounts permitted under any Applicable Law.

The provisions of this Section shall govern and control over every other provision of this Agreement or any other Credit Document which conflicts or is inconsistent with this Section 5.1.3.

5.1.4      Any change in the Applicable Margin in respect of any Availment Option under a Facility shall be determined in accordance with this Section. For purposes of this Section, the term "**Pricing Date**" means, for any Fiscal Quarter of the Canadian Borrower ending on or after the Amendment and Restatement Date, the date on which the Agent is in receipt of the financial statements and Compliance Certificate pursuant to Section 7.4.1(b) or Section 7.4.1(d), as applicable, for such Fiscal Quarter. The Applicable Margin shall be established on a Pricing Date based on the Net Leverage Ratio as of the end of the most recently completed Fiscal Quarter and the Applicable Margin established on a Pricing Date shall remain in effect until the next Pricing Date. If the financial statements and Compliance Certificate are delivered before 10:00 a.m. Toronto time on a specific Business Day (the "**Specific Business Day**") then pricing will be adjusted starting on the Specific Business Day. If the financial statements and Compliance Certificate are received after 10:00 a.m. Toronto time on the Specific Business Day then any pricing adjustment will be effective on the next Business Day. If the Canadian Borrower has not delivered its financial statements and Compliance Certificate by the date such financial statements and Compliance Certificate are required to be delivered pursuant to Section 7.4.1(b) or

- 81 -

Section 7.4.1(d), as applicable, then until such financial statements and Compliance Certificate are delivered, the Applicable Margin shall be based on Level VI. The Applicable Margin established by such financial statements shall be in effect from the Pricing Date that occurs immediately after the end of the Fiscal Quarter covered by such financial statements until the next Pricing Date; provided, that no changes will be made in respect of any Bankers' Acceptances or BA Equivalent Loans which are outstanding on the effective date, until the Rollover thereof and fees paid on the issuance or renewal of a Letter of Credit will not change during the term of a Letter of Credit as a result of a change in the Net Leverage Ratio.

5.1.5    The determination of the Applicable Margin by the Agent shall be conclusive and binding on the Borrowers and the Lenders if reasonably determined, absent manifest error.

5.1.6    Effective upon the occurrence of an Event of Default (the "**effective date**"), the interest rates then applicable to all Availment Options will each increase by 200 basis points and such increase will remain in effect for as long as such Event of Default subsists. An increase in interest rates and fees as aforesaid arising from an Event of Default shall apply to all outstanding Advances under the Facilities and will on the effective date apply proportionately to each outstanding Advance during the continuance of such Event of Default. The Borrowers will pay to the Agent on behalf of the Lenders any resulting increase in stamping fees and Letter of Credit fees on or prior to the third Business Day following the effective date. In addition to the conditions set forth above, the Lenders' obligation to provide any Advances under any Facility, other than Rollovers or Conversions of then maturing Advances (in each case not to exceed a 30 day term), will be suspended for as long as there exists an Event of Default.

5.1.7    If the Canadian Borrower has delivered a Compliance Certificate that is subsequently found to be inaccurate in any way as a result of the Canadian Borrower's financial results having to be restated or if the Canadian Borrower's financial results were inaccurately reflected in the original financial results on which such Compliance Certificate was based or for any other reason and the result thereof is that the Net Leverage Ratio was originally reported as lower (and the corresponding Level in the Applicable Margin table was lower) than it otherwise would have been in the absence of such inaccuracy or prior to such restatement, then the Borrowers will, immediately upon the correction of such inaccuracy or upon such restatement, pay to the Agent for the benefit of the applicable Lenders an amount equal to the interest, Letter of Credit fees, stamping fees in respect of Bankers' Acceptances and standby fees that the Lenders should have received, but did not receive, over the applicable period had the Net Leverage Ratio, and the underlying components thereof, been reported correctly in the first instance.

## 5.2    Voluntary Prepayments

Subject to Section 5.15, the Borrowers may from time to time, without payment of any penalty or fee, upon at least two Business Days' prior written notice to the Agent make a prepayment in respect of any Outstanding Advances under any of the Facilities. In the case of Term Facility, the Term Facility Commitment shall be automatically and permanently reduced by the amount of any such prepayment. Notwithstanding the foregoing, Bankers' Acceptances,

BA Equivalent Loans and LIBOR Loans may not be repaid prior to the maturity thereof (except in accordance with Sections 5.11 and 5.14, as applicable) and unexpired Letter of Credits may not be prepaid prior to the maturity thereof (except by the return of the original thereof to the Issuing Bank or Swingline Lender, as applicable, for cancellation or by the collateralization thereof in the manner set forth in Section 5.16(f)). Prepayments under the Facilities other than under the Swingline shall be in a minimum principal amount of U.S. $500,000 and integral multiples of U.S. $100,000 in excess thereof and shall be applied as directed by the Borrowers to the remaining payments thereof. Any prepayments under the Term Facility shall be made in inverse order of maturity.

**5.3    Mandatory Prepayments**

5.3.1    If any Credit Party receives cash proceeds, or net cash proceeds in the case of clauses (a), (b) and (c) below, from:

(a)    a transaction after the Amendment and Restatement Date involving the creation or incurrence of any Funded Debt (other than Permitted Funded Debt), and notwithstanding any Default or Event of Default that results therefrom;

(b)    transactions involving the sale, lease or other disposition of any assets (other than transactions described in clauses (a) through (d) inclusive and (f) through (j) inclusive of Section 7.2.4), except where such proceeds are reinvested in the business of any Credit Party within the applicable time period permitted in accordance with Section 5.3.2 (the "**Sales Proceeds**"); or

(c)    property, casualty or other insurance proceeds received by any Credit Party, except where such proceeds are reinvested in the business of any Credit Party within the applicable time period permitted in accordance with Section 5.3.2 (the "**Insurance Proceeds**"); and/or

(d)    Specified Equity Contribution;

then, subject to Sections 5.3.2 and 8.6, the Borrowers shall make a Repayment on account of the Outstanding Advances in an amount equal to 100% of such proceeds, or net cash proceeds in the case of clauses (a), (b) and (c) above, within three Business Days (i) after such proceeds are received by the applicable Credit Party in the case of clauses (a) and (d) above, (ii) within three Business Days of the expiry of the applicable reinvestment period set out in Section 5.3.2 after such proceeds are received by the applicable Credit Party in the case of clause (b) above and within three Business Days of the expiry of the insurance proceeds reinvestment period described in Section 5.3.2(a) after such proceeds are received by the applicable Credit Party in the case of clause (c) above. As used herein, "net cash proceeds" in respect of any such transaction means the gross amount payable to the applicable Credit Party in cash in respect of such transaction less (i) any sales commissions, selling expenses, brokers' fees, consulting fees, legal fees, other costs and expenses of the transaction actually incurred, investment banking fees, accountants' fees, consulting fees, underwriting discounts and commissions and other customary fees and expenses actually incurred, (ii) amounts required to be applied to the repayments of Funded Debt, (including

- 83 -

the principal amount, premium or penalty, if any, interest and other amounts required to be applied to the repayment of any Funded Debt secured by a Lien (including because the asset sold is removed from a borrowing base supporting such Funded Debt)), (iii) taxes payable in connection with the transaction, (iv) usual and reasonable adjustments in connection with the transaction and, including the amount of any liability paid or to be paid or reasonable reserve established in accordance with GAAP against any liabilities associated with the assets that are the subject of such event and retained by the Canadian Borrower or any of its Subsidiaries, and (v) any other amount specifically approved by the Agent in writing.

5.3.2    The Sales Proceeds or Insurance Proceeds, as applicable, need not be used by the Credit Parties to make a repayment under Section 5.3.1 and may be used by a Credit Party to purchase assets of the general type then used in the operation of an Eligible Line of Business, or, provided no Default (unless such repayment would cure any such Default) or Event of Default exists at such time, in the case of:

(a)    Insurance Proceeds (i) of insured claims that do not exceed in the aggregate in any one Fiscal Year $7,500,000 or (ii) are used to repair or replace the property in respect of which such Insurance Proceeds were received, if such purchase, repair or replacement occurs within twelve (12) months of the receipt of such proceeds, subject to an extension of up to a further six (6) months to complete such reinvestment; provided, that the Credit Party is contractually bound to such reinvestment prior to the expiry of the initial twelve (12) months period; or

(b)    Sales Proceeds (i) arising from any single transaction or series of related transactions that do not exceed in the aggregate in any one Fiscal Year $3,000,000 or (ii) are used or useful by a Credit Party to purchase assets of the general type then used in the operation of an Eligible Line of Business, within nine (9) months of the receipt of such proceeds, subject to an extension of up to a further three (3) months to complete such reinvestment; provided, that the Credit Party is contractually bound to such reinvestment prior to the expiry of the initial nine (9) period.

In connection with the foregoing, the Agent and the Lenders may rely upon and assume the correctness of all asset values and other statements contained in any certificate provided by an officer of the Canadian Borrower confirming the value of the relevant assets.

5.3.3    Repayments under this Section 5.3 are to be applied first to Outstanding Advances under the Term Facility until they have been fully repaid, and then to Outstanding Advances under the Operating Facilities, as directed by the Canadian Borrower, or failing such direction, pro rata between the Operating Facilities. Repayments under the Facilities under this Section 5.3 shall be applied in inverse order of maturity and will be made pro rata to each Lender under the applicable Facility.

5.3.4    If as a result of currency rate fluctuation, the Outstanding Advances under the Canadian Operating Facility exceeds the Canadian Operating Facility Limit by at least 3% thereof (in each case, a "**Currency Excess**"), the Borrowers will, by the earlier of (a) five

- 84 -

(5) Business Days after a written request from the Agent, and (b) the next date of a Rollover or Conversion, pay the applicable Currency Excess to the Agent as a Repayment for the benefit of the Canadian Operating Lenders to be shared on the basis of each applicable Lender's Proportionate Share under the Canadian Operating Facility. If to pay a Currency Excess it is necessary to repay an Advance made by way of Bankers' Acceptance or a LIBOR Loan prior to the maturity date thereof, the Borrowers will not be required to repay such Advances until the maturity date applicable thereto; provided, however, that at the request of the Agent, the Borrowers will forthwith pay the Currency Excess to the Agent for deposit into a cash collateral account maintained by and in the name of the Agent for the benefit of the Canadian Operating Lenders. The Currency Excess will be held by the Agent for set off against future obligations owing by the Borrowers to the Canadian Operating Lenders in respect of such Currency Excess, if any, and, pending such application, such amounts will bear interest for the Borrowers' account at the rate payable by the Agent in respect of deposits of similar amounts and for similar periods of time. The Agent shall have exclusive control over all amounts at any time on deposit in such cash collateral account. The deposit of the Currency Excess by the Borrowers with the Agent as herein provided will not operate as a Repayment under the Canadian Operating Facility until such time as the Currency Excess is actually paid to the Canadian Operating Lenders as a Repayment. If the Borrowers are required to provide a deposit under this Section 5.3.4 as a result of the Currency Excess with respect to an unmatured Bankers' Acceptance or a LIBOR Loan, and such Currency Excess (or any portion thereof) is no longer in effect on the maturity date of such Bankers' Acceptance or LIBOR Loan, such deposit (or the applicable portion thereof) shall be returned to the Borrowers within three Business Days after the maturity date of such Bankers' Acceptance or LIBOR Loan.

5.3.5    If the aggregate Outstanding Advances under the Facilities, is at any time greater than the then applicable Borrowing Base (the amount of such excess being a "**Borrowing Base Shortfall**"), one or all of the Borrowers shall within three (3) Business Days repay such portion of the Outstanding Advances under the Operating Facilities to the Agent for the Canadian Operating Lenders as is required to eliminate such Borrowing Base Shortfall. The Agent will apply such payments (a) against the Term Facility and (b) thereafter, *pro rata* amongst the Canadian Operating Facility and the U.S. Operating Facility and in the following order: (i) first against Canadian Dollar Prime Rate Loans, U.S. Dollar Base Rate Loans, U.S. Dollar Prime Rate Loans, (ii) second to collateralize Bankers' Acceptances as provided in Section 5.11, (iii) third to repay LIBOR Loans, subject to Section 5.14, and (iv) fourth to collateralize Letters of Credit as provided in Section 5.16(f), until any such Borrowing Base Shortfall has been eliminated. If the Borrowers are required to provide cash collateral under this Section 5.3.5 as a result of a Borrowing Base Shortfall, such amount shall be returned to the Borrowers within three (3) Business Days after such Borrowing Base Shortfall is no longer continuing.

5.3.6    If any Credit Party receives net cash proceeds from any Anchor Sale and Leaseback Transaction, then the Borrowers shall make a Repayment on account of the Outstanding Advances under the Operating Facilities in an amount equal to 100% of such net cash proceeds within five Business Days after such proceeds are received by the applicable Credit Party. As used herein, "net cash proceeds" has the same meaning ascribed thereto in Section 5.3.1. Repayments under this Section 5.3.6 are to be applied to

Outstanding Advances under the Operating Facilities on a pro rata basis. Repayments under this Section 5.3.6 shall not result in a permanent reduction of any Operating Facility.

## 5.4    Notice Periods

5.4.1    The Borrowers shall provide written notice to the Agent in respect of Advances, Rollovers, Conversions and Repayments to the extent set out below:

(a)    no notice is required for Advances and Repayments in respect of Overdrafts under the Swingline;

(b)    notice is required for each voluntary Repayment under any Facility in accordance with Section 5.2;

(c)    except as provided in clauses (a) and (b) above, but subject to (d), (e) and (f) below, one Business Days' notice is required before 10:00 a.m. Toronto time in respect of any Advance, Rollover, Conversion or voluntary Repayment in Canadian Dollars or in U.S. Dollars;

(d)    notwithstanding the foregoing, if an Advance, Rollover, Conversion or voluntary Repayment relates to a Bankers' Acceptance or BA Equivalent Loan, two Business Days' notice is required before 10:00 a.m. Toronto time;

(e)    notwithstanding the foregoing, if an Advance, Rollover, Conversion or voluntary Repayment relates to a LIBOR Loan, three Business Days' notice is required before 10:00 a.m. Toronto time; and

(f)    notwithstanding the foregoing, if an Advance relates to the issuance of a Letter of Credit, (i) if issued to a beneficiary located in Canada or the U.S., three Business Days' notice is required before 10:00 a.m. Toronto time and (ii) if issued to a beneficiary located outside of Canada or the U.S., five (5) Business Days' notice is required before 10:00 a.m. Toronto time.

5.4.2    Notice of any Advance, Rollover, Conversion or voluntary Repayment referred to in Section 5.4.1 above shall be given in the form of a Drawdown Request, Rollover Notice, Conversion Notice or Repayment Notice, as the case may be, attached hereto as Exhibits, and shall be given to the Agent at its address set out in Section 13.11.

5.4.3    If notice is not provided as contemplated herein with respect to the maturity of any Bankers' Acceptance, BA Equivalent Loan and LIBOR Loan the Agent may convert such Bankers' Acceptance, BA Equivalent Loan or LIBOR Loan upon its maturity into a Canadian Dollar Prime Rate Loan or a U.S. Dollar Base Rate Loan, as applicable.

5.4.4    Any Conversion from one form of Availment Option to another shall be subject to satisfaction of all terms and conditions applicable to the form of the new Availment Option.

**5.5**     **Minimum Amounts, Multiples and Procedures re Advances, Conversions and Repayments**

5.5.1     Each request by a Borrower for an Advance or Conversion in the form of a Canadian Dollar Prime Rate Loan shall be in a minimum amount of Cdn. $500,000 and multiples of Cdn. $100,000 thereafter.

5.5.2     Each request of a Borrower for an Advance or Conversion in the form of a U.S. Dollar Base Rate Loan shall be in a minimum amount of U.S. $500,000 and multiples of U.S. $100,000 thereafter.

5.5.3     Each request by a Borrower for an Advance or Conversion in the form of a Bankers' Acceptance or BA Equivalent Loan shall be in a minimum amount of Cdn. $500,000 and multiples of Cdn. $100,000 thereafter.

5.5.4     Each request by a Borrower for an Advance or Conversion in the form of a LIBOR Loan in U.S. Dollars shall be in a minimum amount of U.S. $500,000 and in a multiple of U.S. $100,000 thereafter.

5.5.5     Conversions or Rollovers under the Term Facility can be in such lesser amounts as are necessary to give effect to the principal repayments under the Term Facility required pursuant to Sections 3.4, 5.3.1 and 5.3.2.

5.5.6     Upon receipt of a Drawdown Request under any Facility, the Agent shall promptly notify each Lender under such Facility of the contents thereof and such Lender's Proportionate Share of the Advance. Such Drawdown Request shall not thereafter be revocable.

5.5.7     Each Advance shall be made by the applicable Lenders to the Agent at its address referred to in Section 13.11 or such other address as the Agent may designate by notice in writing to the Lenders from time to time. Each Lender shall make available its Proportionate Share of each said Advance to the Agent. Unless the Agent determines that any condition of the Advance has not been satisfied or waived, the Agent shall make the funds so received from the Lenders available to the applicable Borrower by 2:00 p.m. (Toronto time) on the requested date of the Advance. No Lender shall be responsible for any other Lender's obligation to make available its Proportionate Share of the said Advance.

5.5.8     Each Borrower agrees to deliver to the Agent in favour of any requesting Lender such other agreements and documentation as such Lender may reasonably require (not inconsistent with this Agreement and upon at least two (2) Business Days' prior written notice) in respect of such Lender's requirements for the acceptance of Bankers' Acceptances or the issuance of BA Equivalent Loans.

5.5.9     All payments of principal, interest and other amounts made by the Credit Parties to the Agent in respect of the Outstanding Advances under a Facility shall be paid by the Agent to the Lenders in accordance with their respective Proportionate Shares of the Outstanding Advances under such Facility. For greater certainty, however, (a) stamping

fees in respect of Bankers' Acceptances and BA Equivalent Loans shall be received and retained by the respective Lenders which issued or accepted such Bankers' Acceptances and BA Equivalent Loans and (b) in the event that any payments of principal, interest and other amounts made by the Credit Parties to the Agent instead of to the Swingline Lender in respect of the Outstanding Advances under the Swingline, any such payments shall be paid by the Agent to the Swingline Lender.

## 5.6     Place of Advances and Repayments

5.6.1     Advances by any Lender to a Borrower shall be made by such Lender to the Agent from such Lender's applicable Lending Office. All payments of principal, interest and other amounts to be made by the Borrowers and the other Credit Parties pursuant to this Agreement shall be made to the Agent at its address noted in Section 13.11 or to such other address at a major city in Canada as the Agent may direct in writing from time to time. All such payments received by the Agent on a Business Day before 2:00 p.m. (Toronto time) shall be treated as having been received by the Agent on that day; payments made after such time on a Business Day shall be treated as having been received by the Agent on the next Business Day.

5.6.2     Whenever any payment or the performance of any covenant, duty or other obligation shall be due on (or required within a time period ending on) a day which is not a Business Day, the date for payment or performance thereof shall be extended to the next succeeding Business Day. Interest shall continue to accrue and be payable thereon as provided herein, until the date on which such payment is received by the Agent.

## 5.7     Evidence of Obligations (Noteless Advances)

The Agent shall open and maintain, in accordance with its usual practice, accounts evidencing the Obligations; and the information entered in such accounts shall constitute conclusive evidence of the Obligations absent manifest error. The Agent may, but shall not be obliged to, request the Borrowers to execute and deliver from time to time such promissory notes as may be required as additional evidence of the Obligations; provided, that no promissory notes shall be required in respect of any Hedging Agreements or Banking Services Agreements.

## 5.8     Determination of Equivalent Amounts

Whenever it is necessary or desirable at any time to determine the Equivalent Amount in Canadian Dollars of an amount expressed in U.S. Dollars, or vice-versa (specifically including the determination of the Equivalent Amount in Canadian Dollars of an Advance made in U.S. Dollars (as applicable), the determination of each Lender's Proportionate Share of any Repayment on any date, and the determination of whether the Outstanding Advances under any Facility exceed the limit applicable to such Facility at any time), the Equivalent Amount shall be determined by reference to the Exchange Rate on the date of such determination. Notwithstanding the foregoing, however, for the purposes of determining any Letter of Credit fees under the Canadian Operating Facility or the standby fees applicable to the Canadian Operating Facility, the Agent shall make such determination based upon the Bank of Canada noon spot rate on the first Business Day of each quarter for such quarter as the case may be.

- 88 -

If any basket used hereunder is exceeded solely as a result of fluctuations in applicable currency exchange rates after the last time such basket was utilized, such basket will not be deemed to have been exceeded solely as a result of such fluctuations in currency exchange rates. For purposes of determining the Net Leverage Ratio, amounts denominated in a currency other than U.S. Dollars will be converted to U.S. Dollars for the purposes of (A) testing the financial covenant under Section 7.3.1(a), at the Exchange Rate as of the last day of the Fiscal Quarter for which such measurement is being made, and (B) calculating any Net Leverage Ratio (other than for the purposes of determining compliance with Section 7.3.1(a)), at the Exchange Rate as of the date of calculation, and will, in the case of Funded Debt, reflect the currency translation effects, determined in accordance with GAAP, of Hedging Agreements permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Equivalent Amount in U.S. Dollars of such Funded Debt.

**5.9      Commitment to Purchase Bankers' Acceptances and BA Equivalent Loans**

5.9.1      Each BA Lender which is a bank listed in Schedule I of the *Bank Act* (Canada) agrees to purchase those Bankers' Acceptances which it has accepted, at a discount from the face amount thereof calculated at the CDOR Rate for the relevant period in effect on the issuance date thereof.

5.9.2      Each BA Lender which is a bank listed in Schedule II or Schedule III of the *Bank Act* (Canada) agrees to purchase those Bankers' Acceptances which it has accepted, at a discount from the face amount thereof calculated using a rate not in excess of the CDOR Rate for the relevant period in effect on the issuance date thereof plus up to one-tenth of one percent (0.10%).

5.9.3      Each Non-BA Lender agrees to purchase BA Equivalent Loans issued by it hereunder at a discount from the face amount thereof calculated using a rate not in excess of the CDOR Rate plus up to one tenth of one percent (0.10%) for the relevant period in effect on the issuance date thereof.

5.9.4      The discount applicable to each Bankers' Acceptances and BA Equivalent Loan shall be determined on the basis of a year of 365 days.

**5.10     Special Provisions Regarding Bankers' Acceptances**

The following provisions are applicable to Bankers' Acceptances issued by the Canadian Borrower and accepted by any BA Lender hereunder.

5.10.1     *Payment of Bankers' Acceptances.* The Canadian Borrower agrees to provide for each Bankers' Acceptance by payment of the face amount thereof to the Agent on behalf of the BA Lender on the maturity of the Bankers' Acceptance or, prior to such maturity, on the Acceleration Date; and the Agent shall remit the said amount to such BA Lender and such BA Lender shall in turn remit such amount to the holder of the Bankers' Acceptance. If the Canadian Borrower fails to provide for the payment of the Bankers' Acceptance accordingly, any amount not so paid shall be immediately payable by the Canadian Borrower to the Agent on behalf of the BA Lender together with interest on such amount calculated daily and payable monthly at the rate and in the manner applicable to

Canadian Dollar Prime Rate Loans under the Facility under which such Bankers' Acceptance was issued. The Canadian Borrower agrees not to claim any days of grace for the payment at maturity of any Bankers' Acceptance and agrees to indemnify and save harmless the BA Lender in connection with all payments made by the BA Lender (or by the Agent on its behalf) pursuant to Bankers' Acceptances accepted by the BA Lender, together with all reasonable costs and expenses incurred by the BA Lender in this regard. The Canadian Borrower hereby waives any defences to payment which might otherwise exist if for any reason a Bankers' Acceptance is held by the BA Lender for its own account at maturity.

5.10.2   *Availability of Bankers' Acceptances.* If at any time and from time to time the Agent determines, acting reasonably, that there no longer exists a market for Bankers' Acceptances for the term requested by the Canadian Borrower, or at all, or if any BA Lenders representing no less than 35% of the Commitments advise the Agent in writing that the CDOR Rate will not or does not accurately reflect the cost of funds of such BA Lender, the Agent shall so advise the Canadian Borrower, and in such event the BA Lenders shall not be obliged to accept and the Canadian Borrower shall not be entitled to issue Bankers' Acceptances. If such notice is given and there is any outstanding Drawdown Request, Rollover Notice or Conversion Notice requesting an Advance by way of, or a Rollover or Conversion into, a Bankers' Acceptance at such a time, then such request will be deemed to be a request for, or a Rollover or Conversion into, a Canadian Dollar Prime Rate Loan.

5.10.3   *Power of Attorney.* The Canadian Borrower hereby appoints each BA Lender as its true and lawful attorney to complete and issue Bankers' Acceptances on behalf of the Canadian Borrower in accordance with written (including facsimile) transmitted instructions provided by the Canadian Borrower to the Agent on behalf of such BA Lender, and the Canadian Borrower hereby ratifies all lawful acts that its said attorney may do by virtue thereof. The Canadian Borrower agrees to indemnify and hold harmless the Agent and the BA Lenders and their respective directors, officers and employees from and against any charges, complaints, costs, damages, expenses, losses or liabilities of any kind or nature which they may incur, sustain or suffer, arising from or by reason of acting, or failing to act, as the case may be, in reliance upon this power of attorney, except to the extent caused by the gross negligence or willful misconduct of the Agent or the BA Lender or their respective directors, officers and employees. The Canadian Borrower hereby agrees that each Bankers' Acceptance completed and issued and accepted in accordance with this Section by a BA Lender on behalf of the Canadian Borrower is a valid, binding and negotiable instrument of the Canadian Borrower as drawer and endorser. The Canadian Borrower agrees that each BA Lender's accounts and records will constitute *prima facie* evidence of the execution and delivery by the Canadian Borrower of Bankers' Acceptances. This power of attorney is coupled with an interest and shall continue in force until written notice of revocation with respect to any BA Lender has been served upon the Agent by the Canadian Borrower at the Agent's address set out in Section 13.11.

5.10.4   *Repayment Prior to Maturity.* The Canadian Borrower acknowledges that Advances made by a Lender by way of Bankers' Acceptances and BA Equivalent Loans may not be repaid prior to the maturity thereof. If any Bankers' Acceptance or BA

Equivalent Loan is repaid prior to the scheduled maturity date hereof (whether as a result of Section 2.3 or Section 10.2 or otherwise), the Canadian Borrower will forthwith pay to the Agent for deposit into an escrow account maintained by and in the name of the Agent for the benefit of the applicable Lenders the principal amount of such Bankers' Acceptance or BA Equivalent Loan and the Agent will in its discretion invest any funds in respect of such purported repayment in a term deposit maturing on the scheduled maturity date of the Bankers' Acceptance or BA Equivalent Loan. Any interest accruing on the term deposit will be paid to the Canadian Borrower on the maturity date thereof; provided, that no Event of Default has occurred and is continuing.

5.10.5   *Depository Bills.* It is the intention of the Parties that pursuant to the *Depository Bills and Notes Act* (Canada) ("**DBNA**"), all Bankers' Acceptances accepted by the Lenders under this Agreement will be issued in the form of a "depository bill" (as defined in the DBNA), deposited with a "clearing house" (as defined in the DBNA), including The Canadian Depository for Securities Limited or its nominee CDS Clearing and Depository Services Inc. ("**CDS**"). In order to give effect to the foregoing, the Agent will, subject to the approval of the Canadian Borrower and the Lenders, establish and notify the Canadian Borrower and the Lenders of any additional procedures, consistent with the terms of this Agreement, as are reasonably necessary to accomplish such intention, including:

(a)     any instrument held by the Agent for purposes of Bankers' Acceptances will have marked prominently and legibly on its face and within its text, at or before the time of issue, the words "This is a depository bill subject to the *Depository Bills and Notes Act* (Canada)";

(b)     any reference to the authentication of the Bankers' Acceptance will be removed; and

(c)     any reference to the "bearer" will be removed and such Bankers' Acceptances will not be marked with any words prohibiting negotiation, transfer or assignment of it or of an interest in it.

5.10.6   *Rounding.* In the case of an issue of Bankers' Acceptances, the Agent will round allocations amongst the Lenders to ensure that each Bankers' Acceptance issued has a face amount which is a whole number multiple of $100,000 (and such rounded allocations shall constitute the Lenders' respective Proportionate Share for the purposes of this Agreement).

## 5.11   Escrowed Funds

Upon the request of the Agent after the occurrence and during the continuance of an Event of Default on the cancellation of this Agreement, or if any Outstanding Advances by way of Bankers' Acceptances are required to be prepaid hereunder prior to their maturity, the Canadian Borrower will forthwith pay to the Agent for deposit into an escrow account maintained by and in the name of the Agent for the benefit of the applicable Lenders, an amount equal to the Lenders' maximum potential liability under then outstanding Bankers' Acceptances. Such escrowed funds will be held by the Agent for set-off against future Obligations owing by the Canadian Borrower to the applicable Lenders in respect of such Bankers' Acceptances and pending such application

may be invested in accordance with Section 5.10.4. In the case such Event of Default is either waived or cured in compliance with the terms of this Agreement, then the remaining escrow funds if any, together with any accrued interest to the date of release, will be released to the Canadian Borrower. The deposit of such escrow funds by the Canadian Borrower with the Agent as herein provided, will not operate as a repayment of the Outstanding Advance under the applicable Facility until such time as the escrow funds are actually paid to the applicable Lenders as a Repayment on the applicable maturity date thereof.

**5.12    Special Provisions regarding BA Equivalent Loans**

Each Non-BA Lender will not accept Bankers' Acceptances hereunder, and shall instead from time to time make BA Equivalent Loans to the Canadian Borrower. The amount of each BA Equivalent Loan will be equal to the discount proceeds (based on the discount rate set forth in Section 5.9.3 and subject to Section 5.10.6) which would be realized from a hypothetical sale of the corresponding Bankers' Acceptance on the basis the Lenders purchased such Bankers' Acceptance and the maturity date of each such BA Equivalent Loan will be the same as the maturity date of the corresponding Bankers' Acceptance. Upon the reasonable request of a Non-BA Lender, each BA Equivalent Loan may be evidenced by a non-interest bearing promissory note payable by the Canadian Borrower to the Non-BA Lender in a form acceptable to each such party, acting reasonably. Any such BA Equivalent Loan shall be negotiable by the Non-BA Lender without notice to or the consent of the Canadian Borrower, and the holder thereof shall be entitled to enforce such BA Equivalent Loan against the Canadian Borrower free of any equities, defences or rights of set-off that may exist between the Credit Parties and the Non-BA Lender. In this Agreement, all references to a BA Equivalent Loan shall mean the loan evidenced thereby if required by the context; and all references to the "issuance" of a BA Equivalent Loan by a Non-BA Lender and similar expressions shall mean the making of a BA Equivalent Loan by the Non-BA Lender which is evidenced by a BA Equivalent Loan as if applicable. The following provisions are applicable to each BA Equivalent Loan made by a Non-BA Lender to the Canadian Borrower hereunder:

5.12.1    *Payment of BA Equivalent Loans.* The Canadian Borrower agrees to provide for each BA Equivalent Loan by payment of the face amount thereof to the Agent on behalf of the Non-BA Lender on the maturity of the BA Equivalent Loan or, prior to such maturity, on the Acceleration Date; and the Agent shall remit the said amount to such Non-BA Lender and such Non-BA Lender shall in turn remit such amount to the holder of the BA Equivalent Loan. If the Canadian Borrower fails to provide for the payment of the BA Equivalent Loan accordingly, any amount not so paid shall be immediately payable by the Canadian Borrower to the Agent on behalf of the Non-BA Lender together with interest on such amount calculated daily and payable monthly at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans under the Facility under which such BA Equivalent Loan was made. The Canadian Borrower agrees not to claim any days of grace for the payment at maturity of any BA Equivalent Loan and agrees to indemnify and save harmless the Non-BA Lender in connection with all payments made by the Non-BA Lender (or by the Agent on its behalf) pursuant to BA Equivalent Loans accepted by the Non-BA Lender, together with all reasonable costs and expenses incurred by the Non-BA Lender in this regard. The Canadian Borrower hereby waives any defences to

payment which might otherwise exist if for any reason a BA Equivalent Loan is held by the Non-BA Lender for its own account at maturity.

5.12.2  *Availability of BA Equivalent Loans.* No Non-BA Lender shall have any obligation to issue BA Equivalent Loans during any period in which the BA Lenders' obligation to issue Bankers' Acceptances is suspended pursuant to Section 5.10.2.

## 5.13  Special Provisions Regarding LIBOR Loans

The following provisions are applicable to LIBOR Loans made by any Lender to the Borrowers.

5.13.1  *Drawdown Procedures.* Upon receipt by the Agent from a Borrower of a Drawdown Request, Conversion Notice or Rollover Notice in respect of a LIBOR Loan, the Agent will promptly advise such Borrower of the U.S. Dollar LIBOR Rate, such rate to be determined as at approximately 11:00 a.m. London time, two LIBOR Business Days before the commencement of the LIBOR Period for such LIBOR Loan.

5.13.2  *Interest Payment Dates for LIBOR Loans.* Interest in respect of any LIBOR Loan in U.S. Dollars shall be calculated on the basis of a year of 360 days. Interest in respect of any LIBOR Loan with a LIBOR Period of between one month and three months (inclusive) shall be payable at the time the principal amount of such LIBOR Loan is payable. Interest in respect of any LIBOR Loan with a LIBOR Period longer than three months shall be payable in arrears every three months commencing on the last day of the third month following the commencement of such LIBOR Period, and also at the time the principal amount of such LIBOR Loan is payable.

5.13.3  *Laws Applicable to LIBOR Loans.* Each Borrower acknowledges that the ability of the Lenders to maintain or provide any LIBOR Loan and to charge interest on any LIBOR Loan at the U.S. Dollar LIBOR Rate is and will be subject to any statute, law, regulation, rule or direction by any Governmental Authority having jurisdiction which may prohibit or restrict or limit such loans or such interest. Each Borrower agrees that the Lenders shall have the right to comply with any such requirements and, if the Agent determines it to be necessary as a result of such requirement, the Agent may convert any LIBOR Loan to a U.S. Dollar Base Rate Loan or require immediate repayment of all LIBOR Loans, including accrued interest thereon and all applicable breakage costs pursuant to Section 5.15.

## 5.14  Breakage Costs

The Borrowers may only Repay or Convert any LIBOR Loan prior to the scheduled maturity date thereof, whether as a result of acceleration or for any other reason, if the Borrowers agree to pay to the Agent upon demand all losses, damages, costs and expenses which such Lender has incurred or may incur as a result of such Repayment or Conversion prior to the said scheduled maturity date. The Agent shall provide the Borrowers with a written certificate showing in reasonable detail the basis for such claim, which shall be deemed to be *prima facie* correct, in the absence of manifest error.

**5.15    Inability to Make LIBOR Loans**

If at any time and from time to time:

(a)    the Agent (acting reasonably) determines that by reason of circumstances affecting the London Interbank Eurodollar Market, adequate and fair means do not exist for ascertaining the rate of interest with respect to, or deposits are not available in sufficient amounts in the ordinary course of business at the rate determined hereunder to fund, a requested LIBOR Loan during the ensuing LIBOR Period selected;

(b)    the Agent (acting reasonably) determines that the making or continuing of the requested LIBOR Loan by the Lenders has been made impracticable by the occurrence of an event which materially adversely affects the London Interbank Eurodollar Market generally; or

(c)    the Agent is advised by Lenders representing no less than 35% of the Commitments that the U.S. Dollar LIBOR Rate will not or does not represent the effective cost to such Lender of U.S. Dollar deposits in such market for the relevant LIBOR Period,

then the Agent shall give notice thereof to the Lenders and the Borrowers as soon as possible after such determination or receipt of such notice, as the case may be, and if such notice is given subsequent to the giving of a Drawdown Request or any Rollover Notice or Conversion Notice to the Agent by a Borrower with regard to any requested LIBOR Loan, such Borrower shall, within one Business Day after receipt of such notice and in replacement of the Drawdown Request, Rollover Notice or Conversion Notice, as the case may be, previously given by such Borrower, give the Agent a Drawdown Request or a Conversion Notice, as the case may be, which specifies the Advance of a U.S. Dollar Base Rate Loan or the Conversion of the relevant LIBOR Loan on the last day of the applicable LIBOR Period into a U.S. Dollar Base Rate Loan. In the event a Borrower fails to give, if applicable, a valid replacement Conversion Notice with respect to the maturing LIBOR Loans which were the subject of a Rollover Notice, such maturing LIBOR Loans shall be converted on the last day of the applicable LIBOR Period into U.S. Dollar Base Rate Loans under the applicable Facility as if a Conversion Notice had been given to the Agent by such Borrower pursuant to the provisions hereof. In the event a Borrower fails to give, if applicable, a valid replacement Drawdown Request with respect to an Advance originally requested by way of a LIBOR Loan, then such Borrower shall be deemed to have requested an Advance by way of a U.S. Dollar Base Rate Loan in the amount specified in the original Drawdown Request and, on the originally requested date of Advance, the applicable Lenders (subject to the other provisions hereof) shall make available the requested amount by way of a U.S. Dollar Base Rate Loan under the applicable Facility.

If at any time the Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in Section 5.15(b) have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in Section 5.15(b) have not arisen but the supervisor for the administrator of LIBOR Rate or a Governmental Authority having jurisdiction over the Agent has made a public statement

identifying a specific date after which the LIBOR Rate shall no longer be used for determining interest rates for loans, then the Agent and the Borrowers shall negotiate in good faith to establish an alternate rate of interest to LIBOR Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for LIBOR Loans made in Canada or in the United States at such time, and upon an agreement being reached, shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable. Notwithstanding anything to the contrary herein, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required Lenders stating that such Required Lenders object to such amendment. Provided that, if such alternate rate of interest shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

**5.16    Special Provisions Regarding Letters of Credit**

The following additional provisions are applicable to Letters of Credit issued by hereunder:

(a)    The obligation of a Borrower to reimburse any Issuing Bank for all drawings under Letters of Credit shall be absolute, unconditional and irrevocable and shall be satisfied strictly in accordance with their terms, irrespective of:

   (i)    any lack of validity or enforceability of any Letter of Credit;

   (ii)    the existence of any claim, setoff, defence or other right which such Borrower or any other Person may at any time have against the beneficiary under any Letter of Credit, such Issuing Bank, the Agent or any Lender (other than the defence of payment in accordance with the terms of this Agreement or a defence based on the gross negligence or willful misconduct of such Issuing Bank as determined by a court of competent jurisdiction by final and non-appealable judgment) or any other Person in accordance with this Agreement or other transaction;

   (iii)    any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; and

   (iv)    any other circumstance or event whatsoever, whether or not similar to any of the foregoing.

(b)    In making any payment under any Letter of Credit (a) an Issuing Bank's exclusive reliance on the documents presented to it under such Letter of Credit as to any and all matters set forth therein, including reliance on the amount of any draft presented under such Letter of Credit, whether or not the amount due to the beneficiary equals the amount of such draft and whether or not any document presented pursuant to such Letter of Credit proves to be insufficient in any respect, if such document on its face appears to be in order, and whether or not any other statement or any other

- 95 -

document presented pursuant to such Letter of Credit proves to be forged or invalid or any statement therein proves to be inaccurate or untrue in any respect whatsoever and (b) any non-compliance in any immaterial respect of the documents presented under such Letter of Credit with the terms thereof shall, in each case, not be deemed willful misconduct or negligence of such Issuing Bank.

(c)    Each Issuing Bank and its correspondents may accept and act upon the name, signature, or act of any party purporting to be the executor, administrator, receiver, trustee in bankruptcy or other legal representative of any party designated in any Letter of Credit in the place of the name, signature, or act of such party.

(d)    In addition to amounts payable as elsewhere provided in this Section 5.16, each Borrower hereby agrees to protect, indemnify, pay and save each Issuing Bank and its respective directors, officers, employees, agents and representatives harmless from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including legal fees and expenses) which each such indemnitee may incur or be subject to as a consequence, direct or indirect, of:

    (i)    the issuance of any Letter of Credit, other than as a result of the breach of the standards of reasonable care where such Issuing Bank would not be entitled to the foregoing indemnification under the Uniform Customs or under ISP98, in each case as stated on its face to be applicable to such Letter of Credit;

    (ii)    the inability of an indemnitee to honour a drawing under any Letter of Credit as a result of any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Authority; or

    (iii)    any of the matters listed in Section 5.16(e).

(e)    As between a Borrower, on the one hand, and an Issuing Bank, on the other hand, such Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit issued at its request hereunder by, the respective beneficiaries of such Letters of Credit and, without limitation of the foregoing (but other than to the extent such Issuing Bank breaches the standards of reasonable care specified in the Uniform Customs and otherwise as may be required under ISP98, as applicable, where such Issuing Bank would not be entitled to indemnification under the Uniform Customs or under ISP98, in each case as stated on its face to be applicable to such Letter of Credit), such Issuing Bank shall not be responsible for:

    (i)    the form, validity, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, inaccurate, fraudulent or forged;

    (ii)    the invalidity or insufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or

benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason;

(iii)    errors, omissions, interruptions or delays in transmission or delivery of any messages, by fax, electronic transmission, mail, cable telegraph, telex or otherwise, whether or not they are in cipher;

(iv)    errors in interpretation of technical terms;

(v)    any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof;

(vi)    the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; and

(vii)    any consequences arising from causes beyond the reasonable control of any Lender, including any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Authority.

None of the above shall affect, impair or prevent the vesting of any Issuing Bank's rights or powers hereunder. No action taken or omitted by an Issuing Bank under or in connection with any Letter of Credit issued by it or the related certificates, if taken or omitted in good faith, shall put such Issuing Bank under any resulting liability to the applicable Borrower (<u>provided</u>, that such Issuing Bank acts in accordance with the standards of reasonable care specified in the Uniform Customs and otherwise as may be required under ISP98, in each case as stated on its face to be applicable to the respective Letter of Credit).

(f)    If any Letter of Credit is outstanding on the Facilities Maturity Date, on the date this Agreement and all Commitments hereunder are cancelled, at any time that an Event of Default occurs, a demand for repayment is made hereunder, or a domestic or foreign court issues any judgment or order restricting or prohibiting payment by the applicable Issuing Bank under such Letter of Credit or extending the liability of the applicable Issuing Bank to make payment under such Letter of Credit beyond the expiry date specified therein, the applicable Borrower will forthwith upon demand by the Agent or the applicable Issuing Bank deposit into a cash collateral account maintained by and in the name of the Agent or the applicable Issuing Bank funds in the applicable currency in the amount of the Advance constituted by such Letter of Credit and such funds (together with interest thereon) will be held by the Agent or the applicable Issuing Bank for payment of the liability of the applicable Borrower pursuant to this Section 5.16 or otherwise in respect of such Letter of Credit so long as such Issuing Bank has or may in any circumstance have any liability under such Letter of Credit, and, pending such payment, shall bear interest at the Agent's or the applicable Issuing Bank, as applicable then prevailing rate in respect of deposits of similar amounts and of similar periods of time. Any balance of such funds and interest remaining at such time as the applicable Issuing Bank

- 97 -

does not have and may never have any liability under such Letter of Credit will nevertheless continue to be held by the Agent or the applicable Issuing Bank, if and so long as any Default or Event of Default is continuing or after a demand for repayment is made or both, as security for the remaining liabilities of the applicable Borrower hereunder. The Agent or the applicable Issuing Bank, as applicable, shall have exclusive control over all amounts at any time on deposit in such cash collateral account. The deposit of such funds by a Borrower with the Agent or the applicable Issuing Bank as herein provided will not operate as a repayment of the U.S. Operating Facility or the Swingline Commitment, as applicable, until such time as such funds are actually paid to the U.S. Operating Lenders or the Swingline Lender, as applicable, as a principal repayment.

(g)     The Issuing Bank and the Agent, in the case of Letters of Credit issued under the U.S. Operating Facility, and the Swingline Lender, in the case of Letters of Credit issued under the Swingline, shall each maintain records showing the undrawn and unexpired amount of each Letter of Credit outstanding under such Facility, and showing for each such Letter of Credit:

(i)     the dates of issuance and expiration thereof;

(ii)     the amount thereof; and

(iii)     the date and amount of all payments made thereunder.

The Issuing Bank and the Agent shall make copies of such records in the respect of Letters of Credit issued under the U.S. Operating Facility available to the U.S. Borrower and the U.S. Operating Lenders upon request. The Swingline Lender, shall make copies of such records in respect to Letters of Credit issued under the Swingline available to the Canadian Borrower, the Agent and the Canadian Operating Lenders upon request.

**5.17     Eligible Approved Contracts**

The Canadian Borrower may request, from time to time and by written notice to the Agent, that the Agent designate additional contracts of the Credit Parties (the "**Additional Contracts**") as Eligible Approved Contracts, provided that, any such notice shall only be given concurrently with the delivery of a Borrowing Base Certificate pursuant to 7.4.1(a) and such notice shall include a true and correct copy of each Additional Contract.

If an Additional Contract is in a form (a) previously approved by the Lenders or (b) in respect of which the Agent has previously received a legal opinion opining that such contract or agreement is valid and enforceable under the governing law thereof, then such Additional Contract shall be designated by the Agent as an Eligible Approved Contract as of the date of the notice referred to above, otherwise, such Additional Contract shall not be designated as an Eligible Approved Contract until such time as the Agent has received an opinion of legal counsel opining that such contract or agreement is valid and enforceable under the governing law thereof, which opinion is in form and substance satisfactory to the Agent and is delivered by legal counsel acceptable to the Agent (in each case acting reasonably).

- 98 -

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES

**6.1**    **Representations and Warranties**

Each Borrower jointly and severally hereby represents and warrants to the Agent and the Lenders as follows, with respect to itself and, in the case of the Canadian Borrower, also with respect to each Credit Party:

6.1.1    *Status.* It has been duly incorporated, amalgamated, constituted, formed or established as the case may be, and is validly subsisting under the Laws of its governing jurisdiction and is up to date in respect of all corporate or similar filings and has all necessary corporate power, capacity and authority to carry on its business in each jurisdiction where it carries on business except, in the case of other jurisdiction, to the extent the failure to do so would reasonably be expected to have a Material Adverse Effect.

6.1.2    *Information.* As of the date hereof, Schedule 6.1.2 contains the following information in respect of each Credit Party and each Subsidiary thereof as of the Amendment and Restatement Date: predecessors and prior names (within the immediately preceding five years), jurisdiction of incorporation or establishment, present governing jurisdiction, registered office, chief executive office, all locations at which it has owned or leased places of business or maintained a material amount of assets (other than assets temporarily out of a Credit Party's custody or possession, including assets on the premises of others and items in transit) the number and classes of its issued and outstanding shares and a list of its shareholders including the number and class of shares held by each. All material records related to the Credit Party's Receivables are located at those certain chief executive offices as identified in Schedule 6.1.2, as may be updated from time to time.

6.1.3    *Subsidiaries.* As of the Amendment and Restatement Date, neither Holdco nor the Canadian Borrower has any Material Subsidiaries or other Subsidiaries other than as set out in Schedule 6.1.3 and 100% of the issued and outstanding shares of each Material Subsidiary are directly or indirectly owned by the Canadian Borrower.

6.1.4    *No Pending Corporate Changes.* As of the Amendment and Restatement Date, no Person has any agreement or option or any right or privilege (whether by law, pre-emptive or contractual) capable of becoming an agreement for the purchase of any properties or assets of any Credit Party out of the ordinary course of business or for the purchase, subscription, allotment or issuance of any debt or equity securities, including convertible securities, warrants or convertible obligations of any nature, of the Canadian Borrower.

6.1.5    *No Conflicts under Material Agreements or Material Permits.* Except as disclosed in Schedule 6.1.5, the execution and delivery by each Credit Party of those Credit Documents to which it is a party, will not conflict with, result in a breach of or require any approval or consent under any Material Agreement or Material Permit, other than consents or approvals which have been obtained unconditionally and without imposition of any material conditions.

6.1.6     *No Conflict with Charter Documents.* There are no provisions contained in the charter documents, or by-laws of any Credit Party, or any partnership agreement, shareholders' agreement, voting trust agreement or similar agreement relating thereto or in any Material Agreement or Material Permit, which restrict or limit its powers to borrow money, issue debt obligations, guarantee the payment or performance of the obligations of others or encumber all or any of its present and after-acquired property; or which would be contravened by the execution and delivery of those Credit Documents to which any Credit Party is a party or the performance by any Credit Party of its obligations thereunder and which contravention would reasonably be expected to result in Material Adverse Change.

6.1.7     *Credit Documents.* Each Credit Party has the necessary capacity, power, legal right and authority to borrow from the Lenders, guarantee payment to the Agent and the Lenders of those Obligations which are payable by the Borrowers, perform its obligations under the Credit Documents and provide the Security required to be provided by it hereunder. The execution and delivery of the Credit Documents by the Credit Parties and the performance of their respective obligations therein have been duly authorized by all necessary corporate or other action. This Agreement and the other Credit Documents constitute legal, valid and binding obligations of the Credit Parties, enforceable against them in accordance with the terms and provisions thereof, subject to Laws of general application affecting creditors' rights and the discretion of the court in awarding equitable remedies.

6.1.8     *Conduct of Business; Compliance with Laws and Material Permits.* Except as disclosed in Schedule 6.1.8, each Credit Party is in compliance in all material respects with all Applicable Laws of each jurisdiction in which it carries on business and is duly licensed, registered and qualified to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it or the property owned or leased by it make such qualification necessary, except to the extent that the failure to hold any such licences, registrations and permits would not constitute a Material Adverse Change. Schedule 6.1.8 contains a true and complete list of all Material Permits, and all such Material Permits are valid and subsisting and in good standing.

6.1.9     *Ownership of Assets; Permitted Liens.* Each Credit Party has good and marketable title to (or a valid leasehold interest in) and owns and possesses its undertaking, property and assets (other than intellectual property) (or has a valid leasehold interest in) free and clear of any and all Liens except for Permitted Liens. No Credit Party has any commitment or obligation (contingent or otherwise) to grant any Liens except for Permitted Liens. No event has occurred which constitutes, or which with the giving of notice, lapse of time or both would constitute, a default under any specific Permitted Lien, which default would reasonably be expected to result in a Material Adverse Change.

6.1.10     *Leased Properties.* As of the date hereof, Schedule 6.1.10 contains a true and complete list of the Leased Properties.

6.1.11     *Intellectual Property.* Each Credit Party possesses or has the exclusive right to use all patents, patent rights, trademarks, trademark rights, trade names, trade name rights, service marks, service mark rights, copyrights and other forms of intellectual property

- 100 -

material to the conduct of its business, each of which is in good standing in all material respects, and, to its knowledge, has the right to use such intellectual property without violation of any material rights of others with respect thereto, except, in each case, as would not reasonably be expected to have a Material Adverse Effect. Schedule 6.1.11 contains a list of all such Credit Party's owned material, registered and pending trademarks, service marks, patents and copyrights (excluding commercially available software) as of the Amendment and Restatement Date.

6.1.12    *Insurance.* The Credit Parties have (a) placed insurance, including property, boiler and machinery, business interruption and liability insurance, in appropriate amounts and for appropriate risks as would be considered prudent for similar businesses, and (b) placed Account Receivable Insurance. Attached hereto as Schedule 6.1.12 is a true and complete list of all insurance policies (including the Account Receivable Insurance) held by the Credit Parties as of the Amendment and Restatement Date.

6.1.13    *Material Agreements.* As of the date hereof, Schedule 6.1.13 contains a true and complete list of all Material Agreements, including a description of the nature of each Material Agreement. Each Material Agreement is in full force and effect; and none of the Credit Parties is in breach of any of the terms or conditions contained therein, in each case, which would reasonably be expected to have a Material Adverse Effect. Except as disclosed in writing to the Agent and as permitted hereby, no Material Agreement has been materially amended, supplemented or revised in any manner adverse to the Lenders since the date of execution thereof.

6.1.14    *Labour Agreements.* Except as disclosed in Schedule 6.1.14, there are no labour agreements in effect between any of the Credit Parties and any labour union or employee association and the Credit Parties are not under any obligation to assume any labour agreements to or conduct negotiations with any labour union or employee association with respect to any future agreements; and the Credit Parties are not aware of any current attempts to organize or establish any such labour union or employee association which, in each case, would reasonably be expected to result in a Material Adverse Effect.

6.1.15    *Environmental Laws.* Each Credit Party and its business, operations, assets, equipment, property, leaseholds and other facilities is in compliance with all applicable Requirements of Environmental Law, specifically including all applicable Requirements of Environmental Law concerning the storage and handling of Hazardous Materials except where the failure to do so would not reasonably be expected to result in a Material Adverse Change. Each Credit Party holds all permits, licenses, certificates and approvals from Governmental Authorities which are required by the applicable Requirements of Environmental Law in connection with (i) air emissions; (ii) discharges to surface or groundwater; (iii) noise emissions; (iv) solid or liquid waste disposal; (v) the use, generation, storage, transportation or disposal of Hazardous Materials; and (vi) all other applicable Requirements of Environmental Law, except in each case where the failure to do so would reasonably be expected to result in a Material Adverse Change. Except as disclosed in Schedule 6.1.15 to the knowledge of the Credit Parties there has been no emissions, spills, releases, or discharges into or upon (i) the air; (ii) soils, or any improvements located thereon; (iii) surface water or groundwater; or (iv) any sewer, septic

system or waste treatment, storage or disposal system servicing the premises, of any Hazardous Materials at or from any Land owned by any Credit Party or any of the Leased Properties that would reasonably be expected to have a Material Adverse Effect. Except as disclosed in Schedule 6.1.15 no complaint, order, directive, claim, citation, or notice from any Governmental Authority or any other Person has been received by any Credit Party with respect to (i) air emissions; (ii) spills, releases, or discharges to soils or improvements located thereon, surface water, groundwater or any sewer, septic system or waste treatment, storage or disposal systems servicing any Land owned by any Credit Party or any of the Leased Properties; (iii) noise emissions; (iv) solid or liquid waste disposal; (v) the use, generation, storage, transportation, or disposal of Hazardous Materials; or (vi) other applicable Requirements of Environmental Law affecting any Land owned by any Credit Party or the Leased Properties, in each case, which would reasonably be expected to result in a Material Adverse Change. Except as disclosed in Schedule 6.1.15, there are no legal or administrative proceedings, investigations or claims outstanding or to the Credit Parties' knowledge now threatened or pending, with respect to the presence on or under, or the discharge, emission, spill, radiation or disposal into, upon or from any Land owned by any Credit Party or any of the Leased Properties of any Hazardous Material, including the discharge, emission, spill, radiation or disposal of any Hazardous Material from any such Land or Leased Properties onto or into the atmosphere or any adjacent land, watercourse or body of water; nor are there any material matters under discussion with any Governmental Authority relating thereto; and there is no factual basis for any such proceedings, investigations or claims, in each case, which would reasonably be expected to result in a Material Adverse Change. The Credit Parties have no indebtedness, obligation or liability with respect to the storage, treatment, cleanup or disposal of any Hazardous Materials (including without limitation any such indebtedness, obligation, or liability under any applicable Requirements of Environmental Law regarding such storage, treatment, cleanup or disposal) which would reasonably be expected to result in a Material Adverse Change.

6.1.16   *No Litigation.* Except as disclosed in Schedule 6.1.16, there are no actions, suits or proceedings pending, or to the knowledge of the Credit Parties threatened in writing, against any Credit Party in any court or before or by any federal, provincial, state, municipal or other Governmental Authority, which would reasonably be expected to result in a Material Adverse Change.

6.1.17   *Pension Plans.* As of the Amendment and Restatement Date, the Credit Parties have not established any Pension Plans except as disclosed in Schedule 6.1.17. All of the Credit Parties' Pension Plans have been duly registered under Applicable Law. No steps have been taken to terminate any such Pension Plan (in whole or in part), no contribution failure has occurred with respect to any such Pension Plan sufficient to give rise to a Lien under any Applicable Laws of any jurisdiction, and no condition exists and no event or transaction has occurred with respect to any such Pension Plan, in each case, which would reasonably be expected to result in the incurrence by any Credit Party of any material liability, fine or penalty. Each such Pension Plan is in compliance in all material respects with all applicable pension benefits and tax laws, (i) all contributions (including employee contributions made by authorized payroll deductions or other withholdings) required to be made to the appropriate funding agency in accordance with all Applicable Laws and the

- 102 -

terms of such Pension Plan have been made in accordance with all Applicable Laws and the terms of such Pension Plan, (ii) all liabilities under such Pension Plan are funded, on a going concern and solvency basis, in accordance with the terms of the respective Pension Plans, the requirements of applicable pension benefits laws and of applicable regulatory authorities and the most recent actuarial report filed with respect to the Pension Plan, and (iii) no event has occurred and no conditions exist with respect to any such Pension Plan that has resulted or would reasonably be expected to result in such Pension Plan having its registration revoked or refused for the purposes of any applicable pension benefits or tax laws or being placed under the administration of any relevant pension benefits regulatory authority or being required to pay any taxes or penalties under any applicable pension benefits or tax laws.

6.1.18   *ERISA Liabilities*. No ERISA Event has occurred or is reasonably expected to occur with respect to any Plan which would reasonably be expected to have a Material Adverse Effect. Since the most recent financial statement with respect to a Plan, there has been no change in the funding status of such Plan which would reasonably be expected to result in a Material Adverse Change. Neither any Credit Party nor any ERISA Affiliate has incurred or is reasonably expected to incur any Withdrawal Liability to any Multiemployer Plan which would reasonably be expected to result in a Material Adverse Change. Neither any Credit Party nor any ERISA Affiliate has been notified by the sponsor of a Multiemployer Plan that (i) such Multiemployer Plan has been terminated, within the meaning of Title IV of ERISA, or (ii) such Multiemployer Plan is reasonably expected to be terminated, within the meaning of Title IV of ERISA, which termination would reasonably be expected to result in a Material Adverse Change.

6.1.19   *Financial Statements.* The most recent Year-end Financial Statements and Interim Financial Statements of the Canadian Borrower delivered to the Agent and the Lenders have been prepared in accordance with GAAP (except that in the case of the Interim Financial Statements, subject to normal adjustments and the absence of footnotes) on a basis which is consistent with the previous fiscal period (unless otherwise noted), and present fairly in all material respects in accordance with GAAP:

(a)      its assets and liabilities (whether accrued, absolute, contingent or otherwise) and financial condition as at the dates therein specified;

(b)      its sales, earnings and results of its operations during the periods covered thereby; and

(c)      in the case of the Year-end Financial Statements, its changes in financial position,

and no Material Adverse Change has occurred since the date thereof.

6.1.20   *Financial and Other Information.* All financial and other information provided in writing by or in respect of the Credit Parties to the Agent or the Lenders (other than projections, other forward looking information and information of a general economic or industry-specific nature to) taken as a whole, to the best of the Credit Party's knowledge and belief (including good faith estimates and stated assumptions believed to be reasonable

and fair as of the date made in light of conditions and facts then known), do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made (after giving effect to all supplements from time to time).

6.1.21   *No Funded Debt/Liens.* No Funded Debt has been incurred or assumed by any Credit Party, except for Permitted Funded Debt. No Liens exist on the assets of any Credit Party, except for Permitted Liens.

6.1.22   *Validity and Ranking of Security.* Each Security agreement is effective to create in favor of the Agent for the benefit of the Lenders, legal, valid and enforceable Liens on, and security interests in, the collateral referred to therein. The Obligations are secured by a First-Ranking Security Interest, other than in respect of any Priority Claims.

6.1.23   *Taxes.* Except as disclosed in Schedule 6.1.23, each Credit Party has duly and timely filed all tax returns required to be filed by it, and has paid all taxes which are due and payable by it, except for any taxes which are subject to a Permitted Contest or which the failure to pay, individually or in the aggregate has not and would not reasonably be expected to have a Material Adverse Effect. Each Credit Party has also paid all other taxes, charges, penalties and interest due and payable under or in respect of all assessments and re-assessments of which it has received written notice, except to the extent that such assessments or re-assessments are subject to a Permitted Contest or which the failure to pay, individually or in the aggregate has not and would not reasonably be expected to have a Material Adverse Effect. There are no actions, suits, proceedings, investigations or claims threatened or pending against any Credit Party in respect of taxes, governmental charges or assessments or any matters under discussion with any Governmental Authority relating to taxes, governmental charges or assessments asserted by any such Governmental Authority which would reasonably be expected to result in a Material Adverse Change.

6.1.24   *Statutory Liens.* Each Credit Party has remitted on a timely basis all amounts required to have been withheld and remitted (including withholdings from employee wages and salaries relating to income tax, employment insurance, unemployment insurance and Canada Pension Plan contributions), goods and services tax and all other amounts which if not paid when due could result in the creation of a Statutory Lien against any of its property, except for Permitted Liens.

6.1.25   *No Default, etc.* No Default or Event of Default has occurred and is continuing.

6.1.26   *Solvency.* On the Amendment and Restatement Date (i) the fair market value of the assets of the Credit Parties, on a consolidated basis, at a fair valuation, will exceed their debt and liabilities, subordinated, contingent or otherwise; (ii) the present fair saleable value of the property of the Credit Parties, on a consolidated basis, will be greater than the amount that will be required to pay the probable liability of their indebtedness and other liabilities, subordinated, contingent or otherwise, as such indebtedness and other liabilities become absolute and matured; (iii) the Credit Parties, on a consolidated basis, will be able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and

- 104 -

liabilities become absolute and matured; (iv) the Credit Parties, on a consolidated basis, will not have unreasonably small capital with which to conduct the business in which they are engaged as such business is now conducted and is proposed to be conducted following the date of determination, and (v) the Credit Parties, on a consolidated basis, are not "insolvent" under any applicable Insolvency Legislation or otherwise unable to pay their debts as they fall due.

6.1.27     *Residency.* The Canadian Borrower is not a non-resident of Canada as defined by the *Income Tax Act* (Canada).

6.1.28     *Investment Company Act.* Neither the Canadian Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company," in each case, within the meaning of the Investment Company Act of 1940, as amended.

6.1.29     *Fiscal Year.* The Fiscal Year end of each Credit Party is December 31.

6.1.30     *Place and Type of Business.* As of the Amendment and Restatement Date, Schedule 6.1.2 contains a list of the only jurisdictions in which the Credit Parties carry on any material business. The Credit Parties' sole business is providing drilling fluid and technical expertise to assist in drilling oil and gas wells, including skid controls, drilling waste management and drilling water treatment services and the rental of well bore cleanup tools.

6.1.31     *Economic Sanctions; Corrupt Practices*. No Credit Party is in violation of any Economic Sanctions or the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or any similar legislation or, to its knowledge, is the target or subject of any Economic Sanctions. No Credit Party or any of their respective Subsidiaries and, to the knowledge of any Credit Party, no director, officer, employee, broker or other agent of any Credit Party acting or benefiting in any capacity in connection with the Loans is any of the following:

(a)     a Person that is listed in the annex to the Executive Order, or is otherwise the subject of Economic Sanctions;

(b)     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to the Executive Order, or is otherwise the subject of Economic Sanctions;

(c)     a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Economic Sanctions;

(d)     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)     a Person located, organized or resident in a country or territory that is, or whose government is, the subject of Economic Sanctions; or

(f)      a Person that is named as a "specially designated national and blocked person" on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list.

No Credit Party or any of their respective Subsidiaries and, to the knowledge of any Credit Party, no director, officer, employee, broker or other agent of any Credit Party acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in clauses (a) through (f) above, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to any Economic Sanctions, (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Economic Sanctions, or (iv) is in violation of any applicable Economic Sanctions.

6.1.32   *Use of Facilities.* Each Borrower acknowledges that the Facilities are for the use by the Credit Parties and will be used for the Credit Parties' and their Subsidiaries' lawful business purposes only.

6.1.33   *Use of Eligible Approved Contracts*. As of June 30, 2018, all of the Insured Receivables used in determining the Borrowing Base were Receivables derived from and governed by Eligible Approved Contracts in existence as the Amendment and Restatement Date as set out in Schedule 6.1.33.

6.1.34   *Margin Regulations*. No Credit Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock (as defined in Regulation U). No part of the proceeds of any Loan or any Letter of Credit will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board of Governors of the Federal Reserve, including Regulation T, Regulation U or Regulation X. The pledge of the Collateral pursuant to the Security does not violate such regulations.

## 6.2      Acknowledgement and Deemed Repetition

Each Borrower acknowledges that the Agent and the Lenders are relying upon the representations and warranties in this Article 6 in making the Facilities available to the Borrowers and that the representations and warranties contained in Article 6, except for any representation and warranty made solely as of an earlier date will be deemed to be restated and shall be true and correct effective on the date each and every Advance is made (and any representations and warranties made solely as of an earlier date shall be true and correct as of such earlier date).

## 6.3      Survival of Representations and Warranties

The Credit Parties acknowledge that the Agent and the Lenders shall rely upon the representations and warranties contained in this Article 6 in connection with the establishment and continuation of the Facilities and also in connection with the entering into by a Hedge Provider of any Hedging Agreement with the Credit Parties. Notwithstanding any investigations which may

be made by the Agent or the Lenders, the said representations and warranties shall survive the execution and delivery of this Agreement until full and final payment and satisfaction of the Obligations and this Agreement has been terminated.

## ARTICLE 7
## COVENANTS

### 7.1     Positive Covenants

While there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to any Borrower, each Borrower hereby covenants and agrees with the Agent and the Lenders that it will, and will cause each of the other Credit Parties to:

7.1.1     *Prompt Payment.* In the case of the Borrowers, punctually and unconditionally pay all principal, interest and other amounts due hereunder at the times and in the manner specified herein.

7.1.2     *Preservation of Existence.* Except as permitted by Section 7.2.8, maintain its existence in good standing (or similar status), preserve its rights, powers, licences, privileges, franchises and goodwill, exercise any rights of renewal or extensions of any leases, licences, concessions, franchises or any other rights whatsoever which are material to the conduct of its business, maintain all qualifications to carry on business in each jurisdiction in which such qualifications are required where the failure to do so would not reasonably be expected to result in a Material Adverse Change, and carry on and conduct its business in a proper and efficient manner so as to protect its property and income; and not materially change the nature of its business.

7.1.3     *Compliance with Applicable Laws; Use of Proceeds; Maintenance of Leases and Material Permits.* Comply with all Applicable Laws (specifically including all applicable Requirements of Environmental Law and Economic Sanctions and the *Foreign Corrupt Practices Act*) except where the failure to do so would not reasonably be expected to result in a Material Adverse Change, use the proceeds of all Advances hereunder for legal and proper purposes, and obtain and maintain in good standing all material leases and Material Permits from any and all Governmental Authorities required in respect of its business and operations except where the failure to do so would not reasonably be expected to result in a Material Adverse Change.

7.1.4     *Payment of Priority Claims, Taxes, etc.* Pay when due all Priority Claims, rents, ERISA liabilities, taxes, rates, pension obligations, levies, assessments and governmental charges, fees and dues lawfully levied, assessed or imposed in respect of its property which are material to the conduct of its business, and deliver to the Agent upon request receipts evidencing such payments; except for rents, taxes, rates, pension obligations, levies, assessments and governmental charges, fees or dues in respect of which an appeal or review proceeding has been commenced, a stay of execution pending such appeal or review proceeding has been obtained, reserves reasonably required by the Required Lenders have been established; and except where the failure to pay individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Change.

7.1.5     *Maintain Records.* Maintain adequate books, accounts and records in accordance with GAAP and all material records related to the Credit Parties' Receivables shall be located at the chief executive offices as identified in Schedule 6.1.2, as the same may be updated from time to time.

7.1.6     *Maintenance and Operation of Properties.* Keep its property and assets in good repair and working condition, reasonable wear and tear and casualty or condemnation excepted, and operate its property in accordance with prudent industry standards and the requirements of its insurance policies.

7.1.7     *Inspection.* Permit the Agent and its employees and agents (who may be accompanied by any Lender and its employees and agents), upon reasonable notice and at their own cost, to enter upon and inspect their properties, assets, books and records from time to time during normal business hours and in a manner which does not materially interfere with the operations of the Credit Parties, and make copies of and abstracts from such books and records, and discuss their affairs, finances and accounts with any of their officers, directors, accountants and auditors; provided, that the Agent will deal with any personal information obtained in accordance with applicable privacy legislation; provided, that the Agent may not conduct more than one such examination during any calendar year unless a Default or an Event of Default has occurred and is continuing, in which case the foregoing limit shall not apply. All reasonable and documented out-of-pocket costs and expenses incurred by the Agent and its duly authorized representatives and agents in connection with the exercise of the Agent's rights pursuant to this Section 7.1.7 shall be paid by the Canadian Borrower in accordance with Section 13.5; provided, that so long as no Default or Event of Default exists the Canadian Borrower shall not be responsible for the expenses of the Agent in connection with more than one such visit and inspection per calendar year.

7.1.8     *Liens.* Maintain all of its property, assets and undertaking free of all Liens except Permitted Liens and maintain a First-Ranking Security Interest in favour of the Agent over all of the Collateral subject only to the Security and Permitted Liens which under Applicable Law rank in priority thereto.

7.1.9     *General Insurance Coverage.* Obtain and maintain from financially responsible insurance companies and maintain liability insurance, all-risks property insurance on a replacement cost basis (less a reasonable deductible not to exceed amounts customary in the industry for similarly situated businesses and properties), and insurance in respect of such other risks and in such amounts (giving effect to self-insurance) as would be considered prudent for similar businesses, to the extent available on commercially reasonable terms, all of which policies of insurance shall include a standard mortgage clause approved by the Insurance Bureau of Canada; and the interest of the Agent shall be noted as an additional insured on all liability insurance policies and as first mortgagee and/or lender loss payee, as applicable, on all other insurance policies (other than directors and officers insurance); and the Agent shall be provided with certificates of insurance and certified copies of such policies from time to time upon request; provided, that no more than one request shall be made in any calendar year unless a Default or an Event of Default is continuing or if there has been a material change in any such policy.

- 108 -

7.1.10   *Account Receivable Insurance Coverage.* Obtain and maintain Account Receivable Insurance, pay all required premiums in respect thereof once due and payable and renew such Account Receivable Insurance not less than sixty (60) days prior to the expiry thereof; and the Agent shall be provided with certificates of insurance and certified copies of such policies from time to time upon request; provided that no more than one request shall be made in any twelve month period unless a Default or an Event of Default is continuing. At least 10 days prior to the renewal of any Account Receivable Insurance, the Borrowers shall provide the Agent with all information reasonably requested by the Agent, including for certainty, any proposed modifications to the existing policies then in place, in order for the Agent and third party legal counsel to conduct a review of such Account Receivable Insurance.

7.1.11   *Colombia Payments.* Ensure that payments in favour of a Credit Party which are made under any material agreement executed by any Credit Party which are to be made in Colombian Pesos in Colombia are either directed to a trust established in Colombia which is subject to the Security or to an account over which the Agent has a First-Ranking Security Interest pursuant to an account control agreement or if such payments are otherwise subject to the Security in a manner satisfactory to the Agent, acting reasonably.

7.1.12   *Perform Obligations.* Fulfill all covenants and obligations required to be performed by it under the Credit Documents, the Material Agreements, the Material Permits and the policy governing the Account Receivable Insurance (and as reasonably requested by the Agent, provide evidence of compliance with the risk management and credit policies required thereunder).

7.1.13   *Bank Accounts and Banking Service Agreements.* Maintain:

(a)   all of its bank primary accounts and Banking Service Agreements of the Borrowers in Canada, the U.S. and Mexico with the Agent or an Affiliate thereof unless otherwise consented to by the Required Lenders, in their sole discretion; <u>provided</u>, that the U.S. Borrower shall be permitted to maintain its current bank accounts in the U.S. with Wells Fargo provided that the Deposit Account Control Agreement between the U.S. Borrower, such financial institution and the Agent remains in force and effect, which agreement shall, among other things, provide that such financial institution acknowledges that the Agent has a First-Ranking Security Interest over the applicable bank accounts and that upon written notice from the Agent, the Agent can exert control over such accounts; and

(b)   except as set forth in Section 8.1(i), maintain all of the Credit Parties' other bank accounts used as a primary concentration accounts for collection of proceeds of Eligible Receivables with financial institutions reasonably satisfactory to the Required Lenders; <u>provided</u>, that within 90 days after the formation of any new Material Subsidiary that is a Credit Party from time to time hereafter, such financial institution has entered into a deposit account control or similar account agreement with the Agent and the applicable Credit Party, in a form and substance reasonably satisfactory to the Agent, which agreement, among other things, provides that such financial institution acknowledges that the Agent has a First-Ranking Security

- 109 -

Interest over the applicable bank accounts and that upon written notice from the Agent, the Agent can exert control over such accounts.

Notwithstanding anything herein to the contrary, it is understood and agreed that no deposit account agreements or account agreement shall be required with respect to (i) any account which is not used as a primary concentration account for collection of proceeds of Eligible Receivables or for the direct collection of such proceeds or (ii) any other Excluded Account.

7.1.14   *Formation of Material Subsidiaries.* In the event that any Borrower or any other Credit Party forms or acquires a Material Subsidiary, or a Person otherwise becomes a Material Subsidiary (in each case, for the avoidance of doubt, other than a Securitization SPE), after the Amendment and Restatement Date then, subject to Section 8.9, the Canadian Borrower shall deliver, and shall cause the applicable Subsidiary to deliver, to the Agent not later than (a) thirty (30) Business Days in the case of Material Subsidiaries formed outside of Canada and the U.S., or (b) ten (10) Business Days for Material Subsidiaries formed in Canada or the U.S., in either case, after the formation or acquisition of such Material Subsidiary (or such longer period as the Agent may approve, acting reasonably), a full recourse guarantee and the, within the applicable period therefor, any other Security relative to such Material Subsidiary referred to in Section 8.1 or such other Security as may be requested by the Agent, acting reasonably, together with related corporate documentation and legal opinions as may be requested by the Agent, acting reasonably.

7.1.15   *Ownership of Credit Parties.* The Canadian Borrower will at all times be the (direct or indirect) sole beneficial owner of all of the issued and outstanding shares of each other Credit Party, other than Holdco.

7.1.16   *EBITDA; Ownership of Assets.* Except as otherwise specifically permitted hereunder, the Canadian Borrower will ensure at all times that:

(a)      the EBITDA directly attributed to the Credit Parties determined on an unconsolidated but combined basis is equal to at least 90% of the Canadian Borrower's EBITDA determined on a consolidated basis;

(b)      the Credit Parties legally, beneficially and directly own at least 90% of the Consolidated Net Tangible Assets of the Canadian Borrower (based on the amount thereof set forth in the financial statements most recently delivered as required hereunder); and

(c)      the EBITDA directly attributed to the OECD Credit Parties determined on a consolidated basis is equal to at least 85% of the Canadian Borrower's EBITDA determined on a consolidated basis; provided, that for the purposes of such calculation any Distribution remitted to an OECD Credit Party by any other Subsidiary of the Borrower shall be included in EBITDA;

7.1.17   *Colombian Free Cash Flow Distribution.* The Canadian Borrower will cause the Distribution to it or any other Credit Party whose governing jurisdiction is in Canada, the

U.S., Barbados or another jurisdiction reasonably acceptable to the Required Lenders by way of dividend (or a series of dividends) of no less than 75% of the Colombian Free Cash Flow for each Fiscal Year within 60 days of the end of such Fiscal Year; provided that such 60 day period may be extended by the Required Lenders, acting reasonably, upon the written request of the Canadian Borrower in light of cash flow needs in Colombia at the time of such scheduled distribution.

7.1.18   *Further Assurances.* Provide the Agent and the Lenders with such further information, financial data, documentation and other assurances as they may reasonably require from time to time in order to ensure ongoing compliance with the terms of this Agreement and to achieve the spirit and intent of this Agreement.

7.1.19   *Reviews.* Within 60 days of written demand by the Agent, the Borrowers will have initiated an independent business review by a third party satisfactory to the Agent, acting reasonably, of the business and operations of the Borrowers and their operations in scope, form and substance satisfactory to the Agent, acting reasonably; *provided*, only one such demand by the Agent may be made under this Section 7.1.19.

7.1.20   *Minimum Margin Availability.* The Canadian Borrower will not permit the Minimum Margin Availability measured at the end of each Fiscal Quarter to be less than U.S. $5,000,000.

7.1.21   *Minimum Liquidity.* The Borrowers will not permit the Minimum Liquidity measured at the end of each Fiscal Quarter to be less than U.S. $10,000,000.

## 7.2   **Negative Covenants**

While there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to the Borrowers, each Borrower hereby covenants and agrees with the Agent and the Lenders that it will not, and will ensure that each of its Material Subsidiaries does not, without the prior written consent of the Agent on behalf of the Lenders:

7.2.1   *Liens.* Grant or suffer to exist any Lien in respect of any of its property or assets, except Permitted Liens.

7.2.2   *Funded Debt.* Create, incur or assume any Funded Debt, except Permitted Funded Debt.

7.2.3   *Investments/Financial Assistance.* Provide Financial Assistance to, or invest money in, any Person, firm, joint venture, partnership, company or corporation whether by way of loan, acquisition of shares, acquisition of debt obligations or in any other way whatsoever (collectively "**Investments**"), except for the following (each, a "**Permitted Investment**"):

(a)      Investments in cash and Cash Equivalents;

(b)      Permitted Intercompany Loans;

- 111 -

(c)    Guarantees which comprise part of the Security, are in respect of other Permitted Funded Debt or obligations of other Credit Parties or related to indemnities incurred in the ordinary cause of business;

(d)    Permitted Acquisitions;

(e)    Investments in other Credit Parties; provided, that such Investments together with any Financial Assistance provided to any Non-OECD Guarantors does not exceed in the aggregate at any one time an amount equal to 10% of the net book value of the Canadian Borrower's Consolidated Net Tangible Assets;

(f)    loans and advances by the Credit Parties to employees or directors of any Credit Party in the ordinary course of business (including for travel, entertainment and relocation expenses) not in excess of $250,000 at any one time outstanding in the aggregate so long as no Default or Event of Default has occurred and is continuing or would reasonably be expected to result therefrom;

(g)    Investments made by the Credit Parties in the ordinary course of business consisting of (i) accounts receivables, (ii) negotiable instruments held for collection in the ordinary course of business, (iii) lease, utility and other similar deposits in the ordinary course of business, (iv) securities or debt obligations of trade creditors or customers that are received in settlement of bona fide disputes or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(h)    Investments in existence on the Amendment and Restatement Date and set forth on Schedule 7.2.3 hereto and, in each case, any extensions or renewals thereof, so long as the amount of any Investment made pursuant to this clause (h) is not increased at any time above the amount of such Investment set forth on Schedule 7.2.3 hereto;

(i)    Acquisitions outside of Canada and the U.S., Investments in joint ventures or other minority interest holdings and other Investments in, or Financial Assistance to, Persons which are not Credit Parties (provided, that no such Acquisitions or Investments would result in a breach of Section 7.2.17 or otherwise involve Persons or countries that are the subject of Economic Sanctions or that any Lender's internal compliance policy would prohibit it from engaging in business with) which, after giving *pro forma* effect to all other Acquisitions, Investments or Financial Assistance permitted in reliance on this clause (i) since the date of the last consolidated balance sheet of the Canadian Borrower delivered to the Agent hereunder and outstanding on the date of such Acquisition, Investment or Financial Assistance, do not exceed at any one time, in the aggregate, 15% of Shareholders' Equity (taking into account any increase in Shareholders' Equity as of such date since the date of the last consolidated balance sheet of the Canadian Borrower delivered to the Agent hereunder, and with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value); so long as no Default or Event of Default has occurred and is continuing or would reasonably be expected to result therefrom; and further provided that in

- 112 -

the case of any Acquisitions under this clause (i), if more than 50% of the revenues generated by the Acquired Business are derived from outside of Canada or the U.S., then the applicable Credit Party must receive the prior consent of the Required Lenders thereto;

(j)     extensions of trade credit by the Canadian Borrower and its Material Subsidiaries in the ordinary course of business;

(k)     Investments arising as a result of Permitted Securitization Financings;

(l)     any Acquisition, Financial Assistance or Investment made in respect of Project Desert, the Anchor Acquisition or the Terra Acquisition;

*provided,* that notwithstanding the foregoing, during the Covenant Relief Period, the Borrowers and the Material Subsidiaries shall not (i) complete any Acquisitions pursuant to Sections 7.2.3(d) or 7.2.3(i) without the prior written consent of the Required Lenders, or (ii) make any Investment or provide any Financial Assistance other than Investments and Financial Assistance: (x) existing as of the Amendment and Restatement Date and set forth on Schedule 7.2.3, and any extension or renewal thereof; (y) permitted under paragraphs (a), (b), (c), (e), (g), (j), (k) or (l) of Section 7.2.3; and/or (z) made in or provided to one or more joint ventures or Persons that are not Credit Parties in an aggregate amount, in the case of this clause (z), not to exceed $3,000,000.

7.2.4     *Disposition of Assets.* Directly or indirectly sell, lease, assign, transfer, convey or otherwise dispose of all or any part of its assets, except the Credit Parties may sell, lease, assign, transfer, convey or otherwise dispose of the following:

(a)     inventory and Cash Equivalents in the ordinary course of business;

(b)     worn out, obsolete, no longer useful or immaterial, including assets sales, licenses, sublicenses or other dispositions or abandonment of intellectual property of a Credit Party or its subsidiaries determined by the management of such Credit Party to be no longer useful or necessary in the operation of the business of such Credit Party or any of its subsidiaries;

(c)     assets to a Borrower or any other Credit Party or if a Subsidiary is not a Credit Party, to the Credit Parties or any of their Subsidiaries;

(d)     transactions permitted by Section 7.2.8, Permitted Investments and Permitted Distributions permitted by Section 7.2.5 hereof;

(e)     transfers of properties that have been subject to a casualty to the respective insurer of such property as part of an insurance settlement any casualty or other event of loss; <u>provided</u>, that the requirements of Section 5.3.1 are complied with in connection therewith;

(f)     consignments in the ordinary course of business;

(g)     dispositions of accounts receivables and other assets of Subsidiaries (other than Credit Parties) in the ordinary course of business;

(h)     any assets the value of which (at the time the disposition is made) is not more than the greater of (i) $5,000,000 and (ii) 5% of the net book value of the Canadian Borrower's Consolidated Net Tangible Assets as of the end of the Fiscal Quarter immediately prior to the date of such disposition, in any Fiscal Year; provided, that for such purpose, if such sale, transfer or other disposition is as part of an exchange of equipment to the extent that (A) such equipment is exchanged for credit against the purchase price of similar replacement property or (B) the proceeds thereof are reasonably promptly applied to the purchase price of such replacement property, then the amount of such purchase price of such replacement property in excess of such credited value will still count towards the determination of such 5% of net book value;

(i)     the disposition of Receivables pursuant to a Permitted Factoring Transaction;

(j)     the disposition of Receivables pursuant to a Permitted Securitization Financing, provided that the Receivables subject to such disposition originated in the United States;

(k)     any Anchor Sale and Leaseback Transaction, provided the proceeds of each such Anchor Sale and Leaseback Transaction shall be used to repay the Operating Facilities in accordance with Section 5.3.6;

(clauses (a)-(k), collectively, the "**Permitted Dispositions**"); provided, that the Borrower and its Subsidiaries may, with the prior consent of the Required Lenders, sell, lease, assign, transfer, convey or otherwise dispose of all or any part of its assets in a transaction that does not constitute a Permitted Disposition to the extent that the proceeds thereof are to be used in accordance with Section 5.3.1.

7.2.5    *Distributions.* Make any Distributions other than Permitted Distributions; *provided* that, during the Covenant Relief Period, only Distributions described in paragraphs (b), (f), (g) and (i) of the definition of "Permitted Distribution" shall be permitted under this Section 7.2.5.

7.2.6    *Dealing with Related Parties.* Consummate any transaction with any Affiliate of Holdco or the Canadian Borrower or any of its Subsidiaries other than the following:

(a)     any transaction that is on fair and reasonable terms that are substantially as favorable to the Canadian Borrower and/or its applicable Subsidiary as would be obtainable by the Canadian Borrower or such Subsidiary at the relevant time in a comparable arm's length transaction with a Person that is not an Affiliate;

(b)     payments and transactions provided for in the Material Agreements;

(c)     any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock option

- 114 -

and stock ownership plans approved by the board of directors (or similar governing body) of Holdco, the Canadian Borrower or any of its Subsidiaries or the senior management thereof;

(d)     employment arrangements and transactions pursuant thereto entered into in the ordinary course of business between Credit Parties and any employee thereof including any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees;

(e)     the payments of reasonable and customary fees, compensation, benefits and incentive arrangements paid or provided to, and indemnities provided on behalf of, officers, directors, employees or consultants of Holdco (or any direct or indirect parent thereof), the Canadian Borrower or any of its Subsidiaries;

(f)     any transaction with an Affiliate where the only consideration paid by a Credit Party is capital stock of such Credit Party or any of its Subsidiaries;

(g)     the payment of any Permitted Distribution;

(h)     transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case, in the ordinary course of business and otherwise in compliance with the terms and conditions of this Agreement that are fair to the Credit Parties (as determined in good faith by the board of directors of the Canadian Borrower);

(i)     transactions (i) among the Credit Parties or (ii) between Subsidiaries that are not Credit Parties, in each case that are permitted by this Agreement;

(j)     so long as no Default or Event of Default shall have occurred and be continuing at the time of any action described below or would result therefrom the payment of transaction, advisory or similar fees payable to the Palladium or any Affiliate thereof in an aggregate amount in any Fiscal Year not to exceed $1,000,000, provided, that such fee is paid in connection with a *bona fide* transaction;

(k)     those transactions set forth on Schedule 7.2.6 which are in place as of the Amendment and Restatement Date;

(l)     transactions pursuant to any Permitted Securitization Financing; and

(m)     the Anchor Acquisition Promissory Notes.

7.2.7     *Change or Cease Business.* Cease to carry on the business or change in any material respect the nature of the business as is currently being carried on by it as of the Amendment and Restatement Date, including, for the avoidance of doubt, transactions in connection with a Permitted Securitization Financing, other than as part of a business reasonably related or ancillary thereto, or as otherwise approved in writing by the Required Lenders, acting reasonably.

- 115 -

25877170.9

7.2.8    *Corporate Changes.* Consummate any transaction whereby all or a substantial portion of its undertaking, property and assets would become the property of any other Person, whether by way of reconstruction, reorganization, recapitalization, consolidation, amalgamation, merger, transfer, sale or otherwise; nor merge, amalgamate or acquire any other Person or all or substantially all of its assets; except that any of the foregoing transactions may take place: (a) among the Credit Parties if prompt written notice is given to the Agent, a Material Adverse Change will not occur as a result thereof and the applicable Credit Parties provide such additional or replacement Security as the Agent may reasonably require, (b) to consummate any Permitted Acquisition and (c) in connection with any Permitted Dispositions of all or substantially all of the assets of a Subsidiary of the Canadian Borrower; <u>provided</u> that in any such event which involves the Canadian Borrower, the successor entity is a Person formed under the Laws of Canada or any province thereof remains a Borrower under the same Facilities that it was a borrower under immediately prior to such event.

7.2.9    *Constating Documents.* Amend or restate or otherwise alter the articles of incorporation, amalgamation or continuance, as applicable, or by-laws of (i) any Credit Party in any manner that would reasonably be expected to materially and adversely affect the rights of the Agent and the Lenders under the Credit Documents or (ii) any Subsidiary (other than a Securitization SPE) which is not a Credit Party which would impose any restrictions upon the ability of such Subsidiary to make any Distributions to any Credit Party.

7.2.10   *Capital Expenditures.* Make, or permit any Subsidiary to make, any Capital Expenditure in any Fiscal Year that exceeds in aggregate, for each Fiscal Year, 110% of the estimated maximum amount of such Capital Expenditures as set forth in the annual budget in respect of such Fiscal Year provided by the Canadian Borrower pursuant to Section 7.4.1(c) (unless such Capital Expenditures are funded entirely by the proceeds of equity contributions or Sales Proceeds to the extent permitted under Section 5.3.2); *provided* that, notwithstanding the foregoing, the maximum aggregate amount of Capital Expenditures permitted by this Section 7.2.10 shall be, for the Fiscal Year ending December 31, 2018, U.S. $30,000,000.

7.2.11   *Fiscal Year.* Change its Fiscal Year end.

7.2.12   *Currency Hedging Agreements.* Enter into or be a party to any Currency Hedging Agreement, unless:

(a)    such Currency Hedging Agreement is entered into with one or more Hedge Providers or other counterparties, provided that if it is with any such other counterparties the obligations and liabilities thereunder shall be unsecured;

(b)    in the case of a Currency Hedging Agreement with a Hedge Provider, the Canadian Borrower shall execute an ISDA agreement and all other documentation as may be required by the applicable counterparty to such Interest Rate Hedging Agreement;

- 116 -

(c)        such Currency Hedging Agreement is entered into for the purpose of hedging against the risk of fluctuations in currencies and not for speculative purposes; and

(d)        the maturity date of such Currency Hedging Agreement is not more than one year from the date thereof and, in any event, not later than the Facilities Maturity Date.

7.2.13    *Interest Rate Hedging Agreements.* Enter into or be a party to any Interest Rate Hedging Agreement, unless:

(a)        the aggregate notional amount under all such Interest Rate Hedging Agreements at such time does not exceed $75,000,000;

(b)        such Interest Rate Hedging Agreement is entered into with one or more Hedge Providers or other counterparties, provided that if it is with any such other counterparties the obligations and liabilities thereunder shall be unsecured;

(c)        in the case of an Interest Rate Hedging Agreement with a Hedge Provider, the Canadian Borrower shall execute an ISDA agreement and all other documentation as may be required by the applicable counterparty to such Interest Rate Hedging Agreement;

(d)        such Interest Rate Hedging Agreement is entered into for the purpose of hedging against the risk of fluctuations in interest rates, and not for speculative purposes; and

(e)        the maturity date of such Interest Rate Hedging Agreement is not later than the Facilities Maturity Date.

7.2.14    *Use of Advances Sanctions.* Directly or indirectly use the proceeds of Advances to fund operations, or finance investments in, any country that at the time is prohibited by Economic Sanctions, the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or other Applicable Law, or make payments to any country or Person that at the time is prohibited by Economic Sanctions, the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or other Applicable Law, or directly or indirectly fund any principal repayment with proceeds derived from any such country or Person that will result in a violation by a Credit Party (or any Lender hereunder) of such Economic Sanctions, the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or other Applicable Law.

7.2.15    *Use of Advances General.* Use a material amount of the proceeds of any Advance for any purposes other than those expressly contemplated in this Agreement.

7.2.16    *Subordinated Debt.* Make any payment to any holders of the Subordinated Debt in connection with principal, interest, fees or any other amounts in respect thereof or amend the terms thereof, except payments permitted in accordance with the terms of the applicable Subordination Agreement, and so long as no Default or Event of Default has occurred and is continuing or would reasonably be expected to result therefrom.

7.2.17   *Sanctions.* Directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in 6.1.31, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Economic Sanction, or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Economic Sanction and the Credit Parties shall deliver to the Agent any certification or other evidence requested from time to time confirming the Credit Parties' compliance with this Section 7.2.17.

7.2.18   *Account Receivable Insurance Coverage.* Provide the Agent with prior written notice of all proposed amendments or modifications to any Account Receivable Insurance and, to the extent that any such amendments or modifications (i) de-insures all or a portion of any Marginable Receivable that constitutes part of the Borrowing Base, (ii) modifies the individual country limits under the Account Receivable Insurance, (iii) extends any coverage period under the Account Receivable Insurance, or (iv) affects any of the coverage amounts or any coverage period(s) related to receivables of Petróleos Mexicanos or its Affiliates, shall not give effect to any such amendment or modification without the prior written consent of the Agent, acting reasonably, and in no case taking longer than 3 Business Days to provide such consent, it being understood that should the Agent fail to act within 3 Business Days to provide a an affirmative or negative written response, that failure should be deemed to be an act of consent with regards to the proposed amendment. For certainty, nothing in this Section 7.2.18 shall derogate from the obligations of the Borrowers, or the rights of the Agent, under Section 7.1.10.

7.2.19   *Cash Hoarding.* Use the proceeds of any Advance to accumulate or maintain cash or Cash Equivalents in one or more depository or investment accounts maintained by any Credit Party in an amount, in the aggregate, greater than $20,000,000, but excluding therefrom cash or Cash Equivalents accumulated or maintained for a specified business purpose (to the extent permitted hereunder and other than simply accumulating cash reserve in a manner that is not consistent with past practice of the Credit Parties), and, for certainty, the Lenders may refuse to make any requested Advance which the Lenders, acting reasonably, determine would result in a contravention of this Section 7.2.19.

**7.3   Financial Covenants**

7.3.1   Subject to the Equity Cure provided below in Section 7.3.2, while there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to the Borrowers, the Borrowers will not, without the prior written consent of the Required Lenders:

(a)   permit the Net Leverage Ratio measured at the end of each Fiscal Quarter to exceed (i) 4.75 to 1 for the Fiscal Quarters ending March 31, 2019 and June 30, 2019; (ii) 4.50 to 1 for the Fiscal Quarter ending September 30, 2019; (iii) 4.00 to 1 for the Fiscal Quarter ending December 31, 2019; and (iv) 3.00 to 1 for the Fiscal Quarters ending March 31, 2020 and thereafter;

(b)      permit the Fixed Charge Coverage Ratio measured at the end of each Fiscal Quarter to be less than (i) 1.10 to 1 for the Fiscal Quarters ending June 30, 2018, September 30, 2018 and December 31, 2018; and (ii) 1.25 to 1 for the Fiscal Quarters ending March 31, 2019 and thereafter; and

(c)      permit the Unadjusted EBITDA measured at the end of each Fiscal Quarter to be less than (i) U.S. $4,160,000 for the Fiscal Quarter ending June 30, 2018; (ii) U.S. $5,980,000 for the Fiscal Quarter ending September 30, 2018; (iii) U.S. $6,240,000 for the Fiscal Quarter ending December 31, 2018; and (iv) U.S. $8,580,000 for the Fiscal Quarter ending March 31, 2019.

7.3.2     In the event of any Event of Default of the financial covenants set forth in Section 7.3.1(a) and 7.3.1(b) (the "**Designated Financial Covenants**"), any equity contribution made by Holdco or the shareholders of Holdco to the Canadian Borrower will, at the request of the Canadian Borrower, be included in the calculation of EBITDA solely for the purposes of determining compliance with such financial covenants at the end of the applicable Fiscal Quarter and any subsequent period that includes such Fiscal Quarter (any such equity contribution, a "**Specified Equity Contribution**"); *provided*, that:

(a)      prior written notice of the Canadian Borrower's intention to utilize such Specified Equity Contribution is received by the Agent no later than the date on which the financial statements for such Fiscal Quarter or Fiscal Year (as applicable) are required to be delivered as provided for in Section 7.4;

(b)      such Specified Equity Contribution is received by the Canadian Borrower within ten (10) Business Days after the Canadian Borrower being required to deliver the financial statements for such Fiscal Quarter or Fiscal Year (as applicable) as provided for in Section 7.4;

(c)      the amount of any Specified Equity Contribution included in the calculation of EBITDA will be no greater than: (i) the amount required to cause the Canadian Borrower to be in compliance with the applicable Designated Financial Covenants and (ii) 40% of EBITDA as calculated on a trailing twelve month basis;

(d)      all Specified Equity Contributions will be disregarded for all other purposes under the Credit Documents (including, to the extent applicable, calculating EBITDA for purposes of determining compliance with Section 7.1.16, the Applicable Margin for pricing and other items governed by reference to EBITDA or that include EBITDA in the determination thereof in any respect);

(e)      there shall be no more than four Specified Equity Contributions made during the term of this Agreement and the aggregate amount of all such Specified Equity Contributions shall not exceed $20,000,000;

(f)      no Specified Equity Contribution may be made in consecutive Fiscal Quarters; and

(g)      the proceeds of all Specified Equity Contributions are actually received by the Canadian Borrower and the Canadian Borrower delivered to the Agent 100% of the

aggregate proceeds of such Specified Equity Contribution as a Repayment pursuant to Section 5.3.1(d) (each such Repayment, an "**Equity Cure Repayment**"), and the Equity Cure Repayment shall be ignored for purposes of determining the amount of Total Net Debt of the Borrower and calculating the Designated Financial Covenants and until such time that the Specified Equity Contribution ceases to be calculated as EBITDA pursuant to the provisions of this Section 7.3.2; provided that, (i) notwithstanding the provisions of Section 5.3.3, the proceeds of each Equity Cure Repayment are to be applied first to Outstanding Advances under the Term Facility in inverse order of maturity until they have been fully repaid and, thereafter, to Outstanding Advances under the Operating Facilities in accordance with Section 5.3.3.

If, after giving effect to the recalculations set forth in this Section 7.3.2, the Borrower shall then be in compliance with the Designated Financial Covenants, the Borrower shall be deemed to have satisfied the requirements of the Designated Financial Covenants and the applicable breach or default of the Designated Financial Covenants that had occurred shall be deemed cured for the purposes of this Agreement (in each instance, an "**Equity Cure**").

## 7.4     Reporting Requirements

7.4.1     While there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to the Borrower, the Borrowers shall deliver, or cause to be delivered, the following financial and other information to the Agent at the times indicated below:

(a)     within 35 days after the end of each month after the Amendment and Restatement Date: (i) monthly aged accounts receivable listings, monthly aged accounts payable listings, listings of total inventory and total capital assets by stocking location, cash and Cash Equivalent listing and a Borrowing Base Certificate executed by the Borrower; and (ii) monthly unaudited financial statements of the Borrower, which shall include a balance sheet, statement of cash flows and income statement;

(b)     promptly upon becoming available and in any event within 45 days after the end of each of the first three Fiscal Quarters in each Fiscal Year, a Compliance Certificate along with the Interim Financial Statements of the Borrower, which shall include a balance sheet, statement of cash flows and income statement, on which it is based, and the Borrower shall also make available members of its senior management team for a telephone call with Lenders within five Business Days of the end of each Fiscal Quarter to discuss, inter alia, the financial position of the Borrower;

(c)     promptly upon becoming available and in any event within 120 days after the end of each Fiscal Year, an annual business and financial plan for the Borrower which shall disclose all material assumptions utilized and shall include the following items: projected financial covenant ratios, balance sheet, income statement, cash flow statement and Capital Expenditure program;

(d)     promptly upon becoming available and in any event within 120 days after the end of each Fiscal Year, the Year-end Financial Statements for the Borrower, which shall include a balance sheet, statement of cash flows and income statement, together with a copy of the management discussion and analysis and a Compliance Certificate which shall include all new material business locations and any other changes to Schedule 6.1.2;

(e)     within 15 days of a request therefor by the Agent and only after a Material Adverse Effect or during the continuance of a Default or Event of Default, a listing of (i) each of the "serial number goods" (as defined in the *Personal Property Security Act* (Alberta)) or "collateral" for which a security interest must be indicated on a "certificate of title" (as such terms are defined under the *UCC*) for such collateral owned by the Credit Parties and the location of such serial number goods or certificate of title collateral, and (ii), a legal description of any Lands; but in each case, only to the extent that such assets are included in the Borrowing Base;

(f)     (i) within five Business Days of the end of each calendar week, solely during the Covenant Relief Period, a weekly liquidity report in form and substance satisfactory to the Agent, including, but not limited to, global cash balances and global facility utilization of the Borrower, including individual account summaries; and (ii) solely during the Covenant Relief Period, a rolling thirteen week cash flow and Borrowing Base projection, in form and substance satisfactory to the Agent, to be delivered within 10 Business Days from receipt by the Borrower of the written request of the Agent for such information;

(g)     (i) together with the delivery of the Interim Financial Statements for the Fiscal Quarter ending June 30, 2018, a collateral exam based on such Interim Financial Statements; and (ii) prior to December 31, 2018, updated appraisals of the equipment, inventory and real estate of the Credit Parties; in each case, in form and substance satisfactory to the Lenders, acting reasonably;

(h)     provide prompt notice to the Agent of: (i) the occurrence of any Default or Event of Default (for greater certainty, whether or not such Default or Event of Default is continuing); (ii) any Material Adverse Change or Material Adverse Effect; (iii) any material litigation affecting any Credit Party or any breach of any Requirement of Environmental Law, where in either such case there is a reasonable prospect that the liability of any Credit Party with respect thereto could exceed Cdn. $5,000,000 in any Fiscal Year or which would reasonably be expected to result in a Material Adverse Change; (iv) any material amendments to or replacements of, or waivers of material breaches in respect of, the Material Agreements or the Material Permits; (v) any notice of default, termination or suspension received by any Credit Party in respect of material Funded Debt or in respect of any Material Agreement or Material Permit; and (vi) the occurrence of any ERISA Event that would reasonably be expected to have a Material Adverse Effect;

(i)     provide prompt notice to the Agent of: (i) any labour dispute to which any Credit Party is or is expected to become a party, including any strikes, lockouts or other

- 121 -

labor disputes relating to any of such Person's plants and other facilities, which could reasonably be expected to result in a Material Adverse Effect, (ii) any Worker Adjustment and Retraining Notification Act or related liability incurred with respect to the closing of any plant or other facility of any such Person and (iii) any material liability under Applicable Law similar to the Worker Adjustment and Retraining Notification Act or otherwise arising out of plant closings;

(j)     (x) provide prompt notice to the Agent of any material notices it receives under or in connection with the Accounts Receivable Insurance, including related to: (i) any termination thereof, (ii) any disputed claims related thereto, (iii) any denied coverage thereunder or (iv) any alleged misrepresentations given by any Credit Party in connection therewith and (y) provide prior written notice of any amendment of material terms of the Account Receivable Insurance;

(k)     provide written notice to the Agent of any event or circumstance, with the giving of notice or lapse of time or both, would constitute a default or event of default under a Permitted Securitization Financing promptly (and in any event not less than three Business Days) upon becoming aware of same constituted by a Permitted Securitization Financing; provided such notice shall include reasonable details of the nature of such event or circumstance and the corresponding default or event of default, any applicable cure period with respect thereto and any remedial actions to be taken with respect to same; and

(l)     such additional information and documents as the Agent or the Lenders may reasonably require from time to time, not otherwise inconsistent with the terms of this Agreement, to ensure the ongoing compliance by the Borrower with the terms and conditions of this Agreement, in form reasonably acceptable to the Agent and the Lenders.

## 7.5    Designation of Unrestricted Subsidiaries

(a)     The Canadian Borrower from time to time, by notice to the Agent in the form of Exhibit I, shall be entitled to designate that either:

(i)     a Material Subsidiary will be an Unrestricted Subsidiary; or

(ii)    an Unrestricted Subsidiary will be a Material Subsidiary;

provided, that the Borrower will not be entitled to designate a Material Subsidiary to be an Unrestricted Subsidiary if:

(A)    a Default or an Event of Default has occurred and is continuing unless the exercise of the Borrower's discretion under paragraph (i) or (ii) above would cause such Default or Event of Default to be cured; or

(B)    a Default or an Event of Default would result from or exist immediately after such a designation.

- 122 -

(b)     For the avoidance of doubt, notwithstanding anything in this Agreement or the Credit Documents to the contrary, for purposes of calculating the Borrowing Base, the definition of "Marginable Cash" shall include the unrestricted cash (determined in accordance with GAAP) and Cash Equivalents of each of QMax do Brasil Solucoes do Petroleo Ltda., International Drilling Fluids and Engineering Services (IDEC) Ltd. and QMax Solutions India (Project Office) of QMax Solutions Inc. (or any other Subsidiary of the Borrowers in the Agent's sole discretion, acting reasonably) to the extent (a) such cash and Cash Equivalents are held in collateral account/s maintained by the Agent or an affiliate thereof (or such other bank deemed reasonable in the sole discretion of the Agent), and (b) the Agent has received a guarantee (to the extent of the value of the pledged cash and Cash Equivalents in such account; it being understood that Agent may waive this requirement in its sole discretion if the circumstances warrant) and a deposit account agreement or substantially equivalent agreements under the laws of such local jurisdiction, in form and substance reasonably satisfactory to Agent, whereby, *inter alia*, the Agent retains exclusive control to direct the transfer of funds therefrom during the continuation of an Event of Default under Section 10.1 hereof (with withdrawals by the applicable Credit Party to be permitted upon notice to the Agent so long as the Agent has not delivered a notice of exclusive control upon the occurrence and during the continuation of an Event of Default), together with evidence of all requisite registrations or filings of each such agreement under Applicable Law and such other documentation reasonably satisfactory to Agent, including legal opinions.

(c)     Any Subsidiary of the Borrowers that pledges cash and/or Cash Equivalents in the manner provided for in paragraph (b) above shall, notwithstanding that such Subsidiary is not a Material Subsidiary, be subject to the provisions of Section 7.2.1 hereof; *provided*, such Subsidiary shall otherwise not be subject to Section 7.2.

(d)     The Agent acknowledges that, as of the date hereof, Mud Movers LLC has been designated as an Unrestricted Subsidiary.

## 7.6     Securitization SPE

7.6.1     As of the Amendment and Restatement Date, ADF SPE, LLC, a Delaware limited liability company, shall be designated a Securitization SPE.

7.6.2     After the Amendment and Restatement Date, the Canadian Borrower from time to time, by notice to the Agent, may designate any Unrestricted Subsidiary as a Securitization SPE; provided, that the Borrower will not be entitled to such a designation if (a) a Default or an Event of Default has occurred and is continuing (unless such designation would cause such Default or Event of Default to be cured) or (b) a Default or an Event of Default would result from or exist immediately after such a designation.

7.6.3     No Securitization SPE

(a)     shall incur any Funded Debt other than Funded Debt pursuant to the Permitted Securitization Financing to which it is a party;

(b)     shall conduct any business other than (i) the acquisition of accounts receivable from one or more Credit Parties, and (ii) the consummation and performance of Permitted Securitization Financing.

7.6.4     As at the Amendment and Restatement Date, the Material Subsidiaries and Unrestricted Subsidiaries are as set out in Schedule 6.1.2.

<div align="center">

**ARTICLE 8**
**SECURITY**

</div>

**8.1     Security**

Each Borrower agrees to provide (or cause to be provided) the security listed below to the Agent on behalf of the Lenders and the Hedge Providers as continuing security for the payment and performance of all present and future, direct and indirect, indebtedness and obligations of the Credit Parties to the Agent, the Lenders and the Hedge Providers (on a *pari passu* basis) related to the Credit Documents, the Banking Service Agreements and the Hedging Agreements:

(a)     a general security agreement from each Borrower creating a First-Ranking Security Interest in respect of all of its present and after-acquired property, assets and undertaking and a floating charge over all present and future owned real property;

(b)     an unlimited Guarantee from the U.S. Borrower in respect of present and future, direct and indirect, indebtedness and Obligations of the Canadian Borrower and other Credit Parties to the Agent and the Lenders;

(c)     an unlimited Guarantee from each Material Subsidiary of the Canadian Borrower (excluding, for the avoidance of doubt, any Securitization SPE) which is not a Borrower in respect of present and future, direct and indirect, indebtedness and Obligations of the Borrowers to the Agent and the Lenders;

(d)     a general security agreement or debenture (or other equivalent security applicable in the relevant jurisdiction) from each Guarantor creating a First-Ranking Security Interest in respect of all its present and after acquired property, assets and undertaking and a floating charge over all present and future owned real property, provided, that (a) for so long as the Encina Loan Agreement is in effect, with respect to Anchor and its Subsidiaries the ranking of the First-Ranking Security Interest is to be in accordance with the Encina Intercreditor Agreement and (b) thereafter, so long as the Wells Fargo Credit Agreement is in effect, any Receivables and other assets encumbered by a lien pursuant to the Wells Fargo Credit Agreement and the other loan documents in connection therewith shall be excluded from the Security of the Agent and the Lenders;

<div align="center">- 124 -</div>

(e)     a limited recourse guarantee from Holdco and a share pledge agreement from Holdco in respect of all of the issued and outstanding shares of the Canadian Borrower owned by it;

(f)     a securities pledge agreement or charge over shares (or other equivalent security applicable in the relevant jurisdiction) in respect of the shares or units of the U.S. Borrower and any Material Subsidiary owned by a Credit Party;

(g)     prior to the incurrence of any Subordinated Debt by any Credit Party, a Subordination Agreement in respect to such Subordinated Debt;

(h)     for each Leased Property deemed material by the Required Lenders, acting reasonably, a Landlord Agreement in respect of each such Leased Property; provided that the Agent may impose a three month rent reserve against the Borrowing Base with respect to Eligible Inventory valued in excess of $250,000 (per location) which is located at or on Leased Property in respect of which such Landlord Agreement is not obtained;

(i)     for each Credit Party (other than Anchor, Terra and their Subsidiaries) who does not maintain all of its bank accounts exclusively with the Agent or its Affiliates, deposit account control or blocked account agreements among the Agent and the applicable financial institution which such bank account is maintained with, as may be reasonably required by the Agent subject to the last sentence of Section 7.1.13;

(j)     estoppel letters, consignments agreements, bailee letters, certificates or consents from such third parties as may be reasonably required by the Agent, but subject to any limitations set forth herein or in any other Credit Document; and

(k)     such other security as may be reasonably required by the Agent and the Lenders from time to time;

in each case, in accordance with the time periods set out in Sections 7.1.14.

## 8.2     General Provisions re Security; Registration

The Security shall be in form and substance satisfactory to the Agent and the Lenders, acting reasonably. The Agent may require that any item of Security be governed by the laws of the jurisdiction where the property subject to such item of Security is located. The Security shall be registered by the Borrowers where necessary or desirable to record and perfect the charges contained therein, as determined by the Agent giving consideration to, among other things, the cost thereof relative to the benefit to the Lenders thereof, and if the Borrowers do not so register the Security as requested or if the registration may be effected by the secured party thereunder, the Agent may do the same. Notwithstanding the foregoing, the parties expressly agree that no actions shall be required under this Section 8.2 or in respect of Security generally to the extent that the costs of obtaining such Financial Assistance or Lien or perfecting or registering such Security outweigh the benefits afforded thereby, in the opinion of the Required Lenders, acting reasonably, such determination to be made at the written request of the Canadian Borrower; provided, that the Agent and Lenders shall be entitled to re-evaluate whether the costs of obtaining such Financial

Assistance or Lien or perfecting or registering such Security outweigh the benefits afforded thereby from time to time in their discretion.

If any Lender determines, acting reasonably, that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful for such Lender to hold or benefit from any Guarantee and/or Security, such Lender shall notify the Agent and disclaim any benefit of such Guarantee and/or Security to the extent of such unlawfulness, provided that such disclaimer shall not invalidate or render unenforceable such Guarantee and/or Security for the benefit of any of the other Lenders

**8.3     Opinions re Security**

The Credit Parties shall cause to be delivered to the Agent and the Lenders the results of all applicable searches in respect of the Credit Parties in the applicable jurisdiction as well as the opinions of solicitors for the Credit Parties regarding their corporate status, the due authorization, execution and delivery of the Security provided by them, all registrations in respect of the Security, and the enforceability of such Security; all such opinions to be in form and substance satisfactory to the Agent and its counsel, acting reasonably.

**8.4     After-Acquired Property, Further Assurances**

Each Credit Party agrees to execute and deliver from time to time, and cause each of its Material Subsidiaries to execute and deliver from time to time, all such further documents and assurances as may be reasonably required by the Agent from time to time in order to provide the Security contemplated hereunder, specifically including: supplemental or additional security agreements, assignments and pledge agreements which shall include lists of specific assets to be subject to the security interests required hereunder.

**8.5     Security for Swap Documents with Former Lenders**

(a)     If a Lender ceases to be a Lender under this Agreement (for purposes of this Section 8.5, a "**Former Lender**"), all Secured Hedging Liabilities owing to such Former Lender and its Affiliates under Hedging Agreements entered into while such Former Lender was a Lender shall remain secured by the Security (equally and rateably) to the extent that such Secured Hedging Liabilities were secured by the Security prior to such Lender becoming a Former Lender and, subject to the following provisions of this Section 8.5. For certainty, any Hedging Liabilities under Hedging Agreements entered into with a Former Lender or an Affiliate thereof after the Former Lender has ceased to be a Lender shall not be Secured Hedging Liabilities nor shall they be secured by the Security. Notwithstanding the foregoing, while any Obligations remain outstanding under the Facilities, no Former Lender or any Affiliate thereof shall have any right to cause or require the enforcement of the Security or any right to participate in any decisions relating to the Security, including any decisions relating to the enforcement or manner of enforcement of the Security or decisions relating to any amendment to, waiver under, release of or other dealing with all or any part of the Security; for certainty, the sole right of a Former Lender and its Affiliates with respect to the Security while

any Obligations remain outstanding under the Facilities is to share, on a *pari passu* basis, in any proceeds of realization and enforcement of the Security.

(b)     If this Agreement is terminated, all Secured Hedging Liabilities owing to any Hedge Provider under Hedging Agreements entered into while such Hedge Provider, or its Affiliate, was a Lender hereunder and all Obligations under Banking Service Agreements between one or more Credit Parties and such Lender entered into while the Lender was a Lender hereunder shall no longer be secured by the Security.

## 8.6     Insurance Proceeds

If insurance proceeds become payable in respect of loss of or damage to any property owned by a Credit Party:

(a)     if an Event of Default has occurred and is continuing at such time, the Agent shall apply such proceeds against the Obligations; and

(b)     otherwise, the Agent shall apply such excess proceeds against the Obligations in accordance with Sections 5.3.1 and 5.3.2.

## 8.7     Qualified ECP Guarantor Keepwell

Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Credit Party to honor all of such Credit Party's obligations under this Agreement and the applicable Security (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 8.7 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 8.7, or otherwise under this Agreement and the applicable Security, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 8.7 shall remain in full force and effect until its Obligations have been discharged in full. Each Qualified ECP Guarantor intends that this Section 8.7 constitute, and this Section 8.7 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

## 8.8     Additional Release by Lender

If any Lender determines, acting reasonably, that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender to hold or benefit from a Lien over real property pursuant to any law of the United States or any State thereof, such Lender may notify the Agent and disclaim any benefit of such Lien to the extent of such illegality; provided, that such determination or disclaimer shall not invalidate or render unenforceable such Lien for the benefit of any other beneficiary of such Lien.

**8.9     Security Principles Affecting Certain Subsidiaries**

In obtaining Security from Material Subsidiaries in their respective jurisdiction of incorporation, the Agent, the Lenders and the Canadian Borrower agree that:

(a)     all Guarantees and Security granted will be limited to the extent necessary to comply with local legal requirements, as determined by the Agent acting reasonably;

(b)     general statutory limitations, financial assistance, corporate benefit, fraudulent preference, "thin capitalization" rules, tax restrictions (including tax thin capitalization issues), retention of title claims and similar principles may limit the ability of a Material Subsidiary to provide a Guarantee or other Security or may require that the Guarantee be limited by an amount or otherwise provided that the Canadian Borrower and the applicable Material Subsidiary will use reasonable endeavours to overcome such obstacles and to assist in demonstrating that adequate corporate benefit accrues to the relevant Guarantor;

(c)     the Security and extent of its perfection will be agreed on the basis that the cost to the Credit Parties of providing such Security shall be proportionate to the benefit accruing to the Lenders;

(d)     Material Subsidiaries will not be required to give Guarantees or enter into Security if that would conflict with the fiduciary duties of their directors or contravene any legal prohibition or result in a risk of personal or criminal liability on the part of an officer provided that the relevant Guarantor shall use reasonable endeavours to overcome any such obstacle;

(e)     perfection of security, when required, and other legal formalities will be completed as soon as practicable and, in any event, within the relevant time periods specified herein or, if earlier or to the extent no such time periods are specified herein, within the time periods specified by applicable law in order to ensure due perfection, provided that the perfection of security granted will not be required if it would have a material adverse effect on the ability of the relevant Guarantor to conduct its operations and business in the ordinary course as otherwise permitted by this Agreement;

(f)     where a class of assets to be secured includes material and immaterial assets, if the cost of granting Security over the immaterial assets is disproportionate to the benefit of such Security, security will be granted over the material assets only.

**ARTICLE 9**
**CONDITIONS PRECEDENT**

**9.1     Conditions Precedent to Agreement**

This Agreement shall not become effective unless and until the following conditions have been satisfied, in each case to the satisfaction of the Agent and the Lenders:

(a)     the conditions precedent in Section 9.2 shall have been satisfied;

(b)     the Agent and the Lenders shall be satisfied, in their reasonable discretion, with all Material Agreements, including confirmation that Palladium beneficially owns (within the meaning of Rule 13d-3 promulgated under the United States Securities Exchange Act of 1934) at least 52% of the issued and outstanding shares (excluding stock options) of the Canadian Borrower;

(c)     the Credit Parties shall have obtained insurance in respect of its consolidated property, business and assets, evidenced by an insurance certificate naming the Agent as additional insured and first loss payee;

(d)     the Canadian Borrower shall have in place acceptable Account Receivable Insurance, evidenced by an endorsement or insurance certificate naming the Agent as first loss payee;

(e)     subject to Schedule 9.1, (A) this Agreement and all Security (or in the case of Security that was previously delivered in connection with the Existing Credit Agreement, an acknowledgment and confirmation from the applicable Credit Party thereto if so requested by the Agent) required shall have been executed and delivered and (i) in Alberta, British Columbia and each other applicable Canadian jurisdiction, all registrations and deliveries necessary or desirable in connection therewith shall have been made, and (ii) in any other jurisdiction, the same, as applicable, shall have been delivered to the Agent in proper form for filing, and (B) all legal opinions and other documentation reasonably required by the Lenders in connection therewith shall have been executed and delivered, in each case, in form and substance reasonably satisfactory to the Agent and the Lenders;

(f)     the Agent and the Lenders shall have received satisfactory evidence that there are no Liens affecting any of the assets of the Credit Parties, except for Permitted Liens;

(g)     the Agent and Lenders shall have received satisfactory confirmation that at least 80% of the Insured Receivables forming part of the Borrowing Base are derived from, subject to and governed by Eligible Approved Contracts;

(h)     the Agent shall have received an officer's certificate, certificate of incumbency and certified copies of the articles, by-laws and resolutions of the board of directors of each Borrower and each other Credit Party formed under the laws of Canada, the U.S. or any province or state thereof concerning the due authorization, execution and delivery of the Credit Documents to which it is a party, and such related matters as the Agent and the Lenders may reasonably require;

(i)     the Agent shall have received a certificate of status, certificate of compliance or similar certificate for each Borrower and each other Credit Party formed under the laws of Canada, the U.S. or any province or state thereof issued by its governing jurisdiction;

(j) the Agent and the Lenders shall have received opinions from the solicitors for the Credit Parties in Alberta, British Columbia and Delaware, regarding, amongst other things, its corporate status, the due authorization, execution, delivery and enforceability of the Credit Documents provided by it, perfection and registration of the Security, and such other matters as the Agent and the Lenders may require;

(k) the Agent shall have received an opinion of its solicitors, Torys LLP, with respect to matters as the Agent and the Lenders may require.

(l) the Canadian Borrower shall have delivered a duly executed and completed Borrowing Base Certificate and a *pro forma* Compliance Certificate;

(m) consolidated cash flow projections, *pro forma* balance sheet, income statement and capital expenditure budget of the Canadian Borrower for each of the 2018, 2019 and 2020 Fiscal Years, including an analysis of the Mexican days of sales outstanding;

(n) the Borrowers and the Agent shall have entered into a Fee Agreement;

(o) the Borrowers shall have paid to the Agent all fees and expenses (including the Agent's reasonable and documented out-of-pocket legal expenses) relating to the establishment, amendment and restatement of the Facilities;

(p) no Material Adverse Change shall have occurred since March 31, 2018;

(q) the Agent shall have received satisfactory evidence that the Credit Parties have obtained all necessary consents of all Governmental Authorities required in connection with the execution of the Credit Documents and the consummation of the transactions contemplated thereby and the Canadian Borrower shall have delivered an officer's certificate certifying same;

(r) each of the representations and warranties in Article 6 shall be true and correct in all material respects and the Canadian Borrower shall have delivered an officer's certificate certifying same; and

(s) Holdco shall have received no less than $3,000,000 by way of an equity contribution by Palladium, an Investor or an Affiliate thereof and shall, substantially concurrently therewith, provide reasonably satisfactory evidence of such receipt to the Agent.

## 9.2 Conditions Precedent to all Advances

The Lenders shall have no obligation to make any Advance (including for greater certainty the initial Advance hereunder), unless at the time of making each such Advance the following terms and conditions shall have been satisfied:

(a) the representations and warranties in Article 6 shall be true and correct in all material respects as if made on the date of such Advance except to the extent such

representations and warranties relate to an earlier date in which case the information contained in representations and warranties shall be true and correct in all material respects as of such earlier date;

(b)     no Material Adverse Effect shall have occurred since the date of the then most recent Year-end Financial Statements;

(c)     no Default or Event of Default shall have occurred and be continuing, nor shall the making of the Advance result in the occurrence of any Default or Event of Default;

(d)     no Borrowing Base Shortfall shall and be continuing, nor shall the making of the Advance result in the occurrence of any Borrowing Base Shortfall;

(e)     after giving effect to the proposed drawdown, the outstanding principal of all Outstanding Advances under the applicable Facility shall not exceed the maximum amount of such Facility; and

(f)     the Borrower shall have given a Drawdown Request to the Agent in accordance with the notice requirements provided herein (except in respect of Advances in the form of Overdrafts).

## ARTICLE 10
## DEFAULT AND REMEDIES

**10.1     Events of Default**

The occurrence of any one or more of the following events, after the expiry of any applicable cure period set out below, shall constitute an event of default under this Agreement (an "**Event of Default**"):

(a)     if,

(i)     any Credit Party makes default in the due and punctual payment of any principal amount owing under the Credit Documents, as and when the same becomes due and payable, whether at maturity or otherwise;

(ii)     any Credit Party makes default in the due and punctual payment of Interest or fees owing under the Credit Documents (other than the Hedging Agreements), as and when the same become due and payable, whether at maturity or otherwise and such default continues for a period of three Business Days after written notice thereof is given to the applicable Credit Party by the Agent; or

(iii)     any Credit Party makes default in the due and punctual payment of any amounts in excess, in the aggregate, of $1,000,000 owing under the Hedging Agreements with a Hedge Provider, as and when the same become due and payable, whether at maturity or otherwise and such default continues for a

period of ten (10) Business Days after written notice thereof is given to the applicable Credit Party by the applicable Hedge Provider;

(b)     the Borrower fails to be in compliance with any of the covenants set out in Section 7.2 or Section 7.3 (subject to the Equity Cure in compliance with Section 7.3.2);

(c)     any representation or warranty provided by a Credit Party to the Agent or the Lenders herein or in any other Credit Document was incorrect in any material respect on the date on which such representation or warranty was made;

(d)     any Credit Party fails in a material way to perform or comply with any of its covenants or obligations contained in this Agreement or any other Credit Document (other than those set out in Subsections (a), (b) and (c) above; provided, that if such non-compliance is capable of remedy within 30 days after notice thereof from the Agent and such Credit Party diligently attempts to remedy such non-compliance and periodically informs the Agent of its efforts in this regard, and such non-compliance is remedied within such period, then such non-compliance shall be deemed not to constitute an Event of Default;

(e)     the occurrence of a Change of Control;

(f)     any one or more of the Credit Parties is in default in the payment or performance of any of its or their indebtedness or obligations under any agreement relating to any Funded Debt (other than the Obligations) where the principal amount owing under such agreements in the aggregate is in excess of $10,000,000 (after the expiry of any grace or cure periods relating thereto), and in either case, such indebtedness or obligations have been, or may be, accelerated, unless such default is waived by the applicable counterparties or holders of such debt in accordance with its terms;

(g)     one or more final judgments or decrees for the payment of money shall have been obtained or entered against any one or more of the Credit Parties in excess of $10,000,000 in the aggregate and is not released, bonded, satisfied, discharged, vacated, or stayed within 30 days;

(h)     an Insolvency Event occurs in respect of any Credit Party or any Subsidiary of the Borrowers that pledges cash and/or Cash Equivalents in accordance with Section 7.5(b) hereof; provided, this clause (h) shall exclude an Insolvency Event in respect of any Securitization SPE.

(i)     the Credit Parties (taken as a whole) cease (or take an affirmative action towards ceasing) to carry on business, or a substantial part thereof, or make or threaten to make (or take an affirmative action towards making) a bulk sale of their property, except to the extent specifically permitted hereunder;

(j)     the property of any one or more of the Credit Parties having a fair market value in excess of $10,000,000, in aggregate, shall be seized (including by way of execution, attachment, garnishment or distraint) or any Lien thereon shall be enforced, or such

- 132 -

property shall become subject to any charging order or equitable execution of a court, or any writ of enforcement, writ of execution or distress warrant with respect to obligations in excess of $10,000,000, in aggregate, shall exist in respect of any one or more of any of them, or such property, or any sheriff, civil enforcement agent or other Person shall become lawfully entitled to seize or distrain upon such property under the *Civil Enforcement Act* (Alberta), the *Workers' Compensation Act* (Alberta), the *Personal Property Security Act* (Alberta) or any other applicable Laws whereunder similar remedies are provided, and in any case such seizure, execution, attachment, garnishment, distraint, charging order or equitable execution, or other seizure or right, shall continue in effect and not be released or discharged for more than 30 days;

(k)     a Material Adverse Change has occurred since the date of the then most recent Year-end Financial Statements and remains continuing for more than 30 days after notice thereof is given to the Canadian Borrower by the Agent;

(l)     if an ERISA Event shall have occurred that would reasonably be expected to have a Material Adverse Effect;

(m)     any Credit Document or any material provision thereof is or is declared by any court of competent jurisdiction to be unenforceable, or any Credit Party terminates or purports to terminate its liability under any Credit Document or disputes the validity or enforceability of such Credit Document;

(n)     any of the Security ceases to constitute a valid and perfected First-Ranking Security Interest over Collateral of a value in excess of $5,000,000 in the aggregate and the Borrower shall have failed to remedy such default within 5 days of becoming aware of such fact and being provided by the Agent with any documentation required to be executed to remedy such default; and

(o)     if any Borrower fails to eliminate a Borrowing Base Shortfall as provided in Section 5.3.5.

Notwithstanding the foregoing, a declaration of an Event of Default under clause (i) above shall not: (1) prevent the commencement of a proceeding under Law 1116 of 2006 ("**Law 1116**") or the filing of a petition in Colombia to commence a proceeding under Law 1116 with respect to any Colombian Branch of any Credit Party, whether in a voluntary or involuntary manner; (2) be construed to mean that the purpose of this Section is to prevent or create obstacles to prevent, directly or indirectly, that proceedings be commenced in Colombia under Law 1116 with respect to any Colombian Branch of any Credit Party; (3) prohibit any Colombian Branch of any Credit Party from negotiating or entering into a restructuring agreement under Law 1116; or (4) impose any restrictions or prohibitions, or unfavorable effects "efectos desfavorables" upon any Colombian Branch of any Credit Party for the negotiation or execution of a restructuring agreement under Law 1116. The rights of the Lenders under this Section may not be exercised in connection with clause (i) above if and for so long as a proceeding is commenced or a petition is filed in Colombia to commence a proceeding under Law 1116 with respect to any Colombian Branch clause (i) above, whether in a voluntary or involuntary manner or any Colombian Branch

clause (i) above engage in negotiations to enter into, or enters into a restructuring agreement in Colombia under Law 1116.

## 10.2    Acceleration; Additional Interest

Upon the occurrence of an Insolvency Event in respect of any Credit Party, the Obligations shall become immediately due and payable, without the necessity of any demand upon or notice to the Borrower by the Agent and the Swingline shall be cancelled. Upon the occurrence and during the continuation of any Event of Default other than such an Insolvency Event, the Agent, at the request of and on behalf, of the Required Lenders, shall by written notice to the Borrowers declare the Obligations to be immediately due and payable. From and after the date of the occurrence of an Event of Default and for so long as such Event of Default continues, both before and after the Acceleration Date, all Outstanding Advances may bear interest or fees at the Default Rate in order to compensate the Lenders for the additional risk associated therewith.

## 10.3    Acceleration of Certain Contingent Obligations

Upon the occurrence of an Event of Default which is continuing, any Lender which has issued a Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit or entered into a Hedging Agreement with Credit Party may make a Canadian Dollar Prime Rate Loan, a U.S. Dollar Base Rate Loan or a U.S. Dollar Prime Rate Loan, as applicable, to a Borrower in an amount equal to the face amount of such Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit, or the amount required to unwind such Hedging Agreement (such amount to be determined in accordance with the terms thereof), as the case may be; and the proceeds of any such Loan shall be held by such Lender and used to satisfy the Lender's obligations under the said Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit as such becomes due, or to effect the unwinding of such Hedging Agreement. Any such Loan shall bear interest at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans, U.S. Dollar Base Rate Loans or U.S. Dollar Prime Rate Loan, as applicable, under the Facility under which such Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit was issued. Any such Loan made in respect of a Hedging Agreement shall bear interest at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans under the Canadian Operating Facility which provides for the highest interest rate at such time.

## 10.4    Combining Accounts, Set-Off

Upon the occurrence and during the continuation of an Event of Default, in addition to and not in limitation of any rights now or hereafter granted under Applicable Law, each Lender may without notice to any Credit Party at any time and from time to time:

(a)    combine, consolidate or merge any or all of the deposits or other accounts maintained with such Lender by such Credit Party in respect of this Agreement (whether term, notice, demand or otherwise and whether matured or unmatured) and such Credit Party's obligations to such Lender hereunder; and

(b)    set off, apply or transfer any or all sums standing to the credit of any such deposits or accounts in or towards the satisfaction of the said obligations,

- 134 -

including all claims of any nature or description arising out of or connected with this Agreement, including contingent obligations of the Lenders in respect of unmatured Bankers' Acceptances, in which case the Agent or such Lender will promptly notify the Borrower thereof after the occurrence thereof; provided, that the Agent's or such Lender's failure to give any such notice will not affect the validity thereof. Nothing contained in the Credit Documents will require the Agent or a Lender to exercise any right, or will affect the right of the Agent or a Lender to exercise and retain the benefits of exercising any right, with respect to any Obligations existing otherwise than pursuant to the Credit Documents.

## 10.5    Attorney in Fact

Each Borrower hereby irrevocably constitutes and appoints the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of such Borrower and in the name of such Borrower or in its own name, from time to time in the Agent's discretion, for the purpose of carrying out the terms of the Credit Documents, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Credit Documents and which such Borrower being required by the terms thereof to take or execute has failed to take or execute; provided, that this power of attorney will not be effective until the occurrence and during the continuance of any Event of Default. Each Borrower hereby ratifies all that said attorneys will lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and will be irrevocable until all of the Obligations under the Credit Documents have been unconditionally and irrevocably paid and performed in full. Each Borrower also authorizes the Agent, at any time and from time to time following the occurrence and during the continuance of any Event of Default, to execute any endorsements, assignments or other instruments of conveyance or transfer pursuant to the Security. If requested by the Agent, each Borrower will cause each other Credit Party to constitute and appoint the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney in fact in accordance with the foregoing provisions of this Section 10.5.

## 10.6    Appropriation of Monies

After the occurrence and during the continuation of an Event of Default, the Agent may from time to time apply any Proceeds of Realization against any portion or portions of the Obligations, and the Borrowers may not require any different application. The taking of a judgment or any other action or dealing whatsoever by the Agent or the Lenders in respect of the Security shall not operate as a merger of any of the Obligations hereunder or in any way affect or prejudice the rights, remedies and powers which the Agent or the Lenders may have, and the foreclosure, surrender, cancellation or any other dealing with any Security or the said obligations shall not release or affect the liability of the Borrowers or any other Person in respect of the remaining portion of the Obligations.

## 10.7    No Further Advances

The Lenders shall not be obliged to make any further Advances (including honouring any cheques drawn by a Borrower which are presented for payment) from and after the earliest to occur of the following: (a) delivery by the Agent to the Borrowers of a written notice that a Default or

an Event of Default has occurred and is continuing and that as a result thereof no further Advances will be made (whether or not such notice also requires immediate repayment of the Obligations) and (b) the occurrence and continuance of an Event of Default under Section 10.1(h).

## 10.8    Remedies Cumulative

All of the rights and remedies granted to the Agent and the Lenders in this Agreement, and any other Credit Documents or instruments in existence between the Parties or contemplated hereby, and any other rights and remedies available to the Agent and the Lenders at law or in equity, shall be cumulative. The exercise or failure to exercise any of the said remedies shall not constitute a waiver or release thereof or of any other right or remedy, and shall be non-exclusive.

## 10.9    Performance of Covenants by Agent

If a Credit Party fails to perform any covenant or obligation to be performed by it pursuant to this Agreement, the Agent, at the request of the Required Lenders (in their sole discretion), after written notice to the Borrowers, perform any of the said obligations but shall be under no obligation to do so; and any amounts expended or advanced by the Agent for such purpose shall be payable by the Borrowers upon demand, together with interest thereon at the highest rate then applicable to the Facilities.

## 10.10    Purchase of Participation Following Acceleration

After all Obligations are declared by the Agent to be due and payable pursuant to Section 10.2, (i) each Lender agrees that it will at any time or from time to time thereafter at the request of the Agent as required by any Lender, purchase at par on a non-recourse basis a participation in the Outstanding Advances owing to each of the other Lenders under the Operating Facilities and make any other adjustments as are necessary or appropriate, in order that the Outstanding Advances owing to each of the Lenders under the Operating Facilities, as adjusted pursuant to this Section 10.10, will be in the same proportion as each Lender's Commitment under all the Operating Facilities was to the aggregate Commitment of all Lenders under all the Operating Facilities immediately prior to the Event of Default resulting in such declaration; (ii) the amount of any repayment made by or on behalf of the Credit Parties under the Credit Documents or any proceeds received by the Agent or the Lenders pursuant to Section 11.7 will be applied by the Agent in a manner such that to the extent possible the amount of the Outstanding Advances owing to each Lender under the Operating Facilities after giving effect to such application will be in the same proportion as each Lender's Commitment under all the Operating Facilities was to the aggregate Commitment of all Lenders under all the Operating Facilities immediately prior to the Event of Default resulting in such declaration; provided that: (i) HSBC US shall not purchase any participation under this Section 10.10 from HSBC Bank Canada (and provided that for certainty, the foregoing proviso shall not affect the obligations of HSBC US to any of the other Lenders under this Section 10.10); and (ii) if Applicable Laws or a Lender's internal regulations and policies prohibits such Lender from purchasing a participation in Outstanding Advances owing by a Borrower other than the Canadian Borrower, such Lender shall not be required to purchase a participation in the Outstanding Advances  owing by such Borrower, provided that such Lender hereby indemnifies the other Lenders for its Proportionate Share of such Outstanding Advances as if such purchase had occurred.

## ARTICLE 11
## ADMINISTRATION OF THE FACILITIES

**11.1    Authorization and Action**

Each Lender hereby irrevocably appoints and authorizes the Agent to be its agent in its name and on its behalf and to exercise such rights or powers granted to the Agent or the Lenders under the Credit Documents to the extent specifically provided therein and on the terms thereof, together with such powers and authority as are reasonably incidental thereto. As to any matters not expressly provided for by the Credit Documents, the Agent will not be required to exercise any discretion or take any action, but will be required to act or to refrain from acting (and will be fully indemnified and protected by the Lenders to the greatest extent permitted by Law in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions will be binding upon all Lenders; provided, however, that the Agent will not be required to take any action which, in the opinion of the Agent, might expose the Agent to liability in such capacity, which could result in the Agent incurring any costs and expenses, or which is contrary to the spirit and intent of this Agreement.

**11.2    Decision-Making**

11.2.1    Any amendment to this Agreement relating to the following matters shall require the unanimous agreement of the Lenders:

(a)    decreases in interest rates or fees payable in respect of any Facility;

(b)    increases in the maximum amount of credit available under any Facility;

(c)    extensions, or changes to the definition, of the Facilities Maturity Date;

(d)    extensions or postponements of the scheduled dates or the scheduled amounts for Repayments hereunder;

(e)    reductions in the Outstanding Advances under any Facility;

(f)    releases of all or substantially all of the Security, unless in connection with a Permitted Disposition;

(g)    any change to the definition of Required Lenders;

(h)    any provision of this Agreement which expressly states that the unanimous consent of the Lenders is required in connection with an action to be taken or consent provided by the Lenders;

(i)    any amendment, modification or elimination the definition of Borrowing Base or any of the defined terms that are used in such definition to the extent that any such change results in more credit being made available to the Borrowers based upon the Borrowing Base, but not otherwise;

- 137 -

(j)     any change to Sections 11.8.1, 11.9(b) or any other provision regarding the allocation of payments to the Lenders under this Agreement; and

(k)     this Section 11.2;

provided, that (A) any change to Section 2.6.1(i) or Article 11 will also require the consent of the Agent, (B) any change to Sections 4.6.1(c) and 4.7 (and the related definitions referenced therein) will require the consent of the Issuing Bank under the U.S. Operating Facility and the Agent, (C) any change to Sections 2.6.1(b) and 2.7 (and the related definitions referenced therein) will require the consent of the Swingline Lender and the Agent, (D) any change to Section 5.16 (and the related definitions referenced therein) will require the consent of each Issuing Bank and the Agent (E) any increase to the individual commitment amount of a Lender under a Facility can only be made with the consent of such Lender; and (F) any other change which only effects the Canadian Operating Lenders, the U.S. Operating Lenders, the Canadian Operating Lenders, Term Lenders, the Issuing Bank, the Swingline Lender or the Agent, respectively, shall only require the consent of the affected Persons.

11.2.2    Except for the matters described in Section 11.2.1 above, any amendment to this Agreement or the other Credit Documents shall be effective if made among the Borrower and the Required Lenders, and for greater certainty any such amendment which is agreed to by the Required Lenders shall be final and binding upon all Lenders.

11.2.3    Except for the matters which require the unanimous consent of the Lenders as set out above, any action to be taken or decision to be made by the Lenders pursuant to this Agreement (specifically including for greater certainty the issuance of written notice to the Borrower of the occurrence of a Default or Event of Default, the issuance of a demand for payment of the Obligations, a decision to make an Advance despite any condition precedent relating thereto not being satisfied, the provision of any waiver in respect of a breach of any covenant or the issuance of any consent which may be required under Section 7.2) shall be effective if approved by the Required Lenders; and any such decision or action shall be final and binding upon all the Lenders.

11.2.4    Any action to be taken or decision to be made by the Lenders pursuant to this Agreement which is required to be unanimous shall be made at a meeting of the Lenders called by the Agent pursuant to Section 11.11(k) or by a written instrument executed by all of the Lenders. Any action to be taken or decision to be made by the Lenders pursuant to this Agreement which is required to be made by the Required Lenders shall be made at a meeting of the Lenders called by the Agent pursuant to Section 11.11(k) or by a written instrument executed by the Required Lenders. Any instrument contemplated in this Section 11.2.4 may be executed by fax or pdf and in counterparts.

11.2.5    Subject to Section 8.5(b), the Agent may from time to time without notice to or the consent of the Lenders execute and deliver partial releases of the Security in respect of any item of Collateral (whether or not the proceeds of sale thereof are received by the Agent) which the Credit Parties are permitted to dispose of in connection with a Permitted Disposition; and in releasing any such Security the Agent may rely upon and assume the

- 138 -

correctness of all information contained in any certificate or document provided by any one or more of the Borrowers, without further enquiry. Otherwise, any release or discharge in respect of the Security or any portion thereof shall require the written consent of the Lenders acting unanimously.

## 11.3    Procedure for Making Advances

11.3.1    Subject to Section 11.8.3, all Advances under each Facility will be made in accordance with each Lender's Proportionate Share of such Advance under such Facility.

11.3.2    The Lenders, through the Agent, will make Advances under a Facility available to the Borrower as required hereunder by debiting the account of the Agent to which each Lender's Proportionate Share in respect of each Facility of such Advances has been credited (or causing such account to be debited) and, in the absence of other arrangements agreed to by the Agent and the Borrowers in writing, by transferring (or causing to be transferred) like funds in accordance with the instructions of the Borrowers as set forth in the a Drawdown Request, Conversion Notice or Rollover Notice, as the case may be, in respect of each Advance under each Facility; provided, that the obligation of the Agent hereunder will be limited to taking such steps as are in keeping with its normal banking practice and which are commercially reasonable in the circumstances to implement such instructions, and the Agent will not be liable for any damages, claims or costs which may be suffered by the Borrowers or any of the Lenders and occasioned by the failure of such funds to reach their designated destination, unless such failure is due to the gross negligence or wilful misconduct of the Agent.

## 11.4    Failure to Fund

11.4.1    Unless the Agent has actual knowledge that a Lender has not made or will not make available to the Agent for value on the date of any Advance the applicable amount required from such Lender hereunder, the Agent shall be entitled to assume that such amount has been or will be received from such Lender when so due and the Agent may (but shall not under any circumstances be obliged to), in reliance upon such assumption, make available to the applicable Borrower a corresponding amount (except that no such amount shall be made available to the applicable Borrower in the case of a deemed Advance). If such amount is not in fact received by the Agent from such Lender on such date and the Agent has made available a corresponding amount to the applicable Borrower on such date as aforesaid (or is deemed to have made an Advance to the applicable Borrower in such amount), such Lender shall pay to the Agent on demand an amount equal to the aggregate of the applicable amount required from such Lender hereunder plus an amount equal to the product of (a) the rate per annum applicable to overnight deposits made with the Agent for amounts approximately equal to the amount required from such Lender multiplied by (b) the amount that should have been paid to the Agent by such Lender on such date and was not, multiplied by (c) a fraction, the numerator of which is the number of days that have elapsed from and including such date to but excluding the date on which the amount is received by the Agent from such Lender and the denominator of which is 365 or 366 days, as the case may be, in the case of all Advances. A certificate of the Agent containing details of the amount owing by a Lender under this Section shall be binding and

- 139 -

conclusive in the absence of manifest error. If any such amount is not in fact received by the Agent from such Lender on such date, the Agent shall be entitled to recover from the applicable Borrower, on demand, the related amount made available by the Agent to such Borrower as aforesaid together with interest thereon at the applicable rate per annum payable by such Borrower hereunder.

11.4.2   Notwithstanding the provisions of Section 11.4.1, if any Lender fails to make available to the Agent its Proportionate Share of any Advance, which for greater certainty includes a deemed Advance hereunder (such Lender being herein called the "**Non-Paying Lender**"), the Agent shall forthwith give notice of such failure by the Non-Paying Lender to the applicable Borrower (except where such failure relates to a deemed Advance) and to the other Lenders. The Agent shall then forthwith give notice to the other Lenders that any Lender may make available to the Agent all or any portion of the Non-Paying Lender's Proportionate Share of such Advance (but in no way shall any other Lender or the Agent be obliged to do so) in the place of the Non-Paying Lender. If more than one Lender gives notice that it is prepared to make funds available in the place of a Non-Paying Lender in such circumstances and the aggregate of the funds which such Lenders (herein collectively called the "**Contributing Lenders**" and individually called the "**Contributing Lender**") are prepared to make available exceeds the amount of the Advance which the Non-Paying Lender failed to make, then each Contributing Lender shall be deemed to have given notice that it is prepared to make available its Proportionate Share of such Advance based on the Contributing Lenders' relative commitments to advance in such circumstances. If any Contributing Lender makes funds available in the place of a Non-Paying Lender in such circumstances, then the Non-Paying Lender shall pay to any Contributing Lender making the funds available in its place, forthwith on demand, any amount advanced on its behalf together with interest thereon at the rate applicable to such Advance from the date of advance to the date of payment, against payment by the Contributing Lender making the funds available of all interest received in respect of the Advance from the applicable Borrower. The failure of any Lender to make available to the Agent its Proportionate Share of any Advance as required herein shall not relieve any other Lender of its obligations to make available to the Agent its Proportionate Share of any Advance as required herein.

**11.5    Defaulting Lenders and Replacement of Lenders**

11.5.1   Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)      the standby fees payable to a Defaulting Lender hereunder shall cease to accrue on the unused portion of its Commitment under any Operating Facility, as applicable;

(b)      a Defaulting Lender shall not be included in determining whether, and the Commitment and the Proportionate Share of the Outstanding Advances of such Defaulting Lender under the Facilities, or any of them, shall not be included in determining whether, all Lenders or the Required Lenders, have taken or may take any action hereunder; underlined provided, that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects such

Defaulting Lender differently than other affected Lenders shall require the consent of such Defaulting Lender;

(c) subject to Section 11.4.1, for the purposes of any Advance requested hereunder while there is a Defaulting Lender, each Lender's Proportionate Share thereof shall be calculated based on such Lender's (A) Commitment relative to the total Commitment under the applicable Facility reduced by the Commitment of the Defaulting Lender;

(d) the Agent, the Swingline Lender or the Issuing Bank may require such Defaulting Lender to pay to the Agent for deposit into an escrow account maintained by and in the name of the Agent an amount equal to such Defaulting Lender's maximum contingent obligations hereunder to the Agent, the Swingline Lender or the Issuing Bank, as the case may be (provided that the foregoing shall not apply to Export Development Canada to the extent such a deposit is unlawful under the *Financial Administration Act* (Canada));

(e) the Agent may withhold any payments owing to such Defaulting Lender for set off against such Defaulting Lender's existing or reasonably foreseeable future obligations hereunder; and

(f) for the avoidance of doubt, the Borrowers shall retain and reserve their other rights and remedies respecting each Defaulting Lender.

11.5.2   If a Lender is a Defaulting Lender or refuses to give timely consent to an amendment, modification or waiver of this Agreement that, pursuant to Section 11.2, requires consent of all the Lenders (and the consent of the Required Lenders has been given with respect thereto) (a "**Non-Consenting Lender**") (collectively, the "**Departing Lenders**"), then the Borrowers may:

(a) replace the Departing Lender with another financial institution acceptable to the Agent, the Swingline Lender and the Issuing Bank, each acting reasonably, who purchases at par, or such lower price as the Departing Lender may agree in its sole discretion, the Outstanding Advances and other amounts under all Facilities owing to the Departing Lender and such Lender's entire Commitment and assumes the Departing Lender's Commitment and all other obligations of the Departing Lender hereunder; provided, that prior to or concurrently with such replacement:

    (i) the Departing Lender shall have received payment in full of all principal, interest, fees and other amounts through such date of replacement and a release from any further obligations to make Advances under the Credit Documents after the date of such replacement;

    (ii) the assignment fee required to be paid by Section 13.6.2 shall have been paid to the Agent;

    (iii) all of the other requirements for such assignment contained herein shall have been satisfied, including the consent of the Agent, the Swingline

- 141 -

Lender and the Issuing Bank and the receipt by the Agent of such agreements, documents and instruments as the Agent may reasonably require; and

(iv)   in the case of a Departing Lender who is a Non-Consenting Lender, each assignee consents, at the time of such assignment, to each matter in respect of which such Non-Consenting Lender was a Non-Consenting Lender and the Borrowers also requires each other Lender that is a Non-Consenting Lender to assign the Outstanding Advances owing to it under each Facility and its Commitment; or

(b)   provided, no Default or Event of Default exists at such time, elect to terminate the Departing Lender's Commitment, in which case the Commitment in respect of each Facility shall be reduced by an amount equal to the amount of any Commitment of such Facility so cancelled (provided, that prior to or concurrently with such cancellation the Departing Lender shall have received payment in full of all principal, interest, fees and other amounts through such date of cancellation (including breakage and other costs in accordance with Sections 5.10.4 and 5.14) and a release from any further obligations to make Advances under the Credit Documents after such termination); or

(c)   exercise any combination of the rights under (a) and (b) above; provided, that in each case, each Departing Lender is treated ratably with the other Departing Lenders, if any.

## 11.6   Security and Exercise of Remedies

11.6.1   Except to the extent provided in Section 11.6.2, the Security shall be granted in favour of and held by the Agent for and on behalf of the Lenders in accordance with the provisions of this Agreement. The Agent shall, in accordance with its usual practices in effect from time to time, take all steps required to perfect and maintain the Security to the extent required hereunder, including: taking possession of the certificates representing the securities required to be pledged hereunder to the extent required hereunder; filing renewals and change notices in respect of such Security; and ensuring that the name of the Agent is noted as loss payee or mortgagee on all property insurance policies covering the Collateral. If the Agent becomes aware of any matter concerning the Security which it considers to be material, it shall promptly inform the Lenders. The Agent shall comply with all instructions provided by the Lenders or the Required Lenders, as the case may be, in connection with the enforcement or release of the Security which it holds. The Agent agrees to permit each Lender to review and make photocopies of the original documents comprising the Security from time to time upon reasonable notice. The Agent is hereby authorized to enter into the Subordination Agreement on behalf of the Lenders and to any subordination and postponement agreements in respect of Subordinated Debt from time to time to the extent the same is permitted hereunder. Each Lender further authorizes the Agent to execute on its behalf, directly or through attorneys-in-fact duly appointed for such purposes, and to accept the benefits of, each of the Security governed under the laws of the Republic of Colombia and any other agreements or documents as may be necessary or

- 142 -

advisable in connection with the grant of, or attachment or perfection of, modification, supplement or waiver under any of, the security interest granted to the Agent, for the benefit of the Lenders, pursuant to the Security governed under the laws of the Republic of Colombia. The Lenders and the other Secured Parties authorize the Agent to release any Collateral or Guarantors in accordance with Section 13.21 or if approved, authorized or ratified in accordance with Section 11.2.1. The Lenders and the other Secured Parties hereby irrevocably authorize and instruct the Agent to, without any further consent of any Lender, enter into (or acknowledge and consent to) or amend, renew, extend, supplement, restate, replace, waive or otherwise modify the Encina Intercreditor Agreement and the Wells Fargo Letter to the extent this Agreement does not otherwise require the consent of the Required Lenders or all Lenders therefor.

11.6.2    If any Credit Party has provided security in favour of any Lender directly, except for Permitted Purchase-Money Security Interests and Permitted Liens, such Lender agrees to pay to the Agent all amounts received by it in connection with the enforcement of such security, and all such amounts shall be deemed to constitute Proceeds of Realization and shall be dealt with as provided in Section 11.7.

11.6.3    Except as otherwise provided herein, each Lender hereby acknowledges that, to the extent permitted by Applicable Law, rights and remedies provided under the Credit Documents to the Lenders are for the benefit of the Lenders collectively and not severally and further acknowledges that its rights and remedies thereunder are to be exercised not severally but collectively through the Agent upon the decision of the Lenders (with the required majority or unanimity as herein provided), regardless of whether acceleration of Obligations hereunder was made, and accordingly, notwithstanding any of the provisions contained herein, each of the Lenders hereby covenants and agrees that it will not be entitled to take any action with respect to the Facilities, including any acceleration of Obligations thereunder, but that any such action will be taken only by the Agent with the prior written direction of the Lenders (with the required majority or unanimity as herein provided). Notwithstanding the foregoing or anything else set forth herein to the contrary, in the absence of written instructions from the Lenders, and where in the sole opinion of the Agent the exigencies of the situation warrant such action, the Agent may without notice to or consent of the Lenders take such action on behalf of the Lenders as it deems appropriate or desirable in the circumstances. Each of the Lenders hereby covenants and agrees that it has not heretofore and will not seek, take, accept or receive any Liens in respect of any of the Obligations of the Credit Parties under the Credit Documents and will not enter into any agreement with any of the Parties relating in any manner whatsoever to the Facilities, unless all of the Lenders under the Facilities will at the same time obtain the benefit of any such security or agreement, as the case may be.

## 11.7    Application of Proceeds of Realization

Notwithstanding any other provision of this Agreement, the Proceeds of Realization of the Security or any portion thereof shall be distributed in the following order:

(a)     firstly, in payment of all costs and expenses incurred by the Agent and the Lenders in connection with such realization, including legal, accounting and receivers' fees and disbursements;

(b)     secondly, against the Obligations (including Secured Hedging Liabilities but excluding any other Hedging Liabilities in excess thereof, and, for certainty, excluding any Hedging Liabilities which are owed to a counterparty other than a Lender or Affiliate thereof), each Lender being entitled to receive its Proportionate Share thereof;

(c)     thirdly, against all Hedging Liabilities which are owing to any Lender or Affiliate thereof in excess of Secured Hedging Liabilities; and

(d)     fourthly, if all Obligations of the Borrowers listed above and all other Hedging Liabilities owing to any Lender or Affiliate thereof have been paid and satisfied in full, any surplus Proceeds of Realization shall be paid in accordance with Applicable Law.

## 11.8    Payments by Agent

11.8.1    The following provisions shall apply to all payments made by the Agent to the Lenders hereunder:

(a)     the Agent shall be under no obligation to make any payment (whether in respect of principal, Interest, fees or otherwise) to any Lender until an amount in respect of such payment has been received by the Agent from a Credit Party;

(b)     if the Agent receives a payment of principal, Interest, fees or other amount owing by any Borrower under a Facility which is less than the full amount of any such payment due, the Agent shall distribute such amount received among the Lenders under such Facility in each Lender's Proportionate Share of such Facility;

(c)     if the Agent receives payments in respect of principal, Interest, fees or other amounts owing by a Borrower under more than one Facility which are due on the same day, and if the amounts received are insufficient to satisfy all payments required under such Facilities on such day, the Agent shall, except as otherwise specifically set forth herein, distribute such amounts received among the Lenders under such Facilities in each Lender's Proportionate Share of such Facilities;

(d)     if any Lender has advanced more or less than its Proportionate Share of its Commitment under a Facility, such Lender's entitlement to such payment shall be increased or reduced, as the case may be, in proportion to the amount actually advanced by such Lender;

(e)     if a Lender's Proportionate Share of an Advance under a Facility has been advanced for less than the full period to which any payment by any Credit Party relates, such Lender's entitlement to receive a portion of any payment of interest or fees shall be

- 144 -

reduced in proportion to the length of time such Lender's Proportionate Share has actually been outstanding;

(f)     the Agent acting reasonably and in good faith shall, after consultation with the Lenders in the case of any dispute, determine in all cases the amount of all payments to which each Lender is entitled and such determination shall be deemed to be *prima facie* correct;

(g)     upon request by a Lender, the Agent shall deliver a statement detailing any of the payments to the Lenders referred to herein;

(h)     all payments by the Agent to a Lender hereunder shall be made to such Lender at its address set out herein unless notice to the contrary is received by the Agent from such Lender; and

(i)     if the Agent has received a payment from a Credit Party on a Business Day (not later than the time required for the receipt of such payment as set out in this Agreement) and fails to remit such payment to any Lender entitled to receive its Proportionate Share of such payment on such Business Day, the Agent agrees to pay interest on such late payment at a rate determined by the Agent in accordance with prevailing banking industry practice on interbank compensation.

11.8.2   Each Borrower hereby irrevocably authorizes the Agent to debit any account maintained by it with the Agent after written notice to such Borrower in order to make payments to the Lenders or the Agent of any amount that is overdue and payable hereunder for the purposes of satisfying payment thereof.

11.8.3   The Agent may in its discretion from time to time make adjustments in respect of any Lender's share of an Advance, Conversion, Rollover or Repayment under a Facility in order that the Outstanding Advances due to such Lender under such Facility shall be approximately in accordance with such Lender's Proportionate Share of the Facility.

**11.9     Redistribution of Payment**

Each Lender agrees that, subject to Section 10.4:

(a)     If it exercises any right of counterclaim, set off, bankers' lien or similar right with respect to any property of any Credit Party or if under Applicable Law it receives a secured claim, it will apportion the amount thereof proportionately between:

(i)     amounts outstanding at the time owed by the Credit Party to such Lender under this Agreement, which amounts will be applied in accordance with this Section 11.9; and

(ii)    amounts otherwise owed to it by a Credit Party;

provided, that any cash collateral account held by such Lender as collateral for a letter of credit or bankers' acceptance (including a Bankers' Acceptance) issued or

- 145 -

accepted by such Lender on behalf of a Credit Party may be applied by such Lender to such amounts owed by such Credit Party to such Lender pursuant to such letter of credit or in respect of any such bankers' acceptance without apportionment.

(b)     If it receives, through the exercise of a right or the receipt of a secured claim described in Section 11.9(a) or otherwise, payment of a proportion of the aggregate amount of principal, interest and fees due to it hereunder which is greater than the proportion received by any other Lender in respect of the aggregate amount of principal, interest and fees due in respect of the applicable Facility (having regard to the respective proportionate amounts advanced as Advances by each of the Lenders under the applicable Facility), the Lender receiving such proportionately greater payment will purchase a participation (which will be deemed to have been done simultaneously with receipt of such payment) in that portion of the applicable Facility of the other Lenders so that their respective receipts will be *pro rata* to their respective Proportionate Shares; provided, however, that, if all or part of such proportionately greater payment received by such purchasing Lender is otherwise recovered by it, such purchase will be rescinded and the purchase price for such participation will be returned to the extent of such recovery, but without interest. Such Lender will exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this Section 11.9 to share in the benefits of any recovery on such secured claims.

(c)     If it does any act or thing permitted by Section 11.9(a) or 11.9(b), it will promptly provide full particulars thereof to the Agent.

(d)     Except as permitted under Section 11.9(a) or 11.9(b), no Lender will be entitled to exercise any right of counter claim, set off, bankers' lien or similar right without the prior written consent of the other Lenders.

(e)     Notwithstanding anything else in this Section 11.9, any amounts which are lawfully received by any Hedge Provider in respect of Hedging Liabilities prior to the delivery by the Agent of a declaration of all Obligations becoming due pursuant to Section 11.9 are not required to be shared pursuant to the provisions of this Section 11.9.

(f)     The provisions of this Section 11.9 shall survive repayment of the Obligations.

## 11.10   Protection of Agent

11.10.1   Unless the Agent has actual knowledge or actual notice to the contrary, it may assume that each Lender's address set out in Exhibit "A" attached hereto is correct, unless and until it has received from such Lender a notice designating a different address.

11.10.2   The Agent may engage and pay for the advice or services of any lawyers, accountants or other experts whose advice or services may to it seem necessary, expedient or desirable and rely upon any advice so obtained (and to the extent that such costs are not recovered from the Credit Parties pursuant to this Agreement, each Lender agrees to reimburse the Agent in such Lender's Proportionate Share of such costs).

- 146 -

11.10.3  Unless the Agent has actual knowledge or actual notice to the contrary, it may rely as to matters of fact which might reasonably be expected to be within the knowledge of any Credit Party upon a statement contained in any Credit Document.

11.10.4  Unless the Agent has actual knowledge or actual notice to the contrary, it may rely upon any communication or document believed by it to be genuine.

11.10.5  The Agent may refrain from exercising any right, power or discretion vested in it under this Agreement unless and until instructed by the Required Lenders as to whether or not such right, power or discretion is to be exercised and, if it is to be exercised, as to the manner in which it should be exercised (provided, that such instructions shall be required to be provided by all of the Lenders in respect of any matter for which the unanimous consent of the Lenders is required as set out herein).

11.10.6  The Agent may refrain from exercising any right, power or discretion vested in it which would or might in its sole and unfettered opinion be contrary to any law of any jurisdiction or any directive or otherwise render it liable to any Person, and may do anything which is in its opinion in its sole discretion necessary to comply with any such law or directive.

11.10.7  The Agent may delegate to such other Person, such duties and responsibilities of the Agent hereunder as it shall determine to be appropriate in respect of dealings with or relating to any Credit Party or any other Person and in particular, the Agent may execute any of its duties under this Agreement or any other Credit Document (including, for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security or of exercising any rights and remedies thereunder) by sub-agent or attorney-in-fact. The Agent shall not be responsible for the negligence or misconduct of any sub-agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct on the part of the Agent, as determined by a final and non-appealable judgment of a court of competent jurisdiction. The exculpatory provisions of this Agreement applicable to the Agent shall apply to any such other Person, sub-agent or attorney-in-fact and to the Affiliates of the Agent and any such sub-agent or attorney-in-fact, and shall apply to their respective activities in connection with the syndication of the Facilities as well as activities as Agent.

11.10.8  The Agent may refrain from acting in accordance with any instructions of the Required Lenders to begin any legal action or proceeding arising out of or in connection with this Agreement or take any steps to enforce or realize upon any Security, until it shall have received such security as it may reasonably require (whether by way of payment in advance or otherwise) against all costs, claims, expenses (including legal fees) and liabilities which it will or may expend or incur in complying with such instructions.

11.10.9  The Agent shall not be bound to disclose to any Person any information relating to the Credit Parties or any Related Parties if such disclosure would or might in its opinion in its sole discretion constitute a breach of any law or regulation or be otherwise actionable at the suit of any Person.

- 147 -

11.10.10 The Agent shall not accept any responsibility for the accuracy or completeness of any information supplied in connection herewith or for the legality, validity, effectiveness, adequacy or enforceability of any Credit Document and shall not be under any liability to any Lender as a result of taking or omitting to take any action in relation to any Credit Document except in the case of the Agent's gross negligence or wilful misconduct.

## 11.11  Duties of Agent

The Agent shall:

(a)     hold and maintain the Security to the extent provided in Section 11.6;

(b)     provide to each Lender copies of all financial information received from the Credit Parties promptly after receipt thereof, and copies of any Drawdown Requests, Conversion Notices, Rollover Notices, Repayment Notices and other notices received by the Agent from the Credit Parties upon request by any Lender;

(c)     promptly advise each Lender of Advances required to be made by it hereunder and disburse all Repayments to the Lenders hereunder in accordance with the terms of this Agreement;

(d)     promptly notify each Lender of the occurrence of any Default or Event of Default of which the Agent has actual knowledge or actual notice;

(e)     at the time of engaging any agent, receiver, receiver-manager, consultant, monitor or other party in connection with the Security or the enforcement thereof, obtain the agreement of such party to comply with the applicable terms of this Agreement in carrying out any such enforcement activities and dealing with any Proceeds of Realization;

(f)     account for any monies received by it in connection with this Agreement, the Security and any other agreement delivered in connection herewith or therewith;

(g)     each time a Borrower requests the written consent of the Lenders in connection with any matter, use its best efforts to obtain and communicate to the Borrowers the response of the Lenders in a reasonably prompt and timely manner having due regard to the nature and circumstances of the request;

(h)     give written notice to the Borrowers in respect of any other matter in respect of which notice is required in accordance with or pursuant to this Agreement, promptly or promptly after receiving the consent of the Required Lenders, if required under the terms of this Agreement;

(i)     except as otherwise provided in this Agreement, act in accordance with any instructions given to it by the Required Lenders;

(j)     if so instructed by the Required Lenders, refrain from exercising any right, power or discretion vested in it under this Agreement or any document incidental thereto; and

(k)     call a meeting of the Lenders at any time not earlier than five days and not later than 30 days after receipt of a written request for a meeting provided by any Lender.

## 11.12   Lenders' Obligations Several; No Partnership

The obligations of each Lender under this Agreement are several. The failure of any Lender to carry out its obligations hereunder shall not relieve the other Lenders of any of their respective obligations hereunder. No Lender shall be responsible for the obligations of any other Lender hereunder. Neither the entering into of this Agreement nor the completion of any transactions contemplated herein shall constitute the Lenders and the Agent, or any combination of them, a partnership or give rise to any fiduciary relationship between them.

## 11.13   Reliance Upon Agent

The Borrowers will be entitled to rely upon any certificate, notice or other document or other advice, statement or instruction provided to them (or any one of them) by the Agent pursuant to the Credit Documents, and the Borrowers will be entitled to deal with the Agent with respect to matters under the Credit Documents which the Agent is authorized hereunder to deal with, without any obligation whatsoever to satisfy themselves as to the authority of the Agent to act on behalf of the Lenders and without any liability whatsoever to the Lenders for relying upon any certificate, notice or other document or other advice, statement or instruction provided to them by the Agent, notwithstanding any lack of authority of the Agent to provide the same.

## 11.14   No Liability of Agent

The Agent, in its capacity as agent of the Lenders under the Credit Documents, will have no responsibility or liability to the Borrowers or the Lenders on account of the failure of any Lender to perform its obligations hereunder, or to any Lender on account of the failure of any Borrower to perform its obligations under the Credit Documents.

## 11.15   Agent and Agent Authority

With respect to its Proportionate Share of each Facility and the Advances made by it as a Lender thereunder, as applicable, the Agent will have the same rights and powers under the Credit Documents as any other Lender and may exercise the same as though it were not the Agent. The Agent may accept deposits from, lend money to, and generally engage in any kind of business with any Credit Party, any of their Subsidiaries, their respective shareholders or unitholders or any Person owned or controlled by any of them and any Person which may do business with any of them, all as if the Agent was not serving as Agent, and without any duty or obligation to account therefor to the Lenders.

**11.16   Lenders' Credit Decisions**

It is understood and agreed by each Lender that it has itself been, and will continue to be, solely responsible for making its own independent appraisal of and investigations into the financial condition, creditworthiness, condition, affairs, status and nature of the Credit Parties. Accordingly, each Lender confirms with the Agent that it has not relied, and will not hereafter rely, on the Agent (a) to check or inquire on its behalf into the adequacy, accuracy or completeness of any information provided by the Credit Parties or any other Person under or in connection with the Facilities (whether or not such information has been or is hereafter distributed to such Lender by the Agent) or (b) to assess or keep under review on its behalf the financial condition, creditworthiness, condition, affairs, status or nature of any Credit Party. Each Lender acknowledges that copies of the Credit Documents have been made available to it for review and each Lender acknowledges that it is satisfied with the form and substance of the Credit Documents. A Lender will not make any independent arrangement with any Credit Party for the satisfaction of any Obligations owing to it under the Credit Documents without the written consent of the other Lenders.

**11.17   Indemnification**

The Lenders hereby severally agree to indemnify the Agent and its directors, officers, agents and employees (to the extent not reimbursed by the Credit Parties) in accordance with their respective Proportionate Share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent or its directors, officers, agents and employees in any way relating to or arising out of the Credit Documents or any action taken or omitted by the Agent under or in respect of the Credit Documents in its capacity as Agent; provided, that no Lender will be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross negligence or wilful misconduct, as determined by a final and non-appealable judgment of a court of component jurisdiction. Without limiting the generality of the foregoing, each Lender agrees to reimburse the Agent promptly upon demand for its Proportionate Share of any reasonable out of pocket expenses (including legal fees, on a solicitor and his own client full indemnity basis) incurred by the Agent in connection with the preservation of any right of the Agent or the Lenders under, or the enforcement of, or legal advice in respect of rights or responsibilities under, the Credit Documents, to the extent that the Agent is not reimbursed for such expenses by the Borrowers. This indemnity will survive the termination of the other provisions of this Agreement as a separate and continuing covenant of the Lenders.

**11.18   Successor Agent**

The Agent may, as hereinafter provided, resign at any time by giving 30 days' notice (the "**Resignation Notice**") thereof to the Lenders and the Borrowers. The remaining Lenders, with the consent of the Borrowers, such consent not to be unreasonably withheld, will forthwith upon receipt of the Resignation Notice unanimously appoint a successor agent (the "**Successor Agent**") to assume the duties hereunder of the resigning Agent. Upon the acceptance of any appointment as agent hereunder by a Successor Agent, such Successor Agent will thereupon succeed to and become vested with all the rights, powers, privileges and duties as agent under the Credit Documents of the resigning Agent. Upon such acceptance, the resigning Agent will be discharged

from its further duties and obligations as agent under the Credit Documents, but any such resignation will not affect such resigning Agent's obligations hereunder as a Lender, including for its Proportionate Share of the applicable Commitment. After the resignation of the Agent as agent hereunder, the provisions of this Article 11 will continue to enure to its benefit as to any actions taken or omitted to be taken by it while it was the agent of the Lenders hereunder. Notwithstanding the foregoing, if the remaining Lenders fail to appoint a Successor Agent within 30 days of receipt of the Resignation Notice, the resigning Agent may, with the approval of the Borrowers except during the continuance of an Event of Default, such approval not to be unreasonably withheld, appoint a Successor Agent from among the Lenders (other than Business Development Bank of Canada).

## 11.19   Sharing of Information

The Agent and the Lenders may share among themselves any information they may have from time to time concerning the Credit Parties whether or not such information is confidential; but shall have no obligation to do so (except for any obligations of the Agent to provide information to the extent required in this Agreement). The Agent shall not have any duty to disclose any information obtained or received by it or any of its Affiliates relating to any Credit Party or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as the Agent.

## 11.20   Acknowledgement by Borrowers

Each Borrower hereby acknowledges notice of the terms of the provisions of this Article 11 and agrees to be bound hereby to the extent of its obligations hereunder, and further agrees not to make any payments, take any action or omit to take any action which would result in the non-compliance by the Agent or any Lender with its obligations hereunder.

## 11.21   Amendments to Article 11

The Agent and the Lenders may amend any provision in this Article 11 (other than Section 11.5) without prior notice to or the consent of the Borrowers, and the Agent shall provide a copy of any such amendment to the Borrowers reasonably promptly thereafter; provided, however, if, in the Agent's opinion, any such amendment would materially and adversely affect any rights, entitlements, obligations or liabilities of any Borrower, such amendment shall not be effective until such Borrower provides its written consent thereto, such consent not to be unreasonably withheld or arbitrarily delayed.

## 11.22   Deliveries, etc.

As between the Credit Parties on the one hand, and the Agent and the Lenders on the other hand:

(a)   all statements, certificates, consents and other documents which the Agent purports to deliver to a Credit Party on behalf of the Lenders shall be binding on each of the Lenders, and none of the Credit Parties shall be required to ascertain or confirm the authority of the Agent in delivering such documents;

(b)     all certificates, statements, notices and other documents which are delivered by a Credit Party to the Agent in accordance with this Agreement shall be deemed to have been duly delivered to each of the Lenders; and

(c)     all payments which are delivered by a Credit Party to the Agent in accordance with this Agreement shall be deemed to have been duly delivered to each of the Lenders.

## 11.23   Agency Fee

The Borrowers jointly and severally agree to pay to the Agent an annual agency fee as set out in the Fee Agreement, payable in advance on the Amendment and Restatement Date and annually on each anniversary date thereafter during the term of this Agreement.

<div align="center">

**ARTICLE 12**
**INCREASED COSTS**

</div>

## 12.1   Changes in Law

12.1.1    If, after the Amendment and Restatement Date, due to either:

(a)     the introduction of, or any change in, any Law or any change in the interpretation of any Law, whether having the force of law or not, resulting in the imposition or increase of reserves, deposits or similar requirements by any central bank or Governmental Authority charged with the administration thereof; or

(b)     imposition of any Lender or requirements on any Lender to maintain any capital adequacy or additional capital liquidity requirements in respect of any Advances or Commitments hereunder, or any other condition with respect to this Agreement; or

(c)     the compliance with any guideline or request from any central bank or other Governmental Authority which a Lender, acting reasonably, determines that it is required to comply with,

there will be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining an Advance or there will be any reduction in the effective return to such Lender thereunder, then, subject to Section 12.1.2, the Borrowers jointly and severally agree that they will, within ten Business Days after being notified by such Lender of such event, pay to such Lender, quarterly in arrears, that amount (the "**Additional Compensation**") which such Lender, acting reasonably, determines will compensate it, after taking into account all applicable Taxes and all interest and other amounts received, for any such increased costs or reduced returns incurred or suffered by such Lender provided such Lender is also charging its other borrowers in similar circumstances similar additional compensation.

12.1.2    If Additional Compensation is payable pursuant to Section 12.1.1(a), the Borrowers will have the option to convert the Advance to another type of Advance, in accordance with this Agreement, in respect of which no further such Additional Compensation will be payable, or prepay any amount of the Facility owed to the Lender

<div align="center">- 152 -</div>

entitled to receive the Additional Compensation, subject always to Section 5.13 without obligation to make a corresponding prepayment to any other Lender. If the Additional Compensation relates to outstanding Bankers' Acceptances, such Lender may require the Borrowers to deposit in an interest bearing cash collateral account with such Lender such amount as may be necessary to fully satisfy the contingent obligations of such Lender for all outstanding Bankers' Acceptances in accordance with the arrangements similar to those set out in Section 5.11.

12.1.3    Notwithstanding anything contained in this Section 12.1, the *Dodd-Frank Wall Street Reform and Consumer Protection Act* and all requests, rules, regulations, guidelines and directives thereunder or issued in connection therewith and all requests, rules, regulations, guidelines and directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority or any United States, Canadian or foreign regulatory authority) (collectively, the "**New Rules**") shall, in each case, be deemed a "change in Law" under Section 12.1.1(a) regardless of the date enacted, adopted or issued.

## 12.2    Changes in Circumstances

Notwithstanding anything to the contrary herein or in any of the other Credit Documents contained, if on any date a Lender determines, acting reasonably and in good faith, which determination will be conclusive and binding on the Parties, and provided notice is given to the Agent and the other Lenders and to the Borrowers that its ability to maintain, or continue to offer any Advance has become unlawful or impossible due to:

(a)    any change in Applicable Law, or in the interpretation or administration thereof by Governmental Authorities having jurisdiction in the matter; or

(b)    any Material Adverse Change in or the termination of the London Interbank Eurodollar Market for Eurodollars; or

(c)    the imposition of any condition, restriction or limitation upon such Lender which is outside of its control,

then in any such case, the Borrowers jointly and severally agree that they will forthwith repay to such Lender all principal amounts affected thereby, together with all unpaid interest accrued thereon to the date of Repayment and all other expenses incurred in connection with the termination of any such Advance, including any expenses resulting from the early termination of any LIBOR Period relating thereto in accordance with Section 5.13, without any obligation to make a corresponding prepayment to any other Lender. The Borrowers may utilize other forms of Advance not so affected in order to make any required Repayment and after any such Repayment, the Borrowers may elect to re-borrow the amount repaid by way of some other Advance upon complying with applicable requirements thereof.

## 12.3    Application of Sections 12.1 and 12.2

If a Lender exercises its discretion under either Section 12.1 or 12.2, then concurrently with a notice from such Lender to the Agent and the applicable Borrower requiring compliance with

- 153 -

the applicable Section, such Lender will provide such Borrower (with a copy to the Agent who will notify the other Lenders) with a certificate in reasonable detail outlining the particulars giving rise to such notice and certifying (with reasonable supporting detail) the increased costs, if any, payable by such Borrower thereunder, which will be prima facie evidence thereof and binding on the Parties.

**12.4    Taxes**

12.4.1    Except as provided in this Section 12.4, any and all payments by the Borrowers and any other Credit Party to or for the account of the Agent or any Lender under any Credit Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges imposed by any Governmental Authority, and all liabilities (including additions to tax, penalties and interest) related thereto (collectively, "**Impositions**"), excluding, in the case of the Agent and each Lender or other recipient or beneficial owner of payment to be made by or on account of a Credit Party under any Credit Document, (x) any Impositions imposed on or measured by its net income (including any taxes similar to branch profits tax or capital, and franchise (and similar) taxes imposed on it in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the Laws of which the Agent or such Lender, as the case may be, is organized, resident, in which its principal office is located, in which it maintains its Lending Office or in which it is subject to such Imposition by reason of a present or former connection between it and such jurisdiction (other than a connection arising solely from the Agent or such Lender (or its applicable Lending Office) as the case may be, becoming a party hereto, having executed, delivered or performed its obligations under any Credit Document, received a payment under, enforced its rights under, received or perfected a security interest under, or engaged in any other transaction pursuant to, a Credit Document), and all interest and penalties with respect thereto; (y) U.S. and Canadian federal withholding taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 12.4.6) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to this Section, amounts with respect to such withholding taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office; and (z)(i) U.S. federal withholding taxes imposed under FATCA, (ii) taxes attributable to such recipient's or beneficial owner's failure to comply with the applicable reporting requirements of FATCA, and (iii) taxes attributable to such recipient's or beneficial owner's failure to provide such documentation as is reasonably requested by the Borrower for the Borrower to comply with its obligations under FATCA and to determine that such recipient or beneficial owner has complied with such recipient's or beneficial owner's obligations under FATCA or to determine the amount to deduct and withhold from any payment to such recipient or beneficial owner (all such non-excluded Impositions being hereinafter referred to as "**Taxes**" and all such excluded Impositions being hereinafter referred to as "**Excluded Taxes**"). If any Credit Party or any other applicable withholding agent shall be required by the Applicable Laws of a relevant taxing jurisdiction to deduct any Taxes or Other Taxes from or in respect of any sum payable under any Credit

Document to the Agent or any Lender, (i) the sum payable shall be increased by the applicable Credit Party as necessary so that after all required deductions (including deductions applicable to additional sums payable under this Section 12.4) have been made, each of the Agent and such Lender receives an amount equal to the sum it would have received had only deductions attributable to Excluded Taxes been made, (ii) the applicable withholding agent shall make such deductions, (iii) the applicable withholding agent shall pay the full amount deducted to the relevant taxation authority or other Governmental Authority in accordance with Applicable Laws, and (iv) within thirty (30) days after the date of such payment, the Credit Party making such payments shall furnish to the Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Agent.

12.4.2    In addition but without duplication, the Borrowers agree to pay any and all present or future stamp, court or documentary taxes and any other excise, property, intangible or mortgage recording taxes, charges or similar levies imposed by a relevant taxing jurisdiction which arise from any payment made under any Credit Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Credit Document (hereinafter referred to as "**Other Taxes**").

12.4.3    Each Borrower agrees to indemnify the Agent and each Lender for (i) the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed or asserted by any Governmental Authority of any relevant taxing jurisdiction on amounts payable under this Section 12.4) paid by the Agent and such Lender, and (ii) any reasonable expenses arising therefrom or with respect thereto, in each case whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided the Agent or Lender, as the case may be, provides the Borrowers with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts. Payment under this Section 12.4.3 shall be made within thirty (30) days after the date such Lender or the Agent makes a written demand therefor.

12.4.4    Notwithstanding anything herein to the contrary, each Borrower shall not be required pursuant to this Section 12.4 to pay any additional amount to, or to indemnify, any Lender or the Agent, as the case may be, (i) to the extent that such Lender or the Agent becomes subject to Taxes subsequent to the Amendment and Restatement Date (or, if later, the date such Lender or the Agent becomes a party to this Agreement) as a result of a change in the place of organization or residence of such Lender or the Agent, a change in the Lending Office of such Lender, or a change in the principal office of such Lender or the Agent, except to the extent that any such change is requested or required by the Borrowers or to the extent that such Lender or the Agent was entitled, at the time of the change in place of organization, residence or the change in Lending Office, to receive additional amounts from the Borrowers pursuant to Sections 12.4.1 and 12.4.3 (and provided, that nothing in this Section 12.4 shall be construed as relieving the Borrowers from any obligation to make such payments or indemnification in the event of a change in Applicable Law) or (ii) where for Canadian income tax purposes, such Lender or the Agent, as the case may be, becomes subject to Taxes as a consequence of such Lender or the Agent either not dealing at arm's length with the Borrowers (for purposes of the *Income*

- 155 -

*Tax Act* (Canada)) or being, or not dealing at arm's length with (for purposes of the I*ncome Tax Act* (Canada)) a "specified shareholder" (for purposes of the *Income Tax Act* (Canada)) of the Borrower; provided, that this subclause (ii) shall not apply to the extent that such Lender or the Agent, as the case may be, is considered to have not dealt at arm's length with the Borrowers for Canadian income tax purposes as a result of a change in Applicable Law after the Amendment and Restatement Date.

12.4.5    If any Lender or the Agent determines in its sole discretion (exercised in good faith) that it has received a refund in respect of any Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by the Borrowers pursuant to this Section 12.4, it shall promptly remit such refund (including any interest included in such refund paid by the relevant Governmental Authority) to the Borrowers, net of all out-of-pocket expenses (including any taxes imposed with respect to such refund) of the Lender or the Agent, as the case may be; provided, however, that the Borrowers, upon the request of the Lender or the Agent, as the case may be, agree promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such party in the event such party is required to repay such refund to the relevant taxing authority. Such Lender or the Agent, as the case may be, shall, at the Borrowers' request, provide the Borrowers with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (provided, that such Lender or the Agent may delete any information therein that such Lender or the Agent deems confidential). Notwithstanding anything to the contrary in this Section 12.4.5, in no event will a Lender be required to pay any amount to the Borrowers pursuant to this Section 12.4.5 the payment of which would place such Lender in a less favorable net after-tax position than such Lender would have been in if the Taxes or Other Taxes subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Taxes or Other Taxes had never been paid. Nothing herein contained shall interfere with the right of a Lender or an Agent to arrange its tax affairs in whatever manner it thinks fit nor oblige any Lender or the Agent to disclose any information relating to its tax affairs or any computations in respect thereof or require any Lender or the Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

12.4.6    Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 12.4.1 and 12.4.3 with respect to such Lender it will, if requested by the Borrowers, use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to avoid or reduce to the greatest extent possible any indemnification or additional amounts being due under this Section 12.4, including to designate another Lending Office for any Loan (including, for certainty, any Letter of Credit) affected by such event; provided, that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage, and provided, further, that nothing in this Section 12.4.6 shall affect or postpone any of the Obligations of the Borrowers or the rights of such Lender pursuant to Sections 12.4.1 and 12.4.3. The Borrowers hereby jointly and severally agree to pay all

reasonable costs and expenses incurred by any Lender as a result of a request by the Borrowers under this Section 12.4.6.

## ARTICLE 13
## GENERAL

**13.1    Non-Disclosure**

13.1.1    All information received by the Agent and the Lenders from or in respect of the Credit Parties the confidential nature of which is made known or ought to have been known to the Party receiving such information, including any information relating to a Hostile Acquisition, other than information that is required to be disclosed by Applicable Law (including, for certainty, information required to be disclosed in connection with any legal proceedings, including proceedings relating to the Credit Documents) or to any Governmental Authority of competent jurisdiction, including any central bank or other banking regulatory authority and any official bank examiners or regulators, will be held by the Parties in the strictest confidence and will not be disclosed to any Person, except as provided in this Section 13.1.

13.1.2    Section 13.1.1 does not apply to information:

(a)     of a Party where that Party consents in writing to its disclosure;

(b)     which becomes part of the public domain through no fault of the Agent or the Lenders;

(c)     received from a third party without restriction on further disclosure and which third party was not to the knowledge of the Agent or such Lender, under a duty of confidentiality to the applicable Credit Party at the time the information was so received;

(d)     developed independently without breach of Section 13.1;

(e)     which the Agent or the relevant Lender can show was, prior to receipt thereof from a Credit Party, lawfully in the Agent's or Lender's possession and not then subject to any obligation on its part to the Credit Parties to maintain confidentiality; or

(f)     to the extent required to be disclosed by order or direction of a court or Governmental Authority of competent jurisdiction (including any self-regulatory authority, such as the National Association of Insurance Commissioners) or as other required to be disclosed by Applicable Law or by any subpoena or similar legal process.

13.1.3    Information received by the Agent or a Lender may be disclosed to their respective Affiliates, Hedge Providers, the Agent or any other Lender or Participant, including any financial institution which desires to become a Lender or Participant hereunder, any actual or prospective counterparty (or its advisors) to any securitization, swap or derivative transaction relating to a Borrower or any other Credit Party, and the

- 157 -

Obligations and to their respective employees, auditors, accountants, legal counsel, geologists, engineers and other consultants and financial advisors retained by such Persons on a need to know basis and subject to the obligation to maintain confidentiality; provided, that the Agent or Lender providing the information shall be responsible for any breach by its Affiliate of the aforementioned duty of confidentiality.

## 13.2   Waiver

The failure or delay by the Agent or any Lender in exercising any right or privilege with respect to the non-compliance with any provisions of this Agreement by the Borrower and any course of action on the part of the Agent or any Lender, shall not operate as a waiver of any rights of the Agent or such Lender unless made in writing by the Agent or such Lender. Any such waiver in writing and shall be effective only in the specific instance and for the purpose for which it is given and shall not constitute a waiver of any other rights and remedies of the Agent or such Lender with respect to any other or future non-compliance.

## 13.3   Governing Law

This Agreement shall be interpreted in accordance with the Laws of the Province of Alberta and the federal Laws of Canada applicable therein. Without prejudice to the right of the Agent and the Lenders to commence any proceedings with respect to this Agreement in any other proper jurisdiction, the Parties hereby attorn and submit to the non-exclusive jurisdiction of the courts of the Province of Alberta.

## 13.4   Judgment Currency

To the extent permitted by Applicable Law, if for the purposes of obtaining judgment against any Credit Party in any court in any jurisdiction with respect to this Agreement it becomes necessary for a Lender to convert into the currency of such jurisdiction (in this Section called the "**Judgment Currency**") any amount due to the Lender by such Credit Party under the Credit Documents in any currency other than the Judgment Currency, the conversion shall be made at the Exchange Rate prevailing on the Business Day before the day on which judgment is given. To the extent permitted by Applicable Law, in the event that there is a change in the Exchange Rate prevailing between the Business Day before the day on which the judgment is given and the date of payment of the amount due, the applicable Credit Party will, on the date of payment, pay such additional amounts (if any) or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount paid on such date is the amount in the Judgment Currency which when converted at the Exchange Rate prevailing on the date of payment is the amount then due under this Agreement in such other currency. To the extent permitted by Applicable Law, any additional amount due by a Credit Party under this Section will be due as a separate debt and shall not be affected by judgment being obtained for any other sums due under or in respect of this Agreement.

## 13.5   Expenses of Agent and Lenders

Whether or not the transactions contemplated by this Agreement are completed or any Advance has been made, each Borrower hereby agrees, jointly and severally, to promptly pay, following receipt of invoice therefor from the Agent (and in any event within 30 days after receipt

- 158 -

thereof), from time to time all reasonable and documented expenses incurred by the Agent or any Lender in connection with this Agreement, the Security and all documents contemplated hereby, specifically including: expenses incurred by the Lenders in respect of due diligence, appraisals, insurance consultations, credit reporting and responding to demands of any Governmental Authority (provided, that reimbursement obligations in respect of costs and expenses arising under inspection rights set forth in Section 7.1.7 shall be limited in the manner set forth in such Section); reasonable out-of-pocket legal expenses in connection with the preparation and interpretation of this Agreement and the other Credit Documents, the registration and perfection of the Security and the administration of the Facilities generally, including the preparation of waivers and partial discharges of Security (if there are any additional fees or expenses to be incurred in connection with any of the foregoing over and above those that have already been disclosed to the Borrowers then the Agent agrees to notify the Borrowers of those additional fees or expenses and obtain their concurrence to their payment); and all legal fees and expenses (on a solicitor and his own client basis) in connection with the protection and enforcement of the Security and the exercise of any rights and remedies of the Agent and the Lenders under the Credit Documents. Each Borrower hereby authorizes the Agent to debit its account in order to pay any such expenses if such amount is not paid in full within 30 days after receipt of a written request from the Agent for payment of such amount.

**13.6    Assignment**

13.6.1    This Agreement and the rights and obligations hereunder will not be assignable, in whole or in part, by any Borrower without the prior written consent of all of the Lenders.

13.6.2    Each Lender will have the right to sell or assign its Commitment in minimum amounts of U.S. $5,000,000 (with such Lender, where such sale or assignment is not of all of such Lender's Commitment under the applicable Facility, retaining a Commitment under the applicable Facility of at least U.S. $5,000,000), together with a proportionate share of Outstanding Advances owing to it, to one or more financial institutions with the consent of the Canadian Borrower, the Agent, the Issuing Bank and the Swingline Lender each such consent not to be unreasonably withheld (provided, that the Canadian Borrower may withhold such consent if a Borrower would be required to pay withholding taxes solely as a result of such assignment). An assignment fee of U.S. $3,500 for each such assignment will be payable to the Agent by the assigning Lender. In the event of such sale or assignment, the Borrowers, the Agent and the other Lenders will execute and deliver all such agreements, documents and instruments as the Agent or Lender may reasonably request to effect and recognize such sale or assignment, including an Assignment. Notwithstanding the foregoing, no consent of the Canadian Borrower will be required if an assignment (a) occurs during an Event of Default which is continuing, (b) is made between financial institutions who, at the relevant time, are already Lenders or Affiliates thereof, or (c) is made by a Lender to an Approved Fund. In the event that the Canadian Borrower fails to provide a response to the request for any such consent within five Business Days of the receipt of such request by the Canadian Borrower, the Canadian Borrower shall be deemed to have consented to such request. No consent to an assignment by a Lender shall be required from the U.S. Borrower. Notwithstanding the foregoing, no Lender may assign all or any part of its Commitment or Outstanding Advances to Palladium, an Investor or an Affiliate thereof without the prior written consent of all of the Lenders.

13.6.3    To the extent that any Lender sells or assigns any portion of its Commitment and Outstanding Advances pursuant to this Section 13.6 and such new Lender or new Lenders, as the case may be, has executed and delivered to the Borrower and the Agent an Assignment, such Lender will be relieved and forever discharged of any and all of its covenants and obligations under the Credit Documents in respect of that portion of its Commitment and Outstanding Advances so sold or assigned from and after the date of such Assignment and the Borrower's recourse under the Credit Documents in respect of such portion so sold or assigned from and after the date of the Assignment for matters arising thereunder from and after the date of the Assignment will be to such new Lender or new Lenders only, as the case may be, and their successors and permitted assigns.

13.6.4    Any Lender may at any time sell to one or more financial institutions or other Persons (each of such financial institutions and other Persons being herein called a "**Participant**") participating interests in any of the Advances, commitments, or other interests of such Lender hereunder, without notice to, or consent from, the Agent or the Borrowers; provided, however, that:

(a)    no participation contemplated in this Section 13.6.4 will relieve such Lender from its commitments or its other obligations hereunder or under any other Credit Document;

(b)    such Lender will remain solely responsible for the performance of its commitments and such other obligations as if such participation had not taken place;

(c)    the Agent will continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and each of the other Credit Documents;

(d)    no Participant will have any rights (through a right of consent or approval or otherwise) to require such Lender to take or refrain from taking any action hereunder or under any other Credit Document;

(e)    no Borrower will be required to pay any amount hereunder that is greater than the amount which it would have been required to pay had no participating interest been sold; and

(f)    in the case of any outstanding Bankers' Acceptances, the Participants execute an indemnity agreement in respect of such Bankers' Acceptances.

Each U.S. Operating Lender that sells a participation shall, acting solely for this purpose as an agent of the U.S. Borrower, maintain a register on which it enters the name and address of each Participant in the U.S. Operating Facility and the principal amounts (and stated interest) of each Participant's interest in the Commitments, Outstanding Advances or other obligations under the Credit Documents (the "**Participant Register**"); provided that no U.S. Operating Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under the Credit Documents) to any Person except to the extent that such

disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such U.S. Operating Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

13.6.5   The Agent, acting solely for this purpose as an agent of the U.S. Borrower, shall maintain at its office located at 452 Fifth Avenue, 5th Floor, New York, NY 10018, a copy of each Assignment delivered to it and a register for the recordation of the names and addresses of the U.S. Operating Lenders, and the Commitments of, and principal amounts (and stated interest) of the Outstanding Advances owing to, each U.S. Operating Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agent and the U.S. Operating Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a U.S. Operating Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrowers and any U.S. Operating Lender, at any reasonable time and from time to time upon reasonable prior notice.

**13.7    General Indemnity**

In addition to any liability of the Borrowers to the Lenders under any other provision hereof, each Borrower will and does hereby, jointly and severally, indemnify each Indemnitee and hold each Indemnitee harmless against any losses, claims, costs, damages or liabilities (including reasonable and documented out of pocket expenses and reasonable and documented legal fees on a solicitor and his own client full indemnity basis of one counsel (but, for the avoidance of doubt, excluding the allocated costs of in-house counsel) plus one local counsel in each applicable jurisdiction) incurred by the same as a result of or in connection with: (a) any cost or expense incurred by reason of the liquidation or re-deployment in whole or in part of deposits or other funds required by any Lender to fund any Bankers' Acceptance or to fund or maintain any Advance as a result of any Borrower's failure to complete an Advance or to make any payment, repayment or prepayment on the date required hereunder or specified by it in any notice given hereunder; (b) subject to permitted or deemed Rollovers and Conversions, any Borrower's failure to provide for the payment to the Agent for the account of the Lenders of the full principal amount of each Bankers' Acceptance on its Maturity Date; (c) any Borrower's failure to pay any other amount, including any interest or fees, due hereunder on its due date after the expiration of any applicable grace or notice periods; (d) the prepayment of any outstanding Bankers' Acceptance before the Maturity Date of such Bankers' Acceptance; (e) any Borrower's repayment or prepayment of a LIBOR Loan otherwise than on the last day of its LIBOR Period; (f) the failure of any Borrower or any other Credit Party to make any other payment due hereunder or under any of the other Credit Documents; (g) the occurrence of any other Default or Event of Default and the enforcement of rights and remedies in connection therewith; (h) any instructions given to any Lender to stop payment on any cheque issued by any Borrower or to reverse any wire transfer or other transaction initiated by such Lender at the request of any Borrower; (i) any use of the proceeds of the Facilities,

- 161 -

including to pay the purchase price of the transaction or any other acquisition; and (j) any claim, litigation or other proceeding related to the foregoing, regardless of whether such matter is initiated by a third party or by Holdco, a Borrower or any of their Subsidiaries or Affiliates; provided that this Section 13.7 will not apply to any losses, claims, costs, damages or liabilities that arise by reason of (i) the gross negligence or wilful misconduct of the applicable Indemnitee claiming indemnity hereunder, as determined by a final and non-appealable judgment of a court of component jurisdiction; or (ii) a material breach of the applicable Indemnitee of its obligations under the Credit Documents as determined by a final and non-appealable judgment of a court of competent jurisdiction.

## 13.8    Environmental Indemnity

In addition to any other liability of the Borrowers hereunder, each Borrower hereby agrees to, jointly and severally, indemnify and save harmless the Indemnitees from and against:

(a)    any losses suffered by them for, in connection with, or as a direct or indirect result of, the failure of any Borrower or any of their respective Subsidiaries to comply with all Requirements of Environmental Law;

(b)    any losses suffered by the Indemnitees for, in connection with, or as a direct or indirect result of, the presence of any Hazardous Material situated in, on or under any property owned by any Borrower or any of their respective Subsidiaries or upon which any of them carries on business, specifically including any diminution in value of the business, property and assets of such Person; and

(c)    any and all liabilities, losses, damages, penalties, expenses (including reasonable legal fees) and claims which may be paid, incurred or asserted against the Indemnitees for, in connection with, or as a direct or indirect result of, any legal or administrative proceedings with respect to the presence of any Hazardous Material on or under any property owned by any Borrower or any of its respective Subsidiaries or upon which any of them carries on business, or the discharge, emission, spill, radiation or disposal by any Borrower or any of their respective Subsidiaries of any Hazardous Material into or upon any Land, the atmosphere, or any watercourse or body of water; including the costs of defending, counterclaiming or claiming against third parties in respect of any action or matter and any cost, liability or damage arising out of a settlement entered into by the Indemnitees of any such action or matter,

except to the extent arising from the gross negligence or wilful misconduct of the applicable Indemnitee, as determined by a final and non-appealable judgment of a court of component jurisdiction. For the purpose of this Section 13.8, liabilities means those amounts that are quantifiable and found to be the responsibility of the Indemnitees either alone or jointly or severally with others.

## 13.9    Survival of Certain Obligations despite Termination of Agreement

The termination of this Agreement shall not relieve the Borrowers from their obligations to the Agent and the Lenders arising prior to such termination, such as obligations arising as a

result of or in connection with any breach of this Agreement, any failure to comply with this Agreement or the inaccuracy of any representations and warranties made or deemed to have been made prior to such termination, and obligations arising pursuant to all indemnity obligations contained herein. Without limiting the generality of the foregoing, the obligations of the Borrowers to the Agent and the Lenders arising under or in connection with Sections 8.5(b), 13.7 and 13.8 shall continue in full force and effect despite any termination of this Agreement.

**13.10   Interest on Unpaid Costs and Expenses**

If a Borrower fails to pay when due any amount in respect of costs or expenses or any other amount required to be paid by it hereunder (other than principal or interest on any Advance), the Borrowers shall, jointly and severally, pay interest on such unpaid amount from the time such amount is due until paid at the rate equal to the highest rate of interest then applicable under the Facilities.

**13.11   Notice**

Without prejudice to any other method of giving notice, all communications provided for or permitted hereunder shall be in writing and delivered to the addressee by prepaid private courier or sent by facsimile to the applicable address and to the attention of the officer of the addressee as follows:

(a)     to the Borrowers:

Q'Max Solutions Inc.
11700 Katy Freeway, Suite 200
Houston Texas 77079
United States

Attention:     Chief Financial Officer
Fax No.        (832) 201-8146

(b)     to the Agent:

HSBC Bank Canada, as Agent
7th Floor, 70 York Street
Toronto, Ontario
M5J 1S9

Attention:     Manager Agency
Fax No.        (647) 788-2185

with a copy to (for all notices other than Drawdown Requests, Conversion Notices and Rollover Notices):

HSBC Bank Canada
5th Floor, 70 York Street

Toronto, Ontario
M5J 1S9

<u>Attention</u>:   Director
Fax No.     (647) 788-2185

    (c)     to any Lender, at its addressed noted on Exhibit "A" attached hereto.

Any communication transmitted by prepaid private courier shall be deemed to have been validly and effectively given or delivered on the Business Day after which it is submitted for delivery. Any communication transmitted by facsimile shall be deemed to have been validly and effectively given or delivered on the day on which it is transmitted, if transmitted on a Business Day on or before 5:00 p.m. (local time of the intended recipient), and otherwise on the next following Business Day. Any party may change its address for service or other notices, including electronic communications, by notice given in the foregoing manner. The Parties each covenant to accept service of judicial proceedings arising under the Credit Documents at its respective address set forth herein.

## 13.12   Telephone Instructions

Any verbal instructions given by a Borrower in relation to this Agreement will be at the risk of the Borrowers and neither the Agent nor the Lenders will have any liability for any error or omission in such verbal instructions or in the interpretation or execution thereof by the Agent or a Lender, as the case may be; <u>provided</u>, that the Agent or Lender, as the case may be, acted without gross negligence in the circumstances. The Agent will notify the applicable Borrower of any conflict or inconsistency between any written confirmation of such verbal instructions received from such Borrower and the said verbal advice as soon as practicable after the conflict or inconsistency becomes apparent to the Agent.

## 13.13   Severability

Any provision of this Agreement which is illegal, prohibited or unenforceable in any jurisdiction, in whole or in part, shall not invalidate the remaining provisions hereof; and any such illegality, prohibition or unenforceability in any such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

## 13.14   Further Assurances

Each Borrower shall, at its expense, promptly execute and deliver or cause to be executed and delivered to the Agent upon request, acting reasonably, from time to time all such other and further documents, agreements, opinions, certificates and instruments in compliance with this Agreement, or if necessary or desirable to more fully record or evidence the obligations intended to be entered into herein, or to make any recording, file any notice or obtain any consent.

## 13.15   Tombstone Marketing

For the purpose of "tombstone marketing", each Borrower hereby authorizes and consents to the reproduction, disclosure and use by the Lenders and the Agent of its name, identifying logo

- 164 -

and the Facilities to enable the Lenders to publish promotional "tombstones". Each Borrower acknowledges and agrees: that the Lenders shall be entitled to determine, in their discretion, whether to use such information; that no compensation will be payable by the Lenders or the Agent in connection therewith; and that the Lenders and the Agent shall have no liability whatsoever to any Borrower or any of its respective employees, officers, directors, Affiliates or shareholders in obtaining and using such information as contemplated herein.

**13.16   Entire Agreement**

This Agreement supersedes all discussion papers, term sheets and other writings issued by the Agent or the Lenders prior to the date hereof relating to the Facilities; and this Agreement and any other documents or instruments contemplated herein or therein shall constitute the entire agreement and understanding among the Borrowers, the Lenders and the Agent relating to the subject-matter hereof.

**13.17   Anti-Money Laundering Legislation**

(a)     Each Borrower acknowledges that, pursuant to the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" Laws, whether within Canada or elsewhere (collectively, including any guidelines or orders thereunder, "**AML Legislation**"), the Lenders and the Agent may be required to obtain, verify and record information regarding the Borrowers, Palladium, the other Credit Parties, their respective directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Credit Parties or Palladium, and the transactions contemplated hereby. The Borrowers shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Lender or the Agent, or any prospective assignee of a Lender or the Agent, in order to comply with any applicable AML Legislation, whether now or hereafter in existence.

(b)     If, upon the written request of any Lender, the Agent has ascertained the identity of a Borrower, Palladium or any Credit Party or any authorized signatories of any Borrower or any other Credit Party for the purposes of applicable AML Legislation on such Lender's behalf, then the Agent:

   (i)     shall be deemed to have done so as an agent for such Lender, and this Agreement shall constitute a "written agreement" in such regard between such Lender and the Agent within the meaning of applicable AML Legislation; and

   (ii)    shall provide to such Lender copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness.

(c)     Notwithstanding the preceding sentence, each of the Lenders agrees that the Agent has no obligation to ascertain the identity of the Borrowers, Palladium or any other Credit Party or any authorized signatories of the Borrowers, Palladium or any other

- 165 -

Credit Party, on behalf of any Lender, or to confirm the completeness or accuracy of any information it obtains from the Borrowers, Palladium or any other Credit Party or any such authorized signatory in doing so.

(d) Each Lender that is subject to the PATRIOT Act and the Agent (for itself and not on behalf of any Lender) hereby notifies the Credit Parties that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name, address and tax identification number of the Credit Parties and other information regarding the Credit Parties that will allow such Lender or the Agent, as applicable, to identify the Credit Parties in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to the Lenders and the Agent.

## 13.18   Binding Effect

This Agreement shall be binding upon and shall enure to the benefit of the Parties and their respective successors and permitted assigns; "successors" includes any corporation resulting from the amalgamation of any party with any other corporation.

## 13.19   Execution by Electronic Means and Counterparts

This Agreement may be executed in several counterparts, each of which, when so executed, shall be deemed to be an original and which counterparts together shall constitute one and the same Agreement. This Agreement may be executed by facsimile, pdf or other electronic means, and any signature contained hereon by facsimile, pdf or other electronic means shall be deemed to be equivalent to an original signature for all purposes.

## 13.20   Intercreditor Agreement

In the event of a conflict between the provisions of this Agreement and the provisions of the Encina Intercreditor Agreement, the provisions of the Encina Intercreditor Agreement shall govern.

## 13.21   Release of Liens and Guarantees.

(a) The Agent shall not, during the term of this Agreement, discharge, surrender, amend or otherwise modify any Security without the prior written consent of all of the Lenders, provided that the Agent may accept additional or supplemental Security as provided in the Credit Documents, and shall discharge Security provided hereunder in the Permitted Discretion of the Agent with respect to any Permitted Disposition or, if applicable, any other transaction permitted by this Agreement in respect of which the Agent has received, upon its reasonable request, an officer's certificate of the Canadian Borrower certifying that such disposition or other transaction is permitted by this Agreement, together with any other information from the Canadian Borrower reasonably required by the Agent, if any (and the Agent may rely conclusively on a certificate to that effect provided to it by the Canadian Borrower without further inquiry).

- 166 -

(b)     The Lenders hereby authorize the Agent, and the Agent hereby agrees, to:

(i)     discharge the Security at the Borrower's sole cost and expense, forthwith after all of the Obligations under the Credit Documents (other than contingent obligations intended to survive payout of the Facilities) have been unconditionally and irrevocably paid or performed in full and the Facilities, Credit Documents and all Hedging Agreements have been terminated or, with respect to the Hedging Agreements, collateralized to the satisfaction of the Agent and the applicable Hedge Providers, acting reasonably; and

(ii)    at the request of the Borrower and upon receipt of the Agent of an officer's certificate from a senior officer of the Borrower certifying that such disposition is a Permitted Disposition, to discharge that portion of the Security that applies to the property subject to such Permitted Disposition or execute a no interest letter or similar document in connection therewith.

(c)     As of the Amendment and Restatement Date, the Agent and other Secured Parties hereby release each of (x) QMax Ecuador S.A. and (y) Mud Movers Express LLC as Guarantors, hereby confirm that all such Subsidiaries' Obligations are discharged, in each case, whether now existing or hereafter arising and whether or not matured or contingent, and that the Security granted by such Subsidiaries to the Agent is deemed to be released.

**(SIGNATURE PAGES FOLLOW)**

25877170.9

IN WITNESS WHEREOF this Agreement has been executed, sealed and delivered by the parties hereto under the hands of their proper officers duly authorized in that behalf.

**Q'MAX SOLUTIONS INC.**, as Canadian Borrower

By: _____
Name: Mark Margavio
Title:  Treasurer

**QMAX CANADA OPERATIONS INC.**, as Specified Canadian Swingline Borrower

By: _____
Name: Mark Margavio
Title:  Treasurer

**Q'MAX AMERICA INC.**, as U.S. Borrower

By: _____
Name: Mark Margavio
Title:  Treasurer

**HSBC BANK CANADA**, as Agent

By: _____
Name: Parisa Naghibi
Title: Authorized Signatory

By: _____
Name: PHILIP ALLEN
Title:

**HSBC BANK CANADA**, as a Lender

By: _____
       Name:                                    John Schmidt
       Title:                            Assistant Vice President
                                                 Energy Financing

By: _____
       Name:                                  BRUCE ROBINSON
       Title:                                    Vice President
                                                Energy Financing

**BANK OF MONTREAL**, as a Lender

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

**EXPORT DEVELOPMENT CANADA**, as a
Lender

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

*[Signature Page to Credit Agreement (Q'Max)]*

**HSBC BANK CANADA**, as a Lender

By: _____
          Name:
          Title:

By: _____
          Name:
          Title:

**BANK OF MONTREAL**, as a Lender

By: _____
          Name:
          Title: Connor Irving
                          Director

By: _____
          Name:
          Title:

**EXPORT DEVELOPMENT CANADA**, as a Lender

By: _____
          Name:
          Title:

By: _____
          Name:
          Title:

*[Signature Page to Credit Agreement (Q'Max)]*

**HSBC BANK CANADA**, as a Lender

By: _____
Name:
Title:

By: _____
Name:
Title:

**BANK OF MONTREAL**, as a Lender

By: _____
Name:
Title:

By: _____
Name:
Title:

**EXPORT DEVELOPMENT CANADA**, as a Lender

By: _Christiane de Billy_____
Name:   **Christiane de Billy**
Title:   **Principal**

By: _____
Name:   **Benson Mutalemwa**
Title:   **Financing Manager**

*[Signature Page to Credit Agreement (Q'Max)]*

**BUSINESS DEVELOPMENT BANK OF CANADA**, as a Lender

By:

Name: Derek Church
Title: Director, Business Restructuring

By:

Name: Mark Kearl
Title: AVP, Business Restructuring

**HSBC BANK USA, NATIONAL ASSOCIATION** as a Lender

Name:
Title:

Name:
Title:

**BUSINESS DEVELOPMENT BANK OF CANADA**, as a Lender

By: _____

Name:
Title:

By: _____

Name:
Title:

**HSBC BANK USA, NATIONAL ASSOCIATION** as a Lender

_____

Name: Stephen M. Ellsworth
Title: Vice President

_____

Name:
Title:

## EXHIBIT "A" TO THE Q'MAX SECOND AMENDED AND RESTATED CREDIT AGREEMENT - LENDERS AND LENDERS' COMMITMENTS

*All amounts in U.S. $

| Lender | Total | Swing Line | Syndicated |
|---|---|---|---|
| **CANADIAN OPERATING FACILITY COMMITMENTS** | | | |
| HSBC Bank Canada | 46,018,072.00 | 10,000,000 | 36,018,072 |
| Bank of Montreal | 29,307,284.00 | N/A | 29,307,284 |
| Export Development Canada | 25,332,809.00 | N/A | 25,332,809 |
| Business Development Canada | 9,023,306.00 | N/A | 9,023,306 |
| **Total** | 109,681,471.00 | 10,000,000 | 99,681,471 |
| | | | |
| **TERM FACILITY COMMITMENTS** | | | |
| Lender | Term Facility | | |
| HSBC Bank Canada | 8,155,815.93 | | |
| Bank of Montreal | 4,552,083.49 | | |
| Business Development Canada | 948,350.58 | | |
| **Total** | 13,656,250.00 | | |
| | | | |
| **U.S. OPERATING FACILITY COMMITMENTS** | | | |
| Lender | Total | | |
| HSBC Bank USA, N.A. | 15,000,000.00 | | |
| **Total** | 15,000,000.00 | | |
| | | | |
| **TOTAL COMMITMENT – ALL FACILITIES** | | | |
| Lender | Total | | |
| HSBC Bank Canada | 54,173,877.93 | | |
| HSBC Bank USA, N. A. | 15,000,000.00 | | |
| Bank of Montreal | 33,859,367.49 | | |
| Export Development Canada | 25,332,809.00 | | |
| Business Development Canada | 9,971,656.58 | | |
| **Total** | 138,337,721.00 | | |

**Lenders and Addresses for Service:**

(a)     HSBC Bank Canada
        9th Floor, 407-8th Avenue S.W.
        Calgary, Alberta T2P 1E5
        Attn:   Senior Corporate Banking Manager
        Fax:    (403) 693-8556

(b)     HSBC Bank USA, N.A.
        6363 N. State Highway 161, Suite 125
        Irving, Texas 75039

Attn:   Senior Corporate Banking Manager
Fax:    (972) 367-1050

(c)     Bank of Montreal
        6th Floor, 595 Burrard Street
        Vancouver, British Colombia V7X 1L7
        Attn:   Director
        Fax:    (403) 234-1688

(d)     Export Development Canada
        150 Slater Street
        Ottawa, Ontario K1A 1K3
        Attn:   Senior Asset Manager
        Fax:    (613) 598-3186

(f)     Business Development Bank of Canada
        110, 444 – 7th Avenue S.W.
        Calgary, AB T2P 0X8
        Attn:   Scott Overes or Bobby Chan
        Fax:    (403) 292-6951


<u>BA Lenders</u>:          HSBC Bank Canada
                       Bank of Montreal

<u>Non-BA Lenders</u>:      Export Development Canada
                       Business Development Bank of Canada

2

**EXHIBIT "B" TO THE Q'MAX SECOND AMENDED AND RESTATED CREDIT AGREEMENT – FORM OF DRAWDOWN REQUEST**

To:     HSBC Bank Canada, as Agent (in such capacity, the "**Agent**")

Date:   _____

This Drawdown Request is delivered pursuant to the second amended and restated credit agreement made among Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC., as Borrowers; QMAX CANADA OPERATIONS INC., as Specified Canadian Swingline Borrower; the Agent and the Lenders (as defined therein), dated as of July 31, 2018 (as amended, restated, supplemented, replaced or otherwise modified from time to time, the "**Credit Agreement**"). All capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Credit Agreement.

_____

1.      The **[Canadian] [U.S.] [NTD: Select applicable]** Borrower hereby requests an Advance under the **[insert applicable Facility]** as follows:

        (a)     Facility: _____

        (b)     Date of Advance: _____

        (c)     Amount of Advance: _____

        (d)     Type of Availment Option: _____

        (e)     If Availment Option is one of the following indicate period requested (30 to 180 days): _____
                (i)    a Bankers' Acceptance or BA Equivalent Loan; or
                (ii)   LIBOR Loan.

        (f)     If Letter of Credit requested, attach schedule setting out requested terms:

2.      The **[Canadian] [U.S.] [NTD: Select applicable]** Borrower hereby certifies that as at the date hereof:

        (a)     the representations and warranties in Article 6 of the Credit Agreement are true and correct in all material respects as if made on the date hereof except to the extent such representation and warranty relates to an earlier date in which case the representation and warranty was true and correct as of such date;

        (b)     no Default or Event of Default has occurred and is continuing, nor shall the making of the Advance result in the occurrence of any Default or Event of Default; and

(c)     with respect to all of the obligations of the Borrowers under the Credit Agreement that were to have been complied with on or prior to the date hereof, the Borrowers have complied with all of such obligations in all material respects.

Dated as of the date first written above.

**[NTD: Name of applicable Borrower]**, as Borrower

By: _____
      Name:
      Title:

2

### EXHIBIT "C" TO THE Q'MAX SECOND AMENDED AND RESTATED CREDIT AGREEMENT - FORM OF ROLLOVER NOTICE

To:         HSBC Bank Canada, as Agent (in such capacity, the "**Agent**")

Date:       _____

      This Rollover Notice is delivered pursuant to the second amended and restated credit agreement made among Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC., as Borrowers; QMAX CANADA OPERATIONS INC., as Specified Canadian Swingline Borrower; the Agent and the Lenders (as defined therein), dated as of July 31, 2018 (as amended, restated, supplemented, replaced or otherwise modified from time to time, the "**Credit Agreement**"). All capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Credit Agreement.

_____

1.    The **[Canadian] [U.S.] [NTD: Select applicable]** Borrower hereby requests a Rollover as follows:

     (a)      Facility: _____

     (d)      type of Availment Option: _____

     (e)      amount of maturing Advance: _____

     (f)      date of maturing Advance: _____

     (g)      period requested: _____

2.    The **[Canadian] [U.S.] [NTD: Select applicable]** Borrower hereby certifies that as at the date hereof no Default or Event of Default has occurred and is continuing, nor shall the making of the Advance result in the occurrence of any Default or Event of Default.

Dated as of the date first written above.

                          **[NTD: Name of applicable Borrower]**, as Borrower

                          By: _____
                                Name:
                                Title:

### EXHIBIT "D" TO THE Q'MAX SECOND AMENDED AND RESTATED CREDIT AGREEMENT - FORM OF CONVERSION NOTICE

To:     HSBC Bank Canada, as Agent (in such capacity, the "**Agent**")

Date:   _____

     This Conversion Notice is delivered pursuant to the second amended and restated credit agreement made among Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC., as Borrowers; QMAX CANADA OPERATIONS INC., as Specified Canadian Swingline Borrower; the Agent and the Lenders (as defined therein), dated as of July 31, 2018 (as amended, restated, supplemented, replaced or otherwise modified from time to time, the "**Credit Agreement**"). All capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Credit Agreement.

_____

1.      The **[Canadian] [U.S.] [NTD: Select applicable]** Borrower hereby requests a Conversion as follows:

     (a)     Facility: _____

     (b)     type of Availment Option to be converted: _____

     (c)     amount of maturing Advance: _____

     (d)     date of maturing Advance: _____

     (e)     type of Availment Option requested: _____

     (f)     period requested: _____

2.      The **[Canadian] [U.S.] [NTD: Select applicable]** Borrower hereby certifies that as at the date hereof no Default or Event of Default has occurred and is continuing, nor shall the making of the Advance result in the occurrence of any Default or Event of Default.

Dated as of the date first written above.

**[NTD: Name of applicable Borrower]**, as Borrower

By: _____
     Name:
     Title:

## EXHIBIT "E" TO THE Q'MAX SECOND AMENDED AND RESTATED CREDIT AGREEMENT - FORM OF REPAYMENT NOTICE

To:      HSBC Bank Canada, as Agent (in such capacity, the "**Agent**")

Date:  _____

This Repayment Notice is delivered pursuant to the second amended and restated credit agreement made among Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC., as Borrowers; QMAX CANADA OPERATIONS INC., as Specified Canadian Swingline Borrower; the Agent and the Lenders (as defined therein), dated as of July 31, 2018 (as amended, restated, supplemented, replaced or otherwise modified from time to time, the "**Credit Agreement**"). All capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Credit Agreement.

_____

The **[Canadian] [U.S.] [NTD: Select applicable]** Borrower hereby irrevocably commits to make a Repayment as follows:

(a)      Facility: _____

(b)      Date of Repayment: _____

(c)      Amount of Repayment: _____

(d)      Type of Availment Option to be repaid: _____

Dated as of the date first written above.

**[NTD: Name of applicable Borrower]**, as Borrower

By: _____
      Name:
      Title:

**EXHIBIT "F" TO THE Q'MAX SECOND AMENDED AND RESTATED CREDIT AGREEMENT - FORM OF COMPLIANCE CERTIFICATE[1]**

TO:            HSBC Bank Canada, as Agent (in such capacity, the **"Agent"**)

DATE:        _____

    This Compliance Certificate is delivered pursuant to the second amended and restated credit agreement made among Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC., as Borrowers; QMAX CANADA OPERATIONS INC., as Specified Canadian Swingline Borrower; the Agent and the Lenders (as defined therein) dated July 31, 2018 (the "**Credit Agreement**"). Terms used herein with initial capital letters (other than for grammatical purposes) and not otherwise defined shall have the respective meanings ascribed thereto in the Credit Agreement.

---

1.    The following are the financial ratios and covenants in respect of the Canadian Borrower on a consolidated basis, calculated in accordance with the provisions of the Credit Agreement, as at the end of the **[Fiscal Quarter/Fiscal Year]** ended **[_____]** (the "**Calculation Date**") (or in respect of the financial period(s) ended on such date, as indicated below):

    (a)    Net Leverage Ratio: _____

    (b)    Fixed Charge Coverage Ratio: _____

    (c)    Unadjusted EBITDA: _____

    (d)    Capital Expenditures as a percentage of the estimated maximum amount set forth in the annual Capital Expenditure program made during the current Fiscal Year: _____.

2.    Attached hereto as Exhibit 1 is a detailed calculation of each of the components comprising the financial ratios described in clauses 1(a), 1(b) and 1(c) above.

3.    As of the Calculation Date, the aggregate amount of Earnout Payments paid during the twelve month period ending on the Calculation Date is $_____.

4.    The Credit Parties' aggregate notional amount under their Interest Rate Hedging Agreements as of the Calculation Date is _____. The details of all Hedging Agreements of the Credit Parties are as set out in Exhibit 2 hereto.

5.    The aggregate amount of Insurance Proceeds received **[during the current Fiscal Year as of the Calculation Date][as at the end of the Fiscal Year]** was U.S. $_____.

---

[1] **[NTD: Subject to QMax and PW ongoing review.]**

6.      The aggregate amount of Sales Proceeds received **[during the current Fiscal Year as of the Calculation Date][as at the end of the Fiscal Year]** was U.S. $ _____.

7.      Attached hereto as Exhibit 3 is a detailed calculation of the Capital Expenditures described in clauses 1(c) above.

8.      **[This paragraph is applicable only if a Specified Equity Contribution was made in the most recently ended Fiscal Quarter in a Fiscal Year. ]** The number of Specified Equity Contributions made as of the date is **[one/two/three/four]** and the aggregate amount of all such Specified Equity Contributions is U.S. $ _____.

9.      All new material business locations and any changes to the corporate information of any Credit Party that differs from that set out in Schedule 6.1.2 of the Credit Agreement or any previously delivered Compliance Certificate are as set out in Exhibit 4A hereto.

10.     All Subsidiaries of Holdco and the Canadian Borrower and any changes to the designation of such Subsidiaries as Material Subsidiaries or Unrestricted Subsidiaries that differs from that set out in Schedule 6.1.3 of the Credit Agreement or any previously delivered Compliance Certificate are as set out in Exhibit 4B hereto.

11.     The EBITDA and ownership of assets required pursuant to Section 7.1.16 of the Credit Agreement are as follows:

(a)     The Canadian Borrower's EBITDA determined on a consolidated basis is equal to: _____.

(b)     The EBITDA directly attributed to the Credit Parties determined on an unconsolidated but combined basis is equal to: _____.

(c)     The EBITDA directly attributed to the OECD Credit Parties determined on a consolidated basis is equal to: _____.

(d)     The percentage of the Consolidated Net Tangible Assets of the Canadian Borrower (based on the amount thereof set forth in the financial statements most recently delivered) that are legally, beneficially and directly owned by the Credit Parties is equal to: _____.

Attached hereto as Exhibit 5 is a detailed calculation of the EBITDA described in clauses 11(a), (b) and (c) above and the Consolidated Net Tangible Assets described in clause 11(d) above.

12.     **[This paragraph is applicable only if this Compliance Certificate is given in respect of the last Fiscal Quarter in a Fiscal Year.]**Colombian Free Cash Flow for such Fiscal year is _____ and Distributions representing _____% of such Colombian Free Cash Flow have been made to Credit Parties whose governing jurisdictions are in Canada, the United States of America or Barbados. Attached hereto as Exhibit 6 is a detailed calculation of the Colombian Free Cash Flow and the details of the Distributions described in the foregoing sentence.

13. Shareholders' Equity as at the end of the **[Fiscal Quarter/Fiscal Year]** was $_____, and the aggregate amount of all Acquisitions made pursuant to Section 7.2.3(i) of the Credit Agreement as at the end of the **[Fiscal Quarter/Fiscal Year]** was equal to _____% of such Shareholders' Equity. Attached hereto as Exhibit 7 is a detailed calculation of the aggregate amount of such Acquisitions and the percentage of Shareholders' Equity represented by same, together with the details of the Acquisitions described in the foregoing sentence.

14. The undersigned officer of the Canadian Borrower hereby certifies on behalf of the Canadian Borrower and without personal liability that as at the date hereof:

    (a)    the foregoing information and all information contained in the attachments hereto was true, correct and complete as at the end of the **[Fiscal Quarter/Fiscal Year]**;

    (b)    the Borrowers have complied in all material respects with all of their obligations under the Credit Agreement; and

    (c)    no Default or Event of Default has occurred and is continuing.

Dated as of the date first written above.

**Q'Max Solutions Inc.**, as Canadian Borrower

By: _____
        Name:
        Title:

3

**EXHIBIT 1 - DETAILED CALCULATIONS
OF FINANCIAL COVENANTS**

## EXHIBIT 2 – HEDGING AGREEMENTS

### Applicable to the Fiscal Quarter ending _____

(Note: List all Hedging Agreements to which the Borrower or any Credit Party is a party)

| Deal Type | Counterparty | Notional Amounts | Start Date | Maturity Date | Mark-to Market | Deal Description |
|---|---|---|---|---|---|---|
| Currency | | | | | | |
| Interest Rate | | | | | | |
| | | | | TOTAL: | | |

## EXHIBIT 3 - CAPITAL EXPENDITURES

## EXHIBIT 4A – NEW BUSINESS LOCATIONS/ CHANGES TO MATERIAL SUBSIDIARIES

# EXHIBIT 4B – CHANGES TO SUBSIDIARIES AND DESIGNATIONS

**EXHIBIT 5 – EBITDA/OWNERSHIP OF ASSETS**

**<u>EXHIBIT 6 - COLOMBIAN FREE CASH FLOW</u>**
**<u>AND DISTRIBUTIONS OF SAME</u>**

# EXHIBIT 7 - SHAREHOLDERS' EQUITY AND ACQUISITIONS

## EXHIBIT "G" TO THE Q'MAX SECOND AMENDED AND RESTATED CREDIT AGREEMENT - FORM OF ASSIGNMENT AGREEMENT

**TO:**        HSBC Bank Canada ("**HSBC**"), as Agent

**AND TO:**    The Lenders

**AND TO:**    The Borrowers

**AND TO:**    The Issuing Banks

**AND TO:**    The Swingline Lender

**RE**:        Second Amended and Restated Credit Agreement (the "**Credit Agreement**") dated as of July 31, 2018 among Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC., as borrowers (collectively, the "**Borrowers**"); Q'MAX CANADA OPERATIONS INC., as Specified Canadian Swingline Borrower; the Lenders (as defined therein) and HSBC, as administrative agent for the Lenders (the "**Agent**").

**DATE:**      [■] (the "**Effective Date**")

Unless otherwise indicated, capitalized terms defined in the Credit Agreement have the same meanings when used herein.

1.     **[Name of assignee lender]** (the "**Assignee**") acknowledges that its proper officers have received and reviewed a copy of the Credit Agreement and the other Credit Documents and further acknowledges the provisions of the Credit Agreement and the other Credit Documents.

2.     The Assignee desires to become a Lender under the Credit Agreement. Effective on the Effective Date, **[Name of assigning lender]** (the "**Assignor**") has agreed to and does hereby sell, assign and transfer to the Assignee, and the Assignee hereby irrevocably purchases and assumes, an interest in **[the Term Facility/the Canadian Operating Facility/the U.S. Operating Facility],** the Assignee assumes the obligations of the Assignor in respect of the Assignor's Commitment under **[the Term Facility/the Canadian Operating Facility/the U.S. Operating Facility]** to the extent of $[■] of such commitment (the **"Assigned Commitment"**), and a share of the rights of the Assignor as a Lender under the Credit Agreement to the extent of the Assigned Commitment, including a share (the **"Pro Rata Share"**) of the rights of the Assignor with respect to the Outstanding Advance owing to the Assignor under **[the Term Facility/the Canadian Operating Facility/the U.S. Operating Facility]** equal to the proportion that the amount of the Assigned Commitment bears to $[■] (being the amount of the Commitment of the Assignor under **[the Term Facility/the Canadian Operating Facility/the U.S. Operating Facility]** on the Effective Date prior to the assignment and transfer under this Assignment) (the Assigned Commitment and such Pro Rata Share are referred to herein as the **"Assigned Interest"**); and, accordingly, the Assignee has agreed to execute this Assignment and deliver an original of it to the Agent.

3.      The Assignee, by its execution and delivery of this Assignment, agrees that from and after the date hereof it will be a Lender under the Credit Agreement to the extent of the Assigned Commitment and the Proportionate Share and agrees to be bound by and to perform, where required, all of the terms, conditions and covenants of the Credit Agreement and the other Credit Documents applicable to a Lender; but its liability to make Advances will be limited to its share of such Advances based upon its Commitment identified in paragraph **[4]** below, subject to the provisions of the Credit Agreement under [**the Term Facility/the Canadian Operating Facility/the U.S. Operating Facility**].

4.      The Assignee confirms that its Commitment under [**the Term Facility/the Canadian Operating Facility/the U.S. Operating Facility**] will be as follows:

[**State amount in U.S. Dollars.**]

5.      The Assignee agrees to assume all liabilities and obligations of the Assignor as a Lender under the Credit Agreement and the other Credit Documents to the extent of the Assigned Interest as provided for herein and the Assignor is hereby released and discharged from such obligations and liabilities to the same extent but only in respect of such obligations and liabilities arising from and after the Effective Date.

6.      The Assignor: (a) represents and warrants that: (i) it is the legal and beneficial owner of the Assigned Interest; (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim; and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to: (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Credit Document; (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Documents; (iii) the financial condition of any of the Credit Parties or any other Person obligated in respect of any Credit Document; or (iv) the performance or observance by any of the Credit Parties or any other Person of any of their respective obligations under any Credit Document.

7.      The Assignee: (a) represents and warrants that: (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement; and (ii) it has received a copy of the Credit Agreement, copies of the most recent financial statements of the Canadian Borrower delivered pursuant to the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Agent or any other Lender; and (b) agrees that: (i) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder; (ii) it will, independently and without reliance on the Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Documents; and (iii) it will perform in accordance with their terms

all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

8.    From and after the Effective Date, the Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignee whether such amounts have accrued prior to, on or after the Effective Date. The Assignor and the Assignee shall make all appropriate adjustments in payments by the Agent for periods prior to the Effective Date or with respect to the making of this assignment directly between themselves.

9.    Notices will be given to the Assignee in the manner provided for in the Credit Agreement at the following address:

[■]
Attention:       [■]
Facsimile:       [■]

10.    This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns. This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy or by sending a scanned copy by electronic mail shall be effective as delivery of a manually executed counterpart of this Assignment. This Assignment shall be governed by, and construed in accordance with, the Laws in force in the Province of Alberta from time to time.

**DATED** effective the date and year first above written.

**[Name of Assignee]**

Per:    _____
Name:
Title:

\* \* \*

The Assignor hereby acknowledges the above Assignment and agrees that its individual commitment amount is reduced by an amount equal to the commitment assigned to the assignee hereby.

**DATED** at Calgary, Alberta effective the date first above written.

**[Name of Assignor]**

Per:    _____
Name:
Title:

3

Consented to and acknowledged effective the date and year first above written by:

**HSBC BANK CANADA**, as Agent and Swingline Lender

By: _____
      Name:
      Title:

**Q'MAX SOLUTIONS INC.**, as Canadian Borrower

By: _____
      Name:
      Title:

**HSBC BANK USA, NATIONAL ASSOCIATION**, as Issuing Bank under U.S. Operating Facility

By: _____
      Name:
      Title:

**Q'MAX AMERICA INC.**, as U.S. Borrower

By: _____
      Name:
      Title:

**[NTD: In the event of any assignment to Palladium or any Affiliate thereof, all Lenders to be added as additional signatories as requires their consent]**

4

### EXHIBIT "H" TO THE Q'MAX SECOND AMENDED AND RESTATED CREDIT AGREEMENT – FORM OF BORROWING BASE CERTIFICATE[2]

**TO**:  HSBC Bank Canada, as Agent (in such capacity, the "**Agent**")

**DATE**:  _____

This Borrowing Base Certificate is delivered pursuant to the Second Amended and Restated Credit Agreement made among Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC., as Borrowers; QMAX CANADA OPERATIONS INC., as Specified Canadian Swingline Borrower; the Agent and the Lenders dated as of July 31, 2018 (the "**Credit Agreement**").

_____

This Borrowing Base Certificate is delivered pursuant to Section 7.4(a) of the Credit Agreement.

The Canadian Borrower hereby certifies that:

    (a)    This Borrowing Base Certificate is current to _____, 20_____ (the "**Effective Date**").

    (b)    I am familiar with the provisions of the Credit Agreement and I have made or caused to be made under my supervision such reasonable investigations of corporate records and inquiries of other officers and personnel of the Credit Parties as I have deemed necessary for purposes of this Borrowing Base Certificate.

    (c)    As of the Effective Date, the Borrowing Base was U.S. $_____, the detailed calculations of which are attached hereto as Exhibit 1.

    (d)    As at the Effective Date, the percentage of Insured Receivables arising from the Eligible Approved Contracts is _____%. Attached hereto as Exhibit 2 is a detailed calculation of the Insured Receivables arising from the Eligible Approved Contracts, including a listing of any contract from which more than 10% of the Canadian Borrower's annual revenue was derived from (based on the most recent income statement of the Borrower).

Capitalized words and phrases used herein and not otherwise defined herein have the meanings attributed to them in or for the purposes of the Credit Agreement.

The Canadian Borrower has caused this Borrowing Base Certificate to be executed and delivered, and the certification contained herein to be made, by a duly authorized officer as of the date first written above.

_____

[2] **[NTD: Subject to QMax and PW ongoing review.]**

Dated effective the date first above written.

**Q'Max Solutions Inc.**, as Canadian Borrower


By: _____

      Name:

      Title:

## **EXHIBIT 1 - CALCULATION OF BORROWING BASE**

### Summary

1.   Marginable Receivables

   (a)   90% of Insured Receivables (or such lower percentage as is covered by the applicable Account Receivable Insurance) (not to exceed $175,000,000)   + $ _____

   (b)   85% of Eligible Receivables owed to a Credit Party by Acceptable Account Debtors   + $ _____

   (c)   75% of all other Eligible Receivables   + $ _____

   (d)   90% of Insured Receivables from Pemex outstanding more than 300 days, but not more than 540 days, in respect of contract numbers 423023819 and 423023813 between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V., dated April 22, 2014 and July 17, 2013, respectively, and contract number 423023813, dated July 25, 2013, between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V. (in each case, as may be amended or otherwise modified from time to time)   $ _____

   $ _____

2.   Marginable Inventory

   (a)   50% of Eligible Inventory (not to exceed $35,000,000)   +$ _____

3.   Marginable Cash

   (a)   100% of Eligible Cash (not to exceed $15,000,000)   +$ _____

4.   Marginable Capital Assets

   (a)   60% of the net book value of Eligible Capital Assets, up to a maximum amount of $50,000,000 less the amount of each completed Anchor Sale and Leaseback Transaction; provided that, reductions resulting from Anchor Sale and Leaseback Transactions shall not reduce the amount available below U.S. $30,000,000   +$ _____

5.   Priority Claims   -$ _____

6.   $150,000 (only until such time as the Agent and HSBC USA have received an environmental report or other information from or on behalf of Anchor concerning the Norge, Oklahoma, Roosevelt, and Utah properties owed by the Credit Parties which is satisfactory to both the Agent and HSBC USA (acting reasonably), and the Agent and HSBC USA agree to no longer require this reserve).   -$175,000

   _____

7.  The amount in U.S. Dollars of unrealized losses resulting from mark to market accounting for hedging activities calculated in accordance with GAAP.                    -$ _____

8.  The amount in U.S. Dollars of any deductible payable in respect of the Account Receivable Insurance (other than in respect of Anchor, Terra and their respective Subsidiaries).                    -$ _____

9.  Any amount that is payable to the insurer under the Account Receivable Insurance (other than in respect of Anchor, Terra and their respective Subsidiaries).                    -$ _____

10.  $x$                    =$ _____

Borrowing Base (if $x$ is greater than or equal to the Commitment)                    =$ _____

+$10,000,000

Borrowing Base (if $x$ is less than the Commitment)                    =$ _____

**Details of the foregoing are shown attached hereto.**

**<u>EXHIBIT 2 – CALCULATION OF INSURED RECEIVABLES</u>**
**<u>ARISING FROM ELIGIBLE APPROVED CONTRACTS</u>**

**EXHIBIT "I" TO THE Q'MAX SECOND AMENDED AND RESTATED CREDIT AGREEMENT - FORM OF DESIGNATION NOTICE**

TO:         HSBC Bank Canada, as Agent for the Lenders under the Credit Agreement (in such capacity, the "**Agent**")

DATE:       _____

Re:     Second Amended and Restated Credit Agreement dated as of July 31, 2018 among Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC., as borrowers (collectively, the "**Borrowers**"); QMAX CANADA OPERATIONS INC., as Specified Canadian Swingline Borrower; those financial institutions which are or hereafter become lenders thereunder (collectively, the "**Lenders**") and HSBC BANK CANADA, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Agent**") (as amended from time to time, the "**Credit Agreement**").

_____

1.      Capitalized terms in this Notice shall have the meanings set out in the Credit Agreement.

2.      **[Pursuant to Section 7.5 of the Credit Agreement, the undersigned hereby designates [Name of Subsidiary] as a Material Subsidiary under and for the purposes of the Credit Agreement and the other Credit Documents.**

        **-or-**

        **Pursuant to Section 7.5 of the Credit Agreement, the undersigned hereby designates [Name of Subsidiary] (currently a Material Subsidiary) as an Unrestricted Subsidiary under and for the purposes of the Credit Agreement and the other Credit Documents.]**

3.      **[No Default or Event of Default has occurred and is continuing and no Default or Event of Default would result from or exist immediately after such a designation. –or–**

        **The exercise of the Borrower's discretion under paragraph 2 above would cause such Default or Event of Default to be cured and no Default or Event of Default would result from or exist immediately after such designation.]**

4.      The undersigned is entitled pursuant to the terms of the Credit Agreement to make the designation referenced in this Notice.

5.      The Material Subsidiaries and Unrestricted Subsidiaries under and for the purposes of the Credit Agreement and the Credit Documents as of the date hereof are as set forth in Exhibit A to this Notice.

This Notice is given on the date first above written.

**Q'Max Solutions Inc.**, as Canadian Borrower


By: _____
        Name:
        Title:

25764133.7

**EXHIBIT A - MATERIAL AND UNRESTRICTED SUBSIDIARIES**

**EXHIBIT "J" TO THE Q'MAX SECOND AMENDED AND RESTATED CREDIT AGREEMENT – FORM OF SUBORDINATION AGREEMENT**

**SUBORDINATION AND POSTPONEMENT AGREEMENT**

**[NTD: Template form for use in Canadian law context. To be revised as required for Subordinated Indebtedness under jurisdictions outside of Canada to reflect requirements in applicable jurisdiction, as reasonably satisfactory to the Borrowers and Agent.]**

**THIS AGREEMENT** dated as of the [■] day of [■], 20[■],

AMONG:

**HSBC BANK CANADA,** in its capacity as administrative agent under the Senior Credit Agreement (together with is successors and assigns in such capacity, the "**Agent**")

- and -

[■], a [■] formed under the laws of the [■] (together with its successors and permitted assigns, the "**Subordinated Lender**")**[NTD: Insert description of applicable Subordinated Lender.]**

- and -

[■], a [■] formed under the laws of the [■] (**[collectively,]** together with **[their respective/its]** successors and permitted assigns, the "**Debtor[s]**")**[NTD: Insert description of applicable Credit Party which is the Debtor.]**

**PREAMBLE**:

**WHEREAS** the Debtor is indebted to the Senior Lenders for repayment of the Senior Indebtedness and as security for such, the Debtor has granted, and in the future may grant, the Senior Security to the Agent on behalf of the Senior Lenders to secure the repayment of the Senior Indebtedness;

**AND WHEREAS** the Debtor is indebted to the Subordinated Lender for repayment of the Subordinated Indebtedness;

**AND WHEREAS** the Subordinated Lender has agreed to subordinate and postpone its interests in and to all of the Subordinated Indebtedness, to and in favour of the interests of the Senior Lenders under the Senior Indebtedness.

**AGREEMENT**:

NOW THEREFORE in consideration of the mutual covenants herein contained, and other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged), the parties hereby covenant and agree as follows:

1. In this Agreement, capitalized words and phrases used but not otherwise defined herein have the meanings given to them in the Senior Credit Agreement. In addition, the following terms shall have the meaning set forth below:

   (a) "**Collateral**" shall mean all assets and properties of any kind or character whatsoever, real or personal, tangible or intangible, and wherever located, whether now owned or hereafter acquired, upon which a Lien is now or hereafter granted by the Debtor in favour of any as security for all or any portion of the Senior Indebtedness;

   (b) "**Event of Default**" shall mean each "Event of Default", as such term is defined in the Senior Credit Agreement or the Subordinated Loan Documents, as applicable**[NTD: To be revised as required to reflect equivalent terminology to Event of Default under Subordinated Loan Documents]**;

   (c) "**Lien Enforcement Action**" shall mean, (i) the taking of any action to enforce any Lien in respect of the Collateral, including the institution of any foreclosure proceedings, the provision of notice of any public or private sale or other disposition pursuant to the PPSA or any diligently pursued in good faith attempt to vacate or obtain relief from stay or other injunction restricting any other action described in this definition, (ii) the exercise of any right or remedy provided to a secured creditor under the Senior Security (including, in either case, any delivery of any notice to otherwise seek to obtain payment directly from any account debtor of the Debtor or the taking of any action or the exercise of any right or remedy in respect of the setoff or recoupment against the Collateral or proceeds of Collateral or the appointment of a receiver or receiver and manager), under applicable Laws, at equity, in an Insolvency Event or otherwise, including the acceptance of Collateral in full or partial satisfaction of a Lien, (iii) after the occurrence and during the continuance of a demand or an Event of Default, the sale, assignment, transfer, lease, license or other disposition of all or any portion of the Collateral, by private or public sale or any other means, (iv) the exercise of any other enforcement right relating to the Collateral (including the exercise of any voting rights relating to any capital stock composing a portion of the Collateral) whether under the Senior Security, under Applicable Law of any jurisdiction, in equity, in or as a result of an Insolvency Event, or otherwise or (v) the commencement of, or the joinder with any creditor in commencing, any Insolvency Event against the Debtor or any assets of the Debtor;

   (d) "**PPSA**" shall mean the *Personal Property Security Act* (Alberta), including the regulations thereto, provided that, if perfection or the effect of perfection or non-perfection or the priority of any Lien created hereunder on the Collateral is governed by the personal property security legislation or other applicable

- 4 -

legislation with respect to personal property security as in effect in a jurisdiction other than Alberta, "PPSA" means the *Personal Property Security Act* or such other applicable legislation as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority;**[NTD: To be revised to reflect applicable jurisdiction if other than Alberta.]**

(e) "**Senior Credit Agreement**" means the second amended and restated credit agreement dated as of July 31, 2018 among Q'Max Solutions Inc. and Q'Max America Inc., as joint and several borrowers; QMax Canada Operations Inc., as Specified Canadian Swingline Borrower; the financial institutions a party thereto from time to time as Lenders; and the Agent, as the same may be amended, restated, supplemented or replaced from time to time;

(f) "**Senior Indebtedness**" means, collectively, all the indebtedness, liabilities and obligations of the Debtor to the Senior Lenders, present or future, absolute or contingent, matured or unmatured, direct or indirect and whether secured or unsecured (including, without limitation, pursuant to the Senior Credit Agreement, the other Credit Documents, the Hedging Agreements and the Banking Service Agreements);

(g) "**Senior Lenders**" means, collectively, the Agent, the Lenders, the Hedge Providers and the Affiliates of the Agent and Lenders which are party to any Banking Services Agreements from time to time, and their respective successors and assigns;

(h) "**Senior Security**" means all security now held by the Agent on behalf of the Senior Lenders, or in the future, granted by the Debtor to the Agent on behalf of the Senior Lenders which in any manner secures the payment, performance or discharge of the Senior Indebtedness;

(i) "**Subordinated Indebtedness**" means all the indebtedness of the Debtor to the Subordinated Lender in connection with the Subordinated Loan Documents; and

(j) "**Subordinated Loan Documents**" means the **[insert description]** dated as of **[insert date]** granted by the Debtor in favour of the Subordinated Lender, a true and complete copy of which is attached hereto as Exhibit 1, and all security agreements, mortgages, debentures, pledge agreements, assignments and every other instrument which is provided in connection therewith.

2. Subject to Section 3, the Debtor and the Subordinated Lender hereby covenant and agree that the payment of all Subordinated Indebtedness is hereby unconditionally and irrevocably deferred, postponed and subordinated in all respects to the prior indefeasible payment in full by the Debtor of all the Senior Indebtedness and until the Senior Indebtedness has been indefeasibly paid and performed in full and the Loan Documents have been terminated, no direct or indirect, distribution, payment (including, but not limited to, principal, interest and fees), prepayment or repayment on account of, or other distribution in respect of, the Subordinated Indebtedness shall be made by, or on behalf of, the Debtor or received by, or on behalf of, the Subordinated Lender.

- 5 -

3.     Notwithstanding the foregoing, the Debtor may make (i) scheduled interest payments on the Subordinated Indebtedness and payments of fees in accordance with the terms of the Subordinated Loan Documents and (ii) scheduled principal payments of the Subordinated Indebtedness in accordance with the terms of the Subordinated Loan Documents; provided that in each case there exists no Default or Event of Default (as such terms are defined in the Senior Credit Agreement) at the time of such payment and the making of such payment will not result in the occurrence thereof, and the Subordinated Lender may receive such payments free and clear until such time as the delivery of a Default Notice to the Subordinated Lender from the Agent which has not been rescinded.

4.     The subordination and postponement set out in this Agreement shall apply notwithstanding any of the following:

(a)     the dates of execution, attachment, delivery, registration, recordation, filing, perfection or notification with respect to any of the Senior Security, the Senior Credit Agreement, any other Credit Documents, any Hedging Agreements, any Banking Service Agreements or any Senior Loan Documents;

(b)     the date of any advance or advances of all or any portion of the Senior Indebtedness to the Debtor from the Senior Lenders and the Subordinated Indebtedness from the Subordinated Lender or the date or dates any such amount or amounts arose or may hereafter arise, and the date or dates upon which the obligations secured by the Senior Security arise or become due;

(c)     the time of crystallization of any Lien granted pursuant to the Senior Security;

(d)     the timing of enforcement or realization of the Senior Security;

(e)     failure, inadequate or ineffective registration, recordation, filing or notification with respect to any Lien granted pursuant to the Senior Security;

(f)     that the amount of the obligations secured by the Senior Security may change from time to time;

(g)     the extension of time being given to any Debtor or any other change in the terms of the Senior Credit Agreement, the Senior Security, any other Credit Documents, any Hedging Agreements, any Banking Service Agreements or any Subordinated Loan Documents;

(h)     any compromise, arrangement or plan of debt restructuring or reorganization affecting the Debtor;

(i)     the release of any Person liable as a surety, guarantor or otherwise in respect of the Subordinated Indebtedness or the Senior Indebtedness;

(j)     the omission or refraining from proving the claim or any part of the claim of the Senior Lenders or the Subordinated Lender in any bankruptcy, winding-up, liquidation, arrangement, compromise or other proceeding involving the Debtor;

- 6 -

(k)    the priority granted by any principle of law or any statute, including any applicable real property or personal property security legislation; and

(l)    any other fact, matter or defect which, but for this Agreement, would impact on the subordination and postponement herein provided.

5.    The Subordinated Lender hereby consents to the incurrence by the Debtor of the Senior Obligations, the entering into of the Senior Credit Agreement, the Senior Security, the other Loan Documents, the Hedging Agreements and the Banking Service Agreements, including in each case any amendments thereto from time to time hereafter, and to the granting of security interests and floating charges by the Debtor to the Senior Lenders over the Collateral pursuant to the Senior Security.

6.    The Agent hereby consents the incurrence by the Debtor of the Subordinated Indebtedness and to the entering into of the Subordinated Loan Documents, subject to Section 11(b) of this Agreement.

7.    The Subordinated Lender hereby waives any requirement for marshalling of assets by the Agent in connection with any foreclosure of any security interest or any other realization upon Collateral in respect of the Senior Security, or any exercise of any rights of setoff or otherwise.

8.    The Senior Lenders and the Subordinated Lender assume all responsibility for keeping themselves informed as to the condition (financial or otherwise) of the Debtor, the condition of the Collateral and other circumstances and, except for notices expressly required by this Agreement.

9.    The Agent may enforce the provisions of the Senior Security and exercise remedies thereunder, all in such order and in such manner as it may determine in the exercise of its sole discretion and business judgment, including, without limitation, the exclusive right to take or retake control or possession of such Collateral, to hold, prepare for sale, process, sell, lease, dispose of, or liquidate the Collateral, the rights of an agent appointed by the Agent to dispose of the Collateral, to incur expenses in connection with such disposition, and to exercise all the rights and remedies of a secured creditor under applicable Laws.

10.    Concurrently with the giving thereof to the Debtor, each of the Agent and the Subordinated Lender shall give the other (i) a copy of any written notice by such person of a demand being made under, or an Event of Default under, the Senior Credit Agreement or the Subordinated Loan Documents, as the case may be, or written notice of an acceleration thereunder to the Debtor, and (ii) a copy of any written notice sent by such party to the Debtor at any time a demand or Event of Default exists stating such person's intention to exercise any action to the extent permitted hereunder, and any legal process served or filed in connection therewith (each a "**Default Notice**"); provided, that, that failure of any party to give notice as required hereby shall not result in liability for failure to do so and shall not affect the relative priorities of the Senior Lenders and the Subordinated Lender as provided herein or the validity or effectiveness of any such notice as against the Debtor. Each of the Agent and the Subordinated Lender also agree to provide a written notice of rescission, waiver or withdrawal of any outstanding Default Notice promptly after the

- 7 -

demand or the Event of Default which gave rise to the Default Notice has been cured or waived, as applicable.

11.    Until such time as this Agreement is terminated and of no further force and effect:

(a)    the Subordinated Lender covenants and confirms in favour of the Senior Lenders that it will not take from the Borrower any security for the payment of or performance of obligations in respect of the Subordinated Indebtedness and the Debtor covenants and confirms in favour of the Senior Lenders that it will not deliver to the Subordinated Lender any security for the payment of or performance of obligations in respect of the Subordinated Indebtedness;**[other than the following:][NTD: insert any applicable security which is a Permitted Encumbrance.]**

(b)    the Debtor and the Subordinated Lender covenant and confirm in favour of the Senior Lenders that they shall not amend, modify, supplement, revise or restate the Subordinated Loan Documents, as applicable, without the prior written consent of the Agent;

(c)    without the prior written consent of the Agent, the Subordinated Lender covenants and confirms in favour of the Senior Lenders that it will not exercise or seek to exercise any rights or remedies (including the right to make demand, accelerate payment obligations) with respect to the Subordinated Indebtedness, other than to protect its right to file a claim or response upon the occurrence of an Insolvency Event in respect of the Debtor (but for certainty not to initiate such an Insolvency Event) and the Debtor hereby acknowledges and agrees that any limitation period applicable to the Subordinated Lender's right to enforce the Subordinated Indebtedness shall be extended by such amount of time as the Subordinated Lender is restricted from exercising such rights or remedies;

(d)    the Subordinated Lender covenants and confirms in favour of the Senior Lenders that it (i) will not contest, protest, or object to any exercise of any Lien Enforcement Action by the Senior Lenders and (ii) will have no right to take any other action under the Senior Security;

(e)    the Subordinated Lender covenants and confirms in favour of the Senior Lenders that it will not object to (and hereby waives any and all claims with respect to) the forbearance by the Senior Lenders from exercising any Lien Enforcement Action;

(f)    the Subordinated Lender covenants and confirms in favour of the Senior Lenders that it will not sell, assign or otherwise dispose of the Subordinated Loan Documents or the Subordinated Indebtedness.

12.    The Subordinated Lender represents, warrants and covenants to the Senior Lenders that it does not hold any security for the payment of or performance of obligations in respect of its Subordinated Indebtedness;**[other than the following:][NTD: insert any applicable security which is a Permitted Encumbrance].[NTD: To the extent the Subordinated Loan Documents are secured, additional provisions regarding subordination and**

**postponement of all registrations and security interests related thereto will be added to this form of Subordination Agreement as appropriate for applicable jurisdiction.]**

13. Each of the Subordinated Lender and the Agent represents, warrants and covenants to each other that it has not, prior to the date hereof, sold, assigned or otherwise disposed of any interest in the Subordinated Loan Documents or the Senior Security, as applicable, to any other person or persons over whom it does not have the authority to bind under the terms hereof.

14. The Agent represents, warrants and covenants to the Subordinated Lender that it has the authority to bind the Senior Lenders under the terms hereof.

15. All and every part of the Senior Security is held by the Senior Lenders as security for all and every part of the Senior Indebtedness and the Senior Lenders may apply as a permanent reduction all payments, proceeds and amounts received by the Senior Lenders from the Debtor (resulting from a Lien Enforcement Action or otherwise), to any part of the Senior Debt as the Senior Lenders, in their sole discretion, may determine.

16. In the event of an Insolvency Event commenced by or against the Debtor, the Senior Lenders shall be entitled to receive payment in full of all Senior Indebtedness (including interest accruing after the commencement of any such Insolvency Event at the rate specified in the Senior Credit Agreement, whether or not such interest is an allowable claim in any such proceedings) before the Subordinated Lender is entitled to receive any payment on account of principal, interest or any other amount in respect of its Subordinated Indebtedness.

17. All payments or distributions which are received by the Subordinated Lender, other than as expressly permitted under Section 3 of this Agreement, shall be received by the Subordinated Lender and held in trust for the benefit of the Senior Lenders, shall be segregated from other funds and property held by the Subordinated Lender and shall be forthwith paid over to the Agent on behalf of the Senior Lenders (in the same form as received, if possible, with any necessary endorsement). Each of the Subordinated Lender and the Debtor does hereby acknowledge and agree that the Subordinated Lender will not accept, and the Debtor shall not make, any payment (whether of principal, interest or otherwise) of the Subordinated Indebtedness other than as expressly permitted under this Agreement.

18. The Agent and the Subordinated Lender each acknowledge (and waive any defense based on a claim) that monetary damages are not an adequate remedy to redress a breach by the other hereunder and that a breach by either the Senior Lenders or the Subordinated Lender hereunder would cause irreparable harm to the other. Accordingly, the Agent, on behalf of the Senior Lenders, and the Subordinated Lender agree that upon a breach of this Agreement by the other, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

19. All notices, requests, demands and other communications hereunder shall be in writing and shall be furnished to the parties at the addresses listed below. Notices shall be deemed to have been duly given if delivered personally or by facsimile. Any such notice shall be

- 9 -

deemed to be received when delivered personally or when transmitted by facsimile, upon confirmation of the electronic transmission, on a business day (unless such transmission is received after 4:00 p.m., Calgary time, in which case it shall be deemed to have been received the following business day), as the case may be;

(a)    if to the Agent, to:

HSBC Bank Canada, as Agent
7th Floor, 70 York Street
Toronto, Ontario  M5J 1S9

Attention:    Manager Agency
Fax No.    (647) 788-2185

with a copy to:

HSBC Bank Canada
10th Floor, 407-8th Avenue S.W.
Calgary, Alberta  T2P 1E5

Attention:    Assistant Vice President
Fax No.    (403) 693-8561

(b)    if to the Subordinated Lender, to:

**[insert address]**

Attention:    [■]
Fax No.    [■]

(c)    if to the Debtor, to:

[insert address]

Attention:    [■]
Fax No.    [■]

or at such other address as any party specifies from time to time in a notice to the others.

20.    No delay on the part of the Subordinated Lender or the Senior Lenders in the exercise of any right or remedy shall operate as a waiver thereof; and no single or partial exercise by the Subordinated Lender or the Senior Lenders of any right or remedy shall preclude other or further exercise thereof, or the exercise of any other right or remedy.

21.    In the event of any conflict or ambiguity between the provisions of this Agreement and the provisions of any of the Subordinated Loan Documents, the Senior Credit Agreement or the Senior Security, the provisions of this Agreement shall prevail to the extent necessary to remove the conflict or ambiguity.

25764133.7

- 10 -

22. The Subordinated Lender, the Agent and the Debtor shall each do, perform, execute and deliver all acts, deeds and documents as may be necessary from time to time to give full force and effect to the intent of this Agreement, in each case at the cost of the Debtor.

23. All references herein to any document or documents, agreement or agreements, instruments shall be deemed to include reference to such document or documents, agreement or agreements, instrument or instruments as may be amended, extended, modified, varied, renewed, supplemented or replaced from time to time.

24. No amendment or waiver of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by each of the parties thereto and any such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given. Notwithstanding the foregoing, nothing in this Agreement shall create any rights in favour of, or obligations to, the Debtor, and the covenants and agreements of the Senior Lenders and the Subordinated Lender shall not be enforceable by the Debtor and no consent of the Debtor shall be necessary for any amendment to this Agreement by the Senior Lenders and the Subordinated Lender in order to have effect as between the Senior Lenders and the Subordinated Lender.

25. This Agreement shall, subject to the provisions hereof, enure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

26. The Debtor hereby acknowledges and agrees that the Agent, the Senior Lenders and the Subordinated Lender may, from time to time, exchange information and opinions with respect to the Debtor and the Debtor hereby consents to such exchange of information and opinions.

27. This Agreement shall terminate upon the earlier of:

    (a) the indefeasible payment and performance in full of the Senior Indebtedness and the termination of the Senior Credit Agreement, the Hedging Agreements and the Banking Services Agreements;

    (b) to the extent such payment is permitted to be made pursuant to Section 3, payment in full of the Subordinated Indebtedness owing to the Subordinated Lender and termination of the Subordinated Loan Documents; and

    (c) the written agreement of the Senior Lenders and the Subordinated Lender.

28. **[NTD: If more than one Debtor][The obligations each Debtor hereunder shall be joint and several.]**

29. This Agreement contains the entire agreement among the parties hereto with respect to the subject matter hereof. If any of the provisions of this Agreement shall be held invalid or unenforceable by any court having jurisdiction, this Agreement shall be construed as if not containing those provisions, and the rights and obligations of the parties hereto should be construed and enforced accordingly.

- 11 -

30.     This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts together shall constitute one and the same instrument and shall be effective as of the date hereof. Such counterparts may be executed by facsimile, pdf or other electronic format.

31.     This Agreement shall be governed by and construed in accordance with the laws of the Province of Alberta and the federal laws of Canada therein, applicable to contracts made in and to be wholly performed within such Province.

*[signature pages follow]*

- 12 -

IN WITNESS WHEREOF the parties hereto have executed this Agreement under the hands of their duly authorized officers effective as of the date first written above.

**HSBC BANK CANADA, as Agent**

By: _____

      Name:

      Title:

By: _____

      Name:

      Title:

**[ADD SIGNATURE BLOCK FOR EACH APPLICABLE DEBTOR]**

By: _____

      Name:

      Title:

**[ADD SIGNATURE BLOCK FOR EACH APPLICABLE SUBORDINATED LENDER]**

Per: _____

      Name:

      Title:

- 1 -

**EXHIBIT 1**

**COPY OF SUBORDINATED LOAN DOCUMENTS**

(see attached)

**SCHEDULES TO THE Q'MAX**

**SECOND AMENDED AND RESTATED CREDIT AGREEMENT**

Schedule 1.1.204     –     Existing Permitted Funded Debt

Schedule 1.1.209     –     Existing Permitted Liens

Schedule 1.1.250     –     Surviving Colombian Credit Agreements

Schedule 6.1.2     –     Corporate Information

Schedule 6.1.3     –     Subsidiaries

Schedule 6.1.5     –     Consents and Approvals Required

Schedule 6.1.8     –     Material Permits

Schedule 6.1.10     –     Leased Properties

Schedule 6.1.11     –     Intellectual Property

Schedule 6.1.12     –     Insurance Policies

Schedule 6.1.13     –     Material Agreements

Schedule 6.1.14     –     Labour Matters

Schedule 6.1.15     –     Environmental Matters

Schedule 6.1.16     –     Litigation

Schedule 6.1.17     –     Pension Plans

Schedule 6.1.23     –     Taxes

Schedule 6.1.33     –     Eligible Approved Contracts

Schedule 7.2.3     –     Investments

Schedule 7.2.6     –     Transactions with Affiliates

Schedule 9.1     –     Post-Closing Schedule

## SCHEDULE 1.1.204 - EXISTING PERMITTED FUNDED DEBT

1.      Credit Agreement between Q'Max México, as borrower, Perfolat de México, S.A. de C.V., as lender, and Q'Max Solutions Inc., as guarantor, dated October 27, 2017 (the "<u>Perfolat Loan Agreement</u>"), in the amount of MXP $250,000,000 (Two Hundred Fifty Million Pesos 00/100), ratified on November 1, 2017, before Laura Concepción Rodríguez Narváez, alternate Notary Public of the Notary Public 181. The credit was guaranteed by two mortgages as described in Schedule 1.1.208 hereto and certain machinery and inventory.

2.      Line of Credit with BBVA Colombia, dated December 3, 2012, by QMax Solutions Colombia as Borrower in the amount of US$1,708,234.

3.      Common Terms Agreement, by and between QMax Solutions Colombia and Banco de Bogota S.A., dated May 5, 2009, for the execution of derivatives.  Amount currently outstanding is US$1,007,858.

4.      Master Installment Payment Agreement NO. 584639, by and between De Lage Landen Financial Services Canada Inc. and Q'Max Solutions Inc. dated June 24, 2015, in an initial principal amount of $5,000,000.  Amount currently outstanding is $1,525,000.

5.      Financial Lease Agreement by and between Corplease Egypt and Environmental Solutions for Petroleum Services S.A.E. dated September 29, 2013.

6.      Revolving Loan Agreement by and between Fluid Holding Corp. and Q'Max Solutions Inc., as Borrower, dated July 26, 2016 for up to $25 million. (the "<u>Holdco Revolver</u>").

7.      Credit Facility by and between International Drilling Fluids & Engineering Services Co. (IDEC) Ltd. and Emirates NBD Bank PSJC, dated August 6, 2015, in the amount of AED7,203,000.

8.      Maintenance Management and Fleet Rental Agreement, dated as of August 4, 2014, by and between Enterprise Fleet Management, Inc. and Terra Oilfield Solutions, LLC.

Doc#: US1:12181788v5

## SCHEDULE 1.1.209 - EXISTING PERMITTED LIENS

### Mexico – Perfolat Loan Agreement

1.      Mortgage Agreement regarding the real estate property located in Ranchería González, Tercera Sección de Municipio de Centro, Estado de Tabasco, with a surface area of 46,316 m and a building of 2,368.63 m, formalized under public deed 4,333, granted before Laura Concepción Rodríguez Narváez, alternate Notary Public  of the Notary Public 181 of Chiapas on February 9, 2018. The mortgage was granted by QMax Mexico in favor of Perfolat de México, S.A. de C.V. and Q'Max Solutions Inc. as guarantor.

2.      Mortgage Agreement over the real estate property Lotes 1-A y 21 de la Manzana M del Parque Industrial Laguna Azul in Ciudad del Carmen, located in Prolongación 1 Sur Numero 2-A, Colonia Puerto Pesquero, Laguna Azul, Ciudad del Carmen, Campeche, formalized under public deed 4,334, granted before Laura Concepción Rodríguez  Narváez, alternate Notary Public  of the Notary Public 181 of Chiapas on February 9, 2018. The mortgage was granted by QMax Mexico in favor of Perfolat de México, S.A. de C.V. and Q'Max Solutions Inc. as guarantor.

### Mexico – Scotiabank Loan Agreement[1]

1.      Mortgage Agreement over the real estate property located in Parcel number 38 Z-1P, of Ejido Paseo de Pital, Tihuatlán, Veracruz. The mortgage was granted by QMax Mexico in favor of Scotiabank Inverlat, S.A. Institución de Banca Múltiple, Grupo Financiero Scotiabank Inverlat.

2.      Mortgage Agreement over the real estate property of 8 hectares, 46 areas, 70 centiares in Camargo, Tamaulipas. The mortgage was granted by QMax Mexico in favor of Scotiabank Inverlat, S.A. Institución de Banca Múltiple, Grupo Financiero Scotiabank Inverlat.

3.      Mortgage Agreement over the real estate property of 2 hectares, in Camargo, Tamaulipas. The mortgage was granted by QMax Mexico in favor of Scotiabank Inverlat, S.A. Institución de Banca Múltiple, Grupo Financiero Scotiabank Inverlat.

### Egypt – Corplease Loan Agreement

| | | |
|---|---|---|
| Flottweg  centrifuge SN-NM04 | HI-G Dryer   LS 584-D | Auger 12 ft Long |
| Shale Shaker | VC - 1000 | Auger 12 ft Long |
| KSN Centrifuge | VC - 1000 | Auger 12 ft Long |
| Shale Shaker | VC - 1000 | Auger 12 ft Long |
| Shale Shaker | Auger 12 ft Long | Auger 12 ft Long |
| D 1000 Centrifuge | Auger 12 ft Long | Auger 12 ft Long |
| D 1000 Centrifuge | Auger 12 ft Long | Auger 6 ft Long |
| HI-G Dryer  Q25833 | Auger 12 ft Long | Auger 6 ft Long |
| Vertical Centrifuge | Auger 12 ft Long | Auger 6 ft Long |
| Control Panel | Auger 12 ft Long | Auger 6 ft Long |
| Shale Shaker Black Rhino | Auger 12 ft Long | Drive Head |
| Shale Shaker Black Rhino | Auger 12 ft Long | Drive Head |

---

[1] The underlying indebtedness in respect of these mortgages was paid in full on January 17, 2018.  These mortgages will be released on a post-closing basis.

| | | |
|---|---|---|
| Decanter Centrifuge D355 | Auger 12 ft Long | Drive Head |
| HI-G Dryer  LS 584-D | Auger 12 ft Long | Drive Head |
| VC - 1000 | Auger 12 ft Long | Electrical Panels |
| G 70 - Screw pump | Auger 12 ft Long | Electrical Panels |
| HI-G Dryer  LS 584-D | Auger 12 ft Long | Electrical Panels |
| HI-G Dryer   LS 584-D | Auger 12 ft Long | Electrical Panels |
| HI-G Dryer   LS 584-D | Auger 12 ft Long | Centerifuge DC 450L |
| Verti G Skid | Centerifuge Skid  GLN-297 | Mono pump G70-1 |
| Water Tank          GLN-300 | Three side tank | Oil settling tank  GLN-298 |
| Oil catch tank    GLN-299 | | |
| Cabin GLN-300 | | |
| Pump 440V 60HZ 11KW (SN XBSYG03) | | |
| Auger 11m | | |
| Auger 8m | | |
| Centrifuge D355 | | |
| Centrifuge D355 | | |
| Centrifuge D355 | | |
| TDU | | |
| Centrifuge D355 | | |
| Centrifuge D355 | | |
| Centrifuge D355 | | |
| Centrifuge D355 | | |
| Centrifuge D355 | | |
| VC - 1000 | | |
| VC - 1000 | | |
| Pump | | |
| Pump | | |
| Pump | | |
| Pump | | |
| Pump | | |
| VC | | |
| Electric panel | | |

## Terra Oilfield Solutions, LLC Liens (the "Terra Liens")

| | Jurisdiction | Secured Party | File Date | File Type | File # | Summary |
|---|---|---|---|---|---|---|
| 1. | Delaware | FIFTH THIRD BANK AS AGENT; et al. | 9/22/2014 | Original UCC Filing | 20143781598 | Equipment |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2. | Delaware | KOMATSU FINANCIAL LIMITED PARTNERSHIP | 6/26/2018 | Original UCC Filing | 20184368995 | Equipment |
| 3. | Delaware | KOMATSU FINANCIAL LIMITED PARTNERSHIP | 6/26/2018 | Original UCC Filing | 20184369183 | Equipment |
| 4. | Delaware | KOMATSU FINANCIAL LIMITED PARTNERSHIP | 7/18/2018 | Original UCC Filing | 20184934119 | Equipment |
| 5. | Texas | MOBILEASE, INC.; et al. | 3/30/2017 | Original UCC Filing | 17-0010728298 | Equipment |
| 6. | Texas | MOBILEASE, INC.; et al. | 3/30/2017 | Original UCC Filing | 17-0010728793 | Equipment |
| 7. | Texas | MOBILEASE, INC.; et al. | 3/30/2017 | Original UCC Filing | 17-0010729188 | Equipment |
| 8. | Texas | MOBILEASE, INC.; et al. | 3/30/2017 | Original UCC Filing | 17-0010729683 | Equipment |
| 9. | Texas | MOBILEASE, INC.; et al. | 3/30/2017 | Original UCC Filing | 17-0010730231 | Equipment |
| 10. | Texas | MOBILEASE, INC.; et al. | 3/30/2017 | Original UCC Filing | 17-0010730473 | Equipment |
| 11. | Texas | MOBILEASE, INC.; et al. | 3/30/2017 | Original UCC Filing | 17-0010731626 | Equipment |
| 12. | Texas | MOBILEASE, INC.; et al. | 7/11/2017 | Original UCC Filing | 17-0023574322 | Equipment |
| 13. | Texas | MOBILEASE, INC.; et al. | 6/20/2018 | Original UCC Filing | 18-0021532163 | Equipment |
| 14. | Texas | MOBILEASE, INC.; et al. | 6/20/2018 | Original UCC Filing | 18-0021533053 | Equipment |
| 15. | Texas | FROST BANK | 3/30/2017 | Original UCC Filing | 170010731626 | Equipment |
| 16. | Texas | FROST BANK | 3/30/2017 | Original UCC Filing | 170010730473 | Equipment |
| 17. | Texas | FROST BANK | 3/30/2017 | Original UCC Filing | 170010730231 | Equipment |
| 18. | Texas | FROST BANK | 3/30/2017 | Original UCC Filing | 170010729683 | Equipment |

S-4

| 19. | Texas | FROST BANK | 3/30/2017 | Original UCC Filing | 170010729188 | Equipment |
|-----|-------|------------|-----------|---------------------|--------------|-----------|
| 20. | Texas | FROST BANK | 3/30/2017 | Original UCC Filing | 170010728793 | Equipment |
| 21. | Texas | FROST BANK | 3/30/2017 | Original UCC Filing | 170010728298 | Equipment |

Doc#: US1:12181788v5

## Schedule 1.1.250 – SURVIVING COLOMBIAN CREDIT AGREEMENTS

| Bank | Description | Maximum Facility Amount |
|------|-------------|-------------------------|
| Banco de Bogotá S.A. | Common Terms Agreement for the execution of derivatives dated May 5, 2009, entered into by QMax Solutions Colombia and related promissory note | US$1,007,858 |
| BBVA Colombia | Line of credit dated December 3, 2012 entered into by Q'Max Solutions Colombia as borrower | US$1,708,234 |

S-6

## SCHEDULE 6.1.2 - CORPORATE INFORMATION

A. **Current Entity Name:** Fluid Holding Corp.
   **Former Entity Name(s):** None
   **Jurisdiction of Incorporation:** British Columbia
   **Present Governing Jurisdiction:** British Columbia
   **Registered Office:** Suite 2400, 745 Thurlow Street
   Vancouver, BC V6E 0C5
   Canada

   **Chief Executive Office:** P.O. BOX 10424, Pacific Centre
   1300 – 777 Dunsmuir Street
   Vancouver, BC V7Y 1K2

   **Location(s) of Business:** P.O. BOX 10424, Pacific Centre
   1300 – 777 Dunsmuir Street
   Vancouver, BC V7Y 1K2

   **Number and classes of authorized shares:** An unlimited number of common shares
   An unlimited number of class A-1 voting preferred shares
   An unlimited number of class A-2 voting preferred shares
   An unlimited number of class A-3 voting preferred shares

   **Number and classes of outstanding shares:** 2,287,231- Common
   363,378.73- Class A-1 Voting Preferred without par value
   153,318.5942-Class A-2 Voting Preferred shares without par value
   57,409-Class A-3 Voting Preferred shares without par value

   **Jurisdictions in which material business is carried on:** None

The Shareholders of Fluid Holding Corp. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| PEP Fluid LP | Common shares | 1,092,249.9759 |
| PEP Fluid Co-Invest LP | Common shares | 966,260.0241 |
| Calumet Operating, LLC | Common Shares | 228,721 |
| PEP Fluid LP | Class A-1 Voting Preferred | 214,747.74 |
| PEP Fluid Co-Invest LP | Class A-1 Voting Preferred | 148,360.99 |
| PEP Fluid LP | Class A-2 Voting Preferred | 93,481.1228 |
| PEP Fluid Co-Invest LP | Class A-2 Voting Preferred | 59,837.4714 |
| Calumet Operating, LLC | Class A-3 Voting Preferred | 57,409 |

B. **Current Entity Name:** Q'Max Solutions Inc.
   **Former Entity Name(s):** Fluid Acquisition Corp. (Q'Max Solutions Inc. is successor by amalgamation between Fluid Acquisition Corp. and Q'Max Solutions Inc.)

| | |
|---|---|
| **Jurisdiction of Formation:** | British Columbia |
| **Present Governing Jurisdiction:** | British Columbia (continued to British Columbia in connection with the amalgamation) |
| **Registered Office:** | 2200 Guinness Tower<br>1055 West Hasting Street<br>Vancouver, BC V6E-2E9 |
| **Chief Executive Office:** | 11700 Katy Freeway<br>Suite 200<br>Houston, TX 77079 |
| **Location(s) of Business:** | |
| | 11700 Katy Freeway, Suite 200<br>Houston, Texas 77079<br>370, 815 – 8th Avenue SW,<br>Calgary, Alberta T2P 3P2 |
| **Number and classes of authorized shares:** | An unlimited number of common shares |
| **Number and class of outstanding shares** | 2,741,466.23 |
| **Jurisdictions in which material business is carried on:** | United States & United Arab Emirates |

The Shareholder of Q'Max Solutions Inc. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Fluid Holding Corp. | Common | 2,741,466.23 |

| | | |
|---|---|---|
| C. | **Current Entity Name:** | Q'Max America Inc. |
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Incorporation:** | Delaware |
| | **Present Governing Jurisdiction:** | Delaware |
| | **Registered Office:** | 251 Little Falls Drive<br>Wilmington, D<br>Wilmington, DE 19808 |
| | **Chief Executive Office:** | 11700 Katy Freeway<br>Suite 200<br>Houston, TX 77079 |
| | **Location(s) of Business:** | 11700 Katy Freeway<br>Suite 200<br>Houston, TX 77079 |
| | | 1315 West Sam Houston Parkway<br>North, Suite 180, Houston, Texas |
| | | 2106 East Country Road 120<br>Midland, Texas 79706 |
| | | 101 Flacon Road, Suite 3<br>Elk City, Oklahoma 7662 |
| | | 19626 Hwy. 152<br>Sayre, Oklahoma 73662 |
| | | 2302 N. Mulberry Lane<br>Hobbs, New Mexico 88240 |

S-8

545 West Park Road
Leetsdale, Pennsylvania 15056

BDP International
479 World Houston Parkway
Houston, Texas 77032

107 SE 3rd Street
Wilburton, Oklahoma 73802

1.6 Acres (SE ¼ of Sec 30, TWN 23 N, Range
20 W of Indian Meridian
Woodward, Oklahoma 73802

2414 W. Towne Street
Glendive, Montana 59330

20 Shell Oil Road
Baker, Montana 59317

#20 Encore Road
Belle Creek, Montana 59317

995 North 5th Avenue
Brighton, Colorado 80603

1400 West Red Deer
Canadian, Texas 79014

5370 Poison Spider Road
Casper, Wyoming 82064

2259 County Street 2810
Chickasha, Oklahoma 73018

628 W Kansas Street
Chickasha, Oklahoma 73018

4730 County Road 203
Carpenter, Wyoming 8205

10760 N 2247 Road
Clinton, Oklahoma 73601

410 17th Street, Suite 320
Denver, Colorado 80202

11108 32nd Street SW
Dickenson, North Dakota 58601

38 Jarmon Trail
Douglas, Wyoming 82633

510 Scott Street
Van Buren, Arkansas 72143

S-9

124 Wygant Road, Bldg 2
Horseheads, New York 14845

1.82 Acres (Sec 20, Township 25 S, Range 37E)
Jal, New Mexico 88252

320 Highway 18
Jal, New Mexico 88252

401 NW 3rd Street
Kensett, Arkansas 72082

724 Brickworks Drive
Leetsdale, Pennsylvania 15056

1102 Airport Fernwood Road
McComb, Mississippi 39648

6417 W Industrial
Midland, Texas 79706

200 Enterprise Drive
Newcomerstown, Ohio 73832

3849 95th Avenue NW
Newtown, North Dakota 58763

148 Mcintyre Road
Minden, Louisiana 71055

4402 S. Mockingbird Rd
Chickasha, Oklahoma73132

5909 N.W. Expressway, Suite 250
Oklahoma City, Oklahoma 73132

2002 Tile Factorey Road
Pallestine, Texas 75801

18 Murray Ct, Apartment A
Parachute, Colorado 81635

2111 West 3rd
Pecos, Texas 79722

2623 West 2000 S
Roosevelt, Utah 84066

104 14th Ave. NW
Sidney, Montana 59270

402 10th Ave. NE
Sidney, Montana 59270

3067 S. Hwy 37 Access
Three Rivers, Texas 78071

S-10

2400-A Clark Ave.
Wellsville, Ohio 43968

11279 Perry Highway Suite 505
Wexford, Pennsylvania 15090

302 E 3rd Street
Wilburton, Oklahoma 74578

504 E Oklahoma
Woodward, Oklahoma 73802

25 Hicks Road
Wright, Wyoming 82732

164 Dudley Bernard Road, Suite 611
Port Fourchon, Louisiana 70357

2106 East Country Road 120Midland, Texas
79706

6655 S. Lewis Ave, Suite 300
Tulsa, OK 74136

2303 N. Mulberry Ln.
Hobbs, NM 88240
United States of America

5290 DTC Parkway
Greenwood Village, Colorado 80111

**Number and classes of authorized shares:**     3,000 Common Stock Par Value $.01
**Number and classes of outstanding shares:**     1000 Common Stock Par Value $.01

**Jurisdictions in which material business is carried on:**     Colorado, Texas, Wyoming, Oklahoma, Montana, Pennsylvania, Louisiana, Ohio

The Shareholders of Q'Max America Inc. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Central Procurement Inc. (Delaware) | Common | 1000 |

| | | |
|---|---|---|
| **D.** | **Current Entity Name:** | Central Procurement Inc. |
| | **Former Entity Name(s):** | Q'Max Solutions (Barbados) Inc. |
| | **Jurisdiction of Incorporation:** | Barbados |
| | **Present Governing Jurisdiction:** | Barbados |
| | **Registered Office:** | Radley Court, Upper Collymore Rock,  St. Michael, P.O. Box 1132, Bridgetown, Barbados BB 11000 |
| | **Chief Executive Office:** | Same as Registered Office |
| | **Location(s) of Business:** | Same as Registered Office |
| | **Number and classes of authorized shares:** | Unlimited Common. |

S-11

| | |
|---|---|
| **Number and classes of outstanding shares** | 200 Common |
| **Jurisdictions in which material business is carried on:** | N/A-Holding Company for Colombia Branch |

The Shareholders of Q'Max Solutions Inc.will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Inc. | Common | 200 |

| | | |
|---|---|---|
| E. | **Current Entity Name:** | QMax Solutions Colombia, branch of Barbados entity, Central Procurement Inc. |
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Formation:** | Colombia |
| | **Present Governing Jurisdiction:** | Colombia |
| | **Registered Office:** | Calle 100 No. 8A-49, Torre B, Of. 1018 Bogota, Colombia |
| | **Chief Executive Office:** | Calle 100 No. 8A-49, Torre B, Ofs. 1017-1018-1019-1020 Bogota, Colombia |
| | **Location(s) of Business:** | Colombia - Santa Marta Warehouse. Cr 31 No. 29-36 Loc. 6 Bod. 7 Manz. A2 |
| | | Colombia - Villavicencio Warehouse, Vereda la Unión |
| | | Colombia - Yopal Warehouse Km 4 via Morichal - Complejo industrial Serpet. Parque ind las Mercedes |
| | | Colombia Calle 100 #8A- 49 Torre B oficina 1018, Colombia |
| | | Colombia Carrera 5 sur #29-70 Neiva, Colombia |
| | | Colombia Parque Empresarial San Miguel, Bodega #4 Cota - Laboratory, Colombia |
| | | Colombia Parque Industrial Las Alpujarras Barrancabermeja, Colombia |
| | **Number and classes of authorized shares:** | N/A |
| | **Number and classes of outstanding shares:** | N/A |
| | **Jurisdictions in which material business is carried on:** | Colombia |

The ownership interests of QMax Solutions Colombia will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Central Procurement Inc. | N/A | N/A |

| | | |
|---|---|---|
| F. | **Current Entity Name:** | QMAXECUADOR S.A. |
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Formation:** | Ecuador |
| | **Present Governing Jurisdiction:** | Ecuador |
| | **Registered Office:** | Gregorio Bobadilla N26-125 y Naciones |

|  | Unidas. Edificio Nexia. Piso 1. Oficina 01., Pichincha, Quito, Ecuador Av. Naciones |
|---|---|
| **Chief Executive Office:** | Same as Registered Office |
| **Location(s) of Business:** | Campamento Base: Km. 3 Vía Sacha, Coca - Provincia de Orellana (Bodega) |
|  | El Zurriago y El Vengador. Edificio Modigliani II. Bodega Subsuelo 2 |
| **Number and classes of authorized shares:** | 250,000 ordinary shares |
| **Number and classes of outstanding shares:** | 125,000 ordinary shares |
| **Jurisdictions in which material business is carried on:** | Ecuador |

The ownership interests of QMAXECUADOR S.A. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Inc. | Ordinary | 124,999 |
| 1356760 Alberta Ltd. | Ordinary | 1 |

G. | **Current Entity Name:** | QMax Peru S.A.C.-In Liquidation |
|---|---|---|
| **Former Entity Name(s):** | None |
| **Jurisdiction of Formation:** | Peru |
| **Present Governing Jurisdiction:** | Peru |
| **Registered Office:** |  |
|  | Calle La Camelias 877, interior 302. District San Isidro, Lima |
| **Chief Executive Office:** | Same as Registered Office |
| **Location(s) of Business:** | None |
| **Number and classes of authorized shares:** | 1,750 |
| **Number and classes of outstanding shares:** | 1,750 |
| **Jurisdictions in which material business is carried on:** | None |

The ownership interests of QMax Peru S.A.C.-In Liquidation will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| QMAXECUADOR S.A. | Ordinary | 1,749 |
| 1356760 Alberta Ltd. | Ordinary | 1 |

H. | **Current Entity Name:** | Q'Max Solutions Holdings Inc. |
|---|---|---|
| **Former Entity Name(s):** | None |
| **Jurisdiction of Formation:** | Alberta |
| **Present Governing Jurisdiction:** | Alberta |
| **Registered Office:** |  |
|  | 4500 Bankers Hall East 855 2 Street SW Calgary, Alberta T2P 4K7 |
| **Chief Executive Office:** | 11700 Katy Freeway Suite 200 Houston, TX 77079 |
| **Location(s) of Business:** | Same as Registered Office |
| **Number and classes of authorized shares:** | Unlimited number of Class A Common Unlimited number of Class B Common |

S-13

|                                               |                                          |
|-----------------------------------------------|------------------------------------------|
|                                               | Unlimited number of Class C Preferred    |
|                                               | Unlimited number of Class D Preferred    |
| **Number and classes of outstanding shares:** | 100 Class A Common                       |
|                                               | 60,000 Class C Preferred                 |
| **Jurisdictions in which material business is carried on on:** | N/A- Holding Company    |

The ownership interests of Q'Max Solutions Holdings Inc. will be as follows on the Amendment and Restatement Date:

| Shareholder          | Class            | Outstanding Shares |
|----------------------|------------------|--------------------|
| Q'Max Solutions Inc. | Class A Common   | 100                |
| Q'Max Solutions Inc. | Class C Preferred | 60,000            |

I.  **Current Entity Name:**      QMax Mexico, S.A. de C.V.
    **Former Entity Name(s):**      None
    **Jurisdiction of Formation:**      Mexico
    **Present Governing Jurisdiction:**      Mexico
    **Registered Office:**      N/A (concept inapplicable in Mexico)
    **Chief Executive Office:**      Carretera Cárdenas-Villahermosa Km 155+500 Ranchería Gonzalez 3a Seccion Centro Tabasco C.P. 86280 México

    **Location(s) of Business:**      AV Justo Sierra No. 1, Fracc Justo Sierra, CP 24166, Ciudad Del Carmen, Campeche, Planta 1 Y 2

Blvd. Adolfo López Mateos # 216, entre Nuevo Leon y Nayarit, Col. Unidad Nacional.  CP 89410 Cd. Madero, Tamps.

Calle 1 Sur Lote I Manzana L, Pto. Industrial Pesquero Laguna Azul, C.P. 24140, Ciudad del Carmen, Campeche

Carretera Cárdenas-Villahermosa Km 155+500, Ranchería Gonzalez 3a Seccion, Centro Tabasco, C.P. 86280

Carretera Federal Paraíso – El Bellote, Ría. Ceiba, Paraíso, Tabasco, CP 86600

Carretera Matamoros Victoria Km, 200.  Nuevo Centro de Poblado la Lomita ,  San Fernando, Tamps.

Carretera Peña Blanca Km. 1.  Poblacion Comales, Municipio de Camargo Tamaulipas CP 88460

Carretera Poza Rica-Acontitlan s/n esquina terraceria sin nombre, ejido Paso Pital, municipio de Tihuatlan, Ver. Codigo Postal 92906

Edificio RCB Business CenterCalle: Guanajuato # 230-AColonia: Rodriguez C.P. 88630Ciudad: Reynosa, Tamaulipas

Km. 2 Carretera Piedras Negras-Mata Espino Municipio de Tlalixcoyan, Veracruz C.P. 95222

Masaryk 29 piso 1, Oficina 130, Polanco CDMX. C.P. 11570

Predio Urbano lotes 1-A  y 2 de la manzana M del Parque Industrial Laguna Azul, Ciudad del Carmen, Campeche

Prolongacion Avenida 27 de Febrero # 3017 Fraccionamiento Galaxias Villahermosa, Centro,Tabasco CP 86035 (Rented Office)

**Number and classes of authorized shares:** 50,000 Series B; 348,499,220 variable par 1.00
**Number and classes of outstanding shares:** 49,999 Series B; 348,499,220 variable par 1.00
**Jurisdictions in which material business is carried on:** Mexico

The ownership interests of QMax Mexico, S.A. de C.V. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Holdings Inc. | Series B Par MXP $1.00 | 49,999 Fixed Capital 348,499,220 Variable Capital |
| 1356760 Alberta Ltd. | Series B Par MXP $1.00 | 1 Fixed Capital |

**J.**   **Current Entity Name:** QMax Servicios Tecnicos S.A. de C.V.
  **Former Entity Name(s):** None
  **Jurisdiction of Formation:** Mexico
  **Present Governing Jurisdiction:** Mexico
  **Registered Office:** N/A (concept inapplicable in Mexico)
  **Chief Executive Office:** Carretera Cárdenas-Villahermosa Km 155+500 Ranchería Gonzalez 3a Seccion Centro Tabasco C.P. 86280 México
  **Location(s) of Business:** Same as Chief Executive Office
  **Number and classes of authorized shares:** 50,000 ordinary shares with par value
  **Number and classes of outstanding shares:** 50,000 ordinary shares with par value
  **Jurisdictions in which material business is carried on:** Mexico

The ownership interests of QMax Servicios Tecnicos S.A. de C.V. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| QMax Mexico, S.A. de C.V. | Series A Par MXP $1.00 | 49,999 Fixed Capital |
| 1356760 Alberta Ltd. | Series B Par MXP $1.00 | 1 Fixed Capital |

S-15

| | | |
|---|---|---|
| **K.** | **Current Entity Name:** | QMax Servicios de Ingenieria S.A. de C.V. |
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Formation:** | Mexico |
| | **Present Governing Jurisdiction:** | Mexico |
| | **Registered Office:** | N/A (concept inapplicable in Mexico) |
| | **Chief Executive Office:** | Carretera Cárdenas-Villahermosa Km 155+500 Ranchería Gonzalez 3a Seccion Centro Tabasco C.P. 86280 México |
| | **Location(s) of Business:** | Same as Chief Executive Office |
| | **Number and classes of authorized shares:** | 50,000 ordinary shares with par value |
| | **Number and classes of outstanding shares:** | 50,000 ordinary shares with par value |
| | **Jurisdictions in which material business is carried on:** | Mexico |

The ownership interests of QMax Servicios de Ingenieria S.A. de C.V. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| QMax Mexico, S.A. de C.V. | Series A Par MXP $1.00 | 49,999 Fixed Capital |
| 1356760 Alberta Ltd. | Series B Par MXP $1.00 | 1 Fixed Capital |

| | | |
|---|---|---|
| **L.** | **Current Entity Name:** | QMax Servicios Administrativos S.A. de C.V. |
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Formation:** | Mexico |
| | **Present Governing Jurisdiction:** | Mexico |
| | **Registered Office:** | N/A (concept inapplicable in Mexico) |
| | **Chief Executive Office:** | Carretera Cárdenas-Villahermosa Km 155+500 Ranchería Gonzalez 3a Seccion Centro Tabasco C.P. 86280 México |
| | **Location(s) of Business:** | Same as Chief Executive Office |
| | **Number and classes of authorized shares:** | 50,000 ordinary shares with par value |
| | **Number and classes of outstanding shares:** | 50,000 ordinary shares with par value |
| | **Jurisdictions in which material business is carried on:** | Mexico |

The ownership interests of QMax Servicios Administrativos S.A. de C.V. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| QMax Mexico, S.A. de C.V. | Series A Par MXP $1.00 | 49,999 Fixed Capital |
| 1356760 Alberta Ltd. | Series B Par MXP $1.00 | 1 Fixed Capital |

| | | |
|---|---|---|
| **M.** | **Current Entity Name:** | 1356760 Alberta Ltd. |
| | **Former Entity Name(s):** | 1356760 Alberta Inc. |
| | **Jurisdiction of Formation:** | Alberta |
| | **Present Governing Jurisdiction:** | Alberta |
| | **Registered Office:** | 4500 Bankers Hall East, 855 2 Street SW Calgary, Alberta T2P 4K7 |
| | **Chief Executive Office:** | 11700 Katy Freeway Suite 200 |

|  | Houston, TX 77079 |
|---|---|
| **Location(s) of Business:** | Same as Registered Office |
| **Number and classes of authorized shares:** | Unlimited number of Class A Common |
|  | Unlimited number of Class B Common |
|  | Unlimited number of Class C Preferred |
|  | Unlimited number of Class D Preferred |
| **Number and classes of outstanding shares:** | 2,984,800 Class A Common |
| **Jurisdictions in which material business is carried on:** | N/A- Holding Company |

The ownership interests of 1356760 Alberta Ltd. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Inc. | Class A Common | 2,984,800 |

| **N.** | **Current Entity Name:** | Qmax do Brasil Sulucoes do Petrolea Ltda. |
|---|---|---|
|  | **Former Entity Name(s):** | None |
|  | **Jurisdiction of Formation:** | Brazil |
|  | **Present Governing Jurisdiction:** | Brazil |
|  | **Registered Office:** | Rodovia Governador Mario Covax no°3255 |
|  |  | Sala 207 Bairro Padre Mathias Cariacica |
|  |  | ESCEP 29157-100 |
|  | **Chief Executive Office:** | Same as Registered Office |
|  | **Location(s) of Business:** | Av. Almirante Barroso, 63, Sala 2314, Centro, |
|  |  | Rio de Janeiro, RJ, Brasil CEP |
|  |  |  |
|  |  | "Rodovia Governador Mario Covas, nº 3255, |
|  |  | Sala 207, Bairro Padre Mathias, |
|  |  | Cariacica, ES, CEP 29157-100 |
|  |  |  |
|  |  | Via BA 420, S/N, faixa 02, Nova Pojuca, |
|  |  | Pojuca/BA, CEP 48120- |
|  |  | 000 |
|  | **Number and classes of authorized shares:** | 756,650 quotas |
|  | **Number and classes of outstanding shares:** | 756,650 quotas |
|  | **Jurisdictions in which material business is carried on:** | Brazil |

The ownership interests of Qmax do Brasil Sulucoes do Petrolea Ltda. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Inc. | Ordinary | 756,150 |
| 1356760 Alberta Ltd. | Ordinary | 500 |

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| 1356760 Alberta Ltd. | ordinary shares with par value | 3,096,254 |
| Manuel Sanchez Alvarez | ordinary shares with par value | 1 |

| **O.** | **Current Entity Name:** | Anchor Drilling Fluids USA, LLC |
|---|---|---|
|  | **Former Entity Name(s):** | Anchor Drilling Fluids USA, Inc. |
|  | **Jurisdiction of Formation:** | Delaware |
|  | **Present Governing Jurisdiction:** | Delaware |
|  | **Registered Office:** | 251 Little Falls Dr. |
|  |  | Wilmington Delaware 19808 |

S-17

**Chief Executive Office:**      11700 Katy Freeway, Suite 200
Houston, Texas 77079

**Location(s) of Business:**     11700 Katy Freeway
Suite 200
Houston, TX 77079

1315 West Sam Houston Parkway
North, Suite 180, Houston, Texas

2106 East Country Road 120
Midland, Texas 79706

101 Flacon Road, Suite 3
Elk City, Oklahoma 7662

19626 Hwy. 152
Sayre, Oklahoma 73662

2302 N. Mulberry Lane
Hobbs, New Mexico 88240

545 West Park Road
Leetsdale, Pennsylvania 15056

BDP International
479 World Houston Parkway
Houston, Texas 77032

107 SE 3rd Street
Wilburton, Oklahoma 73802

1.6 Acres (SE ¼ of Sec 30, TWN 23 N, Range
20 W of Indian Meridian
Woodward, Oklahoma 73802

2414 W. Towne Street
Glendive, Montana 59330

20 Shell Oil Road
Baker, Montana 59317

#20 Encore Road
Belle Creek, Montana 59317

995 North 5th Avenue
Brighton, Colorado 80603

1400 West Red Deer
Canadian, Texas 79014

5370 Poison Spider Road
Casper, Wyoming 82064

2259 County Street 2810
Chickasha, Oklahoma 73018

S-18

628 W Kansas Street
Chickasha, Oklahoma 73018

4730 County Road 203
Carpenter, Wyoming 8205

10760 N 2247 Road
Clinton, Oklahoma 73601

410 17th Street, Suite 320
Denver, Colorado 80202

11108 32nd Street SW
Dickenson, North Dakota 58601

38 Jarmon Trail
Douglas, Wyoming 82633

510 Scott Street
Van Buren, Arkansas 72143

124 Wygant Road, Bldg 2
Horseheads, New York 14845

1.82 Acres (Sec 20, Township 25 S, Range 37E)
Jal, New Mexico 88252

320 Highway 18
Jal, New Mexico 88252

401 NW 3rd Street
Kensett, Arkansas 72082

724 Brickworks Drive
Leetsdale, Pennsylvania 15056

1102 Airport Fernwood Road
McComb, Mississippi 39648

6417 W Industrial
Midland, Texas 79706

200 Enterprise Drive
Newcomerstown, Ohio 73832

3849 95th Avenue NW
Newtown, North Dakota 58763

148 Mcintyre Road
Minden, Louisiana 71055

4402 S. Mockingbird Rd
Chickasha, Oklahoma73132

5909 N.W. Expressway, Suite 250

S-19

Oklahoma City, Oklahoma 73132

2002 Tile Factorey Road
Pallestine, Texas 75801

18 Murray Ct, Apartment A
Parachute, Colorado 81635

2111 West 3rd
Pecos, Texas 79722

2623 West 2000 S
Roosevelt, Utah 84066

104 14th Ave. NW
Sidney, Montana 59270

402 10th Ave. NE
Sidney, Montana 59270

3067 S. Hwy 37 Access
Three Rivers, Texas 78071

2400-A Clark Ave.
Wellsville, Ohio 43968

11279 Perry Highway Suite 505
Wexford, Pennsylvania 15090

302 E 3rd Street
Wilburton, Oklahoma 74578

504 E Oklahoma
Woodward, Oklahoma 73802

25 Hicks Road
Wright, Wyoming 82732

164 Dudley Bernard Road, Suite 611
Port Fourchon, Louisiana 70357

2106 East Country Road 120Midland, Texas
79706

6655 S. Lewis Ave, Suite 300
Tulsa, OK 74136

2303 N. Mulberry Ln.
Hobbs, NM 88240
United States of America

| | |
|---|---|
| **Number and classes of authorized shares:** | N/A |
| **Number and classes of outstanding shares:** | N/A |
| **Jurisdictions in which material business is carried on:** | Colorado, Texas, Wyoming, Oklahoma, Montana, New York, Arkansas, Pennsylvania, Louisiana, Ohio, North Dakota, Utah |

S-20

The ownership interests of Anchor Drilling Fluids USA, LLC will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max America Inc. | Membership Interests | N/A |

| P. | **Current Entity Name:** | QMax Canada Operations Inc. |
|---|---|---|
| | **Former Entity Name(s):** | QMax Solutions EE Operations Inc. |
| | **Jurisdiction of Formation:** | Alberta |
| | **Present Governing Jurisdiction:** | British Colombia |
| | **Registered Office:** | Suite 220-1055 West Hastings Street |
| | | Vancouver, BC V6E2E9 |
| | **Chief Executive Office:** | 1210-585 8th Avenue SW |
| | | Calgary, AB 2TP1G1 |
| | **Location(s) of Business:** | 10304 84th Ave. |
| | | Clairmont AB T0H 0W0 |

1210 585-8th Avenue SW
Calgary, AB T2P 1G1

815 8th Avenue #370
Calgary, AB T2P 2T4

5624 58h Avenue
Drayton Valley, AB T7A 0B1

Leased Drilling Fluid and Mud Storage
Formula Powell Locations
Blackfalds, AB and
Lloydminster, AB

| **Number and classes of authorized shares:** | Unlimited Common Shares |
|---|---|
| **Number and classes of outstanding shares:** | 372 |
| **Jurisdictions in which material business is carried on:** | Alberta |

The ownership interests of QMax Canada Operations Inc.will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Inc. | Common | 372 |

| Q. | **Current Entity Name:** | Environmental Solutions for Petroleum Services – Free Zone – S.A.E. |
|---|---|---|
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Formation:** | Egypt |
| | **Present Governing Jurisdiction:** | Egypt |
| | **Registered Office:** | Villa 267, Ground Floor, 2nd District, 1st Zone, El Tasaeem St. 5th District, New Cairo, Cairo Governorate, Arab Republic of Egypt |
| | **Chief Executive Office:** | Villa 267, Ground Floor, 2nd District, 1st Zone, El Tasaeem St. 5th District, New Cairo, Cairo Governorate, Arab Republic of Egypt |
| | **Location(s) of Business:** | Ameriya Free Zone Base - Alexandra - Egypt |

S-21

Villa 75 South Academy, 5th Settlement, New Cairo City

Warehouse and  Base - Ras Garib - Egypt

**Number and classes of authorized shares:** 15,000,000
**Number and classes of outstanding shares:** 15,000,000
**Jurisdictions in which material business is carried on:** Egypt

The ownership interests of Environmental Solutions for Petroleum Services – Free Zone – S.A.E. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Holdings Inc. | N/A | 1500 |
| 1356760 Alberta Ltd. | N/A | 1500 |
| Q'Max Solutions Inc. | N/A | 14,997,000 |

| | | |
|---|---|---|
| **R.** | **Current Entity Name:** | SARL Environmental Solutions Algeria |
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Formation:** | Algeria |
| | **Present Governing Jurisdiction:** | Algeria |
| | **Registered Office:** | 5 Rue ABRI Arezki, Hydra, Municipality of Hydra Province of Algiers |
| | **Chief Executive Office:** | 5 Rue Abri Arezki, Hydra, Algiers, Algeria |
| | **Location(s) of Business:** | 5 Rue Abri Arezki, Hydra, Algiers, Algeria |
| | | Environmental Solutions Free Zone Base – Airport Road - BP 930 Hassi Messoud, Ouargla, Algeria |
| | **Number and classes of authorized shares:** | N/A |
| | **Number and classes of outstanding shares:** | 100 (obtain class-Jocelyn) |
| | **Jurisdictions in which material business is carried on:** | Algeria |

The ownership interests of SARL Environmental Solutions Algeria  will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Environmental Solutions for Petroleum Services – Free Zone – S.A.E. | N/A | 49 |
| Adb Touabi | N/A | 7 |
| Adlane Daoudi | N/A | 14 |
| Naella Madani | N/A | 30 |

| | | |
|---|---|---|
| **S.** | **Current Entity Name:** | International Drilling Fluids & Engineering Services (IDEC) LTD. |
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Formation:** | BVI |
| | **Present Governing Jurisdiction:** | BVI |
| | **Registered Office:** | P.O. Box 173 |

|   |   |
|---|---|
| | Kingson Chambers Row Town, Tortolla, BVI |
| **Chief Executive Office:** | 802, Reef Tower, Cluster O, Jumeirah Lake Towers P.O. Box 31968, Dubai, UAE |
| **Location(s) of Business:** | Same as Chief Executive Office |
| **Number and classes of authorized shares:** | 50,000 |
| **Number and classes of outstanding shares:** | 50,000 |
| **Jurisdictions in which material business is carried on:** | UAE, Kenya, Kurdistan |

The ownership interests of International Drilling Fluids & Engineering Services (IDEC) LTD. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Inc. | N/A | 42500 |
| Wael Elessaway | N/A | 5000 |
| Seedat Ahmed | N/A | 2500 |

| | | |
|---|---|---|
| **T.** | **Current Entity Name:** | South Sudan Branch of International Drilling Fluids & Engineering Services (IDEC) LTD. |
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Formation:** | South Sudan |
| | **Present Governing Jurisdiction:** | South Sudan |
| | **Registered Office:** | Company License expired- NO REGISTERED OFFICE |
| | **Chief Executive Office:** | N/A |
| | **Location(s) of Business:** | N/A |
| | **Number and classes of authorized shares:** | N/A |
| | **Number and classes of outstanding shares:** | N/A |
| | **Jurisdictions in which material business is carried on:** | South Sudan |

The ownership interests of the South Sudan Branch of International Drilling Fluids & Engineering Services (IDEC) LTD.  will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| International Drilling Fluids & Engineering Services (IDEC) LTD. | N/A | N/A |

| | | |
|---|---|---|
| **U.** | **Current Entity Name:** | Iraqi Branch of International Drilling Fluids & Engineering Services (IDEC) LTD. |
| | **Former Entity Name(s):** | None. |
| | **Jurisdiction of Formation:** | Erbil, Iraq Kurdistan |
| | **Present Governing Jurisdiction:** | Erbil, Iraq Kurdistan |
| | **Registered Office:** | Villa No. 153, Pank City, Ankawa, Erbil |
| | **Chief Executive Office:** | Villa No. 153, Pank City, Ankawa, Erbil |
| | **Location(s) of Business:** | Erbil |
| | **Number and classes of authorized shares:** | N/A |
| | **Number and classes of outstanding shares:** | N/A |
| | **Jurisdictions in which material business is carried on:** | Iraq |

The ownership interests of the IraqBranch of International Drilling Fluids & Engineering Services (IDEC) LTD. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| International Drilling Fluids & Engineering Services (IDEC) LTD. | N/A | N/A |

V.  **Current Entity Name:**  DMCC  Branch of International Drilling Fluids & Engineering Services (IDEC) LTD.

    **Former Entity Name(s):**  None.
    **Jurisdiction of Formation:**  UAE
    **Present Governing Jurisdiction:**  UAE
    **Registered Office:**  Unit 802 Reef Tower, Plot No. JLT-PH2-O1A Jumeriah Lakes Towers, Dubai, UAE
    **Chief Executive Office:**  Same as Registered Office
    **Location(s) of Business:**  Dubai
    **Number and classes of authorized shares:**  N/A
    **Number and classes of outstanding shares:**  N/A
    **Jurisdictions in which material business is carried on:**  DMCC

The ownership interests of the DMCC Branch of International Drilling Fluids & Engineering Services (IDEC) LTD. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
| --- | --- | --- |
| International Drilling Fluids & Engineering Services (IDEC) LTD. | N/A | N/A |

W.  **Current Entity Name:**  Kenya Branch of  International Drilling Fluids & Engineering Services (IDEC) LTD.

    **Former Entity Name(s):**  None
    **Jurisdiction of Formation:**  Kenya
    **Present Governing Jurisdiction:**  Kenya
    **Registered Office:**  20th Floor, Lonrho House Standard Street P.O. Box 3085-00100 GPO Nairobi, Kenya
    **Chief Executive Office:**  Apartment Number A 604, Block A, 6th Floor, Rivera Towers, Nairobi, Kenya
    **Location(s) of Business:**  Kenya
    **Number and classes of authorized shares:**  N/A
    **Number and classes of outstanding shares:**  N/A
    **Jurisdictions in which material business is carried on:**  Kenya

The ownership interests of the Kenya Branch of International Drilling Fluids & Engineering Services (IDEC) LTD will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
| --- | --- | --- |
| International Drilling Fluids & Engineering Services (IDEC) LTD. | N/A | N/A |

X.  **Current Entity Name:**  Tanzania Branch of International Drilling Fluids & Engineering Services (IDEC) LTD.

    **Former Entity Name(s):**  None
    **Jurisdiction of Formation:**  Tanzania
    **Present Governing Jurisdiction:**  Tanzania
    **Registered Office:**  Plot No. 18, Rukwa Street Masaki, Dar es Salaam P.O. Box 38192 Dar es Salaam, Tanzania
    **Chief Executive Office:**  Same as Registered Office
    **Location(s) of Business:**  Tanzania
    **Number and classes of authorized shares:**  N/A
    **Number and classes of outstanding shares:**  N/A

Doc#: US1:12181788v5

**Jurisdictions in which material business is carried on:**   Tanzania

The ownership interests of the Tanzania Branch of International Drilling Fluids & Engineering Services (IDEC) LTD. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| International Drilling Fluids & Engineering Services (IDEC) LTD. | N/A | N/A |

| | | |
|---|---|---|
| Y. | **Current Entity Name:** | Central Procurement Inc. |
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Formation:** | Delaware |
| | **Present Governing Jurisdiction:** | Delaware |
| | **Registered Office:** | 251 Little Falls Dr. |
| | | Wilmington, DE 19808 |
| | **Chief Executive Office:** | 11700 Katy Freeway, Suite 200 |
| | | Houston, Texas 77079 |
| | **Location(s) of Business:** | Same as Chief Executive Office |
| | **Number and classes of authorized shares:** | Unlimited |
| | **Number and classes of outstanding shares:** | 1,000 Common Shares |
| | **Jurisdictions in which material business is carried on:** | Texas |

The ownership interests of Central Procurement Inc. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Inc. | Common | 1,000 |

| | | |
|---|---|---|
| Z. | **Current Entity Name:** | Qmax Middle East FZE |
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Formation:** | JAFZA |
| | **Present Governing Jurisdiction:** | JAFZA |
| | **Registered Office:** | Office No. LB16140 |
| | | Jebel Ali, Dubai, UAE |
| | **Chief Executive Office:** | Office No. LB16140 Jebel Ali |
| | | Dubai, UAE |
| | **Location(s) of Business:** | United Arab Emirates |
| | **Number and classes of authorized shares:** | 1- Class N/A |
| | **Number and classes of outstanding shares:** | 1-Class N/A |
| | **Jurisdictions in which material business is carried on:** | JAFZA |

The ownership interests of Qmax Middle East FZE will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Inc. | N/A | 1 |

| | | |
|---|---|---|
| AA. | **Current Entity Name:** | Q'Max Solutions Singapore Pte. Ltd. |
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Formation:** | Singapore |
| | **Present Governing Jurisdiction:** | Singapore |
| | **Registered Office:** | 6 Temask Boulevard #29-00 |
| | | Suntec Tower Four |
| | | Singapore 038986 |
| | **Chief Executive Office:** | Same as Registered Office |
| | **Location(s) of Business:** | None |
| | **Number and classes of authorized shares:** | N/A |

S-25

| | | |
|---|---|---|
| **Number and classes of outstanding shares:** | | 1000 |
| **Jurisdictions in which material business is carried on:** | | Singapore |

The ownership interests of Q'Max Solutions Singapore Pte. Ltd. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Inc. | N/A | 1000 |

**BB.** **Current Entity Name:** India Project Office of Q'Max Solutions Inc. - In Liquidation

| | |
|---|---|
| **Former Entity Name(s):** | None |
| **Jurisdiction of Formation:** | India |
| **Present Governing Jurisdiction:** | India |
| **Registered Office:** | 3rd Floor, 465, The Elements, Phase V Udyog Vihar Industrial Area Gurgaon 122015 Haryana India |
| **Chief Executive Office:** | Same as Registered Office |
| **Location(s) of Business:** | N/A |
| **Number and classes of authorized shares:** | N/A |
| **Number and classes of outstanding shares:** | N/A |
| **Jurisdictions in which material business is carried on:** | India |

The ownership interests of the India Project Office of Q'Max Solutions Inc. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Singapore Pte. Ltd. | N/A | N/A |

**CC.** 
| | |
|---|---|
| **Current Entity Name:** | Uganda Branch of Q'Max Solutions Inc. |
| **Former Entity Name(s):** | None |
| **Jurisdiction of Formation:** | Uganda |
| **Present Governing Jurisdiction:** | Uganda |
| **Registered Office:** | 3rd Floor Rwenzori Courts Plot 2 & 4A Nakasero Road, P.O. Box 3509 Kampala, Uganda |
| **Chief Executive Office:** | Same as Registered Office |
| **Location(s) of Business:** | Uganda |
| **Number and classes of authorized shares:** | N/A |
| **Number and classes of outstanding shares:** | N/A |
| **Jurisdictions in which material business is carried on:** | Uganda |

The ownership interests of the Uganda Branch of Q'Max Solutions Inc. will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Singapore Pte. Ltd. | N/A | N/A |

**DD.** 
| | |
|---|---|
| **Current Entity Name:** | Tri-Max Solutions Limited |
| **Former Entity Name(s):** | None |
| **Jurisdiction of Formation:** | Trinidad & Tobago |
| **Present Governing Jurisdiction:** | Trinidad & Tobago |
| **Registered Office:** | Pembroke Court 17-19 Pembroke Street |

|  |  |
|---|---|
|  | Port of Spain |
| **Chief Executive Office:** | Same as Registered Office |
| **Location(s) of Business:** | Same as Registered Office |
| **Number and classes of authorized shares:** | Unlimited Common and Unlimited Preferred |
| **Number and classes of outstanding shares:** | None |
| **Jurisdictions in which material business is carried on:** | Trinidad & Tobago |

The ownership interests of Tri-Max Solutions Limited will be as follows on the Amendment and Restatement Date:

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Inc. | N/A | None |

| | | |
|---|---|---|
| **EE.** | **Current Entity Name:** | Mud Movers Express LLC |
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Formation:** | Oklahoma |
| | **Present Governing Jurisdiction:** | Oklahoma |
| | **Registered Office:** | |
| | | 10300 Greenbriar Place |
| | | Oklahoma City, Oklahoma 73159 |
| | **Chief Executive Office:** | |
| | | 11700 Katy Freeway, Suite 200 |
| | | Houston, Texas 77079 |
| | **Location(s) of Business:** | N/A- Entity conducts business under the Anchor dba Anchor USA |
| | **Number and classes of authorized shares:** | N/A |
| | **Number and classes of outstanding shares:** | N/A |
| | **Jurisdictions in which material business is carried on:** | N/A-Entity now conducts business under the Anchor dba- Anchor USA |

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max America Inc. | Member Interests | N/A |

| | | |
|---|---|---|
| **FF.** | **Current Entity Name:** | ADF SPV, LLC |
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Formation:** | Delaware |
| | **Present Governing Jurisdiction:** | Delaware |
| | **Registered Office:** | 251 Little Falls Drive |
| | | Wilmington, Delaware 19808 |
| | **Chief Executive Office:** | 11700 Katy Freeway, Suite 200, Houston, TX 77079 |
| | **Location(s) of Business:** | 11700 Katy Freeway, Suite 200, Houston, TX 77079 |
| | **Number and classes of authorized shares:** | N/A |
| | **Number and classes of outstanding shares:** | N/A |
| | **Jurisdictions in which material business is carried on:** | N/A- Holding Company |

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Anchor Drilling Fluids USA, LLC | Member Interests | N/A |

| | | |
|---|---|---|
| **GG.** | **Current Entity Name:** | Chad Branch of Q'Max Solutions Inc. |
| | **Former Entity Name(s):** | None |
| | **Jurisdiction of Formation:** | Chad |
| | **Present Governing Jurisdiction:** | Chad |
| | **Registered Office:** | Quartier Klemat, BP 324, N'djamena- Chad |

| | |
|---|---|
| **Chief Executive Office:** | Same as Registered Office |
| **Location(s) of Business:** | Same as Registered Office |
| **Number and classes of authorized shares:** | N/A |
| **Number and classes of outstanding shares:** | N/A |
| **Jurisdictions in which material business is carried on:** | Chad |

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max Solutions Inc. | N/A | N/A |

| | | |
|---|---|---|
| **HH.** | **Current Entity Name:** | Terra Oilfield Solutions, LLC |
| | **Former Entity Name(s):** | Terra Environmental Solutions, LLC, Commander Pressure Control LLC |
| | **Jurisdiction of Formation:** | Delaware |
| | **Present Governing Jurisdiction:** | Delaware |
| | **Registered Office:** | Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 |
| | **Chief Executive Office:** | 11700 Katy Freeway, Suite 200 Houston, Texas 77079 |
| | **Location(s) of Business:** | 2984 N. Wingate Avenue, Odessa TX 79764 |
| | **Number and classes of authorized shares:** | N/A |
| | **Number and classes of outstanding shares:** | N/A |
| | **Jurisdictions in which material business is carried on:** | Texas, Louisiana, New Mexico, and Oklahoma |

| Shareholder | Class | Outstanding Shares |
|---|---|---|
| Q'Max America Inc. | Membership Interests | N/A |

## SCHEDULE 6.1.3 – SUBSIDIARIES

| | Name | Subsidiary of | Status |
|---|---|---|---|
| 1. | Q'Max Solutions Inc. | Fluid Holding Corp. | Canadian Borrower |
| 2. | 1356760 Alberta Ltd. | Q'Max Solutions Inc. | Guarantor/Material Subsidiary |
| 3. | QMax do Brasil Solucoes do Petroleo Ltda. | Q'Max Solutions Inc. (99.9%) 1356760 Alberta Ltd. (0.1%) | Unrestricted Subsidiary |
| 4. | Q'Max America Inc. | Central Procurement Inc.[2] | US Borrower |
| 5. | Central Procurement Inc.[3] | Q'Max Solutions Inc. | Guarantor/Material Subsidiary |
| 6. | QMAXECUADOR S.A. | Q'Max Solutions Inc. (99.9%) 1356760 Alberta Ltd. (0.1%) | Unrestricted Subsidiary |
| 7. | Q'Max Solutions Holdings Inc. | Q'Max Solutions Inc. | Guarantor/Material Subsidiary |
| 8. | QMax Solutions Colombia (note, this is a branch of the Barbados entity, Central Procurement Inc., and not a separate entity) | Central Procurement Inc. (Barbados) | N/A - not separate entity |
| 9. | QMax Peru S.A.C. | QMAXECUADOR S.A. (99.9%) 1356760 Alberta Ltd. (0.1%) | Unrestricted Subsidiary |
| 10. | QMax Mexico, S.A. de C.V. | Q'Max Solutions Holdings Inc. (99.99%) 1356760 Alberta Ltd. (0.01%) | Guarantor/Material Subsidiary |
| 11. | QMax Servicios Tecnicos, S.A. de C.V. | QMax Mexico S.A. de C.V. (99.99%) 1356760 Alberta Ltd. (0.01%) | Unrestricted Subsidiary |
| 12. | QMax Servicios de Ingenieria, S.A. de C.V. | QMax Mexico S.A. de C.V. (99.99%) 1356760 Alberta Ltd. (0.01%) | Unrestricted Subsidiary |
| 13. | QMax Servicios Administrativos, S.A. de C.V. | QMax Mexico S.A. de C.V. (99.99%) 1356760 Alberta Ltd. (0.01%) | Unrestricted Subsidiary |
| 14. | Anchor Drilling Fluids USA, LLC | Q'Max America Inc. | Guarantor/Material Subsidiary |
| 15. | QMax Canada Operations Inc. | Q'Max Solutions Inc. | Guarantor/Material Subsidiary |

---

[2] Incorporated in Delaware.

[3] Incorporated in Barbados.

Doc#: US1:12181788v5

| 16. | Environmental Solutions for Petroleum Services – Free Zone – S.A.E. | Q'Max Solutions Inc. (99.98%) 1356760 Alberta Ltd. (0.01%) Q'Max Solutions Holdings Inc. (0.01%) | Guarantor/Material Subsidiary |
|---|---|---|---|
| 17. | SARL Environmental Solutions Algeria | Environmental Solutions for Petroleum Services – Free Zone – S.A.E. (49%) Abderrahmane Touabi (7%) Adlane Daoudi (14%) Naella Madani (30%) | Guarantor/Material Subsidiary |
| 18. | International Drilling Fluids & Engineering Services (IDEC) LTD. | Q'Max Solutions Inc. (85%) Wael Elessawy (10%) Seedat Ahmed (5%) | Unrestricted Subsidiary |
| 19. | South Sudan Branch of International Drilling Fluids & Engineering Services (IDEC) LTD. | International Drilling Fluids & Engineering Services (IDEC) LTD. | N/A - not separate entity |
| 20. | Iraqi Branch of International Drilling Fluids & Engineering Services (IDEC) LTD. | International Drilling Fluids & Engineering Services (IDEC) LTD. | N/A - not separate entity |
| 21. | DMCC Branch of International Drilling Fluids & Engineering Services (IDEC) LTD. | International Drilling Fluids & Engineering Services (IDEC) LTD. | N/A - not separate entity |
| 22. | Kenya Branch of International Drilling Fluids & Engineering Services (IDEC) LTD. | International Drilling Fluids & Engineering Services (IDEC) LTD. | N/A - not separate entity |
| 23. | Tanzania Branch of International Drilling Fluids & Engineering Services (IDEC) LTD. | International Drilling Fluids & Engineering Services (IDEC) LTD. | N/A - not separate entity |
| 24. | Central Procurement Inc.[4] | Q'Max Solutions Inc. | Unrestricted Subsidiary |
| 25. | Qmax Middle East FZE | Q'Max Solutions Inc. | Unrestricted Subsidiary |
| 27. | Q'Max Solutions Singapore Pte. Ltd. | Q'Max Solutions Inc. | Unrestricted Subsidiary |
| 28. | India Project Office of Q'Max Solutions Inc. | Q'Max Solutions Inc. | N/A - not separate entity |
| 29. | Uganda Branch of Q'Max Solutions Inc. | Q'Max Solutions Inc. | N/A - not separate entity |
| 30. | Tri-Max Solutions Limited | Q'Max Solutions Inc. | Unrestricted Subsidiary |

---

[4] Incorporated in Delaware.

S-30

| 31. | ADF SPV, LLC | Anchor Drilling Fluids USA, LLC | Special Purpose Securitization Subsidiary |
| 32. | Mud Movers Express LLC | Q'Max America Inc. | Unrestricted Subsidiary |
| 33. | Chad Branch of Q'Max Solutions Inc. | QMax Solutions Inc. | N/A-not separate entity. |
| 34. | Terra Oilfield Solutions, LLC | Q'Max America Inc. | Guarantor/Material Subsidiary |

Doc#: US1:12181788v5

## SCHEDULE 6.1.5 - CONSENTS AND APPROVALS REQUIRED

**A.  Contractual Consents under Material Agreement**

    None.

**B.  Regulatory Consents under Material Permits**

    None.

**C.  Contractual and Regulatory Approval**

    None.

**D.  Existing Currency Hedging Agreements/Licenses**

    None.

Doc#: US1:12181788v5

## SCHEDULE 6.1.8 – COMPLIANCE WITH LAWS AND MATERIAL PERMITS

None.

Doc#: US1:12181788v5

## SCHEDULE 6.1.10  LEASED PROPERTIES

[*See attached*]

Doc#: US1:12181788v5

| Country | Address | City | State | Zip | Lease or Owned? |
|---------|---------|------|-------|-----|-----------------|
| Algeria | 5 Rue Abri Arezki, Hydra, Algiers, Algeria (Office) | Algiers | | | Leased |
| Algeria | Environmental Solutions Free Zone Base – Airport Road - BP 930 Hassi Messoud, Ouargla, Algeria (base) | Hassi Messoud | | | Leased |
| Brazil | Av. Almirante Barroso, 63, Sala 2314, Centro, Rio de Janeiro, RJ, Brasil CEP | Rio de Janeiro | Rio de Janeiro | 20003-913 | Leased |
| Brazil | Rodovia Governador Mario Covas, nº 3255, Sala 207 Bairro Padre Mathias, Cariacica, ES CEP 29157-100 | Cariacica | Espiritu Santo | 29157-100 | Leased |
| Brazil | Via BA 420, S/N, faixa 02, Nova Pojuca, Pojuca/BA, CEP 48120-000 | Pojuca | Bahia | 48120-000 | Leased |
| Canada | 370, 815 8th Avenue Calgary, AB  (Sales Office) | Calgary | Alberta | | Leased |
| Canada | Leased Drilling Fluid and Mud Storage Formula Powell Locations - Blackfalds, AB and Lloydminster, AB | | Alberta | | Leased |
| Colombia | Colombia - Santa Marta Warehouse. Cr 31 No. 29-36 Loc. 6 Bod. 7 Manz. A2 | Santa Marta | Magdalena | Na | Leased |
| Colombia | Colombia - Villavicencio Warehouse, Vereda la Unión | Villavicencio | Meta | Na | Leased |
| Colombia | Colombia - Yopal Warehouse Km 4 via Morichal - Complejo industrial Serpet. Parque ind las Mercedes | Yopal | Casanare | Na | Leased |
| Colombia | Colombia Any other location, Colombia (Pozos) | | | Na | Leased |
| Colombia | Colombia Calle 100 #8A- 49 Torre B oficina 1018, Colombia | Bogotá | Bogotá | 110221 | Leased |
| Colombia | Colombia Carrera 5 sur #29-70 Neiva, Colombia | Neiva | Huila | 410006 | Leased |
| Colombia | Colombia Parque Empresarial San Miguel, Bodega #4 Cota - Laboratory, Colombia | Cota | Cundinamarca | Na | Leased |
| Colombia | Colombia Parque Industrial Las Alpujarras Barrancabermeja, Colombia | Barrancabermeja | Santander | Na | Leased |
| Ecuador | Campamento Base: Km. 3 Via Sacha, Coca - Provincia de Orellana (Bodega) | Sacha | Coca - Provincia de Orellana | 220350 | Leased |
| Ecuador | El Zurriago y El Vengador. Edificio Modigliani II. Bodega Subsuelo 2. | Quito | Pichincha | 170150 | Leased |
| Egypt | Ameriya Free Zone Base - Alexandra - Egypt | Alexandra | | | Leased |
| Egypt | Villa 75 South Academy, 5th Settlement, New Cairo City | New Cairo City | | | Leased |
| Egypt | Warehouse and  Base - Ras garib - Egypt | Ras Garib | | | Leased |
| India | plot no 454, village kuldiha, Durgapur- 713212 | Durgapur | | | Leased |
| India | The Elements, 465, Phase V, Udyog Vihar Industrial Area, Gurgaon-122015 | Gurgaon | | | Leased |
| Iraq | VILLA NO 153, PANK CITY, AINKAWA, ERBIL, KURDISTAN REGION, IRAQ | Erbil | N/A | N/A | Leased |
| Kenya | Apartment Number A 604, Block A, 6th Floor, Rivera Towers, Nairobi-Kenya | Nairobi | | | Leased |
| Mexico | AV Justo Sierra No. 1, Fracc Justo Sierra, CP 24166, Ciudad Del Carmen, Campeche, Planta 1 Y 2 | Ciudad del Carmen | Campeche | 24166 | Leased |
| Mexico | Blvd. Adolfo López Mateos # 216, entre Nuevo Leon y Nayarit, Col. Unidad Nacional.  CP 89410 Cd. Madero, Tamps. | Ciudad Madero | Tamaulipas | 89410 | Leased |
| Mexico | Calle 1 Sur Lote I Manzana L, Pto. Industrial Pesquero Laguna Azul, C.P. 24140, Ciudad del Carmen, Campeche | Ciudad del Carmen | Campeche | 24140 | Leased |
| Mexico | Carretera Federal Paraiso – El Bellote, Ria. Ceiba, Paraiso, Tabasco, CP 86600 | Paraiso | Tabasco | 86600 | Leased |
| Mexico | Edificio RCB Business CenterCalle: Guanajuato # 230-AColonia: Rodríguez C.P. 88630Ciudad: Reynosa, Tamaulipas | Reynosa | Tamaulipas | 88630 | Leased |
| Mexico | Km. 2 Carretera Piedras Negras-Mata Espino Municipio de Tlalixcoyan, Veracruz C.P. 95222 | Piedras Negras | Veracruz | 95222 | Leased |
| Mexico | Masaryk 29 piso 1, Oficina 130, Polanco| CDMX. C.P. 11570 | Mexico City | Mexico City | 11570 | Leased |
| Mexico | Prolongacion Avenida 27 de Febrero # 3017 Fraccionamiento Galaxias Villahermosa, Centro,Tabasco CP 86035 (Rented Office) | Villahermosa | Tabasco | 86035 | Leased |
| U.S.A. | 20 SHELL OIL ROAD | Baker | MT | 59313 | Leased |
| U.S.A. | #20 ENCORE ROAD | Belle Creek | MT | 59317 | Leased |
| U.S.A. | 995 NORTH 5TH AVENUE | Brighton | CO | 80603 | Leased |
| U.S.A. | 4730 COUNTY RD 203 | Carpenter | WY | 82054 | Leased |
| U.S.A. | 5370 POISON SPIDER RD | Casper | WY | 82064 | Leased |
| U.S.A. | 628 W KANSAS STREET | chickasha | OK | 73018 | Leased |
| U.S.A. | 10760 N 2247 ROAD | Clinton | OK | 73601 | Leased |
| U.S.A. | 410 17TH STREET SUITE 320 | Denver | CO | 8020 | Leased |
| U.S.A. | 11108 32ND STREET SW | Dickenson | ND | 58601 | Leased |
| U.S.A. | 38 JARMON TRAIL | Dougals | WY | 82633 | Leased |
| U.S.A. | 2414 W. TOWNE STREET | Glendive | MT | 59330 | Leased |
| U.S.A. | 2303 N. MULBERRY LANE (WAREHOUSE) | Hobbs | NM | 88240 | Leased |
| U.S.A. | 124 WYGANT ROAD, BLDG 2 | Horseheads | NY | 14845 | Leased |
| U.S.A. | 11700 KATY FREEWAY SUITE 200 | Houston | TX | 77079 | Leased |
| U.S.A. | 1315 WEST SAM HOUSTON PARKWAY NORTH, SUITE 180 (HOUSTON TECHNOLOGY CENTER) | Houston | TX | 77043 | Leased |
| U.S.A. | 401 NW 3RD STREET | Kensett | AR | 72082 | Leased |
| U.S.A. | 545 WEST PARK ROAD | Leetsdale | PA | 15056 | Leased |
| U.S.A. | 724  BRICKWORKS DRIVE | Leetsdale | PA | 15056 | Leased |

| U.S.A. | 1102 AIRPORT FERNWOOD ROAD | McComb | MS | 39648 | Leased |
|--------|----------------------------|--------|-----|-------|--------|
| U.S.A. | 2106 EAST COUNTRY ROAD 120 | Midland | TX | 79706 | Leased |
| U.S.A. | 6417 W INDUSTRIAL | Midland | TX | 79706 | Leased |
| U.S.A. | 148 MCINTYRE ROAD | Minden | LA | 71055 | Leased |
| U.S.A. | 200 ENTERPRISE DRIVE | Newcomerstown | OH | 43832 | Leased |
| U.S.A. | 3849 95TH AVE NW | Newtown | ND | 58763 | Leased |
| U.S.A. | 5909 N.W. EXPRESSWAY, SUITE 250 | OKC | OK | 73132 | Leased |
| U.S.A. | 2002 TILE FACTOREY ROAD | Pallestine | TX | 75801 | Leased |
| U.S.A. | 18 MURRAY CT, APT A | Parachute | CO | 81635 | Leased |
| U.S.A. | 2111 W 3RD | Pecos | TX | 79772 | Leased |
| U.S.A. | 164 Dudley Bernard Road, Suite 611 | Port Fourchon | LA | 70357 | Leased |
| U.S.A. | 104 14th Ave. NW | Sidney | MT | 59270 | Leased |
| U.S.A. | 402 10TH AVE NE | Sidney | MT | 59270 | Leased |
| U.S.A. | 3067 S. HWY 37 ACCESS | Three Rivers | TX | 78071 | Leased |
| U.S.A. | 6655 S. Lewis Ave, Suite 300 | Tulsa | OK | 74136 | Leased |
| U.S.A. | 2400-A CLARK AVE | Wellsville | OH | 43968 | Leased |
| U.S.A. | 11279 PERRY HIGHWAY SUITE 505 | Wexford | PA | 15090 | Leased |
| U.S.A. | 107 SE 3RD STREET | Wilburton | OK | 74578 | Leased |
| U.S.A. | 302 E 3RD ST | Wilburton | OK | 74578 | Leased |
| U.S.A. | 25 HICKS ROAD | Wright | WY | 82732 | Leased |
| UAE | Office # 802, Reef Tower, Jumeirah Lake Towers, P O Box 31968, Dubai - UAE | Dubai | | | Leased |
| UAE | Office # LB16140, Jebel Ali, Dubai | Dubai | | | Leased |
| U.S.A. | 220 Adams Circle | Pocasset, | OK | 73079 | Leased |
| U.S.A. | 27902 East Hardy Road | Spring | TX | 77373 | Leased |
| U.S.A. | 3512 North Voyager | Odessa | TX | 79764 | Leased |
| U.S.A. | 3518 North Voyager | Odessa | TX | 79764 | Leased |
| U.S.A. | 588 S.W. 6th Street | Tuttle | OK | 73089 | Leased |
| U.S.A. | 606 S.W. 6th Street | Tuttle | OK | 73089 | Leased |

## SCHEDULE 6.1.11 - INTELLECTUAL PROPERTY

Doc#: US1:12181788v5

<u>Patents</u>

[*See attached*]

QMAX Patent Matters -Pending Applications and Granted/Issued Patents

July 23, 2018

| File # | Title | Matter Type | Country | Status | Date Filed | Application # | Patent # | Grant Date |
|---|---|---|---|---|---|---|---|---|
| 22P01US | THERMAL PROCESS FOR TREATING HYDROCARBON-CONTAMINATED DRILL CUTTINGS | Utility - ORG | United States of America | Issued | Feb 20, 2002 | 10/080,993 | 6695077 | Feb 24, 2004 |
| 22P01WO | THERMAL PROCESS FOR TREATING HYDROCARBON-CONTAMINATED DRILL CUTTINGS | Utility - ORG | PCT | Completed | Feb 10, 2003 | PCT/CA03/00199 | | |
| 22P01WOEP | THERMAL PROCESS FOR TREATING HYDROCARBON-CONTAMINATED DRILL CUTTINGS | Utility - NSPCT | European Patent Office | Issued | Feb 10, 2003 | 3701409.9 | 1476258 | Apr 26, 2006 |
| 22P01WOMX | THERMAL PROCESS FOR TREATING HYDROCARBON-CONTAMINATED DRILL CUTTINGS | Utility - NSPCT | Mexico | Issued | Feb 10, 2003 | PA/A/04/008112 | 247576 | Jul 27, 2007 |
| 22P02US | METHOD FOR REDUCING FORMATION DAMAGE WHEN DRILLING FOR OIL AND GAS | Utility - ORG | United States of America | Issued | Jul 14, 1997 | 08/893,048 | 5877126 | Mar 2, 1999 |
| 22P03CA | FLUID TREATMENT PROCESS AND APPARATUS | Utility - ORG | Canada | Issued | Jan 25, 2006 | 2,533,953 | 2533953 | Nov 1, 2011 |
| 22P03MX | FLUID TREATMENT PROCESS AND APPARATUS | Utility - ORG | Mexico | Issued | Jan 30, 2006 | PA/A/06/001191 | 293759 | Dec 14, 2011 |
| 22P03MX2 | FLUID TREATMENT PROCESS AND APPARATUS | Utility - DIV | Mexico | Issued | Jan 30, 2006 | MX/A/11/008113 | 320445 | May 22, 2014 |
| 22P03US | FLUID TREATMENT APPARATUS | Utility - ORG | United States of America | Issued | Jan 25, 2006 | 11/307,143 | 7527726 | May 5, 2009 |
| 22P03US2 | FLUID TREATMENT PROCESS | Utility - DIV | United States of America | Issued | 24-Mar-09 | 12/410,248 | 7964101 | Jun 21, 2011 |
| 22P04US | APPARATUS AND PROCESS FOR REMOVING DRILLING FLUID FROM DRILL CUTTINGS | Utility - ORG | United States of America | Issued | Feb 17, 2000 | 09/506,085 | 6530438 | Mar 11, 2003 |
| 22P04WOEP | METHOD AND APPARATUS FOR CLEANING DRILL CUTTINGS | Utility - NSPCT | European Patent Office | Issued | Feb 16, 2000 | 00904762.2 | EP1153197 | Apr 14, 2004 |
| 22P05CA | DRILLING FLUID | Utility - ORG | Canada | Issued | Sep 14, 2004 | 2,481,543 | 2481543 | Oct 20, 2009 |
| 22P05US | DRILLING FLUID | Utility - ORG | United States of America | Issued | Apr 2, 2004 | 10/815,826 | 7332458 | Feb 19, 2008 |
| 22P05US2 | DRILLING FLUID | Utility - DIV | United States of America | Issued | Oct 18, 2006 | 11/582,311 | 7338593 | Mar 4, 2008 |
| 22P06MX | SISTEMA DE EMULSION SALINA DE BAJA DENSIDAD (LOW DENSITY SALINE EMULSION SYSTEM) | Utility - ORG | Mexico | Issued | Aug 24, 2010 | MX/A/10/009639 | 324847 | Oct 8, 2014 |
| 22P07EC | NEW TECHNOLOGY DEHYDRATOR - DNT | Utility - ORG | Ecuador | Pending | Mar 18, 2015 | IEPI-2015-10430 | | |
| 22P07US | DEHYDRATOR SYSTEM AND PROCESS OF USING THE SAME | Utility - CIP | United States of America | Published | Sep 23, 2016 | 15/275,064 | | |
| 22P07WO | New Technology Dehydrator - DNT | Utility - ORG | PCT | Published | Mar 26, 2015 | PCT/EC2015/000001 | | |
| 22P08MX | Q Obturoil (CBJ), Sistema Obturante Para Zonas de Perdida en Pozos Petroleros Y ... | Utility - ORG | Mexico | Pending | Jan 16, 2015 | Mx/a/2015/000725 | | |
| 22P09PR | 3-D Drilling Fluid Systems and Methods of Making and Using the Same | Prov - ORG | United States of America | Pending | Feb 13, 2017 | 62/458,272 | | |
| 22P09US | Improved Rheology Drilling Fluid and Method | Utility - NPNEW | United States of America | Pending | Feb 12, 2018 | 15/893,920 | | |
| 22P09WO | Improved Rheology Drilling Fluid and Method | Utility - ORG | PCT | Pending | Feb 12, 2018 | PCT/US2018/017827 | | |
| 22P10PR | DEHYDRATOR SYSTEM AND METHODS OF USING THE SAME | Prov - ORG | United States of America | Pending | Mar 8, 2017 | 62/468,919 | | |
| 22P11PR | METHOD AND SYSTEM FOR TREATMENT OF DRILLING WASTES | Prov - ORG | United States of America | Pending | Mar 1, 2018 | 62/637,122 | | |
| 22P12PR | DEHYDRATOR SYSTEM AND METHODS OF USING THE SAME | Prov - ORG | United States of America | Pending | Mar 12, 2018 | 62/641,956 | | |
| 22P13US | APPARATUS, METHODS AND SYSTEMS FOR REMOVING PARTICULATE IMPURITIES FROM ABOVE ABOVE A SHALE SHAKER | Utility - ORG | United States of America | Issued | May 16, 2013 | 13/896,317 | 9352264 | May 31, 2016 |

Trademarks

[*See attached*]

QMAX Pending and Registered Trademark Matters
July 18, 2018

| Title | File # | Country | Status | Application # | Date Filed | Registration # | Registration Date | GOODS AND DESCRIPTIONS:DESCRIPTION |
|---|---|---|---|---|---|---|---|---|
| QMAX SOLUTIONS INC. | 22M01CA | Canada | Registered | 1,125,697 | Dec 18, 2001 | TMA598329 | Dec 22, 2003 | Drilling fluid services, namely consulting services, implementation and management of drilling fluid systems, preparing, monitoring, testing, handling, transporting and disposing of drilling fluids and laboratory analysis. |
| | | | | | | | | Materials for the servicing of oil and gas well drilling operations, namely drilling fluid systems, drilling fluids, drilling fluid additives and completion fluids, namely alkalinity controls, bactericides, calcium removers, corrosion inhibitors, foam control agents, emulsifying agents, filtration control agents, flocculants, lost circulation control agents, lubricants, shale control inhibitors, surface active agents, fluid thinners, dispersants, viscosifying agents, and weighting materials. |
| QMAX SOLUTIONS INC. & Design | 22M02CA | Canada | Registered | 1,125,698 | Dec 18, 2001 | TMA598331 | Dec 22, 2003 | Drilling fluid services, namely consulting services, implementation and management of drilling fluid systems, preparing, monitoring, testing, handling, transporting and disposing of drilling fluids and laboratory analysis. |
| | | | | | | | | Materials for the servicing of oil and gas well drilling operations, namely drilling fluid systems, drilling fluids, drilling fluid additives and completion fluids, namely alkalinity controls, bactericides, calcium removers, corrosion inhibitors, foam control agents, emulsifying agents, filtration control agents, flocculants, lost circulation control agents, lubricants, shale control inhibitors, surface active agents, fluid thinners, dispersants, viscosifying agents, and weighting materials. |
| MICRONAIRE | 22M03CA | Canada | Registered | 1,095,726 | Mar 12, 2001 | TMA578678 | Apr 1, 2003 | Fluids used in the construction and maintenance of wells, namely drilling fluids. |
| | | | | | | | | Fluids used in the construction and maintenance of wells, namely workover fluids, completion fluids, stimulation fluids and spotting fluids. |
| | | | | | | | | Services related to the construction and maintenance of wells. |
| CBMAX | 22M04CA | Canada | Registered | 1,268,966 | Aug 17, 2005 | TMA668514 | Jul 24, 2006 | Polymers used as a drilling fluid for coal bed methane drilling |
| CBMAX | 22M04CN | China | Pending | 5163530 | Feb 17, 2006 | | | Polymers used as a drilling fluid for coal bed methane drilling |
| CBMAX | 22M04US | United States of America | Registered | 78/815,906 | Feb 15, 2006 | 3394888 | Mar 11, 2008 | Polymers used as a drilling fluid for coal bed methane drilling |
| POLYTAR SYSTEM | 22M05CA | Canada | Registered | 1,174,477 | Apr 9, 2003 | TMA619977 | Sep 20, 2004 | Drilling fluid services, namely consulting services, implementation and management of drilling fluid systems, preparing, monitoring, testing, handling, transporting and disposing of drilling fluids and laboratory analysis. |
| | | | | | | | | Materials for the servicing of oil and gas well drilling operations, namely drilling fluid systems, drilling fluids, drilling additives and completion fluids. |
| Q-STAR ENV | 22M06CA | Canada | Registered | 1,308,168 | Jul 6, 2006 | TMA743313 | Jul 10, 2009 | Derivative starch for use in combination with other products in drilling fluid systems. |
| QMAXDRILL | 22M07CA | Canada | Registered | 1,330,102 | Jan 3, 2007 | TMA706618 | Feb 6, 2008 | Drilling fluid additive. |
| QMAXDRILL | 22M07IN | India | Registered | 1528025 | Feb 5, 2007 | 863079 | Mar 30, 2007 | Drilling fluid additive. |
| SMART SEAL | 22M08CA | Canada | Registered | 1,384,442 | Feb 21, 2008 | TMA763694 | Apr 8, 2010 | Materials for the servicing of oil and gas well drilling operations, namely drilling fluids, drilling fluid additives namely, seepage loss control agents and loss circulation control agents. |
| MUDSTRIPPER & Design (COLOR) | 22M09CA | Canada | Registered | 1,624,995 | May 1, 2013 | TMA882070 | Jul 14, 2014 | Wastewater, effluent, sludge and slurry treatment systems for the purpose of clarifying wastewater for water reclamation, recycling and re-use; drilling fluid treatment systems for the purpose of removing cuttings and recovering and re-using drilling fluid; receiving boxes for wastewater, effluent, sludge, slurry and drilling fluid treatment systems. |

QMAX Pending and Registered Trademark Matters
July 18, 2018

| | Title | File # | Country | Status | Application # | Date Filed | Registration # | Registration Date | GOODS AND DESCRIPTIONS:DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| 19 | | | | | | | | | Custom design of wastewater, effluent, sludge, slurry and drilling fluid treatment systems; installation and operation of wastewater, effluent, sludge, slurry and drilling fluid treatment systems; consulting services in the field of water treatment, including wastewater clarification, process water management, and the treatment of wastewater, effluent, sludge, slurry and drilling fluid for the purpose of recovering and re-using clarified water and drilling fluid. |
| 20 | MUDSTRIPPER & Design (COLOR) | 22M09US | United States of America | Registered | 85/923,298 | May 3, 2013 | 4806315 | Sep 8, 2015 | Wastewater, effluent, sludge and slurry treatment systems for the purpose of clarifying wastewater for water reclamation, recycling and re-use; drilling fluid treatment systems for the purpose of removing cuttings and recovering and re-using drilling fluid; receiving boxes for wastewater, effluent, sludge, slurry and drilling fluid treatment systems |
| 21 | | | | | | | | | Custom design of wastewater, effluent, sludge, slurry and drilling fluid treatment systems; installation and operation of wastewater, effluent, sludge, slurry and drilling fluid treatment systems; consulting services in the field of water treatment, including wastewater clarification, process water management, and the treatment of wastewater, effluent, sludge, slurry and drilling fluid for the purpose of recovering and re-using clarified water and drilling fluid. |
| 22 | MUDSTRIPPER | 22M10CA | Canada | Registered | 1,624,991 | May 1, 2013 | TMA882353 | Jul 17, 2014 | Wastewater, effluent, sludge and slurry treatment systems for the purpose of clarifying wastewater for water reclamation, recycling and re-use; drilling fluid treatment systems for the purpose of removing cuttings and recovering and re-using drilling fluid; receiving boxes for wastewater, effluent, sludge, slurry and drilling fluid treatment systems |
| 23 | | | | | | | | | Custom design of wastewater, effluent, sludge, slurry and drilling fluid treatment systems; installation and operation of wastewater, effluent, sludge, slurry and drilling fluid treatment systems; consulting services in the field of water treatment, including wastewater clarification, process water management, and the treatment of wastewater, effluent, sludge, slurry and drilling fluid for the purpose of recovering and re-using clarified water and drilling fluid. |
| 24 | MUDSTRIPPER | 22M10US | United States of America | Registered | 85/923,318 | May 3, 2013 | 4806316 | Sep 8, 2015 | Wastewater, effluent, sludge and slurry treatment systems for the purpose of clarifying wastewater for water reclamation, recycling and re-use; drilling fluid treatment systems for the purpose of removing cuttings and recovering and re-using drilling fluid; receiving boxes for wastewater, effluent, sludge, slurry and drilling fluid treatment systems. |
| 25 | | | | | | | | | Custom design of wastewater, effluent, sludge, slurry and drilling fluid treatment systems; installation and operation of wastewater, effluent, sludge, slurry and drilling fluid treatment systems; consulting services in the field of water treatment, including wastewater clarification, process water management, and the treatment of wastewater, effluent, sludge, slurry and drilling fluid for the purpose of recovering and re-using clarified water and drilling fluid. |
| 26 | MUDSTRIPPER & Design | 22M11CA | Canada | Registered | 1,624,993 | May 1, 2013 | TMA894019 | Jan 15, 2015 | Wastewater, effluent, sludge and slurry treatment systems for the purpose of clarifying wastewater for water reclamation, recycling and re-use; drilling fluid treatment systems for the purpose of removing cuttings and recovering and re-using drilling fluid; receiving boxes for wastewater, effluent, sludge, slurry and drilling fluid treatment systems |

QMAX Pending and Registered Trademark Matters

July 18, 2018

| | Title | File # | Country | Status | Application # | Date Filed | Registration # | Registration Date | GOODS AND DESCRIPTIONS:DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| 27 | | | | | | | | | Custom design of wastewater, effluent, sludge, slurry and drilling fluid treatment systems; installation and operation of wastewater, effluent, sludge, slurry and drilling fluid treatment systems; consulting services in the field of water treatment, including wastewater clarification, process water management, and the treatment of wastewater, effluent, sludge, slurry and drilling fluid for the purpose of recovering and re-using clarified water and drilling fluid. |
| 28 | MUDSTRIPPER & Design | 22M11US | United States of America | Registered | 85/923,308 | May 3, 2013 | 4810801 | Sep 15, 2015 | Wastewater, effluent, sludge and slurry treatment systems for the purpose of clarifying wastewater for water reclamation, recycling and re-use; drilling fluid treatment systems for the purpose of removing cuttings and recovering and re-using drilling fluid; receiving boxes for wastewater, effluent, sludge, slurry and drilling fluid treatment systems |
| 29 | | | | | | | | | Custom design of wastewater, effluent, sludge, slurry and drilling fluid treatment systems; installation and operation of wastewater, effluent, sludge, slurry and drilling fluid treatment systems; consulting services in the field of water treatment, including wastewater clarification, process water management, and the treatment of wastewater, effluent, sludge, slurry and drilling fluid for the purpose of recovering and re-using clarified water and drilling fluid. |
| 30 | QMAX | 22M12BR1 | Brazil | Registered | 908742517 | Dec 11, 2014 | 908742517 | Jun 6, 2017 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 31 | QMAX | 22M12BR2 | Brazil | Allowed | 908742703 | Dec 11, 2014 | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desitters, mud cleaners, centrifuges and fluids processing units. |
| 32 | QMAX | 22M12BR3 | Brazil | Registered | 908742797 | Dec 11, 2014 | 908742797 | Jun 6, 2017 | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 33 | QMAX | 22M12CA | Canada | Registered | 1,706,048 | Dec 5, 2014 | TMA982433 | Oct 10, 2017 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 34 | | | | | | | | | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 35 | | | | | | | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desitters, mud cleaners, centrifuges and fluids processing units. |
| 36 | QMAX | 22M12CO | Colombia | Allowed | 14267531 | Dec 4, 2014 | | | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 37 | | | | | | | | | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 38 | | | | | | | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desitters, mud cleaners, centrifuges and fluids processing units. |
| 39 | QMAX | 22M12EC1 | Ecuador | Pending | IEPI-2015-142 | Jan 6, 2015 | | | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |

QMAX Pending and Registered Trademark Matters
July 18, 2018

| | Title | File # | Country | Status | Application # | Date Filed | Registration # | Registration Date | GOODS AND DESCRIPTIONS:DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| 40 | QMAX | 22M12EC2 | Ecuador | Pending | IEPI-2015-139 | Jan 6, 2015 | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units. |
| 41 | QMAX | 22M12EC3 | Ecuador | Pending | IEPI-2015-140 | Jan 6, 2015 | | | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 42 | QMAX | 22M12MX1 | Mexico | Registered | 1563820 | Jan 7, 2015 | 1541496 | May 26, 2015 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 43 | QMAX | 22M12MX3 | Mexico | Registered | 1563824 | Jan 7, 2015 | 1541497 | May 26, 2015 | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 44 | QMAX | 22M12PE | Peru | Registered | 601529 | Dec 30, 2014 | 11136 | Jul 9, 2015 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 45 | | | | | | | | | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 46 | | | | | | | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units. |
| 47 | QMAX | 22M12US | United States of America | Registered | 86/422,347 | Oct 13, 2014 | 4991090 | Jul 5, 2016 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; drilling muds and chemical drilling fluids for use in oil well drilling |
| 48 | | | | | | | | | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 49 | | | | | | | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units |
| 50 | Q Logo Design | 22M13BR1 | Brazil | Registered | 908742207 | Dec 11, 2014 | 908742207 | Jun 6, 2017 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 51 | Q Logo Design | 22M13BR2 | Brazil | Registered | 908742266 | Dec 11, 2014 | 908742266 | Jun 6, 2017 | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units. |
| 52 | Q Logo Design | 22M13BR3 | Brazil | Registered | 908742312 | Dec 11, 2014 | 908742797 | Jun 6, 2017 | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 53 | Q Logo Design | 22M13CA | Canada | Registered | 1,706,049 | Dec 5, 2014 | TMA954100 | Nov 2, 2016 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 54 | | | | | | | | | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 55 | | | | | | | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units. |

QMAX Pending and Registered Trademark Matters
July 18, 2018

| | Title | File # | Country | Status | Application # | Date Filed | Registration # | Registration Date | GOODS AND DESCRIPTIONS:DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| 56 | Q Logo Design | 22M13CO | Colombia | Registered | 14267512 | Dec 4, 2014 | 524797 | Sep 23, 2015 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 57 | | | | | | | | | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 58 | | | | | | | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units. |
| 59 | Q Logo Design | 22M13EC1 | Ecuador | Pending | IEPI-2015-132 | Jan 6, 2015 | | | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 60 | Q Logo Design | 22M13EC2 | Ecuador | Pending | IEPI-2015-134 | Jan 6, 2015 | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units. |
| 61 | Q Logo Design | 22M13EC3 | Ecuador | Pending | IEPI-2015-135 | Jan 6, 2015 | | | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 62 | Q Logo Design | 22M13MX1 | Mexico | Registered | 1563822 | Jan 7, 2015 | 1544760 | May 26, 2015 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 63 | Q Logo Design | 22M13MX2 | Mexico | Registered | 1563825 | Jan 7, 2015 | 1580188 | Jan 7, 2015 | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units. |
| 64 | Q Logo Design | 22M13MX3 | Mexico | Registered | 1563826 | Jan 7, 2015 | 1541498 | May 26, 2015 | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 65 | Q Logo Design | 22M13PE | Peru | Registered | 601396 | Dec 29, 2014 | 11064 | Jul 24, 2015 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 66 | | | | | | | | | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 67 | | | | | | | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units. |
| 68 | Q Logo Design | 22M13US | United States of America | Registered | 86/422,422 | Oct 13, 2014 | 4887728 | Jan 19, 2016 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 69 | | | | | | | | | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 70 | | | | | | | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units |
| 71 | Q'MAX | 22M14US | United States of America | Registered | 86/422,393 | Oct 13, 2014 | 5010534 | Aug 2, 2016 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling |

| | Title | File # | Country | Status | Application # | Date Filed | Registration # | Registration Date | GOODS AND DESCRIPTIONS:DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| 72 | | | | | | | | | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 73 | QMAX DO BRASIL | 22M15BR1 | Brazil | Registered | 908989547 | Feb 12, 2015 | 908989547 | Aug 22, 2017 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling |
| 74 | QMAX DO BRASIL | 22M15BR2 | Brazil | Registered | 908989733 | Feb 12, 2015 | 908989733 | Aug 22, 2017 | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units |
| 75 | QMAX DO BRASIL | 22M15BR3 | Brazil | Registered | 908990626 | Feb 12, 2015 | 908990626 | Aug 22, 2017 | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products |
| 76 | QVERT | 22M16MX1 | Mexico | Registered | 1575303 | Feb 6, 2015 | 1550780 | Feb 6, 2015 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling |
| 77 | QVERT | 22M16MX2 | Mexico | Registered | 1575306 | Feb 6, 2015 | 1543659 | Feb 6, 2015 | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units |
| 78 | QVERT | 22M16MX3 | Mexico | Registered | 1575307 | Feb 6, 2015 | 1547416 | Feb 6, 2015 | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products |
| 79 | Q'DNT | 22M17EC1 | Ecuador | Registered | 44995 | Aug 12, 2013 | 527914 | Mar 17, 2014 | |
| 80 | Q'DNT | 22M17EC2 | Ecuador | Registered | 44995 | Aug 12, 2013 | 470014 | Mar 17, 2014 | |
| 81 | Q'DNT | 22M17EC3 | Ecuador | Registered | 44991 | Aug 12, 2013 | 264714 | Mar 18, 2014 | |
| 82 | Q'DNT | 22M17EC4 | Ecuador | Registered | 44990 | Aug 12, 2013 | 209514 | Mar 18, 2014 | |
| 83 | Q'DNT | 22M17EC5 | Ecuador | Registered | 44983 | Aug 12, 2013 | 209314 | Mar 18, 2014 | |
| 84 | Q'DNT | 22M17EC6 | Ecuador | Registered | 44987 | Aug 12, 2013 | 209414 | Mar 18, 2014 | |
| 85 | Q OBTUROIL | 22M18MX | Mexico | Registered | 1627959 | Jun 30, 2015 | 1577791 | Jun 30, 2015 | Fluid sealing systems that form a network of high temperature and pressure resistance in a formation in order to prevent the migration of fluids into the formation. |
| 86 | Q OBTUROIL | 22M18MX2 | Mexico | Pending | 1627960 | Jun 30, 2015 | | | |
| 87 | QMAX Words+Design | 22M19BR1 | Brazil | Allowed | 910145067 | Oct 19, 2015 | | | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for oil drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling |
| 88 | QMAX Words_Design | 22M19BR2 | Brazil | Allowed | 910145385 | Oct 19, 2015 | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units |
| 89 | QMAX Words+Design | 22M19BR3 | Brazil | Allowed | 910145814 | Oct 19, 2015 | | | Engineering services in connection with drilling fluids and drilling fluid use, environmental planning, analysis of data from well sites, namely, data about well fluid design, well drill cuttings, well formation stability, well borehole stability and well fluid circulation, and technical engineering advice on the use of products for drilling, namely, drilling fluids, mud products, mud systems, and solids and control equipment. |
| 90 | QMAX Words+Design | 22M19CA | Canada | Allowed | 1,748,906 | Oct 2, 2015 | | | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for oil drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 91 | | | | | | | | | Cost analysis; business risk management analysis; providing advice to consumers regarding the selection of products to be purchased. |
| 92 | | | | | | | | | Waste management planning. |

QMAX Pending and Registered Trademark Matters
July 18, 2018

| | Title | File # | Country | Status | Application # | Date Filed | Registration # | Registration Date | GOODS AND DESCRIPTIONS:DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| 93 | | | | | | | | | Engineering services in connection with drilling fluids and drilling fluid use, environmental planning, analysis of data from well sites, namely, data about well fluid design, well drill cuttings, well formation stability, well borehole stability and well fluid circulation, and technical engineering advice on the use of products for drilling, namely, drilling fluids, mud products, mud systems, and solids and control equipment. |
| 94 | | | | | | | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units. |
| 95 | QMAX Words+Design | 22M19CO | Colombia | Registered | 15278692 | Nov 23, 2015 | 524797 | Sep 23, 2015 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for oil drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 96 | | | | | | | | | Engineering services in connection with drilling fluids and drilling fluid use, environmental planning, analysis of data from well sites, namely, data about well fluid design, well drill cuttings, well formation stability, well borehole stability and well fluid circulation, and technical engineering advice on the use of products for drilling, namely, drilling fluids, mud products, mud systems, and solids and control equipment. |
| 97 | | | | | | | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units. |
| 98 | QMAX Words+Design | 22M19EC1 | Ecuador | Pending | 2015-42246 | Oct 5, 2015 | | | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 99 | QMAX Words+Design | 22M19EC2 | Ecuador | Registered | 2015-42247 | Oct 5, 2015 | IEPI2016TI006326 | May 11, 2016 | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units. |
| 100 | QMAX Words+Design | 22M19EC3 | Ecuador | Pending | 2015-42250 | Oct 5, 2015 | | | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 101 | QMAX Words+Design | 22M19MX1 | Mexico | Registered | 1664247 | Oct 2, 2015 | 1615878 | Feb 19, 2016 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for use with drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 102 | QMAX Words+Design | 22M19MX3 | Mexico | Registered | 1664249 | Oct 2, 2015 | 1613359 | Feb 12, 2016 | Engineering services in connection with drilling fluids and drilling fluid use, cost and risk analysis, environmental and waste management planning, analysis of data from wellsites and technical advice on products. |
| 103 | QMAX Words+Design | 22M19PE | Peru | Registered | 636411 | Oct 7, 2015 | 13648 | Jun 21, 2016 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for oil drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling |
| 104 | | | | | | | | | Engineering services in connection with drilling fluids and drilling fluid use, environmental planning, analysis of data from well sites, namely, data about well fluid design, well drill cuttings, well formation stability, well borehole stability and well fluid circulation, and technical engineering advice on the use of products for drilling, namely, drilling fluids, mud products, mud systems, and solids and control equipment. |
| 105 | | | | | | | | | Petroleum industry power-operated equipment for drilling fluid processing and solids control, namely, shakers, desanders, desilters, mud cleaners, centrifuges and fluids processing units. |

QMAX Pending and Registered Trademark Matters
July 18, 2018

| | Title | File # | Country | Status | Application # | Date Filed | Registration # | Registration Date | GOODS AND DESCRIPTIONS:DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| 106 | QMAX Words+Design | 22M19US | United States of America | Registered | 86/779,606 | Oct 6, 2015 | 5237677 | Jul 4, 2017 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for oil drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 107 | | | | | | | | | Cost analysis; business risk management analysis; providing advice to consumers regarding the selection of products to be purchased. |
| 108 | | | | | | | | | Waste management planning. |
| 109 | | | | | | | | | Engineering services in connection with drilling fluids and drilling fluid use, environmental planning, analysis of data from well sites, namely, data about well fluid design, well drill cuttings, well formation stability, well borehole stability and well fluid circulation, and technical engineering advice on the use of products for drilling, namely, drilling fluids, mud products, mud systems, and solids and control equipment. |
| 110 | QFLOW | 22M22MX | Mexico | Pending | 1710374 | Feb 5, 2016 | | | Chemicals used in industry, science and photography, as well as in agriculture, horticulture and forestry; unprocessed artificial resins, unprocessed plastics; manures; fire extinguishing compositions; tempering and soldering preparations; chemical substances for preserving foodstuffs; tanning substances; adhesives used in industry, namely, treated sea water used as a drilling fluid. |
| 111 | QFLOW | 22M22US | United States of America | Pending | 87/128,061 | Aug 4, 2016 | | | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for oil drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 112 | QPLUG | 22M23MX | Mexico | Registered | 1710375 | Feb 5, 2016 | 1734514 | Feb 5, 2016 | Chemicals used in industry, science and photography, as well as in agriculture, horticulture and forestry; unprocessed artificial resins, unprocessed plastics; manures; fire extinguishing compositions; tempering and soldering preparations; chemical substances for preserving foodstuffs; tanning substances; adhesives used in industry, namely, treated sea water used as a drilling fluid. |
| 113 | QPLUG | 22M23US | United States of America | Allowed | 87/128,075 | Aug 4, 2016 | | | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for oil drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 114 | TRIMAX | 22M24CO | Colombia | Pending | SD2017/0002457 | Jan 17, 2017 | | | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for oil drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |
| 115 | TRIMAX | 22M24MX | Mexico | Registered | 1832864 | Dec 15, 2016 | 1733815 | Dec 16, 2016 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; drilling muds and chemical drilling fluids for use in oil well drilling; and chemical additives for oil drilling fluids. |
| 116 | TRIMAX | 22M24TT | Trinidad and Tobago | Pending | 52289 | Jan 5, 2017 | | | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; drilling muds and chemical drilling fluids for use in oil well drilling; and chemical additives for oil drilling fluids. |
| 117 | TRIMAX | 22M24US | United States of America | Registered | 87/270,230 | Dec 15, 2016 | 5414032 | Feb 27, 2018 | Chemical drilling fluids for use in subterranean wells, namely, drilling muds, completion fluids, workover fluids and wellbore fluids; chemical additives for oil drilling fluids; drilling muds and chemical drilling fluids for use in oil well drilling. |

| | Title | File # | Country | Status | Application # | Date Filed | Registration # | Registration Date | GOODS AND DESCRIPTIONS:DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| 118 | Q-ENVIRO | 22M25US | United States of America | Pending | 87/794,363 | Feb 12, 2018 | | | Waste treatment in the nature oil removal, solids removal, solids filtration and water separation and recycling of drill cuttings, oily slop wastes, water, solids and sludge from oil and gas drilling and fracking processes; chemical treatment of drilling wastes from oil and gas drilling operations including chemical flocculation; dewatering wastes from oil and gas drilling processes, fracking operations, and oil and gas production and refinery processes; segregating liquid wastes from dry cuttings; collection and recycling of waste water from oil and gas drilling processes and fracking operations; solids control and mud separation processes; consulting services in the field of waste treatments including technical consulting in the field of solid waste management, waste water removal and recycling of water from oil and gas drilling process and fracking operations. |
| 119 | | | | | | | | | Waste treatment apparatus for chemical treatment, oil removal, water separation and recycling, sedimentation, filtration, and flocculation of wastes from oil and gas drilling processes, shale gas drilling and fracking operations, and oil production and refinery processes; waste water treatment apparatus for wastes in the nature of drill cuttings, oily slop wastes, water, solids and sludge including oil removal, solids removal, solids filtration and water separation and recycling; apparatus for segregating liquid wastes from drilling cuttings; apparatus for mud separation processes; apparatus for solidification and stabilization of wet drilling cuttings; apparatus for dewatering sludge, waste, solids, drill cuttings, and drilling mud, and recycling waste water from oil and gas drilling operations. |
| 120 | MAXSITE | 22M26US | United States of America | Pending | 87/794,749 | Feb 12, 2018 | | | Computer software for hydraulic simulation of downhole drilling operations; computer software for optimizing and customizing drilling fluids to achieve a temperature and pressure profile in a well, a wellbore, or a borehole; computer software for drilling fluid calculations performed daily in drilling and drilling fluid management including capacity, mass balance, rheology, equivalent circulating density, pressure, temperature, and other parameters of overall well stability. |
| 121 | MUDSTRIPPER MAX | 22M27US | United States of America | Pending | 87/816,021 | Mar 1, 2018 | | | Custom design of wastewater, effluent, sludge, slurry and drilling fluid treatment systems. |
| 122 | | | | | | | | | Wastewater, effluent, sludge and slurry treatment systems for the purpose of clarifying wastewater for water reclamation, recycling and re-use, comprised of chemical treatment units, solids coagulation and flocculation units, solids separation and dewatering units, water and solids containment tanks; drilling fluid treatment systems for the purpose of removing cuttings and recovering and re-using drilling fluid, comprised of chemical treatment units, solids coagulation and flocculation units, solids separation and dewatering units, water and solids containment tanks; receiving boxes, sold as components for wastewater, effluent, sludge, slurry and drilling fluid treatment systems. |
| 123 | | | | | | | | | Installation of wastewater, effluent, sludge, slurry and drilling fluid treatment systems. |
| 124 | | | | | | | | | Consulting services in the field of water treatment, including wastewater clarification, process water management, and the treatment of wastewater, effluent, sludge, slurry and drilling fluid for the purpose of recovering and re-using clarified water and drilling fluid. |

QMAX Pending and Registered Trademark Matters
July 18, 2018

| | Title | File # | Country | Status | Application # | Date Filed | Registration # | Registration Date | GOODS AND DESCRIPTIONS:DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| 125 | ANCHOR | 22M28US | United States of America | Registered | 85/749,071 | Oct 9, 2012 | 4839121 | Oct 27, 2015 | Chemical additives for drilling muds; chemical additives for oil well drilling fluid; chemical preparations for use in industry, namely, the oil well drilling industry; chemicals for use in the field of oil exploration and production; chemicals used in industry, namely, the oil well drilling industry; chemicals used in oil drilling; all the foregoing not for use in processes related to the separation of oil/gas from water. |
| 126 | ANCHOR | 22M29US | United States of America | Registered | 85/983,278 | Oct 9, 2012 | 4737380 | May 19, 2015 | Well-site equipment rental, namely, rental of oil well drilling tools. |
| 127 | | | | | | | | | Customized Drilling Fluid Engineering Services. |
| 128 | ANCHOR DRILLING FLUIDS | 22M30US | United States of America | Registered | 85/539,883 | Feb 10, 2012 | 4735566 | May 12, 2015 | Chemical additives for drilling muds; chemical additives for oil well drilling fluid; chemical preparations for use in industry; chemicals for use in the field of oil exploration and production; chemicals used in industry; chemicals used in oil drilling. |
| 129 | | | | | | | | | Well-site equipment rental. |
| 130 | | | | | | | | | Customized drilling fluid engineering services. |
| 131 | ALL IN. EVERY WELL. | 22M31US | United States of America | Registered | 86/141,675 | Dec 12, 2013 | 4879290 | Jan 5, 2016 | Providing oilfield services to the oil and natural gas industry, namely, oil and gas well drilling on oil and gas wells, the rental of oil well drilling tools and equipment for the oil and gas wells and drilling waste-water treatment and/or disposable services, namely, hazardous waste disposal services to the oil and natural gas industry. |
| 132 | CLEARPLEX COMPLETE | 22M32US | United States of America | Registered | 86/141,722 | Dec 12, 2013 | 4822825 | Sep 29, 2015 | Chemicals for use in the drilling industry, namely, anionic polymers, or a blend of two or more anionic polymers and water. |
| 133 | CLEARPLEX I | 22M33US | United States of America | Registered | 86/141,700 | Dec 12, 2013 | 4822823 | Sep 29, 2015 | Chemicals for use in the drilling industry, namely, anionic polymers; anionic polymers used to coat solid materials in dewatering applications to aid in the mechanical separation of solids. |
| 134 | CLEARPLEX II | 22M34US | United States of America | Registered | 86/141,705 | Dec 12, 2013 | 4822824 | Sep 29, 2015 | Chemicals for use in the drilling industry, namely, anionic polymers; anionic polymers used to coat solid materials in dewatering applications to aid in the mechanical separation of solids. |

**Terra Oilfield Solutions, LLC Trademarks**

| Mark | App. No. | App. Date | Reg. No. | Reg. Date | Owner |
|---|---|---|---|---|---|
| <br>ENVIRONMENTAL DRILLING SOLUTIONS WASTE REDUCTION & RECYCLING | 85892903 | April 2, 2013 | 4,639,321 | November 18, 2014 | TERRA OILFIELD SOLUTIONS, LLC |
| <br>ENVIRONMENTAL DRILLING SOLUTIONS | 85866525 | March 4, 2013 | 4,635,168 | November 11, 2014 | TERRA OILFIELD SOLUTIONS, LLC |
|  | 85886048 | March 25, 2013 | 4,535,867 | May 27, 2014 | TERRA OILFIELD SOLUTIONS, LLC |
|  | 85866541 | March 4, 2013 | 4,535,778 | May 27, 2014 | TERRA OILFIELD SOLUTIONS, LLC |

<u>Copyrights</u>

None.

Doc#: US1:12181788v5

## SCHEDULE 6.1.12 - INSURANCE POLICIES

1. <u>Global Coverage</u> – See attached.

2. <u>Foreign Placements</u> – See attached.

3. <u>Trade Credit Policy</u> – Policy Number N16812535 issued by Ace American Insurance Company for QMax America Inc. The Policy is effective as of May 22, 2018 and terminates on May 21, 2019. The policy has a $100 million limit of liability.

4. <u>D&O Policies</u>

   Policy Number 1-582-76-45 issued by AIG via National Union Fire Insurance Company of Pittsburgh, Pa. for Q'Max Solutions Inc.  The Policy is effective as of July 1, 2018 and terminates July 1, 2019. The policy has a $10 million limit of liability.

   Side A Policy Number 01-584-10-84 issued by AIG via National Union Fire Insurance Company of Pittsburgh, Pa. for Q'Max Solutions Inc.  The Policy is effective as of July 1, 2018 and terminates July 1, 2019. The policy has a $5 million limit of liability.




**Q'MAX SOLUTIONS, INC.**
**2018 - 2019 SCHEDULE OF INSURANCE**

last updated: 06/25/2018

| Coverage*/Policy No. | Insurer | Term | Limit of Liability | | |
|---|---|---|---|---|---|
| **General Liability**<br>Policy No. TB2-641-445252-038 | Liberty Mutual Fire Insurance Company<br><br>A.M. Best Rating<br>A XV | 06/01/2018 -<br>06/01/2019 | $ 2,000,000 Each Occurrence Limit<br>$ 2,000,000 Fire Damage Limit ( Any One Fire)<br>$ 10,000 Medical Expense Limit (Any One Person)<br>$ 2,000,000 Person & Advertising Injury Limit (Any One Person or Organization)<br>$ 4,000,000 Gen. Aggregate Limit (Other Than Products/Completed Operations)<br>$ 4,000,000 Products/Completed Operations Aggregate Limit | **Premium**<br><br><br><br><br>**Retention:** | $231,489.00<br><br><br><br><br>Guaranteed Cost |
| **Workers' Compensation/**<br>**Employer's Liability**<br>Policy No. WC7-641-445252-018 | Liberty Insurance Corporation<br><br>A.M. Best Rating<br>A XV | 06/01/2018 -<br>06/01/2019 | Statutory Workers' Compensation<br>Employers' Liability:<br><br>$ 1,000,000 each Bodily Injury by Accident<br>$ 1,000,000 policy limit for Bodily Injury by Disease<br>$ 1,000,000 each employee Bodily Injury by Disease | **Premium**<br>**TRIA***<br><br>**Fees/Assess.**<br><br><br><br>**Retention:** | $446,726.00<br>$8,779.00<br><br>$3,143.00<br>$449,869.00<br>*included in premium<br><br>Guaranteed Cost |
| **Automobile Liability**<br>Policy No. AS2-641-445252-028 | Liberty Mutual Fire Insurance Company<br><br>A.M. Best Rating<br>A XV | 06/01/2018 -<br>06/01/2019 | $2,000,000 Combined Single Limit — Symbol 1<br>Statutory Personal Injury Protection — Symbol 5<br>Statutory Uninsured/Underinsured Motorist — Symbol 6<br>Comprehensive — Symbol 2<br>Collision — Symbol 2<br><br>**Physical Damage Deductible:**<br>GVW ≤ 20,000 II $1,000<br>GVW ≥ 20,001 II $5,000 | **Premium**<br><br><br><br>**Retention:** | $446,540.00<br><br><br><br>Guaranteed Cost |
| **Foreign Casualty Package**<br>Policy No. PHFD38247918 001<br>General Liability | ACE American Ins. Co.<br><br>A.M. Best Rating<br>A++ XV | 06/01/2018 -<br>06/01/2019 | **General Liability:**<br>$ 2,000,000 Each Occurrence<br>$ 2,000,000 General Aggregate<br>$ 2,000,000 Products/Completed Operations Aggregate<br>$ 2,000,000 Personal and Advertising Injury Limit (any on person or org)<br>$ 25,000 Medical Expense (any one person)<br>$ 2,000,000 Damage to Premises Rented to You Limit (any one premises)<br>$ 4,000,000 Controlled Master Program Capping of Limits Aggregate<br><br>Employee Benefits Liability:<br>$ 2,000,000 Each Claim<br>$ 2,000,000 Annual Aggregate | **Master GL Premium**<br><br><br><br><br><br><br><br>**Deductibles:**<br>ALAE erodes the retention. | $7,227.00<br><br><br><br><br><br><br><br>$1,000 per claim<br>Employee Benefits Liability |
| Foreign Casualty Package<br>Auto Liability | Included in Above | | **Auto:**<br>$ 1,000,000 Each Accident | **Contingent Auto Premium**<br><br><br>**Deductibles:** | $2,675.00<br><br><br>Nil |

*This Schedule of Policies provides a generalized and abbreviated description of the principal features of your insurance program.  Please refer to the Policy form itself for a complete description of the coverage(s) or contact your Account Executive.




| Coverage*/Policy No. | Insurer | Term | Limit of Liability | | |
|---|---|---|---|---|---|
| Foreign Casualty Package<br>Foreign Voluntary<br>Workers Compensation/EL | Included in Above | | **Employers Responsibility:**<br>Benefits for Voluntary Compensation<br>North Americans: State of Hire<br>Third Country Nationals: Country of Origin<br>Local Nationals: Employers Liability Only | **Employers Responsibility Premium** | $17,940.00 |
| | | | | **Deductible:** | Nil |
| | | | Executive Assistance Services:<br>$1,000,000 Policy Limit for Medical Assistance Services | | |
| | | | Employers Liability Coverage<br>$ 1,000,000 Bodily Injury by Accident (each accident)<br>$ 1,000,000 Bodily Injury by Disease including endemic disease (each employee)<br>$ 1,000,000 Bodily Injury by Disease including by endemic disease (policy limit) | | |
| | | | | Master Policy Premium | $27,842.00 |
| | | | | Local Admitted GL Premium | $62,731.00 |
| | | | | **Total Annual Premium** | **$90,573.00** |
| **$25MM Umbrella**<br>Policy No. 42-UMO-305275-01<br><br>A.M. Best Rating<br>A++ XV | National Fire & Marine<br>Insurance Company | 06/01/2018 -<br>06/01/2019 | $ 25,000,000 Occurrence<br>$ 25,000,000 Other Aggregate<br>$ 25,000,000 Products/Completed Operations Aggregate | **Premium**<br>**TX Surplus Lines Tax**<br>**TX Stamping Fee**<br>**Total Premium** | $400,000.00<br>$19,400.00<br>$600.00<br>**$420,000.00** |
| **Terrorism**<br>Policy No. PRPNA1802049<br><br>A.M. Best Rating<br>A XV | Lloyd's of London<br>Syndicate 1084 | 06/01/2018 -<br>06/01/2019 | $ 5,000,000 Per Occurrence<br>$ 5,000,000 General Aggregate<br>Excludes USA, Barbados & Canada locations | **Premium**<br><br>**Deductible** | $38,000.00<br><br>$25,000 per occ |
| **Master Property**<br>Policy No. GBP002297<br><br>A.M. Best Rating<br>A+ XV | Allianz Global Corporate &<br>Specialty SE | 06/01/2018 -<br>06/01/2019 | $ 25,000,000 Per Occurrence<br><br>Sublimits Various<br><br>Deductible Various | **Non U.S. Premium**<br>**U.S. Allocated Premium**<br><br><br>**TX Surplus Lines Tax**<br>**TX Stamping Fee**<br>**Total Premium** | $180,840.00<br>$145,660.00<br><br><br>$7,064.51<br>$218.49<br>$333,783.00 |
| **Business Travel Accident**<br>Policy No. GTP 0009149743<br><br>A.M. Best Rating<br>A XV | National Union Fire Insurance<br>Company of Pittsburgh, PA | 08/01/2016 -<br>8/1/2017 | $15,000,000 Per Accident (Aggregate Limit of Indemnity)<br><br>**Eligibility**<br>Class I: All Executive Staff: Direct reports of the CEO<br>Class II: All Managers not in Class I<br>Class III: All Spouses of Class I & II Insureds<br>Class IV: All Dependent Child(ren) of Class I & II Insureds<br><br>**Hazards**<br>Class I: 24 Hour Business Travel; War Risk<br>Class II: 24 Hour Business Travel; War Risk | **Premium** | $2,416.00 |

*This Schedule of Policies provides a generalized and abbreviated description of the principal features of your insurance program. Please refer to the Policy form itself for a complete description of the coverage(s) or contact your Account Executive.




| Coverage*/Policy No. | Insurer | Term | Limit of Liability |
|---|---|---|---|

Class III:    Family accompanying the insured
Class IV:    Family accompanying the insured

**Hazards Applicable**
H-12: 24-Hour Accident Protection While On A Trip (Business Only)
H-39: War Risk (Business Only)
H-44: Fmily Accompanying the Insured (Insured Dependents Only)

**Principal Sum/AD&D Benefit**
Class I:    3 x Annual Salary up to $1,000,000
Class II:    3 x Annual Salary up to $500,000
Class III:    $50,000
Class IV:    $25,000

**Benefits Applicable - Various Sublimits**
B-1 Accidental Death
B-2 Accidental Dismemberment & Paralysis
B-4 Bereavement and Trauma Counseling Benefit
B-7 Coma Benefit (Revised)
B-10 Day Care Benefit
B-13 Emergency Evacuation with Family Travel
B-16 Home Alteration and Vehicle Modification Benefit
B-25 Rehabilitation Benefits
B-26 Repatriation of Remains Benefit Rider
B-28 Seat Belt and Air Bag (Percentage of Principal Sum) Benefit Rider (Revised)
B-30 Tuition Benefit
B-42 Security Evacuation
B-44 Attendor Benefit
B-45 Bedside Visitor Benefit Rider

**Q'Max Foreign Placements**

| Country | Coverage | Carrier | Limits | Eff Date | Exp Date | Premium* |
|---|---|---|---|---|---|---|
| BRAZIL | GL & Products/Completed Operations (EL Extension if applicable) | Ace American Insurance Company | $2MM Occurrence $2MM Aggregate | 6/1/2018 | 6/1/2019 | $5,000.00 |
| CANADA | GL & Products/Completed Operations/EL Extension | Ace American Insurance Company | $2MM Occurrence $2MM Aggregate | 6/1/2018 | 6/1/2019 | $10,221.00 |
| | Property | Allianz | Various - See Global Master Policy | 6/1/2018 | 6/1/2019 | |
| | Auto | Royal & Sun Alliance (RS)  through BFL | $1,000,000 per incident | 6/1/2018 | 6/1/2019 | $74,897 CAD |
| COLOMBIA | GL & Products/Completed Operations/EL Extension | Ace American Insurance Company | $2MM Occurrence $2MM Aggregate | 6/1/2018 | 6/1/2019 | $18,394.00 |
| | Property | Allianz | Various - See Global Master Policy | 6/1/2018 | 6/1/2019 | |
| | Auto | Liberty (for vehicle MKW 866) Sura Global (for vehicle RKH 786) | Liability: USD 851/425 (per loss/per person) Own Damage/Vehicle Value: COL49,600,000 (USD 15,030) Deductible: | 6/1/2018 | 6/1/2019 | 6.800.000 COP 5.651.000 COP *expiring premium shown. Pending confirmation of renewal premium |
| EGYPT | GL & Products/Completed Operations/EL Extension | Ace American Insurance Company | $2MM Occurrence $2MM Aggregate | 6/1/2018 | 6/1/2019 | $3,000.00 |
| IRAQ | GL & Products/Completed Operations/EL Extension | Ace American Insurance Company | $2MM Occurrence $2MM Aggregate | 6/1/2018 | 6/1/2019 | $4,100.00 |
| | Property - Villa No. 153, Pank City | UR International Insurance Company | per schedule | 6/1/2018 | 5/31/2019 | $10,907.00 |
| | Workers's Comp./EL | Asia Insurance Company | Various per insured member | 6/1/2018 | 5/31/2019 | $7,897.00 |
| KENYA | GL & Products/Completed Operations/EL Extension | Ace American Insurance Company | $2MM Occurrence $2MM Aggregate | 6/1/2018 | 6/1/2019 | $3,000.00 |
| | Workers Compensation Common Law | The Heritage Insurance Company Kenya Ltd. | Non-renewed. To be re-instated once project starts. | | | |
| | Work Injury Benefits | The Heritage Insurance Company Kenya Ltd. | | | | |
| MEXICO | GL & Products/Completed Operations/EL Extension | | $2MM Occurrence $2MM Aggregate | 6/1/2018 | 6/1/2019 | $19,005.00 |
| | Property | Allianz | Various - See Global Master Policy | 6/1/2018 | 6/1/2019 | |
| | Auto | ABA | Third party liability - $3,000,000 Deductible - 20% Property Damage - ACV - Ded: 3% Burglary-Theft - ACV - Ded: 5% | 6/1/2018 | 6/1/2019 | 445,142 MXN *expiring premium shown. Pending confirmation of renewal premium |

| Country | Coverage | Carrier | Limits | Eff Date | Exp Date | Premium* |
|---------|----------|---------|--------|----------|----------|----------|
| **UNITED ARAB EMIRATES** | Local Combined Package (Property, GL, WC) - DMCC | American Home Assurance Company (AIG) | Various | 6/2/2018 | 6/1/2019 | 4,762 AED |
| | Local Combined Package (Property, GL, WC) - JAFZA | American Home Assurance Company (AIG) | Various | 5/11/2018 | 5/10/2019 | 1,161 AED |

Grey highlight - locally placed policies

*Premium shown as USD unless stated otherwise

## SCHEDULE 6.1.13 - MATERIAL AGREEMENTS

1.      Perfolat Loan Agreement

## SCHEDULE 6.1.14 - LABOUR MATTERS

| Country | Company | Contract Details |
|---|---|---|
| Mexico | Qmax Mexico S.A. de C.V. | Contract with Union Sindical de Obreros de la Industria de la Construccion; White Union to cover Qmax Mexico; still in force |

Doc#: US1:12181788v5

## SCHEDULE 6.1.15 - ENVIRONMENTAL MATTERS

Q'Max Solutions Inc. and certain of its subsidiaries are in the business of procuring, mixing, selling or otherwise distributing to its customers a variety of chemicals and substances used in the oil and gas drilling, solids control and waste management services industry. Some of these substances are considered hazardous. Accordingly, it is hereby noted that Hazardous Materials are routinely purchased, transported on company owned or hired transport, stored in company operated or leased warehouses, and sold or otherwise distributed to customers. Currently, the company's waste management business is only in Algeria and Iraq.  This waste management business treats and disposes of hazardous waste and therefore, from time to time during the delivery of its waste treatment and disposal services, handles, treats, transports and disposes of Hazardous Materials.

1.  *Disclosure of any emissions, spills, releases, or discharges into or upon (i) the air; (ii) soils, or any improvements located thereon; (iii) surface water or groundwater; or (iv) any sewer, septic system or waste treatment, storage or disposal system servicing the premises, of any Hazardous Materials at or from any Land owned by any Credit Party or any of the Leased Properties that would reasonably be expected to have a Material Adverse Effect*:

    None.

2.  *Disclosure of any complaint, order, directive, claim, citation, or notice from any Governmental Authority or any other Person has been received by any Credit Party with respect to (i) air emissions; (ii) spills, releases, or discharges to soils or improvements located thereon, surface water, groundwater or any sewer, septic system or waste treatment, storage or disposal systems servicing any Land owned by any Credit Party or any of the Leased Properties; (iii) noise emissions; (iv) solid or liquid waste disposal; (v) the use, generation, storage, transportation, or disposal of Hazardous Materials; or (vi) other applicable Requirements of Environmental Law affecting any Land owned by any Credit Party or the Leased Properties, in each case, which would reasonably be expected to result in a Material Adverse Change*:

    None.

3.  *Disclosure of any legal or administrative proceedings, investigations or claims outstanding or to the Credit Parties' knowledge now threatened or pending, with respect to the presence on or under, or the discharge, emission, spill, radiation or disposal into, upon or from any Land owned by any Credit Party or any of the Leased Properties of any Hazardous Material, including the discharge, emission, spill, radiation or disposal of any Hazardous Material from any such Land or Leased Properties onto or into the atmosphere or any adjacent land, watercourse or body of water; nor are there any material matters under discussion with any Governmental Authority relating thereto*:

    None.

Doc#: US1:12181788v5

## SCHEDULE 6.1.16 - LITIGATION

None.

Doc#: US1:12181788v5

## SCHEDULE 6.1.17 – PENSION PLANS

None.

Doc#: US1:12181788v5

## SCHEDULE 6.1.23 – TAXES

None.

Doc#: US1:12181788v5

## SCHEDULE 6.1.33 – ELIGIBLE APPROVED CONTRACTS

A.  **Mexican Eligible Approved Contracts**

1.  Contract No. 423024819 entered by and between Pemex Exploracion y Produccion ("PEP") and QMAX Mexico S.A. de C.V. ("QMAX") on April 22, 2014.

2.  Contract 423023813 entered by and between PEP and QMAX on July 27, 2013.

3.  Contract 423014804 entered by and between PEP and QMAX on May 29, 2014.

4.  Contract 423024814 entered by and between PEP and QMAX on April 15, 2014.

5.  Contract 423114804 entered by and between PEP and QMAX on Aril 10, 2014.

B.  **Colombian Eligible Approved Contracts**

1.  Services agreement No.5500002383 between Meta Petroleum Corp and Qmax Solutions Colombia dated January 14, 2013.

2.  Services agreement No. C150413, between Hocol S.A. and Qmax Solutions Colombia. Amendment No. 5 dated May 15, 2015.

3.  Services agreement No.411002023 between Parex Resources  and Qmax Solutions Colombia dated March 25, 2015.

4.  Services agreement No. 411002049 between Parex Resources  and Qmax solutions Colombia, dated May 1, 2015.

5.  Services agreement No. CNE-049-215 between CNE Oil and Gas and Qmax Solutions Colombia dated July 2015.

6.  Services agreement No.8000000861 between Petrominerales and Qmax Solutions Colombia dated April 22, 2015.

7.  Services  agreement  No.UCN-UP-222/30000906 between Ecopetrol and Qmax Solutions Colombia dated May 27, 2016.

8.  Services agreement No. GEO-006-2016 between Geoproduction Oil and Gas  and Qmax Solutions Colombia dated July 1, 2016.

9.  Services agreement number CEC-022-2016/Act of Liquidation between CNE Oil and Gas  and Qmax Solutions Colombia dated December 1, 2016.

10.  Services agreement No.8100000346 between Vetra Exploracion y Produccion Colombia S.A.S.  and Q'Max Solutions Colombia dated January 28, 2017.

11.  Services Agreement   9800001332 between Metapetroleum Corp. Pacific Exploration & Production) and QMax Solutions Colombia dated November 21, 2016

Doc#: US1:12181788v5

12.    Services Agreement No. 8010013642  between Cepsa Colombia S.A.  and Qmax Solutions Colombia dated March 15, 2017.

C.    **Algerian Eligible Approved Contracts**

1.    Contract No. 07/SH-AMT-FOR-DEO/15 between Sonatrach Drilling Division and Environmental Solutions ("ES") and The Egyptian Mud Engineering & Chemicals Company ("EMEC") dated March 8, 2015.

2.    Contract No. 04/SH-AMT-FOR-DEO15 between Sonatrach Drilling Division and ES and EMEC dated March 8, 2015.

3.    Contract No. 02/SH.E.-P/FOR/HSE/16 between Sonatrach Drilling Division and ES dated March 1, 2016.

4.    Contract No. 101/HMD/DEP/2015 between Sonatrach and ES dated December 20, 2016.

5.    Contract No GW/ALG/LOG/2018-030 between GWDC and ES dated March 27, 2018.

6.    Contract No. C13/16 23636-992 between Sonatrach-Organization Ourhoud and SARL Environmental Solutions Algeria ("ES-Algeria") dated September 2, 2017.

7.    Contract No. CO-16-029-FOR between Groupement Timimoun and ES-Algeria dated December 20, 2016.

8.    Contract No. EXP X HSE 02/16 between Arzew and ES-Algeria dated April 12 2018.

D.    **Egyptian Eligible Approved Contracts**

1.    Contract No. OP/07/2011 between SUCO and Environmental Solutions ("ES") dated April 3, 2011.2. Contract No. ST-CON-014-05 between Sino Tharwa and Environmental Solutions ("ES") dated February 27, 2014.

2.    Contract No. 928-2015/206 between GPC and Environmental Solutions ("ES") dated April 1, 2018.

3.    Contract No. 2100000493 between Petrobel and Environmental Solutions ("ES") dated April 1, 2016.

4.    Contract No. QPC-56B between Qarun and Environmental Solutions ("ES") dated November 24, 2015.

5.    Contract No. 46000002651 between SDX and Environmental Solutions ("ES") dated January 2 , 2017.

Doc#: US1:12181788v5

## SCHEDULE 7.2.3 – INVESTMENTS

None.

## SCHEDULE 7.2.6 – TRANSACTIONS WITH AFFILIATES

None.

Doc#: US1:12181788v5

## SCHEDULE 9.1 – POST-CLOSING SCHEDULE

### I.      Non-U.S./Canada Collateral Documentation

*Mexico*:

Within 60 calendar days following the later of (x) receipt by QMax de México, S.A. de C.V. ("QMax Mexico") of signed pages on behalf of the Agent required to proceed and complete the following steps, as applicable, and (y) the Amendment and Restatement Date (or such later date as the Agent may agree in its reasonable discretion), QMax Mexico shall:

i.      execute and cause to be delivered to the Agent a notarized and ratified amendment to that certain Non-Possessory Pledge Agreement, dated as of July 31, 2014 (the "Mexico Non-Possessory Pledge Agreement"), by and between QMax Mexico, as pledgor, and the Agent, as pledgee, reaffirming the non-possessory pledge created in favor of the Agent under the Mexico Non-Possessory Pledge Agreement;

ii.      execute and cause to be delivered to the Agent a notarized and ratified amendment to that certain Stock Pledge Agreement, dated as of July 31, 2014 (the "Mexico Stock Pledge Agreement"), by and among Q'Max Solutions Holdings Inc. and 1356760 Alberta Ltd., as pledgors, and the Agent, as pledgee, reaffirming the stock pledge created in favor of the Agent under the Mexico Stock Pledge Agreement;

iii.      execute and cause to be delivered to the Agent the notarized Shareholders' Meeting Minutes of QMax Mexico approving, among other matters, the amendments and ratifications of the Mexico Non-Possessory Pledge Agreement and the Mexico Stock Pledge Agreement; and

iv.      cause the registration of the Mexico Non-Possessory Pledge Agreement and the Mexico Stock Pledge Agreement in the *Registro Único de Garantías Mobiliarias* and the registration of the Mexico Stock Pledge Agreement in the share registry book (*libro de registro de acciones*) of QMax Mexico, as applicable.

*Egypt*:

Within 60 calendar days following the later of (x) receipt by Environmental Solutions for Petroleum Services – Free Zone – S.A.E. ("Q'Max Egypt") of signed pages on behalf of the Agent required to proceed and complete the following steps, as applicable, and (y) the Amendment and Restatement Date (or such later date as the Agent may agree in its reasonable discretion), Q'Max Egypt shall:

i.      execute and cause to be delivered to the Agent an assignment agreement (the "Egypt Assignment Agreement"), by and between Q'Max Egypt, as assignor, and the Agent, as assignee, pursuant to which Q'Max Egypt will assign its current and future insurance policies to the Agent;

ii.      cause to be delivered to the relevant insurance providers of Q'Max Egypt a notice of assignment with respect to the Egypt Assignment Agreement;

iii.      cause an acknowledgment of assignment from the relevant insurance providers of Q'Max Egypt to be delivered to the Agent;

iv.       execute and cause to be delivered to the Agent a guarantee agreement (the "<u>Egypt Guarantee</u>"), by and between Q'Max Egypt, as guarantor, and the Agent, pursuant to which Q'Max Egypt will guarantee the prompt payment by the Borrowers of the payment obligations under the Restated and Amended Credit Agreement;

v.       execute and cause to be delivered to the Agent the pledge of shares agreement (the "<u>Egypt Share Pledge Agreement</u>"), by and among the Canadian Borrower, Q'Max Solutions Holdings Inc. and 1356760 Alberta Ltd., as pledgors, the Agent, as pledgee, and Q'Max Egypt, pursuant to which the pledgors will pledge their shares in favor of the Agent; and

vi.      annotate the share pledge on share certificates signed by two members of the managing board of Q'Max Egypt and the share ownership register of Q'Max Egypt.

*Algeria*:

Within 60 calendar days following the later of (x) receipt by SARL Environmental Solutions Algeria ("<u>Q'Max Algeria</u>") of signed pages on behalf of the Agent required to proceed and complete the following steps, as applicable, and (y) the Amendment and Restatement Date (or such later date as the Agent may agree in its reasonable discretion), Q'Max Algeria shall cause to be delivered to the Agent:

i.       a copy of the minutes of the extraordinary shareholders meeting of Q'Max Algeria authorizing Q'Max Egypt to pledge for the benefit of the Lenders (represented by the Agent) the issued and outstanding shares of Q'Max Algeria owned by Q'Max Egypt; and

ii.      a notarized share pledge agreement in favor of the Lenders (represented by the Agent) in respect of the issued and outstanding shares of Q'Max Algeria owned by Q'Max Egypt.

*Colombia*:

Within 60 calendar days following receipt by Central Procurement Inc. ("<u>Central Procurement</u>") of the following promissory notes (or such later date as the Agent may agree in its reasonable discretion), Central Procurement shall:

iii.     upon return by the Agent of that certain Promissory Note 01, dated as of July 25, 2014, by Central Procurement in favor of The Bank of Nova Scotia, execute, cause to be notarized and registered and cause to be delivered to the Agent a new promissory note reflecting the terms and commitments of this Agreement, in favor of Business Development Bank of Canada;

iv.      upon return by the Agent of that certain Promissory Note 02, dated as of July 25, 2014, by Central Procurement in favor of HSBC Bank, USA, N.A., execute, cause to be notarized and registered and cause to be delivered to the Agent a new promissory note reflecting the terms and commitments of this Agreement, in favor of HSBC Bank, USA, N.A.;

v.       upon return by the Agent of that certain Promissory Note 03, dated as of July 25, 2014, by Central Procurement Inc. in favor of HSBC Bank Canada, execute, cause to be notarized and registered and cause to be delivered to the Agent a new promissory note reflecting the terms and commitments of this Agreement, in favor of HSBC Bank Canada;

vi.      upon return by the Agent of that certain Promissory Note 04, dated as July 25, 2014, by Central Procurement in favor of Bank of Montreal, execute, cause to be notarized and

registered and cause to be delivered to the Agent a new promissory note reflecting the terms and commitments of this Agreement, in favor of Bank of Montreal; and

vii.     upon return by the Agent of that certain Promissory Note 05, dated as July 25, 2014, by Central Procurement in favor of Export Development Canada, execute, cause to be notarized and registered and cause to be delivered to the Agent a new promissory note reflecting the terms and commitments of this Agreement, in favor of Export Development Canada.

*Ecuador*:

Within 60 calendar days following receipt by QMAXECUADOR S.A. ("QMax Ecuador") of signed pages on behalf of the Agent required to proceed and complete the following steps (or such later date as the Agent may agree in its reasonable discretion), QMax Ecuador shall:

i.     execute and cause to be delivered to the Agent a notarized termination agreement (the "Termination Agreement") in respect of that certain Corporate Guarantee Agreement, dated as of July 31, 2014, by and between QMax Ecuador and the Agent, and cause such Termination Agreement to be registered.

## II.     U.S. Real Estate

At any time after 60 calendar days following the Amendment and Restatement Date, solely in the event that the Borrowers wish to include any of the following properties in the Borrowing Base, the Borrowers shall cause to be delivered to the Agent a mortgage, in form and substance reasonably satisfactory to the Agent, creating a First Ranking Security Interest in favor of the Agent (subject to Permitted Liens), on behalf of the Agent and the Lenders, for each of the following owned properties in order to receive Borrowing Base credit in respect of such property.

|     | **Address** | **City** | **State** | **Owned/Leased** |
| --- | --- | --- | --- | --- |
| 1.  | 2259 County Street 2810 | Chickasha | OK | Owned |
| 2.  | 4402 S Mockingbird Rd. | Chickasha | OK | Owned |
| 3.  | 504 East Oklahoma Avenue | Woodward | OK | Owned |
| 4.  | 1400 South Deer Street | Canadian | TX | Owned |
| 5.  | 510 Scott St. | Van Buren | AR | Owned |
| 6.  | 402 10th Ave NE | Sidney | MT | Owned |
| 7.  | 2623 West 2000 South | Roosevelt | UT | Owned |
| 8.  | 2984 North Wingate Avenue | Odessa | TX | Owned |

THIS IS EXHIBIT " _____4_____ "
referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26 th_

day of _May_ A.D. 20 _20_

**Jonathan Tomm**
**Barrister and Solicitor**

<div align="center">

**FIRST AMENDING AGREEMENT**

</div>

**THIS FIRST AMENDING AGREEMENT** (this "**Agreement**") is made effective as of May 13, 2019 (the "**First Amendment Date**"),

**BETWEEN:**

<div align="center">

**Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC.**
as Borrowers

and

**QMAX CANADA OPERATIONS INC.**
as Specified Canadian Swingline Borrower

and

**THE PERSONS PARTY HERETO FROM TIME TO TIME
IN THEIR CAPACITIES AS LENDERS**
as Lenders

and

**HSBC BANK CANADA**
as Administrative Agent

</div>

**PREAMBLE**:

A.    Pursuant to the second amended and restated credit agreement dated as of July 31, 2018, by and between Q'Max Solutions Inc., Q'Max America Inc., QMax Canada Operations Inc. (collectively, the "**Borrowers**"), the Agent and the Lenders from time to time party thereto (as amended from time to time, the "**Credit Agreement**"), the Agent and the Lenders agreed to provide the Facilities to the Borrower.

B.    The parties hereto wish to otherwise amend the Credit Agreement on the terms and conditions herein provided.

**AGREEMENT**:

In consideration of the premises, the covenants and the agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged between the parties, the parties hereto agree as follows:

1.    **Definitions**. Capitalized terms used in this First Amending Agreement will, unless otherwise defined herein, have the meanings attributed to such terms in the Credit Agreement, as amended hereby.

2.    **First Amendment Date**. The amendments contained herein shall be effective as of the date hereof (the "**First Amendment Date**").

3.  **Amendments**. With effect as of the First Amendment Date, the Credit Agreement is hereby amended with the stricken text deleted (indicated textually in the same manner as the following example: ~~stricken text~~) and with the double-underlined text added (indicated textually in the same manner as the following example: <u>double-underlined text</u>) as set forth in the pages of the Credit Agreement attached as <u>Exhibit A</u> hereto. The parties hereto agree that Schedules 1.1.204, 1.1.209 and 1.1.252 attached to the Credit Agreement as of the Amendment and Restatement Date shall be deemed to refer to Schedules 1.1.205, 1.1.210 and 1.1.253 thereof, respectively, on and after the First Amendment Date.

4.  **Representations and Warranties**. Each Borrower agrees with and confirms to the Agent and the Lenders that as of the First Amendment Date, after giving effect to this Agreement, each of the representations and warranties contained in Section 6.1 of the Credit Agreement is true and accurate in all material respects (without duplication of any materiality qualifier contained in any such representations and warranties) except to the extent such representation and warranty expressly relates to an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date. Further, each Borrower hereby represents and warrants to the Agent and the Lenders that:

    (a)     the execution and delivery of this Agreement and the performance by it of its obligations under this Agreement (i) are within its corporate powers, (ii) have been duly authorized by all necessary corporate action, (iii) have received all necessary governmental approvals (if any required), and (iv) do not and will not contravene or conflict with any provision of Applicable Law or of its constating documents or by-laws; and

    (b)     the Credit Agreement, as amended by this Agreement is a legal, valid and binding obligation of it, enforceable in accordance with its terms except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, winding-up, moratorium or similar Applicable Law relating to the enforcement of creditors' rights generally and by general principles of equity.

5.  **Continuing Effect**. Each of the parties hereto acknowledges and agrees that the Credit Agreement, as amended by this Agreement and all other documents entered into in connection therewith, will be and continue in full force and effect and are hereby confirmed and the rights and obligations of all parties thereunder will not be effected or prejudiced in any manner by this Agreement except as specifically provided herein. In addition, each Borrower acknowledges that the Security previously granted to the Agent by it under or in connection with the Credit Agreement continues in full force and effect without in any way impairing or derogating from any of the guarantees, indemnities, mortgages, pledges, charges, assignments, security interests and covenants therein contained or thereby constituted, as continuing security for all indebtedness, liabilities and other obligations owing by such Borrower under the Credit Agreement, as amended by this Agreement.

6.  **Further Assurance**. Each Borrower will from time to time forthwith at the Agent's request and at the Borrowers' own cost and expense make, execute and deliver, or cause to be done, made, executed and delivered, all such further documents, financing statements, assignments, acts, matters and things which may be reasonably required by the Agent and as are consistent with the intention of the parties as evidenced herein, with respect to all matters arising under the Credit Agreement and this Agreement.

7.  **Expenses**. Each Borrower will be liable jointly and severally for all expenses of the Agent, including, without limitation, reasonable documented and out-of-pocket legal fees (on a solicitor

3

and his own client full indemnity basis) and other out-of-pocket expenses in connection with the negotiation, preparation, establishment, operation or enforcement of the Facilities and of this Agreement (whether or not consummated) by the Agent and the Lenders.

8.    **Governing Law**. This Agreement will be governed by and construed in accordance with the laws in force in the Province of Alberta from time to time.

9.    **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or pdf transmission), each of which when executed and delivered will be deemed to be an original, but all of which when taken together constitutes one and the same instrument. Any party hereto may execute this Agreement by signing any counterpart.

*[signature pages follow]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the First Amendment Date.

**Q'MAX SOLUTIONS INC.**, as Canadian Borrower

By: E-SIGNED by Celina Carter
on 2019-08-13 22:01:28 GMT
_____
Name: Celina Carter
Title:  Secretary


**Q'MAX AMERICA INC.**, as U.S. Borrower

By: E-SIGNED by Celina Carter
on 2019-08-13 22:01:31 GMT
_____
Name: Celina Carter
Title:  Secretary


**QMAX CANADA OPERATIONS INC.**, as Specified Canadian Swingline Borrower

By: E-SIGNED by Celina Carter
on 2019-08-13 22:01:33 GMT
_____
Name: Celina Carter
Title:  Secretary

**HSBC BANK CANADA**, as Agent

By: _CDStockman_____
    Name: CHRISTINE STOCKMAN
    Title: AUTHORIZED SIGNATORY

By: _____
    Name: PHILIP ALLEN
    Title:

**HSBC BANK CANADA**, as Lender

By: _____

Name:

Title:

John Schmidt
Assistant Vice President
Energy Financing

By: _____

Name:

Title:

BRUCE ROBINSON
Vice President
Energy Financing

**BANK OF MONTREAL**, as Lender

By: _____
Name:
Title:

Connor Irving
Director

By: _____
Name:
Title:

**EXPORT DEVELOPMENT CANADA**, as Lender

By: _____
    Name:   **Christopher Wilson**
    Title:    **Senior Financing Manager**

By: _____
    Name:
    Title:    **Matthew Visser**
              **Senior Associate**

**BUSINESS DEVELOPMENT BANK OF CANADA**, as Lender

By: _____

Name:

Title:     Derek Church
           Director, Business Restructuring

By: _____

Name:

Title:     Mark Kearl
           AVP, Business Restructuring

**HSBC BANK USA, NATIONAL ASSOCIATION,**
as Lender

By: _____
    Name: Stephen M. Ellsworth
    Title: Vice President

By: _____
    Name:
    Title:

<u>Exhibit A</u>

**Conformed Copy of Credit Agreement**

[see attached.]

*Execution Version*Exhibit A to First Amending Agreement

*[Conformed Credit Agreement reflecting the First Amending Agreement, dated as of May 13, 2019]*

# SECOND AMENDED AND RESTATED
# CREDIT AGREEMENT

Among

## Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC.
as Borrowers

and

## QMAX CANADA OPERATIONS INC.
as Specified Canadian Swingline Borrower

and

## THE PERSONS PARTY HERETO FROM TIME TO TIME
## IN THEIR CAPACITIES AS LENDERS
as Lenders

and

## HSBC BANK CANADA
as Administrative Agent

and with

## HSBC BANK CANADA
as Sole Lead Arranger, Bookrunner, Syndication Agent
and Documentation Agent

**Dated as of July 31, 2018**

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 INTERPRETATION**     **2**

    1.1    Definitions     2
    1.2    Accounting Principles     61
    1.3    Currency References     61
    1.4    References to Statutes     62
    1.5    Extended Meanings     62
    1.6    Headings     62
    1.7    Subdivisions     62
    1.8    Number     62
    1.9    Time     62
    1.10   Amendments     62
    1.11   No Waiver     63
    1.12   Inconsistency     63
    1.13   Pro Forma Adjustments     63
    1.14   Joint and Several Liability of Borrowers     64
    1.15   Deemed Action by all Borrowers     64
    1.16   Amendment and Restatement     64
    1.17   Exhibits and Schedules     65
    1.18   Covenant Relief Period     66

**ARTICLE 2 CANADIAN OPERATING FACILITY**     **66**

    2.1    Establishment of Canadian Operating Facility     66
    2.2    Purpose     66
    2.3    Revolving Nature     66
    2.4    Repayment     67
    2.5    Availment Options     67
    2.6    Interest and Fees     67
    2.7    Swingline     69

**ARTICLE 3 TERM FACILITY**     **73**

    3.1    Establishment of the Term Facility     73
    3.2    Purpose     74
    3.3    Nature     74
    3.4    Repayment     74
    3.5    Availment Options     74
    3.6    Interest and Fees     75

**ARTICLE 4 U.S. OPERATING FACILITY**     **76**

    4.1    Establishment of U.S. Operating Facility     76
    4.2    Purpose     76
    4.3    Revolving Nature     76
    4.4    Repayment     76

**TABLE OF CONTENTS**
**(continued)**

**Page**

| | | |
|---|---|---|
| 4.5 | Availment Options | 76 |
| 4.6 | Interest and Fees | 77 |
| 4.7 | Letters of Credit | 78 |

**ARTICLE 5 GENERAL CONDITIONS** ........ **80**

| | | |
|---|---|---|
| 5.1 | Matters relating to Interest and Fees | 80 |
| 5.2 | Voluntary Prepayments | 82 |
| 5.3 | Mandatory Prepayments | 83 |
| 5.4 | Notice Periods | 86 |
| 5.5 | Minimum Amounts, Multiples and Procedures re Advances, Conversions and Repayments | 87 |
| 5.6 | Place of Advances and Repayments | 88 |
| 5.7 | Evidence of Obligations (Noteless Advances) | 88 |
| 5.8 | Determination of Equivalent Amounts | 88 |
| 5.9 | Commitment to Purchase Bankers' Acceptances and BA Equivalent Loans | 89 |
| 5.10 | Special Provisions Regarding Bankers' Acceptances | 89 |
| 5.11 | Escrowed Funds | 91 |
| 5.12 | Special Provisions regarding BA Equivalent Loans | 92 |
| 5.13 | Special Provisions Regarding LIBOR Loans | 93 |
| 5.14 | Breakage Costs | 93 |
| 5.15 | Inability to Make LIBOR Loans | 94 |
| 5.16 | Special Provisions Regarding Letters of Credit | 95 |
| 5.17 | Eligible Approved Contracts | 98 |

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES** ........ **99**

| | | |
|---|---|---|
| 6.1 | Representations and Warranties | 99 |
| 6.2 | Acknowledgement and Deemed Repetition | 106 |
| 6.3 | Survival of Representations and Warranties | 106 |

**ARTICLE 7 COVENANTS** ........ **107**

| | | |
|---|---|---|
| 7.1 | Positive Covenants | 107 |
| 7.2 | Negative Covenants | 111 |
| 7.3 | Financial Covenants | ~~118~~**119** |
| 7.4 | Reporting Requirements | 120 |
| 7.5 | Designation of Unrestricted Subsidiaries | 122 |
| 7.6 | Securitization SPE | ~~123~~**124** |

**ARTICLE 8 SECURITY** ........ **124**

| | | |
|---|---|---|
| 8.1 | Security | 124 |
| 8.2 | General Provisions re Security; Registration | ~~125~~**126** |
| 8.3 | Opinions re Security | 126 |
| 8.4 | After-Acquired Property, Further Assurances | 126 |
| 8.5 | Security for Swap Documents with Former Lenders | 126 |

**TABLE OF CONTENTS**
**(continued)**

|  |  | Page |
|---|---|---|
| 8.6 | Insurance Proceeds | 127 |
| 8.7 | Qualified ECP Guarantor Keepwell | 127 |
| 8.8 | Additional Release by Lender | ~~127~~**128** |
| 8.9 | Security Principles Affecting Certain Subsidiaries | 128 |
| **ARTICLE 9 CONDITIONS PRECEDENT** | | ~~128~~**129** |
| 9.1 | Conditions Precedent to Agreement | ~~128~~**129** |
| 9.2 | Conditions Precedent to all Advances | ~~130~~**131** |
| **ARTICLE 10 DEFAULT AND REMEDIES** | | **131** |
| 10.1 | Events of Default | 131 |
| 10.2 | Acceleration; Additional Interest | 134 |
| 10.3 | Acceleration of Certain Contingent Obligations | 134 |
| 10.4 | Combining Accounts, Set-Off | ~~134~~**135** |
| 10.5 | Attorney in Fact | 135 |
| 10.6 | Appropriation of Monies | 135 |
| 10.7 | No Further Advances | ~~135~~**136** |
| 10.8 | Remedies Cumulative | 136 |
| 10.9 | Performance of Covenants by Agent | 136 |
| 10.10 | Purchase of Participation Following Acceleration | 136 |
| **ARTICLE 11 ADMINISTRATION OF THE FACILITIES** | | **137** |
| 11.1 | Authorization and Action | 137 |
| 11.2 | Decision-Making | 137 |
| 11.3 | Procedure for Making Advances | 139 |
| 11.4 | Failure to Fund | 139 |
| 11.5 | Defaulting Lenders and Replacement of Lenders | ~~140~~**141** |
| 11.6 | Security and Exercise of Remedies | 142 |
| 11.7 | Application of Proceeds of Realization | ~~143~~**144** |
| 11.8 | Payments by Agent | 144 |
| 11.9 | Redistribution of Payment | 145 |
| 11.10 | Protection of Agent | ~~146~~**147** |
| 11.11 | Duties of Agent | 148 |
| 11.12 | Lenders' Obligations Several; No Partnership | 149 |
| 11.13 | Reliance Upon Agent | 149 |
| 11.14 | No Liability of Agent | 149 |
| 11.15 | Agent and Agent Authority | ~~149~~**150** |
| 11.16 | Lenders' Credit Decisions | 150 |
| 11.17 | Indemnification | 150 |
| 11.18 | Successor Agent | ~~150~~**151** |
| 11.19 | Sharing of Information | 151 |
| 11.20 | Acknowledgement by Borrowers | 151 |
| 11.21 | Amendments to Article 11 | 151 |

## TABLE OF CONTENTS
### (continued)

Page

11.22   Deliveries, etc. .................................................. ~~151~~**152**
11.23   Agency Fee ...................................................... 152

**ARTICLE 12 INCREASED COSTS** .................................... **152**

12.1   Changes in Law ................................................. 152
12.2   Changes in Circumstances ................................... 153
12.3   Application of Sections 12.1 and 12.2 ..................... ~~153~~**154**
12.4   Taxes ............................................................ 154

**ARTICLE 13 GENERAL** .............................................. **157**

13.1   Non-Disclosure ................................................ 157
13.2   Waiver .......................................................... 158
13.3   Governing Law ................................................. 158
13.4   Judgment Currency ............................................ 158
13.5   Expenses of Agent and Lenders ............................. ~~158~~**159**
13.6   Assignment ..................................................... 159
13.7   General Indemnity ............................................. 161
13.8   Environmental Indemnity ..................................... 162
13.9   Survival of Certain Obligations despite Termination of Agreement ... ~~162~~**163**
13.10   Interest on Unpaid Costs and Expenses ................... 163
13.11   Notice .......................................................... 163
13.12   Telephone Instructions ....................................... 164
13.13   Severability .................................................... 164
13.14   Further Assurances ........................................... ~~164~~**165**
13.15   Tombstone Marketing ......................................... ~~164~~**165**
13.16   Entire Agreement ............................................. 165
13.17   Anti-Money Laundering Legislation ........................ 165
13.18   Binding Effect ................................................ 166
13.19   Execution by Electronic Means and Counterparts ......... 166
13.20   Intercreditor Agreement ..................................... 166
13.21   Release of Liens and Guarantees. ......................... ~~166~~**167**

## SECOND AMENDED AND RESTATED CREDIT AGREEMENT

This Agreement is dated as of July 31, 2018,

AMONG:

### Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC.
as Borrowers

– and –

### QMAX CANADA OPERATIONS INC.
as Specified Canadian Swingline Borrower

– and –

### THE PERSONS PARTY HERETO FROM TIME TO TIME
### IN THEIR CAPACITIES AS LENDERS
as Lenders

– and –

### HSBC BANK CANADA,
as Administrative Agent

– with –

### HSBC BANK CANADA,
as Sole Lead Arranger, Bookrunner, Syndication Agent
and Documentation Agent

**PREAMBLE:**

A.   The Borrowers have requested and the Lenders have agreed to further amend and restate the credit facilities under the Existing Credit Agreement and to continue to provide certain credit facilities on the terms and conditions and for the purposes set out in this Agreement.

B.   HSBC has agreed to continue to act as administrative agent for the Lenders under the Facilities on the terms and conditions and for the purposes set out in this Agreement.

**AGREEMENT:**

In consideration of the covenants and agreements between the Parties contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

# ARTICLE 1
# INTERPRETATION

## 1.1    Definitions

In this Agreement, the following words and phrases shall have the respective meanings set forth below:

1.1.1      "**Acceleration Date**" means the earlier of:

(a)      the occurrence of an Insolvency Event in respect of any Credit Party; and

(b)      the delivery by the Agent to the Borrower of a written notice that the Obligations are immediately due and payable, following the occurrence and during the continuation of an Event of Default other than an Insolvency Event.

1.1.2      "**Acceptable Account Debtors**" means those account debtors in respect of Eligible Receivables who have Investment Grade long term unsecured debt ratings or are otherwise acceptable to the Required Lenders, in their Permitted Discretion.

1.1.3      "**Account Receivable Insurance**" means one or more credit insurance policies issued by (a) Export Development Canada, (b) Export-Import Bank of the United States, or (c) such other governmental entity of Canada or the U.S. or a private insurer, in either case, with, and only for so long as such other insurer maintains, a credit rating of at least A by Standard & Poor's Ratings Services (or an equivalent rating issued by another rating agency acceptable to the Required Lenders, acting reasonably) that is reasonably acceptable to the Required Lenders, in each case, together with all endorsements and agreements related thereto (including a tripartite agreement among the insured, the insurer and the Agent), and on terms and in amounts reasonably acceptable to Agent and which provides for the payment of claims thereunder directly to Agent.

1.1.4      "**Acquired Business**" means the entity or assets acquired by a Credit Party in an Acquisition consummated after the date hereof.

1.1.5      "**Acquisition**" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of a controlling interest in the capital stock, partnership interests, membership interests or equity of any Person (other than a Person that is a Subsidiary or the formation of a Subsidiary solely to facilitate a Permitted Acquisition), or (c) a merger, amalgamation, consolidation or any other combination with another Person (other than a Person that is a Credit Party); <u>provided</u>, that the Borrower or a Person that is or will become a Credit Party is the surviving entity.

1.1.6      "**Advance**" means an extension of credit by one or more of the Lenders to a Borrower pursuant to this Agreement (including by way of issuance of a Letter of Credit or by way of any other Loan permitted by Section 2.7.2 under the Swingline), but does not include any Conversion or Rollover.

25877170.9<u>27367782.4</u>

1.1.7    "**Advisory Services Agreement**" means the management and advisory service agreement dated as of May 23, 2014 between the Canadian Borrower and Palladium, as the same may be amended restated or supplemented from time to time permitted hereunder.

1.1.8    "**Affiliate**" means with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

1.1.9    "**Agent**" means HSBC in its capacity as administrative agent hereunder and any successors in such capacity appointed as agent pursuant to Section 11.18.

1.1.10    "**Agreement**" means this amended and restated credit agreement (including the exhibits and schedules) as it may be amended, replaced or restated from time to time.

1.1.11    "**Amendment and Restatement Date**" means the date of this Agreement or such later Business Day upon which each condition in Section 9.1 shall be satisfied or waived in a manner acceptable to the Required Lenders in their discretion.

1.1.12    "**Anchor**" means Anchor Drilling Fluids USA, LLC.

1.1.13    "**Anchor Acquisition Agreement**" means the Membership Interest Purchase Agreement, dated as of November 21, 2017, by and among Anchor Drilling Fluids USA, LLC, a Delaware limited liability company, Calumet Operating, LLC, a Delaware limited liability company, Q'Max Solutions Inc., a British Columbia corporation, and Q'Max America Inc., a Delaware corporation.

1.1.14    "**Anchor Sale and Leaseback Transaction**" means any arrangement, whether in one transaction or in a series of transactions, with any Person whereby Anchor sells or transfers all or some portion of its truck fleet or similar motor vehicles, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rents or leases such property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

1.1.15    "**Annual Management Fee Cap**" means U.S. $2,500,000 in the aggregate in any Fiscal Year.

1.1.16    "**Applicable Law**" means, in respect of any Person, property, transaction or event, all Laws applicable thereto.

1.1.17    "**Applicable Margin**" means, in respect of any Fiscal Quarter and in respect of any Availment Option or standby fee, the percentage in the column relating to such Availment Option or standby fee in the following table which corresponds to the Net Leverage Ratio in respect of such Fiscal Quarter described in the first column; subject to adjustment from time to time in accordance with Section 5.1.4:

| Level* | Net Leverage Ratio | Canadian Dollar Prime Based Loans, U.S. Dollar Base Rate Loans and U.S. Dollar Prime Rate Loans | BA Fee, LIBOR Loans and Financial Letter of Credit Fee** | Standby Fee (For Canadian Operating Facility and U.S. Operating Facility only) |
|---|---|---|---|---|
| I | < 1.50:1 | 100 bps | 200 bps | 45.000 bps |
| II | ≥ 1.50:1 < 2.00:1 | 125 bps | 225 bps | 50.625 bps |
| III | ≥ 2.00:1 < 2.50:1 | 175 bps | 275 bps | 61.875 bps |
| IV | ≥ 2.50:1 < 3.00:1 | 200 bps | 300 bps | 67.500 bps |
| V | ≥ 3.00:1 < 3.50:1 | 275 bps | 375 bps | 84.375 bps |
| VI | ≥ 3.50:1 < 4.00:1 | 325 bps | 425 bps | 95.625 bps |
| VII | ≥ 4.00:1 | 375 bps | 475 bps | 106.875 bps |

\* On the Amendment and Restatement Date, the Applicable Margin shall be deemed to be at Level VII and shall remain at Level VII at all times during the Covenant Relief Period.

\*\*Non-Financial Letters of Credit will be issued at 66⅔% of the pricing quoted above for Financial Letters of Credit.

1.1.18    "**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

1.1.19    "**Assignment**" means an agreement whereby a financial institution becomes a Lender substantially in the form of Exhibit "G", with the blanks completed.

1.1.20    "**Availment Option**" means a method of borrowing which is available to the Borrower as provided herein and in respect of each Facility, means those particular methods of borrowing which are specifically identified as being available thereunder (in the case of the Canadian Operating Facility under Section 2.5.1, in the case of the Facility under Section 3.5.1 and in the case of the U.S. Operating Facility under Section 4.5.1).

1.1.21    "**BA Equivalent Loan**" means an Advance in Canadian Dollars made by a Non-BA Lender pursuant to Section 5.10.2.

1.1.22    "**BA Lender**" means a Lender identified in Exhibit "A" attached hereto as a Lender which will accept Bankers' Acceptances hereunder.

1.1.23    "**Bankers' Acceptance**" means a bill of exchange or a blank non-interest bearing depository bill as defined in the *Depository Bills and Notes Act* (Canada) drawn by the Borrower and accepted by a BA Lender in respect of which the Borrower becomes obligated to pay the face amount thereof to the holder (which may be a third party or such BA Lender) upon maturity.

1.1.24    "**Banking Service Agreements**" means agreements made between a Borrower or any other Credit Party and the Agent or any Lender or any of their respective Affiliates

in respect of payment cards, credit cards, cash management, payroll, pooling, netting, or other banking services; and "**Banking Service Agreement**" means any one of them as required by the context.

1.1.25   "**Banking Services Liabilities**" mean, collectively, any and all direct and indirect, contingent and absolute obligations and liabilities of each Borrower and each other Credit Party to the Agent, any Lender or any of their respective Affiliates in respect of any Banking Service Agreement as the Credit Parties may from time to time enter into with the Agent, any Lender or any of their respective Affiliates; provided, that a liability shall constitute a "**Banking Service Liability**" if the agreement under which it arose was entered into with the Person who was an Agent, Lender or the Affiliate of a Person who was an Agent or Lender, at the time such agreement was entered into, regardless of whether such Agent or Lender ceased to be the Agent or a Lender hereunder.

1.1.26   "**BCBCA**" means the *Business Corporations Act* (British Columbia), as amended from time to time.

1.1.27   "**BIA**" means the *Bankruptcy and Insolvency Act* (Canada), as amended from time to time.

1.1.28   "**Borrowers**" means, collectively, the Canadian Borrower, the Specified Canadian Swingline Borrower and the U.S. Borrower and "**Borrower**", means any one of them; provided, that "Borrower", in the context of provision hereunder relating to:

(a)     the Term Facility and the Canadian Operating Facility, and Loans thereunder, shall mean the Canadian Borrower and its successors and assigns;

(b)     the U.S. Operating Facility, and Loans thereunder, shall mean the U.S. Borrower and its successors and assigns; and

(c)     the Swingline, and Loans thereunder, shall mean the applicable Swingline Borrower and its successors and assigns.

1.1.29   "**Borrowing Base**" means the amount in U.S. Dollars calculated by the Borrower and approved by the Agent, in its sole discretion, as set out in the most recent Borrowing Base Certificate, being the aggregate amount of (without duplication):

(a)     Marginable Receivables; *plus*

(b)     Marginable Inventory; *plus*

(c)     Marginable Cash; *plus*

(d)     Marginable Capital Assets; *minus*

(e)     Priority Claims; *minus*

(f)     $150,000 (but only until such time as the Agent and HSBC US have received an environmental report or other information from or on behalf of Anchor which is satisfactory to each of them (acting reasonably) related to the Norge, Oklahoma and Roosevelt, Utah properties owned by the Credit Parties, and the Agent and HSBC US agree to no longer require the reserve set out in this clause (f)), provided such reserve shall only apply to the extent such properties form part of the Borrowing Base, *minus*

(g)     the amount in U.S. Dollars of unrealized losses resulting from mark to market accounting for hedging activities calculated in accordance with GAAP, *minus*

(h)     the amount in U.S. Dollars of any deductible payable in respect of the Account Receivable Insurance (other than in respect of Anchor, Terra and their respective Subsidiaries), *minus*

(i)     any amount that is payable to the insurer under the Account Receivable Insurance (other than in respect of Anchor, Terra and their respective Subsidiaries).

1.1.30    "**Borrowing Base Certificate**" means a certificate of the Canadian Borrower, substantially in the form of Exhibit "H".

1.1.31    "**Borrowing Base Shortfall**" is defined under Section 5.3.5.

1.1.32    "**Business Day**" means:

(a)     for the purpose of giving any communication pursuant to Section 13.11 and in the context of U.S. Dollar Base Rate Loans and U.S. Dollar Prime Rate Loans, a day on which the main branches of the Agent or any of its Affiliates in Toronto, Calgary, Montreal, Quebec and New York are open for normal banking business;

(b)     for purposes of LIBOR Loans, also must be a LIBOR Business Day; and

(c)     for all other purposes, a day on which the main branch of the Agent in Calgary, Alberta, Montreal, Quebec and Toronto, Ontario is open for normal banking business,

but in any event not including a Saturday or Sunday or other day on which banks in Calgary or Toronto are authorized or required by law to close.

1.1.33    "**Calumet**" means Calumet Operating, LLC and its successors and permitted assigns.

1.1.34    "**Canadian Borrower**" means Q'Max Solutions Inc., a corporation amalgamated pursuant to the BCBCA, and its successors and permitted assigns.

1.1.35    "**Canadian Dollar Prime Rate Loan**" means a loan made by a Lender to the Canadian Borrower in Canadian Dollars in respect of which interest is determined by

reference to the Canadian Prime Rate, but excluding Advances in the form of Overdrafts and BA Equivalent Loans.

1.1.36    "**Canadian Dollars**" or "**Cdn. $**" means the lawful money of Canada.

1.1.37    "**Canadian Operating Facility**" is defined in Section 2.1.

1.1.38    "**Canadian Operating Facility Commitment**" means, as the context requires, (a) as of the Amendment and Restatement Date, collectively with respect to all Canadian Operating Lenders, in the aggregate, U.S. $109,681,471 or the Equivalent Amount in Cdn. $ (or any combination thereof), as otherwise increased or decreased pursuant to this Agreement and (b) means, with respect to each individual Canadian Operating Lender, the individual commitment amount of such Lender in the maximum principal amount indicated opposite such Canadian Operating Lender's name in Exhibit "A" under the heading "**Canadian Operating Facility Commitments**", as amended from time to time.

1.1.39    "**Canadian Operating Facility Limit**" means the lesser of (a) the Canadian Operating Facility Commitment, and (b) the sum of the Borrowing Base less the then outstanding Advances under the Term Facility and the U.S. Operating Facility.

1.1.40    "**Canadian Operating Lenders**" means the Lenders who have provided a Commitment under the Canadian Operating Facility as set forth in Exhibit "A".

1.1.41    "**Canadian Prime Rate**" means the greater of the following:

(a)    the rate of interest announced from time to time by the Agent as its reference rate then in effect for determining rates of interest on Canadian dollar loans to its customers in Canada and designated as its prime rate; and

(b)    the 30-day CDOR Rate plus 1% per annum;

provided that if the Canadian Prime Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.42    "**Capital Adequacy Requirements**" means the Guideline dated January 2017, entitled "Capital Adequacy Requirements (CAR)" issued by OSFI and all other guidelines or requirements relating to capital adequacy issued by OSFI or any other Governmental Authority regulating or having jurisdiction with respect to any Lender, as amended, modified, supplemented, reissued or replaced from time to time.

1.1.43    "**Capital Expenditures**" means, with respect to any Person for any period, without duplication, the aggregate amount of all expenditures (whether paid in cash or accrued as a liability) by such Person during that period for investments in other Persons and the acquisition or leasing (pursuant to a Capital Lease) of fixed or capital assets or additions to property, plant, or equipment (including replacements, capitalized repairs, and improvements), in each case, which are required to be capitalized on the balance sheet of such Person in accordance with GAAP; provided, however, that Capital Expenditures shall not include:

(a)      expenditures with proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of a Borrower and its Subsidiaries within one year of receipt of such proceeds (or, if not made within such one year period, are committed to be made during such period, but if not so made, such amount will not be excluded in the next applicable period);

(b)      interest capitalized during such period;

(c)      expenditures that are accounted for as Capital Expenditures of such Person and that actually are paid for by a third party (excluding a Borrower or any Subsidiary thereof) and for which neither any Borrower nor any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other Person (whether before, during or after such period);

(d)      the purchase price of equipment (i) that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time, (ii) to the extent the consideration therefor consists of any combination of (A) used or surplus equipment traded in at the time of such purchase and (B) the proceeds of a substantially concurrent sale of used or surplus equipment, in each case in the ordinary course of business; provided that only such credit value of such traded equipment will be excluded for this purpose;

(e)      for purposes of Section 7.2.10 only, expenditures that constitute Permitted Acquisitions and Permitted Investments;

(f)      the book value of any asset owned to the extent such book value is included as a capital expenditure as a result of reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period;

(g)      expenditures of leasehold improvements for which such Person is reimbursed in cash or receives a credit; and

(h)      any non-cash amounts reflected as additions to property, plant or equipment on such Person's consolidated balance sheet.

1.1.44   "**Capital Lease**" means any lease, license or similar transaction determined as a capital lease in accordance with GAAP as in effect on the Amendment and Restatement Date, or any sale and lease back transaction or any other lease (whether a synthetic lease or otherwise).

1.1.45   "**Cash Equivalent**s" means, as of the date of any determination thereof, the following:

(a)     marketable direct obligations issued or unconditionally guaranteed by the Government of Canada, the U.S., or any agency or instrumentality thereof, a government of a province of Canada or of a state of the U.S. or, in each case, any agency thereof, maturing no more than one year after the date of acquisition thereof;

(b)     commercial paper maturing no more than one year after the date of acquisition thereof and having, at the time of acquisition, a rating of at least A1 by Standard & Poor's Ratings Services or at least Prime 1 by Moody's Investors Service, Inc. or at least R1 (low) by Dominion Bond Rating Service Inc.;

(c)     certificates of deposit, deposit notes, term deposit receipts, or time deposits or bankers' acceptances, maturing no more than one year after the date of acquisition thereof, issued by the Lender or by commercial banks incorporated under the laws of Canada or the U.S. or a state thereof, each having a rating of at least A1 by Standard & Poor's Ratings Services or at least Prime 1 by Moody's Investors Service, Inc. or at least R1 (low) by Dominion Bond Rating Service Inc.;

(d)     such local currencies in those countries in which the Borrowers and their Subsidiaries transact business from time to time in the ordinary course of business;

(e)     investments of comparable tenor and credit quality to those described in the foregoing clauses (a) through (c) or otherwise customarily utilized in countries in which the Borrowers and their Subsidiaries operate for short term cash management purposes; and

(f)     investments in any investment company, money market or fund which invests substantially all of their assets in Cash Equivalents of a kind described in (a) through (c) of this definition.

1.1.46   "**Cash Taxes**" means, in respect of any Person for any applicable period, the amount of all income taxes (including federal and provincial income taxes) paid or payable by such Person on its net taxable income for such period (which for greater certainty, does not include future income taxes).

1.1.47   "**Catch Up Management Fee Payments**" is defined in Section ~~1.1.201~~**1.1.202**(a).

1.1.48   "**CDOR Rate**" means on any day the annual rate of interest which is the rate determined as being the arithmetic average of the quotations of all institutions listed in respect of the rate for Canadian Dollar denominated bankers' acceptances for the relevant period displayed and identified as such on the "**Reuters Screen CDOR Page**" (as defined in the International Swaps and Derivatives Association, Inc. definitions, as modified and amended from time to time) as of 10:00 a.m. Toronto, Ontario local time on such day

and, if such day is not a Business Day, then on the immediately preceding Business Day (as adjusted by the Agent after 10:00 a.m. Toronto, Ontario local time to reflect any error in a posted rate of interest or in the posted average annual rate of interest with notice of such adjustment in reasonable detail evidencing the basis for such determination being concurrently provided to the Borrower). If such rates are not available on the Reuters Screen CDOR Page on any particular day, then the CDOR Rate on that day shall be calculated as the arithmetic mean of the rates applicable to Canadian Dollar denominated bankers' acceptances for the relevant period publicly quoted for customers in Canada by those Lenders which are banks listed in Schedule I of the *Bank Act* (Canada) as of 10:00 a.m. Toronto, Ontario local time on such day; or if such day is not a Business Day, then on the immediately preceding Business Day; provided that if the CDOR Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.49    "**Change of Control**" means in respect of the Canadian Borrower or Holdco, the occurrence of any of the following events:

(a)    prior to any initial public offering of the Canadian Borrower or Holdco, as applicable, when Permitted Holders do not beneficially own, collectively, directly or indirectly, shares in the Canadian Borrower or Holdco, as applicable, representing more than 50% of the Voting Securities of the Canadian Borrower or Holdco; and

(b)    after any initial public offering of the Canadian Borrower or Holdco, as applicable, when a Person or Group (other than any employee benefit plan and/or Person acting as the trustee, agent or other fiduciary or administrator) acquires shares in the Canadian Borrower or Holdco, as applicable, representing more than the greater of (i) 35% of the aggregate outstanding Voting Securities of the Canadian Borrower or Holdco, as applicable and (ii) the percentage of then outstanding Voting Securities of the Canadian Borrower or Holdco, as applicable, directly or indirectly, owned by Permitted Holders.

1.1.50    "**Code**" means the United States Internal Revenue Code of 1986, and any successor statute and any regulations thereunder.

1.1.51    "**Collateral**" means, collectively, all property, assets and undertaking of the Credit Parties encumbered by the Liens granted pursuant to the Security in support of the Obligations, and all property, assets and undertaking encumbered by the Liens granted pursuant to the Security in support of the Guarantees, together with all proceeds of the foregoing. For the avoidance of doubt, Collateral shall not include (a) capital assets or inventory of any Credit Party organized outside of the U.S. or Canada, (b) pending United States "intent-to-use" trademark applications for which a verified statement of use or an amendment to allege use has not been filed with and accepted by the United States Patent and Trademark Office, (c) Securitization Assets but only once transferred to a Securitization SPE and (d) any of the "**Excluded Property**" (as defined in the general security agreement from the U.S. Borrower as described in Section 8.1(a)).

- 10 -

1.1.52   "**Collection Rights**" means, in respect of any Eligible Approved Contracts between a Pemex Entity, on the one hand, and QMax Mexico, on the other hand, the collection or credit rights granted to QMax Mexico by such Pemex Entity pursuant to such Eligible Approved Contract.

1.1.53   "**Colombian Free Cash Flow**" means, for any fiscal period, all EBITDA attributable to all Colombian operations of the Canadian Borrower and its Material Subsidiaries determined in accordance with the definition of EBITDA, minus Cash Taxes, Interest Expense and Unfunded Capital Expenditures, in each case, attributable to such Colombian Subsidiaries and operations.

1.1.54   "**Commitment**" means, in respect of any Lender, such Lender's commitment to make Advances to the Borrowers (or any one of them) under all Facilities or under any Facility, as the context requires as set forth in Exhibit "A".

1.1.55   "**Common Shares**" means the common shares in the capital of a Borrower.

1.1.56   "**Compliance Certificate**" means a certificate delivered by the Canadian Borrower to the Agent in the form of Exhibit "F".

1.1.57   "**Consolidated Net Income**" shall mean, for any period, the net income (loss) of any Person and its Subsidiaries determined on a consolidated basis on the basis of GAAP; provided, however, that any net income (loss) of any Person (excluding any Securitization SPE) (i) who is not during such period a Material Subsidiary or (ii) whose net income is accounted for by the equity method of accounting, shall in each case be included in the calculation of Consolidated Net Income for all purposes of this Agreement only to the extent of the amount of any Distributions of such Person paid in cash (or to the extent converted into cash) to the Canadian Borrower or a Material Subsidiary, and "**Consolidated Net Income**" for such period shall include any ordinary course dividends in cash received by the Canadian Borrower or any of its Material Subsidiaries in excess of the amounts included in the foregoing item (i).

1.1.58   "**Consolidated Net Tangible Assets**" means, as at any date of determination, all consolidated assets of the any Person as shown in the most recent consolidated balance sheet of such Person, less the aggregate of the following amounts reflected upon such balance sheet:

(a)      all goodwill, deferred assets, trademarks, copyrights and other similar intangible assets; and

(b)      to the extent not already deducted in computing such assets and without duplication, depreciation, depletion, amortization, reserves and any other account which reflects a decrease in the value of an asset or a periodic allocation of the cost of an asset; provided, that no deduction will be made under this paragraph (b) to the extent that such account reflects a decrease in value or periodic allocation of the cost of any asset referred in the paragraph (a) of this definition,

- 11 -

all as determined in accordance with GAAP.

1.1.59   "**Contributing Lenders**" is defined in Section 11.4.2.

1.1.60   "**control**" means, in respect of any Person, the power to direct or cause the direction of management and policies of such Person, directly or indirectly, through the ownership of Voting Securities, contract or otherwise; and "**controlled**" has a corresponding meaning.

1.1.61   "**Conversion**" means the substitution of one Availment Option for another, and, for certainty, does not constitute a fresh or new Advance (and "**Convert**" shall have a corresponding meaning).

1.1.62   "**Conversion Notice**" means a notice substantially in the form of Exhibit "D" given by a Borrower to the Agent for the purposes of requesting a Conversion.

1.1.63   "**Covenant Relief Period**" means the period from the Amendment and Restatement Date, up to and including December 31, 2019, subject to the Borrowers' right to elect a shorter period pursuant to Section 1.18.

1.1.64   "**Credit Documents**" means this Agreement, the Security and all other agreements, documents, instruments and certificates required or contemplated herein to be provided by the Credit Parties and other Persons to the Agent and the Lenders.

1.1.65   "**Credit Parties**" means, collectively, the Borrowers and any Guarantor; and "**Credit Party**" means any one of them as the context requires. Notwithstanding any provision in this Agreement or any other Credit Document, in no event shall any Securitization SPE be deemed a Credit Party.

1.1.66   "**Currency Hedging Agreement**" means any swap, hedge or other agreement that does not contravene Section 7.2.12 entered into between a Credit Party and a counterparty, from time to time for the purpose of mitigating or hedging currency risk, including foreign exchange forward contracts.

1.1.67   "**Default**" means an event which has occurred and is continuing, and which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

1.1.68   "**Default Rate**" means, while an Event of Default exists, the interest rates and fess comprising the Applicable Margin will each increase by 2.0% per annum.

1.1.69   "**Defaulting Lender**" means any Lender or, in the case of paragraph (e) below, a Lender's parent (being any Person that directly or indirectly controls a Lender where control has the same meaning as in the definition of Affiliate):

(a)      that has failed to fund any payment or its portion of any Advances required to be made by it hereunder, including as a result of being a Non-Paying Lender, within two Business Days of the date such Advances were required to be funded

hereunder unless such Lender notifies the Agent and the Canadian Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied;

(b)    that has failed to pay the Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due;

(c)    that has notified a Borrower (in writing) that it does not intend to or is unable to comply with any of its funding obligations under this Agreement or has made a public statement to that effect (unless such written notice or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such written notice of public statement) cannot be satisfied);

(d)    that has failed, within three Business Days after request by a Borrower, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Advances; or

(e)    that becomes insolvent, has been deemed insolvent by a court of competent jurisdiction, or becomes the subject of bankruptcy or insolvency proceeding.

1.1.70    "**Departing Lenders**" is defined in Section 11.5.2.

1.1.71    "**Deposit Account Control Agreement**" means the deposit account control agreement dated December 29, 2014 between the Agent, Wells Fargo and the U.S. Borrower, as the same may be amended from time to time.

1.1.72    "**Designated Financial Covenants**" is defined in Section 7.3.2

1.1.73    "**Distribution**" means:

(a)    any declaration or payment of dividends or returns of capital, including advisory fees and management fees, of any kind or nature directly or indirectly to any holder of shares of any Credit Party or to any Affiliate or Related Party of such holder and including any similar payments paid by any Credit Party to Palladium or its Affiliates, whether pursuant to the Advisory Services Agreement or any other similar agreement now or hereafter in effect between any one or more Credit Party and any one or more of Palladium or its Affiliates;

(b)    any repurchase, retraction or redemption of shares of any Credit Party for cash or other property; and

(c)    any payment, repayment or prepayment by a Person in cash of any amount of any principal, interest, fees or other amounts in respect of any Subordinated Debt.

For certainty, Distributions shall not include the reimbursement of reasonable out-of-pocket expenses incurred by Palladium or the directors of the Credit Parties in the ordinary cause of business in rendering advisory or management services to the Credit Parties or performing a director's obligations to the applicable Credit Party, as the case may be.

1.1.74    "**Drawdown Request**" means a notice in the form of Exhibit "B" given by the Borrower to the Agent for the purpose of requesting an Advance.

1.1.75    "**Earnout Payments**" means, in respect of any Acquisition, the requirement for any Credit Party, as purchaser, to pay to the vendor under such Acquisition (or any nominee thereof) contingent payments of the purchase price thereof after the closing thereof which are payable when specified targets (including related to revenue or earnings), are satisfied within specified periods.

1.1.76    "**EBITDA**" means, for any fiscal period, Consolidated Net Income of the Canadian Borrower and the Subsidiaries determined on a consolidated basis in accordance with GAAP and measured on a trailing four Fiscal Quarter basis for such period, *plus* all amounts deducted in the calculation thereof on account of (without duplication irrespective if any expense, loss or gain would fall into one or more of the foregoing categories):

(a)    interest expense calculated in accordance with GAAP, including (i) the amortization of debt discounts, (ii) the amortization of all fees (including fees with respect to Hedging Agreements) payable in connection with the incurrence of Funded Debt to the extent included in interest expense, (iii) deferred financing fees and expenses, and (iv) the portion of any payments or accruals with respect to Capital Lease Obligations allocable to interest expense and the capitalized interest of such Person;

(b)    any provision for or payment of taxes based on income, profits or capital gains, calculated in accordance with GAAP, including, without limitation, state, provincial, franchise, property and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) and any deferred/future taxes;

(c)    depreciation and amortization expense, calculated in accordance with GAAP, including amortization of intangible assets, unrecognized prior service costs and actuarial non-cash losses related to pensions and other post-employment benefits, of such;

(d)    Permitted Management Fees (but for certainty, in an amount not exceeding the Annual Management Fee Cap in any Fiscal Year) and the reasonable out-of-pocket expenses related thereto which have been reimbursed by a Credit Party, and any payments permitted under clause (j) of Section 7.2.6, to the extent paid by a Credit Party to a non-Credit Party;

- 14 -

(e)     all non-cash expenses and losses calculated in accordance with GAAP related to: (i) extraordinary and nonrecurring losses to the extent not otherwise dealt with in this definition, (ii) all non-recurring deferred financing costs written off and premiums paid or other expenses incurred directly in connection with any early extinguishment of Funded Debt and any net loss attributable to any write-off or forgiveness of Funded Debt, (iii) any non-cash expense or loss arising from the application of purchase accounting adjustments as a result of any Permitted Acquisition, and (iv) other non-cash expenses and charges to the extent not otherwise dealt with in this definition (in each case, calculated on a *pro forma* basis as though realized on the first day of such period) reducing Consolidated Net Income for such period including resulting from impairment charges and including losses against book value on the disposal or write-off of any business or assets (including pursuant to any sale/leaseback transaction);

(f)     [reserved];

(g)     unrealized losses resulting from mark to market accounting for hedging activities calculated in accordance with GAAP;

(h)     any unrealized foreign currency translation or transaction losses in respect of (i) Funded Debt denominated in a currency other than the functional currency of the relevant Person and (ii) any unrealized foreign exchange losses relating to translation of assets and liabilities denominated in foreign currencies;

(i)     charges, expenses or losses reasonably related to (i) fees and expense in connection with Permitted Acquisitions, Permitted Investments, Permitted Dispositions, the incurrence of Permitted Funded Debt (but only to the extent not already included in clause (a) above), amendments and other modifications to the Credit Documents, the offering or issuance of equity interests and other activities permitted hereunder (in each case, whether or not successful) and (ii) business optimization expenses and restructuring charges, reserves or expenses, (including losses from disposed, abandoned, transferred, closed or discontinued operations) in each case as documented by evidence provided by the Canadian Borrower and acceptable to the Agent (acting reasonably and responding to requests for approval within five (5) Business Days); provided, that all of the foregoing may not exceed a maximum aggregate amount of $5,500,000 for each applicable measurement period of four consecutive Fiscal Quarters, or such higher amount as the Required Lenders may consent to from time, acting reasonably;

(j)     non-cash expenses incurred in connection with any equity based compensation provided pursuant to any management or employee equity based compensation plan (in each case, calculated on a *pro forma* basis as though realized on the first day of such period), and including (i) costs or expenses realized in connection with or resulting from stock appreciation or similar rights, stock options or other rights of officers, directors and employees, in each case of such Person or any such Subsidiary, and (ii) non-cash losses attributable to deferred compensation plans or trusts;

- 15 -

(k)     third party audit, advisory and consulting fees and related out-of-pocket expenses of the Canadian Borrower or any of its Subsidiaries incurred in connection with audits, inspections and reviews conducted in connection with this Agreement at the direction of the Agent or any Lender (but which for certainty does not include audit fees related to the preparation of the financial statements required hereunder);

(l)     fees, costs and expenses in connection with the Anchor Acquisition not to exceed U.S. $11,000,000;

(m)    discounts on sales of receivables and related assets in connection with any Permitted Securitization Financing;

*minus*, in each case to the extent added in the calculation thereof (without duplication irrespective if any expense, loss or gain would fall into one or more of the foregoing categories):

(n)     income tax credits calculated in accordance with GAAP;

(o)     all cash payments during such period relating to non-cash charges which were added back in determining EBITDA in any prior period;

(p)     other non-cash and non-recurring items increasing Consolidated Net Income that are not otherwise dealt with in this definition (but excluding any such non-cash items to the extent that it will result in the receipt of cash payments in any future period), including gains against book value on the disposal of any business or assets;

(q)     unrealized gains resulting from mark to market accounting for hedging activities calculated in accordance with GAAP;

(r)     any unrealized foreign currency translation or transaction gains in respect of Funded Debt denominated in a currency other than the functional currency of the relevant Person and any unrealized foreign exchange gains relating to translation of assets and liabilities denominated in foreign currencies;

(s)     any net gain attributable to any write-off or forgiveness of Funded Debt;

(t)     net gains on the disposal, abandonment, transfer, closing or discontinuance of operations;

(u)     non-cash gains attributable of deferred compensation plans and trusts;

(v)     any non-cash gains arising from the application of purchase accounting adjustments as a result of any Permitted Acquisition or other Acquisitions approved by the Lenders; and

(w)     Consolidated Net Income attributable to or generated from any minority interest in a Person owned directly or indirectly by the Canadian Borrower, except for cash Distributions received by a Credit Party therefrom;

provided, that if any of the events described in Section 1.13 occurs during the relevant period, the calculation of EBITDA will be adjusted as set forth in Section 1.13.

Notwithstanding the foregoing, the Borrowers may elect to calculate EBITDA on the following annualized basis (as opposed to a trailing four Fiscal Quarter basis) for the periods specified below: (i) for the Fiscal Quarter ending March 31, 2018, by calculating EBITDA for the six month period ending as of March 31, 2018 and multiplied by two, and (ii) for the Fiscal Quarter ending June 30, 2018, by calculating EBITDA for the nine month period ending as of June 30, 2018, and multiplied by four-thirds, but only if such alternative calculation would result in a greater value for EBITDA for such period.

In addition, if EBITDA is calculated on the basis described in the immediately preceding paragraph, then the amounts described in paragraph (i) above (the "**Prescribed Amounts**") shall be limited to, the lesser of (x) the Prescribed Amounts actually paid during such period and (y) $5,325,000.

1.1.77     "**Economic Sanctions**" means the restrictions with respect to funding operations, or financing investments, in any country, or making payments to, or receiving payments or property from, any country or Person, then prohibited by:

(a)     any sanctions or requirements imposed by, or based upon the obligations or authorities set forth in the *Executive Order*, the *U.S. Money Laundering Control Act of 1986* (18 U.S.C. §§ 1956 et seq.), the *PATRIOT Act*, the *U.S. International Emergency Economic Powers Act* (50 U.S.C. §§ 1701 et seq.), the *U.S. Trading with the Enemy Act* (50 U.S.C. App. §§ 1 et seq.), the *U.S. United Nations Participation Act*, the *U.S. Syria Accountability and Lebanese Sovereignty Act*, the *U.S. Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010* or the *Iran Sanctions Act*, all as amended, or any of the foreign assets control regulations of the U.S. Department of the Treasury (including but not limited to 31 CFR, Subtitle B, Chapter V, as amended) or any other law or executive order relating thereto or regulation administered by the US State Department or the United States Treasury Department's Office of Foreign Assets Control, in each case, to the extent applicable; and

(b)     any of the economic sanctions of Canada, including those provided for pursuant to the *Special Economic Measures Act* (Canada) or the *United Nations Act* (Canada), in each case, to the extent applicable.

1.1.78     "**Eligible Approved Contracts**" means a contract or other agreement of a Credit Party to provide goods or perform services: (a) that is listed on Schedule 6.1.33; (b) or designated by the Agent as an Eligible Approved Contract pursuant to Section 5.17.

1.1.79   "**Eligible Capital Assets**" means, at any time, the capital assets of the Credit Parties; <u>provided</u>, that, in any event, no capital asset shall be deemed to be a Eligible Capital Asset unless each of the following statements is accurate and complete (and by including such capital asset in any computation of the Borrowing Base, the Borrowers will be deemed to made each of these statements in respect thereof):

(a)      such capital asset is located in Canada or the U.S.;

(b)      such capital asset is in good condition, merchantable, meets all standards imposed by any Governmental Authority having regulatory authority over it or its use and/or sale and is not obsolete and is either currently usable or currently saleable in the normal course of business of the applicable Credit Party;

(c)      the Agent, on behalf of the Lenders, has a First-Ranking Security Interest covering such capital asset;

(d)      such capital asset is, and at all times will be, free and clear of all Liens other than Permitted Liens and unregistered Liens in respect of Priority Claims that are not yet due and payable;

(e)      such capital asset does not constitute Hazardous Materials;

(f)      such capital asset is covered by all applicable insurance as required by Section 7.1.9; and

(g)      the Agent has not determined in its Permitted Discretion that it may not sell or otherwise dispose of such capital asset in accordance with the terms of the applicable Credit Documents without infringing upon the rights of another Person or violating any contract with any other Person.

1.1.80   "**Eligible Cash**" means, as of the date of determination, the aggregate U.S. Dollar amount of the unrestricted cash (determined in accordance with GAAP) and Cash Equivalents of Credit Parties (other than with respect to Anchor and its Subsidiaries until such time as the Encina ABL Loan Agreement is terminated and the obligations thereunder have been repaid in full) that:

(a)      the Agent on behalf of the Lenders, has a first priority perfected Lien covering such unrestricted cash or Cash Equivalent, and such unrestricted cash or Cash Equivalent is, and at all times will be, free and clear of all Liens other than Permitted Liens and unregistered Liens in respect of Priority Claims that are not yet due and payable;

(b)      are held in collateral accounts located in Canada, the U.S., Mexico or another OECD member country; provided, such collateral accounts may be located in non-OECD member countries to the extent maintained by HSBC or an affiliate thereof (or such other bank deemed reasonable in the sole discretion of the Agent);

- 18 -

(c)      subject to the proviso at the end of Section 8.1(i), are held in collateral accounts in the name of the Agent or an agent thereof (or, with the consent of the Agent, the applicable Credit Party), in each case maintained with (i) the Agent or (ii) an Affiliate of the Agent, another Lender, an Affiliate of another Lender or another depositary that has entered into a control agreement (in form and substance reasonably acceptable to the Agent) with the Agent and the applicable Credit Party, and, in each case, with respect to which the Agent retains exclusive control to direct the transfer of funds therefrom during the continuation of an Event of Default (with withdrawals by the applicable Credit Party to be permitted upon notice to the Agent so long as the Agent has not delivered a notice of exclusive control upon the occurrence and during the continuation of an Event of Default);

(d)      subject to clause (ii) above, is otherwise available for use by a Credit Party, without condition or restriction; and

(e)      upon a reasonable request therefor by the Agent, for which Agent shall have received evidence, in form and substance reasonably satisfactory to Agent, of the amount thereof as of the applicable date of calculation,

provided, that such unrestricted cash and Cash Equivalents shall be reduced by an amount equal to, as reasonably estimated by the Borrowers, the withholding tax payable on any cash and Cash Equivalents that are to be remitted by any Credit Party to a foreign jurisdiction; and further provided, that to the extent that any debit balances (or overdrawn amounts) of any accounts of such Credit Parties are deducted from the calculation of unrestricted cash and Cash Equivalents above, they shall be increased by an amount equal to such debit balances (or overdrawn amounts) solely to the extent that availability under the Operating Facilities is reduced by the amount of any Letters of Credits (or any portion thereof) issued and outstanding under the Operating Facilities to backstop such deficit amounts.

1.1.81   "**Eligible Inventory**" means, at any time, all inventory of the Credit Parties valued in U.S. Dollars on a lower of cost (excluding any component of cost representing intercompany profit in the case of inventory acquired from an Affiliate) or market basis in accordance with GAAP, with detailed calculations of lower of cost or market; provided that, in any event, no inventory shall be deemed Eligible Inventory unless each of the following statements is accurate and complete (unless all of the Lenders in their sole discretion elect to otherwise include such inventory) (and by including such inventory in any computation of the applicable Borrowing Base the Borrowers will be deemed to have made each of these statements in respect thereof):

(a)      such inventory is in good condition, merchantable, meets all material standards imposed by any Governmental Authority having regulatory authority over it or its use and/or sale and is not obsolete and is either currently usable or currently saleable in the normal course of business of the applicable Credit Party;

(b)      with respect to any such inventory in excess of $250,000 per location, such inventory is:

- 19 -

(i)    in possession of a Credit Party and (1) located on real property owned or leased by a Credit Party, and (2) within the U.S. or Canada; provided, that if such inventory is located on real property leased by a Credit Party and if so requested by the Agent, the landlord of such real property shall have executed and delivered to the Agent a Landlord Agreement or at the request of a Borrower or in lieu of such an agreement, the Lenders may take a reserve against Eligible Inventory equal to three month's rent;

(ii)    in the possession of a bailee and such bailee shall have executed and delivered to the Agent, a bailee letter in form and substance satisfactory to the Agent or at the request of a Borrower, the Lenders shall be permitted to take a reasonable reserve against Eligible Inventory related to the applicable Credit Party's economic exposure to such bailee;

(iii)    in the case of inventory located in the U.S., is placed on consignment with a consignee and such consignee shall have executed a valid consignment agreement in form and substance satisfactory to Agent and the applicable Borrower has filed (when applicable) appropriate UCC (or comparable) filings to perfect its interest in such inventory; or

(iv)    in transit in Canada or the U.S. (provided, that the jurisdictions through which such inventory is in transit are jurisdictions where the Liens in such inventory under the Security are validly perfected first priority Liens as required by Applicable Law) and between owned or leased locations of the Credit Parties, and upon arrival at its destination, will comply with either clause (i) or (ii) above;

(c)    the Agent on behalf of the Lenders, has a first priority perfected Lien covering such inventory, and such inventory is, and at all times will be, free and clear of all Liens other than Permitted Liens and unregistered Liens in respect of Priority Claims that are not yet due and payable;

(d)    such inventory does not include goods (i) that are not owned by a Credit Party, (ii) that are held by a Credit Party pursuant to a consignment agreement, or (iii) which have been sold by a Credit Party on a bill and hold basis;

(e)    such inventory is not subject to repossession on account of the "30 day goods" rule under section 81.1 of the *Bankruptcy and Insolvency Act* (Canada) or similar Laws except to the extent the applicable vendor has entered into an agreement with the Agent, in form and substance satisfactory to the Agent, waiving its right to repossession;

(f)    such inventory does not consist of work in process, store room materials, samples, prototypes, or packing and shipping materials not considered for sale by the Credit Parties in the ordinary course of business;

(g)    such inventory does not consist of goods that are returned (as defective or not fit for purpose) or used goods taken in trade;

(h)     any portion of the value of such inventory which results from a profit or gain resulting from an inter-company sale or other disposition of such inventory shall be excluded;

(i)     any "seconds" or scrap inventory shall be valued at scrap value;

(j)     such inventory is not evidenced by negotiable documents of title unless delivered to the Agent with endorsements;

(k)     such inventory does not constitute Hazardous Materials;

(l)     such inventory is covered by casualty insurance; and

(m)     the Agent has not determined in its Permitted Discretion that it may not sell or otherwise dispose of such inventory in accordance with the terms of the applicable Credit Documents without infringing upon the rights of another Person or violating any contract with any other Person.

1.1.82   "**Eligible Line of Business**" means any business engaged in as of the date of this Agreement by any of the Credit Parties, and any business reasonably related thereto.

1.1.83   "**Eligible Receivables**" means, at the time of determination, the Receivables of the Credit Parties then existing (other than with respect to Anchor, Terra and their respective Subsidiaries), minus any Receivable to which any of the criteria set forth below applies (unless all of the Lenders in their sole discretion elect to otherwise include such Receivables):

(a)     is not then subject to the applicable duly perfected Liens created by the Security;

(b)     is subject to any Lien or deemed trust (other than a Permitted Lien which does not rank in priority to the Liens created by the Security);

(c)     is outstanding more than (i) 120 days, in the case of Acceptable Account Debtors or (ii) 90 days, in the case of all other account debtors, in either case after the date of shipment of inventory or the provision of the service that created such Receivable;

(d)     is subject to any offset or counterclaim by the applicable account debtor (but only to the extent of such offset);

(e)     is owed by any Person whose principal place of business is located outside Canada or the U.S. unless the sale is on letter of credit, guarantee or some other terms acceptable to the Agent, acting reasonably;

(f)     is payable in a currency other than Canadian Dollars or U.S. Dollars;

(g)     is owed by an Affiliate of the Borrower or any employee, agent or representative of the Borrower or of any such Affiliate;

(h)     with respect to which a cheque, note, draft or other payment instrument has not been honoured in accordance with its terms;

(i)     is owed by any Person that is subject to an Insolvency Event; provided that the Receivables from insolvent account debtors shall be Eligible Receivables if and to the extent that such Receivables are fully covered by credit insurance, letters of credit or other sufficient third-party credit support, or are otherwise deemed by the Agent not to pose an unreasonable risk of non-collectability;

(j)     is subject to a holdback, but only to the extent of the amount of such holdback;

(k)     is in dispute, but only to the extent of the amount thereof in dispute, or is subject to a claim regarding rescission, cancellation or avoidance, whether by operation of law or otherwise;

(l)     to the extent such Receivable is evidenced by a judgment, provided that such Receivables shall be Eligible Receivables if and to the extent that such Receivables are fully covered by credit insurance, letters of credit or other sufficient third-party credit support, or are otherwise deemed by the Agent not to pose an unreasonable risk of non-collectability; and

(m)     is owed by a Governmental Authority where Applicable Law imposes any requirement (including any requirement of notice, acceptance or acknowledgment by the Governmental Authority) to constitute a valid assignment as against such Governmental Authority, unless the applicable Credit Party has assigned its rights to payment of such Receivable to the Agent pursuant to, in the case of a U.S. federal Governmental Authority, the Assignment of Claims Act of 1940, as amended, or complied with such requirement pursuant to Applicable Law in the case of any other Governmental Authority.

(n)     is or has been sold, contributed, financed or otherwise conveyed or pledged pursuant to either of a Permitted Factoring Transaction or a Permitted Securitization Financing.

For certainty, if any Receivable that is otherwise an Eligible Receivable is sold, contributed, financed or otherwise conveyed or pledged pursuant to a Permitted Securitization Financing it shall immediately cease to be an Eligible Receivable.

1.1.84   "**Encina**" means Encina Business Credit, LLC and its successors and permitted assigns.

1.1.85   "**Encina ABL Loan Agreement**" means the credit agreement dated as the November 21, 2017 by and among Anchor, the U.S. Borrower, each Person joined thereto as a borrower form time to time, the lenders from time to time party thereto and Encina as agent on behalf of such lenders, as may be amended, restated, replaced or otherwise modified from time to time to the extent permitted by the Encina Intercreditor Agreement.

1.1.86    "**Encina Intercreditor Agreement**" means the intercreditor agreement dated as of the November 21, 2017 among Encina, the Agent, Anchor and the U.S. Borrower, as may be amended, restated, replaced or otherwise modified from time to time.

1.1.87    "**Equity Cure**" is defined in Section 7.3.2.

1.1.88    "**Equity Cure Repayment**" is defined in Section 7.3.2.

1.1.89    "**Equivalent Amount**" means, in relation to an amount in one currency, the amount in another currency that could be purchased by the amount in the first currency determined by reference to the applicable Exchange Rate at the time of such determination.

1.1.90    "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any applicable regulation promulgated thereunder.

1.1.91    "**ERISA Affiliate**" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of any Credit Party, or under common control with any Credit Party, within the meaning of Section 414 of the Code.

1.1.92    "**ERISA Event**" means (i) the occurrence of a reportable event, as defined in Section 4043 of ERISA, with respect to any Plan unless the 30 day notice requirement with respect to such event has been waived by the PBGC; (ii) the application for a minimum funding waiver pursuant to Section 412(c) of the Code or Section 302(c) of ERISA with respect to a Plan; (iii) the receipt by any Credit Party from the administrator of any Plan of a notice pursuant to Section 4041(a)(2) of ERISA of intent to terminate such Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the cessation of operations at a facility of any Credit Party or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (v) the withdrawal by any Credit Party or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (vi) the conditions for imposition of a Lien under Section 303 of ERISA shall have been met with respect to any Plan; or (vii) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042(a) of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, such Plan.

1.1.93    "**Exchange Rate**" means, on the date of determination of any amount of one currency to be converted into another currency pursuant to this Agreement for any reason, or vice-versa, the spot rate of exchange for converting Canadian Dollars into such other currency or vice-versa, as the case may be, established by the Bank of Canada at approximately 4:30 p.m. (Toronto time) on the Business Day immediately preceding the date of determination, and if no such rate is quoted, the spot rate of exchange for wholesale transactions by the Agent in Toronto, Ontario in accordance with its normal practice;.

1.1.94   "**Excluded Account**" means (a) any deposit account used solely for: (i) funding payroll or segregating payroll taxes or funding other employee wage or benefit payments in the ordinary course of business or (ii) segregating 401k contributions or contributions to an employee stock purchase plan and other health and benefit plan, in each case for payment in accordance with any Applicable Laws, (iii) any zero-balance disbursement accounts, or (iv) disbursements to pay independent contractors, (b) any deposit account the funds in which consist solely of funds held by Holdco or any Subsidiary on behalf of or in trust for the benefit of any third party that is not an Affiliate of Holdco, any Subsidiary or any Investor, (c) any deposit account the funds in which consist solely of cash earnest money deposits or funds deposited under escrow or similar arrangements in connection with any letter of intent or purchase agreement for a Permitted Acquisition or any other transaction permitted under this Agreement, and (d) any deposit account the funds in which consist solely of funds held by Anchor and its Subsidiaries until such time as the Encina ABL Loan Agreement is terminated and the obligations thereunder have been repaid in full;

1.1.95   "**Excluded Hedging Obligation**" means, with respect to any Credit Party, any Hedging Liabilities if, and to the extent that, all or a portion of the Financial Assistance of such Credit Party of, or the grant by such Credit Party of a security interest to secure, such Hedging Liabilities (or any Financial Assistance in respect thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Credit Party's failure for any reason to constitute an Qualified ECP Guarantor at the time the Financial Assistance of such Credit Party, or a grant by such Credit Party of a security interest, becomes effective with respect to such Hedging Liabilities. If a Hedging Liability arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Hedging Liabilities that is attributable to swaps for which such Financial Assistance or security interest is or becomes excluded in accordance with the first sentence of this definition.

1.1.96   "**Executive Order**" means the Executive Order No. 13224 of 23 September 2001, entitled "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism".

1.1.97   "**Existing Credit Agreement**" means the Amended and Restated Credit Agreement, dated January 30, 2015 (as amended, supplemented or otherwise modified from time to time prior to the Amendment and Restatement Date), among the Canadian Borrower, the U.S. Borrower, HSBC, as administrative agent thereunder and the financial institutions from time to time party thereto as lenders.

1.1.98   "**Facilities**" means, collectively, the Term Facility, the Canadian Operating Facility and the U.S. Operating Facility; and "**Facility**" means any of them as the context requires.

1.1.99   "**Facilities Maturity Date**" means, in respect of each Facility, May 22, 2021.

- 24 -

1.1.100  "**FATCA**" means Section 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current and future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

1.1.101  "**Federal Funds Rate**" means, for any day, the rate of interest per annum set forth in the weekly statistical release designated as H.15(519), or any successor publication, published by the Federal Reserve Board (including any such successor, the "**H.15(519)**") for such day opposite the caption "*Federal Funds (Effective)*". If on any relevant day such rate is not yet published in H.15(519), the rate for such day will be the rate of interest per annum set forth in the daily statistical release designated as the Composite 3:30 p.m. Quotations for U.S. Government Securities, or any successor publication, published by the Federal Reserve Bank of New York (including any successor, the "**Composite 3:30 p.m. Quotations**") for such day under the caption "*Federal Funds Effective Rate*". If on any relevant day the appropriate rate per annum for such day is not yet published in either H.15(519) or the Composite 3:30 p.m. Quotations, the rate for such day will be the arithmetic mean of the rates per annum for the last transaction in overnight Federal funds arranged prior to 9:00 a.m. (New York time) on that day by each of three major brokers of Federal funds transactions in New York City, selected by the Agent in its sole discretion, acting reasonably; provided that if the Federal Funds Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.102  "**Fee Agreement**" means the agreement between the Borrowers and the Agent delivered on or before the Amendment and Restatement Date under Section 9.1(n).

1.1.103  "**Financial Assistance**" means with respect of any Person and without duplication, any loan, guarantee, indemnity, assurance, acceptance, extension of credit, loan purchase, share purchase, equity or capital contribution, investment or other form of direct or indirect financial assistance or support of any other Person or any obligation (contingent or otherwise) primarily for the purpose of enabling another Person to incur or pay any indebtedness or to comply with agreements relating thereto or otherwise to assure or protect creditors of the other Person against loss in respect of indebtedness of the other Person and includes any guarantee of or indemnity in respect of the indebtedness of the other Person and any absolute or contingent obligation to (directly or indirectly):

(a)     advance or supply funds for the payment or purchase of any indebtedness of any other Person;

(b)     purchase, sell or lease (as lessee or lessor) any property, assets, goods, services, materials or supplies primarily for the purpose of enabling any Person to make payment of Funded Debt or to assure the holder thereof against loss;

(c)     guarantee, indemnify, hold harmless or otherwise become liable to any creditor of any other Person from or against any losses, liabilities or damages in respect of Funded Debt;

- 25 -

(d)   make a payment to another for goods, property or services regardless of the non-delivery or non-furnishing thereof to a Person; or

(e)   make an advance, loan or other extension of credit to or to make any subscription for equity, equity or capital contribution, or investment in or to maintain the capital, working capital, solvency or general financial condition of another Person;

provided, however, that the term "Financial Assistance" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Amendment and Restatement Date or entered into in connection with any acquisition or disposition of assets permitted by this Agreement.

The amount of any Financial Assistance is the amount of any loan or direct or indirect financial assistance or support, without duplication, given, or all indebtedness of the obligor to which the Financial Assistance relates, unless the Financial Assistance is limited to a determinable amount, in which case the amount of the Financial Assistance is the determinable amount.

1.1.104   "**Financial Letter of Credit**" means a standby Letter of Credit if it serves as a payment guarantee of a Credit Party's financial obligations and is treated as a direct credit substitute for purposes of the Capital Adequacy Guidelines in the Swingline Lender's or Issuing Bank's, as applicable, reasonable opinion.

**1.1.105   "First Amendment Date" means May 13, 2019.**

**1.1.106**   ~~1.1.105~~ "**First-Ranking Security Interest**" in respect of any Collateral means a Lien in such Collateral which is registered where necessary or desirable to record and perfect the charges contained therein and which ranks in priority to all other Liens in such Collateral except for any Permitted Liens which have priority thereto in accordance with Applicable Law or as otherwise agreed in writing by the Lenders.

**1.1.107**   ~~1.1.106~~ "**Fiscal Quarter**" means the three (3) month period commencing on the first day of each Fiscal Year and each successive three (3) month period thereafter during such Fiscal Year.

**1.1.108**   ~~1.1.107~~ "**Fiscal Year**" means the fiscal year of the Borrowers and their Subsidiaries commencing on January 1 of each year and ending on December 31 of each year.

**1.1.109**   ~~1.1.108~~ "**Fixed Charge Coverage Ratio**" means, in respect of the Credit Parties on a combined basis for any applicable period, the ratio of:

(a)   (i) EBITDA for such period, plus, to the extent not included in EBITDA, the aggregate amount of all unencumbered cash (except pursuant to the Security) received by any Credit Party as payment of unbilled Receivables outstanding as of December 31, 2015 that were outstanding for more than 720 days from any of the Pemex Entities, in respect of contract number 423023821 dated August 6, 2013,

between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V., and contract number 423023813 dated July 25, 2013, between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V. (in each case, as may be amended or otherwise modified from time to time), in an amount not to exceed $13,500,000, *minus* (ii) Earnout Payments made during such period (but only to the extent not directly funded by the cash proceeds from the sale of equity interests of the Canadian Borrower and, to the extent contributed to the capital of the Canadian Borrower, equity interests of any of the Canadian Borrower's direct or indirect parent companies), *minus* (iii) Unfunded Capital Expenditures made during such period, *minus* (iv) all Cash Taxes during such period, *minus* (v) Permitted Management Fees and Catch Up Management Fee Payments, if any, paid during such period, *minus* (vi) any payments made during such period pursuant to clauses 7.2.6(l), *minus* (vii) all other Distributions to Persons that are not Credit Parties paid during such period, *minus* (viii) the fees and expenses described in clause (k) of the definition of EBITDA; <u>provided</u> that, any deferred purchase price payments made in accordance with the terms of the Anchor Acquisition Agreement shall not be deducted from EBITDA for the purposes of calculating the Fixed Charge Coverage Ratio;

*divided by*

(b)    the sum total of:

    (i)    all Interest Expense paid or payable in cash for such period;

    (ii)   the scheduled principal component of all Capital Lease payments for such period; and

    (iii)  all scheduled principal repayments under the Term Facility pursuant to Section 3.4.2 or under any other Funded Debt paid during such period;

all determined on a consolidated basis in accordance with GAAP and tested on a trailing 12 month basis at the end of each Fiscal Quarter.

**1.1.110** ~~1.1.109~~ "**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

**1.1.111** ~~1.1.110~~ "**Funded Debt**" means, with respect to any Person, all indebtedness, liabilities and obligations which would in accordance with GAAP be classified in the consolidated balance sheet of such Person as indebtedness for borrowed money and including without duplication:

(a)    money borrowed by way of overdraft;

(b)    indebtedness represented by bonds, debentures or notes payable and drafts accepted representing extensions of credit;

- 27 -

(c)      bankers' acceptances and similar instruments;

(d)      letters of credit, letters of guarantee and surety bonds issued at the request of such Person (to the extent not cash collateralized), but excluding Non-Financial Letters of Credit;

(e)      actual amounts owed under Hedging Agreements upon termination of such Hedging Agreements, including net settlement amounts payable upon maturity and termination payments payable upon termination or early termination, which are not paid when due;

(f)      indebtedness secured by any Lien existing on property of such Person, whether or not the indebtedness secured thereby shall have been assumed;

(g)      all obligations (whether or not with respect to the borrowing of money) that are evidenced by bonds, debentures, notes or other similar instruments, or that are not so evidenced but that would be considered by GAAP to be indebtedness for borrowed money;

(h)      all redemption obligations and mandatory dividend obligations of such Person with respect to any shares issued by such Person and which are by their terms or pursuant to any contract, agreement or arrangement:

      (i)      redeemable, retractable, payable or required to be purchased or otherwise retired or extinguished, or convertible into debt of such Person (A) at a fixed or determinable date, (B) at the option of any holder thereof, or (C) upon the occurrence of a condition not solely within the control and discretion of such Person; or

      (ii)      convertible into any other shares described in clause (i) above;

in any case under this clause (h), except as a result of an initial public offering, change of control or asset sale (so long as the Obligations have otherwise been paid in full prior to any such payment being required to be made under clause (i) above).

(i)      all obligations as lessee under Capital Leases;

(j)      all obligations under or in connection with any (i) Permitted Factoring Transaction and (ii) Permitted Securitization Financing (to the extent included in the consolidated balance sheet of such Person), which shall in each case be deemed to be equal to the net proceeds received thereunder;

(k)      all obligations of such Person secured by Purchase-Money Security Interests; and

(l)      any guarantee or indemnity (other than by endorsement of negotiable instruments for collection or deposit in the ordinary course of business) in any manner of any

25877170.9 27367782.4

part or all of an obligation of another Person of the type included in items (a) through (k) above;

but excluding for greater certainty, deferred income taxes and normal course trade payables.

**1.1.112** 1.1.111 "**GAAP**" means generally accepted accounting principles in Canada or the United States as approved by the Canadian Institute of Chartered Accountants or American Institute of Certified Public Accountants, respectively, in effect from time to time, and as of the Amendment and Restatement Date, includes Canadian or United States generally accepted accounting principles for private enterprises.

**1.1.113** 1.1.112 "**Governmental Authority**" means any:

(a)     national, federal, provincial, state, municipal, local or other governmental or public department, central bank, court, commission, board, bureau, agency or instrumentality, domestic or foreign;

(b)     any subdivision or authority of any of the foregoing; or

(c)     any quasi-governmental, judicial or administrative body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing.

**1.1.114** 1.1.113 "**Group**" means any "**group**" such term as used in Sections 13(d) and 14(d) of the *United States Securities Exchange Act* of 1934, as amended, other than the Permitted Holders.

**1.1.115** 1.1.114 "**Guarantee**" means any agreement by which any Person assumes, guarantees, indemnifies, endorses, contingently agrees to purchase or provide funds for the payment of, or otherwise becomes liable upon, the obligation of any other Person, or agrees to maintain the net worth or working capital or other financial condition of any other Person or otherwise assures any creditor of such Person against loss, and shall include any contingent liability under any letter of credit or similar document or instrument.

**1.1.116** 1.1.115 "**Guarantors**" means Holdco and all current and future direct and indirect Material Subsidiaries of the Canadian Borrower.

**1.1.117** 1.1.116 "**Hazardous Materials**" means any contaminant, pollutant, waste or substance that is likely to cause immediately or at some future time harm or degradation to the surrounding environment or risk to human health; and without restricting the generality of the foregoing, including any pollutant, contaminant, waste, hazardous waste or dangerous goods that is regulated by any Requirements of Environmental Law or that is designated, classified, listed or defined as hazardous, toxic, radioactive or dangerous or as a contaminant, pollutant or waste by any Requirements of Environmental Law.

**1.1.118** 1.1.117 "**Hedge Provider**" means any Lender or any Affiliate thereof that enters into a Hedging Agreement with a Credit Party prior to such Lender ceasing to be a Lender

- 29 -

under this Agreement. For certainty, any Person who enters into a Hedging Agreement after such Person ceases to be a Lender hereunder is not a Hedge Provider for purposes such Hedging Agreement.

**1.1.119** 1.1.118 "**Hedging Agreements**" means Interest Rate Hedging Agreements and Currency Hedging Agreements.

**1.1.120** 1.1.119 "**Hedging Liability**" means the actual indebtedness or obligations of any Credit Party to a counterparty who enters into a Hedging Agreement with such Credit Party under or pursuant to such Hedging Agreement.

**1.1.121** 1.1.120 "**Holdco**" means Fluid Holding Corp., a corporation incorporated under the BCBCA, and its successors and permitted assigns.

**1.1.122** 1.1.121 "**Hostile Acquisition**" means an acquisition, which is required to be reported to applicable securities regulatory authorities, of shares of a corporation where the board of directors of that corporation has not approved such acquisition nor recommended to the shareholders of the corporation that they sell their shares pursuant to the proposed acquisition or of units of a trust where the trustee or manager or administrator of that trust has not approved such acquisition nor recommended to the unitholders of the trust that they sell their units pursuant to the proposed acquisition or of units of a partnership where the board of directors of the general partner(s) thereof has not approved such acquisition nor recommended to the partners of the partnership that they sell their units pursuant to the proposed acquisition.

**1.1.123** 1.1.122 "**HSBC**" means HSBC Bank Canada and its successors and permitted assigns.

**1.1.124** 1.1.123 "**HSBC Mexico**" means HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC.

**1.1.125** 1.1.124 "**HSBC US**" means HSBC Bank USA, National Association and its successors and permitted assigns.

**1.1.126** 1.1.125 "**Impositions**" is defined in Section 12.4.1.

**1.1.127** 1.1.126 "**Indemnitees**" means the Lenders, the Agent and their respective successors and permitted assignees, any agent of any of them (specifically including a receiver or receiver-manager) and the respective officers, directors and employees of the foregoing.

**1.1.128** 1.1.127 "**Insolvency Event**" means, in respect of any Person:

(a)    such Person commits an act of bankruptcy or becomes insolvent (as such terms are used in the BIA); or makes an assignment for the benefit of creditors, files a petition in bankruptcy, makes a proposal or commences a proceeding under Insolvency Legislation; or petitions or applies to any tribunal for, or consents to, the appointment of any receiver, trustee or similar liquidator in respect of all or a

- 30 -

substantial part of its property; or admits the material allegations of a petition or application filed with respect to it in any proceeding commenced in respect of it under Insolvency Legislation; or takes any board action for specifically authorizing any of the foregoing actions; or

(b)   any proceeding or filing is commenced against such Person seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment or composition of it or its debts under any Insolvency Legislation, or seeking appointment of a receiver, trustee, custodian or other similar official for it or any of its property or assets; unless:

(i)   such Person is diligently defending such proceeding in good faith and on reasonable grounds as determined by the Required Lenders acting reasonably and the same shall continue undismissed, or unstayed and in effect, for any period of 60 consecutive days; and

(ii)   such proceeding does not in the reasonable opinion of the Required Lenders materially adversely affect the ability of such Person to carry on its business and to perform and satisfy all of its obligations.

**1.1.129**   1.1.128   "**Insolvency Legislation**" means legislation in any applicable jurisdiction relating to reorganization, arrangement, compromise or re-adjustment of debt, dissolution or winding-up, or any similar legislation, and specifically includes the BIA, the *Companies' Creditors Arrangement Act* (Canada), the *Winding-Up and Restructuring Act* (Canada) and the *Bankruptcy Code* (United States) and any similar legislation under Applicable Law.

**1.1.130**   1.1.129   "**Insurance Proceeds**" is defined in Section 5.3.1(c).

**1.1.131**   1.1.130   "**Insured Receivables**" means Receivables of the Credit Parties owing from account debtors that:

(a)   solely in respect of Insured Receivables that do not derive from and are not governed by the laws of Canada or the United States of America or any political subdivision thereof, no less than 80% of such Receivables arise from Eligible Approved Contracts; *provided* that if the revenue derived from any such single contract exceeds 10% of the Canadian Borrower's annual revenue as set out in the then most recent income statement of the Canadian Borrower that was delivered to the Lenders hereunder, such contract must be an Eligible Approved Contract;

(b)   does not arise under an "excluded contract" or any similar term as provided in the Account Receivable Insurance, are within the approved credit, sovereign, country, single obligor and other limits under the Account Receivable Insurance and are otherwise covered under the Account Receivable Insurance which is in full force and effect;

(c)     the Credit Parties have complied with the credit policy provided for in the Account Receivable Insurance with respect to such Receivables, including the issuance of invoices, *pro forma* invoices and final invoices within the required time periods thereunder;

(d)     there are no events, facts or circumstances which would reasonably be expected to result in the insurer under the Account Receivable Insurance denying (or withholding or delaying) payment of a claim in respect of such Receivables or asserting any defense, dispute or counterclaim with respect to such Receivables;

(e)     the insurer under the Account Receivable Insurance has not denied all or any portion of a claim in respect of such Receivable, and has not asserted any defense, dispute or counterclaim with respect to such Receivable;

(f)     the Credit Parties have not suffered any loss with respect to such Receivables, unless such loss is covered by the Account Receivable Insurance;

(g)     are not in dispute and are valid and enforceable obligations of the account debtor under Applicable Law;

(h)     if Credit Parties have suffered a loss in respect of such Receivable covered by the Account Receivable Insurance, they have submitted a claim for such loss in accordance with the terms of the Account Receivable Insurance and have otherwise complied with all provisions of the Account Receivable Insurance on a timely basis in order to be entitled to have such claim paid by the insurer under the Account Receivable Insurance;

(i)     the Credit Parties have paid any required deductibles under the Account Receivable Insurance in respect of such Receivables; and

(j)     in any case, are due within the time period, including any "waiting period", from the date of billing required under the Account Receivable Insurance in respect of such Receivable.

**1.1.132**  ~~1.1.131~~ "**Intercreditor Agreement**" means that certain intercreditor and priority agreement between the Agent, HSBC Mexico, and the Borrower or QMax Mexico, as amended, modified, supplemented or restated from time to time, with respect to any Permitted Factoring Transaction with HSBC Mexico.

**1.1.133**  ~~1.1.132~~ "**Interest**" means interest on loans, stamping fees in respect of bankers' acceptances, the difference between the proceeds received by the issuers of bankers' acceptances and the amounts payable upon the maturity thereof, issuance fees in respect of letters of credit, and any other charges or fees in connection with the extension of credit which are determined by reference to the amount of credit extended, plus standby fees in respect of the unutilized portion of any credit facility; but for greater certainty "Interest" shall not include agency fees, arrangement fees, structuring fees, fees relating to the granting of consents, waivers, amendments, extensions or restructurings, the reimbursement of costs and expenses, and any similar amounts which may be charged

from time to time in connection with the establishment, administration or enforcement of the credit facilities.

**1.1.134** ~~1.1.133~~ "**Interest Expense**" means, with respect to any Person for any period, the sum of (without duplication) (a) interest expense of such Person for such period on a consolidated basis, including (i) the amortization of debt discounts, (ii) all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances, (iii) standby fees in respect of undrawn debt, (iv) discounts applied to the proceeds of any Permitted Factoring Transaction or Permitted Securitization Financing, and (v) the portion of any payments or accruals with respect to Capital Lease obligations allocable to interest expense (but excluding (A) non-cash interest expense attributable to the movement of mark-to-market hedging obligations or other derivative instruments pursuant to GAAP (B) penalties and interest related to taxes, amortization of debt financing fees, debt issuance costs, commissions, fees and expenses and the expensing of any commitment and other financing fee in each case, to the extent constituting interest expense under GAAP), and (b) capitalized interest of such Person. For purposes of the foregoing, cash interest expense shall be determined after giving effect to any net payments made or received and costs incurred by the Borrower and the Subsidiaries with respect to Interest Rate Hedging Agreements, and interest on a Capital Lease obligation shall be deemed to accrue at an interest rate reasonably determined by the Borrower to be the rate of interest implicit in such Capital Lease obligation in accordance with GAAP.

**1.1.135** ~~1.1.134~~ "**Interest Rate Hedging Agreement**" means any agreement that does not contravene Section 7.2.13 entered into between the Borrower and a counterparty from time to time for the purpose of hedging interest rate risk, including interest rate exchange agreements (commonly known as "**interest rate swaps**") and forward rate agreements; and for greater certainty, including interest rate exchange agreements in U.S. Dollars (commonly known as "**cross-currency swaps**").

**1.1.136** ~~1.1.135~~ "**Interim Financial Statements**" in respect of any Fiscal Quarter means, in respect of any Person, the unaudited financial statements of such Person on a consolidated basis in respect of such Fiscal Quarter (and also on a year-to-date basis in respect of such Fiscal Quarter and all previous Fiscal Quarters in the same Fiscal Year).

**1.1.137** ~~1.1.136~~ "**Investment Grade**" means, with respect to the long term unsecured debt ratings of a Person, of the rating agencies on the date hereof, Baa3 or higher for Moody's Investors Services, Inc. or BBB- or higher for Standard & Poor's Rating Services, a division of The McGraw Hill Companies, Inc. (or in either case, their respective successors).

**1.1.138** ~~1.1.137~~ "**Investments**" has the meaning given to it in Section 7.2.3.

**1.1.139** ~~1.1.138~~ "**Investors**" means Pep Fluid Co-Invest L.P., PEP Fluid L.P. and any other investors from time to time who are approved in writing by the Agent on behalf of the Required Lenders.

**1.1.140** ~~1.1.139~~ "**ISDA**" means the International Swaps and Derivatives Association and its successors and assigns.

**1.1.141** ~~1.1.140~~ "**ISP98**" means the International Standby Practices ISP98, as published by the International Chamber of Commerce and in effect from time to time.

**1.1.142** ~~1.1.141~~ "**Issuing Bank**" means the Swingline Lender under the Canadian Operating Facility and HSBC US under the U.S. Operating Facility, as applicable.

**1.1.143** ~~1.1.142~~ "**Land**" means real property (including a leasehold interest in land) and all buildings, improvements, fixtures and plant situated thereon.

**1.1.144** ~~1.1.143~~ "**Landlord Agreement**" means an agreement between the Agent, the applicable Credit Party and the landlord of a Leased Property in form and substance reasonably satisfactory to the Agent, which shall include the following provisions (except to the extent otherwise agreed by the Agent in its discretion): such landlord consents to the granting of a security interest in the lease applicable to such Leased Property by a Credit Party which is a tenant thereunder in favour of the Agent, agrees to give written notice to the Agent in respect of and a reasonable opportunity to cure any default before terminating the lease, and agrees to waive (or subordinate and defer the enforcement of) its rights and remedies and any security it may hold in respect of any assets owned by the applicable Credit Party located on or affixed to such Leased Property.

**1.1.145** ~~1.1.144~~ "**Laws**" means all laws, statutes, codes, ordinances, decrees, rules, regulations, municipal by-laws, judicial or arbitral or administrative or ministerial or departmental or regulatory judgments, orders, decisions, rulings or awards, or any provisions of such laws, including general principles of common and civil law and equity or policies or guidelines, to the extent such policies or guidelines have the force of law, binding on the Person referred to in the context in which such word is used; and "**Law**" means any of the foregoing.

**1.1.146** ~~1.1.145~~ "**LC Payment**" is defined in Section 2.7.9.

**1.1.147** ~~1.1.146~~ "**Leased Properties**" means all Land leased by any Credit Party as tenant from time to time, specifically including as at the date of this Agreement the Land described in Schedule 6.1.10; and "**Leased Property**" means any of the Leased Properties as the context requires.

**1.1.148** ~~1.1.147~~ "**Lenders**" means the lenders identified in Exhibit "A" attached hereto and any other Persons which may from time to time become lenders pursuant to this Agreement; and their respective successors and permitted assigns; and "**Lender**" means any of them as the context requires.

**1.1.149** ~~1.1.148~~ "**Lending Office**" in respect of any Lender means the office of such Lender designated by it from time to time as the office from which it will make Advances hereunder.

**1.1.150** ~~1.1.149~~ "**Letter of Credit**" means a stand-by letter of credit or a letter of guarantee or documentary letter of credit issued, at the request of and on behalf of the Borrower, by the applicable Issuing Bank.

**1.1.151** ~~1.1.150~~ "**Level**" means the applicable level as set forth in the table set forth in the definition of Applicable Margin.

**1.1.152** ~~1.1.151~~ "**LIBOR Business Day**" means a day on which the main branches of the Agent and commercial banks generally are open for international business (including dealings in U.S. Dollar deposits in the London interbank market) in London, England and New York, New York.

**1.1.153** ~~1.1.152~~ "**LIBOR Interest Period**" means, with respect to each LIBOR Loan, the initial period (subject to availability) of approximately one, two, three, six or twelve months or such other periods as selected by the Borrower and notified in writing to the Agent commencing on and including the date of any Advance, Conversion or Rollover, as the case may be, applicable to such LIBOR Loan and ending on and including the last day of such initial period, and thereafter, each successive period (subject to availability) of approximately one, two, three, six or twelve months or such other periods as selected by the Borrower and notified to the Agent in writing commencing on and including the last day of the prior LIBOR Interest Period; provided, however, that:

(a)    in the case of a Rollover, the last day of each LIBOR Interest Period shall also be the first day of the next LIBOR Interest Period;

(b)    the last day of each LIBOR Interest Period shall be a LIBOR Business Day and if not, the Borrower shall be deemed to have selected a LIBOR Interest Period the last day of which is the first LIBOR Business Day following the last day of the LIBOR Interest Period selected by the Borrower;

(c)    if the Borrower selects a LIBOR Interest Period for a period longer than three months, the last day of such LIBOR Interest Period shall be the date falling three months after the beginning of such LIBOR Interest Period and the next LIBOR Interest Period shall begin on such date; and

(d)    notwithstanding any of the foregoing, the last day of each LIBOR Interest Period shall be on or before the maturity date of the applicable Facility.

**1.1.154** ~~1.1.153~~ "**LIBOR Loan**" means an Advance made by a Lender to a Borrower in U.S. Dollars in accordance with the provisions hereof, bearing interest by reference to the U.S. Dollar LIBOR Rate.

**1.1.155** ~~1.1.154~~ "**LIBOR Market**" means the London Interbank Eurodollar offering market.

**1.1.156** ~~1.1.155~~ "**LIBOR Period**" means, in respect of a LIBOR Loan, the period commencing on the date of the Advance of such LIBOR Loan and ending on the scheduled maturity date of such LIBOR Loan.

**1.1.157** 1.1.156 "**LIBOR Rate**" means, with respect to each LIBOR Interest Period pertaining to any LIBOR Loan, the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other successor thereto which takes over administration of such rate) appearing on Bloomberg Page BBAM1 screen (or on any successor or substitute page of such Bloomberg screen providing rate quotations comparable to those currently provided on such page of such Bloomberg screen, as determined by the Agent from time to time for purposes of providing quotations of interest rates applicable to U.S. Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two LIBOR Business Days prior to the making a LIBOR Loan, as the rate for the offering of U.S. Dollar deposits with a maturity comparable to the LIBOR Interest Period of such LIBOR Loan; provided, however, that if the said page is not available for any reason, the term "**LIBOR Rate**" shall mean the rate per annum at which deposits in U.S. Dollars for the applicable interest period and amount are offered to the Agent in the LIBOR Market; provided that if the LIBOR Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

**1.1.158** 1.1.157 "**Lien**" means:

(a)    a lien, charge, mortgage, deed of trust, pledge, security interest or conditional sale or title retention agreement in the nature of security which secures payment or performance of an obligation;

(b)    an assignment, lease, consignment, deposits, trust or deemed trust that secures payment or performance of an obligation;

(c)    a garnishment; and

(d)    any other encumbrance of any kind in the nature of security which secures payment or performance of an obligation (including any garantía prioritaria por adquisición under law 1676 of 2013 Colombia).

**1.1.159** 1.1.158 "**Loan**" means a Canadian Dollar Prime Rate Loan, U.S. Dollar Base Rate Loan, U.S. Dollar Prime Rate Loan, LIBOR Loan, Bankers' Acceptance, BA Equivalent Loan or Letter of Credit outstanding hereunder, or in the case of the Swingline, Overdraft borrowings and such other Advances permitted under Section 2.7.2.

**1.1.160** 1.1.159 "**Management Shareholders**" means each of the employees of the Canadian Borrower who hold Common Shares of the Canadian Borrower or options in respect of the same on the Amendment and Restatement Date and such other holders thereof from time to time who are approved in writing by the Agent on behalf of the Required Lenders, and "**Management Shareholder**" means any one of them.

**1.1.161** 1.1.160 "**Marginable Capital Assets**" means 60% of the net book value of Eligible Capital Assets at the time of determination, up to a maximum amount of U.S. $50,000,000 less the amount of each completed Anchor Sale and Leaseback Transaction;

provided that, reductions resulting from Anchor Sale and Leaseback Transactions shall not reduce the amount available below U.S. $30,000,000.

**1.1.162** ~~1.1.161~~ "**Marginable Cash**" means 100% of Eligible Cash up to a maximum amount of U.S. $15,000,000 at any time.

**1.1.163** ~~1.1.162~~ "**Marginable Inventory**" means 50% of Eligible Inventory at the time of determination, up to U.S. $35,000,000.

**1.1.164** ~~1.1.163~~ "**Marginable Receivables**" means the sum of the following (without duplication):

(a)     90% of Insured Receivables (or such lower percentage as is covered by the applicable Account Receivable Insurance) up to a maximum amount of U.S. $175,000,000;

(b)     85% of Eligible Receivables owed to a Credit Party by Acceptable Account Debtors;

(c)     75% of all other Eligible Receivables; and

(d)     90% of Insured Receivables from Pemex outstanding more than 300 days, but not more than 540 days, in respect of contract numbers 423023819 and 423023813 between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V., dated April 22, 2014 and July 17, 2013, respectively, and contract number 423023813, dated July 25, 2013, between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V. (in each case, as may be amended or otherwise modified from time to time).

**1.1.165** ~~1.1.164~~ "**Material Adverse Change**" or "**Material Adverse Effect**" means any matter, event or circumstance that individually or in the aggregate could, in the opinion of the Required Lenders, acting reasonably, be expected to result in a material adverse change to or have a material adverse effect on:

(a)     the business, financial condition, prospects, operations, or property, of the Canadian Borrower and its Subsidiaries (excluding any Securitization SPE), taken as a whole;

(b)     the ability of any Credit Party to pay and perform its obligations in accordance with this Agreement or any of the other Credit Documents; or

(c)     the validity or enforceability of this Agreement or any other Credit Document.

**1.1.166** ~~1.1.165~~ "**Material Agreement**" means, in respect of the Credit Parties, an agreement made between the applicable Credit Party or its predecessors and another Person (a) pursuant to which such Credit Party is reasonably expected to incur obligations or liabilities in excess of $10,000,000 in any Fiscal Year (other than any agreement related to the purchase of equipment, software or utility services) and (b) which if

- 37 -

terminated (other than at its scheduled maturity) would, unless replaced with a substantially similar agreement, result, or would have a reasonable likelihood of resulting, in a Default, an Event of Default or a Material Adverse Change, specifically including, as at the Amendment and Restatement Date, each agreement listed in Schedule 6.1.13; provided, in each case, in no event shall the Wells Fargo Credit Agreement or any agreement in connection with a Permitted Securitization Financing be considered a Material Agreement.

**1.1.167** ~~1.1.166~~ "**Material Permit**" means, in respect of the Credit Parties, a licence, permit, approval, registration or qualification granted to or held by the applicable Credit Party which if terminated and not replaced would result, or would have a reasonable likelihood of resulting, in a Default, an Event of Default or a Material Adverse Change; specifically including, as at the date of this Agreement, each licence, permit, approval, registration or qualification listed in Schedule 6.1.8.

**1.1.168** ~~1.1.167~~ "**Material Subsidiary**" means (a) any wholly-owned Subsidiary of the Canadian Borrower which:

    (i)    has Consolidated Net Tangible Assets owned directly by it on an unconsolidated basis equal or greater than 5% of the Canadian Borrower's Consolidated Net Tangible Assets as at the end of the Fiscal Quarter immediately prior to the date of such determination;

    (ii)    has EBITDA generated by it on an unconsolidated basis equal or greater than 5% of the Canadian Borrower's consolidated EBITDA as at the end of the Fiscal Quarter immediately prior to the date of such determination; or

    (iii)    any Subsidiary of the Canadian Borrower that has been designated as a "Material Subsidiary" by the Borrower,

and (b) any Subsidiary which owns, directly or indirectly, any equity or other ownership interest in a Material Subsidiary.

**1.1.169** ~~1.1.168~~ "**Minimum Liquidity**" means the sum of (A) the amount of unrestricted cash (determined in accordance with GAAP) and Cash Equivalents of the Credit Parties held in accounts with any of the Lenders, Encina (or any other lenders party to the Encina ABL Loan Agreement) and Wells Fargo (or any other lenders party to the Wells Fargo Credit Agreement), plus (B) the Minimum Margin Availability and undrawn available amount under the Encina ABL Loan Agreement or the Wells Fargo Credit Agreement, as applicable, plus (C) undrawn and available amounts under other facilities constituting Permitted Funded Debt plus (D) non-Marginable Cash.

**1.1.170** ~~1.1.169~~ "**Minimum Margin Availability**" means the undrawn available amount under the Operating Facilities up to the Borrowing Base (as at the time of determination).

**1.1.171** ~~1.1.170~~ "**Minor Title Defects**" in respect of any parcel of Land means encroachments, restrictions, easements, rights-of-way, servitudes and defects or

irregularities in the title to such Land which are of a minor nature and which, in the aggregate, will not materially impair the use of such Land for the purposes for which such Land is held by the owner thereof.

**1.1.172** 1.1.171 "**Multiemployer Plan**" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Credit Party or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

**1.1.173** 1.1.172 "**Multiple Employer Plan**" means a plan that is described in Section 210 of ERISA and subject to Title IV of ERISA, and (i) is maintained for employees of any Credit Party or any ERISA Affiliate and (ii) in respect of which any Credit Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

**1.1.174** 1.1.173 "**Net Leverage Ratio**" means, in respect of any Fiscal Quarter, the ratio of Total Net Debt at the end of such Fiscal Quarter to EBITDA in the fiscal period comprised of such Fiscal Quarter and the immediately preceding three Fiscal Quarters.

**1.1.175** 1.1.174 "**New Rules**" is defined in Section 12.1.3.

**1.1.176** 1.1.175 "**Non-BA Lender**" means a Lender identified in Exhibit "A" attached hereto as a Lender which will make BA Equivalent Loans instead of accepting Bankers' Acceptances hereunder.

**1.1.177** 1.1.176 "**Non-Consenting Lender**" is defined in Section 11.5.2.

**1.1.178** 1.1.177 "**Non-Financial Letter of Credit**" means a Letter of Credit that is not a Financial Letter of Credit **and, for the purposes of the definition of "Funded Debt", any similar performance letter of credit issued by a party that is not an Issuing Bank**.

**1.1.179** 1.1.178 "**Non-OECD Guarantor**" means any Guarantor whose governing jurisdiction is located in a country which not a member of OECD, excluding Colombia.

**1.1.180** 1.1.179 "**Non-Paying Lender**" is defined in Section 11.4.2.

**1.1.181** 1.1.180 "**Obligations**" means, at any time all direct and indirect, contingent and absolute obligations and liabilities of the Borrower and the other Credit Parties to the Agent and the Lenders under or in connection with this Agreement and the Security (specifically including for greater certainty all Guarantees provided hereunder) at such time, specifically including the Outstanding Advances, all accrued and unpaid interest thereon, all Secured Hedging Liabilities and all Banking Service Liabilities, all indemnity obligations arising under, any other Credit Document, any Banking Service Agreement or any Hedging Agreement with a Hedge Provider, all fees payable in connection with prepayments, all breakage fees payable pursuant to Section 5.15 and all other fees, expenses and other amounts payable pursuant to this Agreement and the Security (specifically including fees relating to the Facilities as may be agreed in writing from time

27367782.4

to time between a Borrower and any Lender); except that if otherwise specified or required by the context, "Obligations" shall mean any portion of the foregoing. Notwithstanding anything herein to the contrary, the "Obligations" shall exclude any Excluded Hedging Obligations.

**1.1.182** 1.1.181 "**OECD**" means The Organisation for Economic Co-operation and Development.

**1.1.183** 1.1.182 "**OECD Credit Party**" means any Credit Party whose governing jurisdiction is in a country which is an OECD member or which has a sovereign currency credit rating at an Investment Grade level.

**1.1.184** 1.1.183 "**OFAC**" means the U.S. Treasury Department Office of Foreign Assets Control.

**1.1.185** 1.1.184 "**Operating Facilities**" means, collectively, the Canadian Operating Facility and the U.S. Operating Facility, and "**Operating Facility**" means any of them as the context requires.

**1.1.186** 1.1.185 "**Other Taxes**" is defined in Section 12.4.2.

**1.1.187** 1.1.186 "**Outstanding Advances**" means, at any time, the aggregate of all obligations of the Borrowers to the Lenders (or if the context requires, to any Lender) in respect of all Advances made under the Facilities (or if the context requires, under any Facility) which have not been repaid or satisfied at such time, determined as follows:

(a) in the case of Canadian Dollar Prime Rate Loans and Overdrafts in Canadian Dollars, the principal amount thereof;

(b) in the case of Bankers' Acceptances and BA Equivalent Loans and Letters of Credit, the face amount thereof;

(c) in the case of Letter of Credit, the undrawn amount thereof (to the extent not cash collateralized, backstopped or otherwise provided for in a manner acceptable to the Issuing Bank, in its discretion, in respect thereof); and

(d) in the case of U.S. Dollar Base Rate Loans, Overdrafts in U.S. Dollars and LIBOR Loans the Equivalent Amount of the principal amount thereof expressed in Canadian Dollars.

**1.1.188** 1.1.187 "**Overdraft**" means indebtedness of the Canadian Borrower to the Swingline Lender arising under the Swingline in connection with all amounts debited to all overdraft accounts established by the Canadian Borrower with the Swingline Lender (in Canadian Dollars or U.S. Dollars, as the case may be), including without limitation all cheques, transfers, withdrawals, interest, costs, charges and fees debited to such accounts.

**1.1.189** 1.1.188 "**Palladium**" means Palladium Capital Management IV LLC.

- 40 -

**1.1.190** ~~1.1.189~~ "**Palladium Equity Line**" means the Loan Agreement, dated as of October 18, 2017, by and between Holdco, as borrower, and PEP Fluid L.P., as lender (together with the revolving demand note related thereto), and any related loan agreement and revolving demand note with PEP Fluid Co-Invest LP and/or Calumet, in an aggregate principal amount of up to $5,000,000, as may be amended, restated, replaced or otherwise modified from time to time.

**1.1.191** ~~1.1.190~~ "**Participant**" is defined in Section 13.6.4.

**1.1.192** ~~1.1.191~~ "**Participant Register**" is defined in Section 13.6.4

**1.1.193** ~~1.1.192~~ "**Parties**" means the Borrowers, the Agent and the Lenders and their respective successors and permitted assigns.

**1.1.194** ~~1.1.193~~ "**PATRIOT Act**" means *The Uniting and Strengthening America by Providing Adequate Tools Required to Intercept and Obstruct Terrorism Act* of 2001 (Title III of Pub. L. No. *107-56 (signed into law October 26, 2001)*).

**1.1.195** ~~1.1.194~~ "**PBGC**" means the Pension Benefit Guaranty Corporation (or any successor).

**1.1.196** ~~1.1.195~~ "**Pemex Entities**" means, collectively, Petroleos Mexicanos, Pemex Exploracion y Produccion and Pemex Perforacion y Servicios.

**1.1.197** ~~1.1.196~~ "**Pension Plan**" means:

(a)     a "pension plan" or "plan" which is subject to the funding requirements of applicable pension benefits legislation in any jurisdiction of Canada and is applicable to employees of a Credit Party resident in Canada; or

(b)     any pension benefit plan or similar arrangement (other than Plans or Multiemployer Plans) applicable to employees of a Credit Party.

**1.1.198** ~~1.1.197~~ "**Permitted Acquisition**" means any Acquisition with respect to which all of the following conditions shall have been satisfied:

(a)     the Acquired Business has positive EBITDA calculated on a trailing twelve month basis (determined using the definition thereof set for herein as if the Acquired Business was the Canadian Borrower for such purpose);

(b)     the Acquired Business is in an Eligible Line of Business in Canada or the U.S.;

(c)     the Acquisition shall not be a Hostile Acquisition and, if the Acquisition involves a merger involving a Credit Party, the surviving entity is or becomes a Credit Party concurrently with the completion of such merger;

(d)     the aggregate purchase price of all such Acquisitions shall not exceed the sum of $50,000,000 in any Fiscal Year;

- 41 -

(e)     if the consideration payable at the closing of the acquisition of the Acquired Business in cash, shares or other tangible assets (but for certainty excluding Earnout Payments), plus the Permitted Funded Debt of the Acquired Business assumed as part of such acquisition, is greater than $15,000,000, then (i) the Net Leverage Ratio on a *pro forma* basis (including the EBITDA and, if applicable, Permitted Funded Debt of the Acquired Business) as of the end of and for the most recently completed four Fiscal Quarter period occurring prior to the closing of the Acquisition in question for which financial statements are available does not exceed the maximum Net Leverage Ratio permitted for such four Fiscal Quarter period under Section 7.3.1(a) *minus* 0.25 to 1, (ii) after giving effect to the funding of the Acquisition in question the sum of: (A) unrestricted cash on hand of the Credit Parties, *plus* (B) undrawn and available amounts under the Operating Facilities, *plus* (C) undrawn and available amounts permitted under operating facilities provided under clauses (c) and (d) of the definition of Permitted Funded Debt (provided, that the stated maturity date of any such facility, if any, is not within 90 days after the date of such Acquisition), is no less than $25,000,000; and (iii) at least 10 Business Days prior to the date that the Acquisition is to close, the Lenders shall have received financial statements and quarterly earnings reports in respect of the Acquired Business which shall be satisfactory to the Required Lenders, acting reasonably, together with any other information in respect of the Acquired Business which the Agent may reasonably request (and in the case of (i) and (ii) above, the resident and/or chief financial officer of the Canadian Borrower will deliver to the Agent an officer's certificate confirming such items, together with detailed calculations thereof);

(f)     if the Acquisition relates to the purchase of shares or other equity of a Person, it must be for 100% of the issued and outstanding shares of such Person;

(g)     if a new Material Subsidiary is formed or acquired as a result of or in connection with the Acquisition, the Borrower shall have complied with the requirements of Article 8 in connection therewith, subject to the last sentence of Section 8.2;

(h)     any existing indebtedness of the Acquired Business will be repaid and, if applicable, cancelled, unless otherwise constituting Permitted Funded Debt; and

(i)     after giving effect to the Acquisition and any Advance in connection therewith, and subject to clause (j) below with respect to the representations and warranties in this Agreement, no Default or Event of Default shall exist, including with respect to the financial covenants contained in Section 7.3 on a *pro forma* basis as of the end of and for the most recently completed four Fiscal Quarter period occurring prior to the closing of the Acquisition for which financial statements are available; and

(j)     all representations and warranties set forth herein (other than those which are specified to be given as of specific date) shall be repeated as of the date of the Acquisition (after giving effect to the Acquisition and any Advance in connection therewith) and must be true in all material respects;

- 42 -

provided that, notwithstanding anything herein to the contrary, the Terra Acquisition shall constitute a Permitted Acquisition if the following conditions shall have been satisfied:

(i) the Terra Acquisition shall not be funded in whole or in part with the proceeds of any Advance hereunder;

(ii) on the date hereof, all amounts outstanding under the Palladium Equity Line shall be repaid in full and, immediately following such repayment, Palladium shall make an equity contribution to the Canadian Borrower in an amount not less than $7,000,000; and

(iii) prior to or substantially concurrently with the closing of the Terra Acquisition, the Permitted Securitization Financing among ADF SPV, LLC, as borrower, Anchor, as servicer, and Wells Fargo Bank, National Association, as lender and agent shall also be consummated or the Credit Parties shall have otherwise arranged sufficient funding to fund such acquisition in a manner that is acceptable to the Required Lenders, acting reasonably.

**1.1.199** 1.1.198 "**Permitted Contest**" means action taken by or on behalf of a Credit Party in good faith by appropriate proceedings diligently pursued to contest a tax, claim or Lien; provided, that:

(a) the Person to which the tax, claim or Lien being contested is relevant (and, in the case of a Subsidiary of the Canadian Borrower, the Canadian Borrower on a consolidated basis) has established reasonable reserves therefor if and to the extent required by GAAP;

(b) proceeding with such contest does not have, and would not reasonably be expected to result in, a Material Adverse Change; and

(c) proceeding with such contest will not create a material risk of sale, forfeiture or loss of, or interference with the use or operation of, a material part of the assets of the Credit Parties, taken as a whole.

**1.1.200** 1.1.199 "**Permitted Discretion**" shall mean the Agent's or any Required Lender's discretion, as the context requires, exercising its reasonable credit judgment in accordance with customary business practices for comparable asset-based lending transactions and, as it relates to the adjustment or imposition of exclusionary criteria, shall require that, (a) such establishment, increase, adjustment or imposition after the Amendment and Restatement Date be based on the analysis of facts or events first occurring, first discovered or quantified by the Agent, or the applicable Required Lender, after the Amendment and Restatement Date or that are materially different from facts or events occurring or known to the Agent, or the Required Lender, on the Amendment and Restatement Date, (b) the contributing factors to such change shall not duplicate the exclusionary criteria set forth in the definitions of "Eligible Capital Assets", "Eligible Inventory" and "Eligible Receivables" as applicable (and vice versa), and (c) the effect of

- 43 -

any adjustment or imposition of exclusionary criteria shall be a quantification of the incremental reduction of the Borrowing Base attributable to such contributing factors which is reasonable in light of reasonable credit judgment exercised in senior secured asset-based revolving credit facilities with comparable companies of similar size, industries, businesses and business practices, including, without limitation, leverage profile and projected free cash flow, in the applicable market.

**1.1.201** ~~1.1.200~~ "**Permitted Dispositions**" is defined in Section 7.2.4.

**1.1.202** ~~1.1.201~~ "**Permitted Distribution**" means:

(a)     the Permitted Management Fees; provided, that no such Distribution is permitted if a Default or an Event of Default exists at such time or would result therefrom; and further provided, that any such payments that were not able to be made during the occurrence of a Default or an Event of Default may be "caught up" when such Default or Event of Default no longer exists (regardless of the Annual Management Fee Cap) (with any such catch up payments in excess of the Annual Management Fee Cap in any Fiscal Year being referred to herein as the "**Catch Up Management Fee Payments**");

(b)     any Distribution from one Credit Party to another Credit Party;

(c)     any other Distribution payable to the shareholders of the Canadian Borrower by any Credit Party if at the time such Distribution is made (i) no Default or Event of Default exists at such time or would result therefrom, (ii) on a *pro forma* basis after giving effect to such Distribution, the Net Leverage Ratio would not exceed 2.50 to 1, as evidenced by the Canadian Borrower providing an officer's certificate to the Agent confirming same, and (iii) no Borrowing Base Shortfall has occurred and is continuing or would result from any such Distribution on a *pro forma* basis as if such Distribution had been made as of the end of the last Fiscal Quarter;

(d)     any dividend payments or other Distributions payable by Holdco or any of its Subsidiaries solely in the equity interests of such Person;

(e)     any Distribution permitted under Section 7.2.6(l);

(f)     non-cash repurchases by Holdco or its Subsidiaries of equity interests deemed to occur upon exercise of stock options or similar equity incentive awards if such equity interests represents a portion of the exercise price of such options or similar equity incentive awards;

(g)     cash dividends to Holdco (and by Holdco to its parent companies) by any Credit Party not to exceed an amount necessary to permit Holdco and its parent companies to pay for normal, reasonable and documented over-head and administrative costs and expenses of Holdco and its parent companies and franchise fees or similar taxes and fees required to maintain its corporate existence and to reimburse out-of-pocket expenses actually incurred by Holdco and its

parent companies for the benefit of the Canadian Borrower, and other Distributions for customary directors' fees to any board members and the reimbursement of out-of-pocket expenses incurred by any board members in such capacity, provided that no Default or Event of Default exists at such time or would result therefrom; and

(h)     Distributions made (i) to Holdco to permit Holdco to, and Holdco may, redeem or repurchase equity interests of Holdco from officers, employees, consultants, managers and directors of the Canadian Borrower or any of its Subsidiaries in connection with the termination of employment or engagement of any such Person or (ii) pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or other agreement or arrangement (including, but not limited to, employment, compensation, severance agreements or arrangements or stockholders agreements), provided that no Default or Event of Default exists at such time or would result therefrom; and

(i)     prior to the closing of the Terra Acquisition, Distributions to Palladium or its Affiliates in repayment of the Palladium Equity Line; provided in the event the Palladium Equity Line is not repaid as contemplated in clause (ii) of the proviso set forth in the definition of "Permitted Acquisition", (x) the Canadian Borrower and its Subsidiaries shall, on a *pro forma* basis, have a Minimum Liquidity of not less than U.S. $15,000,000 immediately after such repayment,  and (y) the principal in respect of the Palladium Equity Line will not be repaid prior to October 31, 2018, unless (A) such prepayment is made in the manner prescribed by clause (ii) of the proviso set forth in the definition of "Permitted Acquisition" and the subsequent equity contribution described in such clause is also effected, or (B) the Required Lenders consent to such earlier prepayment in their Permitted Discretion;

provided that the aggregate of all Distributions made under clauses (g) and (h) above do not in any Fiscal Year exceed $2,000,000 (with unusual amounts in any Fiscal Year being carried over to succeeding Fiscal Years), other than to the extent such Distributions are funded by the cash proceeds from the sale of equity interests of the Canadian Borrower and, to the extent contributed to the capital of the Canadian Borrower, equity interests of any of the Canadian Borrower's direct or indirect parent companies.

**1.1.203**   1.1.202  "**Permitted Factoring Debtors**" means, collectively, the Pemex Entities, Petroamazones EP, Operaciones Río Napo CEM and any other Person agreed to in advance by the Agent, acting reasonably.

**1.1.204**   1.1.203  "**Permitted Factoring Transaction**" means: at the Borrower's option,

(a)     the financing of certain Collection Rights by HSBC Mexico; *provided* that (i) such transaction is non-recourse to the Borrowers and their Material Subsidiaries, except for any Liens granted solely over the Collection Rights and the proceeds thereof, (ii) such transaction shall be and remain subject to the terms and conditions of the Intercreditor Agreement, (iii) QMax Mexico may remain

responsible for the legitimacy and existence of the Collection Rights financed by such transaction at the time of execution of the relevant factoring transaction and (iv) QMax Mexico will no longer be liable for the payment of the Collection Rights to HSBC Mexico or any permitted assignee but may remain liable for the decrease in value of the Collection Rights; and/or

(b)      the financing by the Borrowers or one or more of their Material Subsidiaries of any Receivables (other than as described in paragraph (a) above); *provided* that (i) such transaction results in a legal "true sale" of Receivables, (ii) such transaction is non-recourse to the Borrowers and their Material Subsidiaries, except for any Liens granted solely over such Receivables and the proceeds thereof, and (iii) such transaction shall only involve the sale of Receivables either (x) owing by any of the Permitted Factoring Debtors to a Credit Party or (y) not constituting Eligible Receivables; provided that, the aggregate principal, stated or investment amount of all outstanding loans made to the Credit Parties in respect of all Permitted Factoring Transactions shall not exceed $25,000,000 at any time outstanding; provided, such amount shall be increased to an amount specified by the Borrowers at any time if the Borrowers or one or more Material Subsidiaries provides notice to the Agent of such an increase, and the Agent (on the instruction of Required Lenders) has not objected within three Business Days following receipt of notice thereof. For certainty, if any Eligible Receivable is sold, contributed, financed or otherwise conveyed or pledged pursuant to a Permitted Factoring Transaction it shall immediately cease to be an Eligible Receivable.

**1.1.205** ~~1.1.204~~ "**Permitted Funded Debt**" means, without duplication:

(a)      the Obligations under the Facilities and, to the extent constituting Funded Debt, obligations in respect of Banking Services Agreements of the Canadian Borrower and its Subsidiaries owing to the Agent and the Lenders (and their Affiliates);

(b)      Funded Debt up to ~~Cdn~~**U.S.** $~~10,000,000~~**20,000,000** under a bilateral letter of credit facility with HSBC and insured by ~~Export Development Canada~~**certain third parties reasonably satisfactory to the Agent**;

(c)      Funded Debt of any Credit Party whose governing jurisdiction is Mexico or Colombia which is unsecured or, if secured, which is secured solely by capital assets and/or inventory located in Mexico or Colombia and which are not subject to the Security (subject to the proviso at the end of this definition);

(d)      Funded Debt under the Surviving Colombian Credit Agreements and any Permitted Refinancing Indebtedness in respect thereof from time to time (subject to the proviso at the end of this definition);

(e)      Funded Debt secured by Permitted Purchase Money Security Interests and Funded Debt incurred in conjunction with any Anchor Sale and Leaseback Transaction (in each case subject to the proviso at the end of this definition);

(f)      Permitted Hedging Liabilities;

(g)      Permitted Intercompany Loans;

(h)      Subordinated Debt;

(i)       Funded Debt as set out in Schedule ~~1.1.204~~**1.1.205** hereto and any Permitted Refinancing Indebtedness thereof;

(j)       Funded Debt under a corporate credit card facility with a Lender and other cash management liabilities, up to a maximum aggregate amount of $2,000,000;

(k)      Funded Debt (other than a revolving credit facility) of a Subsidiary acquired or assumed pursuant to a Permitted Acquisition after the Amendment and Restatement Date and any Permitted Refinancing Indebtedness in respect thereof (subject to the proviso at the end of this definition); <u>provided</u>, that such Funded Debt shall not be incurred in anticipation of such Permitted Acquisition;

(l)       obligations in respect of Guarantees or Financial Assistance not prohibited under Section 7.2.3;

(m)     other Funded Debt of the Credit Parties and Permitted Refinancing Indebtedness in respect thereof (subject to the proviso at the end of this definition);

(n)      Funded Debt under a Permitted Factoring Transaction;

(o)      Funded Debt consented to by the Required Lenders, in their discretion, prior to the incurrence or assumption thereof;

(p)      Funded Debt up to an aggregate principal amount of U.S. $75,000,000 under the Encina ABL Loan Agreement and any Permitted Refinancing Indebtedness in respect thereof, provided that all such Funded Debt is and remains subject to the terms of the Encina Intercreditor Agreement;

(q)      after, or concurrently with, the repayment of all Funded Debt incurred under, and the cancellation of, the Encina ABL Loan Agreement, Funded Debt up to an aggregate principal amount of U.S. $90,000,000 in connection with all Permitted Securitization Financing and any Permitted Refinancing Indebtedness in respect thereof; and

(r)       Funded Debt in respect of one or more promissory notes issued by the U.S. Borrower to Calumet, by the U.S. Borrower to the Canadian Borrower and by the Canadian Borrower to Holdco, in each case, substantially contemporaneously with the Anchor Acquisition (the "**Anchor Acquisition Promissory Notes**"),

<u>provided</u> that the outstanding principal amount of Funded Debt under clauses (c**), (d**), (~~d~~**e**), ~~(e),~~ (k) and (m) above does not exceed in the aggregate $45,700,000 during the Covenant Relief Period and $75,000,000 at any time after the Covenant Relief Period.

**1.1.206** ~~1.1.205~~ "**Permitted Hedging Liability**" means a Hedging Liability permitted by the provisions of Sections 7.2.11 and 7.2.13.

**1.1.207** ~~1.1.206~~ "**Permitted Holders**" means (a) Palladium, the Investors, Management Shareholders and (b) any Person with which Palladium and the Management Shareholders form a Group as long as, in the case of clause (b), Palladium and its Affiliates beneficially own more than 50% of the relevant stock beneficially owned by that Group.

**1.1.208** ~~1.1.207~~ "**Permitted Intercompany Loan**" means a loan made by any Credit Party to another Credit Party, provided that the Agent holds a First Ranking Security Interest in all property and assets of both such Credit Parties to the extent required under the terms of the Credit Documents.

**1.1.209** ~~1.1.208~~ "**Permitted Investments**" is defined in Section 7.2.3.

**1.1.210** ~~1.1.209~~ "**Permitted Liens**" means:

(a)     Statutory Liens in respect of any amount which is not at the time overdue;

(b)     Statutory Liens in respect of any amount which may be overdue but the validity of which is subject to a Permitted Contest;

(c)     the reservations, limitations, provisos and conditions, if any, expressed in any original grant from the Crown of any Land or any interest therein;

(d)     servicing agreements, development agreements, site plan agreements and other agreements with Governmental Authorities pertaining to the use or development of any Land, provided same are complied with in all material respects;

(e)     applicable municipal and other governmental restrictions, including municipal by-laws and regulations, affecting the use of Land or the nature of any structures which may be erected thereon, provided such restrictions have been complied with in all material respects;

(f)     Liens or rights of distress reserved in or exercisable under any lease for rent not at the time overdue or for compliance with the terms of such lease not at the time in default;

(g)     Liens or rights reserved to or exercisable by or any obligations or duties affecting any Land due to any public utility or to any Governmental Authority, under or with respect to any franchise, temporary grant, licence or permit in good standing and any defects in title to structures or other facilities arising solely from the fact that such structures or facilities are constructed or installed on Land under government permits, leases or other grants in good standing; provided such facilities, temporary grants, licences and permits have been complied with in all material respects and are in good standing and such Liens, rights, obligations,

- 48 -

duties and defects in the aggregate do not materially impair the use of such property, structures or facilities for the purpose for which they are held;

(h) Liens incurred or deposits made in connection with contracts, bids, tenders or expropriation proceedings, surety or appeal bonds, costs of litigation when required by law, public and statutory obligations, and warehousemen's, storers', repairers', carriers' and other similar Liens and deposits;

(i) security given to a public utility or any Governmental Authority to secure obligations incurred to such utility, municipality, government or other authority in the ordinary course of business and not at the time overdue;

(j) Liens and privileges arising out of judgments or awards in respect of which: an appeal or proceeding for review has been commenced; a stay of execution pending such appeal or proceedings for review has been obtained; and reserves have been established as reasonably required by the Required Lenders;

(k) any Lien arising in connection with the construction or improvement of any Land or arising out of the furnishing of materials or supplies therefor, provided that such Lien secures moneys not at the time overdue (or if overdue, the validity of which is subject to a Permitted Contest), notice of such Lien has not been given to the Agent or any Lender and such Lien has not been registered against title to such Land;

(l) licenses (including licences of intellectual property), leases or subleases granted to third parties or Credit Parties in the ordinary course of business which, individually or in the aggregate, do not materially interfere with the ordinary course of business of the Borrower or any of its Subsidiaries;

(m) the filing of UCC or PPSA financing statements (or equivalents thereto in other jurisdictions) solely as a precautionary measure in connection with operating leases and consignment arrangements;

(n) Liens in favor of customs and revenue authorities arising as a matter of law and in the ordinary course of business to secure payment of customs duties in connection with the importation of goods;

(o) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Credit Party in the ordinary course of business;

(p) Liens (i) on deposits of cash or Cash Equivalents in favor of the seller of any property to be acquired in any Permitted Investment to be applied against the purchase price for such Permitted Investment, (ii) consisting of an agreement to dispose of any property in a Permitted Disposition and (iii) earnest money deposits of cash or Cash Equivalents made by any Credit Party in connection with any letter of intent or purchase agreement permitted hereunder;

(q)     rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions or upon securities in favor of securities intermediaries, solely to the extent incurred in connection with the maintenance of deposit accounts or securities accounts in the ordinary course of business;

(r)     Minor Title Defects;

(s)     the Permitted Purchase-Money Security Interests;

(t)     Liens which are secured solely by assets which are located outside of Canada and the U.S. and which are not subject to the Security; provided that the aggregate principal amount of Funded Debt or other obligations secured thereby constitutes Permitted Funded Debt;

(u)     Liens as set out in Schedule 1.1.2091.1.210 and any extension, renewal or replacement (or successive extensions, renewals or replacements), as a whole or in part, of thereof, so long as any such extension, renewal or replacement of such Lien is limited to all or any part of the same property that secured the Lien extended, renewed or replaced (plus improvements on such property) and the Funded Debt secured thereby is not increased and constitutes Permitted Funded Debt;

(v)     any Lien from time to time which is consented in writing to by the Required Lenders;

(w)     the Security or any other Liens securing the Obligations;

(x)     Liens which secure obligations owing under Permitted Funded Debt described in clause (c), (d) or (m) of the definition thereof; provided that in the case of such clause (m), such Lien does not apply to any of the Collateral; subject to the limitation set forth in the proviso at the end of the definition of Permitted Funded Debt;

(y)     Liens securing Funded Debt permitted by clause (k) of the definition of Permitted Funded Debt, subject to the limitation set forth in the proviso at the end of the definition of Permitted Funded Debt, and existing on any property or asset prior to the acquisition thereof by any Credit Party or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the date hereof prior to the time such Person becomes a Subsidiary; provided, that (i) such Liens do not apply to all of the assets of the acquired Subsidiary generally or to any other property or assets of any Credit Party not securing such Funded Debt prior to the acquisition of such property or asset and (ii) such Lien shall secure only those obligations which it secured on the date of acquisition and extensions, renewals and replacements thereof permitted hereunder that do not increase the outstanding principal amount thereof; provided further, with respect to Liens in connection with Funded Debt that is assumed in connection with an acquisition of assets or equity interests, no such Lien extends to or covers any other assets (other

- 50 -

than the proceeds or products thereof, accessions or additions thereto and improvements thereon) or was created in contemplation of, or in connection with, the applicable acquisition of assets or equity interests (except to the extent the same is otherwise Permitted Funded Debt);

(z)     Liens which secure Subordinated Debt permitted hereunder;

(aa)    Liens arising under a Permitted Factoring Transaction but only to the extent that any such Lien relates to the applicable Receivables sold, contributed, financed or otherwise conveyed or pledged pursuant to such transaction;

(bb)    Liens arising under the Encina ABL Loan Agreement but only to the extent that any such Lien is and remains subject to the terms of the Encina Intercreditor Agreement;

(cc)    Liens arising under any Anchor Sale and Leaseback Transaction;

(dd)    Liens on the Receivables of a Securitization SPE sold pursuant to a Permitted Securitization Financing (together with any and all related security and ancillary rights related thereto which are customary for transactions of such nature) to the extent incurred pursuant to a Permitted Securitization Financing; and

(ee)    any other Liens; provided, that the aggregate principal amount of Funded Debt or other obligations secured thereby does not exceed U.S. $3,000,000;

provided, that the use of the term "Permitted Liens" to describe the foregoing Liens shall mean that such Liens are permitted to exist (whether in priority to or subsequent in priority to the Security, as determined by Applicable Law); and for greater certainty such Liens shall not be entitled to priority over the Security by virtue of being described in this Agreement as "Permitted Liens".

**1.1.211** 1.1.210 "**Permitted Management Fees**" means advisory or management fees payable by the Credit Parties to Palladium and Calumet in an aggregate amount not to exceed the Annual Management Fee Cap in any Fiscal Year.

**1.1.212** 1.1.211    "**Permitted   Purchase-Money   Security   Interests**"   means Purchase-Money Security Interests incurred or assumed in connection with the purchase, leasing or acquisition of capital equipment in the ordinary course of business; provided, that the obligations secured thereby are permitted under clause (e) of the definition of Permitted Funded Debt.

**1.1.213** 1.1.212 "**Permitted Refinancing Indebtedness**" shall mean any Funded Debt issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "**Refinance**"), the Permitted Funded Debt being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Indebtedness); provided, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Permitted Funded Debt so Refinanced (plus unpaid

accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions and expenses), (b) if the Permitted Funded Debt being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing Indebtedness shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Permitted Funded Debt being Refinanced, (c) no Permitted Refinancing Indebtedness shall have different obligors, or greater guarantees or security, than the Permitted Funded Debt being Refinanced, unless such new obligors are Credit Parties and (d) if the Permitted Funded Debt being Refinanced is secured by any collateral (whether equally and ratably with, or junior to, the Lenders or otherwise), such Permitted Refinancing Indebtedness may be secured by such collateral (including pursuant to after acquired property clauses to the extent such type collateral secured the Funded Debt being Refinanced) on terms not materially less favorable to the Lenders than those contained in the documentation governing the Permitted Funded Debt being so Refinanced.

**1.1.214** 1.1.213 "**Permitted Securitization Financing**" shall mean one or more transactions pursuant to which (i) Securitization Assets or interests therein are sold or transferred to or financed by one or more Securitization SPE, and (ii) such Securitization SPE finance (or refinance) their acquisition of such Securitization Assets or interests therein, or the financing thereof, by selling or borrowing against Securitization Assets (including conduit and warehouse financings) and any Hedging Agreements entered into in connection with such Securitization Assets; provided, that recourse to the Borrowers or any Subsidiary (other than the Securitization SPE) in connection with such transactions shall be limited to the extent customary (as determined by the Agent and the Canadian Borrower each acting reasonably and in good faith and acceptable to the Agent acting reasonably) for similar transactions in the applicable jurisdictions (including, to the extent applicable, in a manner consistent with the delivery of a "true sale"/"absolute transfer" opinion with respect to any transfer by the Borrowers or any Subsidiary (other than a Securitization SPE)).

**1.1.215** 1.1.214 "**Person**" includes an individual, corporation, partnership, trust, union, unincorporated association, Governmental Authority or any combination of the above.

**1.1.216** 1.1.215 "**Plan**" means a Single Employer Plan or a Multiple Employer Plan.

**1.1.217** 1.1.216 "**Priority Claims**" means, with respect to any Person, any amount payable or accrued by such Person which ranks or is capable of ranking prior to or *pari passu* with the Liens created by the Security in respect of any Collateral, including amounts owing for wages, vacation pay, severance pay, employee deductions, sales tax, excise tax, tax payable pursuant to Part IX of the *Excise Tax Act* (Canada) (net of GST input credits), income tax, employment insurance, unemployment insurance, workers compensation, government royalties, pension fund obligations or deficiencies, overdue rents or taxes, and other statutory or other claims, deemed trusts or Liens that have or may have priority over, or rank *pari passu* with, the Liens created by the Security. For the avoidance of doubt, no Banking Services Liabilities shall be deemed Priority Claims due to their *pari passu* ranking with the Obligations.

**1.1.218** 1.1.217 "**Proceeds of Realization**", in respect of the Security or any portion thereof, means all amounts received by the Agent and any Lender in connection with:

(a)     any realization thereof, whether occurring as a result of enforcement or otherwise;

(b)     any sale, expropriation, loss or damage or other disposition of the Collateral or any portion thereof; and

(c)     the dissolution, liquidation, bankruptcy or winding-up of a Credit Party or any other distribution of its assets to creditors,

and all other amounts which are expressly deemed to constitute "Proceeds of Realization" in this Agreement.

**1.1.219** 1.1.218 "**Project Desert**" means the acquisition by the Borrowers or any Material Subsidiary of Environmental Solutions for Petroleum Services, an oilfield services company with operations in Algeria and Egypt on substantially the same terms and conditions set forth in the letter of intent dated as of December 11, 2016, as amended, between the Canadian Borrower and Project Desert Egypt.

**1.1.220** 1.1.219 "**Project Desert Algeria**" means Environmental Solutions Algeria S.A.R.L., an Algerian company.

**1.1.221** 1.1.220 "**Project Desert Egypt**" means Environmental Solutions for Petroleum Services (S.A.E.), an Egyptian company.

**1.1.222** 1.1.221 "**Project Desert Subsidiaries**" means each of Project Desert Egypt and Project Desert Algeria.

**1.1.223** 1.1.222 "**Proportionate Share**" means:

(a)     in the context of any Lender's obligation to make Advances under all Facilities, such Lender's Commitment to make Advances under all Facilities divided by the aggregate amount of all Lenders' Commitments to make Advances under all Facilities;

(b)     in the context of any Lender's obligation to make Advances under a Facility, such Lender's Commitment (excluding, as the case may be, the applicable Swingline Limit in the case of the Canadian Operating Facility) to make Advances under such Facility divided by the aggregate amount of all Lenders' Commitments (excluding, as the case may be, the applicable Swingline Limit in the case of Canadian Operating Facility) to make Advances under such Facility;

(c)     in the context of any Lender's entitlement to receive a portion of the standby fee in respect of Canadian Operating Facility or the U.S. Operating Facility payable pursuant to Section 2.6.1(h) or Section 4.6.1(d), as applicable, such Lender's Commitment (excluding, as the case may be, the applicable Swingline Limit) under the applicable Facility to make Advances under Canadian Operating

Facility or the U.S. Operating Facility divided by the aggregate amount of all such Lenders' Commitments (excluding, as the case may be, the applicable Swingline Limit) to make Advances under Canadian Operating Facility or the U.S. Operating Facility, as applicable;

(d)    in the context of any Lender's entitlement to receive payments of principal, interest or fees under all Facilities (other than a portion of the standby fee under Canadian Operating Facility or the U.S. Operating Facility), the Outstanding Advances due to such Lender under all Facilities divided by the aggregate amount of the Outstanding Advances due to all Lenders under all Facilities; and

(e)    in the context of any Lender's entitlement to receive payments of principal, interest or fees under a Facility (other than a portion of the standby fee under Canadian Operating Facility or the U.S. Operating Facility), the Outstanding Advances due to such Lender under such Facility divided by the aggregate amount of the Outstanding Advances due to all Lenders under such Facility.

**1.1.224**   1.1.223 "**Purchase-Money Security Interest**" means:

(a)    a Capital Lease; or

(b)    a Lien on any property or asset which is created, issued or assumed to secure the unpaid purchase price thereof, provided that such Lien is restricted to such property or asset and secures an amount not in excess of the purchase price thereof and any interest and fees payable in respect thereof.

**1.1.225**   1.1.224 "**QMax Mexico**" means QMax Mexico, S.A. de C.V.

**1.1.226**   1.1.225 "**Qualified ECP Guarantor**" means, in respect of any Hedging Agreement, each Credit Party that has total assets exceeding $10,000,000 at the time of the grant of the relevant Security of such Credit Party to such Hedging Agreement or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keep well under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**1.1.227**   1.1.226 "**Receivables**" means and includes, as to the Credit Parties, all of Credit Parties' accounts, contract rights, payment intangibles, instruments (other than those evidencing indebtedness owed to a Credit Party), documents, chattel paper (including electronic chattel paper), general intangibles relating to accounts, drafts and acceptances, and all other forms of obligations owing to a Credit Party arising out of or in connection with the sale or lease of inventory or for services rendered (including, in the case of Insured Receivables, amounts owed with respect to work in progress that are covered by Account Receivable Insurance), all supporting obligations, guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to the Agent hereunder.

**1.1.228**   1.1.227 "**Register**" is defined in Section 13.6.5.

**1.1.229** ~~1.1.228~~ "**Regulation T**" means Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and all official rulings and interpretations thereunder or thereof.

**1.1.230** ~~1.1.229~~ "**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and all official rulings and interpretations thereunder or thereof.

**1.1.231** ~~1.1.230~~ "**Regulation X**" means Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and all official rulings and interpretations thereunder or thereof.

**1.1.232** ~~1.1.231~~ "**Related Party**" means, with respect to any Person, an Affiliate of such Person, a shareholder of such Person (if applicable), or a Person related to or not at arm's length to such Person or holder of shares of such Person, and with respect to the Borrower and its Subsidiaries, includes Palladium, the Management Shareholders, the Investors and any company or entity controlled directly or indirectly by any one or more of such Persons.

**1.1.233** ~~1.1.232~~ "**Repayment**" means a repayment by the Borrower on account of the Outstanding Advances under all Facilities or a Facility, as the context requires, other than the reduction of an Overdraft (and "**Repay**" shall have a corresponding meaning).

**1.1.234** ~~1.1.233~~ "**Repayment Notice**" means a notice delivered by the Borrower to the Agent committing it to make a Repayment, in the form of Exhibit "E".

**1.1.235** ~~1.1.234~~ "**Required Lenders**" means, with the exception of those matters set out in Section 11.2 which require the agreement of all Lenders, (a) if there are two or less Lenders, all Lenders, (b) if there are three or more Lenders, Lenders holding, in aggregate, at least 66⅔% of the Commitments, or (c) during the continuance of an Event of Default, Lenders holding at least 66⅔% of the Outstanding Advances under the Facilities. The Advances and Commitments of any Defaulting Lender shall be disregarded in determining Required Lenders at any time in accordance with Section 11.5.1(b).

**1.1.236** ~~1.1.235~~ "**Requirements of Environmental Law**" means:

(a)      obligations under common law;

(b)      requirements imposed by or pursuant to statutes, regulations and by-laws whether presently or hereafter in force;

(c)      directives, policies and guidelines issued or relied upon by any Governmental Authority to the extent such directives policies or guidelines have the force of law;

(d)      permits, licenses, certificates and approvals issued by Governmental Authorities which are required in connection with air emissions, discharges to surface or

- 55 -

groundwater, noise emissions, solid or liquid waste disposal, the use, generation, storage, transportation or disposal of Hazardous Materials; and

(e)       requirements imposed under any clean-up, compliance or other order made by a Governmental Authority pursuant to any of the foregoing,

in each and every case relating to environmental, health or safety matters including all such obligations and requirements which relate to:

(i)       solid, gaseous or liquid waste generation, handling, treatment, storage, disposal or transportation; and

(ii)      exposure to Hazardous Materials.

**1.1.237** 1.1.236 "**Resignation Notice**" is defined in Section 11.18.

**1.1.238** 1.1.237 "**Rollover**" means the renewal of an Availment Option upon its maturity in the same form.

**1.1.239** 1.1.238 "**Rollover Notice**" means a notice substantially in the form of Exhibit "C" given by the Borrower to the Agent for the purpose of requesting a Rollover.

**1.1.240** 1.1.239 "**Sales Proceeds**" is defined in Section 5.3.1(b).

**1.1.241** 1.1.240 "**Secured Hedging Liability**" means any Hedging Liability under a Hedging Agreement entered into between the Canadian Borrower and a Hedge Provider permitted by the provisions of Sections 7.2.12 and 7.2.13 and, provided that if a Hedge Provider does not have actual knowledge that such Hedging Liability was not permitted under such Sections at the time the applicable Hedging Agreement was entered into by such Hedge Provider, then such Hedging Liability will be deemed to be a Secured Hedging Liability for purposes of Section 8.5.

**1.1.242** 1.1.241 "**Securitization Assets**" shall mean any of the following assets (or interests therein) from time to time originated, acquired or otherwise owned by the Borrowers or any Subsidiary or in which the Borrowers or any Subsidiary has any rights or interests, in each case, without regard to where such assets or interests are located: (a) Receivables, (b) franchise fees, royalties and other similar payments made related to the use of trade names and other intellectual property, business support, training and other services, (c) revenues related to distribution and merchandising of the products of the Borrower and its Subsidiaries, (d) any equipment, contractual rights with unaffiliated third parties, website domains and associated property and rights necessary for a Securitization SPE to operate in accordance with its stated purposes, and (e) other assets and property (or proceeds of such assets or property) to the extent customarily included in securitization transactions of the relevant type in the applicable jurisdictions (as determined by the Agent and the Canadian Borrower each acting reasonably and in good faith).

**1.1.243** ~~1.1.242~~ "**Securitization SPE**" means (i) a direct or indirect Subsidiary of any Borrower established in connection with a Permitted Securitization Financing for the acquisition of Securitization Assets or interests therein, and which is organized in a manner (as determined by the Canadian Borrower in good faith) intended to reduce the likelihood that it would be substantively consolidated with Holdings, the Borrowers or any of the Subsidiaries (other than Securitization SPE) in the event Holdings, the Borrowers or any such Subsidiary becomes subject to a proceeding under the U.S. Bankruptcy Code (or other insolvency law) and (ii) any subsidiary of a Securitization SPE.

**1.1.244** ~~1.1.243~~ "**Security**" means all Guarantees, security agreements, mortgages, control agreements, pledge agreements, debentures and other documents required to be provided to the Agent or the Lenders pursuant to Article 8 and all other documents and agreements delivered by the Borrower and other Persons to the Agent for the benefit of the Lenders from time to time as security for the payment and performance of the Obligations, and the security interests, assignments and Liens constituted by the foregoing.

**1.1.245** ~~1.1.244~~ "**Shareholders' Equity**" means, at any time, the shareholders' equity as shown on the consolidated balance sheet of the Canadian Borrower.

**1.1.246** ~~1.1.245~~ "**Single Employer Plan**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that is subject to Title IV of ERISA, and (i) is maintained for employees of any Credit Party or any ERISA Affiliate and no Person other than the Credit Parties and the ERISA Affiliates or (ii) was so maintained and in respect of which any Credit Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

**1.1.247** ~~1.1.246~~ "**Specified Canadian Swingline Borrower**" means (i) QMax Canada Operations Inc. or (ii) any other Material Subsidiary of the Canadian Borrower that has been formed under the laws of Canada or any province thereof as agreed to in writing by the Canadian Borrower, the Swingline Lender and the Agent, in their sole and absolute discretion.

**1.1.248** ~~1.1.247~~ "**Specified Equity Contribution**" is defined in Section 7.3.2.

**1.1.249** ~~1.1.248~~ "**Statutory Lien**" means a Lien in respect of any property or assets of a Credit Party created by or arising pursuant to any applicable legislation in favour of any Person (such as but not limited to a Governmental Authority), including a Lien for the purpose of securing such Credit Party's obligation to deduct and remit employee source deductions and goods and services tax pursuant to the *Income Tax Act* (Canada), the *Excise Tax Act* (Canada), the *Canada Pension Plan* (Canada), the *Employment Insurance Act* (Canada) and any legislation in any jurisdiction similar to or enacted in replacement of the foregoing from time to time.

**1.1.250** ~~1.1.249~~ "**Subordinated Debt**" means any indebtedness of any Credit Party to any Person, in respect of which the holder thereof has entered into a subordination and

- 57 -

postponement agreement in favour of the Agent on behalf of itself and the Lenders, substantially in the form of Exhibit "J" for any indebtedness which is governed by Applicable Laws of Canada or the U.S., or for any indebtedness governed by other Applicable Laws, such other agreement as is reasonably satisfactory to the Required Lenders (each, a "**Subordination Agreement**") and, to the extent necessary or desirable under Applicable Law, registered in all places where necessary or desirable to protect the priority of the Security, which shall provide (among other things) that:

(a)     upon notice of the occurrence and continuance of an Event of Default hereunder, the holder of such indebtedness may not receive payments on account of principal or interest thereon;

(b)     any security held in respect of such indebtedness is subordinated to the Security; and

(c)     the holder of such indebtedness may not take any enforcement action in respect of any such security without the prior written consent of the Agent (except to the extent, if any, expressly permitted therein).

**1.1.251** ~~1.1.250~~ "**Subordination Agreement**" is defined in the definition of Subordinated Debt.

**1.1.252** ~~1.1.251~~ "**Subsidiary**" means any Person of which more than 50% of the outstanding Voting Securities are owned, directly or indirectly by or for a Credit Party, provided that the ownership of such securities confers the right to elect at least a majority of the board of directors of such Person, or a majority of Persons serving similar roles, and includes any legal entity in like relationship to a Subsidiary.

**1.1.253** ~~1.1.252~~ "**Surviving Colombian Credit Agreements**" means the following agreements by and between QMAX Solutions Colombia, as borrower: (i) revolving credit agreement with Helm Bank, as lender, dated as of October 6, 2009; (ii) common terms agreement for the execution of derivatives with Banco Corpobanca Colombia S.A., as lender, dated as of April 19, 2013; and (iii) common terms agreement for the execution of derivatives with Banco de Bogotá S.A., as lender, dated as of May 5, 2009; (iv) line of credit agreement with BBVA Colombia, as lender, dated as of December 3, 2012; and (v) line of credit agreement with Bancolombia dated January 20, 2010; in each case up to the respective maximum facility amounts set forth in Schedule ~~1.1.252~~**1.1.253** (each as amended, restated, supplemented, waived, replaced, (whether or not upon termination, and whether with the original agents, lenders, or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time, including any agreement refinancing, replacing or otherwise restructuring all or any portion of the indebtedness thereunder or increasing the amount loaned thereunder or altering the maturity thereof), subject to clause (d) of the definition of Permitted Funded Debt.

**1.1.254** ~~1.1.253~~ "**Swingline**" is defined in Section 2.7.1.

**1.1.255** ~~1.1.254~~ "**Swingline Borrower**" is defined in Section 2.7.1.

**1.1.256** ~~1.1.255~~ "**Swingline Lender**" means HSBC.

**1.1.257** ~~1.1.256~~ "**Swingline Limit**" means $10,000,000 or the Equivalent Amount in Cdn. $, or any combination thereof.

**1.1.258** ~~1.1.257~~ "**Swingline Loan**" means any Advance made available to the Borrower by the Swingline Lender outstanding from time to time under the Swingline.

**1.1.259** ~~1.1.258~~ "**Syndicated Advance**" means any Advance under the Canadian Operating Facility that is not a Swingline Loan.

**1.1.260** ~~1.1.259~~ "**Taxes**" is defined in Section 12.4.1.

**1.1.261** ~~1.1.260~~ "**Term Facility**" is defined in Section 3.1.

**1.1.262** ~~1.1.261~~ "**Term Facility Commitment**" means, as the context requires, (a) collectively with respect to all Term Lenders, in the aggregate as of the Amendment and Restatement Date, U.S. $13,656,250, as otherwise increased or decreased pursuant to this Agreement and (b) means, with respect to each individual Term Lender, the individual commitment amount of such Lender in the maximum principal amount indicated opposite such Term Lender's name in Exhibit "A" under the heading "**Term Facility Commitments**", as amended from time to time.

**1.1.263** ~~1.1.262~~ "**Term Lenders**" means the Lenders who have provided a Commitment under the Term Facility as set forth in Exhibit "A".

**1.1.264** ~~1.1.263~~ "**Terra**" means Terra Oilfield Solutions, LLC, a Delaware limited liability company.

**1.1.265** ~~1.1.264~~ "**Terra Acquisition**" means the purchase of all of the membership interests of Terra pursuant to the Terra Purchase Agreement.

**1.1.266** ~~1.1.265~~ "**Terra Purchase Agreement**" means the Membership Interest Purchase Agreement dated July 15, 2018 by and between Q'Max America Inc., as purchaser, and OFS Commander LLC, a Delaware limited liability company, as seller, as the same may be amended, restated or otherwise modified from time to time.

**1.1.267** ~~1.1.266~~ "**Total Net Debt**" means, in respect of the Credit Parties and determined on a combined basis and without duplication, all interest bearing indebtedness for borrowed money, Capital Leases, the drawn and unreimbursed amount outstanding under all letters of credit, letters of guarantee and surety bonds to the extent not cash collateralized (excluding performance bonds provided by insurers), mark to market liabilities on Hedging Agreements, bankers' acceptances and similar instruments, indebtedness secured by a Lien, redemption and mandatory dividend obligations with respect to a Credit Party's shares that are redeemable or convertible into debt at a fixed time at the option of the holder thereof or upon the occurrence of a condition within the control of such Person, obligations evidenced by bonds, debentures, notes or similar instruments and any guarantees or indemnity in any manner in respect of any part or all of

an obligations of any other Person of the type included above, *less* the aggregate amount of cash and Cash Equivalents of the Credit Parties which are held with the Agent or an Affiliate thereof in Canada, the United States or Mexico which is unencumbered (except pursuant to the Security) and the use of which is otherwise unrestricted up to an aggregate principal amount of U.S. $20,000,000.

**1.1.268** 1.1.267 "**Unadjusted EBITDA**" means, as at the date of determination, EBITDA, less any items that were added back in calculation thereof pursuant to paragraphs (d) (other than to the extent such amounts are made by payment-in-kind), (h**i), (k)** and (j**l**) of the definition thereof.

**1.1.269** 1.1.268 "**Unfunded Capital Expenditures**" means for any applicable period, Capital Expenditures of the Credit Parties that are not financed with Funded Debt, or from the proceeds of the issuance of any new equity by the Credit Parties, any Sales Proceeds or any Insurance Proceeds in that period, but excluding therefrom any Capital Expenditures for which any Credit Party has received any reimbursement in the form of cash or Cash Equivalents from any Person other than another Credit Party in connection with such Capital Expenditure, but only to the extent of such reimbursement.

**1.1.270** 1.1.269 "**Uniform Customs**" means the Uniform Customs and Practice for Documentary Credits, published as International Chamber of Commerce publication no. 600 and all subsequent amendments to same, in each case, as are current at the time of issuance of the applicable Letter of Credit.

**1.1.271 "United Joint Venture" means the joint venture in respect of Kuwait Drilling Fluid Company, 49% of the equity interests of which, as of the First Amendment Date, is owned by Q'Max Solutions Inc.**

**1.1.272** 1.1.270 "**Unrestricted Subsidiary**" means any Subsidiary of the Borrower that is not a Material Subsidiary.

**1.1.273** 1.1.271 "**U.S.**" means the United States of America.

**1.1.274** 1.1.272 "**U.S. Base Rate**" means the greater of the following:

(a) the rate of interest announced from time to time by the Agent as its reference rate then in effect for determining rates of interest on U.S. dollar loans to its customers in Canada and designated as its U.S. base rate;

(b) the Federal Funds Rate plus three-quarters of one percent (0.75%) per annum; and

(c) sum of (i) the LIBOR Rate and (ii) one percent (1.00%) per annum.

**1.1.275** 1.1.273 "**U.S. Borrower**" means Q'Max America Inc., a corporation incorporated pursuant to the Laws of the state of Delaware, and its successors and permitted assigns.

**1.1.276** ~~1.1.274~~ "**U.S. Dollar Base Rate Loan**" means an Advance made by a Lender in Canada to the Borrower by way of a direct loan in U.S. Dollars, but excluding Advances in the form of a LIBOR Loan.

**1.1.277** ~~1.1.275~~ "**U.S. Dollar LIBOR Rate**" means, at any time, the LIBOR Rate applicable to LIBOR Loans denominated in U.S. Dollars determined at such time.

**1.1.278** ~~1.1.276~~ "**U.S. Dollar Prime Rate Loan**" means an Advance in U.S. Dollars bearing interest at a fluctuating rate determined by reference to the U.S. Prime Rate.

**1.1.279** ~~1.1.277~~ "**U.S. Dollars**" or "**U.S. $**" means the lawful money of the U.S.

**1.1.280** ~~1.1.278~~ "**U.S. Operating Facility**" is defined in Section 4.1.

**1.1.281** ~~1.1.279~~ "**U.S. Operating Facility Commitment**" means, as the context requires, (a) collectively with respect to all U.S. Operating Lenders, in the aggregate as of the Amendment and Restatement Date, U.S. $15,000,000, as otherwise increased or decreased pursuant to this Agreement and (b) means, with respect to each individual U.S. Operating Lender, the individual commitment amount of such Lender in the maximum principal amount indicated opposite such U.S. Operating Lender's name in Exhibit "A" under the heading "U.S. Operating Facility Commitments", as amended from time to time.

**1.1.282** ~~1.1.280~~ "**U.S. Operating Facility Limit**" means the lesser of (a) the U.S. Operating Facility Commitment, and (b) the sum of the Borrowing Base less the then outstanding Advances under the Term Facility and the Canadian Operating Facility.

**1.1.283** ~~1.1.281~~ "**U.S. Operating Lenders**" means the Lenders who have provided a Commitment under the U.S. Operating Facility as set forth in Exhibit "A".

**1.1.284** ~~1.1.282~~ "**U.S. Prime Rate**" means, for any day, the rate per annum from time to time announced by HSBC US as its prime rate in effect at its principal office in New York City. The U.S. Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  HSBC US may make commercial loans or other loans at rates of interest at, above or below the U.S. Prime Rate.  Any change in the U.S. Prime Rate shall take effect at the opening of business on the day specified in the public announcement of such change.

**1.1.285** ~~1.1.283~~ "**Voting Securities**" means securities of capital stock of any class of any corporation, partnership units in the case of a partnership, trust units in the case of a trust, or other evidence of ownership serving similar purposes, carrying voting rights under all circumstances, provided that, for the purposes of this definition, shares which only carry the right to vote conditionally on the happening of an event will not be considered Voting Securities, whether or not such event will have occurred, nor will any securities be deemed to cease to be Voting Securities solely by reason of a right to vote accruing to securities of another class or classes by reason of the happening of such event.

**1.1.286** ~~1.1.284~~ "**Wells Fargo**" means Wells Fargo Bank, National Association.

**1.1.287** 1.1.285 "**Wells Fargo Credit Agreement**" means the Credit and Security Agreement to be dated on or after the Amendment and Restatement Date, by and among ADF SPV, LLC, as the borrower, Anchor, as the servicer, and Wells Fargo, as lender and collateral agent, as may be amended, restated, supplemented, replaced or otherwise modified from time to time.

**1.1.288** 1.1.286 "**Wells Fargo Letter**" means that certain letter to be dated as of the date of the Wells Fargo Credit Agreement between HSBC, as administrative agent, and Wells Fargo, as lender and collateral agent (to be in form and substance satisfactory to the Agent, acting reasonably), as the same may be amended, restated or otherwise modified from time to time.

**1.1.289** 1.1.287 "**Withdrawal Liability**" has the meaning specified in Part I of Subtitle E of Title IV of ERISA.

**1.1.290** 1.1.288 "**Year-end Financial Statements**" in respect of any Person means the audited consolidated financial statements of such Person prepared in accordance with GAAP, including the notes thereto, in respect of its most recently completed Fiscal Year.

## 1.2    Accounting Principles

Except as otherwise expressly provided herein, all accounting terms, principles and calculations applicable to the Facilities and this Agreement will be interpreted, applied and calculated, as the case may be, in accordance with GAAP. If, after the date of this Agreement, there shall occur any change in GAAP or change in the accounting method under GAAP that are different from those used in the historical preparation of the financial statements, including any change by reason of any change in the rules, regulations, pronouncements, opinions or other requirements of the Canadian Institute of Chartered Accountants (or any successor thereto or agency with similar function), including the adoption of International Financial Reporting Standards, that are different from those used in the preparation of the financial statements delivered pursuant to Section 7.4 and such change shall result in a change in the method of calculation of any financial covenant, ratio, standard or term found in this Agreement, including the treatment of operating and capital leases, either the Canadian Borrower or the Required Lenders may by notice to the Agent and the Canadian Borrower, require that the Lenders and the Canadian Borrower negotiate in good faith to amend such covenants, ratios, standards, and terms so as equitably to reflect such change in accounting principles, with the desired result being that the criteria for evaluating the financial condition of the Canadian Borrower and its Subsidiaries shall be the same as if such change had not been made. No delay by the Canadian Borrower or the Required Lenders in requiring such negotiation shall limit their right to so require such a negotiation at any time after such a change in accounting principles. Until any such covenant, ratio, standard or term is amended in accordance with this Section 1.2, financial covenants shall be computed and determined in accordance with GAAP in effect prior to such change in accounting principles.

## 1.3    Currency References

All amounts referred to in this Agreement are in U.S. Dollars unless otherwise noted.

**1.4      References to Statutes**

Whenever in this Agreement reference is made to a statute or regulations made pursuant to a statute, such reference shall, unless otherwise specified, be deemed to include all amendments to such statute or regulations from time to time and all statutes or regulations which may come into effect from time to time substantially in replacement for the said statutes or regulations.

**1.5      Extended Meanings**

Terms defined in the singular have the same meaning when used in the plural, and vice-versa. When used in the context of a general statement followed by a reference to one or more specific items or matters, the term "including" shall mean "including, without limitation", and the term "includes" shall mean "includes, without limitation". Any reference herein to the exercise of discretion by the Agent or the Lenders (including phrases such as "in the discretion of", "in the opinion of", "to the satisfaction of" and similar phrases) shall mean that such discretion is absolute and unfettered and shall not imply any obligation to act reasonably, unless otherwise expressly stated herein.

**1.6      Headings**

Headings, subheadings and the table of contents contained in the Credit Documents are inserted for convenience of reference only, and will not affect the construction or interpretation of the Credit Documents.

**1.7      Subdivisions**

Unless otherwise stated, reference herein to a Schedule or to an Article, Section, paragraph or other subdivision is a reference to such Schedule to this Agreement or such Article, Section, paragraph or other subdivision of this Agreement. Unless specified otherwise, reference in Schedule "A" to a Schedule or to an Article, Section, paragraph or other subdivision is a reference to such Schedule or Article, Section, paragraph or other subdivision of this Agreement.

**1.8      Number**

Wherever the context in the Credit Documents so requires, a term used herein importing the singular will also include the plural and vice versa.

**1.9      Time**

Time will be of the essence of the Credit Documents.

**1.10     Amendments**

No Credit Document may be amended orally and, subject to Sections 1.11(a) and 11.2, any amendment may only be made by way of an instrument in writing signed by the Parties.

## 1.11   No Waiver

(a)   No waiver by a Party of any provision or of the breach of any provision of the Credit Documents will be effective unless it is contained in a written instrument duly executed by an authorized officer or representative of such Party. Such written waiver will affect only the matter specifically identified in the instrument granting the waiver and will not extend to any other matter, provision or breach.

(b)   The failure of a Party to take any steps in exercising any right in respect of the breach or non fulfilment of any provision of the Credit Documents will not operate as a waiver of that right, breach or provision, nor will any single or partial exercise of any right preclude any other or future exercise of that right or the exercise of any other right, whether in Law or otherwise.

(c)   Acceptance of payment by a Party after a breach or non fulfilment of any provision of the Credit Documents requiring a payment to such Party will constitute a waiver of such provision if cured by such payment, but will not constitute a waiver or cure of any other provision of the Credit Documents.

## 1.12   Inconsistency

To the extent that there is any inconsistency or ambiguity between the provisions of this Agreement and any other Credit Document, the provisions of this Agreement will govern to the extent necessary to eliminate such inconsistency or ambiguity. For greater certainty, a provision of this Agreement and a provision of another Credit Document shall be considered to be inconsistent if both relate to the same subject-matter and the provision in one such document imposes more onerous obligations or restrictions than the corresponding provision in the other.

## 1.13   Pro Forma Adjustments

For purposes of making computations of the Net Leverage Ratio and the Fixed Charge Coverage Ratio herein, if any applicable Person or makes any Permitted Acquisitions, mergers, amalgamations, consolidations, dispositions of assets or divisions or the Canadian Borrower makes any adjustments to the Capital Expenditure budget (each a "**relevant transaction**") during the reference period applicable to such computation shall be calculated on a *pro forma* basis assuming that all such relevant transactions (and the change in EBITDA resulting therefrom) had occurred on the first day of such reference period. If since the beginning of such reference period any Person that subsequently became a Subsidiary or was merged with or into the Borrower or any of its Subsidiaries since the beginning of such period shall have consummated any relevant transactions that would have required adjustment pursuant to this definition, then the Net Leverage Ratio shall be calculated giving pro forma effect thereto for such reference period as if such relevant transaction had occurred at the beginning of the applicable reference period.

For purposes of this Section 1.13, whenever *pro forma* effect is to be given to a transaction, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Canadian Borrower and may include, without duplication, cost savings, operating expense reductions, restructuring charges and expenses and cost-saving synergies

resulting from such acquisition or other relevant transaction, in each case in a manner acceptable to the Required Lenders, acting reasonably.

**1.14    Joint and Several Liability of Borrowers**

Notwithstanding anything else set forth in the Credit Documents to the contrary, each of the Borrowers agrees and confirms to the Agent and Lenders that the liabilities and obligations of the Borrowers under this Agreement and the other Credit Documents are joint and several as between each Borrower.

**1.15    Deemed Action by all Borrowers**

All consents, waivers, notices and other action required, made, given to or received by the Borrowers under this Agreement or any of the other Credit Documents will be deemed to be required, made, given or received by all of the Borrowers if required, made, given or received by one or more of the Borrowers. If a representation, certification or other statement under this Agreement or any of the other Credit Documents is made by one Borrower, or to the knowledge of one Borrower, it will be deemed to be made by all Borrowers, or the knowledge of all Borrowers, as applicable.

**1.16    Amendment and Restatement**

The Borrowers, the Agent and the Lenders agree that effective on the Amendment and Restatement Date, this Agreement is an amendment and restatement of the Existing Credit Agreement and is not a novation of the Existing Credit Agreement. As a consequence, the obligations, indebtedness and liabilities outstanding under the Existing Credit Agreement (including any existing letters of credit thereunder which will be deemed to be Letters of Credit issued by the applicable Issuing Bank under the corresponding Facility hereunder) shall constitute obligations, indebtedness and liabilities hereunder governed by the terms hereof and shall continue to be secured by the Security. Such obligations, indebtedness and liabilities shall be continuing in all respects, and this Agreement shall not be deemed to evidence or result in a novation of such obligations, indebtedness and liabilities or a repayment and reborrowing of such obligations, indebtedness and liabilities. The Existing Credit Agreement has been amended and restated solely for the purposes of reflecting amendments to the Existing Credit Agreement which the Lenders, the Agent and the Borrowers have agreed upon. All references to the "Credit Agreement" contained in the Credit Documents delivered prior to the effectiveness of this Agreement shall be references to this Agreement without further amendment to those Credit Documents. The Borrowers confirm that each of the Credit Documents otherwise remains in full force and effect. All deliverables made under the Existing Credit Agreement shall be deemed to have been delivered under this Agreement. Each Lender authorizes the Agent to take all actions and make such adjustments as are reasonably necessary to give effect to the foregoing. Notwithstanding the foregoing or any other term hereof, all of the applicable continuing covenants, representations and warranties on the part of the Borrowers under the Existing Credit Agreement and all of the claims and causes of action arising against the Borrowers in connection therewith, in respect of all matters, events, circumstances and obligations arising or existing prior to the Amendment and Restatement Date shall continue, survive and shall not be merged in the

execution of this Agreement or any other Credit Documents or any advance or provision of any Loan hereunder.

## 1.17 Exhibits and Schedules

The following exhibits and schedules are attached to this Agreement and incorporated herein by reference:

| | | |
|---|---|---|
| Exhibit "A" | – | Lenders and Lenders' Commitments |
| Exhibit "B" | – | Form of Drawdown Request |
| Exhibit "C" | – | Form of Rollover Notice |
| Exhibit "D" | – | Form of Conversion Notice |
| Exhibit "E" | – | Form of Repayment Notice |
| Exhibit "F" | – | Form of Compliance Certificate |
| Exhibit "G" | – | Form of Assignment Agreement |
| Exhibit "H" | – | Form of Borrowing Base Certificate |
| Exhibit "I" | – | Form of Designation Notice |
| Exhibit "J" | – | Form of Subordination Agreement |
| Schedule ~~1.1.204~~**1.1.205** | – | Existing Permitted Funded Debt |
| Schedule ~~1.1.209~~**1.1.210** | – | Existing Permitted Liens |
| Schedule ~~1.1.252~~**1.1.253** | – | Surviving Colombian Credit Agreements |
| Schedule 6.1.2 | – | Corporate Information |
| Schedule 6.1.3 | – | Subsidiaries |
| Schedule 6.1.5 | – | Consents and Approvals Required |
| Schedule 6.1.8 | – | Material Permits |
| Schedule 6.1.10 | – | Leased Properties |
| Schedule 6.1.11 | – | Intellectual Property |
| Schedule 6.1.12 | – | Insurance Policies |
| Schedule 6.1.13 | – | Material Agreements |
| Schedule 6.1.14 | – | Labour Matters |
| Schedule 6.1.15 | – | Environmental Matters |
| Schedule 6.1.16 | – | Litigation |
| Schedule 6.1.17 | – | Pension Plans |
| Schedule 6.1.23 | – | Taxes |
| Schedule 6.1.33 | – | Eligible Approved Contracts |
| Schedule 7.2.3 | – | Investments |

~~25877170.9~~27367782.4

Schedule 7.2.6      –    Transactions with Affiliates
Schedule 9.1          –    Post-Closing Schedule

## 1.18    Covenant Relief Period

The Borrowers may, by providing an irrevocable written notice to the Agent, terminate the Covenant Relief Period, which notice shall specify the date on which the Covenant Relief Period is to end; provided that, such termination date shall not be retroactive to a date that precedes such notice.

## ARTICLE 2
## CANADIAN OPERATING FACILITY

## 2.1    Establishment of Canadian Operating Facility

Subject to the terms and conditions in this Agreement, each Canadian Operating Lender hereby establishes a committed, revolving credit facility in favour of the Canadian Borrower in the maximum principal amount indicated opposite such Canadian Operating Lender's name in Exhibit "A" under the heading "Canadian Operating Facility Commitments". Such credit facility in the maximum aggregate principal amount of the Canadian Operating Facility Limit are established by the Canadian Operating Lenders severally and not jointly, and are hereinafter collectively referred to as "**Canadian Operating Facility**". Each Advance by a Canadian Operating Lender under the Canadian Operating Facility shall be made by such Canadian Operating Lender in its Proportionate Share of the Canadian Operating Facility. If the Canadian Operating Facility Limit is at any time less than the Canadian Operating Facility Commitment, then each Canadian Operating Lender's obligation to provide Advances under the Canadian Operating Facility will be reduced accordingly on a *pro rata* basis.

## 2.2    Purpose

Advances under the Canadian Operating Facility shall be used by the Canadian Borrower to fund working capital needs and for general corporate purposes, including Permitted Acquisitions (other than a Hostile Acquisition and the Terra Acquisition).

## 2.3    Revolving Nature

The Canadian Operating Facility shall be a revolving facility. For greater certainty, the Borrower shall, subject to the terms of this Agreement, be entitled to obtain Advances under the Canadian Operating Facility from time to time and repay all or any portion of the Outstanding Advances under the Canadian Operating Facility from time to time; provided, that the Outstanding Advances under the Canadian Operating Facility at any time shall not exceed the Canadian Operating Facility Limit in effect at such time. If at any time and for whatever reason the Outstanding Advances under the Canadian Operating Facility exceed the Canadian Operating Facility Limit then in effect, the Canadian Borrower shall, within two Business Days of receipt of a written notice from the Agent, pay to the Agent the principal amount required to reduce the Outstanding Advances under the Canadian Operating Facility to an amount not greater than the Canadian Operating Facility Limit then in effect.

2.4     **Repayment**

The Obligations under the Canadian Operating Facility shall become due and payable on the earlier of: (i) the Acceleration Date; and (ii) the Facilities Maturity Date.

2.5     **Availment Options**

2.5.1     Subject to the restrictions contained in this Section 2.5 and elsewhere in this Agreement (and in particular, Sections 5.4 and 5.5), the Canadian Borrower may receive Advances under the Canadian Operating Facility by any one or more of the following Availment Options (or any combination thereof) in minimum amounts and multiples as provided in Section 5.5:

(a)     Overdrafts in Canadian Dollars or U.S. Dollars (but only under the Swingline);

(b)     Letters of Credit in Canadian Dollars or U.S. Dollars (but only under the Swingline);

(c)     Canadian Dollar Prime Rate Loans;

(d)     U.S. Dollar Base Rate Loans;

(e)     Bankers' Acceptances from the BA Lenders in Canadian Dollars only with a maturity of 30, 60, 90 or 180 days, subject to availability;

(f)     BA Equivalent Loans from the Non-BA Lenders in Canadian Dollars only with a maturity of 30, 60, 90 or 180 days, subject to availability; or

(g)     LIBOR Loans in U.S. Dollars, with a LIBOR Period of 30, 60, 90 or 180 days, subject to availability.

2.5.2     Bankers' Acceptances, BA Equivalent Loans and LIBOR Loans under the Canadian Operating Facility will not be issued with a maturity date later than the Facilities Maturity Date.

2.5.3     The Canadian Borrower may Convert Outstanding Advances under the Canadian Operating Facility in the form of any above Availment Option applicable to it into another form of Availment Option in the same currency, subject to and in accordance with the terms and conditions of this Agreement (but for greater certainty, Bankers' Acceptances, BA Equivalent Loans, LIBOR Loans and Letters of Credit may not be converted into another Availment Option prior to the maturity thereof, except in the case of unexpired Letter of Credits by the return of the original thereof to the Swingline Lender for cancellation).

2.6     **Interest and Fees**

2.6.1     In respect of Advances under the Canadian Operating Facility, the Canadian Borrower agrees to pay the following:

- 68 -

(a)     interest on Overdrafts in Canadian Dollars and interest on Canadian Dollar Prime Rate Loans at the Canadian Prime Rate plus the Applicable Margin per annum, payable monthly in arrears on the last Business Day of such month;

(b)     in respect of each Letter of Credit issued under the Canadian Operating Facility:

    (i)     to the Swingline Lender in respect of the period from the date of issuance of such Letter of Credit to the date of expiry of such Letter of Credit (including the first day but excluding the last day) and divided by 365 or 366 days, as the case may be, a fee equal to the Applicable Margin in effect at the time of issuance multiplied by the face amount of such Letter of Credit multiplied by the number of days in such period and divided by 365 or 366 days, as the case may be, payable on the date of issuance of such Letter of Credit; and

    (ii)     in respect of each Letter of Credit, in addition to the fees referred to in clause (i) immediately above, fees generally applicable to Letters of Credit from time to time (such as issuance, drawing, registration, amendment, communication and other processing and out of pocket fees) at the Swingline Lender's usual rates, payable to the Swingline Lender for its own account,

and each fee referred to in this Section in respect of a Letter of Credit shall be paid in the same currency as the currency of such Letter of Credit;

(c)     in respect of each Bankers' Acceptance, a stamping fee equal to the Applicable Margin multiplied by the face amount of the Bankers' Acceptance with the product thereof further multiplied by the number of days to maturity of the Bankers' Acceptance and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such Bankers' Acceptance will be less than the face amount payable to the holder of such Bankers' Acceptance on the maturity thereof, as more particularly provided in Section 5.10);

(d)     in respect of each BA Equivalent Loan, a stamping fee equal to the Applicable Margin multiplied by the face amount of the BA Equivalent Loan with the product thereof further multiplied by the number of days to maturity of the BA Equivalent Loan and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such BA Equivalent Loan will be less than the principal amount of such BA Equivalent Loan on the maturity thereof, as more particularly provided in Section 5.12);

(e)     interest on Overdrafts in U.S. Dollars and interest on U.S. Dollar Base Rate Loans at the U.S. Base Rate plus the Applicable Margin per annum, payable monthly in

- 69 -

arrears on the last day of each and every month (<u>provided</u>, that if the last day of any month is not a Business Day, interest shall be payable on the next Business Day thereafter);

(f)      interest on LIBOR Loans in U.S. Dollars at the U.S. Dollar LIBOR Rate plus the Applicable Margin per annum calculated on the basis of a year of 360 days, payable in the manner set out in Section 5.13.2;

(g)      a standby fee with respect to the unused portion of the Canadian Operating Facility (other than the Swingline), calculated in U.S. Dollars on a daily basis as being the difference between (i) the Canadian Operating Facility Commitment less the Swingline Limit and (ii) the Outstanding Advances under that portion of the Canadian Operating Facility other than the Swingline, multiplied by the Applicable Margin and divided by 365 or 366 days, as the case may be, which standby fee shall be payable quarterly in arrears on the last day of each Fiscal Quarter;

(h)      a standby fee with respect to the Swingline payable to the Agent for the account of the Swingline Lender, calculated in U.S. Dollars on a daily basis as being the difference between (i) the Swingline Limit and (ii) the Outstanding Advances under the Swingline, multiplied by the Applicable Margin and divided by 365 or 366 days, as the case may be, which standby fee shall be payable quarterly in arrears on the last day of each Fiscal Quarter; and

(i)      such fees payable to the Agent as may be agreed in writing from time to time between the Canadian Borrower and the Agent relating to any Banking Services Agreements and related services which may be provided by the Agent for the Canadian Borrower from time to time.

2.6.2    With respect to any Availment Option under the Canadian Operating Facility, "Applicable Margin" means, in respect of any Fiscal Quarter, the percentage in the column relating to such Availment Option which corresponds to the Net Leverage Ratio as determined pursuant to Section 5.1.4.

## 2.7    Swingline

2.7.1    A portion of the Canadian Operating Facility in the maximum amount of the Swingline Limit is hereby designated as the "**Swingline**" and shall be subject to the terms and conditions in this Section 2.7 (in addition to any other applicable terms and conditions contained in this Agreement). The Swingline shall be available to each of the Canadian Borrower and the Specified Canadian Swingline Borrower (collectively the "**Swingline Borrowers**").

2.7.2    The Swingline shall be established and maintained by the Swingline Lender only. Either Swingline Borrower may only receive Advances under the Swingline by way of Overdrafts, LIBOR Loans, Bankers' Acceptances or the issuance of Letters of Credit, in each case (other than with respect to Bankers' Acceptances), in Canadian Dollars or

U.S. Dollars. The aggregate amount owing under the Swingline may at no time exceed the Swingline Limit and the aggregate principal amount outstanding under the Swingline plus the other Outstanding Advances under the Canadian Operating Facility shall at no time exceed the Canadian Operating Facility Limit. The total number of Bankers' Acceptances and LIBOR Loans outstanding under the Swingline shall not exceed fifteen at any time.

2.7.3    The Swingline shall form a part of the Canadian Operating Facility and, except for the purpose of calculating the Canadian Operating Facility standby fee, any Swingline Loan shall reduce availability under the Canadian Operating Facility on a dollar for dollar basis.

2.7.4    The Swingline Lender will make Advances to the Swingline Borrowers under the Swingline by way of (a) Canadian Dollar Overdraft into Canadian Dollar accounts, or U.S. Dollar Overdraft into U.S. Dollar accounts, in each case held at a branch of the Agent and as designated by either Swingline Borrower from time to time as required in order to honour cheques drawn by either Swingline Borrower on such accounts which are presented to the Swingline Lender for payment, (b) the issuance of Letters of Credit in Canadian Dollars or U.S. Dollars or (c) LIBOR Loans or Bankers' Acceptances. Other than in respect of Letters of Credit, LIBOR Loans or Bankers' Acceptances, no Drawdown Request or minimum amount shall be required in connection therewith and each Swingline Loan shall be on a dollar for dollar basis (i.e. not subject to multiples). As deposits are made into such accounts by the applicable Swingline Borrower, the Swingline Lender shall withdraw funds from such accounts from time to time and apply such funds as Repayments under the Swingline; provided, that the foregoing shall not apply to any Swingline Loans made by way of issuance of a Letter of Credit, LIBOR Loan or Bankers' Acceptance. No notice of repayment shall be required to be given by the Canadian Borrower in respect of any such repayment of any Swingline Loan (other than in respect of LIBOR Loans or Bankers' Acceptances). The Swingline Borrowers authorize and direct the Swingline Lender, in its discretion, to automatically debit, by mechanical, electronic or manual means, the bank accounts of the Swingline Borrowers maintained by it for any amounts (including principal, interest or fees) that are due and payable under this Section 2.7.

2.7.5    Letters of Credit may be issued under the Swingline in Canadian Dollars or U.S. Dollars (or such other currencies as may be agreed to by the Swingline Lender); provided, that the Equivalent Amount expressed in U.S. Dollars (or such other currency, if applicable) of the aggregate face amount of all Letters of Credit outstanding under the Swingline at any time may not exceed U.S. $10,000,000. Each Letter of Credit shall have an expiry date not exceeding the earlier of (a) one year from the date of issuance thereof (subject to any customary auto-renewal terms contained in such Letter of Credit; provided, that such auto-renewal provisions do not provide for a renewal in the singular instance in excess of one year from the date of such renewal), and (b) five Business Days prior to the Facilities Maturity Date. Letters of Credit will not be issued for the purpose of guaranteeing obligations of any Person other than a Credit Party. On the date of issue, the Swingline Lender will complete and issue one or more Letters of Credit in favour of the beneficiary as specified by the applicable Swingline Borrower in its Drawdown Request.

- 71 -

No Letter of Credit shall require payment against a conforming draft to be made thereunder on the same Business Day upon which such draft is presented, if such presentation is made after 11:00 a.m. (Toronto time) on such Business Day. Prior to the issue date, the applicable Swingline Borrower shall specify a precise description of the documents and the verbatim text of any certificate to be presented by the beneficiary prior to payment under the Letter of Credit. The Swingline Lender may require changes in any such documents or certificate, acting reasonably. In determining whether to pay under a Letter of Credit, the Swingline Lender shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit. Sections 4.7.2, 4.7.3, 4.7.4 and 4.7.6 shall apply to Letters of Credit issued under the Swingline *mutatis mutandis* as if the Swingline Lender was the Issuing Bank.

2.7.6    If the Canadian Borrower requests a Syndicated Advance and the Swingline Lender's Proportionate Share of such Syndicated Advance would cause its Proportionate Share of all Syndicated Advances under the Canadian Operating Facility then outstanding together with the aggregate outstanding principal amount of all Swingline Loans to exceed the Swingline Lender's Commitment under the Canadian Operating Facility, then the Canadian Borrower shall be required to repay such Swingline Loans (or to convert the same into a Syndicated Advance in accordance with Section 2.7.7) to the extent of such excess on or before the requested date of such Syndicated Advance; provided, that the foregoing shall not apply to any Swingline Loans made by way of issuance of a Letter of Credit.

2.7.7    Notwithstanding anything to the contrary herein contained, the Canadian Borrower may at any time give notice to the Swingline Lender and the Agent, which notice shall direct a Conversion of any outstanding Swingline Loan into a Syndicated Advance (other than by way of issuance of a Letter of Credit) and shall specify the particulars of such Swingline Loans, and the Agent shall forthwith provide a copy of such notice to the Canadian Operating Lenders and, effective on the effective date of such notice, the Canadian Borrower shall be deemed to have requested a Conversion of such Swingline Loan into a Syndicated Advance (whether or not it was the actual borrower under such Swingline Loan) and in an amount sufficient to repay the relevant Swingline Loan and accrued and unpaid interest in respect thereof. Subject to the same notice period set out in Section 5.4, each Canadian Operating Lender shall disburse to the Agent for payment to the Swingline Lender its respective Proportionate Share of such amounts and such amounts shall thereupon be deemed to have been advanced by such other Canadian Operating Lenders to the Canadian Borrower and to constitute Syndicated Advances by way of Canadian Dollar Prime Rate Loans or U.S. Dollar Base Rate Loans, as applicable. Such Syndicated Advances shall be deemed to be comprised of principal and accrued and unpaid interest in the same proportions as the corresponding Swingline Loans.

2.7.8    Upon the occurrence and any time during the continuance of an Event of Default, the Canadian Operating Lenders shall make such adjusting payments amongst themselves in any manner as may be required to ensure their respective participations in outstanding Advances under the Canadian Operating Facility reflect their respective Proportionate Share under the Canadian Operating Facility. If any Swingline Loans (other

than by way of Letters of Credit) are outstanding, the Swingline Lender may at any time in its sole and absolute discretion, on behalf of either Swingline Borrower (which hereby irrevocably directs and authorizes the Swingline Lender to make such request on its behalf), request that each Canadian Operating Lender, through the Agent, make a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable, to the Canadian Borrower (whether or not it was the actual borrower under such Swingline Loan) in an amount equal to the Lender's Proportionate Share of the principal amount of such Swingline Loan outstanding on the date such notice is given (in this Section, the "**Refunded Swingline Loans**"), provided that the provisions of this clause shall not affect the applicable Swingline Borrower's obligation to repay the Swingline Loans to the extent they remain outstanding. Each Canadian Operating Lender will make the proceeds of any such Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable, available to the Swingline Lender on the Business Day next following the date such notice is given in immediately available funds. The proceeds of such a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan shall be applied by the Swingline Lender to the payment in full of the Refunded Swingline Loans.

2.7.9    In the event of any request for a drawing under any Letter of Credit, the Swingline Lender may notify the applicable Swingline Borrower (with a copy of the notice to the Agent) on or before the date on which it intends to honour such drawing. The applicable Swingline Borrower (whether or not such notice is given) shall reimburse the Swingline Lender within two Business Days of demand by the Swingline Lender, in the relevant currency, an amount, in same day funds, equal to the amount of such drawing (in this Section, an "**LC Payment**"). The applicable Swingline Borrower shall pay to the Swingline Lender interest on the amount of any such drawn Letter of Credit as if such drawn amount was a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable, from the date such Letter of Credit is drawn upon until such time as the applicable Swingline Borrower reimburses the Swingline Lender for the drawn amount of such Letter of Credit. If the applicable Swingline Borrower does not reimburse the Swingline Lender within such two Business Days, the Canadian Operating Lenders shall, on the third Business Day following the date of such initial demand on the applicable Swingline Borrower by the Swingline Lender, at the request of the Swingline Lender, provide its Proportionate Share of the amount drawn under any such Letter of Credit and the Agent shall apply the proceeds thereof to the reimbursement of the Swingline Lender for the amount of such drawing. The applicable Swingline Borrower shall pay to Canadian Operating Lenders interest on the amount of any such drawn Letter of Credit from the date the Swingline Lender requests payment from each of Canadian Operating Lenders in respect of such drawn Letter of Credit until such time as the Canadian Borrower reimburses the Swingline Lender and each of Canadian Operating Lenders for the drawn amount of such Letter of Credit which has been drawn upon as if such drawn amount was a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable. Each Canadian Operating Lender acknowledges and agrees that its obligation to acquire participations in each Letter of Credit issued by the Swingline Lender and its obligation to make the payments specified herein, and the right of the Swingline Lender to receive the same, in the manner specified herein, are absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and

continuance of a Default or Event of Default hereunder, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

2.7.10    The obligations of each Canadian Operating Lender under Sections 2.7.8 and 2.7.9 are unconditional, shall not be subject to any qualification or exception whatsoever and shall be performed in accordance with the terms and conditions of this Agreement under all circumstances including:

(a)    any lack of validity or enforceability of the applicable Swingline Borrower's obligations under this Section 2.7;

(b)    the occurrence of any Default or Event of Default or the exercise of any rights by the Agent under the Credit Documents;

(c)    whether the Borrower under a Swingline loan was the Canadian Borrower or the Specified Canadian Swingline Borrower; and

(d)    the absence of any demand for payment being made, any proof of claim being filed, any proceeding being commenced or any judgment being obtained by any Lender against any Credit Party.

2.7.11    For certainty, it is hereby acknowledged and agreed that the Canadian Operating Lenders shall be obligated to disburse to the Agent for payment to the Swingline Lender their respective Proportionate Shares of any Syndicated Advances contemplated in this Section 2.7 regardless of:

(a)    whether a Default or Event of Default has occurred or is then continuing or whether any other condition in Section 9.2 is met;

(b)    whether or not the Canadian Borrower has, in fact, actually requested such Conversion; and

(c)    whether or not a Person was a Canadian Operating Lender at the time the applicable Swingline Loan was made.

2.7.12    Notwithstanding any other terms of this Section 2.7, this Agreement or any other Loan Document, the Canadian Borrower shall be jointly and severally liable with the Specified Canadian Swingline Borrower for all obligations and indebtedness arising out of any Swingline Loan advanced by the Swingline Lender to the Specified Canadian Swingline Borrower.

<div align="center">

**ARTICLE 3**
**TERM FACILITY**

</div>

**3.1    Establishment of the Term Facility**

Subject to the terms and conditions in this Agreement, each Term Lender hereby establishes a committed non-revolving reducing term credit facility in favour of the Canadian

Borrower in the maximum principal amount indicated opposite such Term Lender's name in Exhibit "A" under the heading "Term Facility Commitments". Such credit facility in the maximum aggregate principal amount of the Term Facility Commitment is established by the Term Lenders severally and not jointly, and is hereinafter referred to as the "**Term Facility**". Each Advance by a Term Lender under the Term Facility shall be made by such Term Lender in its Proportionate Share of the Term Facility.

## 3.2    Purpose

Advances to partially finance the purchase price of certain Acquisitions.

## 3.3    Nature

The Term Facility shall be a non-revolving facility, and any Repayment under the Term Facility may not be re-borrowed. As of the Amendment and Restatement Date, no new Advances are available under the Term Facility.

## 3.4    Repayment

3.4.1    The Obligations under the Term Facility shall become due and payable on the earlier of: (a) the Acceleration Date; and (b) the Facilities Maturity Date.

3.4.2    The Canadian Borrower shall make Repayments under the Term Facility in quarterly installments on the last day of each Fiscal Quarter (and if the last day of a Fiscal Quarter is not a Business Day, such payment shall be due on the next Business Day) of U.S. $1,195,000 in each case, payable on the last Business Day of each such Fiscal Quarter.

3.4.3    Each Repayment under the Term Facility shall be applied to the Term Lenders holding such Loans *pro rata* based upon their Proportionate Share thereof and the Term Facility Commitment shall be reduced by the amount of each such Repayment.

## 3.5    Availment Options

3.5.1    Subject to the restrictions contained in this Section 3.5, the Canadian Borrower may receive Advances under the Term Facility by way of (and may convert Outstanding Advances under the Term Facility into) any one or more of the following Availment Options (or any combination thereof) in minimum amounts and multiples as provided in Section 5.5:

(a)      Canadian Dollar Prime Rate Loans;

(b)      Bankers' Acceptances from the BA Lenders in Canadian Dollars only with a maturity date of 30, 60, 90 or 180 days, subject to availability;

(c)      BA Equivalent Loans from the Non-BA Lenders in Canadian Dollars only with a maturity date of 30, 60, 90 or 180 days, subject to availability;

(d)     U.S. Dollar Base Rate Loans; or

(e)     LIBOR Loans in U.S. Dollars only with a LIBOR Period of 30, 60, 90 or 180 days, subject to availability.

3.5.2     Bankers' Acceptances, BA Equivalent Loans and LIBOR Loans under the Term Facility may not be converted into another Availment Option prior to the maturity thereof, and may not be issued with a maturity date later than the Facilities Maturity Date.

**3.6     Interest and Fees**

3.6.1     In respect of Advances under the Term Facility, the Canadian Borrower agrees to pay the following:

(a)     interest on Canadian Dollar Prime Rate Loans at the Canadian Prime Rate plus the Applicable Margin per annum, payable monthly in arrears on the first Business Day of the next month;

(b)     in respect of each Bankers' Acceptance, a stamping fee equal to the Applicable Margin multiplied by the face amount of the Bankers' Acceptance with the product thereof further multiplied by the number of days to maturity of the Bankers' Acceptance and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such Bankers' Acceptance will be less than the face amount payable to the holder of such Bankers' Acceptance on the maturity thereof, as more particularly provided in Section 5.10);

(c)     in respect of each BA Equivalent Loan, a stamping fee equal to the Applicable Margin multiplied by the face amount of the BA Equivalent Loan with the product thereof further multiplied by the number of days to maturity of the BA Equivalent Loan and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such BA Equivalent Loan will be less than the principal amount of such BA Equivalent Loan on the maturity thereof, as more particularly provided in Section 5.12);

(d)     interest on U.S. Dollar Base Rate Loans at the U.S. Base Rate plus the Applicable Margin per annum, payable monthly in arrears on the first Business Day of the next month; and

(e)     interest on LIBOR Loans in U.S. Dollars at the U.S. Dollar LIBOR Rate plus the Applicable Margin per annum calculated on the basis of a year of 360 days, payable in the manner set out in Section 5.13.2.

3.6.2     With respect to any Availment Option under the Term Facility, "Applicable Margin" means, in respect of any Fiscal Quarter, the percentage in the column relating to

such Availment Option which corresponds to the Net Leverage Ratio as determined pursuant to Section 5.1.4.

# ARTICLE 4
# U.S. OPERATING FACILITY

## 4.1     Establishment of U.S. Operating Facility

Subject to the terms and conditions in this Agreement, each U.S. Operating Lender hereby establishes a committed, revolving credit facility in favour of the U.S. Borrower in the maximum principal amount indicated opposite such U.S. Operating Lender's name in Exhibit "A" under the heading "U.S. Operating Facility Commitments". Such credit facility in the maximum aggregate principal amount of the U.S. Operating Facility Limit are established by the U.S. Operating Lenders severally and not jointly, and are hereinafter collectively referred to as the "**U.S. Operating Facility**". Each Advance by a U.S. Operating Lender under the U.S. Operating Facility shall be made by such U.S. Operating Lender in its Proportionate Share of the U.S. Operating Facility.

## 4.2     Purpose

Advances under the U.S. Operating Facility shall be used by the U.S. Borrower to fund working capital needs and for general corporate purposes including the Permitted Acquisitions (other than a Hostile Acquisition and the Terra Acquisition).

## 4.3     Revolving Nature

The U.S. Operating Facility shall be a revolving facility. For greater certainty, the U.S. Borrower shall, subject to the terms of this Agreement, be entitled to obtain Advances by way of U.S. Dollar Prime Rate Loans, LIBOR Loans or Letters of Credit in U.S. Dollars under the U.S. Operating Facility from time to time and repay all or any portion of the Outstanding Advances under the U.S. Operating Facility from time to time; provided, that the Outstanding Advances under the U.S. Operating Facility at any time shall not exceed the U.S. Operating Facility Commitment in effect at such time. If at any time and for whatever reason the Outstanding Advances under the U.S. Operating Facility exceed the U.S. Operating Facility Commitment then in effect, the U.S. Borrower shall, within two Business Days of receipt of a written notice from the Agent, pay to the Agent the principal amount required to reduce the Outstanding Advances under the U.S. Operating Facility to an amount not greater than the U.S. Operating Facility Commitment then in effect.

## 4.4     Repayment

The Obligations under the U.S. Operating Facility shall become due and payable on the earlier of: (i) the Acceleration Date; and (ii) the Facilities Maturity Date.

## 4.5     Availment Options

4.5.1     Subject to the restrictions contained in this Section 4.5 and elsewhere in this Agreement (and in particular, Sections 5.4 and 5.5), the U.S. Borrower may receive

- 77 -

Advances under the U.S. Operating Facility by any one or more of the following Availment Options (or any combination thereof) in minimum amounts and multiples as provided in Section 5.5:

(a)     Letters of Credit in U.S. Dollars;

(b)     U.S. Dollar Prime Rate Loans; or

(c)     LIBOR Loans in U.S. Dollars, with a LIBOR Period of 30, 60, 90 or 180 days, subject to availability.

4.5.2     LIBOR Loans under the U.S. Operating Facility will not be issued with a maturity date later than the Facilities Maturity Date.

4.5.3     The U.S. Borrower may convert Outstanding Advances under the U.S. Operating Facility in the form of any above Availment Option applicable to it into another form of Availment Option in the same currency, subject to and in accordance with the terms and conditions of this Agreement (but for greater certainty, LIBOR Loans and Letters of Credit may not be converted into another Availment Option prior to the maturity thereof, except in the case of unexpired Letter of Credits by the return of the original thereof to the Issuing Bank for cancellation).

## 4.6     Interest and Fees

4.6.1     In respect of Advances under the U.S. Operating Facility, the U.S. Borrower agrees to pay the following:

(a)     interest on U.S. Dollar Prime Rate Loans in U.S. Dollars at the U.S. Prime Rate plus the Applicable Margin per annum, payable monthly in arrears on the last day of each and every month (provided, that if such day is not a Business Day, interest shall be payable on the next Business Day thereafter);

(b)     interest on LIBOR Loans in U.S. Dollars at the U.S. Dollar LIBOR Rate plus the Applicable Margin per annum calculated on the basis of a year of 360 days, payable in the manner set out in Section 5.13.2;

(c)     in respect of each Letter of Credit issued under the U.S. Operating Facility:

(i)     to the Agent for the account of the U.S. Operating Lenders in respect of the period from the date of issuance of such Letter of Credit to the date of expiry of such Letter of Credit (including the first day but excluding the last day) and divided by 360 days, a fee equal to the Applicable Margin in effect at the time of issuance multiplied by the face amount of such Letter of Credit multiplied by the number of days in such period and divided by 360 days, payable on the date of issuance of such Letter of Credit; and

(ii)     in respect of each Letter of Credit, in addition to the fees referred to in Section 4.6.1(c), fees generally applicable to Letters of Credit from time to

- 78 -

time (such as issuance, drawing, registration, amendment, communication and other processing and out of pocket fees) at the Issuing Bank's usual rates, payable to the Issuing Bank for its own account.

Each fee referred to in this Section in respect of a Letter of Credit shall be paid in U.S. Dollars; and

(d)  an unused commitment fee with respect to the unused portion of the U.S. Operating Facility calculated in U.S. Dollars on a daily basis as being the difference between (i) the U.S. Operating Facility Commitment and (ii) the Outstanding Advances under the U.S. Operating Facility, multiplied by the Applicable Margin and divided by 360 days which standby fee shall be payable quarterly in arrears on the last day of each Fiscal Quarter.

4.6.2    With respect to any Availment Option under the U.S. Operating Facility, "Applicable Margin" means, in respect of any Fiscal Quarter, the percentage in the column relating to such Availment Option which corresponds to the Net Leverage Ratio as determined pursuant to Section 5.1.4.

## 4.7    Letters of Credit

4.7.1    Letters of Credit may be issued under the U.S. Operating Facility in U.S. Dollars (or such other currencies as may be agreed to by the Agent and by the applicable Issuing Bank); provided, that the Equivalent Amount expressed in U.S. Dollars of the aggregate face amount of all Letters of Credit outstanding under the U.S. Operating Facility at any time may not exceed U.S. $5,000,000. Each Letter of Credit shall have an expiry date not exceeding the earlier of (a) one year from the date of issuance thereof (subject to any customary auto-renewal terms contained in such Letter of Credit; provided, that such auto-renewal provisions do not provide for a renewal in the singular instance in excess of one year from the date of such renewal), and (b) five Business Days prior to the Facilities Maturity Date.

4.7.2    Each request for the issuance of a Letter of Credit shall be delivered by the U.S. Borrower to the Issuing Bank (with a copy to the Agent) in accordance with the notice requirements set out in Section 5.4 herein, together with Issuing Bank's customary form of application and indemnity agreement completed to its satisfaction and the proposed form of the Letter of Credit (which shall be satisfactory to the Issuing Bank) and such other certificates, documents and other papers and information as the Issuing Bank may reasonably request.

4.7.3    On the date of issue, the Issuing Bank will complete and issue one or more Letters of Credit in favour of the beneficiary as specified by the U.S. Borrower in its Drawdown Request. No Letter of Credit shall require payment against a conforming draft to be made thereunder on the same Business Day upon which such draft is presented, if such presentation is made after 11:00 a.m. (New York time) on such Business Day. Prior to the issue date, the U.S. Borrower shall specify a precise description of the documents and the verbatim text of any certificate to be presented by the beneficiary prior to payment

- 79 -

under the Letter of Credit. The Issuing Bank may require changes in any such documents or certificate, acting reasonably. In determining whether to pay under a Letter of Credit, the Issuing Bank shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit.

4.7.4    In the event of any request for a drawing under any Letter of Credit, the Issuing Bank may notify the U.S. Borrower (with a copy of the notice to the Agent) on or before the date on which it intends to honour such drawing. The U.S. Borrower (whether or not such notice is given) shall reimburse the Issuing Bank within one Business Day of demand by the Issuing Bank, an amount, in same day funds, equal to the amount of such drawing. The U.S. Borrower shall pay to the Issuing Bank interest on the amount of any such drawn Letter of Credit as if such drawn amount was a U.S. Dollar Prime Rate Loan from the date such Letter of Credit is drawn upon until such time as the U.S. Borrower reimburses the Issuing Bank for the drawn amount of such Letter of Credit. If the U.S. Borrower does not reimburse the Issuing Bank within such two Business Days, U.S. Operating Lenders shall, on the third Business Day following the date of such initial demand on the U.S. Borrower by the Issuing Bank, at the request of the Issuing Bank, provide its Proportionate Share of the amount drawn under any such Letter of Credit and the Agent shall apply the proceeds thereof to the reimbursement of the Issuing Bank for the amount of such drawing. The U.S. Borrower shall pay to U.S. Operating Lenders interest on the amount of any such drawn Letter of Credit from the date the Issuing Bank requests payment from each of U.S. Operating Lenders in respect of such drawn Letter of Credit until such time as the U.S. Borrower reimburses the Issuing Bank and each of U.S. Operating Lenders for the drawn amount of such Letter of Credit which has been drawn upon as if such drawn amount was a U.S. Dollar Base Rate Loan. Each U.S. Operating Lender acknowledges and agrees that its obligation to acquire participations in each Letter of Credit issued by the Issuing Bank and its obligation to make the payments specified herein, and the right of the Issuing Bank to receive the same, in the manner specified herein, are absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or Event of Default hereunder, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

4.7.5    The Issuing Bank shall notify each the Agent of the principal amount, the number, and the expiration date of each Letter of Credit and upon receipt of such information, the Agent shall notify each U.S. Operating Lender of the amount of such U.S. Operating Lender's participation therein. The Issuing Bank shall review each draft and any accompanying documents presented under a Letter of Credit and shall notify the Agent of any such presentment and upon receipt of such information, the Agent shall notify each U.S. Operating Lender of such presentment.

4.7.6    The Issuing Bank shall not be obligated to issue any Letter of Credit (i) in violation of any Applicable Law or policy of such Issuing Bank or any Lender or (ii) if any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Bank from issuing such Letter of Credit. The Issuing Bank shall not at any time be obligated to issue any Letter of Credit if such

issuance would conflict with, or cause the Issuing Bank to exceed any limits imposed by, this Agreement or any applicable requirements of Applicable Law or any regulatory or internal limit.

## ARTICLE 5
## GENERAL CONDITIONS

**5.1     Matters relating to Interest and Fees**

5.1.1     Unless otherwise indicated, Interest on any outstanding principal amount hereunder shall be calculated daily and shall be payable monthly in arrears on the last day of each and every month. If the last day of a month is not a Business Day, the Interest payment due on such day shall be made on the next Business Day, and Interest shall continue to accrue on the said principal amount and shall also be paid on such next Business Day. Interest shall accrue from and including the day upon which an Advance is made or is deemed to have been made, and ending on but excluding the day on which such Advance is repaid or satisfied. Any change in the Canadian Prime Rate shall cause an immediate adjustment of the interest rate applicable to Canadian Dollar Prime Rate Loans and Overdrafts in Canadian Dollars and any change in the U.S. Base Rate shall cause an immediate adjustment of the interest rate applicable to U.S. Dollar Base Rate Loans and Overdrafts in U.S. Dollars, in each case without the necessity of any notice to any Borrower.

5.1.2     Unless otherwise stated, in this Agreement if reference is made to a rate of Interest, fee or other amount "per annum" or a similar expression is used, such interest, fee or other amount shall be calculated on the basis of a year of 365 or 366 days (or 360 days in the case of Loans or Letters of Credit denominated in U.S. Dollars), as the case may be. If the amount of any Interest, fee or other amount is determined or expressed on the basis of a period of less than one year of 365 days or 366 days (or 360 days in the case of Loans denominated in U.S. Dollars), as the case may be, the equivalent yearly rate is equal to the rate so determined or expressed, divided by the number of days in the said period, and multiplied by the actual number of days in that calendar year.

5.1.3     Notwithstanding any other provisions of this Agreement:

(a)     the Borrowers and the Lenders intend to strictly comply with all Applicable Laws, including applicable usury laws (or the usury laws of any jurisdiction whose usury laws are deemed to apply to this Agreement and the other Credit Documents despite the intention and desire of the parties to apply the usury laws of the Province of Alberta and the federal laws applicable therein);

(b)     in no event shall any Borrower or any other Person be obligated to pay, or any Lender have any right or privilege to reserve, receive or retain, (a) any interest in excess of the maximum amount of nonusurious interest permitted under the laws of the Province of Alberta the federal laws of Canada applicable therein, or the Applicable Laws of any other jurisdiction, or (b) total interest in excess of the amount which such Lender could lawfully have contracted for, reserved, received,

- 81 -

retained or charged had the interest been calculated for the full term of the applicable Loan; and

(c) if the amount of any interest, premium, fees or other monies or any rate of interest stipulated for, taken, reserved or extracted under the Credit Documents would otherwise contravene the provisions of Section 347 of the *Criminal Code* (Canada), Section 8 of the *Interest Act* (Canada) or any successor or similar legislation (including any usury law in the U.S.), or would exceed the amounts which any Lender is legally entitled to charge and receive under any law to which such compensation is subject, then such amount or rate of interest shall be reduced to such maximum amount as would not contravene such provision; and to the extent that any excess has been charged or received such Lender shall apply such excess against the Outstanding Advances and refund any further excess amount to the applicable Borrower.

As used in this Section 5.1.3, the term "interest" includes the aggregate of all charges, fees, benefits or other compensation which constitute interest under Applicable Law; <u>provided</u>, that, to the maximum extent permitted by Applicable Law, (a) any non-principal payment shall be characterized as an expense or as compensation for something other than the use, forbearance or detention of money and not as interest, and (b) all interest at any time contracted for, reserved, charged or received shall be amortized, prorated, allocated and spread, using the actuarial method, during the full term of the Facilities. The daily interest rates to be used in calculating interest for the purposes of this Section 5.1.3 shall be determined by dividing the applicable interest rate per annum by the number of days in the calendar year for which such calculation is being made. None of the terms and provisions contained in this Agreement or in any other Credit Document which directly or indirectly relate to interest shall ever be construed without reference to this Section 5.1.3, or be construed to create a contract to pay for the use, forbearance or detention of money at any interest rate in excess of the amounts permitted under any Applicable Law.

The provisions of this Section shall govern and control over every other provision of this Agreement or any other Credit Document which conflicts or is inconsistent with this Section 5.1.3.

5.1.4 Any change in the Applicable Margin in respect of any Availment Option under a Facility shall be determined in accordance with this Section. For purposes of this Section, the term "**Pricing Date**" means, for any Fiscal Quarter of the Canadian Borrower ending on or after the Amendment and Restatement Date, the date on which the Agent is in receipt of the financial statements and Compliance Certificate pursuant to Section 7.4.1(b) or Section 7.4.1(d), as applicable, for such Fiscal Quarter. The Applicable Margin shall be established on a Pricing Date based on the Net Leverage Ratio as of the end of the most recently completed Fiscal Quarter and the Applicable Margin established on a Pricing Date shall remain in effect until the next Pricing Date. If the financial statements and Compliance Certificate are delivered before 10:00 a.m. Toronto time on a specific Business Day (the "**Specific Business Day**") then pricing will be adjusted starting on the Specific Business Day. If the financial statements and Compliance

Certificate are received after 10:00 a.m. Toronto time on the Specific Business Day then any pricing adjustment will be effective on the next Business Day. If the Canadian Borrower has not delivered its financial statements and Compliance Certificate by the date such financial statements and Compliance Certificate are required to be delivered pursuant to Section 7.4.1(b) or Section 7.4.1(d), as applicable, then until such financial statements and Compliance Certificate are delivered, the Applicable Margin shall be based on Level VI. The Applicable Margin established by such financial statements shall be in effect from the Pricing Date that occurs immediately after the end of the Fiscal Quarter covered by such financial statements until the next Pricing Date; provided, that no changes will be made in respect of any Bankers' Acceptances or BA Equivalent Loans which are outstanding on the effective date, until the Rollover thereof and fees paid on the issuance or renewal of a Letter of Credit will not change during the term of a Letter of Credit as a result of a change in the Net Leverage Ratio.

5.1.5    The determination of the Applicable Margin by the Agent shall be conclusive and binding on the Borrowers and the Lenders if reasonably determined, absent manifest error.

5.1.6    Effective upon the occurrence of an Event of Default (the "**effective date**"), the interest rates then applicable to all Availment Options will each increase by 200 basis points and such increase will remain in effect for as long as such Event of Default subsists. An increase in interest rates and fees as aforesaid arising from an Event of Default shall apply to all outstanding Advances under the Facilities and will on the effective date apply proportionately to each outstanding Advance during the continuance of such Event of Default. The Borrowers will pay to the Agent on behalf of the Lenders any resulting increase in stamping fees and Letter of Credit fees on or prior to the third Business Day following the effective date. In addition to the conditions set forth above, the Lenders' obligation to provide any Advances under any Facility, other than Rollovers or Conversions of then maturing Advances (in each case not to exceed a 30 day term), will be suspended for as long as there exists an Event of Default.

5.1.7    If the Canadian Borrower has delivered a Compliance Certificate that is subsequently found to be inaccurate in any way as a result of the Canadian Borrower's financial results having to be restated or if the Canadian Borrower's financial results were inaccurately reflected in the original financial results on which such Compliance Certificate was based or for any other reason and the result thereof is that the Net Leverage Ratio was originally reported as lower (and the corresponding Level in the Applicable Margin table was lower) than it otherwise would have been in the absence of such inaccuracy or prior to such restatement, then the Borrowers will, immediately upon the correction of such inaccuracy or upon such restatement, pay to the Agent for the benefit of the applicable Lenders an amount equal to the interest, Letter of Credit fees, stamping fees in respect of Bankers' Acceptances and standby fees that the Lenders should have received, but did not receive, over the applicable period had the Net Leverage Ratio, and the underlying components thereof, been reported correctly in the first instance.

**5.2    Voluntary Prepayments**

Subject to Section 5.15, the Borrowers may from time to time, without payment of any penalty or fee, upon at least two Business Days' prior written notice to the Agent make a prepayment in respect of any Outstanding Advances under any of the Facilities. In the case of Term Facility, the Term Facility Commitment shall be automatically and permanently reduced by the amount of any such prepayment. Notwithstanding the foregoing, Bankers' Acceptances, BA Equivalent Loans and LIBOR Loans may not be repaid prior to the maturity thereof (except in accordance with Sections 5.11 and 5.14, as applicable) and unexpired Letter of Credits may not be prepaid prior to the maturity thereof (except by the return of the original thereof to the Issuing Bank or Swingline Lender, as applicable, for cancellation or by the collateralization thereof in the manner set forth in Section 5.16(f)). Prepayments under the Facilities other than under the Swingline shall be in a minimum principal amount of U.S. $500,000 and integral multiples of U.S. $100,000 in excess thereof and shall be applied as directed by the Borrowers to the remaining payments thereof. Any prepayments under the Term Facility shall be made in inverse order of maturity.

**5.3    Mandatory Prepayments**

5.3.1    If any Credit Party receives cash proceeds, or net cash proceeds in the case of clauses (a), (b) and (c) below, from:

(a)    a transaction after the Amendment and Restatement Date involving the creation or incurrence of any Funded Debt (other than Permitted Funded Debt), and notwithstanding any Default or Event of Default that results therefrom;

(b)    transactions involving the sale, lease or other disposition of any assets (other than transactions described in clauses (a) through (d) inclusive and (f) through (j) inclusive of Section 7.2.4), except where such proceeds are reinvested in the business of any Credit Party within the applicable time period permitted in accordance with Section 5.3.2 (the "**Sales Proceeds**"); or

(c)    property, casualty or other insurance proceeds received by any Credit Party, except where such proceeds are reinvested in the business of any Credit Party within the applicable time period permitted in accordance with Section 5.3.2 (the "**Insurance Proceeds**"); and/or

(d)    Specified Equity Contribution;

then, subject to Sections 5.3.2 and 8.6, the Borrowers shall make a Repayment on account of the Outstanding Advances in an amount equal to 100% of such proceeds, or net cash proceeds in the case of clauses (a), (b) and (c) above, within three Business Days (i) after such proceeds are received by the applicable Credit Party in the case of clauses (a) and (d) above, (ii) within three Business Days of the expiry of the applicable reinvestment period set out in Section 5.3.2 after such proceeds are received by the applicable Credit Party in the case of clause (b) above and within three Business Days of the expiry of the insurance proceeds reinvestment period described in Section 5.3.2(a) after such proceeds are

25877170.9 27367782.4

received by the applicable Credit Party in the case of clause (c) above. As used herein, "net cash proceeds" in respect of any such transaction means the gross amount payable to the applicable Credit Party in cash in respect of such transaction less (i) any sales commissions, selling expenses, brokers' fees, consulting fees, legal fees, other costs and expenses of the transaction actually incurred, investment banking fees, accountants' fees, consulting fees, underwriting discounts and commissions and other customary fees and expenses actually incurred, (ii) amounts required to be applied to the repayments of Funded Debt, (including the principal amount, premium or penalty, if any, interest and other amounts required to be applied to the repayment of any Funded Debt secured by a Lien (including because the asset sold is removed from a borrowing base supporting such Funded Debt)), (iii) taxes payable in connection with the transaction, (iv) usual and reasonable adjustments in connection with the transaction and, including the amount of any liability paid or to be paid or reasonable reserve established in accordance with GAAP against any liabilities associated with the assets that are the subject of such event and retained by the Canadian Borrower or any of its Subsidiaries, and (v) any other amount specifically approved by the Agent in writing.

5.3.2    The Sales Proceeds or Insurance Proceeds, as applicable, need not be used by the Credit Parties to make a repayment under Section 5.3.1 and may be used by a Credit Party to purchase assets of the general type then used in the operation of an Eligible Line of Business, or, provided no Default (unless such repayment would cure any such Default) or Event of Default exists at such time, in the case of:

(a)    Insurance Proceeds (i) of insured claims that do not exceed in the aggregate in any one Fiscal Year $7,500,000 or (ii) are used to repair or replace the property in respect of which such Insurance Proceeds were received, if such purchase, repair or replacement occurs within twelve (12) months of the receipt of such proceeds, subject to an extension of up to a further six (6) months to complete such reinvestment; provided, that the Credit Party is contractually bound to such reinvestment prior to the expiry of the initial twelve (12) months period; or

(b)    Sales Proceeds (i) arising from any single transaction or series of related transactions that do not exceed in the aggregate in any one Fiscal Year $3,000,000 or (ii) are used or useful by a Credit Party to purchase assets of the general type then used in the operation of an Eligible Line of Business, within nine (9) months of the receipt of such proceeds, subject to an extension of up to a further three (3) months to complete such reinvestment; provided, that the Credit Party is contractually bound to such reinvestment prior to the expiry of the initial nine (9) period.

In connection with the foregoing, the Agent and the Lenders may rely upon and assume the correctness of all asset values and other statements contained in any certificate provided by an officer of the Canadian Borrower confirming the value of the relevant assets.

5.3.3    Repayments under this Section 5.3 are to be applied first to Outstanding Advances under the Term Facility until they have been fully repaid, and then to

Outstanding Advances under the Operating Facilities, as directed by the Canadian Borrower, or failing such direction, *pro rata* between the Operating Facilities. Repayments under the Facilities under this Section 5.3 shall be applied in inverse order of maturity and will be made *pro rata* to each Lender under the applicable Facility.

5.3.4     If as a result of currency rate fluctuation, the Outstanding Advances under the Canadian Operating Facility exceeds the Canadian Operating Facility Limit by at least 3% thereof (in each case, a "**Currency Excess**"), the Borrowers will, by the earlier of (a) five (5) Business Days after a written request from the Agent, and (b) the next date of a Rollover or Conversion, pay the applicable Currency Excess to the Agent as a Repayment for the benefit of the Canadian Operating Lenders to be shared on the basis of each applicable Lender's Proportionate Share under the Canadian Operating Facility. If to pay a Currency Excess it is necessary to repay an Advance made by way of Bankers' Acceptance or a LIBOR Loan prior to the maturity date thereof, the Borrowers will not be required to repay such Advances until the maturity date applicable thereto; provided, however, that at the request of the Agent, the Borrowers will forthwith pay the Currency Excess to the Agent for deposit into a cash collateral account maintained by and in the name of the Agent for the benefit of the Canadian Operating Lenders. The Currency Excess will be held by the Agent for set off against future obligations owing by the Borrowers to the Canadian Operating Lenders in respect of such Currency Excess, if any, and, pending such application, such amounts will bear interest for the Borrowers' account at the rate payable by the Agent in respect of deposits of similar amounts and for similar periods of time. The Agent shall have exclusive control over all amounts at any time on deposit in such cash collateral account. The deposit of the Currency Excess by the Borrowers with the Agent as herein provided will not operate as a Repayment under the Canadian Operating Facility until such time as the Currency Excess is actually paid to the Canadian Operating Lenders as a Repayment. If the Borrowers are required to provide a deposit under this Section 5.3.4 as a result of the Currency Excess with respect to an unmatured Bankers' Acceptance or a LIBOR Loan, and such Currency Excess (or any portion thereof) is no longer in effect on the maturity date of such Bankers' Acceptance or LIBOR Loan, such deposit (or the applicable portion thereof) shall be returned to the Borrowers within three Business Days after the maturity date of such Bankers' Acceptance or LIBOR Loan.

5.3.5     If the aggregate Outstanding Advances under the Facilities, is at any time greater than the then applicable Borrowing Base (the amount of such excess being a "**Borrowing Base Shortfall**"), one or all of the Borrowers shall within three (3) Business Days repay such portion of the Outstanding Advances under the Operating Facilities to the Agent for the Canadian Operating Lenders as is required to eliminate such Borrowing Base Shortfall. The Agent will apply such payments (a) against the Term Facility and (b) thereafter, *pro rata* amongst the Canadian Operating Facility and the U.S. Operating Facility and in the following order: (i) first against Canadian Dollar Prime Rate Loans, U.S. Dollar Base Rate Loans, U.S. Dollar Prime Rate Loans, (ii) second to collateralize Bankers' Acceptances as provided in Section 5.11, (iii) third to repay LIBOR Loans, subject to Section 5.14, and (iv) fourth to collateralize Letters of Credit as provided in Section 5.16(f), until any such Borrowing Base Shortfall has been eliminated. If the Borrowers are required to provide cash collateral under this Section 5.3.5 as a result of a

25877170.927367782.4

Borrowing Base Shortfall, such amount shall be returned to the Borrowers within three (3) Business Days after such Borrowing Base Shortfall is no longer continuing.

5.3.6     If any Credit Party receives net cash proceeds from any Anchor Sale and Leaseback Transaction, then the Borrowers shall make a Repayment on account of the Outstanding Advances under the Operating Facilities in an amount equal to 100% of such net cash proceeds within five Business Days after such proceeds are received by the applicable Credit Party. As used herein, "net cash proceeds" has the same meaning ascribed thereto in Section 5.3.1. Repayments under this Section 5.3.6 are to be applied to Outstanding Advances under the Operating Facilities on a pro rata basis. Repayments under this Section 5.3.6 shall not result in a permanent reduction of any Operating Facility.

**5.4     Notice Periods**

5.4.1     The Borrowers shall provide written notice to the Agent in respect of Advances, Rollovers, Conversions and Repayments to the extent set out below:

(a)     no notice is required for Advances and Repayments in respect of Overdrafts under the Swingline;

(b)     notice is required for each voluntary Repayment under any Facility in accordance with Section 5.2;

(c)     except as provided in clauses (a) and (b) above, but subject to (d), (e) and (f) below, one Business Days' notice is required before 10:00 a.m. Toronto time in respect of any Advance, Rollover, Conversion or voluntary Repayment in Canadian Dollars or in U.S. Dollars;

(d)     notwithstanding the foregoing, if an Advance, Rollover, Conversion or voluntary Repayment relates to a Bankers' Acceptance or BA Equivalent Loan, two Business Days' notice is required before 10:00 a.m. Toronto time;

(e)     notwithstanding the foregoing, if an Advance, Rollover, Conversion or voluntary Repayment relates to a LIBOR Loan, three Business Days' notice is required before 10:00 a.m. Toronto time; and

(f)     notwithstanding the foregoing, if an Advance relates to the issuance of a Letter of Credit, (i) if issued to a beneficiary located in Canada or the U.S., three Business Days' notice is required before 10:00 a.m. Toronto time and (ii) if issued to a beneficiary located outside of Canada or the U.S., five (5) Business Days' notice is required before 10:00 a.m. Toronto time.

5.4.2     Notice of any Advance, Rollover, Conversion or voluntary Repayment referred to in Section 5.4.1 above shall be given in the form of a Drawdown Request, Rollover Notice, Conversion Notice or Repayment Notice, as the case may be, attached hereto as Exhibits, and shall be given to the Agent at its address set out in Section 13.11.

25877170.9 27367782.4

5.4.3    If notice is not provided as contemplated herein with respect to the maturity of any Bankers' Acceptance, BA Equivalent Loan and LIBOR Loan the Agent may convert such Bankers' Acceptance, BA Equivalent Loan or LIBOR Loan upon its maturity into a Canadian Dollar Prime Rate Loan or a U.S. Dollar Base Rate Loan, as applicable.

5.4.4    Any Conversion from one form of Availment Option to another shall be subject to satisfaction of all terms and conditions applicable to the form of the new Availment Option.

## 5.5    Minimum Amounts, Multiples and Procedures re Advances, Conversions and Repayments

5.5.1    Each request by a Borrower for an Advance or Conversion in the form of a Canadian Dollar Prime Rate Loan shall be in a minimum amount of Cdn. $500,000 and multiples of Cdn. $100,000 thereafter.

5.5.2    Each request of a Borrower for an Advance or Conversion in the form of a U.S. Dollar Base Rate Loan shall be in a minimum amount of U.S. $500,000 and multiples of U.S. $100,000 thereafter.

5.5.3    Each request by a Borrower for an Advance or Conversion in the form of a Bankers' Acceptance or BA Equivalent Loan shall be in a minimum amount of Cdn. $500,000 and multiples of Cdn. $100,000 thereafter.

5.5.4    Each request by a Borrower for an Advance or Conversion in the form of a LIBOR Loan in U.S. Dollars shall be in a minimum amount of U.S. $500,000 and in a multiple of U.S. $100,000 thereafter.

5.5.5    Conversions or Rollovers under the Term Facility can be in such lesser amounts as are necessary to give effect to the principal repayments under the Term Facility required pursuant to Sections 3.4, 5.3.1 and 5.3.2.

5.5.6    Upon receipt of a Drawdown Request under any Facility, the Agent shall promptly notify each Lender under such Facility of the contents thereof and such Lender's Proportionate Share of the Advance. Such Drawdown Request shall not thereafter be revocable.

5.5.7    Each Advance shall be made by the applicable Lenders to the Agent at its address referred to in Section 13.11 or such other address as the Agent may designate by notice in writing to the Lenders from time to time. Each Lender shall make available its Proportionate Share of each said Advance to the Agent. Unless the Agent determines that any condition of the Advance has not been satisfied or waived, the Agent shall make the funds so received from the Lenders available to the applicable Borrower by 2:00 p.m. (Toronto time) on the requested date of the Advance. No Lender shall be responsible for any other Lender's obligation to make available its Proportionate Share of the said Advance.

5.5.8     Each Borrower agrees to deliver to the Agent in favour of any requesting Lender such other agreements and documentation as such Lender may reasonably require (not inconsistent with this Agreement and upon at least two (2) Business Days' prior written notice) in respect of such Lender's requirements for the acceptance of Bankers' Acceptances or the issuance of BA Equivalent Loans.

5.5.9     All payments of principal, interest and other amounts made by the Credit Parties to the Agent in respect of the Outstanding Advances under a Facility shall be paid by the Agent to the Lenders in accordance with their respective Proportionate Shares of the Outstanding Advances under such Facility. For greater certainty, however, (a) stamping fees in respect of Bankers' Acceptances and BA Equivalent Loans shall be received and retained by the respective Lenders which issued or accepted such Bankers' Acceptances and BA Equivalent Loans and (b) in the event that any payments of principal, interest and other amounts made by the Credit Parties to the Agent instead of to the Swingline Lender in respect of the Outstanding Advances under the Swingline, any such payments shall be paid by the Agent to the Swingline Lender.

**5.6     Place of Advances and Repayments**

5.6.1     Advances by any Lender to a Borrower shall be made by such Lender to the Agent from such Lender's applicable Lending Office. All payments of principal, interest and other amounts to be made by the Borrowers and the other Credit Parties pursuant to this Agreement shall be made to the Agent at its address noted in Section 13.11 or to such other address at a major city in Canada as the Agent may direct in writing from time to time. All such payments received by the Agent on a Business Day before 2:00 p.m. (Toronto time) shall be treated as having been received by the Agent on that day; payments made after such time on a Business Day shall be treated as having been received by the Agent on the next Business Day.

5.6.2     Whenever any payment or the performance of any covenant, duty or other obligation shall be due on (or required within a time period ending on) a day which is not a Business Day, the date for payment or performance thereof shall be extended to the next succeeding Business Day. Interest shall continue to accrue and be payable thereon as provided herein, until the date on which such payment is received by the Agent.

**5.7     Evidence of Obligations (Noteless Advances)**

The Agent shall open and maintain, in accordance with its usual practice, accounts evidencing the Obligations; and the information entered in such accounts shall constitute conclusive evidence of the Obligations absent manifest error. The Agent may, but shall not be obliged to, request the Borrowers to execute and deliver from time to time such promissory notes as may be required as additional evidence of the Obligations; <u>provided</u>, that no promissory notes shall be required in respect of any Hedging Agreements or Banking Services Agreements.

**5.8     Determination of Equivalent Amounts**

Whenever it is necessary or desirable at any time to determine the Equivalent Amount in Canadian Dollars of an amount expressed in U.S. Dollars, or vice-versa (specifically including

- 89 -

25877170.9 27367782.4

the determination of the Equivalent Amount in Canadian Dollars of an Advance made in U.S. Dollars (as applicable), the determination of each Lender's Proportionate Share of any Repayment on any date, and the determination of whether the Outstanding Advances under any Facility exceed the limit applicable to such Facility at any time), the Equivalent Amount shall be determined by reference to the Exchange Rate on the date of such determination. Notwithstanding the foregoing, however, for the purposes of determining any Letter of Credit fees under the Canadian Operating Facility or the standby fees applicable to the Canadian Operating Facility, the Agent shall make such determination based upon the Bank of Canada noon spot rate on the first Business Day of each quarter for such quarter as the case may be.

If any basket used hereunder is exceeded solely as a result of fluctuations in applicable currency exchange rates after the last time such basket was utilized, such basket will not be deemed to have been exceeded solely as a result of such fluctuations in currency exchange rates. For purposes of determining the Net Leverage Ratio, amounts denominated in a currency other than U.S. Dollars will be converted to U.S. Dollars for the purposes of (A) testing the financial covenant under Section 7.3.1(a), at the Exchange Rate as of the last day of the Fiscal Quarter for which such measurement is being made, and (B) calculating any Net Leverage Ratio (other than for the purposes of determining compliance with Section 7.3.1(a)), at the Exchange Rate as of the date of calculation, and will, in the case of Funded Debt, reflect the currency translation effects, determined in accordance with GAAP, of Hedging Agreements permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Equivalent Amount in U.S. Dollars of such Funded Debt.

**5.9     Commitment to Purchase Bankers' Acceptances and BA Equivalent Loans**

5.9.1     Each BA Lender which is a bank listed in Schedule I of the *Bank Act* (Canada) agrees to purchase those Bankers' Acceptances which it has accepted, at a discount from the face amount thereof calculated at the CDOR Rate for the relevant period in effect on the issuance date thereof.

5.9.2     Each BA Lender which is a bank listed in Schedule II or Schedule III of the *Bank Act* (Canada) agrees to purchase those Bankers' Acceptances which it has accepted, at a discount from the face amount thereof calculated using a rate not in excess of the CDOR Rate for the relevant period in effect on the issuance date thereof plus up to one-tenth of one percent (0.10%).

5.9.3     Each Non-BA Lender agrees to purchase BA Equivalent Loans issued by it hereunder at a discount from the face amount thereof calculated using a rate not in excess of the CDOR Rate plus up to one tenth of one percent (0.10%) for the relevant period in effect on the issuance date thereof.

5.9.4     The discount applicable to each Bankers' Acceptances and BA Equivalent Loan shall be determined on the basis of a year of 365 days.

**5.10     Special Provisions Regarding Bankers' Acceptances**

The following provisions are applicable to Bankers' Acceptances issued by the Canadian Borrower and accepted by any BA Lender hereunder.

5.10.1   *Payment of Bankers' Acceptances.* The Canadian Borrower agrees to provide for each Bankers' Acceptance by payment of the face amount thereof to the Agent on behalf of the BA Lender on the maturity of the Bankers' Acceptance or, prior to such maturity, on the Acceleration Date; and the Agent shall remit the said amount to such BA Lender and such BA Lender shall in turn remit such amount to the holder of the Bankers' Acceptance. If the Canadian Borrower fails to provide for the payment of the Bankers' Acceptance accordingly, any amount not so paid shall be immediately payable by the Canadian Borrower to the Agent on behalf of the BA Lender together with interest on such amount calculated daily and payable monthly at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans under the Facility under which such Bankers' Acceptance was issued. The Canadian Borrower agrees not to claim any days of grace for the payment at maturity of any Bankers' Acceptance and agrees to indemnify and save harmless the BA Lender in connection with all payments made by the BA Lender (or by the Agent on its behalf) pursuant to Bankers' Acceptances accepted by the BA Lender, together with all reasonable costs and expenses incurred by the BA Lender in this regard. The Canadian Borrower hereby waives any defences to payment which might otherwise exist if for any reason a Bankers' Acceptance is held by the BA Lender for its own account at maturity.

5.10.2   *Availability of Bankers' Acceptances.* If at any time and from time to time the Agent determines, acting reasonably, that there no longer exists a market for Bankers' Acceptances for the term requested by the Canadian Borrower, or at all, or if any BA Lenders representing no less than 35% of the Commitments advise the Agent in writing that the CDOR Rate will not or does not accurately reflect the cost of funds of such BA Lender, the Agent shall so advise the Canadian Borrower, and in such event the BA Lenders shall not be obliged to accept and the Canadian Borrower shall not be entitled to issue Bankers' Acceptances. If such notice is given and there is any outstanding Drawdown Request, Rollover Notice or Conversion Notice requesting an Advance by way of, or a Rollover or Conversion into, a Bankers' Acceptance at such a time, then such request will be deemed to be a request for, or a Rollover or Conversion into, a Canadian Dollar Prime Rate Loan.

5.10.3   *Power of Attorney.* The Canadian Borrower hereby appoints each BA Lender as its true and lawful attorney to complete and issue Bankers' Acceptances on behalf of the Canadian Borrower in accordance with written (including facsimile) transmitted instructions provided by the Canadian Borrower to the Agent on behalf of such BA Lender, and the Canadian Borrower hereby ratifies all lawful acts that its said attorney may do by virtue thereof. The Canadian Borrower agrees to indemnify and hold harmless the Agent and the BA Lenders and their respective directors, officers and employees from and against any charges, complaints, costs, damages, expenses, losses or liabilities of any kind or nature which they may incur, sustain or suffer, arising from or by reason of acting, or failing to act, as the case may be, in reliance upon this power of attorney, except to the extent caused by the gross negligence or willful misconduct of the Agent or the BA Lender or their respective directors, officers and employees. The Canadian Borrower hereby agrees that each Bankers' Acceptance completed and issued and accepted in accordance with this Section by a BA Lender on behalf of the Canadian Borrower is a valid, binding and negotiable instrument of the Canadian Borrower as drawer and

endorser. The Canadian Borrower agrees that each BA Lender's accounts and records will constitute *prima facie* evidence of the execution and delivery by the Canadian Borrower of Bankers' Acceptances. This power of attorney is coupled with an interest and shall continue in force until written notice of revocation with respect to any BA Lender has been served upon the Agent by the Canadian Borrower at the Agent's address set out in Section 13.11.

5.10.4   *Repayment Prior to Maturity.* The Canadian Borrower acknowledges that Advances made by a Lender by way of Bankers' Acceptances and BA Equivalent Loans may not be repaid prior to the maturity thereof. If any Bankers' Acceptance or BA Equivalent Loan is repaid prior to the scheduled maturity date hereof (whether as a result of Section 2.3 or Section 10.2 or otherwise), the Canadian Borrower will forthwith pay to the Agent for deposit into an escrow account maintained by and in the name of the Agent for the benefit of the applicable Lenders the principal amount of such Bankers' Acceptance or BA Equivalent Loan and the Agent will in its discretion invest any funds in respect of such purported repayment in a term deposit maturing on the scheduled maturity date of the Bankers' Acceptance or BA Equivalent Loan. Any interest accruing on the term deposit will be paid to the Canadian Borrower on the maturity date thereof; provided, that no Event of Default has occurred and is continuing.

5.10.5   *Depository Bills.* It is the intention of the Parties that pursuant to the *Depository Bills and Notes Act* (Canada) ("**DBNA**"), all Bankers' Acceptances accepted by the Lenders under this Agreement will be issued in the form of a "depository bill" (as defined in the DBNA), deposited with a "clearing house" (as defined in the DBNA), including The Canadian Depository for Securities Limited or its nominee CDS Clearing and Depository Services Inc. ("**CDS**"). In order to give effect to the foregoing, the Agent will, subject to the approval of the Canadian Borrower and the Lenders, establish and notify the Canadian Borrower and the Lenders of any additional procedures, consistent with the terms of this Agreement, as are reasonably necessary to accomplish such intention, including:

(a)   any instrument held by the Agent for purposes of Bankers' Acceptances will have marked prominently and legibly on its face and within its text, at or before the time of issue, the words "This is a depository bill subject to the *Depository Bills and Notes Act* (Canada)";

(b)   any reference to the authentication of the Bankers' Acceptance will be removed; and

(c)   any reference to the "bearer" will be removed and such Bankers' Acceptances will not be marked with any words prohibiting negotiation, transfer or assignment of it or of an interest in it.

5.10.6   *Rounding.* In the case of an issue of Bankers' Acceptances, the Agent will round allocations amongst the Lenders to ensure that each Bankers' Acceptance issued has a face amount which is a whole number multiple of $100,000 (and such rounded

allocations shall constitute the Lenders' respective Proportionate Share for the purposes of this Agreement).

## 5.11    Escrowed Funds

Upon the request of the Agent after the occurrence and during the continuance of an Event of Default on the cancellation of this Agreement, or if any Outstanding Advances by way of Bankers' Acceptances are required to be prepaid hereunder prior to their maturity, the Canadian Borrower will forthwith pay to the Agent for deposit into an escrow account maintained by and in the name of the Agent for the benefit of the applicable Lenders, an amount equal to the Lenders' maximum potential liability under then outstanding Bankers' Acceptances. Such escrowed funds will be held by the Agent for set-off against future Obligations owing by the Canadian Borrower to the applicable Lenders in respect of such Bankers' Acceptances and pending such application may be invested in accordance with Section 5.10.4. In the case such Event of Default is either waived or cured in compliance with the terms of this Agreement, then the remaining escrow funds if any, together with any accrued interest to the date of release, will be released to the Canadian Borrower. The deposit of such escrow funds by the Canadian Borrower with the Agent as herein provided, will not operate as a repayment of the Outstanding Advance under the applicable Facility until such time as the escrow funds are actually paid to the applicable Lenders as a Repayment on the applicable maturity date thereof.

## 5.12    Special Provisions regarding BA Equivalent Loans

Each Non-BA Lender will not accept Bankers' Acceptances hereunder, and shall instead from time to time make BA Equivalent Loans to the Canadian Borrower. The amount of each BA Equivalent Loan will be equal to the discount proceeds (based on the discount rate set forth in Section 5.9.3 and subject to Section 5.10.6) which would be realized from a hypothetical sale of the corresponding Bankers' Acceptance on the basis the Lenders purchased such Bankers' Acceptance and the maturity date of each such BA Equivalent Loan will be the same as the maturity date of the corresponding Bankers' Acceptance. Upon the reasonable request of a Non-BA Lender, each BA Equivalent Loan may be evidenced by a non-interest bearing promissory note payable by the Canadian Borrower to the Non-BA Lender in a form acceptable to each such party, acting reasonably. Any such BA Equivalent Loan shall be negotiable by the Non-BA Lender without notice to or the consent of the Canadian Borrower, and the holder thereof shall be entitled to enforce such BA Equivalent Loan against the Canadian Borrower free of any equities, defences or rights of set-off that may exist between the Credit Parties and the Non-BA Lender. In this Agreement, all references to a BA Equivalent Loan shall mean the loan evidenced thereby if required by the context; and all references to the "issuance" of a BA Equivalent Loan by a Non-BA Lender and similar expressions shall mean the making of a BA Equivalent Loan by the Non-BA Lender which is evidenced by a BA Equivalent Loan as if applicable. The following provisions are applicable to each BA Equivalent Loan made by a Non-BA Lender to the Canadian Borrower hereunder:

5.12.1    *Payment of BA Equivalent Loans.* The Canadian Borrower agrees to provide for each BA Equivalent Loan by payment of the face amount thereof to the Agent on behalf of the Non-BA Lender on the maturity of the BA Equivalent Loan or, prior to such maturity, on the Acceleration Date; and the Agent shall remit the said amount to such

25877170.9 27367782.4

Non-BA Lender and such Non-BA Lender shall in turn remit such amount to the holder of the BA Equivalent Loan. If the Canadian Borrower fails to provide for the payment of the BA Equivalent Loan accordingly, any amount not so paid shall be immediately payable by the Canadian Borrower to the Agent on behalf of the Non-BA Lender together with interest on such amount calculated daily and payable monthly at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans under the Facility under which such BA Equivalent Loan was made. The Canadian Borrower agrees not to claim any days of grace for the payment at maturity of any BA Equivalent Loan and agrees to indemnify and save harmless the Non-BA Lender in connection with all payments made by the Non-BA Lender (or by the Agent on its behalf) pursuant to BA Equivalent Loans accepted by the Non-BA Lender, together with all reasonable costs and expenses incurred by the Non-BA Lender in this regard. The Canadian Borrower hereby waives any defences to payment which might otherwise exist if for any reason a BA Equivalent Loan is held by the Non-BA Lender for its own account at maturity.

5.12.2    *Availability of BA Equivalent Loans.* No Non-BA Lender shall have any obligation to issue BA Equivalent Loans during any period in which the BA Lenders' obligation to issue Bankers' Acceptances is suspended pursuant to Section 5.10.2.

**5.13    Special Provisions Regarding LIBOR Loans**

The following provisions are applicable to LIBOR Loans made by any Lender to the Borrowers.

5.13.1    *Drawdown Procedures.* Upon receipt by the Agent from a Borrower of a Drawdown Request, Conversion Notice or Rollover Notice in respect of a LIBOR Loan, the Agent will promptly advise such Borrower of the U.S. Dollar LIBOR Rate, such rate to be determined as at approximately 11:00 a.m. London time, two LIBOR Business Days before the commencement of the LIBOR Period for such LIBOR Loan.

5.13.2    *Interest Payment Dates for LIBOR Loans.* Interest in respect of any LIBOR Loan in U.S. Dollars shall be calculated on the basis of a year of 360 days. Interest in respect of any LIBOR Loan with a LIBOR Period of between one month and three months (inclusive) shall be payable at the time the principal amount of such LIBOR Loan is payable. Interest in respect of any LIBOR Loan with a LIBOR Period longer than three months shall be payable in arrears every three months commencing on the last day of the third month following the commencement of such LIBOR Period, and also at the time the principal amount of such LIBOR Loan is payable.

5.13.3    *Laws Applicable to LIBOR Loans.* Each Borrower acknowledges that the ability of the Lenders to maintain or provide any LIBOR Loan and to charge interest on any LIBOR Loan at the U.S. Dollar LIBOR Rate is and will be subject to any statute, law, regulation, rule or direction by any Governmental Authority having jurisdiction which may prohibit or restrict or limit such loans or such interest. Each Borrower agrees that the Lenders shall have the right to comply with any such requirements and, if the Agent determines it to be necessary as a result of such requirement, the Agent may convert any LIBOR Loan to a U.S. Dollar Base Rate Loan or require immediate repayment of all

LIBOR Loans, including accrued interest thereon and all applicable breakage costs pursuant to Section 5.15.

**5.14    Breakage Costs**

The Borrowers may only Repay or Convert any LIBOR Loan prior to the scheduled maturity date thereof, whether as a result of acceleration or for any other reason, if the Borrowers agree to pay to the Agent upon demand all losses, damages, costs and expenses which such Lender has incurred or may incur as a result of such Repayment or Conversion prior to the said scheduled maturity date. The Agent shall provide the Borrowers with a written certificate showing in reasonable detail the basis for such claim, which shall be deemed to be *prima facie* correct, in the absence of manifest error.

**5.15    Inability to Make LIBOR Loans**

If at any time and from time to time:

(a)    the Agent (acting reasonably) determines that by reason of circumstances affecting the London Interbank Eurodollar Market, adequate and fair means do not exist for ascertaining the rate of interest with respect to, or deposits are not available in sufficient amounts in the ordinary course of business at the rate determined hereunder to fund, a requested LIBOR Loan during the ensuing LIBOR Period selected;

(b)    the Agent (acting reasonably) determines that the making or continuing of the requested LIBOR Loan by the Lenders has been made impracticable by the occurrence of an event which materially adversely affects the London Interbank Eurodollar Market generally; or

(c)    the Agent is advised by Lenders representing no less than 35% of the Commitments that the U.S. Dollar LIBOR Rate will not or does not represent the effective cost to such Lender of U.S. Dollar deposits in such market for the relevant LIBOR Period,

then the Agent shall give notice thereof to the Lenders and the Borrowers as soon as possible after such determination or receipt of such notice, as the case may be, and if such notice is given subsequent to the giving of a Drawdown Request or any Rollover Notice or Conversion Notice to the Agent by a Borrower with regard to any requested LIBOR Loan, such Borrower shall, within one Business Day after receipt of such notice and in replacement of the Drawdown Request, Rollover Notice or Conversion Notice, as the case may be, previously given by such Borrower, give the Agent a Drawdown Request or a Conversion Notice, as the case may be, which specifies the Advance of a U.S. Dollar Base Rate Loan or the Conversion of the relevant LIBOR Loan on the last day of the applicable LIBOR Period into a U.S. Dollar Base Rate Loan. In the event a Borrower fails to give, if applicable, a valid replacement Conversion Notice with respect to the maturing LIBOR Loans which were the subject of a Rollover Notice, such maturing LIBOR Loans shall be converted on the last day of the applicable LIBOR Period into U.S. Dollar Base Rate Loans under the applicable Facility as if a Conversion Notice had been given to the

25877170.9 27367782.4

Agent by such Borrower pursuant to the provisions hereof. In the event a Borrower fails to give, if applicable, a valid replacement Drawdown Request with respect to an Advance originally requested by way of a LIBOR Loan, then such Borrower shall be deemed to have requested an Advance by way of a U.S. Dollar Base Rate Loan in the amount specified in the original Drawdown Request and, on the originally requested date of Advance, the applicable Lenders (subject to the other provisions hereof) shall make available the requested amount by way of a U.S. Dollar Base Rate Loan under the applicable Facility.

If at any time the Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in Section 5.15(b) have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in Section 5.15(b) have not arisen but the supervisor for the administrator of LIBOR Rate or a Governmental Authority having jurisdiction over the Agent has made a public statement identifying a specific date after which the LIBOR Rate shall no longer be used for determining interest rates for loans, then the Agent and the Borrowers shall negotiate in good faith to establish an alternate rate of interest to LIBOR Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for LIBOR Loans made in Canada or in the United States at such time, and upon an agreement being reached, shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable. Notwithstanding anything to the contrary herein, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required Lenders stating that such Required Lenders object to such amendment. Provided that, if such alternate rate of interest shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

## 5.16   Special Provisions Regarding Letters of Credit

The following additional provisions are applicable to Letters of Credit issued by hereunder:

(a)    The obligation of a Borrower to reimburse any Issuing Bank for all drawings under Letters of Credit shall be absolute, unconditional and irrevocable and shall be satisfied strictly in accordance with their terms, irrespective of:

(i)    any lack of validity or enforceability of any Letter of Credit;

(ii)    the existence of any claim, setoff, defence or other right which such Borrower or any other Person may at any time have against the beneficiary under any Letter of Credit, such Issuing Bank, the Agent or any Lender (other than the defence of payment in accordance with the terms of this Agreement or a defence based on the gross negligence or willful misconduct of such Issuing Bank as determined by a court of competent

jurisdiction by final and non-appealable judgment) or any other Person in accordance with this Agreement or other transaction;

(iii)  any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; and

(iv)  any other circumstance or event whatsoever, whether or not similar to any of the foregoing.

(b)  In making any payment under any Letter of Credit (a) an Issuing Bank's exclusive reliance on the documents presented to it under such Letter of Credit as to any and all matters set forth therein, including reliance on the amount of any draft presented under such Letter of Credit, whether or not the amount due to the beneficiary equals the amount of such draft and whether or not any document presented pursuant to such Letter of Credit proves to be insufficient in any respect, if such document on its face appears to be in order, and whether or not any other statement or any other document presented pursuant to such Letter of Credit proves to be forged or invalid or any statement therein proves to be inaccurate or untrue in any respect whatsoever and (b) any non-compliance in any immaterial respect of the documents presented under such Letter of Credit with the terms thereof shall, in each case, not be deemed willful misconduct or negligence of such Issuing Bank.

(c)  Each Issuing Bank and its correspondents may accept and act upon the name, signature, or act of any party purporting to be the executor, administrator, receiver, trustee in bankruptcy or other legal representative of any party designated in any Letter of Credit in the place of the name, signature, or act of such party.

(d)  In addition to amounts payable as elsewhere provided in this Section 5.16, each Borrower hereby agrees to protect, indemnify, pay and save each Issuing Bank and its respective directors, officers, employees, agents and representatives harmless from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including legal fees and expenses) which each such indemnitee may incur or be subject to as a consequence, direct or indirect, of:

(i)  the issuance of any Letter of Credit, other than as a result of the breach of the standards of reasonable care where such Issuing Bank would not be entitled to the foregoing indemnification under the Uniform Customs or under ISP98, in each case as stated on its face to be applicable to such Letter of Credit;

(ii)  the inability of an indemnitee to honour a drawing under any Letter of Credit as a result of any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Authority; or

(iii)  any of the matters listed in Section 5.16(e).

(e)     As between a Borrower, on the one hand, and an Issuing Bank, on the other hand, such Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit issued at its request hereunder by, the respective beneficiaries of such Letters of Credit and, without limitation of the foregoing (but other than to the extent such Issuing Bank breaches the standards of reasonable care specified in the Uniform Customs and otherwise as may be required under ISP98, as applicable, where such Issuing Bank would not be entitled to indemnification under the Uniform Customs or under ISP98, in each case as stated on its face to be applicable to such Letter of Credit), such Issuing Bank shall not be responsible for:

(i)     the form, validity, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, inaccurate, fraudulent or forged;

(ii)     the invalidity or insufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason;

(iii)     errors, omissions, interruptions or delays in transmission or delivery of any messages, by fax, electronic transmission, mail, cable telegraph, telex or otherwise, whether or not they are in cipher;

(iv)     errors in interpretation of technical terms;

(v)     any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof;

(vi)     the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; and

(vii)     any consequences arising from causes beyond the reasonable control of any Lender, including any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Authority.

None of the above shall affect, impair or prevent the vesting of any Issuing Bank's rights or powers hereunder. No action taken or omitted by an Issuing Bank under or in connection with any Letter of Credit issued by it or the related certificates, if taken or omitted in good faith, shall put such Issuing Bank under any resulting liability to the applicable Borrower (provided, that such Issuing Bank acts in accordance with the standards of reasonable care specified in the Uniform Customs and otherwise as may be required under ISP98, in each case as stated on its face to be applicable to the respective Letter of Credit).

- 98 -

(f)     If any Letter of Credit is outstanding on the Facilities Maturity Date, on the date this Agreement and all Commitments hereunder are cancelled, at any time that an Event of Default occurs, a demand for repayment is made hereunder, or a domestic or foreign court issues any judgment or order restricting or prohibiting payment by the applicable Issuing Bank under such Letter of Credit or extending the liability of the applicable Issuing Bank to make payment under such Letter of Credit beyond the expiry date specified therein, the applicable Borrower will forthwith upon demand by the Agent or the applicable Issuing Bank deposit into a cash collateral account maintained by and in the name of the Agent or the applicable Issuing Bank funds in the applicable currency in the amount of the Advance constituted by such Letter of Credit and such funds (together with interest thereon) will be held by the Agent or the applicable Issuing Bank for payment of the liability of the applicable Borrower pursuant to this Section 5.16 or otherwise in respect of such Letter of Credit so long as such Issuing Bank has or may in any circumstance have any liability under such Letter of Credit, and, pending such payment, shall bear interest at the Agent's or the applicable Issuing Bank, as applicable then prevailing rate in respect of deposits of similar amounts and of similar periods of time. Any balance of such funds and interest remaining at such time as the applicable Issuing Bank does not have and may never have any liability under such Letter of Credit will nevertheless continue to be held by the Agent or the applicable Issuing Bank, if and so long as any Default or Event of Default is continuing or after a demand for repayment is made or both, as security for the remaining liabilities of the applicable Borrower hereunder. The Agent or the applicable Issuing Bank, as applicable, shall have exclusive control over all amounts at any time on deposit in such cash collateral account. The deposit of such funds by a Borrower with the Agent or the applicable Issuing Bank as herein provided will not operate as a repayment of the U.S. Operating Facility or the Swingline Commitment, as applicable, until such time as such funds are actually paid to the U.S. Operating Lenders or the Swingline Lender, as applicable, as a principal repayment.

(g)     The Issuing Bank and the Agent, in the case of Letters of Credit issued under the U.S. Operating Facility, and the Swingline Lender, in the case of Letters of Credit issued under the Swingline, shall each maintain records showing the undrawn and unexpired amount of each Letter of Credit outstanding under such Facility, and showing for each such Letter of Credit:

(i)     the dates of issuance and expiration thereof;

(ii)    the amount thereof; and

(iii)   the date and amount of all payments made thereunder.

The Issuing Bank and the Agent shall make copies of such records in the respect of Letters of Credit issued under the U.S. Operating Facility available to the U.S. Borrower and the U.S. Operating Lenders upon request. The Swingline Lender, shall make copies of such records in respect to Letters of Credit issued under the

- 99 -

Swingline available to the Canadian Borrower, the Agent and the Canadian Operating Lenders upon request.

**5.17    Eligible Approved Contracts**

The Canadian Borrower may request, from time to time and by written notice to the Agent, that the Agent designate additional contracts of the Credit Parties (the "**Additional Contracts**") as Eligible Approved Contracts, provided that, any such notice shall only be given concurrently with the delivery of a Borrowing Base Certificate pursuant to 7.4.1(a) and such notice shall include a true and correct copy of each Additional Contract.

If an Additional Contract is in a form (a) previously approved by the Lenders or (b) in respect of which the Agent has previously received a legal opinion opining that such contract or agreement is valid and enforceable under the governing law thereof, then such Additional Contract shall be designated by the Agent as an Eligible Approved Contract as of the date of the notice referred to above, otherwise, such Additional Contract shall not be designated as an Eligible Approved Contract until such time as the Agent has received an opinion of legal counsel opining that such contract or agreement is valid and enforceable under the governing law thereof, which opinion is in form and substance satisfactory to the Agent and is delivered by legal counsel acceptable to the Agent (in each case acting reasonably).

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES

**6.1    Representations and Warranties**

Each Borrower jointly and severally hereby represents and warrants to the Agent and the Lenders as follows, with respect to itself and, in the case of the Canadian Borrower, also with respect to each Credit Party:

6.1.1    *Status.* It has been duly incorporated, amalgamated, constituted, formed or established as the case may be, and is validly subsisting under the Laws of its governing jurisdiction and is up to date in respect of all corporate or similar filings and has all necessary corporate power, capacity and authority to carry on its business in each jurisdiction where it carries on business except, in the case of other jurisdiction, to the extent the failure to do so would reasonably be expected to have a Material Adverse Effect.

6.1.2    *Information.* As of the date hereof, Schedule 6.1.2 contains the following information in respect of each Credit Party and each Subsidiary thereof as of the Amendment and Restatement Date: predecessors and prior names (within the immediately preceding five years), jurisdiction of incorporation or establishment, present governing jurisdiction, registered office, chief executive office, all locations at which it has owned or leased places of business or maintained a material amount of assets (other than assets temporarily out of a Credit Party's custody or possession, including assets on the premises of others and items in transit) the number and classes of its issued and outstanding shares and a list of its shareholders including the number and class of shares

held by each. All material records related to the Credit Party's Receivables are located at those certain chief executive offices as identified in Schedule 6.1.2, as may be updated from time to time.

6.1.3    *Subsidiaries.* As of the Amendment and Restatement Date, neither Holdco nor the Canadian Borrower has any Material Subsidiaries or other Subsidiaries other than as set out in Schedule 6.1.3 and 100% of the issued and outstanding shares of each Material Subsidiary are directly or indirectly owned by the Canadian Borrower.

6.1.4    *No Pending Corporate Changes.* As of the Amendment and Restatement Date, no Person has any agreement or option or any right or privilege (whether by law, pre-emptive or contractual) capable of becoming an agreement for the purchase of any properties or assets of any Credit Party out of the ordinary course of business or for the purchase, subscription, allotment or issuance of any debt or equity securities, including convertible securities, warrants or convertible obligations of any nature, of the Canadian Borrower.

6.1.5    *No Conflicts under Material Agreements or Material Permits.* Except as disclosed in Schedule 6.1.5, the execution and delivery by each Credit Party of those Credit Documents to which it is a party, will not conflict with, result in a breach of or require any approval or consent under any Material Agreement or Material Permit, other than consents or approvals which have been obtained unconditionally and without imposition of any material conditions.

6.1.6    *No Conflict with Charter Documents.* There are no provisions contained in the charter documents, or by-laws of any Credit Party, or any partnership agreement, shareholders' agreement, voting trust agreement or similar agreement relating thereto or in any Material Agreement or Material Permit, which restrict or limit its powers to borrow money, issue debt obligations, guarantee the payment or performance of the obligations of others or encumber all or any of its present and after-acquired property; or which would be contravened by the execution and delivery of those Credit Documents to which any Credit Party is a party or the performance by any Credit Party of its obligations thereunder and which contravention would reasonably be expected to result in Material Adverse Change.

6.1.7    *Credit Documents.* Each Credit Party has the necessary capacity, power, legal right and authority to borrow from the Lenders, guarantee payment to the Agent and the Lenders of those Obligations which are payable by the Borrowers, perform its obligations under the Credit Documents and provide the Security required to be provided by it hereunder. The execution and delivery of the Credit Documents by the Credit Parties and the performance of their respective obligations therein have been duly authorized by all necessary corporate or other action. This Agreement and the other Credit Documents constitute legal, valid and binding obligations of the Credit Parties, enforceable against them in accordance with the terms and provisions thereof, subject to Laws of general application affecting creditors' rights and the discretion of the court in awarding equitable remedies.

6.1.8    *Conduct of Business; Compliance with Laws and Material Permits.* Except as disclosed in Schedule 6.1.8, each Credit Party is in compliance in all material respects with all Applicable Laws of each jurisdiction in which it carries on business and is duly licensed, registered and qualified to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it or the property owned or leased by it make such qualification necessary, except to the extent that the failure to hold any such licences, registrations and permits would not constitute a Material Adverse Change. Schedule 6.1.8 contains a true and complete list of all Material Permits, and all such Material Permits are valid and subsisting and in good standing.

6.1.9    *Ownership of Assets; Permitted Liens.* Each Credit Party has good and marketable title to (or a valid leasehold interest in) and owns and possesses its undertaking, property and assets (other than intellectual property) (or has a valid leasehold interest in) free and clear of any and all Liens except for Permitted Liens. No Credit Party has any commitment or obligation (contingent or otherwise) to grant any Liens except for Permitted Liens. No event has occurred which constitutes, or which with the giving of notice, lapse of time or both would constitute, a default under any specific Permitted Lien, which default would reasonably be expected to result in a Material Adverse Change.

6.1.10    *Leased Properties.* As of the date hereof, Schedule 6.1.10 contains a true and complete list of the Leased Properties.

6.1.11    *Intellectual Property.* Each Credit Party possesses or has the exclusive right to use all patents, patent rights, trademarks, trademark rights, trade names, trade name rights, service marks, service mark rights, copyrights and other forms of intellectual property material to the conduct of its business, each of which is in good standing in all material respects, and, to its knowledge, has the right to use such intellectual property without violation of any material rights of others with respect thereto, except, in each case, as would not reasonably be expected to have a Material Adverse Effect. Schedule 6.1.11 contains a list of all such Credit Party's owned material, registered and pending trademarks, service marks, patents and copyrights (excluding commercially available software) as of the Amendment and Restatement Date.

6.1.12    *Insurance.* The Credit Parties have (a) placed insurance, including property, boiler and machinery, business interruption and liability insurance, in appropriate amounts and for appropriate risks as would be considered prudent for similar businesses, and (b) placed Account Receivable Insurance. Attached hereto as Schedule 6.1.12 is a true and complete list of all insurance policies (including the Account Receivable Insurance) held by the Credit Parties as of the Amendment and Restatement Date.

6.1.13    *Material Agreements.* As of the date hereof, Schedule 6.1.13 contains a true and complete list of all Material Agreements, including a description of the nature of each Material Agreement. Each Material Agreement is in full force and effect; and none of the Credit Parties is in breach of any of the terms or conditions contained therein, in each case, which would reasonably be expected to have a Material Adverse Effect. Except as disclosed in writing to the Agent and as permitted hereby, no Material Agreement has

- 102 -

been materially amended, supplemented or revised in any manner adverse to the Lenders since the date of execution thereof.

6.1.14    *Labour Agreements.* Except as disclosed in Schedule 6.1.14, there are no labour agreements in effect between any of the Credit Parties and any labour union or employee association and the Credit Parties are not under any obligation to assume any labour agreements to or conduct negotiations with any labour union or employee association with respect to any future agreements; and the Credit Parties are not aware of any current attempts to organize or establish any such labour union or employee association which, in each case, would reasonably be expected to result in a Material Adverse Effect.

6.1.15    *Environmental Laws.* Each Credit Party and its business, operations, assets, equipment, property, leaseholds and other facilities is in compliance with all applicable Requirements of Environmental Law, specifically including all applicable Requirements of Environmental Law concerning the storage and handling of Hazardous Materials except where the failure to do so would not reasonably be expected to result in a Material Adverse Change. Each Credit Party holds all permits, licenses, certificates and approvals from Governmental Authorities which are required by the applicable Requirements of Environmental Law in connection with (i) air emissions; (ii) discharges to surface or groundwater; (iii) noise emissions; (iv) solid or liquid waste disposal; (v) the use, generation, storage, transportation or disposal of Hazardous Materials; and (vi) all other applicable Requirements of Environmental Law, except in each case where the failure to do so would reasonably be expected to result in a Material Adverse Change. Except as disclosed in Schedule 6.1.15 to the knowledge of the Credit Parties there has been no emissions, spills, releases, or discharges into or upon (i) the air; (ii) soils, or any improvements located thereon; (iii) surface water or groundwater; or (iv) any sewer, septic system or waste treatment, storage or disposal system servicing the premises, of any Hazardous Materials at or from any Land owned by any Credit Party or any of the Leased Properties that would reasonably be expected to have a Material Adverse Effect. Except as disclosed in Schedule 6.1.15 no complaint, order, directive, claim, citation, or notice from any Governmental Authority or any other Person has been received by any Credit Party with respect to (i) air emissions; (ii) spills, releases, or discharges to soils or improvements located thereon, surface water, groundwater or any sewer, septic system or waste treatment, storage or disposal systems servicing any Land owned by any Credit Party or any of the Leased Properties; (iii) noise emissions; (iv) solid or liquid waste disposal; (v) the use, generation, storage, transportation, or disposal of Hazardous Materials; or (vi) other applicable Requirements of Environmental Law affecting any Land owned by any Credit Party or the Leased Properties, in each case, which would reasonably be expected to result in a Material Adverse Change. Except as disclosed in Schedule 6.1.15, there are no legal or administrative proceedings, investigations or claims outstanding or to the Credit Parties' knowledge now threatened or pending, with respect to the presence on or under, or the discharge, emission, spill, radiation or disposal into, upon or from any Land owned by any Credit Party or any of the Leased Properties of any Hazardous Material, including the discharge, emission, spill, radiation or disposal of any Hazardous Material from any such Land or Leased Properties onto or into the atmosphere or any adjacent land, watercourse or body of water; nor are there any material matters under discussion with any Governmental Authority relating thereto; and there is no

- 103 -

factual basis for any such proceedings, investigations or claims, in each case, which would reasonably be expected to result in a Material Adverse Change. The Credit Parties have no indebtedness, obligation or liability with respect to the storage, treatment, cleanup or disposal of any Hazardous Materials (including without limitation any such indebtedness, obligation, or liability under any applicable Requirements of Environmental Law regarding such storage, treatment, cleanup or disposal) which would reasonably be expected to result in a Material Adverse Change.

6.1.16    *No Litigation.* Except as disclosed in Schedule 6.1.16, there are no actions, suits or proceedings pending, or to the knowledge of the Credit Parties threatened in writing, against any Credit Party in any court or before or by any federal, provincial, state, municipal or other Governmental Authority, which would reasonably be expected to result in a Material Adverse Change.

6.1.17    *Pension Plans.* As of the Amendment and Restatement Date, the Credit Parties have not established any Pension Plans except as disclosed in Schedule 6.1.17. All of the Credit Parties' Pension Plans have been duly registered under Applicable Law. No steps have been taken to terminate any such Pension Plan (in whole or in part), no contribution failure has occurred with respect to any such Pension Plan sufficient to give rise to a Lien under any Applicable Laws of any jurisdiction, and no condition exists and no event or transaction has occurred with respect to any such Pension Plan, in each case, which would reasonably be expected to result in the incurrence by any Credit Party of any material liability, fine or penalty. Each such Pension Plan is in compliance in all material respects with all applicable pension benefits and tax laws, (i) all contributions (including employee contributions made by authorized payroll deductions or other withholdings) required to be made to the appropriate funding agency in accordance with all Applicable Laws and the terms of such Pension Plan have been made in accordance with all Applicable Laws and the terms of such Pension Plan, (ii) all liabilities under such Pension Plan are funded, on a going concern and solvency basis, in accordance with the terms of the respective Pension Plans, the requirements of applicable pension benefits laws and of applicable regulatory authorities and the most recent actuarial report filed with respect to the Pension Plan, and (iii) no event has occurred and no conditions exist with respect to any such Pension Plan that has resulted or would reasonably be expected to result in such Pension Plan having its registration revoked or refused for the purposes of any applicable pension benefits or tax laws or being placed under the administration of any relevant pension benefits regulatory authority or being required to pay any taxes or penalties under any applicable pension benefits or tax laws.

6.1.18    *ERISA Liabilities.* No ERISA Event has occurred or is reasonably expected to occur with respect to any Plan which would reasonably be expected to have a Material Adverse Effect. Since the most recent financial statement with respect to a Plan, there has been no change in the funding status of such Plan which would reasonably be expected to result in a Material Adverse Change. Neither any Credit Party nor any ERISA Affiliate has incurred or is reasonably expected to incur any Withdrawal Liability to any Multiemployer Plan which would reasonably be expected to result in a Material Adverse Change. Neither any Credit Party nor any ERISA Affiliate has been notified by the sponsor of a Multiemployer Plan that (i) such Multiemployer Plan has been terminated,

- 104 -

within the meaning of Title IV of ERISA, or (ii) such Multiemployer Plan is reasonably expected to be terminated, within the meaning of Title IV of ERISA, which termination would reasonably be expected to result in a Material Adverse Change.

6.1.19   *Financial Statements.* The most recent Year-end Financial Statements and Interim Financial Statements of the Canadian Borrower delivered to the Agent and the Lenders have been prepared in accordance with GAAP (except that in the case of the Interim Financial Statements, subject to normal adjustments and the absence of footnotes) on a basis which is consistent with the previous fiscal period (unless otherwise noted), and present fairly in all material respects in accordance with GAAP:

(a)     its assets and liabilities (whether accrued, absolute, contingent or otherwise) and financial condition as at the dates therein specified;

(b)     its sales, earnings and results of its operations during the periods covered thereby; and

(c)     in the case of the Year-end Financial Statements, its changes in financial position,

and no Material Adverse Change has occurred since the date thereof.

6.1.20   *Financial and Other Information.* All financial and other information provided in writing by or in respect of the Credit Parties to the Agent or the Lenders (other than projections, other forward looking information and information of a general economic or industry-specific nature to) taken as a whole, to the best of the Credit Party's knowledge and belief (including good faith estimates and stated assumptions believed to be reasonable and fair as of the date made in light of conditions and facts then known), do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made (after giving effect to all supplements from time to time).

6.1.21   *No Funded Debt/Liens.* No Funded Debt has been incurred or assumed by any Credit Party, except for Permitted Funded Debt. No Liens exist on the assets of any Credit Party, except for Permitted Liens.

6.1.22   *Validity and Ranking of Security.* Each Security agreement is effective to create in favor of the Agent for the benefit of the Lenders, legal, valid and enforceable Liens on, and security interests in, the collateral referred to therein. The Obligations are secured by a First-Ranking Security Interest, other than in respect of any Priority Claims.

6.1.23   *Taxes.* Except as disclosed in Schedule 6.1.23, each Credit Party has duly and timely filed all tax returns required to be filed by it, and has paid all taxes which are due and payable by it, except for any taxes which are subject to a Permitted Contest or which the failure to pay, individually or in the aggregate has not and would not reasonably be expected to have a Material Adverse Effect. Each Credit Party has also paid all other taxes, charges, penalties and interest due and payable under or in respect of all assessments and re-assessments of which it has received written notice, except to the

25877170.9 27367782.4

extent that such assessments or re-assessments are subject to a Permitted Contest or which the failure to pay, individually or in the aggregate has not and would not reasonably be expected to have a Material Adverse Effect. There are no actions, suits, proceedings, investigations or claims threatened or pending against any Credit Party in respect of taxes, governmental charges or assessments or any matters under discussion with any Governmental Authority relating to taxes, governmental charges or assessments asserted by any such Governmental Authority which would reasonably be expected to result in a Material Adverse Change.

6.1.24   *Statutory Liens.* Each Credit Party has remitted on a timely basis all amounts required to have been withheld and remitted (including withholdings from employee wages and salaries relating to income tax, employment insurance, unemployment insurance and Canada Pension Plan contributions), goods and services tax and all other amounts which if not paid when due could result in the creation of a Statutory Lien against any of its property, except for Permitted Liens.

6.1.25   *No Default, etc.* No Default or Event of Default has occurred and is continuing.

6.1.26   *Solvency.* On the Amendment and Restatement Date (i) the fair market value of the assets of the Credit Parties, on a consolidated basis, at a fair valuation, will exceed their debt and liabilities, subordinated, contingent or otherwise; (ii) the present fair saleable value of the property of the Credit Parties, on a consolidated basis, will be greater than the amount that will be required to pay the probable liability of their indebtedness and other liabilities, subordinated, contingent or otherwise, as such indebtedness and other liabilities become absolute and matured; (iii) the Credit Parties, on a consolidated basis, will be able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; (iv) the Credit Parties, on a consolidated basis, will not have unreasonably small capital with which to conduct the business in which they are engaged as such business is now conducted and is proposed to be conducted following the date of determination, and (v) the Credit Parties, on a consolidated basis, are not "insolvent" under any applicable Insolvency Legislation or otherwise unable to pay their debts as they fall due.

6.1.27   *Residency.* The Canadian Borrower is not a non-resident of Canada as defined by the *Income Tax Act* (Canada).

6.1.28   *Investment Company Act.* Neither the Canadian Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company," in each case, within the meaning of the Investment Company Act of 1940, as amended.

6.1.29   *Fiscal Year.* The Fiscal Year end of each Credit Party is December 31.

6.1.30   *Place and Type of Business.* As of the Amendment and Restatement Date, Schedule 6.1.2 contains a list of the only jurisdictions in which the Credit Parties carry on any material business. The Credit Parties' sole business is providing drilling fluid and technical expertise to assist in drilling oil and gas wells, including skid controls, drilling

25877170.9 27367782.4

waste management and drilling water treatment services and the rental of well bore cleanup tools.

6.1.31    *Economic Sanctions; Corrupt Practices*. No Credit Party is in violation of any Economic Sanctions or the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or any similar legislation or, to its knowledge, is the target or subject of any Economic Sanctions. No Credit Party or any of their respective Subsidiaries and, to the knowledge of any Credit Party, no director, officer, employee, broker or other agent of any Credit Party acting or benefiting in any capacity in connection with the Loans is any of the following:

(a)    a Person that is listed in the annex to the Executive Order, or is otherwise the subject of Economic Sanctions;

(b)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to the Executive Order, or is otherwise the subject of Economic Sanctions;

(c)    a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Economic Sanctions;

(d)    a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)    a Person located, organized or resident in a country or territory that is, or whose government is, the subject of Economic Sanctions; or

(f)    a Person that is named as a "specially designated national and blocked person" on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list.

No Credit Party or any of their respective Subsidiaries and, to the knowledge of any Credit Party, no director, officer, employee, broker or other agent of any Credit Party acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in clauses (a) through (f) above, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to any Economic Sanctions, (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Economic Sanctions, or (iv) is in violation of any applicable Economic Sanctions.

6.1.32    *Use of Facilities.* Each Borrower acknowledges that the Facilities are for the use by the Credit Parties and will be used for the Credit Parties' and their Subsidiaries' lawful business purposes only.

6.1.33    *Use of Eligible Approved Contracts*. As of June 30, 2018, all of the Insured Receivables used in determining the Borrowing Base were Receivables derived from and

- 107 -

governed by Eligible Approved Contracts in existence as the Amendment and Restatement Date as set out in Schedule 6.1.33.

6.1.34   *Margin Regulations.* No Credit Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock (as defined in Regulation U). No part of the proceeds of any Loan or any Letter of Credit will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board of Governors of the Federal Reserve, including Regulation T, Regulation U or Regulation X. The pledge of the Collateral pursuant to the Security does not violate such regulations.

## 6.2    Acknowledgement and Deemed Repetition

Each Borrower acknowledges that the Agent and the Lenders are relying upon the representations and warranties in this Article 6 in making the Facilities available to the Borrowers and that the representations and warranties contained in Article 6, except for any representation and warranty made solely as of an earlier date will be deemed to be restated and shall be true and correct effective on the date each and every Advance is made (and any representations and warranties made solely as of an earlier date shall be true and correct as of such earlier date).

## 6.3    Survival of Representations and Warranties

The Credit Parties acknowledge that the Agent and the Lenders shall rely upon the representations and warranties contained in this Article 6 in connection with the establishment and continuation of the Facilities and also in connection with the entering into by a Hedge Provider of any Hedging Agreement with the Credit Parties. Notwithstanding any investigations which may be made by the Agent or the Lenders, the said representations and warranties shall survive the execution and delivery of this Agreement until full and final payment and satisfaction of the Obligations and this Agreement has been terminated.

## ARTICLE 7
## COVENANTS

## 7.1    Positive Covenants

While there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to any Borrower, each Borrower hereby covenants and agrees with the Agent and the Lenders that it will, and will cause each of the other Credit Parties to:

7.1.1   *Prompt Payment.* In the case of the Borrowers, punctually and unconditionally pay all principal, interest and other amounts due hereunder at the times and in the manner specified herein.

7.1.2   *Preservation of Existence.* Except as permitted by Section 7.2.8, maintain its existence in good standing (or similar status), preserve its rights, powers, licences, privileges, franchises and goodwill, exercise any rights of renewal or extensions of any

leases, licences, concessions, franchises or any other rights whatsoever which are material to the conduct of its business, maintain all qualifications to carry on business in each jurisdiction in which such qualifications are required where the failure to do so would not reasonably be expected to result in a Material Adverse Change, and carry on and conduct its business in a proper and efficient manner so as to protect its property and income; and not materially change the nature of its business.

7.1.3    *Compliance with Applicable Laws; Use of Proceeds; Maintenance of Leases and Material Permits.* Comply with all Applicable Laws (specifically including all applicable Requirements of Environmental Law and Economic Sanctions and the *Foreign Corrupt Practices Act*) except where the failure to do so would not reasonably be expected to result in a Material Adverse Change, use the proceeds of all Advances hereunder for legal and proper purposes, and obtain and maintain in good standing all material leases and Material Permits from any and all Governmental Authorities required in respect of its business and operations except where the failure to do so would not reasonably be expected to result in a Material Adverse Change.

7.1.4    *Payment of Priority Claims, Taxes, etc.* Pay when due all Priority Claims, rents, ERISA liabilities, taxes, rates, pension obligations, levies, assessments and governmental charges, fees and dues lawfully levied, assessed or imposed in respect of its property which are material to the conduct of its business, and deliver to the Agent upon request receipts evidencing such payments; except for rents, taxes, rates, pension obligations, levies, assessments and governmental charges, fees or dues in respect of which an appeal or review proceeding has been commenced, a stay of execution pending such appeal or review proceeding has been obtained, reserves reasonably required by the Required Lenders have been established; and except where the failure to pay individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Change.

7.1.5    *Maintain Records.* Maintain adequate books, accounts and records in accordance with GAAP and all material records related to the Credit Parties' Receivables shall be located at the chief executive offices as identified in Schedule 6.1.2, as the same may be updated from time to time.

7.1.6    *Maintenance and Operation of Properties.* Keep its property and assets in good repair and working condition, reasonable wear and tear and casualty or condemnation excepted, and operate its property in accordance with prudent industry standards and the requirements of its insurance policies.

7.1.7    *Inspection.* Permit the Agent and its employees and agents (who may be accompanied by any Lender and its employees and agents), upon reasonable notice and at their own cost, to enter upon and inspect their properties, assets, books and records from time to time during normal business hours and in a manner which does not materially interfere with the operations of the Credit Parties, and make copies of and abstracts from such books and records, and discuss their affairs, finances and accounts with any of their officers, directors, accountants and auditors; provided, that the Agent will deal with any personal information obtained in accordance with applicable privacy legislation; provided, that the Agent may not conduct more than one such examination during any

calendar year unless a Default or an Event of Default has occurred and is continuing, in which case the foregoing limit shall not apply. All reasonable and documented out-of-pocket costs and expenses incurred by the Agent and its duly authorized representatives and agents in connection with the exercise of the Agent's rights pursuant to this Section 7.1.7 shall be paid by the Canadian Borrower in accordance with Section 13.5; provided, that so long as no Default or Event of Default exists the Canadian Borrower shall not be responsible for the expenses of the Agent in connection with more than one such visit and inspection per calendar year.

7.1.8    *Liens.* Maintain all of its property, assets and undertaking free of all Liens except Permitted Liens and maintain a First-Ranking Security Interest in favour of the Agent over all of the Collateral subject only to the Security and Permitted Liens which under Applicable Law rank in priority thereto.

7.1.9    *General Insurance Coverage.* Obtain and maintain from financially responsible insurance companies and maintain liability insurance, all-risks property insurance on a replacement cost basis (less a reasonable deductible not to exceed amounts customary in the industry for similarly situated businesses and properties), and insurance in respect of such other risks and in such amounts (giving effect to self-insurance) as would be considered prudent for similar businesses, to the extent available on commercially reasonable terms, all of which policies of insurance shall include a standard mortgage clause approved by the Insurance Bureau of Canada; and the interest of the Agent shall be noted as an additional insured on all liability insurance policies and as first mortgagee and/or lender loss payee, as applicable, on all other insurance policies (other than directors and officers insurance); and the Agent shall be provided with certificates of insurance and certified copies of such policies from time to time upon request; provided, that no more than one request shall be made in any calendar year unless a Default or an Event of Default is continuing or if there has been a material change in any such policy.

7.1.10    *Account Receivable Insurance Coverage.* Obtain and maintain Account Receivable Insurance, pay all required premiums in respect thereof once due and payable and renew such Account Receivable Insurance not less than sixty (60) days prior to the expiry thereof; and the Agent shall be provided with certificates of insurance and certified copies of such policies from time to time upon request; provided that no more than one request shall be made in any twelve month period unless a Default or an Event of Default is continuing. At least 10 days prior to the renewal of any Account Receivable Insurance, the Borrowers shall provide the Agent with all information reasonably requested by the Agent, including for certainty, any proposed modifications to the existing policies then in place, in order for the Agent and third party legal counsel to conduct a review of such Account Receivable Insurance.

7.1.11    *Colombia Payments.* Ensure that payments in favour of a Credit Party which are made under any material agreement executed by any Credit Party which are to be made in Colombian Pesos in Colombia are either directed to a trust established in Colombia which is subject to the Security or to an account over which the Agent has a First-Ranking Security Interest pursuant to an account control agreement or if such

payments are otherwise subject to the Security in a manner satisfactory to the Agent, acting reasonably.

7.1.12   *Perform Obligations.* Fulfill all covenants and obligations required to be performed by it under the Credit Documents, the Material Agreements, the Material Permits and the policy governing the Account Receivable Insurance (and as reasonably requested by the Agent, provide evidence of compliance with the risk management and credit policies required thereunder).

7.1.13   *Bank Accounts and Banking Service Agreements.* Maintain:

(a)     all of its bank primary accounts and Banking Service Agreements of the Borrowers in Canada, the U.S. and Mexico with the Agent or an Affiliate thereof unless otherwise consented to by the Required Lenders, in their sole discretion; provided, that the U.S. Borrower shall be permitted to maintain its current bank accounts in the U.S. with Wells Fargo provided that the Deposit Account Control Agreement between the U.S. Borrower, such financial institution and the Agent remains in force and effect, which agreement shall, among other things, provide that such financial institution acknowledges that the Agent has a First-Ranking Security Interest over the applicable bank accounts and that upon written notice from the Agent, the Agent can exert control over such accounts; and

(b)     except as set forth in Section 8.1(i), maintain all of the Credit Parties' other bank accounts used as a primary concentration accounts for collection of proceeds of Eligible Receivables with financial institutions reasonably satisfactory to the Required Lenders; provided, that within 90 days after the formation of any new Material Subsidiary that is a Credit Party from time to time hereafter, such financial institution has entered into a deposit account control or similar account agreement with the Agent and the applicable Credit Party, in a form and substance reasonably satisfactory to the Agent, which agreement, among other things, provides that such financial institution acknowledges that the Agent has a First-Ranking Security Interest over the applicable bank accounts and that upon written notice from the Agent, the Agent can exert control over such accounts.

Notwithstanding anything herein to the contrary, it is understood and agreed that no deposit account agreements or account agreement shall be required with respect to (i) any account which is not used as a primary concentration account for collection of proceeds of Eligible Receivables or for the direct collection of such proceeds or (ii) any other Excluded Account.

7.1.14   *Formation of Material Subsidiaries.* In the event that any Borrower or any other Credit Party forms or acquires a Material Subsidiary, or a Person otherwise becomes a Material Subsidiary (in each case, for the avoidance of doubt, other than a Securitization SPE), after the Amendment and Restatement Date then, subject to Section 8.9, the Canadian Borrower shall deliver, and shall cause the applicable Subsidiary to deliver, to the Agent not later than (a) thirty (30) Business Days in the case of Material Subsidiaries formed outside of Canada and the U.S., or (b) ten (10) Business Days for Material

Subsidiaries formed in Canada or the U.S., in either case, after the formation or acquisition of such Material Subsidiary (or such longer period as the Agent may approve, acting reasonably), a full recourse guarantee and the, within the applicable period therefor, any other Security relative to such Material Subsidiary referred to in Section 8.1 or such other Security as may be requested by the Agent, acting reasonably, together with related corporate documentation and legal opinions as may be requested by the Agent, acting reasonably.

7.1.15    *Ownership of Credit Parties.* The Canadian Borrower will at all times be the (direct or indirect) sole beneficial owner of all of the issued and outstanding shares of each other Credit Party, other than Holdco.

7.1.16    *EBITDA; Ownership of Assets.* Except as otherwise specifically permitted hereunder, the Canadian Borrower will ensure at all times that:

(a)    the EBITDA directly attributed to the Credit Parties determined on an unconsolidated but combined basis is equal to at least 90% of the Canadian Borrower's EBITDA determined on a consolidated basis;

(b)    the Credit Parties legally, beneficially and directly own at least 90% of the Consolidated Net Tangible Assets of the Canadian Borrower (based on the amount thereof set forth in the financial statements most recently delivered as required hereunder); and

(c)    the EBITDA directly attributed to the OECD Credit Parties determined on a consolidated basis is equal to at least 85% of the Canadian Borrower's EBITDA determined on a consolidated basis; provided, that for the purposes of such calculation any Distribution remitted to an OECD Credit Party by any other Subsidiary of the Borrower shall be included in EBITDA;

7.1.17    *Colombian Free Cash Flow Distribution.* The Canadian Borrower will cause the Distribution to it or any other Credit Party whose governing jurisdiction is in Canada, the U.S., Barbados or another jurisdiction reasonably acceptable to the Required Lenders by way of dividend (or a series of dividends) of no less than 75% of the Colombian Free Cash Flow for each Fiscal Year within 60 days of the end of such Fiscal Year; provided that such 60 day period may be extended by the Required Lenders, acting reasonably, upon the written request of the Canadian Borrower in light of cash flow needs in Colombia at the time of such scheduled distribution.

7.1.18    *Further Assurances.* Provide the Agent and the Lenders with such further information, financial data, documentation and other assurances as they may reasonably require from time to time in order to ensure ongoing compliance with the terms of this Agreement and to achieve the spirit and intent of this Agreement.

7.1.19    *Reviews.* Within 60 days of written demand by the Agent, the Borrowers will have initiated an independent business review by a third party satisfactory to the Agent, acting reasonably, of the business and operations of the Borrowers and their operations in

scope, form and substance satisfactory to the Agent, acting reasonably; *provided*, only one such demand by the Agent may be made under this Section 7.1.19.

7.1.20   *Minimum Margin Availability*. The Canadian Borrower will not permit the Minimum Margin Availability measured at the end of each Fiscal Quarter to be less than U.S. $5,000,000.

7.1.21   *Minimum Liquidity*. The Borrowers will not permit the Minimum Liquidity measured at the end of each Fiscal Quarter to be less than U.S. $10,000,000.

## 7.2   Negative Covenants

While there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to the Borrowers, each Borrower hereby covenants and agrees with the Agent and the Lenders that it will not, and will ensure that each of its Material Subsidiaries does not, without the prior written consent of the Agent on behalf of the Lenders:

7.2.1   *Liens.* Grant or suffer to exist any Lien in respect of any of its property or assets, except Permitted Liens.

7.2.2   *Funded Debt.* Create, incur or assume any Funded Debt, except Permitted Funded Debt.

7.2.3   *Investments/Financial Assistance.* Provide Financial Assistance to, or invest money in, any Person, firm, joint venture, partnership, company or corporation whether by way of loan, acquisition of shares, acquisition of debt obligations or in any other way whatsoever (collectively "**Investments**"), except for the following (each, a "**Permitted Investment**"):

(a)      Investments in cash and Cash Equivalents;

(b)      Permitted Intercompany Loans;

(c)      Guarantees which comprise part of the Security, are in respect of other Permitted Funded Debt or obligations of other Credit Parties or related to indemnities incurred in the ordinary cause of business;

(d)      Permitted Acquisitions;

(e)      Investments in other Credit Parties; provided, that such Investments together with any Financial Assistance provided to any Non-OECD Guarantors does not exceed in the aggregate at any one time an amount equal to 10% of the net book value of the Canadian Borrower's Consolidated Net Tangible Assets;

(f)      loans and advances by the Credit Parties to employees or directors of any Credit Party in the ordinary course of business (including for travel, entertainment and relocation expenses) not in excess of $250,000 at any one time outstanding in the

aggregate so long as no Default or Event of Default has occurred and is continuing or would reasonably be expected to result therefrom;

(g)   Investments made by the Credit Parties in the ordinary course of business consisting of (i) accounts receivables, (ii) negotiable instruments held for collection in the ordinary course of business, (iii) lease, utility and other similar deposits in the ordinary course of business, (iv) securities or debt obligations of trade creditors or customers that are received in settlement of bona fide disputes or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(h)   Investments in existence on the Amendment and Restatement Date and set forth on Schedule 7.2.3 hereto and, in each case, any extensions or renewals thereof, so long as the amount of any Investment made pursuant to this clause (h) is not increased at any time above the amount of such Investment set forth on Schedule 7.2.3 hereto;

(i)   Acquisitions outside of Canada and the U.S., Investments in joint ventures or other minority interest holdings and other Investments in, or Financial Assistance to, Persons which are not Credit Parties (provided, that no such Acquisitions or Investments would result in a breach of Section 7.2.17 or otherwise involve Persons or countries that are the subject of Economic Sanctions or that any Lender's internal compliance policy would prohibit it from engaging in business with) which, after giving *pro forma* effect to all other Acquisitions, Investments or Financial Assistance permitted in reliance on this clause (i) since the date of the last consolidated balance sheet of the Canadian Borrower delivered to the Agent hereunder and outstanding on the date of such Acquisition, Investment or Financial Assistance, do not exceed at any one time, in the aggregate, 15% of Shareholders' Equity (taking into account any increase in Shareholders' Equity as of such date since the date of the last consolidated balance sheet of the Canadian Borrower delivered to the Agent hereunder, and with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value); so long as no Default or Event of Default has occurred and is continuing or would reasonably be expected to result therefrom; and further provided that in the case of any Acquisitions under this clause (i), if more than 50% of the revenues generated by the Acquired Business are derived from outside of Canada or the U.S., then the applicable Credit Party must receive the prior consent of the Required Lenders thereto;

(j)   extensions of trade credit by the Canadian Borrower and its Material Subsidiaries in the ordinary course of business;

(k)   Investments arising as a result of Permitted Securitization Financings;

(l)   any Acquisition, Financial Assistance or Investment made in respect of Project Desert, the Anchor Acquisition or the Terra Acquisition;

- 114 -

**(m)     Investments in the United Joint Venture in an aggregate amount not to exceed (i) during the Fiscal Year ending December 31, 2019, U.S. $12,000,000 and (ii) during the Fiscal Year ending December 31, 2020, U.S. $8,000,000; plus, in each case, an amount equal to any returns actually received in respect of any such Investments (provided that any such returns reinvested in the United Joint Venture shall not be included in the calculation of EBITDA);**

*provided,* that notwithstanding the foregoing, during the Covenant Relief Period, the Borrowers and the Material Subsidiaries shall not (i) complete any Acquisitions pursuant to Sections 7.2.3(d) or 7.2.3(i) without the prior written consent of the Required Lenders, or (ii) make any Investment or provide any Financial Assistance other than Investments and Financial Assistance: (x) existing as of the Amendment and Restatement Date and set forth on Schedule 7.2.3, and any extension or renewal thereof; (y) permitted under paragraphs (a), (b), (c), (e), (g), (j), (k)**, (l)** or (~~l~~**m**) of **this** Section 7.2.3; and/or (z) made in or provided to one or more joint ventures or Persons that are not Credit Parties in an aggregate amount, in the case of this clause (z), not to exceed $3,000,000.

7.2.4     *Disposition of Assets.* Directly or indirectly sell, lease, assign, transfer, convey or otherwise dispose of all or any part of its assets, except the Credit Parties may sell, lease, assign, transfer, convey or otherwise dispose of the following:

(a)     inventory and Cash Equivalents in the ordinary course of business;

(b)     worn out, obsolete, no longer useful or immaterial, including assets sales, licenses, sublicenses or other dispositions or abandonment of intellectual property of a Credit Party or its subsidiaries determined by the management of such Credit Party to be no longer useful or necessary in the operation of the business of such Credit Party or any of its subsidiaries;

(c)     assets to a Borrower or any other Credit Party or if a Subsidiary is not a Credit Party, to the Credit Parties or any of their Subsidiaries;

(d)     transactions permitted by Section 7.2.8, Permitted Investments and Permitted Distributions permitted by Section 7.2.5 hereof;

(e)     transfers of properties that have been subject to a casualty to the respective insurer of such property as part of an insurance settlement any casualty or other event of loss; provided, that the requirements of Section 5.3.1 are complied with in connection therewith;

(f)     consignments in the ordinary course of business;

(g)     dispositions of accounts receivables and other assets of Subsidiaries (other than Credit Parties) in the ordinary course of business;

(h)     any assets the value of which (at the time the disposition is made) is not more than the greater of (i) $5,000,000 and (ii) 5% of the net book value of the Canadian

Borrower's Consolidated Net Tangible Assets as of the end of the Fiscal Quarter immediately prior to the date of such disposition, in any Fiscal Year; provided, that for such purpose, if such sale, transfer or other disposition is as part of an exchange of equipment to the extent that (A) such equipment is exchanged for credit against the purchase price of similar replacement property or (B) the proceeds thereof are reasonably promptly applied to the purchase price of such replacement property, then the amount of such purchase price of such replacement property in excess of such credited value will still count towards the determination of such 5% of net book value;

(i)     the disposition of Receivables pursuant to a Permitted Factoring Transaction;

(j)     the disposition of Receivables pursuant to a Permitted Securitization Financing, provided that the Receivables subject to such disposition originated in the United States;

(k)     any Anchor Sale and Leaseback Transaction, provided the proceeds of each such Anchor Sale and Leaseback Transaction shall be used to repay the Operating Facilities in accordance with Section 5.3.6;

(clauses (a)-(k), collectively, the "**Permitted Dispositions**"); provided, that the Borrower and its Subsidiaries may, with the prior consent of the Required Lenders, sell, lease, assign, transfer, convey or otherwise dispose of all or any part of its assets in a transaction that does not constitute a Permitted Disposition to the extent that the proceeds thereof are to be used in accordance with Section 5.3.1.

7.2.5     *Distributions.* Make any Distributions other than Permitted Distributions; *provided* that, during the Covenant Relief Period, only Distributions described in paragraphs (b), (f), (g) and (i) of the definition of "Permitted Distribution" shall be permitted under this Section 7.2.5.

7.2.6     *Dealing with Related Parties.* Consummate any transaction with any Affiliate of Holdco or the Canadian Borrower or any of its Subsidiaries other than the following:

(a)     any transaction that is on fair and reasonable terms that are substantially as favorable to the Canadian Borrower and/or its applicable Subsidiary as would be obtainable by the Canadian Borrower or such Subsidiary at the relevant time in a comparable arm's length transaction with a Person that is not an Affiliate;

(b)     payments and transactions provided for in the Material Agreements;

(c)     any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock option and stock ownership plans approved by the board of directors (or similar governing body) of Holdco, the Canadian Borrower or any of its Subsidiaries or the senior management thereof;

(d)     employment arrangements and transactions pursuant thereto entered into in the ordinary course of business between Credit Parties and any employee thereof including any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees;

(e)     the payments of reasonable and customary fees, compensation, benefits and incentive arrangements paid or provided to, and indemnities provided on behalf of, officers, directors, employees or consultants of Holdco (or any direct or indirect parent thereof), the Canadian Borrower or any of its Subsidiaries;

(f)     any transaction with an Affiliate where the only consideration paid by a Credit Party is capital stock of such Credit Party or any of its Subsidiaries;

(g)     the payment of any Permitted Distribution;

(h)     transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case, in the ordinary course of business and otherwise in compliance with the terms and conditions of this Agreement that are fair to the Credit Parties (as determined in good faith by the board of directors of the Canadian Borrower);

(i)     transactions (i) among the Credit Parties or (ii) between Subsidiaries that are not Credit Parties, in each case that are permitted by this Agreement;

(j)     so long as no Default or Event of Default shall have occurred and be continuing at the time of any action described below or would result therefrom the payment of transaction, advisory or similar fees payable to the Palladium or any Affiliate thereof in an aggregate amount in any Fiscal Year not to exceed $1,000,000, provided, that such fee is paid in connection with a *bona fide* transaction;

(k)     those transactions set forth on Schedule 7.2.6 which are in place as of the Amendment and Restatement Date;

(l)     transactions pursuant to any Permitted Securitization Financing; and

(m)    the Anchor Acquisition Promissory Notes.

7.2.7    *Change or Cease Business.* Cease to carry on the business or change in any material respect the nature of the business as is currently being carried on by it as of the Amendment and Restatement Date, including, for the avoidance of doubt, transactions in connection with a Permitted Securitization Financing, other than as part of a business reasonably related or ancillary thereto, or as otherwise approved in writing by the Required Lenders, acting reasonably.

7.2.8    *Corporate Changes.* Consummate any transaction whereby all or a substantial portion of its undertaking, property and assets would become the property of any other Person, whether by way of reconstruction, reorganization, recapitalization, consolidation, amalgamation, merger, transfer, sale or otherwise; nor merge, amalgamate or acquire any

- 117 -

other Person or all or substantially all of its assets; except that any of the foregoing transactions may take place: (a) among the Credit Parties if prompt written notice is given to the Agent, a Material Adverse Change will not occur as a result thereof and the applicable Credit Parties provide such additional or replacement Security as the Agent may reasonably require, (b) to consummate any Permitted Acquisition and (c) in connection with any Permitted Dispositions of all or substantially all of the assets of a Subsidiary of the Canadian Borrower; provided that in any such event which involves the Canadian Borrower, the successor entity is a Person formed under the Laws of Canada or any province thereof remains a Borrower under the same Facilities that it was a borrower under immediately prior to such event.

7.2.9    *Constating Documents.* Amend or restate or otherwise alter the articles of incorporation, amalgamation or continuance, as applicable, or by-laws of (i) any Credit Party in any manner that would reasonably be expected to materially and adversely affect the rights of the Agent and the Lenders under the Credit Documents or (ii) any Subsidiary (other than a Securitization SPE) which is not a Credit Party which would impose any restrictions upon the ability of such Subsidiary to make any Distributions to any Credit Party.

7.2.10    *Capital Expenditures.* Make, or permit any Subsidiary to make, any Capital Expenditure in any Fiscal Year that exceeds in aggregate, for each Fiscal Year, 110% of the estimated maximum amount of such Capital Expenditures as set forth in the annual budget in respect of such Fiscal Year provided by the Canadian Borrower pursuant to Section 7.4.1(c) (unless such Capital Expenditures are funded entirely by the proceeds of equity contributions or Sales Proceeds to the extent permitted under Section 5.3.2); *provided* that, notwithstanding the foregoing, the maximum aggregate amount of Capital Expenditures permitted by this Section 7.2.10 shall be, for the Fiscal Year ending December 31, 2018, U.S. $30,000,000.

7.2.11    *Fiscal Year.* Change its Fiscal Year end.

7.2.12    *Currency Hedging Agreements.* Enter into or be a party to any Currency Hedging Agreement, unless:

(a)    such Currency Hedging Agreement is entered into with one or more Hedge Providers or other counterparties, provided that if it is with any such other counterparties the obligations and liabilities thereunder shall be unsecured;

(b)    in the case of a Currency Hedging Agreement with a Hedge Provider, the Canadian Borrower shall execute an ISDA agreement and all other documentation as may be required by the applicable counterparty to such Interest Rate Hedging Agreement;

(c)    such Currency Hedging Agreement is entered into for the purpose of hedging against the risk of fluctuations in currencies and not for speculative purposes; and

(d)    the maturity date of such Currency Hedging Agreement is not more than one year from the date thereof and, in any event, not later than the Facilities Maturity Date.

7.2.13   *Interest Rate Hedging Agreements.* Enter into or be a party to any Interest Rate Hedging Agreement, unless:

(a)      the aggregate notional amount under all such Interest Rate Hedging Agreements at such time does not exceed $75,000,000;

(b)      such Interest Rate Hedging Agreement is entered into with one or more Hedge Providers or other counterparties, provided that if it is with any such other counterparties the obligations and liabilities thereunder shall be unsecured;

(c)      in the case of an Interest Rate Hedging Agreement with a Hedge Provider, the Canadian Borrower shall execute an ISDA agreement and all other documentation as may be required by the applicable counterparty to such Interest Rate Hedging Agreement;

(d)      such Interest Rate Hedging Agreement is entered into for the purpose of hedging against the risk of fluctuations in interest rates, and not for speculative purposes; and

(e)      the maturity date of such Interest Rate Hedging Agreement is not later than the Facilities Maturity Date.

7.2.14   *Use of Advances Sanctions.* Directly or indirectly use the proceeds of Advances to fund operations, or finance investments in, any country that at the time is prohibited by Economic Sanctions, the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or other Applicable Law, or make payments to any country or Person that at the time is prohibited by Economic Sanctions, the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or other Applicable Law, or directly or indirectly fund any principal repayment with proceeds derived from any such country or Person that will result in a violation by a Credit Party (or any Lender hereunder) of such Economic Sanctions, the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or other Applicable Law.

7.2.15   *Use of Advances General.* Use a material amount of the proceeds of any Advance for any purposes other than those expressly contemplated in this Agreement.

7.2.16   *Subordinated Debt.* Make any payment to any holders of the Subordinated Debt in connection with principal, interest, fees or any other amounts in respect thereof or amend the terms thereof, except payments permitted in accordance with the terms of the applicable Subordination Agreement, and so long as no Default or Event of Default has occurred and is continuing or would reasonably be expected to result therefrom.

7.2.17   *Sanctions.* Directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in 6.1.31, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Economic Sanction, or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading

- 119 -

or avoiding, or attempts to violate, any of the prohibitions set forth in any Economic Sanction and the Credit Parties shall deliver to the Agent any certification or other evidence requested from time to time confirming the Credit Parties' compliance with this Section 7.2.17.

7.2.18   *Account Receivable Insurance Coverage.* Provide the Agent with prior written notice of all proposed amendments or modifications to any Account Receivable Insurance and, to the extent that any such amendments or modifications (i) de-insures all or a portion of any Marginable Receivable that constitutes part of the Borrowing Base, (ii) modifies the individual country limits under the Account Receivable Insurance, (iii) extends any coverage period under the Account Receivable Insurance, or (iv) affects any of the coverage amounts or any coverage period(s) related to receivables of Petróleos Mexicanos or its Affiliates, shall not give effect to any such amendment or modification without the prior written consent of the Agent, acting reasonably, and in no case taking longer than 3 Business Days to provide such consent, it being understood that should the Agent fail to act within 3 Business Days to provide a an affirmative or negative written response, that failure should be deemed to be an act of consent with regards to the proposed amendment. For certainty, nothing in this Section 7.2.18 shall derogate from the obligations of the Borrowers, or the rights of the Agent, under Section 7.1.10.

7.2.19   *Cash Hoarding.* Use the proceeds of any Advance to accumulate or maintain cash or Cash Equivalents in one or more depository or investment accounts maintained by any Credit Party in an amount, in the aggregate, greater than $20,000,000, but excluding therefrom cash or Cash Equivalents accumulated or maintained for a specified business purpose (to the extent permitted hereunder and other than simply accumulating cash reserve in a manner that is not consistent with past practice of the Credit Parties), and, for certainty, the Lenders may refuse to make any requested Advance which the Lenders, acting reasonably, determine would result in a contravention of this Section 7.2.19.

## 7.3   Financial Covenants

7.3.1   Subject to the Equity Cure provided below in Section 7.3.2, while there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to the Borrowers, the Borrowers will not, without the prior written consent of the Required Lenders:

(a)     permit the Net Leverage Ratio measured at the end of each Fiscal Quarter to exceed (i) 4.75 to 1 for the Fiscal Quarters ending March 31, 2019 and June 30, 2019; (ii) 4.50 to 1 for the Fiscal Quarter ending September 30, 2019; (iii) 4.00 to 1 for the Fiscal Quarter ending December 31, 2019; and (iv) 3.00 to 1 for the Fiscal Quarters ending March 31, 2020 and thereafter;

(b)     permit the Fixed Charge Coverage Ratio measured at the end of each Fiscal Quarter to be less than (i) 1.10 to 1 for the Fiscal Quarters ending June 30, 2018, September 30, 2018 and December 31, 2018; and (ii) 1.25 to 1 for the Fiscal Quarters ending March 31, 2019 and thereafter; and

(c)     permit the Unadjusted EBITDA measured at the end of each Fiscal Quarter to be less than (i) U.S. $4,160,000 for the Fiscal Quarter ending June 30, 2018; (ii) U.S. $5,980,000 for the Fiscal Quarter ending September 30, 2018; (iii) U.S. $6,240,000 for the Fiscal Quarter ending December 31, 2018; and (iv) U.S. $8,580,000 for the Fiscal Quarter ending March 31, 2019.

7.3.2     In the event of any Event of Default of the financial covenants set forth in Section 7.3.1(a) and 7.3.1(b) (the "**Designated Financial Covenants**"), any equity contribution made by Holdco or the shareholders of Holdco to the Canadian Borrower will, at the request of the Canadian Borrower, be included in the calculation of EBITDA **and/or Unadjusted EBITDA** solely for the purposes of determining compliance with such financial covenants at the end of the applicable Fiscal Quarter and any subsequent period that includes such Fiscal Quarter (any such equity contribution, a "**Specified Equity Contribution**"); *provided*, that:

(a)     prior written notice of the Canadian Borrower's intention to utilize such Specified Equity Contribution is received by the Agent no later than the date on which the financial statements for such Fiscal Quarter or Fiscal Year (as applicable) are required to be delivered as provided for in Section 7.4;

(b)     such Specified Equity Contribution is received by the Canadian Borrower within ten (10) Business Days after the Canadian Borrower being required to deliver the financial statements for such Fiscal Quarter or Fiscal Year (as applicable) as provided for in Section 7.4;

(c)     the amount of any Specified Equity Contribution included in the calculation of EBITDA will be no greater than: (i) the amount required to cause the Canadian Borrower to be in compliance with the applicable Designated Financial Covenants and (ii) 40% of EBITDA as calculated on a trailing twelve month basis;

(d)     all Specified Equity Contributions will be disregarded for all other purposes under the Credit Documents (including, to the extent applicable, calculating EBITDA for purposes of determining compliance with Section 7.1.16, the Applicable Margin for pricing and other items governed by reference to EBITDA or that include EBITDA in the determination thereof in any respect);

(e)     there shall be no more than four Specified Equity Contributions made during the term of this Agreement and the aggregate amount of all such Specified Equity Contributions shall not exceed $20,000,000;

(f)     no Specified Equity Contribution may be made in consecutive Fiscal Quarters; and

(g)     the proceeds of all Specified Equity Contributions are actually received by the Canadian Borrower and the Canadian Borrower delivered to the Agent 100% of the aggregate proceeds of such Specified Equity Contribution as a Repayment pursuant to Section 5.3.1(d) (each such Repayment, an "**Equity Cure**

**Repayment**"), and the Equity Cure Repayment shall be ignored for purposes of determining the amount of Total Net Debt of the Borrower and calculating the Designated Financial Covenants and until such time that the Specified Equity Contribution ceases to be calculated as EBITDA pursuant to the provisions of this Section 7.3.2; provided that, (i) notwithstanding the provisions of Section 5.3.3, the proceeds of each Equity Cure Repayment are to be applied first to Outstanding Advances under the Term Facility in inverse order of maturity until they have been fully repaid and, thereafter, to Outstanding Advances under the Operating Facilities in accordance with Section 5.3.3.

If, after giving effect to the recalculations set forth in this Section 7.3.2, the Borrower shall then be in compliance with the Designated Financial Covenants, the Borrower shall be deemed to have satisfied the requirements of the Designated Financial Covenants and the applicable breach or default of the Designated Financial Covenants that had occurred shall be deemed cured for the purposes of this Agreement (in each instance, an "**Equity Cure**").

**7.4**      **Reporting Requirements**

7.4.1      While there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to the Borrower, the Borrowers shall deliver, or cause to be delivered, the following financial and other information to the Agent at the times indicated below:

(a)      within 35 days after the end of each month after the Amendment and Restatement Date: (i) monthly aged accounts receivable listings, monthly aged accounts payable listings, listings of total inventory and total capital assets by stocking location, cash and Cash Equivalent listing and a Borrowing Base Certificate executed by the Borrower; and (ii) monthly unaudited financial statements of the Borrower, which shall include a balance sheet, statement of cash flows and income statement;

(b)      promptly upon becoming available and in any event within 45 days after the end of each of the first three Fiscal Quarters in each Fiscal Year, a Compliance Certificate along with the Interim Financial Statements of the Borrower, which shall include a balance sheet, statement of cash flows and income statement, on which it is based, and the Borrower shall also make available members of its senior management team for a telephone call with Lenders within five Business Days of the end of each Fiscal Quarter to discuss, inter alia, the financial position of the Borrower;

(c)      promptly upon becoming available and in any event within 120 days after the end of each Fiscal Year, an annual business and financial plan for the Borrower which shall disclose all material assumptions utilized and shall include the following items: projected financial covenant ratios, balance sheet, income statement, cash flow statement and Capital Expenditure program;

(d)      promptly upon becoming available and in any event within 120 days after the end of each Fiscal Year, the Year-end Financial Statements for the Borrower, which shall include a balance sheet, statement of cash flows and income statement, together with a copy of the management discussion and analysis and a Compliance Certificate which shall include all new material business locations and any other changes to Schedule 6.1.2;

(e)      within 15 days of a request therefor by the Agent and only after a Material Adverse Effect or during the continuance of a Default or Event of Default, a listing of (i) each of the "serial number goods" (as defined in the *Personal Property Security Act* (Alberta)) or "collateral" for which a security interest must be indicated on a "certificate of title" (as such terms are defined under the *UCC*) for such collateral owned by the Credit Parties and the location of such serial number goods or certificate of title collateral, and (ii), a legal description of any Lands; but in each case, only to the extent that such assets are included in the Borrowing Base;

(f)      (i) within five Business Days of the end of each calendar week, solely during the Covenant Relief Period, a weekly liquidity report in form and substance satisfactory to the Agent, including, but not limited to, global cash balances and global facility utilization of the Borrower, including individual account summaries; and (ii) solely during the Covenant Relief Period, a rolling thirteen week cash flow and Borrowing Base projection, in form and substance satisfactory to the Agent, to be delivered within 10 Business Days from receipt by the Borrower of the written request of the Agent for such information;

(g)      (i) together with the delivery of the Interim Financial Statements for the Fiscal Quarter ending June 30, 2018, a collateral exam based on such Interim Financial Statements; and (ii) prior to December 31, 2018, updated appraisals of the equipment, inventory and real estate of the Credit Parties; in each case, in form and substance satisfactory to the Lenders, acting reasonably;

(h)      provide prompt notice to the Agent of: (i) the occurrence of any Default or Event of Default (for greater certainty, whether or not such Default or Event of Default is continuing); (ii) any Material Adverse Change or Material Adverse Effect; (iii) any material litigation affecting any Credit Party or any breach of any Requirement of Environmental Law, where in either such case there is a reasonable prospect that the liability of any Credit Party with respect thereto could exceed Cdn. $5,000,000 in any Fiscal Year or which would reasonably be expected to result in a Material Adverse Change; (iv) any material amendments to or replacements of, or waivers of material breaches in respect of, the Material Agreements or the Material Permits; (v) any notice of default, termination or suspension received by any Credit Party in respect of material Funded Debt or in respect of any Material Agreement or Material Permit; and (vi) the occurrence of any ERISA Event that would reasonably be expected to have a Material Adverse Effect;

- 123 -

(i)     provide prompt notice to the Agent of: (i) any labour dispute to which any Credit Party is or is expected to become a party, including any strikes, lockouts or other labor disputes relating to any of such Person's plants and other facilities, which could reasonably be expected to result in a Material Adverse Effect, (ii) any Worker Adjustment and Retraining Notification Act or related liability incurred with respect to the closing of any plant or other facility of any such Person and (iii) any material liability under Applicable Law similar to the Worker Adjustment and Retraining Notification Act or otherwise arising out of plant closings;

(j)     (x) provide prompt notice to the Agent of any material notices it receives under or in connection with the Accounts Receivable Insurance, including related to: (i) any termination thereof, (ii) any disputed claims related thereto, (iii) any denied coverage thereunder or (iv) any alleged misrepresentations given by any Credit Party in connection therewith and (y) provide prior written notice of any amendment of material terms of the Account Receivable Insurance;

(k)     provide written notice to the Agent of any event or circumstance, with the giving of notice or lapse of time or both, would constitute a default or event of default under a Permitted Securitization Financing promptly (and in any event not less than three Business Days) upon becoming aware of same constituted by a Permitted Securitization Financing; provided such notice shall include reasonable details of the nature of such event or circumstance and the corresponding default or event of default, any applicable cure period with respect thereto and any remedial actions to be taken with respect to same; and

(l)     such additional information and documents as the Agent or the Lenders may reasonably require from time to time, not otherwise inconsistent with the terms of this Agreement, to ensure the ongoing compliance by the Borrower with the terms and conditions of this Agreement, in form reasonably acceptable to the Agent and the Lenders.

## 7.5     Designation of Unrestricted Subsidiaries

(a)     The Canadian Borrower from time to time, by notice to the Agent in the form of Exhibit I, shall be entitled to designate that either:

(i)     a Material Subsidiary will be an Unrestricted Subsidiary; or

(ii)    an Unrestricted Subsidiary will be a Material Subsidiary;

provided, that the Borrower will not be entitled to designate a Material Subsidiary to be an Unrestricted Subsidiary if:

(A)     a Default or an Event of Default has occurred and is continuing unless the exercise of the Borrower's discretion under paragraph (i) or (ii) above would cause such Default or Event of Default to be cured; or

(B)     a Default or an Event of Default would result from or exist immediately after such a designation.

(b)     For the avoidance of doubt, notwithstanding anything in this Agreement or the Credit Documents to the contrary, for purposes of calculating the Borrowing Base, the definition of "Marginable Cash" shall include the unrestricted cash (determined in accordance with GAAP) and Cash Equivalents of each of QMax do Brasil Solucoes do Petroleo Ltda., International Drilling Fluids and Engineering Services (IDEC) Ltd. and QMax Solutions India (Project Office) of QMax Solutions Inc. (or any other Subsidiary of the Borrowers in the Agent's sole discretion, acting reasonably) to the extent (a) such cash and Cash Equivalents are held in collateral account/s maintained by the Agent or an affiliate thereof (or such other bank deemed reasonable in the sole discretion of the Agent), and (b) the Agent has received a guarantee (to the extent of the value of the pledged cash and Cash Equivalents in such account; it being understood that Agent may waive this requirement in its sole discretion if the circumstances warrant) and a deposit account agreement or substantially equivalent agreements under the laws of such local jurisdiction, in form and substance reasonably satisfactory to Agent, whereby, *inter alia*, the Agent retains exclusive control to direct the transfer of funds therefrom during the continuation of an Event of Default under Section 10.1 hereof (with withdrawals by the applicable Credit Party to be permitted upon notice to the Agent so long as the Agent has not delivered a notice of exclusive control upon the occurrence and during the continuation of an Event of Default), together with evidence of all requisite registrations or filings of each such agreement under Applicable Law and such other documentation reasonably satisfactory to Agent, including legal opinions.

(c)     Any Subsidiary of the Borrowers that pledges cash and/or Cash Equivalents in the manner provided for in paragraph (b) above shall, notwithstanding that such Subsidiary is not a Material Subsidiary, be subject to the provisions of Section 7.2.1 hereof; *provided*, such Subsidiary shall otherwise not be subject to Section 7.2.

(d)     The Agent acknowledges that, as of the date hereof, Mud Movers LLC has been designated as an Unrestricted Subsidiary.

**7.6     Securitization SPE**

7.6.1     As of the Amendment and Restatement Date, ADF SPE, LLC, a Delaware limited liability company, shall be designated a Securitization SPE.

7.6.2     After the Amendment and Restatement Date, the Canadian Borrower from time to time, by notice to the Agent, may designate any Unrestricted Subsidiary as a Securitization SPE; provided, that the Borrower will not be entitled to such a designation if (a) a Default or an Event of Default has occurred and is continuing (unless such designation would cause such Default or Event of Default to be cured) or (b) a Default or an Event of Default would result from or exist immediately after such a designation.

25877170.9 27367782.4

7.6.3      No Securitization SPE

(a)      shall incur any Funded Debt other than Funded Debt pursuant to the Permitted Securitization Financing to which it is a party;

(b)      shall conduct any business other than (i) the acquisition of accounts receivable from one or more Credit Parties, and (ii) the consummation and performance of Permitted Securitization Financing.

7.6.4      As at the Amendment and Restatement Date, the Material Subsidiaries and Unrestricted Subsidiaries are as set out in Schedule 6.1.2.

# ARTICLE 8
# SECURITY

## 8.1      Security

Each Borrower agrees to provide (or cause to be provided) the security listed below to the Agent on behalf of the Lenders and the Hedge Providers as continuing security for the payment and performance of all present and future, direct and indirect, indebtedness and obligations of the Credit Parties to the Agent, the Lenders and the Hedge Providers (on a *pari passu* basis) related to the Credit Documents, the Banking Service Agreements and the Hedging Agreements:

(a)      a general security agreement from each Borrower creating a First-Ranking Security Interest in respect of all of its present and after-acquired property, assets and undertaking and a floating charge over all present and future owned real property;

(b)      an unlimited Guarantee from the U.S. Borrower in respect of present and future, direct and indirect, indebtedness and Obligations of the Canadian Borrower and other Credit Parties to the Agent and the Lenders;

(c)      an unlimited Guarantee from each Material Subsidiary of the Canadian Borrower (excluding, for the avoidance of doubt, any Securitization SPE) which is not a Borrower in respect of present and future, direct and indirect, indebtedness and Obligations of the Borrowers to the Agent and the Lenders;

(d)      a general security agreement or debenture (or other equivalent security applicable in the relevant jurisdiction) from each Guarantor creating a First-Ranking Security Interest in respect of all its present and after acquired property, assets and undertaking and a floating charge over all present and future owned real property, provided, that (a) for so long as the Encina Loan Agreement is in effect, with respect to Anchor and its Subsidiaries the ranking of the First-Ranking Security Interest is to be in accordance with the Encina Intercreditor Agreement and (b) thereafter, so long as the Wells Fargo Credit Agreement is in effect, any Receivables and other assets encumbered by a lien pursuant to the Wells Fargo Credit Agreement and the other loan documents in connection therewith shall be excluded from the Security of the Agent and the Lenders;

(e)      a limited recourse guarantee from Holdco and a share pledge agreement from Holdco in respect of all of the issued and outstanding shares of the Canadian Borrower owned by it;

(f)      a securities pledge agreement or charge over shares (or other equivalent security applicable in the relevant jurisdiction) in respect of the shares or units of the U.S. Borrower and any Material Subsidiary owned by a Credit Party;

(g)      prior to the incurrence of any Subordinated Debt by any Credit Party, a Subordination Agreement in respect to such Subordinated Debt;

(h)      for each Leased Property deemed material by the Required Lenders, acting reasonably, a Landlord Agreement in respect of each such Leased Property; provided that the Agent may impose a three month rent reserve against the Borrowing Base with respect to Eligible Inventory valued in excess of $250,000 (per location) which is located at or on Leased Property in respect of which such Landlord Agreement is not obtained;

(i)      for each Credit Party (other than Anchor, Terra and their Subsidiaries) who does not maintain all of its bank accounts exclusively with the Agent or its Affiliates, deposit account control or blocked account agreements among the Agent and the applicable financial institution which such bank account is maintained with, as may be reasonably required by the Agent subject to the last sentence of Section 7.1.13;

(j)      estoppel letters, consignments agreements, bailee letters, certificates or consents from such third parties as may be reasonably required by the Agent, but subject to any limitations set forth herein or in any other Credit Document; and

(k)      such other security as may be reasonably required by the Agent and the Lenders from time to time;

in each case, in accordance with the time periods set out in Sections 7.1.14.

## 8.2   General Provisions re Security; Registration

The Security shall be in form and substance satisfactory to the Agent and the Lenders, acting reasonably. The Agent may require that any item of Security be governed by the laws of the jurisdiction where the property subject to such item of Security is located. The Security shall be registered by the Borrowers where necessary or desirable to record and perfect the charges contained therein, as determined by the Agent giving consideration to, among other things, the cost thereof relative to the benefit to the Lenders thereof, and if the Borrowers do not so register the Security as requested or if the registration may be effected by the secured party thereunder, the Agent may do the same. Notwithstanding the foregoing, the parties expressly agree that no actions shall be required under this Section 8.2 or in respect of Security generally to the extent that the costs of obtaining such Financial Assistance or Lien or perfecting or registering such Security outweigh the benefits afforded thereby, in the opinion of the Required Lenders, acting reasonably, such determination to be made at the written request of the Canadian Borrower;

provided, that the Agent and Lenders shall be entitled to re-evaluate whether the costs of obtaining such Financial Assistance or Lien or perfecting or registering such Security outweigh the benefits afforded thereby from time to time in their discretion.

If any Lender determines, acting reasonably, that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful for such Lender to hold or benefit from any Guarantee and/or Security, such Lender shall notify the Agent and disclaim any benefit of such Guarantee and/or Security to the extent of such unlawfulness, provided that such disclaimer shall not invalidate or render unenforceable such Guarantee and/or Security for the benefit of any of the other Lenders

**8.3    Opinions re Security**

The Credit Parties shall cause to be delivered to the Agent and the Lenders the results of all applicable searches in respect of the Credit Parties in the applicable jurisdiction as well as the opinions of solicitors for the Credit Parties regarding their corporate status, the due authorization, execution and delivery of the Security provided by them, all registrations in respect of the Security, and the enforceability of such Security; all such opinions to be in form and substance satisfactory to the Agent and its counsel, acting reasonably.

**8.4    After-Acquired Property, Further Assurances**

Each Credit Party agrees to execute and deliver from time to time, and cause each of its Material Subsidiaries to execute and deliver from time to time, all such further documents and assurances as may be reasonably required by the Agent from time to time in order to provide the Security contemplated hereunder, specifically including: supplemental or additional security agreements, assignments and pledge agreements which shall include lists of specific assets to be subject to the security interests required hereunder.

**8.5    Security for Swap Documents with Former Lenders**

(a)    If a Lender ceases to be a Lender under this Agreement (for purposes of this Section 8.5, a "**Former Lender**"), all Secured Hedging Liabilities owing to such Former Lender and its Affiliates under Hedging Agreements entered into while such Former Lender was a Lender shall remain secured by the Security (equally and rateably) to the extent that such Secured Hedging Liabilities were secured by the Security prior to such Lender becoming a Former Lender and, subject to the following provisions of this Section 8.5. For certainty, any Hedging Liabilities under Hedging Agreements entered into with a Former Lender or an Affiliate thereof after the Former Lender has ceased to be a Lender shall not be Secured Hedging Liabilities nor shall they be secured by the Security. Notwithstanding the foregoing, while any Obligations remain outstanding under the Facilities, no Former Lender or any Affiliate thereof shall have any right to cause or require the enforcement of the Security or any right to participate in any decisions relating to the Security, including any decisions relating to the enforcement or manner of enforcement of the Security or decisions relating to any amendment to, waiver under, release of or other dealing with all or any part of the Security; for certainty,

- 128 -

the sole right of a Former Lender and its Affiliates with respect to the Security while any Obligations remain outstanding under the Facilities is to share, on a *pari passu* basis, in any proceeds of realization and enforcement of the Security.

(b)      If this Agreement is terminated, all Secured Hedging Liabilities owing to any Hedge Provider under Hedging Agreements entered into while such Hedge Provider, or its Affiliate, was a Lender hereunder and all Obligations under Banking Service Agreements between one or more Credit Parties and such Lender entered into while the Lender was a Lender hereunder shall no longer be secured by the Security.

## 8.6    Insurance Proceeds

If insurance proceeds become payable in respect of loss of or damage to any property owned by a Credit Party:

(a)      if an Event of Default has occurred and is continuing at such time, the Agent shall apply such proceeds against the Obligations; and

(b)      otherwise, the Agent shall apply such excess proceeds against the Obligations in accordance with Sections 5.3.1 and 5.3.2.

## 8.7    Qualified ECP Guarantor Keepwell

Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Credit Party to honor all of such Credit Party's obligations under this Agreement and the applicable Security (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 8.7 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 8.7, or otherwise under this Agreement and the applicable Security, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 8.7 shall remain in full force and effect until its Obligations have been discharged in full. Each Qualified ECP Guarantor intends that this Section 8.7 constitute, and this Section 8.7 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

## 8.8    Additional Release by Lender

If any Lender determines, acting reasonably, that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender to hold or benefit from a Lien over real property pursuant to any law of the United States or any State thereof, such Lender may notify the Agent and disclaim any benefit of such Lien to the extent of such illegality; provided, that such determination or disclaimer shall not invalidate or render unenforceable such Lien for the benefit of any other beneficiary of such Lien.

**8.9      Security Principles Affecting Certain Subsidiaries**

In obtaining Security from Material Subsidiaries in their respective jurisdiction of incorporation, the Agent, the Lenders and the Canadian Borrower agree that:

(a)      all Guarantees and Security granted will be limited to the extent necessary to comply with local legal requirements, as determined by the Agent acting reasonably;

(b)      general statutory limitations, financial assistance, corporate benefit, fraudulent preference, "thin capitalization" rules, tax restrictions (including tax thin capitalization issues), retention of title claims and similar principles may limit the ability of a Material Subsidiary to provide a Guarantee or other Security or may require that the Guarantee be limited by an amount or otherwise provided that the Canadian Borrower and the applicable Material Subsidiary will use reasonable endeavours to overcome such obstacles and to assist in demonstrating that adequate corporate benefit accrues to the relevant Guarantor;

(c)      the Security and extent of its perfection will be agreed on the basis that the cost to the Credit Parties of providing such Security shall be proportionate to the benefit accruing to the Lenders;

(d)      Material Subsidiaries will not be required to give Guarantees or enter into Security if that would conflict with the fiduciary duties of their directors or contravene any legal prohibition or result in a risk of personal or criminal liability on the part of an officer provided that the relevant Guarantor shall use reasonable endeavours to overcome any such obstacle;

(e)      perfection of security, when required, and other legal formalities will be completed as soon as practicable and, in any event, within the relevant time periods specified herein or, if earlier or to the extent no such time periods are specified herein, within the time periods specified by applicable law in order to ensure due perfection, provided that the perfection of security granted will not be required if it would have a material adverse effect on the ability of the relevant Guarantor to conduct its operations and business in the ordinary course as otherwise permitted by this Agreement;

(f)      where a class of assets to be secured includes material and immaterial assets, if the cost of granting Security over the immaterial assets is disproportionate to the benefit of such Security, security will be granted over the material assets only.

<div align="center">

**ARTICLE 9**
**CONDITIONS PRECEDENT**

</div>

**9.1      Conditions Precedent to Agreement**

This Agreement shall not become effective unless and until the following conditions have been satisfied, in each case to the satisfaction of the Agent and the Lenders:

(a)     the conditions precedent in Section 9.2 shall have been satisfied;

(b)     the Agent and the Lenders shall be satisfied, in their reasonable discretion, with all Material Agreements, including confirmation that Palladium beneficially owns (within the meaning of Rule 13d-3 promulgated under the United States Securities Exchange Act of 1934) at least 52% of the issued and outstanding shares (excluding stock options) of the Canadian Borrower;

(c)     the Credit Parties shall have obtained insurance in respect of its consolidated property, business and assets, evidenced by an insurance certificate naming the Agent as additional insured and first loss payee;

(d)     the Canadian Borrower shall have in place acceptable Account Receivable Insurance, evidenced by an endorsement or insurance certificate naming the Agent as first loss payee;

(e)     subject to Schedule 9.1, (A) this Agreement and all Security (or in the case of Security that was previously delivered in connection with the Existing Credit Agreement, an acknowledgment and confirmation from the applicable Credit Party thereto if so requested by the Agent) required shall have been executed and delivered and (i) in Alberta, British Columbia and each other applicable Canadian jurisdiction, all registrations and deliveries necessary or desirable in connection therewith shall have been made, and (ii) in any other jurisdiction, the same, as applicable, shall have been delivered to the Agent in proper form for filing, and (B) all legal opinions and other documentation reasonably required by the Lenders in connection therewith shall have been executed and delivered, in each case, in form and substance reasonably satisfactory to the Agent and the Lenders;

(f)     the Agent and the Lenders shall have received satisfactory evidence that there are no Liens affecting any of the assets of the Credit Parties, except for Permitted Liens;

(g)     the Agent and Lenders shall have received satisfactory confirmation that at least 80% of the Insured Receivables forming part of the Borrowing Base are derived from, subject to and governed by Eligible Approved Contracts;

(h)     the Agent shall have received an officer's certificate, certificate of incumbency and certified copies of the articles, by-laws and resolutions of the board of directors of each Borrower and each other Credit Party formed under the laws of Canada, the U.S. or any province or state thereof concerning the due authorization, execution and delivery of the Credit Documents to which it is a party, and such related matters as the Agent and the Lenders may reasonably require;

(i)     the Agent shall have received a certificate of status, certificate of compliance or similar certificate for each Borrower and each other Credit Party formed under the laws of Canada, the U.S. or any province or state thereof issued by its governing jurisdiction;

(j)     the Agent and the Lenders shall have received opinions from the solicitors for the Credit Parties in Alberta, British Columbia and Delaware, regarding, amongst other things, its corporate status, the due authorization, execution, delivery and enforceability of the Credit Documents provided by it, perfection and registration of the Security, and such other matters as the Agent and the Lenders may require;

(k)     the Agent shall have received an opinion of its solicitors, Torys LLP, with respect to matters as the Agent and the Lenders may require.

(l)     the Canadian Borrower shall have delivered a duly executed and completed Borrowing Base Certificate and a *pro forma* Compliance Certificate;

(m)     consolidated cash flow projections, *pro forma* balance sheet, income statement and capital expenditure budget of the Canadian Borrower for each of the 2018, 2019 and 2020 Fiscal Years, including an analysis of the Mexican days of sales outstanding;

(n)     the Borrowers and the Agent shall have entered into a Fee Agreement;

(o)     the Borrowers shall have paid to the Agent all fees and expenses (including the Agent's reasonable and documented out-of-pocket legal expenses) relating to the establishment, amendment and restatement of the Facilities;

(p)     no Material Adverse Change shall have occurred since March 31, 2018;

(q)     the Agent shall have received satisfactory evidence that the Credit Parties have obtained all necessary consents of all Governmental Authorities required in connection with the execution of the Credit Documents and the consummation of the transactions contemplated thereby and the Canadian Borrower shall have delivered an officer's certificate certifying same;

(r)     each of the representations and warranties in Article 6 shall be true and correct in all material respects and the Canadian Borrower shall have delivered an officer's certificate certifying same; and

(s)     Holdco shall have received no less than $3,000,000 by way of an equity contribution by Palladium, an Investor or an Affiliate thereof and shall, substantially concurrently therewith, provide reasonably satisfactory evidence of such receipt to the Agent.

## 9.2     Conditions Precedent to all Advances

The Lenders shall have no obligation to make any Advance (including for greater certainty the initial Advance hereunder), unless at the time of making each such Advance the following terms and conditions shall have been satisfied:

(a)     the representations and warranties in Article 6 shall be true and correct in all material respects as if made on the date of such Advance except to the extent such

representations and warranties relate to an earlier date in which case the information contained in representations and warranties shall be true and correct in all material respects as of such earlier date;

(b)      no Material Adverse Effect shall have occurred since the date of the then most recent Year-end Financial Statements;

(c)      no Default or Event of Default shall have occurred and be continuing, nor shall the making of the Advance result in the occurrence of any Default or Event of Default;

(d)      no Borrowing Base Shortfall shall and be continuing, nor shall the making of the Advance result in the occurrence of any Borrowing Base Shortfall;

(e)      after giving effect to the proposed drawdown, the outstanding principal of all Outstanding Advances under the applicable Facility shall not exceed the maximum amount of such Facility; and

(f)      the Borrower shall have given a Drawdown Request to the Agent in accordance with the notice requirements provided herein (except in respect of Advances in the form of Overdrafts).

## ARTICLE 10
## DEFAULT AND REMEDIES

**10.1    Events of Default**

The occurrence of any one or more of the following events, after the expiry of any applicable cure period set out below, shall constitute an event of default under this Agreement (an "**Event of Default**"):

(a)      if,

(i)      any Credit Party makes default in the due and punctual payment of any principal amount owing under the Credit Documents, as and when the same becomes due and payable, whether at maturity or otherwise;

(ii)     any Credit Party makes default in the due and punctual payment of Interest or fees owing under the Credit Documents (other than the Hedging Agreements), as and when the same become due and payable, whether at maturity or otherwise and such default continues for a period of three Business Days after written notice thereof is given to the applicable Credit Party by the Agent; or

(iii)    any Credit Party makes default in the due and punctual payment of any amounts in excess, in the aggregate, of $1,000,000 owing under the Hedging Agreements with a Hedge Provider, as and when the same become due and payable, whether at maturity or otherwise and such

- 133 -

default continues for a period of ten (10) Business Days after written notice thereof is given to the applicable Credit Party by the applicable Hedge Provider;

(b)     the Borrower fails to be in compliance with any of the covenants set out in Section 7.2 or Section 7.3 (subject to the Equity Cure in compliance with Section 7.3.2);

(c)     any representation or warranty provided by a Credit Party to the Agent or the Lenders herein or in any other Credit Document was incorrect in any material respect on the date on which such representation or warranty was made;

(d)     any Credit Party fails in a material way to perform or comply with any of its covenants or obligations contained in this Agreement or any other Credit Document (other than those set out in Subsections (a), (b) and (c) above); provided, that if such non-compliance is capable of remedy within 30 days after notice thereof from the Agent and such Credit Party diligently attempts to remedy such non-compliance and periodically informs the Agent of its efforts in this regard, and such non-compliance is remedied within such period, then such non-compliance shall be deemed not to constitute an Event of Default;

(e)     the occurrence of a Change of Control;

(f)     any one or more of the Credit Parties is in default in the payment or performance of any of its or their indebtedness or obligations under any agreement relating to any Funded Debt (other than the Obligations) where the principal amount owing under such agreements in the aggregate is in excess of $10,000,000 (after the expiry of any grace or cure periods relating thereto), and in either case, such indebtedness or obligations have been, or may be, accelerated, unless such default is waived by the applicable counterparties or holders of such debt in accordance with its terms;

(g)     one or more final judgments or decrees for the payment of money shall have been obtained or entered against any one or more of the Credit Parties in excess of $10,000,000 in the aggregate and is not released, bonded, satisfied, discharged, vacated, or stayed within 30 days;

(h)     an Insolvency Event occurs in respect of any Credit Party or any Subsidiary of the Borrowers that pledges cash and/or Cash Equivalents in accordance with Section 7.5(b) hereof; provided, this clause (h) shall exclude an Insolvency Event in respect of any Securitization SPE.

(i)     the Credit Parties (taken as a whole) cease (or take an affirmative action towards ceasing) to carry on business, or a substantial part thereof, or make or threaten to make (or take an affirmative action towards making) a bulk sale of their property, except to the extent specifically permitted hereunder;

(j)     the property of any one or more of the Credit Parties having a fair market value in excess of $10,000,000, in aggregate, shall be seized (including by way of

execution, attachment, garnishment or distraint) or any Lien thereon shall be enforced, or such property shall become subject to any charging order or equitable execution of a court, or any writ of enforcement, writ of execution or distress warrant with respect to obligations in excess of $10,000,000, in aggregate, shall exist in respect of any one or more of any of them, or such property, or any sheriff, civil enforcement agent or other Person shall become lawfully entitled to seize or distrain upon such property under the *Civil Enforcement Act* (Alberta), the *Workers' Compensation Act* (Alberta), the *Personal Property Security Act* (Alberta) or any other applicable Laws whereunder similar remedies are provided, and in any case such seizure, execution, attachment, garnishment, distraint, charging order or equitable execution, or other seizure or right, shall continue in effect and not be released or discharged for more than 30 days;

(k)     a Material Adverse Change has occurred since the date of the then most recent Year-end Financial Statements and remains continuing for more than 30 days after notice thereof is given to the Canadian Borrower by the Agent;

(l)     if an ERISA Event shall have occurred that would reasonably be expected to have a Material Adverse Effect;

(m)     any Credit Document or any material provision thereof is or is declared by any court of competent jurisdiction to be unenforceable, or any Credit Party terminates or purports to terminate its liability under any Credit Document or disputes the validity or enforceability of such Credit Document;

(n)     any of the Security ceases to constitute a valid and perfected First-Ranking Security Interest over Collateral of a value in excess of $5,000,000 in the aggregate and the Borrower shall have failed to remedy such default within 5 days of becoming aware of such fact and being provided by the Agent with any documentation required to be executed to remedy such default; and

(o)     if any Borrower fails to eliminate a Borrowing Base Shortfall as provided in Section 5.3.5.

Notwithstanding the foregoing, a declaration of an Event of Default under clause (i) above shall not: (1) prevent the commencement of a proceeding under Law 1116 of 2006 ("**Law 1116**") or the filing of a petition in Colombia to commence a proceeding under Law 1116 with respect to any Colombian Branch of any Credit Party, whether in a voluntary or involuntary manner; (2) be construed to mean that the purpose of this Section is to prevent or create obstacles to prevent, directly or indirectly, that proceedings be commenced in Colombia under Law 1116 with respect to any Colombian Branch of any Credit Party; (3) prohibit any Colombian Branch of any Credit Party from negotiating or entering into a restructuring agreement under Law 1116; or (4) impose any restrictions or prohibitions, or unfavorable effects "efectos desfavorables" upon any Colombian Branch of any Credit Party for the negotiation or execution of a restructuring agreement under Law 1116. The rights of the Lenders under this Section may not be exercised in connection with clause (i) above if and for so long as a proceeding is commenced or a petition is filed in Colombia to commence a proceeding under Law 1116 with respect to any Colombian

25877170.9 27367782.4

Branch clause (i) above, whether in a voluntary or involuntary manner or any Colombian Branch clause (i) above engage in negotiations to enter into, or enters into a restructuring agreement in Colombia under Law 1116.

## 10.2    Acceleration; Additional Interest

Upon the occurrence of an Insolvency Event in respect of any Credit Party, the Obligations shall become immediately due and payable, without the necessity of any demand upon or notice to the Borrower by the Agent and the Swingline shall be cancelled. Upon the occurrence and during the continuation of any Event of Default other than such an Insolvency Event, the Agent, at the request of and on behalf, of the Required Lenders, shall by written notice to the Borrowers declare the Obligations to be immediately due and payable. From and after the date of the occurrence of an Event of Default and for so long as such Event of Default continues, both before and after the Acceleration Date, all Outstanding Advances may bear interest or fees at the Default Rate in order to compensate the Lenders for the additional risk associated therewith.

## 10.3    Acceleration of Certain Contingent Obligations

Upon the occurrence of an Event of Default which is continuing, any Lender which has issued a Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit or entered into a Hedging Agreement with Credit Party may make a Canadian Dollar Prime Rate Loan, a U.S. Dollar Base Rate Loan or a U.S. Dollar Prime Rate Loan, as applicable, to a Borrower in an amount equal to the face amount of such Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit, or the amount required to unwind such Hedging Agreement (such amount to be determined in accordance with the terms thereof), as the case may be; and the proceeds of any such Loan shall be held by such Lender and used to satisfy the Lender's obligations under the said Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit as such becomes due, or to effect the unwinding of such Hedging Agreement. Any such Loan shall bear interest at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans, U.S. Dollar Base Rate Loans or U.S. Dollar Prime Rate Loan, as applicable, under the Facility under which such Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit was issued. Any such Loan made in respect of a Hedging Agreement shall bear interest at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans under the Canadian Operating Facility which provides for the highest interest rate at such time.

## 10.4    Combining Accounts, Set-Off

Upon the occurrence and during the continuation of an Event of Default, in addition to and not in limitation of any rights now or hereafter granted under Applicable Law, each Lender may without notice to any Credit Party at any time and from time to time:

(a)    combine, consolidate or merge any or all of the deposits or other accounts maintained with such Lender by such Credit Party in respect of this Agreement (whether term, notice, demand or otherwise and whether matured or unmatured) and such Credit Party's obligations to such Lender hereunder; and

25877170.9 27367782.4

       (b)       set off, apply or transfer any or all sums standing to the credit of any such deposits or accounts in or towards the satisfaction of the said obligations,

including all claims of any nature or description arising out of or connected with this Agreement, including contingent obligations of the Lenders in respect of unmatured Bankers' Acceptances, in which case the Agent or such Lender will promptly notify the Borrower thereof after the occurrence thereof; provided, that the Agent's or such Lender's failure to give any such notice will not affect the validity thereof. Nothing contained in the Credit Documents will require the Agent or a Lender to exercise any right, or will affect the right of the Agent or a Lender to exercise and retain the benefits of exercising any right, with respect to any Obligations existing otherwise than pursuant to the Credit Documents.

## 10.5    Attorney in Fact

Each Borrower hereby irrevocably constitutes and appoints the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of such Borrower and in the name of such Borrower or in its own name, from time to time in the Agent's discretion, for the purpose of carrying out the terms of the Credit Documents, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Credit Documents and which such Borrower being required by the terms thereof to take or execute has failed to take or execute; provided, that this power of attorney will not be effective until the occurrence and during the continuance of any Event of Default. Each Borrower hereby ratifies all that said attorneys will lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and will be irrevocable until all of the Obligations under the Credit Documents have been unconditionally and irrevocably paid and performed in full. Each Borrower also authorizes the Agent, at any time and from time to time following the occurrence and during the continuance of any Event of Default, to execute any endorsements, assignments or other instruments of conveyance or transfer pursuant to the Security. If requested by the Agent, each Borrower will cause each other Credit Party to constitute and appoint the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney in fact in accordance with the foregoing provisions of this Section 10.5.

## 10.6    Appropriation of Monies

After the occurrence and during the continuation of an Event of Default, the Agent may from time to time apply any Proceeds of Realization against any portion or portions of the Obligations, and the Borrowers may not require any different application. The taking of a judgment or any other action or dealing whatsoever by the Agent or the Lenders in respect of the Security shall not operate as a merger of any of the Obligations hereunder or in any way affect or prejudice the rights, remedies and powers which the Agent or the Lenders may have, and the foreclosure, surrender, cancellation or any other dealing with any Security or the said obligations shall not release or affect the liability of the Borrowers or any other Person in respect of the remaining portion of the Obligations.

**10.7    No Further Advances**

The Lenders shall not be obliged to make any further Advances (including honouring any cheques drawn by a Borrower which are presented for payment) from and after the earliest to occur of the following: (a) delivery by the Agent to the Borrowers of a written notice that a Default or an Event of Default has occurred and is continuing and that as a result thereof no further Advances will be made (whether or not such notice also requires immediate repayment of the Obligations) and (b) the occurrence and continuance of an Event of Default under Section 10.1(h).

**10.8    Remedies Cumulative**

All of the rights and remedies granted to the Agent and the Lenders in this Agreement, and any other Credit Documents or instruments in existence between the Parties or contemplated hereby, and any other rights and remedies available to the Agent and the Lenders at law or in equity, shall be cumulative. The exercise or failure to exercise any of the said remedies shall not constitute a waiver or release thereof or of any other right or remedy, and shall be non-exclusive.

**10.9    Performance of Covenants by Agent**

If a Credit Party fails to perform any covenant or obligation to be performed by it pursuant to this Agreement, the Agent, at the request of the Required Lenders (in their sole discretion), after written notice to the Borrowers, perform any of the said obligations but shall be under no obligation to do so; and any amounts expended or advanced by the Agent for such purpose shall be payable by the Borrowers upon demand, together with interest thereon at the highest rate then applicable to the Facilities.

**10.10    Purchase of Participation Following Acceleration**

After all Obligations are declared by the Agent to be due and payable pursuant to Section 10.2, (i) each Lender agrees that it will at any time or from time to time thereafter at the request of the Agent as required by any Lender, purchase at par on a non-recourse basis a participation in the Outstanding Advances owing to each of the other Lenders under the Operating Facilities and make any other adjustments as are necessary or appropriate, in order that the Outstanding Advances owing to each of the Lenders under the Operating Facilities, as adjusted pursuant to this Section 10.10, will be in the same proportion as each Lender's Commitment under all the Operating Facilities was to the aggregate Commitment of all Lenders under all the Operating Facilities immediately prior to the Event of Default resulting in such declaration; (ii) the amount of any repayment made by or on behalf of the Credit Parties under the Credit Documents or any proceeds received by the Agent or the Lenders pursuant to Section 11.7 will be applied by the Agent in a manner such that to the extent possible the amount of the Outstanding Advances owing to each Lender under the Operating Facilities after giving effect to such application will be in the same proportion as each Lender's Commitment under all the Operating Facilities was to the aggregate Commitment of all Lenders under all the Operating Facilities immediately prior to the Event of Default resulting in such declaration; provided that: (i) HSBC US shall not purchase any participation under this Section 10.10 from HSBC Bank Canada (and provided that for certainty, the foregoing proviso shall not affect the obligations of HSBC US to any of the other

- 138 -

Lenders under this Section 10.10); and (ii) if Applicable Laws or a Lender's internal regulations and policies prohibits such Lender from purchasing a participation in Outstanding Advances owing by a Borrower other than the Canadian Borrower, such Lender shall not be required to purchase a participation in the Outstanding Advances  owing by such Borrower, provided that such Lender hereby indemnifies the other Lenders for its Proportionate Share of such Outstanding Advances as if such purchase had occurred.

<div align="center">

**ARTICLE 11**
**ADMINISTRATION OF THE FACILITIES**

</div>

**11.1    Authorization and Action**

Each Lender hereby irrevocably appoints and authorizes the Agent to be its agent in its name and on its behalf and to exercise such rights or powers granted to the Agent or the Lenders under the Credit Documents to the extent specifically provided therein and on the terms thereof, together with such powers and authority as are reasonably incidental thereto. As to any matters not expressly provided for by the Credit Documents, the Agent will not be required to exercise any discretion or take any action, but will be required to act or to refrain from acting (and will be fully indemnified and protected by the Lenders to the greatest extent permitted by Law in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions will be binding upon all Lenders; provided, however, that the Agent will not be required to take any action which, in the opinion of the Agent, might expose the Agent to liability in such capacity, which could result in the Agent incurring any costs and expenses, or which is contrary to the spirit and intent of this Agreement.

**11.2    Decision-Making**

11.2.1    Any amendment to this Agreement relating to the following matters shall require the unanimous agreement of the Lenders:

(a)    decreases in interest rates or fees payable in respect of any Facility;

(b)    increases in the maximum amount of credit available under any Facility;

(c)    extensions, or changes to the definition, of the Facilities Maturity Date;

(d)    extensions or postponements of the scheduled dates or the scheduled amounts for Repayments hereunder;

(e)    reductions in the Outstanding Advances under any Facility;

(f)    releases of all or substantially all of the Security, unless in connection with a Permitted Disposition;

(g)    any change to the definition of Required Lenders;

(h)    any provision of this Agreement which expressly states that the unanimous consent of the Lenders is required in connection with an action to be taken or consent provided by the Lenders;

(i)    any amendment, modification or elimination the definition of Borrowing Base or any of the defined terms that are used in such definition to the extent that any such change results in more credit being made available to the Borrowers based upon the Borrowing Base, but not otherwise;

(j)    any change to Sections 11.8.1, 11.9(b) or any other provision regarding the allocation of payments to the Lenders under this Agreement; and

(k)    this Section 11.2;

provided, that (A) any change to Section 2.6.1(i) or Article 11 will also require the consent of the Agent, (B) any change to Sections 4.6.1(c) and 4.7 (and the related definitions referenced therein) will require the consent of the Issuing Bank under the U.S. Operating Facility and the Agent, (C) any change to Sections 2.6.1(b) and 2.7 (and the related definitions referenced therein) will require the consent of the Swingline Lender and the Agent, (D) any change to Section 5.16 (and the related definitions referenced therein) will require the consent of each Issuing Bank and the Agent (E) any increase to the individual commitment amount of a Lender under a Facility can only be made with the consent of such Lender; and (F) any other change which only effects the Canadian Operating Lenders, the U.S. Operating Lenders, the Canadian Operating Lenders, Term Lenders, the Issuing Bank, the Swingline Lender or the Agent, respectively, shall only require the consent of the affected Persons.

11.2.2    Except for the matters described in Section 11.2.1 above, any amendment to this Agreement or the other Credit Documents shall be effective if made among the Borrower and the Required Lenders, and for greater certainty any such amendment which is agreed to by the Required Lenders shall be final and binding upon all Lenders.

11.2.3    Except for the matters which require the unanimous consent of the Lenders as set out above, any action to be taken or decision to be made by the Lenders pursuant to this Agreement (specifically including for greater certainty the issuance of written notice to the Borrower of the occurrence of a Default or Event of Default, the issuance of a demand for payment of the Obligations, a decision to make an Advance despite any condition precedent relating thereto not being satisfied, the provision of any waiver in respect of a breach of any covenant or the issuance of any consent which may be required under Section 7.2) shall be effective if approved by the Required Lenders; and any such decision or action shall be final and binding upon all the Lenders.

11.2.4    Any action to be taken or decision to be made by the Lenders pursuant to this Agreement which is required to be unanimous shall be made at a meeting of the Lenders called by the Agent pursuant to Section 11.11(k) or by a written instrument executed by all of the Lenders. Any action to be taken or decision to be made by the Lenders pursuant to this Agreement which is required to be made by the Required Lenders shall be made at

- 140 -

a meeting of the Lenders called by the Agent pursuant to Section 11.11(k) or by a written instrument executed by the Required Lenders. Any instrument contemplated in this Section 11.2.4 may be executed by fax or pdf and in counterparts.

11.2.5   Subject to Section 8.5(b), the Agent may from time to time without notice to or the consent of the Lenders execute and deliver partial releases of the Security in respect of any item of Collateral (whether or not the proceeds of sale thereof are received by the Agent) which the Credit Parties are permitted to dispose of in connection with a Permitted Disposition; and in releasing any such Security the Agent may rely upon and assume the correctness of all information contained in any certificate or document provided by any one or more of the Borrowers, without further enquiry. Otherwise, any release or discharge in respect of the Security or any portion thereof shall require the written consent of the Lenders acting unanimously.

**11.3   Procedure for Making Advances**

11.3.1   Subject to Section 11.8.3, all Advances under each Facility will be made in accordance with each Lender's Proportionate Share of such Advance under such Facility.

11.3.2   The Lenders, through the Agent, will make Advances under a Facility available to the Borrower as required hereunder by debiting the account of the Agent to which each Lender's Proportionate Share in respect of each Facility of such Advances has been credited (or causing such account to be debited) and, in the absence of other arrangements agreed to by the Agent and the Borrowers in writing, by transferring (or causing to be transferred) like funds in accordance with the instructions of the Borrowers as set forth in the a Drawdown Request, Conversion Notice or Rollover Notice, as the case may be, in respect of each Advance under each Facility; provided, that the obligation of the Agent hereunder will be limited to taking such steps as are in keeping with its normal banking practice and which are commercially reasonable in the circumstances to implement such instructions, and the Agent will not be liable for any damages, claims or costs which may be suffered by the Borrowers or any of the Lenders and occasioned by the failure of such funds to reach their designated destination, unless such failure is due to the gross negligence or wilful misconduct of the Agent.

**11.4   Failure to Fund**

11.4.1   Unless the Agent has actual knowledge that a Lender has not made or will not make available to the Agent for value on the date of any Advance the applicable amount required from such Lender hereunder, the Agent shall be entitled to assume that such amount has been or will be received from such Lender when so due and the Agent may (but shall not under any circumstances be obliged to), in reliance upon such assumption, make available to the applicable Borrower a corresponding amount (except that no such amount shall be made available to the applicable Borrower in the case of a deemed Advance). If such amount is not in fact received by the Agent from such Lender on such date and the Agent has made available a corresponding amount to the applicable Borrower on such date as aforesaid (or is deemed to have made an Advance to the applicable Borrower in such amount), such Lender shall pay to the Agent on demand an

amount equal to the aggregate of the applicable amount required from such Lender hereunder plus an amount equal to the product of (a) the rate per annum applicable to overnight deposits made with the Agent for amounts approximately equal to the amount required from such Lender multiplied by (b) the amount that should have been paid to the Agent by such Lender on such date and was not, multiplied by (c) a fraction, the numerator of which is the number of days that have elapsed from and including such date to but excluding the date on which the amount is received by the Agent from such Lender and the denominator of which is 365 or 366 days, as the case may be, in the case of all Advances. A certificate of the Agent containing details of the amount owing by a Lender under this Section shall be binding and conclusive in the absence of manifest error. If any such amount is not in fact received by the Agent from such Lender on such date, the Agent shall be entitled to recover from the applicable Borrower, on demand, the related amount made available by the Agent to such Borrower as aforesaid together with interest thereon at the applicable rate per annum payable by such Borrower hereunder.

11.4.2   Notwithstanding the provisions of Section 11.4.1, if any Lender fails to make available to the Agent its Proportionate Share of any Advance, which for greater certainty includes a deemed Advance hereunder (such Lender being herein called the "**Non-Paying Lender**"), the Agent shall forthwith give notice of such failure by the Non-Paying Lender to the applicable Borrower (except where such failure relates to a deemed Advance) and to the other Lenders. The Agent shall then forthwith give notice to the other Lenders that any Lender may make available to the Agent all or any portion of the Non-Paying Lender's Proportionate Share of such Advance (but in no way shall any other Lender or the Agent be obliged to do so) in the place of the Non-Paying Lender. If more than one Lender gives notice that it is prepared to make funds available in the place of a Non-Paying Lender in such circumstances and the aggregate of the funds which such Lenders (herein collectively called the "**Contributing Lenders**" and individually called the "**Contributing Lender**") are prepared to make available exceeds the amount of the Advance which the Non-Paying Lender failed to make, then each Contributing Lender shall be deemed to have given notice that it is prepared to make available its Proportionate Share of such Advance based on the Contributing Lenders' relative commitments to advance in such circumstances. If any Contributing Lender makes funds available in the place of a Non-Paying Lender in such circumstances, then the Non-Paying Lender shall pay to any Contributing Lender making the funds available in its place, forthwith on demand, any amount advanced on its behalf together with interest thereon at the rate applicable to such Advance from the date of advance to the date of payment, against payment by the Contributing Lender making the funds available of all interest received in respect of the Advance from the applicable Borrower. The failure of any Lender to make available to the Agent its Proportionate Share of any Advance as required herein shall not relieve any other Lender of its obligations to make available to the Agent its Proportionate Share of any Advance as required herein.

**11.5    Defaulting Lenders and Replacement of Lenders**

11.5.1   Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)     the standby fees payable to a Defaulting Lender hereunder shall cease to accrue on the unused portion of its Commitment under any Operating Facility, as applicable;

(b)     a Defaulting Lender shall not be included in determining whether, and the Commitment and the Proportionate Share of the Outstanding Advances of such Defaulting Lender under the Facilities, or any of them, shall not be included in determining whether, all Lenders or the Required Lenders, have taken or may take any action hereunder; provided, that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects such Defaulting Lender differently than other affected Lenders shall require the consent of such Defaulting Lender;

(c)     subject to Section 11.4.1, for the purposes of any Advance requested hereunder while there is a Defaulting Lender, each Lender's Proportionate Share thereof shall be calculated based on such Lender's (A) Commitment relative to the total Commitment under the applicable Facility reduced by the Commitment of the Defaulting Lender;

(d)     the Agent, the Swingline Lender or the Issuing Bank may require such Defaulting Lender to pay to the Agent for deposit into an escrow account maintained by and in the name of the Agent an amount equal to such Defaulting Lender's maximum contingent obligations hereunder to the Agent, the Swingline Lender or the Issuing Bank, as the case may be (provided that the foregoing shall not apply to Export Development Canada to the extent such a deposit is unlawful under the *Financial Administration Act* (Canada));

(e)     the Agent may withhold any payments owing to such Defaulting Lender for set off against such Defaulting Lender's existing or reasonably foreseeable future obligations hereunder; and

(f)     for the avoidance of doubt, the Borrowers shall retain and reserve their other rights and remedies respecting each Defaulting Lender.

11.5.2   If a Lender is a Defaulting Lender or refuses to give timely consent to an amendment, modification or waiver of this Agreement that, pursuant to Section 11.2, requires consent of all the Lenders (and the consent of the Required Lenders has been given with respect thereto) (a "**Non-Consenting Lender**") (collectively, the "**Departing Lenders**"), then the Borrowers may:

(a)     replace the Departing Lender with another financial institution acceptable to the Agent, the Swingline Lender and the Issuing Bank, each acting reasonably, who purchases at par, or such lower price as the Departing Lender may agree in its sole discretion, the Outstanding Advances and other amounts under all Facilities owing to the Departing Lender and such Lender's entire Commitment and assumes the Departing Lender's Commitment and all other obligations of the Departing Lender hereunder; provided, that prior to or concurrently with such replacement:

- 143 -

(i)     the Departing Lender shall have received payment in full of all principal, interest, fees and other amounts through such date of replacement and a release from any further obligations to make Advances under the Credit Documents after the date of such replacement;

(ii)    the assignment fee required to be paid by Section 13.6.2 shall have been paid to the Agent;

(iii)   all of the other requirements for such assignment contained herein shall have been satisfied, including the consent of the Agent, the Swingline Lender and the Issuing Bank and the receipt by the Agent of such agreements, documents and instruments as the Agent may reasonably require; and

(iv)    in the case of a Departing Lender who is a Non-Consenting Lender, each assignee consents, at the time of such assignment, to each matter in respect of which such Non-Consenting Lender was a Non-Consenting Lender and the Borrowers also requires each other Lender that is a Non-Consenting Lender to assign the Outstanding Advances owing to it under each Facility and its Commitment; or

(b)   provided, no Default or Event of Default exists at such time, elect to terminate the Departing Lender's Commitment, in which case the Commitment in respect of each Facility shall be reduced by an amount equal to the amount of any Commitment of such Facility so cancelled (provided, that prior to or concurrently with such cancellation the Departing Lender shall have received payment in full of all principal, interest, fees and other amounts through such date of cancellation (including breakage and other costs in accordance with Sections 5.10.4 and 5.14) and a release from any further obligations to make Advances under the Credit Documents after such termination); or

(c)   exercise any combination of the rights under (a) and (b) above; provided, that in each case, each Departing Lender is treated ratably with the other Departing Lenders, if any.

**11.6    Security and Exercise of Remedies**

11.6.1    Except to the extent provided in Section 11.6.2, the Security shall be granted in favour of and held by the Agent for and on behalf of the Lenders in accordance with the provisions of this Agreement. The Agent shall, in accordance with its usual practices in effect from time to time, take all steps required to perfect and maintain the Security to the extent required hereunder, including: taking possession of the certificates representing the securities required to be pledged hereunder to the extent required hereunder; filing renewals and change notices in respect of such Security; and ensuring that the name of the Agent is noted as loss payee or mortgagee on all property insurance policies covering the Collateral. If the Agent becomes aware of any matter concerning the Security which it considers to be material, it shall promptly inform the Lenders. The Agent shall comply

- 144 -

with all instructions provided by the Lenders or the Required Lenders, as the case may be, in connection with the enforcement or release of the Security which it holds. The Agent agrees to permit each Lender to review and make photocopies of the original documents comprising the Security from time to time upon reasonable notice. The Agent is hereby authorized to enter into the Subordination Agreement on behalf of the Lenders and to any subordination and postponement agreements in respect of Subordinated Debt from time to time to the extent the same is permitted hereunder. Each Lender further authorizes the Agent to execute on its behalf, directly or through attorneys-in-fact duly appointed for such purposes, and to accept the benefits of, each of the Security governed under the laws of the Republic of Colombia and any other agreements or documents as may be necessary or advisable in connection with the grant of, or attachment or perfection of, modification, supplement or waiver under any of, the security interest granted to the Agent, for the benefit of the Lenders, pursuant to the Security governed under the laws of the Republic of Colombia. The Lenders and the other Secured Parties authorize the Agent to release any Collateral or Guarantors in accordance with Section 13.21 or if approved, authorized or ratified in accordance with Section 11.2.1. The Lenders and the other Secured Parties hereby irrevocably authorize and instruct the Agent to, without any further consent of any Lender, enter into (or acknowledge and consent to) or amend, renew, extend, supplement, restate, replace, waive or otherwise modify the Encina Intercreditor Agreement and the Wells Fargo Letter to the extent this Agreement does not otherwise require the consent of the Required Lenders or all Lenders therefor.

11.6.2     If any Credit Party has provided security in favour of any Lender directly, except for Permitted Purchase-Money Security Interests and Permitted Liens, such Lender agrees to pay to the Agent all amounts received by it in connection with the enforcement of such security, and all such amounts shall be deemed to constitute Proceeds of Realization and shall be dealt with as provided in Section 11.7.

11.6.3     Except as otherwise provided herein, each Lender hereby acknowledges that, to the extent permitted by Applicable Law, rights and remedies provided under the Credit Documents to the Lenders are for the benefit of the Lenders collectively and not severally and further acknowledges that its rights and remedies thereunder are to be exercised not severally but collectively through the Agent upon the decision of the Lenders (with the required majority or unanimity as herein provided), regardless of whether acceleration of Obligations hereunder was made, and accordingly, notwithstanding any of the provisions contained herein, each of the Lenders hereby covenants and agrees that it will not be entitled to take any action with respect to the Facilities, including any acceleration of Obligations thereunder, but that any such action will be taken only by the Agent with the prior written direction of the Lenders (with the required majority or unanimity as herein provided). Notwithstanding the foregoing or anything else set forth herein to the contrary, in the absence of written instructions from the Lenders, and where in the sole opinion of the Agent the exigencies of the situation warrant such action, the Agent may without notice to or consent of the Lenders take such action on behalf of the Lenders as it deems appropriate or desirable in the circumstances. Each of the Lenders hereby covenants and agrees that it has not heretofore and will not seek, take, accept or receive any Liens in respect of any of the Obligations of the Credit Parties under the Credit Documents and will not enter into any agreement with any of the Parties relating in any manner

- 145 -

whatsoever to the Facilities, unless all of the Lenders under the Facilities will at the same time obtain the benefit of any such security or agreement, as the case may be.

**11.7    Application of Proceeds of Realization**

Notwithstanding any other provision of this Agreement, the Proceeds of Realization of the Security or any portion thereof shall be distributed in the following order:

(a)    firstly, in payment of all costs and expenses incurred by the Agent and the Lenders in connection with such realization, including legal, accounting and receivers' fees and disbursements;

(b)    secondly, against the Obligations (including Secured Hedging Liabilities but excluding any other Hedging Liabilities in excess thereof, and, for certainty, excluding any Hedging Liabilities which are owed to a counterparty other than a Lender or Affiliate thereof), each Lender being entitled to receive its Proportionate Share thereof;

(c)    thirdly, against all Hedging Liabilities which are owing to any Lender or Affiliate thereof in excess of Secured Hedging Liabilities; and

(d)    fourthly, if all Obligations of the Borrowers listed above and all other Hedging Liabilities owing to any Lender or Affiliate thereof have been paid and satisfied in full, any surplus Proceeds of Realization shall be paid in accordance with Applicable Law.

**11.8    Payments by Agent**

11.8.1    The following provisions shall apply to all payments made by the Agent to the Lenders hereunder:

(a)    the Agent shall be under no obligation to make any payment (whether in respect of principal, Interest, fees or otherwise) to any Lender until an amount in respect of such payment has been received by the Agent from a Credit Party;

(b)    if the Agent receives a payment of principal, Interest, fees or other amount owing by any Borrower under a Facility which is less than the full amount of any such payment due, the Agent shall distribute such amount received among the Lenders under such Facility in each Lender's Proportionate Share of such Facility;

(c)    if the Agent receives payments in respect of principal, Interest, fees or other amounts owing by a Borrower under more than one Facility which are due on the same day, and if the amounts received are insufficient to satisfy all payments required under such Facilities on such day, the Agent shall, except as otherwise specifically set forth herein, distribute such amounts received among the Lenders under such Facilities in each Lender's Proportionate Share of such Facilities;

(d)     if any Lender has advanced more or less than its Proportionate Share of its Commitment under a Facility, such Lender's entitlement to such payment shall be increased or reduced, as the case may be, in proportion to the amount actually advanced by such Lender;

(e)     if a Lender's Proportionate Share of an Advance under a Facility has been advanced for less than the full period to which any payment by any Credit Party relates, such Lender's entitlement to receive a portion of any payment of interest or fees shall be reduced in proportion to the length of time such Lender's Proportionate Share has actually been outstanding;

(f)     the Agent acting reasonably and in good faith shall, after consultation with the Lenders in the case of any dispute, determine in all cases the amount of all payments to which each Lender is entitled and such determination shall be deemed to be *prima facie* correct;

(g)     upon request by a Lender, the Agent shall deliver a statement detailing any of the payments to the Lenders referred to herein;

(h)     all payments by the Agent to a Lender hereunder shall be made to such Lender at its address set out herein unless notice to the contrary is received by the Agent from such Lender; and

(i)     if the Agent has received a payment from a Credit Party on a Business Day (not later than the time required for the receipt of such payment as set out in this Agreement) and fails to remit such payment to any Lender entitled to receive its Proportionate Share of such payment on such Business Day, the Agent agrees to pay interest on such late payment at a rate determined by the Agent in accordance with prevailing banking industry practice on interbank compensation.

11.8.2   Each Borrower hereby irrevocably authorizes the Agent to debit any account maintained by it with the Agent after written notice to such Borrower in order to make payments to the Lenders or the Agent of any amount that is overdue and payable hereunder for the purposes of satisfying payment thereof.

11.8.3   The Agent may in its discretion from time to time make adjustments in respect of any Lender's share of an Advance, Conversion, Rollover or Repayment under a Facility in order that the Outstanding Advances due to such Lender under such Facility shall be approximately in accordance with such Lender's Proportionate Share of the Facility.

## 11.9   Redistribution of Payment

Each Lender agrees that, subject to Section 10.4:

(a)     If it exercises any right of counterclaim, set off, bankers' lien or similar right with respect to any property of any Credit Party or if under Applicable Law it receives a secured claim, it will apportion the amount thereof proportionately between:

(i)     amounts outstanding at the time owed by the Credit Party to such Lender under this Agreement, which amounts will be applied in accordance with this Section 11.9; and

(ii)    amounts otherwise owed to it by a Credit Party;

provided, that any cash collateral account held by such Lender as collateral for a letter of credit or bankers' acceptance (including a Bankers' Acceptance) issued or accepted by such Lender on behalf of a Credit Party may be applied by such Lender to such amounts owed by such Credit Party to such Lender pursuant to such letter of credit or in respect of any such bankers' acceptance without apportionment.

(b)     If it receives, through the exercise of a right or the receipt of a secured claim described in Section 11.9(a) or otherwise, payment of a proportion of the aggregate amount of principal, interest and fees due to it hereunder which is greater than the proportion received by any other Lender in respect of the aggregate amount of principal, interest and fees due in respect of the applicable Facility (having regard to the respective proportionate amounts advanced as Advances by each of the Lenders under the applicable Facility), the Lender receiving such proportionately greater payment will purchase a participation (which will be deemed to have been done simultaneously with receipt of such payment) in that portion of the applicable Facility of the other Lenders so that their respective receipts will be *pro rata* to their respective Proportionate Shares; provided, however, that, if all or part of such proportionately greater payment received by such purchasing Lender is otherwise recovered by it, such purchase will be rescinded and the purchase price for such participation will be returned to the extent of such recovery, but without interest. Such Lender will exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this Section 11.9 to share in the benefits of any recovery on such secured claims.

(c)     If it does any act or thing permitted by Section 11.9(a) or 11.9(b), it will promptly provide full particulars thereof to the Agent.

(d)     Except as permitted under Section 11.9(a) or 11.9(b), no Lender will be entitled to exercise any right of counter claim, set off, bankers' lien or similar right without the prior written consent of the other Lenders.

(e)     Notwithstanding anything else in this Section 11.9, any amounts which are lawfully received by any Hedge Provider in respect of Hedging Liabilities prior to the delivery by the Agent of a declaration of all Obligations becoming due pursuant to Section 11.9 are not required to be shared pursuant to the provisions of this Section 11.9.

(f)     The provisions of this Section 11.9 shall survive repayment of the Obligations.

25877170.9 27367782.4

**11.10   Protection of Agent**

11.10.1   Unless the Agent has actual knowledge or actual notice to the contrary, it may assume that each Lender's address set out in Exhibit "A" attached hereto is correct, unless and until it has received from such Lender a notice designating a different address.

11.10.2   The Agent may engage and pay for the advice or services of any lawyers, accountants or other experts whose advice or services may to it seem necessary, expedient or desirable and rely upon any advice so obtained (and to the extent that such costs are not recovered from the Credit Parties pursuant to this Agreement, each Lender agrees to reimburse the Agent in such Lender's Proportionate Share of such costs).

11.10.3   Unless the Agent has actual knowledge or actual notice to the contrary, it may rely as to matters of fact which might reasonably be expected to be within the knowledge of any Credit Party upon a statement contained in any Credit Document.

11.10.4   Unless the Agent has actual knowledge or actual notice to the contrary, it may rely upon any communication or document believed by it to be genuine.

11.10.5   The Agent may refrain from exercising any right, power or discretion vested in it under this Agreement unless and until instructed by the Required Lenders as to whether or not such right, power or discretion is to be exercised and, if it is to be exercised, as to the manner in which it should be exercised (underlined provided, that such instructions shall be required to be provided by all of the Lenders in respect of any matter for which the unanimous consent of the Lenders is required as set out herein).

11.10.6   The Agent may refrain from exercising any right, power or discretion vested in it which would or might in its sole and unfettered opinion be contrary to any law of any jurisdiction or any directive or otherwise render it liable to any Person, and may do anything which is in its opinion in its sole discretion necessary to comply with any such law or directive.

11.10.7   The Agent may delegate to such other Person, such duties and responsibilities of the Agent hereunder as it shall determine to be appropriate in respect of dealings with or relating to any Credit Party or any other Person and in particular, the Agent may execute any of its duties under this Agreement or any other Credit Document (including, for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security or of exercising any rights and remedies thereunder) by sub-agent or attorney-in-fact. The Agent shall not be responsible for the negligence or misconduct of any sub-agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct on the part of the Agent, as determined by a final and non-appealable judgment of a court of competent jurisdiction. The exculpatory provisions of this Agreement applicable to the Agent shall apply to any such other Person, sub-agent or attorney-in-fact and to the Affiliates of the Agent and any such sub-agent or attorney-in-fact, and shall apply to their respective activities in connection with the syndication of the Facilities as well as activities as Agent.

11.10.8  The Agent may refrain from acting in accordance with any instructions of the Required Lenders to begin any legal action or proceeding arising out of or in connection with this Agreement or take any steps to enforce or realize upon any Security, until it shall have received such security as it may reasonably require (whether by way of payment in advance or otherwise) against all costs, claims, expenses (including legal fees) and liabilities which it will or may expend or incur in complying with such instructions.

11.10.9  The Agent shall not be bound to disclose to any Person any information relating to the Credit Parties or any Related Parties if such disclosure would or might in its opinion in its sole discretion constitute a breach of any law or regulation or be otherwise actionable at the suit of any Person.

11.10.10  The Agent shall not accept any responsibility for the accuracy or completeness of any information supplied in connection herewith or for the legality, validity, effectiveness, adequacy or enforceability of any Credit Document and shall not be under any liability to any Lender as a result of taking or omitting to take any action in relation to any Credit Document except in the case of the Agent's gross negligence or wilful misconduct.

## 11.11   Duties of Agent

The Agent shall:

(a)    hold and maintain the Security to the extent provided in Section 11.6;

(b)    provide to each Lender copies of all financial information received from the Credit Parties promptly after receipt thereof, and copies of any Drawdown Requests, Conversion Notices, Rollover Notices, Repayment Notices and other notices received by the Agent from the Credit Parties upon request by any Lender;

(c)    promptly advise each Lender of Advances required to be made by it hereunder and disburse all Repayments to the Lenders hereunder in accordance with the terms of this Agreement;

(d)    promptly notify each Lender of the occurrence of any Default or Event of Default of which the Agent has actual knowledge or actual notice;

(e)    at the time of engaging any agent, receiver, receiver-manager, consultant, monitor or other party in connection with the Security or the enforcement thereof, obtain the agreement of such party to comply with the applicable terms of this Agreement in carrying out any such enforcement activities and dealing with any Proceeds of Realization;

(f)    account for any monies received by it in connection with this Agreement, the Security and any other agreement delivered in connection herewith or therewith;

(g)    each time a Borrower requests the written consent of the Lenders in connection with any matter, use its best efforts to obtain and communicate to the Borrowers

the response of the Lenders in a reasonably prompt and timely manner having due regard to the nature and circumstances of the request;

(h)     give written notice to the Borrowers in respect of any other matter in respect of which notice is required in accordance with or pursuant to this Agreement, promptly or promptly after receiving the consent of the Required Lenders, if required under the terms of this Agreement;

(i)     except as otherwise provided in this Agreement, act in accordance with any instructions given to it by the Required Lenders;

(j)     if so instructed by the Required Lenders, refrain from exercising any right, power or discretion vested in it under this Agreement or any document incidental thereto; and

(k)     call a meeting of the Lenders at any time not earlier than five days and not later than 30 days after receipt of a written request for a meeting provided by any Lender.

## 11.12   Lenders' Obligations Several; No Partnership

The obligations of each Lender under this Agreement are several. The failure of any Lender to carry out its obligations hereunder shall not relieve the other Lenders of any of their respective obligations hereunder. No Lender shall be responsible for the obligations of any other Lender hereunder. Neither the entering into of this Agreement nor the completion of any transactions contemplated herein shall constitute the Lenders and the Agent, or any combination of them, a partnership or give rise to any fiduciary relationship between them.

## 11.13   Reliance Upon Agent

The Borrowers will be entitled to rely upon any certificate, notice or other document or other advice, statement or instruction provided to them (or any one of them) by the Agent pursuant to the Credit Documents, and the Borrowers will be entitled to deal with the Agent with respect to matters under the Credit Documents which the Agent is authorized hereunder to deal with, without any obligation whatsoever to satisfy themselves as to the authority of the Agent to act on behalf of the Lenders and without any liability whatsoever to the Lenders for relying upon any certificate, notice or other document or other advice, statement or instruction provided to them by the Agent, notwithstanding any lack of authority of the Agent to provide the same.

## 11.14   No Liability of Agent

The Agent, in its capacity as agent of the Lenders under the Credit Documents, will have no responsibility or liability to the Borrowers or the Lenders on account of the failure of any Lender to perform its obligations hereunder, or to any Lender on account of the failure of any Borrower to perform its obligations under the Credit Documents.

**11.15   Agent and Agent Authority**

With respect to its Proportionate Share of each Facility and the Advances made by it as a Lender thereunder, as applicable, the Agent will have the same rights and powers under the Credit Documents as any other Lender and may exercise the same as though it were not the Agent. The Agent may accept deposits from, lend money to, and generally engage in any kind of business with any Credit Party, any of their Subsidiaries, their respective shareholders or unitholders or any Person owned or controlled by any of them and any Person which may do business with any of them, all as if the Agent was not serving as Agent, and without any duty or obligation to account therefor to the Lenders.

**11.16   Lenders' Credit Decisions**

It is understood and agreed by each Lender that it has itself been, and will continue to be, solely responsible for making its own independent appraisal of and investigations into the financial condition, creditworthiness, condition, affairs, status and nature of the Credit Parties. Accordingly, each Lender confirms with the Agent that it has not relied, and will not hereafter rely, on the Agent (a) to check or inquire on its behalf into the adequacy, accuracy or completeness of any information provided by the Credit Parties or any other Person under or in connection with the Facilities (whether or not such information has been or is hereafter distributed to such Lender by the Agent) or (b) to assess or keep under review on its behalf the financial condition, creditworthiness, condition, affairs, status or nature of any Credit Party. Each Lender acknowledges that copies of the Credit Documents have been made available to it for review and each Lender acknowledges that it is satisfied with the form and substance of the Credit Documents. A Lender will not make any independent arrangement with any Credit Party for the satisfaction of any Obligations owing to it under the Credit Documents without the written consent of the other Lenders.

**11.17   Indemnification**

The Lenders hereby severally agree to indemnify the Agent and its directors, officers, agents and employees (to the extent not reimbursed by the Credit Parties) in accordance with their respective Proportionate Share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent or its directors, officers, agents and employees in any way relating to or arising out of the Credit Documents or any action taken or omitted by the Agent under or in respect of the Credit Documents in its capacity as Agent; provided, that no Lender will be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross negligence or wilful misconduct, as determined by a final and non-appealable judgment of a court of component jurisdiction. Without limiting the generality of the foregoing, each Lender agrees to reimburse the Agent promptly upon demand for its Proportionate Share of any reasonable out of pocket expenses (including legal fees, on a solicitor and his own client full indemnity basis) incurred by the Agent in connection with the preservation of any right of the Agent or the Lenders under, or the enforcement of, or legal advice in respect of rights or responsibilities under, the Credit Documents, to the extent that the Agent is not reimbursed for such expenses by the Borrowers.

This indemnity will survive the termination of the other provisions of this Agreement as a separate and continuing covenant of the Lenders.

**11.18   Successor Agent**

The Agent may, as hereinafter provided, resign at any time by giving 30 days' notice (the "**Resignation Notice**") thereof to the Lenders and the Borrowers. The remaining Lenders, with the consent of the Borrowers, such consent not to be unreasonably withheld, will forthwith upon receipt of the Resignation Notice unanimously appoint a successor agent (the "**Successor Agent**") to assume the duties hereunder of the resigning Agent. Upon the acceptance of any appointment as agent hereunder by a Successor Agent, such Successor Agent will thereupon succeed to and become vested with all the rights, powers, privileges and duties as agent under the Credit Documents of the resigning Agent. Upon such acceptance, the resigning Agent will be discharged from its further duties and obligations as agent under the Credit Documents, but any such resignation will not affect such resigning Agent's obligations hereunder as a Lender, including for its Proportionate Share of the applicable Commitment. After the resignation of the Agent as agent hereunder, the provisions of this Article 11 will continue to enure to its benefit as to any actions taken or omitted to be taken by it while it was the agent of the Lenders hereunder. Notwithstanding the foregoing, if the remaining Lenders fail to appoint a Successor Agent within 30 days of receipt of the Resignation Notice, the resigning Agent may, with the approval of the Borrowers except during the continuance of an Event of Default, such approval not to be unreasonably withheld, appoint a Successor Agent from among the Lenders (other than Business Development Bank of Canada).

**11.19   Sharing of Information**

The Agent and the Lenders may share among themselves any information they may have from time to time concerning the Credit Parties whether or not such information is confidential; but shall have no obligation to do so (except for any obligations of the Agent to provide information to the extent required in this Agreement). The Agent shall not have any duty to disclose any information obtained or received by it or any of its Affiliates relating to any Credit Party or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as the Agent.

**11.20   Acknowledgement by Borrowers**

Each Borrower hereby acknowledges notice of the terms of the provisions of this Article 11 and agrees to be bound hereby to the extent of its obligations hereunder, and further agrees not to make any payments, take any action or omit to take any action which would result in the non-compliance by the Agent or any Lender with its obligations hereunder.

**11.21   Amendments to Article 11**

The Agent and the Lenders may amend any provision in this Article 11 (other than Section 11.5) without prior notice to or the consent of the Borrowers, and the Agent shall provide a copy of any such amendment to the Borrowers reasonably promptly thereafter; <u>provided</u>, <u>however</u>, if, in the Agent's opinion, any such amendment would materially and adversely affect

any rights, entitlements, obligations or liabilities of any Borrower, such amendment shall not be effective until such Borrower provides its written consent thereto, such consent not to be unreasonably withheld or arbitrarily delayed.

**11.22   Deliveries, etc.**

As between the Credit Parties on the one hand, and the Agent and the Lenders on the other hand:

(a)   all statements, certificates, consents and other documents which the Agent purports to deliver to a Credit Party on behalf of the Lenders shall be binding on each of the Lenders, and none of the Credit Parties shall be required to ascertain or confirm the authority of the Agent in delivering such documents;

(b)   all certificates, statements, notices and other documents which are delivered by a Credit Party to the Agent in accordance with this Agreement shall be deemed to have been duly delivered to each of the Lenders; and

(c)   all payments which are delivered by a Credit Party to the Agent in accordance with this Agreement shall be deemed to have been duly delivered to each of the Lenders.

**11.23   Agency Fee**

The Borrowers jointly and severally agree to pay to the Agent an annual agency fee as set out in the Fee Agreement, payable in advance on the Amendment and Restatement Date and annually on each anniversary date thereafter during the term of this Agreement.

<div align="center">

**ARTICLE 12
INCREASED COSTS**

</div>

**12.1   Changes in Law**

12.1.1   If, after the Amendment and Restatement Date, due to either:

(a)   the introduction of, or any change in, any Law or any change in the interpretation of any Law, whether having the force of law or not, resulting in the imposition or increase of reserves, deposits or similar requirements by any central bank or Governmental Authority charged with the administration thereof; or

(b)   imposition of any Lender or requirements on any Lender to maintain any capital adequacy or additional capital liquidity requirements in respect of any Advances or Commitments hereunder, or any other condition with respect to this Agreement; or

(c)   the compliance with any guideline or request from any central bank or other Governmental Authority which a Lender, acting reasonably, determines that it is required to comply with,

there will be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining an Advance or there will be any reduction in the effective return to such Lender thereunder, then, subject to Section 12.1.2, the Borrowers jointly and severally agree that they will, within ten Business Days after being notified by such Lender of such event, pay to such Lender, quarterly in arrears, that amount (the "**Additional Compensation**") which such Lender, acting reasonably, determines will compensate it, after taking into account all applicable Taxes and all interest and other amounts received, for any such increased costs or reduced returns incurred or suffered by such Lender provided such Lender is also charging its other borrowers in similar circumstances similar additional compensation.

12.1.2   If Additional Compensation is payable pursuant to Section 12.1.1(a), the Borrowers will have the option to convert the Advance to another type of Advance, in accordance with this Agreement, in respect of which no further such Additional Compensation will be payable, or prepay any amount of the Facility owed to the Lender entitled to receive the Additional Compensation, subject always to Section 5.13 without obligation to make a corresponding prepayment to any other Lender. If the Additional Compensation relates to outstanding Bankers' Acceptances, such Lender may require the Borrowers to deposit in an interest bearing cash collateral account with such Lender such amount as may be necessary to fully satisfy the contingent obligations of such Lender for all outstanding Bankers' Acceptances in accordance with the arrangements similar to those set out in Section 5.11.

12.1.3   Notwithstanding anything contained in this Section 12.1, the *Dodd-Frank Wall Street Reform and Consumer Protection Act* and all requests, rules, regulations, guidelines and directives thereunder or issued in connection therewith and all requests, rules, regulations, guidelines and directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority or any United States, Canadian or foreign regulatory authority) (collectively, the "**New Rules**") shall, in each case, be deemed a "change in Law" under Section 12.1.1(a) regardless of the date enacted, adopted or issued.

## 12.2   Changes in Circumstances

Notwithstanding anything to the contrary herein or in any of the other Credit Documents contained, if on any date a Lender determines, acting reasonably and in good faith, which determination will be conclusive and binding on the Parties, and provided notice is given to the Agent and the other Lenders and to the Borrowers that its ability to maintain, or continue to offer any Advance has become unlawful or impossible due to:

(a)   any change in Applicable Law, or in the interpretation or administration thereof by Governmental Authorities having jurisdiction in the matter; or

(b)   any Material Adverse Change in or the termination of the London Interbank Eurodollar Market for Eurodollars; or

(c)      the imposition of any condition, restriction or limitation upon such Lender which is outside of its control,

then in any such case, the Borrowers jointly and severally agree that they will forthwith repay to such Lender all principal amounts affected thereby, together with all unpaid interest accrued thereon to the date of Repayment and all other expenses incurred in connection with the termination of any such Advance, including any expenses resulting from the early termination of any LIBOR Period relating thereto in accordance with Section 5.13, without any obligation to make a corresponding prepayment to any other Lender. The Borrowers may utilize other forms of Advance not so affected in order to make any required Repayment and after any such Repayment, the Borrowers may elect to re-borrow the amount repaid by way of some other Advance upon complying with applicable requirements thereof.

**12.3     Application of Sections 12.1 and 12.2**

If a Lender exercises its discretion under either Section 12.1 or 12.2, then concurrently with a notice from such Lender to the Agent and the applicable Borrower requiring compliance with the applicable Section, such Lender will provide such Borrower (with a copy to the Agent who will notify the other Lenders) with a certificate in reasonable detail outlining the particulars giving rise to such notice and certifying (with reasonable supporting detail) the increased costs, if any, payable by such Borrower thereunder, which will be prima facie evidence thereof and binding on the Parties.

**12.4     Taxes**

12.4.1     Except as provided in this Section 12.4, any and all payments by the Borrowers and any other Credit Party to or for the account of the Agent or any Lender under any Credit Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges imposed by any Governmental Authority, and all liabilities (including additions to tax, penalties and interest) related thereto (collectively, "**Impositions**"), excluding, in the case of the Agent and each Lender or other recipient or beneficial owner of payment to be made by or on account of a Credit Party under any Credit Document, (x) any Impositions imposed on or measured by its net income (including any taxes similar to branch profits tax or capital, and franchise (and similar) taxes imposed on it in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the Laws of which the Agent or such Lender, as the case may be, is organized, resident, in which its principal office is located, in which it maintains its Lending Office or in which it is subject to such Imposition by reason of a present or former connection between it and such jurisdiction (other than a connection arising solely from the Agent or such Lender (or its applicable Lending Office) as the case may be, becoming a party hereto, having executed, delivered or performed its obligations under any Credit Document, received a payment under, enforced its rights under, received or perfected a security interest under, or engaged in any other transaction pursuant to, a Credit Document), and all interest and penalties with respect thereto; (y) U.S. and Canadian federal withholding taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a

law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 12.4.6) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to this Section, amounts with respect to such withholding taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office; and (z)(i) U.S. federal withholding taxes imposed under FATCA, (ii) taxes attributable to such recipient's or beneficial owner's failure to comply with the applicable reporting requirements of FATCA, and (iii) taxes attributable to such recipient's or beneficial owner's failure to provide such documentation as is reasonably requested by the Borrower for the Borrower to comply with its obligations under FATCA and to determine that such recipient or beneficial owner has complied with such recipient's or beneficial owner's obligations under FATCA or to determine the amount to deduct and withhold from any payment to such recipient or beneficial owner (all such non-excluded Impositions being hereinafter referred to as "**Taxes**" and all such excluded Impositions being hereinafter referred to as "**Excluded Taxes**"). If any Credit Party or any other applicable withholding agent shall be required by the Applicable Laws of a relevant taxing jurisdiction to deduct any Taxes or Other Taxes from or in respect of any sum payable under any Credit Document to the Agent or any Lender, (i) the sum payable shall be increased by the applicable Credit Party as necessary so that after all required deductions (including deductions applicable to additional sums payable under this Section 12.4) have been made, each of the Agent and such Lender receives an amount equal to the sum it would have received had only deductions attributable to Excluded Taxes been made, (ii) the applicable withholding agent shall make such deductions, (iii) the applicable withholding agent shall pay the full amount deducted to the relevant taxation authority or other Governmental Authority in accordance with Applicable Laws, and (iv) within thirty (30) days after the date of such payment, the Credit Party making such payments shall furnish to the Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Agent.

12.4.2   In addition but without duplication, the Borrowers agree to pay any and all present or future stamp, court or documentary taxes and any other excise, property, intangible or mortgage recording taxes, charges or similar levies imposed by a relevant taxing jurisdiction which arise from any payment made under any Credit Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Credit Document (hereinafter referred to as "**Other Taxes**").

12.4.3   Each Borrower agrees to indemnify the Agent and each Lender for (i) the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed or asserted by any Governmental Authority of any relevant taxing jurisdiction on amounts payable under this Section 12.4) paid by the Agent and such Lender, and (ii) any reasonable expenses arising therefrom or with respect thereto, in each case whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided the Agent or Lender, as the case may be, provides the Borrowers with a written statement thereof setting forth in reasonable detail the basis and

- 157 -

calculation of such amounts. Payment under this Section 12.4.3 shall be made within thirty (30) days after the date such Lender or the Agent makes a written demand therefor.

12.4.4   Notwithstanding anything herein to the contrary, each Borrower shall not be required pursuant to this Section 12.4 to pay any additional amount to, or to indemnify, any Lender or the Agent, as the case may be, (i) to the extent that such Lender or the Agent becomes subject to Taxes subsequent to the Amendment and Restatement Date (or, if later, the date such Lender or the Agent becomes a party to this Agreement) as a result of a change in the place of organization or residence of such Lender or the Agent, a change in the Lending Office of such Lender, or a change in the principal office of such Lender or the Agent, except to the extent that any such change is requested or required by the Borrowers or to the extent that such Lender or the Agent was entitled, at the time of the change in place of organization, residence or the change in Lending Office, to receive additional amounts from the Borrowers pursuant to Sections 12.4.1 and 12.4.3 (and provided, that nothing in this Section 12.4 shall be construed as relieving the Borrowers from any obligation to make such payments or indemnification in the event of a change in Applicable Law) or (ii) where for Canadian income tax purposes, such Lender or the Agent, as the case may be, becomes subject to Taxes as a consequence of such Lender or the Agent either not dealing at arm's length with the Borrowers (for purposes of the *Income Tax Act* (Canada)) or being, or not dealing at arm's length with (for purposes of the I*ncome Tax Act* (Canada) a "specified shareholder" (for purposes of the *Income Tax Act* (Canada)) of the Borrower; <u>provided</u>, that this subclause (ii) shall not apply to the extent that such Lender or the Agent, as the case may be, is considered to have not dealt at arm's length with the Borrowers for Canadian income tax purposes as a result of a change in Applicable Law after the Amendment and Restatement Date.

12.4.5   If any Lender or the Agent determines in its sole discretion (exercised in good faith) that it has received a refund in respect of any Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by the Borrowers pursuant to this Section 12.4, it shall promptly remit such refund (including any interest included in such refund paid by the relevant Governmental Authority) to the Borrowers, net of all out-of-pocket expenses (including any taxes imposed with respect to such refund) of the Lender or the Agent, as the case may be; <u>provided</u>, <u>however</u>, that the Borrowers, upon the request of the Lender or the Agent, as the case may be, agree promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such party in the event such party is required to repay such refund to the relevant taxing authority. Such Lender or the Agent, as the case may be, shall, at the Borrowers' request, provide the Borrowers with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (<u>provided</u>, that such Lender or the Agent may delete any information therein that such Lender or the Agent deems confidential). Notwithstanding anything to the contrary in this Section 12.4.5, in no event will a Lender be required to pay any amount to the Borrowers pursuant to this Section 12.4.5 the payment of which would place such Lender in a less favorable net after-tax position than such Lender would have been in if the Taxes or Other Taxes subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Taxes or Other

Taxes had never been paid. Nothing herein contained shall interfere with the right of a Lender or the Agent to arrange its tax affairs in whatever manner it thinks fit nor oblige any Lender or the Agent to disclose any information relating to its tax affairs or any computations in respect thereof or require any Lender or the Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

12.4.6    Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 12.4.1 and 12.4.3 with respect to such Lender it will, if requested by the Borrowers, use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to avoid or reduce to the greatest extent possible any indemnification or additional amounts being due under this Section 12.4, including to designate another Lending Office for any Loan (including, for certainty, any Letter of Credit) affected by such event; provided, that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage, and provided, further, that nothing in this Section 12.4.6 shall affect or postpone any of the Obligations of the Borrowers or the rights of such Lender pursuant to Sections 12.4.1 and 12.4.3. The Borrowers hereby jointly and severally agree to pay all reasonable costs and expenses incurred by any Lender as a result of a request by the Borrowers under this Section 12.4.6.

## ARTICLE 13
## GENERAL

### 13.1    Non-Disclosure

13.1.1    All information received by the Agent and the Lenders from or in respect of the Credit Parties the confidential nature of which is made known or ought to have been known to the Party receiving such information, including any information relating to a Hostile Acquisition, other than information that is required to be disclosed by Applicable Law (including, for certainty, information required to be disclosed in connection with any legal proceedings, including proceedings relating to the Credit Documents) or to any Governmental Authority of competent jurisdiction, including any central bank or other banking regulatory authority and any official bank examiners or regulators, will be held by the Parties in the strictest confidence and will not be disclosed to any Person, except as provided in this Section 13.1.

13.1.2    Section 13.1.1 does not apply to information:

(a)    of a Party where that Party consents in writing to its disclosure;

(b)    which becomes part of the public domain through no fault of the Agent or the Lenders;

(c)    received from a third party without restriction on further disclosure and which third party was not to the knowledge of the Agent or such Lender, under a duty of

- 159 -

confidentiality to the applicable Credit Party at the time the information was so received;

(d)     developed independently without breach of Section 13.1;

(e)     which the Agent or the relevant Lender can show was, prior to receipt thereof from a Credit Party, lawfully in the Agent's or Lender's possession and not then subject to any obligation on its part to the Credit Parties to maintain confidentiality; or

(f)     to the extent required to be disclosed by order or direction of a court or Governmental Authority of competent jurisdiction (including any self-regulatory authority, such as the National Association of Insurance Commissioners) or as otherwise required to be disclosed by Applicable Law or by any subpoena or similar legal process.

13.1.3   Information received by the Agent or a Lender may be disclosed to their respective Affiliates, Hedge Providers, the Agent or any other Lender or Participant, including any financial institution which desires to become a Lender or Participant hereunder, any actual or prospective counterparty (or its advisors) to any securitization, swap or derivative transaction relating to a Borrower or any other Credit Party, and the Obligations and to their respective employees, auditors, accountants, legal counsel, geologists, engineers and other consultants and financial advisors retained by such Persons on a need to know basis and subject to the obligation to maintain confidentiality; provided, that the Agent or Lender providing the information shall be responsible for any breach by its Affiliate of the aforementioned duty of confidentiality.

## 13.2   Waiver

The failure or delay by the Agent or any Lender in exercising any right or privilege with respect to the non-compliance with any provisions of this Agreement by the Borrower and any course of action on the part of the Agent or any Lender, shall not operate as a waiver of any rights of the Agent or such Lender unless made in writing by the Agent or such Lender. Any such waiver in writing and shall be effective only in the specific instance and for the purpose for which it is given and shall not constitute a waiver of any other rights and remedies of the Agent or such Lender with respect to any other or future non-compliance.

## 13.3   Governing Law

This Agreement shall be interpreted in accordance with the Laws of the Province of Alberta and the federal Laws of Canada applicable therein. Without prejudice to the right of the Agent and the Lenders to commence any proceedings with respect to this Agreement in any other proper jurisdiction, the Parties hereby attorn and submit to the non-exclusive jurisdiction of the courts of the Province of Alberta.

### 13.4    Judgment Currency

To the extent permitted by Applicable Law, if for the purposes of obtaining judgment against any Credit Party in any court in any jurisdiction with respect to this Agreement it becomes necessary for a Lender to convert into the currency of such jurisdiction (in this Section called the "**Judgment Currency**") any amount due to the Lender by such Credit Party under the Credit Documents in any currency other than the Judgment Currency, the conversion shall be made at the Exchange Rate prevailing on the Business Day before the day on which judgment is given. To the extent permitted by Applicable Law, in the event that there is a change in the Exchange Rate prevailing between the Business Day before the day on which the judgment is given and the date of payment of the amount due, the applicable Credit Party will, on the date of payment, pay such additional amounts (if any) or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount paid on such date is the amount in the Judgment Currency which when converted at the Exchange Rate prevailing on the date of payment is the amount then due under this Agreement in such other currency. To the extent permitted by Applicable Law, any additional amount due by a Credit Party under this Section will be due as a separate debt and shall not be affected by judgment being obtained for any other sums due under or in respect of this Agreement.

### 13.5    Expenses of Agent and Lenders

Whether or not the transactions contemplated by this Agreement are completed or any Advance has been made, each Borrower hereby agrees, jointly and severally, to promptly pay, following receipt of invoice therefor from the Agent (and in any event within 30 days after receipt thereof), from time to time all reasonable and documented expenses incurred by the Agent or any Lender in connection with this Agreement, the Security and all documents contemplated hereby, specifically including: expenses incurred by the Lenders in respect of due diligence, appraisals, insurance consultations, credit reporting and responding to demands of any Governmental Authority (provided, that reimbursement obligations in respect of costs and expenses arising under inspection rights set forth in Section 7.1.7 shall be limited in the manner set forth in such Section); reasonable out-of-pocket legal expenses in connection with the preparation and interpretation of this Agreement and the other Credit Documents, the registration and perfection of the Security and the administration of the Facilities generally, including the preparation of waivers and partial discharges of Security (if there are any additional fees or expenses to be incurred in connection with any of the foregoing over and above those that have already been disclosed to the Borrowers then the Agent agrees to notify the Borrowers of those additional fees or expenses and obtain their concurrence to their payment); and all legal fees and expenses (on a solicitor and his own client basis) in connection with the protection and enforcement of the Security and the exercise of any rights and remedies of the Agent and the Lenders under the Credit Documents. Each Borrower hereby authorizes the Agent to debit its account in order to pay any such expenses if such amount is not paid in full within 30 days after receipt of a written request from the Agent for payment of such amount.

**13.6    Assignment**

13.6.1    This Agreement and the rights and obligations hereunder will not be assignable, in whole or in part, by any Borrower without the prior written consent of all of the Lenders.

13.6.2    Each Lender will have the right to sell or assign its Commitment in minimum amounts of U.S. $5,000,000 (with such Lender, where such sale or assignment is not of all of such Lender's Commitment under the applicable Facility, retaining a Commitment under the applicable Facility of at least U.S. $5,000,000), together with a proportionate share of Outstanding Advances owing to it, to one or more financial institutions with the consent of the Canadian Borrower, the Agent, the Issuing Bank and the Swingline Lender each such consent not to be unreasonably withheld (provided, that the Canadian Borrower may withhold such consent if a Borrower would be required to pay withholding taxes solely as a result of such assignment). An assignment fee of U.S. $3,500 for each such assignment will be payable to the Agent by the assigning Lender. In the event of such sale or assignment, the Borrowers, the Agent and the other Lenders will execute and deliver all such agreements, documents and instruments as the Agent or Lender may reasonably request to effect and recognize such sale or assignment, including an Assignment. Notwithstanding the foregoing, no consent of the Canadian Borrower will be required if an assignment (a) occurs during an Event of Default which is continuing, (b) is made between financial institutions who, at the relevant time, are already Lenders or Affiliates thereof, or (c) is made by a Lender to an Approved Fund. In the event that the Canadian Borrower fails to provide a response to the request for any such consent within five Business Days of the receipt of such request by the Canadian Borrower, the Canadian Borrower shall be deemed to have consented to such request. No consent to an assignment by a Lender shall be required from the U.S. Borrower. Notwithstanding the foregoing, no Lender may assign all or any part of its Commitment or Outstanding Advances to Palladium, an Investor or an Affiliate thereof without the prior written consent of all of the Lenders.

13.6.3    To the extent that any Lender sells or assigns any portion of its Commitment and Outstanding Advances pursuant to this Section 13.6 and such new Lender or new Lenders, as the case may be, has executed and delivered to the Borrower and the Agent an Assignment, such Lender will be relieved and forever discharged of any and all of its covenants and obligations under the Credit Documents in respect of that portion of its Commitment and Outstanding Advances so sold or assigned from and after the date of such Assignment and the Borrower's recourse under the Credit Documents in respect of such portion so sold or assigned from and after the date of the Assignment for matters arising thereunder from and after the date of the Assignment will be to such new Lender or new Lenders only, as the case may be, and their successors and permitted assigns.

13.6.4    Any Lender may at any time sell to one or more financial institutions or other Persons (each of such financial institutions and other Persons being herein called a "**Participant**") participating interests in any of the Advances, commitments, or other interests of such Lender hereunder, without notice to, or consent from, the Agent or the Borrowers; provided, however, that:

(a)     no participation contemplated in this Section 13.6.4 will relieve such Lender from its commitments or its other obligations hereunder or under any other Credit Document;

(b)     such Lender will remain solely responsible for the performance of its commitments and such other obligations as if such participation had not taken place;

(c)     the Agent will continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and each of the other Credit Documents;

(d)     no Participant will have any rights (through a right of consent or approval or otherwise) to require such Lender to take or refrain from taking any action hereunder or under any other Credit Document;

(e)     no Borrower will be required to pay any amount hereunder that is greater than the amount which it would have been required to pay had no participating interest been sold; and

(f)     in the case of any outstanding Bankers' Acceptances, the Participants execute an indemnity agreement in respect of such Bankers' Acceptances.

Each U.S. Operating Lender that sells a participation shall, acting solely for this purpose as an agent of the U.S. Borrower, maintain a register on which it enters the name and address of each Participant in the U.S. Operating Facility and the principal amounts (and stated interest) of each Participant's interest in the Commitments, Outstanding Advances or other obligations under the Credit Documents (the "**Participant Register**"); provided that no U.S. Operating Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under the Credit Documents) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such U.S. Operating Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

13.6.5     The Agent, acting solely for this purpose as an agent of the U.S. Borrower, shall maintain at its office located at 452 Fifth Avenue, 5th Floor, New York, NY 10018, a copy of each Assignment delivered to it and a register for the recordation of the names and addresses of the U.S. Operating Lenders, and the Commitments of, and principal amounts (and stated interest) of the Outstanding Advances owing to, each U.S. Operating Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the

- 163 -

Register shall be conclusive absent manifest error, and the Borrower, the Agent and the U.S. Operating Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a U.S. Operating Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrowers and any U.S. Operating Lender, at any reasonable time and from time to time upon reasonable prior notice.

## 13.7   General Indemnity

In addition to any liability of the Borrowers to the Lenders under any other provision hereof, each Borrower will and does hereby, jointly and severally, indemnify each Indemnitee and hold each Indemnitee harmless against any losses, claims, costs, damages or liabilities (including reasonable and documented out of pocket expenses and reasonable and documented legal fees on a solicitor and his own client full indemnity basis of one counsel (but, for the avoidance of doubt, excluding the allocated costs of in-house counsel) plus one local counsel in each applicable jurisdiction) incurred by the same as a result of or in connection with: (a) any cost or expense incurred by reason of the liquidation or re-deployment in whole or in part of deposits or other funds required by any Lender to fund any Bankers' Acceptance or to fund or maintain any Advance as a result of any Borrower's failure to complete an Advance or to make any payment, repayment or prepayment on the date required hereunder or specified by it in any notice given hereunder; (b) subject to permitted or deemed Rollovers and Conversions, any Borrower's failure to provide for the payment to the Agent for the account of the Lenders of the full principal amount of each Bankers' Acceptance on its Maturity Date; (c) any Borrower's failure to pay any other amount, including any interest or fees, due hereunder on its due date after the expiration of any applicable grace or notice periods; (d) the prepayment of any outstanding Bankers' Acceptance before the Maturity Date of such Bankers' Acceptance; (e) any Borrower's repayment or prepayment of a LIBOR Loan otherwise than on the last day of its LIBOR Period; (f) the failure of any Borrower or any other Credit Party to make any other payment due hereunder or under any of the other Credit Documents; (g) the occurrence of any other Default or Event of Default and the enforcement of rights and remedies in connection therewith; (h) any instructions given to any Lender to stop payment on any cheque issued by any Borrower or to reverse any wire transfer or other transaction initiated by such Lender at the request of any Borrower; (i) any use of the proceeds of the Facilities, including to pay the purchase price of the transaction or any other acquisition; and (j) any claim, litigation or other proceeding related to the foregoing, regardless of whether such matter is initiated by a third party or by Holdco, a Borrower or any of their Subsidiaries or Affiliates; provided that this Section 13.7 will not apply to any losses, claims, costs, damages or liabilities that arise by reason of (i) the gross negligence or wilful misconduct of the applicable Indemnitee claiming indemnity hereunder, as determined by a final and non-appealable judgment of a court of component jurisdiction; or (ii) a material breach of the applicable Indemnitee of its obligations under the Credit Documents as determined by a final and non-appealable judgment of a court of competent jurisdiction.

## 13.8   Environmental Indemnity

In addition to any other liability of the Borrowers hereunder, each Borrower hereby agrees to, jointly and severally, indemnify and save harmless the Indemnitees from and against:

(a)     any losses suffered by them for, in connection with, or as a direct or indirect result of, the failure of any Borrower or any of their respective Subsidiaries to comply with all Requirements of Environmental Law;

(b)     any losses suffered by the Indemnitees for, in connection with, or as a direct or indirect result of, the presence of any Hazardous Material situated in, on or under any property owned by any Borrower or any of their respective Subsidiaries or upon which any of them carries on business, specifically including any diminution in value of the business, property and assets of such Person; and

(c)     any and all liabilities, losses, damages, penalties, expenses (including reasonable legal fees) and claims which may be paid, incurred or asserted against the Indemnitees for, in connection with, or as a direct or indirect result of, any legal or administrative proceedings with respect to the presence of any Hazardous Material on or under any property owned by any Borrower or any of its respective Subsidiaries or upon which any of them carries on business, or the discharge, emission, spill, radiation or disposal by any Borrower or any of their respective Subsidiaries of any Hazardous Material into or upon any Land, the atmosphere, or any watercourse or body of water; including the costs of defending, counterclaiming or claiming against third parties in respect of any action or matter and any cost, liability or damage arising out of a settlement entered into by the Indemnitees of any such action or matter,

except to the extent arising from the gross negligence or wilful misconduct of the applicable Indemnitee, as determined by a final and non-appealable judgment of a court of component jurisdiction. For the purpose of this Section 13.8, liabilities means those amounts that are quantifiable and found to be the responsibility of the Indemnitees either alone or jointly or severally with others.

## 13.9     Survival of Certain Obligations despite Termination of Agreement

The termination of this Agreement shall not relieve the Borrowers from their obligations to the Agent and the Lenders arising prior to such termination, such as obligations arising as a result of or in connection with any breach of this Agreement, any failure to comply with this Agreement or the inaccuracy of any representations and warranties made or deemed to have been made prior to such termination, and obligations arising pursuant to all indemnity obligations contained herein. Without limiting the generality of the foregoing, the obligations of the Borrowers to the Agent and the Lenders arising under or in connection with Sections 8.5(b), 13.7 and 13.8 shall continue in full force and effect despite any termination of this Agreement.

## 13.10    Interest on Unpaid Costs and Expenses

If a Borrower fails to pay when due any amount in respect of costs or expenses or any other amount required to be paid by it hereunder (other than principal or interest on any Advance), the Borrowers shall, jointly and severally, pay interest on such unpaid amount from the time such amount is due until paid at the rate equal to the highest rate of interest then applicable under the Facilities.

25877170.9 27367782.4

### 13.11   Notice

Without prejudice to any other method of giving notice, all communications provided for or permitted hereunder shall be in writing and delivered to the addressee by prepaid private courier or sent by facsimile to the applicable address and to the attention of the officer of the addressee as follows:

(a)     to the Borrowers:

Q'Max Solutions Inc.
11700 Katy Freeway, Suite 200
Houston Texas 77079
United States

<u>Attention</u>:     Chief Financial Officer
Fax No.        (832) 201-8146

(b)     to the Agent:

HSBC Bank Canada, as Agent
7th Floor, 70 York Street
Toronto, Ontario
M5J 1S9

<u>Attention</u>:     Manager Agency
Fax No.        (647) 788-2185

with a copy to (for all notices other than Drawdown Requests, Conversion Notices and Rollover Notices):

HSBC Bank Canada
5th Floor, 70 York Street
Toronto, Ontario
M5J 1S9

<u>Attention</u>:     Director
Fax No.        (647) 788-2185

(c)     to any Lender, at its addressed noted on Exhibit "A" attached hereto.

Any communication transmitted by prepaid private courier shall be deemed to have been validly and effectively given or delivered on the Business Day after which it is submitted for delivery. Any communication transmitted by facsimile shall be deemed to have been validly and effectively given or delivered on the day on which it is transmitted, if transmitted on a Business Day on or before 5:00 p.m. (local time of the intended recipient), and otherwise on the next following Business Day. Any party may change its address for service or other notices, including electronic communications, by notice given in the foregoing manner. The Parties each covenant

to accept service of judicial proceedings arising under the Credit Documents at its respective address set forth herein.

## 13.12   Telephone Instructions

Any verbal instructions given by a Borrower in relation to this Agreement will be at the risk of the Borrowers and neither the Agent nor the Lenders will have any liability for any error or omission in such verbal instructions or in the interpretation or execution thereof by the Agent or a Lender, as the case may be; provided, that the Agent or Lender, as the case may be, acted without gross negligence in the circumstances. The Agent will notify the applicable Borrower of any conflict or inconsistency between any written confirmation of such verbal instructions received from such Borrower and the said verbal advice as soon as practicable after the conflict or inconsistency becomes apparent to the Agent.

## 13.13   Severability

Any provision of this Agreement which is illegal, prohibited or unenforceable in any jurisdiction, in whole or in part, shall not invalidate the remaining provisions hereof; and any such illegality, prohibition or unenforceability in any such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

## 13.14   Further Assurances

Each Borrower shall, at its expense, promptly execute and deliver or cause to be executed and delivered to the Agent upon request, acting reasonably, from time to time all such other and further documents, agreements, opinions, certificates and instruments in compliance with this Agreement, or if necessary or desirable to more fully record or evidence the obligations intended to be entered into herein, or to make any recording, file any notice or obtain any consent.

## 13.15   Tombstone Marketing

For the purpose of "tombstone marketing", each Borrower hereby authorizes and consents to the reproduction, disclosure and use by the Lenders and the Agent of its name, identifying logo and the Facilities to enable the Lenders to publish promotional "tombstones". Each Borrower acknowledges and agrees: that the Lenders shall be entitled to determine, in their discretion, whether to use such information; that no compensation will be payable by the Lenders or the Agent in connection therewith; and that the Lenders and the Agent shall have no liability whatsoever to any Borrower or any of its respective employees, officers, directors, Affiliates or shareholders in obtaining and using such information as contemplated herein.

## 13.16   Entire Agreement

This Agreement supersedes all discussion papers, term sheets and other writings issued by the Agent or the Lenders prior to the date hereof relating to the Facilities; and this Agreement and any other documents or instruments contemplated herein or therein shall constitute the entire agreement and understanding among the Borrowers, the Lenders and the Agent relating to the subject-matter hereof.

### 13.17   Anti-Money Laundering Legislation

(a)   Each Borrower acknowledges that, pursuant to the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" Laws, whether within Canada or elsewhere (collectively, including any guidelines or orders thereunder, "**AML Legislation**"), the Lenders and the Agent may be required to obtain, verify and record information regarding the Borrowers, Palladium, the other Credit Parties, their respective directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Credit Parties or Palladium, and the transactions contemplated hereby. The Borrowers shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Lender or the Agent, or any prospective assignee of a Lender or the Agent, in order to comply with any applicable AML Legislation, whether now or hereafter in existence.

(b)   If, upon the written request of any Lender, the Agent has ascertained the identity of a Borrower, Palladium or any Credit Party or any authorized signatories of any Borrower or any other Credit Party for the purposes of applicable AML Legislation on such Lender's behalf, then the Agent:

   (i)   shall be deemed to have done so as an agent for such Lender, and this Agreement shall constitute a "written agreement" in such regard between such Lender and the Agent within the meaning of applicable AML Legislation; and

   (ii)   shall provide to such Lender copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness.

(c)   Notwithstanding the preceding sentence, each of the Lenders agrees that the Agent has no obligation to ascertain the identity of the Borrowers, Palladium or any other Credit Party or any authorized signatories of the Borrowers, Palladium or any other Credit Party, on behalf of any Lender, or to confirm the completeness or accuracy of any information it obtains from the Borrowers, Palladium or any other Credit Party or any such authorized signatory in doing so.

(d)   Each Lender that is subject to the PATRIOT Act and the Agent (for itself and not on behalf of any Lender) hereby notifies the Credit Parties that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name, address and tax identification number of the Credit Parties and other information regarding the Credit Parties that will allow such Lender or the Agent, as applicable, to identify the Credit Parties in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to the Lenders and the Agent.

**13.18   Binding Effect**

This Agreement shall be binding upon and shall enure to the benefit of the Parties and their respective successors and permitted assigns; "successors" includes any corporation resulting from the amalgamation of any party with any other corporation.

**13.19   Execution by Electronic Means and Counterparts**

This Agreement may be executed in several counterparts, each of which, when so executed, shall be deemed to be an original and which counterparts together shall constitute one and the same Agreement. This Agreement may be executed by facsimile, pdf or other electronic means, and any signature contained hereon by facsimile, pdf or other electronic means shall be deemed to be equivalent to an original signature for all purposes.

**13.20   Intercreditor Agreement**

In the event of a conflict between the provisions of this Agreement and the provisions of the Encina Intercreditor Agreement, the provisions of the Encina Intercreditor Agreement shall govern.

**13.21   Release of Liens and Guarantees.**

(a)      The Agent shall not, during the term of this Agreement, discharge, surrender, amend or otherwise modify any Security without the prior written consent of all of the Lenders, provided that the Agent may accept additional or supplemental Security as provided in the Credit Documents, and shall discharge Security provided hereunder in the Permitted Discretion of the Agent with respect to any Permitted Disposition or, if applicable, any other transaction permitted by this Agreement in respect of which the Agent has received, upon its reasonable request, an officer's certificate of the Canadian Borrower certifying that such disposition or other transaction is permitted by this Agreement, together with any other information from the Canadian Borrower reasonably required by the Agent, if any (and the Agent may rely conclusively on a certificate to that effect provided to it by the Canadian Borrower without further inquiry).

(b)      The Lenders hereby authorize the Agent, and the Agent hereby agrees, to:

(i)      discharge the Security at the Borrower's sole cost and expense, forthwith after all of the Obligations under the Credit Documents (other than contingent obligations intended to survive payout of the Facilities) have been unconditionally and irrevocably paid or performed in full and the Facilities, Credit Documents and all Hedging Agreements have been terminated or, with respect to the Hedging Agreements, collateralized to the satisfaction of the Agent and the applicable Hedge Providers, acting reasonably; and

(ii)      at the request of the Borrower and upon receipt of the Agent of an officer's certificate from a senior officer of the Borrower certifying that such

- 169 -

disposition is a Permitted Disposition, to discharge that portion of the Security that applies to the property subject to such Permitted Disposition or execute a no interest letter or similar document in connection therewith.

(c)     As of the Amendment and Restatement Date, the Agent and other Secured Parties hereby release each of (x) QMax Ecuador S.A. and (y) Mud Movers Express LLC as Guarantors, hereby confirm that all such Subsidiaries' Obligations are discharged, in each case, whether now existing or hereafter arising and whether or not matured or contingent, and that the Security granted by such Subsidiaries to the Agent is deemed to be released.

**(SIGNATURE PAGES FOLLOW)**

THIS IS EXHIBIT " _5_ "

referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26 th_

day of _May_ A.D. 20 _20_

**Jonathan Tomm**
**Barrister and Solicitor**

## SECOND AMENDING AGREEMENT

**THIS SECOND AMENDING AGREEMENT** (this "**Agreement**") is made effective as of July 22, 2019 (the "**Second Amendment Date**"),

**BETWEEN:**

### Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC.
as Borrowers

and

### QMAX CANADA OPERATIONS INC.
as Specified Canadian Swingline Borrower

and

### THE PERSONS PARTY HERETO FROM TIME TO TIME
### IN THEIR CAPACITIES AS LENDERS
as Lenders

and

### HSBC BANK CANADA
as Administrative Agent

<u>**PREAMBLE**</u>:

A.    Pursuant to the second amended and restated credit agreement dated as of July 31, 2018, by and between Q'Max Solutions Inc., Q'Max America Inc., QMax Canada Operations Inc. (collectively, the "**Borrowers**"), the Agent and the Lenders from time to time party thereto (as amended by that certain First Amending Agreement, dated as of May 13, 2019 and as further amended from time to time, the "**Credit Agreement**"), the Agent and the Lenders agreed to provide the Facilities to the Borrowers.

B.    The parties hereto wish to otherwise amend the Credit Agreement on the terms and conditions herein provided.

<u>**AGREEMENT**</u>:

In consideration of the premises, the covenants and the agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged between the parties, the parties hereto agree on the Second Amendment Date as follows:

1.    <u>**Definitions**</u>. Capitalized terms used in this Second Amending Agreement will, unless otherwise defined herein, have the meanings attributed to such terms in the Credit Agreement, as amended hereby.

2.      **Amendments**.

With effect upon the satisfaction of the conditions precedent set forth in Section 5 hereof:

(a)     The Credit Agreement is hereby amended with the stricken text deleted (indicated textually in the same manner as the following example: ~~stricken text~~) and with the double-underlined text added (indicated textually in the same manner as the following example: <u>double-underlined text</u>) as set forth in the pages of the Credit Agreement attached as <u>Exhibit A</u> hereto. The parties hereto agree that Schedule 1.1.253 attached to the Credit Agreement as of the Amendment and Restatement Date shall be deemed to refer to Schedule 1.1.254 thereof on and after the Second Amendment Date.

(b)     Exhibit "A" to the Credit Agreement is hereby amended and replaced in its entirety with Annex I hereto.

3.      **Commitment Increase**. With effect upon satisfaction of the conditions precedent set forth in Section 5 hereof Bank of Montreal, as Lender, hereby agrees to increase its Canadian Operating Facility Commitments by U.S. $10,000,000 to an aggregate principal amount of U.S. $39,307,284.00.

4.      **Representations and Warranties**. Each Borrower agrees with and confirms to the Agent and the Lenders that as of the Second Amendment Date, after giving effect to this Agreement, each of the representations and warranties contained in Section 6.1 of the Credit Agreement is true and accurate in all material respects (without duplication of any materiality qualifier contained in any such representations and warranties) except to the extent such representation and warranty expressly relates to an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date. Further, each Borrower hereby represents and warrants to the Agent and the Lenders that:

(a)     the execution and delivery of this Agreement and the performance by it of its obligations under this Agreement (i) are within its corporate powers, (ii) have been duly authorized by all necessary corporate action, (iii) have received all necessary governmental approvals (if any required), and (iv) do not and will not contravene or conflict with any provision of Applicable Law or of its constating documents or by-laws; and

(b)     the Credit Agreement, as amended by this Agreement is a legal, valid and binding obligation of it, enforceable in accordance with its terms except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, winding-up, moratorium or similar Applicable Law relating to the enforcement of creditors' rights generally and by general principles of equity.

5.      **Conditions Precedent**. This Agreement is only effective upon the satisfaction of the following conditions precedent:

(a)     The Administrative Agent shall have received a counterpart of this Agreement signed on behalf of each Credit Party party hereto, the Administrative Agent, and each Lender party to the Credit Agreement as of the Second Amendment Date;

(b)     The Agent shall have received evidence satisfactory to it, acting reasonably, that (i) the Canadian Borrower has received not less than U.S. $30,000,000 in the aggregate by way of one or more cash contributions by Holdco or the shareholders of Holdco during the

Fiscal Quarters ended March 31, 2019 and June 30, 2019 (the "**Holdco Shareholder Loans**") and (ii) no less than $30,000,000 of the Holdco Shareholder Loans shall have been repaid and an amount equal to at least $30,000,000 of the Holdco Shareholder Loans shall have been contributed in equity in the Canadian Borrower (the "**Equity Contribution**"). The Equity Contribution shall be deemed to constitute a Specified Equity Contribution in an amount equal to $30,000,000, as set forth in Section 7.3.2 of the Credit Agreement, as amended hereby (the "**2019 Equity Contribution**");

(c)     Receipt by the Agent of:

   (i)      duly executed acknowledgement and confirmation agreements from each Credit Party formed under the laws of Canada, the U.S. or any province or state thereof in respect of the Security Agreement to which such Credit Party is a party, in form and substance satisfactory to the Agent, acting reasonably;

   (ii)     duly executed officer's certificates from each Credit Party formed under the laws of Canada, the U.S. or any province or state thereof in form and substance satisfactory to the Agent, acting reasonably;

   (iii)    a certificate of status, certificate of compliance or similar certificate for each Borrower and each other Credit Party formed under the laws of Canada, the U.S. or any province or state thereof issued by its governing jurisdiction;

   (iv)     opinion from the counsel to the Credit Parties formed under the laws of Canada, the U.S. or any province or state thereof, in each case in form and substance satisfactory to the Agent, acting reasonably;

   (v)      evidence satisfactory to the Agent that Wells Fargo has consented or will otherwise amend, substantially concurrently with the effectiveness of this Agreement, the financial covenants under the Wells Fargo Credit Agreement in a manner that is substantially similar to the amendments effected hereunder in respect of Section 7.3 of the Credit Agreement, as amended hereby, in such a manner satisfactory to the Agent, acting reasonably;

   (vi)     duly executed *pro forma* Compliance Certificate giving effect to the 2019 Equity Contribution, in form and substance satisfactory to the Agent, acting reasonably;

(d)     Notwithstanding Section 11.9 of the Credit Agreement or any other provision of the Credit Agreement or the Amended Credit Agreement to the contrary, the Canadian Borrower shall have paid to the Agent all fees due and payable in connection with this Agreement and the amendments constituted hereby, including, for certainty, all fees required pursuant to the Fee Letter, dated as of the date hereof, between the Agent and the Canadian Borrower, and all fees payable to Bank of Montreal, for its own account in its capacity as Lender, in connection with such Lender increasing its Commitment pursuant to Section 3 hereof as described in the Side Fee Letter, dated as of the date hereof, between Bank of Montreal, as Lender and the Canadian Borrower.

6.     **Continuing Effect**. Each of the parties hereto acknowledges and agrees that the Credit Agreement, as amended by this Agreement and all other documents entered into in connection therewith, will be and continue in full force and effect and are hereby confirmed and the rights and obligations of all parties thereunder will not be effected or prejudiced in any manner by this

4

Agreement except as specifically provided herein. In addition, each Borrower acknowledges that the Security previously granted to the Agent by it under or in connection with the Credit Agreement continues in full force and effect without in any way impairing or derogating from any of the guarantees, indemnities, mortgages, pledges, charges, assignments, security interests and covenants therein contained or thereby constituted, as continuing security for all indebtedness, liabilities and other obligations owing by such Borrower under the Credit Agreement, as amended by this Agreement.

7.  **Outstanding Advances**. The Lenders hereby acknowledge and agree that, notwithstanding the terms of the Amended Credit Agreement, each Lender's Proportionate Share under any Advance made by way of Bankers' Acceptances or LIBOR Loans under the Operating Facilities which are outstanding immediately before the Second Amendment Date will remain unchanged until the maturity date thereof. Any new Advances made by way of Bankers' Acceptances or LIBOR Loans after the Second Amendment Date or any Rollovers of such outstanding Bankers' Acceptances or LIBOR Loans after the Second Amendment Date shall be issued in accordance with each Lender's Proportionate Share after giving effect to the changes to the Commitment of each Lender scheduled to occur on the Second Amendment Date as provided for in this Second Amending Agreement.

8.  **Further Assurance**. Each Borrower will from time to time forthwith at the Agent's request and at the Borrowers' own cost and expense make, execute and deliver, or cause to be done, made, executed and delivered, all such further documents, financing statements, assignments, acts, matters and things which may be reasonably required by the Agent and as are consistent with the intention of the parties as evidenced herein, with respect to all matters arising under the Credit Agreement and this Agreement.

9.  **Expenses**. Each Borrower will be liable jointly and severally for all expenses of the Agent, including, without limitation, reasonable documented and out-of-pocket legal fees (on a solicitor and his own client full indemnity basis) and other out-of-pocket expenses in connection with the negotiation, preparation, establishment, operation or enforcement of the Facilities and of this Agreement (whether or not consummated) by the Agent and the Lenders.

10. **Governing Law**. This Agreement will be governed by and construed in accordance with the laws in force in the Province of Alberta from time to time.

11. **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or pdf transmission), each of which when executed and delivered will be deemed to be an original, but all of which when taken together constitutes one and the same instrument. Any party hereto may execute this Agreement by signing any counterpart.

*[signature pages follow]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the Second Amendment Date.

Q'MAX SOLUTIONS INC., as Canadian Borrower

By: _____

Name: Christopher Rivers

Title: president

Q'MAX AMERICA INC., as U.S. Borrower

By: _____

Name: Christopher Rivers

Title: President and Chief Executive Officer

QMAX CANADA OPERATIONS INC., as Specified Canadian Swingline Borrower

By: _____

Name: Christopher Rivers

Title: President

**HSBC BANK CANADA**, as Agent

By: _____
Name: CHRISTINE STOCKMAN
Title: AUTHORIZED SIGNATORY

By: _____
Name: PHILIP ALLEN
Title: Authorized Signatory

**HSBC BANK CANADA**, as Lender

By:

Name:
Title:

Sean Cochrane
Assistant Vice President
Corporate Banking

By:

Name:
Title:

BRUCE ROBINSON
Vice President
Energy Financing

[Second Amending Agreement – Q'Max]

**BANK OF MONTREAL**, as Lender

By: _____
Name:
Title:     Connor Irving
           Director

By: _____
Name:
Title:

[Second Amending Agreement – Q'Max]

**EXPORT DEVELOPMENT CANADA**, as Lender

By: _____
    Name:    **Matthew Visser**
    Title:   **Senior Associate**

By: _____
    Name:
    Title:   **Christopher Wilson**
             **Senior Financing Manager**

**BUSINESS DEVELOPMENT BANK OF CANADA**, as Lender

By: _____

Name: **Derek Church**
Title: **Director, Business Restructuring**

By: _____

Name:
Title:

Valerie Lock
Director, Business Restructuring

[Second Amending Agreement – Q'Max]

HSBC BANK USA, NATIONAL ASSOCIATION,
as Lender

By: _____
Name: Stephen M. Ellsworth
Title: Vice President

By: _____
Name:
Title:

[Second Amending Agreement – Q'Max]

<u>Exhibit A</u>

**Conformed Copy of Credit Agreement**

[see attached.]

**Exhibit A to ~~First~~Second Amending Agreement**

*[Conformed Credit Agreement reflecting the ~~First~~Second Amending Agreement, dated as of ~~May 13,~~July 22, 2019]*

# SECOND AMENDED AND RESTATED
# CREDIT AGREEMENT

Among

## Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC.
as Borrowers

and

## QMAX CANADA OPERATIONS INC.
as Specified Canadian Swingline Borrower

and

## THE PERSONS PARTY HERETO FROM TIME TO TIME
## IN THEIR CAPACITIES AS LENDERS
as Lenders

and

## HSBC BANK CANADA
as Administrative Agent

and with

## HSBC BANK CANADA
as Sole Lead Arranger, Bookrunner, Syndication Agent
and Documentation Agent

**Dated as of July 31, 2018**

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 INTERPRETATION**      **2**

1.1    Definitions    2
1.2    Accounting Principles    61
1.3    Currency References    61
1.4    References to Statutes    62
1.5    Extended Meanings    62
1.6    Headings    62
1.7    Subdivisions    62
1.8    Number    62
1.9    Time    62
1.10    Amendments    62
1.11    No Waiver    63
1.12    Inconsistency    63
1.13    Pro Forma Adjustments    63
1.14    Joint and Several Liability of Borrowers    64
1.15    Deemed Action by all Borrowers    64
1.16    Amendment and Restatement    64
1.17    Exhibits and Schedules    65
1.18    Covenant Relief Period    66

**ARTICLE 2 CANADIAN OPERATING FACILITY**      **66**

2.1    Establishment of Canadian Operating Facility    66
2.2    Purpose    66
2.3    Revolving Nature    66
2.4    Repayment    67
2.5    Availment Options    67
2.6    Interest and Fees    67
2.7    Swingline    69

**ARTICLE 3 TERM FACILITY**      **~~73~~75**

3.1    Establishment of the Term Facility    ~~73~~75
3.2    Purpose    ~~74~~75
3.3    Nature    ~~74~~76
3.4    Repayment    ~~74~~76
3.5    Availment Options    ~~74~~76
3.6    Interest and Fees    ~~75~~77

**ARTICLE 4 U.S. OPERATING FACILITY**      **~~76~~78**

4.1    Establishment of U.S. Operating Facility    ~~76~~78
4.2    Purpose    ~~76~~78
4.3    Revolving Nature    ~~76~~78
4.4    Repayment    ~~76~~78

**TABLE OF CONTENTS**
**(continued)**

**Page**

| | | |
|---|---|---|
| 4.5 | Availment Options | ~~76~~**78** |
| 4.6 | Interest and Fees | ~~77~~**79** |
| 4.7 | Letters of Credit | ~~78~~**80** |

**ARTICLE 5 GENERAL CONDITIONS** ........................................... ~~80~~**82**

| | | |
|---|---|---|
| 5.1 | Matters relating to Interest and Fees | ~~80~~**82** |
| 5.2 | Voluntary Prepayments | ~~82~~**84** |
| 5.3 | Mandatory Prepayments | ~~83~~**85** |
| 5.4 | Notice Periods | ~~86~~**88** |
| 5.5 | Minimum Amounts, Multiples and Procedures re Advances, Conversions and Repayments | ~~87~~**89** |
| 5.6 | Place of Advances and Repayments | ~~88~~**90** |
| 5.7 | Evidence of Obligations (Noteless Advances) | ~~88~~**90** |
| 5.8 | Determination of Equivalent Amounts | ~~88~~**90** |
| 5.9 | Commitment to Purchase Bankers' Acceptances and BA Equivalent Loans | ~~89~~**91** |
| 5.10 | Special Provisions Regarding Bankers' Acceptances | ~~89~~**91** |
| 5.11 | Escrowed Funds | ~~91~~**93** |
| 5.12 | Special Provisions regarding BA Equivalent Loans | ~~92~~**94** |
| 5.13 | Special Provisions Regarding LIBOR Loans | ~~93~~**95** |
| 5.14 | Breakage Costs | ~~93~~**95** |
| 5.15 | Inability to Make LIBOR Loans | ~~94~~**96** |
| 5.16 | Special Provisions Regarding Letters of Credit | ~~95~~**97** |
| 5.17 | Eligible Approved Contracts | ~~98~~**100** |

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES** .............. ~~99~~**101**

| | | |
|---|---|---|
| 6.1 | Representations and Warranties | ~~99~~**101** |
| 6.2 | Acknowledgement and Deemed Repetition | ~~106~~**108** |
| 6.3 | Survival of Representations and Warranties | ~~106~~**108** |

**ARTICLE 7 COVENANTS** ....................................................... ~~107~~**109**

| | | |
|---|---|---|
| 7.1 | Positive Covenants | ~~107~~**109** |
| 7.2 | Negative Covenants | ~~111~~**113** |
| 7.3 | Financial Covenants | ~~119~~**121** |
| 7.4 | Reporting Requirements | ~~120~~**122** |
| 7.5 | Designation of Unrestricted Subsidiaries | ~~122~~**125** |
| 7.6 | Securitization SPE | ~~124~~**126** |

**ARTICLE 8 SECURITY** ........................................................... ~~124~~**126**

| | | |
|---|---|---|
| 8.1 | Security | ~~124~~**126** |
| 8.2 | General Provisions re Security; Registration | ~~126~~**128** |
| 8.3 | Opinions re Security | ~~126~~**128** |
| 8.4 | After-Acquired Property, Further Assurances | ~~126~~**128** |

**TABLE OF CONTENTS**
**(continued)**

Page

| | | | |
|---|---|---|---|
| 8.5 | Security for Swap Documents with Former Lenders | ~~126~~**129** | |
| 8.6 | Insurance Proceeds | ~~127~~**129** | |
| 8.7 | Qualified ECP Guarantor Keepwell | ~~127~~**129** | |
| 8.8 | Additional Release by Lender | ~~128~~**130** | |
| 8.9 | Security Principles Affecting Certain Subsidiaries | ~~128~~**130** | |

**ARTICLE 9 CONDITIONS PRECEDENT** — ~~129~~**131**

| | | |
|---|---|---|
| 9.1 | Conditions Precedent to Agreement | ~~129~~**131** |
| 9.2 | Conditions Precedent to all Advances | ~~131~~**133** |

**ARTICLE 10 DEFAULT AND REMEDIES** — ~~131~~**134**

| | | |
|---|---|---|
| 10.1 | Events of Default | ~~131~~**134** |
| 10.2 | Acceleration; Additional Interest | ~~134~~**136** |
| 10.3 | Acceleration of Certain Contingent Obligations | ~~134~~**136** |
| 10.4 | Combining Accounts, Set-Off | ~~135~~**137** |
| 10.5 | Attorney in Fact | ~~135~~**137** |
| 10.6 | Appropriation of Monies | ~~135~~**138** |
| 10.7 | No Further Advances | ~~136~~**138** |
| 10.8 | Remedies Cumulative | ~~136~~**138** |
| 10.9 | Performance of Covenants by Agent | ~~136~~**138** |
| 10.10 | Purchase of Participation Following Acceleration | ~~136~~**139** |

**ARTICLE 11 ADMINISTRATION OF THE FACILITIES** — ~~137~~**139**

| | | |
|---|---|---|
| 11.1 | Authorization and Action | ~~137~~**139** |
| 11.2 | Decision-Making | ~~137~~**140** |
| 11.3 | Procedure for Making Advances | ~~139~~**141** |
| 11.4 | Failure to Fund | ~~139~~**142** |
| 11.5 | Defaulting Lenders and Replacement of Lenders | ~~141~~**143** |
| 11.6 | Security and Exercise of Remedies | ~~142~~**145** |
| 11.7 | Application of Proceeds of Realization | ~~144~~**146** |
| 11.8 | Payments by Agent | ~~144~~**147** |
| 11.9 | Redistribution of Payment | ~~145~~**148** |
| 11.10 | Protection of Agent | ~~147~~**149** |
| 11.11 | Duties of Agent | ~~148~~**150** |
| 11.12 | Lenders' Obligations Several; No Partnership | ~~149~~**151** |
| 11.13 | Reliance Upon Agent | ~~149~~**152** |
| 11.14 | No Liability of Agent | ~~149~~**152** |
| 11.15 | Agent and Agent Authority | ~~150~~**152** |
| 11.16 | Lenders' Credit Decisions | ~~150~~**152** |
| 11.17 | Indemnification | ~~150~~**153** |
| 11.18 | Successor Agent | ~~151~~**153** |
| 11.19 | Sharing of Information | ~~151~~**153** |

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| 11.20 | Acknowledgement by Borrowers | ~~151~~**154** |
| 11.21 | Amendments to Article 11 | ~~151~~**154** |
| 11.22 | Deliveries, etc. | ~~152~~**154** |
| 11.23 | Agency Fee | ~~152~~**154** |

**ARTICLE 12 INCREASED COSTS** ............................................................ ~~152~~**155**

| | | |
|---|---|---|
| 12.1 | Changes in Law | ~~152~~**155** |
| 12.2 | Changes in Circumstances | ~~153~~**156** |
| 12.3 | Application of Sections 12.1 and 12.2 | ~~154~~**156** |
| 12.4 | Taxes | ~~154~~**156** |

**ARTICLE 13 GENERAL** ............................................................................. ~~157~~**159**

| | | |
|---|---|---|
| 13.1 | Non-Disclosure | ~~157~~**159** |
| 13.2 | Waiver | ~~158~~**160** |
| 13.3 | Governing Law | ~~158~~**161** |
| 13.4 | Judgment Currency | ~~158~~**161** |
| 13.5 | Expenses of Agent and Lenders | ~~159~~**161** |
| 13.6 | Assignment | ~~159~~**162** |
| 13.7 | General Indemnity | ~~161~~**164** |
| 13.8 | Environmental Indemnity | ~~162~~**165** |
| 13.9 | Survival of Certain Obligations despite Termination of Agreement | ~~163~~**165** |
| 13.10 | Interest on Unpaid Costs and Expenses | ~~163~~**166** |
| 13.11 | Notice | ~~163~~**166** |
| 13.12 | Telephone Instructions | ~~164~~**167** |
| 13.13 | Severability | ~~164~~**167** |
| 13.14 | Further Assurances | ~~165~~**167** |
| 13.15 | Tombstone Marketing | ~~165~~**167** |
| 13.16 | Entire Agreement | ~~165~~**168** |
| 13.17 | Anti-Money Laundering Legislation | ~~165~~**168** |
| 13.18 | Binding Effect | ~~166~~**169** |
| 13.19 | Execution by Electronic Means and Counterparts | ~~166~~**169** |
| 13.20 | Intercreditor Agreement | ~~166~~**169** |
| 13.21 | Release of Liens and Guarantees. | ~~167~~**169** |

# SECOND AMENDED AND RESTATED CREDIT AGREEMENT

This Agreement is dated as of July 31, 2018,

AMONG:

### Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC.
as Borrowers

– and –

### QMAX CANADA OPERATIONS INC.
as Specified Canadian Swingline Borrower

– and –

### THE PERSONS PARTY HERETO FROM TIME TO TIME IN THEIR CAPACITIES AS LENDERS
as Lenders

– and –

### HSBC BANK CANADA,
as Administrative Agent

– with –

### HSBC BANK CANADA,
as Sole Lead Arranger, Bookrunner, Syndication Agent and Documentation Agent

**PREAMBLE:**

A.    The Borrowers have requested and the Lenders have agreed to further amend and restate the credit facilities under the Existing Credit Agreement and to continue to provide certain credit facilities on the terms and conditions and for the purposes set out in this Agreement.

B.    HSBC has agreed to continue to act as administrative agent for the Lenders under the Facilities on the terms and conditions and for the purposes set out in this Agreement.

**AGREEMENT:**

In consideration of the covenants and agreements between the Parties contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

# ARTICLE 1
# INTERPRETATION

**1.1     Definitions**

In this Agreement, the following words and phrases shall have the respective meanings set forth below:

1.1.1      "**Acceleration Date**" means the earlier of:

(a)     the occurrence of an Insolvency Event in respect of any Credit Party; and

(b)     the delivery by the Agent to the Borrower of a written notice that the Obligations are immediately due and payable, following the occurrence and during the continuation of an Event of Default other than an Insolvency Event.

1.1.2      "**Acceptable Account Debtors**" means those account debtors in respect of Eligible Receivables who have Investment Grade long term unsecured debt ratings or are otherwise acceptable to the Required Lenders, in their Permitted Discretion.

1.1.3      "**Account Receivable Insurance**" means one or more credit insurance policies issued by (a) Export Development Canada, (b) Export-Import Bank of the United States, or (c) such other governmental entity of Canada or the U.S. or a private insurer, in either case, with, and only for so long as such other insurer maintains, a credit rating of at least A by Standard & Poor's Ratings Services (or an equivalent rating issued by another rating agency acceptable to the Required Lenders, acting reasonably) that is reasonably acceptable to the Required Lenders, in each case, together with all endorsements and agreements related thereto (including a tripartite agreement among the insured, the insurer and the Agent), and on terms and in amounts reasonably acceptable to Agent and which provides for the payment of claims thereunder directly to Agent.

1.1.4      "**Acquired Business**" means the entity or assets acquired by a Credit Party in an Acquisition consummated after the date hereof.

1.1.5      "**Acquisition**" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of a controlling interest in the capital stock, partnership interests, membership interests or equity of any Person (other than a Person that is a Subsidiary or the formation of a Subsidiary solely to facilitate a Permitted Acquisition), or (c) a merger, amalgamation, consolidation or any other combination with another Person (other than a Person that is a Credit Party); <u>provided</u>, that the Borrower or a Person that is or will become a Credit Party is the surviving entity.

1.1.6      "**Advance**" means an extension of credit by one or more of the Lenders to a Borrower pursuant to this Agreement (including by way of issuance of a Letter of Credit or by way of any other Loan permitted by Section 2.7.2 under the Swingline), but does not include any Conversion or Rollover.

1.1.7    "**Advisory Services Agreement**" means the management and advisory service agreement dated as of May 23, 2014 between the Canadian Borrower and Palladium, as the same may be amended restated or supplemented from time to time permitted hereunder.

1.1.8    "**Affiliate**" means with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

1.1.9    "**Agent**" means HSBC in its capacity as administrative agent hereunder and any successors in such capacity appointed as agent pursuant to Section 11.18.

1.1.10    "**Agreement**" means this amended and restated credit agreement (including the exhibits and schedules) as it may be amended, replaced or restated from time to time.

1.1.11    "**Amendment and Restatement Date**" means the date of this Agreement or such later Business Day upon which each condition in Section 9.1 shall be satisfied or waived in a manner acceptable to the Required Lenders in their discretion.

1.1.12    "**Anchor**" means Anchor Drilling Fluids USA, LLC.

1.1.13    "**Anchor Acquisition Agreement**" means the Membership Interest Purchase Agreement, dated as of November 21, 2017, by and among Anchor Drilling Fluids USA, LLC, a Delaware limited liability company, Calumet Operating, LLC, a Delaware limited liability company, Q'Max Solutions Inc., a British Columbia corporation, and Q'Max America Inc., a Delaware corporation.

1.1.14    "**Anchor Sale and Leaseback Transaction**" means any arrangement, whether in one transaction or in a series of transactions, with any Person whereby Anchor sells or transfers all or some portion of its truck fleet or similar motor vehicles, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rents or leases such property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

1.1.15    "**Annual Management Fee Cap**" means U.S. $2,500,000 in the aggregate in any Fiscal Year.

1.1.16    "**Applicable Law**" means, in respect of any Person, property, transaction or event, all Laws applicable thereto.

1.1.17    "**Applicable Margin**" means, in respect of any Fiscal Quarter and in respect of any Availment Option or standby fee, the percentage in the column relating to such Availment Option or standby fee in the following table which corresponds to the Net Leverage Ratio in respect of such Fiscal Quarter described in the first column; subject to adjustment from time to time in accordance with Section 5.1.4:

| Level* | Net Leverage Ratio | Canadian Dollar Prime Based Loans, U.S. Dollar Base Rate Loans and U.S. Dollar Prime Rate Loans | BA Fee, LIBOR Loans and Financial Letter of Credit Fee** | Standby Fee (For Canadian Operating Facility and U.S. Operating Facility only) |
|--------|-------------------|---|---|---|
| I | < 1.50:1 | 100 bps | 200 bps | 45.000 bps |
| II | ≥ 1.50:1 < 2.00:1 | 125 bps | 225 bps | 50.625 bps |
| III | ≥ 2.00:1 < 2.50:1 | 175 bps | 275 bps | 61.875 bps |
| IV | ≥ 2.50:1 < 3.00:1 | 200 bps | 300 bps | 67.500 bps |
| V | ≥ 3.00:1 < 3.50:1 | 275 bps | 375 bps | 84.375 bps |
| VI | ≥ 3.50:1 < 4.00:1 | 325 bps | 425 bps | 95.625 bps |
| VII | ≥ 4.00:1 | 375 bps | 475 bps | 106.875 bps |

\* On the Amendment and Restatement Date, the Applicable Margin shall be deemed to be at Level VII and shall remain at Level VII at all times during the Covenant Relief Period.

\*\*Non-Financial Letters of Credit will be issued at 66⅔% of the pricing quoted above for Financial Letters of Credit.

1.1.18    "**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

1.1.19    "**Assignment**" means an agreement whereby a financial institution becomes a Lender substantially in the form of Exhibit "G", with the blanks completed.

1.1.20    "**Availment Option**" means a method of borrowing which is available to the Borrower as provided herein and in respect of each Facility, means those particular methods of borrowing which are specifically identified as being available thereunder (in the case of the Canadian Operating Facility under Section 2.5.1, in the case of the Facility under Section 3.5.1 and in the case of the U.S. Operating Facility under Section 4.5.1).

1.1.21    "**BA Equivalent Loan**" means an Advance in Canadian Dollars made by a Non-BA Lender pursuant to Section 5.10.2.

1.1.22    "**BA Lender**" means a Lender identified in Exhibit "A" attached hereto as a Lender which will accept Bankers' Acceptances hereunder.

1.1.23    "**Bankers' Acceptance**" means a bill of exchange or a blank non-interest bearing depository bill as defined in the *Depository Bills and Notes Act* (Canada) drawn by the Borrower and accepted by a BA Lender in respect of which the Borrower becomes obligated to pay the face amount thereof to the holder (which may be a third party or such BA Lender) upon maturity.

1.1.24    "**Banking Service Agreements**" means agreements made between a Borrower or any other Credit Party and the Agent or any Lender or any of their respective Affiliates

in respect of payment cards, credit cards, cash management, payroll, pooling, netting, or other banking services; and "**Banking Service Agreement**" means any one of them as required by the context.

1.1.25   "**Banking Services Liabilities**" mean, collectively, any and all direct and indirect, contingent and absolute obligations and liabilities of each Borrower and each other Credit Party to the Agent, any Lender or any of their respective Affiliates in respect of any Banking Service Agreement as the Credit Parties may from time to time enter into with the Agent, any Lender or any of their respective Affiliates; provided, that a liability shall constitute a "**Banking Service Liability**" if the agreement under which it arose was entered into with the Person who was an Agent, Lender or the Affiliate of a Person who was an Agent or Lender, at the time such agreement was entered into, regardless of whether such Agent or Lender ceased to be the Agent or a Lender hereunder.

1.1.26   "**BCBCA**" means the *Business Corporations Act* (British Columbia), as amended from time to time.

1.1.27   "**BIA**" means the *Bankruptcy and Insolvency Act* (Canada), as amended from time to time.

1.1.28   "**Borrowers**" means, collectively, the Canadian Borrower, the Specified Canadian Swingline Borrower and the U.S. Borrower and "**Borrower**", means any one of them; provided, that "Borrower", in the context of provision hereunder relating to:

(a)     the Term Facility and the Canadian Operating Facility, and Loans thereunder, shall mean the Canadian Borrower and its successors and assigns;

(b)     the U.S. Operating Facility, and Loans thereunder, shall mean the U.S. Borrower and its successors and assigns; and

(c)     the Swingline, and Loans thereunder, shall mean the applicable Swingline Borrower and its successors and assigns.

1.1.29   "**Borrowing Base**" means the amount in U.S. Dollars calculated by the Borrower and approved by the Agent, in its sole discretion, as set out in the most recent Borrowing Base Certificate, being the aggregate amount of (without duplication):

(a)     Marginable Receivables; *plus*

(b)     Marginable Inventory; *plus*

(c)     Marginable Cash; *plus*

(d)     Marginable Capital Assets; *minus*

(e)     Priority Claims; *minus*

(f)     $150,000 (but only until such time as the Agent and HSBC US have received an environmental report or other information from or on behalf of Anchor which is satisfactory to each of them (acting reasonably) related to the Norge, Oklahoma and Roosevelt, Utah properties owned by the Credit Parties, and the Agent and HSBC US agree to no longer require the reserve set out in this clause (f)), provided such reserve shall only apply to the extent such properties form part of the Borrowing Base, *minus*

(g)     the amount in U.S. Dollars of unrealized losses resulting from mark to market accounting for hedging activities calculated in accordance with GAAP, *minus*

(h)     the amount in U.S. Dollars of any deductible payable in respect of the Account Receivable Insurance (other than in respect of Anchor, Terra and their respective Subsidiaries), *minus*

(i)     any amount that is payable to the insurer under the Account Receivable Insurance (other than in respect of Anchor, Terra and their respective Subsidiaries).

1.1.30   "**Borrowing Base Certificate**" means a certificate of the Canadian Borrower, substantially in the form of Exhibit "H".

1.1.31   "**Borrowing Base Shortfall**" is defined under Section 5.3.5.

1.1.32   "**Business Day**" means:

(a)     for the purpose of giving any communication pursuant to Section 13.11 and in the context of U.S. Dollar Base Rate Loans and U.S. Dollar Prime Rate Loans, a day on which the main branches of the Agent or any of its Affiliates in Toronto, Calgary, Montreal, Quebec and New York are open for normal banking business;

(b)     for purposes of LIBOR Loans, also must be a LIBOR Business Day; and

(c)     for all other purposes, a day on which the main branch of the Agent in Calgary, Alberta, Montreal, Quebec and Toronto, Ontario is open for normal banking business,

but in any event not including a Saturday or Sunday or other day on which banks in Calgary or Toronto are authorized or required by law to close.

1.1.33   "**Calumet**" means Calumet Operating, LLC and its successors and permitted assigns.

1.1.34   "**Canadian Borrower**" means Q'Max Solutions Inc., a corporation amalgamated pursuant to the BCBCA, and its successors and permitted assigns.

1.1.35   "**Canadian Dollar Prime Rate Loan**" means a loan made by a Lender to the Canadian Borrower in Canadian Dollars in respect of which interest is determined by

reference to the Canadian Prime Rate, but excluding Advances in the form of Overdrafts and BA Equivalent Loans.

1.1.36    "**Canadian Dollars**" or "**Cdn. $**" means the lawful money of Canada.

1.1.37    "**Canadian Operating Facility**" is defined in Section 2.1.

1.1.38    "**Canadian Operating Facility Commitment**" means, as the context requires, (a) as of the **Second** Amendment ~~and Restatement~~ Date, collectively with respect to all Canadian Operating Lenders, in the aggregate, U.S. $~~109,681,471~~**119,681,471** or the Equivalent Amount in Cdn. $ (or any combination thereof), as otherwise increased or decreased pursuant to this Agreement and (b) means, with respect to each individual Canadian Operating Lender, the individual commitment amount of such Lender in the maximum principal amount indicated opposite such Canadian Operating Lender's name in Exhibit "A" under the heading "**Canadian Operating Facility Commitments**", as amended from time to time.

1.1.39    "**Canadian Operating Facility Limit**" means the lesser of (a) the Canadian Operating Facility Commitment, and (b) the sum of the Borrowing Base less the then outstanding Advances under the Term Facility and the U.S. Operating Facility.

1.1.40    "**Canadian Operating Lenders**" means the Lenders who have provided a Commitment under the Canadian Operating Facility as set forth in Exhibit "A".

1.1.41    "**Canadian Prime Rate**" means the greater of the following:

(a)       the rate of interest announced from time to time by the Agent as its reference rate then in effect for determining rates of interest on Canadian dollar loans to its customers in Canada and designated as its prime rate; and

(b)       the 30-day CDOR Rate plus 1% per annum;

provided that if the Canadian Prime Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.42    "**Capital Adequacy Requirements**" means the Guideline dated January 2017, entitled "Capital Adequacy Requirements (CAR)" issued by OSFI and all other guidelines or requirements relating to capital adequacy issued by OSFI or any other Governmental Authority regulating or having jurisdiction with respect to any Lender, as amended, modified, supplemented, reissued or replaced from time to time.

1.1.43    "**Capital Expenditures**" means, with respect to any Person for any period, without duplication, the aggregate amount of all expenditures (whether paid in cash or accrued as a liability) by such Person during that period for investments in other Persons and the acquisition or leasing (pursuant to a Capital Lease) of fixed or capital assets or additions to property, plant, or equipment (including replacements, capitalized repairs, and improvements), in each case, which are required to be capitalized on the balance

sheet of such Person in accordance with GAAP; provided, however, that Capital Expenditures shall not include:

(a)     expenditures with proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of a Borrower and its Subsidiaries within one year of receipt of such proceeds (or, if not made within such one year period, are committed to be made during such period, but if not so made, such amount will not be excluded in the next applicable period);

(b)     interest capitalized during such period;

(c)     expenditures that are accounted for as Capital Expenditures of such Person and that actually are paid for by a third party (excluding a Borrower or any Subsidiary thereof) and for which neither any Borrower nor any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other Person (whether before, during or after such period);

(d)     the purchase price of equipment (i) that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time, (ii) to the extent the consideration therefor consists of any combination of (A) used or surplus equipment traded in at the time of such purchase and (B) the proceeds of a substantially concurrent sale of used or surplus equipment, in each case in the ordinary course of business; provided that only such credit value of such traded equipment will be excluded for this purpose;

(e)     for purposes of Section 7.2.10 only, expenditures that constitute Permitted Acquisitions and Permitted Investments;

(f)     the book value of any asset owned to the extent such book value is included as a capital expenditure as a result of reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period;

(g)     expenditures of leasehold improvements for which such Person is reimbursed in cash or receives a credit; and

(h)     any non-cash amounts reflected as additions to property, plant or equipment on such Person's consolidated balance sheet.

1.1.44   "**Capital Lease**" means any lease, license or similar transaction determined as a capital lease in accordance with GAAP as in effect on the Amendment and Restatement

Date, or any sale and lease back transaction or any other lease (whether a synthetic lease or otherwise).

1.1.45   "**Cash Equivalent**s" means, as of the date of any determination thereof, the following:

(a)      marketable direct obligations issued or unconditionally guaranteed by the Government of Canada, the U.S., or any agency or instrumentality thereof, a government of a province of Canada or of a state of the U.S. or, in each case, any agency thereof, maturing no more than one year after the date of acquisition thereof;

(b)      commercial paper maturing no more than one year after the date of acquisition thereof and having, at the time of acquisition, a rating of at least A1 by Standard & Poor's Ratings Services or at least Prime 1 by Moody's Investors Service, Inc. or at least R1 (low) by Dominion Bond Rating Service Inc.;

(c)      certificates of deposit, deposit notes, term deposit receipts, or time deposits or bankers' acceptances, maturing no more than one year after the date of acquisition thereof, issued by the Lender or by commercial banks incorporated under the laws of Canada or the U.S. or a state thereof, each having a rating of at least A1 by Standard & Poor's Ratings Services or at least Prime 1 by Moody's Investors Service, Inc. or at least R1 (low) by Dominion Bond Rating Service Inc.;

(d)      such local currencies in those countries in which the Borrowers and their Subsidiaries transact business from time to time in the ordinary course of business;

(e)      investments of comparable tenor and credit quality to those described in the foregoing clauses (a) through (c) or otherwise customarily utilized in countries in which the Borrowers and their Subsidiaries operate for short term cash management purposes; and

(f)      investments in any investment company, money market or fund which invests substantially all of their assets in Cash Equivalents of a kind described in (a) through (c) of this definition.

1.1.46   "**Cash Taxes**" means, in respect of any Person for any applicable period, the amount of all income taxes (including federal and provincial income taxes) paid or payable by such Person on its net taxable income for such period (which for greater certainty, does not include future income taxes).

1.1.47   "**Catch Up Management Fee Payments**" is defined in Section 1.1.202(a).

1.1.48   "**CDOR Rate**" means on any day the annual rate of interest which is the rate determined as being the arithmetic average of the quotations of all institutions listed in respect of the rate for Canadian Dollar denominated bankers' acceptances for the relevant period displayed and identified as such on the "**Reuters Screen CDOR Page**" (as defined

in the International Swaps and Derivatives Association, Inc. definitions, as modified and amended from time to time) as of 10:00 a.m. Toronto, Ontario local time on such day and, if such day is not a Business Day, then on the immediately preceding Business Day (as adjusted by the Agent after 10:00 a.m. Toronto, Ontario local time to reflect any error in a posted rate of interest or in the posted average annual rate of interest with notice of such adjustment in reasonable detail evidencing the basis for such determination being concurrently provided to the Borrower). If such rates are not available on the Reuters Screen CDOR Page on any particular day, then the CDOR Rate on that day shall be calculated as the arithmetic mean of the rates applicable to Canadian Dollar denominated bankers' acceptances for the relevant period publicly quoted for customers in Canada by those Lenders which are banks listed in Schedule I of the *Bank Act* (Canada) as of 10:00 a.m. Toronto, Ontario local time on such day; or if such day is not a Business Day, then on the immediately preceding Business Day; provided that if the CDOR Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.49    "**Change of Control**" means in respect of the Canadian Borrower or Holdco, the occurrence of any of the following events:

(a)    prior to any initial public offering of the Canadian Borrower or Holdco, as applicable, when Permitted Holders do not beneficially own, collectively, directly or indirectly, shares in the Canadian Borrower or Holdco, as applicable, representing more than 50% of the Voting Securities of the Canadian Borrower or Holdco; and

(b)    after any initial public offering of the Canadian Borrower or Holdco, as applicable, when a Person or Group (other than any employee benefit plan and/or Person acting as the trustee, agent or other fiduciary or administrator) acquires shares in the Canadian Borrower or Holdco, as applicable, representing more than the greater of (i) 35% of the aggregate outstanding Voting Securities of the Canadian Borrower or Holdco, as applicable and (ii) the percentage of then outstanding Voting Securities of the Canadian Borrower or Holdco, as applicable, directly or indirectly, owned by Permitted Holders.

1.1.50    "**Code**" means the United States Internal Revenue Code of 1986, and any successor statute and any regulations thereunder.

1.1.51    "**Collateral**" means, collectively, all property, assets and undertaking of the Credit Parties encumbered by the Liens granted pursuant to the Security in support of the Obligations, and all property, assets and undertaking encumbered by the Liens granted pursuant to the Security in support of the Guarantees, together with all proceeds of the foregoing. For the avoidance of doubt, Collateral shall not include (a) capital assets or inventory of any Credit Party organized outside of the U.S. or Canada, (b) pending United States "intent-to-use" trademark applications for which a verified statement of use or an amendment to allege use has not been filed with and accepted by the United States Patent and Trademark Office, (c) Securitization Assets but only once transferred to a

Securitization SPE and (d) any of the "**Excluded Property**" (as defined in the general security agreement from the U.S. Borrower as described in Section 8.1(a)).

1.1.52   "**Collection Rights**" means, in respect of any Eligible Approved Contracts between a Pemex Entity, on the one hand, and QMax Mexico, on the other hand, the collection or credit rights granted to QMax Mexico by such Pemex Entity pursuant to such Eligible Approved Contract.

1.1.53   "**Colombian Free Cash Flow**" means, for any fiscal period, all EBITDA attributable to all Colombian operations of the Canadian Borrower and its Material Subsidiaries determined in accordance with the definition of EBITDA, minus Cash Taxes, Interest Expense and Unfunded Capital Expenditures, in each case, attributable to such Colombian Subsidiaries and operations.

1.1.54   "**Commitment**" means, in respect of any Lender, such Lender's commitment to make Advances to the Borrowers (or any one of them) under all Facilities or under any Facility, as the context requires as set forth in Exhibit "A".

1.1.55   "**Common Shares**" means the common shares in the capital of a Borrower.

1.1.56   "**Compliance Certificate**" means a certificate delivered by the Canadian Borrower to the Agent in the form of Exhibit "F".

1.1.57   "**Consolidated Net Income**" shall mean, for any period, the net income (loss) of any Person and its Subsidiaries determined on a consolidated basis on the basis of GAAP; provided, however, that any net income (loss) of any Person (excluding any Securitization SPE) (i) who is not during such period a Material Subsidiary or (ii) whose net income is accounted for by the equity method of accounting, shall in each case be included in the calculation of Consolidated Net Income for all purposes of this Agreement only to the extent of the amount of any Distributions of such Person paid in cash (or to the extent converted into cash) to the Canadian Borrower or a Material Subsidiary, and "**Consolidated Net Income**" for such period shall include any ordinary course dividends in cash received by the Canadian Borrower or any of its Material Subsidiaries in excess of the amounts included in the foregoing item (i).

1.1.58   "**Consolidated Net Tangible Assets**" means, as at any date of determination, all consolidated assets of the any Person as shown in the most recent consolidated balance sheet of such Person, less the aggregate of the following amounts reflected upon such balance sheet:

(a)   all goodwill, deferred assets, trademarks, copyrights and other similar intangible assets; and

(b)   to the extent not already deducted in computing such assets and without duplication, depreciation, depletion, amortization, reserves and any other account which reflects a decrease in the value of an asset or a periodic allocation of the cost of an asset; provided, that no deduction will be made under this paragraph (b)

to the extent that such account reflects a decrease in value or periodic allocation of the cost of any asset referred in the paragraph (a) of this definition,

all as determined in accordance with GAAP.

1.1.59   "**Contributing Lenders**" is defined in Section 11.4.2.

1.1.60   "**control**" means, in respect of any Person, the power to direct or cause the direction of management and policies of such Person, directly or indirectly, through the ownership of Voting Securities, contract or otherwise; and "**controlled**" has a corresponding meaning.

1.1.61   "**Conversion**" means the substitution of one Availment Option for another, and, for certainty, does not constitute a fresh or new Advance (and "**Convert**" shall have a corresponding meaning).

1.1.62   "**Conversion Notice**" means a notice substantially in the form of Exhibit "D" given by a Borrower to the Agent for the purposes of requesting a Conversion.

1.1.63   "**Covenant Relief Period**" means the period from the Amendment and Restatement Date, up to and including December 31, ~~2019~~,**2020,** subject to the Borrowers' right to elect a shorter period pursuant to Section 1.18.

1.1.64   "**Credit Documents**" means this Agreement, the Security and all other agreements, documents, instruments and certificates required or contemplated herein to be provided by the Credit Parties and other Persons to the Agent and the Lenders.

1.1.65   "**Credit Parties**" means, collectively, the Borrowers and any Guarantor; and "**Credit Party**" means any one of them as the context requires. Notwithstanding any provision in this Agreement or any other Credit Document, in no event shall any Securitization SPE be deemed a Credit Party.

1.1.66   "**Currency Hedging Agreement**" means any swap, hedge or other agreement that does not contravene Section 7.2.12 entered into between a Credit Party and a counterparty, from time to time for the purpose of mitigating or hedging currency risk, including foreign exchange forward contracts.

1.1.67   "**Default**" means an event which has occurred and is continuing, and which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

1.1.68   "**Default Rate**" means, while an Event of Default exists, the interest rates and fess comprising the Applicable Margin will each increase by 2.0% per annum.

1.1.69   "**Defaulting Lender**" means any Lender or, in the case of paragraph (e) below, a Lender's parent (being any Person that directly or indirectly controls a Lender where control has the same meaning as in the definition of Affiliate):

(a)     that has failed to fund any payment or its portion of any Advances required to be made by it hereunder, including as a result of being a Non-Paying Lender, within two Business Days of the date such Advances were required to be funded hereunder unless such Lender notifies the Agent and the Canadian Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied;

(b)     that has failed to pay the Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due;

(c)     that has notified a Borrower (in writing) that it does not intend to or is unable to comply with any of its funding obligations under this Agreement or has made a public statement to that effect (unless such written notice or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such written notice of public statement) cannot be satisfied);

(d)     that has failed, within three Business Days after request by a Borrower, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Advances; or

(e)     that becomes insolvent, has been deemed insolvent by a court of competent jurisdiction, or becomes the subject of bankruptcy or insolvency proceeding.

1.1.70    "**Departing Lenders**" is defined in Section 11.5.2.

1.1.71    "**Deposit Account Control Agreement**" means the deposit account control agreement dated December 29, 2014 between the Agent, Wells Fargo and the U.S. Borrower, as the same may be amended from time to time.

1.1.72    "**Designated Financial Covenants**" is defined in Section 7.3.2

1.1.73    "**Distribution**" means:

(a)     any declaration or payment of dividends or returns of capital, including advisory fees and management fees, of any kind or nature directly or indirectly to any holder of shares of any Credit Party or to any Affiliate or Related Party of such holder and including any similar payments paid by any Credit Party to Palladium or its Affiliates, whether pursuant to the Advisory Services Agreement or any other similar agreement now or hereafter in effect between any one or more Credit Party and any one or more of Palladium or its Affiliates;

(b)     any repurchase, retraction or redemption of shares of any Credit Party for cash or other property; and

(c)    any payment, repayment or prepayment by a Person in cash of any amount of any principal, interest, fees or other amounts in respect of any Subordinated Debt.

For certainty, Distributions shall not include the reimbursement of reasonable out-of-pocket expenses incurred by Palladium or the directors of the Credit Parties in the ordinary cause of business in rendering advisory or management services to the Credit Parties or performing a director's obligations to the applicable Credit Party, as the case may be.

1.1.74    "**Drawdown Request**" means a notice in the form of Exhibit "B" given by the Borrower to the Agent for the purpose of requesting an Advance.

1.1.75    "**Earnout Payments**" means, in respect of any Acquisition, the requirement for any Credit Party, as purchaser, to pay to the vendor under such Acquisition (or any nominee thereof) contingent payments of the purchase price thereof after the closing thereof which are payable when specified targets (including related to revenue or earnings), are satisfied within specified periods.

1.1.76    "**EBITDA**" means, for any fiscal period, Consolidated Net Income of the Canadian Borrower and the Subsidiaries determined on a consolidated basis in accordance with GAAP and measured on a trailing four Fiscal Quarter basis for such period, *plus* all amounts deducted in the calculation thereof on account of (without duplication irrespective if any expense, loss or gain would fall into one or more of the foregoing categories):

(a)    interest expense calculated in accordance with GAAP, including (i) the amortization of debt discounts, (ii) the amortization of all fees (including fees with respect to Hedging Agreements) payable in connection with the incurrence of Funded Debt to the extent included in interest expense, (iii) deferred financing fees and expenses, and (iv) the portion of any payments or accruals with respect to Capital Lease Obligations allocable to interest expense and the capitalized interest of such Person;

(b)    any provision for or payment of taxes based on income, profits or capital gains, calculated in accordance with GAAP, including, without limitation, state, provincial, franchise, property and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) and any deferred/future taxes;

(c)    depreciation and amortization expense, calculated in accordance with GAAP, including amortization of intangible assets, unrecognized prior service costs and actuarial non-cash losses related to pensions and other post-employment benefits, of such;

(d)    Permitted Management Fees (but for certainty, in an amount not exceeding the Annual Management Fee Cap in any Fiscal Year) and the reasonable out-of-pocket expenses related thereto which have been reimbursed by a Credit

Party, and any payments permitted under clause (j) of Section 7.2.6, to the extent paid by a Credit Party to a non-Credit Party;

(e)     all non-cash expenses and losses calculated in accordance with GAAP related to: (i) extraordinary and nonrecurring losses to the extent not otherwise dealt with in this definition, (ii) all non-recurring deferred financing costs written off and premiums paid or other expenses incurred directly in connection with any early extinguishment of Funded Debt and any net loss attributable to any write-off or forgiveness of Funded Debt, (iii) any non-cash expense or loss arising from the application of purchase accounting adjustments as a result of any Permitted Acquisition, and (iv) other non-cash expenses and charges to the extent not otherwise dealt with in this definition (in each case, calculated on a *pro forma* basis as though realized on the first day of such period) reducing Consolidated Net Income for such period including resulting from impairment charges and including losses against book value on the disposal or write-off of any business or assets (including pursuant to any sale/leaseback transaction);

(f)     [reserved];

(g)     unrealized losses resulting from mark to market accounting for hedging activities calculated in accordance with GAAP;

(h)     any unrealized foreign currency translation or transaction losses in respect of (i) Funded Debt denominated in a currency other than the functional currency of the relevant Person and (ii) any unrealized foreign exchange losses relating to translation of assets and liabilities denominated in foreign currencies;

(i)     charges, expenses or losses reasonably related to (i) fees and expense in connection with Permitted Acquisitions, Permitted Investments, Permitted Dispositions, the incurrence of Permitted Funded Debt (but only to the extent not already included in clause (a) above), amendments and other modifications to the Credit Documents, the offering or issuance of **debt securities and** equity interests and other **capital raising** activities permitted hereunder**, including, without limitation, refinancing of the Facilities** (in each case, whether or not successful) and (ii) business optimization expenses and restructuring charges, reserves or expenses, (including losses from disposed, abandoned, transferred, closed or discontinued operations) in each case as documented by evidence provided by the Canadian Borrower and acceptable to the Agent (acting reasonably and responding to requests for approval within five (5) Business Days); provided, that all of the foregoing may not exceed a maximum aggregate amount of $5,500,000 for each applicable measurement period of four consecutive Fiscal Quarters, or such higher amount as the Required Lenders may consent to from time, acting reasonably;

(j)     non-cash expenses incurred in connection with any equity based compensation provided pursuant to any management or employee equity based compensation plan (in each case, calculated on a *pro forma* basis as though realized on the first

day of such period), and including (i) costs or expenses realized in connection with or resulting from stock appreciation or similar rights, stock options or other rights of officers, directors and employees, in each case of such Person or any such Subsidiary, and (ii) non-cash losses attributable to deferred compensation plans or trusts;

(k)     third party audit, advisory and consulting fees and related out-of-pocket expenses of the Canadian Borrower or any of its Subsidiaries incurred in connection with audits, inspections and reviews conducted in connection with this Agreement at the direction of the Agent or any Lender (but which for certainty does not include audit fees related to the preparation of the financial statements required hereunder);

(l)     fees, costs and expenses in connection with the Anchor Acquisition not to exceed U.S. $11,000,000;

(m)     discounts on sales of receivables and related assets in connection with any Permitted Securitization Financing;

*minus*, in each case to the extent added in the calculation thereof (without duplication irrespective if any expense, loss or gain would fall into one or more of the foregoing categories):

(n)     income tax credits calculated in accordance with GAAP;

(o)     all cash payments during such period relating to non-cash charges which were added back in determining EBITDA in any prior period;

(p)     other non-cash and non-recurring items increasing Consolidated Net Income that are not otherwise dealt with in this definition (but excluding any such non-cash items to the extent that it will result in the receipt of cash payments in any future period), including gains against book value on the disposal of any business or assets;

(q)     unrealized gains resulting from mark to market accounting for hedging activities calculated in accordance with GAAP;

(r)     any unrealized foreign currency translation or transaction gains in respect of Funded Debt denominated in a currency other than the functional currency of the relevant Person and any unrealized foreign exchange gains relating to translation of assets and liabilities denominated in foreign currencies;

(s)     any net gain attributable to any write-off or forgiveness of Funded Debt;

(t)     net gains on the disposal, abandonment, transfer, closing or discontinuance of operations;

(u)     non-cash gains attributable of deferred compensation plans and trusts;

(v)    any non-cash gains arising from the application of purchase accounting adjustments as a result of any Permitted Acquisition or other Acquisitions approved by the Lenders; and

(w)    Consolidated Net Income attributable to or generated from any minority interest in a Person owned directly or indirectly by the Canadian Borrower, except for cash Distributions received by a Credit Party therefrom;

provided, that if any of the events described in Section 1.13 occurs during the relevant period, the calculation of EBITDA will be adjusted as set forth in Section 1.13.

Notwithstanding the foregoing, the Borrowers may elect to calculate EBITDA on the following annualized basis (as opposed to a trailing four Fiscal Quarter basis) for the periods specified below: (i) for the Fiscal Quarter ending March 31, 2018, by calculating EBITDA for the six month period ending as of March 31, 2018 and multiplied by two, and (ii) for the Fiscal Quarter ending June 30, 2018, by calculating EBITDA for the nine month period ending as of June 30, 2018, and multiplied by four-thirds, but only if such alternative calculation would result in a greater value for EBITDA for such period.

In addition, if EBITDA is calculated on the basis described in the immediately preceding paragraph, then the amounts described in paragraph (i) above (the "**Prescribed Amounts**") shall be limited to, the lesser of (x) the Prescribed Amounts actually paid during such period and (y) $5,325,000.

1.1.77    "**Economic Sanctions**" means the restrictions with respect to funding operations, or financing investments, in any country, or making payments to, or receiving payments or property from, any country or Person, then prohibited by:

(a)    any sanctions or requirements imposed by, or based upon the obligations or authorities set forth in the *Executive Order*, the *U.S. Money Laundering Control Act of 1986* (18 U.S.C. §§ 1956 et seq.), the *PATRIOT Act*, the *U.S. International Emergency Economic Powers Act* (50 U.S.C. §§ 1701 et seq.), the *U.S. Trading with the Enemy Act* (50 U.S.C. App. §§ 1 et seq.), the *U.S. United Nations Participation Act*, the *U.S. Syria Accountability and Lebanese Sovereignty Act*, the *U.S. Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010* or the *Iran Sanctions Act*, all as amended, or any of the foreign assets control regulations of the U.S. Department of the Treasury (including but not limited to 31 CFR, Subtitle B, Chapter V, as amended) or any other law or executive order relating thereto or regulation administered by the US State Department or the United States Treasury Department's Office of Foreign Assets Control, in each case, to the extent applicable; and

(b)    any of the economic sanctions of Canada, including those provided for pursuant to the *Special Economic Measures Act* (Canada) or the *United Nations Act* (Canada), in each case, to the extent applicable.

1.1.78   "**Eligible Approved Contracts**" means a contract or other agreement of a Credit Party to provide goods or perform services: (a) that is listed on Schedule 6.1.33; (b) or designated by the Agent as an Eligible Approved Contract pursuant to Section 5.17.

1.1.79   "**Eligible Capital Assets**" means, at any time, the capital assets of the Credit Parties; provided, that, in any event, no capital asset shall be deemed to be a Eligible Capital Asset unless each of the following statements is accurate and complete (and by including such capital asset in any computation of the Borrowing Base, the Borrowers will be deemed to made each of these statements in respect thereof):

(a)      such capital asset is located in Canada or the U.S.;

(b)      such capital asset is in good condition, merchantable, meets all standards imposed by any Governmental Authority having regulatory authority over it or its use and/or sale and is not obsolete and is either currently usable or currently saleable in the normal course of business of the applicable Credit Party;

(c)      the Agent, on behalf of the Lenders, has a First-Ranking Security Interest covering such capital asset;

(d)      such capital asset is, and at all times will be, free and clear of all Liens other than Permitted Liens and unregistered Liens in respect of Priority Claims that are not yet due and payable;

(e)      such capital asset does not constitute Hazardous Materials;

(f)      such capital asset is covered by all applicable insurance as required by Section 7.1.9; and

(g)      the Agent has not determined in its Permitted Discretion that it may not sell or otherwise dispose of such capital asset in accordance with the terms of the applicable Credit Documents without infringing upon the rights of another Person or violating any contract with any other Person.

1.1.80   "**Eligible Cash**" means, as of the date of determination, the aggregate U.S. Dollar amount of the unrestricted cash (determined in accordance with GAAP) and Cash Equivalents of Credit Parties (other than with respect to Anchor and its Subsidiaries until such time as the Encina ABL Loan Agreement is terminated and the obligations thereunder have been repaid in full) that:

(a)      the Agent on behalf of the Lenders, has a first priority perfected Lien covering such unrestricted cash or Cash Equivalent, and such unrestricted cash or Cash Equivalent is, and at all times will be, free and clear of all Liens other than Permitted Liens and unregistered Liens in respect of Priority Claims that are not yet due and payable;

(b)      are held in collateral accounts located in Canada, the U.S., Mexico or another OECD member country; provided, such collateral accounts may be located in

non-OECD member countries to the extent maintained by HSBC or an affiliate thereof (or such other bank deemed reasonable in the sole discretion of the Agent);

(c)     subject to the proviso at the end of Section 8.1(i), are held in collateral accounts in the name of the Agent or an agent thereof (or, with the consent of the Agent, the applicable Credit Party), in each case maintained with (i) the Agent or (ii) an Affiliate of the Agent, another Lender, an Affiliate of another Lender or another depositary that has entered into a control agreement (in form and substance reasonably acceptable to the Agent) with the Agent and the applicable Credit Party, and, in each case, with respect to which the Agent retains exclusive control to direct the transfer of funds therefrom during the continuation of an Event of Default (with withdrawals by the applicable Credit Party to be permitted upon notice to the Agent so long as the Agent has not delivered a notice of exclusive control upon the occurrence and during the continuation of an Event of Default);

(d)     subject to clause (ii) above, is otherwise available for use by a Credit Party, without condition or restriction; and

(e)     upon a reasonable request therefor by the Agent, for which Agent shall have received evidence, in form and substance reasonably satisfactory to Agent, of the amount thereof as of the applicable date of calculation,

provided, that such unrestricted cash and Cash Equivalents shall be reduced by an amount equal to, as reasonably estimated by the Borrowers, the withholding tax payable on any cash and Cash Equivalents that are to be remitted by any Credit Party to a foreign jurisdiction; and further provided, that to the extent that any debit balances (or overdrawn amounts) of any accounts of such Credit Parties are deducted from the calculation of unrestricted cash and Cash Equivalents above, they shall be increased by an amount equal to the such debit balances (or overdrawn amounts) solely to the extent that availability under the Operating Facilities is reduced by the amount of any Letters of Credits (or any portion thereof) issued and outstanding under the Operating Facilities to backstop such deficit amounts.

1.1.81    "**Eligible Inventory**" means, at any time, all inventory of the Credit Parties valued in U.S. Dollars on a lower of cost (excluding any component of cost representing intercompany profit in the case of inventory acquired from an Affiliate) or market basis in accordance with GAAP, with detailed calculations of lower of cost or market; provided that, in any event, no inventory shall be deemed Eligible Inventory unless each of the following statements is accurate and complete (unless all of the Lenders in their sole discretion elect to otherwise include such inventory) (and by including such inventory in any computation of the applicable Borrowing Base the Borrowers will be deemed to have made each of these statements in respect thereof):

(a)     such inventory is in good condition, merchantable, meets all material standards imposed by any Governmental Authority having regulatory authority over it or its

use and/or sale and is not obsolete and is either currently usable or currently saleable in the normal course of business of the applicable Credit Party;

(b)    with respect to any such inventory in excess of $250,000 per location, such inventory is:

    (i)    in possession of a Credit Party and (1) located on real property owned or leased by a Credit Party, and (2) within the U.S. or Canada; provided, that if such inventory is located on real property leased by a Credit Party and if so requested by the Agent, the landlord of such real property shall have executed and delivered to the Agent a Landlord Agreement or at the request of a Borrower or in lieu of such an agreement, the Lenders may take a reserve against Eligible Inventory equal to three month's rent;

    (ii)    in the possession of a bailee and such bailee shall have executed and delivered to the Agent, a bailee letter in form and substance satisfactory to the Agent or at the request of a Borrower, the Lenders shall be permitted to take a reasonable reserve against Eligible Inventory related to the applicable Credit Party's economic exposure to such bailee;

    (iii)    in the case of inventory located in the U.S., is placed on consignment with a consignee and such consignee shall have executed a valid consignment agreement in form and substance satisfactory to Agent and the applicable Borrower has filed (when applicable) appropriate UCC (or comparable) filings to perfect its interest in such inventory; or

    (iv)    in transit in Canada or the U.S. (provided, that the jurisdictions through which such inventory is in transit are jurisdictions where the Liens in such inventory under the Security are validly perfected first priority Liens as required by Applicable Law) and between owned or leased locations of the Credit Parties, and upon arrival at its destination, will comply with either clause (i) or (ii) above;

(c)    the Agent on behalf of the Lenders, has a first priority perfected Lien covering such inventory, and such inventory is, and at all times will be, free and clear of all Liens other than Permitted Liens and unregistered Liens in respect of Priority Claims that are not yet due and payable;

(d)    such inventory does not include goods (i) that are not owned by a Credit Party, (ii) that are held by a Credit Party pursuant to a consignment agreement, or (iii) which have been sold by a Credit Party on a bill and hold basis;

(e)    such inventory is not subject to repossession on account of the "30 day goods" rule under section 81.1 of the *Bankruptcy and Insolvency Act* (Canada) or similar Laws except to the extent the applicable vendor has entered into an agreement with the Agent, in form and substance satisfactory to the Agent, waiving its right to repossession;

(f)     such inventory does not consist of work in process, store room materials, samples, prototypes, or packing and shipping materials not considered for sale by the Credit Parties in the ordinary course of business;

(g)     such inventory does not consist of goods that are returned (as defective or not fit for purpose) or used goods taken in trade;

(h)     any portion of the value of such inventory which results from a profit or gain resulting from an inter-company sale or other disposition of such inventory shall be excluded;

(i)     any "seconds" or scrap inventory shall be valued at scrap value;

(j)     such inventory is not evidenced by negotiable documents of title unless delivered to the Agent with endorsements;

(k)     such inventory does not constitute Hazardous Materials;

(l)     such inventory is covered by casualty insurance; and

(m)     the Agent has not determined in its Permitted Discretion that it may not sell or otherwise dispose of such inventory in accordance with the terms of the applicable Credit Documents without infringing upon the rights of another Person or violating any contract with any other Person.

1.1.82    "**Eligible Line of Business**" means any business engaged in as of the date of this Agreement by any of the Credit Parties, and any business reasonably related thereto.

1.1.83    "**Eligible Receivables**" means, at the time of determination, the Receivables of the Credit Parties then existing (other than with respect to Anchor, Terra and their respective Subsidiaries), minus any Receivable to which any of the criteria set forth below applies (unless all of the Lenders in their sole discretion elect to otherwise include such Receivables):

(a)     is not then subject to the applicable duly perfected Liens created by the Security;

(b)     is subject to any Lien or deemed trust (other than a Permitted Lien which does not rank in priority to the Liens created by the Security);

(c)     is outstanding more than (i) 120 days, in the case of Acceptable Account Debtors or (ii) 90 days, in the case of all other account debtors, in either case after the date of shipment of inventory or the provision of the service that created such Receivable;

(d)     is subject to any offset or counterclaim by the applicable account debtor (but only to the extent of such offset);

(e)     is owed by any Person whose principal place of business is located outside Canada or the U.S. unless the sale is on letter of credit, guarantee or some other terms acceptable to the Agent, acting reasonably;

(f)     is payable in a currency other than Canadian Dollars or U.S. Dollars;

(g)     is owed by an Affiliate of the Borrower or any employee, agent or representative of the Borrower or of any such Affiliate;

(h)     with respect to which a cheque, note, draft or other payment instrument has not been honoured in accordance with its terms;

(i)     is owed by any Person that is subject to an Insolvency Event; provided that the Receivables from insolvent account debtors shall be Eligible Receivables if and to the extent that such Receivables are fully covered by credit insurance, letters of credit or other sufficient third-party credit support, or are otherwise deemed by the Agent not to pose an unreasonable risk of non-collectability;

(j)     is subject to a holdback, but only to the extent of the amount of such holdback;

(k)     is in dispute, but only to the extent of the amount thereof in dispute, or is subject to a claim regarding rescission, cancellation or avoidance, whether by operation of law or otherwise;

(l)     to the extent such Receivable is evidenced by a judgment, provided that such Receivables shall be Eligible Receivables if and to the extent that such Receivables are fully covered by credit insurance, letters of credit or other sufficient third-party credit support, or are otherwise deemed by the Agent not to pose an unreasonable risk of non-collectability; and

(m)     is owed by a Governmental Authority where Applicable Law imposes any requirement (including any requirement of notice, acceptance or acknowledgment by the Governmental Authority) to constitute a valid assignment as against such Governmental Authority, unless the applicable Credit Party has assigned its rights to payment of such Receivable to the Agent pursuant to, in the case of a U.S. federal Governmental Authority, the Assignment of Claims Act of 1940, as amended, or complied with such requirement pursuant to Applicable Law in the case of any other Governmental Authority.

(n)     is or has been sold, contributed, financed or otherwise conveyed or pledged pursuant to either of a Permitted Factoring Transaction or a Permitted Securitization Financing.

For certainty, if any Receivable that is otherwise an Eligible Receivable is sold, contributed, financed or otherwise conveyed or pledged pursuant to a Permitted Securitization Financing it shall immediately cease to be an Eligible Receivable.

1.1.84   "**Encina**" means Encina Business Credit, LLC and its successors and permitted assigns.

1.1.85   "**Encina ABL Loan Agreement**" means the credit agreement dated as the November 21, 2017 by and among Anchor, the U.S. Borrower, each Person joined thereto as a borrower form time to time, the lenders from time to time party thereto and Encina as agent on behalf of such lenders, as may be amended, restated, replaced or otherwise modified from time to time to the extent permitted by the Encina Intercreditor Agreement.

1.1.86   "**Encina Intercreditor Agreement**" means the intercreditor agreement dated as of the November 21, 2017 among Encina, the Agent, Anchor and the U.S. Borrower, as may be amended, restated, replaced or otherwise modified from time to time.

1.1.87   "**Equity Cure**" is defined in Section 7.3.2.

1.1.88   "**Equity Cure Repayment**" is defined in Section 7.3.2.

1.1.89   "**Equivalent Amount**" means, in relation to an amount in one currency, the amount in another currency that could be purchased by the amount in the first currency determined by reference to the applicable Exchange Rate at the time of such determination.

1.1.90   "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any applicable regulation promulgated thereunder.

1.1.91   "**ERISA Affiliate**" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of any Credit Party, or under common control with any Credit Party, within the meaning of Section 414 of the Code.

1.1.92   "**ERISA Event**" means (i) the occurrence of a reportable event, as defined in Section 4043 of ERISA, with respect to any Plan unless the 30 day notice requirement with respect to such event has been waived by the PBGC; (ii) the application for a minimum funding waiver pursuant to Section 412(c) of the Code or Section 302(c) of ERISA with respect to a Plan; (iii) the receipt by any Credit Party from the administrator of any Plan of a notice pursuant to Section 4041(a)(2) of ERISA of intent to terminate such Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the cessation of operations at a facility of any Credit Party or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (v) the withdrawal by any Credit Party or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (vi) the conditions for imposition of a Lien under Section 303 of ERISA shall have been met with respect to any Plan; or (vii) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042(a) of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, such Plan.

1.1.93   "**Exchange Rate**" means, on the date of determination of any amount of one currency to be converted into another currency pursuant to this Agreement for any reason, or vice-versa, the spot rate of exchange for converting Canadian Dollars into such other currency or vice-versa, as the case may be, established by the Bank of Canada at approximately 4:30 p.m. (Toronto time) on the Business Day immediately preceding the date of determination, and if no such rate is quoted, the spot rate of exchange for wholesale transactions by the Agent in Toronto, Ontario in accordance with its normal practice;.

1.1.94   "**Excluded Account**" means (a) any deposit account used solely for: (i) funding payroll or segregating payroll taxes or funding other employee wage or benefit payments in the ordinary course of business or (ii) segregating 401k contributions or contributions to an employee stock purchase plan and other health and benefit plan, in each case for payment in accordance with any Applicable Laws, (iii) any zero-balance disbursement accounts, or (iv) disbursements to pay independent contractors, (b) any deposit account the funds in which consist solely of funds held by Holdco or any Subsidiary on behalf of or in trust for the benefit of any third party that is not an Affiliate of Holdco, any Subsidiary or any Investor, (c) any deposit account the funds in which consist solely of cash earnest money deposits or funds deposited under escrow or similar arrangements in connection with any letter of intent or purchase agreement for a Permitted Acquisition or any other transaction permitted under this Agreement, and (d) any deposit account the funds in which consist solely of funds held by Anchor and its Subsidiaries until such time as the Encina ABL Loan Agreement is terminated and the obligations thereunder have been repaid in full;

1.1.95   "**Excluded Hedging Obligation**" means, with respect to any Credit Party, any Hedging Liabilities if, and to the extent that, all or a portion of the Financial Assistance of such Credit Party of, or the grant by such Credit Party of a security interest to secure, such Hedging Liabilities (or any Financial Assistance in respect thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Credit Party's failure for any reason to constitute an Qualified ECP Guarantor at the time the Financial Assistance of such Credit Party, or a grant by such Credit Party of a security interest, becomes effective with respect to such Hedging Liabilities. If a Hedging Liability arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Hedging Liabilities that is attributable to swaps for which such Financial Assistance or security interest is or becomes excluded in accordance with the first sentence of this definition.

1.1.96   "**Executive Order**" means the Executive Order No. 13224 of 23 September 2001, entitled "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism".

1.1.97   "**Existing Credit Agreement**" means the Amended and Restated Credit Agreement, dated January 30, 2015 (as amended, supplemented or otherwise modified from time to time prior to the Amendment and Restatement Date), among the Canadian

Borrower, the U.S. Borrower, HSBC, as administrative agent thereunder and the financial institutions from time to time party thereto as lenders.

1.1.98 "**Facilities**" means, collectively, the Term Facility, the Canadian Operating Facility and the U.S. Operating Facility; and "**Facility**" means any of them as the context requires.

1.1.99 "**Facilities Maturity Date**" means, in respect of each Facility, May 22, 2021.

1.1.100 "**FATCA**" means Section 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current and future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

1.1.101 "**Federal Funds Rate**" means, for any day, the rate of interest per annum set forth in the weekly statistical release designated as H.15(519), or any successor publication, published by the Federal Reserve Board (including any such successor, the "**H.15(519)**") for such day opposite the caption "*Federal Funds (Effective)*". If on any relevant day such rate is not yet published in H.15(519), the rate for such day will be the rate of interest per annum set forth in the daily statistical release designated as the Composite 3:30 p.m. Quotations for U.S. Government Securities, or any successor publication, published by the Federal Reserve Bank of New York (including any successor, the "**Composite 3:30 p.m. Quotations**") for such day under the caption "*Federal Funds Effective Rate*". If on any relevant day the appropriate rate per annum for such day is not yet published in either H.15(519) or the Composite 3:30 p.m. Quotations, the rate for such day will be the arithmetic mean of the rates per annum for the last transaction in overnight Federal funds arranged prior to 9:00 a.m. (New York time) on that day by each of three major brokers of Federal funds transactions in New York City, selected by the Agent in its sole discretion, acting reasonably; provided that if the Federal Funds Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.102 "**Fee Agreement**" means the agreement between the Borrowers and the Agent delivered on or before the Amendment and Restatement Date under Section 9.1(n).

1.1.103 "**Financial Assistance**" means with respect of any Person and without duplication, any loan, guarantee, indemnity, assurance, acceptance, extension of credit, loan purchase, share purchase, equity or capital contribution, investment or other form of direct or indirect financial assistance or support of any other Person or any obligation (contingent or otherwise) primarily for the purpose of enabling another Person to incur or pay any indebtedness or to comply with agreements relating thereto or otherwise to assure or protect creditors of the other Person against loss in respect of indebtedness of the other Person and includes any guarantee of or indemnity in respect of the indebtedness of the other Person and any absolute or contingent obligation to (directly or indirectly):

     (a)     advance or supply funds for the payment or purchase of any indebtedness of any other Person;

     (b)     purchase, sell or lease (as lessee or lessor) any property, assets, goods, services, materials or supplies primarily for the purpose of enabling any Person to make payment of Funded Debt or to assure the holder thereof against loss;

     (c)     guarantee, indemnify, hold harmless or otherwise become liable to any creditor of any other Person from or against any losses, liabilities or damages in respect of Funded Debt;

     (d)     make a payment to another for goods, property or services regardless of the non-delivery or non-furnishing thereof to a Person; or

     (e)     make an advance, loan or other extension of credit to or to make any subscription for equity, equity or capital contribution, or investment in or to maintain the capital, working capital, solvency or general financial condition of another Person;

provided, however, that the term "Financial Assistance" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Amendment and Restatement Date or entered into in connection with any acquisition or disposition of assets permitted by this Agreement.

The amount of any Financial Assistance is the amount of any loan or direct or indirect financial assistance or support, without duplication, given, or all indebtedness of the obligor to which the Financial Assistance relates, unless the Financial Assistance is limited to a determinable amount, in which case the amount of the Financial Assistance is the determinable amount.

1.1.104  "**Financial Letter of Credit**" means a standby Letter of Credit if it serves as a payment guarantee of a Credit Party's financial obligations and is treated as a direct credit substitute for purposes of the Capital Adequacy Guidelines in the Swingline Lender's or Issuing Bank's, as applicable, reasonable opinion.

1.1.105  "**First Amendment Date**" means May 13, 2019.

1.1.106  "**First-Ranking Security Interest**" in respect of any Collateral means a Lien in such Collateral which is registered where necessary or desirable to record and perfect the charges contained therein and which ranks in priority to all other Liens in such Collateral except for any Permitted Liens which have priority thereto in accordance with Applicable Law or as otherwise agreed in writing by the Lenders.

1.1.107  "**Fiscal Quarter**" means the three (3) month period commencing on the first day of each Fiscal Year and each successive three (3) month period thereafter during such Fiscal Year.

1.1.108 "**Fiscal Year**" means the fiscal year of the Borrowers and their Subsidiaries commencing on January 1 of each year and ending on December 31 of each year.

1.1.109 "**Fixed Charge Coverage Ratio**" means, in respect of the Credit Parties on a combined basis for any applicable period, the ratio of:

(a)    (i) EBITDA for such period, plus, to the extent not included in EBITDA, the aggregate amount of all unencumbered cash (except pursuant to the Security) received by any Credit Party as payment of unbilled Receivables outstanding as of December 31, 2015 that were outstanding for more than 720 days from any of the Pemex Entities, in respect of contract number 423023821 dated August 6, 2013, between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V., and contract number 423023813 dated July 25, 2013, between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V. (in each case, as may be amended or otherwise modified from time to time), in an amount not to exceed $13,500,000, *minus* (ii) Earnout Payments made during such period (but only to the extent not directly funded by the cash proceeds from the sale of equity interests of the Canadian Borrower and, to the extent contributed to the capital of the Canadian Borrower, equity interests of any of the Canadian Borrower's direct or indirect parent companies), *minus* (iii) Unfunded Capital Expenditures made during such period, *minus* (iv) all Cash Taxes during such period, *minus* (v) Permitted Management Fees and Catch Up Management Fee Payments, if any, paid during such period, *minus* (vi) any payments made during such period pursuant to clauses 7.2.6(l), *minus* (vii) all other Distributions to Persons that are not Credit Parties paid during such period, *minus* (viii) the fees and expenses described in clause (k) of the definition of EBITDA; <u>provided</u> that, any deferred purchase price payments made in accordance with the terms of the Anchor Acquisition Agreement shall not be deducted from EBITDA for the purposes of calculating the Fixed Charge Coverage Ratio;

*divided by*

(b)    the sum total of:

(i)    all Interest Expense paid or payable in cash for such period;

(ii)    the scheduled principal component of all Capital Lease payments for such period; and

(iii)    all scheduled principal repayments under the Term Facility pursuant to Section 3.4.2 or under any other Funded Debt paid during such period;

all determined on a consolidated basis in accordance with GAAP and tested on a trailing 12 month basis at the end of each Fiscal Quarter.

1.1.110 "**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

1.1.111  "**Funded Debt**" means, with respect to any Person, all indebtedness, liabilities and obligations which would in accordance with GAAP be classified in the consolidated balance sheet of such Person as indebtedness for borrowed money and including without duplication:

(a)     money borrowed by way of overdraft;

(b)     indebtedness represented by bonds, debentures or notes payable and drafts accepted representing extensions of credit;

(c)     bankers' acceptances and similar instruments;

(d)     letters of credit, letters of guarantee and surety bonds issued at the request of such Person (to the extent not cash collateralized), but excluding Non-Financial Letters of Credit;

(e)     actual amounts owed under Hedging Agreements upon termination of such Hedging Agreements, including net settlement amounts payable upon maturity and termination payments payable upon termination or early termination, which are not paid when due;

(f)     indebtedness secured by any Lien existing on property of such Person, whether or not the indebtedness secured thereby shall have been assumed;

(g)     all obligations (whether or not with respect to the borrowing of money) that are evidenced by bonds, debentures, notes or other similar instruments, or that are not so evidenced but that would be considered by GAAP to be indebtedness for borrowed money;

(h)     all redemption obligations and mandatory dividend obligations of such Person with respect to any shares issued by such Person and which are by their terms or pursuant to any contract, agreement or arrangement:

(i)      redeemable, retractable, payable or required to be purchased or otherwise retired or extinguished, or convertible into debt of such Person (A) at a fixed or determinable date, (B) at the option of any holder thereof, or (C) upon the occurrence of a condition not solely within the control and discretion of such Person; or

(ii)     convertible into any other shares described in clause (i) above;

in any case under this clause (h), except as a result of an initial public offering, change of control or asset sale (so long as the Obligations have otherwise been paid in full prior to any such payment being required to be made under clause (i) above).

(i)     all obligations as lessee under Capital Leases;

(j)     all obligations under or in connection with any (i) Permitted Factoring Transaction and (ii) Permitted Securitization Financing (to the extent included in the consolidated balance sheet of such Person), which shall in each case be deemed to be equal to the net proceeds received thereunder;

(k)     all obligations of such Person secured by Purchase-Money Security Interests; and

(l)     any guarantee or indemnity (other than by endorsement of negotiable instruments for collection or deposit in the ordinary course of business) in any manner of any part or all of an obligation of another Person of the type included in items (a) through (k) above;

but excluding for greater certainty, deferred income taxes and normal course trade payables.

1.1.112 "**GAAP**" means generally accepted accounting principles in Canada or the United States as approved by the Canadian Institute of Chartered Accountants or American Institute of Certified Public Accountants, respectively, in effect from time to time, and as of the Amendment and Restatement Date, includes Canadian or United States generally accepted accounting principles for private enterprises.

1.1.113  "**Governmental Authority**" means any:

(a)     national, federal, provincial, state, municipal, local or other governmental or public department, central bank, court, commission, board, bureau, agency or instrumentality, domestic or foreign;

(b)     any subdivision or authority of any of the foregoing; or

(c)     any quasi-governmental, judicial or administrative body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing.

1.1.114  "**Group**" means any "**group**" such term as used in Sections 13(d) and 14(d) of the *United States Securities Exchange Act* of 1934, as amended, other than the Permitted Holders.

1.1.115  "**Guarantee**" means any agreement by which any Person assumes, guarantees, indemnifies, endorses, contingently agrees to purchase or provide funds for the payment of, or otherwise becomes liable upon, the obligation of any other Person, or agrees to maintain the net worth or working capital or other financial condition of any other Person or otherwise assures any creditor of such Person against loss, and shall include any contingent liability under any letter of credit or similar document or instrument.

1.1.116  "**Guarantors**" means Holdco and all current and future direct and indirect Material Subsidiaries of the Canadian Borrower.

1.1.117  "**Hazardous Materials**" means any contaminant, pollutant, waste or substance that is likely to cause immediately or at some future time harm or degradation to the

surrounding environment or risk to human health; and without restricting the generality of the foregoing, including any pollutant, contaminant, waste, hazardous waste or dangerous goods that is regulated by any Requirements of Environmental Law or that is designated, classified, listed or defined as hazardous, toxic, radioactive or dangerous or as a contaminant, pollutant or waste by any Requirements of Environmental Law.

1.1.118  "**Hedge Provider**" means any Lender or any Affiliate thereof that enters into a Hedging Agreement with a Credit Party prior to such Lender ceasing to be a Lender under this Agreement. For certainty, any Person who enters into a Hedging Agreement after such Person ceases to be a Lender hereunder is not a Hedge Provider for purposes such Hedging Agreement.

1.1.119  "**Hedging Agreements**" means Interest Rate Hedging Agreements and Currency Hedging Agreements.

1.1.120  "**Hedging Liability**" means the actual indebtedness or obligations of any Credit Party to a counterparty who enters into a Hedging Agreement with such Credit Party under or pursuant to such Hedging Agreement.

1.1.121  "**Holdco**" means Fluid Holding Corp., a corporation incorporated under the BCBCA, and its successors and permitted assigns.

1.1.122  "**Hostile Acquisition**" means an acquisition, which is required to be reported to applicable securities regulatory authorities, of shares of a corporation where the board of directors of that corporation has not approved such acquisition nor recommended to the shareholders of the corporation that they sell their shares pursuant to the proposed acquisition or of units of a trust where the trustee or manager or administrator of that trust has not approved such acquisition nor recommended to the unitholders of the trust that they sell their units pursuant to the proposed acquisition or of units of a partnership where the board of directors of the general partner(s) thereof has not approved such acquisition nor recommended to the partners of the partnership that they sell their units pursuant to the proposed acquisition.

1.1.123  "**HSBC**" means HSBC Bank Canada and its successors and permitted assigns.

1.1.124  "**HSBC Mexico**" means HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC.

1.1.125  "**HSBC US**" means HSBC Bank USA, National Association and its successors and permitted assigns.

1.1.126  "**Impositions**" is defined in Section 12.4.1.

1.1.127  "**Indemnitees**" means the Lenders, the Agent and their respective successors and permitted assignees, any agent of any of them (specifically including a receiver or receiver-manager) and the respective officers, directors and employees of the foregoing.

1.1.128  "**Insolvency Event**" means, in respect of any Person:

(a)     such Person commits an act of bankruptcy or becomes insolvent (as such terms are used in the BIA); or makes an assignment for the benefit of creditors, files a petition in bankruptcy, makes a proposal or commences a proceeding under Insolvency Legislation; or petitions or applies to any tribunal for, or consents to, the appointment of any receiver, trustee or similar liquidator in respect of all or a substantial part of its property; or admits the material allegations of a petition or application filed with respect to it in any proceeding commenced in respect of it under Insolvency Legislation; or takes any board action for specifically authorizing any of the foregoing actions; or

(b)     any proceeding or filing is commenced against such Person seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment or composition of it or its debts under any Insolvency Legislation, or seeking appointment of a receiver, trustee, custodian or other similar official for it or any of its property or assets; unless:

   (i)     such Person is diligently defending such proceeding in good faith and on reasonable grounds as determined by the Required Lenders acting reasonably and the same shall continue undismissed, or unstayed and in effect, for any period of 60 consecutive days; and

   (ii)    such proceeding does not in the reasonable opinion of the Required Lenders materially adversely affect the ability of such Person to carry on its business and to perform and satisfy all of its obligations.

1.1.129 "**Insolvency Legislation**" means legislation in any applicable jurisdiction relating to reorganization, arrangement, compromise or re-adjustment of debt, dissolution or winding-up, or any similar legislation, and specifically includes the BIA, the *Companies' Creditors Arrangement Act* (Canada), the *Winding-Up and Restructuring Act* (Canada) and the *Bankruptcy Code* (United States) and any similar legislation under Applicable Law.

1.1.130  "**Insurance Proceeds**" is defined in Section 5.3.1(c).

1.1.131  "**Insured Receivables**" means Receivables of the Credit Parties owing from account debtors that:

(a)     solely in respect of Insured Receivables that do not derive from and are not governed by the laws of Canada or the United States of America or any political subdivision thereof, no less than 80% of such Receivables arise from Eligible Approved Contracts; *provided* that if the revenue derived from any such single contract exceeds 10% of the Canadian Borrower's annual revenue as set out in the then most recent income statement of the Canadian Borrower that was delivered to the Lenders hereunder, such contract must be an Eligible Approved Contract;

(b)     does not arise under an "excluded contract" or any similar term as provided in the Account Receivable Insurance, are within the approved credit, sovereign, country, single obligor and other limits under the Account Receivable Insurance and are otherwise covered under the Account Receivable Insurance which is in full force and effect;

(c)     the Credit Parties have complied with the credit policy provided for in the Account Receivable Insurance with respect to such Receivables, including the issuance of invoices, *pro forma* invoices and final invoices within the required time periods thereunder;

(d)     there are no events, facts or circumstances which would reasonably be expected to result in the insurer under the Account Receivable Insurance denying (or withholding or delaying) payment of a claim in respect of such Receivables or asserting any defense, dispute or counterclaim with respect to such Receivables;

(e)     the insurer under the Account Receivable Insurance has not denied all or any portion of a claim in respect of such Receivable, and has not asserted any defense, dispute or counterclaim with respect to such Receivable;

(f)     the Credit Parties have not suffered any loss with respect to such Receivables, unless such loss is covered by the Account Receivable Insurance;

(g)     are not in dispute and are valid and enforceable obligations of the account debtor under Applicable Law;

(h)     if Credit Parties have suffered a loss in respect of such Receivable covered by the Account Receivable Insurance, they have submitted a claim for such loss in accordance with the terms of the Account Receivable Insurance and have otherwise complied with all provisions of the Account Receivable Insurance on a timely basis in order to be entitled to have such claim paid by the insurer under the Account Receivable Insurance;

(i)     the Credit Parties have paid any required deductibles under the Account Receivable Insurance in respect of such Receivables; and

(j)     in any case, are due within the time period, including any "waiting period", from the date of billing required under the Account Receivable Insurance in respect of such Receivable.

1.1.132 "**Intercreditor Agreement**" means that certain intercreditor and priority agreement between the Agent, HSBC Mexico, and the Borrower or QMax Mexico, as amended, modified, supplemented or restated from time to time, with respect to any Permitted Factoring Transaction with HSBC Mexico.

1.1.133 "**Interest**" means interest on loans, stamping fees in respect of bankers' acceptances, the difference between the proceeds received by the issuers of bankers' acceptances and the amounts payable upon the maturity thereof, issuance fees in respect

of letters of credit, and any other charges or fees in connection with the extension of credit which are determined by reference to the amount of credit extended, plus standby fees in respect of the unutilized portion of any credit facility; but for greater certainty "Interest" shall not include agency fees, arrangement fees, structuring fees, fees relating to the granting of consents, waivers, amendments, extensions or restructurings, the reimbursement of costs and expenses, and any similar amounts which may be charged from time to time in connection with the establishment, administration or enforcement of the credit facilities.

1.1.134  "**Interest Expense**" means, with respect to any Person for any period, the sum of (without duplication) (a) interest expense of such Person for such period on a consolidated basis, including (i) the amortization of debt discounts, (ii) all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances, (iii) standby fees in respect of undrawn debt, (iv) discounts applied to the proceeds of any Permitted Factoring Transaction or Permitted Securitization Financing, and (v) the portion of any payments or accruals with respect to Capital Lease obligations allocable to interest expense (but excluding (A) non-cash interest expense attributable to the movement of mark-to-market hedging obligations or other derivative instruments pursuant to GAAP (B) penalties and interest related to taxes, amortization of debt financing fees, debt issuance costs, commissions, fees and expenses and the expensing of any commitment and other financing fee in each case, to the extent constituting interest expense under GAAP), and (b) capitalized interest of such Person. For purposes of the foregoing, cash interest expense shall be determined after giving effect to any net payments made or received and costs incurred by the Borrower and the Subsidiaries with respect to Interest Rate Hedging Agreements, and interest on a Capital Lease obligation shall be deemed to accrue at an interest rate reasonably determined by the Borrower to be the rate of interest implicit in such Capital Lease obligation in accordance with GAAP.

1.1.135  "**Interest Rate Hedging Agreement**" means any agreement that does not contravene Section 7.2.13 entered into between the Borrower and a counterparty from time to time for the purpose of hedging interest rate risk, including interest rate exchange agreements (commonly known as "**interest rate swaps**") and forward rate agreements; and for greater certainty, including interest rate exchange agreements in U.S. Dollars (commonly known as "**cross-currency swaps**").

1.1.136  "**Interim Financial Statements**" in respect of any Fiscal Quarter means, in respect of any Person, the unaudited financial statements of such Person on a consolidated basis in respect of such Fiscal Quarter (and also on a year-to-date basis in respect of such Fiscal Quarter and all previous Fiscal Quarters in the same Fiscal Year).

1.1.137  "**Investment Grade**" means, with respect to the long term unsecured debt ratings of a Person, of the rating agencies on the date hereof, Baa3 or higher for Moody's Investors Services, Inc. or BBB- or higher for Standard & Poor's Rating Services, a division of The McGraw Hill Companies, Inc. (or in either case, their respective successors).

1.1.138  "**Investments**" has the meaning given to it in Section 7.2.3.

1.1.139  "**Investors**" means Pep Fluid Co-Invest L.P., PEP Fluid L.P. and any other investors from time to time who are approved in writing by the Agent on behalf of the Required Lenders.

1.1.140  "**ISDA**" means the International Swaps and Derivatives Association and its successors and assigns.

1.1.141  "**ISP98**" means the International Standby Practices ISP98, as published by the International Chamber of Commerce and in effect from time to time.

1.1.142  "**Issuing Bank**" means the Swingline Lender under the Canadian Operating Facility and HSBC US under the U.S. Operating Facility, as applicable.

1.1.143  "**Land**" means real property (including a leasehold interest in land) and all buildings, improvements, fixtures and plant situated thereon.

1.1.144  "**Landlord Agreement**" means an agreement between the Agent, the applicable Credit Party and the landlord of a Leased Property in form and substance reasonably satisfactory to the Agent, which shall include the following provisions (except to the extent otherwise agreed by the Agent in its discretion): such landlord consents to the granting of a security interest in the lease applicable to such Leased Property by a Credit Party which is a tenant thereunder in favour of the Agent, agrees to give written notice to the Agent in respect of and a reasonable opportunity to cure any default before terminating the lease, and agrees to waive (or subordinate and defer the enforcement of) its rights and remedies and any security it may hold in respect of any assets owned by the applicable Credit Party located on or affixed to such Leased Property.

1.1.145  "**Laws**" means all laws, statutes, codes, ordinances, decrees, rules, regulations, municipal by-laws, judicial or arbitral or administrative or ministerial or departmental or regulatory judgments, orders, decisions, rulings or awards, or any provisions of such laws, including general principles of common and civil law and equity or policies or guidelines, to the extent such policies or guidelines have the force of law, binding on the Person referred to in the context in which such word is used; and "**Law**" means any of the foregoing.

1.1.146  "**LC Payment**" is defined in Section 2.7.9.

1.1.147  "**Leased Properties**" means all Land leased by any Credit Party as tenant from time to time, specifically including as at the date of this Agreement the Land described in Schedule 6.1.10; and "**Leased Property**" means any of the Leased Properties as the context requires.

1.1.148  "**Lenders**" means the lenders identified in Exhibit "A" attached hereto and any other Persons which may from time to time become lenders pursuant to this Agreement; and their respective successors and permitted assigns; and "**Lender**" means any of them as the context requires.

1.1.149 "**Lending Office**" in respect of any Lender means the office of such Lender designated by it from time to time as the office from which it will make Advances hereunder.

1.1.150 "**Letter of Credit**" means a stand-by letter of credit or a letter of guarantee or documentary letter of credit issued, at the request of and on behalf of the Borrower, by the applicable Issuing Bank.

1.1.151 "**Level**" means the applicable level as set forth in the table set forth in the definition of Applicable Margin.

1.1.152 "**LIBOR Business Day**" means a day on which the main branches of the Agent and commercial banks generally are open for international business (including dealings in U.S. Dollar deposits in the London interbank market) in London, England and New York, New York.

1.1.153 "**LIBOR Interest Period**" means, with respect to each LIBOR Loan, the initial period (subject to availability) of approximately one, two, three, six or twelve months or such other periods as selected by the Borrower and notified in writing to the Agent commencing on and including the date of any Advance, Conversion or Rollover, as the case may be, applicable to such LIBOR Loan and ending on and including the last day of such initial period, and thereafter, each successive period (subject to availability) of approximately one, two, three, six or twelve months or such other periods as selected by the Borrower and notified to the Agent in writing commencing on and including the last day of the prior LIBOR Interest Period; provided, however, that:

(a)     in the case of a Rollover, the last day of each LIBOR Interest Period shall also be the first day of the next LIBOR Interest Period;

(b)     the last day of each LIBOR Interest Period shall be a LIBOR Business Day and if not, the Borrower shall be deemed to have selected a LIBOR Interest Period the last day of which is the first LIBOR Business Day following the last day of the LIBOR Interest Period selected by the Borrower;

(c)     if the Borrower selects a LIBOR Interest Period for a period longer than three months, the last day of such LIBOR Interest Period shall be the date falling three months after the beginning of such LIBOR Interest Period and the next LIBOR Interest Period shall begin on such date; and

(d)     notwithstanding any of the foregoing, the last day of each LIBOR Interest Period shall be on or before the maturity date of the applicable Facility.

1.1.154 "**LIBOR Loan**" means an Advance made by a Lender to a Borrower in U.S. Dollars in accordance with the provisions hereof, bearing interest by reference to the U.S. Dollar LIBOR Rate.

1.1.155 "**LIBOR Market**" means the London Interbank Eurodollar offering market.

1.1.156 "**LIBOR Period**" means, in respect of a LIBOR Loan, the period commencing on the date of the Advance of such LIBOR Loan and ending on the scheduled maturity date of such LIBOR Loan.

1.1.157 "**LIBOR Rate**" means, with respect to each LIBOR Interest Period pertaining to any LIBOR Loan, the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other successor thereto which takes over administration of such rate) appearing on Bloomberg Page BBAM1 screen (or on any successor or substitute page of such Bloomberg screen providing rate quotations comparable to those currently provided on such page of such Bloomberg screen, as determined by the Agent from time to time for purposes of providing quotations of interest rates applicable to U.S. Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two LIBOR Business Days prior to the making a LIBOR Loan, as the rate for the offering of U.S. Dollar deposits with a maturity comparable to the LIBOR Interest Period of such LIBOR Loan; provided, however, that if the said page is not available for any reason, the term "**LIBOR Rate**" shall mean the rate per annum at which deposits in U.S. Dollars for the applicable interest period and amount are offered to the Agent in the LIBOR Market; provided that if the LIBOR Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.158 "**Lien**" means:

(a)   a lien, charge, mortgage, deed of trust, pledge, security interest or conditional sale or title retention agreement in the nature of security which secures payment or performance of an obligation;

(b)   an assignment, lease, consignment, deposits, trust or deemed trust that secures payment or performance of an obligation;

(c)   a garnishment; and

(d)   any other encumbrance of any kind in the nature of security which secures payment or performance of an obligation (including any garantía prioritaria por adquisición under law 1676 of 2013 Colombia).

1.1.159 "**Loan**" means a Canadian Dollar Prime Rate Loan, U.S. Dollar Base Rate Loan, U.S. Dollar Prime Rate Loan, LIBOR Loan, Bankers' Acceptance, BA Equivalent Loan or Letter of Credit outstanding hereunder, or in the case of the Swingline, Overdraft borrowings and such other Advances permitted under Section 2.7.2.

1.1.160 "**Management Shareholders**" means each of the employees of the Canadian Borrower who hold Common Shares of the Canadian Borrower or options in respect of the same on the Amendment and Restatement Date and such other holders thereof from time to time who are approved in writing by the Agent on behalf of the Required Lenders, and "**Management Shareholder**" means any one of them.

1.1.161 "**Marginable Capital Assets**" means 60% of the net book value of Eligible Capital Assets at the time of determination, up to a maximum amount of U.S. $50,000,000 less the amount of each completed Anchor Sale and Leaseback Transaction; provided that, reductions resulting from Anchor Sale and Leaseback Transactions shall not reduce the amount available below U.S. $30,000,000.

1.1.162 "**Marginable Cash**" means 100% of Eligible Cash up to a maximum amount of U.S. $15,000,000 at any time.

1.1.163 "**Marginable Inventory**" means 50% of Eligible Inventory at the time of determination, up to U.S. $35,000,000.

1.1.164 "**Marginable Receivables**" means the sum of the following (without duplication):

(a)     90% of Insured Receivables (or such lower percentage as is covered by the applicable Account Receivable Insurance) up to a maximum amount of U.S. $175,000,000;

(b)     85% of Eligible Receivables owed to a Credit Party by Acceptable Account Debtors;

(c)     75% of all other Eligible Receivables; and

(d)     90% of Insured Receivables from Pemex outstanding more than 300 days, but not more than 540 days, in respect of contract numbers 423023819 and 423023813 between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V., dated April 22, 2014 and July 17, 2013, respectively, and contract number 423023813, dated July 25, 2013, between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V. (in each case, as may be amended or otherwise modified from time to time).

1.1.165 "**Material Adverse Change**" or "**Material Adverse Effect**" means any matter, event or circumstance that individually or in the aggregate could, in the opinion of the Required Lenders, acting reasonably, be expected to result in a material adverse change to or have a material adverse effect on:

(a)     the business, financial condition, prospects, operations, or property, of the Canadian Borrower and its Subsidiaries (excluding any Securitization SPE), taken as a whole;

(b)     the ability of any Credit Party to pay and perform its obligations in accordance with this Agreement or any of the other Credit Documents; or

(c)     the validity or enforceability of this Agreement or any other Credit Document.

1.1.166 "**Material Agreement**" means, in respect of the Credit Parties, an agreement made between the applicable Credit Party or its predecessors and another Person (a)

pursuant to which such Credit Party is reasonably expected to incur obligations or liabilities in excess of $10,000,000 in any Fiscal Year (other than any agreement related to the purchase of equipment, software or utility services) and (b) which if terminated (other than at its scheduled maturity) would, unless replaced with a substantially similar agreement, result, or would have a reasonable likelihood of resulting, in a Default, an Event of Default or a Material Adverse Change, specifically including, as at the Amendment and Restatement Date, each agreement listed in Schedule 6.1.13; provided, in each case, in no event shall the Wells Fargo Credit Agreement or any agreement in connection with a Permitted Securitization Financing be considered a Material Agreement.

1.1.167 "**Material Permit**" means, in respect of the Credit Parties, a licence, permit, approval, registration or qualification granted to or held by the applicable Credit Party which if terminated and not replaced would result, or would have a reasonable likelihood of resulting, in a Default, an Event of Default or a Material Adverse Change; specifically including, as at the date of this Agreement, each licence, permit, approval, registration or qualification listed in Schedule 6.1.8.

1.1.168 "**Material Subsidiary**" means (a) any wholly-owned Subsidiary of the Canadian Borrower which:

(i) has Consolidated Net Tangible Assets owned directly by it on an unconsolidated basis equal or greater than 5% of the Canadian Borrower's Consolidated Net Tangible Assets as at the end of the Fiscal Quarter immediately prior to the date of such determination;

(ii) has EBITDA generated by it on an unconsolidated basis equal or greater than 5% of the Canadian Borrower's consolidated EBITDA as at the end of the Fiscal Quarter immediately prior to the date of such determination; or

(iii) any Subsidiary of the Canadian Borrower that has been designated as a "Material Subsidiary" by the Borrower,

and (b) any Subsidiary which owns, directly or indirectly, any equity or other ownership interest in a Material Subsidiary.

1.1.169 "**Minimum Liquidity**" means the sum of (A) the amount of unrestricted cash (determined in accordance with GAAP) and Cash Equivalents of the Credit Parties held in accounts with any of the Lenders, Encina (or any other lenders party to the Encina ABL Loan Agreement) and Wells Fargo (or any other lenders party to the Wells Fargo Credit Agreement), plus (B) the Minimum Margin Availability and undrawn available amount under the Encina ABL Loan Agreement or the Wells Fargo Credit Agreement, as applicable, plus (C) undrawn and available amounts under other facilities constituting Permitted Funded Debt plus (D) non-Marginable Cash.

1.1.170 "**Minimum Margin Availability**" means the undrawn available amount under the Operating Facilities up to the Borrowing Base (as at the time of determination).

1.1.171 "**Minor Title Defects**" in respect of any parcel of Land means encroachments, restrictions, easements, rights-of-way, servitudes and defects or irregularities in the title to such Land which are of a minor nature and which, in the aggregate, will not materially impair the use of such Land for the purposes for which such Land is held by the owner thereof.

1.1.172 "**Multiemployer Plan**" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Credit Party or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

1.1.173 "**Multiple Employer Plan**" means a plan that is described in Section 210 of ERISA and subject to Title IV of ERISA, and (i) is maintained for employees of any Credit Party or any ERISA Affiliate and (ii) in respect of which any Credit Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

1.1.174 "**Net Leverage Ratio**" means, in respect of any Fiscal Quarter, the ratio of Total Net Debt at the end of such Fiscal Quarter to EBITDA in the fiscal period comprised of such Fiscal Quarter and the immediately preceding three Fiscal Quarters.

1.1.175 "**New Rules**" is defined in Section 12.1.3.

1.1.176 "**Non-BA Lender**" means a Lender identified in Exhibit "A" attached hereto as a Lender which will make BA Equivalent Loans instead of accepting Bankers' Acceptances hereunder.

1.1.177 "**Non-Consenting Lender**" is defined in Section 11.5.2.

1.1.178 "**Non-Financial Letter of Credit**" means a Letter of Credit that is not a Financial Letter of Credit and, for the purposes of the definition of "Funded Debt", any similar performance letter of credit issued by a party that is not an Issuing Bank.

1.1.179 "**Non-OECD Guarantor**" means any Guarantor whose governing jurisdiction is located in a country which not a member of OECD, excluding Colombia.

1.1.180 "**Non-Paying Lender**" is defined in Section 11.4.2.

1.1.181 "**Obligations**" means, at any time all direct and indirect, contingent and absolute obligations and liabilities of the Borrower and the other Credit Parties to the Agent and the Lenders under or in connection with this Agreement and the Security (specifically including for greater certainty all Guarantees provided hereunder) at such time, specifically including the Outstanding Advances, all accrued and unpaid interest thereon, all Secured Hedging Liabilities and all Banking Service Liabilities, all indemnity obligations arising under, any other Credit Document, any Banking Service Agreement or

any Hedging Agreement with a Hedge Provider, all fees payable in connection with prepayments, all breakage fees payable pursuant to Section 5.15 and all other fees, expenses and other amounts payable pursuant to this Agreement and the Security (specifically including fees relating to the Facilities as may be agreed in writing from time to time between a Borrower and any Lender); except that if otherwise specified or required by the context, "Obligations" shall mean any portion of the foregoing. Notwithstanding anything herein to the contrary, the "Obligations" shall exclude any Excluded Hedging Obligations.

1.1.182 "**OECD**" means The Organisation for Economic Co-operation and Development.

1.1.183 "**OECD Credit Party**" means any Credit Party whose governing jurisdiction is in a country which is an OECD member or which has a sovereign currency credit rating at an Investment Grade level.

1.1.184 "**OFAC**" means the U.S. Treasury Department Office of Foreign Assets Control.

1.1.185 "**Operating Facilities**" means, collectively, the Canadian Operating Facility and the U.S. Operating Facility, and "**Operating Facility**" means any of them as the context requires.

1.1.186 "**Other Taxes**" is defined in Section 12.4.2.

1.1.187 "**Outstanding Advances**" means, at any time, the aggregate of all obligations of the Borrowers to the Lenders (or if the context requires, to any Lender) in respect of all Advances made under the Facilities (or if the context requires, under any Facility) which have not been repaid or satisfied at such time, determined as follows:

(a)     in the case of Canadian Dollar Prime Rate Loans and Overdrafts in Canadian Dollars, the principal amount thereof;

(b)     in the case of Bankers' Acceptances and BA Equivalent Loans and Letters of Credit, the face amount thereof;

(c)     in the case of Letter of Credit, the undrawn amount thereof (to the extent not cash collateralized, backstopped or otherwise provided for in a manner acceptable to the Issuing Bank, in its discretion, in respect thereof); and

(d)     in the case of U.S. Dollar Base Rate Loans, Overdrafts in U.S. Dollars and LIBOR Loans the Equivalent Amount of the principal amount thereof expressed in Canadian Dollars.

1.1.188 "**Overdraft**" means indebtedness of the Canadian Borrower to the Swingline Lender arising under the Swingline in connection with all amounts debited to all overdraft accounts established by the Canadian Borrower with the Swingline Lender (in Canadian Dollars or U.S. Dollars, as the case may be), including without limitation all cheques, transfers, withdrawals, interest, costs, charges and fees debited to such accounts.

1.1.189 "**Palladium**" means Palladium Capital Management IV LLC.

1.1.190 "**Palladium Equity Line**" means the Loan Agreement, dated as of October 18, 2017, by and between Holdco, as borrower, and PEP Fluid L.P., as lender (together with the revolving demand note related thereto), and any related loan agreement and revolving demand note with PEP Fluid Co-Invest LP and/or Calumet, in an aggregate principal amount of up to $5,000,000, as may be amended, restated, replaced or otherwise modified from time to time.

1.1.191 "**Participant**" is defined in Section 13.6.4.

1.1.192 "**Participant Register**" is defined in Section 13.6.4

1.1.193 "**Parties**" means the Borrowers, the Agent and the Lenders and their respective successors and permitted assigns.

1.1.194 "**PATRIOT Act**" means *The Uniting and Strengthening America by Providing Adequate Tools Required to Intercept and Obstruct Terrorism Act* of 2001 (Title III of Pub. L. No. *107-56 (signed into law October 26, 2001)*).

1.1.195 "**PBGC**" means the Pension Benefit Guaranty Corporation (or any successor).

1.1.196 "**Pemex Entities**" means, collectively, Petroleos Mexicanos, Pemex Exploracion y Produccion and Pemex Perforacion y Servicios.

1.1.197 "**Pension Plan**" means:

(a) a "pension plan" or "plan" which is subject to the funding requirements of applicable pension benefits legislation in any jurisdiction of Canada and is applicable to employees of a Credit Party resident in Canada; or

(b) any pension benefit plan or similar arrangement (other than Plans or Multiemployer Plans) applicable to employees of a Credit Party.

1.1.198 "**Permitted Acquisition**" means any Acquisition with respect to which all of the following conditions shall have been satisfied:

(a) the Acquired Business has positive EBITDA calculated on a trailing twelve month basis (determined using the definition thereof set for herein as if the Acquired Business was the Canadian Borrower for such purpose);

(b) the Acquired Business is in an Eligible Line of Business in Canada or the U.S.;

(c) the Acquisition shall not be a Hostile Acquisition and, if the Acquisition involves a merger involving a Credit Party, the surviving entity is or becomes a Credit Party concurrently with the completion of such merger;

(d)    the aggregate purchase price of all such Acquisitions shall not exceed the sum of $50,000,000 in any Fiscal Year;

(e)    if the consideration payable at the closing of the acquisition of the Acquired Business in cash, shares or other tangible assets (but for certainty excluding Earnout Payments), plus the Permitted Funded Debt of the Acquired Business assumed as part of such acquisition, is greater than $15,000,000, then (i) the Net Leverage Ratio on a *pro forma* basis (including the EBITDA and, if applicable, Permitted Funded Debt of the Acquired Business) as of the end of and for the most recently completed four Fiscal Quarter period occurring prior to the closing of the Acquisition in question for which financial statements are available does not exceed the maximum Net Leverage Ratio permitted for such four Fiscal Quarter period under Section 7.3.1(a) *minus* 0.25 to 1, (ii) after giving effect to the funding of the Acquisition in question the sum of: (A) unrestricted cash on hand of the Credit Parties, *plus* (B) undrawn and available amounts under the Operating Facilities, *plus* (C) undrawn and available amounts permitted under operating facilities provided under clauses (c) and (d) of the definition of Permitted Funded Debt (provided, that the stated maturity date of any such facility, if any, is not within 90 days after the date of such Acquisition), is no less than $25,000,000; and (iii) at least 10 Business Days prior to the date that the Acquisition is to close, the Lenders shall have received financial statements and quarterly earnings reports in respect of the Acquired Business which shall be satisfactory to the Required Lenders, acting reasonably, together with any other information in respect of the Acquired Business which the Agent may reasonably request (and in the case of (i) and (ii) above, the resident and/or chief financial officer of the Canadian Borrower will deliver to the Agent an officer's certificate confirming such items, together with detailed calculations thereof);

(f)    if the Acquisition relates to the purchase of shares or other equity of a Person, it must be for 100% of the issued and outstanding shares of such Person;

(g)    if a new Material Subsidiary is formed or acquired as a result of or in connection with the Acquisition, the Borrower shall have complied with the requirements of Article 8 in connection therewith, subject to the last sentence of Section 8.2;

(h)    any existing indebtedness of the Acquired Business will be repaid and, if applicable, cancelled, unless otherwise constituting Permitted Funded Debt; and

(i)    after giving effect to the Acquisition and any Advance in connection therewith, and subject to clause (j) below with respect to the representations and warranties in this Agreement, no Default or Event of Default shall exist, including with respect to the financial covenants contained in Section 7.3 on a *pro forma* basis as of the end of and for the most recently completed four Fiscal Quarter period occurring prior to the closing of the Acquisition for which financial statements are available; and

(j)     all representations and warranties set forth herein (other than those which are specified to be given as of specific date) shall be repeated as of the date of the Acquisition (after giving effect to the Acquisition and any Advance in connection therewith) and must be true in all material respects;

provided that, notwithstanding anything herein to the contrary, the Terra Acquisition shall constitute a Permitted Acquisition if the following conditions shall have been satisfied:

(i)     the Terra Acquisition shall not be funded in whole or in part with the proceeds of any Advance hereunder;

(ii)    on the date hereof, all amounts outstanding under the Palladium Equity Line shall be repaid in full and, immediately following such repayment, Palladium shall make an equity contribution to the Canadian Borrower in an amount not less than $7,000,000; and

(iii)   prior to or substantially concurrently with the closing of the Terra Acquisition, the Permitted Securitization Financing among ADF SPV, LLC, as borrower, Anchor, as servicer, and Wells Fargo Bank, National Association, as lender and agent shall also be consummated or the Credit Parties shall have otherwise arranged sufficient funding to fund such acquisition in a manner that is acceptable to the Required Lenders, acting reasonably.

1.1.199   **"Permitted Contest"** means action taken by or on behalf of a Credit Party in good faith by appropriate proceedings diligently pursued to contest a tax, claim or Lien; provided, that:

(a)     the Person to which the tax, claim or Lien being contested is relevant (and, in the case of a Subsidiary of the Canadian Borrower, the Canadian Borrower on a consolidated basis) has established reasonable reserves therefor if and to the extent required by GAAP;

(b)     proceeding with such contest does not have, and would not reasonably be expected to result in, a Material Adverse Change; and

(c)     proceeding with such contest will not create a material risk of sale, forfeiture or loss of, or interference with the use or operation of, a material part of the assets of the Credit Parties, taken as a whole.

1.1.200  "**Permitted Discretion**" shall mean the Agent's or any Required Lender's discretion, as the context requires, exercising its reasonable credit judgment in accordance with customary business practices for comparable asset-based lending transactions and, as it relates to the adjustment or imposition of exclusionary criteria, shall require that, (a) such establishment, increase, adjustment or imposition after the Amendment and Restatement Date be based on the analysis of facts or events first occurring, first discovered or quantified by the Agent, or the applicable Required Lender, after the Amendment and Restatement Date or that are materially different from facts or events

occurring or known to the Agent, or the Required Lender, on the Amendment and Restatement Date, (b) the contributing factors to such change shall not duplicate the exclusionary criteria set forth in the definitions of "Eligible Capital Assets", "Eligible Inventory" and "Eligible Receivables" as applicable (and vice versa), and (c) the effect of any adjustment or imposition of exclusionary criteria shall be a quantification of the incremental reduction of the Borrowing Base attributable to such contributing factors which is reasonable in light of reasonable credit judgment exercised in senior secured asset-based revolving credit facilities with comparable companies of similar size, industries, businesses and business practices, including, without limitation, leverage profile and projected free cash flow, in the applicable market.

1.1.201   "**Permitted Dispositions**" is defined in Section 7.2.4.

1.1.202   "**Permitted Distribution**" means:

(a)     the Permitted Management Fees; provided, that no such Distribution is permitted if a Default or an Event of Default exists at such time or would result therefrom; and further provided, that any such payments that were not able to be made during the occurrence of a Default or an Event of Default may be "caught up" when such Default or Event of Default no longer exists (regardless of the Annual Management Fee Cap) (with any such catch up payments in excess of the Annual Management Fee Cap in any Fiscal Year being referred to herein as the "**Catch Up Management Fee Payments**");

(b)     any Distribution from one Credit Party to another Credit Party;

(c)     any other Distribution payable to the shareholders of the Canadian Borrower by any Credit Party if at the time such Distribution is made (i) no Default or Event of Default exists at such time or would result therefrom, (ii) on a *pro forma* basis after giving effect to such Distribution, the Net Leverage Ratio would not exceed 2.50 to 1, as evidenced by the Canadian Borrower providing an officer's certificate to the Agent confirming same, and (iii) no Borrowing Base Shortfall has occurred and is continuing or would result from any such Distribution on a *pro forma* basis as if such Distribution had been made as of the end of the last Fiscal Quarter;

(d)     any dividend payments or other Distributions payable by Holdco or any of its Subsidiaries solely in the equity interests of such Person;

(e)     any Distribution permitted under Section 7.2.6(l);

(f)     non-cash repurchases by Holdco or its Subsidiaries of equity interests deemed to occur upon exercise of stock options or similar equity incentive awards if such equity interests represents a portion of the exercise price of such options or similar equity incentive awards;

(g)     cash dividends to Holdco (and by Holdco to its parent companies) by any Credit Party not to exceed an amount necessary to permit Holdco and its parent

companies to pay for normal, reasonable and documented over-head and administrative costs and expenses of Holdco and its parent companies and franchise fees or similar taxes and fees required to maintain its corporate existence and to reimburse out-of-pocket expenses actually incurred by Holdco and its parent companies for the benefit of the Canadian Borrower, and other Distributions for customary directors' fees to any board members and the reimbursement of out-of-pocket expenses incurred by any board members in such capacity, provided that no Default or Event of Default exists at such time or would result therefrom; and

(h)     Distributions made (i) to Holdco to permit Holdco to, and Holdco may, redeem or repurchase equity interests of Holdco from officers, employees, consultants, managers and directors of the Canadian Borrower or any of its Subsidiaries in connection with the termination of employment or engagement of any such Person or (ii) pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or other agreement or arrangement (including, but not limited to, employment, compensation, severance agreements or arrangements or stockholders agreements), provided that no Default or Event of Default exists at such time or would result therefrom; and

(i)     prior to the closing of the Terra Acquisition, Distributions to Palladium or its Affiliates in repayment of the Palladium Equity Line; provided in the event the Palladium Equity Line is not repaid as contemplated in clause (ii) of the proviso set forth in the definition of "Permitted Acquisition", (x) the Canadian Borrower and its Subsidiaries shall, on a *pro forma* basis, have a Minimum Liquidity of not less than U.S. $15,000,000 immediately after such repayment,  and (y) the principal in respect of the Palladium Equity Line will not be repaid prior to October 31, 2018, unless (A) such prepayment is made in the manner prescribed by clause (ii) of the proviso set forth in the definition of "Permitted Acquisition" and the subsequent equity contribution described in such clause is also effected, or (B) the Required Lenders consent to such earlier prepayment in their Permitted Discretion;

provided that the aggregate of all Distributions made under clauses (g) and (h) above do not in any Fiscal Year exceed $2,000,000 (with unusual amounts in any Fiscal Year being carried over to succeeding Fiscal Years), other than to the extent such Distributions are funded by the cash proceeds from the sale of equity interests of the Canadian Borrower and, to the extent contributed to the capital of the Canadian Borrower, equity interests of any of the Canadian Borrower's direct or indirect parent companies.

1.1.203 "**Permitted Factoring Debtors**" means, collectively, the Pemex Entities, Petroamazones EP, Operaciones Río Napo CEM and any other Person agreed to in advance by the Agent, acting reasonably.

1.1.204 "**Permitted Factoring Transaction**" means: at the Borrower's option,

(a)     the financing of certain Collection Rights by HSBC Mexico; *provided* that (i) such transaction is non-recourse to the Borrowers and their Material Subsidiaries, except for any Liens granted solely over the Collection Rights and the proceeds thereof, (ii) such transaction shall be and remain subject to the terms and conditions of the Intercreditor Agreement, (iii) QMax Mexico may remain responsible for the legitimacy and existence of the Collection Rights financed by such transaction at the time of execution of the relevant factoring transaction and (iv) QMax Mexico will no longer be liable for the payment of the Collection Rights to HSBC Mexico or any permitted assignee but may remain liable for the decrease in value of the Collection Rights; and/or

(b)     the financing by the Borrowers or one or more of their Material Subsidiaries of any Receivables (other than as described in paragraph (a) above); *provided* that (i) such transaction results in a legal "true sale" of Receivables, (ii) such transaction is non-recourse to the Borrowers and their Material Subsidiaries, except for any Liens granted solely over such Receivables and the proceeds thereof, and (iii) such transaction shall only involve the sale of Receivables either (x) owing by any of the Permitted Factoring Debtors to a Credit Party or (y) not constituting Eligible Receivables; provided that, the aggregate principal, stated or investment amount of all outstanding loans made to the Credit Parties in respect of all Permitted Factoring Transactions shall not exceed $25,000,000 at any time outstanding; provided, such amount shall be increased to an amount specified by the Borrowers at any time if the Borrowers or one or more Material Subsidiaries provides notice to the Agent of such an increase, and the Agent (on the instruction of Required Lenders) has not objected within three Business Days following receipt of notice thereof. For certainty, if any Eligible Receivable is sold, contributed, financed or otherwise conveyed or pledged pursuant to a Permitted Factoring Transaction it shall immediately cease to be an Eligible Receivable.

1.1.205  "**Permitted Funded Debt**" means, without duplication:

(a)     the Obligations under the Facilities and, to the extent constituting Funded Debt, obligations in respect of Banking Services Agreements of the Canadian Borrower and its Subsidiaries owing to the Agent and the Lenders (and their Affiliates);

(b)     Funded Debt up to U.S. $20,000,000 under a bilateral letter of credit facility with HSBC and insured by certain third parties reasonably satisfactory to the Agent;

(c)     Funded Debt of any Credit Party whose governing jurisdiction is Mexico or Colombia which is unsecured or, if secured, which is secured solely by capital assets and/or inventory located in Mexico or Colombia and which are not subject to the Security (subject to the proviso at the end of this definition);

(d)     Funded Debt under the Surviving Colombian Credit Agreements and any Permitted Refinancing Indebtedness in respect thereof from time to time (subject to the proviso at the end of this definition);

(e)     Funded Debt secured by Permitted Purchase Money Security Interests and Funded Debt incurred in conjunction with any Anchor Sale and Leaseback Transaction (in each case subject to the proviso at the end of this definition);

(f)     Permitted Hedging Liabilities;

(g)     Permitted Intercompany Loans;

(h)     Subordinated Debt;

(i)     Funded Debt as set out in Schedule 1.1.205 hereto and any Permitted Refinancing Indebtedness thereof;

(j)     Funded Debt under a corporate credit card facility with a Lender and other cash management liabilities, up to a maximum aggregate amount of $2,000,000;

(k)     Funded Debt (other than a revolving credit facility) of a Subsidiary acquired or assumed pursuant to a Permitted Acquisition after the Amendment and Restatement Date and any Permitted Refinancing Indebtedness in respect thereof (subject to the proviso at the end of this definition); provided, that such Funded Debt shall not be incurred in anticipation of such Permitted Acquisition;

(l)     obligations in respect of Guarantees or Financial Assistance not prohibited under Section 7.2.3;

(m)     other Funded Debt of the Credit Parties and Permitted Refinancing Indebtedness in respect thereof (subject to the proviso at the end of this definition);

(n)     Funded Debt under a Permitted Factoring Transaction;

(o)     Funded Debt consented to by the Required Lenders, in their discretion, prior to the incurrence or assumption thereof;

(p)     Funded Debt up to an aggregate principal amount of U.S. $75,000,000 under the Encina ABL Loan Agreement and any Permitted Refinancing Indebtedness in respect thereof, provided that all such Funded Debt is and remains subject to the terms of the Encina Intercreditor Agreement;

(q)     after, or concurrently with, the repayment of all Funded Debt incurred under, and the cancellation of, the Encina ABL Loan Agreement, Funded Debt up to an aggregate principal amount of U.S. $90,000,000 in connection with all Permitted Securitization Financing and any Permitted Refinancing Indebtedness in respect thereof; and

(r)     Funded Debt in respect of one or more promissory notes issued by the U.S. Borrower to Calumet, by the U.S. Borrower to the Canadian Borrower and by the Canadian Borrower to Holdco, in each case, substantially contemporaneously with the Anchor Acquisition (the "**Anchor Acquisition Promissory Notes**"),

<u>provided</u> that the outstanding principal amount of Funded Debt under clauses (c), (d), (e), (k) and (m) above does not exceed in the aggregate $45,700,000 during the Covenant Relief Period and $75,000,000 at any time after the Covenant Relief Period.

1.1.206 "**Permitted Hedging Liability**" means a Hedging Liability permitted by the provisions of Sections 7.2.11 and 7.2.13.

1.1.207 "**Permitted Holders**" means (a) Palladium, the Investors, Management Shareholders and (b) any Person with which Palladium and the Management Shareholders form a Group as long as, in the case of clause (b), Palladium and its Affiliates beneficially own more than 50% of the relevant stock beneficially owned by that Group.

1.1.208 "**Permitted Intercompany Loan**" means a loan made by any Credit Party to another Credit Party, provided that the Agent holds a First Ranking Security Interest in all property and assets of both such Credit Parties to the extent required under the terms of the Credit Documents.

1.1.209 "**Permitted Investments**" is defined in Section 7.2.3.

1.1.210 "**Permitted Liens**" means:

(a)     Statutory Liens in respect of any amount which is not at the time overdue;

(b)     Statutory Liens in respect of any amount which may be overdue but the validity of which is subject to a Permitted Contest;

(c)     the reservations, limitations, provisos and conditions, if any, expressed in any original grant from the Crown of any Land or any interest therein;

(d)     servicing agreements, development agreements, site plan agreements and other agreements with Governmental Authorities pertaining to the use or development of any Land, provided same are complied with in all material respects;

(e)     applicable municipal and other governmental restrictions, including municipal by-laws and regulations, affecting the use of Land or the nature of any structures which may be erected thereon, provided such restrictions have been complied with in all material respects;

(f)     Liens or rights of distress reserved in or exercisable under any lease for rent not at the time overdue or for compliance with the terms of such lease not at the time in default;

(g)     Liens or rights reserved to or exercisable by or any obligations or duties affecting any Land due to any public utility or to any Governmental Authority, under or with respect to any franchise, temporary grant, licence or permit in good standing and any defects in title to structures or other facilities arising solely from the fact that such structures or facilities are constructed or installed on Land under

government permits, leases or other grants in good standing; provided such facilities, temporary grants, licences and permits have been complied with in all material respects and are in good standing and such Liens, rights, obligations, duties and defects in the aggregate do not materially impair the use of such property, structures or facilities for the purpose for which they are held;

(h)    Liens incurred or deposits made in connection with contracts, bids, tenders or expropriation proceedings, surety or appeal bonds, costs of litigation when required by law, public and statutory obligations, and warehousemen's, storers', repairers', carriers' and other similar Liens and deposits;

(i)    security given to a public utility or any Governmental Authority to secure obligations incurred to such utility, municipality, government or other authority in the ordinary course of business and not at the time overdue;

(j)    Liens and privileges arising out of judgments or awards in respect of which: an appeal or proceeding for review has been commenced; a stay of execution pending such appeal or proceedings for review has been obtained; and reserves have been established as reasonably required by the Required Lenders;

(k)    any Lien arising in connection with the construction or improvement of any Land or arising out of the furnishing of materials or supplies therefor, provided that such Lien secures moneys not at the time overdue (or if overdue, the validity of which is subject to a Permitted Contest), notice of such Lien has not been given to the Agent or any Lender and such Lien has not been registered against title to such Land;

(l)    licenses (including licences of intellectual property), leases or subleases granted to third parties or Credit Parties in the ordinary course of business which, individually or in the aggregate, do not materially interfere with the ordinary course of business of the Borrower or any of its Subsidiaries;

(m)    the filing of UCC or PPSA financing statements (or equivalents thereto in other jurisdictions) solely as a precautionary measure in connection with operating leases and consignment arrangements;

(n)    Liens in favor of customs and revenue authorities arising as a matter of law and in the ordinary course of business to secure payment of customs duties in connection with the importation of goods;

(o)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Credit Party in the ordinary course of business;

(p)    Liens (i) on deposits of cash or Cash Equivalents in favor of the seller of any property to be acquired in any Permitted Investment to be applied against the purchase price for such Permitted Investment, (ii) consisting of an agreement to dispose of any property in a Permitted Disposition and (iii) earnest money

deposits of cash or Cash Equivalents made by any Credit Party in connection with any letter of intent or purchase agreement permitted hereunder;

(q)     rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions or upon securities in favor of securities intermediaries, solely to the extent incurred in connection with the maintenance of deposit accounts or securities accounts in the ordinary course of business;

(r)     Minor Title Defects;

(s)     the Permitted Purchase-Money Security Interests;

(t)     Liens which are secured solely by assets which are located outside of Canada and the U.S. and which are not subject to the Security; provided that the aggregate principal amount of Funded Debt or other obligations secured thereby constitutes Permitted Funded Debt;

(u)     Liens as set out in Schedule 1.1.210 and any extension, renewal or replacement (or successive extensions, renewals or replacements), as a whole or in part, of thereof, so long as any such extension, renewal or replacement of such Lien is limited to all or any part of the same property that secured the Lien extended, renewed or replaced (plus improvements on such property) and the Funded Debt secured thereby is not increased and constitutes Permitted Funded Debt;

(v)     any Lien from time to time which is consented in writing to by the Required Lenders;

(w)     the Security or any other Liens securing the Obligations;

(x)     Liens which secure obligations owing under Permitted Funded Debt described in clause (c), (d) or (m) of the definition thereof; provided that in the case of such clause (m), such Lien does not apply to any of the Collateral; subject to the limitation set forth in the proviso at the end of the definition of Permitted Funded Debt;

(y)     Liens securing Funded Debt permitted by clause (k) of the definition of Permitted Funded Debt, subject to the limitation set forth in the proviso at the end of the definition of Permitted Funded Debt, and existing on any property or asset prior to the acquisition thereof by any Credit Party or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the date hereof prior to the time such Person becomes a Subsidiary; provided, that (i) such Liens do not apply to all of the assets of the acquired Subsidiary generally or to any other property or assets of any Credit Party not securing such Funded Debt prior to the acquisition of such property or asset and (ii) such Lien shall secure only those obligations which it secured on the date of acquisition and extensions, renewals and replacements thereof permitted hereunder that do not increase the outstanding principal amount thereof; provided further, with respect to Liens in connection with Funded Debt that is assumed in connection with an acquisition of

assets or equity interests, no such Lien extends to or covers any other assets (other than the proceeds or products thereof, accessions or additions thereto and improvements thereon) or was created in contemplation of, or in connection with, the applicable acquisition of assets or equity interests (except to the extent the same is otherwise Permitted Funded Debt);

(z)     Liens which secure Subordinated Debt permitted hereunder;

(aa)    Liens arising under a Permitted Factoring Transaction but only to the extent that any such Lien relates to the applicable Receivables sold, contributed, financed or otherwise conveyed or pledged pursuant to such transaction;

(bb)    Liens arising under the Encina ABL Loan Agreement but only to the extent that any such Lien is and remains subject to the terms of the Encina Intercreditor Agreement;

(cc)    Liens arising under any Anchor Sale and Leaseback Transaction;

(dd)    Liens on the Receivables of a Securitization SPE sold pursuant to a Permitted Securitization Financing (together with any and all related security and ancillary rights related thereto which are customary for transactions of such nature) to the extent incurred pursuant to a Permitted Securitization Financing; and

(ee)    any other Liens; provided, that the aggregate principal amount of Funded Debt or other obligations secured thereby does not exceed U.S. $~~3,000,000~~;**5,000,000.**

provided, that the use of the term "Permitted Liens" to describe the foregoing Liens shall mean that such Liens are permitted to exist (whether in priority to or subsequent in priority to the Security, as determined by Applicable Law); and for greater certainty such Liens shall not be entitled to priority over the Security by virtue of being described in this Agreement as "Permitted Liens".

1.1.211   "**Permitted Management Fees**" means advisory or management fees payable by the Credit Parties to Palladium and Calumet in an aggregate amount not to exceed the Annual Management Fee Cap in any Fiscal Year.

1.1.212   "**Permitted Purchase-Money Security Interests**" means Purchase-Money Security Interests incurred or assumed in connection with the purchase, leasing or acquisition of capital equipment in the ordinary course of business; provided, that the obligations secured thereby are permitted under clause (e) of the definition of Permitted Funded Debt.

1.1.213   "**Permitted Refinancing Indebtedness**" shall mean any Funded Debt issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "**Refinance**"), the Permitted Funded Debt being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Indebtedness); provided, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or

accreted value, if applicable) of the Permitted Funded Debt so Refinanced (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions and expenses), (b) if the Permitted Funded Debt being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing Indebtedness shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Permitted Funded Debt being Refinanced, (c) no Permitted Refinancing Indebtedness shall have different obligors, or greater guarantees or security, than the Permitted Funded Debt being Refinanced, unless such new obligors are Credit Parties and (d) if the Permitted Funded Debt being Refinanced is secured by any collateral (whether equally and ratably with, or junior to, the Lenders or otherwise), such Permitted Refinancing Indebtedness may be secured by such collateral (including pursuant to after acquired property clauses to the extent such type collateral secured the Funded Debt being Refinanced) on terms not materially less favorable to the Lenders than those contained in the documentation governing the Permitted Funded Debt being so Refinanced.

1.1.214  "**Permitted Securitization Financing**" shall mean one or more transactions pursuant to which (i) Securitization Assets or interests therein are sold or transferred to or financed by one or more Securitization SPE, and (ii) such Securitization SPE finance (or refinance) their acquisition of such Securitization Assets or interests therein, or the financing thereof, by selling or borrowing against Securitization Assets (including conduit and warehouse financings) and any Hedging Agreements entered into in connection with such Securitization Assets; provided, that recourse to the Borrowers or any Subsidiary (other than the Securitization SPE) in connection with such transactions shall be limited to the extent customary (as determined by the Agent and the Canadian Borrower each acting reasonably and in good faith and acceptable to the Agent acting reasonably) for similar transactions in the applicable jurisdictions (including, to the extent applicable, in a manner consistent with the delivery of a "true sale"/"absolute transfer" opinion with respect to any transfer by the Borrowers or any Subsidiary (other than a Securitization SPE)).

1.1.215  "**Person**" includes an individual, corporation, partnership, trust, union, unincorporated association, Governmental Authority or any combination of the above.

1.1.216  "**Plan**" means a Single Employer Plan or a Multiple Employer Plan.

1.1.217  "**Priority Claims**" means, with respect to any Person, any amount payable or accrued by such Person which ranks or is capable of ranking prior to or *pari passu* with the Liens created by the Security in respect of any Collateral, including amounts owing for wages, vacation pay, severance pay, employee deductions, sales tax, excise tax, tax payable pursuant to Part IX of the *Excise Tax Act* (Canada) (net of GST input credits), income tax, employment insurance, unemployment insurance, workers compensation, government royalties, pension fund obligations or deficiencies, overdue rents or taxes, and other statutory or other claims, deemed trusts or Liens that have or may have priority over, or rank *pari passu* with, the Liens created by the Security. For the avoidance of

doubt, no Banking Services Liabilities shall be deemed Priority Claims due to their *pari passu* ranking with the Obligations.

1.1.218 "**Proceeds of Realization**", in respect of the Security or any portion thereof, means all amounts received by the Agent and any Lender in connection with:

(a)     any realization thereof, whether occurring as a result of enforcement or otherwise;

(b)     any sale, expropriation, loss or damage or other disposition of the Collateral or any portion thereof; and

(c)     the dissolution, liquidation, bankruptcy or winding-up of a Credit Party or any other distribution of its assets to creditors,

and all other amounts which are expressly deemed to constitute "Proceeds of Realization" in this Agreement.

1.1.219 "**Project Desert**" means the acquisition by the Borrowers or any Material Subsidiary of Environmental Solutions for Petroleum Services, an oilfield services company with operations in Algeria and Egypt on substantially the same terms and conditions set forth in the letter of intent dated as of December 11, 2016, as amended, between the Canadian Borrower and Project Desert Egypt.

1.1.220 "**Project Desert Algeria**" means Environmental Solutions Algeria S.A.R.L., an Algerian company.

1.1.221 "**Project Desert Egypt**" means Environmental Solutions for Petroleum Services (S.A.E.), an Egyptian company.

1.1.222 "**Project Desert Subsidiaries**" means each of Project Desert Egypt and Project Desert Algeria.

1.1.223 "**Proportionate Share**" means:

(a)     in the context of any Lender's obligation to make Advances under all Facilities, such Lender's Commitment to make Advances under all Facilities divided by the aggregate amount of all Lenders' Commitments to make Advances under all Facilities;

(b)     in the context of any Lender's obligation to make Advances under a Facility, such Lender's Commitment (excluding, as the case may be, the applicable Swingline Limit in the case of the Canadian Operating Facility) to make Advances under such Facility divided by the aggregate amount of all Lenders' Commitments (excluding, as the case may be, the applicable Swingline Limit in the case of Canadian Operating Facility) to make Advances under such Facility;

(c)     in the context of any Lender's entitlement to receive a portion of the standby fee in respect of Canadian Operating Facility or the U.S. Operating Facility payable

pursuant to Section 2.6.1(h) or Section 4.6.1(d), as applicable, such Lender's Commitment (excluding, as the case may be, the applicable Swingline Limit) under the applicable Facility to make Advances under Canadian Operating Facility or the U.S. Operating Facility divided by the aggregate amount of all such Lenders' Commitments (excluding, as the case may be, the applicable Swingline Limit) to make Advances under Canadian Operating Facility or the U.S. Operating Facility, as applicable;

(d)     in the context of any Lender's entitlement to receive payments of principal, interest or fees under all Facilities (other than a portion of the standby fee under Canadian Operating Facility or the U.S. Operating Facility), the Outstanding Advances due to such Lender under all Facilities divided by the aggregate amount of the Outstanding Advances due to all Lenders under all Facilities; and

(e)     in the context of any Lender's entitlement to receive payments of principal, interest or fees under a Facility (other than a portion of the standby fee under Canadian Operating Facility or the U.S. Operating Facility), the Outstanding Advances due to such Lender under such Facility divided by the aggregate amount of the Outstanding Advances due to all Lenders under such Facility.

1.1.224  "**Purchase-Money Security Interest**" means:

(a)     a Capital Lease; or

(b)     a Lien on any property or asset which is created, issued or assumed to secure the unpaid purchase price thereof, provided that such Lien is restricted to such property or asset and secures an amount not in excess of the purchase price thereof and any interest and fees payable in respect thereof.

1.1.225  "**QMax Mexico**" means QMax Mexico, S.A. de C.V.

1.1.226  "**Qualified ECP Guarantor**" means, in respect of any Hedging Agreement, each Credit Party that has total assets exceeding $10,000,000 at the time of the grant of the relevant Security of such Credit Party to such Hedging Agreement or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keep well under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

1.1.227  "**Receivables**" means and includes, as to the Credit Parties, all of Credit Parties' accounts, contract rights, payment intangibles, instruments (other than those evidencing indebtedness owed to a Credit Party), documents, chattel paper (including electronic chattel paper), general intangibles relating to accounts, drafts and acceptances, and all other forms of obligations owing to a Credit Party arising out of or in connection with the sale or lease of inventory or for services rendered (including, in the case of Insured Receivables, amounts owed with respect to work in progress that are covered by Account Receivable Insurance), all supporting obligations, guarantees and other security therefor,

whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to the Agent hereunder.

1.1.228  "**Register**" is defined in Section 13.6.5.

1.1.229  "**Regulation T**" means Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and all official rulings and interpretations thereunder or thereof.

1.1.230  "**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and all official rulings and interpretations thereunder or thereof.

1.1.231  "**Regulation X**" means Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and all official rulings and interpretations thereunder or thereof.

1.1.232  "**Related Party**" means, with respect to any Person, an Affiliate of such Person, a shareholder of such Person (if applicable), or a Person related to or not at arm's length to such Person or holder of shares of such Person, and with respect to the Borrower and its Subsidiaries, includes Palladium, the Management Shareholders, the Investors and any company or entity controlled directly or indirectly by any one or more of such Persons.

1.1.233  "**Repayment**" means a repayment by the Borrower on account of the Outstanding Advances under all Facilities or a Facility, as the context requires, other than the reduction of an Overdraft (and "**Repay**" shall have a corresponding meaning).

1.1.234  "**Repayment Notice**" means a notice delivered by the Borrower to the Agent committing it to make a Repayment, in the form of Exhibit "E".

1.1.235  "**Required Lenders**" means, with the exception of those matters set out in Section 11.2 which require the agreement of all Lenders, (a) if there are two or less Lenders, all Lenders, (b) if there are three or more Lenders, Lenders holding, in aggregate, at least 66⅔% of the Commitments, or (c) during the continuance of an Event of Default, Lenders holding at least 66⅔% of the Outstanding Advances under the Facilities. The Advances and Commitments of any Defaulting Lender shall be disregarded in determining Required Lenders at any time in accordance with Section 11.5.1(b).

1.1.236  "**Requirements of Environmental Law**" means:

(a)  obligations under common law;

(b)  requirements imposed by or pursuant to statutes, regulations and by-laws whether presently or hereafter in force;

(c)  directives, policies and guidelines issued or relied upon by any Governmental Authority to the extent such directives policies or guidelines have the force of law;

(d)    permits, licenses, certificates and approvals issued by Governmental Authorities which are required in connection with air emissions, discharges to surface or groundwater, noise emissions, solid or liquid waste disposal, the use, generation, storage, transportation or disposal of Hazardous Materials; and

(e)    requirements imposed under any clean-up, compliance or other order made by a Governmental Authority pursuant to any of the foregoing,

in each and every case relating to environmental, health or safety matters including all such obligations and requirements which relate to:

(i)    solid, gaseous or liquid waste generation, handling, treatment, storage, disposal or transportation; and

(ii)    exposure to Hazardous Materials.

1.1.237  "**Resignation Notice**" is defined in Section 11.18.

1.1.238  "**Rollover**" means the renewal of an Availment Option upon its maturity in the same form.

1.1.239  "**Rollover Notice**" means a notice substantially in the form of Exhibit "C" given by the Borrower to the Agent for the purpose of requesting a Rollover.

1.1.240  "**Sales Proceeds**" is defined in Section 5.3.1(b).

**1.1.241  "Second Amendment Date" means July ▪, 2019.**

**1.1.242** ~~1.1.241~~ "**Secured Hedging Liability**" means any Hedging Liability under a Hedging Agreement entered into between the Canadian Borrower and a Hedge Provider permitted by the provisions of Sections 7.2.12 and 7.2.13 and, provided that if a Hedge Provider does not have actual knowledge that such Hedging Liability was not permitted under such Sections at the time the applicable Hedging Agreement was entered into by such Hedge Provider, then such Hedging Liability will be deemed to be a Secured Hedging Liability for purposes of Section 8.5.

**1.1.243** ~~1.1.242~~ "**Securitization Assets**" shall mean any of the following assets (or interests therein) from time to time originated, acquired or otherwise owned by the Borrowers or any Subsidiary or in which the Borrowers or any Subsidiary has any rights or interests, in each case, without regard to where such assets or interests are located: (a) Receivables, (b) franchise fees, royalties and other similar payments made related to the use of trade names and other intellectual property, business support, training and other services, (c) revenues related to distribution and merchandising of the products of the Borrower and its Subsidiaries, (d) any equipment, contractual rights with unaffiliated third parties, website domains and associated property and rights necessary for a Securitization SPE to operate in accordance with its stated purposes, and (e) other assets and property (or proceeds of such assets or property) to the extent customarily included in securitization transactions of the relevant type in the applicable jurisdictions (as

determined by the Agent and the Canadian Borrower each acting reasonably and in good faith).

**1.1.244** ~~1.1.243~~ "**Securitization SPE**" means (i) a direct or indirect Subsidiary of any Borrower established in connection with a Permitted Securitization Financing for the acquisition of Securitization Assets or interests therein, and which is organized in a manner (as determined by the Canadian Borrower in good faith) intended to reduce the likelihood that it would be substantively consolidated with Holdings, the Borrowers or any of the Subsidiaries (other than Securitization SPE) in the event Holdings, the Borrowers or any such Subsidiary becomes subject to a proceeding under the U.S. Bankruptcy Code (or other insolvency law) and (ii) any subsidiary of a Securitization SPE.

**1.1.245** ~~1.1.244~~ "**Security**" means all Guarantees, security agreements, mortgages, control agreements, pledge agreements, debentures and other documents required to be provided to the Agent or the Lenders pursuant to Article 8 and all other documents and agreements delivered by the Borrower and other Persons to the Agent for the benefit of the Lenders from time to time as security for the payment and performance of the Obligations, and the security interests, assignments and Liens constituted by the foregoing.

**1.1.246** ~~1.1.245~~ "**Shareholders' Equity**" means, at any time, the shareholders' equity as shown on the consolidated balance sheet of the Canadian Borrower.

**1.1.247** ~~1.1.246~~ "**Single Employer Plan**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that is subject to Title IV of ERISA, and (i) is maintained for employees of any Credit Party or any ERISA Affiliate and no Person other than the Credit Parties and the ERISA Affiliates or (ii) was so maintained and in respect of which any Credit Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

**1.1.248** ~~1.1.247~~ "**Specified Canadian Swingline Borrower**" means (i) QMax Canada Operations Inc. or (ii) any other Material Subsidiary of the Canadian Borrower that has been formed under the laws of Canada or any province thereof as agreed to in writing by the Canadian Borrower, the Swingline Lender and the Agent, in their sole and absolute discretion.

**1.1.249** ~~1.1.248~~ "**Specified Equity Contribution**" is defined in Section 7.3.2.

**1.1.250** ~~1.1.249~~ "**Statutory Lien**" means a Lien in respect of any property or assets of a Credit Party created by or arising pursuant to any applicable legislation in favour of any Person (such as but not limited to a Governmental Authority), including a Lien for the purpose of securing such Credit Party's obligation to deduct and remit employee source deductions and goods and services tax pursuant to the *Income Tax Act* (Canada), the *Excise Tax Act* (Canada), the *Canada Pension Plan* (Canada), the *Employment Insurance Act* (Canada) and any legislation in any jurisdiction similar to or enacted in replacement of the foregoing from time to time.

**1.1.251** ~~1.1.250~~ "**Subordinated Debt**" means any indebtedness of any Credit Party to any Person, in respect of which the holder thereof has entered into a subordination and postponement agreement in favour of the Agent on behalf of itself and the Lenders, substantially in the form of Exhibit "J" for any indebtedness which is governed by Applicable Laws of Canada or the U.S., or for any indebtedness governed by other Applicable Laws, such other agreement as is reasonably satisfactory to the Required Lenders (each, a "**Subordination Agreement**") and, to the extent necessary or desirable under Applicable Law, registered in all places where necessary or desirable to protect the priority of the Security, which shall provide (among other things) that:

(a)  upon notice of the occurrence and continuance of an Event of Default hereunder, the holder of such indebtedness may not receive payments on account of principal or interest thereon;

(b)  any security held in respect of such indebtedness is subordinated to the Security; and

(c)  the holder of such indebtedness may not take any enforcement action in respect of any such security without the prior written consent of the Agent (except to the extent, if any, expressly permitted therein).

**1.1.252** ~~1.1.251~~ "**Subordination Agreement**" is defined in the definition of Subordinated Debt.

**1.1.253** ~~1.1.252~~ "**Subsidiary**" means any Person of which more than 50% of the outstanding Voting Securities are owned, directly or indirectly by or for a Credit Party, provided that the ownership of such securities confers the right to elect at least a majority of the board of directors of such Person, or a majority of Persons serving similar roles, and includes any legal entity in like relationship to a Subsidiary.

**1.1.254** ~~1.1.253~~ "**Surviving Colombian Credit Agreements**" means the following agreements by and between QMAX Solutions Colombia, as borrower: (i) revolving credit agreement with Helm Bank, as lender, dated as of October 6, 2009; (ii) common terms agreement for the execution of derivatives with Banco Corpobanca Colombia S.A., as lender, dated as of April 19, 2013; and (iii) common terms agreement for the execution of derivatives with Banco de Bogotá S.A., as lender, dated as of May 5, 2009; (iv) line of credit agreement with BBVA Colombia, as lender, dated as of December 3, 2012; and (v) line of credit agreement with Bancolombia dated January 20, 2010; in each case up to the respective maximum facility amounts set forth in Schedule ~~1.1.253~~**1.1.254** (each as amended, restated, supplemented, waived, replaced, (whether or not upon termination, and whether with the original agents, lenders, or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time, including any agreement refinancing, replacing or otherwise restructuring all or any portion of the indebtedness thereunder or increasing the amount loaned thereunder or altering the maturity thereof), subject to clause (d) of the definition of Permitted Funded Debt.

**1.1.255** ~~1.1.254~~ "**Swingline**" is defined in Section 2.7.1.

**1.1.256** ~~1.1.255~~ **"Swingline Borrower"** is defined in Section 2.7.1.

**1.1.257** ~~1.1.256~~ **"Swingline Lender"** means HSBC.

**1.1.258** ~~1.1.257~~ **"Swingline Limit"** means $10,000,000 or the Equivalent Amount in Cdn. $, or any combination thereof.

**1.1.259** ~~1.1.258~~ **"Swingline Loan"** means any Advance made available to the Borrower by the Swingline Lender outstanding from time to time under the Swingline.

**1.1.260** ~~1.1.259~~ **"Syndicated Advance"** means any Advance under the Canadian Operating Facility that is not a Swingline Loan.

**1.1.261** ~~1.1.260~~ **"Taxes"** is defined in Section 12.4.1.

**1.1.262** ~~1.1.261~~ **"Term Facility"** is defined in Section 3.1.

**1.1.263** ~~1.1.262~~ **"Term Facility Commitment"** means, as the context requires, (a) collectively with respect to all Term Lenders, in the aggregate as of the **Second** Amendment ~~and Restatement~~ Date, U.S. $~~13,656,250~~**10,071,250,** as otherwise increased or decreased pursuant to this Agreement and (b) means, with respect to each individual Term Lender, the individual commitment amount of such Lender in the maximum principal amount indicated opposite such Term Lender's name in Exhibit "A" under the heading "**Term Facility Commitments**", as amended from time to time.

**1.1.264** ~~1.1.263~~ **"Term Lenders"** means the Lenders who have provided a Commitment under the Term Facility as set forth in Exhibit "A".

**1.1.265** ~~1.1.264~~ **"Terra"** means Terra Oilfield Solutions, LLC, a Delaware limited liability company.

**1.1.266** ~~1.1.265~~ **"Terra Acquisition"** means the purchase of all of the membership interests of Terra pursuant to the Terra Purchase Agreement.

**1.1.267** ~~1.1.266~~ **"Terra Purchase Agreement"** means the Membership Interest Purchase Agreement dated July 15, 2018 by and between Q'Max America Inc., as purchaser, and OFS Commander LLC, a Delaware limited liability company, as seller, as the same may be amended, restated or otherwise modified from time to time.

**1.1.268** ~~1.1.267~~ **"Total Net Debt"** means, in respect of the Credit Parties and determined on a combined basis and without duplication, all interest bearing indebtedness for borrowed money, Capital Leases, the drawn and unreimbursed amount outstanding under all letters of credit, letters of guarantee and surety bonds to the extent not cash collateralized (excluding performance bonds provided by insurers), mark to market liabilities on Hedging Agreements, bankers' acceptances and similar instruments, indebtedness secured by a Lien, redemption and mandatory dividend obligations with respect to a Credit Party's shares that are redeemable or convertible into debt at a fixed time at the option of the holder thereof or upon the occurrence of a condition within the

1.1.276  "**U.S. Dollar Base Rate Loan**" means an Advance made by a Lender in Canada to the Borrower by way of a direct loan in U.S. Dollars, but excluding Advances in the form of a LIBOR Loan.

1.1.277  "**U.S. Dollar LIBOR Rate**" means, at any time, the LIBOR Rate applicable to LIBOR Loans denominated in U.S. Dollars determined at such time.

1.1.278  "**U.S. Dollar Prime Rate Loan**" means an Advance in U.S. Dollars bearing interest at a fluctuating rate determined by reference to the U.S. Prime Rate.

1.1.279  "**U.S. Dollars**" or "**U.S. $**" means the lawful money of the U.S.

1.1.280  "**U.S. Operating Facility**" is defined in Section 4.1.

1.1.281  "**U.S. Operating Facility Commitment**" means, as the context requires, (a) collectively with respect to all U.S. Operating Lenders, in the aggregate as of the Amendment and Restatement Date, U.S. $15,000,000, as otherwise increased or decreased pursuant to this Agreement and (b) means, with respect to each individual U.S. Operating Lender, the individual commitment amount of such Lender in the maximum principal amount indicated opposite such U.S. Operating Lender's name in Exhibit "A" under the heading "U.S. Operating Facility Commitments", as amended from time to time.

1.1.282  "**U.S. Operating Facility Limit**" means the lesser of (a) the U.S. Operating Facility Commitment, and (b) the sum of the Borrowing Base less the then outstanding Advances under the Term Facility and the Canadian Operating Facility.

1.1.283  "**U.S. Operating Lenders**" means the Lenders who have provided a Commitment under the U.S. Operating Facility as set forth in Exhibit "A".

1.1.284  "**U.S. Prime Rate**" means, for any day, the rate per annum from time to time announced by HSBC US as its prime rate in effect at its principal office in New York City. The U.S. Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  HSBC US may make commercial loans or other loans at rates of interest at, above or below the U.S. Prime Rate.  Any change in the U.S. Prime Rate shall take effect at the opening of business on the day specified in the public announcement of such change.

1.1.285  "**Voting Securities**" means securities of capital stock of any class of any corporation, partnership units in the case of a partnership, trust units in the case of a trust, or other evidence of ownership serving similar purposes, carrying voting rights under all circumstances, provided that, for the purposes of this definition, shares which only carry the right to vote conditionally on the happening of an event will not be considered Voting Securities, whether or not such event will have occurred, nor will any securities be deemed to cease to be Voting Securities solely by reason of a right to vote accruing to securities of another class or classes by reason of the happening of such event.

1.1.286  "**Wells Fargo**" means Wells Fargo Bank, National Association.

1.1.287 "**Wells Fargo Credit Agreement**" means the Credit and Security Agreement to be dated on or after the Amendment and Restatement Date, by and among ADF SPV, LLC, as the borrower, Anchor, as the servicer, and Wells Fargo, as lender and collateral agent, as may be amended, restated, supplemented, replaced or otherwise modified from time to time.

1.1.288 "**Wells Fargo Letter**" means that certain letter to be dated as of the date of the Wells Fargo Credit Agreement between HSBC, as administrative agent, and Wells Fargo, as lender and collateral agent (to be in form and substance satisfactory to the Agent, acting reasonably), as the same may be amended, restated or otherwise modified from time to time.

1.1.289 "**Withdrawal Liability**" has the meaning specified in Part I of Subtitle E of Title IV of ERISA.

1.1.290 "**Year-end Financial Statements**" in respect of any Person means the audited consolidated financial statements of such Person prepared in accordance with GAAP, including the notes thereto, in respect of its most recently completed Fiscal Year.

## 1.2    Accounting Principles

Except as otherwise expressly provided herein, all accounting terms, principles and calculations applicable to the Facilities and this Agreement will be interpreted, applied and calculated, as the case may be, in accordance with GAAP. If, after the date of this Agreement, there shall occur any change in GAAP or change in the accounting method under GAAP that are different from those used in the historical preparation of the financial statements, including any change by reason of any change in the rules, regulations, pronouncements, opinions or other requirements of the Canadian Institute of Chartered Accountants (or any successor thereto or agency with similar function), including the adoption of International Financial Reporting Standards, that are different from those used in the preparation of the financial statements delivered pursuant to Section 7.4 and such change shall result in a change in the method of calculation of any financial covenant, ratio, standard or term found in this Agreement, including the treatment of operating and capital leases, either the Canadian Borrower or the Required Lenders may by notice to the Agent and the Canadian Borrower, respectively, require that the Lenders and the Canadian Borrower negotiate in good faith to amend such covenants, ratios, standards, and terms so as equitably to reflect such change in accounting principles, with the desired result being that the criteria for evaluating the financial condition of the Canadian Borrower and its Subsidiaries shall be the same as if such change had not been made. No delay by the Canadian Borrower or the Required Lenders in requiring such negotiation shall limit their right to so require such a negotiation at any time after such a change in accounting principles. Until any such covenant, ratio, standard or term is amended in accordance with this Section 1.2, financial covenants shall be computed and determined in accordance with GAAP in effect prior to such change in accounting principles.

## 1.3    Currency References

All amounts referred to in this Agreement are in U.S. Dollars unless otherwise noted.

**1.4      References to Statutes**

Whenever in this Agreement reference is made to a statute or regulations made pursuant to a statute, such reference shall, unless otherwise specified, be deemed to include all amendments to such statute or regulations from time to time and all statutes or regulations which may come into effect from time to time substantially in replacement for the said statutes or regulations.

**1.5      Extended Meanings**

Terms defined in the singular have the same meaning when used in the plural, and vice-versa. When used in the context of a general statement followed by a reference to one or more specific items or matters, the term "including" shall mean "including, without limitation", and the term "includes" shall mean "includes, without limitation". Any reference herein to the exercise of discretion by the Agent or the Lenders (including phrases such as "in the discretion of", "in the opinion of", "to the satisfaction of" and similar phrases) shall mean that such discretion is absolute and unfettered and shall not imply any obligation to act reasonably, unless otherwise expressly stated herein.

**1.6      Headings**

Headings, subheadings and the table of contents contained in the Credit Documents are inserted for convenience of reference only, and will not affect the construction or interpretation of the Credit Documents.

**1.7      Subdivisions**

Unless otherwise stated, reference herein to a Schedule or to an Article, Section, paragraph or other subdivision is a reference to such Schedule to this Agreement or such Article, Section, paragraph or other subdivision of this Agreement. Unless specified otherwise, reference in Schedule "A" to a Schedule or to an Article, Section, paragraph or other subdivision is a reference to such Schedule or Article, Section, paragraph or other subdivision of this Agreement.

**1.8      Number**

Wherever the context in the Credit Documents so requires, a term used herein importing the singular will also include the plural and vice versa.

**1.9      Time**

Time will be of the essence of the Credit Documents.

**1.10     Amendments**

No Credit Document may be amended orally and, subject to Sections 1.11(a) and 11.2, any amendment may only be made by way of an instrument in writing signed by the Parties.

**1.11    No Waiver**

(a)    No waiver by a Party of any provision or of the breach of any provision of the Credit Documents will be effective unless it is contained in a written instrument duly executed by an authorized officer or representative of such Party. Such written waiver will affect only the matter specifically identified in the instrument granting the waiver and will not extend to any other matter, provision or breach.

(b)    The failure of a Party to take any steps in exercising any right in respect of the breach or non fulfilment of any provision of the Credit Documents will not operate as a waiver of that right, breach or provision, nor will any single or partial exercise of any right preclude any other or future exercise of that right or the exercise of any other right, whether in Law or otherwise.

(c)    Acceptance of payment by a Party after a breach or non fulfilment of any provision of the Credit Documents requiring a payment to such Party will constitute a waiver of such provision if cured by such payment, but will not constitute a waiver or cure of any other provision of the Credit Documents.

**1.12    Inconsistency**

To the extent that there is any inconsistency or ambiguity between the provisions of this Agreement and any other Credit Document, the provisions of this Agreement will govern to the extent necessary to eliminate such inconsistency or ambiguity. For greater certainty, a provision of this Agreement and a provision of another Credit Document shall be considered to be inconsistent if both relate to the same subject-matter and the provision in one such document imposes more onerous obligations or restrictions than the corresponding provision in the other.

**1.13    Pro Forma Adjustments**

For purposes of making computations of the Net Leverage Ratio and the Fixed Charge Coverage Ratio herein, if any applicable Person or makes any Permitted Acquisitions, mergers, amalgamations, consolidations, dispositions of assets or divisions or the Canadian Borrower makes any adjustments to the Capital Expenditure budget (each a "**relevant transaction**") during the reference period applicable to such computation shall be calculated on a *pro forma* basis assuming that all such relevant transactions (and the change in EBITDA resulting therefrom) had occurred on the first day of such reference period. If since the beginning of such reference period any Person that subsequently became a Subsidiary or was merged with or into the Borrower or any of its Subsidiaries since the beginning of such period shall have consummated any relevant transactions that would have required adjustment pursuant to this definition, then the Net Leverage Ratio shall be calculated giving pro forma effect thereto for such reference period as if such relevant transaction had occurred at the beginning of the applicable reference period.

For purposes of this Section 1.13, whenever *pro forma* effect is to be given to a transaction, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Canadian Borrower and may include, without duplication, cost savings, operating expense reductions, restructuring charges and expenses and cost-saving synergies

resulting from such acquisition or other relevant transaction, in each case in a manner acceptable to the Required Lenders, acting reasonably.

## 1.14   Joint and Several Liability of Borrowers

Notwithstanding anything else set forth in the Credit Documents to the contrary, each of the Borrowers agrees and confirms to the Agent and Lenders that the liabilities and obligations of the Borrowers under this Agreement and the other Credit Documents are joint and several as between each Borrower.

## 1.15   Deemed Action by all Borrowers

All consents, waivers, notices and other action required, made, given to or received by the Borrowers under this Agreement or any of the other Credit Documents will be deemed to be required, made, given or received by all of the Borrowers if required, made, given or received by one or more of the Borrowers. If a representation, certification or other statement under this Agreement or any of the other Credit Documents is made by one Borrower, or to the knowledge of one Borrower, it will be deemed to be made by all Borrowers, or the knowledge of all Borrowers, as applicable.

## 1.16   Amendment and Restatement

The Borrowers, the Agent and the Lenders agree that effective on the Amendment and Restatement Date, this Agreement is an amendment and restatement of the Existing Credit Agreement and is not a novation of the Existing Credit Agreement. As a consequence, the obligations, indebtedness and liabilities outstanding under the Existing Credit Agreement (including any existing letters of credit thereunder which will be deemed to be Letters of Credit issued by the applicable Issuing Bank under the corresponding Facility hereunder) shall constitute obligations, indebtedness and liabilities hereunder governed by the terms hereof and shall continue to be secured by the Security. Such obligations, indebtedness and liabilities shall be continuing in all respects, and this Agreement shall not be deemed to evidence or result in a novation of such obligations, indebtedness and liabilities or a repayment and reborrowing of such obligations, indebtedness and liabilities. The Existing Credit Agreement has been amended and restated solely for the purposes of reflecting amendments to the Existing Credit Agreement which the Lenders, the Agent and the Borrowers have agreed upon. All references to the "Credit Agreement" contained in the Credit Documents delivered prior to the effectiveness of this Agreement shall be references to this Agreement without further amendment to those Credit Documents. The Borrowers confirm that each of the Credit Documents otherwise remains in full force and effect. All deliverables made under the Existing Credit Agreement shall be deemed to have been delivered under this Agreement. Each Lender authorizes the Agent to take all actions and make such adjustments as are reasonably necessary to give effect to the foregoing. Notwithstanding the foregoing or any other term hereof, all of the applicable continuing covenants, representations and warranties on the part of the Borrowers under the Existing Credit Agreement and all of the claims and causes of action arising against the Borrowers in connection therewith, in respect of all matters, events, circumstances and obligations arising or existing prior to the Amendment and Restatement Date shall continue, survive and shall not be merged in the

execution of this Agreement or any other Credit Documents or any advance or provision of any Loan hereunder.

**1.17   Exhibits and Schedules**

The following exhibits and schedules are attached to this Agreement and incorporated herein by reference:

| | | |
|---|---|---|
| Exhibit "A" | – | Lenders and Lenders' Commitments |
| Exhibit "B" | – | Form of Drawdown Request |
| Exhibit "C" | – | Form of Rollover Notice |
| Exhibit "D" | – | Form of Conversion Notice |
| Exhibit "E" | – | Form of Repayment Notice |
| Exhibit "F" | – | Form of Compliance Certificate |
| Exhibit "G" | – | Form of Assignment Agreement |
| Exhibit "H" | – | Form of Borrowing Base Certificate |
| Exhibit "I" | – | Form of Designation Notice |
| Exhibit "J" | – | Form of Subordination Agreement |
| Schedule 1.1.205 | – | Existing Permitted Funded Debt |
| Schedule 1.1.210 | – | Existing Permitted Liens |
| Schedule ~~1.1.253~~**1.1.254** | – | Surviving Colombian Credit Agreements |
| Schedule 6.1.2 | – | Corporate Information |
| Schedule 6.1.3 | – | Subsidiaries |
| Schedule 6.1.5 | – | Consents and Approvals Required |
| Schedule 6.1.8 | – | Material Permits |
| Schedule 6.1.10 | – | Leased Properties |
| Schedule 6.1.11 | – | Intellectual Property |
| Schedule 6.1.12 | – | Insurance Policies |
| Schedule 6.1.13 | – | Material Agreements |
| Schedule 6.1.14 | – | Labour Matters |
| Schedule 6.1.15 | – | Environmental Matters |
| Schedule 6.1.16 | – | Litigation |
| Schedule 6.1.17 | – | Pension Plans |
| Schedule 6.1.23 | – | Taxes |
| Schedule 6.1.33 | – | Eligible Approved Contracts |
| Schedule 7.2.3 | – | Investments |
| Schedule 7.2.6 | – | Transactions with Affiliates |

Schedule 9.1          –   Post-Closing Schedule

## 1.18    Covenant Relief Period

The Borrowers may, by providing an irrevocable written notice to the Agent, terminate the Covenant Relief Period, which notice shall specify the date on which the Covenant Relief Period is to end; provided that, such termination date shall not be retroactive to a date that precedes such notice.

<div align="center">

**ARTICLE 2**
**CANADIAN OPERATING FACILITY**

</div>

## 2.1    Establishment of Canadian Operating Facility

Subject to the terms and conditions in this Agreement, each Canadian Operating Lender hereby establishes a committed, revolving credit facility in favour of the Canadian Borrower in the maximum principal amount indicated opposite such Canadian Operating Lender's name in Exhibit "A" under the heading "Canadian Operating Facility Commitments". Such credit facility in the maximum aggregate principal amount of the Canadian Operating Facility Limit are established by the Canadian Operating Lenders severally and not jointly, and are hereinafter collectively referred to as "**Canadian Operating Facility**". Each Advance by a Canadian Operating Lender under the Canadian Operating Facility shall be made by such Canadian Operating Lender in its Proportionate Share of the Canadian Operating Facility. If the Canadian Operating Facility Limit is at any time less than the Canadian Operating Facility Commitment, then each Canadian Operating Lender's obligation to provide Advances under the Canadian Operating Facility will be reduced accordingly on a *pro rata* basis.

## 2.2    Purpose

Advances under the Canadian Operating Facility shall be used by the Canadian Borrower to fund working capital needs and for general corporate purposes, including Permitted Acquisitions (other than a Hostile Acquisition and the Terra Acquisition).

## 2.3    Revolving Nature

The Canadian Operating Facility shall be a revolving facility. For greater certainty, the Borrower shall, subject to the terms of this Agreement, be entitled to obtain Advances under the Canadian Operating Facility from time to time and repay all or any portion of the Outstanding Advances under the Canadian Operating Facility from time to time; provided, that the Outstanding Advances under the Canadian Operating Facility at any time shall not exceed the Canadian Operating Facility Limit in effect at such time. If at any time and for whatever reason the Outstanding Advances under the Canadian Operating Facility exceed the Canadian Operating Facility Limit then in effect, the Canadian Borrower shall, within two Business Days of receipt of a written notice from the Agent, pay to the Agent the principal amount required to reduce the Outstanding Advances under the Canadian Operating Facility to an amount not greater than the Canadian Operating Facility Limit then in effect.

**2.4     Repayment**

The Obligations under the Canadian Operating Facility shall become due and payable on the earlier of: (i) the Acceleration Date; and (ii) the Facilities Maturity Date.

**2.5     Availment Options**

2.5.1     Subject to the restrictions contained in this Section 2.5 and elsewhere in this Agreement (and in particular, Sections 5.4 and 5.5), the Canadian Borrower may receive Advances under the Canadian Operating Facility by any one or more of the following Availment Options (or any combination thereof) in minimum amounts and multiples as provided in Section 5.5:

(a)     Overdrafts in Canadian Dollars or U.S. Dollars (but only under the Swingline);

(b)     Letters of Credit in Canadian Dollars or U.S. Dollars (but only under the Swingline);

(c)     Canadian Dollar Prime Rate Loans;

(d)     U.S. Dollar Base Rate Loans;

(e)     Bankers' Acceptances from the BA Lenders in Canadian Dollars only with a maturity of 30, 60, 90 or 180 days, subject to availability;

(f)     BA Equivalent Loans from the Non-BA Lenders in Canadian Dollars only with a maturity of 30, 60, 90 or 180 days, subject to availability; or

(g)     LIBOR Loans in U.S. Dollars, with a LIBOR Period of 30, 60, 90 or 180 days, subject to availability.

2.5.2     Bankers' Acceptances, BA Equivalent Loans and LIBOR Loans under the Canadian Operating Facility will not be issued with a maturity date later than the Facilities Maturity Date.

2.5.3     The Canadian Borrower may Convert Outstanding Advances under the Canadian Operating Facility in the form of any above Availment Option applicable to it into another form of Availment Option in the same currency, subject to and in accordance with the terms and conditions of this Agreement (but for greater certainty, Bankers' Acceptances, BA Equivalent Loans, LIBOR Loans and Letters of Credit may not be converted into another Availment Option prior to the maturity thereof, except in the case of unexpired Letter of Credits by the return of the original thereof to the Swingline Lender for cancellation).

**2.6     Interest and Fees**

2.6.1     In respect of Advances under the Canadian Operating Facility, the Canadian Borrower agrees to pay the following:

(a)   interest on Overdrafts in Canadian Dollars and interest on Canadian Dollar Prime Rate Loans at the Canadian Prime Rate plus the Applicable Margin per annum, payable monthly in arrears on the last Business Day of such month;

(b)   in respect of each Letter of Credit issued under the Canadian Operating Facility:

   (i)   to the Swingline Lender in respect of the period from the date of issuance of such Letter of Credit to the date of expiry of such Letter of Credit (including the first day but excluding the last day) and divided by 365 or 366 days, as the case may be, a fee equal to the Applicable Margin in effect at the time of issuance multiplied by the face amount of such Letter of Credit multiplied by the number of days in such period and divided by 365 or 366 days, as the case may be, payable on the date of issuance of such Letter of Credit; and

   (ii)   in respect of each Letter of Credit, in addition to the fees referred to in clause (i) immediately above, fees generally applicable to Letters of Credit from time to time (such as issuance, drawing, registration, amendment, communication and other processing and out of pocket fees) at the Swingline Lender's usual rates, payable to the Swingline Lender for its own account,

   and each fee referred to in this Section in respect of a Letter of Credit shall be paid in the same currency as the currency of such Letter of Credit;

(c)   in respect of each Bankers' Acceptance, a stamping fee equal to the Applicable Margin multiplied by the face amount of the Bankers' Acceptance with the product thereof further multiplied by the number of days to maturity of the Bankers' Acceptance and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such Bankers' Acceptance will be less than the face amount payable to the holder of such Bankers' Acceptance on the maturity thereof, as more particularly provided in Section 5.10);

(d)   in respect of each BA Equivalent Loan, a stamping fee equal to the Applicable Margin multiplied by the face amount of the BA Equivalent Loan with the product thereof further multiplied by the number of days to maturity of the BA Equivalent Loan and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such BA Equivalent Loan will be less than the principal amount of such BA Equivalent Loan on the maturity thereof, as more particularly provided in Section 5.12);

(e)   interest on Overdrafts in U.S. Dollars and interest on U.S. Dollar Base Rate Loans at the U.S. Base Rate plus the Applicable Margin per annum, payable monthly in

arrears on the last day of each and every month (<u>provided</u>, that if the last day of any month is not a Business Day, interest shall be payable on the next Business Day thereafter);

(f)     interest on LIBOR Loans in U.S. Dollars at the U.S. Dollar LIBOR Rate plus the Applicable Margin per annum calculated on the basis of a year of 360 days, payable in the manner set out in Section 5.13.2;

(g)     a standby fee with respect to the unused portion of the Canadian Operating Facility (other than the Swingline), calculated in U.S. Dollars on a daily basis as being the difference between (i) the Canadian Operating Facility Commitment less the Swingline Limit and (ii) the Outstanding Advances under that portion of the Canadian Operating Facility other than the Swingline, multiplied by the Applicable Margin and divided by 365 or 366 days, as the case may be, which standby fee shall be payable quarterly in arrears on the last day of each Fiscal Quarter;

(h)     a standby fee with respect to the Swingline payable to the Agent for the account of the Swingline Lender, calculated in U.S. Dollars on a daily basis as being the difference between (i) the Swingline Limit and (ii) the Outstanding Advances under the Swingline, multiplied by the Applicable Margin and divided by 365 or 366 days, as the case may be, which standby fee shall be payable quarterly in arrears on the last day of each Fiscal Quarter; and

(i)     such fees payable to the Agent as may be agreed in writing from time to time between the Canadian Borrower and the Agent relating to any Banking Services Agreements and related services which may be provided by the Agent for the Canadian Borrower from time to time.

2.6.2    With respect to any Availment Option under the Canadian Operating Facility, "Applicable Margin" means, in respect of any Fiscal Quarter, the percentage in the column relating to such Availment Option which corresponds to the Net Leverage Ratio as determined pursuant to Section 5.1.4.

## 2.7    Swingline

2.7.1    A portion of the Canadian Operating Facility in the maximum amount of the Swingline Limit is hereby designated as the "**Swingline**" and shall be subject to the terms and conditions in this Section 2.7 (in addition to any other applicable terms and conditions contained in this Agreement). The Swingline shall be available to each of the Canadian Borrower and the Specified Canadian Swingline Borrower (collectively the "**Swingline Borrowers**").

2.7.2    The Swingline shall be established and maintained by the Swingline Lender only. Either Swingline Borrower may only receive Advances under the Swingline by way of Overdrafts, LIBOR Loans, Bankers' Acceptances or the issuance of Letters of Credit, in each case (other than with respect to Bankers' Acceptances), in Canadian Dollars or

U.S. Dollars. The aggregate amount owing under the Swingline may at no time exceed the Swingline Limit and the aggregate principal amount outstanding under the Swingline plus the other Outstanding Advances under the Canadian Operating Facility shall at no time exceed the Canadian Operating Facility Limit. The total number of Bankers' Acceptances and LIBOR Loans outstanding under the Swingline shall not exceed fifteen at any time.

2.7.3    The Swingline shall form a part of the Canadian Operating Facility and, except for the purpose of calculating the Canadian Operating Facility standby fee, any Swingline Loan shall reduce availability under the Canadian Operating Facility on a dollar for dollar basis.

2.7.4    The Swingline Lender will make Advances to the Swingline Borrowers under the Swingline by way of (a) Canadian Dollar Overdraft into Canadian Dollar accounts, or U.S. Dollar Overdraft into U.S. Dollar accounts, in each case held at a branch of the Agent and as designated by either Swingline Borrower from time to time as required in order to honour cheques drawn by either Swingline Borrower on such accounts which are presented to the Swingline Lender for payment, (b) the issuance of Letters of Credit in Canadian Dollars or U.S. Dollars or (c) LIBOR Loans or Bankers' Acceptances. Other than in respect of Letters of Credit, LIBOR Loans or Bankers' Acceptances, no Drawdown Request or minimum amount shall be required in connection therewith and each Swingline Loan shall be on a dollar for dollar basis (i.e. not subject to multiples). As deposits are made into such accounts by the applicable Swingline Borrower, the Swingline Lender shall withdraw funds from such accounts from time to time and apply such funds as Repayments under the Swingline; provided, that the foregoing shall not apply to any Swingline Loans made by way of issuance of a Letter of Credit, LIBOR Loan or Bankers' Acceptance. No notice of repayment shall be required to be given by the Canadian Borrower in respect of any such repayment of any Swingline Loan (other than in respect of LIBOR Loans or Bankers' Acceptances). The Swingline Borrowers authorize and direct the Swingline Lender, in its discretion, to automatically debit, by mechanical, electronic or manual means, the bank accounts of the Swingline Borrowers maintained by it for any amounts (including principal, interest or fees) that are due and payable under this Section 2.7.

2.7.5    Letters of Credit may be issued under the Swingline in Canadian Dollars or U.S. Dollars (or such other currencies as may be agreed to by the Swingline Lender); provided, that the Equivalent Amount expressed in U.S. Dollars (or such other currency, if applicable) of the aggregate face amount of all Letters of Credit outstanding under the Swingline at any time may not exceed U.S. $10,000,000. Each Letter of Credit shall have an expiry date not exceeding the earlier of (a) one year from the date of issuance thereof (subject to any customary auto-renewal terms contained in such Letter of Credit; provided, that such auto-renewal provisions do not provide for a renewal in the singular instance in excess of one year from the date of such renewal), and (b) five Business Days prior to the Facilities Maturity Date. Letters of Credit will not be issued for the purpose of guaranteeing obligations of any Person other than a Credit Party. On the date of issue, the Swingline Lender will complete and issue one or more Letters of Credit in favour of the beneficiary as specified by the applicable Swingline Borrower in its Drawdown Request.

No Letter of Credit shall require payment against a conforming draft to be made thereunder on the same Business Day upon which such draft is presented, if such presentation is made after 11:00 a.m. (Toronto time) on such Business Day. Prior to the issue date, the applicable Swingline Borrower shall specify a precise description of the documents and the verbatim text of any certificate to be presented by the beneficiary prior to payment under the Letter of Credit. The Swingline Lender may require changes in any such documents or certificate, acting reasonably. In determining whether to pay under a Letter of Credit, the Swingline Lender shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit. Sections 4.7.2, 4.7.3, 4.7.4 and 4.7.6 shall apply to Letters of Credit issued under the Swingline *mutatis mutandis* as if the Swingline Lender was the Issuing Bank.

2.7.6    If the Canadian Borrower requests a Syndicated Advance and the Swingline Lender's Proportionate Share of such Syndicated Advance would cause its Proportionate Share of all Syndicated Advances under the Canadian Operating Facility then outstanding together with the aggregate outstanding principal amount of all Swingline Loans to exceed the Swingline Lender's Commitment under the Canadian Operating Facility, then the Canadian Borrower shall be required to repay such Swingline Loans (or to convert the same into a Syndicated Advance in accordance with Section 2.7.7) to the extent of such excess on or before the requested date of such Syndicated Advance; provided, that the foregoing shall not apply to any Swingline Loans made by way of issuance of a Letter of Credit.

2.7.7    Notwithstanding anything to the contrary herein contained, the Canadian Borrower may at any time give notice to the Swingline Lender and the Agent, which notice shall direct a Conversion of any outstanding Swingline Loan into a Syndicated Advance (other than by way of issuance of a Letter of Credit) and shall specify the particulars of such Swingline Loans, and the Agent shall forthwith provide a copy of such notice to the Canadian Operating Lenders and, effective on the effective date of such notice, the Canadian Borrower shall be deemed to have requested a Conversion of such Swingline Loan into a Syndicated Advance (whether or not it was the actual borrower under such Swingline Loan) and in an amount sufficient to repay the relevant Swingline Loan and accrued and unpaid interest in respect thereof. Subject to the same notice period set out in Section 5.4, each Canadian Operating Lender shall disburse to the Agent for payment to the Swingline Lender its respective Proportionate Share of such amounts and such amounts shall thereupon be deemed to have been advanced by such other Canadian Operating Lenders to the Canadian Borrower and to constitute Syndicated Advances by way of Canadian Dollar Prime Rate Loans or U.S. Dollar Base Rate Loans, as applicable. Such Syndicated Advances shall be deemed to be comprised of principal and accrued and unpaid interest in the same proportions as the corresponding Swingline Loans.

2.7.8    Upon the occurrence and any time during the continuance of an Event of Default, the Canadian Operating Lenders shall make such adjusting payments amongst themselves in any manner as may be required to ensure their respective participations in outstanding Advances under the Canadian Operating Facility reflect their respective Proportionate Share under the Canadian Operating Facility. If any Swingline Loans (other

than by way of Letters of Credit) are outstanding, the Swingline Lender may at any time in its sole and absolute discretion, on behalf of either Swingline Borrower (which hereby irrevocably directs and authorizes the Swingline Lender to make such request on its behalf), request that each Canadian Operating Lender, through the Agent, make a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable, to the Canadian Borrower (whether or not it was the actual borrower under such Swingline Loan) in an amount equal to the Lender's Proportionate Share of the principal amount of such Swingline Loan outstanding on the date such notice is given (in this Section, the "**Refunded Swingline Loans**"), provided that the provisions of this clause shall not affect the applicable Swingline Borrower's obligation to repay the Swingline Loans to the extent they remain outstanding. Each Canadian Operating Lender will make the proceeds of any such Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable, available to the Swingline Lender on the Business Day next following the date such notice is given in immediately available funds. The proceeds of such a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan shall be applied by the Swingline Lender to the payment in full of the Refunded Swingline Loans.

2.7.9    In the event of any request for a drawing under any Letter of Credit, the Swingline Lender may notify the applicable Swingline Borrower (with a copy of the notice to the Agent) on or before the date on which it intends to honour such drawing. The applicable Swingline Borrower (whether or not such notice is given) shall reimburse the Swingline Lender within two Business Days of demand by the Swingline Lender, in the relevant currency, an amount, in same day funds, equal to the amount of such drawing (in this Section, an "**LC Payment**"). The applicable Swingline Borrower shall pay to the Swingline Lender interest on the amount of any such drawn Letter of Credit as if such drawn amount was a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable, from the date such Letter of Credit is drawn upon until such time as the applicable Swingline Borrower reimburses the Swingline Lender for the drawn amount of such Letter of Credit. If the applicable Swingline Borrower does not reimburse the Swingline Lender within such two Business Days, the Canadian Operating Lenders shall, on the third Business Day following the date of such initial demand on the applicable Swingline Borrower by the Swingline Lender, at the request of the Swingline Lender, provide its Proportionate Share of the amount drawn under any such Letter of Credit and the Agent shall apply the proceeds thereof to the reimbursement of the Swingline Lender for the amount of such drawing. The applicable Swingline Borrower shall pay to Canadian Operating Lenders interest on the amount of any such drawn Letter of Credit from the date the Swingline Lender requests payment from each of Canadian Operating Lenders in respect of such drawn Letter of Credit until such time as the Canadian Borrower reimburses the Swingline Lender and each of Canadian Operating Lenders for the drawn amount of such Letter of Credit which has been drawn upon as if such drawn amount was a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable. Each Canadian Operating Lender acknowledges and agrees that its obligation to acquire participations in each Letter of Credit issued by the Swingline Lender and its obligation to make the payments specified herein, and the right of the Swingline Lender to receive the same, in the manner specified herein, are absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and

continuance of a Default or Event of Default hereunder, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

2.7.10   The obligations of each Canadian Operating Lender under Sections 2.7.8 and 2.7.9 are unconditional, shall not be subject to any qualification or exception whatsoever and shall be performed in accordance with the terms and conditions of this Agreement under all circumstances including:

(a)   any lack of validity or enforceability of the applicable Swingline Borrower's obligations under this Section 2.7;

(b)   the occurrence of any Default or Event of Default or the exercise of any rights by the Agent under the Credit Documents;

(c)   whether the Borrower under a Swingline loan was the Canadian Borrower or the Specified Canadian Swingline Borrower; and

(d)   the absence of any demand for payment being made, any proof of claim being filed, any proceeding being commenced or any judgment being obtained by any Lender against any Credit Party.

2.7.11   For certainty, it is hereby acknowledged and agreed that the Canadian Operating Lenders shall be obligated to disburse to the Agent for payment to the Swingline Lender their respective Proportionate Shares of any Syndicated Advances contemplated in this Section 2.7 regardless of:

(a)   whether a Default or Event of Default has occurred or is then continuing or whether any other condition in Section 9.2 is met;

(b)   whether or not the Canadian Borrower has, in fact, actually requested such Conversion; and

(c)   whether or not a Person was a Canadian Operating Lender at the time the applicable Swingline Loan was made.

2.7.12   Notwithstanding any other terms of this Section 2.7, this Agreement or any other Loan Document, the Canadian Borrower shall be jointly and severally liable with the Specified Canadian Swingline Borrower for all obligations and indebtedness arising out of any Swingline Loan advanced by the Swingline Lender to the Specified Canadian Swingline Borrower.

## **2.8   Accordion - Increase in the Canadian Operating Facility Commitment Amount**

**2.8.1   The Canadian Borrower may at any time and from time to time (a) with the consent of the Agent and the Swingline Lender add additional financial institutions hereunder, as Canadian Operating Lenders or, (b) with the consent of the applicable Canadian Operating Lender, the Agent and the Swingline Lender, increase the individual Canadian Operating Facility Commitment of such Canadian**

Operating Lender, and, in each case, thereby increase the Canadian Operating Facility Commitment; provided, that at the time of any such addition or increase:

    (A)    no Default or Event of Default has occurred and is continuing or would result therefrom and the Agent has received a certificate from the Borrower confirming the same;

    (B)    the aggregate amount of all increases to the Canadian Operating Facility Commitment pursuant to this Section 2.8.1 shall not exceed $10,000,000;

    (C)    the aggregate of the U.S. Operating Facility Commitment and the Canadian Operating Facility Commitment (as increased) does not at any time exceed $144,681,471;

    (D)    the Agent and the Swingline Lender have each consented to such Canadian Operating Lender increasing its Canadian Operating Facility Commitment, each such consent not to be unreasonably withheld or delayed;

    (E)    (i) the Canadian Operating Facility Commitment increased pursuant to this Section 2.8.1 and (ii) the individual Canadian Operating Facility Commitment of any new financial institution being added as a Lender pursuant to this Section 2.8.1, shall in each case be no less than $2,500,000;

    (F)    concurrently with the addition of a financial institution as an additional Canadian Operating Lender or the increase of a Canadian Operating Lender's Canadian Operating Facility Commitment, such financial institution or Canadian Operating Lender, as the case may be, shall purchase from each Canadian Operating Lender, such portion of the Outstanding Advances owed to each Canadian Operating Lender under the Canadian Operating Facility as is necessary to ensure that the Outstanding Advances owed to all Canadian Operating Lenders and including therein such additional financial institution and the increased Canadian Operating Facility Commitment of any Canadian Operating Lender, as applicable, are in accordance with the Lender's Proportionate Shares of all such Canadian Operating Lenders (including the new financial institution and the increased Canadian Operating Facility Commitment of any Lender) and such financial institution shall execute such documentation as is required by the Agent, acting reasonably, to novate such financial institution as a Canadian Operating Lender hereunder; provided that with respect to any portion of such Outstanding Advances which is outstanding by way of

**Bankers' Acceptance, the new financial institution or such Canadian Operating Lender shall provide an indemnity to the other Lenders (provided that no such indemnity may exceed one month in duration unless agreed to by all of the affected Lenders) in order to ensure such Bankers' Acceptances are outstanding in accordance with the new Proportionate Shares; and**

**(G)     the Canadian Borrower has provided to the Agent a certified copy of a directors' resolution of the Canadian Borrower authorizing any such increase in the Canadian Operating Facility Commitment (which may be the original directors' resolution authorizing the credit facility hereunder) together with (i) an acknowledgement and confirmation agreement in respect of Security from each Credit Party formed under the laws of Canada, the U.S. or any province or state thereof and (ii) a legal opinion with respect each Credit Party formed under the laws of Canada, the U.S. or any province or state thereof, in each case in form and substance satisfactory to the Agent, acting reasonably;**

**provided, in the case of any Canadian Operating Lender which is requested to provide an increase to its Canadian Operating Facility Commitment, (i) each Canadian Operating Lender shall notify the Agent within the time period specified in the Agent's notice of such increase to such Canadian Operating Lender (which shall in no event be less than ten Business Days from the date of delivery of such notice to the Canadian Operating Lenders) whether or not it agrees to increase its Canadian Operating Facility Commitment and by what amount; (ii) any Canadian Operating Lender not responding within such time period shall be deemed to have declined to increase its Canadian Operating Facility Commitment; and (iii) in no event shall any existing Canadian Operating Lender be required to increase its Canadian Operating Facility Commitment.**

## ARTICLE 3
## TERM FACILITY

**3.1     Establishment of the Term Facility**

Subject to the terms and conditions in this Agreement, each Term Lender hereby establishes a committed non-revolving reducing term credit facility in favour of the Canadian Borrower in the maximum principal amount indicated opposite such Term Lender's name in Exhibit "A" under the heading "Term Facility Commitments". Such credit facility in the maximum aggregate principal amount of the Term Facility Commitment is established by the Term Lenders severally and not jointly, and is hereinafter referred to as the "**Term Facility**". Each Advance by a Term Lender under the Term Facility shall be made by such Term Lender in its Proportionate Share of the Term Facility.

**3.2**   **Purpose**

Advances to partially finance the purchase price of certain Acquisitions.

**3.3**   **Nature**

The Term Facility shall be a non-revolving facility, and any Repayment under the Term Facility may not be re-borrowed. As of the Amendment and Restatement Date, no new Advances are available under the Term Facility.

**3.4**   **Repayment**

3.4.1    The Obligations under the Term Facility shall become due and payable on the earlier of: (a) the Acceleration Date; and (b) the Facilities Maturity Date.

3.4.2    The Canadian Borrower shall make Repayments under the Term Facility in quarterly installments on the last day of each Fiscal Quarter (and if the last day of a Fiscal Quarter is not a Business Day, such payment shall be due on the next Business Day) of U.S. $1,195,000 in each case, payable on the last Business Day of each such Fiscal Quarter.**; provided, however, that no such Repayment shall be required under this Section 3.4.2 with respect to the Fiscal Quarters ending June 30, 2019, September 30, 2019 and December 31, 2019.**

3.4.3    Each Repayment under the Term Facility shall be applied to the Term Lenders holding such Loans *pro rata* based upon their Proportionate Share thereof and the Term Facility Commitment shall be reduced by the amount of each such Repayment.

**3.5**   **Availment Options**

3.5.1    Subject to the restrictions contained in this Section 3.5, the Canadian Borrower may receive Advances under the Term Facility by way of (and may convert Outstanding Advances under the Term Facility into) any one or more of the following Availment Options (or any combination thereof) in minimum amounts and multiples as provided in Section 5.5:

(a)    Canadian Dollar Prime Rate Loans;

(b)    Bankers' Acceptances from the BA Lenders in Canadian Dollars only with a maturity date of 30, 60, 90 or 180 days, subject to availability;

(c)    BA Equivalent Loans from the Non-BA Lenders in Canadian Dollars only with a maturity date of 30, 60, 90 or 180 days, subject to availability;

(d)    U.S. Dollar Base Rate Loans; or

(e)    LIBOR Loans in U.S. Dollars only with a LIBOR Period of 30, 60, 90 or 180 days, subject to availability.

3.5.2    Bankers' Acceptances, BA Equivalent Loans and LIBOR Loans under the Term Facility may not be converted into another Availment Option prior to the maturity thereof, and may not be issued with a maturity date later than the Facilities Maturity Date.

**3.6    Interest and Fees**

3.6.1    In respect of Advances under the Term Facility, the Canadian Borrower agrees to pay the following:

(a)    interest on Canadian Dollar Prime Rate Loans at the Canadian Prime Rate plus the Applicable Margin per annum, payable monthly in arrears on the first Business Day of the next month;

(b)    in respect of each Bankers' Acceptance, a stamping fee equal to the Applicable Margin multiplied by the face amount of the Bankers' Acceptance with the product thereof further multiplied by the number of days to maturity of the Bankers' Acceptance and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such Bankers' Acceptance will be less than the face amount payable to the holder of such Bankers' Acceptance on the maturity thereof, as more particularly provided in Section 5.10);

(c)    in respect of each BA Equivalent Loan, a stamping fee equal to the Applicable Margin multiplied by the face amount of the BA Equivalent Loan with the product thereof further multiplied by the number of days to maturity of the BA Equivalent Loan and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such BA Equivalent Loan will be less than the principal amount of such BA Equivalent Loan on the maturity thereof, as more particularly provided in Section 5.12);

(d)    interest on U.S. Dollar Base Rate Loans at the U.S. Base Rate plus the Applicable Margin per annum, payable monthly in arrears on the first Business Day of the next month; and

(e)    interest on LIBOR Loans in U.S. Dollars at the U.S. Dollar LIBOR Rate plus the Applicable Margin per annum calculated on the basis of a year of 360 days, payable in the manner set out in Section 5.13.2.

3.6.2    With respect to any Availment Option under the Term Facility, "Applicable Margin" means, in respect of any Fiscal Quarter, the percentage in the column relating to such Availment Option which corresponds to the Net Leverage Ratio as determined pursuant to Section 5.1.4.

# ARTICLE 4
# U.S. OPERATING FACILITY

## 4.1     Establishment of U.S. Operating Facility

Subject to the terms and conditions in this Agreement, each U.S. Operating Lender hereby establishes a committed, revolving credit facility in favour of the U.S. Borrower in the maximum principal amount indicated opposite such U.S. Operating Lender's name in Exhibit "A" under the heading "U.S. Operating Facility Commitments". Such credit facility in the maximum aggregate principal amount of the U.S. Operating Facility Limit are established by the U.S. Operating Lenders severally and not jointly, and are hereinafter collectively referred to as the "**U.S. Operating Facility**". Each Advance by a U.S. Operating Lender under the U.S. Operating Facility shall be made by such U.S. Operating Lender in its Proportionate Share of the U.S. Operating Facility.

## 4.2     Purpose

Advances under the U.S. Operating Facility shall be used by the U.S. Borrower to fund working capital needs and for general corporate purposes including the Permitted Acquisitions (other than a Hostile Acquisition and the Terra Acquisition).

## 4.3     Revolving Nature

The U.S. Operating Facility shall be a revolving facility. For greater certainty, the U.S. Borrower shall, subject to the terms of this Agreement, be entitled to obtain Advances by way of U.S. Dollar Prime Rate Loans, LIBOR Loans or Letters of Credit in U.S. Dollars under the U.S. Operating Facility from time to time and repay all or any portion of the Outstanding Advances under the U.S. Operating Facility from time to time; provided, that the Outstanding Advances under the U.S. Operating Facility at any time shall not exceed the U.S. Operating Facility Commitment in effect at such time. If at any time and for whatever reason the Outstanding Advances under the U.S. Operating Facility exceed the U.S. Operating Facility Commitment then in effect, the U.S. Borrower shall, within two Business Days of receipt of a written notice from the Agent, pay to the Agent the principal amount required to reduce the Outstanding Advances under the U.S. Operating Facility to an amount not greater than the U.S. Operating Facility Commitment then in effect.

## 4.4     Repayment

The Obligations under the U.S. Operating Facility shall become due and payable on the earlier of: (i) the Acceleration Date; and (ii) the Facilities Maturity Date.

## 4.5     Availment Options

4.5.1     Subject to the restrictions contained in this Section 4.5 and elsewhere in this Agreement (and in particular, Sections 5.4 and 5.5), the U.S. Borrower may receive Advances under the U.S. Operating Facility by any one or more of the following Availment Options (or any combination thereof) in minimum amounts and multiples as provided in Section 5.5:

(a)     Letters of Credit in U.S. Dollars;

(b)     U.S. Dollar Prime Rate Loans; or

(c)     LIBOR Loans in U.S. Dollars, with a LIBOR Period of 30, 60, 90 or 180 days, subject to availability.

4.5.2     LIBOR Loans under the U.S. Operating Facility will not be issued with a maturity date later than the Facilities Maturity Date.

4.5.3     The U.S. Borrower may convert Outstanding Advances under the U.S. Operating Facility in the form of any above Availment Option applicable to it into another form of Availment Option in the same currency, subject to and in accordance with the terms and conditions of this Agreement (but for greater certainty, LIBOR Loans and Letters of Credit may not be converted into another Availment Option prior to the maturity thereof, except in the case of unexpired Letter of Credits by the return of the original thereof to the Issuing Bank for cancellation).

## 4.6     Interest and Fees

4.6.1     In respect of Advances under the U.S. Operating Facility, the U.S. Borrower agrees to pay the following:

(a)     interest on U.S. Dollar Prime Rate Loans in U.S. Dollars at the U.S. Prime Rate plus the Applicable Margin per annum, payable monthly in arrears on the last day of each and every month (provided, that if such day is not a Business Day, interest shall be payable on the next Business Day thereafter);

(b)     interest on LIBOR Loans in U.S. Dollars at the U.S. Dollar LIBOR Rate plus the Applicable Margin per annum calculated on the basis of a year of 360 days, payable in the manner set out in Section 5.13.2;

(c)     in respect of each Letter of Credit issued under the U.S. Operating Facility:

(i)     to the Agent for the account of the U.S. Operating Lenders in respect of the period from the date of issuance of such Letter of Credit to the date of expiry of such Letter of Credit (including the first day but excluding the last day) and divided by 360 days, a fee equal to the Applicable Margin in effect at the time of issuance multiplied by the face amount of such Letter of Credit multiplied by the number of days in such period and divided by 360 days, payable on the date of issuance of such Letter of Credit; and

(ii)     in respect of each Letter of Credit, in addition to the fees referred to in Section 4.6.1(c), fees generally applicable to Letters of Credit from time to time (such as issuance, drawing, registration, amendment, communication and other processing and out of pocket fees) at the Issuing Bank's usual rates, payable to the Issuing Bank for its own account.

Each fee referred to in this Section in respect of a Letter of Credit shall be paid in U.S. Dollars; and

(d)    an unused commitment fee with respect to the unused portion of the U.S. Operating Facility calculated in U.S. Dollars on a daily basis as being the difference between (i) the U.S. Operating Facility Commitment and (ii) the Outstanding Advances under the U.S. Operating Facility, multiplied by the Applicable Margin and divided by 360 days which standby fee shall be payable quarterly in arrears on the last day of each Fiscal Quarter.

4.6.2    With respect to any Availment Option under the U.S. Operating Facility, "Applicable Margin" means, in respect of any Fiscal Quarter, the percentage in the column relating to such Availment Option which corresponds to the Net Leverage Ratio as determined pursuant to Section 5.1.4.

## 4.7    Letters of Credit

4.7.1    Letters of Credit may be issued under the U.S. Operating Facility in U.S. Dollars (or such other currencies as may be agreed to by the Agent and by the applicable Issuing Bank); provided, that the Equivalent Amount expressed in U.S. Dollars of the aggregate face amount of all Letters of Credit outstanding under the U.S. Operating Facility at any time may not exceed U.S. $5,000,000. Each Letter of Credit shall have an expiry date not exceeding the earlier of (a) one year from the date of issuance thereof (subject to any customary auto-renewal terms contained in such Letter of Credit; provided, that such auto-renewal provisions do not provide for a renewal in the singular instance in excess of one year from the date of such renewal), and (b) five Business Days prior to the Facilities Maturity Date.

4.7.2    Each request for the issuance of a Letter of Credit shall be delivered by the U.S. Borrower to the Issuing Bank (with a copy to the Agent) in accordance with the notice requirements set out in Section 5.4 herein, together with Issuing Bank's customary form of application and indemnity agreement completed to its satisfaction and the proposed form of the Letter of Credit (which shall be satisfactory to the Issuing Bank) and such other certificates, documents and other papers and information as the Issuing Bank may reasonably request.

4.7.3    On the date of issue, the Issuing Bank will complete and issue one or more Letters of Credit in favour of the beneficiary as specified by the U.S. Borrower in its Drawdown Request. No Letter of Credit shall require payment against a conforming draft to be made thereunder on the same Business Day upon which such draft is presented, if such presentation is made after 11:00 a.m. (New York time) on such Business Day. Prior to the issue date, the U.S. Borrower shall specify a precise description of the documents and the verbatim text of any certificate to be presented by the beneficiary prior to payment under the Letter of Credit. The Issuing Bank may require changes in any such documents or certificate, acting reasonably. In determining whether to pay under a Letter of Credit, the Issuing Bank shall be responsible only to determine that the documents and

certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit.

4.7.4     In the event of any request for a drawing under any Letter of Credit, the Issuing Bank may notify the U.S. Borrower (with a copy of the notice to the Agent) on or before the date on which it intends to honour such drawing. The U.S. Borrower (whether or not such notice is given) shall reimburse the Issuing Bank within one Business Day of demand by the Issuing Bank, an amount, in same day funds, equal to the amount of such drawing. The U.S. Borrower shall pay to the Issuing Bank interest on the amount of any such drawn Letter of Credit as if such drawn amount was a U.S. Dollar Prime Rate Loan from the date such Letter of Credit is drawn upon until such time as the U.S. Borrower reimburses the Issuing Bank for the drawn amount of such Letter of Credit. If the U.S. Borrower does not reimburse the Issuing Bank within such two Business Days, U.S. Operating Lenders shall, on the third Business Day following the date of such initial demand on the U.S. Borrower by the Issuing Bank, at the request of the Issuing Bank, provide its Proportionate Share of the amount drawn under any such Letter of Credit and the Agent shall apply the proceeds thereof to the reimbursement of the Issuing Bank for the amount of such drawing. The U.S. Borrower shall pay to U.S. Operating Lenders interest on the amount of any such drawn Letter of Credit from the date the Issuing Bank requests payment from each of U.S. Operating Lenders in respect of such drawn Letter of Credit until such time as the U.S. Borrower reimburses the Issuing Bank and each of U.S. Operating Lenders for the drawn amount of such Letter of Credit which has been drawn upon as if such drawn amount was a U.S. Dollar Base Rate Loan. Each U.S. Operating Lender acknowledges and agrees that its obligation to acquire participations in each Letter of Credit issued by the Issuing Bank and its obligation to make the payments specified herein, and the right of the Issuing Bank to receive the same, in the manner specified herein, are absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or Event of Default hereunder, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

4.7.5     The Issuing Bank shall notify each the Agent of the principal amount, the number, and the expiration date of each Letter of Credit and upon receipt of such information, the Agent shall notify each U.S. Operating Lender of the amount of such U.S. Operating Lender's participation therein. The Issuing Bank shall review each draft and any accompanying documents presented under a Letter of Credit and shall notify the Agent of any such presentment and upon receipt of such information, the Agent shall notify each U.S. Operating Lender of such presentment.

4.7.6     The Issuing Bank shall not be obligated to issue any Letter of Credit (i) in violation of any Applicable Law or policy of such Issuing Bank or any Lender or (ii) if any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Bank from issuing such Letter of Credit. The Issuing Bank shall not at any time be obligated to issue any Letter of Credit if such issuance would conflict with, or cause the Issuing Bank to exceed any limits imposed by, this Agreement or any applicable requirements of Applicable Law or any regulatory or internal limit.

# ARTICLE 5
## GENERAL CONDITIONS

**5.1     Matters relating to Interest and Fees**

5.1.1     Unless otherwise indicated, Interest on any outstanding principal amount hereunder shall be calculated daily and shall be payable monthly in arrears on the last day of each and every month. If the last day of a month is not a Business Day, the Interest payment due on such day shall be made on the next Business Day, and Interest shall continue to accrue on the said principal amount and shall also be paid on such next Business Day. Interest shall accrue from and including the day upon which an Advance is made or is deemed to have been made, and ending on but excluding the day on which such Advance is repaid or satisfied. Any change in the Canadian Prime Rate shall cause an immediate adjustment of the interest rate applicable to Canadian Dollar Prime Rate Loans and Overdrafts in Canadian Dollars and any change in the U.S. Base Rate shall cause an immediate adjustment of the interest rate applicable to U.S. Dollar Base Rate Loans and Overdrafts in U.S. Dollars, in each case without the necessity of any notice to any Borrower.

5.1.2     Unless otherwise stated, in this Agreement if reference is made to a rate of Interest, fee or other amount "per annum" or a similar expression is used, such interest, fee or other amount shall be calculated on the basis of a year of 365 or 366 days (or 360 days in the case of Loans or Letters of Credit denominated in U.S. Dollars), as the case may be. If the amount of any Interest, fee or other amount is determined or expressed on the basis of a period of less than one year of 365 days or 366 days (or 360 days in the case of Loans denominated in U.S. Dollars), as the case may be, the equivalent yearly rate is equal to the rate so determined or expressed, divided by the number of days in the said period, and multiplied by the actual number of days in that calendar year.

5.1.3     Notwithstanding any other provisions of this Agreement:

(a)     the Borrowers and the Lenders intend to strictly comply with all Applicable Laws, including applicable usury laws (or the usury laws of any jurisdiction whose usury laws are deemed to apply to this Agreement and the other Credit Documents despite the intention and desire of the parties to apply the usury laws of the Province of Alberta and the federal laws applicable therein);

(b)     in no event shall any Borrower or any other Person be obligated to pay, or any Lender have any right or privilege to reserve, receive or retain, (a) any interest in excess of the maximum amount of nonusurious interest permitted under the laws of the Province of Alberta the federal laws of Canada applicable therein, or the Applicable Laws of any other jurisdiction, or (b) total interest in excess of the amount which such Lender could lawfully have contracted for, reserved, received, retained or charged had the interest been calculated for the full term of the applicable Loan; and

(c)     if the amount of any interest, premium, fees or other monies or any rate of interest stipulated for, taken, reserved or extracted under the Credit Documents would otherwise contravene the provisions of Section 347 of the *Criminal Code* (Canada), Section 8 of the *Interest Act* (Canada) or any successor or similar legislation (including any usury law in the U.S.), or would exceed the amounts which any Lender is legally entitled to charge and receive under any law to which such compensation is subject, then such amount or rate of interest shall be reduced to such maximum amount as would not contravene such provision; and to the extent that any excess has been charged or received such Lender shall apply such excess against the Outstanding Advances and refund any further excess amount to the applicable Borrower.

As used in this Section 5.1.3, the term "interest" includes the aggregate of all charges, fees, benefits or other compensation which constitute interest under Applicable Law; <u>provided</u>, that, to the maximum extent permitted by Applicable Law, (a) any non-principal payment shall be characterized as an expense or as compensation for something other than the use, forbearance or detention of money and not as interest, and (b) all interest at any time contracted for, reserved, charged or received shall be amortized, prorated, allocated and spread, using the actuarial method, during the full term of the Facilities. The daily interest rates to be used in calculating interest for the purposes of this Section 5.1.3 shall be determined by dividing the applicable interest rate per annum by the number of days in the calendar year for which such calculation is being made. None of the terms and provisions contained in this Agreement or in any other Credit Document which directly or indirectly relate to interest shall ever be construed without reference to this Section 5.1.3, or be construed to create a contract to pay for the use, forbearance or detention of money at any interest rate in excess of the amounts permitted under any Applicable Law.

The provisions of this Section shall govern and control over every other provision of this Agreement or any other Credit Document which conflicts or is inconsistent with this Section 5.1.3.

5.1.4     Any change in the Applicable Margin in respect of any Availment Option under a Facility shall be determined in accordance with this Section. For purposes of this Section, the term "**Pricing Date**" means, for any Fiscal Quarter of the Canadian Borrower ending on or after the Amendment and Restatement Date, the date on which the Agent is in receipt of the financial statements and Compliance Certificate pursuant to Section 7.4.1(b) or Section 7.4.1(d), as applicable, for such Fiscal Quarter. The Applicable Margin shall be established on a Pricing Date based on the Net Leverage Ratio as of the end of the most recently completed Fiscal Quarter and the Applicable Margin established on a Pricing Date shall remain in effect until the next Pricing Date. If the financial statements and Compliance Certificate are delivered before 10:00 a.m. Toronto time on a specific Business Day (the "**Specific Business Day**") then pricing will be adjusted starting on the Specific Business Day. If the financial statements and Compliance Certificate are received after 10:00 a.m. Toronto time on the Specific Business Day then any pricing adjustment will be effective on the next Business Day. If the Canadian Borrower has not delivered its financial statements and Compliance Certificate by the

date such financial statements and Compliance Certificate are required to be delivered pursuant to Section 7.4.1(b) or Section 7.4.1(d), as applicable, then until such financial statements and Compliance Certificate are delivered, the Applicable Margin shall be based on Level VI. The Applicable Margin established by such financial statements shall be in effect from the Pricing Date that occurs immediately after the end of the Fiscal Quarter covered by such financial statements until the next Pricing Date; provided, that no changes will be made in respect of any Bankers' Acceptances or BA Equivalent Loans which are outstanding on the effective date, until the Rollover thereof and fees paid on the issuance or renewal of a Letter of Credit will not change during the term of a Letter of Credit as a result of a change in the Net Leverage Ratio.

5.1.5    The determination of the Applicable Margin by the Agent shall be conclusive and binding on the Borrowers and the Lenders if reasonably determined, absent manifest error.

5.1.6    Effective upon the occurrence of an Event of Default (the "**effective date**"), the interest rates then applicable to all Availment Options will each increase by 200 basis points and such increase will remain in effect for as long as such Event of Default subsists. An increase in interest rates and fees as aforesaid arising from an Event of Default shall apply to all outstanding Advances under the Facilities and will on the effective date apply proportionately to each outstanding Advance during the continuance of such Event of Default. The Borrowers will pay to the Agent on behalf of the Lenders any resulting increase in stamping fees and Letter of Credit fees on or prior to the third Business Day following the effective date. In addition to the conditions set forth above, the Lenders' obligation to provide any Advances under any Facility, other than Rollovers or Conversions of then maturing Advances (in each case not to exceed a 30 day term), will be suspended for as long as there exists an Event of Default.

5.1.7    If the Canadian Borrower has delivered a Compliance Certificate that is subsequently found to be inaccurate in any way as a result of the Canadian Borrower's financial results having to be restated or if the Canadian Borrower's financial results were inaccurately reflected in the original financial results on which such Compliance Certificate was based or for any other reason and the result thereof is that the Net Leverage Ratio was originally reported as lower (and the corresponding Level in the Applicable Margin table was lower) than it otherwise would have been in the absence of such inaccuracy or prior to such restatement, then the Borrowers will, immediately upon the correction of such inaccuracy or upon such restatement, pay to the Agent for the benefit of the applicable Lenders an amount equal to the interest, Letter of Credit fees, stamping fees in respect of Bankers' Acceptances and standby fees that the Lenders should have received, but did not receive, over the applicable period had the Net Leverage Ratio, and the underlying components thereof, been reported correctly in the first instance.

## 5.2    Voluntary Prepayments

Subject to Section 5.15, the Borrowers may from time to time, without payment of any penalty or fee, upon at least two Business Days' prior written notice to the Agent make a

prepayment in respect of any Outstanding Advances under any of the Facilities. In the case of Term Facility, the Term Facility Commitment shall be automatically and permanently reduced by the amount of any such prepayment. Notwithstanding the foregoing, Bankers' Acceptances, BA Equivalent Loans and LIBOR Loans may not be repaid prior to the maturity thereof (except in accordance with Sections 5.11 and 5.14, as applicable) and unexpired Letter of Credits may not be prepaid prior to the maturity thereof (except by the return of the original thereof to the Issuing Bank or Swingline Lender, as applicable, for cancellation or by the collateralization thereof in the manner set forth in Section 5.16(f)). Prepayments under the Facilities other than under the Swingline shall be in a minimum principal amount of U.S. $500,000 and integral multiples of U.S. $100,000 in excess thereof and shall be applied as directed by the Borrowers to the remaining payments thereof. Any prepayments under the Term Facility shall be made in inverse order of maturity.

**5.3      Mandatory Prepayments**

5.3.1     If any Credit Party receives cash proceeds, or net cash proceeds in the case of clauses (a), (b) and (c) below, from:

(a)      a transaction after the Amendment and Restatement Date involving the creation or incurrence of any Funded Debt (other than Permitted Funded Debt), and notwithstanding any Default or Event of Default that results therefrom;

(b)      transactions involving the sale, lease or other disposition of any assets (other than transactions described in clauses (a) through (d) inclusive and (f) through (j) inclusive of Section 7.2.4), except where such proceeds are reinvested in the business of any Credit Party within the applicable time period permitted in accordance with Section 5.3.2 (the "**Sales Proceeds**"); or

(c)      property, casualty or other insurance proceeds received by any Credit Party, except where such proceeds are reinvested in the business of any Credit Party within the applicable time period permitted in accordance with Section 5.3.2 (the "**Insurance Proceeds**"); and/or

(d)      Specified Equity Contribution **(other than the Specified Equity Contribution deemed to be made on the Second Amendment Date)**;

then, subject to Sections 5.3.2 and 8.6, the Borrowers shall make a Repayment on account of the Outstanding Advances in an amount equal to 100% of such proceeds, or net cash proceeds in the case of clauses (a), (b) and (c) above, within three Business Days (i) after such proceeds are received by the applicable Credit Party in the case of clauses (a) and (d) above, (ii) within three Business Days of the expiry of the applicable reinvestment period set out in Section 5.3.2 after such proceeds are received by the applicable Credit Party in the case of clause (b) above and within three Business Days of the expiry of the insurance proceeds reinvestment period described in Section 5.3.2(a) after such proceeds are received by the applicable Credit Party in the case of clause (c) above. As used herein, "net cash proceeds" in respect of any such transaction means the gross amount payable to the applicable Credit Party in cash in respect of such transaction less (i) any sales

commissions, selling expenses, brokers' fees, consulting fees, legal fees, other costs and expenses of the transaction actually incurred, investment banking fees, accountants' fees, consulting fees, underwriting discounts and commissions and other customary fees and expenses actually incurred, (ii) amounts required to be applied to the repayments of Funded Debt, (including the principal amount, premium or penalty, if any, interest and other amounts required to be applied to the repayment of any Funded Debt secured by a Lien (including because the asset sold is removed from a borrowing base supporting such Funded Debt)), (iii) taxes payable in connection with the transaction, (iv) usual and reasonable adjustments in connection with the transaction and, including the amount of any liability paid or to be paid or reasonable reserve established in accordance with GAAP against any liabilities associated with the assets that are the subject of such event and retained by the Canadian Borrower or any of its Subsidiaries, and (v) any other amount specifically approved by the Agent in writing.

5.3.2    The Sales Proceeds or Insurance Proceeds, as applicable, need not be used by the Credit Parties to make a repayment under Section 5.3.1 and may be used by a Credit Party to purchase assets of the general type then used in the operation of an Eligible Line of Business, or, provided no Default (unless such repayment would cure any such Default) or Event of Default exists at such time, in the case of:

(a)    Insurance Proceeds (i) of insured claims that do not exceed in the aggregate in any one Fiscal Year $7,500,000 or (ii) are used to repair or replace the property in respect of which such Insurance Proceeds were received, if such purchase, repair or replacement occurs within twelve (12) months of the receipt of such proceeds, subject to an extension of up to a further six (6) months to complete such reinvestment; provided, that the Credit Party is contractually bound to such reinvestment prior to the expiry of the initial twelve (12) months period; or

(b)    Sales Proceeds (i) arising from any single transaction or series of related transactions that do not exceed in the aggregate in any one Fiscal Year $3,000,000 or (ii) are used or useful by a Credit Party to purchase assets of the general type then used in the operation of an Eligible Line of Business, within nine (9) months of the receipt of such proceeds, subject to an extension of up to a further three (3) months to complete such reinvestment; provided, that the Credit Party is contractually bound to such reinvestment prior to the expiry of the initial nine (9) period.

In connection with the foregoing, the Agent and the Lenders may rely upon and assume the correctness of all asset values and other statements contained in any certificate provided by an officer of the Canadian Borrower confirming the value of the relevant assets.

5.3.3    Repayments under this Section 5.3 are to be applied first to Outstanding Advances under the Term Facility until they have been fully repaid, and then to Outstanding Advances under the Operating Facilities, as directed by the Canadian Borrower, or failing such direction, *pro rata* between the Operating Facilities.

Repayments under the Facilities under this Section 5.3 shall be applied in inverse order of maturity and will be made *pro rata* to each Lender under the applicable Facility.

5.3.4    If as a result of currency rate fluctuation, the Outstanding Advances under the Canadian Operating Facility exceeds the Canadian Operating Facility Limit by at least 3% thereof (in each case, a "**Currency Excess**"), the Borrowers will, by the earlier of (a) five (5) Business Days after a written request from the Agent, and (b) the next date of a Rollover or Conversion, pay the applicable Currency Excess to the Agent as a Repayment for the benefit of the Canadian Operating Lenders to be shared on the basis of each applicable Lender's Proportionate Share under the Canadian Operating Facility. If to pay a Currency Excess it is necessary to repay an Advance made by way of Bankers' Acceptance or a LIBOR Loan prior to the maturity date thereof, the Borrowers will not be required to repay such Advances until the maturity date applicable thereto; provided, however, that at the request of the Agent, the Borrowers will forthwith pay the Currency Excess to the Agent for deposit into a cash collateral account maintained by and in the name of the Agent for the benefit of the Canadian Operating Lenders. The Currency Excess will be held by the Agent for set off against future obligations owing by the Borrowers to the Canadian Operating Lenders in respect of such Currency Excess, if any, and, pending such application, such amounts will bear interest for the Borrowers' account at the rate payable by the Agent in respect of deposits of similar amounts and for similar periods of time. The Agent shall have exclusive control over all amounts at any time on deposit in such cash collateral account. The deposit of the Currency Excess by the Borrowers with the Agent as herein provided will not operate as a Repayment under the Canadian Operating Facility until such time as the Currency Excess is actually paid to the Canadian Operating Lenders as a Repayment. If the Borrowers are required to provide a deposit under this Section 5.3.4 as a result of the Currency Excess with respect to an unmatured Bankers' Acceptance or a LIBOR Loan, and such Currency Excess (or any portion thereof) is no longer in effect on the maturity date of such Bankers' Acceptance or LIBOR Loan, such deposit (or the applicable portion thereof) shall be returned to the Borrowers within three Business Days after the maturity date of such Bankers' Acceptance or LIBOR Loan.

5.3.5    If the aggregate Outstanding Advances under the Facilities, is at any time greater than the then applicable Borrowing Base (the amount of such excess being a "**Borrowing Base Shortfall**"), one or all of the Borrowers shall within three (3) Business Days repay such portion of the Outstanding Advances under the Operating Facilities to the Agent for the Canadian Operating Lenders as is required to eliminate such Borrowing Base Shortfall. The Agent will apply such payments (a) against the Term Facility and (b) thereafter, *pro rata* amongst the Canadian Operating Facility and the U.S. Operating Facility and in the following order: (i) first against Canadian Dollar Prime Rate Loans, U.S. Dollar Base Rate Loans, U.S. Dollar Prime Rate Loans, (ii) second to collateralize Bankers' Acceptances as provided in Section 5.11, (iii) third to repay LIBOR Loans, subject to Section 5.14, and (iv) fourth to collateralize Letters of Credit as provided in Section 5.16(f), until any such Borrowing Base Shortfall has been eliminated. If the Borrowers are required to provide cash collateral under this Section 5.3.5 as a result of a Borrowing Base Shortfall, such amount shall be returned to the Borrowers within three (3) Business Days after such Borrowing Base Shortfall is no longer continuing.

5.3.6    If any Credit Party receives net cash proceeds from any Anchor Sale and Leaseback Transaction, then the Borrowers shall make a Repayment on account of the Outstanding Advances under the Operating Facilities in an amount equal to 100% of such net cash proceeds within five Business Days after such proceeds are received by the applicable Credit Party. As used herein, "net cash proceeds" has the same meaning ascribed thereto in Section 5.3.1. Repayments under this Section 5.3.6 are to be applied to Outstanding Advances under the Operating Facilities on a pro rata basis. Repayments under this Section 5.3.6 shall not result in a permanent reduction of any Operating Facility.

## 5.4    Notice Periods

5.4.1    The Borrowers shall provide written notice to the Agent in respect of Advances, Rollovers, Conversions and Repayments to the extent set out below:

(a)    no notice is required for Advances and Repayments in respect of Overdrafts under the Swingline;

(b)    notice is required for each voluntary Repayment under any Facility in accordance with Section 5.2;

(c)    except as provided in clauses (a) and (b) above, but subject to (d), (e) and (f) below, one Business Days' notice is required before 10:00 a.m. Toronto time in respect of any Advance, Rollover, Conversion or voluntary Repayment in Canadian Dollars or in U.S. Dollars;

(d)    notwithstanding the foregoing, if an Advance, Rollover, Conversion or voluntary Repayment relates to a Bankers' Acceptance or BA Equivalent Loan, two Business Days' notice is required before 10:00 a.m. Toronto time;

(e)    notwithstanding the foregoing, if an Advance, Rollover, Conversion or voluntary Repayment relates to a LIBOR Loan, three Business Days' notice is required before 10:00 a.m. Toronto time; and

(f)    notwithstanding the foregoing, if an Advance relates to the issuance of a Letter of Credit, (i) if issued to a beneficiary located in Canada or the U.S., three Business Days' notice is required before 10:00 a.m. Toronto time and (ii) if issued to a beneficiary located outside of Canada or the U.S., five (5) Business Days' notice is required before 10:00 a.m. Toronto time.

5.4.2    Notice of any Advance, Rollover, Conversion or voluntary Repayment referred to in Section 5.4.1 above shall be given in the form of a Drawdown Request, Rollover Notice, Conversion Notice or Repayment Notice, as the case may be, attached hereto as Exhibits, and shall be given to the Agent at its address set out in Section 13.11.

5.4.3    If notice is not provided as contemplated herein with respect to the maturity of any Bankers' Acceptance, BA Equivalent Loan and LIBOR Loan the Agent may convert

such Bankers' Acceptance, BA Equivalent Loan or LIBOR Loan upon its maturity into a Canadian Dollar Prime Rate Loan or a U.S. Dollar Base Rate Loan, as applicable.

5.4.4    Any Conversion from one form of Availment Option to another shall be subject to satisfaction of all terms and conditions applicable to the form of the new Availment Option.

## 5.5    Minimum Amounts, Multiples and Procedures re Advances, Conversions and Repayments

5.5.1    Each request by a Borrower for an Advance or Conversion in the form of a Canadian Dollar Prime Rate Loan shall be in a minimum amount of Cdn. $500,000 and multiples of Cdn. $100,000 thereafter.

5.5.2    Each request of a Borrower for an Advance or Conversion in the form of a U.S. Dollar Base Rate Loan shall be in a minimum amount of U.S. $500,000 and multiples of U.S. $100,000 thereafter.

5.5.3    Each request by a Borrower for an Advance or Conversion in the form of a Bankers' Acceptance or BA Equivalent Loan shall be in a minimum amount of Cdn. $500,000 and multiples of Cdn. $100,000 thereafter.

5.5.4    Each request by a Borrower for an Advance or Conversion in the form of a LIBOR Loan in U.S. Dollars shall be in a minimum amount of U.S. $500,000 and in a multiple of U.S. $100,000 thereafter.

5.5.5    Conversions or Rollovers under the Term Facility can be in such lesser amounts as are necessary to give effect to the principal repayments under the Term Facility required pursuant to Sections 3.4, 5.3.1 and 5.3.2.

5.5.6    Upon receipt of a Drawdown Request under any Facility, the Agent shall promptly notify each Lender under such Facility of the contents thereof and such Lender's Proportionate Share of the Advance. Such Drawdown Request shall not thereafter be revocable.

5.5.7    Each Advance shall be made by the applicable Lenders to the Agent at its address referred to in Section 13.11 or such other address as the Agent may designate by notice in writing to the Lenders from time to time. Each Lender shall make available its Proportionate Share of each said Advance to the Agent. Unless the Agent determines that any condition of the Advance has not been satisfied or waived, the Agent shall make the funds so received from the Lenders available to the applicable Borrower by 2:00 p.m. (Toronto time) on the requested date of the Advance. No Lender shall be responsible for any other Lender's obligation to make available its Proportionate Share of the said Advance.

5.5.8    Each Borrower agrees to deliver to the Agent in favour of any requesting Lender such other agreements and documentation as such Lender may reasonably require (not inconsistent with this Agreement and upon at least two (2) Business Days' prior written

notice) in respect of such Lender's requirements for the acceptance of Bankers' Acceptances or the issuance of BA Equivalent Loans.

5.5.9     All payments of principal, interest and other amounts made by the Credit Parties to the Agent in respect of the Outstanding Advances under a Facility shall be paid by the Agent to the Lenders in accordance with their respective Proportionate Shares of the Outstanding Advances under such Facility. For greater certainty, however, (a) stamping fees in respect of Bankers' Acceptances and BA Equivalent Loans shall be received and retained by the respective Lenders which issued or accepted such Bankers' Acceptances and BA Equivalent Loans and (b) in the event that any payments of principal, interest and other amounts made by the Credit Parties to the Agent instead of to the Swingline Lender in respect of the Outstanding Advances under the Swingline, any such payments shall be paid by the Agent to the Swingline Lender.

## 5.6     Place of Advances and Repayments

5.6.1     Advances by any Lender to a Borrower shall be made by such Lender to the Agent from such Lender's applicable Lending Office. All payments of principal, interest and other amounts to be made by the Borrowers and the other Credit Parties pursuant to this Agreement shall be made to the Agent at its address noted in Section 13.11 or to such other address at a major city in Canada as the Agent may direct in writing from time to time. All such payments received by the Agent on a Business Day before 2:00 p.m. (Toronto time) shall be treated as having been received by the Agent on that day; payments made after such time on a Business Day shall be treated as having been received by the Agent on the next Business Day.

5.6.2     Whenever any payment or the performance of any covenant, duty or other obligation shall be due on (or required within a time period ending on) a day which is not a Business Day, the date for payment or performance thereof shall be extended to the next succeeding Business Day. Interest shall continue to accrue and be payable thereon as provided herein, until the date on which such payment is received by the Agent.

## 5.7     Evidence of Obligations (Noteless Advances)

The Agent shall open and maintain, in accordance with its usual practice, accounts evidencing the Obligations; and the information entered in such accounts shall constitute conclusive evidence of the Obligations absent manifest error. The Agent may, but shall not be obliged to, request the Borrowers to execute and deliver from time to time such promissory notes as may be required as additional evidence of the Obligations; provided, that no promissory notes shall be required in respect of any Hedging Agreements or Banking Services Agreements.

## 5.8     Determination of Equivalent Amounts

Whenever it is necessary or desirable at any time to determine the Equivalent Amount in Canadian Dollars of an amount expressed in U.S. Dollars, or vice-versa (specifically including the determination of the Equivalent Amount in Canadian Dollars of an Advance made in U.S. Dollars (as applicable), the determination of each Lender's Proportionate Share of any Repayment on any date, and the determination of whether the Outstanding Advances under any

Facility exceed the limit applicable to such Facility at any time), the Equivalent Amount shall be determined by reference to the Exchange Rate on the date of such determination. Notwithstanding the foregoing, however, for the purposes of determining any Letter of Credit fees under the Canadian Operating Facility or the standby fees applicable to the Canadian Operating Facility, the Agent shall make such determination based upon the Bank of Canada noon spot rate on the first Business Day of each quarter for such quarter as the case may be.

If any basket used hereunder is exceeded solely as a result of fluctuations in applicable currency exchange rates after the last time such basket was utilized, such basket will not be deemed to have been exceeded solely as a result of such fluctuations in currency exchange rates. For purposes of determining the Net Leverage Ratio, amounts denominated in a currency other than U.S. Dollars will be converted to U.S. Dollars for the purposes of (A) testing the financial covenant under Section 7.3.1(a), at the Exchange Rate as of the last day of the Fiscal Quarter for which such measurement is being made, and (B) calculating any Net Leverage Ratio (other than for the purposes of determining compliance with Section 7.3.1(a)), at the Exchange Rate as of the date of calculation, and will, in the case of Funded Debt, reflect the currency translation effects, determined in accordance with GAAP, of Hedging Agreements permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Equivalent Amount in U.S. Dollars of such Funded Debt.

## 5.9   Commitment to Purchase Bankers' Acceptances and BA Equivalent Loans

5.9.1     Each BA Lender which is a bank listed in Schedule I of the *Bank Act* (Canada) agrees to purchase those Bankers' Acceptances which it has accepted, at a discount from the face amount thereof calculated at the CDOR Rate for the relevant period in effect on the issuance date thereof.

5.9.2     Each BA Lender which is a bank listed in Schedule II or Schedule III of the *Bank Act* (Canada) agrees to purchase those Bankers' Acceptances which it has accepted, at a discount from the face amount thereof calculated using a rate not in excess of the CDOR Rate for the relevant period in effect on the issuance date thereof plus up to one-tenth of one percent (0.10%).

5.9.3     Each Non-BA Lender agrees to purchase BA Equivalent Loans issued by it hereunder at a discount from the face amount thereof calculated using a rate not in excess of the CDOR Rate plus up to one tenth of one percent (0.10%) for the relevant period in effect on the issuance date thereof.

5.9.4     The discount applicable to each Bankers' Acceptances and BA Equivalent Loan shall be determined on the basis of a year of 365 days.

## 5.10   Special Provisions Regarding Bankers' Acceptances

The following provisions are applicable to Bankers' Acceptances issued by the Canadian Borrower and accepted by any BA Lender hereunder.

5.10.1     *Payment of Bankers' Acceptances.* The Canadian Borrower agrees to provide for each Bankers' Acceptance by payment of the face amount thereof to the Agent on behalf

of the BA Lender on the maturity of the Bankers' Acceptance or, prior to such maturity, on the Acceleration Date; and the Agent shall remit the said amount to such BA Lender and such BA Lender shall in turn remit such amount to the holder of the Bankers' Acceptance. If the Canadian Borrower fails to provide for the payment of the Bankers' Acceptance accordingly, any amount not so paid shall be immediately payable by the Canadian Borrower to the Agent on behalf of the BA Lender together with interest on such amount calculated daily and payable monthly at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans under the Facility under which such Bankers' Acceptance was issued. The Canadian Borrower agrees not to claim any days of grace for the payment at maturity of any Bankers' Acceptance and agrees to indemnify and save harmless the BA Lender in connection with all payments made by the BA Lender (or by the Agent on its behalf) pursuant to Bankers' Acceptances accepted by the BA Lender, together with all reasonable costs and expenses incurred by the BA Lender in this regard. The Canadian Borrower hereby waives any defences to payment which might otherwise exist if for any reason a Bankers' Acceptance is held by the BA Lender for its own account at maturity.

5.10.2   *Availability of Bankers' Acceptances.* If at any time and from time to time the Agent determines, acting reasonably, that there no longer exists a market for Bankers' Acceptances for the term requested by the Canadian Borrower, or at all, or if any BA Lenders representing no less than 35% of the Commitments advise the Agent in writing that the CDOR Rate will not or does not accurately reflect the cost of funds of such BA Lender, the Agent shall so advise the Canadian Borrower, and in such event the BA Lenders shall not be obliged to accept and the Canadian Borrower shall not be entitled to issue Bankers' Acceptances. If such notice is given and there is any outstanding Drawdown Request, Rollover Notice or Conversion Notice requesting an Advance by way of, or a Rollover or Conversion into, a Bankers' Acceptance at such a time, then such request will be deemed to be a request for, or a Rollover or Conversion into, a Canadian Dollar Prime Rate Loan.

5.10.3   *Power of Attorney.* The Canadian Borrower hereby appoints each BA Lender as its true and lawful attorney to complete and issue Bankers' Acceptances on behalf of the Canadian Borrower in accordance with written (including facsimile) transmitted instructions provided by the Canadian Borrower to the Agent on behalf of such BA Lender, and the Canadian Borrower hereby ratifies all lawful acts that its said attorney may do by virtue thereof. The Canadian Borrower agrees to indemnify and hold harmless the Agent and the BA Lenders and their respective directors, officers and employees from and against any charges, complaints, costs, damages, expenses, losses or liabilities of any kind or nature which they may incur, sustain or suffer, arising from or by reason of acting, or failing to act, as the case may be, in reliance upon this power of attorney, except to the extent caused by the gross negligence or willful misconduct of the Agent or the BA Lender or their respective directors, officers and employees. The Canadian Borrower hereby agrees that each Bankers' Acceptance completed and issued and accepted in accordance with this Section by a BA Lender on behalf of the Canadian Borrower is a valid, binding and negotiable instrument of the Canadian Borrower as drawer and endorser. The Canadian Borrower agrees that each BA Lender's accounts and records will constitute *prima facie* evidence of the execution and delivery by the Canadian Borrower

of Bankers' Acceptances. This power of attorney is coupled with an interest and shall continue in force until written notice of revocation with respect to any BA Lender has been served upon the Agent by the Canadian Borrower at the Agent's address set out in Section 13.11.

5.10.4   *Repayment Prior to Maturity*. The Canadian Borrower acknowledges that Advances made by a Lender by way of Bankers' Acceptances and BA Equivalent Loans may not be repaid prior to the maturity thereof. If any Bankers' Acceptance or BA Equivalent Loan is repaid prior to the scheduled maturity date hereof (whether as a result of Section 2.3 or Section 10.2 or otherwise), the Canadian Borrower will forthwith pay to the Agent for deposit into an escrow account maintained by and in the name of the Agent for the benefit of the applicable Lenders the principal amount of such Bankers' Acceptance or BA Equivalent Loan and the Agent will in its discretion invest any funds in respect of such purported repayment in a term deposit maturing on the scheduled maturity date of the Bankers' Acceptance or BA Equivalent Loan. Any interest accruing on the term deposit will be paid to the Canadian Borrower on the maturity date thereof; provided, that no Event of Default has occurred and is continuing.

5.10.5   *Depository Bills*. It is the intention of the Parties that pursuant to the *Depository Bills and Notes Act* (Canada) ("**DBNA**"), all Bankers' Acceptances accepted by the Lenders under this Agreement will be issued in the form of a "depository bill" (as defined in the DBNA), deposited with a "clearing house" (as defined in the DBNA), including The Canadian Depository for Securities Limited or its nominee CDS Clearing and Depository Services Inc. ("**CDS**"). In order to give effect to the foregoing, the Agent will, subject to the approval of the Canadian Borrower and the Lenders, establish and notify the Canadian Borrower and the Lenders of any additional procedures, consistent with the terms of this Agreement, as are reasonably necessary to accomplish such intention, including:

(a)     any instrument held by the Agent for purposes of Bankers' Acceptances will have marked prominently and legibly on its face and within its text, at or before the time of issue, the words "This is a depository bill subject to the *Depository Bills and Notes Act* (Canada)";

(b)     any reference to the authentication of the Bankers' Acceptance will be removed; and

(c)     any reference to the "bearer" will be removed and such Bankers' Acceptances will not be marked with any words prohibiting negotiation, transfer or assignment of it or of an interest in it.

5.10.6   *Rounding*. In the case of an issue of Bankers' Acceptances, the Agent will round allocations amongst the Lenders to ensure that each Bankers' Acceptance issued has a face amount which is a whole number multiple of $100,000 (and such rounded allocations shall constitute the Lenders' respective Proportionate Share for the purposes of this Agreement).

**5.11    Escrowed Funds**

Upon the request of the Agent after the occurrence and during the continuance of an Event of Default on the cancellation of this Agreement, or if any Outstanding Advances by way of Bankers' Acceptances are required to be prepaid hereunder prior to their maturity, the Canadian Borrower will forthwith pay to the Agent for deposit into an escrow account maintained by and in the name of the Agent for the benefit of the applicable Lenders, an amount equal to the Lenders' maximum potential liability under then outstanding Bankers' Acceptances. Such escrowed funds will be held by the Agent for set-off against future Obligations owing by the Canadian Borrower to the applicable Lenders in respect of such Bankers' Acceptances and pending such application may be invested in accordance with Section 5.10.4. In the case such Event of Default is either waived or cured in compliance with the terms of this Agreement, then the remaining escrow funds if any, together with any accrued interest to the date of release, will be released to the Canadian Borrower. The deposit of such escrow funds by the Canadian Borrower with the Agent as herein provided, will not operate as a repayment of the Outstanding Advance under the applicable Facility until such time as the escrow funds are actually paid to the applicable Lenders as a Repayment on the applicable maturity date thereof.

**5.12    Special Provisions regarding BA Equivalent Loans**

Each Non-BA Lender will not accept Bankers' Acceptances hereunder, and shall instead from time to time make BA Equivalent Loans to the Canadian Borrower. The amount of each BA Equivalent Loan will be equal to the discount proceeds (based on the discount rate set forth in Section 5.9.3 and subject to Section 5.10.6) which would be realized from a hypothetical sale of the corresponding Bankers' Acceptance on the basis the Lenders purchased such Bankers' Acceptance and the maturity date of each such BA Equivalent Loan will be the same as the maturity date of the corresponding Bankers' Acceptance. Upon the reasonable request of a Non-BA Lender, each BA Equivalent Loan may be evidenced by a non-interest bearing promissory note payable by the Canadian Borrower to the Non-BA Lender in a form acceptable to each such party, acting reasonably. Any such BA Equivalent Loan shall be negotiable by the Non-BA Lender without notice to or the consent of the Canadian Borrower, and the holder thereof shall be entitled to enforce such BA Equivalent Loan against the Canadian Borrower free of any equities, defences or rights of set-off that may exist between the Credit Parties and the Non-BA Lender. In this Agreement, all references to a BA Equivalent Loan shall mean the loan evidenced thereby if required by the context; and all references to the "issuance" of a BA Equivalent Loan by a Non-BA Lender and similar expressions shall mean the making of a BA Equivalent Loan by the Non-BA Lender which is evidenced by a BA Equivalent Loan as if applicable. The following provisions are applicable to each BA Equivalent Loan made by a Non-BA Lender to the Canadian Borrower hereunder:

5.12.1    *Payment of BA Equivalent Loans.* The Canadian Borrower agrees to provide for each BA Equivalent Loan by payment of the face amount thereof to the Agent on behalf of the Non-BA Lender on the maturity of the BA Equivalent Loan or, prior to such maturity, on the Acceleration Date; and the Agent shall remit the said amount to such Non-BA Lender and such Non-BA Lender shall in turn remit such amount to the holder of the BA Equivalent Loan. If the Canadian Borrower fails to provide for the payment of the BA Equivalent Loan accordingly, any amount not so paid shall be immediately

payable by the Canadian Borrower to the Agent on behalf of the Non-BA Lender together with interest on such amount calculated daily and payable monthly at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans under the Facility under which such BA Equivalent Loan was made. The Canadian Borrower agrees not to claim any days of grace for the payment at maturity of any BA Equivalent Loan and agrees to indemnify and save harmless the Non-BA Lender in connection with all payments made by the Non-BA Lender (or by the Agent on its behalf) pursuant to BA Equivalent Loans accepted by the Non-BA Lender, together with all reasonable costs and expenses incurred by the Non-BA Lender in this regard. The Canadian Borrower hereby waives any defences to payment which might otherwise exist if for any reason a BA Equivalent Loan is held by the Non-BA Lender for its own account at maturity.

5.12.2   *Availability of BA Equivalent Loans.* No Non-BA Lender shall have any obligation to issue BA Equivalent Loans during any period in which the BA Lenders' obligation to issue Bankers' Acceptances is suspended pursuant to Section 5.10.2.

**5.13   Special Provisions Regarding LIBOR Loans**

The following provisions are applicable to LIBOR Loans made by any Lender to the Borrowers.

5.13.1   *Drawdown Procedures.* Upon receipt by the Agent from a Borrower of a Drawdown Request, Conversion Notice or Rollover Notice in respect of a LIBOR Loan, the Agent will promptly advise such Borrower of the U.S. Dollar LIBOR Rate, such rate to be determined as at approximately 11:00 a.m. London time, two LIBOR Business Days before the commencement of the LIBOR Period for such LIBOR Loan.

5.13.2   *Interest Payment Dates for LIBOR Loans.* Interest in respect of any LIBOR Loan in U.S. Dollars shall be calculated on the basis of a year of 360 days. Interest in respect of any LIBOR Loan with a LIBOR Period of between one month and three months (inclusive) shall be payable at the time the principal amount of such LIBOR Loan is payable. Interest in respect of any LIBOR Loan with a LIBOR Period longer than three months shall be payable in arrears every three months commencing on the last day of the third month following the commencement of such LIBOR Period, and also at the time the principal amount of such LIBOR Loan is payable.

5.13.3   *Laws Applicable to LIBOR Loans.* Each Borrower acknowledges that the ability of the Lenders to maintain or provide any LIBOR Loan and to charge interest on any LIBOR Loan at the U.S. Dollar LIBOR Rate is and will be subject to any statute, law, regulation, rule or direction by any Governmental Authority having jurisdiction which may prohibit or restrict or limit such loans or such interest. Each Borrower agrees that the Lenders shall have the right to comply with any such requirements and, if the Agent determines it to be necessary as a result of such requirement, the Agent may convert any LIBOR Loan to a U.S. Dollar Base Rate Loan or require immediate repayment of all LIBOR Loans, including accrued interest thereon and all applicable breakage costs pursuant to Section 5.15.

### 5.14    Breakage Costs

The Borrowers may only Repay or Convert any LIBOR Loan prior to the scheduled maturity date thereof, whether as a result of acceleration or for any other reason, if the Borrowers agree to pay to the Agent upon demand all losses, damages, costs and expenses which such Lender has incurred or may incur as a result of such Repayment or Conversion prior to the said scheduled maturity date. The Agent shall provide the Borrowers with a written certificate showing in reasonable detail the basis for such claim, which shall be deemed to be *prima facie* correct, in the absence of manifest error.

### 5.15    Inability to Make LIBOR Loans

If at any time and from time to time:

(a)    the Agent (acting reasonably) determines that by reason of circumstances affecting the London Interbank Eurodollar Market, adequate and fair means do not exist for ascertaining the rate of interest with respect to, or deposits are not available in sufficient amounts in the ordinary course of business at the rate determined hereunder to fund, a requested LIBOR Loan during the ensuing LIBOR Period selected;

(b)    the Agent (acting reasonably) determines that the making or continuing of the requested LIBOR Loan by the Lenders has been made impracticable by the occurrence of an event which materially adversely affects the London Interbank Eurodollar Market generally; or

(c)    the Agent is advised by Lenders representing no less than 35% of the Commitments that the U.S. Dollar LIBOR Rate will not or does not represent the effective cost to such Lender of U.S. Dollar deposits in such market for the relevant LIBOR Period,

then the Agent shall give notice thereof to the Lenders and the Borrowers as soon as possible after such determination or receipt of such notice, as the case may be, and if such notice is given subsequent to the giving of a Drawdown Request or any Rollover Notice or Conversion Notice to the Agent by a Borrower with regard to any requested LIBOR Loan, such Borrower shall, within one Business Day after receipt of such notice and in replacement of the Drawdown Request, Rollover Notice or Conversion Notice, as the case may be, previously given by such Borrower, give the Agent a Drawdown Request or a Conversion Notice, as the case may be, which specifies the Advance of a U.S. Dollar Base Rate Loan or the Conversion of the relevant LIBOR Loan on the last day of the applicable LIBOR Period into a U.S. Dollar Base Rate Loan. In the event a Borrower fails to give, if applicable, a valid replacement Conversion Notice with respect to the maturing LIBOR Loans which were the subject of a Rollover Notice, such maturing LIBOR Loans shall be converted on the last day of the applicable LIBOR Period into U.S. Dollar Base Rate Loans under the applicable Facility as if a Conversion Notice had been given to the Agent by such Borrower pursuant to the provisions hereof. In the event a Borrower fails to give, if applicable, a valid replacement Drawdown Request with respect to an Advance

originally requested by way of a LIBOR Loan, then such Borrower shall be deemed to have requested an Advance by way of a U.S. Dollar Base Rate Loan in the amount specified in the original Drawdown Request and, on the originally requested date of Advance, the applicable Lenders (subject to the other provisions hereof) shall make available the requested amount by way of a U.S. Dollar Base Rate Loan under the applicable Facility.

If at any time the Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in Section 5.15(b) have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in Section 5.15(b) have not arisen but the supervisor for the administrator of LIBOR Rate or a Governmental Authority having jurisdiction over the Agent has made a public statement identifying a specific date after which the LIBOR Rate shall no longer be used for determining interest rates for loans, then the Agent and the Borrowers shall negotiate in good faith to establish an alternate rate of interest to LIBOR Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for LIBOR Loans made in Canada or in the United States at such time, and upon an agreement being reached, shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable. Notwithstanding anything to the contrary herein, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required Lenders stating that such Required Lenders object to such amendment. Provided that, if such alternate rate of interest shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

## 5.16    Special Provisions Regarding Letters of Credit

The following additional provisions are applicable to Letters of Credit issued by hereunder:

(a)    The obligation of a Borrower to reimburse any Issuing Bank for all drawings under Letters of Credit shall be absolute, unconditional and irrevocable and shall be satisfied strictly in accordance with their terms, irrespective of:

(i)    any lack of validity or enforceability of any Letter of Credit;

(ii)    the existence of any claim, setoff, defence or other right which such Borrower or any other Person may at any time have against the beneficiary under any Letter of Credit, such Issuing Bank, the Agent or any Lender (other than the defence of payment in accordance with the terms of this Agreement or a defence based on the gross negligence or willful misconduct of such Issuing Bank as determined by a court of competent jurisdiction by final and non-appealable judgment) or any other Person in accordance with this Agreement or other transaction;

(iii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; and

(iv) any other circumstance or event whatsoever, whether or not similar to any of the foregoing.

(b) In making any payment under any Letter of Credit (a) an Issuing Bank's exclusive reliance on the documents presented to it under such Letter of Credit as to any and all matters set forth therein, including reliance on the amount of any draft presented under such Letter of Credit, whether or not the amount due to the beneficiary equals the amount of such draft and whether or not any document presented pursuant to such Letter of Credit proves to be insufficient in any respect, if such document on its face appears to be in order, and whether or not any other statement or any other document presented pursuant to such Letter of Credit proves to be forged or invalid or any statement therein proves to be inaccurate or untrue in any respect whatsoever and (b) any non-compliance in any immaterial respect of the documents presented under such Letter of Credit with the terms thereof shall, in each case, not be deemed willful misconduct or negligence of such Issuing Bank.

(c) Each Issuing Bank and its correspondents may accept and act upon the name, signature, or act of any party purporting to be the executor, administrator, receiver, trustee in bankruptcy or other legal representative of any party designated in any Letter of Credit in the place of the name, signature, or act of such party.

(d) In addition to amounts payable as elsewhere provided in this Section 5.16, each Borrower hereby agrees to protect, indemnify, pay and save each Issuing Bank and its respective directors, officers, employees, agents and representatives harmless from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including legal fees and expenses) which each such indemnitee may incur or be subject to as a consequence, direct or indirect, of:

(i) the issuance of any Letter of Credit, other than as a result of the breach of the standards of reasonable care where such Issuing Bank would not be entitled to the foregoing indemnification under the Uniform Customs or under ISP98, in each case as stated on its face to be applicable to such Letter of Credit;

(ii) the inability of an indemnitee to honour a drawing under any Letter of Credit as a result of any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Authority; or

(iii) any of the matters listed in Section 5.16(e).

(e) As between a Borrower, on the one hand, and an Issuing Bank, on the other hand, such Borrower assumes all risks of the acts and omissions of, or misuse of the

Letters of Credit issued at its request hereunder by, the respective beneficiaries of such Letters of Credit and, without limitation of the foregoing (but other than to the extent such Issuing Bank breaches the standards of reasonable care specified in the Uniform Customs and otherwise as may be required under ISP98, as applicable, where such Issuing Bank would not be entitled to indemnification under the Uniform Customs or under ISP98, in each case as stated on its face to be applicable to such Letter of Credit), such Issuing Bank shall not be responsible for:

(i)      the form, validity, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, inaccurate, fraudulent or forged;

(ii)     the invalidity or insufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason;

(iii)    errors, omissions, interruptions or delays in transmission or delivery of any messages, by fax, electronic transmission, mail, cable telegraph, telex or otherwise, whether or not they are in cipher;

(iv)    errors in interpretation of technical terms;

(v)     any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof;

(vi)    the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; and

(vii)   any consequences arising from causes beyond the reasonable control of any Lender, including any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Authority.

None of the above shall affect, impair or prevent the vesting of any Issuing Bank's rights or powers hereunder. No action taken or omitted by an Issuing Bank under or in connection with any Letter of Credit issued by it or the related certificates, if taken or omitted in good faith, shall put such Issuing Bank under any resulting liability to the applicable Borrower (provided, that such Issuing Bank acts in accordance with the standards of reasonable care specified in the Uniform Customs and otherwise as may be required under ISP98, in each case as stated on its face to be applicable to the respective Letter of Credit).

(f)     If any Letter of Credit is outstanding on the Facilities Maturity Date, on the date this Agreement and all Commitments hereunder are cancelled, at any time that an Event of Default occurs, a demand for repayment is made hereunder, or a

domestic or foreign court issues any judgment or order restricting or prohibiting payment by the applicable Issuing Bank under such Letter of Credit or extending the liability of the applicable Issuing Bank to make payment under such Letter of Credit beyond the expiry date specified therein, the applicable Borrower will forthwith upon demand by the Agent or the applicable Issuing Bank deposit into a cash collateral account maintained by and in the name of the Agent or the applicable Issuing Bank funds in the applicable currency in the amount of the Advance constituted by such Letter of Credit and such funds (together with interest thereon) will be held by the Agent or the applicable Issuing Bank for payment of the liability of the applicable Borrower pursuant to this Section 5.16 or otherwise in respect of such Letter of Credit so long as such Issuing Bank has or may in any circumstance have any liability under such Letter of Credit, and, pending such payment, shall bear interest at the Agent's or the applicable Issuing Bank, as applicable then prevailing rate in respect of deposits of similar amounts and of similar periods of time. Any balance of such funds and interest remaining at such time as the applicable Issuing Bank does not have and may never have any liability under such Letter of Credit will nevertheless continue to be held by the Agent or the applicable Issuing Bank, if and so long as any Default or Event of Default is continuing or after a demand for repayment is made or both, as security for the remaining liabilities of the applicable Borrower hereunder. The Agent or the applicable Issuing Bank, as applicable, shall have exclusive control over all amounts at any time on deposit in such cash collateral account. The deposit of such funds by a Borrower with the Agent or the applicable Issuing Bank as herein provided will not operate as a repayment of the U.S. Operating Facility or the Swingline Commitment, as applicable, until such time as such funds are actually paid to the U.S. Operating Lenders or the Swingline Lender, as applicable, as a principal repayment.

(g)     The Issuing Bank and the Agent, in the case of Letters of Credit issued under the U.S. Operating Facility, and the Swingline Lender, in the case of Letters of Credit issued under the Swingline, shall each maintain records showing the undrawn and unexpired amount of each Letter of Credit outstanding under such Facility, and showing for each such Letter of Credit:

(i)     the dates of issuance and expiration thereof;

(ii)    the amount thereof; and

(iii)   the date and amount of all payments made thereunder.

The Issuing Bank and the Agent shall make copies of such records in the respect of Letters of Credit issued under the U.S. Operating Facility available to the U.S. Borrower and the U.S. Operating Lenders upon request. The Swingline Lender, shall make copies of such records in respect to Letters of Credit issued under the Swingline available to the Canadian Borrower, the Agent and the Canadian Operating Lenders upon request.

**5.17     Eligible Approved Contracts**

The Canadian Borrower may request, from time to time and by written notice to the Agent, that the Agent designate additional contracts of the Credit Parties (the "**Additional Contracts**") as Eligible Approved Contracts, provided that, any such notice shall only be given concurrently with the delivery of a Borrowing Base Certificate pursuant to 7.4.1(a) and such notice shall include a true and correct copy of each Additional Contract.

If an Additional Contract is in a form (a) previously approved by the Lenders or (b) in respect of which the Agent has previously received a legal opinion opining that such contract or agreement is valid and enforceable under the governing law thereof, then such Additional Contract shall be designated by the Agent as an Eligible Approved Contract as of the date of the notice referred to above, otherwise, such Additional Contract shall not be designated as an Eligible Approved Contract until such time as the Agent has received an opinion of legal counsel opining that such contract or agreement is valid and enforceable under the governing law thereof, which opinion is in form and substance satisfactory to the Agent and is delivered by legal counsel acceptable to the Agent (in each case acting reasonably).

<div align="center">

**ARTICLE 6**
**REPRESENTATIONS AND WARRANTIES**

</div>

**6.1     Representations and Warranties**

Each Borrower jointly and severally hereby represents and warrants to the Agent and the Lenders as follows, with respect to itself and, in the case of the Canadian Borrower, also with respect to each Credit Party:

6.1.1     *Status.* It has been duly incorporated, amalgamated, constituted, formed or established as the case may be, and is validly subsisting under the Laws of its governing jurisdiction and is up to date in respect of all corporate or similar filings and has all necessary corporate power, capacity and authority to carry on its business in each jurisdiction where it carries on business except, in the case of other jurisdiction, to the extent the failure to do so would reasonably be expected to have a Material Adverse Effect.

6.1.2     *Information.* As of the date hereof, Schedule 6.1.2 contains the following information in respect of each Credit Party and each Subsidiary thereof as of the Amendment and Restatement Date: predecessors and prior names (within the immediately preceding five years), jurisdiction of incorporation or establishment, present governing jurisdiction, registered office, chief executive office, all locations at which it has owned or leased places of business or maintained a material amount of assets (other than assets temporarily out of a Credit Party's custody or possession, including assets on the premises of others and items in transit) the number and classes of its issued and outstanding shares and a list of its shareholders including the number and class of shares held by each. All material records related to the Credit Party's Receivables are located at those certain chief executive offices as identified in Schedule 6.1.2, as may be updated from time to time.

6.1.3     *Subsidiaries.* As of the Amendment and Restatement Date, neither Holdco nor the Canadian Borrower has any Material Subsidiaries or other Subsidiaries other than as set out in Schedule 6.1.3 and 100% of the issued and outstanding shares of each Material Subsidiary are directly or indirectly owned by the Canadian Borrower.

6.1.4     *No Pending Corporate Changes.* As of the Amendment and Restatement Date, no Person has any agreement or option or any right or privilege (whether by law, pre-emptive or contractual) capable of becoming an agreement for the purchase of any properties or assets of any Credit Party out of the ordinary course of business or for the purchase, subscription, allotment or issuance of any debt or equity securities, including convertible securities, warrants or convertible obligations of any nature, of the Canadian Borrower.

6.1.5     *No Conflicts under Material Agreements or Material Permits.* Except as disclosed in Schedule 6.1.5, the execution and delivery by each Credit Party of those Credit Documents to which it is a party, will not conflict with, result in a breach of or require any approval or consent under any Material Agreement or Material Permit, other than consents or approvals which have been obtained unconditionally and without imposition of any material conditions.

6.1.6     *No Conflict with Charter Documents.* There are no provisions contained in the charter documents, or by-laws of any Credit Party, or any partnership agreement, shareholders' agreement, voting trust agreement or similar agreement relating thereto or in any Material Agreement or Material Permit, which restrict or limit its powers to borrow money, issue debt obligations, guarantee the payment or performance of the obligations of others or encumber all or any of its present and after-acquired property; or which would be contravened by the execution and delivery of those Credit Documents to which any Credit Party is a party or the performance by any Credit Party of its obligations thereunder and which contravention would reasonably be expected to result in Material Adverse Change.

6.1.7     *Credit Documents.* Each Credit Party has the necessary capacity, power, legal right and authority to borrow from the Lenders, guarantee payment to the Agent and the Lenders of those Obligations which are payable by the Borrowers, perform its obligations under the Credit Documents and provide the Security required to be provided by it hereunder. The execution and delivery of the Credit Documents by the Credit Parties and the performance of their respective obligations therein have been duly authorized by all necessary corporate or other action. This Agreement and the other Credit Documents constitute legal, valid and binding obligations of the Credit Parties, enforceable against them in accordance with the terms and provisions thereof, subject to Laws of general application affecting creditors' rights and the discretion of the court in awarding equitable remedies.

6.1.8     *Conduct of Business; Compliance with Laws and Material Permits.* Except as disclosed in Schedule 6.1.8, each Credit Party is in compliance in all material respects with all Applicable Laws of each jurisdiction in which it carries on business and is duly licensed, registered and qualified to do business and is in good standing in each

jurisdiction in which the nature of the business conducted by it or the property owned or leased by it make such qualification necessary, except to the extent that the failure to hold any such licences, registrations and permits would not constitute a Material Adverse Change. Schedule 6.1.8 contains a true and complete list of all Material Permits, and all such Material Permits are valid and subsisting and in good standing.

6.1.9    *Ownership of Assets; Permitted Liens.* Each Credit Party has good and marketable title to (or a valid leasehold interest in) and owns and possesses its undertaking, property and assets (other than intellectual property) (or has a valid leasehold interest in) free and clear of any and all Liens except for Permitted Liens. No Credit Party has any commitment or obligation (contingent or otherwise) to grant any Liens except for Permitted Liens. No event has occurred which constitutes, or which with the giving of notice, lapse of time or both would constitute, a default under any specific Permitted Lien, which default would reasonably be expected to result in a Material Adverse Change.

6.1.10    *Leased Properties.* As of the date hereof, Schedule 6.1.10 contains a true and complete list of the Leased Properties.

6.1.11    *Intellectual Property.* Each Credit Party possesses or has the exclusive right to use all patents, patent rights, trademarks, trademark rights, trade names, trade name rights, service marks, service mark rights, copyrights and other forms of intellectual property material to the conduct of its business, each of which is in good standing in all material respects, and, to its knowledge, has the right to use such intellectual property without violation of any material rights of others with respect thereto, except, in each case, as would not reasonably be expected to have a Material Adverse Effect. Schedule 6.1.11 contains a list of all such Credit Party's owned material, registered and pending trademarks, service marks, patents and copyrights (excluding commercially available software) as of the Amendment and Restatement Date.

6.1.12    *Insurance.* The Credit Parties have (a) placed insurance, including property, boiler and machinery, business interruption and liability insurance, in appropriate amounts and for appropriate risks as would be considered prudent for similar businesses, and (b) placed Account Receivable Insurance. Attached hereto as Schedule 6.1.12 is a true and complete list of all insurance policies (including the Account Receivable Insurance) held by the Credit Parties as of the Amendment and Restatement Date.

6.1.13    *Material Agreements.* As of the date hereof, Schedule 6.1.13 contains a true and complete list of all Material Agreements, including a description of the nature of each Material Agreement. Each Material Agreement is in full force and effect; and none of the Credit Parties is in breach of any of the terms or conditions contained therein, in each case, which would reasonably be expected to have a Material Adverse Effect. Except as disclosed in writing to the Agent and as permitted hereby, no Material Agreement has been materially amended, supplemented or revised in any manner adverse to the Lenders since the date of execution thereof.

6.1.14    *Labour Agreements.* Except as disclosed in Schedule 6.1.14, there are no labour agreements in effect between any of the Credit Parties and any labour union or employee association and the Credit Parties are not under any obligation to assume any labour agreements to or conduct negotiations with any labour union or employee association with respect to any future agreements; and the Credit Parties are not aware of any current attempts to organize or establish any such labour union or employee association which, in each case, would reasonably be expected to result in a Material Adverse Effect.

6.1.15    *Environmental Laws.* Each Credit Party and its business, operations, assets, equipment, property, leaseholds and other facilities is in compliance with all applicable Requirements of Environmental Law, specifically including all applicable Requirements of Environmental Law concerning the storage and handling of Hazardous Materials except where the failure to do so would not reasonably be expected to result in a Material Adverse Change. Each Credit Party holds all permits, licenses, certificates and approvals from Governmental Authorities which are required by the applicable Requirements of Environmental Law in connection with (i) air emissions; (ii) discharges to surface or groundwater; (iii) noise emissions; (iv) solid or liquid waste disposal; (v) the use, generation, storage, transportation or disposal of Hazardous Materials; and (vi) all other applicable Requirements of Environmental Law, except in each case where the failure to do so would reasonably be expected to result in a Material Adverse Change. Except as disclosed in Schedule 6.1.15 to the knowledge of the Credit Parties there has been no emissions, spills, releases, or discharges into or upon (i) the air; (ii) soils, or any improvements located thereon; (iii) surface water or groundwater; or (iv) any sewer, septic system or waste treatment, storage or disposal system servicing the premises, of any Hazardous Materials at or from any Land owned by any Credit Party or any of the Leased Properties that would reasonably be expected to have a Material Adverse Effect. Except as disclosed in Schedule 6.1.15 no complaint, order, directive, claim, citation, or notice from any Governmental Authority or any other Person has been received by any Credit Party with respect to (i) air emissions; (ii) spills, releases, or discharges to soils or improvements located thereon, surface water, groundwater or any sewer, septic system or waste treatment, storage or disposal systems servicing any Land owned by any Credit Party or any of the Leased Properties; (iii) noise emissions; (iv) solid or liquid waste disposal; (v) the use, generation, storage, transportation, or disposal of Hazardous Materials; or (vi) other applicable Requirements of Environmental Law affecting any Land owned by any Credit Party or the Leased Properties, in each case, which would reasonably be expected to result in a Material Adverse Change. Except as disclosed in Schedule 6.1.15, there are no legal or administrative proceedings, investigations or claims outstanding or to the Credit Parties' knowledge now threatened or pending, with respect to the presence on or under, or the discharge, emission, spill, radiation or disposal into, upon or from any Land owned by any Credit Party or any of the Leased Properties of any Hazardous Material, including the discharge, emission, spill, radiation or disposal of any Hazardous Material from any such Land or Leased Properties onto or into the atmosphere or any adjacent land, watercourse or body of water; nor are there any material matters under discussion with any Governmental Authority relating thereto; and there is no factual basis for any such proceedings, investigations or claims, in each case, which would reasonably be expected to result in a Material Adverse Change. The Credit Parties have no indebtedness, obligation or liability with respect to the storage, treatment,

cleanup or disposal of any Hazardous Materials (including without limitation any such indebtedness, obligation, or liability under any applicable Requirements of Environmental Law regarding such storage, treatment, cleanup or disposal) which would reasonably be expected to result in a Material Adverse Change.

6.1.16   *No Litigation.* Except as disclosed in Schedule 6.1.16, there are no actions, suits or proceedings pending, or to the knowledge of the Credit Parties threatened in writing, against any Credit Party in any court or before or by any federal, provincial, state, municipal or other Governmental Authority, which would reasonably be expected to result in a Material Adverse Change.

6.1.17   *Pension Plans.* As of the Amendment and Restatement Date, the Credit Parties have not established any Pension Plans except as disclosed in Schedule 6.1.17. All of the Credit Parties' Pension Plans have been duly registered under Applicable Law. No steps have been taken to terminate any such Pension Plan (in whole or in part), no contribution failure has occurred with respect to any such Pension Plan sufficient to give rise to a Lien under any Applicable Laws of any jurisdiction, and no condition exists and no event or transaction has occurred with respect to any such Pension Plan, in each case, which would reasonably be expected to result in the incurrence by any Credit Party of any material liability, fine or penalty. Each such Pension Plan is in compliance in all material respects with all applicable pension benefits and tax laws, (i) all contributions (including employee contributions made by authorized payroll deductions or other withholdings) required to be made to the appropriate funding agency in accordance with all Applicable Laws and the terms of such Pension Plan have been made in accordance with all Applicable Laws and the terms of such Pension Plan, (ii) all liabilities under such Pension Plan are funded, on a going concern and solvency basis, in accordance with the terms of the respective Pension Plans, the requirements of applicable pension benefits laws and of applicable regulatory authorities and the most recent actuarial report filed with respect to the Pension Plan, and (iii) no event has occurred and no conditions exist with respect to any such Pension Plan that has resulted or would reasonably be expected to result in such Pension Plan having its registration revoked or refused for the purposes of any applicable pension benefits or tax laws or being placed under the administration of any relevant pension benefits regulatory authority or being required to pay any taxes or penalties under any applicable pension benefits or tax laws.

6.1.18   *ERISA Liabilities*. No ERISA Event has occurred or is reasonably expected to occur with respect to any Plan which would reasonably be expected to have a Material Adverse Effect. Since the most recent financial statement with respect to a Plan, there has been no change in the funding status of such Plan which would reasonably be expected to result in a Material Adverse Change. Neither any Credit Party nor any ERISA Affiliate has incurred or is reasonably expected to incur any Withdrawal Liability to any Multiemployer Plan which would reasonably be expected to result in a Material Adverse Change. Neither any Credit Party nor any ERISA Affiliate has been notified by the sponsor of a Multiemployer Plan that (i) such Multiemployer Plan has been terminated, within the meaning of Title IV of ERISA, or (ii) such Multiemployer Plan is reasonably expected to be terminated, within the meaning of Title IV of ERISA, which termination would reasonably be expected to result in a Material Adverse Change.

6.1.19   *Financial Statements.* The most recent Year-end Financial Statements and Interim Financial Statements of the Canadian Borrower delivered to the Agent and the Lenders have been prepared in accordance with GAAP (except that in the case of the Interim Financial Statements, subject to normal adjustments and the absence of footnotes) on a basis which is consistent with the previous fiscal period (unless otherwise noted), and present fairly in all material respects in accordance with GAAP:

(a)     its assets and liabilities (whether accrued, absolute, contingent or otherwise) and financial condition as at the dates therein specified;

(b)     its sales, earnings and results of its operations during the periods covered thereby; and

(c)     in the case of the Year-end Financial Statements, its changes in financial position,

and no Material Adverse Change has occurred since the date thereof.

6.1.20   *Financial and Other Information.* All financial and other information provided in writing by or in respect of the Credit Parties to the Agent or the Lenders (other than projections, other forward looking information and information of a general economic or industry-specific nature to) taken as a whole, to the best of the Credit Party's knowledge and belief (including good faith estimates and stated assumptions believed to be reasonable and fair as of the date made in light of conditions and facts then known), do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made (after giving effect to all supplements from time to time).

6.1.21   *No Funded Debt/Liens.* No Funded Debt has been incurred or assumed by any Credit Party, except for Permitted Funded Debt. No Liens exist on the assets of any Credit Party, except for Permitted Liens.

6.1.22   *Validity and Ranking of Security.* Each Security agreement is effective to create in favor of the Agent for the benefit of the Lenders, legal, valid and enforceable Liens on, and security interests in, the collateral referred to therein. The Obligations are secured by a First-Ranking Security Interest, other than in respect of any Priority Claims.

6.1.23   *Taxes.* Except as disclosed in Schedule 6.1.23, each Credit Party has duly and timely filed all tax returns required to be filed by it, and has paid all taxes which are due and payable by it, except for any taxes which are subject to a Permitted Contest or which the failure to pay, individually or in the aggregate has not and would not reasonably be expected to have a Material Adverse Effect. Each Credit Party has also paid all other taxes, charges, penalties and interest due and payable under or in respect of all assessments and re-assessments of which it has received written notice, except to the extent that such assessments or re-assessments are subject to a Permitted Contest or which the failure to pay, individually or in the aggregate has not and would not reasonably be expected to have a Material Adverse Effect. There are no actions, suits, proceedings, investigations or claims threatened or pending against any Credit Party in

respect of taxes, governmental charges or assessments or any matters under discussion with any Governmental Authority relating to taxes, governmental charges or assessments asserted by any such Governmental Authority which would reasonably be expected to result in a Material Adverse Change.

6.1.24   *Statutory Liens.* Each Credit Party has remitted on a timely basis all amounts required to have been withheld and remitted (including withholdings from employee wages and salaries relating to income tax, employment insurance, unemployment insurance and Canada Pension Plan contributions), goods and services tax and all other amounts which if not paid when due could result in the creation of a Statutory Lien against any of its property, except for Permitted Liens.

6.1.25   *No Default, etc.* No Default or Event of Default has occurred and is continuing.

6.1.26   *Solvency.* On the Amendment and Restatement Date (i) the fair market value of the assets of the Credit Parties, on a consolidated basis, at a fair valuation, will exceed their debt and liabilities, subordinated, contingent or otherwise; (ii) the present fair saleable value of the property of the Credit Parties, on a consolidated basis, will be greater than the amount that will be required to pay the probable liability of their indebtedness and other liabilities, subordinated, contingent or otherwise, as such indebtedness and other liabilities become absolute and matured; (iii) the Credit Parties, on a consolidated basis, will be able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; (iv) the Credit Parties, on a consolidated basis, will not have unreasonably small capital with which to conduct the business in which they are engaged as such business is now conducted and is proposed to be conducted following the date of determination, and (v) the Credit Parties, on a consolidated basis, are not "insolvent" under any applicable Insolvency Legislation or otherwise unable to pay their debts as they fall due.

6.1.27   *Residency.* The Canadian Borrower is not a non-resident of Canada as defined by the *Income Tax Act* (Canada).

6.1.28   *Investment Company Act.* Neither the Canadian Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company," in each case, within the meaning of the Investment Company Act of 1940, as amended.

6.1.29   *Fiscal Year.* The Fiscal Year end of each Credit Party is December 31.

6.1.30   *Place and Type of Business.* As of the Amendment and Restatement Date, Schedule 6.1.2 contains a list of the only jurisdictions in which the Credit Parties carry on any material business. The Credit Parties' sole business is providing drilling fluid and technical expertise to assist in drilling oil and gas wells, including skid controls, drilling waste management and drilling water treatment services and the rental of well bore cleanup tools.

6.1.31   *Economic Sanctions; Corrupt Practices.* No Credit Party is in violation of any Economic Sanctions or the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or any similar legislation or, to its knowledge, is the target

or subject of any Economic Sanctions. No Credit Party or any of their respective Subsidiaries and, to the knowledge of any Credit Party, no director, officer, employee, broker or other agent of any Credit Party acting or benefiting in any capacity in connection with the Loans is any of the following:

(a)  a Person that is listed in the annex to the Executive Order, or is otherwise the subject of Economic Sanctions;

(b)  a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to the Executive Order, or is otherwise the subject of Economic Sanctions;

(c)  a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Economic Sanctions;

(d)  a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)  a Person located, organized or resident in a country or territory that is, or whose government is, the subject of Economic Sanctions; or

(f)  a Person that is named as a "specially designated national and blocked person" on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list.

No Credit Party or any of their respective Subsidiaries and, to the knowledge of any Credit Party, no director, officer, employee, broker or other agent of any Credit Party acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in clauses (a) through (f) above, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to any Economic Sanctions, (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Economic Sanctions, or (iv) is in violation of any applicable Economic Sanctions.

6.1.32  *Use of Facilities.* Each Borrower acknowledges that the Facilities are for the use by the Credit Parties and will be used for the Credit Parties' and their Subsidiaries' lawful business purposes only.

6.1.33  *Use of Eligible Approved Contracts.* As of June 30, 2018, all of the Insured Receivables used in determining the Borrowing Base were Receivables derived from and governed by Eligible Approved Contracts in existence as the Amendment and Restatement Date as set out in Schedule 6.1.33.

6.1.34  *Margin Regulations.* No Credit Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock (as defined in Regulation U). No part of the proceeds of any Loan

or any Letter of Credit will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board of Governors of the Federal Reserve, including Regulation T, Regulation U or Regulation X. The pledge of the Collateral pursuant to the Security does not violate such regulations.

**6.2     Acknowledgement and Deemed Repetition**

Each Borrower acknowledges that the Agent and the Lenders are relying upon the representations and warranties in this Article 6 in making the Facilities available to the Borrowers and that the representations and warranties contained in Article 6, except for any representation and warranty made solely as of an earlier date will be deemed to be restated and shall be true and correct effective on the date each and every Advance is made (and any representations and warranties made solely as of an earlier date shall be true and correct as of such earlier date).

**6.3     Survival of Representations and Warranties**

The Credit Parties acknowledge that the Agent and the Lenders shall rely upon the representations and warranties contained in this Article 6 in connection with the establishment and continuation of the Facilities and also in connection with the entering into by a Hedge Provider of any Hedging Agreement with the Credit Parties. Notwithstanding any investigations which may be made by the Agent or the Lenders, the said representations and warranties shall survive the execution and delivery of this Agreement until full and final payment and satisfaction of the Obligations and this Agreement has been terminated.

<div align="center">

**ARTICLE 7**
**COVENANTS**

</div>

**7.1     Positive Covenants**

While there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to any Borrower, each Borrower hereby covenants and agrees with the Agent and the Lenders that it will, and will cause each of the other Credit Parties to:

7.1.1     *Prompt Payment.* In the case of the Borrowers, punctually and unconditionally pay all principal, interest and other amounts due hereunder at the times and in the manner specified herein.

7.1.2     *Preservation of Existence.* Except as permitted by Section 7.2.8, maintain its existence in good standing (or similar status), preserve its rights, powers, licences, privileges, franchises and goodwill, exercise any rights of renewal or extensions of any leases, licences, concessions, franchises or any other rights whatsoever which are material to the conduct of its business, maintain all qualifications to carry on business in each jurisdiction in which such qualifications are required where the failure to do so would not reasonably be expected to result in a Material Adverse Change, and carry on and conduct its business in a proper and efficient manner so as to protect its property and income; and not materially change the nature of its business.

7.1.3    *Compliance with Applicable Laws; Use of Proceeds; Maintenance of Leases and Material Permits.* Comply with all Applicable Laws (specifically including all applicable Requirements of Environmental Law and Economic Sanctions and the *Foreign Corrupt Practices Act*) except where the failure to do so would not reasonably be expected to result in a Material Adverse Change, use the proceeds of all Advances hereunder for legal and proper purposes, and obtain and maintain in good standing all material leases and Material Permits from any and all Governmental Authorities required in respect of its business and operations except where the failure to do so would not reasonably be expected to result in a Material Adverse Change.

7.1.4    *Payment of Priority Claims, Taxes, etc.* Pay when due all Priority Claims, rents, ERISA liabilities, taxes, rates, pension obligations, levies, assessments and governmental charges, fees and dues lawfully levied, assessed or imposed in respect of its property which are material to the conduct of its business, and deliver to the Agent upon request receipts evidencing such payments; except for rents, taxes, rates, pension obligations, levies, assessments and governmental charges, fees or dues in respect of which an appeal or review proceeding has been commenced, a stay of execution pending such appeal or review proceeding has been obtained, reserves reasonably required by the Required Lenders have been established; and except where the failure to pay individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Change.

7.1.5    *Maintain Records.* Maintain adequate books, accounts and records in accordance with GAAP and all material records related to the Credit Parties' Receivables shall be located at the chief executive offices as identified in Schedule 6.1.2, as the same may be updated from time to time.

7.1.6    *Maintenance and Operation of Properties.* Keep its property and assets in good repair and working condition, reasonable wear and tear and casualty or condemnation excepted, and operate its property in accordance with prudent industry standards and the requirements of its insurance policies.

7.1.7    *Inspection.* Permit the Agent and its employees and agents (who may be accompanied by any Lender and its employees and agents), upon reasonable notice and at their own cost, to enter upon and inspect their properties, assets, books and records from time to time during normal business hours and in a manner which does not materially interfere with the operations of the Credit Parties, and make copies of and abstracts from such books and records, and discuss their affairs, finances and accounts with any of their officers, directors, accountants and auditors; provided, that the Agent will deal with any personal information obtained in accordance with applicable privacy legislation; provided, that the Agent may not conduct more than one such examination during any calendar year unless a Default or an Event of Default has occurred and is continuing, in which case the foregoing limit shall not apply. All reasonable and documented out-of-pocket costs and expenses incurred by the Agent and its duly authorized representatives and agents in connection with the exercise of the Agent's rights pursuant to this Section 7.1.7 shall be paid by the Canadian Borrower in accordance with Section 13.5; provided, that so long as no Default or Event of Default exists the Canadian

Borrower shall not be responsible for the expenses of the Agent in connection with more than one such visit and inspection per calendar year.

7.1.8    *Liens.* Maintain all of its property, assets and undertaking free of all Liens except Permitted Liens and maintain a First-Ranking Security Interest in favour of the Agent over all of the Collateral subject only to the Security and Permitted Liens which under Applicable Law rank in priority thereto.

7.1.9    *General Insurance Coverage.* Obtain and maintain from financially responsible insurance companies and maintain liability insurance, all-risks property insurance on a replacement cost basis (less a reasonable deductible not to exceed amounts customary in the industry for similarly situated businesses and properties), and insurance in respect of such other risks and in such amounts (giving effect to self-insurance) as would be considered prudent for similar businesses, to the extent available on commercially reasonable terms, all of which policies of insurance shall include a standard mortgage clause approved by the Insurance Bureau of Canada; and the interest of the Agent shall be noted as an additional insured on all liability insurance policies and as first mortgagee and/or lender loss payee, as applicable, on all other insurance policies (other than directors and officers insurance); and the Agent shall be provided with certificates of insurance and certified copies of such policies from time to time upon request; provided, that no more than one request shall be made in any calendar year unless a Default or an Event of Default is continuing or if there has been a material change in any such policy.

7.1.10    *Account Receivable Insurance Coverage.* Obtain and maintain Account Receivable Insurance, pay all required premiums in respect thereof once due and payable and renew such Account Receivable Insurance not less than sixty (60) days prior to the expiry thereof; and the Agent shall be provided with certificates of insurance and certified copies of such policies from time to time upon request; provided that no more than one request shall be made in any ~~twelve-month~~ period **of four consecutive fiscal quarters** unless a Default or an Event of Default is continuing. At least 10 days prior to the renewal of any Account Receivable Insurance, the Borrowers shall provide the Agent with all information reasonably requested by the Agent, including for certainty, any proposed modifications to the existing policies then in place, in order for the Agent and third party legal counsel to conduct a review of such Account Receivable Insurance.

7.1.11    *Colombia Payments*. Ensure that payments in favour of a Credit Party which are made under any material agreement executed by any Credit Party which are to be made in Colombian Pesos in Colombia are either directed to a trust established in Colombia which is subject to the Security or to an account over which the Agent has a First-Ranking Security Interest pursuant to an account control agreement or if such payments are otherwise subject to the Security in a manner satisfactory to the Agent, acting reasonably.

7.1.12    *Perform Obligations.* Fulfill all covenants and obligations required to be performed by it under the Credit Documents, the Material Agreements, the Material Permits and the policy governing the Account Receivable Insurance (and as reasonably

requested by the Agent, provide evidence of compliance with the risk management and credit policies required thereunder).

7.1.13   *Bank Accounts and Banking Service Agreements*. Maintain:

(a)      all of its bank primary accounts and Banking Service Agreements of the Borrowers in Canada, the U.S. and Mexico with the Agent or an Affiliate thereof unless otherwise consented to by the Required Lenders, in their sole discretion; provided, that the U.S. Borrower shall be permitted to maintain its current bank accounts in the U.S. with Wells Fargo provided that the Deposit Account Control Agreement between the U.S. Borrower, such financial institution and the Agent remains in force and effect, which agreement shall, among other things, provide that such financial institution acknowledges that the Agent has a First-Ranking Security Interest over the applicable bank accounts and that upon written notice from the Agent, the Agent can exert control over such accounts; and

(b)      except as set forth in Section 8.1(i), maintain all of the Credit Parties' other bank accounts used as a primary concentration accounts for collection of proceeds of Eligible Receivables with financial institutions reasonably satisfactory to the Required Lenders; provided, that within 90 days after the formation of any new Material Subsidiary that is a Credit Party from time to time hereafter, such financial institution has entered into a deposit account control or similar account agreement with the Agent and the applicable Credit Party, in a form and substance reasonably satisfactory to the Agent, which agreement, among other things, provides that such financial institution acknowledges that the Agent has a First-Ranking Security Interest over the applicable bank accounts and that upon written notice from the Agent, the Agent can exert control over such accounts.

Notwithstanding anything herein to the contrary, it is understood and agreed that no deposit account agreements or account agreement shall be required with respect to (i) any account which is not used as a primary concentration account for collection of proceeds of Eligible Receivables or for the direct collection of such proceeds or (ii) any other Excluded Account.

7.1.14   *Formation of Material Subsidiaries.* In the event that any Borrower or any other Credit Party forms or acquires a Material Subsidiary, or a Person otherwise becomes a Material Subsidiary (in each case, for the avoidance of doubt, other than a Securitization SPE), after the Amendment and Restatement Date then, subject to Section 8.9, the Canadian Borrower shall deliver, and shall cause the applicable Subsidiary to deliver, to the Agent not later than (a) thirty (30) Business Days in the case of Material Subsidiaries formed outside of Canada and the U.S., or (b) ten (10) Business Days for Material Subsidiaries formed in Canada or the U.S., in either case, after the formation or acquisition of such Material Subsidiary (or such longer period as the Agent may approve, acting reasonably), a full recourse guarantee and the, within the applicable period therefor, any other Security relative to such Material Subsidiary referred to in Section 8.1 or such other Security as may be requested by the Agent, acting reasonably, together with

related corporate documentation and legal opinions as may be requested by the Agent, acting reasonably.

7.1.15   *Ownership of Credit Parties.* The Canadian Borrower will at all times be the (direct or indirect) sole beneficial owner of all of the issued and outstanding shares of each other Credit Party, other than Holdco.

7.1.16   *EBITDA; Ownership of Assets.* Except as otherwise specifically permitted hereunder, the Canadian Borrower will ensure at all times that:

(a)   the EBITDA directly attributed to the Credit Parties determined on an unconsolidated but combined basis is equal to at least 90% of the Canadian Borrower's EBITDA determined on a consolidated basis;

(b)   the Credit Parties legally, beneficially and directly own at least 90% of the Consolidated Net Tangible Assets of the Canadian Borrower (based on the amount thereof set forth in the financial statements most recently delivered as required hereunder); and

(c)   the EBITDA directly attributed to the OECD Credit Parties determined on a consolidated basis is equal to at least 85% of the Canadian Borrower's EBITDA determined on a consolidated basis; provided, that for the purposes of such calculation any Distribution remitted to an OECD Credit Party by any other Subsidiary of the Borrower shall be included in EBITDA;

7.1.17   *Colombian Free Cash Flow Distribution.* The Canadian Borrower will cause the Distribution to it or any other Credit Party whose governing jurisdiction is in Canada, the U.S., Barbados or another jurisdiction reasonably acceptable to the Required Lenders by way of dividend (or a series of dividends) of no less than 75% of the Colombian Free Cash Flow for each Fiscal Year within 60 days of the end of such Fiscal Year; provided that such 60 day period may be extended by the Required Lenders, acting reasonably, upon the written request of the Canadian Borrower in light of cash flow needs in Colombia at the time of such scheduled distribution.

7.1.18   *Further Assurances.* Provide the Agent and the Lenders with such further information, financial data, documentation and other assurances as they may reasonably require from time to time in order to ensure ongoing compliance with the terms of this Agreement and to achieve the spirit and intent of this Agreement.

7.1.19   *Reviews.* Within 60 days of written demand by the Agent, the Borrowers will have initiated an independent business review by a third party satisfactory to the Agent, acting reasonably, of the business and operations of the Borrowers and their operations in scope, form and substance satisfactory to the Agent, acting reasonably; *provided*, only one such demand by the Agent may be made under this Section 7.1.19.

7.1.20   ~~*Minimum Margin Availability.* The Canadian Borrower will not permit the Minimum Margin Availability measured at the end of each Fiscal Quarter to be less than U.S. $5,000,000.~~**[Reserved].**

7.1.21    *Minimum Liquidity.* ~~The~~**Commencing with the month ended June 30, 2019, the** Borrowers will not permit the Minimum Liquidity measured at the end of each ~~Fiscal Quarter~~**month** to be less than U.S. $10,000,000.

## 7.2    Negative Covenants

While there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to the Borrowers, each Borrower hereby covenants and agrees with the Agent and the Lenders that it will not, and will ensure that each of its Material Subsidiaries does not, without the prior written consent of the Agent on behalf of the Lenders:

7.2.1    *Liens.* Grant or suffer to exist any Lien in respect of any of its property or assets, except Permitted Liens.

7.2.2    *Funded Debt.* Create, incur or assume any Funded Debt, except Permitted Funded Debt.

7.2.3    *Investments/Financial Assistance.* Provide Financial Assistance to, or invest money in, any Person, firm, joint venture, partnership, company or corporation whether by way of loan, acquisition of shares, acquisition of debt obligations or in any other way whatsoever (collectively "**Investments**"), except for the following (each, a "**Permitted Investment**"):

(a)    Investments in cash and Cash Equivalents;

(b)    Permitted Intercompany Loans;

(c)    Guarantees which comprise part of the Security, are in respect of other Permitted Funded Debt or obligations of other Credit Parties or related to indemnities incurred in the ordinary cause of business;

(d)    Permitted Acquisitions;

(e)    Investments in other Credit Parties; provided, that such Investments together with any Financial Assistance provided to any Non-OECD Guarantors does not exceed in the aggregate at any one time an amount equal to 10% of the net book value of the Canadian Borrower's Consolidated Net Tangible Assets;

(f)    loans and advances by the Credit Parties to employees or directors of any Credit Party in the ordinary course of business (including for travel, entertainment and relocation expenses) not in excess of $250,000 at any one time outstanding in the aggregate so long as no Default or Event of Default has occurred and is continuing or would reasonably be expected to result therefrom;

(g)    Investments made by the Credit Parties in the ordinary course of business consisting of (i) accounts receivables, (ii) negotiable instruments held for collection in the ordinary course of business, (iii) lease, utility and other similar deposits in the ordinary course of business, (iv) securities or debt obligations of

trade creditors or customers that are received in settlement of bona fide disputes or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(h)    Investments in existence on the Amendment and Restatement Date and set forth on Schedule 7.2.3 hereto and, in each case, any extensions or renewals thereof, so long as the amount of any Investment made pursuant to this clause (h) is not increased at any time above the amount of such Investment set forth on Schedule 7.2.3 hereto;

(i)    Acquisitions outside of Canada and the U.S., Investments in joint ventures or other minority interest holdings and other Investments in, or Financial Assistance to, Persons which are not Credit Parties (provided, that no such Acquisitions or Investments would result in a breach of Section 7.2.17 or otherwise involve Persons or countries that are the subject of Economic Sanctions or that any Lender's internal compliance policy would prohibit it from engaging in business with) which, after giving *pro forma* effect to all other Acquisitions, Investments or Financial Assistance permitted in reliance on this clause (i) since the date of the last consolidated balance sheet of the Canadian Borrower delivered to the Agent hereunder and outstanding on the date of such Acquisition, Investment or Financial Assistance, do not exceed at any one time, in the aggregate, 15% of Shareholders' Equity (taking into account any increase in Shareholders' Equity as of such date since the date of the last consolidated balance sheet of the Canadian Borrower delivered to the Agent hereunder, and with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value); so long as no Default or Event of Default has occurred and is continuing or would reasonably be expected to result therefrom; and further provided that in the case of any Acquisitions under this clause (i), if more than 50% of the revenues generated by the Acquired Business are derived from outside of Canada or the U.S., then the applicable Credit Party must receive the prior consent of the Required Lenders thereto;

(j)    extensions of trade credit by the Canadian Borrower and its Material Subsidiaries in the ordinary course of business;

(k)    Investments arising as a result of Permitted Securitization Financings;

(l)    any Acquisition, Financial Assistance or Investment made in respect of Project Desert, the Anchor Acquisition or the Terra Acquisition;

(m)    Investments in the United Joint Venture in an aggregate amount not to exceed (i) during the Fiscal Year ending December 31, 2019, U.S. $12,000,000 and (ii) during the Fiscal Year ending December 31, 2020, U.S. $8,000,000; plus, in each case, an amount equal to any returns actually received in respect of any such Investments (provided that any such returns reinvested in the United Joint Venture shall not be included in the calculation of EBITDA);

*provided,* that notwithstanding the foregoing, during the Covenant Relief Period, the Borrowers and the Material Subsidiaries shall not (i) complete any Acquisitions pursuant to Sections 7.2.3(d) or 7.2.3(i) without the prior written consent of the Required Lenders, or (ii) make any Investment or provide any Financial Assistance other than Investments and Financial Assistance: (x) existing as of the Amendment and Restatement Date and set forth on Schedule 7.2.3, and any extension or renewal thereof; (y) permitted under paragraphs (a), (b), (c), (e), (g), (j), (k), (l) or (m) of this Section 7.2.3; and/or (z) made in or provided to one or more joint ventures or Persons that are not Credit Parties in an aggregate amount, in the case of this clause (z), not to exceed $3,000,000.

7.2.4    *Disposition of Assets.* Directly or indirectly sell, lease, assign, transfer, convey or otherwise dispose of all or any part of its assets, except the Credit Parties may sell, lease, assign, transfer, convey or otherwise dispose of the following:

(a)    inventory and Cash Equivalents in the ordinary course of business;

(b)    worn out, obsolete, no longer useful or immaterial, including assets sales, licenses, sublicenses or other dispositions or abandonment of intellectual property of a Credit Party or its subsidiaries determined by the management of such Credit Party to be no longer useful or necessary in the operation of the business of such Credit Party or any of its subsidiaries;

(c)    assets to a Borrower or any other Credit Party or if a Subsidiary is not a Credit Party, to the Credit Parties or any of their Subsidiaries;

(d)    transactions permitted by Section 7.2.8, Permitted Investments and Permitted Distributions permitted by Section 7.2.5 hereof;

(e)    transfers of properties that have been subject to a casualty to the respective insurer of such property as part of an insurance settlement any casualty or other event of loss; provided, that the requirements of Section 5.3.1 are complied with in connection therewith;

(f)    consignments in the ordinary course of business;

(g)    dispositions of accounts receivables and other assets of Subsidiaries (other than Credit Parties) in the ordinary course of business;

(h)    any assets the value of which (at the time the disposition is made) is not more than the greater of (i) $5,000,000 and (ii) 5% of the net book value of the Canadian Borrower's Consolidated Net Tangible Assets as of the end of the Fiscal Quarter immediately prior to the date of such disposition, in any Fiscal Year; provided, that for such purpose, if such sale, transfer or other disposition is as part of an exchange of equipment to the extent that (A) such equipment is exchanged for credit against the purchase price of similar replacement property or (B) the proceeds thereof are reasonably promptly applied to the purchase price of such replacement property, then the amount of such purchase price of such replacement

property in excess of such credited value will still count towards the determination of such 5% of net book value;

(i)    the disposition of Receivables pursuant to a Permitted Factoring Transaction;

(j)    the disposition of Receivables pursuant to a Permitted Securitization Financing, provided that the Receivables subject to such disposition originated in the United States;

(k)    any Anchor Sale and Leaseback Transaction, provided the proceeds of each such Anchor Sale and Leaseback Transaction shall be used to repay the Operating Facilities in accordance with Section 5.3.6;

(clauses (a)-(k), collectively, the "**Permitted Dispositions**"); provided, that the Borrower and its Subsidiaries may, with the prior consent of the Required Lenders, sell, lease, assign, transfer, convey or otherwise dispose of all or any part of its assets in a transaction that does not constitute a Permitted Disposition to the extent that the proceeds thereof are to be used in accordance with Section 5.3.1.

7.2.5    *Distributions.* Make any Distributions other than Permitted Distributions; *provided* that, during the Covenant Relief Period, only Distributions described in paragraphs (b), (f), (g) and (i) of the definition of "Permitted Distribution" shall be permitted under this Section 7.2.5.

7.2.6    *Dealing with Related Parties.* Consummate any transaction with any Affiliate of Holdco or the Canadian Borrower or any of its Subsidiaries other than the following:

(a)    any transaction that is on fair and reasonable terms that are substantially as favorable to the Canadian Borrower and/or its applicable Subsidiary as would be obtainable by the Canadian Borrower or such Subsidiary at the relevant time in a comparable arm's length transaction with a Person that is not an Affiliate;

(b)    payments and transactions provided for in the Material Agreements;

(c)    any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock option and stock ownership plans approved by the board of directors (or similar governing body) of Holdco, the Canadian Borrower or any of its Subsidiaries or the senior management thereof;

(d)    employment arrangements and transactions pursuant thereto entered into in the ordinary course of business between Credit Parties and any employee thereof including any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees;

(e)    the payments of reasonable and customary fees, compensation, benefits and incentive arrangements paid or provided to, and indemnities provided on behalf

of, officers, directors, employees or consultants of Holdco (or any direct or indirect parent thereof), the Canadian Borrower or any of its Subsidiaries;

(f)   any transaction with an Affiliate where the only consideration paid by a Credit Party is capital stock of such Credit Party or any of its Subsidiaries;

(g)   the payment of any Permitted Distribution;

(h)   transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case, in the ordinary course of business and otherwise in compliance with the terms and conditions of this Agreement that are fair to the Credit Parties (as determined in good faith by the board of directors of the Canadian Borrower);

(i)   transactions (i) among the Credit Parties or (ii) between Subsidiaries that are not Credit Parties, in each case that are permitted by this Agreement;

(j)   so long as no Default or Event of Default shall have occurred and be continuing at the time of any action described below or would result therefrom the payment of transaction, advisory or similar fees payable to the Palladium or any Affiliate thereof in an aggregate amount in any Fiscal Year not to exceed $1,000,000, provided, that such fee is paid in connection with a *bona fide* transaction;

(k)   those transactions set forth on Schedule 7.2.6 which are in place as of the Amendment and Restatement Date;

(l)   transactions pursuant to any Permitted Securitization Financing; and

(m)   the Anchor Acquisition Promissory Notes.

7.2.7   *Change or Cease Business.* Cease to carry on the business or change in any material respect the nature of the business as is currently being carried on by it as of the Amendment and Restatement Date, including, for the avoidance of doubt, transactions in connection with a Permitted Securitization Financing, other than as part of a business reasonably related or ancillary thereto, or as otherwise approved in writing by the Required Lenders, acting reasonably.

7.2.8   *Corporate Changes.* Consummate any transaction whereby all or a substantial portion of its undertaking, property and assets would become the property of any other Person, whether by way of reconstruction, reorganization, recapitalization, consolidation, amalgamation, merger, transfer, sale or otherwise; nor merge, amalgamate or acquire any other Person or all or substantially all of its assets; except that any of the foregoing transactions may take place: (a) among the Credit Parties if prompt written notice is given to the Agent, a Material Adverse Change will not occur as a result thereof and the applicable Credit Parties provide such additional or replacement Security as the Agent may reasonably require, (b) to consummate any Permitted Acquisition and (c) in connection with any Permitted Dispositions of all or substantially all of the assets of a Subsidiary of the Canadian Borrower; provided that in any such event which involves the

Canadian Borrower, the successor entity is a Person formed under the Laws of Canada or any province thereof remains a Borrower under the same Facilities that it was a borrower under immediately prior to such event.

7.2.9    *Constating Documents.* Amend or restate or otherwise alter the articles of incorporation, amalgamation or continuance, as applicable, or by-laws of (i) any Credit Party in any manner that would reasonably be expected to materially and adversely affect the rights of the Agent and the Lenders under the Credit Documents or (ii) any Subsidiary (other than a Securitization SPE) which is not a Credit Party which would impose any restrictions upon the ability of such Subsidiary to make any Distributions to any Credit Party.

7.2.10    *Capital Expenditures.* Make, or permit any Subsidiary to make, any Capital Expenditure in any Fiscal Year that exceeds in aggregate, for each Fiscal Year, 110% of the estimated maximum amount of such Capital Expenditures as set forth in the annual budget in respect of such Fiscal Year provided by the Canadian Borrower pursuant to Section 7.4.1(c) (unless such Capital Expenditures are funded entirely by the proceeds of equity contributions or Sales Proceeds to the extent permitted under Section 5.3.2); *provided* that, notwithstanding the foregoing, the maximum aggregate amount of Capital Expenditures permitted by this Section 7.2.10 shall be, for the Fiscal Year ending December 31, 2018, U.S. $30,000,000.

7.2.11    *Fiscal Year.* Change its Fiscal Year end.

7.2.12    *Currency Hedging Agreements.* Enter into or be a party to any Currency Hedging Agreement, unless:

(a)    such Currency Hedging Agreement is entered into with one or more Hedge Providers or other counterparties, provided that if it is with any such other counterparties the obligations and liabilities thereunder shall be unsecured;

(b)    in the case of a Currency Hedging Agreement with a Hedge Provider, the Canadian Borrower shall execute an ISDA agreement and all other documentation as may be required by the applicable counterparty to such Interest Rate Hedging Agreement;

(c)    such Currency Hedging Agreement is entered into for the purpose of hedging against the risk of fluctuations in currencies and not for speculative purposes; and

(d)    the maturity date of such Currency Hedging Agreement is not more than one year from the date thereof and, in any event, not later than the Facilities Maturity Date.

7.2.13    *Interest Rate Hedging Agreements.* Enter into or be a party to any Interest Rate Hedging Agreement, unless:

(a)    the aggregate notional amount under all such Interest Rate Hedging Agreements at such time does not exceed $75,000,000;

(b)     such Interest Rate Hedging Agreement is entered into with one or more Hedge Providers or other counterparties, provided that if it is with any such other counterparties the obligations and liabilities thereunder shall be unsecured;

(c)     in the case of an Interest Rate Hedging Agreement with a Hedge Provider, the Canadian Borrower shall execute an ISDA agreement and all other documentation as may be required by the applicable counterparty to such Interest Rate Hedging Agreement;

(d)     such Interest Rate Hedging Agreement is entered into for the purpose of hedging against the risk of fluctuations in interest rates, and not for speculative purposes; and

(e)     the maturity date of such Interest Rate Hedging Agreement is not later than the Facilities Maturity Date.

7.2.14   *Use of Advances Sanctions.* Directly or indirectly use the proceeds of Advances to fund operations, or finance investments in, any country that at the time is prohibited by Economic Sanctions, the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or other Applicable Law, or make payments to any country or Person that at the time is prohibited by Economic Sanctions, the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or other Applicable Law, or directly or indirectly fund any principal repayment with proceeds derived from any such country or Person that will result in a violation by a Credit Party (or any Lender hereunder) of such Economic Sanctions, the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or other Applicable Law.

7.2.15   *Use of Advances General.* Use a material amount of the proceeds of any Advance for any purposes other than those expressly contemplated in this Agreement.

7.2.16   *Subordinated Debt.* Make any payment to any holders of the Subordinated Debt in connection with principal, interest, fees or any other amounts in respect thereof or amend the terms thereof, except payments permitted in accordance with the terms of the applicable Subordination Agreement, and so long as no Default or Event of Default has occurred and is continuing or would reasonably be expected to result therefrom.

7.2.17   *Sanctions.* Directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in 6.1.31, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Economic Sanction, or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Economic Sanction and the Credit Parties shall deliver to the Agent any certification or other evidence requested from time to time confirming the Credit Parties' compliance with this Section 7.2.17.

7.2.18   *Account Receivable Insurance Coverage.* Provide the Agent with prior written notice of all proposed amendments or modifications to any Account Receivable Insurance and, to the extent that any such amendments or modifications (i) de-insures all or a portion of any Marginable Receivable that constitutes part of the Borrowing Base, (ii) modifies the individual country limits under the Account Receivable Insurance, (iii) extends any coverage period under the Account Receivable Insurance, or (iv) affects any of the coverage amounts or any coverage period(s) related to receivables of Petróleos Mexicanos or its Affiliates, shall not give effect to any such amendment or modification without the prior written consent of the Agent, acting reasonably, and in no case taking longer than 3 Business Days to provide such consent, it being understood that should the Agent fail to act within 3 Business Days to provide a an affirmative or negative written response, that failure should be deemed to be an act of consent with regards to the proposed amendment. For certainty, nothing in this Section 7.2.18 shall derogate from the obligations of the Borrowers, or the rights of the Agent, under Section 7.1.10.

7.2.19   *Cash Hoarding.* Use the proceeds of any Advance to accumulate or maintain cash or Cash Equivalents in one or more depository or investment accounts maintained by any Credit Party in an amount, in the aggregate, greater than $20,000,000, but excluding therefrom cash or Cash Equivalents accumulated or maintained for a specified business purpose (to the extent permitted hereunder and other than simply accumulating cash reserve in a manner that is not consistent with past practice of the Credit Parties), and, for certainty, the Lenders may refuse to make any requested Advance which the Lenders, acting reasonably, determine would result in a contravention of this Section 7.2.19.

## 7.3   Financial Covenants

7.3.1   Subject to the Equity Cure provided below in Section 7.3.2, while there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to the Borrowers, the Borrowers will not, without the prior written consent of the Required Lenders:

(a)   permit the Net Leverage Ratio measured at the end of each Fiscal Quarter to exceed (i) 4.75 to 1 for the Fiscal ~~Quarters~~**Quarter** ending March 31, ~~2019 and June 30,~~ 2019; (ii) ~~4.50~~**3.50** to 1 for the Fiscal ~~Quarter~~**Quarters** ending **June 30, 2019,** September 30, 2019 **and December 31, 2019**; (iii) ~~4.00~~**3.50** to 1 for the Fiscal Quarter ending ~~December 31, 2019; and~~ March 31, **2020; (iv) 4.75 to 1 for the Fiscal Quarter ending June 30, 2020; (v) 4.50 to 1 for the Fiscal Quarter ending September 30, 2020; (vi) 4.25 to 1 for the Fiscal Quarter ending December 31, 2020; and (vii)** 3.00 to 1 for the Fiscal Quarters ending March 31, ~~2020~~**2021** and thereafter**; and**

(b)   permit the Fixed Charge Coverage Ratio measured at the end of each Fiscal Quarter to be less than (i) 1.10 to 1 for the Fiscal Quarters ending June 30, 2018, September 30, 2018 and December 31, 2018; and (ii) 1.25 to 1 for the Fiscal Quarters ending March 31, 2019 and thereafter~~; and.~~

(c)     ~~permit the Unadjusted EBITDA measured at the end of each Fiscal Quarter to be less than (i) U.S. $4,160,000 for the Fiscal Quarter ending June 30, 2018; (ii) U.S. $5,980,000 for the Fiscal Quarter ending September 30, 2018; (iii) U.S. $6,240,000 for the Fiscal Quarter ending December 31, 2018; and (iv) U.S. $8,580,000 for the Fiscal Quarter ending~~ March 31, 2019.

7.3.2     In the event of any Event of Default of the financial covenants set forth in Section 7.3.1 (the "**Designated Financial Covenants**"), any equity contribution made by Holdco or the shareholders of Holdco to the Canadian Borrower will, at the request of the Canadian Borrower, be included in the calculation of EBITDA ~~or Unadjusted EBITDA~~ solely for the purposes of determining compliance with such financial covenants at the end of the applicable Fiscal Quarter and any subsequent period that includes such Fiscal Quarter (any such equity contribution, a "**Specified Equity Contribution**"); *provided*, that:

(a)     prior written notice of the Canadian Borrower's intention to utilize such Specified Equity Contribution is received by the Agent no later than the date on which the financial statements for such Fiscal Quarter or Fiscal Year (as applicable) are required to be delivered as provided for in Section 7.4;

(b)     such Specified Equity Contribution is received by the Canadian Borrower within ten (10) Business Days after the Canadian Borrower being required to deliver the financial statements for such Fiscal Quarter or Fiscal Year (as applicable) as provided for in Section 7.4;

(c)     the amount of any Specified Equity Contribution included in the calculation of EBITDA will be no greater than: (i) the amount required to cause the Canadian Borrower to be in compliance with the applicable Designated Financial Covenants and (ii) 40% of EBITDA as calculated on a trailing twelve month basis; ***provided, this paragraph shall not apply to the Specified Equity Contribution deemed to be made on the Second Amendment Date;***

(d)     all Specified Equity Contributions will be disregarded for all other purposes under the Credit Documents (including, to the extent applicable, calculating EBITDA for purposes of determining compliance with Section 7.1.16, the Applicable Margin for pricing and other items governed by reference to EBITDA or that include EBITDA in the determination thereof in any respect);

(e)     there shall be no more than ~~four~~**one** Specified Equity ~~Contributions made during the term of this Agreement~~**Contribution during any period of four consecutive Fiscal Quarters** and the aggregate amount of all such Specified Equity Contributions shall not exceed $20,000,000;~~(f)     no~~ **provided that for certainty, the** Specified Equity Contribution ~~may be made in consecutive Fiscal Quarters; and~~**deemed to be made on the Second Amendment Date shall not be included for the purposes of calculating the $20,000,000 limit set forth in this paragraph;**

(f)     **[reserved]:**

(g)     the proceeds of all Specified Equity Contributions are actually received by the Canadian Borrower and**, except for the Specified Equity Contribution deemed to be made on the Second Amendment Date,** the Canadian Borrower **has** delivered to the Agent 100% of the aggregate proceeds of such Specified Equity Contribution as a Repayment pursuant to Section 5.3.1(d) (each such Repayment, an "**Equity Cure Repayment**")~~, and the~~ **provided that each such** Equity Cure Repayment shall be ignored for purposes of determining the amount of Total Net Debt of the Borrower ~~and calculating~~**, including where Total Net Debt is used in the calculation** the Designated Financial Covenants ~~and~~**,** until such time that the Specified Equity Contribution ceases to be calculated as EBITDA pursuant to the provisions of this Section 7.3.2; provided that, ~~(i)~~ notwithstanding the provisions of Section 5.3.3, the proceeds of each Equity Cure Repayment are to be applied first to Outstanding Advances under the Term Facility in inverse order of maturity until they have been fully repaid and, thereafter, to Outstanding Advances under the Operating Facilities in accordance with Section 5.3.3.

If, after giving effect to the recalculations set forth in this Section 7.3.2, the Borrower shall then be in compliance with the Designated Financial Covenants, the Borrower shall be deemed to have satisfied the requirements of the Designated Financial Covenants and the applicable breach or default of the Designated Financial Covenants that had occurred shall be deemed cured for the purposes of this Agreement (in each instance, an "**Equity Cure**").

**Pursuant to the exercise of the Specified Equity Contribution deemed to be made on the Second Amendment Date, the Designated Financial Covenants shall be recalculated giving effect to a pro forma adjustment by which EBITDA shall be increased for each of the Fiscal Quarters ending June 30, 2019, September 30, 2019, December 31, 2019 and March 31, 2020, and any four-quarter period that contains such quarter, by an amount equal to the Specified Equity Contribution deemed to be made on the Second Amendment Date in accordance with the terms above.**

**7.4     Reporting Requirements**

7.4.1     While there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to the Borrower, the Borrowers shall deliver, or cause to be delivered, the following financial and other information to the Agent at the times indicated below:

(a)     within 35 days after the end of each month after the Amendment and Restatement Date: (i) monthly aged accounts receivable listings, monthly aged accounts payable listings, listings of total inventory and total capital assets by stocking location, cash and Cash Equivalent listing and a Borrowing Base Certificate executed by the Borrower; and (ii) monthly unaudited financial statements of the Borrower, which shall include a balance sheet, statement of cash flows and income statement;

(b)     promptly upon becoming available and in any event within 45 days after the end of each of the first three Fiscal Quarters in each Fiscal Year, a Compliance Certificate along with the Interim Financial Statements of the Borrower, which shall include a balance sheet, statement of cash flows and income statement, on which it is based, and the Borrower shall also make available members of its senior management team for a telephone call with Lenders within five Business Days of the end of each Fiscal Quarter to discuss, inter alia, the financial position of the Borrower;

(c)     promptly upon becoming available and in any event within 120 days after the end of each Fiscal Year, an annual business and financial plan for the Borrower which shall disclose all material assumptions utilized and shall include the following items: projected financial covenant ratios, balance sheet, income statement, cash flow statement and Capital Expenditure program;

(d)     promptly upon becoming available and in any event within 120 days after the end of each Fiscal Year, the Year-end Financial Statements for the Borrower, which shall include a balance sheet, statement of cash flows and income statement, together with a copy of the management discussion and analysis and a Compliance Certificate which shall include all new material business locations and any other changes to Schedule 6.1.2;

(e)     within 15 days of a request therefor by the Agent and only after a Material Adverse Effect or during the continuance of a Default or Event of Default, a listing of (i) each of the "serial number goods" (as defined in the *Personal Property Security Act* (Alberta)) or "collateral" for which a security interest must be indicated on a "certificate of title" (as such terms are defined under the *UCC*) for such collateral owned by the Credit Parties and the location of such serial number goods or certificate of title collateral, and (ii), a legal description of any Lands; but in each case, only to the extent that such assets are included in the Borrowing Base;

(f)     (i) within five Business Days of the end of each calendar week, solely during the Covenant Relief Period, a weekly liquidity report in form and substance satisfactory to the Agent, including, but not limited to, global cash balances and global facility utilization of the Borrower, including individual account summaries; and (ii) solely during the Covenant Relief Period, a rolling thirteen week cash flow and Borrowing Base projection, in form and substance satisfactory to the Agent, to be delivered within 10 Business Days from receipt by the Borrower of the written request of the Agent for such information;

(g)     (i) together with the delivery of the Interim Financial Statements for the Fiscal Quarter ending June 30, 2018, a collateral exam based on such Interim Financial Statements; and (ii) prior to December 31, 2018, updated appraisals of the equipment, inventory and real estate of the Credit Parties; in each case, in form and substance satisfactory to the Lenders, acting reasonably;

(h)     provide prompt notice to the Agent of: (i) the occurrence of any Default or Event of Default (for greater certainty, whether or not such Default or Event of Default is continuing); (ii) any Material Adverse Change or Material Adverse Effect; (iii) any material litigation affecting any Credit Party or any breach of any Requirement of Environmental Law, where in either such case there is a reasonable prospect that the liability of any Credit Party with respect thereto could exceed Cdn. $5,000,000 in any Fiscal Year or which would reasonably be expected to result in a Material Adverse Change; (iv) any material amendments to or replacements of, or waivers of material breaches in respect of, the Material Agreements or the Material Permits; (v) any notice of default, termination or suspension received by any Credit Party in respect of material Funded Debt or in respect of any Material Agreement or Material Permit; and (vi) the occurrence of any ERISA Event that would reasonably be expected to have a Material Adverse Effect;

(i)     provide prompt notice to the Agent of: (i) any labour dispute to which any Credit Party is or is expected to become a party, including any strikes, lockouts or other labor disputes relating to any of such Person's plants and other facilities, which could reasonably be expected to result in a Material Adverse Effect, (ii) any Worker Adjustment and Retraining Notification Act or related liability incurred with respect to the closing of any plant or other facility of any such Person and (iii) any material liability under Applicable Law similar to the Worker Adjustment and Retraining Notification Act or otherwise arising out of plant closings;

(j)     (x) provide prompt notice to the Agent of any material notices it receives under or in connection with the Accounts Receivable Insurance, including related to: (i) any termination thereof, (ii) any disputed claims related thereto, (iii) any denied coverage thereunder or (iv) any alleged misrepresentations given by any Credit Party in connection therewith and (y) provide prior written notice of any amendment of material terms of the Account Receivable Insurance;

(k)     provide written notice to the Agent of any event or circumstance, with the giving of notice or lapse of time or both, would constitute a default or event of default under a Permitted Securitization Financing promptly (and in any event not less than three Business Days) upon becoming aware of same constituted by a Permitted Securitization Financing; provided such notice shall include reasonable details of the nature of such event or circumstance and the corresponding default or event of default, any applicable cure period with respect thereto and any remedial actions to be taken with respect to same; and

(l)     such additional information and documents as the Agent or the Lenders may reasonably require from time to time, not otherwise inconsistent with the terms of this Agreement, to ensure the ongoing compliance by the Borrower with the terms and conditions of this Agreement, in form reasonably acceptable to the Agent and the Lenders.

**7.5**    **Designation of Unrestricted Subsidiaries**

(a)    The Canadian Borrower from time to time, by notice to the Agent in the form of Exhibit I, shall be entitled to designate that either:

    (i)    a Material Subsidiary will be an Unrestricted Subsidiary; or

    (ii)    an Unrestricted Subsidiary will be a Material Subsidiary;

    provided, that the Borrower will not be entitled to designate a Material Subsidiary to be an Unrestricted Subsidiary if:

        (A)    a Default or an Event of Default has occurred and is continuing unless the exercise of the Borrower's discretion under paragraph (i) or (ii) above would cause such Default or Event of Default to be cured; or

        (B)    a Default or an Event of Default would result from or exist immediately after such a designation.

(b)    For the avoidance of doubt, notwithstanding anything in this Agreement or the Credit Documents to the contrary, for purposes of calculating the Borrowing Base, the definition of "Marginable Cash" shall include the unrestricted cash (determined in accordance with GAAP) and Cash Equivalents of each of QMax do Brasil Solucoes do Petroleo Ltda., International Drilling Fluids and Engineering Services (IDEC) Ltd. and QMax Solutions India (Project Office) of QMax Solutions Inc. (or any other Subsidiary of the Borrowers in the Agent's sole discretion, acting reasonably) to the extent (a) such cash and Cash Equivalents are held in collateral account/s maintained by the Agent or an affiliate thereof (or such other bank deemed reasonable in the sole discretion of the Agent), and (b) the Agent has received a guarantee (to the extent of the value of the pledged cash and Cash Equivalents in such account; it being understood that Agent may waive this requirement in its sole discretion if the circumstances warrant) and a deposit account agreement or substantially equivalent agreements under the laws of such local jurisdiction, in form and substance reasonably satisfactory to Agent, whereby, *inter alia*, the Agent retains exclusive control to direct the transfer of funds therefrom during the continuation of an Event of Default under Section 10.1 hereof (with withdrawals by the applicable Credit Party to be permitted upon notice to the Agent so long as the Agent has not delivered a notice of exclusive control upon the occurrence and during the continuation of an Event of Default), together with evidence of all requisite registrations or filings of each such agreement under Applicable Law and such other documentation reasonably satisfactory to Agent, including legal opinions.

(c)    Any Subsidiary of the Borrowers that pledges cash and/or Cash Equivalents in the manner provided for in paragraph (b) above shall, notwithstanding that such Subsidiary is not a Material Subsidiary, be subject to the provisions of Section

7.2.1 hereof; *provided*, such Subsidiary shall otherwise not be subject to Section 7.2.

(d)    The Agent acknowledges that, as of the date hereof, Mud Movers LLC has been designated as an Unrestricted Subsidiary.

## 7.6    Securitization SPE

7.6.1    As of the Amendment and Restatement Date, ADF SPE, LLC, a Delaware limited liability company, shall be designated a Securitization SPE.

7.6.2    After the Amendment and Restatement Date, the Canadian Borrower from time to time, by notice to the Agent, may designate any Unrestricted Subsidiary as a Securitization SPE; provided, that the Borrower will not be entitled to such a designation if (a) a Default or an Event of Default has occurred and is continuing (unless such designation would cause such Default or Event of Default to be cured) or (b) a Default or an Event of Default would result from or exist immediately after such a designation.

7.6.3    No Securitization SPE

(a)    shall incur any Funded Debt other than Funded Debt pursuant to the Permitted Securitization Financing to which it is a party;

(b)    shall conduct any business other than (i) the acquisition of accounts receivable from one or more Credit Parties, and (ii) the consummation and performance of Permitted Securitization Financing.

7.6.4    As at the Amendment and Restatement Date, the Material Subsidiaries and Unrestricted Subsidiaries are as set out in Schedule 6.1.2.

## ARTICLE 8
## SECURITY

### 8.1    Security

Each Borrower agrees to provide (or cause to be provided) the security listed below to the Agent on behalf of the Lenders and the Hedge Providers as continuing security for the payment and performance of all present and future, direct and indirect, indebtedness and obligations of the Credit Parties to the Agent, the Lenders and the Hedge Providers (on a *pari passu* basis) related to the Credit Documents, the Banking Service Agreements and the Hedging Agreements:

(a)    a general security agreement from each Borrower creating a First-Ranking Security Interest in respect of all of its present and after-acquired property, assets and undertaking and a floating charge over all present and future owned real property;

(b)     an unlimited Guarantee from the U.S. Borrower in respect of present and future, direct and indirect, indebtedness and Obligations of the Canadian Borrower and other Credit Parties to the Agent and the Lenders;

(c)     an unlimited Guarantee from each Material Subsidiary of the Canadian Borrower (excluding, for the avoidance of doubt, any Securitization SPE) which is not a Borrower in respect of present and future, direct and indirect, indebtedness and Obligations of the Borrowers to the Agent and the Lenders;

(d)     a general security agreement or debenture (or other equivalent security applicable in the relevant jurisdiction) from each Guarantor creating a First-Ranking Security Interest in respect of all its present and after acquired property, assets and undertaking and a floating charge over all present and future owned real property, <u>provided</u>, that (a) for so long as the Encina Loan Agreement is in effect, with respect to Anchor and its Subsidiaries the ranking of the First-Ranking Security Interest is to be in accordance with the Encina Intercreditor Agreement and (b) thereafter, so long as the Wells Fargo Credit Agreement is in effect, any Receivables and other assets encumbered by a lien pursuant to the Wells Fargo Credit Agreement and the other loan documents in connection therewith shall be excluded from the Security of the Agent and the Lenders;

(e)     a limited recourse guarantee from Holdco and a share pledge agreement from Holdco in respect of all of the issued and outstanding shares of the Canadian Borrower owned by it;

(f)     a securities pledge agreement or charge over shares (or other equivalent security applicable in the relevant jurisdiction) in respect of the shares or units of the U.S. Borrower and any Material Subsidiary owned by a Credit Party;

(g)     prior to the incurrence of any Subordinated Debt by any Credit Party, a Subordination Agreement in respect to such Subordinated Debt;

(h)     for each Leased Property deemed material by the Required Lenders, acting reasonably, a Landlord Agreement in respect of each such Leased Property; provided that the Agent may impose a three month rent reserve against the Borrowing Base with respect to Eligible Inventory valued in excess of $250,000 (per location) which is located at or on Leased Property in respect of which such Landlord Agreement is not obtained;

(i)     for each Credit Party (other than Anchor, Terra and their Subsidiaries) who does not maintain all of its bank accounts exclusively with the Agent or its Affiliates, deposit account control or blocked account agreements among the Agent and the applicable financial institution which such bank account is maintained with, as may be reasonably required by the Agent subject to the last sentence of Section 7.1.13;

(j)    estoppel letters, consignments agreements, bailee letters, certificates or consents from such third parties as may be reasonably required by the Agent, but subject to any limitations set forth herein or in any other Credit Document; and

(k)    such other security as may be reasonably required by the Agent and the Lenders from time to time;

in each case, in accordance with the time periods set out in Sections 7.1.14.

## 8.2    General Provisions re Security; Registration

The Security shall be in form and substance satisfactory to the Agent and the Lenders, acting reasonably. The Agent may require that any item of Security be governed by the laws of the jurisdiction where the property subject to such item of Security is located. The Security shall be registered by the Borrowers where necessary or desirable to record and perfect the charges contained therein, as determined by the Agent giving consideration to, among other things, the cost thereof relative to the benefit to the Lenders thereof, and if the Borrowers do not so register the Security as requested or if the registration may be effected by the secured party thereunder, the Agent may do the same. Notwithstanding the foregoing, the parties expressly agree that no actions shall be required under this Section 8.2 or in respect of Security generally to the extent that the costs of obtaining such Financial Assistance or Lien or perfecting or registering such Security outweigh the benefits afforded thereby, in the opinion of the Required Lenders, acting reasonably, such determination to be made at the written request of the Canadian Borrower; provided, that the Agent and Lenders shall be entitled to re-evaluate whether the costs of obtaining such Financial Assistance or Lien or perfecting or registering such Security outweigh the benefits afforded thereby from time to time in their discretion.

If any Lender determines, acting reasonably, that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful for such Lender to hold or benefit from any Guarantee and/or Security, such Lender shall notify the Agent and disclaim any benefit of such Guarantee and/or Security to the extent of such unlawfulness, provided that such disclaimer shall not invalidate or render unenforceable such Guarantee and/or Security for the benefit of any of the other Lenders

## 8.3    Opinions re Security

The Credit Parties shall cause to be delivered to the Agent and the Lenders the results of all applicable searches in respect of the Credit Parties in the applicable jurisdiction as well as the opinions of solicitors for the Credit Parties regarding their corporate status, the due authorization, execution and delivery of the Security provided by them, all registrations in respect of the Security, and the enforceability of such Security; all such opinions to be in form and substance satisfactory to the Agent and its counsel, acting reasonably.

## 8.4    After-Acquired Property, Further Assurances

Each Credit Party agrees to execute and deliver from time to time, and cause each of its Material Subsidiaries to execute and deliver from time to time, all such further documents and assurances as may be reasonably required by the Agent from time to time in order to provide the

Security contemplated hereunder, specifically including: supplemental or additional security agreements, assignments and pledge agreements which shall include lists of specific assets to be subject to the security interests required hereunder.

**8.5      Security for Swap Documents with Former Lenders**

(a)      If a Lender ceases to be a Lender under this Agreement (for purposes of this Section 8.5, a "**Former Lender**"), all Secured Hedging Liabilities owing to such Former Lender and its Affiliates under Hedging Agreements entered into while such Former Lender was a Lender shall remain secured by the Security (equally and rateably) to the extent that such Secured Hedging Liabilities were secured by the Security prior to such Lender becoming a Former Lender and, subject to the following provisions of this Section 8.5. For certainty, any Hedging Liabilities under Hedging Agreements entered into with a Former Lender or an Affiliate thereof after the Former Lender has ceased to be a Lender shall not be Secured Hedging Liabilities nor shall they be secured by the Security. Notwithstanding the foregoing, while any Obligations remain outstanding under the Facilities, no Former Lender or any Affiliate thereof shall have any right to cause or require the enforcement of the Security or any right to participate in any decisions relating to the Security, including any decisions relating to the enforcement or manner of enforcement of the Security or decisions relating to any amendment to, waiver under, release of or other dealing with all or any part of the Security; for certainty, the sole right of a Former Lender and its Affiliates with respect to the Security while any Obligations remain outstanding under the Facilities is to share, on a *pari passu* basis, in any proceeds of realization and enforcement of the Security.

(b)      If this Agreement is terminated, all Secured Hedging Liabilities owing to any Hedge Provider under Hedging Agreements entered into while such Hedge Provider, or its Affiliate, was a Lender hereunder and all Obligations under Banking Service Agreements between one or more Credit Parties and such Lender entered into while the Lender was a Lender hereunder shall no longer be secured by the Security.

**8.6      Insurance Proceeds**

If insurance proceeds become payable in respect of loss of or damage to any property owned by a Credit Party:

(a)      if an Event of Default has occurred and is continuing at such time, the Agent shall apply such proceeds against the Obligations; and

(b)      otherwise, the Agent shall apply such excess proceeds against the Obligations in accordance with Sections 5.3.1 and 5.3.2.

**8.7      Qualified ECP Guarantor Keepwell**

Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to

time by each other Credit Party to honor all of such Credit Party's obligations under this Agreement and the applicable Security (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 8.7 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 8.7, or otherwise under this Agreement and the applicable Security, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 8.7 shall remain in full force and effect until its Obligations have been discharged in full. Each Qualified ECP Guarantor intends that this Section 8.7 constitute, and this Section 8.7 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**8.8     Additional Release by Lender**

If any Lender determines, acting reasonably, that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender to hold or benefit from a Lien over real property pursuant to any law of the United States or any State thereof, such Lender may notify the Agent and disclaim any benefit of such Lien to the extent of such illegality; provided, that such determination or disclaimer shall not invalidate or render unenforceable such Lien for the benefit of any other beneficiary of such Lien.

**8.9     Security Principles Affecting Certain Subsidiaries**

In obtaining Security from Material Subsidiaries in their respective jurisdiction of incorporation, the Agent, the Lenders and the Canadian Borrower agree that:

(a)     all Guarantees and Security granted will be limited to the extent necessary to comply with local legal requirements, as determined by the Agent acting reasonably;

(b)     general statutory limitations, financial assistance, corporate benefit, fraudulent preference, "thin capitalization" rules, tax restrictions (including tax thin capitalization issues), retention of title claims and similar principles may limit the ability of a Material Subsidiary to provide a Guarantee or other Security or may require that the Guarantee be limited by an amount or otherwise provided that the Canadian Borrower and the applicable Material Subsidiary will use reasonable endeavours to overcome such obstacles and to assist in demonstrating that adequate corporate benefit accrues to the relevant Guarantor;

(c)     the Security and extent of its perfection will be agreed on the basis that the cost to the Credit Parties of providing such Security shall be proportionate to the benefit accruing to the Lenders;

(d)     Material Subsidiaries will not be required to give Guarantees or enter into Security if that would conflict with the fiduciary duties of their directors or contravene any legal prohibition or result in a risk of personal or criminal liability on the part of an officer provided that the relevant Guarantor shall use reasonable endeavours to overcome any such obstacle;

(e) perfection of security, when required, and other legal formalities will be completed as soon as practicable and, in any event, within the relevant time periods specified herein or, if earlier or to the extent no such time periods are specified herein, within the time periods specified by applicable law in order to ensure due perfection, provided that the perfection of security granted will not be required if it would have a material adverse effect on the ability of the relevant Guarantor to conduct its operations and business in the ordinary course as otherwise permitted by this Agreement;

(f) where a class of assets to be secured includes material and immaterial assets, if the cost of granting Security over the immaterial assets is disproportionate to the benefit of such Security, security will be granted over the material assets only.

**ARTICLE 9**
**CONDITIONS PRECEDENT**

**9.1** **Conditions Precedent to Agreement**

This Agreement shall not become effective unless and until the following conditions have been satisfied, in each case to the satisfaction of the Agent and the Lenders:

(a) the conditions precedent in Section 9.2 shall have been satisfied;

(b) the Agent and the Lenders shall be satisfied, in their reasonable discretion, with all Material Agreements, including confirmation that Palladium beneficially owns (within the meaning of Rule 13d-3 promulgated under the United States Securities Exchange Act of 1934) at least 52% of the issued and outstanding shares (excluding stock options) of the Canadian Borrower;

(c) the Credit Parties shall have obtained insurance in respect of its consolidated property, business and assets, evidenced by an insurance certificate naming the Agent as additional insured and first loss payee;

(d) the Canadian Borrower shall have in place acceptable Account Receivable Insurance, evidenced by an endorsement or insurance certificate naming the Agent as first loss payee;

(e) subject to Schedule 9.1, (A) this Agreement and all Security (or in the case of Security that was previously delivered in connection with the Existing Credit Agreement, an acknowledgment and confirmation from the applicable Credit Party thereto if so requested by the Agent) required shall have been executed and delivered and (i) in Alberta, British Columbia and each other applicable Canadian jurisdiction, all registrations and deliveries necessary or desirable in connection therewith shall have been made, and (ii) in any other jurisdiction, the same, as applicable, shall have been delivered to the Agent in proper form for filing, and (B) all legal opinions and other documentation reasonably required by the Lenders in connection therewith shall have been executed and delivered, in each case, in form and substance reasonably satisfactory to the Agent and the Lenders;

(f)     the Agent and the Lenders shall have received satisfactory evidence that there are no Liens affecting any of the assets of the Credit Parties, except for Permitted Liens;

(g)     the Agent and Lenders shall have received satisfactory confirmation that at least 80% of the Insured Receivables forming part of the Borrowing Base are derived from, subject to and governed by Eligible Approved Contracts;

(h)     the Agent shall have received an officer's certificate, certificate of incumbency and certified copies of the articles, by-laws and resolutions of the board of directors of each Borrower and each other Credit Party formed under the laws of Canada, the U.S. or any province or state thereof concerning the due authorization, execution and delivery of the Credit Documents to which it is a party, and such related matters as the Agent and the Lenders may reasonably require;

(i)     the Agent shall have received a certificate of status, certificate of compliance or similar certificate for each Borrower and each other Credit Party formed under the laws of Canada, the U.S. or any province or state thereof issued by its governing jurisdiction;

(j)     the Agent and the Lenders shall have received opinions from the solicitors for the Credit Parties in Alberta, British Columbia and Delaware, regarding, amongst other things, its corporate status, the due authorization, execution, delivery and enforceability of the Credit Documents provided by it, perfection and registration of the Security, and such other matters as the Agent and the Lenders may require;

(k)     the Agent shall have received an opinion of its solicitors, Torys LLP, with respect to matters as the Agent and the Lenders may require.

(l)     the Canadian Borrower shall have delivered a duly executed and completed Borrowing Base Certificate and a *pro forma* Compliance Certificate;

(m)     consolidated cash flow projections, *pro forma* balance sheet, income statement and capital expenditure budget of the Canadian Borrower for each of the 2018, 2019 and 2020 Fiscal Years, including an analysis of the Mexican days of sales outstanding;

(n)     the Borrowers and the Agent shall have entered into a Fee Agreement;

(o)     the Borrowers shall have paid to the Agent all fees and expenses (including the Agent's reasonable and documented out-of-pocket legal expenses) relating to the establishment, amendment and restatement of the Facilities;

(p)     no Material Adverse Change shall have occurred since March 31, 2018;

(q)     the Agent shall have received satisfactory evidence that the Credit Parties have obtained all necessary consents of all Governmental Authorities required in

connection with the execution of the Credit Documents and the consummation of the transactions contemplated thereby and the Canadian Borrower shall have delivered an officer's certificate certifying same;

(r)     each of the representations and warranties in Article 6 shall be true and correct in all material respects and the Canadian Borrower shall have delivered an officer's certificate certifying same; and

(s)     Holdco shall have received no less than $3,000,000 by way of an equity contribution by Palladium, an Investor or an Affiliate thereof and shall, substantially concurrently therewith, provide reasonably satisfactory evidence of such receipt to the Agent.

## 9.2     Conditions Precedent to all Advances

The Lenders shall have no obligation to make any Advance (including for greater certainty the initial Advance hereunder), unless at the time of making each such Advance the following terms and conditions shall have been satisfied:

(a)     the representations and warranties in Article 6 shall be true and correct in all material respects as if made on the date of such Advance except to the extent such representations and warranties relate to an earlier date in which case the information contained in representations and warranties shall be true and correct in all material respects as of such earlier date;

(b)     no Material Adverse Effect shall have occurred since the date of the then most recent Year-end Financial Statements;

(c)     no Default or Event of Default shall have occurred and be continuing, nor shall the making of the Advance result in the occurrence of any Default or Event of Default;

(d)     no Borrowing Base Shortfall shall and be continuing, nor shall the making of the Advance result in the occurrence of any Borrowing Base Shortfall;

(e)     after giving effect to the proposed drawdown, the outstanding principal of all Outstanding Advances under the applicable Facility shall not exceed the maximum amount of such Facility; and

(f)     the Borrower shall have given a Drawdown Request to the Agent in accordance with the notice requirements provided herein (except in respect of Advances in the form of Overdrafts).

## ARTICLE 10
## DEFAULT AND REMEDIES

**10.1    Events of Default**

The occurrence of any one or more of the following events, after the expiry of any applicable cure period set out below, shall constitute an event of default under this Agreement (an "**Event of Default**"):

(a)    if,

    (i)    any Credit Party makes default in the due and punctual payment of any principal amount owing under the Credit Documents, as and when the same becomes due and payable, whether at maturity or otherwise;

    (ii)    any Credit Party makes default in the due and punctual payment of Interest or fees owing under the Credit Documents (other than the Hedging Agreements), as and when the same become due and payable, whether at maturity or otherwise and such default continues for a period of three Business Days after written notice thereof is given to the applicable Credit Party by the Agent; or

    (iii)    any Credit Party makes default in the due and punctual payment of any amounts in excess, in the aggregate, of $1,000,000 owing under the Hedging Agreements with a Hedge Provider, as and when the same become due and payable, whether at maturity or otherwise and such default continues for a period of ten (10) Business Days after written notice thereof is given to the applicable Credit Party by the applicable Hedge Provider;

(b)    the Borrower fails to be in compliance with any of the covenants set out in Section 7.2 or Section 7.3 (subject to the Equity Cure in compliance with Section 7.3.2);

(c)    any representation or warranty provided by a Credit Party to the Agent or the Lenders herein or in any other Credit Document was incorrect in any material respect on the date on which such representation or warranty was made;

(d)    any Credit Party fails in a material way to perform or comply with any of its covenants or obligations contained in this Agreement or any other Credit Document (other than those set out in Subsections (a), (b) and (c) above); provided, that if such non-compliance is capable of remedy within 30 days after notice thereof from the Agent and such Credit Party diligently attempts to remedy such non-compliance and periodically informs the Agent of its efforts in this regard, and such non-compliance is remedied within such period, then such non-compliance shall be deemed not to constitute an Event of Default;

(e)    the occurrence of a Change of Control;

(f)     any one or more of the Credit Parties is in default in the payment or performance of any of its or their indebtedness or obligations under any agreement relating to any Funded Debt (other than the Obligations) where the principal amount owing under such agreements in the aggregate is in excess of $10,000,000 (after the expiry of any grace or cure periods relating thereto), and in either case, such indebtedness or obligations have been, or may be, accelerated, unless such default is waived by the applicable counterparties or holders of such debt in accordance with its terms;

(g)     one or more final judgments or decrees for the payment of money shall have been obtained or entered against any one or more of the Credit Parties in excess of $10,000,000 in the aggregate and is not released, bonded, satisfied, discharged, vacated, or stayed within 30 days;

(h)     an Insolvency Event occurs in respect of any Credit Party or any Subsidiary of the Borrowers that pledges cash and/or Cash Equivalents in accordance with Section 7.5(b) hereof; provided, this clause (h) shall exclude an Insolvency Event in respect of any Securitization SPE.

(i)     the Credit Parties (taken as a whole) cease (or take an affirmative action towards ceasing) to carry on business, or a substantial part thereof, or make or threaten to make (or take an affirmative action towards making) a bulk sale of their property, except to the extent specifically permitted hereunder;

(j)     the property of any one or more of the Credit Parties having a fair market value in excess of $10,000,000, in aggregate, shall be seized (including by way of execution, attachment, garnishment or distraint) or any Lien thereon shall be enforced, or such property shall become subject to any charging order or equitable execution of a court, or any writ of enforcement, writ of execution or distress warrant with respect to obligations in excess of $10,000,000, in aggregate, shall exist in respect of any one or more of any of them, or such property, or any sheriff, civil enforcement agent or other Person shall become lawfully entitled to seize or distrain upon such property under the *Civil Enforcement Act* (Alberta), the *Workers' Compensation Act* (Alberta), the *Personal Property Security Act* (Alberta) or any other applicable Laws whereunder similar remedies are provided, and in any case such seizure, execution, attachment, garnishment, distraint, charging order or equitable execution, or other seizure or right, shall continue in effect and not be released or discharged for more than 30 days;

(k)     a Material Adverse Change has occurred since the date of the then most recent Year-end Financial Statements and remains continuing for more than 30 days after notice thereof is given to the Canadian Borrower by the Agent;

(l)     if an ERISA Event shall have occurred that would reasonably be expected to have a Material Adverse Effect;

(m)     any Credit Document or any material provision thereof is or is declared by any court of competent jurisdiction to be unenforceable, or any Credit Party terminates or purports to terminate its liability under any Credit Document or disputes the validity or enforceability of such Credit Document;

(n)     any of the Security ceases to constitute a valid and perfected First-Ranking Security Interest over Collateral of a value in excess of $5,000,000 in the aggregate and the Borrower shall have failed to remedy such default within 5 days of becoming aware of such fact and being provided by the Agent with any documentation required to be executed to remedy such default; and

(o)     if any Borrower fails to eliminate a Borrowing Base Shortfall as provided in Section 5.3.5.

Notwithstanding the foregoing, a declaration of an Event of Default under clause (i) above shall not: (1) prevent the commencement of a proceeding under Law 1116 of 2006 ("**Law 1116**") or the filing of a petition in Colombia to commence a proceeding under Law 1116 with respect to any Colombian Branch of any Credit Party, whether in a voluntary or involuntary manner; (2) be construed to mean that the purpose of this Section is to prevent or create obstacles to prevent, directly or indirectly, that proceedings be commenced in Colombia under Law 1116 with respect to any Colombian Branch of any Credit Party; (3) prohibit any Colombian Branch of any Credit Party from negotiating or entering into a restructuring agreement under Law 1116; or (4) impose any restrictions or prohibitions, or unfavorable effects "efectos desfavorables" upon any Colombian Branch of any Credit Party for the negotiation or execution of a restructuring agreement under Law 1116. The rights of the Lenders under this Section may not be exercised in connection with clause (i) above if and for so long as a proceeding is commenced or a petition is filed in Colombia to commence a proceeding under Law 1116 with respect to any Colombian Branch clause (i) above, whether in a voluntary or involuntary manner or any Colombian Branch clause (i) above engage in negotiations to enter into, or enters into a restructuring agreement in Colombia under Law 1116.

## 10.2    Acceleration; Additional Interest

Upon the occurrence of an Insolvency Event in respect of any Credit Party, the Obligations shall become immediately due and payable, without the necessity of any demand upon or notice to the Borrower by the Agent and the Swingline shall be cancelled. Upon the occurrence and during the continuation of any Event of Default other than such an Insolvency Event, the Agent, at the request of and on behalf, of the Required Lenders, shall by written notice to the Borrowers declare the Obligations to be immediately due and payable. From and after the date of the occurrence of an Event of Default and for so long as such Event of Default continues, both before and after the Acceleration Date, all Outstanding Advances may bear interest or fees at the Default Rate in order to compensate the Lenders for the additional risk associated therewith.

**10.3     Acceleration of Certain Contingent Obligations**

Upon the occurrence of an Event of Default which is continuing, any Lender which has issued a Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit or entered into a Hedging Agreement with Credit Party may make a Canadian Dollar Prime Rate Loan, a U.S. Dollar Base Rate Loan or a U.S. Dollar Prime Rate Loan, as applicable, to a Borrower in an amount equal to the face amount of such Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit, or the amount required to unwind such Hedging Agreement (such amount to be determined in accordance with the terms thereof), as the case may be; and the proceeds of any such Loan shall be held by such Lender and used to satisfy the Lender's obligations under the said Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit as such becomes due, or to effect the unwinding of such Hedging Agreement. Any such Loan shall bear interest at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans, U.S. Dollar Base Rate Loans or U.S. Dollar Prime Rate Loan, as applicable, under the Facility under which such Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit was issued. Any such Loan made in respect of a Hedging Agreement shall bear interest at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans under the Canadian Operating Facility which provides for the highest interest rate at such time.

**10.4     Combining Accounts, Set-Off**

Upon the occurrence and during the continuation of an Event of Default, in addition to and not in limitation of any rights now or hereafter granted under Applicable Law, each Lender may without notice to any Credit Party at any time and from time to time:

(a)     combine, consolidate or merge any or all of the deposits or other accounts maintained with such Lender by such Credit Party in respect of this Agreement (whether term, notice, demand or otherwise and whether matured or unmatured) and such Credit Party's obligations to such Lender hereunder; and

(b)     set off, apply or transfer any or all sums standing to the credit of any such deposits or accounts in or towards the satisfaction of the said obligations,

including all claims of any nature or description arising out of or connected with this Agreement, including contingent obligations of the Lenders in respect of unmatured Bankers' Acceptances, in which case the Agent or such Lender will promptly notify the Borrower thereof after the occurrence thereof; provided, that the Agent's or such Lender's failure to give any such notice will not affect the validity thereof. Nothing contained in the Credit Documents will require the Agent or a Lender to exercise any right, or will affect the right of the Agent or a Lender to exercise and retain the benefits of exercising any right, with respect to any Obligations existing otherwise than pursuant to the Credit Documents.

**10.5     Attorney in Fact**

Each Borrower hereby irrevocably constitutes and appoints the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of such Borrower and in the name of such Borrower or in its own name, from time to time in the Agent's discretion, for the purpose of

carrying out the terms of the Credit Documents, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Credit Documents and which such Borrower being required by the terms thereof to take or execute has failed to take or execute; provided, that this power of attorney will not be effective until the occurrence and during the continuance of any Event of Default. Each Borrower hereby ratifies all that said attorneys will lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and will be irrevocable until all of the Obligations under the Credit Documents have been unconditionally and irrevocably paid and performed in full. Each Borrower also authorizes the Agent, at any time and from time to time following the occurrence and during the continuance of any Event of Default, to execute any endorsements, assignments or other instruments of conveyance or transfer pursuant to the Security. If requested by the Agent, each Borrower will cause each other Credit Party to constitute and appoint the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney in fact in accordance with the foregoing provisions of this Section 10.5.

**10.6    Appropriation of Monies**

After the occurrence and during the continuation of an Event of Default, the Agent may from time to time apply any Proceeds of Realization against any portion or portions of the Obligations, and the Borrowers may not require any different application. The taking of a judgment or any other action or dealing whatsoever by the Agent or the Lenders in respect of the Security shall not operate as a merger of any of the Obligations hereunder or in any way affect or prejudice the rights, remedies and powers which the Agent or the Lenders may have, and the foreclosure, surrender, cancellation or any other dealing with any Security or the said obligations shall not release or affect the liability of the Borrowers or any other Person in respect of the remaining portion of the Obligations.

**10.7    No Further Advances**

The Lenders shall not be obliged to make any further Advances (including honouring any cheques drawn by a Borrower which are presented for payment) from and after the earliest to occur of the following: (a) delivery by the Agent to the Borrowers of a written notice that a Default or an Event of Default has occurred and is continuing and that as a result thereof no further Advances will be made (whether or not such notice also requires immediate repayment of the Obligations) and (b) the occurrence and continuance of an Event of Default under Section 10.1(h).

**10.8    Remedies Cumulative**

All of the rights and remedies granted to the Agent and the Lenders in this Agreement, and any other Credit Documents or instruments in existence between the Parties or contemplated hereby, and any other rights and remedies available to the Agent and the Lenders at law or in equity, shall be cumulative. The exercise or failure to exercise any of the said remedies shall not constitute a waiver or release thereof or of any other right or remedy, and shall be non-exclusive.

**10.9     Performance of Covenants by Agent**

If a Credit Party fails to perform any covenant or obligation to be performed by it pursuant to this Agreement, the Agent, at the request of the Required Lenders (in their sole discretion), after written notice to the Borrowers, perform any of the said obligations but shall be under no obligation to do so; and any amounts expended or advanced by the Agent for such purpose shall be payable by the Borrowers upon demand, together with interest thereon at the highest rate then applicable to the Facilities.

**10.10    Purchase of Participation Following Acceleration**

After all Obligations are declared by the Agent to be due and payable pursuant to Section 10.2, (i) each Lender agrees that it will at any time or from time to time thereafter at the request of the Agent as required by any Lender, purchase at par on a non-recourse basis a participation in the Outstanding Advances owing to each of the other Lenders under the Operating Facilities and make any other adjustments as are necessary or appropriate, in order that the Outstanding Advances owing to each of the Lenders under the Operating Facilities, as adjusted pursuant to this Section 10.10, will be in the same proportion as each Lender's Commitment under all the Operating Facilities was to the aggregate Commitment of all Lenders under all the Operating Facilities immediately prior to the Event of Default resulting in such declaration; (ii) the amount of any repayment made by or on behalf of the Credit Parties under the Credit Documents or any proceeds received by the Agent or the Lenders pursuant to Section 11.7 will be applied by the Agent in a manner such that to the extent possible the amount of the Outstanding Advances owing to each Lender under the Operating Facilities after giving effect to such application will be in the same proportion as each Lender's Commitment under all the Operating Facilities was to the aggregate Commitment of all Lenders under all the Operating Facilities immediately prior to the Event of Default resulting in such declaration; provided that: (i) HSBC US shall not purchase any participation under this Section 10.10 from HSBC Bank Canada (and provided that for certainty, the foregoing proviso shall not affect the obligations of HSBC US to any of the other Lenders under this Section 10.10); and (ii) if Applicable Laws or a Lender's internal regulations and policies prohibits such Lender from purchasing a participation in Outstanding Advances owing by a Borrower other than the Canadian Borrower, such Lender shall not be required to purchase a participation in the Outstanding Advances  owing by such Borrower, provided that such Lender hereby indemnifies the other Lenders for its Proportionate Share of such Outstanding Advances as if such purchase had occurred.

**ARTICLE 11**
**ADMINISTRATION OF THE FACILITIES**

**11.1    Authorization and Action**

Each Lender hereby irrevocably appoints and authorizes the Agent to be its agent in its name and on its behalf and to exercise such rights or powers granted to the Agent or the Lenders under the Credit Documents to the extent specifically provided therein and on the terms thereof, together with such powers and authority as are reasonably incidental thereto. As to any matters not expressly provided for by the Credit Documents, the Agent will not be required to exercise any discretion or take any action, but will be required to act or to refrain from acting (and will be

fully indemnified and protected by the Lenders to the greatest extent permitted by Law in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions will be binding upon all Lenders; provided, however, that the Agent will not be required to take any action which, in the opinion of the Agent, might expose the Agent to liability in such capacity, which could result in the Agent incurring any costs and expenses, or which is contrary to the spirit and intent of this Agreement.

**11.2   Decision-Making**

11.2.1   Any amendment to this Agreement relating to the following matters shall require the unanimous agreement of the Lenders:

(a)   decreases in interest rates or fees payable in respect of any Facility;

(b)   increases in the maximum amount of credit available under any Facility **(other than increases made pursuant to Section 2.8.1)**;

(c)   extensions, or changes to the definition, of the Facilities Maturity Date;

(d)   extensions or postponements of the scheduled dates or the scheduled amounts for Repayments hereunder;

(e)   reductions in the Outstanding Advances under any Facility;

(f)   releases of all or substantially all of the Security, unless in connection with a Permitted Disposition;

(g)   any change to the definition of Required Lenders;

(h)   any provision of this Agreement which expressly states that the unanimous consent of the Lenders is required in connection with an action to be taken or consent provided by the Lenders;

(i)   any amendment, modification or elimination the definition of Borrowing Base or any of the defined terms that are used in such definition to the extent that any such change results in more credit being made available to the Borrowers based upon the Borrowing Base, but not otherwise;

(j)   any change to Sections 11.8.1, 11.9(b) or any other provision regarding the allocation of payments to the Lenders under this Agreement; and

(k)   this Section 11.2;

provided, that (A) any change to Section 2.6.1(i) or Article 11 will also require the consent of the Agent, (B) any change to Sections 4.6.1(c) and 4.7 (and the related definitions referenced therein) will require the consent of the Issuing Bank under the U.S. Operating Facility and the Agent, (C) any change to Sections 2.6.1(b) and 2.7 (and the related definitions referenced therein) will require the consent of the Swingline Lender

and the Agent, (D) any change to Section 5.16 (and the related definitions referenced therein) will require the consent of each Issuing Bank and the Agent (E) any increase to the individual commitment amount of a Lender under a Facility can only be made with the consent of such Lender; and (F) any other change which only effects the Canadian Operating Lenders, the U.S. Operating Lenders, the Canadian Operating Lenders, Term Lenders, the Issuing Bank, the Swingline Lender or the Agent, respectively, shall only require the consent of the affected Persons.

11.2.2   Except for the matters described in Section 11.2.1 above, any amendment to this Agreement or the other Credit Documents shall be effective if made among the Borrower and the Required Lenders, and for greater certainty any such amendment which is agreed to by the Required Lenders shall be final and binding upon all Lenders.

11.2.3   Except for the matters which require the unanimous consent of the Lenders as set out above, any action to be taken or decision to be made by the Lenders pursuant to this Agreement (specifically including for greater certainty the issuance of written notice to the Borrower of the occurrence of a Default or Event of Default, the issuance of a demand for payment of the Obligations, a decision to make an Advance despite any condition precedent relating thereto not being satisfied, the provision of any waiver in respect of a breach of any covenant or the issuance of any consent which may be required under Section 7.2) shall be effective if approved by the Required Lenders; and any such decision or action shall be final and binding upon all the Lenders.

11.2.4   Any action to be taken or decision to be made by the Lenders pursuant to this Agreement which is required to be unanimous shall be made at a meeting of the Lenders called by the Agent pursuant to Section 11.11(k) or by a written instrument executed by all of the Lenders. Any action to be taken or decision to be made by the Lenders pursuant to this Agreement which is required to be made by the Required Lenders shall be made at a meeting of the Lenders called by the Agent pursuant to Section 11.11(k) or by a written instrument executed by the Required Lenders. Any instrument contemplated in this Section 11.2.4 may be executed by fax or pdf and in counterparts.

11.2.5   Subject to Section 8.5(b), the Agent may from time to time without notice to or the consent of the Lenders execute and deliver partial releases of the Security in respect of any item of Collateral (whether or not the proceeds of sale thereof are received by the Agent) which the Credit Parties are permitted to dispose of in connection with a Permitted Disposition; and in releasing any such Security the Agent may rely upon and assume the correctness of all information contained in any certificate or document provided by any one or more of the Borrowers, without further enquiry. Otherwise, any release or discharge in respect of the Security or any portion thereof shall require the written consent of the Lenders acting unanimously.

**11.3    Procedure for Making Advances**

11.3.1   Subject to Section 11.8.3, all Advances under each Facility will be made in accordance with each Lender's Proportionate Share of such Advance under such Facility.

11.3.2    The Lenders, through the Agent, will make Advances under a Facility available to the Borrower as required hereunder by debiting the account of the Agent to which each Lender's Proportionate Share in respect of each Facility of such Advances has been credited (or causing such account to be debited) and, in the absence of other arrangements agreed to by the Agent and the Borrowers in writing, by transferring (or causing to be transferred) like funds in accordance with the instructions of the Borrowers as set forth in the a Drawdown Request, Conversion Notice or Rollover Notice, as the case may be, in respect of each Advance under each Facility; provided, that the obligation of the Agent hereunder will be limited to taking such steps as are in keeping with its normal banking practice and which are commercially reasonable in the circumstances to implement such instructions, and the Agent will not be liable for any damages, claims or costs which may be suffered by the Borrowers or any of the Lenders and occasioned by the failure of such funds to reach their designated destination, unless such failure is due to the gross negligence or wilful misconduct of the Agent.

**11.4    Failure to Fund**

11.4.1    Unless the Agent has actual knowledge that a Lender has not made or will not make available to the Agent for value on the date of any Advance the applicable amount required from such Lender hereunder, the Agent shall be entitled to assume that such amount has been or will be received from such Lender when so due and the Agent may (but shall not under any circumstances be obliged to), in reliance upon such assumption, make available to the applicable Borrower a corresponding amount (except that no such amount shall be made available to the applicable Borrower in the case of a deemed Advance). If such amount is not in fact received by the Agent from such Lender on such date and the Agent has made available a corresponding amount to the applicable Borrower on such date as aforesaid (or is deemed to have made an Advance to the applicable Borrower in such amount), such Lender shall pay to the Agent on demand an amount equal to the aggregate of the applicable amount required from such Lender hereunder plus an amount equal to the product of (a) the rate per annum applicable to overnight deposits made with the Agent for amounts approximately equal to the amount required from such Lender multiplied by (b) the amount that should have been paid to the Agent by such Lender on such date and was not, multiplied by (c) a fraction, the numerator of which is the number of days that have elapsed from and including such date to but excluding the date on which the amount is received by the Agent from such Lender and the denominator of which is 365 or 366 days, as the case may be, in the case of all Advances. A certificate of the Agent containing details of the amount owing by a Lender under this Section shall be binding and conclusive in the absence of manifest error. If any such amount is not in fact received by the Agent from such Lender on such date, the Agent shall be entitled to recover from the applicable Borrower, on demand, the related amount made available by the Agent to such Borrower as aforesaid together with interest thereon at the applicable rate per annum payable by such Borrower hereunder.

11.4.2    Notwithstanding the provisions of Section 11.4.1, if any Lender fails to make available to the Agent its Proportionate Share of any Advance, which for greater certainty includes a deemed Advance hereunder (such Lender being herein called the "**Non-Paying Lender**"), the Agent shall forthwith give notice of such failure by the Non-Paying Lender

to the applicable Borrower (except where such failure relates to a deemed Advance) and to the other Lenders. The Agent shall then forthwith give notice to the other Lenders that any Lender may make available to the Agent all or any portion of the Non-Paying Lender's Proportionate Share of such Advance (but in no way shall any other Lender or the Agent be obliged to do so) in the place of the Non-Paying Lender. If more than one Lender gives notice that it is prepared to make funds available in the place of a Non-Paying Lender in such circumstances and the aggregate of the funds which such Lenders (herein collectively called the "**Contributing Lenders**" and individually called the "**Contributing Lender**") are prepared to make available exceeds the amount of the Advance which the Non-Paying Lender failed to make, then each Contributing Lender shall be deemed to have given notice that it is prepared to make available its Proportionate Share of such Advance based on the Contributing Lenders' relative commitments to advance in such circumstances. If any Contributing Lender makes funds available in the place of a Non-Paying Lender in such circumstances, then the Non-Paying Lender shall pay to any Contributing Lender making the funds available in its place, forthwith on demand, any amount advanced on its behalf together with interest thereon at the rate applicable to such Advance from the date of advance to the date of payment, against payment by the Contributing Lender making the funds available of all interest received in respect of the Advance from the applicable Borrower. The failure of any Lender to make available to the Agent its Proportionate Share of any Advance as required herein shall not relieve any other Lender of its obligations to make available to the Agent its Proportionate Share of any Advance as required herein.

**11.5    Defaulting Lenders and Replacement of Lenders**

11.5.1    Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    the standby fees payable to a Defaulting Lender hereunder shall cease to accrue on the unused portion of its Commitment under any Operating Facility, as applicable;

(b)    a Defaulting Lender shall not be included in determining whether, and the Commitment and the Proportionate Share of the Outstanding Advances of such Defaulting Lender under the Facilities, or any of them, shall not be included in determining whether, all Lenders or the Required Lenders, have taken or may take any action hereunder; provided, that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects such Defaulting Lender differently than other affected Lenders shall require the consent of such Defaulting Lender;

(c)    subject to Section 11.4.1, for the purposes of any Advance requested hereunder while there is a Defaulting Lender, each Lender's Proportionate Share thereof shall be calculated based on such Lender's (A) Commitment relative to the total Commitment under the applicable Facility reduced by the Commitment of the Defaulting Lender;

(d)     the Agent, the Swingline Lender or the Issuing Bank may require such Defaulting Lender to pay to the Agent for deposit into an escrow account maintained by and in the name of the Agent an amount equal to such Defaulting Lender's maximum contingent obligations hereunder to the Agent, the Swingline Lender or the Issuing Bank, as the case may be (provided that the foregoing shall not apply to Export Development Canada to the extent such a deposit is unlawful under the *Financial Administration Act* (Canada));

(e)     the Agent may withhold any payments owing to such Defaulting Lender for set off against such Defaulting Lender's existing or reasonably foreseeable future obligations hereunder; and

(f)     for the avoidance of doubt, the Borrowers shall retain and reserve their other rights and remedies respecting each Defaulting Lender.

11.5.2   If a Lender is a Defaulting Lender or refuses to give timely consent to an amendment, modification or waiver of this Agreement that, pursuant to Section 11.2, requires consent of all the Lenders (and the consent of the Required Lenders has been given with respect thereto) (a "**Non-Consenting Lender**") (collectively, the "**Departing Lenders**"), then the Borrowers may:

(a)     replace the Departing Lender with another financial institution acceptable to the Agent, the Swingline Lender and the Issuing Bank, each acting reasonably, who purchases at par, or such lower price as the Departing Lender may agree in its sole discretion, the Outstanding Advances and other amounts under all Facilities owing to the Departing Lender and such Lender's entire Commitment and assumes the Departing Lender's Commitment and all other obligations of the Departing Lender hereunder; <u>provided</u>, that prior to or concurrently with such replacement:

  (i)     the Departing Lender shall have received payment in full of all principal, interest, fees and other amounts through such date of replacement and a release from any further obligations to make Advances under the Credit Documents after the date of such replacement;

  (ii)    the assignment fee required to be paid by Section 13.6.2 shall have been paid to the Agent;

  (iii)   all of the other requirements for such assignment contained herein shall have been satisfied, including the consent of the Agent, the Swingline Lender and the Issuing Bank and the receipt by the Agent of such agreements, documents and instruments as the Agent may reasonably require; and

  (iv)    in the case of a Departing Lender who is a Non-Consenting Lender, each assignee consents, at the time of such assignment, to each matter in respect of which such Non-Consenting Lender was a Non-Consenting Lender and

the Borrowers also requires each other Lender that is a Non-Consenting Lender to assign the Outstanding Advances owing to it under each Facility and its Commitment; or

(b)     <u>provided</u>, no Default or Event of Default exists at such time, elect to terminate the Departing Lender's Commitment, in which case the Commitment in respect of each Facility shall be reduced by an amount equal to the amount of any Commitment of such Facility so cancelled (<u>provided</u>, that prior to or concurrently with such cancellation the Departing Lender shall have received payment in full of all principal, interest, fees and other amounts through such date of cancellation (including breakage and other costs in accordance with Sections 5.10.4 and 5.14) and a release from any further obligations to make Advances under the Credit Documents after such termination); or

(c)     exercise any combination of the rights under (a) and (b) above; <u>provided</u>, that in each case, each Departing Lender is treated ratably with the other Departing Lenders, if any.

## 11.6     Security and Exercise of Remedies

11.6.1    Except to the extent provided in Section 11.6.2, the Security shall be granted in favour of and held by the Agent for and on behalf of the Lenders in accordance with the provisions of this Agreement. The Agent shall, in accordance with its usual practices in effect from time to time, take all steps required to perfect and maintain the Security to the extent required hereunder, including: taking possession of the certificates representing the securities required to be pledged hereunder to the extent required hereunder; filing renewals and change notices in respect of such Security; and ensuring that the name of the Agent is noted as loss payee or mortgagee on all property insurance policies covering the Collateral. If the Agent becomes aware of any matter concerning the Security which it considers to be material, it shall promptly inform the Lenders. The Agent shall comply with all instructions provided by the Lenders or the Required Lenders, as the case may be, in connection with the enforcement or release of the Security which it holds. The Agent agrees to permit each Lender to review and make photocopies of the original documents comprising the Security from time to time upon reasonable notice. The Agent is hereby authorized to enter into the Subordination Agreement on behalf of the Lenders and to any subordination and postponement agreements in respect of Subordinated Debt from time to time to the extent the same is permitted hereunder. Each Lender further authorizes the Agent to execute on its behalf, directly or through attorneys-in-fact duly appointed for such purposes, and to accept the benefits of, each of the Security governed under the laws of the Republic of Colombia and any other agreements or documents as may be necessary or advisable in connection with the grant of, or attachment or perfection of, modification, supplement or waiver under any of, the security interest granted to the Agent, for the benefit of the Lenders, pursuant to the Security governed under the laws of the Republic of Colombia. The Lenders and the other Secured Parties authorize the Agent to release any Collateral or Guarantors in accordance with Section 13.21 or if approved, authorized or ratified in accordance with Section 11.2.1. The Lenders and the other Secured Parties hereby irrevocably authorize and instruct the Agent to, without any further consent of any

Lender, enter into (or acknowledge and consent to) or amend, renew, extend, supplement, restate, replace, waive or otherwise modify the Encina Intercreditor Agreement and the Wells Fargo Letter to the extent this Agreement does not otherwise require the consent of the Required Lenders or all Lenders therefor.

11.6.2    If any Credit Party has provided security in favour of any Lender directly, except for Permitted Purchase-Money Security Interests and Permitted Liens, such Lender agrees to pay to the Agent all amounts received by it in connection with the enforcement of such security, and all such amounts shall be deemed to constitute Proceeds of Realization and shall be dealt with as provided in Section 11.7.

11.6.3    Except as otherwise provided herein, each Lender hereby acknowledges that, to the extent permitted by Applicable Law, rights and remedies provided under the Credit Documents to the Lenders are for the benefit of the Lenders collectively and not severally and further acknowledges that its rights and remedies thereunder are to be exercised not severally but collectively through the Agent upon the decision of the Lenders (with the required majority or unanimity as herein provided), regardless of whether acceleration of Obligations hereunder was made, and accordingly, notwithstanding any of the provisions contained herein, each of the Lenders hereby covenants and agrees that it will not be entitled to take any action with respect to the Facilities, including any acceleration of Obligations thereunder, but that any such action will be taken only by the Agent with the prior written direction of the Lenders (with the required majority or unanimity as herein provided). Notwithstanding the foregoing or anything else set forth herein to the contrary, in the absence of written instructions from the Lenders, and where in the sole opinion of the Agent the exigencies of the situation warrant such action, the Agent may without notice to or consent of the Lenders take such action on behalf of the Lenders as it deems appropriate or desirable in the circumstances. Each of the Lenders hereby covenants and agrees that it has not heretofore and will not seek, take, accept or receive any Liens in respect of any of the Obligations of the Credit Parties under the Credit Documents and will not enter into any agreement with any of the Parties relating in any manner whatsoever to the Facilities, unless all of the Lenders under the Facilities will at the same time obtain the benefit of any such security or agreement, as the case may be.

**11.7    Application of Proceeds of Realization**

Notwithstanding any other provision of this Agreement, the Proceeds of Realization of the Security or any portion thereof shall be distributed in the following order:

(a)    firstly, in payment of all costs and expenses incurred by the Agent and the Lenders in connection with such realization, including legal, accounting and receivers' fees and disbursements;

(b)    secondly, against the Obligations (including Secured Hedging Liabilities but excluding any other Hedging Liabilities in excess thereof, and, for certainty, excluding any Hedging Liabilities which are owed to a counterparty other than a Lender or Affiliate thereof), each Lender being entitled to receive its Proportionate Share thereof;

(c)     thirdly, against all Hedging Liabilities which are owing to any Lender or Affiliate thereof in excess of Secured Hedging Liabilities; and

(d)     fourthly, if all Obligations of the Borrowers listed above and all other Hedging Liabilities owing to any Lender or Affiliate thereof have been paid and satisfied in full, any surplus Proceeds of Realization shall be paid in accordance with Applicable Law.

## 11.8   Payments by Agent

11.8.1   The following provisions shall apply to all payments made by the Agent to the Lenders hereunder:

(a)     the Agent shall be under no obligation to make any payment (whether in respect of principal, Interest, fees or otherwise) to any Lender until an amount in respect of such payment has been received by the Agent from a Credit Party;

(b)     if the Agent receives a payment of principal, Interest, fees or other amount owing by any Borrower under a Facility which is less than the full amount of any such payment due, the Agent shall distribute such amount received among the Lenders under such Facility in each Lender's Proportionate Share of such Facility;

(c)     if the Agent receives payments in respect of principal, Interest, fees or other amounts owing by a Borrower under more than one Facility which are due on the same day, and if the amounts received are insufficient to satisfy all payments required under such Facilities on such day, the Agent shall, except as otherwise specifically set forth herein, distribute such amounts received among the Lenders under such Facilities in each Lender's Proportionate Share of such Facilities;

(d)     if any Lender has advanced more or less than its Proportionate Share of its Commitment under a Facility, such Lender's entitlement to such payment shall be increased or reduced, as the case may be, in proportion to the amount actually advanced by such Lender;

(e)     if a Lender's Proportionate Share of an Advance under a Facility has been advanced for less than the full period to which any payment by any Credit Party relates, such Lender's entitlement to receive a portion of any payment of interest or fees shall be reduced in proportion to the length of time such Lender's Proportionate Share has actually been outstanding;

(f)     the Agent acting reasonably and in good faith shall, after consultation with the Lenders in the case of any dispute, determine in all cases the amount of all payments to which each Lender is entitled and such determination shall be deemed to be *prima facie* correct;

(g)     upon request by a Lender, the Agent shall deliver a statement detailing any of the payments to the Lenders referred to herein;

(h)     all payments by the Agent to a Lender hereunder shall be made to such Lender at its address set out herein unless notice to the contrary is received by the Agent from such Lender; and

(i)     if the Agent has received a payment from a Credit Party on a Business Day (not later than the time required for the receipt of such payment as set out in this Agreement) and fails to remit such payment to any Lender entitled to receive its Proportionate Share of such payment on such Business Day, the Agent agrees to pay interest on such late payment at a rate determined by the Agent in accordance with prevailing banking industry practice on interbank compensation.

11.8.2    Each Borrower hereby irrevocably authorizes the Agent to debit any account maintained by it with the Agent after written notice to such Borrower in order to make payments to the Lenders or the Agent of any amount that is overdue and payable hereunder for the purposes of satisfying payment thereof.

11.8.3    The Agent may in its discretion from time to time make adjustments in respect of any Lender's share of an Advance, Conversion, Rollover or Repayment under a Facility in order that the Outstanding Advances due to such Lender under such Facility shall be approximately in accordance with such Lender's Proportionate Share of the Facility.

## 11.9    Redistribution of Payment

Each Lender agrees that, subject to Section 10.4:

(a)     If it exercises any right of counterclaim, set off, bankers' lien or similar right with respect to any property of any Credit Party or if under Applicable Law it receives a secured claim, it will apportion the amount thereof proportionately between:

(i)     amounts outstanding at the time owed by the Credit Party to such Lender under this Agreement, which amounts will be applied in accordance with this Section 11.9; and

(ii)    amounts otherwise owed to it by a Credit Party;

provided, that any cash collateral account held by such Lender as collateral for a letter of credit or bankers' acceptance (including a Bankers' Acceptance) issued or accepted by such Lender on behalf of a Credit Party may be applied by such Lender to such amounts owed by such Credit Party to such Lender pursuant to such letter of credit or in respect of any such bankers' acceptance without apportionment.

(b)     If it receives, through the exercise of a right or the receipt of a secured claim described in Section 11.9(a) or otherwise, payment of a proportion of the aggregate amount of principal, interest and fees due to it hereunder which is greater than the proportion received by any other Lender in respect of the aggregate amount of principal, interest and fees due in respect of the applicable

Facility (having regard to the respective proportionate amounts advanced as Advances by each of the Lenders under the applicable Facility), the Lender receiving such proportionately greater payment will purchase a participation (which will be deemed to have been done simultaneously with receipt of such payment) in that portion of the applicable Facility of the other Lenders so that their respective receipts will be *pro rata* to their respective Proportionate Shares; provided, however, that, if all or part of such proportionately greater payment received by such purchasing Lender is otherwise recovered by it, such purchase will be rescinded and the purchase price for such participation will be returned to the extent of such recovery, but without interest. Such Lender will exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this Section 11.9 to share in the benefits of any recovery on such secured claims.

(c)     If it does any act or thing permitted by Section 11.9(a) or 11.9(b), it will promptly provide full particulars thereof to the Agent.

(d)     Except as permitted under Section 11.9(a) or 11.9(b), no Lender will be entitled to exercise any right of counter claim, set off, bankers' lien or similar right without the prior written consent of the other Lenders.

(e)     Notwithstanding anything else in this Section 11.9, any amounts which are lawfully received by any Hedge Provider in respect of Hedging Liabilities prior to the delivery by the Agent of a declaration of all Obligations becoming due pursuant to Section 11.9 are not required to be shared pursuant to the provisions of this Section 11.9.

(f)     The provisions of this Section 11.9 shall survive repayment of the Obligations.

## 11.10   Protection of Agent

11.10.1  Unless the Agent has actual knowledge or actual notice to the contrary, it may assume that each Lender's address set out in Exhibit "A" attached hereto is correct, unless and until it has received from such Lender a notice designating a different address.

11.10.2  The Agent may engage and pay for the advice or services of any lawyers, accountants or other experts whose advice or services may to it seem necessary, expedient or desirable and rely upon any advice so obtained (and to the extent that such costs are not recovered from the Credit Parties pursuant to this Agreement, each Lender agrees to reimburse the Agent in such Lender's Proportionate Share of such costs).

11.10.3  Unless the Agent has actual knowledge or actual notice to the contrary, it may rely as to matters of fact which might reasonably be expected to be within the knowledge of any Credit Party upon a statement contained in any Credit Document.

11.10.4  Unless the Agent has actual knowledge or actual notice to the contrary, it may rely upon any communication or document believed by it to be genuine.

11.10.5  The Agent may refrain from exercising any right, power or discretion vested in it under this Agreement unless and until instructed by the Required Lenders as to whether or not such right, power or discretion is to be exercised and, if it is to be exercised, as to the manner in which it should be exercised (provided, that such instructions shall be required to be provided by all of the Lenders in respect of any matter for which the unanimous consent of the Lenders is required as set out herein).

11.10.6  The Agent may refrain from exercising any right, power or discretion vested in it which would or might in its sole and unfettered opinion be contrary to any law of any jurisdiction or any directive or otherwise render it liable to any Person, and may do anything which is in its opinion in its sole discretion necessary to comply with any such law or directive.

11.10.7  The Agent may delegate to such other Person, such duties and responsibilities of the Agent hereunder as it shall determine to be appropriate in respect of dealings with or relating to any Credit Party or any other Person and in particular, the Agent may execute any of its duties under this Agreement or any other Credit Document (including, for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security or of exercising any rights and remedies thereunder) by sub-agent or attorney-in-fact. The Agent shall not be responsible for the negligence or misconduct of any sub-agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct on the part of the Agent, as determined by a final and non-appealable judgment of a court of competent jurisdiction. The exculpatory provisions of this Agreement applicable to the Agent shall apply to any such other Person, sub-agent or attorney-in-fact and to the Affiliates of the Agent and any such sub-agent or attorney-in-fact, and shall apply to their respective activities in connection with the syndication of the Facilities as well as activities as Agent.

11.10.8  The Agent may refrain from acting in accordance with any instructions of the Required Lenders to begin any legal action or proceeding arising out of or in connection with this Agreement or take any steps to enforce or realize upon any Security, until it shall have received such security as it may reasonably require (whether by way of payment in advance or otherwise) against all costs, claims, expenses (including legal fees) and liabilities which it will or may expend or incur in complying with such instructions.

11.10.9  The Agent shall not be bound to disclose to any Person any information relating to the Credit Parties or any Related Parties if such disclosure would or might in its opinion in its sole discretion constitute a breach of any law or regulation or be otherwise actionable at the suit of any Person.

11.10.10 The Agent shall not accept any responsibility for the accuracy or completeness of any information supplied in connection herewith or for the legality, validity, effectiveness, adequacy or enforceability of any Credit Document and shall not be under any liability to any Lender as a result of taking or omitting to take any action in relation to any Credit Document except in the case of the Agent's gross negligence or wilful misconduct.

**11.11   Duties of Agent**

The Agent shall:

(a)     hold and maintain the Security to the extent provided in Section 11.6;

(b)     provide to each Lender copies of all financial information received from the Credit Parties promptly after receipt thereof, and copies of any Drawdown Requests, Conversion Notices, Rollover Notices, Repayment Notices and other notices received by the Agent from the Credit Parties upon request by any Lender;

(c)     promptly advise each Lender of Advances required to be made by it hereunder and disburse all Repayments to the Lenders hereunder in accordance with the terms of this Agreement;

(d)     promptly notify each Lender of the occurrence of any Default or Event of Default of which the Agent has actual knowledge or actual notice;

(e)     at the time of engaging any agent, receiver, receiver-manager, consultant, monitor or other party in connection with the Security or the enforcement thereof, obtain the agreement of such party to comply with the applicable terms of this Agreement in carrying out any such enforcement activities and dealing with any Proceeds of Realization;

(f)     account for any monies received by it in connection with this Agreement, the Security and any other agreement delivered in connection herewith or therewith;

(g)     each time a Borrower requests the written consent of the Lenders in connection with any matter, use its best efforts to obtain and communicate to the Borrowers the response of the Lenders in a reasonably prompt and timely manner having due regard to the nature and circumstances of the request;

(h)     give written notice to the Borrowers in respect of any other matter in respect of which notice is required in accordance with or pursuant to this Agreement, promptly or promptly after receiving the consent of the Required Lenders, if required under the terms of this Agreement;

(i)     except as otherwise provided in this Agreement, act in accordance with any instructions given to it by the Required Lenders;

(j)     if so instructed by the Required Lenders, refrain from exercising any right, power or discretion vested in it under this Agreement or any document incidental thereto; and

(k)     call a meeting of the Lenders at any time not earlier than five days and not later than 30 days after receipt of a written request for a meeting provided by any Lender.

**11.12   Lenders' Obligations Several; No Partnership**

The obligations of each Lender under this Agreement are several. The failure of any Lender to carry out its obligations hereunder shall not relieve the other Lenders of any of their respective obligations hereunder. No Lender shall be responsible for the obligations of any other Lender hereunder. Neither the entering into of this Agreement nor the completion of any transactions contemplated herein shall constitute the Lenders and the Agent, or any combination of them, a partnership or give rise to any fiduciary relationship between them.

**11.13   Reliance Upon Agent**

The Borrowers will be entitled to rely upon any certificate, notice or other document or other advice, statement or instruction provided to them (or any one of them) by the Agent pursuant to the Credit Documents, and the Borrowers will be entitled to deal with the Agent with respect to matters under the Credit Documents which the Agent is authorized hereunder to deal with, without any obligation whatsoever to satisfy themselves as to the authority of the Agent to act on behalf of the Lenders and without any liability whatsoever to the Lenders for relying upon any certificate, notice or other document or other advice, statement or instruction provided to them by the Agent, notwithstanding any lack of authority of the Agent to provide the same.

**11.14   No Liability of Agent**

The Agent, in its capacity as agent of the Lenders under the Credit Documents, will have no responsibility or liability to the Borrowers or the Lenders on account of the failure of any Lender to perform its obligations hereunder, or to any Lender on account of the failure of any Borrower to perform its obligations under the Credit Documents.

**11.15   Agent and Agent Authority**

With respect to its Proportionate Share of each Facility and the Advances made by it as a Lender thereunder, as applicable, the Agent will have the same rights and powers under the Credit Documents as any other Lender and may exercise the same as though it were not the Agent. The Agent may accept deposits from, lend money to, and generally engage in any kind of business with any Credit Party, any of their Subsidiaries, their respective shareholders or unitholders or any Person owned or controlled by any of them and any Person which may do business with any of them, all as if the Agent was not serving as Agent, and without any duty or obligation to account therefor to the Lenders.

**11.16   Lenders' Credit Decisions**

It is understood and agreed by each Lender that it has itself been, and will continue to be, solely responsible for making its own independent appraisal of and investigations into the financial condition, creditworthiness, condition, affairs, status and nature of the Credit Parties. Accordingly, each Lender confirms with the Agent that it has not relied, and will not hereafter rely, on the Agent (a) to check or inquire on its behalf into the adequacy, accuracy or completeness of any information provided by the Credit Parties or any other Person under or in connection with the Facilities (whether or not such information has been or is hereafter distributed to such Lender by the Agent) or (b) to assess or keep under review on its behalf the

financial condition, creditworthiness, condition, affairs, status or nature of any Credit Party. Each Lender acknowledges that copies of the Credit Documents have been made available to it for review and each Lender acknowledges that it is satisfied with the form and substance of the Credit Documents. A Lender will not make any independent arrangement with any Credit Party for the satisfaction of any Obligations owing to it under the Credit Documents without the written consent of the other Lenders.

## 11.17   Indemnification

The Lenders hereby severally agree to indemnify the Agent and its directors, officers, agents and employees (to the extent not reimbursed by the Credit Parties) in accordance with their respective Proportionate Share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent or its directors, officers, agents and employees in any way relating to or arising out of the Credit Documents or any action taken or omitted by the Agent under or in respect of the Credit Documents in its capacity as Agent; provided, that no Lender will be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross negligence or wilful misconduct, as determined by a final and non-appealable judgment of a court of component jurisdiction. Without limiting the generality of the foregoing, each Lender agrees to reimburse the Agent promptly upon demand for its Proportionate Share of any reasonable out of pocket expenses (including legal fees, on a solicitor and his own client full indemnity basis) incurred by the Agent in connection with the preservation of any right of the Agent or the Lenders under, or the enforcement of, or legal advice in respect of rights or responsibilities under, the Credit Documents, to the extent that the Agent is not reimbursed for such expenses by the Borrowers. This indemnity will survive the termination of the other provisions of this Agreement as a separate and continuing covenant of the Lenders.

## 11.18   Successor Agent

The Agent may, as hereinafter provided, resign at any time by giving 30 days' notice (the "**Resignation Notice**") thereof to the Lenders and the Borrowers. The remaining Lenders, with the consent of the Borrowers, such consent not to be unreasonably withheld, will forthwith upon receipt of the Resignation Notice unanimously appoint a successor agent (the "**Successor Agent**") to assume the duties hereunder of the resigning Agent. Upon the acceptance of any appointment as agent hereunder by a Successor Agent, such Successor Agent will thereupon succeed to and become vested with all the rights, powers, privileges and duties as agent under the Credit Documents of the resigning Agent. Upon such acceptance, the resigning Agent will be discharged from its further duties and obligations as agent under the Credit Documents, but any such resignation will not affect such resigning Agent's obligations hereunder as a Lender, including for its Proportionate Share of the applicable Commitment. After the resignation of the Agent as agent hereunder, the provisions of this Article 11 will continue to enure to its benefit as to any actions taken or omitted to be taken by it while it was the agent of the Lenders hereunder. Notwithstanding the foregoing, if the remaining Lenders fail to appoint a Successor Agent within 30 days of receipt of the Resignation Notice, the resigning Agent may, with the approval of the Borrowers except during the continuance of an Event of Default, such approval not to be

unreasonably withheld, appoint a Successor Agent from among the Lenders (other than Business Development Bank of Canada).

## 11.19   Sharing of Information

The Agent and the Lenders may share among themselves any information they may have from time to time concerning the Credit Parties whether or not such information is confidential; but shall have no obligation to do so (except for any obligations of the Agent to provide information to the extent required in this Agreement). The Agent shall not have any duty to disclose any information obtained or received by it or any of its Affiliates relating to any Credit Party or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as the Agent.

## 11.20   Acknowledgement by Borrowers

Each Borrower hereby acknowledges notice of the terms of the provisions of this Article 11 and agrees to be bound hereby to the extent of its obligations hereunder, and further agrees not to make any payments, take any action or omit to take any action which would result in the non-compliance by the Agent or any Lender with its obligations hereunder.

## 11.21   Amendments to Article 11

The Agent and the Lenders may amend any provision in this Article 11 (other than Section 11.5) without prior notice to or the consent of the Borrowers, and the Agent shall provide a copy of any such amendment to the Borrowers reasonably promptly thereafter; provided, however, if, in the Agent's opinion, any such amendment would materially and adversely affect any rights, entitlements, obligations or liabilities of any Borrower, such amendment shall not be effective until such Borrower provides its written consent thereto, such consent not to be unreasonably withheld or arbitrarily delayed.

## 11.22   Deliveries, etc.

As between the Credit Parties on the one hand, and the Agent and the Lenders on the other hand:

(a)    all statements, certificates, consents and other documents which the Agent purports to deliver to a Credit Party on behalf of the Lenders shall be binding on each of the Lenders, and none of the Credit Parties shall be required to ascertain or confirm the authority of the Agent in delivering such documents;

(b)    all certificates, statements, notices and other documents which are delivered by a Credit Party to the Agent in accordance with this Agreement shall be deemed to have been duly delivered to each of the Lenders; and

(c)    all payments which are delivered by a Credit Party to the Agent in accordance with this Agreement shall be deemed to have been duly delivered to each of the Lenders.

**11.23   Agency Fee**

The Borrowers jointly and severally agree to pay to the Agent an annual agency fee as set out in the Fee Agreement, payable in advance on the Amendment and Restatement Date and annually on each anniversary date thereafter during the term of this Agreement.

## ARTICLE 12
## INCREASED COSTS

**12.1   Changes in Law**

12.1.1   If, after the Amendment and Restatement Date, due to either:

(a)     the introduction of, or any change in, any Law or any change in the interpretation of any Law, whether having the force of law or not, resulting in the imposition or increase of reserves, deposits or similar requirements by any central bank or Governmental Authority charged with the administration thereof; or

(b)     imposition of any Lender or requirements on any Lender to maintain any capital adequacy or additional capital liquidity requirements in respect of any Advances or Commitments hereunder, or any other condition with respect to this Agreement; or

(c)     the compliance with any guideline or request from any central bank or other Governmental Authority which a Lender, acting reasonably, determines that it is required to comply with,

there will be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining an Advance or there will be any reduction in the effective return to such Lender thereunder, then, subject to Section 12.1.2, the Borrowers jointly and severally agree that they will, within ten Business Days after being notified by such Lender of such event, pay to such Lender, quarterly in arrears, that amount (the "**Additional Compensation**") which such Lender, acting reasonably, determines will compensate it, after taking into account all applicable Taxes and all interest and other amounts received, for any such increased costs or reduced returns incurred or suffered by such Lender provided such Lender is also charging its other borrowers in similar circumstances similar additional compensation.

12.1.2   If Additional Compensation is payable pursuant to Section 12.1.1(a), the Borrowers will have the option to convert the Advance to another type of Advance, in accordance with this Agreement, in respect of which no further such Additional Compensation will be payable, or prepay any amount of the Facility owed to the Lender entitled to receive the Additional Compensation, subject always to Section 5.13 without obligation to make a corresponding prepayment to any other Lender. If the Additional Compensation relates to outstanding Bankers' Acceptances, such Lender may require the Borrowers to deposit in an interest bearing cash collateral account with such Lender such amount as may be necessary to fully satisfy the contingent obligations of such Lender for

all outstanding Bankers' Acceptances in accordance with the arrangements similar to those set out in Section 5.11.

12.1.3    Notwithstanding anything contained in this Section 12.1, the *Dodd-Frank Wall Street Reform and Consumer Protection Act* and all requests, rules, regulations, guidelines and directives thereunder or issued in connection therewith and all requests, rules, regulations, guidelines and directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority or any United States, Canadian or foreign regulatory authority) (collectively, the "**New Rules**") shall, in each case, be deemed a "change in Law" under Section 12.1.1(a) regardless of the date enacted, adopted or issued.

## 12.2    Changes in Circumstances

Notwithstanding anything to the contrary herein or in any of the other Credit Documents contained, if on any date a Lender determines, acting reasonably and in good faith, which determination will be conclusive and binding on the Parties, and provided notice is given to the Agent and the other Lenders and to the Borrowers that its ability to maintain, or continue to offer any Advance has become unlawful or impossible due to:

(a)    any change in Applicable Law, or in the interpretation or administration thereof by Governmental Authorities having jurisdiction in the matter; or

(b)    any Material Adverse Change in or the termination of the London Interbank Eurodollar Market for Eurodollars; or

(c)    the imposition of any condition, restriction or limitation upon such Lender which is outside of its control,

then in any such case, the Borrowers jointly and severally agree that they will forthwith repay to such Lender all principal amounts affected thereby, together with all unpaid interest accrued thereon to the date of Repayment and all other expenses incurred in connection with the termination of any such Advance, including any expenses resulting from the early termination of any LIBOR Period relating thereto in accordance with Section 5.13, without any obligation to make a corresponding prepayment to any other Lender. The Borrowers may utilize other forms of Advance not so affected in order to make any required Repayment and after any such Repayment, the Borrowers may elect to re-borrow the amount repaid by way of some other Advance upon complying with applicable requirements thereof.

## 12.3    Application of Sections 12.1 and 12.2

If a Lender exercises its discretion under either Section 12.1 or 12.2, then concurrently with a notice from such Lender to the Agent and the applicable Borrower requiring compliance with the applicable Section, such Lender will provide such Borrower (with a copy to the Agent who will notify the other Lenders) with a certificate in reasonable detail outlining the particulars giving rise to such notice and certifying (with reasonable supporting detail) the increased costs, if any, payable by such Borrower thereunder, which will be prima facie evidence thereof and binding on the Parties.

**12.4    Taxes**

12.4.1    Except as provided in this Section 12.4, any and all payments by the Borrowers and any other Credit Party to or for the account of the Agent or any Lender under any Credit Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges imposed by any Governmental Authority, and all liabilities (including additions to tax, penalties and interest) related thereto (collectively, "**Impositions**"), excluding, in the case of the Agent and each Lender or other recipient or beneficial owner of payment to be made by or on account of a Credit Party under any Credit Document, (x) any Impositions imposed on or measured by its net income (including any taxes similar to branch profits tax or capital, and franchise (and similar) taxes imposed on it in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the Laws of which the Agent or such Lender, as the case may be, is organized, resident, in which its principal office is located, in which it maintains its Lending Office or in which it is subject to such Imposition by reason of a present or former connection between it and such jurisdiction (other than a connection arising solely from the Agent or such Lender (or its applicable Lending Office) as the case may be, becoming a party hereto, having executed, delivered or performed its obligations under any Credit Document, received a payment under, enforced its rights under, received or perfected a security interest under, or engaged in any other transaction pursuant to, a Credit Document), and all interest and penalties with respect thereto; (y) U.S. and Canadian federal withholding taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 12.4.6) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to this Section, amounts with respect to such withholding taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office; and (z)(i) U.S. federal withholding taxes imposed under FATCA, (ii) taxes attributable to such recipient's or beneficial owner's failure to comply with the applicable reporting requirements of FATCA, and (iii) taxes attributable to such recipient's or beneficial owner's failure to provide such documentation as is reasonably requested by the Borrower for the Borrower to comply with its obligations under FATCA and to determine that such recipient or beneficial owner has complied with such recipient's or beneficial owner's obligations under FATCA or to determine the amount to deduct and withhold from any payment to such recipient or beneficial owner (all such non-excluded Impositions being hereinafter referred to as "**Taxes**" and all such excluded Impositions being hereinafter referred to as "**Excluded Taxes**"). If any Credit Party or any other applicable withholding agent shall be required by the Applicable Laws of a relevant taxing jurisdiction to deduct any Taxes or Other Taxes from or in respect of any sum payable under any Credit Document to the Agent or any Lender, (i) the sum payable shall be increased by the applicable Credit Party as necessary so that after all required deductions (including deductions applicable to additional sums payable under this Section 12.4) have been made, each of the Agent and such Lender receives an amount equal to the sum it would have received had only deductions attributable to Excluded Taxes been

made, (ii) the applicable withholding agent shall make such deductions, (iii) the applicable withholding agent shall pay the full amount deducted to the relevant taxation authority or other Governmental Authority in accordance with Applicable Laws, and (iv) within thirty (30) days after the date of such payment, the Credit Party making such payments shall furnish to the Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Agent.

12.4.2    In addition but without duplication, the Borrowers agree to pay any and all present or future stamp, court or documentary taxes and any other excise, property, intangible or mortgage recording taxes, charges or similar levies imposed by a relevant taxing jurisdiction which arise from any payment made under any Credit Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Credit Document (hereinafter referred to as "**Other Taxes**").

12.4.3    Each Borrower agrees to indemnify the Agent and each Lender for (i) the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed or asserted by any Governmental Authority of any relevant taxing jurisdiction on amounts payable under this Section 12.4) paid by the Agent and such Lender, and (ii) any reasonable expenses arising therefrom or with respect thereto, in each case whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided the Agent or Lender, as the case may be, provides the Borrowers with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts. Payment under this Section 12.4.3 shall be made within thirty (30) days after the date such Lender or the Agent makes a written demand therefor.

12.4.4    Notwithstanding anything herein to the contrary, each Borrower shall not be required pursuant to this Section 12.4 to pay any additional amount to, or to indemnify, any Lender or the Agent, as the case may be, (i) to the extent that such Lender or the Agent becomes subject to Taxes subsequent to the Amendment and Restatement Date (or, if later, the date such Lender or the Agent becomes a party to this Agreement) as a result of a change in the place of organization or residence of such Lender or the Agent, a change in the Lending Office of such Lender, or a change in the principal office of such Lender or the Agent, except to the extent that any such change is requested or required by the Borrowers or to the extent that such Lender or the Agent was entitled, at the time of the change in place of organization, residence or the change in Lending Office, to receive additional amounts from the Borrowers pursuant to Sections 12.4.1 and 12.4.3 (and provided, that nothing in this Section 12.4 shall be construed as relieving the Borrowers from any obligation to make such payments or indemnification in the event of a change in Applicable Law) or (ii) where for Canadian income tax purposes, such Lender or the Agent, as the case may be, becomes subject to Taxes as a consequence of such Lender or the Agent either not dealing at arm's length with the Borrowers (for purposes of the *Income Tax Act* (Canada)) or being, or not dealing at arm's length with (for purposes of the I*ncome Tax Act* (Canada) a "specified shareholder" (for purposes of the *Income Tax Act* (Canada)) of the Borrower; <u>provided</u>, that this subclause (ii) shall not apply to the extent that such Lender or the Agent, as the case may be, is considered to have not dealt

at arm's length with the Borrowers for Canadian income tax purposes as a result of a change in Applicable Law after the Amendment and Restatement Date.

12.4.5   If any Lender or the Agent determines in its sole discretion (exercised in good faith) that it has received a refund in respect of any Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by the Borrowers pursuant to this Section 12.4, it shall promptly remit such refund (including any interest included in such refund paid by the relevant Governmental Authority) to the Borrowers, net of all out-of-pocket expenses (including any taxes imposed with respect to such refund) of the Lender or the Agent, as the case may be; provided, however, that the Borrowers, upon the request of the Lender or the Agent, as the case may be, agree promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such party in the event such party is required to repay such refund to the relevant taxing authority. Such Lender or the Agent, as the case may be, shall, at the Borrowers' request, provide the Borrowers with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (provided, that such Lender or the Agent may delete any information therein that such Lender or the Agent deems confidential). Notwithstanding anything to the contrary in this Section 12.4.5, in no event will a Lender be required to pay any amount to the Borrowers pursuant to this Section 12.4.5 the payment of which would place such Lender in a less favorable net after-tax position than such Lender would have been in if the Taxes or Other Taxes subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Taxes or Other Taxes had never been paid. Nothing herein contained shall interfere with the right of a Lender or the Agent to arrange its tax affairs in whatever manner it thinks fit nor oblige any Lender or the Agent to disclose any information relating to its tax affairs or any computations in respect thereof or require any Lender or the Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

12.4.6   Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 12.4.1 and 12.4.3 with respect to such Lender it will, if requested by the Borrowers, use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to avoid or reduce to the greatest extent possible any indemnification or additional amounts being due under this Section 12.4, including to designate another Lending Office for any Loan (including, for certainty, any Letter of Credit) affected by such event; provided, that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage, and provided, further, that nothing in this Section 12.4.6 shall affect or postpone any of the Obligations of the Borrowers or the rights of such Lender pursuant to Sections 12.4.1 and 12.4.3. The Borrowers hereby jointly and severally agree to pay all reasonable costs and expenses incurred by any Lender as a result of a request by the Borrowers under this Section 12.4.6.

# ARTICLE 13
# GENERAL

**13.1    Non-Disclosure**

13.1.1    All information received by the Agent and the Lenders from or in respect of the Credit Parties the confidential nature of which is made known or ought to have been known to the Party receiving such information, including any information relating to a Hostile Acquisition, other than information that is required to be disclosed by Applicable Law (including, for certainty, information required to be disclosed in connection with any legal proceedings, including proceedings relating to the Credit Documents) or to any Governmental Authority of competent jurisdiction, including any central bank or other banking regulatory authority and any official bank examiners or regulators, will be held by the Parties in the strictest confidence and will not be disclosed to any Person, except as provided in this Section 13.1.

13.1.2    Section 13.1.1 does not apply to information:

(a)    of a Party where that Party consents in writing to its disclosure;

(b)    which becomes part of the public domain through no fault of the Agent or the Lenders;

(c)    received from a third party without restriction on further disclosure and which third party was not to the knowledge of the Agent or such Lender, under a duty of confidentiality to the applicable Credit Party at the time the information was so received;

(d)    developed independently without breach of Section 13.1;

(e)    which the Agent or the relevant Lender can show was, prior to receipt thereof from a Credit Party, lawfully in the Agent's or Lender's possession and not then subject to any obligation on its part to the Credit Parties to maintain confidentiality; or

(f)    to the extent required to be disclosed by order or direction of a court or Governmental Authority of competent jurisdiction (including any self-regulatory authority, such as the National Association of Insurance Commissioners) or as other required to be disclosed by Applicable Law or by any subpoena or similar legal process.

13.1.3    Information received by the Agent or a Lender may be disclosed to their respective Affiliates, Hedge Providers, the Agent or any other Lender or Participant, including any financial institution which desires to become a Lender or Participant hereunder, any actual or prospective counterparty (or its advisors) to any securitization, swap or derivative transaction relating to a Borrower or any other Credit Party, and the Obligations and to their respective employees, auditors, accountants, legal counsel, geologists, engineers and other consultants and financial advisors retained by such

Persons on a need to know basis and subject to the obligation to maintain confidentiality; provided, that the Agent or Lender providing the information shall be responsible for any breach by its Affiliate of the aforementioned duty of confidentiality.

## 13.2   Waiver

The failure or delay by the Agent or any Lender in exercising any right or privilege with respect to the non-compliance with any provisions of this Agreement by the Borrower and any course of action on the part of the Agent or any Lender, shall not operate as a waiver of any rights of the Agent or such Lender unless made in writing by the Agent or such Lender. Any such waiver in writing and shall be effective only in the specific instance and for the purpose for which it is given and shall not constitute a waiver of any other rights and remedies of the Agent or such Lender with respect to any other or future non-compliance.

## 13.3   Governing Law

This Agreement shall be interpreted in accordance with the Laws of the Province of Alberta and the federal Laws of Canada applicable therein. Without prejudice to the right of the Agent and the Lenders to commence any proceedings with respect to this Agreement in any other proper jurisdiction, the Parties hereby attorn and submit to the non-exclusive jurisdiction of the courts of the Province of Alberta.

## 13.4   Judgment Currency

To the extent permitted by Applicable Law, if for the purposes of obtaining judgment against any Credit Party in any court in any jurisdiction with respect to this Agreement it becomes necessary for a Lender to convert into the currency of such jurisdiction (in this Section called the "**Judgment Currency**") any amount due to the Lender by such Credit Party under the Credit Documents in any currency other than the Judgment Currency, the conversion shall be made at the Exchange Rate prevailing on the Business Day before the day on which judgment is given. To the extent permitted by Applicable Law, in the event that there is a change in the Exchange Rate prevailing between the Business Day before the day on which the judgment is given and the date of payment of the amount due, the applicable Credit Party will, on the date of payment, pay such additional amounts (if any) or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount paid on such date is the amount in the Judgment Currency which when converted at the Exchange Rate prevailing on the date of payment is the amount then due under this Agreement in such other currency. To the extent permitted by Applicable Law, any additional amount due by a Credit Party under this Section will be due as a separate debt and shall not be affected by judgment being obtained for any other sums due under or in respect of this Agreement.

## 13.5   Expenses of Agent and Lenders

Whether or not the transactions contemplated by this Agreement are completed or any Advance has been made, each Borrower hereby agrees, jointly and severally, to promptly pay, following receipt of invoice therefor from the Agent (and in any event within 30 days after receipt thereof), from time to time all reasonable and documented expenses incurred by the

Agent or any Lender in connection with this Agreement, the Security and all documents contemplated hereby, specifically including: expenses incurred by the Lenders in respect of due diligence, appraisals, insurance consultations, credit reporting and responding to demands of any Governmental Authority (provided, that reimbursement obligations in respect of costs and expenses arising under inspection rights set forth in Section 7.1.7 shall be limited in the manner set forth in such Section); reasonable out-of-pocket legal expenses in connection with the preparation and interpretation of this Agreement and the other Credit Documents, the registration and perfection of the Security and the administration of the Facilities generally, including the preparation of waivers and partial discharges of Security (if there are any additional fees or expenses to be incurred in connection with any of the foregoing over and above those that have already been disclosed to the Borrowers then the Agent agrees to notify the Borrowers of those additional fees or expenses and obtain their concurrence to their payment); and all legal fees and expenses (on a solicitor and his own client basis) in connection with the protection and enforcement of the Security and the exercise of any rights and remedies of the Agent and the Lenders under the Credit Documents. Each Borrower hereby authorizes the Agent to debit its account in order to pay any such expenses if such amount is not paid in full within 30 days after receipt of a written request from the Agent for payment of such amount.

## 13.6    Assignment

13.6.1    This Agreement and the rights and obligations hereunder will not be assignable, in whole or in part, by any Borrower without the prior written consent of all of the Lenders.

13.6.2    Each Lender will have the right to sell or assign its Commitment in minimum amounts of U.S. $5,000,000 (with such Lender, where such sale or assignment is not of all of such Lender's Commitment under the applicable Facility, retaining a Commitment under the applicable Facility of at least U.S. $5,000,000), together with a proportionate share of Outstanding Advances owing to it, to one or more financial institutions with the consent of the Canadian Borrower, the Agent, the Issuing Bank and the Swingline Lender each such consent not to be unreasonably withheld (provided, that the Canadian Borrower may withhold such consent if a Borrower would be required to pay withholding taxes solely as a result of such assignment). An assignment fee of U.S. $3,500 for each such assignment will be payable to the Agent by the assigning Lender. In the event of such sale or assignment, the Borrowers, the Agent and the other Lenders will execute and deliver all such agreements, documents and instruments as the Agent or Lender may reasonably request to effect and recognize such sale or assignment, including an Assignment. Notwithstanding the foregoing, no consent of the Canadian Borrower will be required if an assignment (a) occurs during an Event of Default which is continuing, (b) is made between financial institutions who, at the relevant time, are already Lenders or Affiliates thereof, or (c) is made by a Lender to an Approved Fund. In the event that the Canadian Borrower fails to provide a response to the request for any such consent within five Business Days of the receipt of such request by the Canadian Borrower, the Canadian Borrower shall be deemed to have consented to such request. No consent to an assignment by a Lender shall be required from the U.S. Borrower. Notwithstanding the foregoing, no Lender may assign all or any part of its Commitment or Outstanding

Advances to Palladium, an Investor or an Affiliate thereof without the prior written consent of all of the Lenders.

13.6.3    To the extent that any Lender sells or assigns any portion of its Commitment and Outstanding Advances pursuant to this Section 13.6 and such new Lender or new Lenders, as the case may be, has executed and delivered to the Borrower and the Agent an Assignment, such Lender will be relieved and forever discharged of any and all of its covenants and obligations under the Credit Documents in respect of that portion of its Commitment and Outstanding Advances so sold or assigned from and after the date of such Assignment and the Borrower's recourse under the Credit Documents in respect of such portion so sold or assigned from and after the date of the Assignment for matters arising thereunder from and after the date of the Assignment will be to such new Lender or new Lenders only, as the case may be, and their successors and permitted assigns.

13.6.4    Any Lender may at any time sell to one or more financial institutions or other Persons (each of such financial institutions and other Persons being herein called a "**Participant**") participating interests in any of the Advances, commitments, or other interests of such Lender hereunder, without notice to, or consent from, the Agent or the Borrowers; provided, however, that:

(a)     no participation contemplated in this Section 13.6.4 will relieve such Lender from its commitments or its other obligations hereunder or under any other Credit Document;

(b)     such Lender will remain solely responsible for the performance of its commitments and such other obligations as if such participation had not taken place;

(c)     the Agent will continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and each of the other Credit Documents;

(d)     no Participant will have any rights (through a right of consent or approval or otherwise) to require such Lender to take or refrain from taking any action hereunder or under any other Credit Document;

(e)     no Borrower will be required to pay any amount hereunder that is greater than the amount which it would have been required to pay had no participating interest been sold; and

(f)     in the case of any outstanding Bankers' Acceptances, the Participants execute an indemnity agreement in respect of such Bankers' Acceptances.

Each U.S. Operating Lender that sells a participation shall, acting solely for this purpose as an agent of the U.S. Borrower, maintain a register on which it enters the name and address of each Participant in the U.S. Operating Facility and the principal amounts (and stated interest) of each Participant's interest in the Commitments, Outstanding Advances or other obligations under the Credit Documents (the "**Participant Register**"); provided

that no U.S. Operating Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under the Credit Documents) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such U.S. Operating Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

13.6.5    The Agent, acting solely for this purpose as an agent of the U.S. Borrower, shall maintain at its office located at 452 Fifth Avenue, 5th Floor, New York, NY 10018, a copy of each Assignment delivered to it and a register for the recordation of the names and addresses of the U.S. Operating Lenders, and the Commitments of, and principal amounts (and stated interest) of the Outstanding Advances owing to, each U.S. Operating Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agent and the U.S. Operating Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a U.S. Operating Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrowers and any U.S. Operating Lender, at any reasonable time and from time to time upon reasonable prior notice.

## 13.7    General Indemnity

In addition to any liability of the Borrowers to the Lenders under any other provision hereof, each Borrower will and does hereby, jointly and severally, indemnify each Indemnitee and hold each Indemnitee harmless against any losses, claims, costs, damages or liabilities (including reasonable and documented out of pocket expenses and reasonable and documented legal fees on a solicitor and his own client full indemnity basis of one counsel (but, for the avoidance of doubt, excluding the allocated costs of in-house counsel) plus one local counsel in each applicable jurisdiction) incurred by the same as a result of or in connection with: (a) any cost or expense incurred by reason of the liquidation or re-deployment in whole or in part of deposits or other funds required by any Lender to fund any Bankers' Acceptance or to fund or maintain any Advance as a result of any Borrower's failure to complete an Advance or to make any payment, repayment or prepayment on the date required hereunder or specified by it in any notice given hereunder; (b) subject to permitted or deemed Rollovers and Conversions, any Borrower's failure to provide for the payment to the Agent for the account of the Lenders of the full principal amount of each Bankers' Acceptance on its Maturity Date; (c) any Borrower's failure to pay any other amount, including any interest or fees, due hereunder on its due date after the expiration of any applicable grace or notice periods; (d) the prepayment of any outstanding Bankers' Acceptance before the Maturity Date of such Bankers' Acceptance; (e) any Borrower's repayment or prepayment of a LIBOR Loan otherwise than on the last day of its LIBOR Period; (f) the failure of any Borrower or any other Credit Party to make any other payment due

hereunder or under any of the other Credit Documents; (g) the occurrence of any other Default or Event of Default and the enforcement of rights and remedies in connection therewith; (h) any instructions given to any Lender to stop payment on any cheque issued by any Borrower or to reverse any wire transfer or other transaction initiated by such Lender at the request of any Borrower; (i) any use of the proceeds of the Facilities, including to pay the purchase price of the transaction or any other acquisition; and (j) any claim, litigation or other proceeding related to the foregoing, regardless of whether such matter is initiated by a third party or by Holdco, a Borrower or any of their Subsidiaries or Affiliates; provided that this Section 13.7 will not apply to any losses, claims, costs, damages or liabilities that arise by reason of (i) the gross negligence or wilful misconduct of the applicable Indemnitee claiming indemnity hereunder, as determined by a final and non-appealable judgment of a court of component jurisdiction; or (ii) a material breach of the applicable Indemnitee of its obligations under the Credit Documents as determined by a final and non-appealable judgment of a court of competent jurisdiction.

## 13.8    Environmental Indemnity

In addition to any other liability of the Borrowers hereunder, each Borrower hereby agrees to, jointly and severally, indemnify and save harmless the Indemnitees from and against:

(a)    any losses suffered by them for, in connection with, or as a direct or indirect result of, the failure of any Borrower or any of their respective Subsidiaries to comply with all Requirements of Environmental Law;

(b)    any losses suffered by the Indemnitees for, in connection with, or as a direct or indirect result of, the presence of any Hazardous Material situated in, on or under any property owned by any Borrower or any of their respective Subsidiaries or upon which any of them carries on business, specifically including any diminution in value of the business, property and assets of such Person; and

(c)    any and all liabilities, losses, damages, penalties, expenses (including reasonable legal fees) and claims which may be paid, incurred or asserted against the Indemnitees for, in connection with, or as a direct or indirect result of, any legal or administrative proceedings with respect to the presence of any Hazardous Material on or under any property owned by any Borrower or any of its respective Subsidiaries or upon which any of them carries on business, or the discharge, emission, spill, radiation or disposal by any Borrower or any of their respective Subsidiaries of any Hazardous Material into or upon any Land, the atmosphere, or any watercourse or body of water; including the costs of defending, counterclaiming or claiming against third parties in respect of any action or matter and any cost, liability or damage arising out of a settlement entered into by the Indemnitees of any such action or matter,

except to the extent arising from the gross negligence or wilful misconduct of the applicable Indemnitee, as determined by a final and non-appealable judgment of a court of component jurisdiction. For the purpose of this Section 13.8, liabilities means those amounts that are quantifiable and found to be the responsibility of the Indemnitees either alone or jointly or severally with others.

**13.9      Survival of Certain Obligations despite Termination of Agreement**

The termination of this Agreement shall not relieve the Borrowers from their obligations to the Agent and the Lenders arising prior to such termination, such as obligations arising as a result of or in connection with any breach of this Agreement, any failure to comply with this Agreement or the inaccuracy of any representations and warranties made or deemed to have been made prior to such termination, and obligations arising pursuant to all indemnity obligations contained herein. Without limiting the generality of the foregoing, the obligations of the Borrowers to the Agent and the Lenders arising under or in connection with Sections 8.5(b), 13.7 and 13.8 shall continue in full force and effect despite any termination of this Agreement.

**13.10     Interest on Unpaid Costs and Expenses**

If a Borrower fails to pay when due any amount in respect of costs or expenses or any other amount required to be paid by it hereunder (other than principal or interest on any Advance), the Borrowers shall, jointly and severally, pay interest on such unpaid amount from the time such amount is due until paid at the rate equal to the highest rate of interest then applicable under the Facilities.

**13.11     Notice**

Without prejudice to any other method of giving notice, all communications provided for or permitted hereunder shall be in writing and delivered to the addressee by prepaid private courier or sent by facsimile to the applicable address and to the attention of the officer of the addressee as follows:

(a)      to the Borrowers:

Q'Max Solutions Inc.
11700 Katy Freeway, Suite 200
Houston Texas 77079
United States

<u>Attention</u>:      Chief Financial Officer
Fax No.          (832) 201-8146

(b)      to the Agent:

HSBC Bank Canada, as Agent
7th Floor, 70 York Street
Toronto, Ontario
M5J 1S9

<u>Attention</u>:      Manager Agency
Fax No.          (647) 788-2185

with a copy to (for all notices other than Drawdown Requests, Conversion Notices and Rollover Notices):

HSBC Bank Canada
5th Floor, 70 York Street
Toronto, Ontario
M5J 1S9

<u>Attention</u>:    Director
Fax No.    (647) 788-2185

(c)    to any Lender, at its addressed noted on Exhibit "A" attached hereto.

Any communication transmitted by prepaid private courier shall be deemed to have been validly and effectively given or delivered on the Business Day after which it is submitted for delivery. Any communication transmitted by facsimile shall be deemed to have been validly and effectively given or delivered on the day on which it is transmitted, if transmitted on a Business Day on or before 5:00 p.m. (local time of the intended recipient), and otherwise on the next following Business Day. Any party may change its address for service or other notices, including electronic communications, by notice given in the foregoing manner. The Parties each covenant to accept service of judicial proceedings arising under the Credit Documents at its respective address set forth herein.

## 13.12   Telephone Instructions

Any verbal instructions given by a Borrower in relation to this Agreement will be at the risk of the Borrowers and neither the Agent nor the Lenders will have any liability for any error or omission in such verbal instructions or in the interpretation or execution thereof by the Agent or a Lender, as the case may be; <u>provided</u>, that the Agent or Lender, as the case may be, acted without gross negligence in the circumstances. The Agent will notify the applicable Borrower of any conflict or inconsistency between any written confirmation of such verbal instructions received from such Borrower and the said verbal advice as soon as practicable after the conflict or inconsistency becomes apparent to the Agent.

## 13.13   Severability

Any provision of this Agreement which is illegal, prohibited or unenforceable in any jurisdiction, in whole or in part, shall not invalidate the remaining provisions hereof; and any such illegality, prohibition or unenforceability in any such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

## 13.14   Further Assurances

Each Borrower shall, at its expense, promptly execute and deliver or cause to be executed and delivered to the Agent upon request, acting reasonably, from time to time all such other and further documents, agreements, opinions, certificates and instruments in compliance with this Agreement, or if necessary or desirable to more fully record or evidence the obligations intended to be entered into herein, or to make any recording, file any notice or obtain any consent.

## 13.15   Tombstone Marketing

For the purpose of "tombstone marketing", each Borrower hereby authorizes and consents to the reproduction, disclosure and use by the Lenders and the Agent of its name, identifying logo and the Facilities to enable the Lenders to publish promotional "tombstones". Each Borrower acknowledges and agrees: that the Lenders shall be entitled to determine, in their discretion, whether to use such information; that no compensation will be payable by the Lenders or the Agent in connection therewith; and that the Lenders and the Agent shall have no liability whatsoever to any Borrower or any of its respective employees, officers, directors, Affiliates or shareholders in obtaining and using such information as contemplated herein.

## 13.16   Entire Agreement

This Agreement supersedes all discussion papers, term sheets and other writings issued by the Agent or the Lenders prior to the date hereof relating to the Facilities; and this Agreement and any other documents or instruments contemplated herein or therein shall constitute the entire agreement and understanding among the Borrowers, the Lenders and the Agent relating to the subject-matter hereof.

## 13.17   Anti-Money Laundering Legislation

(a)     Each Borrower acknowledges that, pursuant to the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" Laws, whether within Canada or elsewhere (collectively, including any guidelines or orders thereunder, "**AML Legislation**"), the Lenders and the Agent may be required to obtain, verify and record information regarding the Borrowers, Palladium, the other Credit Parties, their respective directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Credit Parties or Palladium, and the transactions contemplated hereby. The Borrowers shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Lender or the Agent, or any prospective assignee of a Lender or the Agent, in order to comply with any applicable AML Legislation, whether now or hereafter in existence.

(b)     If, upon the written request of any Lender, the Agent has ascertained the identity of a Borrower, Palladium or any Credit Party or any authorized signatories of any Borrower or any other Credit Party for the purposes of applicable AML Legislation on such Lender's behalf, then the Agent:

(i)      shall be deemed to have done so as an agent for such Lender, and this Agreement shall constitute a "written agreement" in such regard between such Lender and the Agent within the meaning of applicable AML Legislation; and

(ii)   shall provide to such Lender copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness.

(c)   Notwithstanding the preceding sentence, each of the Lenders agrees that the Agent has no obligation to ascertain the identity of the Borrowers, Palladium or any other Credit Party or any authorized signatories of the Borrowers, Palladium or any other Credit Party, on behalf of any Lender, or to confirm the completeness or accuracy of any information it obtains from the Borrowers, Palladium or any other Credit Party or any such authorized signatory in doing so.

(d)   Each Lender that is subject to the PATRIOT Act and the Agent (for itself and not on behalf of any Lender) hereby notifies the Credit Parties that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Credit Parties, which information includes the name, address and tax identification number of the Credit Parties and other information regarding the Credit Parties that will allow such Lender or the Agent, as applicable, to identify the Credit Parties in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to the Lenders and the Agent.

## 13.18   Binding Effect

This Agreement shall be binding upon and shall enure to the benefit of the Parties and their respective successors and permitted assigns; "successors" includes any corporation resulting from the amalgamation of any party with any other corporation.

## 13.19   Execution by Electronic Means and Counterparts

This Agreement may be executed in several counterparts, each of which, when so executed, shall be deemed to be an original and which counterparts together shall constitute one and the same Agreement. This Agreement may be executed by facsimile, pdf or other electronic means, and any signature contained hereon by facsimile, pdf or other electronic means shall be deemed to be equivalent to an original signature for all purposes.

## 13.20   Intercreditor Agreement

In the event of a conflict between the provisions of this Agreement and the provisions of the Encina Intercreditor Agreement, the provisions of the Encina Intercreditor Agreement shall govern.

## 13.21   Release of Liens and Guarantees.

(a)   The Agent shall not, during the term of this Agreement, discharge, surrender, amend or otherwise modify any Security without the prior written consent of all of the Lenders, provided that the Agent may accept additional or supplemental Security as provided in the Credit Documents, and shall discharge Security provided hereunder in the Permitted Discretion of the Agent with respect to any

Permitted Disposition or, if applicable, any other transaction permitted by this Agreement in respect of which the Agent has received, upon its reasonable request, an officer's certificate of the Canadian Borrower certifying that such disposition or other transaction is permitted by this Agreement, together with any other information from the Canadian Borrower reasonably required by the Agent, if any (and the Agent may rely conclusively on a certificate to that effect provided to it by the Canadian Borrower without further inquiry).

(b)     The Lenders hereby authorize the Agent, and the Agent hereby agrees, to:

    (i)     discharge the Security at the Borrower's sole cost and expense, forthwith after all of the Obligations under the Credit Documents (other than contingent obligations intended to survive payout of the Facilities) have been unconditionally and irrevocably paid or performed in full and the Facilities, Credit Documents and all Hedging Agreements have been terminated or, with respect to the Hedging Agreements, collateralized to the satisfaction of the Agent and the applicable Hedge Providers, acting reasonably; and

    (ii)     at the request of the Borrower and upon receipt of the Agent of an officer's certificate from a senior officer of the Borrower certifying that such disposition is a Permitted Disposition, to discharge that portion of the Security that applies to the property subject to such Permitted Disposition or execute a no interest letter or similar document in connection therewith.

(c)     As of the Amendment and Restatement Date, the Agent and other Secured Parties hereby release each of (x) QMax Ecuador S.A. and (y) Mud Movers Express LLC as Guarantors, hereby confirm that all such Subsidiaries' Obligations are discharged, in each case, whether now existing or hereafter arising and whether or not matured or contingent, and that the Security granted by such Subsidiaries to the Agent is deemed to be released.

Annex I

**Amended and Restated Commitments**

[see attached.]

## EXHIBIT "A" TO THE Q'MAX SECOND AMENDED AND RESTATED CREDIT AGREEMENT - LENDERS AND LENDERS' COMMITMENTS

*All amounts in U.S. $

| Lender | Total | Swing Line | Syndicated |
|---|---|---|---|
| **CANADIAN OPERATING FACILITY COMMITMENTS** | | | |
| HSBC Bank Canada | 46,018,072.00 | 10,000,000 | 36,018,072 |
| Bank of Montreal | 39,307,284.00 | N/A | 39,307,284 |
| Export Development Canada | 25,332,809.00 | N/A | 25,332,809 |
| Business Development Canada | 9,023,306.00 | N/A | 9,023,306 |
| **Total** | 119,681,471.00 | 10,000,000 | 109,681,471 |
| | | | |

| Lender | Term Facility |
|---|---|
| **TERM FACILITY COMMITMENTS** | |
| HSBC Bank Canada | 6,014,774.28 |
| Bank of Montreal | 3,357,083.44 |
| Business Development Canada | 699,392.28 |
| **Total** | 10,071,250.00 |

| Lender | Total |
|---|---|
| **U.S. OPERATING FACILITY COMMITMENTS** | |
| HSBC Bank USA, N.A. | 15,000,000.00 |
| **Total** | 15,000,000.00 |

| Lender | Total |
|---|---|
| **TOTAL COMMITMENT – ALL FACILITIES** | |
| HSBC Bank Canada | 52,032,846.28 |
| HSBC Bank USA, N. A. | 15,000,000.00 |
| Bank of Montreal | 42,664,367.44 |
| Export Development Canada | 25,332,809.00 |
| Business Development Canada | 9,722,698.28 |
| **Total** | 144,752,721.00 |

**Lenders and Addresses for Service:**

(a)     HSBC Bank Canada
        9th Floor, 407-8th Avenue S.W.
        Calgary, Alberta T2P 1E5
        Attn:  Senior Corporate Banking Manager
        Fax:   (403) 693-8556

(b)     HSBC Bank USA
        6363 N. State Highway 161, Suite 125
        Irving, Texas 75039
        Attn:  Senior Corporate Banking Manager
        Fax:   (972) 367-1050

(c)     Bank of Montreal
        6th Floor, 595 Burrard Street
        Vancouver, British Colombia V7X 1L7
        Attn:   Director
        Fax:    (403) 234-1688

(d)     Export Development Canada
        150 Slater Street
        Ottawa, Ontario K1A 1K3
        Attn:   Senior Asset Manager
        Fax:    (613) 598-3186

(f)     Business Development Bank of Canada
        110, 444 – 7th Avenue S.W.
        Calgary, AB T2P 0X8
        Attn:   Scott Overes or Bobby Chan
        Fax:    (403) 292-6951


BA Lenders:             HSBC Bank Canada
                        Bank of Montreal

Non-BA Lenders:         Export Development Canada
                        Business Development Bank of Canada

THIS IS EXHIBIT " 6 "
referred to in the Affidavit of

Cameron Bailey

Sworn before me this 26th

day of May A.D. 20 20

Jonathan Tomm
Barrister and Solicitor

## THIRD AMENDING AGREEMENT

**THIS THIRD AMENDING AGREEMENT** (this "**Agreement**") is made effective as of September 6, 2019 (the "**Third Amendment Date**"),

**BETWEEN:**

### Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC.
as Borrowers

and

### QMAX CANADA OPERATIONS INC.
as Specified Canadian Swingline Borrower

and

### THE PERSONS PARTY HERETO FROM TIME TO TIME
### IN THEIR CAPACITIES AS LENDERS
as Lenders

and

### HSBC BANK CANADA
as Administrative Agent

**PREAMBLE**:

A.    Pursuant to the second amended and restated credit agreement dated as of July 31, 2018, by and between Q'Max Solutions Inc., Q'Max America Inc., QMax Canada Operations Inc. (collectively, the "**Borrowers**"), the Agent and the Lenders from time to time party thereto (as amended by that certain First Amending Agreement, dated as of May 13, 2019, a Second Amending Agreement, dated as of July 22, 2019, and as further amended from time to time, the "**Credit Agreement**"), the Agent and the Lenders agreed to provide the Facilities to the Borrowers.

B.    The parties hereto wish to otherwise amend the Credit Agreement on the terms and conditions herein provided.

**AGREEMENT**:

In consideration of the premises, the covenants and the agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged between the parties, the parties hereto agree on the Third Amendment Date as follows:

1.    **Definitions**. Capitalized terms used in this Third Amending Agreement will, unless otherwise defined herein, have the meanings attributed to such terms in the Credit Agreement, as amended hereby.

2.     **Amendments**.

With effect upon the satisfaction of the conditions precedent set forth in Section 4 hereof, the Credit Agreement is hereby amended with the stricken text deleted (indicated textually in the same manner as the following example: ~~stricken text~~) and with the double-underlined text added (indicated textually in the same manner as the following example: <u>double-underlined text</u>) as set forth in the pages of the Credit Agreement attached as <u>Exhibit A</u> hereto.

3.     **Representations and Warranties**. Each Borrower agrees with and confirms to the Agent and the Lenders that as of the Third Amendment Date, after giving effect to this Agreement, each of the representations and warranties contained in Section 6.1 of the Credit Agreement is true and accurate in all material respects (without duplication of any materiality qualifier contained in any such representations and warranties) except to the extent such representation and warranty expressly relates to an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date. Further, each Borrower hereby represents and warrants to the Agent and the Lenders that:

(a)     the execution and delivery of this Agreement and the performance by it of its obligations under this Agreement (i) are within its corporate powers, (ii) have been duly authorized by all necessary corporate action, (iii) have received all necessary governmental approvals (if any required), and (iv) do not and will not contravene or conflict with any provision of Applicable Law or of its constating documents or by-laws; and

(b)     the Credit Agreement, as amended by this Agreement is a legal, valid and binding obligation of it, enforceable in accordance with its terms except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, winding-up, moratorium or similar Applicable Law relating to the enforcement of creditors' rights generally and by general principles of equity.

4.     **Conditions Precedent**. This Agreement is only effective upon the satisfaction of the following conditions precedent:

(a)     The Administrative Agent shall have received a counterpart of this Agreement signed on behalf of each Credit Party party hereto, the Administrative Agent, and the Required Lenders party to the Credit Agreement as of the Third Amendment Date;

(b)     Receipt by the Agent of:

(i)     evidence that the existing Wells Fargo Credit Agreement will be: (A) repaid in full with the initial advance under the Encina ABL Loan Agreement; and (B) terminated immediately following such repayment;

(ii)     duly executed copies of the Encina ABL Loan Agreement and the Encina Intercreditor Agreement, each in form and substance satisfactory to the Required Lenders, acting reasonably;

(iii)     a certificate of status, certificate of compliance or similar certificate for each Borrower issued by its governing jurisdiction;

3

(iv)    an amendment fee equal to $5,000 for each Lender that consents to the amendments set forth herein.

5.    **Continuing Effect**. Each of the parties hereto acknowledges and agrees that the Credit Agreement, as amended by this Agreement and all other documents entered into in connection therewith, will be and continue in full force and effect and are hereby confirmed and the rights and obligations of all parties thereunder will not be effected or prejudiced in any manner by this Agreement except as specifically provided herein. In addition, each Borrower acknowledges that the Security previously granted to the Agent by each Credit Party under or in connection with the Credit Agreement continues in full force and effect without in any way impairing or derogating from any of the guarantees, indemnities, mortgages, pledges, charges, assignments, security interests and covenants therein contained or thereby constituted, as continuing security for all indebtedness, liabilities and other obligations owing by the Borrowers under the Credit Agreement, as amended by this Agreement.

6.    **Further Assurance**. Each Borrower will from time to time forthwith at the Agent's request and at the Borrowers' own cost and expense make, execute and deliver, or cause to be done, made, executed and delivered, all such further documents, financing statements, assignments, acts, matters and things which may be reasonably required by the Agent and as are consistent with the intention of the parties as evidenced herein, with respect to all matters arising under the Credit Agreement and this Agreement.

7.    **Expenses**. Each Borrower will be liable jointly and severally for all expenses of the Agent, including, without limitation, reasonable documented and out-of-pocket legal fees (on a solicitor and his own client full indemnity basis) and other out-of-pocket expenses in connection with the negotiation, preparation, establishment, operation or enforcement of the Facilities and of this Agreement (whether or not consummated) by the Agent and the Lenders.

8.    **Governing Law**. This Agreement will be governed by and construed in accordance with the laws in force in the Province of Alberta from time to time.

9.    **Counterparts**. This Agreement may be executed in any number of counterparts (including by facsimile or pdf transmission), each of which when executed and delivered will be deemed to be an original, but all of which when taken together constitutes one and the same instrument. Any party hereto may execute this Agreement by signing any counterpart.

*[signature pages follow]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the Third Amendment Date.

**Q'MAX SOLUTIONS INC.**, as Canadian Borrower

By: _____

     Name:  Christopher Rivers
     Title:    President and Chief Executive Officer

**Q'MAX AMERICA INC.**, as U.S. Borrower

By: _____

     Name:  Christopher Rivers
     Title:    President and Chief Executive Officer

**QMAX CANADA OPERATIONS INC.**, as Specified Canadian Swingline Borrower

By: _____

     Name:  Christopher Rivers
     Title:    President and Chief Executive Officer

**HSBC BANK CANADA**, as Agent

By: _____
Name: CHRISTINE STOELMAN
Title: AUTHORIZED SIGNATORY

By: _____
Name: PHILIP ALLEN
Title: Authorized Signatory

[Third Amending Agreement – Q'Max]

**HSBC BANK CANADA,** in its capacity as the
Parent Facility Agent

By: _____

Name: Christine Strachan   *PHILIP ALLEN*

Title: Authorized Signatory   *Authorized Signatory*

**HSBC BANK CANADA**, as Lender

By: _____
    Name:
    Title:

John Schmidt
Assistant Vice President
Energy Financing

By: _____
    Name:
    Title:

Ryan Smith
Assistant Vice President,
Energy Financing

**BANK OF MONTREAL**, as Lender

By: _____
Name: Connor Irving
Title: Director

By: _____
Name:
Title:

[Third Amending Agreement – Q'Max]

**EXPORT DEVELOPMENT CANADA**, as Lender

By: _____

Name:  Philip Sauvé
Title:   Financing Manager

By: _____

Name:  Chris Wilson
Title:   Sr. Financing Manager

**BUSINESS DEVELOPMENT BANK OF
CANADA**, as Lender

By: _____
    Name: Brad Wagner
    Title: Director, BRU

By: _____
    Name:
    Title: Mark Kearl
           AVP, Business Restructuring

[Third Amending Agreement – Q'Max]

**HSBC BANK USA, NATIONAL ASSOCIATION,**
as Lender

By: _____

    Name: John G. Tierney

    Title: Senior Vice President

By: _____

    Name:

    Title:

<u>Exhibit A</u>

**Conformed Copy of Credit Agreement**

**Exhibit A to Third Amending Agreement**

*Conformed Credit Agreement reflecting the Third Amending Agreement, dated as of September 6, 2019*

# SECOND AMENDED AND RESTATED
# CREDIT AGREEMENT

Among

## Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC.
as Borrowers

and

## QMAX CANADA OPERATIONS INC.
as Specified Canadian Swingline Borrower

and

## THE PERSONS PARTY HERETO FROM TIME TO TIME
## IN THEIR CAPACITIES AS LENDERS
as Lenders

and

## HSBC BANK CANADA
as Administrative Agent

and with

## HSBC BANK CANADA
as Sole Lead Arranger, Bookrunner, Syndication Agent
and Documentation Agent

**Dated as of July 31, 2018**

# TABLE OF CONTENTS

Page

**ARTICLE 1 INTERPRETATION**..................................................................... 2

| | | |
|---|---|---|
| 1.1 | Definitions | 2 |
| 1.2 | Accounting Principles | 61 |
| 1.3 | Currency References | 61 |
| 1.4 | References to Statutes | 61 |
| 1.5 | Extended Meanings | 62 |
| 1.6 | Headings | 62 |
| 1.7 | Subdivisions | 62 |
| 1.8 | Number | 62 |
| 1.9 | Time | 62 |
| 1.10 | Amendments | 62 |
| 1.11 | No Waiver | 62 |
| 1.12 | Inconsistency | 63 |
| 1.13 | Pro Forma Adjustments | 63 |
| 1.14 | Joint and Several Liability of Borrowers | 63 |
| 1.15 | Deemed Action by all Borrowers | 64 |
| 1.16 | Amendment and Restatement | 64 |
| 1.17 | Exhibits and Schedules | 64 |
| 1.18 | Covenant Relief Period | 65 |

**ARTICLE 2 CANADIAN OPERATING FACILITY**......................................... 66

| | | |
|---|---|---|
| 2.1 | Establishment of Canadian Operating Facility | 66 |
| 2.2 | Purpose | 66 |
| 2.3 | Revolving Nature | 66 |
| 2.4 | Repayment | 66 |
| 2.5 | Availment Options | 66 |
| 2.6 | Interest and Fees | 67 |
| 2.7 | Swingline | 69 |

**ARTICLE 3 TERM FACILITY**.......................................................................... 75

| | | |
|---|---|---|
| 3.1 | Establishment of the Term Facility | 75 |
| 3.2 | Purpose | 75 |
| 3.3 | Nature | 75 |
| 3.4 | Repayment | 75 |
| 3.5 | Availment Options | 76 |
| 3.6 | Interest and Fees | 76 |

**ARTICLE 4 U.S. OPERATING FACILITY**...................................................... 77

| | | |
|---|---|---|
| 4.1 | Establishment of U.S. Operating Facility | 77 |
| 4.2 | Purpose | 78 |
| 4.3 | Revolving Nature | 78 |
| 4.4 | Repayment | 78 |
| 4.5 | Availment Options | 78 |

**TABLE OF CONTENTS**
(continued)

Page

4.6     Interest and Fees ................................................................................... 79
4.7     Letters of Credit .................................................................................... 80

**ARTICLE 5 GENERAL CONDITIONS ............................................................. 81**

5.1     Matters relating to Interest and Fees .................................................... 81
5.2     Voluntary Prepayments ......................................................................... 84
5.3     Mandatory Prepayments ....................................................................... 84
5.4     Notice Periods ....................................................................................... 87
5.5     Minimum Amounts, Multiples and Procedures re Advances, Conversions
        and Repayments .................................................................................... 88
5.6     Place of Advances and Repayments ...................................................... 89
5.7     Evidence of Obligations (Noteless Advances) ..................................... 90
5.8     Determination of Equivalent Amounts ................................................. 90
5.9     Commitment to Purchase Bankers' Acceptances and BA Equivalent Loans ...... 91
5.10    Special Provisions Regarding Bankers' Acceptances ........................... 91
5.11    Escrowed Funds ..................................................................................... 93
5.12    Special Provisions regarding BA Equivalent Loans ............................. 93
5.13    Special Provisions Regarding LIBOR Loans ........................................ 94
5.14    Breakage Costs ...................................................................................... 95
5.15    Inability to Make LIBOR Loans ........................................................... 95
5.16    Special Provisions Regarding Letters of Credit .................................... 97
5.17    Eligible Approved Contracts ............................................................... 100

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES .............................. 100**

6.1     Representations and Warranties .......................................................... 100
6.2     Acknowledgement and Deemed Repetition ........................................ 108
6.3     Survival of Representations and Warranties ....................................... 108

**ARTICLE 7 COVENANTS ............................................................................... 109**

7.1     Positive Covenants .............................................................................. 109
7.2     Negative Covenants ............................................................................ 113
7.3     Financial Covenants ............................................................................ 121
7.4     Reporting Requirements ...................................................................... 122
7.5     Designation of Unrestricted Subsidiaries ........................................... 125
7.6     Securitization SPE .............................................................................. 126

**ARTICLE 8 SECURITY .................................................................................... 126**

8.1     Security ................................................................................................ 126
8.2     General Provisions re Security; Registration ...................................... 128
8.3     Opinions re Security ............................................................................ 128
8.4     After-Acquired Property, Further Assurances ..................................... 128
8.5     Security for Swap Documents with Former Lenders ........................... 129
8.6     Insurance Proceeds .............................................................................. 129

- ii -

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 8.7 | Qualified ECP Guarantor Keepwell | 129 |
| 8.8 | Additional Release by Lender | 130 |
| 8.9 | Security Principles Affecting Certain Subsidiaries | 130 |

**ARTICLE 9 CONDITIONS PRECEDENT** ... **131**

| | | |
|---|---|---|
| 9.1 | Conditions Precedent to Agreement | 131 |
| 9.2 | Conditions Precedent to all Advances | 133 |

**ARTICLE 10 DEFAULT AND REMEDIES** ... **134**

| | | |
|---|---|---|
| 10.1 | Events of Default | 134 |
| 10.2 | Acceleration; Additional Interest | 136 |
| 10.3 | Acceleration of Certain Contingent Obligations | 136 |
| 10.4 | Combining Accounts, Set-Off | 137 |
| 10.5 | Attorney in Fact | 137 |
| 10.6 | Appropriation of Monies | 138 |
| 10.7 | No Further Advances | 138 |
| 10.8 | Remedies Cumulative | 138 |
| 10.9 | Performance of Covenants by Agent | 138 |
| 10.10 | Purchase of Participation Following Acceleration | 139 |

**ARTICLE 11 ADMINISTRATION OF THE FACILITIES** ... **139**

| | | |
|---|---|---|
| 11.1 | Authorization and Action | 139 |
| 11.2 | Decision-Making | 140 |
| 11.3 | Procedure for Making Advances | 141 |
| 11.4 | Failure to Fund | 142 |
| 11.5 | Defaulting Lenders and Replacement of Lenders | 143 |
| 11.6 | Security and Exercise of Remedies | 145 |
| 11.7 | Application of Proceeds of Realization | 146 |
| 11.8 | Payments by Agent | 147 |
| 11.9 | Redistribution of Payment | 148 |
| 11.10 | Protection of Agent | 149 |
| 11.11 | Duties of Agent | 150 |
| 11.12 | Lenders' Obligations Several; No Partnership | 151 |
| 11.13 | Reliance Upon Agent | 152 |
| 11.14 | No Liability of Agent | 152 |
| 11.15 | Agent and Agent Authority | 152 |
| 11.16 | Lenders' Credit Decisions | 152 |
| 11.17 | Indemnification | 153 |
| 11.18 | Successor Agent | 153 |
| 11.19 | Sharing of Information | 153 |
| 11.20 | Acknowledgement by Borrowers | 154 |
| 11.21 | Amendments to Article 11 | 154 |
| 11.22 | Deliveries, etc. | 154 |

**TABLE OF CONTENTS**
**(continued)**

Page

11.23   Agency Fee ......................................................................................... 154

**ARTICLE 12 INCREASED COSTS**........................................................... **155**

12.1   Changes in Law................................................................................... 155
12.2   Changes in Circumstances ................................................................. 156
12.3   Application of Sections 12.1 and 12.2 .............................................. 156
12.4   Taxes ................................................................................................... 156

**ARTICLE 13 GENERAL**............................................................................ **159**

13.1   Non-Disclosure ................................................................................... 159
13.2   Waiver ................................................................................................. 160
13.3   Governing Law ................................................................................... 161
13.4   Judgment Currency ............................................................................ 161
13.5   Expenses of Agent and Lenders ........................................................ 161
13.6   Assignment ......................................................................................... 162
13.7   General Indemnity .............................................................................. 164
13.8   Environmental Indemnity .................................................................. 165
13.9   Survival of Certain Obligations despite Termination of Agreement ................. 165
13.10  Interest on Unpaid Costs and Expenses ........................................... 166
13.11  Notice ................................................................................................. 166
13.12  Telephone Instructions ...................................................................... 167
13.13  Severability ........................................................................................ 167
13.14  Further Assurances............................................................................. 167
13.15  Tombstone Marketing ........................................................................ 167
13.16  Entire Agreement ............................................................................... 168
13.17  Anti-Money Laundering Legislation ................................................ 168
13.18  Binding Effect .................................................................................... 169
13.19  Execution by Electronic Means and Counterparts ........................... 169
13.20  Intercreditor Agreement .................................................................... 169
13.21  Release of Liens and Guarantees. ..................................................... 169

Doc#: US1:12956486v6

# SECOND AMENDED AND RESTATED CREDIT AGREEMENT

This Agreement is dated as of July 31, 2018,

AMONG:

## Q'MAX SOLUTIONS INC. and Q'MAX AMERICA INC.
as Borrowers

– and –

## QMAX CANADA OPERATIONS INC.
as Specified Canadian Swingline Borrower

– and –

## THE PERSONS PARTY HERETO FROM TIME TO TIME
## IN THEIR CAPACITIES AS LENDERS
as Lenders

– and –

## HSBC BANK CANADA,
as Administrative Agent

– with –

## HSBC BANK CANADA,
as Sole Lead Arranger, Bookrunner, Syndication Agent
and Documentation Agent

**PREAMBLE:**

A.   The Borrowers have requested and the Lenders have agreed to further amend and restate the credit facilities under the Existing Credit Agreement and to continue to provide certain credit facilities on the terms and conditions and for the purposes set out in this Agreement.

B.   HSBC has agreed to continue to act as administrative agent for the Lenders under the Facilities on the terms and conditions and for the purposes set out in this Agreement.

**AGREEMENT:**

In consideration of the covenants and agreements between the Parties contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

# ARTICLE 1
# INTERPRETATION

## 1.1    Definitions

In this Agreement, the following words and phrases shall have the respective meanings set forth below:

1.1.1     "**Acceleration Date**" means the earlier of:

(a)    the occurrence of an Insolvency Event in respect of any Credit Party; and

(b)    the delivery by the Agent to the Borrower of a written notice that the Obligations are immediately due and payable, following the occurrence and during the continuation of an Event of Default other than an Insolvency Event.

1.1.2     "**Acceptable Account Debtors**" means those account debtors in respect of Eligible Receivables who have Investment Grade long term unsecured debt ratings or are otherwise acceptable to the Required Lenders, in their Permitted Discretion.

1.1.3     "**Account Receivable Insurance**" means one or more credit insurance policies issued by (a) Export Development Canada, (b) Export-Import Bank of the United States, or (c) such other governmental entity of Canada or the U.S. or a private insurer, in either case, with, and only for so long as such other insurer maintains, a credit rating of at least A by Standard & Poor's Ratings Services (or an equivalent rating issued by another rating agency acceptable to the Required Lenders, acting reasonably) that is reasonably acceptable to the Required Lenders, in each case, together with all endorsements and agreements related thereto (including a tripartite agreement among the insured, the insurer and the Agent), and on terms and in amounts reasonably acceptable to Agent and which provides for the payment of claims thereunder directly to Agent.

1.1.4     "**Acquired Business**" means the entity or assets acquired by a Credit Party in an Acquisition consummated after the date hereof.

1.1.5     "**Acquisition**" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of a controlling interest in the capital stock, partnership interests, membership interests or equity of any Person (other than a Person that is a Subsidiary or the formation of a Subsidiary solely to facilitate a Permitted Acquisition), or (c) a merger, amalgamation, consolidation or any other combination with another Person (other than a Person that is a Credit Party); provided, that the Borrower or a Person that is or will become a Credit Party is the surviving entity.

1.1.6     "**Advance**" means an extension of credit by one or more of the Lenders to a Borrower pursuant to this Agreement (including by way of issuance of a Letter of Credit or by way of any other Loan permitted by Section 2.7.2 under the Swingline), but does not include any Conversion or Rollover.

1.1.7    "**Advisory Services Agreement**" means the management and advisory service agreement dated as of May 23, 2014 between the Canadian Borrower and Palladium, as the same may be amended restated or supplemented from time to time permitted hereunder.

1.1.8    "**Affiliate**" means with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

1.1.9    "**Agent**" means HSBC in its capacity as administrative agent hereunder and any successors in such capacity appointed as agent pursuant to Section 11.18.

1.1.10    "**Agreement**" means this amended and restated credit agreement (including the exhibits and schedules) as it may be amended, replaced or restated from time to time.

1.1.11    "**Amendment and Restatement Date**" means the date of this Agreement or such later Business Day upon which each condition in Section 9.1 shall be satisfied or waived in a manner acceptable to the Required Lenders in their discretion.

1.1.12    "**Anchor**" means Anchor Drilling Fluids USA, LLC.

1.1.13    "**Anchor Acquisition Agreement**" means the Membership Interest Purchase Agreement, dated as of November 21, 2017, by and among Anchor Drilling Fluids USA, LLC, a Delaware limited liability company, Calumet Operating, LLC, a Delaware limited liability company, Q'Max Solutions Inc., a British Columbia corporation, and Q'Max America Inc., a Delaware corporation.

1.1.14    "**Anchor Sale and Leaseback Transaction**" means any arrangement, whether in one transaction or in a series of transactions, with any Person whereby Anchor sells or transfers all or some portion of its truck fleet or similar motor vehicles, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rents or leases such property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

1.1.15    "**Annual Management Fee Cap**" means U.S. $2,500,000 in the aggregate in any Fiscal Year.

1.1.16    "**Applicable Law**" means, in respect of any Person, property, transaction or event, all Laws applicable thereto.

1.1.17    "**Applicable Margin**" means, in respect of any Fiscal Quarter and in respect of any Availment Option or standby fee, the percentage in the column relating to such Availment Option or standby fee in the following table which corresponds to the Net Leverage Ratio in respect of such Fiscal Quarter described in the first column; subject to adjustment from time to time in accordance with Section 5.1.4:

| Level* | Net Leverage Ratio | Canadian Dollar Prime Based Loans, U.S. Dollar Base Rate Loans and U.S. Dollar Prime Rate Loans | BA Fee, LIBOR Loans and Financial Letter of Credit Fee** | Standby Fee (For Canadian Operating Facility and U.S. Operating Facility only) |
|---|---|---|---|---|
| I | < 1.50:1 | 100 bps | 200 bps | 45.000 bps |
| II | ≥ 1.50:1 < 2.00:1 | 125 bps | 225 bps | 50.625 bps |
| III | ≥ 2.00:1 < 2.50:1 | 175 bps | 275 bps | 61.875 bps |
| IV | ≥ 2.50:1 < 3.00:1 | 200 bps | 300 bps | 67.500 bps |
| V | ≥ 3.00:1 < 3.50:1 | 275 bps | 375 bps | 84.375 bps |
| VI | ≥ 3.50:1 < 4.00:1 | 325 bps | 425 bps | 95.625 bps |
| VII | ≥ 4.00:1 | 375 bps | 475 bps | 106.875 bps |

\* On the Amendment and Restatement Date, the Applicable Margin shall be deemed to be at Level VII and shall remain at Level VII at all times during the Covenant Relief Period.

\*\*Non-Financial Letters of Credit will be issued at 66⅔% of the pricing quoted above for Financial Letters of Credit.

1.1.18   "**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

1.1.19   "**Assignment**" means an agreement whereby a financial institution becomes a Lender substantially in the form of Exhibit "G", with the blanks completed.

1.1.20   "**Availment Option**" means a method of borrowing which is available to the Borrower as provided herein and in respect of each Facility, means those particular methods of borrowing which are specifically identified as being available thereunder (in the case of the Canadian Operating Facility under Section 2.5.1, in the case of the Facility under Section 3.5.1 and in the case of the U.S. Operating Facility under Section 4.5.1).

1.1.21   "**BA Equivalent Loan**" means an Advance in Canadian Dollars made by a Non-BA Lender pursuant to Section 5.10.2.

1.1.22   "**BA Lender**" means a Lender identified in Exhibit "A" attached hereto as a Lender which will accept Bankers' Acceptances hereunder.

1.1.23   "**Bankers' Acceptance**" means a bill of exchange or a blank non-interest bearing depository bill as defined in the *Depository Bills and Notes Act* (Canada) drawn by the Borrower and accepted by a BA Lender in respect of which the Borrower becomes obligated to pay the face amount thereof to the holder (which may be a third party or such BA Lender) upon maturity.

1.1.24   "**Banking Service Agreements**" means agreements made between a Borrower or any other Credit Party and the Agent or any Lender or any of their respective Affiliates in respect of payment cards, credit cards, cash management, payroll, pooling, netting, or other

banking services; and "**Banking Service Agreement**" means any one of them as required by the context.

1.1.25   "**Banking Services Liabilities**" mean, collectively, any and all direct and indirect, contingent and absolute obligations and liabilities of each Borrower and each other Credit Party to the Agent, any Lender or any of their respective Affiliates in respect of any Banking Service Agreement as the Credit Parties may from time to time enter into with the Agent, any Lender or any of their respective Affiliates; provided, that a liability shall constitute a "**Banking Service Liability**" if the agreement under which it arose was entered into with the Person who was an Agent, Lender or the Affiliate of a Person who was an Agent or Lender, at the time such agreement was entered into, regardless of whether such Agent or Lender ceased to be the Agent or a Lender hereunder.

1.1.26   "**BCBCA**" means the *Business Corporations Act* (British Columbia), as amended from time to time.

1.1.27   "**BIA**" means the *Bankruptcy and Insolvency Act* (Canada), as amended from time to time.

1.1.28   "**Borrowers**" means, collectively, the Canadian Borrower, the Specified Canadian Swingline Borrower and the U.S. Borrower and "**Borrower**", means any one of them; provided, that "Borrower", in the context of provision hereunder relating to:

(a)   the Term Facility and the Canadian Operating Facility, and Loans thereunder, shall mean the Canadian Borrower and its successors and assigns;

(b)   the U.S. Operating Facility, and Loans thereunder, shall mean the U.S. Borrower and its successors and assigns; and

(c)   the Swingline, and Loans thereunder, shall mean the applicable Swingline Borrower and its successors and assigns.

1.1.29   "**Borrowing Base**" means the amount in U.S. Dollars calculated by the Borrower and approved by the Agent, in its sole discretion, as set out in the most recent Borrowing Base Certificate, being the aggregate amount of (without duplication):

(a)   Marginable Receivables; *plus*

(b)   Marginable Inventory; *plus*

(c)   Marginable Cash; *plus*

(d)   Marginable Capital Assets; *minus*

(e)   Priority Claims; *minus*

(f)   $150,000 (but only until such time as the Agent and HSBC US have received an environmental report or other information from or on behalf of Anchor which is

satisfactory to each of them (acting reasonably) related to the Norge, Oklahoma and Roosevelt, Utah properties owned by the Credit Parties, and the Agent and HSBC US agree to no longer require the reserve set out in this clause (f)), provided such reserve shall only apply to the extent such properties form part of the Borrowing Base, *minus*

(g)     the amount in U.S. Dollars of unrealized losses resulting from mark to market accounting for hedging activities calculated in accordance with GAAP, *minus*

(h)     the amount in U.S. Dollars of any deductible payable in respect of the Account Receivable Insurance (other than in respect of Anchor, Terra and their respective Subsidiaries), *minus*

(i)     any amount that is payable to the insurer under the Account Receivable Insurance (other than in respect of Anchor, Terra and their respective Subsidiaries).

1.1.30    "**Borrowing Base Certificate**" means a certificate of the Canadian Borrower, substantially in the form of Exhibit "H".

1.1.31    "**Borrowing Base Shortfall**" is defined under Section 5.3.5.

1.1.32    "**Business Day**" means:

(a)     for the purpose of giving any communication pursuant to Section 13.11 and in the context of U.S. Dollar Base Rate Loans and U.S. Dollar Prime Rate Loans, a day on which the main branches of the Agent or any of its Affiliates in Toronto, Calgary, Montreal, Quebec and New York are open for normal banking business;

(b)     for purposes of LIBOR Loans, also must be a LIBOR Business Day; and

(c)     for all other purposes, a day on which the main branch of the Agent in Calgary, Alberta, Montreal, Quebec and Toronto, Ontario is open for normal banking business,

but in any event not including a Saturday or Sunday or other day on which banks in Calgary or Toronto are authorized or required by law to close.

1.1.33    "**Calumet**" means Calumet Operating, LLC and its successors and permitted assigns.

1.1.34    "**Canadian Borrower**" means Q'Max Solutions Inc., a corporation amalgamated pursuant to the BCBCA, and its successors and permitted assigns.

1.1.35    "**Canadian Dollar Prime Rate Loan**" means a loan made by a Lender to the Canadian Borrower in Canadian Dollars in respect of which interest is determined by reference to the Canadian Prime Rate, but excluding Advances in the form of Overdrafts and BA Equivalent Loans.

1.1.36   "**Canadian Dollars**" or "**Cdn. $**" means the lawful money of Canada.

1.1.37   "**Canadian Operating Facility**" is defined in Section 2.1.

1.1.38   "**Canadian Operating Facility Commitment**" means, as the context requires, (a) as of the Second Amendment Date, collectively with respect to all Canadian Operating Lenders, in the aggregate, U.S. $119,681,471 or the Equivalent Amount in Cdn. $ (or any combination thereof), as otherwise increased or decreased pursuant to this Agreement and (b) means, with respect to each individual Canadian Operating Lender, the individual commitment amount of such Lender in the maximum principal amount indicated opposite such Canadian Operating Lender's name in Exhibit "A" under the heading "**Canadian Operating Facility Commitments**", as amended from time to time.

1.1.39   "**Canadian Operating Facility Limit**" means the lesser of (a) the Canadian Operating Facility Commitment, and (b) the sum of the Borrowing Base less the then outstanding Advances under the Term Facility and the U.S. Operating Facility.

1.1.40   "**Canadian Operating Lenders**" means the Lenders who have provided a Commitment under the Canadian Operating Facility as set forth in Exhibit "A".

1.1.41   "**Canadian Prime Rate**" means the greater of the following:

(a)      the rate of interest announced from time to time by the Agent as its reference rate then in effect for determining rates of interest on Canadian dollar loans to its customers in Canada and designated as its prime rate; and

(b)      the 30-day CDOR Rate plus 1% per annum;

provided that if the Canadian Prime Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.42   "**Capital Adequacy Requirements**" means the Guideline dated January 2017, entitled "Capital Adequacy Requirements (CAR)" issued by OSFI and all other guidelines or requirements relating to capital adequacy issued by OSFI or any other Governmental Authority regulating or having jurisdiction with respect to any Lender, as amended, modified, supplemented, reissued or replaced from time to time.

1.1.43   "**Capital Expenditures**" means, with respect to any Person for any period, without duplication, the aggregate amount of all expenditures (whether paid in cash or accrued as a liability) by such Person during that period for investments in other Persons and the acquisition or leasing (pursuant to a Capital Lease) of fixed or capital assets or additions to property, plant, or equipment (including replacements, capitalized repairs, and improvements), in each case, which are required to be capitalized on the balance sheet of such Person in accordance with GAAP; provided, however, that Capital Expenditures shall not include:

(a)      expenditures with proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets,

equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of a Borrower and its Subsidiaries within one year of receipt of such proceeds (or, if not made within such one year period, are committed to be made during such period, but if not so made, such amount will not be excluded in the next applicable period);

(b)    interest capitalized during such period;

(c)    expenditures that are accounted for as Capital Expenditures of such Person and that actually are paid for by a third party (excluding a Borrower or any Subsidiary thereof) and for which neither any Borrower nor any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other Person (whether before, during or after such period);

(d)    the purchase price of equipment (i) that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time, (ii) to the extent the consideration therefor consists of any combination of (A) used or surplus equipment traded in at the time of such purchase and (B) the proceeds of a substantially concurrent sale of used or surplus equipment, in each case in the ordinary course of business; provided that only such credit value of such traded equipment will be excluded for this purpose;

(e)    for purposes of Section 7.2.10 only, expenditures that constitute Permitted Acquisitions and Permitted Investments;

(f)    the book value of any asset owned to the extent such book value is included as a capital expenditure as a result of reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period;

(g)    expenditures of leasehold improvements for which such Person is reimbursed in cash or receives a credit; and

(h)    any non-cash amounts reflected as additions to property, plant or equipment on such Person's consolidated balance sheet.

1.1.44    "**Capital Lease**" means any lease, license or similar transaction determined as a capital lease in accordance with GAAP as in effect on the Amendment and Restatement Date, or any sale and lease back transaction or any other lease (whether a synthetic lease or otherwise).

1.1.45    "**Cash Equivalent**s" means, as of the date of any determination thereof, the following:

(a)     marketable direct obligations issued or unconditionally guaranteed by the Government of Canada, the U.S., or any agency or instrumentality thereof, a government of a province of Canada or of a state of the U.S. or, in each case, any agency thereof, maturing no more than one year after the date of acquisition thereof;

(b)     commercial paper maturing no more than one year after the date of acquisition thereof and having, at the time of acquisition, a rating of at least A1 by Standard & Poor's Ratings Services or at least Prime 1 by Moody's Investors Service, Inc. or at least R1 (low) by Dominion Bond Rating Service Inc.;

(c)     certificates of deposit, deposit notes, term deposit receipts, or time deposits or bankers' acceptances, maturing no more than one year after the date of acquisition thereof, issued by the Lender or by commercial banks incorporated under the laws of Canada or the U.S. or a state thereof, each having a rating of at least A1 by Standard & Poor's Ratings Services or at least Prime 1 by Moody's Investors Service, Inc. or at least R1 (low) by Dominion Bond Rating Service Inc.;

(d)     such local currencies in those countries in which the Borrowers and their Subsidiaries transact business from time to time in the ordinary course of business;

(e)     investments of comparable tenor and credit quality to those described in the foregoing clauses (a) through (c) or otherwise customarily utilized in countries in which the Borrowers and their Subsidiaries operate for short term cash management purposes; and

(f)     investments in any investment company, money market or fund which invests substantially all of their assets in Cash Equivalents of a kind described in (a) through (c) of this definition.

1.1.46   "**Cash Taxes**" means, in respect of any Person for any applicable period, the amount of all income taxes (including federal and provincial income taxes) paid or payable by such Person on its net taxable income for such period (which for greater certainty, does not include future income taxes).

1.1.47   "**Catch Up Management Fee Payments**" is defined in Section 1.1.202(a).

1.1.48   "**CDOR Rate**" means on any day the annual rate of interest which is the rate determined as being the arithmetic average of the quotations of all institutions listed in respect of the rate for Canadian Dollar denominated bankers' acceptances for the relevant period displayed and identified as such on the "**Reuters Screen CDOR Page**" (as defined in the International Swaps and Derivatives Association, Inc. definitions, as modified and amended from time to time) as of 10:00 a.m. Toronto, Ontario local time on such day and, if such day is not a Business Day, then on the immediately preceding Business Day (as adjusted by the Agent after 10:00 a.m. Toronto, Ontario local time to reflect any error in a posted rate of interest or in the posted average annual rate of interest with notice of such adjustment in reasonable detail evidencing the basis for such determination being concurrently provided to the Borrower). If such rates are not available on the Reuters Screen CDOR Page on any particular day, then the CDOR Rate on that day shall be

calculated as the arithmetic mean of the rates applicable to Canadian Dollar denominated bankers' acceptances for the relevant period publicly quoted for customers in Canada by those Lenders which are banks listed in Schedule I of the *Bank Act* (Canada) as of 10:00 a.m. Toronto, Ontario local time on such day; or if such day is not a Business Day, then on the immediately preceding Business Day; provided that if the CDOR Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.49    "**Change of Control**" means in respect of the Canadian Borrower or Holdco, the occurrence of any of the following events:

(a)    prior to any initial public offering of the Canadian Borrower or Holdco, as applicable, when Permitted Holders do not beneficially own, collectively, directly or indirectly, shares in the Canadian Borrower or Holdco, as applicable, representing more than 50% of the Voting Securities of the Canadian Borrower or Holdco; and

(b)    after any initial public offering of the Canadian Borrower or Holdco, as applicable, when a Person or Group (other than any employee benefit plan and/or Person acting as the trustee, agent or other fiduciary or administrator) acquires shares in the Canadian Borrower or Holdco, as applicable, representing more than the greater of (i) 35% of the aggregate outstanding Voting Securities of the Canadian Borrower or Holdco, as applicable and (ii) the percentage of then outstanding Voting Securities of the Canadian Borrower or Holdco, as applicable, directly or indirectly, owned by Permitted Holders.

1.1.50    "**Code**" means the United States Internal Revenue Code of 1986, and any successor statute and any regulations thereunder.

1.1.51    "**Collateral**" means, collectively, all property, assets and undertaking of the Credit Parties encumbered by the Liens granted pursuant to the Security in support of the Obligations, and all property, assets and undertaking encumbered by the Liens granted pursuant to the Security in support of the Guarantees, together with all proceeds of the foregoing. For the avoidance of doubt, Collateral shall not include (a) capital assets or inventory of any Credit Party organized outside of the U.S. or Canada, (b) pending United States "intent-to-use" trademark applications for which a verified statement of use or an amendment to allege use has not been filed with and accepted by the United States Patent and Trademark Office, (c) Securitization Assets but only once transferred to a Securitization SPE and (d) any of the "**Excluded Property**" (as defined in the general security agreement from the U.S. Borrower as described in Section 8.1(a)).

1.1.52    "**Collection Rights**" means, in respect of any Eligible Approved Contracts between a Pemex Entity, on the one hand, and QMax Mexico, on the other hand, the collection or credit rights granted to QMax Mexico by such Pemex Entity pursuant to such Eligible Approved Contract.

1.1.53    "**Colombian Free Cash Flow**" means, for any fiscal period, all EBITDA attributable to all Colombian operations of the Canadian Borrower and its Material Subsidiaries determined in accordance with the definition of EBITDA, minus Cash Taxes, Interest Expense and Unfunded Capital Expenditures, in each case, attributable to such Colombian Subsidiaries and operations.

1.1.54    "**Commitment**" means, in respect of any Lender, such Lender's commitment to make Advances to the Borrowers (or any one of them) under all Facilities or under any Facility, as the context requires as set forth in Exhibit "A".

1.1.55    "**Common Shares**" means the common shares in the capital of a Borrower.

1.1.56    "**Compliance Certificate**" means a certificate delivered by the Canadian Borrower to the Agent in the form of Exhibit "F".

1.1.57    "**Consolidated Net Income**" shall mean, for any period, the net income (loss) of any Person and its Subsidiaries determined on a consolidated basis on the basis of GAAP; provided, however, that any net income (loss) of any Person (excluding any Securitization SPE) (i) who is not during such period a Material Subsidiary or (ii) whose net income is accounted for by the equity method of accounting, shall in each case be included in the calculation of Consolidated Net Income for all purposes of this Agreement only to the extent of the amount of any Distributions of such Person paid in cash (or to the extent converted into cash) to the Canadian Borrower or a Material Subsidiary, and "**Consolidated Net Income**" for such period shall include any ordinary course dividends in cash received by the Canadian Borrower or any of its Material Subsidiaries in excess of the amounts included in the foregoing item (i).

1.1.58    "**Consolidated Net Tangible Assets**" means, as at any date of determination, all consolidated assets of the any Person as shown in the most recent consolidated balance sheet of such Person, less the aggregate of the following amounts reflected upon such balance sheet:

(a)    all goodwill, deferred assets, trademarks, copyrights and other similar intangible assets; and

(b)    to the extent not already deducted in computing such assets and without duplication, depreciation, depletion, amortization, reserves and any other account which reflects a decrease in the value of an asset or a periodic allocation of the cost of an asset; provided, that no deduction will be made under this paragraph (b) to the extent that such account reflects a decrease in value or periodic allocation of the cost of any asset referred in the paragraph (a) of this definition,

all as determined in accordance with GAAP.

1.1.59    "**Contributing Lenders**" is defined in Section 11.4.2.

1.1.60    "**control**" means, in respect of any Person, the power to direct or cause the direction of management and policies of such Person, directly or indirectly, through the

ownership of Voting Securities, contract or otherwise; and "**controlled**" has a corresponding meaning.

1.1.61    "**Conversion**" means the substitution of one Availment Option for another, and, for certainty, does not constitute a fresh or new Advance (and "**Convert**" shall have a corresponding meaning).

1.1.62    "**Conversion Notice**" means a notice substantially in the form of Exhibit "D" given by a Borrower to the Agent for the purposes of requesting a Conversion.

1.1.63    "**Covenant Relief Period**" means the period from the Amendment and Restatement Date, up to and including December 31, 2020, subject to the Borrowers' right to elect a shorter period pursuant to Section 1.18.

1.1.64    "**Credit Documents**" means this Agreement, the Security and all other agreements, documents, instruments and certificates required or contemplated herein to be provided by the Credit Parties and other Persons to the Agent and the Lenders.

1.1.65    "**Credit Parties**" means, collectively, the Borrowers and any Guarantor; and "**Credit Party**" means any one of them as the context requires. Notwithstanding any provision in this Agreement or any other Credit Document, in no event shall any Securitization SPE be deemed a Credit Party.

1.1.66    "**Currency Hedging Agreement**" means any swap, hedge or other agreement that does not contravene Section 7.2.12 entered into between a Credit Party and a counterparty, from time to time for the purpose of mitigating or hedging currency risk, including foreign exchange forward contracts.

1.1.67    "**Default**" means an event which has occurred and is continuing, and which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

1.1.68    "**Default Rate**" means, while an Event of Default exists, the interest rates and fess comprising the Applicable Margin will each increase by 2.0% per annum.

1.1.69    "**Defaulting Lender**" means any Lender or, in the case of paragraph (e) below, a Lender's parent (being any Person that directly or indirectly controls a Lender where control has the same meaning as in the definition of Affiliate):

(a)    that has failed to fund any payment or its portion of any Advances required to be made by it hereunder, including as a result of being a Non-Paying Lender, within two Business Days of the date such Advances were required to be funded hereunder unless such Lender notifies the Agent and the Canadian Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied;

(b)    that has failed to pay the Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due;

(c)    that has notified a Borrower (in writing) that it does not intend to or is unable to comply with any of its funding obligations under this Agreement or has made a public statement to that effect (unless such written notice or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such written notice of public statement) cannot be satisfied);

(d)    that has failed, within three Business Days after request by a Borrower, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Advances; or

(e)    that becomes insolvent, has been deemed insolvent by a court of competent jurisdiction, or becomes the subject of bankruptcy or insolvency proceeding.

1.1.70   "**Departing Lenders**" is defined in Section 11.5.2.

1.1.71   "**Deposit Account Control Agreement**" means the deposit account control agreement dated December 29, 2014 between the Agent, Wells Fargo and the U.S. Borrower, as the same may be amended from time to time.

1.1.72   "**Designated Financial Covenants**" is defined in Section 7.3.2

1.1.73   "**Distribution**" means:

(a)    any declaration or payment of dividends or returns of capital, including advisory fees and management fees, of any kind or nature directly or indirectly to any holder of shares of any Credit Party or to any Affiliate or Related Party of such holder and including any similar payments paid by any Credit Party to Palladium or its Affiliates, whether pursuant to the Advisory Services Agreement or any other similar agreement now or hereafter in effect between any one or more Credit Party and any one or more of Palladium or its Affiliates;

(b)    any repurchase, retraction or redemption of shares of any Credit Party for cash or other property; and

(c)    any payment, repayment or prepayment by a Person in cash of any amount of any principal, interest, fees or other amounts in respect of any Subordinated Debt.

For certainty, Distributions shall not include the reimbursement of reasonable out-of-pocket expenses incurred by Palladium or the directors of the Credit Parties in the ordinary cause of business in rendering advisory or management services to the Credit Parties or performing a director's obligations to the applicable Credit Party, as the case may be.

1.1.74    "**Drawdown Request**" means a notice in the form of Exhibit "B" given by the Borrower to the Agent for the purpose of requesting an Advance.

1.1.75    "**Earnout Payments**" means, in respect of any Acquisition, the requirement for any Credit Party, as purchaser, to pay to the vendor under such Acquisition (or any nominee thereof) contingent payments of the purchase price thereof after the closing thereof which are payable when specified targets (including related to revenue or earnings), are satisfied within specified periods.

1.1.76    "**EBITDA**" means, for any fiscal period, Consolidated Net Income of the Canadian Borrower and the Subsidiaries determined on a consolidated basis in accordance with GAAP and measured on a trailing four Fiscal Quarter basis for such period, *plus* all amounts deducted in the calculation thereof on account of (without duplication irrespective if any expense, loss or gain would fall into one or more of the foregoing categories):

(a)    interest expense calculated in accordance with GAAP, including (i) the amortization of debt discounts, (ii) the amortization of all fees (including fees with respect to Hedging Agreements) payable in connection with the incurrence of Funded Debt to the extent included in interest expense, (iii) deferred financing fees and expenses, and (iv) the portion of any payments or accruals with respect to Capital Lease Obligations allocable to interest expense and the capitalized interest of such Person;

(b)    any provision for or payment of taxes based on income, profits or capital gains, calculated in accordance with GAAP, including, without limitation, state, provincial, franchise, property and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) and any deferred/future taxes;

(c)    depreciation and amortization expense, calculated in accordance with GAAP, including amortization of intangible assets, unrecognized prior service costs and actuarial non-cash losses related to pensions and other post-employment benefits, of such;

(d)    Permitted Management Fees (but for certainty, in an amount not exceeding the Annual Management Fee Cap in any Fiscal Year) and the reasonable out-of-pocket expenses related thereto which have been reimbursed by a Credit Party, and any payments permitted under clause (j) of Section 7.2.6, to the extent paid by a Credit Party to a non-Credit Party;

(e)    all non-cash expenses and losses calculated in accordance with GAAP related to: (i) extraordinary and nonrecurring losses to the extent not otherwise dealt with in this definition, (ii) all non-recurring deferred financing costs written off and premiums paid or other expenses incurred directly in connection with any early extinguishment of Funded Debt and any net loss attributable to any write-off or forgiveness of Funded Debt, (iii) any non-cash expense or loss arising from the application of purchase accounting adjustments as a result of any Permitted

Acquisition, and (iv) other non-cash expenses and charges to the extent not otherwise dealt with in this definition (in each case, calculated on a *pro forma* basis as though realized on the first day of such period) reducing Consolidated Net Income for such period including resulting from impairment charges and including losses against book value on the disposal or write-off of any business or assets (including pursuant to any sale/leaseback transaction);

(f)     [reserved];

(g)     unrealized losses resulting from mark to market accounting for hedging activities calculated in accordance with GAAP;

(h)     any unrealized foreign currency translation or transaction losses in respect of (i) Funded Debt denominated in a currency other than the functional currency of the relevant Person and (ii) any unrealized foreign exchange losses relating to translation of assets and liabilities denominated in foreign currencies;

(i)     charges, expenses or losses reasonably related to (i) fees and expense in connection with Permitted Acquisitions, Permitted Investments, Permitted Dispositions, the incurrence of Permitted Funded Debt (but only to the extent not already included in clause (a) above), amendments and other modifications to the Credit Documents, the offering or issuance of debt securities and equity interests and other capital raising activities permitted hereunder, including, without limitation, refinancing of the Facilities (in each case, whether or not successful) and (ii) business optimization expenses and restructuring charges, reserves or expenses, (including losses from disposed, abandoned, transferred, closed or discontinued operations) in each case as documented by evidence provided by the Canadian Borrower and acceptable to the Agent (acting reasonably and responding to requests for approval within five (5) Business Days); provided, that all of the foregoing may not exceed a maximum aggregate amount of $5,500,000 for each applicable measurement period of four consecutive Fiscal Quarters, or such higher amount as the Required Lenders may consent to from time, acting reasonably;

(j)     non-cash expenses incurred in connection with any equity based compensation provided pursuant to any management or employee equity based compensation plan (in each case, calculated on a *pro forma* basis as though realized on the first day of such period), and including (i) costs or expenses realized in connection with or resulting from stock appreciation or similar rights, stock options or other rights of officers, directors and employees, in each case of such Person or any such Subsidiary, and (ii) non-cash losses attributable to deferred compensation plans or trusts;

(k)     third party audit, advisory and consulting fees and related out-of-pocket expenses of the Canadian Borrower or any of its Subsidiaries incurred in connection with audits, inspections and reviews conducted in connection with this Agreement at the direction of the Agent or any Lender (but which for certainty does not include audit fees related to the preparation of the financial statements required hereunder);

(l)     fees, costs and expenses in connection with the Anchor Acquisition not to exceed U.S. $11,000,000;

(m)     discounts on sales of receivables and related assets in connection with any Permitted Securitization Financing;

*minus*, in each case to the extent added in the calculation thereof (without duplication irrespective if any expense, loss or gain would fall into one or more of the foregoing categories):

(n)     income tax credits calculated in accordance with GAAP;

(o)     all cash payments during such period relating to non-cash charges which were added back in determining EBITDA in any prior period;

(p)     other non-cash and non-recurring items increasing Consolidated Net Income that are not otherwise dealt with in this definition (but excluding any such non-cash items to the extent that it will result in the receipt of cash payments in any future period), including gains against book value on the disposal of any business or assets;

(q)     unrealized gains resulting from mark to market accounting for hedging activities calculated in accordance with GAAP;

(r)     any unrealized foreign currency translation or transaction gains in respect of Funded Debt denominated in a currency other than the functional currency of the relevant Person and any unrealized foreign exchange gains relating to translation of assets and liabilities denominated in foreign currencies;

(s)     any net gain attributable to any write-off or forgiveness of Funded Debt;

(t)     net gains on the disposal, abandonment, transfer, closing or discontinuance of operations;

(u)     non-cash gains attributable of deferred compensation plans and trusts;

(v)     any non-cash gains arising from the application of purchase accounting adjustments as a result of any Permitted Acquisition or other Acquisitions approved by the Lenders; and

(w)     Consolidated Net Income attributable to or generated from any minority interest in a Person owned directly or indirectly by the Canadian Borrower, except for cash Distributions received by a Credit Party therefrom;

provided, that if any of the events described in Section 1.13 occurs during the relevant period, the calculation of EBITDA will be adjusted as set forth in Section 1.13.

Notwithstanding the foregoing, the Borrowers may elect to calculate EBITDA on the following annualized basis (as opposed to a trailing four Fiscal Quarter basis) for the periods specified below: (i) for the Fiscal Quarter ending March 31, 2018, by calculating EBITDA for the six month period ending as of March 31, 2018 and multiplied by two, and (ii) for the Fiscal Quarter ending June 30, 2018, by calculating EBITDA for the nine month period ending as of June 30, 2018, and multiplied by four-thirds, but only if such alternative calculation would result in a greater value for EBITDA for such period.

In addition, if EBITDA is calculated on the basis described in the immediately preceding paragraph, then the amounts described in paragraph (i) above (the "**Prescribed Amounts**") shall be limited to, the lesser of (x) the Prescribed Amounts actually paid during such period and (y) $5,325,000.

1.1.77    "**Economic Sanctions**" means the restrictions with respect to funding operations, or financing investments, in any country, or making payments to, or receiving payments or property from, any country or Person, then prohibited by:

(a)    any sanctions or requirements imposed by, or based upon the obligations or authorities set forth in the *Executive Order*, the *U.S. Money Laundering Control Act of 1986* (18 U.S.C. §§ 1956 et seq.), the *PATRIOT Act*, the *U.S. International Emergency Economic Powers Act* (50 U.S.C. §§ 1701 et seq.), the *U.S. Trading with the Enemy Act* (50 U.S.C. App. §§ 1 et seq.), the *U.S. United Nations Participation Act*, the *U.S. Syria Accountability and Lebanese Sovereignty Act*, the *U.S. Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010* or the *Iran Sanctions Act*, all as amended, or any of the foreign assets control regulations of the U.S. Department of the Treasury (including but not limited to 31 CFR, Subtitle B, Chapter V, as amended) or any other law or executive order relating thereto or regulation administered by the US State Department or the United States Treasury Department's Office of Foreign Assets Control, in each case, to the extent applicable; and

(b)    any of the economic sanctions of Canada, including those provided for pursuant to the *Special Economic Measures Act* (Canada) or the *United Nations Act* (Canada), in each case, to the extent applicable.

1.1.78    "**Eligible Approved Contracts**" means a contract or other agreement of a Credit Party to provide goods or perform services: (a) that is listed on Schedule 6.1.33; (b) or designated by the Agent as an Eligible Approved Contract pursuant to Section 5.17.

1.1.79    "**Eligible Capital Assets**" means, at any time, the capital assets of the Credit Parties; provided, that, in any event, no capital asset shall be deemed to be a Eligible Capital Asset unless each of the following statements is accurate and complete (and by including such capital asset in any computation of the Borrowing Base, the Borrowers will be deemed to made each of these statements in respect thereof):

(a)    such capital asset is located in Canada or the U.S.;

(b)     such capital asset is in good condition, merchantable, meets all standards imposed by any Governmental Authority having regulatory authority over it or its use and/or sale and is not obsolete and is either currently usable or currently saleable in the normal course of business of the applicable Credit Party;

(c)     the Agent, on behalf of the Lenders, has a First-Ranking Security Interest covering such capital asset;

(d)     such capital asset is, and at all times will be, free and clear of all Liens other than Permitted Liens and unregistered Liens in respect of Priority Claims that are not yet due and payable;

(e)     such capital asset does not constitute Hazardous Materials;

(f)     such capital asset is covered by all applicable insurance as required by Section 7.1.9; and

(g)     the Agent has not determined in its Permitted Discretion that it may not sell or otherwise dispose of such capital asset in accordance with the terms of the applicable Credit Documents without infringing upon the rights of another Person or violating any contract with any other Person.

1.1.80   "**Eligible Cash**" means, as of the date of determination, the aggregate U.S. Dollar amount of the unrestricted cash (determined in accordance with GAAP) and Cash Equivalents of Credit Parties (other than with respect to Anchor and its Subsidiaries until such time as the Encina ABL Loan Agreement is terminated and the obligations thereunder have been repaid in full) that:

(a)     the Agent on behalf of the Lenders, has a first priority perfected Lien covering such unrestricted cash or Cash Equivalent, and such unrestricted cash or Cash Equivalent is, and at all times will be, free and clear of all Liens other than Permitted Liens and unregistered Liens in respect of Priority Claims that are not yet due and payable;

(b)     are held in collateral accounts located in Canada, the U.S., Mexico or another OECD member country; provided, such collateral accounts may be located in non-OECD member countries to the extent maintained by HSBC or an affiliate thereof (or such other bank deemed reasonable in the sole discretion of the Agent);

(c)     subject to the proviso at the end of Section 8.1(i), are held in collateral accounts in the name of the Agent or an agent thereof (or, with the consent of the Agent, the applicable Credit Party), in each case maintained with (i) the Agent or (ii) an Affiliate of the Agent, another Lender, an Affiliate of another Lender or another depositary that has entered into a control agreement (in form and substance reasonably acceptable to the Agent) with the Agent and the applicable Credit Party, and, in each case, with respect to which the Agent retains exclusive control to direct the transfer of funds therefrom during the continuation of an Event of Default (with withdrawals by the applicable Credit Party to be permitted upon notice to the Agent

so long as the Agent has not delivered a notice of exclusive control upon the occurrence and during the continuation of an Event of Default);

(d)     subject to clause (ii) above, is otherwise available for use by a Credit Party, without condition or restriction; and

(e)     upon a reasonable request therefor by the Agent, for which Agent shall have received evidence, in form and substance reasonably satisfactory to Agent, of the amount thereof as of the applicable date of calculation,

provided, that such unrestricted cash and Cash Equivalents shall be reduced by an amount equal to, as reasonably estimated by the Borrowers, the withholding tax payable on any cash and Cash Equivalents that are to be remitted by any Credit Party to a foreign jurisdiction; and further provided, that to the extent that any debit balances (or overdrawn amounts) of any accounts of such Credit Parties are deducted from the calculation of unrestricted cash and Cash Equivalents above, they shall be increased by an amount equal to the such debit balances (or overdrawn amounts) solely to the extent that availability under the Operating Facilities is reduced by the amount of any Letters of Credits (or any portion thereof) issued and outstanding under the Operating Facilities to backstop such deficit amounts.

1.1.81   "**Eligible Inventory**" means, at any time, all inventory of the Credit Parties valued in U.S. Dollars on a lower of cost (excluding any component of cost representing intercompany profit in the case of inventory acquired from an Affiliate) or market basis in accordance with GAAP, with detailed calculations of lower of cost or market; provided that, in any event, no inventory shall be deemed Eligible Inventory unless each of the following statements is accurate and complete (unless all of the Lenders in their sole discretion elect to otherwise include such inventory) (and by including such inventory in any computation of the applicable Borrowing Base the Borrowers will be deemed to have made each of these statements in respect thereof):

(a)     such inventory is in good condition, merchantable, meets all material standards imposed by any Governmental Authority having regulatory authority over it or its use and/or sale and is not obsolete and is either currently usable or currently saleable in the normal course of business of the applicable Credit Party;

(b)     with respect to any such inventory in excess of $250,000 per location, such inventory is:

    (i)     in possession of a Credit Party and (1) located on real property owned or leased by a Credit Party, and (2) within the U.S. or Canada; provided, that if such inventory is located on real property leased by a Credit Party and if so requested by the Agent, the landlord of such real property shall have executed and delivered to the Agent a Landlord Agreement or at the request of a Borrower or in lieu of such an agreement, the Lenders may take a reserve against Eligible Inventory equal to three month's rent;

(ii)     in the possession of a bailee and such bailee shall have executed and delivered to the Agent, a bailee letter in form and substance satisfactory to the Agent or at the request of a Borrower, the Lenders shall be permitted to take a reasonable reserve against Eligible Inventory related to the applicable Credit Party's economic exposure to such bailee;

(iii)    in the case of inventory located in the U.S., is placed on consignment with a consignee and such consignee shall have executed a valid consignment agreement in form and substance satisfactory to Agent and the applicable Borrower has filed (when applicable) appropriate UCC (or comparable) filings to perfect its interest in such inventory; or

(iv)    in transit in Canada or the U.S. (*provided*, that the jurisdictions through which such inventory is in transit are jurisdictions where the Liens in such inventory under the Security are validly perfected first priority Liens as required by Applicable Law) and between owned or leased locations of the Credit Parties, and upon arrival at its destination, will comply with either clause (i) or (ii) above;

(c)    the Agent on behalf of the Lenders, has a first priority perfected Lien covering such inventory, and such inventory is, and at all times will be, free and clear of all Liens other than Permitted Liens and unregistered Liens in respect of Priority Claims that are not yet due and payable;

(d)    such inventory does not include goods (i) that are not owned by a Credit Party, (ii) that are held by a Credit Party pursuant to a consignment agreement, or (iii) which have been sold by a Credit Party on a bill and hold basis;

(e)    such inventory is not subject to repossession on account of the "30 day goods" rule under section 81.1 of the *Bankruptcy and Insolvency Act* (Canada) or similar Laws except to the extent the applicable vendor has entered into an agreement with the Agent, in form and substance satisfactory to the Agent, waiving its right to repossession;

(f)    such inventory does not consist of work in process, store room materials, samples, prototypes, or packing and shipping materials not considered for sale by the Credit Parties in the ordinary course of business;

(g)    such inventory does not consist of goods that are returned (as defective or not fit for purpose) or used goods taken in trade;

(h)    any portion of the value of such inventory which results from a profit or gain resulting from an inter-company sale or other disposition of such inventory shall be excluded;

(i)    any "seconds" or scrap inventory shall be valued at scrap value;

(j)     such inventory is not evidenced by negotiable documents of title unless delivered to the Agent with endorsements;

(k)     such inventory does not constitute Hazardous Materials;

(l)     such inventory is covered by casualty insurance; and

(m)     the Agent has not determined in its Permitted Discretion that it may not sell or otherwise dispose of such inventory in accordance with the terms of the applicable Credit Documents without infringing upon the rights of another Person or violating any contract with any other Person.

1.1.82   "**Eligible Line of Business**" means any business engaged in as of the date of this Agreement by any of the Credit Parties, and any business reasonably related thereto.

1.1.83   "**Eligible Receivables**" means, at the time of determination, the Receivables of the Credit Parties then existing (other than with respect to Anchor, Terra and their respective Subsidiaries), minus any Receivable to which any of the criteria set forth below applies (unless all of the Lenders in their sole discretion elect to otherwise include such Receivables):

(a)     is not then subject to the applicable duly perfected Liens created by the Security;

(b)     is subject to any Lien or deemed trust (other than a Permitted Lien which does not rank in priority to the Liens created by the Security);

(c)     is outstanding more than (i) 120 days, in the case of Acceptable Account Debtors or (ii) 90 days, in the case of all other account debtors, in either case after the date of shipment of inventory or the provision of the service that created such Receivable;

(d)     is subject to any offset or counterclaim by the applicable account debtor (but only to the extent of such offset);

(e)     is owed by any Person whose principal place of business is located outside Canada or the U.S. unless the sale is on letter of credit, guarantee or some other terms acceptable to the Agent, acting reasonably;

(f)     is payable in a currency other than Canadian Dollars or U.S. Dollars;

(g)     is owed by an Affiliate of the Borrower or any employee, agent or representative of the Borrower or of any such Affiliate;

(h)     with respect to which a cheque, note, draft or other payment instrument has not been honoured in accordance with its terms;

(i)     is owed by any Person that is subject to an Insolvency Event; provided that the Receivables from insolvent account debtors shall be Eligible Receivables if and to

the extent that such Receivables are fully covered by credit insurance, letters of credit or other sufficient third-party credit support, or are otherwise deemed by the Agent not to pose an unreasonable risk of non-collectability;

(j) is subject to a holdback, but only to the extent of the amount of such holdback;

(k) is in dispute, but only to the extent of the amount thereof in dispute, or is subject to a claim regarding rescission, cancellation or avoidance, whether by operation of law or otherwise;

(l) to the extent such Receivable is evidenced by a judgment, provided that such Receivables shall be Eligible Receivables if and to the extent that such Receivables are fully covered by credit insurance, letters of credit or other sufficient third-party credit support, or are otherwise deemed by the Agent not to pose an unreasonable risk of non-collectability; and

(m) is owed by a Governmental Authority where Applicable Law imposes any requirement (including any requirement of notice, acceptance or acknowledgment by the Governmental Authority) to constitute a valid assignment as against such Governmental Authority, unless the applicable Credit Party has assigned its rights to payment of such Receivable to the Agent pursuant to, in the case of a U.S. federal Governmental Authority, the Assignment of Claims Act of 1940, as amended, or complied with such requirement pursuant to Applicable Law in the case of any other Governmental Authority.

(n) is or has been sold, contributed, financed or otherwise conveyed or pledged pursuant to either of a Permitted Factoring Transaction or a Permitted Securitization Financing.

For certainty, if any Receivable that is otherwise an Eligible Receivable is sold, contributed, financed or otherwise conveyed or pledged pursuant to a Permitted Securitization Financing it shall immediately cease to be an Eligible Receivable.

1.1.84   "**Encina**" means Encina Business Credit, LLC and its successors and permitted assigns.

1.1.85   "**Encina ABL Loan Agreement**" means the credit agreement dated as of September 6, 2019, by and among Anchor, the U.S. Borrower, each Person joined thereto as a borrower form time to time, the lenders from time to time party thereto and Encina as agent on behalf of such lenders, as may be amended, restated, replaced or otherwise modified from time to time to the extent permitted by the Encina Intercreditor Agreement.

1.1.86   "**Encina Intercreditor Agreement**" means the intercreditor agreement dated as of September 6, 2019, among Encina, the Agent, Anchor and the U.S. Borrower, as may be amended, restated, replaced or otherwise modified from time to time.

1.1.87   "**Equity Cure**" is defined in Section 7.3.2.

1.1.88    "**Equity Cure Repayment**" is defined in Section 7.3.2.

1.1.89    "**Equivalent Amount**" means, in relation to an amount in one currency, the amount in another currency that could be purchased by the amount in the first currency determined by reference to the applicable Exchange Rate at the time of such determination.

1.1.90    "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any applicable regulation promulgated thereunder.

1.1.91    "**ERISA Affiliate**" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of any Credit Party, or under common control with any Credit Party, within the meaning of Section 414 of the Code.

1.1.92    "**ERISA Event**" means (i) the occurrence of a reportable event, as defined in Section 4043 of ERISA, with respect to any Plan unless the 30 day notice requirement with respect to such event has been waived by the PBGC; (ii) the application for a minimum funding waiver pursuant to Section 412(c) of the Code or Section 302(c) of ERISA with respect to a Plan; (iii) the receipt by any Credit Party from the administrator of any Plan of a notice pursuant to Section 4041(a)(2) of ERISA of intent to terminate such Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the cessation of operations at a facility of any Credit Party or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (v) the withdrawal by any Credit Party or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (vi) the conditions for imposition of a Lien under Section 303 of ERISA shall have been met with respect to any Plan; or (vii) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042(a) of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, such Plan.

1.1.93    "**Exchange Rate**" means, on the date of determination of any amount of one currency to be converted into another currency pursuant to this Agreement for any reason, or vice-versa, the spot rate of exchange for converting Canadian Dollars into such other currency or vice-versa, as the case may be, established by the Bank of Canada at approximately 4:30 p.m. (Toronto time) on the Business Day immediately preceding the date of determination, and if no such rate is quoted, the spot rate of exchange for wholesale transactions by the Agent in Toronto, Ontario in accordance with its normal practice;.

1.1.94    "**Excluded Account**" means (a) any deposit account used solely for: (i) funding payroll or segregating payroll taxes or funding other employee wage or benefit payments in the ordinary course of business or (ii) segregating 401k contributions or contributions to an employee stock purchase plan and other health and benefit plan, in each case for payment in accordance with any Applicable Laws, (iii) any zero-balance disbursement accounts, or (iv) disbursements to pay independent contractors, (b) any deposit account the funds in which consist solely of funds held by Holdco or any Subsidiary on behalf of or in trust for the benefit of any third party that is not an Affiliate of Holdco, any Subsidiary or any Investor, (c) any deposit account the funds in which consist solely of cash earnest

money deposits or funds deposited under escrow or similar arrangements in connection with any letter of intent or purchase agreement for a Permitted Acquisition or any other transaction permitted under this Agreement, and (d) any deposit account the funds in which consist solely of funds held by Anchor and its Subsidiaries until such time as the Encina ABL Loan Agreement is terminated and the obligations thereunder have been repaid in full;

1.1.95   "**Excluded Hedging Obligation**" means, with respect to any Credit Party, any Hedging Liabilities if, and to the extent that, all or a portion of the Financial Assistance of such Credit Party of, or the grant by such Credit Party of a security interest to secure, such Hedging Liabilities (or any Financial Assistance in respect thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Credit Party's failure for any reason to constitute an Qualified ECP Guarantor at the time the Financial Assistance of such Credit Party, or a grant by such Credit Party of a security interest, becomes effective with respect to such Hedging Liabilities. If a Hedging Liability arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Hedging Liabilities that is attributable to swaps for which such Financial Assistance or security interest is or becomes excluded in accordance with the first sentence of this definition.

1.1.96   "**Executive Order**" means the Executive Order No. 13224 of 23 September 2001, entitled "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism".

1.1.97   "**Existing Credit Agreement**" means the Amended and Restated Credit Agreement, dated January 30, 2015 (as amended, supplemented or otherwise modified from time to time prior to the Amendment and Restatement Date), among the Canadian Borrower, the U.S. Borrower, HSBC, as administrative agent thereunder and the financial institutions from time to time party thereto as lenders.

1.1.98   "**Facilities**" means, collectively, the Term Facility, the Canadian Operating Facility and the U.S. Operating Facility; and "**Facility**" means any of them as the context requires.

1.1.99   "**Facilities Maturity Date**" means, in respect of each Facility, May 22, 2021.

1.1.100   "**FATCA**" means Section 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current and future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

1.1.101   "**Federal Funds Rate**" means, for any day, the rate of interest per annum set forth in the weekly statistical release designated as H.15(519), or any successor publication, published by the Federal Reserve Board (including any such successor, the "**H.15(519)**") for such day opposite the caption "*Federal Funds (Effective)*". If on any relevant day such

rate is not yet published in H.15(519), the rate for such day will be the rate of interest per annum set forth in the daily statistical release designated as the Composite 3:30 p.m. Quotations for U.S. Government Securities, or any successor publication, published by the Federal Reserve Bank of New York (including any successor, the "**Composite 3:30 p.m. Quotations**") for such day under the caption "*Federal Funds Effective Rate*". If on any relevant day the appropriate rate per annum for such day is not yet published in either H.15(519) or the Composite 3:30 p.m. Quotations, the rate for such day will be the arithmetic mean of the rates per annum for the last transaction in overnight Federal funds arranged prior to 9:00 a.m. (New York time) on that day by each of three major brokers of Federal funds transactions in New York City, selected by the Agent in its sole discretion, acting reasonably; provided that if the Federal Funds Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.102   "**Fee Agreement**" means the agreement between the Borrowers and the Agent delivered on or before the Amendment and Restatement Date under Section 9.1(n).

1.1.103   "**Financial Assistance**" means with respect of any Person and without duplication, any loan, guarantee, indemnity, assurance, acceptance, extension of credit, loan purchase, share purchase, equity or capital contribution, investment or other form of direct or indirect financial assistance or support of any other Person or any obligation (contingent or otherwise) primarily for the purpose of enabling another Person to incur or pay any indebtedness or to comply with agreements relating thereto or otherwise to assure or protect creditors of the other Person against loss in respect of indebtedness of the other Person and includes any guarantee of or indemnity in respect of the indebtedness of the other Person and any absolute or contingent obligation to (directly or indirectly):

(a)     advance or supply funds for the payment or purchase of any indebtedness of any other Person;

(b)     purchase, sell or lease (as lessee or lessor) any property, assets, goods, services, materials or supplies primarily for the purpose of enabling any Person to make payment of Funded Debt or to assure the holder thereof against loss;

(c)     guarantee, indemnify, hold harmless or otherwise become liable to any creditor of any other Person from or against any losses, liabilities or damages in respect of Funded Debt;

(d)     make a payment to another for goods, property or services regardless of the non-delivery or non-furnishing thereof to a Person; or

(e)     make an advance, loan or other extension of credit to or to make any subscription for equity, equity or capital contribution, or investment in or to maintain the capital, working capital, solvency or general financial condition of another Person;

provided, however, that the term "Financial Assistance" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Amendment and Restatement Date or

entered into in connection with any acquisition or disposition of assets permitted by this Agreement.

The amount of any Financial Assistance is the amount of any loan or direct or indirect financial assistance or support, without duplication, given, or all indebtedness of the obligor to which the Financial Assistance relates, unless the Financial Assistance is limited to a determinable amount, in which case the amount of the Financial Assistance is the determinable amount.

1.1.104  "**Financial Letter of Credit**" means a standby Letter of Credit if it serves as a payment guarantee of a Credit Party's financial obligations and is treated as a direct credit substitute for purposes of the Capital Adequacy Guidelines in the Swingline Lender's or Issuing Bank's, as applicable, reasonable opinion.

1.1.105  "**First Amendment Date**" means May 13, 2019.

1.1.106  "**First-Ranking Security Interest**" in respect of any Collateral means a Lien in such Collateral which is registered where necessary or desirable to record and perfect the charges contained therein and which ranks in priority to all other Liens in such Collateral except for any Permitted Liens which have priority thereto in accordance with Applicable Law or as otherwise agreed in writing by the Lenders.

1.1.107  "**Fiscal Quarter**" means the three (3) month period commencing on the first day of each Fiscal Year and each successive three (3) month period thereafter during such Fiscal Year.

1.1.108  "**Fiscal Year**" means the fiscal year of the Borrowers and their Subsidiaries commencing on January 1 of each year and ending on December 31 of each year.

1.1.109  "**Fixed Charge Coverage Ratio**" means, in respect of the Credit Parties on a combined basis for any applicable period, the ratio of:

(a)  (i) EBITDA for such period, plus, to the extent not included in EBITDA, the aggregate amount of all unencumbered cash (except pursuant to the Security) received by any Credit Party as payment of unbilled Receivables outstanding as of December 31, 2015 that were outstanding for more than 720 days from any of the Pemex Entities, in respect of contract number 423023821 dated August 6, 2013, between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V., and contract number 423023813 dated July 25, 2013, between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V. (in each case, as may be amended or otherwise modified from time to time), in an amount not to exceed $13,500,000, *minus* (ii) Earnout Payments made during such period (but only to the extent not directly funded by the cash proceeds from the sale of equity interests of the Canadian Borrower and, to the extent contributed to the capital of the Canadian Borrower, equity interests of any of the Canadian Borrower's direct or indirect parent companies), *minus* (iii) Unfunded Capital Expenditures made during such period, *minus* (iv) all Cash Taxes during such period, *minus* (v) Permitted Management Fees and Catch Up Management Fee Payments, if any, paid during

such period, *minus* (vi) any payments made during such period pursuant to clauses 7.2.6(l), *minus* (vii) all other Distributions to Persons that are not Credit Parties paid during such period, *minus* (viii) the fees and expenses described in clause (k) of the definition of EBITDA; <u>provided</u> that, any deferred purchase price payments made in accordance with the terms of the Anchor Acquisition Agreement shall not be deducted from EBITDA for the purposes of calculating the Fixed Charge Coverage Ratio;

*divided by*

(b)      the sum total of:

      (i)      all Interest Expense paid or payable in cash for such period;

      (ii)      the scheduled principal component of all Capital Lease payments for such period; and

      (iii)      all scheduled principal repayments under the Term Facility pursuant to Section 3.4.2 or under any other Funded Debt paid during such period;

all determined on a consolidated basis in accordance with GAAP and tested on a trailing 12 month basis at the end of each Fiscal Quarter.

1.1.110   "**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

1.1.111   "**Funded Debt**" means, with respect to any Person, all indebtedness, liabilities and obligations which would in accordance with GAAP be classified in the consolidated balance sheet of such Person as indebtedness for borrowed money and including without duplication:

(a)      money borrowed by way of overdraft;

(b)      indebtedness represented by bonds, debentures or notes payable and drafts accepted representing extensions of credit;

(c)      bankers' acceptances and similar instruments;

(d)      letters of credit, letters of guarantee and surety bonds issued at the request of such Person (to the extent not cash collateralized), but excluding Non-Financial Letters of Credit;

(e)      actual amounts owed under Hedging Agreements upon termination of such Hedging Agreements, including net settlement amounts payable upon maturity and termination payments payable upon termination or early termination, which are not paid when due;

(f)    indebtedness secured by any Lien existing on property of such Person, whether or not the indebtedness secured thereby shall have been assumed;

(g)    all obligations (whether or not with respect to the borrowing of money) that are evidenced by bonds, debentures, notes or other similar instruments, or that are not so evidenced but that would be considered by GAAP to be indebtedness for borrowed money;

(h)    all redemption obligations and mandatory dividend obligations of such Person with respect to any shares issued by such Person and which are by their terms or pursuant to any contract, agreement or arrangement:

    (i)    redeemable, retractable, payable or required to be purchased or otherwise retired or extinguished, or convertible into debt of such Person (A) at a fixed or determinable date, (B) at the option of any holder thereof, or (C) upon the occurrence of a condition not solely within the control and discretion of such Person; or

    (ii)    convertible into any other shares described in clause (i) above;

in any case under this clause (h), except as a result of an initial public offering, change of control or asset sale (so long as the Obligations have otherwise been paid in full prior to any such payment being required to be made under clause (i) above).

(i)    all obligations as lessee under Capital Leases;

(j)    all obligations under or in connection with any (i) Permitted Factoring Transaction and (ii) Permitted Securitization Financing (to the extent included in the consolidated balance sheet of such Person), which shall in each case be deemed to be equal to the net proceeds received thereunder;

(k)    all obligations of such Person secured by Purchase-Money Security Interests; and

(l)    any guarantee or indemnity (other than by endorsement of negotiable instruments for collection or deposit in the ordinary course of business) in any manner of any part or all of an obligation of another Person of the type included in items (a) through (k) above;

but excluding for greater certainty, deferred income taxes and normal course trade payables.

1.1.112  "**GAAP**" means generally accepted accounting principles in Canada or the United States as approved by the Canadian Institute of Chartered Accountants or American Institute of Certified Public Accountants, respectively, in effect from time to time, and as of the Amendment and Restatement Date, includes Canadian or United States generally accepted accounting principles for private enterprises.

1.1.113  "**Governmental Authority**" means any:

(a)     national, federal, provincial, state, municipal, local or other governmental or public department, central bank, court, commission, board, bureau, agency or instrumentality, domestic or foreign;

(b)     any subdivision or authority of any of the foregoing; or

(c)     any quasi-governmental, judicial or administrative body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing.

1.1.114  "**Group**" means any "**group**" such term as used in Sections 13(d) and 14(d) of the *United States Securities Exchange Act* of 1934, as amended, other than the Permitted Holders.

1.1.115  "**Guarantee**" means any agreement by which any Person assumes, guarantees, indemnifies, endorses, contingently agrees to purchase or provide funds for the payment of, or otherwise becomes liable upon, the obligation of any other Person, or agrees to maintain the net worth or working capital or other financial condition of any other Person or otherwise assures any creditor of such Person against loss, and shall include any contingent liability under any letter of credit or similar document or instrument.

1.1.116  "**Guarantors**" means Holdco and all current and future direct and indirect Material Subsidiaries of the Canadian Borrower.

1.1.117  "**Hazardous Materials**" means any contaminant, pollutant, waste or substance that is likely to cause immediately or at some future time harm or degradation to the surrounding environment or risk to human health; and without restricting the generality of the foregoing, including any pollutant, contaminant, waste, hazardous waste or dangerous goods that is regulated by any Requirements of Environmental Law or that is designated, classified, listed or defined as hazardous, toxic, radioactive or dangerous or as a contaminant, pollutant or waste by any Requirements of Environmental Law.

1.1.118  "**Hedge Provider**" means any Lender or any Affiliate thereof that enters into a Hedging Agreement with a Credit Party prior to such Lender ceasing to be a Lender under this Agreement. For certainty, any Person who enters into a Hedging Agreement after such Person ceases to be a Lender hereunder is not a Hedge Provider for purposes such Hedging Agreement.

1.1.119  "**Hedging Agreements**" means Interest Rate Hedging Agreements and Currency Hedging Agreements.

1.1.120  "**Hedging Liability**" means the actual indebtedness or obligations of any Credit Party to a counterparty who enters into a Hedging Agreement with such Credit Party under or pursuant to such Hedging Agreement.

1.1.121  "**Holdco**" means Fluid Holding Corp., a corporation incorporated under the BCBCA, and its successors and permitted assigns.

1.1.122 "**Hostile Acquisition**" means an acquisition, which is required to be reported to applicable securities regulatory authorities, of shares of a corporation where the board of directors of that corporation has not approved such acquisition nor recommended to the shareholders of the corporation that they sell their shares pursuant to the proposed acquisition or of units of a trust where the trustee or manager or administrator of that trust has not approved such acquisition nor recommended to the unitholders of the trust that they sell their units pursuant to the proposed acquisition or of units of a partnership where the board of directors of the general partner(s) thereof has not approved such acquisition nor recommended to the partners of the partnership that they sell their units pursuant to the proposed acquisition.

1.1.123 "**HSBC**" means HSBC Bank Canada and its successors and permitted assigns.

1.1.124 "**HSBC Mexico**" means HSBC México, S.A., Institución de Banca Múltiple, Grupo Financiero HSBC.

1.1.125 "**HSBC US**" means HSBC Bank USA, National Association and its successors and permitted assigns.

1.1.126 "**Impositions**" is defined in Section 12.4.1.

1.1.127 "**Indemnitees**" means the Lenders, the Agent and their respective successors and permitted assignees, any agent of any of them (specifically including a receiver or receiver-manager) and the respective officers, directors and employees of the foregoing.

1.1.128 "**Insolvency Event**" means, in respect of any Person:

(a)     such Person commits an act of bankruptcy or becomes insolvent (as such terms are used in the BIA); or makes an assignment for the benefit of creditors, files a petition in bankruptcy, makes a proposal or commences a proceeding under Insolvency Legislation; or petitions or applies to any tribunal for, or consents to, the appointment of any receiver, trustee or similar liquidator in respect of all or a substantial part of its property; or admits the material allegations of a petition or application filed with respect to it in any proceeding commenced in respect of it under Insolvency Legislation; or takes any board action for specifically authorizing any of the foregoing actions; or

(b)     any proceeding or filing is commenced against such Person seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment or composition of it or its debts under any Insolvency Legislation, or seeking appointment of a receiver, trustee, custodian or other similar official for it or any of its property or assets; unless:

(i)     such Person is diligently defending such proceeding in good faith and on reasonable grounds as determined by the Required Lenders acting reasonably and the same shall continue undismissed, or unstayed and in effect, for any period of 60 consecutive days; and

(ii)  such proceeding does not in the reasonable opinion of the Required Lenders materially adversely affect the ability of such Person to carry on its business and to perform and satisfy all of its obligations.

1.1.129  "**Insolvency Legislation**" means legislation in any applicable jurisdiction relating to reorganization, arrangement, compromise or re-adjustment of debt, dissolution or winding-up, or any similar legislation, and specifically includes the BIA, the *Companies' Creditors Arrangement Act* (Canada), the *Winding-Up and Restructuring Act* (Canada) and the *Bankruptcy Code* (United States) and any similar legislation under Applicable Law.

1.1.130  "**Insurance Proceeds**" is defined in Section 5.3.1(c).

1.1.131  "**Insured Receivables**" means Receivables of the Credit Parties owing from account debtors that:

(a)  solely in respect of Insured Receivables that do not derive from and are not governed by the laws of Canada or the United States of America or any political subdivision thereof, no less than 80% of such Receivables arise from Eligible Approved Contracts; *provided* that if the revenue derived from any such single contract exceeds 10% of the Canadian Borrower's annual revenue as set out in the then most recent income statement of the Canadian Borrower that was delivered to the Lenders hereunder, such contract must be an Eligible Approved Contract;

(b)  does not arise under an "excluded contract" or any similar term as provided in the Account Receivable Insurance, are within the approved credit, sovereign, country, single obligor and other limits under the Account Receivable Insurance and are otherwise covered under the Account Receivable Insurance which is in full force and effect;

(c)  the Credit Parties have complied with the credit policy provided for in the Account Receivable Insurance with respect to such Receivables, including the issuance of invoices, *pro forma* invoices and final invoices within the required time periods thereunder;

(d)  there are no events, facts or circumstances which would reasonably be expected to result in the insurer under the Account Receivable Insurance denying (or withholding or delaying) payment of a claim in respect of such Receivables or asserting any defense, dispute or counterclaim with respect to such Receivables;

(e)  the insurer under the Account Receivable Insurance has not denied all or any portion of a claim in respect of such Receivable, and has not asserted any defense, dispute or counterclaim with respect to such Receivable;

(f)  the Credit Parties have not suffered any loss with respect to such Receivables, unless such loss is covered by the Account Receivable Insurance;

(g)  are not in dispute and are valid and enforceable obligations of the account debtor under Applicable Law;

(h)     if Credit Parties have suffered a loss in respect of such Receivable covered by the Account Receivable Insurance, they have submitted a claim for such loss in accordance with the terms of the Account Receivable Insurance and have otherwise complied with all provisions of the Account Receivable Insurance on a timely basis in order to be entitled to have such claim paid by the insurer under the Account Receivable Insurance;

(i)     the Credit Parties have paid any required deductibles under the Account Receivable Insurance in respect of such Receivables; and

(j)     in any case, are due within the time period, including any "waiting period", from the date of billing required under the Account Receivable Insurance in respect of such Receivable.

1.1.132 "**Intercreditor Agreement**" means that certain intercreditor and priority agreement between the Agent, HSBC Mexico, and the Borrower or QMax Mexico, as amended, modified, supplemented or restated from time to time, with respect to any Permitted Factoring Transaction with HSBC Mexico.

1.1.133 "**Interest**" means interest on loans, stamping fees in respect of bankers' acceptances, the difference between the proceeds received by the issuers of bankers' acceptances and the amounts payable upon the maturity thereof, issuance fees in respect of letters of credit, and any other charges or fees in connection with the extension of credit which are determined by reference to the amount of credit extended, plus standby fees in respect of the unutilized portion of any credit facility; but for greater certainty "Interest" shall not include agency fees, arrangement fees, structuring fees, fees relating to the granting of consents, waivers, amendments, extensions or restructurings, the reimbursement of costs and expenses, and any similar amounts which may be charged from time to time in connection with the establishment, administration or enforcement of the credit facilities.

1.1.134  "**Interest Expense**" means, with respect to any Person for any period, the sum of (without duplication) (a) interest expense of such Person for such period on a consolidated basis, including (i) the amortization of debt discounts, (ii) all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances, (iii) standby fees in respect of undrawn debt, (iv) discounts applied to the proceeds of any Permitted Factoring Transaction or Permitted Securitization Financing, and (v) the portion of any payments or accruals with respect to Capital Lease obligations allocable to interest expense (but excluding (A) non-cash interest expense attributable to the movement of mark-to-market hedging obligations or other derivative instruments pursuant to GAAP (B) penalties and interest related to taxes, amortization of debt financing fees, debt issuance costs, commissions, fees and expenses and the expensing of any commitment and other financing fee in each case, to the extent constituting interest expense under GAAP), and (b) capitalized interest of such Person. For purposes of the foregoing, cash interest expense shall be determined after giving effect to any net payments made or received and costs incurred by the Borrower and the Subsidiaries with respect to Interest Rate Hedging Agreements, and interest on a Capital Lease obligation shall be deemed to accrue at an

interest rate reasonably determined by the Borrower to be the rate of interest implicit in such Capital Lease obligation in accordance with GAAP.

1.1.135 "**Interest Rate Hedging Agreement**" means any agreement that does not contravene Section 7.2.13 entered into between the Borrower and a counterparty from time to time for the purpose of hedging interest rate risk, including interest rate exchange agreements (commonly known as "**interest rate swaps**") and forward rate agreements; and for greater certainty, including interest rate exchange agreements in U.S. Dollars (commonly known as "**cross-currency swaps**").

1.1.136 "**Interim Financial Statements**" in respect of any Fiscal Quarter means, in respect of any Person, the unaudited financial statements of such Person on a consolidated basis in respect of such Fiscal Quarter (and also on a year-to-date basis in respect of such Fiscal Quarter and all previous Fiscal Quarters in the same Fiscal Year).

1.1.137 "**Investment Grade**" means, with respect to the long term unsecured debt ratings of a Person, of the rating agencies on the date hereof, Baa3 or higher for Moody's Investors Services, Inc. or BBB- or higher for Standard & Poor's Rating Services, a division of The McGraw Hill Companies, Inc. (or in either case, their respective successors).

1.1.138 "**Investments**" has the meaning given to it in Section 7.2.3.

1.1.139 "**Investors**" means Pep Fluid Co-Invest L.P., PEP Fluid L.P. and any other investors from time to time who are approved in writing by the Agent on behalf of the Required Lenders.

1.1.140 "**ISDA**" means the International Swaps and Derivatives Association and its successors and assigns.

1.1.141 "**ISP98**" means the International Standby Practices ISP98, as published by the International Chamber of Commerce and in effect from time to time.

1.1.142 "**Issuing Bank**" means the Swingline Lender under the Canadian Operating Facility and HSBC US under the U.S. Operating Facility, as applicable.

1.1.143 "**Land**" means real property (including a leasehold interest in land) and all buildings, improvements, fixtures and plant situated thereon.

1.1.144 "**Landlord Agreement**" means an agreement between the Agent, the applicable Credit Party and the landlord of a Leased Property in form and substance reasonably satisfactory to the Agent, which shall include the following provisions (except to the extent otherwise agreed by the Agent in its discretion): such landlord consents to the granting of a security interest in the lease applicable to such Leased Property by a Credit Party which is a tenant thereunder in favour of the Agent, agrees to give written notice to the Agent in respect of and a reasonable opportunity to cure any default before terminating the lease, and agrees to waive (or subordinate and defer the enforcement of) its rights and remedies and any security it may hold in respect of any assets owned by the applicable Credit Party located on or affixed to such Leased Property.

1.1.145 "**Laws**" means all laws, statutes, codes, ordinances, decrees, rules, regulations, municipal by-laws, judicial or arbitral or administrative or ministerial or departmental or regulatory judgments, orders, decisions, rulings or awards, or any provisions of such laws, including general principles of common and civil law and equity or policies or guidelines, to the extent such policies or guidelines have the force of law, binding on the Person referred to in the context in which such word is used; and "**Law**" means any of the foregoing.

1.1.146 "**LC Payment**" is defined in Section 2.7.9.

1.1.147 "**Leased Properties**" means all Land leased by any Credit Party as tenant from time to time, specifically including as at the date of this Agreement the Land described in Schedule 6.1.10; and "**Leased Property**" means any of the Leased Properties as the context requires.

1.1.148 "**Lenders**" means the lenders identified in Exhibit "A" attached hereto and any other Persons which may from time to time become lenders pursuant to this Agreement; and their respective successors and permitted assigns; and "**Lender**" means any of them as the context requires.

1.1.149 "**Lending Office**" in respect of any Lender means the office of such Lender designated by it from time to time as the office from which it will make Advances hereunder.

1.1.150 "**Letter of Credit**" means a stand-by letter of credit or a letter of guarantee or documentary letter of credit issued, at the request of and on behalf of the Borrower, by the applicable Issuing Bank.

1.1.151 "**Level**" means the applicable level as set forth in the table set forth in the definition of Applicable Margin.

1.1.152 "**LIBOR Business Day**" means a day on which the main branches of the Agent and commercial banks generally are open for international business (including dealings in U.S. Dollar deposits in the London interbank market) in London, England and New York, New York.

1.1.153 "**LIBOR Interest Period**" means, with respect to each LIBOR Loan, the initial period (subject to availability) of approximately one, two, three, six or twelve months or such other periods as selected by the Borrower and notified in writing to the Agent commencing on and including the date of any Advance, Conversion or Rollover, as the case may be, applicable to such LIBOR Loan and ending on and including the last day of such initial period, and thereafter, each successive period (subject to availability) of approximately one, two, three, six or twelve months or such other periods as selected by the Borrower and notified to the Agent in writing commencing on and including the last day of the prior LIBOR Interest Period; provided, however, that:

(a)     in the case of a Rollover, the last day of each LIBOR Interest Period shall also be the first day of the next LIBOR Interest Period;

(b)    the last day of each LIBOR Interest Period shall be a LIBOR Business Day and if not, the Borrower shall be deemed to have selected a LIBOR Interest Period the last day of which is the first LIBOR Business Day following the last day of the LIBOR Interest Period selected by the Borrower;

(c)    if the Borrower selects a LIBOR Interest Period for a period longer than three months, the last day of such LIBOR Interest Period shall be the date falling three months after the beginning of such LIBOR Interest Period and the next LIBOR Interest Period shall begin on such date; and

(d)    notwithstanding any of the foregoing, the last day of each LIBOR Interest Period shall be on or before the maturity date of the applicable Facility.

1.1.154 "**LIBOR Loan**" means an Advance made by a Lender to a Borrower in U.S. Dollars in accordance with the provisions hereof, bearing interest by reference to the U.S. Dollar LIBOR Rate.

1.1.155 "**LIBOR Market**" means the London Interbank Eurodollar offering market.

1.1.156 "**LIBOR Period**" means, in respect of a LIBOR Loan, the period commencing on the date of the Advance of such LIBOR Loan and ending on the scheduled maturity date of such LIBOR Loan.

1.1.157 "**LIBOR Rate**" means, with respect to each LIBOR Interest Period pertaining to any LIBOR Loan, the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other successor thereto which takes over administration of such rate) appearing on Bloomberg Page BBAM1 screen (or on any successor or substitute page of such Bloomberg screen providing rate quotations comparable to those currently provided on such page of such Bloomberg screen, as determined by the Agent from time to time for purposes of providing quotations of interest rates applicable to U.S. Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two LIBOR Business Days prior to the making a LIBOR Loan, as the rate for the offering of U.S. Dollar deposits with a maturity comparable to the LIBOR Interest Period of such LIBOR Loan; provided, however, that if the said page is not available for any reason, the term "**LIBOR Rate**" shall mean the rate per annum at which deposits in U.S. Dollars for the applicable interest period and amount are offered to the Agent in the LIBOR Market; provided that if the LIBOR Rate calculated for any purpose would be less than zero on any day, then such rate shall be deemed to be zero for such purpose.

1.1.158 "**Lien**" means:

(a)    a lien, charge, mortgage, deed of trust, pledge, security interest or conditional sale or title retention agreement in the nature of security which secures payment or performance of an obligation;

(b)    an assignment, lease, consignment, deposits, trust or deemed trust that secures payment or performance of an obligation;

(c)      a garnishment; and

(d)      any other encumbrance of any kind in the nature of security which secures payment or performance of an obligation (including any garantía prioritaria por adquisición under law 1676 of 2013 Colombia).

1.1.159  "**Loan**" means a Canadian Dollar Prime Rate Loan, U.S. Dollar Base Rate Loan, U.S. Dollar Prime Rate Loan, LIBOR Loan, Bankers' Acceptance, BA Equivalent Loan or Letter of Credit outstanding hereunder, or in the case of the Swingline, Overdraft borrowings and such other Advances permitted under Section 2.7.2.

1.1.160  "**Management Shareholders**" means each of the employees of the Canadian Borrower who hold Common Shares of the Canadian Borrower or options in respect of the same on the Amendment and Restatement Date and such other holders thereof from time to time who are approved in writing by the Agent on behalf of the Required Lenders, and "**Management Shareholder**" means any one of them.

1.1.161  "**Marginable Capital Assets**" means 60% of the net book value of Eligible Capital Assets at the time of determination, up to a maximum amount of U.S. $50,000,000 less the amount of each completed Anchor Sale and Leaseback Transaction; provided that, reductions resulting from Anchor Sale and Leaseback Transactions shall not reduce the amount available below U.S. $30,000,000.

1.1.162  "**Marginable Cash**" means 100% of Eligible Cash up to a maximum amount of U.S. $15,000,000 at any time.

1.1.163  "**Marginable Inventory**" means 50% of Eligible Inventory at the time of determination, up to U.S. $35,000,000.

1.1.164  "**Marginable Receivables**" means the sum of the following (without duplication):

(a)      90% of Insured Receivables (or such lower percentage as is covered by the applicable Account Receivable Insurance) up to a maximum amount of U.S. $175,000,000;

(b)      85% of Eligible Receivables owed to a Credit Party by Acceptable Account Debtors;

(c)      75% of all other Eligible Receivables; and

(d)      90% of Insured Receivables from Pemex outstanding more than 300 days, but not more than 540 days, in respect of contract numbers 423023819 and 423023813 between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V., dated April 22, 2014 and July 17, 2013, respectively, and contract number 423023813, dated July 25, 2013, between Pemex Exploracion y Produccion and Qmax Mexico, S.A. de C.V. (in each case, as may be amended or otherwise modified from time to time).

1.1.165  "**Material Adverse Change**" or "**Material Adverse Effect**" means any matter, event or circumstance that individually or in the aggregate could, in the opinion of the Required Lenders, acting reasonably, be expected to result in a material adverse change to or have a material adverse effect on:

(a)     the business, financial condition, prospects, operations, or property, of the Canadian Borrower and its Subsidiaries (excluding any Securitization SPE), taken as a whole;

(b)     the ability of any Credit Party to pay and perform its obligations in accordance with this Agreement or any of the other Credit Documents; or

(c)     the validity or enforceability of this Agreement or any other Credit Document.

1.1.166  "**Material Agreement**" means, in respect of the Credit Parties, an agreement made between the applicable Credit Party or its predecessors and another Person (a) pursuant to which such Credit Party is reasonably expected to incur obligations or liabilities in excess of $10,000,000 in any Fiscal Year (other than any agreement related to the purchase of equipment, software or utility services) and (b) which if terminated (other than at its scheduled maturity) would, unless replaced with a substantially similar agreement, result, or would have a reasonable likelihood of resulting, in a Default, an Event of Default or a Material Adverse Change, specifically including, as at the Amendment and Restatement Date, each agreement listed in Schedule 6.1.13; <u>provided</u>, in each case, in no event shall the Wells Fargo Credit Agreement or any agreement in connection with a Permitted Securitization Financing be considered a Material Agreement.

1.1.167  "**Material Permit**" means, in respect of the Credit Parties, a licence, permit, approval, registration or qualification granted to or held by the applicable Credit Party which if terminated and not replaced would result, or would have a reasonable likelihood of resulting, in a Default, an Event of Default or a Material Adverse Change; specifically including, as at the date of this Agreement, each licence, permit, approval, registration or qualification listed in Schedule 6.1.8.

1.1.168  "**Material Subsidiary**" means (a) any wholly-owned Subsidiary of the Canadian Borrower which:

(i)     has Consolidated Net Tangible Assets owned directly by it on an unconsolidated basis equal or greater than 5% of the Canadian Borrower's Consolidated Net Tangible Assets as at the end of the Fiscal Quarter immediately prior to the date of such determination;

(ii)     has EBITDA generated by it on an unconsolidated basis equal or greater than 5% of the Canadian Borrower's consolidated EBITDA as at the end of the Fiscal Quarter immediately prior to the date of such determination; or

(iii)     any Subsidiary of the Canadian Borrower that has been designated as a "Material Subsidiary" by the Borrower,

and (b) any Subsidiary which owns, directly or indirectly, any equity or other ownership interest in a Material Subsidiary.

1.1.169   "**Minimum Liquidity**" means the sum of (A) the amount of unrestricted cash (determined in accordance with GAAP) and Cash Equivalents of the Credit Parties held in accounts with any of the Lenders, Encina (or any other lenders party to the Encina ABL Loan Agreement) and Wells Fargo (or any other lenders party to the Wells Fargo Credit Agreement), plus (B) the Minimum Margin Availability and undrawn available amount under the Encina ABL Loan Agreement or the Wells Fargo Credit Agreement, as applicable, plus (C) undrawn and available amounts under other facilities constituting Permitted Funded Debt plus (D) non-Marginable Cash.

1.1.170   "**Minimum Margin Availability**" means the undrawn available amount under the Operating Facilities up to the Borrowing Base (as at the time of determination).

1.1.171   "**Minor Title Defects**" in respect of any parcel of Land means encroachments, restrictions, easements, rights-of-way, servitudes and defects or irregularities in the title to such Land which are of a minor nature and which, in the aggregate, will not materially impair the use of such Land for the purposes for which such Land is held by the owner thereof.

1.1.172   "**Multiemployer Plan**" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Credit Party or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

1.1.173   "**Multiple Employer Plan**" means a plan that is described in Section 210 of ERISA and subject to Title IV of ERISA, and (i) is maintained for employees of any Credit Party or any ERISA Affiliate and (ii) in respect of which any Credit Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

1.1.174   "**Net Leverage Ratio**" means, in respect of any Fiscal Quarter, the ratio of Total Net Debt at the end of such Fiscal Quarter to EBITDA in the fiscal period comprised of such Fiscal Quarter and the immediately preceding three Fiscal Quarters.

1.1.175   "**New Rules**" is defined in Section 12.1.3.

1.1.176   "**Non-BA Lender**" means a Lender identified in Exhibit "A" attached hereto as a Lender which will make BA Equivalent Loans instead of accepting Bankers' Acceptances hereunder.

1.1.177   "**Non-Consenting Lender**" is defined in Section 11.5.2.

1.1.178   "**Non-Financial Letter of Credit**" means a Letter of Credit that is not a Financial Letter of Credit and, for the purposes of the definition of "Funded Debt", any similar performance letter of credit issued by a party that is not an Issuing Bank.

1.1.179  "**Non-OECD Guarantor**" means any Guarantor whose governing jurisdiction is located in a country which not a member of OECD, excluding Colombia.

1.1.180  "**Non-Paying Lender**" is defined in Section 11.4.2.

1.1.181  "**Obligations**" means, at any time all direct and indirect, contingent and absolute obligations and liabilities of the Borrower and the other Credit Parties to the Agent and the Lenders under or in connection with this Agreement and the Security (specifically including for greater certainty all Guarantees provided hereunder) at such time, specifically including the Outstanding Advances, all accrued and unpaid interest thereon, all Secured Hedging Liabilities and all Banking Service Liabilities, all indemnity obligations arising under, any other Credit Document, any Banking Service Agreement or any Hedging Agreement with a Hedge Provider, all fees payable in connection with prepayments, all breakage fees payable pursuant to Section 5.15 and all other fees, expenses and other amounts payable pursuant to this Agreement and the Security (specifically including fees relating to the Facilities as may be agreed in writing from time to time between a Borrower and any Lender); except that if otherwise specified or required by the context, "Obligations" shall mean any portion of the foregoing. Notwithstanding anything herein to the contrary, the "Obligations" shall exclude any Excluded Hedging Obligations.

1.1.182  "**OECD**" means The Organisation for Economic Co-operation and Development.

1.1.183  "**OECD Credit Party**" means any Credit Party whose governing jurisdiction is in a country which is an OECD member or which has a sovereign currency credit rating at an Investment Grade level.

1.1.184  "**OFAC**" means the U.S. Treasury Department Office of Foreign Assets Control.

1.1.185  "**Operating Facilities**" means, collectively, the Canadian Operating Facility and the U.S. Operating Facility, and "**Operating Facility**" means any of them as the context requires.

1.1.186  "**Other Taxes**" is defined in Section 12.4.2.

1.1.187  "**Outstanding Advances**" means, at any time, the aggregate of all obligations of the Borrowers to the Lenders (or if the context requires, to any Lender) in respect of all Advances made under the Facilities (or if the context requires, under any Facility) which have not been repaid or satisfied at such time, determined as follows:

(a)     in the case of Canadian Dollar Prime Rate Loans and Overdrafts in Canadian Dollars, the principal amount thereof;

(b)     in the case of Bankers' Acceptances and BA Equivalent Loans and Letters of Credit, the face amount thereof;

(c)     in the case of Letter of Credit, the undrawn amount thereof (to the extent not cash collateralized, backstopped or otherwise provided for in a manner acceptable to the Issuing Bank, in its discretion, in respect thereof); and

(d)     in the case of U.S. Dollar Base Rate Loans, Overdrafts in U.S. Dollars and LIBOR Loans the Equivalent Amount of the principal amount thereof expressed in Canadian Dollars.

1.1.188  "**Overdraft**" means indebtedness of the Canadian Borrower to the Swingline Lender arising under the Swingline in connection with all amounts debited to all overdraft accounts established by the Canadian Borrower with the Swingline Lender (in Canadian Dollars or U.S. Dollars, as the case may be), including without limitation all cheques, transfers, withdrawals, interest, costs, charges and fees debited to such accounts.

1.1.189  "**Palladium**" means Palladium Capital Management IV LLC.

1.1.190  "**Palladium Equity Line**" means the Loan Agreement, dated as of October 18, 2017, by and between Holdco, as borrower, and PEP Fluid L.P., as lender (together with the revolving demand note related thereto), and any related loan agreement and revolving demand note with PEP Fluid Co-Invest LP and/or Calumet, in an aggregate principal amount of up to $5,000,000, as may be amended, restated, replaced or otherwise modified from time to time.

1.1.191  "**Participant**" is defined in Section 13.6.4.

1.1.192  "**Participant Register**" is defined in Section 13.6.4

1.1.193  "**Parties**" means the Borrowers, the Agent and the Lenders and their respective successors and permitted assigns.

1.1.194  "**PATRIOT Act**" means *The Uniting and Strengthening America by Providing Adequate Tools Required to Intercept and Obstruct Terrorism Act* of 2001 (Title III of Pub. L. No. *107-56 (signed into law October 26, 2001)*).

1.1.195  "**PBGC**" means the Pension Benefit Guaranty Corporation (or any successor).

1.1.196  "**Pemex Entities**" means, collectively, Petroleos Mexicanos, Pemex Exploracion y Produccion and Pemex Perforacion y Servicios.

1.1.197  "**Pension Plan**" means:

(a)     a "pension plan" or "plan" which is subject to the funding requirements of applicable pension benefits legislation in any jurisdiction of Canada and is applicable to employees of a Credit Party resident in Canada; or

(b)     any pension benefit plan or similar arrangement (other than Plans or Multiemployer Plans) applicable to employees of a Credit Party.

1.1.198  "**Permitted Acquisition**" means any Acquisition with respect to which all of the following conditions shall have been satisfied:

(a)     the Acquired Business has positive EBITDA calculated on a trailing twelve month basis (determined using the definition thereof set for herein as if the Acquired Business was the Canadian Borrower for such purpose);

(b)     the Acquired Business is in an Eligible Line of Business in Canada or the U.S.;

(c)     the Acquisition shall not be a Hostile Acquisition and, if the Acquisition involves a merger involving a Credit Party, the surviving entity is or becomes a Credit Party concurrently with the completion of such merger;

(d)     the aggregate purchase price of all such Acquisitions shall not exceed the sum of $50,000,000 in any Fiscal Year;

(e)     if the consideration payable at the closing of the acquisition of the Acquired Business in cash, shares or other tangible assets (but for certainty excluding Earnout Payments), plus the Permitted Funded Debt of the Acquired Business assumed as part of such acquisition, is greater than $15,000,000, then (i) the Net Leverage Ratio on a *pro forma* basis (including the EBITDA and, if applicable, Permitted Funded Debt of the Acquired Business) as of the end of and for the most recently completed four Fiscal Quarter period occurring prior to the closing of the Acquisition in question for which financial statements are available does not exceed the maximum Net Leverage Ratio permitted for such four Fiscal Quarter period under Section 7.3.1(a) *minus* 0.25 to 1, (ii) after giving effect to the funding of the Acquisition in question the sum of: (A) unrestricted cash on hand of the Credit Parties, *plus* (B) undrawn and available amounts under the Operating Facilities, *plus* (C) undrawn and available amounts permitted under operating facilities provided under clauses (c) and (d) of the definition of Permitted Funded Debt (<u>provided</u>, that the stated maturity date of any such facility, if any, is not within 90 days after the date of such Acquisition), is no less than $25,000,000; and (iii) at least 10 Business Days prior to the date that the Acquisition is to close, the Lenders shall have received financial statements and quarterly earnings reports in respect of the Acquired Business which shall be satisfactory to the Required Lenders, acting reasonably, together with any other information in respect of the Acquired Business which the Agent may reasonably request (and in the case of (i) and (ii) above, the resident and/or chief financial officer of the Canadian Borrower will deliver to the Agent an officer's certificate confirming such items, together with detailed calculations thereof);

(f)     if the Acquisition relates to the purchase of shares or other equity of a Person, it must be for 100% of the issued and outstanding shares of such Person;

(g)     if a new Material Subsidiary is formed or acquired as a result of or in connection with the Acquisition, the Borrower shall have complied with the requirements of Article 8 in connection therewith, subject to the last sentence of Section 8.2;

(h)     any existing indebtedness of the Acquired Business will be repaid and, if applicable, cancelled, unless otherwise constituting Permitted Funded Debt; and

(i)      after giving effect to the Acquisition and any Advance in connection therewith, and subject to clause (j) below with respect to the representations and warranties in this Agreement, no Default or Event of Default shall exist, including with respect to the financial covenants contained in Section 7.3 on a *pro forma* basis as of the end of and for the most recently completed four Fiscal Quarter period occurring prior to the closing of the Acquisition for which financial statements are available; and

(j)      all representations and warranties set forth herein (other than those which are specified to be given as of specific date) shall be repeated as of the date of the Acquisition (after giving effect to the Acquisition and any Advance in connection therewith) and must be true in all material respects;

provided that, notwithstanding anything herein to the contrary, the Terra Acquisition shall constitute a Permitted Acquisition if the following conditions shall have been satisfied:

(i)      the Terra Acquisition shall not be funded in whole or in part with the proceeds of any Advance hereunder;

(ii)      on the date hereof, all amounts outstanding under the Palladium Equity Line shall be repaid in full and, immediately following such repayment, Palladium shall make an equity contribution to the Canadian Borrower in an amount not less than $7,000,000; and

(iii)      prior to or substantially concurrently with the closing of the Terra Acquisition, the Permitted Securitization Financing among ADF SPV, LLC, as borrower, Anchor, as servicer, and Wells Fargo Bank, National Association, as lender and agent shall also be consummated or the Credit Parties shall have otherwise arranged sufficient funding to fund such acquisition in a manner that is acceptable to the Required Lenders, acting reasonably.

1.1.199   "**Permitted Contest**" means action taken by or on behalf of a Credit Party in good faith by appropriate proceedings diligently pursued to contest a tax, claim or Lien; provided, that:

(a)      the Person to which the tax, claim or Lien being contested is relevant (and, in the case of a Subsidiary of the Canadian Borrower, the Canadian Borrower on a consolidated basis) has established reasonable reserves therefor if and to the extent required by GAAP;

(b)      proceeding with such contest does not have, and would not reasonably be expected to result in, a Material Adverse Change; and

(c)      proceeding with such contest will not create a material risk of sale, forfeiture or loss of, or interference with the use or operation of, a material part of the assets of the Credit Parties, taken as a whole.

1.1.200 "**Permitted Discretion**" shall mean the Agent's or any Required Lender's discretion, as the context requires, exercising its reasonable credit judgment in accordance with customary business practices for comparable asset-based lending transactions and, as it relates to the adjustment or imposition of exclusionary criteria, shall require that, (a) such establishment, increase, adjustment or imposition after the Amendment and Restatement Date be based on the analysis of facts or events first occurring, first discovered or quantified by the Agent, or the applicable Required Lender, after the Amendment and Restatement Date or that are materially different from facts or events occurring or known to the Agent, or the Required Lender, on the Amendment and Restatement Date, (b) the contributing factors to such change shall not duplicate the exclusionary criteria set forth in the definitions of "Eligible Capital Assets", "Eligible Inventory" and "Eligible Receivables" as applicable (and vice versa), and (c) the effect of any adjustment or imposition of exclusionary criteria shall be a quantification of the incremental reduction of the Borrowing Base attributable to such contributing factors which is reasonable in light of reasonable credit judgment exercised in senior secured asset-based revolving credit facilities with comparable companies of similar size, industries, businesses and business practices, including, without limitation, leverage profile and projected free cash flow, in the applicable market.

1.1.201 "**Permitted Dispositions**" is defined in Section 7.2.4.

1.1.202 "**Permitted Distribution**" means:

(a)     the Permitted Management Fees; provided, that no such Distribution is permitted if a Default or an Event of Default exists at such time or would result therefrom; and further provided, that any such payments that were not able to be made during the occurrence of a Default or an Event of Default may be "caught up" when such Default or Event of Default no longer exists (regardless of the Annual Management Fee Cap) (with any such catch up payments in excess of the Annual Management Fee Cap in any Fiscal Year being referred to herein as the "**Catch Up Management Fee Payments**");

(b)     any Distribution from one Credit Party to another Credit Party;

(c)     any other Distribution payable to the shareholders of the Canadian Borrower by any Credit Party if at the time such Distribution is made (i) no Default or Event of Default exists at such time or would result therefrom, (ii) on a *pro forma* basis after giving effect to such Distribution, the Net Leverage Ratio would not exceed 2.50 to 1, as evidenced by the Canadian Borrower providing an officer's certificate to the Agent confirming same, and (iii) no Borrowing Base Shortfall has occurred and is continuing or would result from any such Distribution on a *pro forma* basis as if such Distribution had been made as of the end of the last Fiscal Quarter;

(d)     any dividend payments or other Distributions payable by Holdco or any of its Subsidiaries solely in the equity interests of such Person;

(e)     any Distribution permitted under Section 7.2.6(l);

(f) non-cash repurchases by Holdco or its Subsidiaries of equity interests deemed to occur upon exercise of stock options or similar equity incentive awards if such equity interests represents a portion of the exercise price of such options or similar equity incentive awards;

(g) cash dividends to Holdco (and by Holdco to its parent companies) by any Credit Party not to exceed an amount necessary to permit Holdco and its parent companies to pay for normal, reasonable and documented over-head and administrative costs and expenses of Holdco and its parent companies and franchise fees or similar taxes and fees required to maintain its corporate existence and to reimburse out-of-pocket expenses actually incurred by Holdco and its parent companies for the benefit of the Canadian Borrower, and other Distributions for customary directors' fees to any board members and the reimbursement of out-of-pocket expenses incurred by any board members in such capacity, provided that no Default or Event of Default exists at such time or would result therefrom; and

(h) Distributions made (i) to Holdco to permit Holdco to, and Holdco may, redeem or repurchase equity interests of Holdco from officers, employees, consultants, managers and directors of the Canadian Borrower or any of its Subsidiaries in connection with the termination of employment or engagement of any such Person or (ii) pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or other agreement or arrangement (including, but not limited to, employment, compensation, severance agreements or arrangements or stockholders agreements), provided that no Default or Event of Default exists at such time or would result therefrom; and

(i) prior to the closing of the Terra Acquisition, Distributions to Palladium or its Affiliates in repayment of the Palladium Equity Line; <u>provided</u> in the event the Palladium Equity Line is not repaid as contemplated in clause (ii) of the proviso set forth in the definition of "Permitted Acquisition", (x) the Canadian Borrower and its Subsidiaries shall, on a *pro forma* basis, have a Minimum Liquidity of not less than U.S. $15,000,000 immediately after such repayment, and (y) the principal in respect of the Palladium Equity Line will not be repaid prior to October 31, 2018, unless (A) such prepayment is made in the manner prescribed by clause (ii) of the proviso set forth in the definition of "Permitted Acquisition" and the subsequent equity contribution described in such clause is also effected, or (B) the Required Lenders consent to such earlier prepayment in their Permitted Discretion;

provided that the aggregate of all Distributions made under clauses (g) and (h) above do not in any Fiscal Year exceed $2,000,000 (with unusual amounts in any Fiscal Year being carried over to succeeding Fiscal Years), other than to the extent such Distributions are funded by the cash proceeds from the sale of equity interests of the Canadian Borrower and, to the extent contributed to the capital of the Canadian Borrower, equity interests of any of the Canadian Borrower's direct or indirect parent companies.

1.1.203 "**Permitted Factoring Debtors**" means, collectively, the Pemex Entities, Petroamazones EP, Operaciones Río Napo CEM and any other Person agreed to in advance by the Agent, acting reasonably.

1.1.204 "**Permitted Factoring Transaction**" means: at the Borrower's option,

(a)     the financing of certain Collection Rights by HSBC Mexico; *provided* that (i) such transaction is non-recourse to the Borrowers and their Material Subsidiaries, except for any Liens granted solely over the Collection Rights and the proceeds thereof, (ii) such transaction shall be and remain subject to the terms and conditions of the Intercreditor Agreement, (iii) QMax Mexico may remain responsible for the legitimacy and existence of the Collection Rights financed by such transaction at the time of execution of the relevant factoring transaction and (iv) QMax Mexico will no longer be liable for the payment of the Collection Rights to HSBC Mexico or any permitted assignee but may remain liable for the decrease in value of the Collection Rights; and/or

(b)     the financing by the Borrowers or one or more of their Material Subsidiaries of any Receivables (other than as described in paragraph (a) above); *provided* that (i) such transaction results in a legal "true sale" of Receivables, (ii) such transaction is non-recourse to the Borrowers and their Material Subsidiaries, except for any Liens granted solely over such Receivables and the proceeds thereof, and (iii) such transaction shall only involve the sale of Receivables either (x) owing by any of the Permitted Factoring Debtors to a Credit Party or (y) not constituting Eligible Receivables; provided that, the aggregate principal, stated or investment amount of all outstanding loans made to the Credit Parties in respect of all Permitted Factoring Transactions shall not exceed $25,000,000 at any time outstanding; provided, such amount shall be increased to an amount specified by the Borrowers at any time if the Borrowers or one or more Material Subsidiaries provides notice to the Agent of such an increase, and the Agent (on the instruction of Required Lenders) has not objected within three Business Days following receipt of notice thereof. For certainty, if any Eligible Receivable is sold, contributed, financed or otherwise conveyed or pledged pursuant to a Permitted Factoring Transaction it shall immediately cease to be an Eligible Receivable.

1.1.205 "**Permitted Funded Debt**" means, without duplication:

(a)     the Obligations under the Facilities and, to the extent constituting Funded Debt, obligations in respect of Banking Services Agreements of the Canadian Borrower and its Subsidiaries owing to the Agent and the Lenders (and their Affiliates);

(b)     Funded Debt up to U.S. $20,000,000 under a bilateral letter of credit facility with HSBC and insured by certain third parties reasonably satisfactory to the Agent;

(c)     Funded Debt of any Credit Party whose governing jurisdiction is Mexico or Colombia which is unsecured or, if secured, which is secured solely by capital

assets and/or inventory located in Mexico or Colombia and which are not subject to the Security (subject to the proviso at the end of this definition);

(d)    Funded Debt under the Surviving Colombian Credit Agreements and any Permitted Refinancing Indebtedness in respect thereof from time to time (subject to the proviso at the end of this definition);

(e)    Funded Debt secured by Permitted Purchase Money Security Interests and Funded Debt incurred in conjunction with any Anchor Sale and Leaseback Transaction (in each case subject to the proviso at the end of this definition);

(f)    Permitted Hedging Liabilities;

(g)    Permitted Intercompany Loans;

(h)    Subordinated Debt;

(i)    Funded Debt as set out in Schedule 1.1.205 hereto and any Permitted Refinancing Indebtedness thereof;

(j)    Funded Debt under a corporate credit card facility with a Lender and other cash management liabilities, up to a maximum aggregate amount of $2,000,000;

(k)    Funded Debt (other than a revolving credit facility) of a Subsidiary acquired or assumed pursuant to a Permitted Acquisition after the Amendment and Restatement Date and any Permitted Refinancing Indebtedness in respect thereof (subject to the proviso at the end of this definition); provided, that such Funded Debt shall not be incurred in anticipation of such Permitted Acquisition;

(l)    obligations in respect of Guarantees or Financial Assistance not prohibited under Section 7.2.3;

(m)    other Funded Debt of the Credit Parties and Permitted Refinancing Indebtedness in respect thereof (subject to the proviso at the end of this definition);

(n)    Funded Debt under a Permitted Factoring Transaction;

(o)    Funded Debt consented to by the Required Lenders, in their discretion, prior to the incurrence or assumption thereof;

(p)    Funded Debt up to an aggregate principal amount of up to U.S. $90,000,000 under the Encina ABL Loan Agreement and any Permitted Refinancing Indebtedness in respect thereof, provided that all such Funded Debt is and remains subject to the terms of the Encina Intercreditor Agreement;

(q)    Funded Debt in connection with all Permitted Securitization Financing and any Permitted Refinancing Indebtedness in respect thereof; provided that the aggregate

principal amount of Funded Debt under clauses (p) and (q) (or commitments in respect thereof) does not exceed U.S.$90,000,000 at any time; and

(r)    Funded Debt in respect of one or more promissory notes issued by the U.S. Borrower to Calumet, by the U.S. Borrower to the Canadian Borrower and by the Canadian Borrower to Holdco, in each case, substantially contemporaneously with the Anchor Acquisition (the "**Anchor Acquisition Promissory Notes**"),

provided that the outstanding principal amount of Funded Debt under clauses (c), (d), (e), (k) and (m) above does not exceed in the aggregate $45,700,000 during the Covenant Relief Period and $75,000,000 at any time after the Covenant Relief Period.

1.1.206 "**Permitted Hedging Liability**" means a Hedging Liability permitted by the provisions of Sections 7.2.11 and 7.2.13.

1.1.207 "**Permitted Holders**" means (a) Palladium, the Investors, Management Shareholders and (b) any Person with which Palladium and the Management Shareholders form a Group as long as, in the case of clause (b), Palladium and its Affiliates beneficially own more than 50% of the relevant stock beneficially owned by that Group.

1.1.208 "**Permitted Intercompany Loan**" means a loan made by any Credit Party to another Credit Party, provided that the Agent holds a First Ranking Security Interest in all property and assets of both such Credit Parties to the extent required under the terms of the Credit Documents.

1.1.209 "**Permitted Investments**" is defined in Section 7.2.3.

1.1.210 "**Permitted Liens**" means:

(a)    Statutory Liens in respect of any amount which is not at the time overdue;

(b)    Statutory Liens in respect of any amount which may be overdue but the validity of which is subject to a Permitted Contest;

(c)    the reservations, limitations, provisos and conditions, if any, expressed in any original grant from the Crown of any Land or any interest therein;

(d)    servicing agreements, development agreements, site plan agreements and other agreements with Governmental Authorities pertaining to the use or development of any Land, provided same are complied with in all material respects;

(e)    applicable municipal and other governmental restrictions, including municipal by-laws and regulations, affecting the use of Land or the nature of any structures which may be erected thereon, provided such restrictions have been complied with in all material respects;

(f)     Liens or rights of distress reserved in or exercisable under any lease for rent not at the time overdue or for compliance with the terms of such lease not at the time in default;

(g)     Liens or rights reserved to or exercisable by or any obligations or duties affecting any Land due to any public utility or to any Governmental Authority, under or with respect to any franchise, temporary grant, licence or permit in good standing and any defects in title to structures or other facilities arising solely from the fact that such structures or facilities are constructed or installed on Land under government permits, leases or other grants in good standing; provided such facilities, temporary grants, licences and permits have been complied with in all material respects and are in good standing and such Liens, rights, obligations, duties and defects in the aggregate do not materially impair the use of such property, structures or facilities for the purpose for which they are held;

(h)     Liens incurred or deposits made in connection with contracts, bids, tenders or expropriation proceedings, surety or appeal bonds, costs of litigation when required by law, public and statutory obligations, and warehousemen's, storers', repairers', carriers' and other similar Liens and deposits;

(i)     security given to a public utility or any Governmental Authority to secure obligations incurred to such utility, municipality, government or other authority in the ordinary course of business and not at the time overdue;

(j)     Liens and privileges arising out of judgments or awards in respect of which: an appeal or proceeding for review has been commenced; a stay of execution pending such appeal or proceedings for review has been obtained; and reserves have been established as reasonably required by the Required Lenders;

(k)     any Lien arising in connection with the construction or improvement of any Land or arising out of the furnishing of materials or supplies therefor, provided that such Lien secures moneys not at the time overdue (or if overdue, the validity of which is subject to a Permitted Contest), notice of such Lien has not been given to the Agent or any Lender and such Lien has not been registered against title to such Land;

(l)     licenses (including licences of intellectual property), leases or subleases granted to third parties or Credit Parties in the ordinary course of business which, individually or in the aggregate, do not materially interfere with the ordinary course of business of the Borrower or any of its Subsidiaries;

(m)     the filing of UCC or PPSA financing statements (or equivalents thereto in other jurisdictions) solely as a precautionary measure in connection with operating leases and consignment arrangements;

(n)     Liens in favor of customs and revenue authorities arising as a matter of law and in the ordinary course of business to secure payment of customs duties in connection with the importation of goods;

(o)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Credit Party in the ordinary course of business;

(p)    Liens (i) on deposits of cash or Cash Equivalents in favor of the seller of any property to be acquired in any Permitted Investment to be applied against the purchase price for such Permitted Investment, (ii) consisting of an agreement to dispose of any property in a Permitted Disposition and (iii) earnest money deposits of cash or Cash Equivalents made by any Credit Party in connection with any letter of intent or purchase agreement permitted hereunder;

(q)    rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions or upon securities in favor of securities intermediaries, solely to the extent incurred in connection with the maintenance of deposit accounts or securities accounts in the ordinary course of business;

(r)    Minor Title Defects;

(s)    the Permitted Purchase-Money Security Interests;

(t)    Liens which are secured solely by assets which are located outside of Canada and the U.S. and which are not subject to the Security; provided that the aggregate principal amount of Funded Debt or other obligations secured thereby constitutes Permitted Funded Debt;

(u)    Liens as set out in Schedule 1.1.210 and any extension, renewal or replacement (or successive extensions, renewals or replacements), as a whole or in part, of thereof, so long as any such extension, renewal or replacement of such Lien is limited to all or any part of the same property that secured the Lien extended, renewed or replaced (plus improvements on such property) and the Funded Debt secured thereby is not increased and constitutes Permitted Funded Debt;

(v)    any Lien from time to time which is consented in writing to by the Required Lenders;

(w)    the Security or any other Liens securing the Obligations;

(x)    Liens which secure obligations owing under Permitted Funded Debt described in clause (c), (d) or (m) of the definition thereof; provided that in the case of such clause (m), such Lien does not apply to any of the Collateral; subject to the limitation set forth in the proviso at the end of the definition of Permitted Funded Debt;

(y)    Liens securing Funded Debt permitted by clause (k) of the definition of Permitted Funded Debt, subject to the limitation set forth in the proviso at the end of the definition of Permitted Funded Debt, and existing on any property or asset prior to the acquisition thereof by any Credit Party or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the date hereof prior

to the time such Person becomes a Subsidiary; <u>provided</u>, that (i) such Liens do not apply to all of the assets of the acquired Subsidiary generally or to any other property or assets of any Credit Party not securing such Funded Debt prior to the acquisition of such property or asset and (ii) such Lien shall secure only those obligations which it secured on the date of acquisition and extensions, renewals and replacements thereof permitted hereunder that do not increase the outstanding principal amount thereof; provided further, with respect to Liens in connection with Funded Debt that is assumed in connection with an acquisition of assets or equity interests, no such Lien extends to or covers any other assets (other than the proceeds or products thereof, accessions or additions thereto and improvements thereon) or was created in contemplation of, or in connection with, the applicable acquisition of assets or equity interests (except to the extent the same is otherwise Permitted Funded Debt);

(z)     Liens which secure Subordinated Debt permitted hereunder;

(aa)     Liens arising under a Permitted Factoring Transaction but only to the extent that any such Lien relates to the applicable Receivables sold, contributed, financed or otherwise conveyed or pledged pursuant to such transaction;

(bb)     Liens arising under the Encina ABL Loan Agreement but only to the extent that any such Lien is and remains subject to the terms of the Encina Intercreditor Agreement;

(cc)     Liens arising under any Anchor Sale and Leaseback Transaction;

(dd)     Liens on the Receivables of a Securitization SPE sold pursuant to a Permitted Securitization Financing (together with any and all related security and ancillary rights related thereto which are customary for transactions of such nature) to the extent incurred pursuant to a Permitted Securitization Financing; and

(ee)     any other Liens; provided, that the aggregate principal amount of Funded Debt or other obligations secured thereby does not exceed U.S. $5,000,000.

<u>provided</u>, that the use of the term "Permitted Liens" to describe the foregoing Liens shall mean that such Liens are permitted to exist (whether in priority to or subsequent in priority to the Security, as determined by Applicable Law); and for greater certainty such Liens shall not be entitled to priority over the Security by virtue of being described in this Agreement as "Permitted Liens".

1.1.211  "**Permitted Management Fees**" means advisory or management fees payable by the Credit Parties to Palladium and Calumet in an aggregate amount not to exceed the Annual Management Fee Cap in any Fiscal Year.

1.1.212  "**Permitted Purchase-Money Security Interests**" means Purchase-Money Security Interests incurred or assumed in connection with the purchase, leasing or acquisition of capital equipment in the ordinary course of business; <u>provided</u>, that the

obligations secured thereby are permitted under clause (e) of the definition of Permitted Funded Debt.

1.1.213   "**Permitted Refinancing Indebtedness**" shall mean any Funded Debt issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "**Refinance**"), the Permitted Funded Debt being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Indebtedness); <u>provided</u>, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Permitted Funded Debt so Refinanced (plus unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions and expenses), (b) if the Permitted Funded Debt being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing Indebtedness shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Permitted Funded Debt being Refinanced, (c) no Permitted Refinancing Indebtedness shall have different obligors, or greater guarantees or security, than the Permitted Funded Debt being Refinanced, unless such new obligors are Credit Parties and (d) if the Permitted Funded Debt being Refinanced is secured by any collateral (whether equally and ratably with, or junior to, the Lenders or otherwise), such Permitted Refinancing Indebtedness may be secured by such collateral (including pursuant to after acquired property clauses to the extent such type collateral secured the Funded Debt being Refinanced) on terms not materially less favorable to the Lenders than those contained in the documentation governing the Permitted Funded Debt being so Refinanced.

1.1.214   "**Permitted Securitization Financing**" shall mean one or more transactions pursuant to which (i) Securitization Assets or interests therein are sold or transferred to or financed by one or more Securitization SPE, and (ii) such Securitization SPE finance (or refinance) their acquisition of such Securitization Assets or interests therein, or the financing thereof, by selling or borrowing against Securitization Assets (including conduit and warehouse financings) and any Hedging Agreements entered into in connection with such Securitization Assets; <u>provided</u>, that recourse to the Borrowers or any Subsidiary (other than the Securitization SPE) in connection with such transactions shall be limited to the extent customary (as determined by the Agent and the Canadian Borrower each acting reasonably and in good faith and acceptable to the Agent acting reasonably) for similar transactions in the applicable jurisdictions (including, to the extent applicable, in a manner consistent with the delivery of a "true sale"/"absolute transfer" opinion with respect to any transfer by the Borrowers or any Subsidiary (other than a Securitization SPE)).

1.1.215 "**Person**" includes an individual, corporation, partnership, trust, union, unincorporated association, Governmental Authority or any combination of the above.

1.1.216   "**Plan**" means a Single Employer Plan or a Multiple Employer Plan.

1.1.217   "**Priority Claims**" means, with respect to any Person, any amount payable or accrued by such Person which ranks or is capable of ranking prior to or *pari passu* with the Liens created by the Security in respect of any Collateral, including amounts owing for

wages, vacation pay, severance pay, employee deductions, sales tax, excise tax, tax payable pursuant to Part IX of the *Excise Tax Act* (Canada) (net of GST input credits), income tax, employment insurance, unemployment insurance, workers compensation, government royalties, pension fund obligations or deficiencies, overdue rents or taxes, and other statutory or other claims, deemed trusts or Liens that have or may have priority over, or rank *pari passu* with, the Liens created by the Security. For the avoidance of doubt, no Banking Services Liabilities shall be deemed Priority Claims due to their *pari passu* ranking with the Obligations.

1.1.218  "**Proceeds of Realization**", in respect of the Security or any portion thereof, means all amounts received by the Agent and any Lender in connection with:

(a)  any realization thereof, whether occurring as a result of enforcement or otherwise;

(b)  any sale, expropriation, loss or damage or other disposition of the Collateral or any portion thereof; and

(c)  the dissolution, liquidation, bankruptcy or winding-up of a Credit Party or any other distribution of its assets to creditors,

and all other amounts which are expressly deemed to constitute "Proceeds of Realization" in this Agreement.

1.1.219  "**Project Desert**" means the acquisition by the Borrowers or any Material Subsidiary of Environmental Solutions for Petroleum Services, an oilfield services company with operations in Algeria and Egypt on substantially the same terms and conditions set forth in the letter of intent dated as of December 11, 2016, as amended, between the Canadian Borrower and Project Desert Egypt.

1.1.220  "**Project Desert Algeria**" means Environmental Solutions Algeria S.A.R.L., an Algerian company.

1.1.221  "**Project Desert Egypt**" means Environmental Solutions for Petroleum Services (S.A.E.), an Egyptian company.

1.1.222  "**Project Desert Subsidiaries**" means each of Project Desert Egypt and Project Desert Algeria.

1.1.223  "**Proportionate Share**" means:

(a)  in the context of any Lender's obligation to make Advances under all Facilities, such Lender's Commitment to make Advances under all Facilities divided by the aggregate amount of all Lenders' Commitments to make Advances under all Facilities;

(b)  in the context of any Lender's obligation to make Advances under a Facility, such Lender's Commitment (excluding, as the case may be, the applicable Swingline Limit in the case of the Canadian Operating Facility) to make Advances under such

Facility divided by the aggregate amount of all Lenders' Commitments (excluding, as the case may be, the applicable Swingline Limit in the case of Canadian Operating Facility) to make Advances under such Facility;

(c)     in the context of any Lender's entitlement to receive a portion of the standby fee in respect of Canadian Operating Facility or the U.S. Operating Facility payable pursuant to Section 2.6.1(h) or Section 4.6.1(d), as applicable, such Lender's Commitment (excluding, as the case may be, the applicable Swingline Limit) under the applicable Facility to make Advances under Canadian Operating Facility or the U.S. Operating Facility divided by the aggregate amount of all Lenders' Commitments (excluding, as the case may be, the applicable Swingline Limit) to make Advances under Canadian Operating Facility or the U.S. Operating Facility, as applicable;

(d)     in the context of any Lender's entitlement to receive payments of principal, interest or fees under all Facilities (other than a portion of the standby fee under Canadian Operating Facility or the U.S. Operating Facility), the Outstanding Advances due to such Lender under all Facilities divided by the aggregate amount of the Outstanding Advances due to all Lenders under all Facilities; and

(e)     in the context of any Lender's entitlement to receive payments of principal, interest or fees under a Facility (other than a portion of the standby fee under Canadian Operating Facility or the U.S. Operating Facility), the Outstanding Advances due to such Lender under such Facility divided by the aggregate amount of the Outstanding Advances due to all Lenders under such Facility.

1.1.224   "**Purchase-Money Security Interest**" means:

(a)     a Capital Lease; or

(b)     a Lien on any property or asset which is created, issued or assumed to secure the unpaid purchase price thereof, provided that such Lien is restricted to such property or asset and secures an amount not in excess of the purchase price thereof and any interest and fees payable in respect thereof.

1.1.225   "**QMax Mexico**" means QMax Mexico, S.A. de C.V.

1.1.226   "**Qualified ECP Guarantor**" means, in respect of any Hedging Agreement, each Credit Party that has total assets exceeding $10,000,000 at the time of the grant of the relevant Security of such Credit Party to such Hedging Agreement or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keep well under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

1.1.227   "**Receivables**" means and includes, as to the Credit Parties, all of Credit Parties' accounts, contract rights, payment intangibles, instruments (other than those evidencing indebtedness owed to a Credit Party), documents, chattel paper (including electronic chattel

paper), general intangibles relating to accounts, drafts and acceptances, and all other forms of obligations owing to a Credit Party arising out of or in connection with the sale or lease of inventory or for services rendered (including, in the case of Insured Receivables, amounts owed with respect to work in progress that are covered by Account Receivable Insurance), all supporting obligations, guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to the Agent hereunder.

1.1.228 "**Register**" is defined in Section 13.6.5.

1.1.229 "**Regulation T**" means Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and all official rulings and interpretations thereunder or thereof.

1.1.230 "**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and all official rulings and interpretations thereunder or thereof.

1.1.231 "**Regulation X**" means Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and all official rulings and interpretations thereunder or thereof.

1.1.232 "**Related Party**" means, with respect to any Person, an Affiliate of such Person, a shareholder of such Person (if applicable), or a Person related to or not at arm's length to such Person or holder of shares of such Person, and with respect to the Borrower and its Subsidiaries, includes Palladium, the Management Shareholders, the Investors and any company or entity controlled directly or indirectly by any one or more of such Persons.

1.1.233 "**Repayment**" means a repayment by the Borrower on account of the Outstanding Advances under all Facilities or a Facility, as the context requires, other than the reduction of an Overdraft (and "**Repay**" shall have a corresponding meaning).

1.1.234 "**Repayment Notice**" means a notice delivered by the Borrower to the Agent committing it to make a Repayment, in the form of Exhibit "E".

1.1.235 "**Required Lenders**" means, with the exception of those matters set out in Section 11.2 which require the agreement of all Lenders, (a) if there are two or less Lenders, all Lenders, (b) if there are three or more Lenders, Lenders holding, in aggregate, at least 66⅔% of the Commitments, or (c) during the continuance of an Event of Default, Lenders holding at least 66⅔% of the Outstanding Advances under the Facilities. The Advances and Commitments of any Defaulting Lender shall be disregarded in determining Required Lenders at any time in accordance with Section 11.5.1(b).

1.1.236 "**Requirements of Environmental Law**" means:

(a)     obligations under common law;

(b)    requirements imposed by or pursuant to statutes, regulations and by-laws whether presently or hereafter in force;

(c)    directives, policies and guidelines issued or relied upon by any Governmental Authority to the extent such directives policies or guidelines have the force of law;

(d)    permits, licenses, certificates and approvals issued by Governmental Authorities which are required in connection with air emissions, discharges to surface or groundwater, noise emissions, solid or liquid waste disposal, the use, generation, storage, transportation or disposal of Hazardous Materials; and

(e)    requirements imposed under any clean-up, compliance or other order made by a Governmental Authority pursuant to any of the foregoing,

in each and every case relating to environmental, health or safety matters including all such obligations and requirements which relate to:

(i)    solid, gaseous or liquid waste generation, handling, treatment, storage, disposal or transportation; and

(ii)    exposure to Hazardous Materials.

1.1.237 "**Resignation Notice**" is defined in Section 11.18.

1.1.238 "**Rollover**" means the renewal of an Availment Option upon its maturity in the same form.

1.1.239 "**Rollover Notice**" means a notice substantially in the form of Exhibit "C" given by the Borrower to the Agent for the purpose of requesting a Rollover.

1.1.240 "**Sales Proceeds**" is defined in Section 5.3.1(b).

1.1.241 "**Second Amendment Date**" means July 22, 2019.

1.1.242 "**Secured Hedging Liability**" means any Hedging Liability under a Hedging Agreement entered into between the Canadian Borrower and a Hedge Provider permitted by the provisions of Sections 7.2.12 and 7.2.13 and, provided that if a Hedge Provider does not have actual knowledge that such Hedging Liability was not permitted under such Sections at the time the applicable Hedging Agreement was entered into by such Hedge Provider, then such Hedging Liability will be deemed to be a Secured Hedging Liability for purposes of Section 8.5.

1.1.243 "**Securitization Assets**" shall mean any of the following assets (or interests therein) from time to time originated, acquired or otherwise owned by the Borrowers or any Subsidiary or in which the Borrowers or any Subsidiary has any rights or interests, in each case, without regard to where such assets or interests are located: (a) Receivables, (b) franchise fees, royalties and other similar payments made related to the use of trade names and other intellectual property, business support, training and other services, (c) revenues

related to distribution and merchandising of the products of the Borrower and its Subsidiaries, (d) any equipment, contractual rights with unaffiliated third parties, website domains and associated property and rights necessary for a Securitization SPE to operate in accordance with its stated purposes, and (e) other assets and property (or proceeds of such assets or property) to the extent customarily included in securitization transactions of the relevant type in the applicable jurisdictions (as determined by the Agent and the Canadian Borrower each acting reasonably and in good faith).

1.1.244 "**Securitization SPE**" means (i) a direct or indirect Subsidiary of any Borrower established in connection with a Permitted Securitization Financing for the acquisition of Securitization Assets or interests therein, and which is organized in a manner (as determined by the Canadian Borrower in good faith) intended to reduce the likelihood that it would be substantively consolidated with Holdings, the Borrowers or any of the Subsidiaries (other than Securitization SPE) in the event Holdings, the Borrowers or any such Subsidiary becomes subject to a proceeding under the U.S. Bankruptcy Code (or other insolvency law) and (ii) any subsidiary of a Securitization SPE.

1.1.245 "**Security**" means all Guarantees, security agreements, mortgages, control agreements, pledge agreements, debentures and other documents required to be provided to the Agent or the Lenders pursuant to Article 8 and all other documents and agreements delivered by the Borrower and other Persons to the Agent for the benefit of the Lenders from time to time as security for the payment and performance of the Obligations, and the security interests, assignments and Liens constituted by the foregoing.

1.1.246 "**Shareholders' Equity**" means, at any time, the shareholders' equity as shown on the consolidated balance sheet of the Canadian Borrower.

1.1.247 "**Single Employer Plan**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that is subject to Title IV of ERISA, and (i) is maintained for employees of any Credit Party or any ERISA Affiliate and no Person other than the Credit Parties and the ERISA Affiliates or (ii) was so maintained and in respect of which any Credit Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

1.1.248 "**Specified Canadian Swingline Borrower**" means (i) QMax Canada Operations Inc. or (ii) any other Material Subsidiary of the Canadian Borrower that has been formed under the laws of Canada or any province thereof as agreed to in writing by the Canadian Borrower, the Swingline Lender and the Agent, in their sole and absolute discretion.

1.1.249 "**Specified Equity Contribution**" is defined in Section 7.3.2.

1.1.250 "**Statutory Lien**" means a Lien in respect of any property or assets of a Credit Party created by or arising pursuant to any applicable legislation in favour of any Person (such as but not limited to a Governmental Authority), including a Lien for the purpose of securing such Credit Party's obligation to deduct and remit employee source deductions and goods and services tax pursuant to the *Income Tax Act* (Canada), the *Excise Tax Act* (Canada), the *Canada Pension Plan* (Canada), the *Employment Insurance Act* (Canada)

and any legislation in any jurisdiction similar to or enacted in replacement of the foregoing from time to time.

1.1.251  "**Subordinated Debt**" means any indebtedness of any Credit Party to any Person, in respect of which the holder thereof has entered into a subordination and postponement agreement in favour of the Agent on behalf of itself and the Lenders, substantially in the form of Exhibit "J" for any indebtedness which is governed by Applicable Laws of Canada or the U.S., or for any indebtedness governed by other Applicable Laws, such other agreement as is reasonably satisfactory to the Required Lenders (each, a "**Subordination Agreement**") and, to the extent necessary or desirable under Applicable Law, registered in all places where necessary or desirable to protect the priority of the Security, which shall provide (among other things) that:

(a)     upon notice of the occurrence and continuance of an Event of Default hereunder, the holder of such indebtedness may not receive payments on account of principal or interest thereon;

(b)     any security held in respect of such indebtedness is subordinated to the Security; and

(c)     the holder of such indebtedness may not take any enforcement action in respect of any such security without the prior written consent of the Agent (except to the extent, if any, expressly permitted therein).

1.1.252  "**Subordination Agreement**" is defined in the definition of Subordinated Debt.

1.1.253  "**Subsidiary**" means any Person of which more than 50% of the outstanding Voting Securities are owned, directly or indirectly by or for a Credit Party, provided that the ownership of such securities confers the right to elect at least a majority of the board of directors of such Person, or a majority of Persons serving similar roles, and includes any legal entity in like relationship to a Subsidiary.

1.1.254  "**Surviving Colombian Credit Agreements**" means the following agreements by and between QMAX Solutions Colombia, as borrower: (i) revolving credit agreement with Helm Bank, as lender, dated as of October 6, 2009; (ii) common terms agreement for the execution of derivatives with Banco Corpobanca Colombia S.A., as lender, dated as of April 19, 2013; and (iii) common terms agreement for the execution of derivatives with Banco de Bogotá S.A., as lender, dated as of May 5, 2009; (iv) line of credit agreement with BBVA Colombia, as lender, dated as of December 3, 2012; and (v) line of credit agreement with Bancolombia dated January 20, 2010; in each case up to the respective maximum facility amounts set forth in Schedule 1.1.254 (each as amended, restated, supplemented, waived, replaced, (whether or not upon termination, and whether with the original agents, lenders, or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time, including any agreement refinancing, replacing or otherwise restructuring all or any portion of the indebtedness thereunder or increasing the amount loaned thereunder or altering the maturity thereof), subject to clause (d) of the definition of Permitted Funded Debt.

1.1.255  "**Swingline**" is defined in Section 2.7.1.

1.1.256  **"Swingline Borrower"** is defined in Section 2.7.1.

1.1.257  "**Swingline Lender**" means HSBC.

1.1.258  "**Swingline Limit**" means $10,000,000 or the Equivalent Amount in Cdn. $, or any combination thereof.

1.1.259  "**Swingline Loan**" means any Advance made available to the Borrower by the Swingline Lender outstanding from time to time under the Swingline.

1.1.260  "**Syndicated Advance**" means any Advance under the Canadian Operating Facility that is not a Swingline Loan.

1.1.261  "**Taxes**" is defined in Section 12.4.1.

1.1.262  "**Term Facility**" is defined in Section 3.1.

1.1.263  "**Term Facility Commitment**" means, as the context requires, (a) collectively with respect to all Term Lenders, in the aggregate as of the Second Amendment Date, U.S. $10,071,250, as otherwise increased or decreased pursuant to this Agreement and (b) means, with respect to each individual Term Lender, the individual commitment amount of such Lender in the maximum principal amount indicated opposite such Term Lender's name in Exhibit "A" under the heading "**Term Facility Commitments**", as amended from time to time.

1.1.264  "**Term Lenders**" means the Lenders who have provided a Commitment under the Term Facility as set forth in Exhibit "A".

1.1.265  "**Terra**" means Terra Oilfield Solutions, LLC, a Delaware limited liability company.

1.1.266  "**Terra Acquisition**" means the purchase of all of the membership interests of Terra pursuant to the Terra Purchase Agreement.

1.1.267  "**Terra Purchase Agreement**" means the Membership Interest Purchase Agreement dated July 15, 2018 by and between Q'Max America Inc., as purchaser, and OFS Commander LLC, a Delaware limited liability company, as seller, as the same may be amended, restated or otherwise modified from time to time.

1.1.268  "**Total Net Debt**" means, in respect of the Credit Parties and determined on a combined basis and without duplication, all interest bearing indebtedness for borrowed money, Capital Leases, the drawn and unreimbursed amount outstanding under all letters of credit, letters of guarantee and surety bonds to the extent not cash collateralized (excluding performance bonds provided by insurers), mark to market liabilities on Hedging Agreements, bankers' acceptances and similar instruments, indebtedness secured by a Lien, redemption and mandatory dividend obligations with respect to a Credit Party's

shares that are redeemable or convertible into debt at a fixed time at the option of the holder thereof or upon the occurrence of a condition within the control of such Person, obligations evidenced by bonds, debentures, notes or similar instruments and any guarantees or indemnity in any manner in respect of any part or all of an obligations of any other Person of the type included above, *less* the aggregate amount of cash and Cash Equivalents of the Credit Parties which are held with the Agent or an Affiliate thereof in Canada, the United States or Mexico which is unencumbered (except pursuant to the Security) and the use of which is otherwise unrestricted up to an aggregate principal amount of U.S. $20,000,000.

1.1.269 "**Unfunded Capital Expenditures**" means for any applicable period, Capital Expenditures of the Credit Parties that are not financed with Funded Debt, or from the proceeds of the issuance of any new equity by the Credit Parties, any Sales Proceeds or any Insurance Proceeds in that period, but excluding therefrom any Capital Expenditures for which any Credit Party has received any reimbursement in the form of cash or Cash Equivalents from any Person other than another Credit Party in connection with such Capital Expenditure, but only to the extent of such reimbursement.

1.1.270 "**Uniform Customs**" means the Uniform Customs and Practice for Documentary Credits, published as International Chamber of Commerce publication no. 600 and all subsequent amendments to same, in each case, as are current at the time of issuance of the applicable Letter of Credit.

1.1.271 "**United Joint Venture**" means the joint venture in respect of Kuwait Drilling Fluid Company, 49% of the equity interests of which, as of the First Amendment Date, is owned by Q'Max Solutions Inc.

1.1.272 "**Unrestricted Subsidiary**" means any Subsidiary of the Borrower that is not a Material Subsidiary.

1.1.273 "**U.S.**" means the United States of America.

1.1.274 "**U.S. Base Rate**" means the greater of the following:

(a)     the rate of interest announced from time to time by the Agent as its reference rate then in effect for determining rates of interest on U.S. dollar loans to its customers in Canada and designated as its U.S. base rate;

(b)     the Federal Funds Rate plus three-quarters of one percent (0.75%) per annum; and

(c)     sum of (i) the LIBOR Rate and (ii) one percent (1.00%) per annum.

1.1.275 "**U.S. Borrower**" means Q'Max America Inc., a corporation incorporated pursuant to the Laws of the state of Delaware, and its successors and permitted assigns.

1.1.276 "**U.S. Dollar Base Rate Loan**" means an Advance made by a Lender in Canada to the Borrower by way of a direct loan in U.S. Dollars, but excluding Advances in the form of a LIBOR Loan.

1.1.277 "**U.S. Dollar LIBOR Rate**" means, at any time, the LIBOR Rate applicable to LIBOR Loans denominated in U.S. Dollars determined at such time.

1.1.278 "**U.S. Dollar Prime Rate Loan**" means an Advance in U.S. Dollars bearing interest at a fluctuating rate determined by reference to the U.S. Prime Rate.

1.1.279 "**U.S. Dollars**" or "**U.S. $**" means the lawful money of the U.S.

1.1.280 "**U.S. Operating Facility**" is defined in Section 4.1.

1.1.281 "**U.S. Operating Facility Commitment**" means, as the context requires, (a) collectively with respect to all U.S. Operating Lenders, in the aggregate as of the Amendment and Restatement Date, U.S. $15,000,000, as otherwise increased or decreased pursuant to this Agreement and (b) means, with respect to each individual U.S. Operating Lender, the individual commitment amount of such Lender in the maximum principal amount indicated opposite such U.S. Operating Lender's name in Exhibit "A" under the heading "U.S. Operating Facility Commitments", as amended from time to time.

1.1.282 "**U.S. Operating Facility Limit**" means the lesser of (a) the U.S. Operating Facility Commitment, and (b) the sum of the Borrowing Base less the then outstanding Advances under the Term Facility and the Canadian Operating Facility.

1.1.283 "**U.S. Operating Lenders**" means the Lenders who have provided a Commitment under the U.S. Operating Facility as set forth in Exhibit "A".

1.1.284 "**U.S. Prime Rate**" means, for any day, the rate per annum from time to time announced by HSBC US as its prime rate in effect at its principal office in New York City. The U.S. Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. HSBC US may make commercial loans or other loans at rates of interest at, above or below the U.S. Prime Rate. Any change in the U.S. Prime Rate shall take effect at the opening of business on the day specified in the public announcement of such change.

1.1.285 "**Voting Securities**" means securities of capital stock of any class of any corporation, partnership units in the case of a partnership, trust units in the case of a trust, or other evidence of ownership serving similar purposes, carrying voting rights under all circumstances, provided that, for the purposes of this definition, shares which only carry the right to vote conditionally on the happening of an event will not be considered Voting Securities, whether or not such event will have occurred, nor will any securities be deemed to cease to be Voting Securities solely by reason of a right to vote accruing to securities of another class or classes by reason of the happening of such event.

1.1.286 "**Wells Fargo**" means Wells Fargo Bank, National Association.

1.1.287 "**Wells Fargo Credit Agreement**" means the Credit and Security Agreement dated July 31, 2018, by and among ADF SPV, LLC, as the borrower, Anchor, as the servicer, and Wells Fargo, as lender and collateral agent, as may be amended, restated, supplemented, replaced or otherwise modified from time to time.

1.1.288 "**Wells Fargo Letter**" means that certain letter to be dated as of the date of the Wells Fargo Credit Agreement between HSBC, as administrative agent, and Wells Fargo, as lender and collateral agent (to be in form and substance satisfactory to the Agent, acting reasonably), as the same may be amended, restated or otherwise modified from time to time.

1.1.289 "**Withdrawal Liability**" has the meaning specified in Part I of Subtitle E of Title IV of ERISA.

1.1.290 "**Year-end Financial Statements**" in respect of any Person means the audited consolidated financial statements of such Person prepared in accordance with GAAP, including the notes thereto, in respect of its most recently completed Fiscal Year.

## 1.2   Accounting Principles

Except as otherwise expressly provided herein, all accounting terms, principles and calculations applicable to the Facilities and this Agreement will be interpreted, applied and calculated, as the case may be, in accordance with GAAP. If, after the date of this Agreement, there shall occur any change in GAAP or change in the accounting method under GAAP that are different from those used in the historical preparation of the financial statements, including any change by reason of any change in the rules, regulations, pronouncements, opinions or other requirements of the Canadian Institute of Chartered Accountants (or any successor thereto or agency with similar function), including the adoption of International Financial Reporting Standards, that are different from those used in the preparation of the financial statements delivered pursuant to Section 7.4 and such change shall result in a change in the method of calculation of any financial covenant, ratio, standard or term found in this Agreement, including the treatment of operating and capital leases, either the Canadian Borrower or the Required Lenders may by notice to the Agent and the Canadian Borrower, respectively, require that the Lenders and the Canadian Borrower negotiate in good faith to amend such covenants, ratios, standards, and terms so as equitably to reflect such change in accounting principles, with the desired result being that the criteria for evaluating the financial condition of the Canadian Borrower and its Subsidiaries shall be the same as if such change had not been made. No delay by the Canadian Borrower or the Required Lenders in requiring such negotiation shall limit their right to so require such a negotiation at any time after such a change in accounting principles. Until any such covenant, ratio, standard or term is amended in accordance with this Section 1.2, financial covenants shall be computed and determined in accordance with GAAP in effect prior to such change in accounting principles.

## 1.3   Currency References

All amounts referred to in this Agreement are in U.S. Dollars unless otherwise noted.

## 1.4   References to Statutes

Whenever in this Agreement reference is made to a statute or regulations made pursuant to a statute, such reference shall, unless otherwise specified, be deemed to include all amendments to such statute or regulations from time to time and all statutes or regulations which may come into effect from time to time substantially in replacement for the said statutes or regulations.

**1.5**      **Extended Meanings**

Terms defined in the singular have the same meaning when used in the plural, and vice-versa. When used in the context of a general statement followed by a reference to one or more specific items or matters, the term "including" shall mean "including, without limitation", and the term "includes" shall mean "includes, without limitation". Any reference herein to the exercise of discretion by the Agent or the Lenders (including phrases such as "in the discretion of", "in the opinion of", "to the satisfaction of" and similar phrases) shall mean that such discretion is absolute and unfettered and shall not imply any obligation to act reasonably, unless otherwise expressly stated herein.

**1.6**      **Headings**

Headings, subheadings and the table of contents contained in the Credit Documents are inserted for convenience of reference only, and will not affect the construction or interpretation of the Credit Documents.

**1.7**      **Subdivisions**

Unless otherwise stated, reference herein to a Schedule or to an Article, Section, paragraph or other subdivision is a reference to such Schedule to this Agreement or such Article, Section, paragraph or other subdivision of this Agreement. Unless specified otherwise, reference in Schedule "A" to a Schedule or to an Article, Section, paragraph or other subdivision is a reference to such Schedule or Article, Section, paragraph or other subdivision of this Agreement.

**1.8**      **Number**

Wherever the context in the Credit Documents so requires, a term used herein importing the singular will also include the plural and vice versa.

**1.9**      **Time**

Time will be of the essence of the Credit Documents.

**1.10**      **Amendments**

No Credit Document may be amended orally and, subject to Sections 1.11(a) and 11.2, any amendment may only be made by way of an instrument in writing signed by the Parties.

**1.11**      **No Waiver**

(a)      No waiver by a Party of any provision or of the breach of any provision of the Credit Documents will be effective unless it is contained in a written instrument duly executed by an authorized officer or representative of such Party. Such written waiver will affect only the matter specifically identified in the instrument granting the waiver and will not extend to any other matter, provision or breach.

(b) The failure of a Party to take any steps in exercising any right in respect of the breach or non fulfilment of any provision of the Credit Documents will not operate as a waiver of that right, breach or provision, nor will any single or partial exercise of any right preclude any other or future exercise of that right or the exercise of any other right, whether in Law or otherwise.

(c) Acceptance of payment by a Party after a breach or non fulfilment of any provision of the Credit Documents requiring a payment to such Party will constitute a waiver of such provision if cured by such payment, but will not constitute a waiver or cure of any other provision of the Credit Documents.

## 1.12   Inconsistency

To the extent that there is any inconsistency or ambiguity between the provisions of this Agreement and any other Credit Document, the provisions of this Agreement will govern to the extent necessary to eliminate such inconsistency or ambiguity. For greater certainty, a provision of this Agreement and a provision of another Credit Document shall be considered to be inconsistent if both relate to the same subject-matter and the provision in one such document imposes more onerous obligations or restrictions than the corresponding provision in the other.

## 1.13   Pro Forma Adjustments

For purposes of making computations of the Net Leverage Ratio and the Fixed Charge Coverage Ratio herein, if any applicable Person or makes any Permitted Acquisitions, mergers, amalgamations, consolidations, dispositions of assets or divisions or the Canadian Borrower makes any adjustments to the Capital Expenditure budget (each a "**relevant transaction**") during the reference period applicable to such computation shall be calculated on a *pro forma* basis assuming that all such relevant transactions (and the change in EBITDA resulting therefrom) had occurred on the first day of such reference period. If since the beginning of such reference period any Person that subsequently became a Subsidiary or was merged with or into the Borrower or any of its Subsidiaries since the beginning of such period shall have consummated any relevant transactions that would have required adjustment pursuant to this definition, then the Net Leverage Ratio shall be calculated giving pro forma effect thereto for such reference period as if such relevant transaction had occurred at the beginning of the applicable reference period.

For purposes of this Section 1.13, whenever *pro forma* effect is to be given to a transaction, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Canadian Borrower and may include, without duplication, cost savings, operating expense reductions, restructuring charges and expenses and cost-saving synergies resulting from such acquisition or other relevant transaction, in each case in a manner acceptable to the Required Lenders, acting reasonably.

## 1.14   Joint and Several Liability of Borrowers

Notwithstanding anything else set forth in the Credit Documents to the contrary, each of the Borrowers agrees and confirms to the Agent and Lenders that the liabilities and obligations of the Borrowers under this Agreement and the other Credit Documents are joint and several as between each Borrower.

**1.15     Deemed Action by all Borrowers**

All consents, waivers, notices and other action required, made, given to or received by the Borrowers under this Agreement or any of the other Credit Documents will be deemed to be required, made, given or received by all of the Borrowers if required, made, given or received by one or more of the Borrowers. If a representation, certification or other statement under this Agreement or any of the other Credit Documents is made by one Borrower, or to the knowledge of one Borrower, it will be deemed to be made by all Borrowers, or the knowledge of all Borrowers, as applicable.

**1.16     Amendment and Restatement**

The Borrowers, the Agent and the Lenders agree that effective on the Amendment and Restatement Date, this Agreement is an amendment and restatement of the Existing Credit Agreement and is not a novation of the Existing Credit Agreement. As a consequence, the obligations, indebtedness and liabilities outstanding under the Existing Credit Agreement (including any existing letters of credit thereunder which will be deemed to be Letters of Credit issued by the applicable Issuing Bank under the corresponding Facility hereunder) shall constitute obligations, indebtedness and liabilities hereunder governed by the terms hereof and shall continue to be secured by the Security. Such obligations, indebtedness and liabilities shall be continuing in all respects, and this Agreement shall not be deemed to evidence or result in a novation of such obligations, indebtedness and liabilities or a repayment and reborrowing of such obligations, indebtedness and liabilities. The Existing Credit Agreement has been amended and restated solely for the purposes of reflecting amendments to the Existing Credit Agreement which the Lenders, the Agent and the Borrowers have agreed upon. All references to the "Credit Agreement" contained in the Credit Documents delivered prior to the effectiveness of this Agreement shall be references to this Agreement without further amendment to those Credit Documents. The Borrowers confirm that each of the Credit Documents otherwise remains in full force and effect. All deliverables made under the Existing Credit Agreement shall be deemed to have been delivered under this Agreement. Each Lender authorizes the Agent to take all actions and make such adjustments as are reasonably necessary to give effect to the foregoing. Notwithstanding the foregoing or any other term hereof, all of the applicable continuing covenants, representations and warranties on the part of the Borrowers under the Existing Credit Agreement and all of the claims and causes of action arising against the Borrowers in connection therewith, in respect of all matters, events, circumstances and obligations arising or existing prior to the Amendment and Restatement Date shall continue, survive and shall not be merged in the execution of this Agreement or any other Credit Documents or any advance or provision of any Loan hereunder.

**1.17     Exhibits and Schedules**

The following exhibits and schedules are attached to this Agreement and incorporated herein by reference:

| | | |
|---|---|---|
| Exhibit "A" | – | Lenders and Lenders' Commitments |
| Exhibit "B" | – | Form of Drawdown Request |
| Exhibit "C" | – | Form of Rollover Notice |

| | | |
|---|---|---|
| Exhibit "D" | – | Form of Conversion Notice |
| Exhibit "E" | – | Form of Repayment Notice |
| Exhibit "F" | – | Form of Compliance Certificate |
| Exhibit "G" | – | Form of Assignment Agreement |
| Exhibit "H" | – | Form of Borrowing Base Certificate |
| Exhibit "I" | – | Form of Designation Notice |
| Exhibit "J" | – | Form of Subordination Agreement |
| Schedule 1.1.205 | – | Existing Permitted Funded Debt |
| Schedule 1.1.210 | – | Existing Permitted Liens |
| Schedule 1.1.254 | – | Surviving Colombian Credit Agreements |
| Schedule 6.1.2 | – | Corporate Information |
| Schedule 6.1.3 | – | Subsidiaries |
| Schedule 6.1.5 | – | Consents and Approvals Required |
| Schedule 6.1.8 | – | Material Permits |
| Schedule 6.1.10 | – | Leased Properties |
| Schedule 6.1.11 | – | Intellectual Property |
| Schedule 6.1.12 | – | Insurance Policies |
| Schedule 6.1.13 | – | Material Agreements |
| Schedule 6.1.14 | – | Labour Matters |
| Schedule 6.1.15 | – | Environmental Matters |
| Schedule 6.1.16 | – | Litigation |
| Schedule 6.1.17 | – | Pension Plans |
| Schedule 6.1.23 | – | Taxes |
| Schedule 6.1.33 | – | Eligible Approved Contracts |
| Schedule 7.2.3 | – | Investments |
| Schedule 7.2.6 | – | Transactions with Affiliates |
| Schedule 9.1 | – | Post-Closing Schedule |

## 1.18   Covenant Relief Period

The Borrowers may, by providing an irrevocable written notice to the Agent, terminate the Covenant Relief Period, which notice shall specify the date on which the Covenant Relief Period is to end; provided that, such termination date shall not be retroactive to a date that precedes such notice.

# ARTICLE 2
# CANADIAN OPERATING FACILITY

## 2.1   Establishment of Canadian Operating Facility

Subject to the terms and conditions in this Agreement, each Canadian Operating Lender hereby establishes a committed, revolving credit facility in favour of the Canadian Borrower in the maximum principal amount indicated opposite such Canadian Operating Lender's name in Exhibit "A" under the heading "Canadian Operating Facility Commitments". Such credit facility in the maximum aggregate principal amount of the Canadian Operating Facility Limit are established by the Canadian Operating Lenders severally and not jointly, and are hereinafter collectively referred to as "**Canadian Operating Facility**". Each Advance by a Canadian Operating Lender under the Canadian Operating Facility shall be made by such Canadian Operating Lender in its Proportionate Share of the Canadian Operating Facility. If the Canadian Operating Facility Limit is at any time less than the Canadian Operating Facility Commitment, then each Canadian Operating Lender's obligation to provide Advances under the Canadian Operating Facility will be reduced accordingly on a *pro rata* basis.

## 2.2   Purpose

Advances under the Canadian Operating Facility shall be used by the Canadian Borrower to fund working capital needs and for general corporate purposes, including Permitted Acquisitions (other than a Hostile Acquisition and the Terra Acquisition).

## 2.3   Revolving Nature

The Canadian Operating Facility shall be a revolving facility. For greater certainty, the Borrower shall, subject to the terms of this Agreement, be entitled to obtain Advances under the Canadian Operating Facility from time to time and repay all or any portion of the Outstanding Advances under the Canadian Operating Facility from time to time; provided, that the Outstanding Advances under the Canadian Operating Facility at any time shall not exceed the Canadian Operating Facility Limit in effect at such time. If at any time and for whatever reason the Outstanding Advances under the Canadian Operating Facility exceed the Canadian Operating Facility Limit then in effect, the Canadian Borrower shall, within two Business Days of receipt of a written notice from the Agent, pay to the Agent the principal amount required to reduce the Outstanding Advances under the Canadian Operating Facility to an amount not greater than the Canadian Operating Facility Limit then in effect.

## 2.4   Repayment

The Obligations under the Canadian Operating Facility shall become due and payable on the earlier of: (i) the Acceleration Date; and (ii) the Facilities Maturity Date.

## 2.5   Availment Options

2.5.1   Subject to the restrictions contained in this Section 2.5 and elsewhere in this Agreement (and in particular, Sections 5.4 and 5.5), the Canadian Borrower may receive Advances under the Canadian Operating Facility by any one or more of the following

Availment Options (or any combination thereof) in minimum amounts and multiples as provided in Section 5.5:

(a)     Overdrafts in Canadian Dollars or U.S. Dollars (but only under the Swingline);

(b)     Letters of Credit in Canadian Dollars or U.S. Dollars (but only under the Swingline);

(c)     Canadian Dollar Prime Rate Loans;

(d)     U.S. Dollar Base Rate Loans;

(e)     Bankers' Acceptances from the BA Lenders in Canadian Dollars only with a maturity of 30, 60, 90 or 180 days, subject to availability;

(f)     BA Equivalent Loans from the Non-BA Lenders in Canadian Dollars only with a maturity of 30, 60, 90 or 180 days, subject to availability; or

(g)     LIBOR Loans in U.S. Dollars, with a LIBOR Period of 30, 60, 90 or 180 days, subject to availability.

2.5.2     Bankers' Acceptances, BA Equivalent Loans and LIBOR Loans under the Canadian Operating Facility will not be issued with a maturity date later than the Facilities Maturity Date.

2.5.3     The Canadian Borrower may Convert Outstanding Advances under the Canadian Operating Facility in the form of any above Availment Option applicable to it into another form of Availment Option in the same currency, subject to and in accordance with the terms and conditions of this Agreement (but for greater certainty, Bankers' Acceptances, BA Equivalent Loans, LIBOR Loans and Letters of Credit may not be converted into another Availment Option prior to the maturity thereof, except in the case of unexpired Letter of Credits by the return of the original thereof to the Swingline Lender for cancellation).

**2.6     Interest and Fees**

2.6.1     In respect of Advances under the Canadian Operating Facility, the Canadian Borrower agrees to pay the following:

(a)     interest on Overdrafts in Canadian Dollars and interest on Canadian Dollar Prime Rate Loans at the Canadian Prime Rate plus the Applicable Margin per annum, payable monthly in arrears on the last Business Day of such month;

(b)     in respect of each Letter of Credit issued under the Canadian Operating Facility:

(i)     to the Swingline Lender in respect of the period from the date of issuance of such Letter of Credit to the date of expiry of such Letter of Credit (including the first day but excluding the last day) and divided by 365 or

366 days, as the case may be, a fee equal to the Applicable Margin in effect at the time of issuance multiplied by the face amount of such Letter of Credit multiplied by the number of days in such period and divided by 365 or 366 days, as the case may be, payable on the date of issuance of such Letter of Credit; and

(ii)     in respect of each Letter of Credit, in addition to the fees referred to in clause (i) immediately above, fees generally applicable to Letters of Credit from time to time (such as issuance, drawing, registration, amendment, communication and other processing and out of pocket fees) at the Swingline Lender's usual rates, payable to the Swingline Lender for its own account,

and each fee referred to in this Section in respect of a Letter of Credit shall be paid in the same currency as the currency of such Letter of Credit;

(c)     in respect of each Bankers' Acceptance, a stamping fee equal to the Applicable Margin multiplied by the face amount of the Bankers' Acceptance with the product thereof further multiplied by the number of days to maturity of the Bankers' Acceptance and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such Bankers' Acceptance will be less than the face amount payable to the holder of such Bankers' Acceptance on the maturity thereof, as more particularly provided in Section 5.10);

(d)     in respect of each BA Equivalent Loan, a stamping fee equal to the Applicable Margin multiplied by the face amount of the BA Equivalent Loan with the product thereof further multiplied by the number of days to maturity of the BA Equivalent Loan and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such BA Equivalent Loan will be less than the principal amount of such BA Equivalent Loan on the maturity thereof, as more particularly provided in Section 5.12);

(e)     interest on Overdrafts in U.S. Dollars and interest on U.S. Dollar Base Rate Loans at the U.S. Base Rate plus the Applicable Margin per annum, payable monthly in arrears on the last day of each and every month (provided, that if the last day of any month is not a Business Day, interest shall be payable on the next Business Day thereafter);

(f)     interest on LIBOR Loans in U.S. Dollars at the U.S. Dollar LIBOR Rate plus the Applicable Margin per annum calculated on the basis of a year of 360 days, payable in the manner set out in Section 5.13.2;

(g)     a standby fee with respect to the unused portion of the Canadian Operating Facility (other than the Swingline), calculated in U.S. Dollars on a daily basis as being the difference between (i) the Canadian Operating Facility Commitment less the Swingline Limit and (ii) the Outstanding Advances under that portion of the Canadian Operating Facility other than the Swingline, multiplied by the Applicable Margin and divided by 365 or 366 days, as the case may be, which standby fee shall be payable quarterly in arrears on the last day of each Fiscal Quarter;

(h)     a standby fee with respect to the Swingline payable to the Agent for the account of the Swingline Lender, calculated in U.S. Dollars on a daily basis as being the difference between (i) the Swingline Limit and (ii) the Outstanding Advances under the Swingline, multiplied by the Applicable Margin and divided by 365 or 366 days, as the case may be, which standby fee shall be payable quarterly in arrears on the last day of each Fiscal Quarter; and

(i)     such fees payable to the Agent as may be agreed in writing from time to time between the Canadian Borrower and the Agent relating to any Banking Services Agreements and related services which may be provided by the Agent for the Canadian Borrower from time to time.

2.6.2     With respect to any Availment Option under the Canadian Operating Facility, "Applicable Margin" means, in respect of any Fiscal Quarter, the percentage in the column relating to such Availment Option which corresponds to the Net Leverage Ratio as determined pursuant to Section 5.1.4.

**2.7     Swingline**

2.7.1     A portion of the Canadian Operating Facility in the maximum amount of the Swingline Limit is hereby designated as the "**Swingline**" and shall be subject to the terms and conditions in this Section 2.7 (in addition to any other applicable terms and conditions contained in this Agreement). The Swingline shall be available to each of the Canadian Borrower and the Specified Canadian Swingline Borrower (collectively the "**Swingline Borrowers**").

2.7.2     The Swingline shall be established and maintained by the Swingline Lender only. Either Swingline Borrower may only receive Advances under the Swingline by way of Overdrafts, LIBOR Loans, Bankers' Acceptances or the issuance of Letters of Credit, in each case (other than with respect to Bankers' Acceptances), in Canadian Dollars or U.S. Dollars. The aggregate amount owing under the Swingline may at no time exceed the Swingline Limit and the aggregate principal amount outstanding under the Swingline plus the other Outstanding Advances under the Canadian Operating Facility shall at no time exceed the Canadian Operating Facility Limit. The total number of Bankers' Acceptances and LIBOR Loans outstanding under the Swingline shall not exceed fifteen at any time.

2.7.3     The Swingline shall form a part of the Canadian Operating Facility and, except for the purpose of calculating the Canadian Operating Facility standby fee, any Swingline

Loan shall reduce availability under the Canadian Operating Facility on a dollar for dollar basis.

2.7.4     The Swingline Lender will make Advances to the Swingline Borrowers under the Swingline by way of (a) Canadian Dollar Overdraft into Canadian Dollar accounts, or U.S. Dollar Overdraft into U.S. Dollar accounts, in each case held at a branch of the Agent and as designated by either Swingline Borrower from time to time as required in order to honour cheques drawn by either Swingline Borrower on such accounts which are presented to the Swingline Lender for payment, (b) the issuance of Letters of Credit in Canadian Dollars or U.S. Dollars or (c) LIBOR Loans or Bankers' Acceptances. Other than in respect of Letters of Credit, LIBOR Loans or Bankers' Acceptances, no Drawdown Request or minimum amount shall be required in connection therewith and each Swingline Loan shall be on a dollar for dollar basis (i.e. not subject to multiples). As deposits are made into such accounts by the applicable Swingline Borrower, the Swingline Lender shall withdraw funds from such accounts from time to time and apply such funds as Repayments under the Swingline; provided, that the foregoing shall not apply to any Swingline Loans made by way of issuance of a Letter of Credit, LIBOR Loan or Bankers' Acceptance. No notice of repayment shall be required to be given by the Canadian Borrower in respect of any such repayment of any Swingline Loan (other than in respect of LIBOR Loans or Bankers' Acceptances). The Swingline Borrowers authorize and direct the Swingline Lender, in its discretion, to automatically debit, by mechanical, electronic or manual means, the bank accounts of the Swingline Borrowers maintained by it for any amounts (including principal, interest or fees) that are due and payable under this Section 2.7.

2.7.5     Letters of Credit may be issued under the Swingline in Canadian Dollars or U.S. Dollars (or such other currencies as may be agreed to by the Swingline Lender); provided, that the Equivalent Amount expressed in U.S. Dollars (or such other currency, if applicable) of the aggregate face amount of all Letters of Credit outstanding under the Swingline at any time may not exceed U.S. $10,000,000. Each Letter of Credit shall have an expiry date not exceeding the earlier of (a) one year from the date of issuance thereof (subject to any customary auto-renewal terms contained in such Letter of Credit; provided, that such auto-renewal provisions do not provide for a renewal in the singular instance in excess of one year from the date of such renewal), and (b) five Business Days prior to the Facilities Maturity Date. Letters of Credit will not be issued for the purpose of guaranteeing obligations of any Person other than a Credit Party. On the date of issue, the Swingline Lender will complete and issue one or more Letters of Credit in favour of the beneficiary as specified by the applicable Swingline Borrower in its Drawdown Request. No Letter of Credit shall require payment against a conforming draft to be made thereunder on the same Business Day upon which such draft is presented, if such presentation is made after 11:00 a.m. (Toronto time) on such Business Day. Prior to the issue date, the applicable Swingline Borrower shall specify a precise description of the documents and the verbatim text of any certificate to be presented by the beneficiary prior to payment under the Letter of Credit. The Swingline Lender may require changes in any such documents or certificate, acting reasonably. In determining whether to pay under a Letter of Credit, the Swingline Lender shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit. Sections 4.7.2, 4.7.3, 4.7.4 and

4.7.6 shall apply to Letters of Credit issued under the Swingline *mutatis mutandis* as if the Swingline Lender was the Issuing Bank.

2.7.6     If the Canadian Borrower requests a Syndicated Advance and the Swingline Lender's Proportionate Share of such Syndicated Advance would cause its Proportionate Share of all Syndicated Advances under the Canadian Operating Facility then outstanding together with the aggregate outstanding principal amount of all Swingline Loans to exceed the Swingline Lender's Commitment under the Canadian Operating Facility, then the Canadian Borrower shall be required to repay such Swingline Loans (or to convert the same into a Syndicated Advance in accordance with Section 2.7.7) to the extent of such excess on or before the requested date of such Syndicated Advance; provided, that the foregoing shall not apply to any Swingline Loans made by way of issuance of a Letter of Credit.

2.7.7     Notwithstanding anything to the contrary herein contained, the Canadian Borrower may at any time give notice to the Swingline Lender and the Agent, which notice shall direct a Conversion of any outstanding Swingline Loan into a Syndicated Advance (other than by way of issuance of a Letter of Credit) and shall specify the particulars of such Swingline Loans, and the Agent shall forthwith provide a copy of such notice to the Canadian Operating Lenders and, effective on the effective date of such notice, the Canadian Borrower shall be deemed to have requested a Conversion of such Swingline Loan into a Syndicated Advance (whether or not it was the actual borrower under such Swingline Loan) and in an amount sufficient to repay the relevant Swingline Loan and accrued and unpaid interest in respect thereof. Subject to the same notice period set out in Section 5.4, each Canadian Operating Lender shall disburse to the Agent for payment to the Swingline Lender its respective Proportionate Share of such amounts and such amounts shall thereupon be deemed to have been advanced by such other Canadian Operating Lenders to the Canadian Borrower and to constitute Syndicated Advances by way of Canadian Dollar Prime Rate Loans or U.S. Dollar Base Rate Loans, as applicable. Such Syndicated Advances shall be deemed to be comprised of principal and accrued and unpaid interest in the same proportions as the corresponding Swingline Loans.

2.7.8     Upon the occurrence and any time during the continuance of an Event of Default, the Canadian Operating Lenders shall make such adjusting payments amongst themselves in any manner as may be required to ensure their respective participations in outstanding Advances under the Canadian Operating Facility reflect their respective Proportionate Share under the Canadian Operating Facility. If any Swingline Loans (other than by way of Letters of Credit) are outstanding, the Swingline Lender may at any time in its sole and absolute discretion, on behalf of either Swingline Borrower (which hereby irrevocably directs and authorizes the Swingline Lender to make such request on its behalf), request that each Canadian Operating Lender, through the Agent, make a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable, to the Canadian Borrower (whether or not it was the actual borrower under such Swingline Loan) in an amount equal to the Lender's Proportionate Share of the principal amount of such Swingline Loan outstanding on the date such notice is given (in this Section, the "**Refunded Swingline Loans**"), provided that the provisions of this clause shall not affect the applicable Swingline Borrower's obligation to repay the Swingline Loans to the extent they remain

outstanding. Each Canadian Operating Lender will make the proceeds of any such Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable, available to the Swingline Lender on the Business Day next following the date such notice is given in immediately available funds. The proceeds of such a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan shall be applied by the Swingline Lender to the payment in full of the Refunded Swingline Loans.

2.7.9    In the event of any request for a drawing under any Letter of Credit, the Swingline Lender may notify the applicable Swingline Borrower (with a copy of the notice to the Agent) on or before the date on which it intends to honour such drawing. The applicable Swingline Borrower (whether or not such notice is given) shall reimburse the Swingline Lender within two Business Days of demand by the Swingline Lender, in the relevant currency, an amount, in same day funds, equal to the amount of such drawing (in this Section, an "**LC Payment**"). The applicable Swingline Borrower shall pay to the Swingline Lender interest on the amount of any such drawn Letter of Credit as if such drawn amount was a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable, from the date such Letter of Credit is drawn upon until such time as the applicable Swingline Borrower reimburses the Swingline Lender for the drawn amount of such Letter of Credit. If the applicable Swingline Borrower does not reimburse the Swingline Lender within such two Business Days, the Canadian Operating Lenders shall, on the third Business Day following the date of such initial demand on the applicable Swingline Borrower by the Swingline Lender, at the request of the Swingline Lender, provide its Proportionate Share of the amount drawn under any such Letter of Credit and the Agent shall apply the proceeds thereof to the reimbursement of the Swingline Lender for the amount of such drawing. The applicable Swingline Borrower shall pay to Canadian Operating Lenders interest on the amount of any such drawn Letter of Credit from the date the Swingline Lender requests payment from each of Canadian Operating Lenders in respect of such drawn Letter of Credit until such time as the Canadian Borrower reimburses the Swingline Lender and each of Canadian Operating Lenders for the drawn amount of such Letter of Credit which has been drawn upon as if such drawn amount was a Canadian Dollar Prime Rate Loan or U.S. Dollar Base Rate Loan, as applicable. Each Canadian Operating Lender acknowledges and agrees that its obligation to acquire participations in each Letter of Credit issued by the Swingline Lender and its obligation to make the payments specified herein, and the right of the Swingline Lender to receive the same, in the manner specified herein, are absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or Event of Default hereunder, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

2.7.10    The obligations of each Canadian Operating Lender under Sections 2.7.8 and 2.7.9 are unconditional, shall not be subject to any qualification or exception whatsoever and shall be performed in accordance with the terms and conditions of this Agreement under all circumstances including:

(a)    any lack of validity or enforceability of the applicable Swingline Borrower's obligations under this Section 2.7;

(b)     the occurrence of any Default or Event of Default or the exercise of any rights by the Agent under the Credit Documents;

(c)     whether the Borrower under a Swingline loan was the Canadian Borrower or the Specified Canadian Swingline Borrower; and

(d)     the absence of any demand for payment being made, any proof of claim being filed, any proceeding being commenced or any judgment being obtained by any Lender against any Credit Party.

2.7.11   For certainty, it is hereby acknowledged and agreed that the Canadian Operating Lenders shall be obligated to disburse to the Agent for payment to the Swingline Lender their respective Proportionate Shares of any Syndicated Advances contemplated in this Section 2.7 regardless of:

(a)     whether a Default or Event of Default has occurred or is then continuing or whether any other condition in Section 9.2 is met;

(b)     whether or not the Canadian Borrower has, in fact, actually requested such Conversion; and

(c)     whether or not a Person was a Canadian Operating Lender at the time the applicable Swingline Loan was made.

2.7.12   Notwithstanding any other terms of this Section 2.7, this Agreement or any other Loan Document, the Canadian Borrower shall be jointly and severally liable with the Specified Canadian Swingline Borrower for all obligations and indebtedness arising out of any Swingline Loan advanced by the Swingline Lender to the Specified Canadian Swingline Borrower.

## 2.8    Accordion - Increase in the Canadian Operating Facility Commitment Amount

2.8.1   The Canadian Borrower may at any time and from time to time (a) with the consent of the Agent and the Swingline Lender add additional financial institutions hereunder, as Canadian Operating Lenders or, (b) with the consent of the applicable Canadian Operating Lender, the Agent and the Swingline Lender, increase the individual Canadian Operating Facility Commitment of such Canadian Operating Lender, and, in each case, thereby increase the Canadian Operating Facility Commitment; provided, that at the time of any such addition or increase:

(A)     no Default or Event of Default has occurred and is continuing or would result therefrom and the Agent has received a certificate from the Borrower confirming the same;

(B)     the aggregate amount of all increases to the Canadian Operating Facility Commitment pursuant to this Section 2.8.1 shall not exceed $10,000,000;

(C)     the aggregate of the U.S. Operating Facility Commitment and the Canadian Operating Facility Commitment (as increased) does not at any time exceed $144,681,471;

(D)     the Agent and the Swingline Lender have each consented to such Canadian Operating Lender increasing its Canadian Operating Facility Commitment, each such consent not to be unreasonably withheld or delayed;

(E)     (i) the Canadian Operating Facility Commitment increased pursuant to this Section 2.8.1 and (ii) the individual Canadian Operating Facility Commitment of any new financial institution being added as a Lender pursuant to this Section 2.8.1, shall in each case be no less than $2,500,000;

(F)     concurrently with the addition of a financial institution as an additional Canadian Operating Lender or the increase of a Canadian Operating Lender's Canadian Operating Facility Commitment, such financial institution or Canadian Operating Lender, as the case may be, shall purchase from each Canadian Operating Lender, such portion of the Outstanding Advances owed to each Canadian Operating Lender under the Canadian Operating Facility as is necessary to ensure that the Outstanding Advances owed to all Canadian Operating Lenders and including therein such additional financial institution and the increased Canadian Operating Facility Commitment of any Canadian Operating Lender, as applicable, are in accordance with the Lender's Proportionate Shares of all such Canadian Operating Lenders (including the new financial institution and the increased Canadian Operating Facility Commitment of any Lender) and such financial institution shall execute such documentation as is required by the Agent, acting reasonably, to novate such financial institution as a Canadian Operating Lender hereunder; provided that with respect to any portion of such Outstanding Advances which is outstanding by way of Bankers' Acceptance, the new financial institution or such Canadian Operating Lender shall provide an indemnity to the other Lenders (provided that no such indemnity may exceed one month in duration unless agreed to by all of the affected Lenders) in order to ensure such Bankers' Acceptances are outstanding in accordance with the new Proportionate Shares; and

(G)     the Canadian Borrower has provided to the Agent a certified copy of a directors' resolution of the Canadian Borrower authorizing any such increase in the Canadian Operating Facility Commitment (which may be the original directors' resolution authorizing the credit facility hereunder) together with (i) an acknowledgement and confirmation agreement in respect of Security from each Credit

Party formed under the laws of Canada, the U.S. or any province or state thereof and (ii) a legal opinion with respect each Credit Party formed under the laws of Canada, the U.S. or any province or state thereof, in each case in form and substance satisfactory to the Agent, acting reasonably;

provided, in the case of any Canadian Operating Lender which is requested to provide an increase to its Canadian Operating Facility Commitment, (i) each Canadian Operating Lender shall notify the Agent within the time period specified in the Agent's notice of such increase to such Canadian Operating Lender (which shall in no event be less than ten Business Days from the date of delivery of such notice to the Canadian Operating Lenders) whether or not it agrees to increase its Canadian Operating Facility Commitment and by what amount; (ii) any Canadian Operating Lender not responding within such time period shall be deemed to have declined to increase its Canadian Operating Facility Commitment; and (iii) in no event shall any existing Canadian Operating Lender be required to increase its Canadian Operating Facility Commitment.

## ARTICLE 3
## TERM FACILITY

### 3.1     Establishment of the Term Facility

Subject to the terms and conditions in this Agreement, each Term Lender hereby establishes a committed non-revolving reducing term credit facility in favour of the Canadian Borrower in the maximum principal amount indicated opposite such Term Lender's name in Exhibit "A" under the heading "Term Facility Commitments". Such credit facility in the maximum aggregate principal amount of the Term Facility Commitment is established by the Term Lenders severally and not jointly, and is hereinafter referred to as the "**Term Facility**". Each Advance by a Term Lender under the Term Facility shall be made by such Term Lender in its Proportionate Share of the Term Facility.

### 3.2     Purpose

Advances to partially finance the purchase price of certain Acquisitions.

### 3.3     Nature

The Term Facility shall be a non-revolving facility, and any Repayment under the Term Facility may not be re-borrowed. As of the Amendment and Restatement Date, no new Advances are available under the Term Facility.

### 3.4     Repayment

3.4.1     The Obligations under the Term Facility shall become due and payable on the earlier of: (a) the Acceleration Date; and (b) the Facilities Maturity Date.

3.4.2     The Canadian Borrower shall make Repayments under the Term Facility in quarterly installments on the last day of each Fiscal Quarter (and if the last day of a Fiscal

Quarter is not a Business Day, such payment shall be due on the next Business Day) of U.S. $1,195,000 in each case, payable on the last Business Day of each such Fiscal Quarter; provided, however, that no such Repayment shall be required under this Section 3.4.2 with respect to the Fiscal Quarters ending June 30, 2019, September 30, 2019 and December 31, 2019.

3.4.3     Each Repayment under the Term Facility shall be applied to the Term Lenders holding such Loans *pro rata* based upon their Proportionate Share thereof and the Term Facility Commitment shall be reduced by the amount of each such Repayment.

## 3.5     Availment Options

3.5.1     Subject to the restrictions contained in this Section 3.5, the Canadian Borrower may receive Advances under the Term Facility by way of (and may convert Outstanding Advances under the Term Facility into) any one or more of the following Availment Options (or any combination thereof) in minimum amounts and multiples as provided in Section 5.5:

(a)     Canadian Dollar Prime Rate Loans;

(b)     Bankers' Acceptances from the BA Lenders in Canadian Dollars only with a maturity date of 30, 60, 90 or 180 days, subject to availability;

(c)     BA Equivalent Loans from the Non-BA Lenders in Canadian Dollars only with a maturity date of 30, 60, 90 or 180 days, subject to availability;

(d)     U.S. Dollar Base Rate Loans; or

(e)     LIBOR Loans in U.S. Dollars only with a LIBOR Period of 30, 60, 90 or 180 days, subject to availability.

3.5.2     Bankers' Acceptances, BA Equivalent Loans and LIBOR Loans under the Term Facility may not be converted into another Availment Option prior to the maturity thereof, and may not be issued with a maturity date later than the Facilities Maturity Date.

## 3.6     Interest and Fees

3.6.1     In respect of Advances under the Term Facility, the Canadian Borrower agrees to pay the following:

(a)     interest on Canadian Dollar Prime Rate Loans at the Canadian Prime Rate plus the Applicable Margin per annum, payable monthly in arrears on the first Business Day of the next month;

(b)     in respect of each Bankers' Acceptance, a stamping fee equal to the Applicable Margin multiplied by the face amount of the Bankers' Acceptance with the product thereof further multiplied by the number of days to maturity of the Bankers' Acceptance and divided by 365 or 366 days, as the case may be, payable at the time

of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such Bankers' Acceptance will be less than the face amount payable to the holder of such Bankers' Acceptance on the maturity thereof, as more particularly provided in Section 5.10);

(c)     in respect of each BA Equivalent Loan, a stamping fee equal to the Applicable Margin multiplied by the face amount of the BA Equivalent Loan with the product thereof further multiplied by the number of days to maturity of the BA Equivalent Loan and divided by 365 or 366 days, as the case may be, payable at the time of acceptance (and for greater certainty, in addition to paying the said stamping fee, the Canadian Borrower acknowledges that the proceeds received upon the issuance of such BA Equivalent Loan will be less than the principal amount of such BA Equivalent Loan on the maturity thereof, as more particularly provided in Section 5.12);

(d)     interest on U.S. Dollar Base Rate Loans at the U.S. Base Rate plus the Applicable Margin per annum, payable monthly in arrears on the first Business Day of the next month; and

(e)     interest on LIBOR Loans in U.S. Dollars at the U.S. Dollar LIBOR Rate plus the Applicable Margin per annum calculated on the basis of a year of 360 days, payable in the manner set out in Section 5.13.2.

3.6.2     With respect to any Availment Option under the Term Facility, "Applicable Margin" means, in respect of any Fiscal Quarter, the percentage in the column relating to such Availment Option which corresponds to the Net Leverage Ratio as determined pursuant to Section 5.1.4.

## ARTICLE 4
## U.S. OPERATING FACILITY

**4.1     Establishment of U.S. Operating Facility**

Subject to the terms and conditions in this Agreement, each U.S. Operating Lender hereby establishes a committed, revolving credit facility in favour of the U.S. Borrower in the maximum principal amount indicated opposite such U.S. Operating Lender's name in Exhibit "A" under the heading "U.S. Operating Facility Commitments". Such credit facility in the maximum aggregate principal amount of the U.S. Operating Facility Limit are established by the U.S. Operating Lenders severally and not jointly, and are hereinafter collectively referred to as the "**U.S. Operating Facility**". Each Advance by a U.S. Operating Lender under the U.S. Operating Facility shall be made by such U.S. Operating Lender in its Proportionate Share of the U.S. Operating Facility.

## 4.2     Purpose

Advances under the U.S. Operating Facility shall be used by the U.S. Borrower to fund working capital needs and for general corporate purposes including the Permitted Acquisitions (other than a Hostile Acquisition and the Terra Acquisition).

## 4.3     Revolving Nature

The U.S. Operating Facility shall be a revolving facility. For greater certainty, the U.S. Borrower shall, subject to the terms of this Agreement, be entitled to obtain Advances by way of U.S. Dollar Prime Rate Loans, LIBOR Loans or Letters of Credit in U.S. Dollars under the U.S. Operating Facility from time to time and repay all or any portion of the Outstanding Advances under the U.S. Operating Facility from time to time; provided, that the Outstanding Advances under the U.S. Operating Facility at any time shall not exceed the U.S. Operating Facility Commitment in effect at such time. If at any time and for whatever reason the Outstanding Advances under the U.S. Operating Facility exceed the U.S. Operating Facility Commitment then in effect, the U.S. Borrower shall, within two Business Days of receipt of a written notice from the Agent, pay to the Agent the principal amount required to reduce the Outstanding Advances under the U.S. Operating Facility to an amount not greater than the U.S. Operating Facility Commitment then in effect.

## 4.4     Repayment

The Obligations under the U.S. Operating Facility shall become due and payable on the earlier of: (i) the Acceleration Date; and (ii) the Facilities Maturity Date.

## 4.5     Availment Options

4.5.1     Subject to the restrictions contained in this Section 4.5 and elsewhere in this Agreement (and in particular, Sections 5.4 and 5.5), the U.S. Borrower may receive Advances under the U.S. Operating Facility by any one or more of the following Availment Options (or any combination thereof) in minimum amounts and multiples as provided in Section 5.5:

(a)     Letters of Credit in U.S. Dollars;

(b)     U.S. Dollar Prime Rate Loans; or

(c)     LIBOR Loans in U.S. Dollars, with a LIBOR Period of 30, 60, 90 or 180 days, subject to availability.

4.5.2     LIBOR Loans under the U.S. Operating Facility will not be issued with a maturity date later than the Facilities Maturity Date.

4.5.3     The U.S. Borrower may convert Outstanding Advances under the U.S. Operating Facility in the form of any above Availment Option applicable to it into another form of Availment Option in the same currency, subject to and in accordance with the terms and conditions of this Agreement (but for greater certainty, LIBOR Loans and Letters of Credit

may not be converted into another Availment Option prior to the maturity thereof, except in the case of unexpired Letter of Credits by the return of the original thereof to the Issuing Bank for cancellation).

**4.6     Interest and Fees**

4.6.1     In respect of Advances under the U.S. Operating Facility, the U.S. Borrower agrees to pay the following:

(a)     interest on U.S. Dollar Prime Rate Loans in U.S. Dollars at the U.S. Prime Rate plus the Applicable Margin per annum, payable monthly in arrears on the last day of each and every month (provided, that if such day is not a Business Day, interest shall be payable on the next Business Day thereafter);

(b)     interest on LIBOR Loans in U.S. Dollars at the U.S. Dollar LIBOR Rate plus the Applicable Margin per annum calculated on the basis of a year of 360 days, payable in the manner set out in Section 5.13.2;

(c)     in respect of each Letter of Credit issued under the U.S. Operating Facility:

(i)     to the Agent for the account of the U.S. Operating Lenders in respect of the period from the date of issuance of such Letter of Credit to the date of expiry of such Letter of Credit (including the first day but excluding the last day) and divided by 360 days, a fee equal to the Applicable Margin in effect at the time of issuance multiplied by the face amount of such Letter of Credit multiplied by the number of days in such period and divided by 360 days, payable on the date of issuance of such Letter of Credit; and

(ii)     in respect of each Letter of Credit, in addition to the fees referred to in Section 4.6.1(c), fees generally applicable to Letters of Credit from time to time (such as issuance, drawing, registration, amendment, communication and other processing and out of pocket fees) at the Issuing Bank's usual rates, payable to the Issuing Bank for its own account.

Each fee referred to in this Section in respect of a Letter of Credit shall be paid in U.S. Dollars; and

(d)     an unused commitment fee with respect to the unused portion of the U.S. Operating Facility calculated in U.S. Dollars on a daily basis as being the difference between (i) the U.S. Operating Facility Commitment and (ii) the Outstanding Advances under the U.S. Operating Facility, multiplied by the Applicable Margin and divided by 360 days which standby fee shall be payable quarterly in arrears on the last day of each Fiscal Quarter.

4.6.2     With respect to any Availment Option under the U.S. Operating Facility, "Applicable Margin" means, in respect of any Fiscal Quarter, the percentage in the column relating to such Availment Option which corresponds to the Net Leverage Ratio as determined pursuant to Section 5.1.4.

**4.7     Letters of Credit**

4.7.1     Letters of Credit may be issued under the U.S. Operating Facility in U.S. Dollars (or such other currencies as may be agreed to by the Agent and by the applicable Issuing Bank); <u>provided</u>, that the Equivalent Amount expressed in U.S. Dollars of the aggregate face amount of all Letters of Credit outstanding under the U.S. Operating Facility at any time may not exceed U.S. $5,000,000. Each Letter of Credit shall have an expiry date not exceeding the earlier of (a) one year from the date of issuance thereof (subject to any customary auto-renewal terms contained in such Letter of Credit; <u>provided</u>, that such auto-renewal provisions do not provide for a renewal in the singular instance in excess of one year from the date of such renewal), and (b) five Business Days prior to the Facilities Maturity Date.

4.7.2     Each request for the issuance of a Letter of Credit shall be delivered by the U.S. Borrower to the Issuing Bank (with a copy to the Agent) in accordance with the notice requirements set out in Section 5.4 herein, together with Issuing Bank's customary form of application and indemnity agreement completed to its satisfaction and the proposed form of the Letter of Credit (which shall be satisfactory to the Issuing Bank) and such other certificates, documents and other papers and information as the Issuing Bank may reasonably request.

4.7.3     On the date of issue, the Issuing Bank will complete and issue one or more Letters of Credit in favour of the beneficiary as specified by the U.S. Borrower in its Drawdown Request. No Letter of Credit shall require payment against a conforming draft to be made thereunder on the same Business Day upon which such draft is presented, if such presentation is made after 11:00 a.m. (New York time) on such Business Day. Prior to the issue date, the U.S. Borrower shall specify a precise description of the documents and the verbatim text of any certificate to be presented by the beneficiary prior to payment under the Letter of Credit. The Issuing Bank may require changes in any such documents or certificate, acting reasonably. In determining whether to pay under a Letter of Credit, the Issuing Bank shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit.

4.7.4     In the event of any request for a drawing under any Letter of Credit, the Issuing Bank may notify the U.S. Borrower (with a copy of the notice to the Agent) on or before the date on which it intends to honour such drawing. The U.S. Borrower (whether or not such notice is given) shall reimburse the Issuing Bank within one Business Day of demand by the Issuing Bank, an amount, in same day funds, equal to the amount of such drawing. The U.S. Borrower shall pay to the Issuing Bank interest on the amount of any such drawn Letter of Credit as if such drawn amount was a U.S. Dollar Prime Rate Loan from the date such Letter of Credit is drawn upon until such time as the U.S. Borrower reimburses the Issuing Bank for the drawn amount of such Letter of Credit. If the U.S. Borrower does not reimburse the Issuing Bank within such two Business Days, U.S. Operating Lenders shall, on the third Business Day following the date of such initial demand on the U.S. Borrower by the Issuing Bank, at the request of the Issuing Bank, provide its Proportionate Share of the amount drawn under any such Letter of Credit and the Agent shall apply the proceeds

thereof to the reimbursement of the Issuing Bank for the amount of such drawing. The U.S. Borrower shall pay to U.S. Operating Lenders interest on the amount of any such drawn Letter of Credit from the date the Issuing Bank requests payment from each of U.S. Operating Lenders in respect of such drawn Letter of Credit until such time as the U.S. Borrower reimburses the Issuing Bank and each of U.S. Operating Lenders for the drawn amount of such Letter of Credit which has been drawn upon as if such drawn amount was a U.S. Dollar Base Rate Loan. Each U.S. Operating Lender acknowledges and agrees that its obligation to acquire participations in each Letter of Credit issued by the Issuing Bank and its obligation to make the payments specified herein, and the right of the Issuing Bank to receive the same, in the manner specified herein, are absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or Event of Default hereunder, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

4.7.5    The Issuing Bank shall notify each the Agent of the principal amount, the number, and the expiration date of each Letter of Credit and upon receipt of such information, the Agent shall notify each U.S. Operating Lender of the amount of such U.S. Operating Lender's participation therein. The Issuing Bank shall review each draft and any accompanying documents presented under a Letter of Credit and shall notify the Agent of any such presentment and upon receipt of such information, the Agent shall notify each U.S. Operating Lender of such presentment.

4.7.6    The Issuing Bank shall not be obligated to issue any Letter of Credit (i) in violation of any Applicable Law or policy of such Issuing Bank or any Lender or (ii) if any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Bank from issuing such Letter of Credit. The Issuing Bank shall not at any time be obligated to issue any Letter of Credit if such issuance would conflict with, or cause the Issuing Bank to exceed any limits imposed by, this Agreement or any applicable requirements of Applicable Law or any regulatory or internal limit.

## ARTICLE 5
## GENERAL CONDITIONS

**5.1    Matters relating to Interest and Fees**

5.1.1    Unless otherwise indicated, Interest on any outstanding principal amount hereunder shall be calculated daily and shall be payable monthly in arrears on the last day of each and every month. If the last day of a month is not a Business Day, the Interest payment due on such day shall be made on the next Business Day, and Interest shall continue to accrue on the said principal amount and shall also be paid on such next Business Day. Interest shall accrue from and including the day upon which an Advance is made or is deemed to have been made, and ending on but excluding the day on which such Advance is repaid or satisfied. Any change in the Canadian Prime Rate shall cause an immediate adjustment of the interest rate applicable to Canadian Dollar Prime Rate Loans and Overdrafts in Canadian Dollars and any change in the U.S. Base Rate shall cause an immediate adjustment of the interest rate applicable to U.S. Dollar Base Rate Loans and

Overdrafts in U.S. Dollars, in each case without the necessity of any notice to any Borrower.

5.1.2    Unless otherwise stated, in this Agreement if reference is made to a rate of Interest, fee or other amount "per annum" or a similar expression is used, such interest, fee or other amount shall be calculated on the basis of a year of 365 or 366 days (or 360 days in the case of Loans or Letters of Credit denominated in U.S. Dollars), as the case may be. If the amount of any Interest, fee or other amount is determined or expressed on the basis of a period of less than one year of 365 days or 366 days (or 360 days in the case of Loans denominated in U.S. Dollars), as the case may be, the equivalent yearly rate is equal to the rate so determined or expressed, divided by the number of days in the said period, and multiplied by the actual number of days in that calendar year.

5.1.3    Notwithstanding any other provisions of this Agreement:

(a)    the Borrowers and the Lenders intend to strictly comply with all Applicable Laws, including applicable usury laws (or the usury laws of any jurisdiction whose usury laws are deemed to apply to this Agreement and the other Credit Documents despite the intention and desire of the parties to apply the usury laws of the Province of Alberta and the federal laws applicable therein);

(b)    in no event shall any Borrower or any other Person be obligated to pay, or any Lender have any right or privilege to reserve, receive or retain, (a) any interest in excess of the maximum amount of nonusurious interest permitted under the laws of the Province of Alberta the federal laws of Canada applicable therein, or the Applicable Laws of any other jurisdiction, or (b) total interest in excess of the amount which such Lender could lawfully have contracted for, reserved, received, retained or charged had the interest been calculated for the full term of the applicable Loan; and

(c)    if the amount of any interest, premium, fees or other monies or any rate of interest stipulated for, taken, reserved or extracted under the Credit Documents would otherwise contravene the provisions of Section 347 of the *Criminal Code* (Canada), Section 8 of the *Interest Act* (Canada) or any successor or similar legislation (including any usury law in the U.S.), or would exceed the amounts which any Lender is legally entitled to charge and receive under any law to which such compensation is subject, then such amount or rate of interest shall be reduced to such maximum amount as would not contravene such provision; and to the extent that any excess has been charged or received such Lender shall apply such excess against the Outstanding Advances and refund any further excess amount to the applicable Borrower.

As used in this Section 5.1.3, the term "interest" includes the aggregate of all charges, fees, benefits or other compensation which constitute interest under Applicable Law; provided, that, to the maximum extent permitted by Applicable Law, (a) any non-principal payment shall be characterized as an expense or as compensation for something other than the use, forbearance or detention of money and not as interest, and (b) all interest at any time

contracted for, reserved, charged or received shall be amortized, prorated, allocated and spread, using the actuarial method, during the full term of the Facilities. The daily interest rates to be used in calculating interest for the purposes of this Section 5.1.3 shall be determined by dividing the applicable interest rate per annum by the number of days in the calendar year for which such calculation is being made. None of the terms and provisions contained in this Agreement or in any other Credit Document which directly or indirectly relate to interest shall ever be construed without reference to this Section 5.1.3, or be construed to create a contract to pay for the use, forbearance or detention of money at any interest rate in excess of the amounts permitted under any Applicable Law.

The provisions of this Section shall govern and control over every other provision of this Agreement or any other Credit Document which conflicts or is inconsistent with this Section 5.1.3.

5.1.4     Any change in the Applicable Margin in respect of any Availment Option under a Facility shall be determined in accordance with this Section. For purposes of this Section, the term "**Pricing Date**" means, for any Fiscal Quarter of the Canadian Borrower ending on or after the Amendment and Restatement Date, the date on which the Agent is in receipt of the financial statements and Compliance Certificate pursuant to Section 7.4.1(b) or Section 7.4.1(d), as applicable, for such Fiscal Quarter. The Applicable Margin shall be established on a Pricing Date based on the Net Leverage Ratio as of the end of the most recently completed Fiscal Quarter and the Applicable Margin established on a Pricing Date shall remain in effect until the next Pricing Date. If the financial statements and Compliance Certificate are delivered before 10:00 a.m. Toronto time on a specific Business Day (the "**Specific Business Day**") then pricing will be adjusted starting on the Specific Business Day. If the financial statements and Compliance Certificate are received after 10:00 a.m. Toronto time on the Specific Business Day then any pricing adjustment will be effective on the next Business Day. If the Canadian Borrower has not delivered its financial statements and Compliance Certificate by the date such financial statements and Compliance Certificate are required to be delivered pursuant to Section 7.4.1(b) or Section 7.4.1(d), as applicable, then until such financial statements and Compliance Certificate are delivered, the Applicable Margin shall be based on Level VI. The Applicable Margin established by such financial statements shall be in effect from the Pricing Date that occurs immediately after the end of the Fiscal Quarter covered by such financial statements until the next Pricing Date; provided, that no changes will be made in respect of any Bankers' Acceptances or BA Equivalent Loans which are outstanding on the effective date, until the Rollover thereof and fees paid on the issuance or renewal of a Letter of Credit will not change during the term of a Letter of Credit as a result of a change in the Net Leverage Ratio.

5.1.5     The determination of the Applicable Margin by the Agent shall be conclusive and binding on the Borrowers and the Lenders if reasonably determined, absent manifest error.

5.1.6     Effective upon the occurrence of an Event of Default (the "**effective date**"), the interest rates then applicable to all Availment Options will each increase by 200 basis points and such increase will remain in effect for as long as such Event of Default subsists. An increase in interest rates and fees as aforesaid arising from an Event of Default shall

apply to all outstanding Advances under the Facilities and will on the effective date apply proportionately to each outstanding Advance during the continuance of such Event of Default. The Borrowers will pay to the Agent on behalf of the Lenders any resulting increase in stamping fees and Letter of Credit fees on or prior to the third Business Day following the effective date. In addition to the conditions set forth above, the Lenders' obligation to provide any Advances under any Facility, other than Rollovers or Conversions of then maturing Advances (in each case not to exceed a 30 day term), will be suspended for as long as there exists an Event of Default.

5.1.7    If the Canadian Borrower has delivered a Compliance Certificate that is subsequently found to be inaccurate in any way as a result of the Canadian Borrower's financial results having to be restated or if the Canadian Borrower's financial results were inaccurately reflected in the original financial results on which such Compliance Certificate was based or for any other reason and the result thereof is that the Net Leverage Ratio was originally reported as lower (and the corresponding Level in the Applicable Margin table was lower) than it otherwise would have been in the absence of such inaccuracy or prior to such restatement, then the Borrowers will, immediately upon the correction of such inaccuracy or upon such restatement, pay to the Agent for the benefit of the applicable Lenders an amount equal to the interest, Letter of Credit fees, stamping fees in respect of Bankers' Acceptances and standby fees that the Lenders should have received, but did not receive, over the applicable period had the Net Leverage Ratio, and the underlying components thereof, been reported correctly in the first instance.

## 5.2    Voluntary Prepayments

Subject to Section 5.15, the Borrowers may from time to time, without payment of any penalty or fee, upon at least two Business Days' prior written notice to the Agent make a prepayment in respect of any Outstanding Advances under any of the Facilities. In the case of Term Facility, the Term Facility Commitment shall be automatically and permanently reduced by the amount of any such prepayment. Notwithstanding the foregoing, Bankers' Acceptances, BA Equivalent Loans and LIBOR Loans may not be repaid prior to the maturity thereof (except in accordance with Sections 5.11 and 5.14, as applicable) and unexpired Letter of Credits may not be prepaid prior to the maturity thereof (except by the return of the original thereof to the Issuing Bank or Swingline Lender, as applicable, for cancellation or by the collateralization thereof in the manner set forth in Section 5.16(f)). Prepayments under the Facilities other than under the Swingline shall be in a minimum principal amount of U.S. $500,000 and integral multiples of U.S. $100,000 in excess thereof and shall be applied as directed by the Borrowers to the remaining payments thereof. Any prepayments under the Term Facility shall be made in inverse order of maturity.

## 5.3    Mandatory Prepayments

5.3.1    If any Credit Party receives cash proceeds, or net cash proceeds in the case of clauses (a), (b) and (c) below, from:

(a)     a transaction after the Amendment and Restatement Date involving the creation or incurrence of any Funded Debt (other than Permitted Funded Debt), and notwithstanding any Default or Event of Default that results therefrom;

(b)     transactions involving the sale, lease or other disposition of any assets (other than transactions described in clauses (a) through (d) inclusive and (f) through (j) inclusive of Section 7.2.4), except where such proceeds are reinvested in the business of any Credit Party within the applicable time period permitted in accordance with Section 5.3.2 (the "**Sales Proceeds**"); or

(c)     property, casualty or other insurance proceeds received by any Credit Party, except where such proceeds are reinvested in the business of any Credit Party within the applicable time period permitted in accordance with Section 5.3.2 (the "**Insurance Proceeds**"); and/or

(d)     Specified Equity Contribution (other than the Specified Equity Contribution deemed to be made on the Second Amendment Date);

then, subject to Sections 5.3.2 and 8.6, the Borrowers shall make a Repayment on account of the Outstanding Advances in an amount equal to 100% of such proceeds, or net cash proceeds in the case of clauses (a), (b) and (c) above, within three Business Days (i) after such proceeds are received by the applicable Credit Party in the case of clauses (a) and (d) above, (ii) within three Business Days of the expiry of the applicable reinvestment period set out in Section 5.3.2 after such proceeds are received by the applicable Credit Party in the case of clause (b) above and within three Business Days of the expiry of the insurance proceeds reinvestment period described in Section 5.3.2(a) after such proceeds are received by the applicable Credit Party in the case of clause (c) above. As used herein, "net cash proceeds" in respect of any such transaction means the gross amount payable to the applicable Credit Party in cash in respect of such transaction less (i) any sales commissions, selling expenses, brokers' fees, consulting fees, legal fees, other costs and expenses of the transaction actually incurred, investment banking fees, accountants' fees, consulting fees, underwriting discounts and commissions and other customary fees and expenses actually incurred, (ii) amounts required to be applied to the repayments of Funded Debt, (including the principal amount, premium or penalty, if any, interest and other amounts required to be applied to the repayment of any Funded Debt secured by a Lien (including because the asset sold is removed from a borrowing base supporting such Funded Debt)), (iii) taxes payable in connection with the transaction, (iv) usual and reasonable adjustments in connection with the transaction and, including the amount of any liability paid or to be paid or reasonable reserve established in accordance with GAAP against any liabilities associated with the assets that are the subject of such event and retained by the Canadian Borrower or any of its Subsidiaries, and (v) any other amount specifically approved by the Agent in writing.

5.3.2     The Sales Proceeds or Insurance Proceeds, as applicable, need not be used by the Credit Parties to make a repayment under Section 5.3.1 and may be used by a Credit Party to purchase assets of the general type then used in the operation of an Eligible Line of

Business, or, provided no Default (unless such repayment would cure any such Default) or Event of Default exists at such time, in the case of:

(a)     Insurance Proceeds (i) of insured claims that do not exceed in the aggregate in any one Fiscal Year $7,500,000 or (ii) are used to repair or replace the property in respect of which such Insurance Proceeds were received, if such purchase, repair or replacement occurs within twelve (12) months of the receipt of such proceeds, subject to an extension of up to a further six (6) months to complete such reinvestment; provided, that the Credit Party is contractually bound to such reinvestment prior to the expiry of the initial twelve (12) months period; or

(b)     Sales Proceeds (i) arising from any single transaction or series of related transactions that do not exceed in the aggregate in any one Fiscal Year $3,000,000 or (ii) are used or useful by a Credit Party to purchase assets of the general type then used in the operation of an Eligible Line of Business, within nine (9) months of the receipt of such proceeds, subject to an extension of up to a further three (3) months to complete such reinvestment; provided, that the Credit Party is contractually bound to such reinvestment prior to the expiry of the initial nine (9) period.

In connection with the foregoing, the Agent and the Lenders may rely upon and assume the correctness of all asset values and other statements contained in any certificate provided by an officer of the Canadian Borrower confirming the value of the relevant assets.

5.3.3     Repayments under this Section 5.3 are to be applied first to Outstanding Advances under the Term Facility until they have been fully repaid, and then to Outstanding Advances under the Operating Facilities, as directed by the Canadian Borrower, or failing such direction, *pro rata* between the Operating Facilities. Repayments under the Facilities under this Section 5.3 shall be applied in inverse order of maturity and will be made *pro rata* to each Lender under the applicable Facility.

5.3.4     If as a result of currency rate fluctuation, the Outstanding Advances under the Canadian Operating Facility exceeds the Canadian Operating Facility Limit by at least 3% thereof (in each case, a "**Currency Excess**"), the Borrowers will, by the earlier of (a) five (5) Business Days after a written request from the Agent, and (b) the next date of a Rollover or Conversion, pay the applicable Currency Excess to the Agent as a Repayment for the benefit of the Canadian Operating Lenders to be shared on the basis of each applicable Lender's Proportionate Share under the Canadian Operating Facility. If to pay a Currency Excess it is necessary to repay an Advance made by way of Bankers' Acceptance or a LIBOR Loan prior to the maturity date thereof, the Borrowers will not be required to repay such Advances until the maturity date applicable thereto; provided, however, that at the request of the Agent, the Borrowers will forthwith pay the Currency Excess to the Agent for deposit into a cash collateral account maintained by and in the name of the Agent for the benefit of the Canadian Operating Lenders. The Currency Excess will be held by the Agent for set off against future obligations owing by the Borrowers to the Canadian Operating Lenders in respect of such Currency Excess, if any, and, pending such application, such amounts will bear interest for the Borrowers' account at the rate payable

by the Agent in respect of deposits of similar amounts and for similar periods of time. The Agent shall have exclusive control over all amounts at any time on deposit in such cash collateral account. The deposit of the Currency Excess by the Borrowers with the Agent as herein provided will not operate as a Repayment under the Canadian Operating Facility until such time as the Currency Excess is actually paid to the Canadian Operating Lenders as a Repayment. If the Borrowers are required to provide a deposit under this Section 5.3.4 as a result of the Currency Excess with respect to an unmatured Bankers' Acceptance or a LIBOR Loan, and such Currency Excess (or any portion thereof) is no longer in effect on the maturity date of such Bankers' Acceptance or LIBOR Loan, such deposit (or the applicable portion thereof) shall be returned to the Borrowers within three Business Days after the maturity date of such Bankers' Acceptance or LIBOR Loan.

5.3.5    If the aggregate Outstanding Advances under the Facilities, is at any time greater than the then applicable Borrowing Base (the amount of such excess being a "**Borrowing Base Shortfall**"), one or all of the Borrowers shall within three (3) Business Days repay such portion of the Outstanding Advances under the Operating Facilities to the Agent for the Canadian Operating Lenders as is required to eliminate such Borrowing Base Shortfall. The Agent will apply such payments (a) against the Term Facility and (b) thereafter, *pro rata* amongst the Canadian Operating Facility and the U.S. Operating Facility and in the following order: (i) first against Canadian Dollar Prime Rate Loans, U.S. Dollar Base Rate Loans, U.S. Dollar Prime Rate Loans, (ii) second to collateralize Bankers' Acceptances as provided in Section 5.11, (iii) third to repay LIBOR Loans, subject to Section 5.14, and (iv) fourth to collateralize Letters of Credit as provided in Section 5.16(f), until any such Borrowing Base Shortfall has been eliminated. If the Borrowers are required to provide cash collateral under this Section 5.3.5 as a result of a Borrowing Base Shortfall, such amount shall be returned to the Borrowers within three (3) Business Days after such Borrowing Base Shortfall is no longer continuing.

5.3.6    If any Credit Party receives net cash proceeds from any Anchor Sale and Leaseback Transaction, then the Borrowers shall make a Repayment on account of the Outstanding Advances under the Operating Facilities in an amount equal to 100% of such net cash proceeds within five Business Days after such proceeds are received by the applicable Credit Party. As used herein, "net cash proceeds" has the same meaning ascribed thereto in Section 5.3.1. Repayments under this Section 5.3.6 are to be applied to Outstanding Advances under the Operating Facilities on a pro rata basis. Repayments under this Section 5.3.6 shall not result in a permanent reduction of any Operating Facility.

**5.4    Notice Periods**

5.4.1    The Borrowers shall provide written notice to the Agent in respect of Advances, Rollovers, Conversions and Repayments to the extent set out below:

(a)    no notice is required for Advances and Repayments in respect of Overdrafts under the Swingline;

(b)    notice is required for each voluntary Repayment under any Facility in accordance with Section 5.2;

(c)     except as provided in clauses (a) and (b) above, but subject to (d), (e) and (f) below, one Business Days' notice is required before 10:00 a.m. Toronto time in respect of any Advance, Rollover, Conversion or voluntary Repayment in Canadian Dollars or in U.S. Dollars;

(d)     notwithstanding the foregoing, if an Advance, Rollover, Conversion or voluntary Repayment relates to a Bankers' Acceptance or BA Equivalent Loan, two Business Days' notice is required before 10:00 a.m. Toronto time;

(e)     notwithstanding the foregoing, if an Advance, Rollover, Conversion or voluntary Repayment relates to a LIBOR Loan, three Business Days' notice is required before 10:00 a.m. Toronto time; and

(f)     notwithstanding the foregoing, if an Advance relates to the issuance of a Letter of Credit, (i) if issued to a beneficiary located in Canada or the U.S., three Business Days' notice is required before 10:00 a.m. Toronto time and (ii) if issued to a beneficiary located outside of Canada or the U.S., five (5) Business Days' notice is required before 10:00 a.m. Toronto time.

5.4.2    Notice of any Advance, Rollover, Conversion or voluntary Repayment referred to in Section 5.4.1 above shall be given in the form of a Drawdown Request, Rollover Notice, Conversion Notice or Repayment Notice, as the case may be, attached hereto as Exhibits, and shall be given to the Agent at its address set out in Section 13.11.

5.4.3    If notice is not provided as contemplated herein with respect to the maturity of any Bankers' Acceptance, BA Equivalent Loan and LIBOR Loan the Agent may convert such Bankers' Acceptance, BA Equivalent Loan or LIBOR Loan upon its maturity into a Canadian Dollar Prime Rate Loan or a U.S. Dollar Base Rate Loan, as applicable.

5.4.4    Any Conversion from one form of Availment Option to another shall be subject to satisfaction of all terms and conditions applicable to the form of the new Availment Option.

## 5.5    Minimum Amounts, Multiples and Procedures re Advances, Conversions and Repayments

5.5.1    Each request by a Borrower for an Advance or Conversion in the form of a Canadian Dollar Prime Rate Loan shall be in a minimum amount of Cdn. $500,000 and multiples of Cdn. $100,000 thereafter.

5.5.2    Each request of a Borrower for an Advance or Conversion in the form of a U.S. Dollar Base Rate Loan shall be in a minimum amount of U.S. $500,000 and multiples of U.S. $100,000 thereafter.

5.5.3    Each request by a Borrower for an Advance or Conversion in the form of a Bankers' Acceptance or BA Equivalent Loan shall be in a minimum amount of Cdn. $500,000 and multiples of Cdn. $100,000 thereafter.

5.5.4     Each request by a Borrower for an Advance or Conversion in the form of a LIBOR Loan in U.S. Dollars shall be in a minimum amount of U.S. $500,000 and in a multiple of U.S. $100,000 thereafter.

5.5.5     Conversions or Rollovers under the Term Facility can be in such lesser amounts as are necessary to give effect to the principal repayments under the Term Facility required pursuant to Sections 3.4, 5.3.1 and 5.3.2.

5.5.6     Upon receipt of a Drawdown Request under any Facility, the Agent shall promptly notify each Lender under such Facility of the contents thereof and such Lender's Proportionate Share of the Advance. Such Drawdown Request shall not thereafter be revocable.

5.5.7     Each Advance shall be made by the applicable Lenders to the Agent at its address referred to in Section 13.11 or such other address as the Agent may designate by notice in writing to the Lenders from time to time. Each Lender shall make available its Proportionate Share of each said Advance to the Agent. Unless the Agent determines that any condition of the Advance has not been satisfied or waived, the Agent shall make the funds so received from the Lenders available to the applicable Borrower by 2:00 p.m. (Toronto time) on the requested date of the Advance. No Lender shall be responsible for any other Lender's obligation to make available its Proportionate Share of the said Advance.

5.5.8     Each Borrower agrees to deliver to the Agent in favour of any requesting Lender such other agreements and documentation as such Lender may reasonably require (not inconsistent with this Agreement and upon at least two (2) Business Days' prior written notice) in respect of such Lender's requirements for the acceptance of Bankers' Acceptances or the issuance of BA Equivalent Loans.

5.5.9     All payments of principal, interest and other amounts made by the Credit Parties to the Agent in respect of the Outstanding Advances under a Facility shall be paid by the Agent to the Lenders in accordance with their respective Proportionate Shares of the Outstanding Advances under such Facility. For greater certainty, however, (a) stamping fees in respect of Bankers' Acceptances and BA Equivalent Loans shall be received and retained by the respective Lenders which issued or accepted such Bankers' Acceptances and BA Equivalent Loans and (b) in the event that any payments of principal, interest and other amounts made by the Credit Parties to the Agent instead of to the Swingline Lender in respect of the Outstanding Advances under the Swingline, any such payments shall be paid by the Agent to the Swingline Lender.

**5.6      Place of Advances and Repayments**

5.6.1     Advances by any Lender to a Borrower shall be made by such Lender to the Agent from such Lender's applicable Lending Office. All payments of principal, interest and other amounts to be made by the Borrowers and the other Credit Parties pursuant to this Agreement shall be made to the Agent at its address noted in Section 13.11 or to such other address at a major city in Canada as the Agent may direct in writing from time to time. All

such payments received by the Agent on a Business Day before 2:00 p.m. (Toronto time) shall be treated as having been received by the Agent on that day; payments made after such time on a Business Day shall be treated as having been received by the Agent on the next Business Day.

5.6.2    Whenever any payment or the performance of any covenant, duty or other obligation shall be due on (or required within a time period ending on) a day which is not a Business Day, the date for payment or performance thereof shall be extended to the next succeeding Business Day. Interest shall continue to accrue and be payable thereon as provided herein, until the date on which such payment is received by the Agent.

## 5.7    Evidence of Obligations (Noteless Advances)

The Agent shall open and maintain, in accordance with its usual practice, accounts evidencing the Obligations; and the information entered in such accounts shall constitute conclusive evidence of the Obligations absent manifest error. The Agent may, but shall not be obliged to, request the Borrowers to execute and deliver from time to time such promissory notes as may be required as additional evidence of the Obligations; provided, that no promissory notes shall be required in respect of any Hedging Agreements or Banking Services Agreements.

## 5.8    Determination of Equivalent Amounts

Whenever it is necessary or desirable at any time to determine the Equivalent Amount in Canadian Dollars of an amount expressed in U.S. Dollars, or vice-versa (specifically including the determination of the Equivalent Amount in Canadian Dollars of an Advance made in U.S. Dollars (as applicable), the determination of each Lender's Proportionate Share of any Repayment on any date, and the determination of whether the Outstanding Advances under any Facility exceed the limit applicable to such Facility at any time), the Equivalent Amount shall be determined by reference to the Exchange Rate on the date of such determination. Notwithstanding the foregoing, however, for the purposes of determining any Letter of Credit fees under the Canadian Operating Facility or the standby fees applicable to the Canadian Operating Facility, the Agent shall make such determination based upon the Bank of Canada noon spot rate on the first Business Day of each quarter for such quarter as the case may be.

If any basket used hereunder is exceeded solely as a result of fluctuations in applicable currency exchange rates after the last time such basket was utilized, such basket will not be deemed to have been exceeded solely as a result of such fluctuations in currency exchange rates. For purposes of determining the Net Leverage Ratio, amounts denominated in a currency other than U.S. Dollars will be converted to U.S. Dollars for the purposes of (A) testing the financial covenant under Section 7.3.1(a), at the Exchange Rate as of the last day of the Fiscal Quarter for which such measurement is being made, and (B) calculating any Net Leverage Ratio (other than for the purposes of determining compliance with Section 7.3.1(a)), at the Exchange Rate as of the date of calculation, and will, in the case of Funded Debt, reflect the currency translation effects, determined in accordance with GAAP, of Hedging Agreements permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Equivalent Amount in U.S. Dollars of such Funded Debt.

**5.9      Commitment to Purchase Bankers' Acceptances and BA Equivalent Loans**

5.9.1      Each BA Lender which is a bank listed in Schedule I of the *Bank Act* (Canada) agrees to purchase those Bankers' Acceptances which it has accepted, at a discount from the face amount thereof calculated at the CDOR Rate for the relevant period in effect on the issuance date thereof.

5.9.2      Each BA Lender which is a bank listed in Schedule II or Schedule III of the *Bank Act* (Canada) agrees to purchase those Bankers' Acceptances which it has accepted, at a discount from the face amount thereof calculated using a rate not in excess of the CDOR Rate for the relevant period in effect on the issuance date thereof plus up to one-tenth of one percent (0.10%).

5.9.3      Each Non-BA Lender agrees to purchase BA Equivalent Loans issued by it hereunder at a discount from the face amount thereof calculated using a rate not in excess of the CDOR Rate plus up to one tenth of one percent (0.10%) for the relevant period in effect on the issuance date thereof.

5.9.4      The discount applicable to each Bankers' Acceptances and BA Equivalent Loan shall be determined on the basis of a year of 365 days.

**5.10      Special Provisions Regarding Bankers' Acceptances**

The following provisions are applicable to Bankers' Acceptances issued by the Canadian Borrower and accepted by any BA Lender hereunder.

5.10.1      *Payment of Bankers' Acceptances.* The Canadian Borrower agrees to provide for each Bankers' Acceptance by payment of the face amount thereof to the Agent on behalf of the BA Lender on the maturity of the Bankers' Acceptance or, prior to such maturity, on the Acceleration Date; and the Agent shall remit the said amount to such BA Lender and such BA Lender shall in turn remit such amount to the holder of the Bankers' Acceptance. If the Canadian Borrower fails to provide for the payment of the Bankers' Acceptance accordingly, any amount not so paid shall be immediately payable by the Canadian Borrower to the Agent on behalf of the BA Lender together with interest on such amount calculated daily and payable monthly at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans under the Facility under which such Bankers' Acceptance was issued. The Canadian Borrower agrees not to claim any days of grace for the payment at maturity of any Bankers' Acceptance and agrees to indemnify and save harmless the BA Lender in connection with all payments made by the BA Lender (or by the Agent on its behalf) pursuant to Bankers' Acceptances accepted by the BA Lender, together with all reasonable costs and expenses incurred by the BA Lender in this regard. The Canadian Borrower hereby waives any defences to payment which might otherwise exist if for any reason a Bankers' Acceptance is held by the BA Lender for its own account at maturity.

5.10.2      *Availability of Bankers' Acceptances.* If at any time and from time to time the Agent determines, acting reasonably, that there no longer exists a market for Bankers' Acceptances for the term requested by the Canadian Borrower, or at all, or if any BA

Lenders representing no less than 35% of the Commitments advise the Agent in writing that the CDOR Rate will not or does not accurately reflect the cost of funds of such BA Lender, the Agent shall so advise the Canadian Borrower, and in such event the BA Lenders shall not be obliged to accept and the Canadian Borrower shall not be entitled to issue Bankers' Acceptances. If such notice is given and there is any outstanding Drawdown Request, Rollover Notice or Conversion Notice requesting an Advance by way of, or a Rollover or Conversion into, a Bankers' Acceptance at such a time, then such request will be deemed to be a request for, or a Rollover or Conversion into, a Canadian Dollar Prime Rate Loan.

5.10.3   *Power of Attorney.* The Canadian Borrower hereby appoints each BA Lender as its true and lawful attorney to complete and issue Bankers' Acceptances on behalf of the Canadian Borrower in accordance with written (including facsimile) transmitted instructions provided by the Canadian Borrower to the Agent on behalf of such BA Lender, and the Canadian Borrower hereby ratifies all lawful acts that its said attorney may do by virtue thereof. The Canadian Borrower agrees to indemnify and hold harmless the Agent and the BA Lenders and their respective directors, officers and employees from and against any charges, complaints, costs, damages, expenses, losses or liabilities of any kind or nature which they may incur, sustain or suffer, arising from or by reason of acting, or failing to act, as the case may be, in reliance upon this power of attorney, except to the extent caused by the gross negligence or willful misconduct of the Agent or the BA Lender or their respective directors, officers and employees. The Canadian Borrower hereby agrees that each Bankers' Acceptance completed and issued and accepted in accordance with this Section by a BA Lender on behalf of the Canadian Borrower is a valid, binding and negotiable instrument of the Canadian Borrower as drawer and endorser. The Canadian Borrower agrees that each BA Lender's accounts and records will constitute *prima facie* evidence of the execution and delivery by the Canadian Borrower of Bankers' Acceptances. This power of attorney is coupled with an interest and shall continue in force until written notice of revocation with respect to any BA Lender has been served upon the Agent by the Canadian Borrower at the Agent's address set out in Section 13.11.

5.10.4   *Repayment Prior to Maturity.* The Canadian Borrower acknowledges that Advances made by a Lender by way of Bankers' Acceptances and BA Equivalent Loans may not be repaid prior to the maturity thereof. If any Bankers' Acceptance or BA Equivalent Loan is repaid prior to the scheduled maturity date hereof (whether as a result of Section 2.3 or Section 10.2 or otherwise), the Canadian Borrower will forthwith pay to the Agent for deposit into an escrow account maintained by and in the name of the Agent for the benefit of the applicable Lenders the principal amount of such Bankers' Acceptance or BA Equivalent Loan and the Agent will in its discretion invest any funds in respect of such purported repayment in a term deposit maturing on the scheduled maturity date of the Bankers' Acceptance or BA Equivalent Loan. Any interest accruing on the term deposit will be paid to the Canadian Borrower on the maturity date thereof; provided, that no Event of Default has occurred and is continuing.

5.10.5   *Depository Bills.* It is the intention of the Parties that pursuant to the *Depository Bills and Notes Act* (Canada) ("**DBNA**"), all Bankers' Acceptances accepted by the Lenders under this Agreement will be issued in the form of a "depository bill" (as defined

in the DBNA), deposited with a "clearing house" (as defined in the DBNA), including The Canadian Depository for Securities Limited or its nominee CDS Clearing and Depository Services Inc. ("**CDS**"). In order to give effect to the foregoing, the Agent will, subject to the approval of the Canadian Borrower and the Lenders, establish and notify the Canadian Borrower and the Lenders of any additional procedures, consistent with the terms of this Agreement, as are reasonably necessary to accomplish such intention, including:

(a)     any instrument held by the Agent for purposes of Bankers' Acceptances will have marked prominently and legibly on its face and within its text, at or before the time of issue, the words "This is a depository bill subject to the *Depository Bills and Notes Act* (Canada)";

(b)     any reference to the authentication of the Bankers' Acceptance will be removed; and

(c)     any reference to the "bearer" will be removed and such Bankers' Acceptances will not be marked with any words prohibiting negotiation, transfer or assignment of it or of an interest in it.

5.10.6     *Rounding.* In the case of an issue of Bankers' Acceptances, the Agent will round allocations amongst the Lenders to ensure that each Bankers' Acceptance issued has a face amount which is a whole number multiple of $100,000 (and such rounded allocations shall constitute the Lenders' respective Proportionate Share for the purposes of this Agreement).

**5.11     Escrowed Funds**

Upon the request of the Agent after the occurrence and during the continuance of an Event of Default on the cancellation of this Agreement, or if any Outstanding Advances by way of Bankers' Acceptances are required to be prepaid hereunder prior to their maturity, the Canadian Borrower will forthwith pay to the Agent for deposit into an escrow account maintained by and in the name of the Agent for the benefit of the applicable Lenders, an amount equal to the Lenders' maximum potential liability under then outstanding Bankers' Acceptances. Such escrowed funds will be held by the Agent for set-off against future Obligations owing by the Canadian Borrower to the applicable Lenders in respect of such Bankers' Acceptances and pending such application may be invested in accordance with Section 5.10.4. In the case such Event of Default is either waived or cured in compliance with the terms of this Agreement, then the remaining escrow funds if any, together with any accrued interest to the date of release, will be released to the Canadian Borrower. The deposit of such escrow funds by the Canadian Borrower with the Agent as herein provided, will not operate as a repayment of the Outstanding Advance under the applicable Facility until such time as the escrow funds are actually paid to the applicable Lenders as a Repayment on the applicable maturity date thereof.

**5.12     Special Provisions regarding BA Equivalent Loans**

Each Non-BA Lender will not accept Bankers' Acceptances hereunder, and shall instead from time to time make BA Equivalent Loans to the Canadian Borrower. The amount of each BA Equivalent Loan will be equal to the discount proceeds (based on the discount rate set forth in Section 5.9.3 and subject to Section 5.10.6) which would be realized from a hypothetical sale of

the corresponding Bankers' Acceptance on the basis the Lenders purchased such Bankers' Acceptance and the maturity date of each such BA Equivalent Loan will be the same as the maturity date of the corresponding Bankers' Acceptance. Upon the reasonable request of a Non-BA Lender, each BA Equivalent Loan may be evidenced by a non-interest bearing promissory note payable by the Canadian Borrower to the Non-BA Lender in a form acceptable to each such party, acting reasonably. Any such BA Equivalent Loan shall be negotiable by the Non-BA Lender without notice to or the consent of the Canadian Borrower, and the holder thereof shall be entitled to enforce such BA Equivalent Loan against the Canadian Borrower free of any equities, defences or rights of set-off that may exist between the Credit Parties and the Non-BA Lender. In this Agreement, all references to a BA Equivalent Loan shall mean the loan evidenced thereby if required by the context; and all references to the "issuance" of a BA Equivalent Loan by a Non-BA Lender and similar expressions shall mean the making of a BA Equivalent Loan by the Non-BA Lender which is evidenced by a BA Equivalent Loan as if applicable. The following provisions are applicable to each BA Equivalent Loan made by a Non-BA Lender to the Canadian Borrower hereunder:

5.12.1   *Payment of BA Equivalent Loans.* The Canadian Borrower agrees to provide for each BA Equivalent Loan by payment of the face amount thereof to the Agent on behalf of the Non-BA Lender on the maturity of the BA Equivalent Loan or, prior to such maturity, on the Acceleration Date; and the Agent shall remit the said amount to such Non-BA Lender and such Non-BA Lender shall in turn remit such amount to the holder of the BA Equivalent Loan. If the Canadian Borrower fails to provide for the payment of the BA Equivalent Loan accordingly, any amount not so paid shall be immediately payable by the Canadian Borrower to the Agent on behalf of the Non-BA Lender together with interest on such amount calculated daily and payable monthly at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans under the Facility under which such BA Equivalent Loan was made. The Canadian Borrower agrees not to claim any days of grace for the payment at maturity of any BA Equivalent Loan and agrees to indemnify and save harmless the Non-BA Lender in connection with all payments made by the Non-BA Lender (or by the Agent on its behalf) pursuant to BA Equivalent Loans accepted by the Non-BA Lender, together with all reasonable costs and expenses incurred by the Non-BA Lender in this regard. The Canadian Borrower hereby waives any defences to payment which might otherwise exist if for any reason a BA Equivalent Loan is held by the Non-BA Lender for its own account at maturity.

5.12.2   *Availability of BA Equivalent Loans.* No Non-BA Lender shall have any obligation to issue BA Equivalent Loans during any period in which the BA Lenders' obligation to issue Bankers' Acceptances is suspended pursuant to Section 5.10.2.

**5.13   Special Provisions Regarding LIBOR Loans**

The following provisions are applicable to LIBOR Loans made by any Lender to the Borrowers.

5.13.1   *Drawdown Procedures.* Upon receipt by the Agent from a Borrower of a Drawdown Request, Conversion Notice or Rollover Notice in respect of a LIBOR Loan, the Agent will promptly advise such Borrower of the U.S. Dollar LIBOR Rate, such rate

to be determined as at approximately 11:00 a.m. London time, two LIBOR Business Days before the commencement of the LIBOR Period for such LIBOR Loan.

5.13.2   *Interest Payment Dates for LIBOR Loans.* Interest in respect of any LIBOR Loan in U.S. Dollars shall be calculated on the basis of a year of 360 days. Interest in respect of any LIBOR Loan with a LIBOR Period of between one month and three months (inclusive) shall be payable at the time the principal amount of such LIBOR Loan is payable. Interest in respect of any LIBOR Loan with a LIBOR Period longer than three months shall be payable in arrears every three months commencing on the last day of the third month following the commencement of such LIBOR Period, and also at the time the principal amount of such LIBOR Loan is payable.

5.13.3   *Laws Applicable to LIBOR Loans.* Each Borrower acknowledges that the ability of the Lenders to maintain or provide any LIBOR Loan and to charge interest on any LIBOR Loan at the U.S. Dollar LIBOR Rate is and will be subject to any statute, law, regulation, rule or direction by any Governmental Authority having jurisdiction which may prohibit or restrict or limit such loans or such interest. Each Borrower agrees that the Lenders shall have the right to comply with any such requirements and, if the Agent determines it to be necessary as a result of such requirement, the Agent may convert any LIBOR Loan to a U.S. Dollar Base Rate Loan or require immediate repayment of all LIBOR Loans, including accrued interest thereon and all applicable breakage costs pursuant to Section 5.15.

## 5.14   Breakage Costs

The Borrowers may only Repay or Convert any LIBOR Loan prior to the scheduled maturity date thereof, whether as a result of acceleration or for any other reason, if the Borrowers agree to pay to the Agent upon demand all losses, damages, costs and expenses which such Lender has incurred or may incur as a result of such Repayment or Conversion prior to the said scheduled maturity date. The Agent shall provide the Borrowers with a written certificate showing in reasonable detail the basis for such claim, which shall be deemed to be *prima facie* correct, in the absence of manifest error.

## 5.15   Inability to Make LIBOR Loans

If at any time and from time to time:

(a)   the Agent (acting reasonably) determines that by reason of circumstances affecting the London Interbank Eurodollar Market, adequate and fair means do not exist for ascertaining the rate of interest with respect to, or deposits are not available in sufficient amounts in the ordinary course of business at the rate determined hereunder to fund, a requested LIBOR Loan during the ensuing LIBOR Period selected;

(b)   the Agent (acting reasonably) determines that the making or continuing of the requested LIBOR Loan by the Lenders has been made impracticable by the occurrence of an event which materially adversely affects the London Interbank Eurodollar Market generally; or

(c)     the Agent is advised by Lenders representing no less than 35% of the Commitments that the U.S. Dollar LIBOR Rate will not or does not represent the effective cost to such Lender of U.S. Dollar deposits in such market for the relevant LIBOR Period,

then the Agent shall give notice thereof to the Lenders and the Borrowers as soon as possible after such determination or receipt of such notice, as the case may be, and if such notice is given subsequent to the giving of a Drawdown Request or any Rollover Notice or Conversion Notice to the Agent by a Borrower with regard to any requested LIBOR Loan, such Borrower shall, within one Business Day after receipt of such notice and in replacement of the Drawdown Request, Rollover Notice or Conversion Notice, as the case may be, previously given by such Borrower, give the Agent a Drawdown Request or a Conversion Notice, as the case may be, which specifies the Advance of a U.S. Dollar Base Rate Loan or the Conversion of the relevant LIBOR Loan on the last day of the applicable LIBOR Period into a U.S. Dollar Base Rate Loan. In the event a Borrower fails to give, if applicable, a valid replacement Conversion Notice with respect to the maturing LIBOR Loans which were the subject of a Rollover Notice, such maturing LIBOR Loans shall be converted on the last day of the applicable LIBOR Period into U.S. Dollar Base Rate Loans under the applicable Facility as if a Conversion Notice had been given to the Agent by such Borrower pursuant to the provisions hereof. In the event a Borrower fails to give, if applicable, a valid replacement Drawdown Request with respect to an Advance originally requested by way of a LIBOR Loan, then such Borrower shall be deemed to have requested an Advance by way of a U.S. Dollar Base Rate Loan in the amount specified in the original Drawdown Request and, on the originally requested date of Advance, the applicable Lenders (subject to the other provisions hereof) shall make available the requested amount by way of a U.S. Dollar Base Rate Loan under the applicable Facility.

If at any time the Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in Section 5.15(b) have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in Section 5.15(b) have not arisen but the supervisor for the administrator of LIBOR Rate or a Governmental Authority having jurisdiction over the Agent has made a public statement identifying a specific date after which the LIBOR Rate shall no longer be used for determining interest rates for loans, then the Agent and the Borrowers shall negotiate in good faith to establish an alternate rate of interest to LIBOR Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for LIBOR Loans made in Canada or in the United States at such time, and upon an agreement being reached, shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable. Notwithstanding anything to the contrary herein, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required Lenders stating that such Required Lenders object to such amendment. Provided that, if such alternate rate of interest shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

**5.16**    **Special Provisions Regarding Letters of Credit**

The following additional provisions are applicable to Letters of Credit issued by hereunder:

(a)     The obligation of a Borrower to reimburse any Issuing Bank for all drawings under Letters of Credit shall be absolute, unconditional and irrevocable and shall be satisfied strictly in accordance with their terms, irrespective of:

   (i)     any lack of validity or enforceability of any Letter of Credit;

   (ii)    the existence of any claim, setoff, defence or other right which such Borrower or any other Person may at any time have against the beneficiary under any Letter of Credit, such Issuing Bank, the Agent or any Lender (other than the defence of payment in accordance with the terms of this Agreement or a defence based on the gross negligence or willful misconduct of such Issuing Bank as determined by a court of competent jurisdiction by final and non-appealable judgment) or any other Person in accordance with this Agreement or other transaction;

   (iii)   any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; and

   (iv)    any other circumstance or event whatsoever, whether or not similar to any of the foregoing.

(b)     In making any payment under any Letter of Credit (a) an Issuing Bank's exclusive reliance on the documents presented to it under such Letter of Credit as to any and all matters set forth therein, including reliance on the amount of any draft presented under such Letter of Credit, whether or not the amount due to the beneficiary equals the amount of such draft and whether or not any document presented pursuant to such Letter of Credit proves to be insufficient in any respect, if such document on its face appears to be in order, and whether or not any other statement or any other document presented pursuant to such Letter of Credit proves to be forged or invalid or any statement therein proves to be inaccurate or untrue in any respect whatsoever and (b) any non-compliance in any immaterial respect of the documents presented under such Letter of Credit with the terms thereof shall, in each case, not be deemed willful misconduct or negligence of such Issuing Bank.

(c)     Each Issuing Bank and its correspondents may accept and act upon the name, signature, or act of any party purporting to be the executor, administrator, receiver, trustee in bankruptcy or other legal representative of any party designated in any Letter of Credit in the place of the name, signature, or act of such party.

(d)     In addition to amounts payable as elsewhere provided in this Section 5.16, each Borrower hereby agrees to protect, indemnify, pay and save each Issuing Bank and its respective directors, officers, employees, agents and representatives harmless from and against any and all claims, demands, liabilities, damages, losses, costs,

charges and expenses (including legal fees and expenses) which each such indemnitee may incur or be subject to as a consequence, direct or indirect, of:

(i) the issuance of any Letter of Credit, other than as a result of the breach of the standards of reasonable care where such Issuing Bank would not be entitled to the foregoing indemnification under the Uniform Customs or under ISP98, in each case as stated on its face to be applicable to such Letter of Credit;

(ii) the inability of an indemnitee to honour a drawing under any Letter of Credit as a result of any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Authority; or

(iii) any of the matters listed in Section 5.16(e).

(e) As between a Borrower, on the one hand, and an Issuing Bank, on the other hand, such Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit issued at its request hereunder by, the respective beneficiaries of such Letters of Credit and, without limitation of the foregoing (but other than to the extent such Issuing Bank breaches the standards of reasonable care specified in the Uniform Customs and otherwise as may be required under ISP98, as applicable, where such Issuing Bank would not be entitled to indemnification under the Uniform Customs or under ISP98, in each case as stated on its face to be applicable to such Letter of Credit), such Issuing Bank shall not be responsible for:

(i) the form, validity, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, inaccurate, fraudulent or forged;

(ii) the invalidity or insufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason;

(iii) errors, omissions, interruptions or delays in transmission or delivery of any messages, by fax, electronic transmission, mail, cable telegraph, telex or otherwise, whether or not they are in cipher;

(iv) errors in interpretation of technical terms;

(v) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof;

(vi) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; and

(vii)   any consequences arising from causes beyond the reasonable control of any Lender, including any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Authority.

None of the above shall affect, impair or prevent the vesting of any Issuing Bank's rights or powers hereunder. No action taken or omitted by an Issuing Bank under or in connection with any Letter of Credit issued by it or the related certificates, if taken or omitted in good faith, shall put such Issuing Bank under any resulting liability to the applicable Borrower (provided, that such Issuing Bank acts in accordance with the standards of reasonable care specified in the Uniform Customs and otherwise as may be required under ISP98, in each case as stated on its face to be applicable to the respective Letter of Credit).

(f)   If any Letter of Credit is outstanding on the Facilities Maturity Date, on the date this Agreement and all Commitments hereunder are cancelled, at any time that an Event of Default occurs, a demand for repayment is made hereunder, or a domestic or foreign court issues any judgment or order restricting or prohibiting payment by the applicable Issuing Bank under such Letter of Credit or extending the liability of the applicable Issuing Bank to make payment under such Letter of Credit beyond the expiry date specified therein, the applicable Borrower will forthwith upon demand by the Agent or the applicable Issuing Bank deposit into a cash collateral account maintained by and in the name of the Agent or the applicable Issuing Bank funds in the applicable currency in the amount of the Advance constituted by such Letter of Credit and such funds (together with interest thereon) will be held by the Agent or the applicable Issuing Bank for payment of the liability of the applicable Borrower pursuant to this Section 5.16 or otherwise in respect of such Letter of Credit so long as such Issuing Bank has or may in any circumstance have any liability under such Letter of Credit, and, pending such payment, shall bear interest at the Agent's or the applicable Issuing Bank, as applicable then prevailing rate in respect of deposits of similar amounts and of similar periods of time. Any balance of such funds and interest remaining at such time as the applicable Issuing Bank does not have and may never have any liability under such Letter of Credit will nevertheless continue to be held by the Agent or the applicable Issuing Bank, if and so long as any Default or Event of Default is continuing or after a demand for repayment is made or both, as security for the remaining liabilities of the applicable Borrower hereunder. The Agent or the applicable Issuing Bank, as applicable, shall have exclusive control over all amounts at any time on deposit in such cash collateral account. The deposit of such funds by a Borrower with the Agent or the applicable Issuing Bank as herein provided will not operate as a repayment of the U.S. Operating Facility or the Swingline Commitment, as applicable, until such time as such funds are actually paid to the U.S. Operating Lenders or the Swingline Lender, as applicable, as a principal repayment.

(g)   The Issuing Bank and the Agent, in the case of Letters of Credit issued under the U.S. Operating Facility, and the Swingline Lender, in the case of Letters of Credit issued under the Swingline, shall each maintain records showing the undrawn and

unexpired amount of each Letter of Credit outstanding under such Facility, and showing for each such Letter of Credit:

(i)     the dates of issuance and expiration thereof;

(ii)    the amount thereof; and

(iii)   the date and amount of all payments made thereunder.

The Issuing Bank and the Agent shall make copies of such records in the respect of Letters of Credit issued under the U.S. Operating Facility available to the U.S. Borrower and the U.S. Operating Lenders upon request. The Swingline Lender, shall make copies of such records in respect to Letters of Credit issued under the Swingline available to the Canadian Borrower, the Agent and the Canadian Operating Lenders upon request.

## 5.17    Eligible Approved Contracts

The Canadian Borrower may request, from time to time and by written notice to the Agent, that the Agent designate additional contracts of the Credit Parties (the "**Additional Contracts**") as Eligible Approved Contracts, provided that, any such notice shall only be given concurrently with the delivery of a Borrowing Base Certificate pursuant to 7.4.1(a) and such notice shall include a true and correct copy of each Additional Contract.

If an Additional Contract is in a form (a) previously approved by the Lenders or (b) in respect of which the Agent has previously received a legal opinion opining that such contract or agreement is valid and enforceable under the governing law thereof, then such Additional Contract shall be designated by the Agent as an Eligible Approved Contract as of the date of the notice referred to above, otherwise, such Additional Contract shall not be designated as an Eligible Approved Contract until such time as the Agent has received an opinion of legal counsel opining that such contract or agreement is valid and enforceable under the governing law thereof, which opinion is in form and substance satisfactory to the Agent and is delivered by legal counsel acceptable to the Agent (in each case acting reasonably).

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES

## 6.1    Representations and Warranties

Each Borrower jointly and severally hereby represents and warrants to the Agent and the Lenders as follows, with respect to itself and, in the case of the Canadian Borrower, also with respect to each Credit Party:

6.1.1   *Status.* It has been duly incorporated, amalgamated, constituted, formed or established as the case may be, and is validly subsisting under the Laws of its governing jurisdiction and is up to date in respect of all corporate or similar filings and has all necessary corporate power, capacity and authority to carry on its business in each

jurisdiction where it carries on business except, in the case of other jurisdiction, to the extent the failure to do so would reasonably be expected to have a Material Adverse Effect.

6.1.2    *Information.* As of the date hereof, Schedule 6.1.2 contains the following information in respect of each Credit Party and each Subsidiary thereof as of the Amendment and Restatement Date: predecessors and prior names (within the immediately preceding five years), jurisdiction of incorporation or establishment, present governing jurisdiction, registered office, chief executive office, all locations at which it has owned or leased places of business or maintained a material amount of assets (other than assets temporarily out of a Credit Party's custody or possession, including assets on the premises of others and items in transit) the number and classes of its issued and outstanding shares and a list of its shareholders including the number and class of shares held by each. All material records related to the Credit Party's Receivables are located at those certain chief executive offices as identified in Schedule 6.1.2, as may be updated from time to time.

6.1.3    *Subsidiaries.* As of the Amendment and Restatement Date, neither Holdco nor the Canadian Borrower has any Material Subsidiaries or other Subsidiaries other than as set out in Schedule 6.1.3 and 100% of the issued and outstanding shares of each Material Subsidiary are directly or indirectly owned by the Canadian Borrower.

6.1.4    *No Pending Corporate Changes.* As of the Amendment and Restatement Date, no Person has any agreement or option or any right or privilege (whether by law, pre-emptive or contractual) capable of becoming an agreement for the purchase of any properties or assets of any Credit Party out of the ordinary course of business or for the purchase, subscription, allotment or issuance of any debt or equity securities, including convertible securities, warrants or convertible obligations of any nature, of the Canadian Borrower.

6.1.5    *No Conflicts under Material Agreements or Material Permits.* Except as disclosed in Schedule 6.1.5, the execution and delivery by each Credit Party of those Credit Documents to which it is a party, will not conflict with, result in a breach of or require any approval or consent under any Material Agreement or Material Permit, other than consents or approvals which have been obtained unconditionally and without imposition of any material conditions.

6.1.6    *No Conflict with Charter Documents.* There are no provisions contained in the charter documents, or by-laws of any Credit Party, or any partnership agreement, shareholders' agreement, voting trust agreement or similar agreement relating thereto or in any Material Agreement or Material Permit, which restrict or limit its powers to borrow money, issue debt obligations, guarantee the payment or performance of the obligations of others or encumber all or any of its present and after-acquired property; or which would be contravened by the execution and delivery of those Credit Documents to which any Credit Party is a party or the performance by any Credit Party of its obligations thereunder and which contravention would reasonably be expected to result in Material Adverse Change.

6.1.7    *Credit Documents.* Each Credit Party has the necessary capacity, power, legal right and authority to borrow from the Lenders, guarantee payment to the Agent and the Lenders of those Obligations which are payable by the Borrowers, perform its obligations

under the Credit Documents and provide the Security required to be provided by it hereunder. The execution and delivery of the Credit Documents by the Credit Parties and the performance of their respective obligations therein have been duly authorized by all necessary corporate or other action. This Agreement and the other Credit Documents constitute legal, valid and binding obligations of the Credit Parties, enforceable against them in accordance with the terms and provisions thereof, subject to Laws of general application affecting creditors' rights and the discretion of the court in awarding equitable remedies.

6.1.8     *Conduct of Business; Compliance with Laws and Material Permits.* Except as disclosed in Schedule 6.1.8, each Credit Party is in compliance in all material respects with all Applicable Laws of each jurisdiction in which it carries on business and is duly licensed, registered and qualified to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it or the property owned or leased by it make such qualification necessary, except to the extent that the failure to hold any such licences, registrations and permits would not constitute a Material Adverse Change. Schedule 6.1.8 contains a true and complete list of all Material Permits, and all such Material Permits are valid and subsisting and in good standing.

6.1.9     *Ownership of Assets; Permitted Liens.* Each Credit Party has good and marketable title to (or a valid leasehold interest in) and owns and possesses its undertaking, property and assets (other than intellectual property) (or has a valid leasehold interest in) free and clear of any and all Liens except for Permitted Liens. No Credit Party has any commitment or obligation (contingent or otherwise) to grant any Liens except for Permitted Liens. No event has occurred which constitutes, or which with the giving of notice, lapse of time or both would constitute, a default under any specific Permitted Lien, which default would reasonably be expected to result in a Material Adverse Change.

6.1.10     *Leased Properties.* As of the date hereof, Schedule 6.1.10 contains a true and complete list of the Leased Properties.

6.1.11     *Intellectual Property.* Each Credit Party possesses or has the exclusive right to use all patents, patent rights, trademarks, trademark rights, trade names, trade name rights, service marks, service mark rights, copyrights and other forms of intellectual property material to the conduct of its business, each of which is in good standing in all material respects, and, to its knowledge, has the right to use such intellectual property without violation of any material rights of others with respect thereto, except, in each case, as would not reasonably be expected to have a Material Adverse Effect. Schedule 6.1.11 contains a list of all such Credit Party's owned material, registered and pending trademarks, service marks, patents and copyrights (excluding commercially available software) as of the Amendment and Restatement Date.

6.1.12     *Insurance.* The Credit Parties have (a) placed insurance, including property, boiler and machinery, business interruption and liability insurance, in appropriate amounts and for appropriate risks as would be considered prudent for similar businesses, and (b) placed Account Receivable Insurance. Attached hereto as Schedule 6.1.12 is a true and complete

list of all insurance policies (including the Account Receivable Insurance) held by the Credit Parties as of the Amendment and Restatement Date.

6.1.13   *Material Agreements.* As of the date hereof, Schedule 6.1.13 contains a true and complete list of all Material Agreements, including a description of the nature of each Material Agreement. Each Material Agreement is in full force and effect; and none of the Credit Parties is in breach of any of the terms or conditions contained therein, in each case, which would reasonably be expected to have a Material Adverse Effect. Except as disclosed in writing to the Agent and as permitted hereby, no Material Agreement has been materially amended, supplemented or revised in any manner adverse to the Lenders since the date of execution thereof.

6.1.14   *Labour Agreements.* Except as disclosed in Schedule 6.1.14, there are no labour agreements in effect between any of the Credit Parties and any labour union or employee association and the Credit Parties are not under any obligation to assume any labour agreements to or conduct negotiations with any labour union or employee association with respect to any future agreements; and the Credit Parties are not aware of any current attempts to organize or establish any such labour union or employee association which, in each case, would reasonably be expected to result in a Material Adverse Effect.

6.1.15   *Environmental Laws.* Each Credit Party and its business, operations, assets, equipment, property, leaseholds and other facilities is in compliance with all applicable Requirements of Environmental Law, specifically including all applicable Requirements of Environmental Law concerning the storage and handling of Hazardous Materials except where the failure to do so would not reasonably be expected to result in a Material Adverse Change. Each Credit Party holds all permits, licenses, certificates and approvals from Governmental Authorities which are required by the applicable Requirements of Environmental Law in connection with (i) air emissions; (ii) discharges to surface or groundwater; (iii) noise emissions; (iv) solid or liquid waste disposal; (v) the use, generation, storage, transportation or disposal of Hazardous Materials; and (vi) all other applicable Requirements of Environmental Law, except in each case where the failure to do so would reasonably be expected to result in a Material Adverse Change. Except as disclosed in Schedule 6.1.15 to the knowledge of the Credit Parties there has been no emissions, spills, releases, or discharges into or upon (i) the air; (ii) soils, or any improvements located thereon; (iii) surface water or groundwater; or (iv) any sewer, septic system or waste treatment, storage or disposal system servicing the premises, of any Hazardous Materials at or from any Land owned by any Credit Party or any of the Leased Properties that would reasonably be expected to have a Material Adverse Effect. Except as disclosed in Schedule 6.1.15 no complaint, order, directive, claim, citation, or notice from any Governmental Authority or any other Person has been received by any Credit Party with respect to (i) air emissions; (ii) spills, releases, or discharges to soils or improvements located thereon, surface water, groundwater or any sewer, septic system or waste treatment, storage or disposal systems servicing any Land owned by any Credit Party or any of the Leased Properties; (iii) noise emissions; (iv) solid or liquid waste disposal; (v) the use, generation, storage, transportation, or disposal of Hazardous Materials; or (vi) other applicable Requirements of Environmental Law affecting any Land owned by any Credit Party or the Leased Properties, in each case, which would reasonably be expected to result

in a Material Adverse Change. Except as disclosed in Schedule 6.1.15, there are no legal or administrative proceedings, investigations or claims outstanding or to the Credit Parties' knowledge now threatened or pending, with respect to the presence on or under, or the discharge, emission, spill, radiation or disposal into, upon or from any Land owned by any Credit Party or any of the Leased Properties of any Hazardous Material, including the discharge, emission, spill, radiation or disposal of any Hazardous Material from any such Land or Leased Properties onto or into the atmosphere or any adjacent land, watercourse or body of water; nor are there any material matters under discussion with any Governmental Authority relating thereto; and there is no factual basis for any such proceedings, investigations or claims, in each case, which would reasonably be expected to result in a Material Adverse Change. The Credit Parties have no indebtedness, obligation or liability with respect to the storage, treatment, cleanup or disposal of any Hazardous Materials (including without limitation any such indebtedness, obligation, or liability under any applicable Requirements of Environmental Law regarding such storage, treatment, cleanup or disposal) which would reasonably be expected to result in a Material Adverse Change.

6.1.16    *No Litigation.* Except as disclosed in Schedule 6.1.16, there are no actions, suits or proceedings pending, or to the knowledge of the Credit Parties threatened in writing, against any Credit Party in any court or before or by any federal, provincial, state, municipal or other Governmental Authority, which would reasonably be expected to result in a Material Adverse Change.

6.1.17    *Pension Plans.* As of the Amendment and Restatement Date, the Credit Parties have not established any Pension Plans except as disclosed in Schedule 6.1.17. All of the Credit Parties' Pension Plans have been duly registered under Applicable Law. No steps have been taken to terminate any such Pension Plan (in whole or in part), no contribution failure has occurred with respect to any such Pension Plan sufficient to give rise to a Lien under any Applicable Laws of any jurisdiction, and no condition exists and no event or transaction has occurred with respect to any such Pension Plan, in each case, which would reasonably be expected to result in the incurrence by any Credit Party of any material liability, fine or penalty. Each such Pension Plan is in compliance in all material respects with all applicable pension benefits and tax laws, (i) all contributions (including employee contributions made by authorized payroll deductions or other withholdings) required to be made to the appropriate funding agency in accordance with all Applicable Laws and the terms of such Pension Plan have been made in accordance with all Applicable Laws and the terms of such Pension Plan, (ii) all liabilities under such Pension Plan are funded, on a going concern and solvency basis, in accordance with the terms of the respective Pension Plans, the requirements of applicable pension benefits laws and of applicable regulatory authorities and the most recent actuarial report filed with respect to the Pension Plan, and (iii) no event has occurred and no conditions exist with respect to any such Pension Plan that has resulted or would reasonably be expected to result in such Pension Plan having its registration revoked or refused for the purposes of any applicable pension benefits or tax laws or being placed under the administration of any relevant pension benefits regulatory authority or being required to pay any taxes or penalties under any applicable pension benefits or tax laws.

6.1.18    *ERISA Liabilities.* No ERISA Event has occurred or is reasonably expected to occur with respect to any Plan which would reasonably be expected to have a Material Adverse Effect. Since the most recent financial statement with respect to a Plan, there has been no change in the funding status of such Plan which would reasonably be expected to result in a Material Adverse Change. Neither any Credit Party nor any ERISA Affiliate has incurred or is reasonably expected to incur any Withdrawal Liability to any Multiemployer Plan which would reasonably be expected to result in a Material Adverse Change. Neither any Credit Party nor any ERISA Affiliate has been notified by the sponsor of a Multiemployer Plan that (i) such Multiemployer Plan has been terminated, within the meaning of Title IV of ERISA, or (ii) such Multiemployer Plan is reasonably expected to be terminated, within the meaning of Title IV of ERISA, which termination would reasonably be expected to result in a Material Adverse Change.

6.1.19    *Financial Statements.* The most recent Year-end Financial Statements and Interim Financial Statements of the Canadian Borrower delivered to the Agent and the Lenders have been prepared in accordance with GAAP (except that in the case of the Interim Financial Statements, subject to normal adjustments and the absence of footnotes) on a basis which is consistent with the previous fiscal period (unless otherwise noted), and present fairly in all material respects in accordance with GAAP:

(a)    its assets and liabilities (whether accrued, absolute, contingent or otherwise) and financial condition as at the dates therein specified;

(b)    its sales, earnings and results of its operations during the periods covered thereby; and

(c)    in the case of the Year-end Financial Statements, its changes in financial position,

and no Material Adverse Change has occurred since the date thereof.

6.1.20    *Financial and Other Information.* All financial and other information provided in writing by or in respect of the Credit Parties to the Agent or the Lenders (other than projections, other forward looking information and information of a general economic or industry-specific nature to) taken as a whole, to the best of the Credit Party's knowledge and belief (including good faith estimates and stated assumptions believed to be reasonable and fair as of the date made in light of conditions and facts then known), do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made (after giving effect to all supplements from time to time).

6.1.21    *No Funded Debt/Liens.* No Funded Debt has been incurred or assumed by any Credit Party, except for Permitted Funded Debt. No Liens exist on the assets of any Credit Party, except for Permitted Liens.

6.1.22    *Validity and Ranking of Security.* Each Security agreement is effective to create in favor of the Agent for the benefit of the Lenders, legal, valid and enforceable Liens on,

and security interests in, the collateral referred to therein. The Obligations are secured by a First-Ranking Security Interest, other than in respect of any Priority Claims.

6.1.23    *Taxes.* Except as disclosed in Schedule 6.1.23, each Credit Party has duly and timely filed all tax returns required to be filed by it, and has paid all taxes which are due and payable by it, except for any taxes which are subject to a Permitted Contest or which the failure to pay, individually or in the aggregate has not and would not reasonably be expected to have a Material Adverse Effect. Each Credit Party has also paid all other taxes, charges, penalties and interest due and payable under or in respect of all assessments and re-assessments of which it has received written notice, except to the extent that such assessments or re-assessments are subject to a Permitted Contest or which the failure to pay, individually or in the aggregate has not and would not reasonably be expected to have a Material Adverse Effect. There are no actions, suits, proceedings, investigations or claims threatened or pending against any Credit Party in respect of taxes, governmental charges or assessments or any matters under discussion with any Governmental Authority relating to taxes, governmental charges or assessments asserted by any such Governmental Authority which would reasonably be expected to result in a Material Adverse Change.

6.1.24    *Statutory Liens.* Each Credit Party has remitted on a timely basis all amounts required to have been withheld and remitted (including withholdings from employee wages and salaries relating to income tax, employment insurance, unemployment insurance and Canada Pension Plan contributions), goods and services tax and all other amounts which if not paid when due could result in the creation of a Statutory Lien against any of its property, except for Permitted Liens.

6.1.25    *No Default, etc.* No Default or Event of Default has occurred and is continuing.

6.1.26    *Solvency.* On the Amendment and Restatement Date (i) the fair market value of the assets of the Credit Parties, on a consolidated basis, at a fair valuation, will exceed their debt and liabilities, subordinated, contingent or otherwise; (ii) the present fair saleable value of the property of the Credit Parties, on a consolidated basis, will be greater than the amount that will be required to pay the probable liability of their indebtedness and other liabilities, subordinated, contingent or otherwise, as such indebtedness and other liabilities become absolute and matured; (iii) the Credit Parties, on a consolidated basis, will be able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; (iv) the Credit Parties, on a consolidated basis, will not have unreasonably small capital with which to conduct the business in which they are engaged as such business is now conducted and is proposed to be conducted following the date of determination, and (v) the Credit Parties, on a consolidated basis, are not "insolvent" under any applicable Insolvency Legislation or otherwise unable to pay their debts as they fall due.

6.1.27    *Residency.* The Canadian Borrower is not a non-resident of Canada as defined by the *Income Tax Act* (Canada).

6.1.28   *Investment Company Act.* Neither the Canadian Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company," in each case, within the meaning of the Investment Company Act of 1940, as amended.

6.1.29   *Fiscal Year.* The Fiscal Year end of each Credit Party is December 31.

6.1.30   *Place and Type of Business.* As of the Amendment and Restatement Date, Schedule 6.1.2 contains a list of the only jurisdictions in which the Credit Parties carry on any material business. The Credit Parties' sole business is providing drilling fluid and technical expertise to assist in drilling oil and gas wells, including skid controls, drilling waste management and drilling water treatment services and the rental of well bore cleanup tools.

6.1.31   *Economic Sanctions; Corrupt Practices.* No Credit Party is in violation of any Economic Sanctions or the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or any similar legislation or, to its knowledge, is the target or subject of any Economic Sanctions. No Credit Party or any of their respective Subsidiaries and, to the knowledge of any Credit Party, no director, officer, employee, broker or other agent of any Credit Party acting or benefiting in any capacity in connection with the Loans is any of the following:

(a)   a Person that is listed in the annex to the Executive Order, or is otherwise the subject of Economic Sanctions;

(b)   a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to the Executive Order, or is otherwise the subject of Economic Sanctions;

(c)   a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Economic Sanctions;

(d)   a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)   a Person located, organized or resident in a country or territory that is, or whose government is, the subject of Economic Sanctions; or

(f)   a Person that is named as a "specially designated national and blocked person" on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list.

No Credit Party or any of their respective Subsidiaries and, to the knowledge of any Credit Party, no director, officer, employee, broker or other agent of any Credit Party acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in clauses (a) through (f) above, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to any Economic Sanctions, (iii) engages in or conspires to engage in any transaction that evades

or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Economic Sanctions, or (iv) is in violation of any applicable Economic Sanctions.

6.1.32   *Use of Facilities.* Each Borrower acknowledges that the Facilities are for the use by the Credit Parties and will be used for the Credit Parties' and their Subsidiaries' lawful business purposes only.

6.1.33   *Use of Eligible Approved Contracts.* As of June 30, 2018, all of the Insured Receivables used in determining the Borrowing Base were Receivables derived from and governed by Eligible Approved Contracts in existence as the Amendment and Restatement Date as set out in Schedule 6.1.33.

6.1.34   *Margin Regulations.* No Credit Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock (as defined in Regulation U). No part of the proceeds of any Loan or any Letter of Credit will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board of Governors of the Federal Reserve, including Regulation T, Regulation U or Regulation X. The pledge of the Collateral pursuant to the Security does not violate such regulations.

## 6.2     Acknowledgement and Deemed Repetition

Each Borrower acknowledges that the Agent and the Lenders are relying upon the representations and warranties in this Article 6 in making the Facilities available to the Borrowers and that the representations and warranties contained in Article 6, except for any representation and warranty made solely as of an earlier date will be deemed to be restated and shall be true and correct effective on the date each and every Advance is made (and any representations and warranties made solely as of an earlier date shall be true and correct as of such earlier date).

## 6.3     Survival of Representations and Warranties

The Credit Parties acknowledge that the Agent and the Lenders shall rely upon the representations and warranties contained in this Article 6 in connection with the establishment and continuation of the Facilities and also in connection with the entering into by a Hedge Provider of any Hedging Agreement with the Credit Parties. Notwithstanding any investigations which may be made by the Agent or the Lenders, the said representations and warranties shall survive the execution and delivery of this Agreement until full and final payment and satisfaction of the Obligations and this Agreement has been terminated.

# ARTICLE 7
# COVENANTS

## 7.1    Positive Covenants

While there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to any Borrower, each Borrower hereby covenants and agrees with the Agent and the Lenders that it will, and will cause each of the other Credit Parties to:

7.1.1    *Prompt Payment.* In the case of the Borrowers, punctually and unconditionally pay all principal, interest and other amounts due hereunder at the times and in the manner specified herein.

7.1.2    *Preservation of Existence.* Except as permitted by Section 7.2.8, maintain its existence in good standing (or similar status), preserve its rights, powers, licences, privileges, franchises and goodwill, exercise any rights of renewal or extensions of any leases, licences, concessions, franchises or any other rights whatsoever which are material to the conduct of its business, maintain all qualifications to carry on business in each jurisdiction in which such qualifications are required where the failure to do so would not reasonably be expected to result in a Material Adverse Change, and carry on and conduct its business in a proper and efficient manner so as to protect its property and income; and not materially change the nature of its business.

7.1.3    *Compliance with Applicable Laws; Use of Proceeds; Maintenance of Leases and Material Permits.* Comply with all Applicable Laws (specifically including all applicable Requirements of Environmental Law and Economic Sanctions and the *Foreign Corrupt Practices Act*) except where the failure to do so would not reasonably be expected to result in a Material Adverse Change, use the proceeds of all Advances hereunder for legal and proper purposes, and obtain and maintain in good standing all material leases and Material Permits from any and all Governmental Authorities required in respect of its business and operations except where the failure to do so would not reasonably be expected to result in a Material Adverse Change.

7.1.4    *Payment of Priority Claims, Taxes, etc.* Pay when due all Priority Claims, rents, ERISA liabilities, taxes, rates, pension obligations, levies, assessments and governmental charges, fees and dues lawfully levied, assessed or imposed in respect of its property which are material to the conduct of its business, and deliver to the Agent upon request receipts evidencing such payments; except for rents, taxes, rates, pension obligations, levies, assessments and governmental charges, fees or dues in respect of which an appeal or review proceeding has been commenced, a stay of execution pending such appeal or review proceeding has been obtained, reserves reasonably required by the Required Lenders have been established; and except where the failure to pay individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Change.

7.1.5    *Maintain Records.* Maintain adequate books, accounts and records in accordance with GAAP and all material records related to the Credit Parties' Receivables shall be

located at the chief executive offices as identified in Schedule 6.1.2, as the same may be updated from time to time.

7.1.6    *Maintenance and Operation of Properties.* Keep its property and assets in good repair and working condition, reasonable wear and tear and casualty or condemnation excepted, and operate its property in accordance with prudent industry standards and the requirements of its insurance policies.

7.1.7    *Inspection.* Permit the Agent and its employees and agents (who may be accompanied by any Lender and its employees and agents), upon reasonable notice and at their own cost, to enter upon and inspect their properties, assets, books and records from time to time during normal business hours and in a manner which does not materially interfere with the operations of the Credit Parties, and make copies of and abstracts from such books and records, and discuss their affairs, finances and accounts with any of their officers, directors, accountants and auditors; <u>provided</u>, that the Agent will deal with any personal information obtained in accordance with applicable privacy legislation; <u>provided</u>, that the Agent may not conduct more than one such examination during any calendar year unless a Default or an Event of Default has occurred and is continuing, in which case the foregoing limit shall not apply. All reasonable and documented out-of-pocket costs and expenses incurred by the Agent and its duly authorized representatives and agents in connection with the exercise of the Agent's rights pursuant to this Section 7.1.7 shall be paid by the Canadian Borrower in accordance with Section 13.5; <u>provided</u>, that so long as no Default or Event of Default exists the Canadian Borrower shall not be responsible for the expenses of the Agent in connection with more than one such visit and inspection per calendar year.

7.1.8    *Liens.* Maintain all of its property, assets and undertaking free of all Liens except Permitted Liens and maintain a First-Ranking Security Interest in favour of the Agent over all of the Collateral subject only to the Security and Permitted Liens which under Applicable Law rank in priority thereto.

7.1.9    *General Insurance Coverage.* Obtain and maintain from financially responsible insurance companies and maintain liability insurance, all-risks property insurance on a replacement cost basis (less a reasonable deductible not to exceed amounts customary in the industry for similarly situated businesses and properties), and insurance in respect of such other risks and in such amounts (giving effect to self-insurance) as would be considered prudent for similar businesses, to the extent available on commercially reasonable terms, all of which policies of insurance shall include a standard mortgage clause approved by the Insurance Bureau of Canada; and the interest of the Agent shall be noted as an additional insured on all liability insurance policies and as first mortgagee and/or lender loss payee, as applicable, on all other insurance policies (other than directors and officers insurance); and the Agent shall be provided with certificates of insurance and certified copies of such policies from time to time upon request; <u>provided</u>, that no more than one request shall be made in any calendar year unless a Default or an Event of Default is continuing or if there has been a material change in any such policy.

7.1.10   *Account Receivable Insurance Coverage.* Obtain and maintain Account Receivable Insurance, pay all required premiums in respect thereof once due and payable and renew such Account Receivable Insurance not less than sixty (60) days prior to the expiry thereof; and the Agent shall be provided with certificates of insurance and certified copies of such policies from time to time upon request; provided that no more than one request shall be made in any period of four consecutive fiscal quarters unless a Default or an Event of Default is continuing. At least 10 days prior to the renewal of any Account Receivable Insurance, the Borrowers shall provide the Agent with all information reasonably requested by the Agent, including for certainty, any proposed modifications to the existing policies then in place, in order for the Agent and third party legal counsel to conduct a review of such Account Receivable Insurance.

7.1.11   *Colombia Payments.* Ensure that payments in favour of a Credit Party which are made under any material agreement executed by any Credit Party which are to be made in Colombian Pesos in Colombia are either directed to a trust established in Colombia which is subject to the Security or to an account over which the Agent has a First-Ranking Security Interest pursuant to an account control agreement or if such payments are otherwise subject to the Security in a manner satisfactory to the Agent, acting reasonably.

7.1.12   *Perform Obligations.* Fulfill all covenants and obligations required to be performed by it under the Credit Documents, the Material Agreements, the Material Permits and the policy governing the Account Receivable Insurance (and as reasonably requested by the Agent, provide evidence of compliance with the risk management and credit policies required thereunder).

7.1.13   *Bank Accounts and Banking Service Agreements.* Maintain:

(a)    all of its bank primary accounts and Banking Service Agreements of the Borrowers in Canada, the U.S. and Mexico with the Agent or an Affiliate thereof unless otherwise consented to by the Required Lenders, in their sole discretion; provided, that the U.S. Borrower shall be permitted to maintain its current bank accounts in the U.S. with Wells Fargo provided that the Deposit Account Control Agreement between the U.S. Borrower, such financial institution and the Agent remains in force and effect, which agreement shall, among other things, provide that such financial institution acknowledges that the Agent has a First-Ranking Security Interest over the applicable bank accounts and that upon written notice from the Agent, the Agent can exert control over such accounts; and

(b)    except as set forth in Section 8.1(i), maintain all of the Credit Parties' other bank accounts used as a primary concentration accounts for collection of proceeds of Eligible Receivables with financial institutions reasonably satisfactory to the Required Lenders; provided, that within 90 days after the formation of any new Material Subsidiary that is a Credit Party from time to time hereafter, such financial institution has entered into a deposit account control or similar account agreement with the Agent and the applicable Credit Party, in a form and substance reasonably satisfactory to the Agent, which agreement, among other things, provides that such financial institution acknowledges that the Agent has a First-Ranking Security

Interest over the applicable bank accounts and that upon written notice from the Agent, the Agent can exert control over such accounts.

Notwithstanding anything herein to the contrary, it is understood and agreed that no deposit account agreements or account agreement shall be required with respect to (i) any account which is not used as a primary concentration account for collection of proceeds of Eligible Receivables or for the direct collection of such proceeds or (ii) any other Excluded Account.

7.1.14 *Formation of Material Subsidiaries.* In the event that any Borrower or any other Credit Party forms or acquires a Material Subsidiary, or a Person otherwise becomes a Material Subsidiary (in each case, for the avoidance of doubt, other than a Securitization SPE), after the Amendment and Restatement Date then, subject to Section 8.9, the Canadian Borrower shall deliver, and shall cause the applicable Subsidiary to deliver, to the Agent not later than (a) thirty (30) Business Days in the case of Material Subsidiaries formed outside of Canada and the U.S., or (b) ten (10) Business Days for Material Subsidiaries formed in Canada or the U.S., in either case, after the formation or acquisition of such Material Subsidiary (or such longer period as the Agent may approve, acting reasonably), a full recourse guarantee and the, within the applicable period therefor, any other Security relative to such Material Subsidiary referred to in Section 8.1 or such other Security as may be requested by the Agent, acting reasonably, together with related corporate documentation and legal opinions as may be requested by the Agent, acting reasonably.

7.1.15 *Ownership of Credit Parties.* The Canadian Borrower will at all times be the (direct or indirect) sole beneficial owner of all of the issued and outstanding shares of each other Credit Party, other than Holdco.

7.1.16 *EBITDA; Ownership of Assets.* Except as otherwise specifically permitted hereunder, the Canadian Borrower will ensure at all times that:

(a)     the EBITDA directly attributed to the Credit Parties determined on an unconsolidated but combined basis is equal to at least 90% of the Canadian Borrower's EBITDA determined on a consolidated basis;

(b)     the Credit Parties legally, beneficially and directly own at least 90% of the Consolidated Net Tangible Assets of the Canadian Borrower (based on the amount thereof set forth in the financial statements most recently delivered as required hereunder); and

(c)     the EBITDA directly attributed to the OECD Credit Parties determined on a consolidated basis is equal to at least 85% of the Canadian Borrower's EBITDA determined on a consolidated basis; provided, that for the purposes of such calculation any Distribution remitted to an OECD Credit Party by any other Subsidiary of the Borrower shall be included in EBITDA;

7.1.17 *Colombian Free Cash Flow Distribution.* The Canadian Borrower will cause the Distribution to it or any other Credit Party whose governing jurisdiction is in Canada, the

U.S., Barbados or another jurisdiction reasonably acceptable to the Required Lenders by way of dividend (or a series of dividends) of no less than 75% of the Colombian Free Cash Flow for each Fiscal Year within 60 days of the end of such Fiscal Year; provided that such 60 day period may be extended by the Required Lenders, acting reasonably, upon the written request of the Canadian Borrower in light of cash flow needs in Colombia at the time of such scheduled distribution.

7.1.18   *Further Assurances.* Provide the Agent and the Lenders with such further information, financial data, documentation and other assurances as they may reasonably require from time to time in order to ensure ongoing compliance with the terms of this Agreement and to achieve the spirit and intent of this Agreement.

7.1.19   *Reviews.* Within 60 days of written demand by the Agent, the Borrowers will have initiated an independent business review by a third party satisfactory to the Agent, acting reasonably, of the business and operations of the Borrowers and their operations in scope, form and substance satisfactory to the Agent, acting reasonably; *provided*, only one such demand by the Agent may be made under this Section 7.1.19.

7.1.20   [*Reserved*].

7.1.21   *Minimum Liquidity.* Commencing with the month ended June 30, 2019, the Borrowers will not permit the Minimum Liquidity measured at the end of each month to be less than U.S. $10,000,000.

## 7.2   Negative Covenants

While there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to the Borrowers, each Borrower hereby covenants and agrees with the Agent and the Lenders that it will not, and will ensure that each of its Material Subsidiaries does not, without the prior written consent of the Agent on behalf of the Lenders:

7.2.1   *Liens.* Grant or suffer to exist any Lien in respect of any of its property or assets, except Permitted Liens.

7.2.2   *Funded Debt.* Create, incur or assume any Funded Debt, except Permitted Funded Debt.

7.2.3   *Investments/Financial Assistance.* Provide Financial Assistance to, or invest money in, any Person, firm, joint venture, partnership, company or corporation whether by way of loan, acquisition of shares, acquisition of debt obligations or in any other way whatsoever (collectively "**Investments**"), except for the following (each, a "**Permitted Investment**"):

(a)      Investments in cash and Cash Equivalents;

(b)      Permitted Intercompany Loans;

(c)     Guarantees which comprise part of the Security, are in respect of other Permitted Funded Debt or obligations of other Credit Parties or related to indemnities incurred in the ordinary cause of business;

(d)     Permitted Acquisitions;

(e)     Investments in other Credit Parties; provided, that such Investments together with any Financial Assistance provided to any Non-OECD Guarantors does not exceed in the aggregate at any one time an amount equal to 10% of the net book value of the Canadian Borrower's Consolidated Net Tangible Assets;

(f)     loans and advances by the Credit Parties to employees or directors of any Credit Party in the ordinary course of business (including for travel, entertainment and relocation expenses) not in excess of $250,000 at any one time outstanding in the aggregate so long as no Default or Event of Default has occurred and is continuing or would reasonably be expected to result therefrom;

(g)     Investments made by the Credit Parties in the ordinary course of business consisting of (i) accounts receivables, (ii) negotiable instruments held for collection in the ordinary course of business, (iii) lease, utility and other similar deposits in the ordinary course of business, (iv) securities or debt obligations of trade creditors or customers that are received in settlement of bona fide disputes or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(h)     Investments in existence on the Amendment and Restatement Date and set forth on Schedule 7.2.3 hereto and, in each case, any extensions or renewals thereof, so long as the amount of any Investment made pursuant to this clause (h) is not increased at any time above the amount of such Investment set forth on Schedule 7.2.3 hereto;

(i)     Acquisitions outside of Canada and the U.S., Investments in joint ventures or other minority interest holdings and other Investments in, or Financial Assistance to, Persons which are not Credit Parties (provided, that no such Acquisitions or Investments would result in a breach of Section 7.2.17 or otherwise involve Persons or countries that are the subject of Economic Sanctions or that any Lender's internal compliance policy would prohibit it from engaging in business with) which, after giving *pro forma* effect to all other Acquisitions, Investments or Financial Assistance permitted in reliance on this clause (i) since the date of the last consolidated balance sheet of the Canadian Borrower delivered to the Agent hereunder and outstanding on the date of such Acquisition, Investment or Financial Assistance, do not exceed at any one time, in the aggregate, 15% of Shareholders' Equity (taking into account any increase in Shareholders' Equity as of such date since the date of the last consolidated balance sheet of the Canadian Borrower delivered to the Agent hereunder, and with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value); so long as no Default or Event of Default has occurred and is continuing or would reasonably be expected to result therefrom; and further provided that in

the case of any Acquisitions under this clause (i), if more than 50% of the revenues generated by the Acquired Business are derived from outside of Canada or the U.S., then the applicable Credit Party must receive the prior consent of the Required Lenders thereto;

(j)     extensions of trade credit by the Canadian Borrower and its Material Subsidiaries in the ordinary course of business;

(k)     Investments arising as a result of Permitted Securitization Financings;

(l)     any Acquisition, Financial Assistance or Investment made in respect of Project Desert, the Anchor Acquisition or the Terra Acquisition;

(m)    Investments in the United Joint Venture in an aggregate amount not to exceed (i) during the Fiscal Year ending December 31, 2019, U.S. $12,000,000 and (ii) during the Fiscal Year ending December 31, 2020, U.S. $8,000,000; plus, in each case, an amount equal to any returns actually received in respect of any such Investments (provided that any such returns reinvested in the United Joint Venture shall not be included in the calculation of EBITDA);

*provided,* that notwithstanding the foregoing, during the Covenant Relief Period, the Borrowers and the Material Subsidiaries shall not (i) complete any Acquisitions pursuant to Sections 7.2.3(d) or 7.2.3(i) without the prior written consent of the Required Lenders, or (ii) make any Investment or provide any Financial Assistance other than Investments and Financial Assistance: (x) existing as of the Amendment and Restatement Date and set forth on Schedule 7.2.3, and any extension or renewal thereof; (y) permitted under paragraphs (a), (b), (c), (e), (g), (j), (k), (l) or (m) of this Section 7.2.3; and/or (z) made in or provided to one or more joint ventures or Persons that are not Credit Parties in an aggregate amount, in the case of this clause (z), not to exceed $3,000,000.

7.2.4     *Disposition of Assets.* Directly or indirectly sell, lease, assign, transfer, convey or otherwise dispose of all or any part of its assets, except the Credit Parties may sell, lease, assign, transfer, convey or otherwise dispose of the following:

(a)     inventory and Cash Equivalents in the ordinary course of business;

(b)     worn out, obsolete, no longer useful or immaterial, including assets sales, licenses, sublicenses or other dispositions or abandonment of intellectual property of a Credit Party or its subsidiaries determined by the management of such Credit Party to be no longer useful or necessary in the operation of the business of such Credit Party or any of its subsidiaries;

(c)     assets to a Borrower or any other Credit Party or if a Subsidiary is not a Credit Party, to the Credit Parties or any of their Subsidiaries;

(d)     transactions permitted by Section 7.2.8, Permitted Investments and Permitted Distributions permitted by Section 7.2.5 hereof;

(e)     transfers of properties that have been subject to a casualty to the respective insurer of such property as part of an insurance settlement any casualty or other event of loss; _provided_, that the requirements of Section 5.3.1 are complied with in connection therewith;

(f)     consignments in the ordinary course of business;

(g)     dispositions of accounts receivables and other assets of Subsidiaries (other than Credit Parties) in the ordinary course of business;

(h)     any assets the value of which (at the time the disposition is made) is not more than the greater of (i) $5,000,000 and (ii) 5% of the net book value of the Canadian Borrower's Consolidated Net Tangible Assets as of the end of the Fiscal Quarter immediately prior to the date of such disposition, in any Fiscal Year; _provided_, that for such purpose, if such sale, transfer or other disposition is as part of an exchange of equipment to the extent that (A) such equipment is exchanged for credit against the purchase price of similar replacement property or (B) the proceeds thereof are reasonably promptly applied to the purchase price of such replacement property, then the amount of such purchase price of such replacement property in excess of such credited value will still count towards the determination of such 5% of net book value;

(i)     the disposition of Receivables pursuant to a Permitted Factoring Transaction;

(j)     the disposition of Receivables pursuant to a Permitted Securitization Financing, provided that the Receivables subject to such disposition originated in the United States;

(k)     any Anchor Sale and Leaseback Transaction, provided the proceeds of each such Anchor Sale and Leaseback Transaction shall be used to repay the Operating Facilities in accordance with Section 5.3.6;

(clauses (a)-(k), collectively, the "**Permitted Dispositions**"); _provided_, that the Borrower and its Subsidiaries may, with the prior consent of the Required Lenders, sell, lease, assign, transfer, convey or otherwise dispose of all or any part of its assets in a transaction that does not constitute a Permitted Disposition to the extent that the proceeds thereof are to be used in accordance with Section 5.3.1.

7.2.5     _Distributions._ Make any Distributions other than Permitted Distributions; _provided_ that, during the Covenant Relief Period, only Distributions described in paragraphs (b), (f), (g) and (i) of the definition of "Permitted Distribution" shall be permitted under this Section 7.2.5.

7.2.6     _Dealing with Related Parties._ Consummate any transaction with any Affiliate of Holdco or the Canadian Borrower or any of its Subsidiaries other than the following:

(a)     any transaction that is on fair and reasonable terms that are substantially as favorable to the Canadian Borrower and/or its applicable Subsidiary as would be

obtainable by the Canadian Borrower or such Subsidiary at the relevant time in a comparable arm's length transaction with a Person that is not an Affiliate;

(b)     payments and transactions provided for in the Material Agreements;

(c)     any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock option and stock ownership plans approved by the board of directors (or similar governing body) of Holdco, the Canadian Borrower or any of its Subsidiaries or the senior management thereof;

(d)     employment arrangements and transactions pursuant thereto entered into in the ordinary course of business between Credit Parties and any employee thereof including any employee compensation, benefit plan or arrangement, any health, disability or similar insurance plan which covers employees;

(e)     the payments of reasonable and customary fees, compensation, benefits and incentive arrangements paid or provided to, and indemnities provided on behalf of, officers, directors, employees or consultants of Holdco (or any direct or indirect parent thereof), the Canadian Borrower or any of its Subsidiaries;

(f)     any transaction with an Affiliate where the only consideration paid by a Credit Party is capital stock of such Credit Party or any of its Subsidiaries;

(g)     the payment of any Permitted Distribution;

(h)     transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case, in the ordinary course of business and otherwise in compliance with the terms and conditions of this Agreement that are fair to the Credit Parties (as determined in good faith by the board of directors of the Canadian Borrower);

(i)     transactions (i) among the Credit Parties or (ii) between Subsidiaries that are not Credit Parties, in each case that are permitted by this Agreement;

(j)     so long as no Default or Event of Default shall have occurred and be continuing at the time of any action described below or would result therefrom the payment of transaction, advisory or similar fees payable to the Palladium or any Affiliate thereof in an aggregate amount in any Fiscal Year not to exceed $1,000,000, provided, that such fee is paid in connection with a *bona fide* transaction;

(k)     those transactions set forth on Schedule 7.2.6 which are in place as of the Amendment and Restatement Date;

(l)     transactions pursuant to any Permitted Securitization Financing; and

(m)     the Anchor Acquisition Promissory Notes.

7.2.7    *Change or Cease Business.* Cease to carry on the business or change in any material respect the nature of the business as is currently being carried on by it as of the Amendment and Restatement Date, including, for the avoidance of doubt, transactions in connection with a Permitted Securitization Financing, other than as part of a business reasonably related or ancillary thereto, or as otherwise approved in writing by the Required Lenders, acting reasonably.

7.2.8    *Corporate Changes.* Consummate any transaction whereby all or a substantial portion of its undertaking, property and assets would become the property of any other Person, whether by way of reconstruction, reorganization, recapitalization, consolidation, amalgamation, merger, transfer, sale or otherwise; nor merge, amalgamate or acquire any other Person or all or substantially all of its assets; except that any of the foregoing transactions may take place: (a) among the Credit Parties if prompt written notice is given to the Agent, a Material Adverse Change will not occur as a result thereof and the applicable Credit Parties provide such additional or replacement Security as the Agent may reasonably require, (b) to consummate any Permitted Acquisition and (c) in connection with any Permitted Dispositions of all or substantially all of the assets of a Subsidiary of the Canadian Borrower; <u>provided</u> that in any such event which involves the Canadian Borrower, the successor entity is a Person formed under the Laws of Canada or any province thereof remains a Borrower under the same Facilities that it was a borrower under immediately prior to such event.

7.2.9    *Constating Documents.* Amend or restate or otherwise alter the articles of incorporation, amalgamation or continuance, as applicable, or by-laws of (i) any Credit Party in any manner that would reasonably be expected to materially and adversely affect the rights of the Agent and the Lenders under the Credit Documents or (ii) any Subsidiary (other than a Securitization SPE) which is not a Credit Party which would impose any restrictions upon the ability of such Subsidiary to make any Distributions to any Credit Party.

7.2.10    *Capital Expenditures.* Make, or permit any Subsidiary to make, any Capital Expenditure in any Fiscal Year that exceeds in aggregate, for each Fiscal Year, 110% of the estimated maximum amount of such Capital Expenditures as set forth in the annual budget in respect of such Fiscal Year provided by the Canadian Borrower pursuant to Section 7.4.1(c) (unless such Capital Expenditures are funded entirely by the proceeds of equity contributions or Sales Proceeds to the extent permitted under Section 5.3.2); *provided* that, notwithstanding the foregoing, the maximum aggregate amount of Capital Expenditures permitted by this Section 7.2.10 shall be, for the Fiscal Year ending December 31, 2018, U.S. $30,000,000.

7.2.11    *Fiscal Year.* Change its Fiscal Year end.

7.2.12    *Currency Hedging Agreements.* Enter into or be a party to any Currency Hedging Agreement, unless:

(a)     such Currency Hedging Agreement is entered into with one or more Hedge Providers or other counterparties, provided that if it is with any such other counterparties the obligations and liabilities thereunder shall be unsecured;

(b)     in the case of a Currency Hedging Agreement with a Hedge Provider, the Canadian Borrower shall execute an ISDA agreement and all other documentation as may be required by the applicable counterparty to such Interest Rate Hedging Agreement;

(c)     such Currency Hedging Agreement is entered into for the purpose of hedging against the risk of fluctuations in currencies and not for speculative purposes; and

(d)     the maturity date of such Currency Hedging Agreement is not more than one year from the date thereof and, in any event, not later than the Facilities Maturity Date.

7.2.13   *Interest Rate Hedging Agreements.* Enter into or be a party to any Interest Rate Hedging Agreement, unless:

(a)     the aggregate notional amount under all such Interest Rate Hedging Agreements at such time does not exceed $75,000,000;

(b)     such Interest Rate Hedging Agreement is entered into with one or more Hedge Providers or other counterparties, provided that if it is with any such other counterparties the obligations and liabilities thereunder shall be unsecured;

(c)     in the case of an Interest Rate Hedging Agreement with a Hedge Provider, the Canadian Borrower shall execute an ISDA agreement and all other documentation as may be required by the applicable counterparty to such Interest Rate Hedging Agreement;

(d)     such Interest Rate Hedging Agreement is entered into for the purpose of hedging against the risk of fluctuations in interest rates, and not for speculative purposes; and

(e)     the maturity date of such Interest Rate Hedging Agreement is not later than the Facilities Maturity Date.

7.2.14   *Use of Advances Sanctions.* Directly or indirectly use the proceeds of Advances to fund operations, or finance investments in, any country that at the time is prohibited by Economic Sanctions, the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or other Applicable Law, or make payments to any country or Person that at the time is prohibited by Economic Sanctions, the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or other Applicable Law, or directly or indirectly fund any principal repayment with proceeds derived from any such country or Person that will result in a violation by a Credit Party (or any Lender hereunder) of such Economic Sanctions, the *Foreign Corrupt Practices Act*, the *Corruption of Foreign Public Officials Act* (Canada) or other Applicable Law.

7.2.15   *Use of Advances General.* Use a material amount of the proceeds of any Advance for any purposes other than those expressly contemplated in this Agreement.

7.2.16   *Subordinated Debt.* Make any payment to any holders of the Subordinated Debt in connection with principal, interest, fees or any other amounts in respect thereof or amend the terms thereof, except payments permitted in accordance with the terms of the applicable Subordination Agreement, and so long as no Default or Event of Default has occurred and is continuing or would reasonably be expected to result therefrom.

7.2.17   *Sanctions.* Directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in 6.1.31, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Economic Sanction, or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Economic Sanction and the Credit Parties shall deliver to the Agent any certification or other evidence requested from time to time confirming the Credit Parties' compliance with this Section 7.2.17.

7.2.18   *Account Receivable Insurance Coverage.* Provide the Agent with prior written notice of all proposed amendments or modifications to any Account Receivable Insurance and, to the extent that any such amendments or modifications (i) de-insures all or a portion of any Marginable Receivable that constitutes part of the Borrowing Base, (ii) modifies the individual country limits under the Account Receivable Insurance, (iii) extends any coverage period under the Account Receivable Insurance, or (iv) affects any of the coverage amounts or any coverage period(s) related to receivables of Petróleos Mexicanos or its Affiliates, shall not give effect to any such amendment or modification without the prior written consent of the Agent, acting reasonably, and in no case taking longer than 3 Business Days to provide such consent, it being understood that should the Agent fail to act within 3 Business Days to provide a an affirmative or negative written response, that failure should be deemed to be an act of consent with regards to the proposed amendment. For certainty, nothing in this Section 7.2.18 shall derogate from the obligations of the Borrowers, or the rights of the Agent, under Section 7.1.10.

7.2.19   *Cash Hoarding.* Use the proceeds of any Advance to accumulate or maintain cash or Cash Equivalents in one or more depository or investment accounts maintained by any Credit Party in an amount, in the aggregate, greater than $20,000,000, but excluding therefrom cash or Cash Equivalents accumulated or maintained for a specified business purpose (to the extent permitted hereunder and other than simply accumulating cash reserve in a manner that is not consistent with past practice of the Credit Parties), and, for certainty, the Lenders may refuse to make any requested Advance which the Lenders, acting reasonably, determine would result in a contravention of this Section 7.2.19.

**7.3**     **Financial Covenants**

7.3.1     Subject to the Equity Cure provided below in Section 7.3.2, while there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to the Borrowers, the Borrowers will not, without the prior written consent of the Required Lenders:

(a)     permit the Net Leverage Ratio measured at the end of each Fiscal Quarter to exceed (i) 4.75 to 1 for the Fiscal Quarter ending March 31, 2019; (ii) 3.50 to 1 for the Fiscal Quarters ending June 30, 2019, September 30, 2019 and December 31, 2019; (iii) 3.50 to 1 for the Fiscal Quarter ending March 31, 2020; (iv) 4.75 to 1 for the Fiscal Quarter ending June 30, 2020; (v) 4.50 to 1 for the Fiscal Quarter ending September 30, 2020; (vi) 4.25 to 1 for the Fiscal Quarter ending December 31, 2020; and (vii) 3.00 to 1 for the Fiscal Quarters ending March 31, 2021 and thereafter; and

(b)     permit the Fixed Charge Coverage Ratio measured at the end of each Fiscal Quarter to be less than (i) 1.10 to 1 for the Fiscal Quarters ending June 30, 2018, September 30, 2018 and December 31, 2018; and (ii) 1.25 to 1 for the Fiscal Quarters ending March 31, 2019 and thereafter.

7.3.2     In the event of any Event of Default of the financial covenants set forth in Section 7.3.1 (the "**Designated Financial Covenants**"), any equity contribution made by Holdco or the shareholders of Holdco to the Canadian Borrower will, at the request of the Canadian Borrower, be included in the calculation of EBITDA solely for the purposes of determining compliance with such financial covenants at the end of the applicable Fiscal Quarter and any subsequent period that includes such Fiscal Quarter (any such equity contribution, a "**Specified Equity Contribution**"); *provided*, that:

(a)     prior written notice of the Canadian Borrower's intention to utilize such Specified Equity Contribution is received by the Agent no later than the date on which the financial statements for such Fiscal Quarter or Fiscal Year (as applicable) are required to be delivered as provided for in Section 7.4;

(b)     such Specified Equity Contribution is received by the Canadian Borrower within ten (10) Business Days after the Canadian Borrower being required to deliver the financial statements for such Fiscal Quarter or Fiscal Year (as applicable) as provided for in Section 7.4;

(c)     the amount of any Specified Equity Contribution included in the calculation of EBITDA will be no greater than: (i) the amount required to cause the Canadian Borrower to be in compliance with the applicable Designated Financial Covenants and (ii) 40% of EBITDA as calculated on a trailing twelve month basis; *provided*, this paragraph shall not apply to the Specified Equity Contribution deemed to be made on the Second Amendment Date;

(d)     all Specified Equity Contributions will be disregarded for all other purposes under the Credit Documents (including, to the extent applicable, calculating EBITDA for

purposes of determining compliance with Section 7.1.16, the Applicable Margin for pricing and other items governed by reference to EBITDA or that include EBITDA in the determination thereof in any respect);

(e)    there shall be no more than one Specified Equity Contribution during any period of four consecutive Fiscal Quarters and the aggregate amount of all such Specified Equity Contributions shall not exceed $20,000,000; provided that for certainty, the Specified Equity Contribution deemed to be made on the Second Amendment Date shall not be included for the purposes of calculating the $20,000,000 limit set forth in this paragraph;

(f)    [**reserved**];

(g)    the proceeds of all Specified Equity Contributions are actually received by the Canadian Borrower and, except for the Specified Equity Contribution deemed to be made on the Second Amendment Date, the Canadian Borrower has delivered to the Agent 100% of the aggregate proceeds of such Specified Equity Contribution as a Repayment pursuant to Section 5.3.1(d) (each such Repayment, an "**Equity Cure Repayment**") provided that each such Equity Cure Repayment shall be ignored for purposes of determining the amount of Total Net Debt of the Borrower, including where Total Net Debt is used in the calculation the Designated Financial Covenants, until such time that the Specified Equity Contribution ceases to be calculated as EBITDA pursuant to the provisions of this Section 7.3.2; provided that, notwithstanding the provisions of Section 5.3.3, the proceeds of each Equity Cure Repayment are to be applied first to Outstanding Advances under the Term Facility in inverse order of maturity until they have been fully repaid and, thereafter, to Outstanding Advances under the Operating Facilities in accordance with Section 5.3.3.

If, after giving effect to the recalculations set forth in this Section 7.3.2, the Borrower shall then be in compliance with the Designated Financial Covenants, the Borrower shall be deemed to have satisfied the requirements of the Designated Financial Covenants and the applicable breach or default of the Designated Financial Covenants that had occurred shall be deemed cured for the purposes of this Agreement (in each instance, an "**Equity Cure**").

Pursuant to the exercise of the Specified Equity Contribution deemed to be made on the Second Amendment Date, the Designated Financial Covenants shall be recalculated giving effect to a pro forma adjustment by which EBITDA shall be increased for each of the Fiscal Quarters ending June 30, 2019, September 30, 2019, December 31, 2019 and March 31, 2020, and any four-quarter period that contains such quarter, by an amount equal to the Specified Equity Contribution deemed to be made on the Second Amendment Date in accordance with the terms above.

## 7.4    Reporting Requirements

7.4.1    While there are any Outstanding Advances under the Facilities or while any of the Facilities remains available to the Borrower, the Borrowers shall deliver, or cause to be

delivered, the following financial and other information to the Agent at the times indicated below:

(a)    within 35 days after the end of each month after the Amendment and Restatement Date: (i) monthly aged accounts receivable listings, monthly aged accounts payable listings, listings of total inventory and total capital assets by stocking location, cash and Cash Equivalent listing and a Borrowing Base Certificate executed by the Borrower; and (ii) monthly unaudited financial statements of the Borrower, which shall include a balance sheet, statement of cash flows and income statement;

(b)    promptly upon becoming available and in any event within 45 days after the end of each of the first three Fiscal Quarters in each Fiscal Year, a Compliance Certificate along with the Interim Financial Statements of the Borrower, which shall include a balance sheet, statement of cash flows and income statement, on which it is based, and the Borrower shall also make available members of its senior management team for a telephone call with Lenders within five Business Days of the end of each Fiscal Quarter to discuss, inter alia, the financial position of the Borrower;

(c)    promptly upon becoming available and in any event within 120 days after the end of each Fiscal Year, an annual business and financial plan for the Borrower which shall disclose all material assumptions utilized and shall include the following items: projected financial covenant ratios, balance sheet, income statement, cash flow statement and Capital Expenditure program;

(d)    promptly upon becoming available and in any event within 120 days after the end of each Fiscal Year, the Year-end Financial Statements for the Borrower, which shall include a balance sheet, statement of cash flows and income statement, together with a copy of the management discussion and analysis and a Compliance Certificate which shall include all new material business locations and any other changes to Schedule 6.1.2;

(e)    within 15 days of a request therefor by the Agent and only after a Material Adverse Effect or during the continuance of a Default or Event of Default, a listing of (i) each of the "serial number goods" (as defined in the *Personal Property Security Act* (Alberta)) or "collateral" for which a security interest must be indicated on a "certificate of title" (as such terms are defined under the *UCC*) for such collateral owned by the Credit Parties and the location of such serial number goods or certificate of title collateral, and (ii), a legal description of any Lands; but in each case, only to the extent that such assets are included in the Borrowing Base;

(f)    (i) within five Business Days of the end of each calendar week, solely during the Covenant Relief Period, a weekly liquidity report in form and substance satisfactory to the Agent, including, but not limited to, global cash balances and global facility utilization of the Borrower, including individual account summaries; and (ii) solely during the Covenant Relief Period, a rolling thirteen week cash flow and Borrowing Base projection, in form and substance satisfactory to the Agent, to be delivered

within 10 Business Days from receipt by the Borrower of the written request of the Agent for such information;

(g)    (i) together with the delivery of the Interim Financial Statements for the Fiscal Quarter ending June 30, 2018, a collateral exam based on such Interim Financial Statements; and (ii) prior to December 31, 2018, updated appraisals of the equipment, inventory and real estate of the Credit Parties; in each case, in form and substance satisfactory to the Lenders, acting reasonably;

(h)    provide prompt notice to the Agent of: (i) the occurrence of any Default or Event of Default (for greater certainty, whether or not such Default or Event of Default is continuing); (ii) any Material Adverse Change or Material Adverse Effect; (iii) any material litigation affecting any Credit Party or any breach of any Requirement of Environmental Law, where in either such case there is a reasonable prospect that the liability of any Credit Party with respect thereto could exceed Cdn. $5,000,000 in any Fiscal Year or which would reasonably be expected to result in a Material Adverse Change; (iv) any material amendments to or replacements of, or waivers of material breaches in respect of, the Material Agreements or the Material Permits; (v) any notice of default, termination or suspension received by any Credit Party in respect of material Funded Debt or in respect of any Material Agreement or Material Permit; and (vi) the occurrence of any ERISA Event that would reasonably be expected to have a Material Adverse Effect;

(i)    provide prompt notice to the Agent of: (i) any labour dispute to which any Credit Party is or is expected to become a party, including any strikes, lockouts or other labor disputes relating to any of such Person's plants and other facilities, which could reasonably be expected to result in a Material Adverse Effect, (ii) any Worker Adjustment and Retraining Notification Act or related liability incurred with respect to the closing of any plant or other facility of any such Person and (iii) any material liability under Applicable Law similar to the Worker Adjustment and Retraining Notification Act or otherwise arising out of plant closings;

(j)    (x) provide prompt notice to the Agent of any material notices it receives under or in connection with the Accounts Receivable Insurance, including related to: (i) any termination thereof, (ii) any disputed claims related thereto, (iii) any denied coverage thereunder or (iv) any alleged misrepresentations given by any Credit Party in connection therewith and (y) provide prior written notice of any amendment of material terms of the Account Receivable Insurance;

(k)    provide written notice to the Agent of any event or circumstance, with the giving of notice or lapse of time or both, would constitute a default or event of default under a Permitted Securitization Financing promptly (and in any event not less than three Business Days) upon becoming aware of same constituted by a Permitted Securitization Financing; provided such notice shall include reasonable details of the nature of such event or circumstance and the corresponding default or event of default, any applicable cure period with respect thereto and any remedial actions to be taken with respect to same; and

(l)    such additional information and documents as the Agent or the Lenders may reasonably require from time to time, not otherwise inconsistent with the terms of this Agreement, to ensure the ongoing compliance by the Borrower with the terms and conditions of this Agreement, in form reasonably acceptable to the Agent and the Lenders.

## 7.5    Designation of Unrestricted Subsidiaries

(a)    The Canadian Borrower from time to time, by notice to the Agent in the form of Exhibit I, shall be entitled to designate that either:

(i)    a Material Subsidiary will be an Unrestricted Subsidiary; or

(ii)    an Unrestricted Subsidiary will be a Material Subsidiary;

provided, that the Borrower will not be entitled to designate a Material Subsidiary to be an Unrestricted Subsidiary if:

(A)    a Default or an Event of Default has occurred and is continuing unless the exercise of the Borrower's discretion under paragraph (i) or (ii) above would cause such Default or Event of Default to be cured; or

(B)    a Default or an Event of Default would result from or exist immediately after such a designation.

(b)    For the avoidance of doubt, notwithstanding anything in this Agreement or the Credit Documents to the contrary, for purposes of calculating the Borrowing Base, the definition of "Marginable Cash" shall include the unrestricted cash (determined in accordance with GAAP) and Cash Equivalents of each of QMax do Brasil Solucoes do Petroleo Ltda., International Drilling Fluids and Engineering Services (IDEC) Ltd. and QMax Solutions India (Project Office) of QMax Solutions Inc. (or any other Subsidiary of the Borrowers in the Agent's sole discretion, acting reasonably) to the extent (a) such cash and Cash Equivalents are held in collateral account/s maintained by the Agent or an affiliate thereof (or such other bank deemed reasonable in the sole discretion of the Agent), and (b) the Agent has received a guarantee (to the extent of the value of the pledged cash and Cash Equivalents in such account; it being understood that Agent may waive this requirement in its sole discretion if the circumstances warrant) and a deposit account agreement or substantially equivalent agreements under the laws of such local jurisdiction, in form and substance reasonably satisfactory to Agent, whereby, inter alia, the Agent retains exclusive control to direct the transfer of funds therefrom during the continuation of an Event of Default under Section 10.1 hereof (with withdrawals by the applicable Credit Party to be permitted upon notice to the Agent so long as the Agent has not delivered a notice of exclusive control upon the occurrence and during the continuation of an Event of Default), together with evidence of all requisite registrations or filings of each such agreement under

Applicable Law and such other documentation reasonably satisfactory to Agent, including legal opinions.

(c)     Any Subsidiary of the Borrowers that pledges cash and/or Cash Equivalents in the manner provided for in paragraph (b) above shall, notwithstanding that such Subsidiary is not a Material Subsidiary, be subject to the provisions of Section 7.2.1 hereof; *provided*, such Subsidiary shall otherwise not be subject to Section 7.2.

(d)     The Agent acknowledges that, as of the date hereof, Mud Movers LLC has been designated as an Unrestricted Subsidiary.

## 7.6     Securitization SPE

7.6.1     As of the Amendment and Restatement Date, ADF SPE, LLC, a Delaware limited liability company, shall be designated a Securitization SPE.

7.6.2     After the Amendment and Restatement Date, the Canadian Borrower from time to time, by notice to the Agent, may designate any Unrestricted Subsidiary as a Securitization SPE; underlined provided, that the Borrower will not be entitled to such a designation if (a) a Default or an Event of Default has occurred and is continuing (unless such designation would cause such Default or Event of Default to be cured) or (b) a Default or an Event of Default would result from or exist immediately after such a designation.

7.6.3     No Securitization SPE

(a)     shall incur any Funded Debt other than Funded Debt pursuant to the Permitted Securitization Financing to which it is a party;

(b)     shall conduct any business other than (i) the acquisition of accounts receivable from one or more Credit Parties, and (ii) the consummation and performance of Permitted Securitization Financing.

7.6.4     As at the Amendment and Restatement Date, the Material Subsidiaries and Unrestricted Subsidiaries are as set out in Schedule 6.1.2.

## ARTICLE 8
## SECURITY

## 8.1     Security

Each Borrower agrees to provide (or cause to be provided) the security listed below to the Agent on behalf of the Lenders and the Hedge Providers as continuing security for the payment and performance of all present and future, direct and indirect, indebtedness and obligations of the Credit Parties to the Agent, the Lenders and the Hedge Providers (on a *pari passu* basis) related to the Credit Documents, the Banking Service Agreements and the Hedging Agreements:

(a)     a general security agreement from each Borrower creating a First-Ranking Security Interest in respect of all of its present and after-acquired property, assets and undertaking and a floating charge over all present and future owned real property;

(b)     an unlimited Guarantee from the U.S. Borrower in respect of present and future, direct and indirect, indebtedness and Obligations of the Canadian Borrower and other Credit Parties to the Agent and the Lenders;

(c)     an unlimited Guarantee from each Material Subsidiary of the Canadian Borrower (excluding, for the avoidance of doubt, any Securitization SPE) which is not a Borrower in respect of present and future, direct and indirect, indebtedness and Obligations of the Borrowers to the Agent and the Lenders;

(d)     a general security agreement or debenture (or other equivalent security applicable in the relevant jurisdiction) from each Guarantor creating a First-Ranking Security Interest in respect of all its present and after acquired property, assets and undertaking and a floating charge over all present and future owned real property, provided, that (a) for so long as the Encina Loan Agreement is in effect, with respect to Anchor and its Subsidiaries the ranking of the First-Ranking Security Interest is to be in accordance with the Encina Intercreditor Agreement and (b) thereafter, so long as the Wells Fargo Credit Agreement is in effect, any Receivables and other assets encumbered by a lien pursuant to the Wells Fargo Credit Agreement and the other loan documents in connection therewith shall be excluded from the Security of the Agent and the Lenders;

(e)     a limited recourse guarantee from Holdco and a share pledge agreement from Holdco in respect of all of the issued and outstanding shares of the Canadian Borrower owned by it;

(f)     a securities pledge agreement or charge over shares (or other equivalent security applicable in the relevant jurisdiction) in respect of the shares or units of the U.S. Borrower and any Material Subsidiary owned by a Credit Party;

(g)     prior to the incurrence of any Subordinated Debt by any Credit Party, a Subordination Agreement in respect to such Subordinated Debt;

(h)     for each Leased Property deemed material by the Required Lenders, acting reasonably, a Landlord Agreement in respect of each such Leased Property; provided that the Agent may impose a three month rent reserve against the Borrowing Base with respect to Eligible Inventory valued in excess of $250,000 (per location) which is located at or on Leased Property in respect of which such Landlord Agreement is not obtained;

(i)     for each Credit Party (other than Anchor, Terra and their Subsidiaries) who does not maintain all of its bank accounts exclusively with the Agent or its Affiliates, deposit account control or blocked account agreements among the Agent and the applicable financial institution which such bank account is maintained with, as may be reasonably required by the Agent subject to the last sentence of Section 7.1.13;

(j)      estoppel letters, consignments agreements, bailee letters, certificates or consents from such third parties as may be reasonably required by the Agent, but subject to any limitations set forth herein or in any other Credit Document; and

(k)      such other security as may be reasonably required by the Agent and the Lenders from time to time;

in each case, in accordance with the time periods set out in Sections 7.1.14.

## 8.2    General Provisions re Security; Registration

The Security shall be in form and substance satisfactory to the Agent and the Lenders, acting reasonably. The Agent may require that any item of Security be governed by the laws of the jurisdiction where the property subject to such item of Security is located. The Security shall be registered by the Borrowers where necessary or desirable to record and perfect the charges contained therein, as determined by the Agent giving consideration to, among other things, the cost thereof relative to the benefit to the Lenders thereof, and if the Borrowers do not so register the Security as requested or if the registration may be effected by the secured party thereunder, the Agent may do the same. Notwithstanding the foregoing, the parties expressly agree that no actions shall be required under this Section 8.2 or in respect of Security generally to the extent that the costs of obtaining such Financial Assistance or Lien or perfecting or registering such Security outweigh the benefits afforded thereby, in the opinion of the Required Lenders, acting reasonably, such determination to be made at the written request of the Canadian Borrower; provided, that the Agent and Lenders shall be entitled to re-evaluate whether the costs of obtaining such Financial Assistance or Lien or perfecting or registering such Security outweigh the benefits afforded thereby from time to time in their discretion.

If any Lender determines, acting reasonably, that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful for such Lender to hold or benefit from any Guarantee and/or Security, such Lender shall notify the Agent and disclaim any benefit of such Guarantee and/or Security to the extent of such unlawfulness, provided that such disclaimer shall not invalidate or render unenforceable such Guarantee and/or Security for the benefit of any of the other Lenders

## 8.3    Opinions re Security

The Credit Parties shall cause to be delivered to the Agent and the Lenders the results of all applicable searches in respect of the Credit Parties in the applicable jurisdiction as well as the opinions of solicitors for the Credit Parties regarding their corporate status, the due authorization, execution and delivery of the Security provided by them, all registrations in respect of the Security, and the enforceability of such Security; all such opinions to be in form and substance satisfactory to the Agent and its counsel, acting reasonably.

## 8.4    After-Acquired Property, Further Assurances

Each Credit Party agrees to execute and deliver from time to time, and cause each of its Material Subsidiaries to execute and deliver from time to time, all such further documents and assurances as may be reasonably required by the Agent from time to time in order to provide the

Security contemplated hereunder, specifically including: supplemental or additional security agreements, assignments and pledge agreements which shall include lists of specific assets to be subject to the security interests required hereunder.

**8.5      Security for Swap Documents with Former Lenders**

(a)      If a Lender ceases to be a Lender under this Agreement (for purposes of this Section 8.5, a "**Former Lender**"), all Secured Hedging Liabilities owing to such Former Lender and its Affiliates under Hedging Agreements entered into while such Former Lender was a Lender shall remain secured by the Security (equally and rateably) to the extent that such Secured Hedging Liabilities were secured by the Security prior to such Lender becoming a Former Lender and, subject to the following provisions of this Section 8.5. For certainty, any Hedging Liabilities under Hedging Agreements entered into with a Former Lender or an Affiliate thereof after the Former Lender has ceased to be a Lender shall not be Secured Hedging Liabilities nor shall they be secured by the Security. Notwithstanding the foregoing, while any Obligations remain outstanding under the Facilities, no Former Lender or any Affiliate thereof shall have any right to cause or require the enforcement of the Security or any right to participate in any decisions relating to the Security, including any decisions relating to the enforcement or manner of enforcement of the Security or decisions relating to any amendment to, waiver under, release of or other dealing with all or any part of the Security; for certainty, the sole right of a Former Lender and its Affiliates with respect to the Security while any Obligations remain outstanding under the Facilities is to share, on a *pari passu* basis, in any proceeds of realization and enforcement of the Security.

(b)      If this Agreement is terminated, all Secured Hedging Liabilities owing to any Hedge Provider under Hedging Agreements entered into while such Hedge Provider, or its Affiliate, was a Lender hereunder and all Obligations under Banking Service Agreements between one or more Credit Parties and such Lender entered into while the Lender was a Lender hereunder shall no longer be secured by the Security.

**8.6      Insurance Proceeds**

If insurance proceeds become payable in respect of loss of or damage to any property owned by a Credit Party:

(a)      if an Event of Default has occurred and is continuing at such time, the Agent shall apply such proceeds against the Obligations; and

(b)      otherwise, the Agent shall apply such excess proceeds against the Obligations in accordance with Sections 5.3.1 and 5.3.2.

**8.7      Qualified ECP Guarantor Keepwell**

Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to

time by each other Credit Party to honor all of such Credit Party's obligations under this Agreement and the applicable Security (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 8.7 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 8.7, or otherwise under this Agreement and the applicable Security, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 8.7 shall remain in full force and effect until its Obligations have been discharged in full. Each Qualified ECP Guarantor intends that this Section 8.7 constitute, and this Section 8.7 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

## 8.8    Additional Release by Lender

If any Lender determines, acting reasonably, that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender to hold or benefit from a Lien over real property pursuant to any law of the United States or any State thereof, such Lender may notify the Agent and disclaim any benefit of such Lien to the extent of such illegality; provided, that such determination or disclaimer shall not invalidate or render unenforceable such Lien for the benefit of any other beneficiary of such Lien.

## 8.9    Security Principles Affecting Certain Subsidiaries

In obtaining Security from Material Subsidiaries in their respective jurisdiction of incorporation, the Agent, the Lenders and the Canadian Borrower agree that:

(a)    all Guarantees and Security granted will be limited to the extent necessary to comply with local legal requirements, as determined by the Agent acting reasonably;

(b)    general statutory limitations, financial assistance, corporate benefit, fraudulent preference, "thin capitalization" rules, tax restrictions (including tax thin capitalization issues), retention of title claims and similar principles may limit the ability of a Material Subsidiary to provide a Guarantee or other Security or may require that the Guarantee be limited by an amount or otherwise provided that the Canadian Borrower and the applicable Material Subsidiary will use reasonable endeavours to overcome such obstacles and to assist in demonstrating that adequate corporate benefit accrues to the relevant Guarantor;

(c)    the Security and extent of its perfection will be agreed on the basis that the cost to the Credit Parties of providing such Security shall be proportionate to the benefit accruing to the Lenders;

(d)    Material Subsidiaries will not be required to give Guarantees or enter into Security if that would conflict with the fiduciary duties of their directors or contravene any legal prohibition or result in a risk of personal or criminal liability on the part of an officer provided that the relevant Guarantor shall use reasonable endeavours to overcome any such obstacle;

(e)     perfection of security, when required, and other legal formalities will be completed as soon as practicable and, in any event, within the relevant time periods specified herein or, if earlier or to the extent no such time periods are specified herein, within the time periods specified by applicable law in order to ensure due perfection, provided that the perfection of security granted will not be required if it would have a material adverse effect on the ability of the relevant Guarantor to conduct its operations and business in the ordinary course as otherwise permitted by this Agreement;

(f)     where a class of assets to be secured includes material and immaterial assets, if the cost of granting Security over the immaterial assets is disproportionate to the benefit of such Security, security will be granted over the material assets only.

**ARTICLE 9**
**CONDITIONS PRECEDENT**

**9.1     Conditions Precedent to Agreement**

This Agreement shall not become effective unless and until the following conditions have been satisfied, in each case to the satisfaction of the Agent and the Lenders:

(a)     the conditions precedent in Section 9.2 shall have been satisfied;

(b)     the Agent and the Lenders shall be satisfied, in their reasonable discretion, with all Material Agreements, including confirmation that Palladium beneficially owns (within the meaning of Rule 13d-3 promulgated under the United States Securities Exchange Act of 1934) at least 52% of the issued and outstanding shares (excluding stock options) of the Canadian Borrower;

(c)     the Credit Parties shall have obtained insurance in respect of its consolidated property, business and assets, evidenced by an insurance certificate naming the Agent as additional insured and first loss payee;

(d)     the Canadian Borrower shall have in place acceptable Account Receivable Insurance, evidenced by an endorsement or insurance certificate naming the Agent as first loss payee;

(e)     subject to Schedule 9.1, (A) this Agreement and all Security (or in the case of Security that was previously delivered in connection with the Existing Credit Agreement, an acknowledgment and confirmation from the applicable Credit Party thereto if so requested by the Agent) required shall have been executed and delivered and (i) in Alberta, British Columbia and each other applicable Canadian jurisdiction, all registrations and deliveries necessary or desirable in connection therewith shall have been made, and (ii) in any other jurisdiction, the same, as applicable, shall have been delivered to the Agent in proper form for filing, and (B) all legal opinions and other documentation reasonably required by the Lenders in connection therewith shall have been executed and delivered, in each case, in form and substance reasonably satisfactory to the Agent and the Lenders;

(f)     the Agent and the Lenders shall have received satisfactory evidence that there are no Liens affecting any of the assets of the Credit Parties, except for Permitted Liens;

(g)     the Agent and Lenders shall have received satisfactory confirmation that at least 80% of the Insured Receivables forming part of the Borrowing Base are derived from, subject to and governed by Eligible Approved Contracts;

(h)     the Agent shall have received an officer's certificate, certificate of incumbency and certified copies of the articles, by-laws and resolutions of the board of directors of each Borrower and each other Credit Party formed under the laws of Canada, the U.S. or any province or state thereof concerning the due authorization, execution and delivery of the Credit Documents to which it is a party, and such related matters as the Agent and the Lenders may reasonably require;

(i)     the Agent shall have received a certificate of status, certificate of compliance or similar certificate for each Borrower and each other Credit Party formed under the laws of Canada, the U.S. or any province or state thereof issued by its governing jurisdiction;

(j)     the Agent and the Lenders shall have received opinions from the solicitors for the Credit Parties in Alberta, British Columbia and Delaware, regarding, amongst other things, its corporate status, the due authorization, execution, delivery and enforceability of the Credit Documents provided by it, perfection and registration of the Security, and such other matters as the Agent and the Lenders may require;

(k)     the Agent shall have received an opinion of its solicitors, Torys LLP, with respect to matters as the Agent and the Lenders may require.

(l)     the Canadian Borrower shall have delivered a duly executed and completed Borrowing Base Certificate and a *pro forma* Compliance Certificate;

(m)     consolidated cash flow projections, *pro forma* balance sheet, income statement and capital expenditure budget of the Canadian Borrower for each of the 2018, 2019 and 2020 Fiscal Years, including an analysis of the Mexican days of sales outstanding;

(n)     the Borrowers and the Agent shall have entered into a Fee Agreement;

(o)     the Borrowers shall have paid to the Agent all fees and expenses (including the Agent's reasonable and documented out-of-pocket legal expenses) relating to the establishment, amendment and restatement of the Facilities;

(p)     no Material Adverse Change shall have occurred since March 31, 2018;

(q)     the Agent shall have received satisfactory evidence that the Credit Parties have obtained all necessary consents of all Governmental Authorities required in connection with the execution of the Credit Documents and the consummation of

the transactions contemplated thereby and the Canadian Borrower shall have delivered an officer's certificate certifying same;

(r) each of the representations and warranties in Article 6 shall be true and correct in all material respects and the Canadian Borrower shall have delivered an officer's certificate certifying same; and

(s) Holdco shall have received no less than $3,000,000 by way of an equity contribution by Palladium, an Investor or an Affiliate thereof and shall, substantially concurrently therewith, provide reasonably satisfactory evidence of such receipt to the Agent.

**9.2     Conditions Precedent to all Advances**

The Lenders shall have no obligation to make any Advance (including for greater certainty the initial Advance hereunder), unless at the time of making each such Advance the following terms and conditions shall have been satisfied:

(a) the representations and warranties in Article 6 shall be true and correct in all material respects as if made on the date of such Advance except to the extent such representations and warranties relate to an earlier date in which case the information contained in representations and warranties shall be true and correct in all material respects as of such earlier date;

(b) no Material Adverse Effect shall have occurred since the date of the then most recent Year-end Financial Statements;

(c) no Default or Event of Default shall have occurred and be continuing, nor shall the making of the Advance result in the occurrence of any Default or Event of Default;

(d) no Borrowing Base Shortfall shall and be continuing, nor shall the making of the Advance result in the occurrence of any Borrowing Base Shortfall;

(e) after giving effect to the proposed drawdown, the outstanding principal of all Outstanding Advances under the applicable Facility shall not exceed the maximum amount of such Facility; and

(f) the Borrower shall have given a Drawdown Request to the Agent in accordance with the notice requirements provided herein (except in respect of Advances in the form of Overdrafts).

**ARTICLE 10**
**DEFAULT AND REMEDIES**

**10.1    Events of Default**

The occurrence of any one or more of the following events, after the expiry of any applicable cure period set out below, shall constitute an event of default under this Agreement (an "**Event of Default**"):

(a)    if,

    (i)    any Credit Party makes default in the due and punctual payment of any principal amount owing under the Credit Documents, as and when the same becomes due and payable, whether at maturity or otherwise;

    (ii)    any Credit Party makes default in the due and punctual payment of Interest or fees owing under the Credit Documents (other than the Hedging Agreements), as and when the same become due and payable, whether at maturity or otherwise and such default continues for a period of three Business Days after written notice thereof is given to the applicable Credit Party by the Agent; or

    (iii)    any Credit Party makes default in the due and punctual payment of any amounts in excess, in the aggregate, of $1,000,000 owing under the Hedging Agreements with a Hedge Provider, as and when the same become due and payable, whether at maturity or otherwise and such default continues for a period of ten (10) Business Days after written notice thereof is given to the applicable Credit Party by the applicable Hedge Provider;

(b)    the Borrower fails to be in compliance with any of the covenants set out in Section 7.2 or Section 7.3 (subject to the Equity Cure in compliance with Section 7.3.2);

(c)    any representation or warranty provided by a Credit Party to the Agent or the Lenders herein or in any other Credit Document was incorrect in any material respect on the date on which such representation or warranty was made;

(d)    any Credit Party fails in a material way to perform or comply with any of its covenants or obligations contained in this Agreement or any other Credit Document (other than those set out in Subsections (a), (b) and (c) above); provided, that if such non-compliance is capable of remedy within 30 days after notice thereof from the Agent and such Credit Party diligently attempts to remedy such non-compliance and periodically informs the Agent of its efforts in this regard, and such non-compliance is remedied within such period, then such non-compliance shall be deemed not to constitute an Event of Default;

(e)    the occurrence of a Change of Control;

(f)     any one or more of the Credit Parties is in default in the payment or performance of any of its or their indebtedness or obligations under any agreement relating to any Funded Debt (other than the Obligations) where the principal amount owing under such agreements in the aggregate is in excess of $10,000,000 (after the expiry of any grace or cure periods relating thereto), and in either case, such indebtedness or obligations have been, or may be, accelerated, unless such default is waived by the applicable counterparties or holders of such debt in accordance with its terms;

(g)     one or more final judgments or decrees for the payment of money shall have been obtained or entered against any one or more of the Credit Parties in excess of $10,000,000 in the aggregate and is not released, bonded, satisfied, discharged, vacated, or stayed within 30 days;

(h)     an Insolvency Event occurs in respect of any Credit Party or any Subsidiary of the Borrowers that pledges cash and/or Cash Equivalents in accordance with Section 7.5(b) hereof; provided, this clause (h) shall exclude an Insolvency Event in respect of any Securitization SPE.

(i)     the Credit Parties (taken as a whole) cease (or take an affirmative action towards ceasing) to carry on business, or a substantial part thereof, or make or threaten to make (or take an affirmative action towards making) a bulk sale of their property, except to the extent specifically permitted hereunder;

(j)     the property of any one or more of the Credit Parties having a fair market value in excess of $10,000,000, in aggregate, shall be seized (including by way of execution, attachment, garnishment or distraint) or any Lien thereon shall be enforced, or such property shall become subject to any charging order or equitable execution of a court, or any writ of enforcement, writ of execution or distress warrant with respect to obligations in excess of $10,000,000, in aggregate, shall exist in respect of any one or more of any of them, or such property, or any sheriff, civil enforcement agent or other Person shall become lawfully entitled to seize or distrain upon such property under the *Civil Enforcement Act* (Alberta), the *Workers' Compensation Act* (Alberta), the *Personal Property Security Act* (Alberta) or any other applicable Laws whereunder similar remedies are provided, and in any case such seizure, execution, attachment, garnishment, distraint, charging order or equitable execution, or other seizure or right, shall continue in effect and not be released or discharged for more than 30 days;

(k)     a Material Adverse Change has occurred since the date of the then most recent Year-end Financial Statements and remains continuing for more than 30 days after notice thereof is given to the Canadian Borrower by the Agent;

(l)     if an ERISA Event shall have occurred that would reasonably be expected to have a Material Adverse Effect;

(m)     any Credit Document or any material provision thereof is or is declared by any court of competent jurisdiction to be unenforceable, or any Credit Party terminates

or purports to terminate its liability under any Credit Document or disputes the validity or enforceability of such Credit Document;

(n)    any of the Security ceases to constitute a valid and perfected First-Ranking Security Interest over Collateral of a value in excess of $5,000,000 in the aggregate and the Borrower shall have failed to remedy such default within 5 days of becoming aware of such fact and being provided by the Agent with any documentation required to be executed to remedy such default; and

(o)    if any Borrower fails to eliminate a Borrowing Base Shortfall as provided in Section 5.3.5.

Notwithstanding the foregoing, a declaration of an Event of Default under clause (i) above shall not: (1) prevent the commencement of a proceeding under Law 1116 of 2006 ("**Law 1116**") or the filing of a petition in Colombia to commence a proceeding under Law 1116 with respect to any Colombian Branch of any Credit Party, whether in a voluntary or involuntary manner; (2) be construed to mean that the purpose of this Section is to prevent or create obstacles to prevent, directly or indirectly, that proceedings be commenced in Colombia under Law 1116 with respect to any Colombian Branch of any Credit Party; (3) prohibit any Colombian Branch of any Credit Party from negotiating or entering into a restructuring agreement under Law 1116; or (4) impose any restrictions or prohibitions, or unfavorable effects "efectos desfavorables" upon any Colombian Branch of any Credit Party for the negotiation or execution of a restructuring agreement under Law 1116. The rights of the Lenders under this Section may not be exercised in connection with clause (i) above if and for so long as a proceeding is commenced or a petition is filed in Colombia to commence a proceeding under Law 1116 with respect to any Colombian Branch clause (i) above, whether in a voluntary or involuntary manner or any Colombian Branch clause (i) above engage in negotiations to enter into, or enters into a restructuring agreement in Colombia under Law 1116.

## 10.2    Acceleration; Additional Interest

Upon the occurrence of an Insolvency Event in respect of any Credit Party, the Obligations shall become immediately due and payable, without the necessity of any demand upon or notice to the Borrower by the Agent and the Swingline shall be cancelled. Upon the occurrence and during the continuation of any Event of Default other than such an Insolvency Event, the Agent, at the request of and on behalf, of the Required Lenders, shall by written notice to the Borrowers declare the Obligations to be immediately due and payable. From and after the date of the occurrence of an Event of Default and for so long as such Event of Default continues, both before and after the Acceleration Date, all Outstanding Advances may bear interest or fees at the Default Rate in order to compensate the Lenders for the additional risk associated therewith.

## 10.3    Acceleration of Certain Contingent Obligations

Upon the occurrence of an Event of Default which is continuing, any Lender which has issued a Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit or entered into a Hedging Agreement with Credit Party may make a Canadian Dollar Prime Rate Loan, a U.S. Dollar Base Rate Loan or a U.S. Dollar Prime Rate Loan, as applicable, to a Borrower in an

amount equal to the face amount of such Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit, or the amount required to unwind such Hedging Agreement (such amount to be determined in accordance with the terms thereof), as the case may be; and the proceeds of any such Loan shall be held by such Lender and used to satisfy the Lender's obligations under the said Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit as such becomes due, or to effect the unwinding of such Hedging Agreement. Any such Loan shall bear interest at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans, U.S. Dollar Base Rate Loans or U.S. Dollar Prime Rate Loan, as applicable, under the Facility under which such Bankers' Acceptance, BA Equivalent Loan, LIBOR Loan or Letter of Credit was issued. Any such Loan made in respect of a Hedging Agreement shall bear interest at the rate and in the manner applicable to Canadian Dollar Prime Rate Loans under the Canadian Operating Facility which provides for the highest interest rate at such time.

**10.4     Combining Accounts, Set-Off**

Upon the occurrence and during the continuation of an Event of Default, in addition to and not in limitation of any rights now or hereafter granted under Applicable Law, each Lender may without notice to any Credit Party at any time and from time to time:

(a)     combine, consolidate or merge any or all of the deposits or other accounts maintained with such Lender by such Credit Party in respect of this Agreement (whether term, notice, demand or otherwise and whether matured or unmatured) and such Credit Party's obligations to such Lender hereunder; and

(b)     set off, apply or transfer any or all sums standing to the credit of any such deposits or accounts in or towards the satisfaction of the said obligations,

including all claims of any nature or description arising out of or connected with this Agreement, including contingent obligations of the Lenders in respect of unmatured Bankers' Acceptances, in which case the Agent or such Lender will promptly notify the Borrower thereof after the occurrence thereof; provided, that the Agent's or such Lender's failure to give any such notice will not affect the validity thereof. Nothing contained in the Credit Documents will require the Agent or a Lender to exercise any right, or will affect the right of the Agent or a Lender to exercise and retain the benefits of exercising any right, with respect to any Obligations existing otherwise than pursuant to the Credit Documents.

**10.5     Attorney in Fact**

Each Borrower hereby irrevocably constitutes and appoints the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of such Borrower and in the name of such Borrower or in its own name, from time to time in the Agent's discretion, for the purpose of carrying out the terms of the Credit Documents, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Credit Documents and which such Borrower being required by the terms thereof to take or execute has failed to take or execute; provided, that this power of attorney will not be effective until the occurrence and during the continuance of any Event of Default. Each

Borrower hereby ratifies all that said attorneys will lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and will be irrevocable until all of the Obligations under the Credit Documents have been unconditionally and irrevocably paid and performed in full. Each Borrower also authorizes the Agent, at any time and from time to time following the occurrence and during the continuance of any Event of Default, to execute any endorsements, assignments or other instruments of conveyance or transfer pursuant to the Security. If requested by the Agent, each Borrower will cause each other Credit Party to constitute and appoint the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney in fact in accordance with the foregoing provisions of this Section 10.5.

**10.6    Appropriation of Monies**

After the occurrence and during the continuation of an Event of Default, the Agent may from time to time apply any Proceeds of Realization against any portion or portions of the Obligations, and the Borrowers may not require any different application. The taking of a judgment or any other action or dealing whatsoever by the Agent or the Lenders in respect of the Security shall not operate as a merger of any of the Obligations hereunder or in any way affect or prejudice the rights, remedies and powers which the Agent or the Lenders may have, and the foreclosure, surrender, cancellation or any other dealing with any Security or the said obligations shall not release or affect the liability of the Borrowers or any other Person in respect of the remaining portion of the Obligations.

**10.7    No Further Advances**

The Lenders shall not be obliged to make any further Advances (including honouring any cheques drawn by a Borrower which are presented for payment) from and after the earliest to occur of the following: (a) delivery by the Agent to the Borrowers of a written notice that a Default or an Event of Default has occurred and is continuing and that as a result thereof no further Advances will be made (whether or not such notice also requires immediate repayment of the Obligations) and (b) the occurrence and continuance of an Event of Default under Section 10.1(h).

**10.8    Remedies Cumulative**

All of the rights and remedies granted to the Agent and the Lenders in this Agreement, and any other Credit Documents or instruments in existence between the Parties or contemplated hereby, and any other rights and remedies available to the Agent and the Lenders at law or in equity, shall be cumulative. The exercise or failure to exercise any of the said remedies shall not constitute a waiver or release thereof or of any other right or remedy, and shall be non-exclusive.

**10.9    Performance of Covenants by Agent**

If a Credit Party fails to perform any covenant or obligation to be performed by it pursuant to this Agreement, the Agent, at the request of the Required Lenders (in their sole discretion), after written notice to the Borrowers, perform any of the said obligations but shall be under no obligation to do so; and any amounts expended or advanced by the Agent for such purpose shall be payable by the Borrowers upon demand, together with interest thereon at the highest rate then applicable to the Facilities.

**10.10   Purchase of Participation Following Acceleration**

After all Obligations are declared by the Agent to be due and payable pursuant to Section 10.2, (i) each Lender agrees that it will at any time or from time to time thereafter at the request of the Agent as required by any Lender, purchase at par on a non-recourse basis a participation in the Outstanding Advances owing to each of the other Lenders under the Operating Facilities and make any other adjustments as are necessary or appropriate, in order that the Outstanding Advances owing to each of the Lenders under the Operating Facilities, as adjusted pursuant to this Section 10.10, will be in the same proportion as each Lender's Commitment under all the Operating Facilities was to the aggregate Commitment of all Lenders under all the Operating Facilities immediately prior to the Event of Default resulting in such declaration; (ii) the amount of any repayment made by or on behalf of the Credit Parties under the Credit Documents or any proceeds received by the Agent or the Lenders pursuant to Section 11.7 will be applied by the Agent in a manner such that to the extent possible the amount of the Outstanding Advances owing to each Lender under the Operating Facilities after giving effect to such application will be in the same proportion as each Lender's Commitment under all the Operating Facilities was to the aggregate Commitment of all Lenders under all the Operating Facilities immediately prior to the Event of Default resulting in such declaration; provided that: (i) HSBC US shall not purchase any participation under this Section 10.10 from HSBC Bank Canada (and provided that for certainty, the foregoing proviso shall not affect the obligations of HSBC US to any of the other Lenders under this Section 10.10); and (ii) if Applicable Laws or a Lender's internal regulations and policies prohibits such Lender from purchasing a participation in Outstanding Advances owing by a Borrower other than the Canadian Borrower, such Lender shall not be required to purchase a participation in the Outstanding Advances owing by such Borrower, provided that such Lender hereby indemnifies the other Lenders for its Proportionate Share of such Outstanding Advances as if such purchase had occurred.

**ARTICLE 11**
**ADMINISTRATION OF THE FACILITIES**

**11.1   Authorization and Action**

Each Lender hereby irrevocably appoints and authorizes the Agent to be its agent in its name and on its behalf and to exercise such rights or powers granted to the Agent or the Lenders under the Credit Documents to the extent specifically provided therein and on the terms thereof, together with such powers and authority as are reasonably incidental thereto. As to any matters not expressly provided for by the Credit Documents, the Agent will not be required to exercise any discretion or take any action, but will be required to act or to refrain from acting (and will be fully indemnified and protected by the Lenders to the greatest extent permitted by Law in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions will be binding upon all Lenders; provided, however, that the Agent will not be required to take any action which, in the opinion of the Agent, might expose the Agent to liability in such capacity, which could result in the Agent incurring any costs and expenses, or which is contrary to the spirit and intent of this Agreement.

**11.2     Decision-Making**

11.2.1     Any amendment to this Agreement relating to the following matters shall require the unanimous agreement of the Lenders:

(a)     decreases in interest rates or fees payable in respect of any Facility;

(b)     increases in the maximum amount of credit available under any Facility (other than increases made pursuant to Section 2.8.1);

(c)     extensions, or changes to the definition, of the Facilities Maturity Date;

(d)     extensions or postponements of the scheduled dates or the scheduled amounts for Repayments hereunder;

(e)     reductions in the Outstanding Advances under any Facility;

(f)     releases of all or substantially all of the Security, unless in connection with a Permitted Disposition;

(g)     any change to the definition of Required Lenders;

(h)     any provision of this Agreement which expressly states that the unanimous consent of the Lenders is required in connection with an action to be taken or consent provided by the Lenders;

(i)     any amendment, modification or elimination the definition of Borrowing Base or any of the defined terms that are used in such definition to the extent that any such change results in more credit being made available to the Borrowers based upon the Borrowing Base, but not otherwise;

(j)     any change to Sections 11.8.1, 11.9(b) or any other provision regarding the allocation of payments to the Lenders under this Agreement; and

(k)     this Section 11.2;

provided, that (A) any change to Section 2.6.1(i) or Article 11 will also require the consent of the Agent, (B) any change to Sections 4.6.1(c) and 4.7 (and the related definitions referenced therein) will require the consent of the Issuing Bank under the U.S. Operating Facility and the Agent, (C) any change to Sections 2.6.1(b) and 2.7 (and the related definitions referenced therein) will require the consent of the Swingline Lender and the Agent, (D) any change to Section 5.16 (and the related definitions referenced therein) will require the consent of each Issuing Bank and the Agent (E) any increase to the individual commitment amount of a Lender under a Facility can only be made with the consent of such Lender; and (F) any other change which only effects the Canadian Operating Lenders, the U.S. Operating Lenders, the Canadian Operating Lenders, Term Lenders, the Issuing Bank, the Swingline Lender or the Agent, respectively, shall only require the consent of the affected Persons.

11.2.2    Except for the matters described in Section 11.2.1 above, any amendment to this Agreement or the other Credit Documents shall be effective if made among the Borrower and the Required Lenders, and for greater certainty any such amendment which is agreed to by the Required Lenders shall be final and binding upon all Lenders.

11.2.3    Except for the matters which require the unanimous consent of the Lenders as set out above, any action to be taken or decision to be made by the Lenders pursuant to this Agreement (specifically including for greater certainty the issuance of written notice to the Borrower of the occurrence of a Default or Event of Default, the issuance of a demand for payment of the Obligations, a decision to make an Advance despite any condition precedent relating thereto not being satisfied, the provision of any waiver in respect of a breach of any covenant or the issuance of any consent which may be required under Section 7.2) shall be effective if approved by the Required Lenders; and any such decision or action shall be final and binding upon all the Lenders.

11.2.4    Any action to be taken or decision to be made by the Lenders pursuant to this Agreement which is required to be unanimous shall be made at a meeting of the Lenders called by the Agent pursuant to Section 11.11(k) or by a written instrument executed by all of the Lenders. Any action to be taken or decision to be made by the Lenders pursuant to this Agreement which is required to be made by the Required Lenders shall be made at a meeting of the Lenders called by the Agent pursuant to Section 11.11(k) or by a written instrument executed by the Required Lenders. Any instrument contemplated in this Section 11.2.4 may be executed by fax or pdf and in counterparts.

11.2.5    Subject to Section 8.5(b), the Agent may from time to time without notice to or the consent of the Lenders execute and deliver partial releases of the Security in respect of any item of Collateral (whether or not the proceeds of sale thereof are received by the Agent) which the Credit Parties are permitted to dispose of in connection with a Permitted Disposition; and in releasing any such Security the Agent may rely upon and assume the correctness of all information contained in any certificate or document provided by any one or more of the Borrowers, without further enquiry. Otherwise, any release or discharge in respect of the Security or any portion thereof shall require the written consent of the Lenders acting unanimously.

**11.3    Procedure for Making Advances**

11.3.1    Subject to Section 11.8.3, all Advances under each Facility will be made in accordance with each Lender's Proportionate Share of such Advance under such Facility.

11.3.2    The Lenders, through the Agent, will make Advances under a Facility available to the Borrower as required hereunder by debiting the account of the Agent to which each Lender's Proportionate Share in respect of each Facility of such Advances has been credited (or causing such account to be debited) and, in the absence of other arrangements agreed to by the Agent and the Borrowers in writing, by transferring (or causing to be transferred) like funds in accordance with the instructions of the Borrowers as set forth in the a Drawdown Request, Conversion Notice or Rollover Notice, as the case may be, in respect of each Advance under each Facility; provided, that the obligation of the Agent

hereunder will be limited to taking such steps as are in keeping with its normal banking practice and which are commercially reasonable in the circumstances to implement such instructions, and the Agent will not be liable for any damages, claims or costs which may be suffered by the Borrowers or any of the Lenders and occasioned by the failure of such funds to reach their designated destination, unless such failure is due to the gross negligence or wilful misconduct of the Agent.

## 11.4    Failure to Fund

11.4.1    Unless the Agent has actual knowledge that a Lender has not made or will not make available to the Agent for value on the date of any Advance the applicable amount required from such Lender hereunder, the Agent shall be entitled to assume that such amount has been or will be received from such Lender when so due and the Agent may (but shall not under any circumstances be obliged to), in reliance upon such assumption, make available to the applicable Borrower a corresponding amount (except that no such amount shall be made available to the applicable Borrower in the case of a deemed Advance). If such amount is not in fact received by the Agent from such Lender on such date and the Agent has made available a corresponding amount to the applicable Borrower on such date as aforesaid (or is deemed to have made an Advance to the applicable Borrower in such amount), such Lender shall pay to the Agent on demand an amount equal to the aggregate of the applicable amount required from such Lender hereunder plus an amount equal to the product of (a) the rate per annum applicable to overnight deposits made with the Agent for amounts approximately equal to the amount required from such Lender multiplied by (b) the amount that should have been paid to the Agent by such Lender on such date and was not, multiplied by (c) a fraction, the numerator of which is the number of days that have elapsed from and including such date to but excluding the date on which the amount is received by the Agent from such Lender and the denominator of which is 365 or 366 days, as the case may be, in the case of all Advances. A certificate of the Agent containing details of the amount owing by a Lender under this Section shall be binding and conclusive in the absence of manifest error. If any such amount is not in fact received by the Agent from such Lender on such date, the Agent shall be entitled to recover from the applicable Borrower, on demand, the related amount made available by the Agent to such Borrower as aforesaid together with interest thereon at the applicable rate per annum payable by such Borrower hereunder.

11.4.2    Notwithstanding the provisions of Section 11.4.1, if any Lender fails to make available to the Agent its Proportionate Share of any Advance, which for greater certainty includes a deemed Advance hereunder (such Lender being herein called the "**Non-Paying Lender**"), the Agent shall forthwith give notice of such failure by the Non-Paying Lender to the applicable Borrower (except where such failure relates to a deemed Advance) and to the other Lenders. The Agent shall then forthwith give notice to the other Lenders that any Lender may make available to the Agent all or any portion of the Non-Paying Lender's Proportionate Share of such Advance (but in no way shall any other Lender or the Agent be obliged to do so) in the place of the Non-Paying Lender. If more than one Lender gives notice that it is prepared to make funds available in the place of a Non-Paying Lender in such circumstances and the aggregate of the funds which such Lenders (herein collectively called the "**Contributing Lenders**" and individually called the "**Contributing Lender**")

are prepared to make available exceeds the amount of the Advance which the Non-Paying Lender failed to make, then each Contributing Lender shall be deemed to have given notice that it is prepared to make available its Proportionate Share of such Advance based on the Contributing Lenders' relative commitments to advance in such circumstances. If any Contributing Lender makes funds available in the place of a Non-Paying Lender in such circumstances, then the Non-Paying Lender shall pay to any Contributing Lender making the funds available in its place, forthwith on demand, any amount advanced on its behalf together with interest thereon at the rate applicable to such Advance from the date of advance to the date of payment, against payment by the Contributing Lender making the funds available of all interest received in respect of the Advance from the applicable Borrower. The failure of any Lender to make available to the Agent its Proportionate Share of any Advance as required herein shall not relieve any other Lender of its obligations to make available to the Agent its Proportionate Share of any Advance as required herein.

**11.5    Defaulting Lenders and Replacement of Lenders**

11.5.1    Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    the standby fees payable to a Defaulting Lender hereunder shall cease to accrue on the unused portion of its Commitment under any Operating Facility, as applicable;

(b)    a Defaulting Lender shall not be included in determining whether, and the Commitment and the Proportionate Share of the Outstanding Advances of such Defaulting Lender under the Facilities, or any of them, shall not be included in determining whether, all Lenders or the Required Lenders, have taken or may take any action hereunder; provided, that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects such Defaulting Lender differently than other affected Lenders shall require the consent of such Defaulting Lender;

(c)    subject to Section 11.4.1, for the purposes of any Advance requested hereunder while there is a Defaulting Lender, each Lender's Proportionate Share thereof shall be calculated based on such Lender's (A) Commitment relative to the total Commitment under the applicable Facility reduced by the Commitment of the Defaulting Lender;

(d)    the Agent, the Swingline Lender or the Issuing Bank may require such Defaulting Lender to pay to the Agent for deposit into an escrow account maintained by and in the name of the Agent an amount equal to such Defaulting Lender's maximum contingent obligations hereunder to the Agent, the Swingline Lender or the Issuing Bank, as the case may be (provided that the foregoing shall not apply to Export Development Canada to the extent such a deposit is unlawful under the *Financial Administration Act* (Canada));

(e)     the Agent may withhold any payments owing to such Defaulting Lender for set off against such Defaulting Lender's existing or reasonably foreseeable future obligations hereunder; and

(f)     for the avoidance of doubt, the Borrowers shall retain and reserve their other rights and remedies respecting each Defaulting Lender.

11.5.2   If a Lender is a Defaulting Lender or refuses to give timely consent to an amendment, modification or waiver of this Agreement that, pursuant to Section 11.2, requires consent of all the Lenders (and the consent of the Required Lenders has been given with respect thereto) (a "**Non-Consenting Lender**") (collectively, the "**Departing Lenders**"), then the Borrowers may:

(a)     replace the Departing Lender with another financial institution acceptable to the Agent, the Swingline Lender and the Issuing Bank, each acting reasonably, who purchases at par, or such lower price as the Departing Lender may agree in its sole discretion, the Outstanding Advances and other amounts under all Facilities owing to the Departing Lender and such Lender's entire Commitment and assumes the Departing Lender's Commitment and all other obligations of the Departing Lender hereunder; provided, that prior to or concurrently with such replacement:

   (i)     the Departing Lender shall have received payment in full of all principal, interest, fees and other amounts through such date of replacement and a release from any further obligations to make Advances under the Credit Documents after the date of such replacement;

   (ii)    the assignment fee required to be paid by Section 13.6.2 shall have been paid to the Agent;

   (iii)   all of the other requirements for such assignment contained herein shall have been satisfied, including the consent of the Agent, the Swingline Lender and the Issuing Bank and the receipt by the Agent of such agreements, documents and instruments as the Agent may reasonably require; and

   (iv)    in the case of a Departing Lender who is a Non-Consenting Lender, each assignee consents, at the time of such assignment, to each matter in respect of which such Non-Consenting Lender was a Non-Consenting Lender and the Borrowers also requires each other Lender that is a Non-Consenting Lender to assign the Outstanding Advances owing to it under each Facility and its Commitment; or

(b)     provided, no Default or Event of Default exists at such time, elect to terminate the Departing Lender's Commitment, in which case the Commitment in respect of each Facility shall be reduced by an amount equal to the amount of any Commitment of such Facility so cancelled (provided, that prior to or concurrently with such cancellation the Departing Lender shall have received payment in full of all principal, interest, fees and other amounts through such date of cancellation

(including breakage and other costs in accordance with Sections 5.10.4 and 5.14) and a release from any further obligations to make Advances under the Credit Documents after such termination); or

(c)   exercise any combination of the rights under (a) and (b) above; provided, that in each case, each Departing Lender is treated ratably with the other Departing Lenders, if any.

## 11.6   Security and Exercise of Remedies

11.6.1   Except to the extent provided in Section 11.6.2, the Security shall be granted in favour of and held by the Agent for and on behalf of the Lenders in accordance with the provisions of this Agreement. The Agent shall, in accordance with its usual practices in effect from time to time, take all steps required to perfect and maintain the Security to the extent required hereunder, including: taking possession of the certificates representing the securities required to be pledged hereunder to the extent required hereunder; filing renewals and change notices in respect of such Security; and ensuring that the name of the Agent is noted as loss payee or mortgagee on all property insurance policies covering the Collateral. If the Agent becomes aware of any matter concerning the Security which it considers to be material, it shall promptly inform the Lenders. The Agent shall comply with all instructions provided by the Lenders or the Required Lenders, as the case may be, in connection with the enforcement or release of the Security which it holds. The Agent agrees to permit each Lender to review and make photocopies of the original documents comprising the Security from time to time upon reasonable notice. The Agent is hereby authorized to enter into the Subordination Agreement on behalf of the Lenders and to any subordination and postponement agreements in respect of Subordinated Debt from time to time to the extent the same is permitted hereunder. Each Lender further authorizes the Agent to execute on its behalf, directly or through attorneys-in-fact duly appointed for such purposes, and to accept the benefits of, each of the Security governed under the laws of the Republic of Colombia and any other agreements or documents as may be necessary or advisable in connection with the grant of, or attachment or perfection of, modification, supplement or waiver under any of, the security interest granted to the Agent, for the benefit of the Lenders, pursuant to the Security governed under the laws of the Republic of Colombia. The Lenders and the other Secured Parties authorize the Agent to release any Collateral or Guarantors in accordance with Section 13.21 or if approved, authorized or ratified in accordance with Section 11.2.1. The Lenders and the other Secured Parties hereby irrevocably authorize and instruct the Agent to, without any further consent of any Lender, enter into (or acknowledge and consent to) or amend, renew, extend, supplement, restate, replace, waive or otherwise modify the Encina Intercreditor Agreement and the Wells Fargo Letter to the extent this Agreement does not otherwise require the consent of the Required Lenders or all Lenders therefor.

11.6.2   If any Credit Party has provided security in favour of any Lender directly, except for Permitted Purchase-Money Security Interests and Permitted Liens, such Lender agrees to pay to the Agent all amounts received by it in connection with the enforcement of such security, and all such amounts shall be deemed to constitute Proceeds of Realization and shall be dealt with as provided in Section 11.7.

11.6.3    Except as otherwise provided herein, each Lender hereby acknowledges that, to the extent permitted by Applicable Law, rights and remedies provided under the Credit Documents to the Lenders are for the benefit of the Lenders collectively and not severally and further acknowledges that its rights and remedies thereunder are to be exercised not severally but collectively through the Agent upon the decision of the Lenders (with the required majority or unanimity as herein provided), regardless of whether acceleration of Obligations hereunder was made, and accordingly, notwithstanding any of the provisions contained herein, each of the Lenders hereby covenants and agrees that it will not be entitled to take any action with respect to the Facilities, including any acceleration of Obligations thereunder, but that any such action will be taken only by the Agent with the prior written direction of the Lenders (with the required majority or unanimity as herein provided). Notwithstanding the foregoing or anything else set forth herein to the contrary, in the absence of written instructions from the Lenders, and where in the sole opinion of the Agent the exigencies of the situation warrant such action, the Agent may without notice to or consent of the Lenders take such action on behalf of the Lenders as it deems appropriate or desirable in the circumstances. Each of the Lenders hereby covenants and agrees that it has not heretofore and will not seek, take, accept or receive any Liens in respect of any of the Obligations of the Credit Parties under the Credit Documents and will not enter into any agreement with any of the Parties relating in any manner whatsoever to the Facilities, unless all of the Lenders under the Facilities will at the same time obtain the benefit of any such security or agreement, as the case may be.

**11.7    Application of Proceeds of Realization**

Notwithstanding any other provision of this Agreement, the Proceeds of Realization of the Security or any portion thereof shall be distributed in the following order:

(a)    firstly, in payment of all costs and expenses incurred by the Agent and the Lenders in connection with such realization, including legal, accounting and receivers' fees and disbursements;

(b)    secondly, against the Obligations (including Secured Hedging Liabilities but excluding any other Hedging Liabilities in excess thereof, and, for certainty, excluding any Hedging Liabilities which are owed to a counterparty other than a Lender or Affiliate thereof), each Lender being entitled to receive its Proportionate Share thereof;

(c)    thirdly, against all Hedging Liabilities which are owing to any Lender or Affiliate thereof in excess of Secured Hedging Liabilities; and

(d)    fourthly, if all Obligations of the Borrowers listed above and all other Hedging Liabilities owing to any Lender or Affiliate thereof have been paid and satisfied in full, any surplus Proceeds of Realization shall be paid in accordance with Applicable Law.

**11.8    Payments by Agent**

11.8.1    The following provisions shall apply to all payments made by the Agent to the Lenders hereunder:

(a)    the Agent shall be under no obligation to make any payment (whether in respect of principal, Interest, fees or otherwise) to any Lender until an amount in respect of such payment has been received by the Agent from a Credit Party;

(b)    if the Agent receives a payment of principal, Interest, fees or other amount owing by any Borrower under a Facility which is less than the full amount of any such payment due, the Agent shall distribute such amount received among the Lenders under such Facility in each Lender's Proportionate Share of such Facility;

(c)    if the Agent receives payments in respect of principal, Interest, fees or other amounts owing by a Borrower under more than one Facility which are due on the same day, and if the amounts received are insufficient to satisfy all payments required under such Facilities on such day, the Agent shall, except as otherwise specifically set forth herein, distribute such amounts received among the Lenders under such Facilities in each Lender's Proportionate Share of such Facilities;

(d)    if any Lender has advanced more or less than its Proportionate Share of its Commitment under a Facility, such Lender's entitlement to such payment shall be increased or reduced, as the case may be, in proportion to the amount actually advanced by such Lender;

(e)    if a Lender's Proportionate Share of an Advance under a Facility has been advanced for less than the full period to which any payment by any Credit Party relates, such Lender's entitlement to receive a portion of any payment of interest or fees shall be reduced in proportion to the length of time such Lender's Proportionate Share has actually been outstanding;

(f)    the Agent acting reasonably and in good faith shall, after consultation with the Lenders in the case of any dispute, determine in all cases the amount of all payments to which each Lender is entitled and such determination shall be deemed to be *prima facie* correct;

(g)    upon request by a Lender, the Agent shall deliver a statement detailing any of the payments to the Lenders referred to herein;

(h)    all payments by the Agent to a Lender hereunder shall be made to such Lender at its address set out herein unless notice to the contrary is received by the Agent from such Lender; and

(i)    if the Agent has received a payment from a Credit Party on a Business Day (not later than the time required for the receipt of such payment as set out in this Agreement) and fails to remit such payment to any Lender entitled to receive its Proportionate Share of such payment on such Business Day, the Agent agrees to

pay interest on such late payment at a rate determined by the Agent in accordance with prevailing banking industry practice on interbank compensation.

11.8.2    Each Borrower hereby irrevocably authorizes the Agent to debit any account maintained by it with the Agent after written notice to such Borrower in order to make payments to the Lenders or the Agent of any amount that is overdue and payable hereunder for the purposes of satisfying payment thereof.

11.8.3    The Agent may in its discretion from time to time make adjustments in respect of any Lender's share of an Advance, Conversion, Rollover or Repayment under a Facility in order that the Outstanding Advances due to such Lender under such Facility shall be approximately in accordance with such Lender's Proportionate Share of the Facility.

## 11.9    Redistribution of Payment

Each Lender agrees that, subject to Section 10.4:

(a)    If it exercises any right of counterclaim, set off, bankers' lien or similar right with respect to any property of any Credit Party or if under Applicable Law it receives a secured claim, it will apportion the amount thereof proportionately between:

(i)    amounts outstanding at the time owed by the Credit Party to such Lender under this Agreement, which amounts will be applied in accordance with this Section 11.9; and

(ii)    amounts otherwise owed to it by a Credit Party;

provided, that any cash collateral account held by such Lender as collateral for a letter of credit or bankers' acceptance (including a Bankers' Acceptance) issued or accepted by such Lender on behalf of a Credit Party may be applied by such Lender to such amounts owed by such Credit Party to such Lender pursuant to such letter of credit or in respect of any such bankers' acceptance without apportionment.

(b)    If it receives, through the exercise of a right or the receipt of a secured claim described in Section 11.9(a) or otherwise, payment of a proportion of the aggregate amount of principal, interest and fees due to it hereunder which is greater than the proportion received by any other Lender in respect of the aggregate amount of principal, interest and fees due in respect of the applicable Facility (having regard to the respective proportionate amounts advanced as Advances by each of the Lenders under the applicable Facility), the Lender receiving such proportionately greater payment will purchase a participation (which will be deemed to have been done simultaneously with receipt of such payment) in that portion of the applicable Facility of the other Lenders so that their respective receipts will be *pro rata* to their respective Proportionate Shares; provided, however, that, if all or part of such proportionately greater payment received by such purchasing Lender is otherwise recovered by it, such purchase will be rescinded and the purchase price for such participation will be returned to the extent of such recovery, but without interest. Such Lender will exercise its rights in respect of such secured claim in a manner

consistent with the rights of the Lenders entitled under this Section 11.9 to share in the benefits of any recovery on such secured claims.

(c)    If it does any act or thing permitted by Section 11.9(a) or 11.9(b), it will promptly provide full particulars thereof to the Agent.

(d)    Except as permitted under Section 11.9(a) or 11.9(b), no Lender will be entitled to exercise any right of counter claim, set off, bankers' lien or similar right without the prior written consent of the other Lenders.

(e)    Notwithstanding anything else in this Section 11.9, any amounts which are lawfully received by any Hedge Provider in respect of Hedging Liabilities prior to the delivery by the Agent of a declaration of all Obligations becoming due pursuant to Section 11.9 are not required to be shared pursuant to the provisions of this Section 11.9.

(f)    The provisions of this Section 11.9 shall survive repayment of the Obligations.

## 11.10  Protection of Agent

11.10.1  Unless the Agent has actual knowledge or actual notice to the contrary, it may assume that each Lender's address set out in Exhibit "A" attached hereto is correct, unless and until it has received from such Lender a notice designating a different address.

11.10.2  The Agent may engage and pay for the advice or services of any lawyers, accountants or other experts whose advice or services may to it seem necessary, expedient or desirable and rely upon any advice so obtained (and to the extent that such costs are not recovered from the Credit Parties pursuant to this Agreement, each Lender agrees to reimburse the Agent in such Lender's Proportionate Share of such costs).

11.10.3  Unless the Agent has actual knowledge or actual notice to the contrary, it may rely as to matters of fact which might reasonably be expected to be within the knowledge of any Credit Party upon a statement contained in any Credit Document.

11.10.4  Unless the Agent has actual knowledge or actual notice to the contrary, it may rely upon any communication or document believed by it to be genuine.

11.10.5  The Agent may refrain from exercising any right, power or discretion vested in it under this Agreement unless and until instructed by the Required Lenders as to whether or not such right, power or discretion is to be exercised and, if it is to be exercised, as to the manner in which it should be exercised (provided, that such instructions shall be required to be provided by all of the Lenders in respect of any matter for which the unanimous consent of the Lenders is required as set out herein).

11.10.6  The Agent may refrain from exercising any right, power or discretion vested in it which would or might in its sole and unfettered opinion be contrary to any law of any jurisdiction or any directive or otherwise render it liable to any Person, and may do

anything which is in its opinion in its sole discretion necessary to comply with any such law or directive.

11.10.7  The Agent may delegate to such other Person, such duties and responsibilities of the Agent hereunder as it shall determine to be appropriate in respect of dealings with or relating to any Credit Party or any other Person and in particular, the Agent may execute any of its duties under this Agreement or any other Credit Document (including, for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security or of exercising any rights and remedies thereunder) by sub-agent or attorney-in-fact. The Agent shall not be responsible for the negligence or misconduct of any sub-agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct on the part of the Agent, as determined by a final and non-appealable judgment of a court of competent jurisdiction. The exculpatory provisions of this Agreement applicable to the Agent shall apply to any such other Person, sub-agent or attorney-in-fact and to the Affiliates of the Agent and any such sub-agent or attorney-in-fact, and shall apply to their respective activities in connection with the syndication of the Facilities as well as activities as Agent.

11.10.8  The Agent may refrain from acting in accordance with any instructions of the Required Lenders to begin any legal action or proceeding arising out of or in connection with this Agreement or take any steps to enforce or realize upon any Security, until it shall have received such security as it may reasonably require (whether by way of payment in advance or otherwise) against all costs, claims, expenses (including legal fees) and liabilities which it will or may expend or incur in complying with such instructions.

11.10.9  The Agent shall not be bound to disclose to any Person any information relating to the Credit Parties or any Related Parties if such disclosure would or might in its opinion in its sole discretion constitute a breach of any law or regulation or be otherwise actionable at the suit of any Person.

11.10.10 The Agent shall not accept any responsibility for the accuracy or completeness of any information supplied in connection herewith or for the legality, validity, effectiveness, adequacy or enforceability of any Credit Document and shall not be under any liability to any Lender as a result of taking or omitting to take any action in relation to any Credit Document except in the case of the Agent's gross negligence or wilful misconduct.

## 11.11  Duties of Agent

The Agent shall:

(a)  hold and maintain the Security to the extent provided in Section 11.6;

(b)  provide to each Lender copies of all financial information received from the Credit Parties promptly after receipt thereof, and copies of any Drawdown Requests, Conversion Notices, Rollover Notices, Repayment Notices and other notices received by the Agent from the Credit Parties upon request by any Lender;

(c)      promptly advise each Lender of Advances required to be made by it hereunder and disburse all Repayments to the Lenders hereunder in accordance with the terms of this Agreement;

(d)      promptly notify each Lender of the occurrence of any Default or Event of Default of which the Agent has actual knowledge or actual notice;

(e)      at the time of engaging any agent, receiver, receiver-manager, consultant, monitor or other party in connection with the Security or the enforcement thereof, obtain the agreement of such party to comply with the applicable terms of this Agreement in carrying out any such enforcement activities and dealing with any Proceeds of Realization;

(f)      account for any monies received by it in connection with this Agreement, the Security and any other agreement delivered in connection herewith or therewith;

(g)      each time a Borrower requests the written consent of the Lenders in connection with any matter, use its best efforts to obtain and communicate to the Borrowers the response of the Lenders in a reasonably prompt and timely manner having due regard to the nature and circumstances of the request;

(h)      give written notice to the Borrowers in respect of any other matter in respect of which notice is required in accordance with or pursuant to this Agreement, promptly or promptly after receiving the consent of the Required Lenders, if required under the terms of this Agreement;

(i)      except as otherwise provided in this Agreement, act in accordance with any instructions given to it by the Required Lenders;

(j)      if so instructed by the Required Lenders, refrain from exercising any right, power or discretion vested in it under this Agreement or any document incidental thereto; and

(k)      call a meeting of the Lenders at any time not earlier than five days and not later than 30 days after receipt of a written request for a meeting provided by any Lender.

**11.12   Lenders' Obligations Several; No Partnership**

The obligations of each Lender under this Agreement are several. The failure of any Lender to carry out its obligations hereunder shall not relieve the other Lenders of any of their respective obligations hereunder. No Lender shall be responsible for the obligations of any other Lender hereunder. Neither the entering into of this Agreement nor the completion of any transactions contemplated herein shall constitute the Lenders and the Agent, or any combination of them, a partnership or give rise to any fiduciary relationship between them.

**11.13   Reliance Upon Agent**

The Borrowers will be entitled to rely upon any certificate, notice or other document or other advice, statement or instruction provided to them (or any one of them) by the Agent pursuant to the Credit Documents, and the Borrowers will be entitled to deal with the Agent with respect to matters under the Credit Documents which the Agent is authorized hereunder to deal with, without any obligation whatsoever to satisfy themselves as to the authority of the Agent to act on behalf of the Lenders and without any liability whatsoever to the Lenders for relying upon any certificate, notice or other document or other advice, statement or instruction provided to them by the Agent, notwithstanding any lack of authority of the Agent to provide the same.

**11.14   No Liability of Agent**

The Agent, in its capacity as agent of the Lenders under the Credit Documents, will have no responsibility or liability to the Borrowers or the Lenders on account of the failure of any Lender to perform its obligations hereunder, or to any Lender on account of the failure of any Borrower to perform its obligations under the Credit Documents.

**11.15   Agent and Agent Authority**

With respect to its Proportionate Share of each Facility and the Advances made by it as a Lender thereunder, as applicable, the Agent will have the same rights and powers under the Credit Documents as any other Lender and may exercise the same as though it were not the Agent. The Agent may accept deposits from, lend money to, and generally engage in any kind of business with any Credit Party, any of their Subsidiaries, their respective shareholders or unitholders or any Person owned or controlled by any of them and any Person which may do business with any of them, all as if the Agent was not serving as Agent, and without any duty or obligation to account therefor to the Lenders.

**11.16   Lenders' Credit Decisions**

It is understood and agreed by each Lender that it has itself been, and will continue to be, solely responsible for making its own independent appraisal of and investigations into the financial condition, creditworthiness, condition, affairs, status and nature of the Credit Parties. Accordingly, each Lender confirms with the Agent that it has not relied, and will not hereafter rely, on the Agent (a) to check or inquire on its behalf into the adequacy, accuracy or completeness of any information provided by the Credit Parties or any other Person under or in connection with the Facilities (whether or not such information has been or is hereafter distributed to such Lender by the Agent) or (b) to assess or keep under review on its behalf the financial condition, creditworthiness, condition, affairs, status or nature of any Credit Party. Each Lender acknowledges that copies of the Credit Documents have been made available to it for review and each Lender acknowledges that it is satisfied with the form and substance of the Credit Documents. A Lender will not make any independent arrangement with any Credit Party for the satisfaction of any Obligations owing to it under the Credit Documents without the written consent of the other Lenders.

**11.17   Indemnification**

The Lenders hereby severally agree to indemnify the Agent and its directors, officers, agents and employees (to the extent not reimbursed by the Credit Parties) in accordance with their respective Proportionate Share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent or its directors, officers, agents and employees in any way relating to or arising out of the Credit Documents or any action taken or omitted by the Agent under or in respect of the Credit Documents in its capacity as Agent; provided, that no Lender will be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross negligence or wilful misconduct, as determined by a final and non-appealable judgment of a court of component jurisdiction. Without limiting the generality of the foregoing, each Lender agrees to reimburse the Agent promptly upon demand for its Proportionate Share of any reasonable out of pocket expenses (including legal fees, on a solicitor and his own client full indemnity basis) incurred by the Agent in connection with the preservation of any right of the Agent or the Lenders under, or the enforcement of, or legal advice in respect of rights or responsibilities under, the Credit Documents, to the extent that the Agent is not reimbursed for such expenses by the Borrowers. This indemnity will survive the termination of the other provisions of this Agreement as a separate and continuing covenant of the Lenders.

**11.18   Successor Agent**

The Agent may, as hereinafter provided, resign at any time by giving 30 days' notice (the "**Resignation Notice**") thereof to the Lenders and the Borrowers. The remaining Lenders, with the consent of the Borrowers, such consent not to be unreasonably withheld, will forthwith upon receipt of the Resignation Notice unanimously appoint a successor agent (the "**Successor Agent**") to assume the duties hereunder of the resigning Agent. Upon the acceptance of any appointment as agent hereunder by a Successor Agent, such Successor Agent will thereupon succeed to and become vested with all the rights, powers, privileges and duties as agent under the Credit Documents of the resigning Agent. Upon such acceptance, the resigning Agent will be discharged from its further duties and obligations as agent under the Credit Documents, but any such resignation will not affect such resigning Agent's obligations hereunder as a Lender, including for its Proportionate Share of the applicable Commitment. After the resignation of the Agent as agent hereunder, the provisions of this Article 11 will continue to enure to its benefit as to any actions taken or omitted to be taken by it while it was the agent of the Lenders hereunder. Notwithstanding the foregoing, if the remaining Lenders fail to appoint a Successor Agent within 30 days of receipt of the Resignation Notice, the resigning Agent may, with the approval of the Borrowers except during the continuance of an Event of Default, such approval not to be unreasonably withheld, appoint a Successor Agent from among the Lenders (other than Business Development Bank of Canada).

**11.19   Sharing of Information**

The Agent and the Lenders may share among themselves any information they may have from time to time concerning the Credit Parties whether or not such information is confidential; but shall have no obligation to do so (except for any obligations of the Agent to provide

information to the extent required in this Agreement). The Agent shall not have any duty to disclose any information obtained or received by it or any of its Affiliates relating to any Credit Party or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as the Agent.

**11.20   Acknowledgement by Borrowers**

Each Borrower hereby acknowledges notice of the terms of the provisions of this Article 11 and agrees to be bound hereby to the extent of its obligations hereunder, and further agrees not to make any payments, take any action or omit to take any action which would result in the non-compliance by the Agent or any Lender with its obligations hereunder.

**11.21   Amendments to Article 11**

The Agent and the Lenders may amend any provision in this Article 11 (other than Section 11.5) without prior notice to or the consent of the Borrowers, and the Agent shall provide a copy of any such amendment to the Borrowers reasonably promptly thereafter; provided, however, if, in the Agent's opinion, any such amendment would materially and adversely affect any rights, entitlements, obligations or liabilities of any Borrower, such amendment shall not be effective until such Borrower provides its written consent thereto, such consent not to be unreasonably withheld or arbitrarily delayed.

**11.22   Deliveries, etc.**

As between the Credit Parties on the one hand, and the Agent and the Lenders on the other hand:

(a)      all statements, certificates, consents and other documents which the Agent purports to deliver to a Credit Party on behalf of the Lenders shall be binding on each of the Lenders, and none of the Credit Parties shall be required to ascertain or confirm the authority of the Agent in delivering such documents;

(b)      all certificates, statements, notices and other documents which are delivered by a Credit Party to the Agent in accordance with this Agreement shall be deemed to have been duly delivered to each of the Lenders; and

(c)      all payments which are delivered by a Credit Party to the Agent in accordance with this Agreement shall be deemed to have been duly delivered to each of the Lenders.

**11.23   Agency Fee**

The Borrowers jointly and severally agree to pay to the Agent an annual agency fee as set out in the Fee Agreement, payable in advance on the Amendment and Restatement Date and annually on each anniversary date thereafter during the term of this Agreement.

# ARTICLE 12
# INCREASED COSTS

**12.1    Changes in Law**

12.1.1    If, after the Amendment and Restatement Date, due to either:

(a)     the introduction of, or any change in, any Law or any change in the interpretation of any Law, whether having the force of law or not, resulting in the imposition or increase of reserves, deposits or similar requirements by any central bank or Governmental Authority charged with the administration thereof; or

(b)     imposition of any Lender or requirements on any Lender to maintain any capital adequacy or additional capital liquidity requirements in respect of any Advances or Commitments hereunder, or any other condition with respect to this Agreement; or

(c)     the compliance with any guideline or request from any central bank or other Governmental Authority which a Lender, acting reasonably, determines that it is required to comply with,

there will be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining an Advance or there will be any reduction in the effective return to such Lender thereunder, then, subject to Section 12.1.2, the Borrowers jointly and severally agree that they will, within ten Business Days after being notified by such Lender of such event, pay to such Lender, quarterly in arrears, that amount (the "**Additional Compensation**") which such Lender, acting reasonably, determines will compensate it, after taking into account all applicable Taxes and all interest and other amounts received, for any such increased costs or reduced returns incurred or suffered by such Lender provided such Lender is also charging its other borrowers in similar circumstances similar additional compensation.

12.1.2    If Additional Compensation is payable pursuant to Section 12.1.1(a), the Borrowers will have the option to convert the Advance to another type of Advance, in accordance with this Agreement, in respect of which no further such Additional Compensation will be payable, or prepay any amount of the Facility owed to the Lender entitled to receive the Additional Compensation, subject always to Section 5.13 without obligation to make a corresponding prepayment to any other Lender. If the Additional Compensation relates to outstanding Bankers' Acceptances, such Lender may require the Borrowers to deposit in an interest bearing cash collateral account with such Lender such amount as may be necessary to fully satisfy the contingent obligations of such Lender for all outstanding Bankers' Acceptances in accordance with the arrangements similar to those set out in Section 5.11.

12.1.3    Notwithstanding anything contained in this Section 12.1, the *Dodd-Frank Wall Street Reform and Consumer Protection Act* and all requests, rules, regulations, guidelines and directives thereunder or issued in connection therewith and all requests, rules, regulations, guidelines and directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any

successor or similar authority or any United States, Canadian or foreign regulatory authority) (collectively, the "**New Rules**") shall, in each case, be deemed a "change in Law" under Section 12.1.1(a) regardless of the date enacted, adopted or issued.

## 12.2    Changes in Circumstances

Notwithstanding anything to the contrary herein or in any of the other Credit Documents contained, if on any date a Lender determines, acting reasonably and in good faith, which determination will be conclusive and binding on the Parties, and provided notice is given to the Agent and the other Lenders and to the Borrowers that its ability to maintain, or continue to offer any Advance has become unlawful or impossible due to:

(a)    any change in Applicable Law, or in the interpretation or administration thereof by Governmental Authorities having jurisdiction in the matter; or

(b)    any Material Adverse Change in or the termination of the London Interbank Eurodollar Market for Eurodollars; or

(c)    the imposition of any condition, restriction or limitation upon such Lender which is outside of its control,

then in any such case, the Borrowers jointly and severally agree that they will forthwith repay to such Lender all principal amounts affected thereby, together with all unpaid interest accrued thereon to the date of Repayment and all other expenses incurred in connection with the termination of any such Advance, including any expenses resulting from the early termination of any LIBOR Period relating thereto in accordance with Section 5.13, without any obligation to make a corresponding prepayment to any other Lender. The Borrowers may utilize other forms of Advance not so affected in order to make any required Repayment and after any such Repayment, the Borrowers may elect to re-borrow the amount repaid by way of some other Advance upon complying with applicable requirements thereof.

## 12.3    Application of Sections 12.1 and 12.2

If a Lender exercises its discretion under either Section 12.1 or 12.2, then concurrently with a notice from such Lender to the Agent and the applicable Borrower requiring compliance with the applicable Section, such Lender will provide such Borrower (with a copy to the Agent who will notify the other Lenders) with a certificate in reasonable detail outlining the particulars giving rise to such notice and certifying (with reasonable supporting detail) the increased costs, if any, payable by such Borrower thereunder, which will be prima facie evidence thereof and binding on the Parties.

## 12.4    Taxes

12.4.1    Except as provided in this Section 12.4, any and all payments by the Borrowers and any other Credit Party to or for the account of the Agent or any Lender under any Credit Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges imposed by any Governmental Authority, and all liabilities (including

additions to tax, penalties and interest) related thereto (collectively, "**Impositions**"), excluding, in the case of the Agent and each Lender or other recipient or beneficial owner of payment to be made by or on account of a Credit Party under any Credit Document, (x) any Impositions imposed on or measured by its net income (including any taxes similar to branch profits tax or capital, and franchise (and similar) taxes imposed on it in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the Laws of which the Agent or such Lender, as the case may be, is organized, resident, in which its principal office is located, in which it maintains its Lending Office or in which it is subject to such Imposition by reason of a present or former connection between it and such jurisdiction (other than a connection arising solely from the Agent or such Lender (or its applicable Lending Office) as the case may be, becoming a party hereto, having executed, delivered or performed its obligations under any Credit Document, received a payment under, enforced its rights under, received or perfected a security interest under, or engaged in any other transaction pursuant to, a Credit Document), and all interest and penalties with respect thereto; (y) U.S. and Canadian federal withholding taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 12.4.6) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to this Section, amounts with respect to such withholding taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office; and (z)(i) U.S. federal withholding taxes imposed under FATCA, (ii) taxes attributable to such recipient's or beneficial owner's failure to comply with the applicable reporting requirements of FATCA, and (iii) taxes attributable to such recipient's or beneficial owner's failure to provide such documentation as is reasonably requested by the Borrower for the Borrower to comply with its obligations under FATCA and to determine that such recipient or beneficial owner has complied with such recipient's or beneficial owner's obligations under FATCA or to determine the amount to deduct and withhold from any payment to such recipient or beneficial owner (all such non-excluded Impositions being hereinafter referred to as "**Taxes**" and all such excluded Impositions being hereinafter referred to as "**Excluded Taxes**"). If any Credit Party or any other applicable withholding agent shall be required by the Applicable Laws of a relevant taxing jurisdiction to deduct any Taxes or Other Taxes from or in respect of any sum payable under any Credit Document to the Agent or any Lender, (i) the sum payable shall be increased by the applicable Credit Party as necessary so that after all required deductions (including deductions applicable to additional sums payable under this Section 12.4) have been made, each of the Agent and such Lender receives an amount equal to the sum it would have received had only deductions attributable to Excluded Taxes been made, (ii) the applicable withholding agent shall make such deductions, (iii) the applicable withholding agent shall pay the full amount deducted to the relevant taxation authority or other Governmental Authority in accordance with Applicable Laws, and (iv) within thirty (30) days after the date of such payment, the Credit Party making such payments shall furnish to the Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Agent.

12.4.2    In addition but without duplication, the Borrowers agree to pay any and all present or future stamp, court or documentary taxes and any other excise, property, intangible or mortgage recording taxes, charges or similar levies imposed by a relevant taxing jurisdiction which arise from any payment made under any Credit Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Credit Document (hereinafter referred to as "**Other Taxes**").

12.4.3    Each Borrower agrees to indemnify the Agent and each Lender for (i) the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed or asserted by any Governmental Authority of any relevant taxing jurisdiction on amounts payable under this Section 12.4) paid by the Agent and such Lender, and (ii) any reasonable expenses arising therefrom or with respect thereto, in each case whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided the Agent or Lender, as the case may be, provides the Borrowers with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts. Payment under this Section 12.4.3 shall be made within thirty (30) days after the date such Lender or the Agent makes a written demand therefor.

12.4.4    Notwithstanding anything herein to the contrary, each Borrower shall not be required pursuant to this Section 12.4 to pay any additional amount to, or to indemnify, any Lender or the Agent, as the case may be, (i) to the extent that such Lender or the Agent becomes subject to Taxes subsequent to the Amendment and Restatement Date (or, if later, the date such Lender or the Agent becomes a party to this Agreement) as a result of a change in the place of organization or residence of such Lender or the Agent, a change in the Lending Office of such Lender, or a change in the principal office of such Lender or the Agent, except to the extent that any such change is requested or required by the Borrowers or to the extent that such Lender or the Agent was entitled, at the time of the change in place of organization, residence or the change in Lending Office, to receive additional amounts from the Borrowers pursuant to Sections 12.4.1 and 12.4.3 (and provided, that nothing in this Section 12.4 shall be construed as relieving the Borrowers from any obligation to make such payments or indemnification in the event of a change in Applicable Law) or (ii) where for Canadian income tax purposes, such Lender or the Agent, as the case may be, becomes subject to Taxes as a consequence of such Lender or the Agent either not dealing at arm's length with the Borrowers (for purposes of the *Income Tax Act* (Canada)) or being, or not dealing at arm's length with (for purposes of the I*ncome Tax Act* (Canada)) a "specified shareholder" (for purposes of the *Income Tax Act* (Canada)) of the Borrower; <u>provided</u>, that this subclause (ii) shall not apply to the extent that such Lender or the Agent, as the case may be, is considered to have not dealt at arm's length with the Borrowers for Canadian income tax purposes as a result of a change in Applicable Law after the Amendment and Restatement Date.

12.4.5    If any Lender or the Agent determines in its sole discretion (exercised in good faith) that it has received a refund in respect of any Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by the Borrowers pursuant to this Section 12.4, it shall promptly remit such refund (including any interest included in such refund paid by the relevant Governmental Authority) to the Borrowers, net of all out-of-pocket expenses (including any taxes imposed with respect to such refund) of the Lender

or the Agent, as the case may be; provided, however, that the Borrowers, upon the request of the Lender or the Agent, as the case may be, agree promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such party in the event such party is required to repay such refund to the relevant taxing authority. Such Lender or the Agent, as the case may be, shall, at the Borrowers' request, provide the Borrowers with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (provided, that such Lender or the Agent may delete any information therein that such Lender or the Agent deems confidential). Notwithstanding anything to the contrary in this Section 12.4.5, in no event will a Lender be required to pay any amount to the Borrowers pursuant to this Section 12.4.5 the payment of which would place such Lender in a less favorable net after-tax position than such Lender would have been in if the Taxes or Other Taxes subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Taxes or Other Taxes had never been paid. Nothing herein contained shall interfere with the right of a Lender or the Agent to arrange its tax affairs in whatever manner it thinks fit nor oblige any Lender or the Agent to disclose any information relating to its tax affairs or any computations in respect thereof or require any Lender or the Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

12.4.6   Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 12.4.1 and 12.4.3 with respect to such Lender it will, if requested by the Borrowers, use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to avoid or reduce to the greatest extent possible any indemnification or additional amounts being due under this Section 12.4, including to designate another Lending Office for any Loan (including, for certainty, any Letter of Credit) affected by such event; provided, that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage, and provided, further, that nothing in this Section 12.4.6 shall affect or postpone any of the Obligations of the Borrowers or the rights of such Lender pursuant to Sections 12.4.1 and 12.4.3. The Borrowers hereby jointly and severally agree to pay all reasonable costs and expenses incurred by any Lender as a result of a request by the Borrowers under this Section 12.4.6.

## ARTICLE 13
## GENERAL

### 13.1   Non-Disclosure

13.1.1   All information received by the Agent and the Lenders from or in respect of the Credit Parties the confidential nature of which is made known or ought to have been known to the Party receiving such information, including any information relating to a Hostile Acquisition, other than information that is required to be disclosed by Applicable Law (including, for certainty, information required to be disclosed in connection with any legal proceedings, including proceedings relating to the Credit Documents) or to any

Governmental Authority of competent jurisdiction, including any central bank or other banking regulatory authority and any official bank examiners or regulators, will be held by the Parties in the strictest confidence and will not be disclosed to any Person, except as provided in this Section 13.1.

13.1.2   Section 13.1.1 does not apply to information:

(a)      of a Party where that Party consents in writing to its disclosure;

(b)      which becomes part of the public domain through no fault of the Agent or the Lenders;

(c)      received from a third party without restriction on further disclosure and which third party was not to the knowledge of the Agent or such Lender, under a duty of confidentiality to the applicable Credit Party at the time the information was so received;

(d)      developed independently without breach of Section 13.1;

(e)      which the Agent or the relevant Lender can show was, prior to receipt thereof from a Credit Party, lawfully in the Agent's or Lender's possession and not then subject to any obligation on its part to the Credit Parties to maintain confidentiality; or

(f)      to the extent required to be disclosed by order or direction of a court or Governmental Authority of competent jurisdiction (including any self-regulatory authority, such as the National Association of Insurance Commissioners) or as other required to be disclosed by Applicable Law or by any subpoena or similar legal process.

13.1.3   Information received by the Agent or a Lender may be disclosed to their respective Affiliates, Hedge Providers, the Agent or any other Lender or Participant, including any financial institution which desires to become a Lender or Participant hereunder, any actual or prospective counterparty (or its advisors) to any securitization, swap or derivative transaction relating to a Borrower or any other Credit Party, and the Obligations and to their respective employees, auditors, accountants, legal counsel, geologists, engineers and other consultants and financial advisors retained by such Persons on a need to know basis and subject to the obligation to maintain confidentiality; <u>provided</u>, that the Agent or Lender providing the information shall be responsible for any breach by its Affiliate of the aforementioned duty of confidentiality.

## 13.2   Waiver

The failure or delay by the Agent or any Lender in exercising any right or privilege with respect to the non-compliance with any provisions of this Agreement by the Borrower and any course of action on the part of the Agent or any Lender, shall not operate as a waiver of any rights of the Agent or such Lender unless made in writing by the Agent or such Lender. Any such waiver in writing and shall be effective only in the specific instance and for the purpose for which it is

given and shall not constitute a waiver of any other rights and remedies of the Agent or such Lender with respect to any other or future non-compliance.

**13.3    Governing Law**

This Agreement shall be interpreted in accordance with the Laws of the Province of Alberta and the federal Laws of Canada applicable therein. Without prejudice to the right of the Agent and the Lenders to commence any proceedings with respect to this Agreement in any other proper jurisdiction, the Parties hereby attorn and submit to the non-exclusive jurisdiction of the courts of the Province of Alberta.

**13.4    Judgment Currency**

To the extent permitted by Applicable Law, if for the purposes of obtaining judgment against any Credit Party in any court in any jurisdiction with respect to this Agreement it becomes necessary for a Lender to convert into the currency of such jurisdiction (in this Section called the "**Judgment Currency**") any amount due to the Lender by such Credit Party under the Credit Documents in any currency other than the Judgment Currency, the conversion shall be made at the Exchange Rate prevailing on the Business Day before the day on which judgment is given. To the extent permitted by Applicable Law, in the event that there is a change in the Exchange Rate prevailing between the Business Day before the day on which the judgment is given and the date of payment of the amount due, the applicable Credit Party will, on the date of payment, pay such additional amounts (if any) or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount paid on such date is the amount in the Judgment Currency which when converted at the Exchange Rate prevailing on the date of payment is the amount then due under this Agreement in such other currency. To the extent permitted by Applicable Law, any additional amount due by a Credit Party under this Section will be due as a separate debt and shall not be affected by judgment being obtained for any other sums due under or in respect of this Agreement.

**13.5    Expenses of Agent and Lenders**

Whether or not the transactions contemplated by this Agreement are completed or any Advance has been made, each Borrower hereby agrees, jointly and severally, to promptly pay, following receipt of invoice therefor from the Agent (and in any event within 30 days after receipt thereof), from time to time all reasonable and documented expenses incurred by the Agent or any Lender in connection with this Agreement, the Security and all documents contemplated hereby, specifically including: expenses incurred by the Lenders in respect of due diligence, appraisals, insurance consultations, credit reporting and responding to demands of any Governmental Authority (underlined provided, that reimbursement obligations in respect of costs and expenses arising under inspection rights set forth in Section 7.1.7 shall be limited in the manner set forth in such Section); reasonable out-of-pocket legal expenses in connection with the preparation and interpretation of this Agreement and the other Credit Documents, the registration and perfection of the Security and the administration of the Facilities generally, including the preparation of waivers and partial discharges of Security (if there are any additional fees or expenses to be incurred in connection with any of the foregoing over and above those that have already been disclosed to the Borrowers then the Agent agrees to notify the Borrowers of those additional fees or expenses and obtain their

concurrence to their payment); and all legal fees and expenses (on a solicitor and his own client basis) in connection with the protection and enforcement of the Security and the exercise of any rights and remedies of the Agent and the Lenders under the Credit Documents. Each Borrower hereby authorizes the Agent to debit its account in order to pay any such expenses if such amount is not paid in full within 30 days after receipt of a written request from the Agent for payment of such amount.

**13.6    Assignment**

13.6.1    This Agreement and the rights and obligations hereunder will not be assignable, in whole or in part, by any Borrower without the prior written consent of all of the Lenders.

13.6.2    Each Lender will have the right to sell or assign its Commitment in minimum amounts of U.S. $5,000,000 (with such Lender, where such sale or assignment is not of all of such Lender's Commitment under the applicable Facility, retaining a Commitment under the applicable Facility of at least U.S. $5,000,000), together with a proportionate share of Outstanding Advances owing to it, to one or more financial institutions with the consent of the Canadian Borrower, the Agent, the Issuing Bank and the Swingline Lender each such consent not to be unreasonably withheld (<u>provided</u>, that the Canadian Borrower may withhold such consent if a Borrower would be required to pay withholding taxes solely as a result of such assignment). An assignment fee of U.S. $3,500 for each such assignment will be payable to the Agent by the assigning Lender. In the event of such sale or assignment, the Borrowers, the Agent and the other Lenders will execute and deliver all such agreements, documents and instruments as the Agent or Lender may reasonably request to effect and recognize such sale or assignment, including an Assignment. Notwithstanding the foregoing, no consent of the Canadian Borrower will be required if an assignment (a) occurs during an Event of Default which is continuing, (b) is made between financial institutions who, at the relevant time, are already Lenders or Affiliates thereof, or (c) is made by a Lender to an Approved Fund. In the event that the Canadian Borrower fails to provide a response to the request for any such consent within five Business Days of the receipt of such request by the Canadian Borrower, the Canadian Borrower shall be deemed to have consented to such request. No consent to an assignment by a Lender shall be required from the U.S. Borrower. Notwithstanding the foregoing, no Lender may assign all or any part of its Commitment or Outstanding Advances to Palladium, an Investor or an Affiliate thereof without the prior written consent of all of the Lenders.

13.6.3    To the extent that any Lender sells or assigns any portion of its Commitment and Outstanding Advances pursuant to this Section 13.6 and such new Lender or new Lenders, as the case may be, has executed and delivered to the Borrower and the Agent an Assignment, such Lender will be relieved and forever discharged of any and all of its covenants and obligations under the Credit Documents in respect of that portion of its Commitment and Outstanding Advances so sold or assigned from and after the date of such Assignment and the Borrower's recourse under the Credit Documents in respect of such portion so sold or assigned from and after the date of the Assignment for matters arising thereunder from and after the date of the Assignment will be to such new Lender or new Lenders only, as the case may be, and their successors and permitted assigns.

13.6.4   Any Lender may at any time sell to one or more financial institutions or other Persons (each of such financial institutions and other Persons being herein called a "**Participant**") participating interests in any of the Advances, commitments, or other interests of such Lender hereunder, without notice to, or consent from, the Agent or the Borrowers; provided, however, that:

(a)     no participation contemplated in this Section 13.6.4 will relieve such Lender from its commitments or its other obligations hereunder or under any other Credit Document;

(b)     such Lender will remain solely responsible for the performance of its commitments and such other obligations as if such participation had not taken place;

(c)     the Agent will continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and each of the other Credit Documents;

(d)     no Participant will have any rights (through a right of consent or approval or otherwise) to require such Lender to take or refrain from taking any action hereunder or under any other Credit Document;

(e)     no Borrower will be required to pay any amount hereunder that is greater than the amount which it would have been required to pay had no participating interest been sold; and

(f)     in the case of any outstanding Bankers' Acceptances, the Participants execute an indemnity agreement in respect of such Bankers' Acceptances.

Each U.S. Operating Lender that sells a participation shall, acting solely for this purpose as an agent of the U.S. Borrower, maintain a register on which it enters the name and address of each Participant in the U.S. Operating Facility and the principal amounts (and stated interest) of each Participant's interest in the Commitments, Outstanding Advances or other obligations under the Credit Documents (the "**Participant Register**"); provided that no U.S. Operating Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under the Credit Documents) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such U.S. Operating Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

13.6.5   The Agent, acting solely for this purpose as an agent of the U.S. Borrower, shall maintain at its office located at 452 Fifth Avenue, 5th Floor, New York, NY 10018, a copy

of each Assignment delivered to it and a register for the recordation of the names and addresses of the U.S. Operating Lenders, and the Commitments of, and principal amounts (and stated interest) of the Outstanding Advances owing to, each U.S. Operating Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agent and the U.S. Operating Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a U.S. Operating Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrowers and any U.S. Operating Lender, at any reasonable time and from time to time upon reasonable prior notice.

**13.7    General Indemnity**

In addition to any liability of the Borrowers to the Lenders under any other provision hereof, each Borrower will and does hereby, jointly and severally, indemnify each Indemnitee and hold each Indemnitee harmless against any losses, claims, costs, damages or liabilities (including reasonable and documented out of pocket expenses and reasonable and documented legal fees on a solicitor and his own client full indemnity basis of one counsel (but, for the avoidance of doubt, excluding the allocated costs of in-house counsel) plus one local counsel in each applicable jurisdiction) incurred by the same as a result of or in connection with: (a) any cost or expense incurred by reason of the liquidation or re-deployment in whole or in part of deposits or other funds required by any Lender to fund any Bankers' Acceptance or to fund or maintain any Advance as a result of any Borrower's failure to complete an Advance or to make any payment, repayment or prepayment on the date required hereunder or specified by it in any notice given hereunder; (b) subject to permitted or deemed Rollovers and Conversions, any Borrower's failure to provide for the payment to the Agent for the account of the Lenders of the full principal amount of each Bankers' Acceptance on its Maturity Date; (c) any Borrower's failure to pay any other amount, including any interest or fees, due hereunder on its due date after the expiration of any applicable grace or notice periods; (d) the prepayment of any outstanding Bankers' Acceptance before the Maturity Date of such Bankers' Acceptance; (e) any Borrower's repayment or prepayment of a LIBOR Loan otherwise than on the last day of its LIBOR Period; (f) the failure of any Borrower or any other Credit Party to make any other payment due hereunder or under any of the other Credit Documents; (g) the occurrence of any other Default or Event of Default and the enforcement of rights and remedies in connection therewith; (h) any instructions given to any Lender to stop payment on any cheque issued by any Borrower or to reverse any wire transfer or other transaction initiated by such Lender at the request of any Borrower; (i) any use of the proceeds of the Facilities, including to pay the purchase price of the transaction or any other acquisition; and (j) any claim, litigation or other proceeding related to the foregoing, regardless of whether such matter is initiated by a third party or by Holdco, a Borrower or any of their Subsidiaries or Affiliates; provided that this Section 13.7 will not apply to any losses, claims, costs, damages or liabilities that arise by reason of (i) the gross negligence or wilful misconduct of the applicable Indemnitee claiming indemnity hereunder, as determined by a final and non-appealable judgment of a court of component jurisdiction; or (ii) a material breach of the applicable Indemnitee of its obligations under the Credit Documents as determined by a final and non-appealable judgment of a court of competent jurisdiction.

**13.8    Environmental Indemnity**

In addition to any other liability of the Borrowers hereunder, each Borrower hereby agrees to, jointly and severally, indemnify and save harmless the Indemnitees from and against:

(a)    any losses suffered by them for, in connection with, or as a direct or indirect result of, the failure of any Borrower or any of their respective Subsidiaries to comply with all Requirements of Environmental Law;

(b)    any losses suffered by the Indemnitees for, in connection with, or as a direct or indirect result of, the presence of any Hazardous Material situated in, on or under any property owned by any Borrower or any of their respective Subsidiaries or upon which any of them carries on business, specifically including any diminution in value of the business, property and assets of such Person; and

(c)    any and all liabilities, losses, damages, penalties, expenses (including reasonable legal fees) and claims which may be paid, incurred or asserted against the Indemnitees for, in connection with, or as a direct or indirect result of, any legal or administrative proceedings with respect to the presence of any Hazardous Material on or under any property owned by any Borrower or any of its respective Subsidiaries or upon which any of them carries on business, or the discharge, emission, spill, radiation or disposal by any Borrower or any of their respective Subsidiaries of any Hazardous Material into or upon any Land, the atmosphere, or any watercourse or body of water; including the costs of defending, counterclaiming or claiming against third parties in respect of any action or matter and any cost, liability or damage arising out of a settlement entered into by the Indemnitees of any such action or matter,

except to the extent arising from the gross negligence or wilful misconduct of the applicable Indemnitee, as determined by a final and non-appealable judgment of a court of component jurisdiction. For the purpose of this Section 13.8, liabilities means those amounts that are quantifiable and found to be the responsibility of the Indemnitees either alone or jointly or severally with others.

**13.9    Survival of Certain Obligations despite Termination of Agreement**

The termination of this Agreement shall not relieve the Borrowers from their obligations to the Agent and the Lenders arising prior to such termination, such as obligations arising as a result of or in connection with any breach of this Agreement, any failure to comply with this Agreement or the inaccuracy of any representations and warranties made or deemed to have been made prior to such termination, and obligations arising pursuant to all indemnity obligations contained herein. Without limiting the generality of the foregoing, the obligations of the Borrowers to the Agent and the Lenders arising under or in connection with Sections 8.5(b), 13.7 and 13.8 shall continue in full force and effect despite any termination of this Agreement.

**13.10   Interest on Unpaid Costs and Expenses**

If a Borrower fails to pay when due any amount in respect of costs or expenses or any other amount required to be paid by it hereunder (other than principal or interest on any Advance), the Borrowers shall, jointly and severally, pay interest on such unpaid amount from the time such amount is due until paid at the rate equal to the highest rate of interest then applicable under the Facilities.

**13.11   Notice**

Without prejudice to any other method of giving notice, all communications provided for or permitted hereunder shall be in writing and delivered to the addressee by prepaid private courier or sent by facsimile to the applicable address and to the attention of the officer of the addressee as follows:

(a)     to the Borrowers:

Q'Max Solutions Inc.
11700 Katy Freeway, Suite 200
Houston Texas 77079
United States

Attention:     Chief Financial Officer
Fax No.        (832) 201-8146

(b)     to the Agent:

HSBC Bank Canada, as Agent
7th Floor, 70 York Street
Toronto, Ontario
M5J 1S9

Attention:     Manager Agency
Fax No.        (647) 788-2185

with a copy to (for all notices other than Drawdown Requests, Conversion Notices and Rollover Notices):

HSBC Bank Canada
5th Floor, 70 York Street
Toronto, Ontario
M5J 1S9

Attention:     Director
Fax No.        (647) 788-2185

(c)     to any Lender, at its addressed noted on Exhibit "A" attached hereto.

Any communication transmitted by prepaid private courier shall be deemed to have been validly and effectively given or delivered on the Business Day after which it is submitted for delivery. Any communication transmitted by facsimile shall be deemed to have been validly and effectively given or delivered on the day on which it is transmitted, if transmitted on a Business Day on or before 5:00 p.m. (local time of the intended recipient), and otherwise on the next following Business Day. Any party may change its address for service or other notices, including electronic communications, by notice given in the foregoing manner. The Parties each covenant to accept service of judicial proceedings arising under the Credit Documents at its respective address set forth herein.

**13.12   Telephone Instructions**

Any verbal instructions given by a Borrower in relation to this Agreement will be at the risk of the Borrowers and neither the Agent nor the Lenders will have any liability for any error or omission in such verbal instructions or in the interpretation or execution thereof by the Agent or a Lender, as the case may be; provided, that the Agent or Lender, as the case may be, acted without gross negligence in the circumstances. The Agent will notify the applicable Borrower of any conflict or inconsistency between any written confirmation of such verbal instructions received from such Borrower and the said verbal advice as soon as practicable after the conflict or inconsistency becomes apparent to the Agent.

**13.13   Severability**

Any provision of this Agreement which is illegal, prohibited or unenforceable in any jurisdiction, in whole or in part, shall not invalidate the remaining provisions hereof; and any such illegality, prohibition or unenforceability in any such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**13.14   Further Assurances**

Each Borrower shall, at its expense, promptly execute and deliver or cause to be executed and delivered to the Agent upon request, acting reasonably, from time to time all such other and further documents, agreements, opinions, certificates and instruments in compliance with this Agreement, or if necessary or desirable to more fully record or evidence the obligations intended to be entered into herein, or to make any recording, file any notice or obtain any consent.

**13.15   Tombstone Marketing**

For the purpose of "tombstone marketing", each Borrower hereby authorizes and consents to the reproduction, disclosure and use by the Lenders and the Agent of its name, identifying logo and the Facilities to enable the Lenders to publish promotional "tombstones". Each Borrower acknowledges and agrees: that the Lenders shall be entitled to determine, in their discretion, whether to use such information; that no compensation will be payable by the Lenders or the Agent in connection therewith; and that the Lenders and the Agent shall have no liability whatsoever to any Borrower or any of its respective employees, officers, directors, Affiliates or shareholders in obtaining and using such information as contemplated herein.

**13.16   Entire Agreement**

This Agreement supersedes all discussion papers, term sheets and other writings issued by the Agent or the Lenders prior to the date hereof relating to the Facilities; and this Agreement and any other documents or instruments contemplated herein or therein shall constitute the entire agreement and understanding among the Borrowers, the Lenders and the Agent relating to the subject-matter hereof.

**13.17   Anti-Money Laundering Legislation**

(a)   Each Borrower acknowledges that, pursuant to the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" Laws, whether within Canada or elsewhere (collectively, including any guidelines or orders thereunder, "**AML Legislation**"), the Lenders and the Agent may be required to obtain, verify and record information regarding the Borrowers, Palladium, the other Credit Parties, their respective directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Credit Parties or Palladium, and the transactions contemplated hereby. The Borrowers shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Lender or the Agent, or any prospective assignee of a Lender or the Agent, in order to comply with any applicable AML Legislation, whether now or hereafter in existence.

(b)   If, upon the written request of any Lender, the Agent has ascertained the identity of a Borrower, Palladium or any Credit Party or any authorized signatories of any Borrower or any other Credit Party for the purposes of applicable AML Legislation on such Lender's behalf, then the Agent:

(i)   shall be deemed to have done so as an agent for such Lender, and this Agreement shall constitute a "written agreement" in such regard between such Lender and the Agent within the meaning of applicable AML Legislation; and

(ii)   shall provide to such Lender copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness.

(c)   Notwithstanding the preceding sentence, each of the Lenders agrees that the Agent has no obligation to ascertain the identity of the Borrowers, Palladium or any other Credit Party or any authorized signatories of the Borrowers, Palladium or any other Credit Party, on behalf of any Lender, or to confirm the completeness or accuracy of any information it obtains from the Borrowers, Palladium or any other Credit Party or any such authorized signatory in doing so.

(d)   Each Lender that is subject to the PATRIOT Act and the Agent (for itself and not on behalf of any Lender) hereby notifies the Credit Parties that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record

information that identifies the Credit Parties, which information includes the name, address and tax identification number of the Credit Parties and other information regarding the Credit Parties that will allow such Lender or the Agent, as applicable, to identify the Credit Parties in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to the Lenders and the Agent.

## 13.18  Binding Effect

This Agreement shall be binding upon and shall enure to the benefit of the Parties and their respective successors and permitted assigns; "successors" includes any corporation resulting from the amalgamation of any party with any other corporation.

## 13.19  Execution by Electronic Means and Counterparts

This Agreement may be executed in several counterparts, each of which, when so executed, shall be deemed to be an original and which counterparts together shall constitute one and the same Agreement. This Agreement may be executed by facsimile, pdf or other electronic means, and any signature contained hereon by facsimile, pdf or other electronic means shall be deemed to be equivalent to an original signature for all purposes.

## 13.20  Intercreditor Agreement

In the event of a conflict between the provisions of this Agreement and the provisions of the Encina Intercreditor Agreement, the provisions of the Encina Intercreditor Agreement shall govern.

## 13.21  Release of Liens and Guarantees.

(a)     The Agent shall not, during the term of this Agreement, discharge, surrender, amend or otherwise modify any Security without the prior written consent of all of the Lenders, provided that the Agent may accept additional or supplemental Security as provided in the Credit Documents, and shall discharge Security provided hereunder in the Permitted Discretion of the Agent with respect to any Permitted Disposition or, if applicable, any other transaction permitted by this Agreement in respect of which the Agent has received, upon its reasonable request, an officer's certificate of the Canadian Borrower certifying that such disposition or other transaction is permitted by this Agreement, together with any other information from the Canadian Borrower reasonably required by the Agent, if any (and the Agent may rely conclusively on a certificate to that effect provided to it by the Canadian Borrower without further inquiry).

(b)     The Lenders hereby authorize the Agent, and the Agent hereby agrees, to:

(i)     discharge the Security at the Borrower's sole cost and expense, forthwith after all of the Obligations under the Credit Documents (other than contingent obligations intended to survive payout of the Facilities) have been unconditionally and irrevocably paid or performed in full and the

Facilities, Credit Documents and all Hedging Agreements have been terminated or, with respect to the Hedging Agreements, collateralized to the satisfaction of the Agent and the applicable Hedge Providers, acting reasonably; and

(ii)     at the request of the Borrower and upon receipt of the Agent of an officer's certificate from a senior officer of the Borrower certifying that such disposition is a Permitted Disposition, to discharge that portion of the Security that applies to the property subject to such Permitted Disposition or execute a no interest letter or similar document in connection therewith.

(c)     As of the Amendment and Restatement Date, the Agent and other Secured Parties hereby release each of (x) QMax Ecuador S.A. and (y) Mud Movers Express LLC as Guarantors, hereby confirm that all such Subsidiaries' Obligations are discharged, in each case, whether now existing or hereafter arising and whether or not matured or contingent, and that the Security granted by such Subsidiaries to the Agent is deemed to be released.

**(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)**

THIS IS EXHIBIT " _1_ "
referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26 th_

day of _May_ A.D. 20 _20_

**Jonathan Tomm**
**Barrister and Solicitor**

## WAIVER AND FOURTH AMENDING AGREEMENT

**This Waiver and Fourth Amending Agreement** (the **Agreement**) is dated the 31st day of March, 2020 among:

> **Q'MAX SOLUTIONS INC. AND Q'MAX AMERICA INC., as borrowers, AND QMAX CANADA OPERATIONS INC., as specified Canadian swingline borrower** (the **Borrowers**);
>
> **HSBC BANK CANADA, as administrative agent** (the **Agent**); and
>
> **THE FINANCIAL INSTITUTIONS LISTED ON THE SIGNATURE PAGES HERETO**

1.    **PREMABLE**

**WHEREAS** the Agent and the financial institutions that may from time to time be parties to the Existing Credit Agreement as lenders (collectively, the **Lenders**) agreed to make certain credit facilities available to the Borrowers upon the terms and conditions contained in that certain second amended and restated credit agreement dated as of July 31, 2018, among the Borrowers, the Agent and the Lenders from time to time party thereto (as amended by a first amending agreement made effective as of May 13, 2019, a second amending agreement made effective as of July 22, 2019, and a third amending agreement made effective as of September 6, 2019, the **Existing Credit Agreement**).

**AND WHEREAS** pursuant to Section 7.3.1 of the Credit Agreement, the Borrowers are not permitted to, among other things, have a Net Leverage Ratio at the end of the Fiscal Quarters ending December 31, 2019 and March 31, 2020 that exceeds 3.50 to 1, nor a Fixed Charge Coverage Ratio at end of the Fiscal Quarters ending December 31, 2019 and March 31, 2020 that is less than 1.25 to 1 (the **Designated Financial Covenants**);

**AND WHEREAS** pursuant to Section 2.6.1(a) of the Credit Agreement, the Canadian Borrower is required, among other things, to pay interest on Overdrafts in Canadian Dollars and interest on Canadian Dollar Prime Rate Loans plus the Applicable Margin per annum payable monthly in arrears on the last Business Day of each month (the **Canadian Facility Interest Payment Obligation**);

**AND WHEREAS** pursuant to Section 4.6.1(a) of the Credit Agreement, the U.S. Borrower is required, among other things, to pay interest on U.S. Dollar Prime Rate Loans in U.S. Dollars at the U.S. Prime Rate plus the Applicable Margin per annum, payable monthly in arrears on the last  day of each and every month (the **US Facility Interest Payment Obligation**);

**AND WHEREAS** pursuant to Sections 2.6.1(g) and (h), and Section 4.6.1(d), the Borrowers, as applicable, are required, among other things, to pay certain standby and unused commitment fees with respect to each of the Canadian Operating Facility (including the Swingline) and the U.S. Operating Facility (the **Standby Fee Obligations**);

**AND WHEREAS** pursuant to Section 3.4.2 of the Credit Agreement, the Canadian Borrower is required, among other things, to make Repayments under the Term Facility in quarterly installments on the last day of each Fiscal Quarter in an amount equal to U.S. $1,195,000 (the **Term Loan Repayment Obligation**);

**AND WHEREAS** the Borrowers have requested that the Lenders waive strict compliance with (a) each of the Canadian Facility Interest Payment Obligation, the US Facility Interest Payment Obligation and the Standby Fee Obligations (collectively, the **Designated Interest and Fee Payment Obligations**) and the Term Loan Repayment Obligation and (b) the Designated Financial Covenants, in each case for a limited period of time as further described herein;

**AND WHEREAS** as of the Effective Date (as defined below), certain LIBOR Loans more particularly described in Schedule A attached hereto (the **Existing LIBOR Loans**) are outstanding under the Facilities;

**AND WHEREAS** pursuant to Section 2.6.1(f), Section 3.6.1(e), Section 4.6.1(b) and Section 5.13.2 of the Credit Agreement, the applicable Borrower is required to, among other things, pay interest on LIBOR Loans in U.S. Dollars at the U.S. Dollar LIBOR Rate plus the Applicable Margin per annum and to repay (or otherwise Rollover or Convert) an outstanding Libor Loan at the end of the applicable LIBOR Period (the **LIBOR Loan Payment Obligation**);

**AND WHEREAS** the Borrowers and the Lenders have agreed to make certain amendments, waivers and additional agreements in order to give effect to the foregoing recitals and certain other matters as hereinafter described;

**NOW THEREFORE**, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

**2.     DEFINED TERMS, ETC.**

2.1.     Capitalized terms used in this Agreement and not otherwise defined have the meanings given to them in the Credit Agreement. The Existing Credit Agreement, as amended by this Agreement, and as may be further amended, restated or otherwise modified from time to time, is referred to as the **Credit Agreement**.

2.2.     This Agreement shall constitute a Credit Document.

**3.     WAIVERS**

3.1.     In reliance upon the representations and warranties made by the Borrowers in Section 8 below, and subject to the other terms and conditions set out herein, the Agent and each of the Lenders hereby confirm that, after giving effect to this Agreement, so long as no Default or Event of Default has occurred or is continuing:

(a)     solely with respect to the Fiscal Quarters ending December 31, 2019 and March 31, 2020, the Lenders waive compliance with the Designated Financial Covenants;

(b)     solely with respect to the Designated Interest and Fee Payment Obligations arising on each of March 31, 2020, April 30, 2020, and June 1, 2020, the Borrowers shall not be required to make payments of Interest or standby fees as otherwise required pursuant to the terms of the Credit Agreement, provided, however, that Interest and standby fees shall continue to accrue on all Obligations pursuant to the terms of the Credit Agreement, and each Borrower shall, as applicable, pay all Interest and fees that have been deferred hereby on the next applicable payment date (which date is June 30, 2020);

(c)     the Canadian Borrower shall not be required to make a Repayment under the Term Facility pursuant to Section 3.4.2 of the Credit Agreement, solely in respect of the Term Facility Repayment Obligation arising on March 31, 2020, provided, however, that the Canadian Borrower shall thereafter be required to continue to make Repayments under the Term Facility pursuant to and in accordance with the terms of the Credit Agreement, with any outstanding Obligations remaining under the Term Facility due and payable on the earlier of: (a) the Acceleration Date and (b) the Facilities Maturity Date.

3.2.     For purposes of the foregoing waivers, the Agent and the Lenders waive compliance with the Credit Agreement solely to the extent necessary to give effect to such waivers. For

2

greater certainty, the waivers granted herein shall be immediately terminated and of no further force and effect upon the occurrence of, or during the continuance of (after giving effect to this Agreement), any Default or Event of Default.

4. **AMENDMENTS**

4.1.    The parties hereto agree that Section 1.1 of the Existing Credit Agreement is amended by adding the following definition thereto in the appropriate alphabetical order:

"**Waiver and Fourth Amending Agreement**" means that certain waiver and fourth amending agreement among the Borrowers, the Agent and the Lenders dated as of March 31, 2020.

4.2.    The parties hereto agree that Section 5.3.2(b) of the Existing Credit Agreement is amended by deleting the reference therein to "$3,000,000" and replacing it with "$500,000".

4.3.    The parties hereto agree that Section 7.1.21 of the Existing Credit Agreement is hereby amended by deleting the period at the end of such Section and replacing it with the following:

"; provided, however, that the Borrowers shall not be required to maintain any such Minimum Liquidity for the months ended March 31, 2020, April 30, 2020 and May 31, 2020.".

4.4.    The parties hereto agree that Section 7.1 of the Existing Credit Agreement is hereby amended by adding the following as new Sections 7.1.22, 7.1.23, 7.1.24 and 7.1.25 thereto:

"7.1.22  *Weekly Cash Flow Statements*.  As soon as available, and in any event, on or before 5:00 p.m. MST on the third Business Day of each week (or such later date as the Agent may agree), furnish to the Agent a consolidated 13 week cash flow forecast detailing, among other things, cash receipts and cash disbursements on a weekly basis, together with an unaudited consolidated statement of cash flows for the preceding week and a reasonably detailed discussion of any material variances from the most recently delivered cash flow forecast, in each case in a form satisfactory to the Agent, acting reasonably.

7.1.23  *Business Plan*.  As soon as available, and in any event within seven (7) calendar days of the date of the Waiver and Fourth Amending Agreement, furnish to the Agent updated financial forecasts for the 2020 calendar year and a business plan detailing, among other things, the Borrowers' proposed plan to generate positive cash flows among all business segments.

7.1.24  *Financial Advisor*.  Cooperate fully with, and bear the reasonable and invoiced costs associated with, a financial advisor engaged by the Agent or its counsel (including KPMG LLP), including the execution of any engagement agreement in respect thereof.

7.1.25  *Sales Process Updates*.  Deliver to the Agent, concurrently with the delivery of the Borrowers' weekly cash flow statements pursuant to Section 7.1.22, an update with respect to the sale by the Borrowers of QMax Solutions Colombia, QMax Mexico, S.A. de. C.V. and the Borrowers' Middle East business."

4.5.    The parties hereto agree that Section 7.2.19 of the Existing Credit Agreement is amended by deleting the reference therein to "$20,000,000" and replacing it with "$5,000,000".

5.      **ADDITIONAL AGREEMENTS**

    5.1.    The parties hereto agree to the following:

        (a)    notwithstanding anything to the contrary in the Credit Agreement, commencing on the Effective Date and ending on such date as may be agreed to by the Agent in writing, the Borrowers shall not be permitted to request further Advances by way of, Rollover, or Covert any Loan into, Bankers' Acceptances, BA Equivalent Loans, or LIBOR Loans;

        (b)    upon the maturity of the LIBOR Period of each Existing LIBOR Loan, each Existing LIBOR Loan outstanding under (x) the Canadian Operating Facility shall be deemed to be Converted into a U.S. Dollar Base Rate Loan under the Canadian Operating Facility; (y) the US Operating Facility shall be deemed to be Converted into a U.S. Dollar Prime Rate Loan under the US Operating Facility, and (z) the Term Facility shall be deemed to be Converted into a U.S. Dollar Base Rate Loan under the Term Facility;

        (c)    all principal, Interest and fees that would otherwise be payable pursuant to the LIBOR Loan Payment Obligation shall continue as Obligations under the Canadian Operating Facility, the US Operating Facility, or the Term Facility, as applicable, which Obligations shall, for greater certainty, be subject to the waiver and payment deferral terms set out in Section 3.1 above; and

        (d)    notwithstanding Section 5.1.4 of the Credit Agreement, from the Effective Date until the delivery by the Borrowers of a Compliance Certificate in respect of the Fiscal Quarter ending June 30, 2020 in accordance with Section 7.4.1(b) and (d) of the Credit Agreement, the Applicable Margin shall be at Level VII, and shall thereafter be determined in accordance with Section 5.1.4 of the Credit Agreement.

6.      **CONFIRMATION**

The waivers in Section 3 above are effective only in this instance and for the specific purpose stated herein. They shall not be, or be deemed to be, consents to, or waivers of, any preceding or subsequent breach of the same or any other covenant or provision of the Credit Agreement or any of the other Credit Documents nor shall they operate as waivers of any right, power or remedy of the Agent or the Lenders under the Credit Agreement and the other Credit Documents.

7.      **FEES**

In consideration of the waivers and amendments provided for herein, the Borrowers shall pay to the Agent, for and on behalf of the Lenders on a *pro rata* basis, a fee of 20 bps on all Lenders' Commitments (the **Waiver Fee**), which fee shall, on the Effective Date, be fully earned and shall be deemed to be an Obligation outstanding and shall accrue interest in the same manner as a U.S. Dollar Base Rate Loan outstanding under the Canadian Operating Facility. The Waiver Fee is in addition to all other fees, interest, costs and expenses payable in connection with the Credit Documents, and may be charged by the Agent to any account of the Borrowers maintained by the Agent.

8.      **REPRESENTATIONS AND WARRANTIES**

    8.1.    The Borrowers represent and warrant to the Agent and the Lenders as follows:

        (a)    the recitals to this Agreement are true and correct;

(b)     the representations and warranties of the Borrowers contained in the Credit Agreement and the Credit Documents are true, complete, correct and not misleading as of the date hereof to the same extent as though made on and as of this date;

(c)     as at the date hereof, after giving effect to this Agreement, each Credit Party is in full compliance with its respective covenants and obligations in the Credit Agreement and each other Credit Document to which it is a party;

(d)     after giving effect to this Agreement, no Default or Event of Default shall have occurred or be continuing and no Default or Event of Default will occur as a result of the execution, delivery and performance of this Agreement and the Credit Agreement;

(e)     each Credit Party is in compliance in all material respects with all Applicable Laws of each jurisdiction in which it carries on business and is duly licensed, registered and qualified to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it or the property owned or leased by it make such qualification necessary, except to the extent that the failure to hold any such licences, registrations and permits would not constitute a Material Adverse Change; and

(f)     each Credit Party has the necessary capacity, power, legal right and authority to borrow from the Lenders, guarantee payment to the Agent and the Lenders of those Obligations which are payable by the Borrowers, perform its obligations under the Credit Documents and provide the Security required to be provided by it thereunder. The execution and delivery of this Agreement by the Borrowers and the performance of their respective obligations herein and in the Credit Agreement (i) have been duly authorized by all necessary corporate or other action, (ii) are within the powers of each Borrower, (iii) have received all necessary governmental approvals (if any are required), and (iv) do not and will not contravene or conflict with any provision of Applicable Law or of the Borrowers' constating documents or by-laws. This Agreement, the Credit Agreement and the other Credit Documents constitute legal, valid and binding obligations of the Credit Parties, as applicable, enforceable against them in accordance with the terms and provisions thereof, subject to Laws of general application affecting creditors' rights and the discretion of the court in awarding equitable remedies.

## 9.     CONDITIONS TO EFFECTIVENESS

This agreement shall become effective only upon the Agents receipt of the duly executed counterparts of this Agreement which, when taken together, bear the authorized signatures of the Borrowers, the Lenders and the Agent (the date of such receipt being referred to herein as the **Effective Date**).

## 10.     GOVERNING LAW

This agreement is governed by and is to be interpreted and enforced in accordance with the laws of the Province of Alberta and the laws of Canada applicable therein.

## 11.     COUNTERPARTS

This agreement may be executed in any number of separate counterparts and all such signed counterparts will together constitute one and the same instrument. To evidence its execution of an original counterpart of this agreement, a party may send a copy of its signature on the execution page hereof to the other party

by facsimile or other means of recorded electronic transmission (including in PDF form) and such transmission shall constitute valid delivery of an executed copy of this agreement to the receiving party.

*[Signature pages follow.]*

**IN WITNESS WHEREOF**, the Agent, the Lenders and the Borrowers have executed and delivered this Agreement.

**Q'MAX SOLUTIONS INC., as Canadian Borrower**

Per: _____

Name: Rafael Diaz-Granados

Title: President

**Q'MAX AMERICA INC., as U.S. Borrower**

Per: _____

Name: Rafael Diaz-Granados

Title: President

**Q'MAX CANADA OPERATIONS INC., as Specified Canadian Swingline Borrower**

Per: _____

Name: Rafael Diaz-Granados

Title: President

**HSBC BANK CANADA, as Administrative Agent**

Per:  _____

Name:   Cameron Bailey

Title:

Per:  _____

Name:

Title:   Paul Irving, Vice President LMU

**HSBC BANK CANADA, as Lender**

Per: _____

Name:
Title:      Cameron Bailey

Per: _____

Name:
Title:

**BANK OF MONTREAL, as Lender**

Per: _____

Name:  Stanley Julien

Title:   Managing Director

Per: _____

Name:  Jesse Agassiz

Title:   Senior Manager

**EXPORT DEVELOPMENT CANADA, as Lender**

Per: _____

Name:

Title:   Katie Furfaro
         Special Risks Manager

Per: _____

Name:   Geoff Bleich

Title:   Special Risks Manager

**BUSINESS DEVELOPMENT BANK OF CANADA, as Lender**

Per: <u>BRAD WAGNER</u>

Name: Brad Wagner

Title: Director, Business Restructuring

Per: <u>MARK KEARL</u>

Name: Mark Kearl

Title: AVP, Business Restruturing

**HSBC BANK USA, NATIONAL ASSOCIATION, as Lender**

Per: _Stephen M. Ellsworth V.P._

Name: Stephen M. Ellsowrth

Title: Vice President


Per: ------------------------------------------------------------

Name: -----------------------------------------------------------

Title: ------------------------------------------------------------

--Stephen M. Ellsowrth------------------------------------

**SCHEDULE A**

**Existing LIBOR Loans**

| Facility | Current Amount | Effective Date | Maturity Date |
|---|---|---|---|
| Canadian Operating Facility | 14,226,489.69 USD | January 29, 2020 | April 29, 2020 |
| Canadian Operating Facility | 3,975,873.12 USD | January 29, 2020 | April 29, 2020 |
| Canadian Operating Facility | 56,253,904.45 USD | January 29, 2020 | April 29, 2020 |
| Canadian Operating Facility | 20,532,319.39 USD | February 4, 2020 | May 4, 2020 |
| Canadian Operating Facility | 3,975,873.12 USD | February 12, 2020 | May 12, 2020 |
| Canadian Operating Facility | 6,500,000.00 USD | February 12, 2020 | May 12, 2020 |
| Canadian Operating Facility | 2,160,643.70 USD | March 2, 2020 | June 2, 2020 |
| Term Facility | 8,876,250.00 USD | January 31, 2020 | April 30, 2020 |
| U.S. Operating Facility | 1,024,126.88 USD | January 29, 2020 | April 29, 2020 |
| U.S. Operating Facility | 3,773,510.31 USD | January 29, 2020 | April 29, 2020 |
| U.S. Operating Facility | 1,024,126.88 USD | February 12, 2020 | May 12, 2020 |

THIS IS EXHIBIT " _____8_____ "
referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26th_

day of _May_ A.D. 20 _20_

Jonathan Tomm
Barrister and Solicitor

## GUARANTEE

TO:      **HSBC BANK CANADA**, as Agent (the "**Agent**")

DATE:     May 23, 2014

*PREAMBLE:*

A.     Fluid Acquisition Corp. and Q'Max America Inc. (collectively, the "**Borrowers**"), as borrowers, HSBC Bank Canada and those other financial institutions which are from time to time party thereto as lenders (collectively, the "**Lenders**") and HSBC Bank Canada, as administrative agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "**Agent**") are parties to a credit agreement dated as of the date hereof (as such credit agreement may be amended, supplemented or otherwise modified or restated from time to time, the "**Credit Agreement**").

B.     The Borrowers and the Guarantors (as defined in the Credit Agreement) (collectively, the "**Credit Parties**" and each a "**Credit Party**") may, from time to time, incur indebtedness, obligations and liabilities to the Agent, the Lenders, the Hedge Providers and counterparties providing services pursuant to the Banking Services Agreements (collectively, the "**Creditors**") pursuant to or in connection with the Credit Agreement, the other Loan Documents, the Hedging Agreements and the Banking Services Agreements from time to time.

C.     It is in the interests of 1356760 Alberta Ltd. (the "**Guarantor**"), that the Creditors extend credit to the Borrowers pursuant to the applicable Credit Documents and therefore the Guarantor is prepared to issue this Guarantee to the Agent for and on behalf of the Creditors.

**AGREEMENT:**

For valuable consideration, the receipt and sufficiency of which are hereby conclusively acknowledged by the Guarantor, the Guarantor hereby agrees in favour of the Agent for its own benefit and on behalf of the Creditors as follows:

1.     **Defined Terms**.  In this Guarantee, capitalized words and phrases which are not otherwise defined have the respective meanings given to such terms in the Credit Agreement. In addition, the term "**Loan Documents**" when used herein means the Credit Agreement, the Hedging Agreements, the Banking Services Agreements, the Security and any other Credit Documents, instruments or agreements entered into pursuant thereto or in connection therewith.

2.     **Guarantee**.  The Guarantor hereby unconditionally and irrevocably guarantees the prompt payment and performance to the Agent for its own benefit and on behalf of the Creditors forthwith upon demand by the Agent during the occurrence and continuance of an Event of Default of all indebtedness, liabilities and obligations of any kind whatsoever

- 2 -

(whether direct or indirect, joint or several, absolute or contingent, matured or unmatured) which the Borrowers or any other Credit Party (other than the Guarantor) has from time to time incurred or is under or may hereafter incur or be under to the Agent or any Creditor under or in connection with or with respect to the Loan Documents (collectively, the "**Guaranteed Obligations**"). All amounts payable by the Guarantor hereunder will be paid to the Agent for its own benefit and on behalf of the Creditors at the address of the Agent set forth in Section 23 below or as otherwise directed in writing by the Agent. Any amounts payable by the Guarantor under this Guarantee which are not paid forthwith upon demand therefor by the Agent as aforesaid for its own benefit and on behalf of the Creditors will bear interest from the date of such demand at the rate or rates applicable to the corresponding Guaranteed Obligations.

3.   **Continuing, Unconditional and Absolute Guarantee**. The obligations of the Guarantor under this Guarantee are continuing, unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged, diminished, limited or otherwise affected by (and the Guarantor hereby consents to or waives, as applicable, to the fullest extent permitted by Applicable Laws):

(a)   any extension, other indulgence, renewal, settlement, discharge, compromise, waiver, subordination or release in respect of any Guaranteed Obligation, security, Person or otherwise, unless such settlement, discharge, compromise or release shall specifically release the Guarantor from its obligations, indebtedness or liabilities hereunder or any part thereof or is a payment of the Guaranteed Obligations;

(b)   any waiver, modification, restatement or amendment of or supplement to any Loan Document or the Guaranteed Obligations, including any increase or decrease in the principal, the rates of interest or other amounts payable thereunder;

(c)   any change in the time, manner or place of payment of or in any other term of any Loan Document or the Guaranteed Obligations, or the failure on the part of the Borrowers or any other Credit Party to carry out any of its Guaranteed Obligations under any Loan Document;

(d)   any impossibility, impracticability, frustration of purpose, illegality, force majeure or act of government;

(e)   any non-perfection or invalidity of any direct or indirect security for any Guaranteed Obligation;

(f)   any change in the existence, structure, constitution, name, objects, powers, business, control or ownership of the Borrowers, any other Credit Party or any other Person, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrowers, any other Credit Party or any other Person or its assets;

- 3 -

(g)    the existence of any claim, set-off or other rights which the Guarantor may have at any time against the Borrowers, any other Credit Party, the Agent or any other Person, whether in connection herewith or any unrelated transactions;

(h)    any invalidity, illegality or unenforceability relating to or against the Borrowers or any other Credit Party or any provision of Applicable Law purporting to prohibit the payment by the Borrowers or any other Credit Party of the principal or interest under the Guaranteed Obligations;

(i)    any limitation, postponement, prohibition, subordination or other restriction on the rights of the Agent or any Creditor to receive payment of the Guaranteed Obligations;

(j)    any release, substitution or addition of any co-signer, endorser or other guarantor of the Guaranteed Obligations;

(k)    any defence arising by reason of any failure of the Agent or any Creditor to make any presentment, demand for performance, notice of non-performance, protest, and any other notice, including notice of all of the following:  acceptance of this Guarantee, partial payment or non-payment of all or any part of the Guaranteed Obligations and the existence, creation, or incurring of new or additional Guaranteed Obligations;

(l)    any defence arising by reason of any failure of the Agent or any Creditor to proceed against the Borrowers, any other Credit Party or any other Person, to proceed against, apply or exhaust any security held from the Borrowers, any other Credit Party or any other Person for the Guaranteed Obligations, to proceed against, apply or exhaust any security held from the Guarantor or any other Person for this Guarantee or to pursue any other remedy in the power of the Agent or any Creditor whatsoever;

(m)    any Applicable Law which provides that the obligation of a guarantor must neither be larger in amount nor in other respects more burdensome than that of the principal obligation or which reduces a guarantor's obligation in proportion to the principal obligation;

(n)    any defence arising by reason of any incapacity, lack of authority, or other defence of the Borrowers, any other Credit Party or any other Person, or by reason of any limitation, postponement, prohibition on the Agent's or any Creditor's right to receive payment of the Guaranteed Obligations or any part thereof, or by reason of the cessation from any cause whatsoever of the liability of the Borrowers, any other Credit Party or any other Person with respect to all or any part of the Guaranteed Obligations, or by reason of any act or omission of the Agent or any Creditor or others which directly or indirectly results in the discharge or release of the Borrowers, any other Credit Party or any other Person or all or any part of the Guaranteed Obligations or any security or guarantee therefor, whether by contract, operation of law or otherwise;

- 4 -

(o)  any defence arising by reason of any failure by the Agent or any Creditor to obtain, perfect or maintain a perfected or prior (or any) security interest in or Lien upon any property of the Borrowers, any other Credit Party or any other Person, or by reason of any interest of the Agent or any Creditor in any property, whether as owner thereof or the holder of a security interest therein or Lien thereon, being invalidated, voided, declared fraudulent or preferential or otherwise set aside, or by reason of any impairment by the Agent of any right to recourse or collateral;

(p)  any defence arising by reason of the failure of the Agent or any Creditor to marshal any assets;

(q)  any defence based upon any failure of the Agent or any Creditor to give to the Borrowers, any other Credit Party, the Guarantor or any other Person notice of any sale or other disposition of any property securing any or all of the Guaranteed Obligations or any guarantee thereof, or any defect in any notice that may be given in connection with any sale or other disposition of any such property, or any failure of the Agent or any Creditor to comply with any provision of Applicable Law in enforcing any Lien upon any such property, including any failure by the Agent or any Creditor to dispose of any such property in a commercially reasonable manner;

(r)  any dealing whatsoever with the Borrowers, any other Credit Party or other Person or any security, whether negligently or not, or any failure to do so;

(s)  any defence based upon or arising out of any bankruptcy, insolvency, reorganization, moratorium, arrangement, readjustment of debt, liquidation or dissolution proceeding commenced by or against the Borrowers, any other Credit Party or any other Person, including any discharge of, or bar against collecting, any of the Guaranteed Obligations, in or as a result of any such proceeding; or

(t)  any other act or omission to act or delay of any kind by the Borrowers, any other Credit Party, the Agent, a Creditor or any other Person or any other circumstance whatsoever, whether similar or dissimilar to the foregoing, which might, but for the provisions of this Section 3, constitute a legal or equitable discharge, limitation or reduction of the Guarantor's obligations hereunder (other than the irrevocable and unconditional payment in full of all of the Guaranteed Obligations).

The foregoing provisions apply (and the foregoing waivers will be effective) even if the effect of any action (or failure to take action) by the Agent or any Creditor is to destroy or diminish the Guarantor's subrogation rights, the Guarantor's right to proceed against the Borrowers or any other Credit Party for reimbursement, the Guarantor's right to recover contribution from any other guarantor or any other right or remedy.

4.  **Release of Guaranteed Obligations**.  This Guarantee will remain in full force and effect until the Guaranteed Obligations are irrevocably and unconditionally performed and paid in full.

- 5 -

5.    **Validity of Agreements**.  The Guarantor will not contest or otherwise challenge the legality, validity or enforceability of any term, condition or other provision contained in the Loan Documents.  The Guarantor represents to the Agent for and on behalf of the Creditors that it is familiar with and consents to the terms and conditions of the Loan Documents.

6.    **Assumption of Authority**.  The Agent, for and on behalf of the Creditors, is entitled to assume, notwithstanding any investigation by or on behalf of the Agent or any Creditor, the power and authority of the officers, directors, agents or other Persons acting or purporting to act on behalf of the Borrowers, the Guarantor or the other Credit Parties, and any Guaranteed Obligations made or created in reliance upon the exercise of such power or authority will be guaranteed hereunder.

7.    **Recourse against Credit Parties and Others**.  The Agent, for and on behalf of the Creditors, is not required to exhaust its recourse against the Borrowers, the other Credit Parties, any other guarantor or other Person or under any other security or other guarantee before being entitled to payment from the Guarantor under this Guarantee.

8.    **Settlement of Accounts**.  Any account settled or stated between the Agent, for and on behalf of the Creditors, and the Borrowers or the other Credit Parties will be accepted by the Guarantor as prima facie evidence, subject to manifest error, that the amount thereby appearing due by the Borrowers or the other Credit Parties to the Agent and the Creditors is so due.

9.    **No Waiver**.  No delay on the part of the Agent, for and on behalf of the Creditors, in exercising any of its options, powers or rights, or partial or single exercise thereof, will constitute a waiver thereof.  No waiver of any of the Agent's or any Creditor's rights hereunder, and no modification or amendment of this Guarantee, will be deemed to be made by the Agent for and on behalf of the Creditors unless the same will be in writing, duly signed by the Agent, for and on behalf of the Creditors, and the Guarantor, and each such waiver, if any, will apply only with respect to the specific instance involved, and will in no way impair the rights of the Agent and the Creditors or the liabilities of the Guarantor to the Agent and the Creditors in any other respect at any other time.

10.   **Guarantee of all Credit Obtained; Indemnity**.  All moneys and credits in fact borrowed or obtained by the Borrowers or any other Credit Party from the Agent or any Creditor under the Loan Documents will be deemed to form part of the Guaranteed Obligations notwithstanding any incapacity, disability or lack or limitation of status or power of the Borrowers or any other Credit Party or of the directors, officers, employees, partners or agents thereof, or that the Borrowers or any other Credit Party may not be a legal entity, or any irregularity, defect or informality in the borrowing or obtaining of such moneys or credits.  If any amount in respect of the Guaranteed Obligations is not recoverable from the Guarantor hereunder on the basis of a guarantee, then, notwithstanding any other provision hereof, the Guarantor will indemnify and save harmless the Agent and each Creditor and all of their respective directors, officers, shareholders and agents from and against any and all losses, damages, costs, expenses or liabilities suffered or incurred by the Agent or any Creditor or any of their respective

- 6 -

directors, officers, shareholders and agents resulting or arising from or relating to any failure of the Borrowers or any other Credit Party to unconditionally and irrevocably pay in full or fully perform the Guaranteed Obligations as and when due provided that the amount of such indemnification shall not exceed the amount of such Guaranteed Obligations and any amounts due and owing hereunder.

11.   **Stay of Acceleration**.  If acceleration of the time for payment, or the liability of the Borrowers or any other Credit Party to make payment, of any amount specified to be payable by the Borrowers or any other Credit Party in respect of the Guaranteed Obligations is stayed, prohibited or otherwise affected upon the insolvency, bankruptcy, reorganization or winding-up of the Borrowers or any other Credit Party or any moratorium affecting the payment of the Guaranteed Obligations, all such amounts otherwise subject to acceleration or payment will nonetheless be deemed for all purposes of this Guarantee to be and to become due and payable by the Borrowers or any other Credit Party and will be payable by the Guarantor hereunder forthwith on demand by the Agent for and on behalf of the Creditors.

12.   **Reinstatement**.  If, at any time, all or any part of any payment previously applied by the Agent or any Creditor to any Guaranteed Obligation is or must be rescinded or returned by the Agent or any Creditor for any reason whatsoever (including the insolvency, bankruptcy, or reorganization of the Borrowers or any other Credit Party), such Guaranteed Obligation will, for the purpose of this Guarantee, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Agent or any such Creditor, and this Guarantee will continue to be effective or be reinstated, as the case may be, as to such Guaranteed Obligation, all as though such application by the Agent or any such Creditor had not been made.

13.   **Assignment and Postponement**.  All present and future indebtedness and liability of the Borrowers and each other Credit Party to the Guarantor is hereby assigned by the Guarantor to the Agent for its own benefit and on behalf of the Creditors and subordinated to the Guaranteed Obligations and all moneys received by the Guarantor in respect thereof following the occurrence and during the continuance of an Event of Default will be received in trust for and, unless prior written authorization from the Agent to the contrary will have been obtained by the Guarantor, will be paid over to the Agent for its own benefit and on behalf of the Creditors upon demand by the Agent.  If the Agent receives from the Guarantor a payment or payments in full or on account of the liability of the Guarantor hereunder, the Guarantor will not be entitled to claim repayment against the Borrowers or any other Credit Party until the Agent's and the Creditors' claims against the Borrowers or the applicable Credit Party have been irrevocably and unconditionally paid in full.  In case of liquidation, winding up or bankruptcy of the Borrowers or any other Credit Party (whether voluntary or involuntary) or any composition with creditors or scheme of arrangement, the Agent for its own benefit and on behalf of the Creditors will have the right to rank for its full claims and receive all or other payments in respect thereof in priority to the Guarantor until the Guaranteed Obligations have been irrevocably and unconditionally paid in full, and the Guarantor will continue to be liable hereunder for any balance which may be owing to the Agent for

- 7 -

its own benefit and on behalf of the Creditors by the Borrowers or any other Credit Party. In the event of the valuation by the Agent of any of its security and/or the retention thereof by the Agent, such valuation and/or retention will not, as between the Agent and the Guarantor, be considered as a purchase of such security, or as payment or satisfaction of the Guaranteed Obligations or any part thereof.  The foregoing provisions of this Section 13 will not in any way limit or lessen the liability of the Guarantor under any other section of this Guarantee.

14.    **No Subrogation**.  Notwithstanding any payment made by the Guarantor under this Guarantee or any setoff or application of funds of the Guarantor by the Agent or any Creditor, the Guarantor will have no right of subrogation to, and waives, to the fullest extent permitted by Applicable Law, any right to enforce any remedy which the Agent now has or may hereafter have against the Borrowers or any other Credit Party, until all of the Guaranteed Obligations have been irrevocably and unconditionally paid in full; and until that time, the Guarantor waives any benefit of, and any right to participate in, any security, whether real or personal property, now or hereafter held by the Agent or any Creditor for the Guaranteed Obligations.

15.    **Foreign Currency Guaranteed Obligations**.    The Guarantor will make payment relative to each Guaranteed Obligation in the currency (the "**Original Currency**") in which the Borrowers or any other Credit Party is required to pay such Guaranteed Obligation.  If the Guarantor makes payment relative to any Guaranteed Obligation to the Agent or any Creditor in a currency (the "**Other Currency**") other than the Original Currency (whether voluntarily or pursuant to an order or judgment of a court or tribunal of any jurisdiction), such payment will constitute a discharge of the liability of the Guarantor hereunder in respect of such Guaranteed Obligation only to the extent of the amount of the Original Currency which the Agent is able to purchase at Toronto, Ontario with the amount it receives on the date of receipt.  If the amount of the Original Currency which the Agent is able to purchase is less than the amount of such currency originally due to it in respect to the relevant Guaranteed Obligation, the Guarantor will indemnify and save the Agent and each Creditor harmless from and against any loss or damage arising as a result of such deficiency.  This indemnity will constitute an obligation separate and independent from the other obligations contained in this Guarantee, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by the Agent, for its own benefit and on behalf of the Creditors, and will continue in full force and effect notwithstanding any judgment or order in respect of any amount due hereunder or under any judgment or order.

16.    **Taxes**.  All payments to be made by the Guarantor hereunder will be made without set-off or counterclaim and without deduction for any taxes, levies, duties, fees, deductions, withholdings, restrictions or conditions of any nature whatsoever.  If at any time any Applicable Law, regulation or international agreement requires the Guarantor to make any such deduction or withholding from any such payment, the sum due from the Guarantor with respect to such payment will be increased to the extent necessary to ensure that, after the making of such deduction or withholding, the Agent, for its own benefit and on behalf of the Creditors, receives a net sum equal to the sum which it would have received had no deduction or withholding been required.

- 8 -

17. **Payment of Expenses; Indemnification**. The Guarantor will pay on demand during the occurrence and continuance of an Event of Default, and will indemnify and save the Agent and each Creditor harmless from, any and all liabilities, all reasonable costs and expenses (including reasonable out-of-pocket legal fees and expenses on a solicitor and his own client full indemnity basis and any sales, goods and services or other similar taxes payable to any Governmental Authority with respect to any such liabilities, costs and expenses) (a) incurred by the Agent for its own benefit and on behalf of the Creditors in the administration or enforcement of this Guarantee, (b) with respect to, or resulting from, any failure or delay by the Guarantor in performing or observing any of its obligations under this Guarantee, or (c) incurred by the Agent in performing or observing any of the other covenants of the Guarantor under this Guarantee.

18. **Additional Security**. This Guarantee is in addition and without prejudice to any security of any kind (including other guarantees) now or hereafter held by or for the benefit of the Agent or the Creditors and any other rights or remedies that the Agent or the Creditors might have.

19. **Governing Law; Attornment**. This Guarantee will be governed by and construed in accordance with the laws of the Province of Alberta and the laws of Canada applicable therein, without giving effect to the conflict of law principles thereof. Without prejudice to the ability of the Agent or any Creditor to enforce this Guarantee in any other proper jurisdiction, the Guarantor irrevocably submits and attorns to the non-exclusive jurisdiction of the courts of the Province of Alberta, or any appellate court thereof, for the purposes of this Guarantee. To the extent legally permitted, the Guarantor waives any right it may have to, or to apply for, trial by jury in connection with any matter, action, proceeding, claim or counterclaim arising out of or relating to the Loan Documents or any of the transactions contemplated thereby.

20. **Successors and Assigns**. The provisions of this Guarantee will be binding upon and enure to the benefit of the Agent, the Creditors and their respective successors and assigns and will be binding upon the Guarantor and its successors. The Guarantor's obligations hereunder will not be assigned or delegated. The Agent or any Creditor may from time to time, and without notice to or the consent of the Guarantor, assign or transfer all or any of the Guaranteed Obligations or any interest therein in accordance with the Loan Documents and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, any such Guaranteed Obligation or part thereof so transferred or assigned will remain a "Guaranteed Obligation" for the purposes of this Guarantee and any immediate and successive permitted assignee or transferee of any Guaranteed Obligation or any interest therein will, to the extent of the interest so assigned or transferred, be entitled to the benefit of, and the right to enforce, this Guarantee.

21. **Time**. Time will be of the essence in this Guarantee.

22. **Severability**. If any portion of this Guarantee or the application thereof to any circumstance will be held invalid or unenforceable by a court of competent jurisdiction from which no further appeal has or is taken, to an extent that does not affect in a

- 9 -

fundamental way the operation of this Guarantee, the remainder of the provision in question, or its application to any circumstance other than that to which it has been held invalid or unenforceable, and the remainder of this Guarantee will not be affected thereby and will be valid and enforceable to the fullest extent permitted by Applicable Laws.

23.    **Notice**.  All notices, requests and demands to or upon the Agent or the Guarantor under this Agreement shall be in writing and given as provided in Section 13.11 of the Credit Agreement to the address (a) of the Agent set forth in the Credit Agreement and (b) of the Guarantor at the following address for notice:

By personal delivery:
1356760 Alberta Ltd.
407 2nd St. S.W., Ste. 1700
Calgary, Alberta T2P 2Y3

By mail:
1356760 Alberta Ltd.
407 2nd St. S.W., Ste. 1700
Calgary, Alberta T2P 2Y3

Attention:    Mark Roberts, Chief Financial Officer
Fax No.:    (403) 269-2251

or in either case at such other address as shall be designated reasonably beforehand by such party in a written notice to each other party.

24.    **Credit Parties' Financial Condition**.  The Guarantor is fully aware of the financial condition of the Borrowers and the other Credit Parties.

25.    **Negotiated Document**.  This Guarantee is the result of negotiations between the Guarantor and the Agent and have been reviewed by counsel to the Guarantor and the Agent and is the product of both the Guarantor and the Agent.  Accordingly, this Guarantee is not to be construed against the Agent merely because of its involvement in this Guarantee's preparation.

26.    **Interpretation**.  The division of this Guarantee into sections and paragraphs, and the insertion of headings, is for convenience of reference only and will not affect the construction or interpretation of this Guarantee.  Unless the context otherwise requires, words importing the singular include the plural and vice versa, and words importing gender include all genders.  When used in this Guarantee, the word "including" (or includes) means "including (or includes) without limitation".

27.    **Receipt of Copy**.  The Guarantor acknowledges receipt of an executed copy of this Guarantee.  The Guarantor waives the right to receive any amount that it may now or hereafter be entitled to receive (whether by way of damages, fine, penalty or otherwise) by reason of the failure of the Agent to deliver to the Guarantor a copy of any financing

- 10 -

statement or any statement issued by any registry that confirms registration of a financing statement relating to this Guarantee.

28.  **Acknowledgement.**   The Guarantor acknowledges having reviewed each of the representations, warranties and covenants set forth in the Credit Agreement (including Articles 6 and 7 thereof) and hereby restates each of such representations, warranties and covenants herein to the extent they relate to the Guarantor as a "Credit Party" and the Guarantor agrees to be bound by each such representations, warranties and covenants as if it was repeated herein, subject to the same cure periods, if any, set out in the Credit Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**THIS GUARANTEE** executed effective the date first written above.

**1356760 ALBERTA LTD.**

Per:
Name:    Mark Roberts
Title:    Chief Financial Officer

THIS IS EXHIBIT " _____ 9 _____ "

referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26 th_

day of _May_ A.D. 20 _20_

**Jonathan Tomm**
**Barrister and Solicitor**

## GUARANTEE

TO:      **HSBC BANK CANADA**, as Agent (the "**Agent**")

DATE:    May 23, 2014

*PREAMBLE:*

A.      Fluid Acquisition Corp. and Q'Max America Inc. (collectively, the "**Borrowers**"), as borrowers, HSBC Bank Canada and those other financial institutions which are from time to time party thereto as lenders (collectively, the "**Lenders**") and HSBC Bank Canada, as administrative agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "**Agent**") are parties to a credit agreement dated as of the date hereof (as such credit agreement may be amended, supplemented or otherwise modified or restated from time to time, the "**Credit Agreement**").

B.      The Borrowers and the Guarantors (as defined in the Credit Agreement) (collectively, the "**Credit Parties**" and each a "**Credit Party**") may, from time to time, incur indebtedness, obligations and liabilities to the Agent, the Lenders, the Hedge Providers and counterparties providing services pursuant to the Banking Services Agreements (collectively, the "**Creditors**") pursuant to or in connection with the Credit Agreement, the other Loan Documents, the Hedging Agreements and the Banking Services Agreements from time to time.

C.      It is in the interests of Q'Max Solutions Holdings Inc. (the "**Guarantor**"), that the Creditors extend credit to the Borrowers pursuant to the applicable Credit Documents and therefore the Guarantor is prepared to issue this Guarantee to the Agent for and on behalf of the Creditors.

**AGREEMENT:**

For valuable consideration, the receipt and sufficiency of which are hereby conclusively acknowledged by the Guarantor, the Guarantor hereby agrees in favour of the Agent for its own benefit and on behalf of the Creditors as follows:

1.      **Defined Terms**. In this Guarantee, capitalized words and phrases which are not otherwise defined have the respective meanings given to such terms in the Credit Agreement. In addition, the term "**Loan Documents**" when used herein means the Credit Agreement, the Hedging Agreements, the Banking Services Agreements, the Security and any other Credit Documents, instruments or agreements entered into pursuant thereto or in connection therewith.

2.      **Guarantee**. The Guarantor hereby unconditionally and irrevocably guarantees the prompt payment and performance to the Agent for its own benefit and on behalf of the Creditors forthwith upon demand by the Agent during the occurrence and continuance of an Event of Default of all indebtedness, liabilities and obligations of any kind whatsoever

- 2 -

(whether direct or indirect, joint or several, absolute or contingent, matured or unmatured) which the Borrowers or any other Credit Party (other than the Guarantor) has from time to time incurred or is under or may hereafter incur or be under to the Agent or any Creditor under or in connection with or with respect to the Loan Documents (collectively, the "**Guaranteed Obligations**"). All amounts payable by the Guarantor hereunder will be paid to the Agent for its own benefit and on behalf of the Creditors at the address of the Agent set forth in Section 23 below or as otherwise directed in writing by the Agent. Any amounts payable by the Guarantor under this Guarantee which are not paid forthwith upon demand therefor by the Agent as aforesaid for its own benefit and on behalf of the Creditors will bear interest from the date of such demand at the rate or rates applicable to the corresponding Guaranteed Obligations.

3.   **Continuing, Unconditional and Absolute Guarantee**. The obligations of the Guarantor under this Guarantee are continuing, unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged, diminished, limited or otherwise affected by (and the Guarantor hereby consents to or waives, as applicable, to the fullest extent permitted by Applicable Laws):

(a)   any extension, other indulgence, renewal, settlement, discharge, compromise, waiver, subordination or release in respect of any Guaranteed Obligation, security, Person or otherwise, unless such settlement, discharge, compromise or release shall specifically release the Guarantor from its obligations, indebtedness or liabilities hereunder or any part thereof or is a payment of the Guaranteed Obligations;

(b)   any waiver, modification, restatement or amendment of or supplement to any Loan Document or the Guaranteed Obligations, including any increase or decrease in the principal, the rates of interest or other amounts payable thereunder;

(c)   any change in the time, manner or place of payment of or in any other term of any Loan Document or the Guaranteed Obligations, or the failure on the part of the Borrowers or any other Credit Party to carry out any of its Guaranteed Obligations under any Loan Document;

(d)   any impossibility, impracticability, frustration of purpose, illegality, force majeure or act of government;

(e)   any non-perfection or invalidity of any direct or indirect security for any Guaranteed Obligation;

(f)   any change in the existence, structure, constitution, name, objects, powers, business, control or ownership of the Borrowers, any other Credit Party or any other Person, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrowers, any other Credit Party or any other Person or its assets;

- 3 -

(g)     the existence of any claim, set-off or other rights which the Guarantor may have at any time against the Borrowers, any other Credit Party, the Agent or any other Person, whether in connection herewith or any unrelated transactions;

(h)     any invalidity, illegality or unenforceability relating to or against the Borrowers or any other Credit Party or any provision of Applicable Law purporting to prohibit the payment by the Borrowers or any other Credit Party of the principal or interest under the Guaranteed Obligations;

(i)     any limitation, postponement, prohibition, subordination or other restriction on the rights of the Agent or any Creditor to receive payment of the Guaranteed Obligations;

(j)     any release, substitution or addition of any co-signer, endorser or other guarantor of the Guaranteed Obligations;

(k)     any defence arising by reason of any failure of the Agent or any Creditor to make any presentment, demand for performance, notice of non-performance, protest, and any other notice, including notice of all of the following:  acceptance of this Guarantee, partial payment or non-payment of all or any part of the Guaranteed Obligations and the existence, creation, or incurring of new or additional Guaranteed Obligations;

(l)     any defence arising by reason of any failure of the Agent or any Creditor to proceed against the Borrowers, any other Credit Party or any other Person, to proceed against, apply or exhaust any security held from the Borrowers, any other Credit Party or any other Person for the Guaranteed Obligations, to proceed against, apply or exhaust any security held from the Guarantor or any other Person for this Guarantee or to pursue any other remedy in the power of the Agent or any Creditor whatsoever;

(m)     any Applicable Law which provides that the obligation of a guarantor must neither be larger in amount nor in other respects more burdensome than that of the principal obligation or which reduces a guarantor's obligation in proportion to the principal obligation;

(n)     any defence arising by reason of any incapacity, lack of authority, or other defence of the Borrowers, any other Credit Party or any other Person, or by reason of any limitation, postponement, prohibition on the Agent's or any Creditor's right to receive payment of the Guaranteed Obligations or any part thereof, or by reason of the cessation from any cause whatsoever of the liability of the Borrowers, any other Credit Party or any other Person with respect to all or any part of the Guaranteed Obligations, or by reason of any act or omission of the Agent or any Creditor or others which directly or indirectly results in the discharge or release of the Borrowers, any other Credit Party or any other Person or all or any part of the Guaranteed Obligations or any security or guarantee therefor, whether by contract, operation of law or otherwise;

- 4 -

(o)     any defence arising by reason of any failure by the Agent or any Creditor to obtain, perfect or maintain a perfected or prior (or any) security interest in or Lien upon any property of the Borrowers, any other Credit Party or any other Person, or by reason of any interest of the Agent or any Creditor in any property, whether as owner thereof or the holder of a security interest therein or Lien thereon, being invalidated, voided, declared fraudulent or preferential or otherwise set aside, or by reason of any impairment by the Agent of any right to recourse or collateral;

(p)     any defence arising by reason of the failure of the Agent or any Creditor to marshal any assets;

(q)     any defence based upon any failure of the Agent or any Creditor to give to the Borrowers, any other Credit Party, the Guarantor or any other Person notice of any sale or other disposition of any property securing any or all of the Guaranteed Obligations or any guarantee thereof, or any defect in any notice that may be given in connection with any sale or other disposition of any such property, or any failure of the Agent or any Creditor to comply with any provision of Applicable Law in enforcing any Lien upon any such property, including any failure by the Agent or any Creditor to dispose of any such property in a commercially reasonable manner;

(r)     any dealing whatsoever with the Borrowers, any other Credit Party or other Person or any security, whether negligently or not, or any failure to do so;

(s)     any defence based upon or arising out of any bankruptcy, insolvency, reorganization, moratorium, arrangement, readjustment of debt, liquidation or dissolution proceeding commenced by or against the Borrowers, any other Credit Party or any other Person, including any discharge of, or bar against collecting, any of the Guaranteed Obligations, in or as a result of any such proceeding; or

(t)     any other act or omission to act or delay of any kind by the Borrowers, any other Credit Party, the Agent, a Creditor or any other Person or any other circumstance whatsoever, whether similar or dissimilar to the foregoing, which might, but for the provisions of this Section 3, constitute a legal or equitable discharge, limitation or reduction of the Guarantor's obligations hereunder (other than the irrevocable and unconditional payment in full of all of the Guaranteed Obligations).

The foregoing provisions apply (and the foregoing waivers will be effective) even if the effect of any action (or failure to take action) by the Agent or any Creditor is to destroy or diminish the Guarantor's subrogation rights, the Guarantor's right to proceed against the Borrowers or any other Credit Party for reimbursement, the Guarantor's right to recover contribution from any other guarantor or any other right or remedy.

4.     **Release of Guaranteed Obligations**.  This Guarantee will remain in full force and effect until the Guaranteed Obligations are irrevocably and unconditionally performed and paid in full.

- 5 -

5.   **Validity of Agreements**.  The Guarantor will not contest or otherwise challenge the legality, validity or enforceability of any term, condition or other provision contained in the Loan Documents.  The Guarantor represents to the Agent for and on behalf of the Creditors that it is familiar with and consents to the terms and conditions of the Loan Documents.

6.   **Assumption of Authority**.  The Agent, for and on behalf of the Creditors, is entitled to assume, notwithstanding any investigation by or on behalf of the Agent or any Creditor, the power and authority of the officers, directors, agents or other Persons acting or purporting to act on behalf of the Borrowers, the Guarantor or the other Credit Parties, and any Guaranteed Obligations made or created in reliance upon the exercise of such power or authority will be guaranteed hereunder.

7.   **Recourse against Credit Parties and Others**.  The Agent, for and on behalf of the Creditors, is not required to exhaust its recourse against the Borrowers, the other Credit Parties, any other guarantor or other Person or under any other security or other guarantee before being entitled to payment from the Guarantor under this Guarantee.

8.   **Settlement of Accounts**.  Any account settled or stated between the Agent, for and on behalf of the Creditors, and the Borrowers or the other Credit Parties will be accepted by the Guarantor as prima facie evidence, subject to manifest error, that the amount thereby appearing due by the Borrowers or the other Credit Parties to the Agent and the Creditors is so due.

9.   **No Waiver**.  No delay on the part of the Agent, for and on behalf of the Creditors, in exercising any of its options, powers or rights, or partial or single exercise thereof, will constitute a waiver thereof.  No waiver of any of the Agent's or any Creditor's rights hereunder, and no modification or amendment of this Guarantee, will be deemed to be made by the Agent for and on behalf of the Creditors unless the same will be in writing, duly signed by the Agent, for and on behalf of the Creditors, and the Guarantor, and each such waiver, if any, will apply only with respect to the specific instance involved, and will in no way impair the rights of the Agent and the Creditors or the liabilities of the Guarantor to the Agent and the Creditors in any other respect at any other time.

10.  **Guarantee of all Credit Obtained; Indemnity**.  All moneys and credits in fact borrowed or obtained by the Borrowers or any other Credit Party from the Agent or any Creditor under the Loan Documents will be deemed to form part of the Guaranteed Obligations notwithstanding any incapacity, disability or lack or limitation of status or power of the Borrowers or any other Credit Party or of the directors, officers, employees, partners or agents thereof, or that the Borrowers or any other Credit Party may not be a legal entity, or any irregularity, defect or informality in the borrowing or obtaining of such moneys or credits.  If any amount in respect of the Guaranteed Obligations is not recoverable from the Guarantor hereunder on the basis of a guarantee, then, notwithstanding any other provision hereof, the Guarantor will indemnify and save harmless the Agent and each Creditor and all of their respective directors, officers, shareholders and agents from and against any and all losses, damages, costs, expenses or liabilities suffered or incurred by the Agent or any Creditor or any of their respective

- 6 -

directors, officers, shareholders and agents resulting or arising from or relating to any failure of the Borrowers or any other Credit Party to unconditionally and irrevocably pay in full or fully perform the Guaranteed Obligations as and when due provided that the amount of such indemnification shall not exceed the amount of such Guaranteed Obligations and any amounts due and owing hereunder.

11.    **Stay of Acceleration**.  If acceleration of the time for payment, or the liability of the Borrowers or any other Credit Party to make payment, of any amount specified to be payable by the Borrowers or any other Credit Party in respect of the Guaranteed Obligations is stayed, prohibited or otherwise affected upon the insolvency, bankruptcy, reorganization or winding-up of the Borrowers or any other Credit Party or any moratorium affecting the payment of the Guaranteed Obligations, all such amounts otherwise subject to acceleration or payment will nonetheless be deemed for all purposes of this Guarantee to be and to become due and payable by the Borrowers or any other Credit Party and will be payable by the Guarantor hereunder forthwith on demand by the Agent for and on behalf of the Creditors.

12.    **Reinstatement**.  If, at any time, all or any part of any payment previously applied by the Agent or any Creditor to any Guaranteed Obligation is or must be rescinded or returned by the Agent or any Creditor for any reason whatsoever (including the insolvency, bankruptcy, or reorganization of the Borrowers or any other Credit Party), such Guaranteed Obligation will, for the purpose of this Guarantee, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Agent or any such Creditor, and this Guarantee will continue to be effective or be reinstated, as the case may be, as to such Guaranteed Obligation, all as though such application by the Agent or any such Creditor had not been made.

13.    **Assignment and Postponement**.  All present and future indebtedness and liability of the Borrowers and each other Credit Party to the Guarantor is hereby assigned by the Guarantor to the Agent for its own benefit and on behalf of the Creditors and subordinated to the Guaranteed Obligations and all moneys received by the Guarantor in respect thereof following the occurrence and during the continuance of an Event of Default will be received in trust for and, unless prior written authorization from the Agent to the contrary will have been obtained by the Guarantor, will be paid over to the Agent for its own benefit and on behalf of the Creditors upon demand by the Agent.  If the Agent receives from the Guarantor a payment or payments in full or on account of the liability of the Guarantor hereunder, the Guarantor will not be entitled to claim repayment against the Borrowers or any other Credit Party until the Agent's and the Creditors' claims against the Borrowers or the applicable Credit Party have been irrevocably and unconditionally paid in full.  In case of liquidation, winding up or bankruptcy of the Borrowers or any other Credit Party (whether voluntary or involuntary) or any composition with creditors or scheme of arrangement, the Agent for its own benefit and on behalf of the Creditors will have the right to rank for its full claims and receive all or other payments in respect thereof in priority to the Guarantor until the Guaranteed Obligations have been irrevocably and unconditionally paid in full, and the Guarantor will continue to be liable hereunder for any balance which may be owing to the Agent for

- 7 -

its own benefit and on behalf of the Creditors by the Borrowers or any other Credit Party. In the event of the valuation by the Agent of any of its security and/or the retention thereof by the Agent, such valuation and/or retention will not, as between the Agent and the Guarantor, be considered as a purchase of such security, or as payment or satisfaction of the Guaranteed Obligations or any part thereof. The foregoing provisions of this Section 13 will not in any way limit or lessen the liability of the Guarantor under any other section of this Guarantee.

14. **No Subrogation**. Notwithstanding any payment made by the Guarantor under this Guarantee or any setoff or application of funds of the Guarantor by the Agent or any Creditor, the Guarantor will have no right of subrogation to, and waives, to the fullest extent permitted by Applicable Law, any right to enforce any remedy which the Agent now has or may hereafter have against the Borrowers or any other Credit Party, until all of the Guaranteed Obligations have been irrevocably and unconditionally paid in full; and until that time, the Guarantor waives any benefit of, and any right to participate in, any security, whether real or personal property, now or hereafter held by the Agent or any Creditor for the Guaranteed Obligations.

15. **Foreign Currency Guaranteed Obligations**. The Guarantor will make payment relative to each Guaranteed Obligation in the currency (the "**Original Currency**") in which the Borrowers or any other Credit Party is required to pay such Guaranteed Obligation. If the Guarantor makes payment relative to any Guaranteed Obligation to the Agent or any Creditor in a currency (the "**Other Currency**") other than the Original Currency (whether voluntarily or pursuant to an order or judgment of a court or tribunal of any jurisdiction), such payment will constitute a discharge of the liability of the Guarantor hereunder in respect of such Guaranteed Obligation only to the extent of the amount of the Original Currency which the Agent is able to purchase at Toronto, Ontario with the amount it receives on the date of receipt. If the amount of the Original Currency which the Agent is able to purchase is less than the amount of such currency originally due to it in respect to the relevant Guaranteed Obligation, the Guarantor will indemnify and save the Agent and each Creditor harmless from and against any loss or damage arising as a result of such deficiency. This indemnity will constitute an obligation separate and independent from the other obligations contained in this Guarantee, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by the Agent, for its own benefit and on behalf of the Creditors, and will continue in full force and effect notwithstanding any judgment or order in respect of any amount due hereunder or under any judgment or order.

16. **Taxes**. All payments to be made by the Guarantor hereunder will be made without set-off or counterclaim and without deduction for any taxes, levies, duties, fees, deductions, withholdings, restrictions or conditions of any nature whatsoever. If at any time any Applicable Law, regulation or international agreement requires the Guarantor to make any such deduction or withholding from any such payment, the sum due from the Guarantor with respect to such payment will be increased to the extent necessary to ensure that, after the making of such deduction or withholding, the Agent, for its own benefit and on behalf of the Creditors, receives a net sum equal to the sum which it would have received had no deduction or withholding been required.

- 8 -

17.   **Payment of Expenses; Indemnification**. The Guarantor will pay on demand during the occurrence and continuance of an Event of Default, and will indemnify and save the Agent and each Creditor harmless from, any and all liabilities, all reasonable costs and expenses (including reasonable out-of-pocket legal fees and expenses on a solicitor and his own client full indemnity basis and any sales, goods and services or other similar taxes payable to any Governmental Authority with respect to any such liabilities, costs and expenses) (a) incurred by the Agent for its own benefit and on behalf of the Creditors in the administration or enforcement of this Guarantee, (b) with respect to, or resulting from, any failure or delay by the Guarantor in performing or observing any of its obligations under this Guarantee, or (c) incurred by the Agent in performing or observing any of the other covenants of the Guarantor under this Guarantee.

18.   **Additional Security**. This Guarantee is in addition and without prejudice to any security of any kind (including other guarantees) now or hereafter held by or for the benefit of the Agent or the Creditors and any other rights or remedies that the Agent or the Creditors might have.

19.   **Governing Law; Attornment**. This Guarantee will be governed by and construed in accordance with the laws of the Province of Alberta and the laws of Canada applicable therein, without giving effect to the conflict of law principles thereof. Without prejudice to the ability of the Agent or any Creditor to enforce this Guarantee in any other proper jurisdiction, the Guarantor irrevocably submits and attorns to the non-exclusive jurisdiction of the courts of the Province of Alberta, or any appellate court thereof, for the purposes of this Guarantee. To the extent legally permitted, the Guarantor waives any right it may have to, or to apply for, trial by jury in connection with any matter, action, proceeding, claim or counterclaim arising out of or relating to the Loan Documents or any of the transactions contemplated thereby.

20.   **Successors and Assigns**. The provisions of this Guarantee will be binding upon and enure to the benefit of the Agent, the Creditors and their respective successors and assigns and will be binding upon the Guarantor and its successors. The Guarantor's obligations hereunder will not be assigned or delegated. The Agent or any Creditor may from time to time, and without notice to or the consent of the Guarantor, assign or transfer all or any of the Guaranteed Obligations or any interest therein in accordance with the Loan Documents and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, any such Guaranteed Obligation or part thereof so transferred or assigned will remain a "Guaranteed Obligation" for the purposes of this Guarantee and any immediate and successive permitted assignee or transferee of any Guaranteed Obligation or any interest therein will, to the extent of the interest so assigned or transferred, be entitled to the benefit of, and the right to enforce, this Guarantee.

21.   **Time**. Time will be of the essence in this Guarantee.

22.   **Severability**. If any portion of this Guarantee or the application thereof to any circumstance will be held invalid or unenforceable by a court of competent jurisdiction from which no further appeal has or is taken, to an extent that does not affect in a

- 9 -

fundamental way the operation of this Guarantee, the remainder of the provision in question, or its application to any circumstance other than that to which it has been held invalid or unenforceable, and the remainder of this Guarantee will not be affected thereby and will be valid and enforceable to the fullest extent permitted by Applicable Laws.

23. **Notice**.  All notices, requests and demands to or upon the Agent or the Guarantor under this Agreement shall be in writing and given as provided in Section 13.11 of the Credit Agreement to the address (a) of the Agent set forth in the Credit Agreement and (b) of the Guarantor at the following address for notice:

By personal delivery:
Q'Max Solutions Holdings Inc.
407 2nd St. S.W., Ste. 1700
Calgary, Alberta T2P 2Y3

By mail:
Q'Max Solutions Holdings Inc.
407 2nd St. S.W., Ste. 1700
Calgary, Alberta T2P 2Y3

Attention:     Mark Roberts, Chief Financial Officer
Fax No.:        (403) 269-2251

or in either case at such other address as shall be designated reasonably beforehand by such party in a written notice to each other party.

24. **Credit Parties' Financial Condition**.  The Guarantor is fully aware of the financial condition of the Borrowers and the other Credit Parties.

25. **Negotiated Document**.  This Guarantee is the result of negotiations between the Guarantor and the Agent and have been reviewed by counsel to the Guarantor and the Agent and is the product of both the Guarantor and the Agent.  Accordingly, this Guarantee is not to be construed against the Agent merely because of its involvement in this Guarantee's preparation.

26. **Interpretation**.  The division of this Guarantee into sections and paragraphs, and the insertion of headings, is for convenience of reference only and will not affect the construction or interpretation of this Guarantee.  Unless the context otherwise requires, words importing the singular include the plural and vice versa, and words importing gender include all genders.  When used in this Guarantee, the word "including" (or includes) means "including (or includes) without limitation".

27. **Receipt of Copy**.  The Guarantor acknowledges receipt of an executed copy of this Guarantee.  The Guarantor waives the right to receive any amount that it may now or hereafter be entitled to receive (whether by way of damages, fine, penalty or otherwise) by reason of the failure of the Agent to deliver to the Guarantor a copy of any financing

- 10 -

statement or any statement issued by any registry that confirms registration of a financing statement relating to this Guarantee.

28. **Acknowledgement.**   The Guarantor acknowledges having reviewed each of the representations, warranties and covenants set forth in the Credit Agreement (including Articles 6 and 7 thereof) and hereby restates each of such representations, warranties and covenants herein to the extent they relate to the Guarantor as a "Credit Party" and the Guarantor agrees to be bound by each such representations, warranties and covenants as if it was repeated herein, subject to the same cure periods, if any, set out in the Credit Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**THIS GUARANTEE** executed effective the date first written above.

<div align="right">

**Q'MAX SOLUTIONS HOLDINGS INC.**

Per: _____

Name:    Mark Roberts

Title:    Chief Financial Officer

</div>

THIS IS EXHIBIT " *10* "

referred to in the Affidavit of

*Cameron Bailey*

Sworn before me this *26th*

day of *May* A.D. 20 *20*

Jonathan Tomm
Barrister and Solicitor

## GUARANTEE

TO:        **HSBC BANK CANADA**, as Agent (the "**Agent**")

DATE:      May 23, 2014

*PREAMBLE:*

A.      Fluid Acquisition Corp. and Q'Max America Inc. (collectively, the "**Borrowers**"), as borrowers, HSBC Bank Canada and those other financial institutions which are from time to time party thereto as lenders (collectively, the "**Lenders**") and HSBC Bank Canada, as administrative agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "**Agent**") are parties to a credit agreement dated as of the date hereof (as such credit agreement may be amended, supplemented or otherwise modified or restated from time to time, the "**Credit Agreement**").

B.      The Borrowers and the Guarantors (as defined in the Credit Agreement) (collectively, the "**Credit Parties**" and each a "**Credit Party**") may, from time to time, incur indebtedness, obligations and liabilities to the Agent, the Lenders, the Hedge Providers and counterparties providing services pursuant to the Banking Services Agreements (collectively, the "**Creditors**") pursuant to or in connection with the Credit Agreement, the other Loan Documents, the Hedging Agreements and the Banking Services Agreements from time to time.

C.      It is in the interests of Q'Max Solutions Inc. (the "**Guarantor**"), that the Creditors extend credit to the Borrowers pursuant to the applicable Credit Documents and therefore the Guarantor is prepared to issue this Guarantee to the Agent for and on behalf of the Creditors.

**AGREEMENT:**

For valuable consideration, the receipt and sufficiency of which are hereby conclusively acknowledged by the Guarantor, the Guarantor hereby agrees in favour of the Agent for its own benefit and on behalf of the Creditors as follows:

1.      **Defined Terms**.  In this Guarantee, capitalized words and phrases which are not otherwise defined have the respective meanings given to such terms in the Credit Agreement. In addition, the term "**Loan Documents**" when used herein means the Credit Agreement, the Hedging Agreements, the Banking Services Agreements, the Security and any other Credit Documents, instruments or agreements entered into pursuant thereto or in connection therewith.

2.      **Guarantee**.  The Guarantor hereby unconditionally and irrevocably guarantees the prompt payment and performance to the Agent for its own benefit and on behalf of the Creditors forthwith upon demand by the Agent during the occurrence and continuance of an Event of Default of all indebtedness, liabilities and obligations of any kind whatsoever

- 2 -

(whether direct or indirect, joint or several, absolute or contingent, matured or unmatured) which the Borrowers or any other Credit Party (other than the Guarantor) has from time to time incurred or is under or may hereafter incur or be under to the Agent or any Creditor under or in connection with or with respect to the Loan Documents (collectively, the "**Guaranteed Obligations**"). All amounts payable by the Guarantor hereunder will be paid to the Agent for its own benefit and on behalf of the Creditors at the address of the Agent set forth in Section 23 below or as otherwise directed in writing by the Agent. Any amounts payable by the Guarantor under this Guarantee which are not paid forthwith upon demand therefor by the Agent as aforesaid for its own benefit and on behalf of the Creditors will bear interest from the date of such demand at the rate or rates applicable to the corresponding Guaranteed Obligations.

3.  **Continuing, Unconditional and Absolute Guarantee**. The obligations of the Guarantor under this Guarantee are continuing, unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged, diminished, limited or otherwise affected by (and the Guarantor hereby consents to or waives, as applicable, to the fullest extent permitted by Applicable Laws):

(a)  any extension, other indulgence, renewal, settlement, discharge, compromise, waiver, subordination or release in respect of any Guaranteed Obligation, security, Person or otherwise, unless such settlement, discharge, compromise or release shall specifically release the Guarantor from its obligations, indebtedness or liabilities hereunder or any part thereof or is a payment of the Guaranteed Obligations;

(b)  any waiver, modification, restatement or amendment of or supplement to any Loan Document or the Guaranteed Obligations, including any increase or decrease in the principal, the rates of interest or other amounts payable thereunder;

(c)  any change in the time, manner or place of payment of or in any other term of any Loan Document or the Guaranteed Obligations, or the failure on the part of the Borrowers or any other Credit Party to carry out any of its Guaranteed Obligations under any Loan Document;

(d)  any impossibility, impracticability, frustration of purpose, illegality, force majeure or act of government;

(e)  any non-perfection or invalidity of any direct or indirect security for any Guaranteed Obligation;

(f)  any change in the existence, structure, constitution, name, objects, powers, business, control or ownership of the Borrowers, any other Credit Party or any other Person, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrowers, any other Credit Party or any other Person or its assets;

- 3 -

(g)     the existence of any claim, set-off or other rights which the Guarantor may have at any time against the Borrowers, any other Credit Party, the Agent or any other Person, whether in connection herewith or any unrelated transactions;

(h)     any invalidity, illegality or unenforceability relating to or against the Borrowers or any other Credit Party or any provision of Applicable Law purporting to prohibit the payment by the Borrowers or any other Credit Party of the principal or interest under the Guaranteed Obligations;

(i)     any limitation, postponement, prohibition, subordination or other restriction on the rights of the Agent or any Creditor to receive payment of the Guaranteed Obligations;

(j)     any release, substitution or addition of any co-signer, endorser or other guarantor of the Guaranteed Obligations;

(k)     any defence arising by reason of any failure of the Agent or any Creditor to make any presentment, demand for performance, notice of non-performance, protest, and any other notice, including notice of all of the following:  acceptance of this Guarantee, partial payment or non-payment of all or any part of the Guaranteed Obligations and the existence, creation, or incurring of new or additional Guaranteed Obligations;

(l)     any defence arising by reason of any failure of the Agent or any Creditor to proceed against the Borrowers, any other Credit Party or any other Person, to proceed against, apply or exhaust any security held from the Borrowers, any other Credit Party or any other Person for the Guaranteed Obligations, to proceed against, apply or exhaust any security held from the Guarantor or any other Person for this Guarantee or to pursue any other remedy in the power of the Agent or any Creditor whatsoever;

(m)     any Applicable Law which provides that the obligation of a guarantor must neither be larger in amount nor in other respects more burdensome than that of the principal obligation or which reduces a guarantor's obligation in proportion to the principal obligation;

(n)     any defence arising by reason of any incapacity, lack of authority, or other defence of the Borrowers, any other Credit Party or any other Person, or by reason of any limitation, postponement, prohibition on the Agent's or any Creditor's right to receive payment of the Guaranteed Obligations or any part thereof, or by reason of the cessation from any cause whatsoever of the liability of the Borrowers, any other Credit Party or any other Person with respect to all or any part of the Guaranteed Obligations, or by reason of any act or omission of the Agent or any Creditor or others which directly or indirectly results in the discharge or release of the Borrowers, any other Credit Party or any other Person or all or any part of the Guaranteed Obligations or any security or guarantee therefor, whether by contract, operation of law or otherwise;

- 4 -

(o)    any defence arising by reason of any failure by the Agent or any Creditor to obtain, perfect or maintain a perfected or prior (or any) security interest in or Lien upon any property of the Borrowers, any other Credit Party or any other Person, or by reason of any interest of the Agent or any Creditor in any property, whether as owner thereof or the holder of a security interest therein or Lien thereon, being invalidated, voided, declared fraudulent or preferential or otherwise set aside, or by reason of any impairment by the Agent of any right to recourse or collateral;

(p)    any defence arising by reason of the failure of the Agent or any Creditor to marshal any assets;

(q)    any defence based upon any failure of the Agent or any Creditor to give to the Borrowers, any other Credit Party, the Guarantor or any other Person notice of any sale or other disposition of any property securing any or all of the Guaranteed Obligations or any guarantee thereof, or any defect in any notice that may be given in connection with any sale or other disposition of any such property, or any failure of the Agent or any Creditor to comply with any provision of Applicable Law in enforcing any Lien upon any such property, including any failure by the Agent or any Creditor to dispose of any such property in a commercially reasonable manner;

(r)    any dealing whatsoever with the Borrowers, any other Credit Party or other Person or any security, whether negligently or not, or any failure to do so;

(s)    any defence based upon or arising out of any bankruptcy, insolvency, reorganization, moratorium, arrangement, readjustment of debt, liquidation or dissolution proceeding commenced by or against the Borrowers, any other Credit Party or any other Person, including any discharge of, or bar against collecting, any of the Guaranteed Obligations, in or as a result of any such proceeding; or

(t)    any other act or omission to act or delay of any kind by the Borrowers, any other Credit Party, the Agent, a Creditor or any other Person or any other circumstance whatsoever, whether similar or dissimilar to the foregoing, which might, but for the provisions of this Section 3, constitute a legal or equitable discharge, limitation or reduction of the Guarantor's obligations hereunder (other than the irrevocable and unconditional payment in full of all of the Guaranteed Obligations).

The foregoing provisions apply (and the foregoing waivers will be effective) even if the effect of any action (or failure to take action) by the Agent or any Creditor is to destroy or diminish the Guarantor's subrogation rights, the Guarantor's right to proceed against the Borrowers or any other Credit Party for reimbursement, the Guarantor's right to recover contribution from any other guarantor or any other right or remedy.

4.    **Release of Guaranteed Obligations**.  This Guarantee will remain in full force and effect until the Guaranteed Obligations are irrevocably and unconditionally performed and paid in full.

- 5 -

5.  **Validity of Agreements**.  The Guarantor will not contest or otherwise challenge the legality, validity or enforceability of any term, condition or other provision contained in the Loan Documents.  The Guarantor represents to the Agent for and on behalf of the Creditors that it is familiar with and consents to the terms and conditions of the Loan Documents.

6.  **Assumption of Authority**.  The Agent, for and on behalf of the Creditors, is entitled to assume, notwithstanding any investigation by or on behalf of the Agent or any Creditor, the power and authority of the officers, directors, agents or other Persons acting or purporting to act on behalf of the Borrowers, the Guarantor or the other Credit Parties, and any Guaranteed Obligations made or created in reliance upon the exercise of such power or authority will be guaranteed hereunder.

7.  **Recourse against Credit Parties and Others**.  The Agent, for and on behalf of the Creditors, is not required to exhaust its recourse against the Borrowers, the other Credit Parties, any other guarantor or other Person or under any other security or other guarantee before being entitled to payment from the Guarantor under this Guarantee.

8.  **Settlement of Accounts**.  Any account settled or stated between the Agent, for and on behalf of the Creditors, and the Borrowers or the other Credit Parties will be accepted by the Guarantor as prima facie evidence, subject to manifest error, that the amount thereby appearing due by the Borrowers or the other Credit Parties to the Agent and the Creditors is so due.

9.  **No Waiver**.  No delay on the part of the Agent, for and on behalf of the Creditors, in exercising any of its options, powers or rights, or partial or single exercise thereof, will constitute a waiver thereof.  No waiver of any of the Agent's or any Creditor's rights hereunder, and no modification or amendment of this Guarantee, will be deemed to be made by the Agent for and on behalf of the Creditors unless the same will be in writing, duly signed by the Agent, for and on behalf of the Creditors, and the Guarantor, and each such waiver, if any, will apply only with respect to the specific instance involved, and will in no way impair the rights of the Agent and the Creditors or the liabilities of the Guarantor to the Agent and the Creditors in any other respect at any other time.

10. **Guarantee of all Credit Obtained; Indemnity**.  All moneys and credits in fact borrowed or obtained by the Borrowers or any other Credit Party from the Agent or any Creditor under the Loan Documents will be deemed to form part of the Guaranteed Obligations notwithstanding any incapacity, disability or lack or limitation of status or power of the Borrowers or any other Credit Party or of the directors, officers, employees, partners or agents thereof, or that the Borrowers or any other Credit Party may not be a legal entity, or any irregularity, defect or informality in the borrowing or obtaining of such moneys or credits.  If any amount in respect of the Guaranteed Obligations is not recoverable from the Guarantor hereunder on the basis of a guarantee, then, notwithstanding any other provision hereof, the Guarantor will indemnify and save harmless the Agent and each Creditor and all of their respective directors, officers, shareholders and agents from and against any and all losses, damages, costs, expenses or liabilities suffered or incurred by the Agent or any Creditor or any of their respective

- 6 -

directors, officers, shareholders and agents resulting or arising from or relating to any failure of the Borrowers or any other Credit Party to unconditionally and irrevocably pay in full or fully perform the Guaranteed Obligations as and when due provided that the amount of such indemnification shall not exceed the amount of such Guaranteed Obligations and any amounts due and owing hereunder.

11. **Stay of Acceleration**. If acceleration of the time for payment, or the liability of the Borrowers or any other Credit Party to make payment, of any amount specified to be payable by the Borrowers or any other Credit Party in respect of the Guaranteed Obligations is stayed, prohibited or otherwise affected upon the insolvency, bankruptcy, reorganization or winding-up of the Borrowers or any other Credit Party or any moratorium affecting the payment of the Guaranteed Obligations, all such amounts otherwise subject to acceleration or payment will nonetheless be deemed for all purposes of this Guarantee to be and to become due and payable by the Borrowers or any other Credit Party and will be payable by the Guarantor hereunder forthwith on demand by the Agent for and on behalf of the Creditors.

12. **Reinstatement**. If, at any time, all or any part of any payment previously applied by the Agent or any Creditor to any Guaranteed Obligation is or must be rescinded or returned by the Agent or any Creditor for any reason whatsoever (including the insolvency, bankruptcy, or reorganization of the Borrowers or any other Credit Party), such Guaranteed Obligation will, for the purpose of this Guarantee, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Agent or any such Creditor, and this Guarantee will continue to be effective or be reinstated, as the case may be, as to such Guaranteed Obligation, all as though such application by the Agent or any such Creditor had not been made.

13. **Assignment and Postponement**. All present and future indebtedness and liability of the Borrowers and each other Credit Party to the Guarantor is hereby assigned by the Guarantor to the Agent for its own benefit and on behalf of the Creditors and subordinated to the Guaranteed Obligations and all moneys received by the Guarantor in respect thereof following the occurrence and during the continuance of an Event of Default will be received in trust for and, unless prior written authorization from the Agent to the contrary will have been obtained by the Guarantor, will be paid over to the Agent for its own benefit and on behalf of the Creditors upon demand by the Agent. If the Agent receives from the Guarantor a payment or payments in full or on account of the liability of the Guarantor hereunder, the Guarantor will not be entitled to claim repayment against the Borrowers or any other Credit Party until the Agent's and the Creditors' claims against the Borrowers or the applicable Credit Party have been irrevocably and unconditionally paid in full. In case of liquidation, winding up or bankruptcy of the Borrowers or any other Credit Party (whether voluntary or involuntary) or any composition with creditors or scheme of arrangement, the Agent for its own benefit and on behalf of the Creditors will have the right to rank for its full claims and receive all or other payments in respect thereof in priority to the Guarantor until the Guaranteed Obligations have been irrevocably and unconditionally paid in full, and the Guarantor will continue to be liable hereunder for any balance which may be owing to the Agent for

its own benefit and on behalf of the Creditors by the Borrowers or any other Credit Party. In the event of the valuation by the Agent of any of its security and/or the retention thereof by the Agent, such valuation and/or retention will not, as between the Agent and the Guarantor, be considered as a purchase of such security, or as payment or satisfaction of the Guaranteed Obligations or any part thereof. The foregoing provisions of this Section 13 will not in any way limit or lessen the liability of the Guarantor under any other section of this Guarantee.

14. **No Subrogation**. Notwithstanding any payment made by the Guarantor under this Guarantee or any setoff or application of funds of the Guarantor by the Agent or any Creditor, the Guarantor will have no right of subrogation to, and waives, to the fullest extent permitted by Applicable Law, any right to enforce any remedy which the Agent now has or may hereafter have against the Borrowers or any other Credit Party, until all of the Guaranteed Obligations have been irrevocably and unconditionally paid in full; and until that time, the Guarantor waives any benefit of, and any right to participate in, any security, whether real or personal property, now or hereafter held by the Agent or any Creditor for the Guaranteed Obligations.

15. **Foreign Currency Guaranteed Obligations**. The Guarantor will make payment relative to each Guaranteed Obligation in the currency (the "**Original Currency**") in which the Borrowers or any other Credit Party is required to pay such Guaranteed Obligation. If the Guarantor makes payment relative to any Guaranteed Obligation to the Agent or any Creditor in a currency (the "**Other Currency**") other than the Original Currency (whether voluntarily or pursuant to an order or judgment of a court or tribunal of any jurisdiction), such payment will constitute a discharge of the liability of the Guarantor hereunder in respect of such Guaranteed Obligation only to the extent of the amount of the Original Currency which the Agent is able to purchase at Toronto, Ontario with the amount it receives on the date of receipt. If the amount of the Original Currency which the Agent is able to purchase is less than the amount of such currency originally due to it in respect to the relevant Guaranteed Obligation, the Guarantor will indemnify and save the Agent and each Creditor harmless from and against any loss or damage arising as a result of such deficiency. This indemnity will constitute an obligation separate and independent from the other obligations contained in this Guarantee, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by the Agent, for its own benefit and on behalf of the Creditors, and will continue in full force and effect notwithstanding any judgment or order in respect of any amount due hereunder or under any judgment or order.

16. **Taxes**. All payments to be made by the Guarantor hereunder will be made without set-off or counterclaim and without deduction for any taxes, levies, duties, fees, deductions, withholdings, restrictions or conditions of any nature whatsoever. If at any time any Applicable Law, regulation or international agreement requires the Guarantor to make any such deduction or withholding from any such payment, the sum due from the Guarantor with respect to such payment will be increased to the extent necessary to ensure that, after the making of such deduction or withholding, the Agent, for its own benefit and on behalf of the Creditors, receives a net sum equal to the sum which it would have received had no deduction or withholding been required.

17. **Payment of Expenses; Indemnification**. The Guarantor will pay on demand during the occurrence and continuance of an Event of Default, and will indemnify and save the Agent and each Creditor harmless from, any and all liabilities, all reasonable costs and expenses (including reasonable out-of-pocket legal fees and expenses on a solicitor and his own client full indemnity basis and any sales, goods and services or other similar taxes payable to any Governmental Authority with respect to any such liabilities, costs and expenses) (a) incurred by the Agent for its own benefit and on behalf of the Creditors in the administration or enforcement of this Guarantee, (b) with respect to, or resulting from, any failure or delay by the Guarantor in performing or observing any of its obligations under this Guarantee, or (c) incurred by the Agent in performing or observing any of the other covenants of the Guarantor under this Guarantee.

18. **Additional Security**. This Guarantee is in addition and without prejudice to any security of any kind (including other guarantees) now or hereafter held by or for the benefit of the Agent or the Creditors and any other rights or remedies that the Agent or the Creditors might have.

19. **Governing Law; Attornment**. This Guarantee will be governed by and construed in accordance with the laws of the Province of Alberta and the laws of Canada applicable therein, without giving effect to the conflict of law principles thereof. Without prejudice to the ability of the Agent or any Creditor to enforce this Guarantee in any other proper jurisdiction, the Guarantor irrevocably submits and attorns to the non-exclusive jurisdiction of the courts of the Province of Alberta, or any appellate court thereof, for the purposes of this Guarantee. To the extent legally permitted, the Guarantor waives any right it may have to, or to apply for, trial by jury in connection with any matter, action, proceeding, claim or counterclaim arising out of or relating to the Loan Documents or any of the transactions contemplated thereby.

20. **Successors and Assigns**. The provisions of this Guarantee will be binding upon and enure to the benefit of the Agent, the Creditors and their respective successors and assigns and will be binding upon the Guarantor and its successors. The Guarantor's obligations hereunder will not be assigned or delegated. The Agent or any Creditor may from time to time, and without notice to or the consent of the Guarantor, assign or transfer all or any of the Guaranteed Obligations or any interest therein in accordance with the Loan Documents and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, any such Guaranteed Obligation or part thereof so transferred or assigned will remain a "Guaranteed Obligation" for the purposes of this Guarantee and any immediate and successive permitted assignee or transferee of any Guaranteed Obligation or any interest therein will, to the extent of the interest so assigned or transferred, be entitled to the benefit of, and the right to enforce, this Guarantee.

21. **Time**. Time will be of the essence in this Guarantee.

22. **Severability**. If any portion of this Guarantee or the application thereof to any circumstance will be held invalid or unenforceable by a court of competent jurisdiction from which no further appeal has or is taken, to an extent that does not affect in a

- 9 -

fundamental way the operation of this Guarantee, the remainder of the provision in question, or its application to any circumstance other than that to which it has been held invalid or unenforceable, and the remainder of this Guarantee will not be affected thereby and will be valid and enforceable to the fullest extent permitted by Applicable Laws.

23.  **Notice**.  All notices, requests and demands to or upon the Agent or the Guarantor under this Agreement shall be in writing and given as provided in Section 13.11 of the Credit Agreement to the address (a) of the Agent set forth in the Credit Agreement and (b) of the Guarantor at the following address for notice:

By personal delivery:
Q'Max Solutions Inc.
407 2nd St. S.W., Ste. 1700
Calgary, Alberta T2P 2Y3

By mail:
Q'Max Solutions Inc.
407 2nd St. S.W., Ste. 1700
Calgary, Alberta T2P 2Y3

Attention:     Mark Roberts, Chief Financial Officer
Fax No.:       (403) 269-2251

or in either case at such other address as shall be designated reasonably beforehand by such party in a written notice to each other party.

24.  **Credit Parties' Financial Condition**.  The Guarantor is fully aware of the financial condition of the Borrowers and the other Credit Parties.

25.  **Negotiated Document**.  This Guarantee is the result of negotiations between the Guarantor and the Agent and have been reviewed by counsel to the Guarantor and the Agent and is the product of both the Guarantor and the Agent.  Accordingly, this Guarantee is not to be construed against the Agent merely because of its involvement in this Guarantee's preparation.

26.  **Interpretation**.  The division of this Guarantee into sections and paragraphs, and the insertion of headings, is for convenience of reference only and will not affect the construction or interpretation of this Guarantee.  Unless the context otherwise requires, words importing the singular include the plural and vice versa, and words importing gender include all genders.  When used in this Guarantee, the word "including" (or includes) means "including (or includes) without limitation".

27.  **Receipt of Copy**.  The Guarantor acknowledges receipt of an executed copy of this Guarantee.  The Guarantor waives the right to receive any amount that it may now or hereafter be entitled to receive (whether by way of damages, fine, penalty or otherwise) by reason of the failure of the Agent to deliver to the Guarantor a copy of any financing

- 10 -

statement or any statement issued by any registry that confirms registration of a financing statement relating to this Guarantee.

28.    **Acknowledgement.**    The Guarantor acknowledges having reviewed each of the representations, warranties and covenants set forth in the Credit Agreement (including Articles 6 and 7 thereof) and hereby restates each of such representations, warranties and covenants herein to the extent they relate to the Guarantor as a "Credit Party" and the Guarantor agrees to be bound by each such representations, warranties and covenants as if it was repeated herein, subject to the same cure periods, if any, set out in the Credit Agreement.

<div align="center">

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

</div>

**THIS GUARANTEE** executed effective the date first written above.

<div align="right">

**Q'MAX SOLUTIONS INC.**

Per: _____

Name:   Mark Roberts
Title:    Chief Financial Officer

</div>

THIS IS EXHIBIT " _____11_____ "

referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26th_

day of _May_ A.D. 20 _20_

**Jonathan Tomm**
**Barrister and Solicitor**

## GUARANTEE

TO:        **HSBC BANK CANADA**, as Agent (the "**Agent**")

DATE:     September 1, 2016

### *PREAMBLE:*

A.     Q'Max Solutions Inc. and Q'Max America Inc. (collectively, the "**Borrowers**"), as borrowers, HSBC Bank Canada and those other financial institutions which are from time to time party thereto as lenders (collectively, the "**Lenders**") and HSBC Bank Canada, as administrative agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "**Agent**") are parties to an amended and restated credit agreement dated as of January 30, 2015 (as amended by a first amending agreement dated as of September 3, 2015, and as further amended by a second amending agreement dated as of March 30, 2016, as may be further amended, supplemented or otherwise modified or restated from time to time, the "**Credit Agreement**").

B.     The Borrowers and the Guarantors (as defined in the Credit Agreement) (collectively, the "**Credit Parties**" and each a "**Credit Party**") may, from time to time, incur indebtedness, obligations and liabilities to the Agent, the Lenders, the Hedge Providers and counterparties providing services pursuant to the Banking Services Agreements (collectively, the "**Creditors**") pursuant to or in connection with the Credit Agreement, the other Loan Documents, the Hedging Agreements and the Banking Services Agreements from time to time.

C.     It is in the interests of QMax Canada Operations Inc. (the "**Guarantor**"), that the Creditors extend credit to the Borrowers pursuant to the applicable Credit Documents and therefore the Guarantor is prepared to issue this Guarantee to the Agent for and on behalf of the Creditors.

### AGREEMENT:

For valuable consideration, the receipt and sufficiency of which are hereby conclusively acknowledged by the Guarantor, the Guarantor hereby agrees in favour of the Agent for its own benefit and on behalf of the Creditors as follows:

1.     **Defined Terms**.   In this Guarantee, capitalized words and phrases which are not otherwise defined have the respective meanings given to such terms in the Credit Agreement. In addition, the term "**Loan Documents**" when used herein means the Credit Agreement, the Hedging Agreements, the Banking Services Agreements, the Security and any other Credit Documents, instruments or agreements entered into pursuant thereto or in connection therewith.

2.     **Guarantee**.   The Guarantor hereby unconditionally and irrevocably guarantees the prompt payment and performance to the Agent for its own benefit and on behalf of the

- 2 -

Creditors forthwith upon demand by the Agent during the occurrence and continuance of an Event of Default of all indebtedness, liabilities and obligations of any kind whatsoever (whether direct or indirect, joint or several, absolute or contingent, matured or unmatured) which the Borrowers or any other Credit Party (other than the Guarantor) has from time to time incurred or is under or may hereafter incur or be under to the Agent or any Creditor under or in connection with or with respect to the Loan Documents (collectively, the "**Guaranteed Obligations**"). All amounts payable by the Guarantor hereunder will be paid to the Agent for its own benefit and on behalf of the Creditors at the address of the Agent set forth in Section 23 below or as otherwise directed in writing by the Agent. Any amounts payable by the Guarantor under this Guarantee which are not paid forthwith upon demand therefor by the Agent as aforesaid for its own benefit and on behalf of the Creditors will bear interest from the date of such demand at the rate or rates applicable to the corresponding Guaranteed Obligations.

3. **Continuing, Unconditional and Absolute Guarantee**. The obligations of the Guarantor under this Guarantee are continuing, unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged, diminished, limited or otherwise affected by (and the Guarantor hereby consents to or waives, as applicable, to the fullest extent permitted by Applicable Laws):

   (a) any extension, other indulgence, renewal, settlement, discharge, compromise, waiver, subordination or release in respect of any Guaranteed Obligation, security, Person or otherwise, unless such settlement, discharge, compromise or release shall specifically release the Guarantor from its obligations, indebtedness or liabilities hereunder or any part thereof or is a payment of the Guaranteed Obligations;

   (b) any waiver, modification, restatement or amendment of or supplement to any Loan Document or the Guaranteed Obligations, including any increase or decrease in the principal, the rates of interest or other amounts payable thereunder;

   (c) any change in the time, manner or place of payment of or in any other term of any Loan Document or the Guaranteed Obligations, or the failure on the part of the Borrowers or any other Credit Party to carry out any of its Guaranteed Obligations under any Loan Document;

   (d) any impossibility, impracticability, frustration of purpose, illegality, force majeure or act of government;

   (e) any non-perfection or invalidity of any direct or indirect security for any Guaranteed Obligation;

   (f) any change in the existence, structure, constitution, name, objects, powers, business, control or ownership of the Borrowers, any other Credit Party or any other Person, or any insolvency, bankruptcy, reorganization or other similar

- 3 -

proceeding affecting the Borrowers, any other Credit Party or any other Person or its assets;

(g)     the existence of any claim, set-off or other rights which the Guarantor may have at any time against the Borrowers, any other Credit Party, the Agent or any other Person, whether in connection herewith or any unrelated transactions;

(h)     any invalidity, illegality or unenforceability relating to or against the Borrowers or any other Credit Party or any provision of Applicable Law purporting to prohibit the payment by the Borrowers or any other Credit Party of the principal or interest under the Guaranteed Obligations;

(i)     any limitation, postponement, prohibition, subordination or other restriction on the rights of the Agent or any Creditor to receive payment of the Guaranteed Obligations;

(j)     any release, substitution or addition of any co-signer, endorser or other guarantor of the Guaranteed Obligations;

(k)     any defence arising by reason of any failure of the Agent or any Creditor to make any presentment, demand for performance, notice of non-performance, protest, and any other notice, including notice of all of the following: acceptance of this Guarantee, partial payment or non-payment of all or any part of the Guaranteed Obligations and the existence, creation, or incurring of new or additional Guaranteed Obligations;

(l)     any defence arising by reason of any failure of the Agent or any Creditor to proceed against the Borrowers, any other Credit Party or any other Person, to proceed against, apply or exhaust any security held from the Borrowers, any other Credit Party or any other Person for the Guaranteed Obligations, to proceed against, apply or exhaust any security held from the Guarantor or any other Person for this Guarantee or to pursue any other remedy in the power of the Agent or any Creditor whatsoever;

(m)     any Applicable Law which provides that the obligation of a guarantor must neither be larger in amount nor in other respects more burdensome than that of the principal obligation or which reduces a guarantor's obligation in proportion to the principal obligation;

(n)     any defence arising by reason of any incapacity, lack of authority, or other defence of the Borrowers, any other Credit Party or any other Person, or by reason of any limitation, postponement, prohibition on the Agent's or any Creditor's right to receive payment of the Guaranteed Obligations or any part thereof, or by reason of the cessation from any cause whatsoever of the liability of the Borrowers, any other Credit Party or any other Person with respect to all or any part of the Guaranteed Obligations, or by reason of any act or omission of the Agent or any Creditor or others which directly or indirectly results in the discharge or release of the Borrowers, any other Credit Party or any other Person

- 4 -

or all or any part of the Guaranteed Obligations or any security or guarantee therefor, whether by contract, operation of law or otherwise;

(o)    any defence arising by reason of any failure by the Agent or any Creditor to obtain, perfect or maintain a perfected or prior (or any) security interest in or Lien upon any property of the Borrowers, any other Credit Party or any other Person, or by reason of any interest of the Agent or any Creditor in any property, whether as owner thereof or the holder of a security interest therein or Lien thereon, being invalidated, voided, declared fraudulent or preferential or otherwise set aside, or by reason of any impairment by the Agent of any right to recourse or collateral;

(p)    any defence arising by reason of the failure of the Agent or any Creditor to marshal any assets;

(q)    any defence based upon any failure of the Agent or any Creditor to give to the Borrowers, any other Credit Party, the Guarantor or any other Person notice of any sale or other disposition of any property securing any or all of the Guaranteed Obligations or any guarantee thereof, or any defect in any notice that may be given in connection with any sale or other disposition of any such property, or any failure of the Agent or any Creditor to comply with any provision of Applicable Law in enforcing any Lien upon any such property, including any failure by the Agent or any Creditor to dispose of any such property in a commercially reasonable manner;

(r)    any dealing whatsoever with the Borrowers, any other Credit Party or other Person or any security, whether negligently or not, or any failure to do so;

(s)    any defence based upon or arising out of any bankruptcy, insolvency, reorganization, moratorium, arrangement, readjustment of debt, liquidation or dissolution proceeding commenced by or against the Borrowers, any other Credit Party or any other Person, including any discharge of, or bar against collecting, any of the Guaranteed Obligations, in or as a result of any such proceeding; or

(t)    any other act or omission to act or delay of any kind by the Borrowers, any other Credit Party, the Agent, a Creditor or any other Person or any other circumstance whatsoever, whether similar or dissimilar to the foregoing, which might, but for the provisions of this Section 3, constitute a legal or equitable discharge, limitation or reduction of the Guarantor's obligations hereunder (other than the irrevocable and unconditional payment in full of all of the Guaranteed Obligations).

The foregoing provisions apply (and the foregoing waivers will be effective) even if the effect of any action (or failure to take action) by the Agent or any Creditor is to destroy or diminish the Guarantor's subrogation rights, the Guarantor's right to proceed against the Borrowers or any other Credit Party for reimbursement, the Guarantor's right to recover contribution from any other guarantor or any other right or remedy.

- 5 -

4.  **Release of Guaranteed Obligations**. This Guarantee will remain in full force and effect until the Guaranteed Obligations are irrevocably and unconditionally performed and paid in full.

5.  **Validity of Agreements**. The Guarantor will not contest or otherwise challenge the legality, validity or enforceability of any term, condition or other provision contained in the Loan Documents. The Guarantor represents to the Agent for and on behalf of the Creditors that it is familiar with and consents to the terms and conditions of the Loan Documents.

6.  **Assumption of Authority**. The Agent, for and on behalf of the Creditors, is entitled to assume, notwithstanding any investigation by or on behalf of the Agent or any Creditor, the power and authority of the officers, directors, agents or other Persons acting or purporting to act on behalf of the Borrowers, the Guarantor or the other Credit Parties, and any Guaranteed Obligations made or created in reliance upon the exercise of such power or authority will be guaranteed hereunder.

7.  **Recourse against Credit Parties and Others**. The Agent, for and on behalf of the Creditors, is not required to exhaust its recourse against the Borrowers, the other Credit Parties, any other guarantor or other Person or under any other security or other guarantee before being entitled to payment from the Guarantor under this Guarantee.

8.  **Settlement of Accounts**. Any account settled or stated between the Agent, for and on behalf of the Creditors, and the Borrowers or the other Credit Parties will be accepted by the Guarantor as prima facie evidence, subject to manifest error, that the amount thereby appearing due by the Borrowers or the other Credit Parties to the Agent and the Creditors is so due.

9.  **No Waiver**. No delay on the part of the Agent, for and on behalf of the Creditors, in exercising any of its options, powers or rights, or partial or single exercise thereof, will constitute a waiver thereof. No waiver of any of the Agent's or any Creditor's rights hereunder, and no modification or amendment of this Guarantee, will be deemed to be made by the Agent for and on behalf of the Creditors unless the same will be in writing, duly signed by the Agent, for and on behalf of the Creditors, and the Guarantor, and each such waiver, if any, will apply only with respect to the specific instance involved, and will in no way impair the rights of the Agent and the Creditors or the liabilities of the Guarantor to the Agent and the Creditors in any other respect at any other time.

10. **Guarantee of all Credit Obtained; Indemnity**. All moneys and credits in fact borrowed or obtained by the Borrowers or any other Credit Party from the Agent or any Creditor under the Loan Documents will be deemed to form part of the Guaranteed Obligations notwithstanding any incapacity, disability or lack or limitation of status or power of the Borrowers or any other Credit Party or of the directors, officers, employees, partners or agents thereof, or that the Borrowers or any other Credit Party may not be a legal entity, or any irregularity, defect or informality in the borrowing or obtaining of such moneys or credits. If any amount in respect of the Guaranteed Obligations is not recoverable from the Guarantor hereunder on the basis of a guarantee, then,

21947678.3

notwithstanding any other provision hereof, the Guarantor will indemnify and save harmless the Agent and each Creditor and all of their respective directors, officers, shareholders and agents from and against any and all losses, damages, costs, expenses or liabilities suffered or incurred by the Agent or any Creditor or any of their respective directors, officers, shareholders and agents resulting or arising from or relating to any failure of the Borrowers or any other Credit Party to unconditionally and irrevocably pay in full or fully perform the Guaranteed Obligations as and when due provided that the amount of such indemnification shall not exceed the amount of such Guaranteed Obligations and any amounts due and owing hereunder.

11.    **Stay of Acceleration**.  If acceleration of the time for payment, or the liability of the Borrowers or any other Credit Party to make payment, of any amount specified to be payable by the Borrowers or any other Credit Party in respect of the Guaranteed Obligations is stayed, prohibited or otherwise affected upon the insolvency, bankruptcy, reorganization or winding-up of the Borrowers or any other Credit Party or any moratorium affecting the payment of the Guaranteed Obligations, all such amounts otherwise subject to acceleration or payment will nonetheless be deemed for all purposes of this Guarantee to be and to become due and payable by the Borrowers or any other Credit Party and will be payable by the Guarantor hereunder forthwith on demand by the Agent for and on behalf of the Creditors.

12.    **Reinstatement**.  If, at any time, all or any part of any payment previously applied by the Agent or any Creditor to any Guaranteed Obligation is or must be rescinded or returned by the Agent or any Creditor for any reason whatsoever (including the insolvency, bankruptcy, or reorganization of the Borrowers or any other Credit Party), such Guaranteed Obligation will, for the purpose of this Guarantee, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Agent or any such Creditor, and this Guarantee will continue to be effective or be reinstated, as the case may be, as to such Guaranteed Obligation, all as though such application by the Agent or any such Creditor had not been made.

13.    **Assignment and Postponement**.  All present and future indebtedness and liability of the Borrowers and each other Credit Party to the Guarantor is hereby assigned by the Guarantor to the Agent for its own benefit and on behalf of the Creditors and subordinated to the Guaranteed Obligations and all moneys received by the Guarantor in respect thereof following the occurrence and during the continuance of an Event of Default will be received in trust for and, unless prior written authorization from the Agent to the contrary will have been obtained by the Guarantor, will be paid over to the Agent for its own benefit and on behalf of the Creditors upon demand by the Agent.  If the Agent receives from the Guarantor a payment or payments in full or on account of the liability of the Guarantor hereunder, the Guarantor will not be entitled to claim repayment against the Borrowers or any other Credit Party until the Agent's and the Creditors' claims against the Borrowers or the applicable Credit Party have been irrevocably and unconditionally paid in full.  In case of liquidation, winding up or bankruptcy of the Borrowers or any other Credit Party (whether voluntary or involuntary) or any composition with creditors or scheme of arrangement, the Agent for its own benefit and

on behalf of the Creditors will have the right to rank for its full claims and receive all or other payments in respect thereof in priority to the Guarantor until the Guaranteed Obligations have been irrevocably and unconditionally paid in full, and the Guarantor will continue to be liable hereunder for any balance which may be owing to the Agent for its own benefit and on behalf of the Creditors by the Borrowers or any other Credit Party. In the event of the valuation by the Agent of any of its security and/or the retention thereof by the Agent, such valuation and/or retention will not, as between the Agent and the Guarantor, be considered as a purchase of such security, or as payment or satisfaction of the Guaranteed Obligations or any part thereof. The foregoing provisions of this Section 13 will not in any way limit or lessen the liability of the Guarantor under any other section of this Guarantee.

14.   **No Subrogation.** Notwithstanding any payment made by the Guarantor under this Guarantee or any set-off or application of funds of the Guarantor by the Agent or any Creditor, the Guarantor will have no right of subrogation to, and waives, to the fullest extent permitted by Applicable Law, any right to enforce any remedy which the Agent now has or may hereafter have against the Borrowers or any other Credit Party, until all of the Guaranteed Obligations have been irrevocably and unconditionally paid in full; and until that time, the Guarantor waives any benefit of, and any right to participate in, any security, whether real or personal property, now or hereafter held by the Agent or any Creditor for the Guaranteed Obligations.

15.   **Foreign Currency Guaranteed Obligations.** The Guarantor will make payment relative to each Guaranteed Obligation in the currency (the "**Original Currency**") in which the Borrowers or any other Credit Party is required to pay such Guaranteed Obligation. If the Guarantor makes payment relative to any Guaranteed Obligation to the Agent or any Creditor in a currency (the "**Other Currency**") other than the Original Currency (whether voluntarily or pursuant to an order or judgment of a court or tribunal of any jurisdiction), such payment will constitute a discharge of the liability of the Guarantor hereunder in respect of such Guaranteed Obligation only to the extent of the amount of the Original Currency which the Agent is able to purchase at Toronto, Ontario with the amount it receives on the date of receipt. If the amount of the Original Currency which the Agent is able to purchase is less than the amount of such currency originally due to it in respect to the relevant Guaranteed Obligation, the Guarantor will indemnify and save the Agent and each Creditor harmless from and against any loss or damage arising as a result of such deficiency. This indemnity will constitute an obligation separate and independent from the other obligations contained in this Guarantee, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by the Agent, for its own benefit and on behalf of the Creditors, and will continue in full force and effect notwithstanding any judgment or order in respect of any amount due hereunder or under any judgment or order.

16.   **Taxes.** All payments to be made by the Guarantor hereunder will be made without set-off or counterclaim and without deduction for any taxes, levies, duties, fees, deductions, withholdings, restrictions or conditions of any nature whatsoever. If at any time any Applicable Law, regulation or international agreement requires the Guarantor to make any such deduction or withholding from any such payment, the sum due from the

- 8 -

Guarantor with respect to such payment will be increased to the extent necessary to ensure that, after the making of such deduction or withholding, the Agent, for its own benefit and on behalf of the Creditors, receives a net sum equal to the sum which it would have received had no deduction or withholding been required.

17. **Payment of Expenses; Indemnification**. The Guarantor will pay on demand during the occurrence and continuance of an Event of Default, and will indemnify and save the Agent and each Creditor harmless from, any and all liabilities, all reasonable costs and expenses (including reasonable out-of-pocket legal fees and expenses on a solicitor and his own client full indemnity basis and any sales, goods and services or other similar taxes payable to any Governmental Authority with respect to any such liabilities, costs and expenses) (a) incurred by the Agent for its own benefit and on behalf of the Creditors in the administration or enforcement of this Guarantee, (b) with respect to, or resulting from, any failure or delay by the Guarantor in performing or observing any of its obligations under this Guarantee, or (c) incurred by the Agent in performing or observing any of the other covenants of the Guarantor under this Guarantee.

18. **Additional Security**. This Guarantee is in addition and without prejudice to any security of any kind (including other guarantees) now or hereafter held by or for the benefit of the Agent or the Creditors and any other rights or remedies that the Agent or the Creditors might have.

19. **Governing Law; Attornment**. This Guarantee will be governed by and construed in accordance with the laws of the Province of Alberta and the laws of Canada applicable therein, without giving effect to the conflict of law principles thereof. Without prejudice to the ability of the Agent or any Creditor to enforce this Guarantee in any other proper jurisdiction, the Guarantor irrevocably submits and attorns to the non-exclusive jurisdiction of the courts of the Province of Alberta, or any appellate court thereof, for the purposes of this Guarantee. To the extent legally permitted, the Guarantor waives any right it may have to, or to apply for, trial by jury in connection with any matter, action, proceeding, claim or counterclaim arising out of or relating to the Loan Documents or any of the transactions contemplated thereby.

20. **Successors and Assigns**. The provisions of this Guarantee will be binding upon and enure to the benefit of the Agent, the Creditors and their respective successors and assigns and will be binding upon the Guarantor and its successors. The Guarantor's obligations hereunder will not be assigned or delegated. The Agent or any Creditor may from time to time, and without notice to or the consent of the Guarantor, assign or transfer all or any of the Guaranteed Obligations or any interest therein in accordance with the Loan Documents and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, any such Guaranteed Obligation or part thereof so transferred or assigned will remain a "Guaranteed Obligation" for the purposes of this Guarantee and any immediate and successive permitted assignee or transferee of any Guaranteed Obligation or any interest therein will, to the extent of the interest so assigned or transferred, be entitled to the benefit of, and the right to enforce, this Guarantee.

- 9 -

21. **Time**.  Time will be of the essence in this Guarantee.

22. **Severability**.  If any portion of this Guarantee or the application thereof to any circumstance will be held invalid or unenforceable by a court of competent jurisdiction from which no further appeal has or is taken, to an extent that does not affect in a fundamental way the operation of this Guarantee, the remainder of the provision in question, or its application to any circumstance other than that to which it has been held invalid or unenforceable, and the remainder of this Guarantee will not be affected thereby and will be valid and enforceable to the fullest extent permitted by Applicable Laws.

23. **Notice**.  All notices, requests and demands to or upon the Agent or the Guarantor under this Agreement shall be in writing and given as provided in Section 13.11 of the Credit Agreement to the address (a) of the Agent set forth in the Credit Agreement and (b) of the Guarantor at the following address for notice:

QMax Canada Operations Inc.
11700 Katy Freeway
Suite 200
Houston, Texas 77079

Attention:      Legal Department
Fax No.:        (832) 201-8146

or in either case at such other address as shall be designated reasonably beforehand by such party in a written notice to each other party.

24. **Credit Parties' Financial Condition**.  The Guarantor is fully aware of the financial condition of the Borrowers and the other Credit Parties.

25. **Negotiated Document**.  This Guarantee is the result of negotiations between the Guarantor and the Agent and have been reviewed by counsel to the Guarantor and the Agent and is the product of both the Guarantor and the Agent.  Accordingly, this Guarantee is not to be construed against the Agent merely because of its involvement in this Guarantee's preparation.

26. **Interpretation**.  The division of this Guarantee into sections and paragraphs, and the insertion of headings, is for convenience of reference only and will not affect the construction or interpretation of this Guarantee.  Unless the context otherwise requires, words importing the singular include the plural and vice versa, and words importing gender include all genders.  When used in this Guarantee, the word "including" (or includes) means "including (or includes) without limitation".

27. **Receipt of Copy**.  The Guarantor acknowledges receipt of an executed copy of this Guarantee.  The Guarantor waives the right to receive any amount that it may now or hereafter be entitled to receive (whether by way of damages, fine, penalty or otherwise) by reason of the failure of the Agent to deliver to the Guarantor a copy of any financing

21947678.3

- 10 -

statement or any statement issued by any registry that confirms registration of a financing statement relating to this Guarantee.

28.     **Acknowledgement.**     The Guarantor acknowledges having reviewed each of the representations, warranties and covenants set forth in the Credit Agreement (including Articles 6 and 7 thereof) and hereby restates each of such representations, warranties and covenants herein to the extent they relate to the Guarantor as a "Credit Party" and the Guarantor agrees to be bound by each such representations, warranties and covenants as if it was repeated herein, subject to the same cure periods, if any, set out in the Credit Agreement.

29.     **Signature Page**.     Delivery of an executed signature page of this Guarantee by facsimile transmission or any electronic transmission shall be as effective as delivery of a manually executed counterpart hereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**THIS GUARANTEE** executed effective the date first written above.

QMax Canada Operations Inc.

Per: _____
Name:   Christopher Rivers
Title:   Director

THIS IS EXHIBIT " _12_ "
referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26th_

day of _May_ A.D. 20 _20_

Jonathan Tomm
Barrister and Solicitor

# <u>LIMITED RECOURSE GUARANTEE</u>

TO:        **HSBC BANK CANADA**, as Agent (the "**Agent**")

DATE:      May 23, 2014

*PREAMBLE:*

A.     Fluid Acquisition Corp. and Q'Max America Inc. (collectively, the "**Borrowers**"), as borrowers, HSBC Bank Canada and those other financial institutions which are from time to time party thereto as lenders (collectively, the "**Lenders**") and HSBC Bank Canada, as administrative agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "**Agent**") are parties to a credit agreement dated as of the date hereof (as such credit agreement may be amended, supplemented or otherwise modified or restated from time to time, the "**Credit Agreement**").

B.     The Borrowers and the Guarantors (as defined in the Credit Agreement) (collectively, the "**Credit Parties**" and each a "**Credit Party**") may, from time to time, incur indebtedness, obligations and liabilities to the Agent, the Lenders, the Hedge Providers and counterparties providing services pursuant to the Banking Services Agreements (collectively, the "**Creditors**") pursuant to or in connection with the Credit Agreement, the other Loan Documents, the Hedging Agreements and the Banking Services Agreements from time to time.

C.     It is in the interests of Fluid Holding Corp. (the "**Guarantor**"), that the Creditors extend credit to the Borrowers pursuant to the applicable Credit Documents and therefore the Guarantor is prepared to issue this Limited Recourse Guarantee to the Agent for and on behalf of the Creditors.

D.     Pursuant to a securities pledge agreement (the "**Securities Pledge**") dated as of the date hereof, the Guarantor as pledgor has pledged to the Agent a Security Interest (as defined in the Securities Pledge) in respect of the Collateral (as defined in the Securities Pledge).

**AGREEMENT:**

For valuable consideration, the receipt and sufficiency of which are hereby conclusively acknowledged by the Guarantor, the Guarantor hereby agrees in favour of the Agent for its own benefit and on behalf of the Creditors as follows:

1.     **Defined Terms**. In this Guarantee, capitalized words and phrases which are not otherwise defined have the respective meanings given to such terms in the Credit Agreement. In addition, the term "**Loan Documents**" when used herein means the Credit Agreement, the Hedging Agreements, the Banking Services Agreements, the Security and any other Credit Documents, instruments or agreements entered into pursuant thereto or in connection therewith.

- 2 -

2.   **Guarantee**.  Subject to Section 3 below, the Guarantor hereby unconditionally and irrevocably guarantees the prompt payment and performance to the Agent for its own benefit and on behalf of the Creditors forthwith upon demand by the Agent during the occurrence and continuance of an Event of Default of all indebtedness, liabilities and obligations of any kind whatsoever (whether direct or indirect, joint or several, absolute or contingent, matured or unmatured) which the Borrowers or any other Credit Party (other than the Guarantor) has from time to time incurred or is under or may hereafter incur or be under to the Agent or any Creditor under or in connection with or with respect to the Loan Documents (collectively, the "**Guaranteed Obligations**"). All amounts payable by the Guarantor hereunder will be paid to the Agent for its own benefit and on behalf of the Creditors at the address of the Agent set forth in Section 23 below or as otherwise directed in writing by the Agent.  Any amounts payable by the Guarantor under this Guarantee which are not paid forthwith upon demand therefor by the Agent as aforesaid for its own benefit and on behalf of the Creditors will bear interest from the date of such demand at the rate or rates applicable to the corresponding Guaranteed Obligations.

3.   **Limitation of Liability**.  Notwithstanding anything to the contrary in this Guarantee, the Securities Pledge, the other Loan Documents or otherwise, in the event that the Guarantor shall default in its obligations under the Guarantee, the sole recourse of the Agent, for and on behalf of the Creditors, against the Guarantor shall be with respect to the Collateral (as defined in the Securities Pledge) charged pursuant to the Securities Pledge; and neither the Agent nor any of the Creditors shall, under any circumstances, have any right to payment from the Guarantor or against any property or assets or rights of the Guarantor other than such Collateral.  Other than in respect of Section 17 below, the Guarantor shall not be liable to the Agent or the Creditors hereunder in respect of the Guaranteed Obligations or any other amount except to the extent such liability is required to permit realization against the Collateral to be commenced or completed and the Guarantor shall not be liable for any deficiency resulting from any such realization or otherwise.

4.   **Continuing, Unconditional and Absolute Guarantee**.  Subject to Section 3 above, the obligations of the Guarantor under this Guarantee are continuing, unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged, diminished, limited or otherwise affected by (and the Guarantor hereby consents to or waives, as applicable, to the fullest extent permitted by Applicable Laws):

   (a)   any extension, other indulgence, renewal, settlement, discharge, compromise, waiver, subordination or release in respect of any Guaranteed Obligation, security, Person or otherwise, unless such settlement, discharge, compromise or release shall specifically release the Guarantor from its obligations, indebtedness or liabilities hereunder or any part thereof or is a payment of the Guaranteed Obligations;

   (b)   any waiver, modification, restatement or amendment of or supplement to any Loan Document or the Guaranteed Obligations, including any increase or

- 3 -

decrease in the principal, the rates of interest or other amounts payable thereunder;

(c)     any change in the time, manner or place of payment of or in any other term of any Loan Document or the Guaranteed Obligations, or the failure on the part of the Borrowers or any other Credit Party to carry out any of its Guaranteed Obligations under any Loan Document;

(d)     any impossibility, impracticability, frustration of purpose, illegality, force majeure or act of government;

(e)     any non-perfection or invalidity of any direct or indirect security for any Guaranteed Obligation;

(f)     any change in the existence, structure, constitution, name, objects, powers, business, control or ownership of the Borrowers, any other Credit Party or any other Person, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrowers, any other Credit Party or any other Person or its assets;

(g)     the existence of any claim, set-off or other rights which the Guarantor may have at any time against the Borrowers, any other Credit Party, the Agent or any other Person, whether in connection herewith or any unrelated transactions;

(h)     any invalidity, illegality or unenforceability relating to or against the Borrowers or any other Credit Party or any provision of Applicable Law purporting to prohibit the payment by the Borrowers or any other Credit Party of the principal or interest under the Guaranteed Obligations;

(i)     any limitation, postponement, prohibition, subordination or other restriction on the rights of the Agent or any Creditor to receive payment of the Guaranteed Obligations;

(j)     any release, substitution or addition of any co-signer, endorser or other guarantor of the Guaranteed Obligations;

(k)     any defence arising by reason of any failure of the Agent or any Creditor to make any presentment, demand for performance, notice of non-performance, protest, and any other notice, including notice of all of the following: acceptance of this Guarantee, partial payment or non-payment of all or any part of the Guaranteed Obligations and the existence, creation, or incurring of new or additional Guaranteed Obligations;

(l)     any defence arising by reason of any failure of the Agent or any Creditor to proceed against the Borrowers, any other Credit Party or any other Person, to proceed against, apply or exhaust any security held from the Borrowers, any other Credit Party or any other Person for the Guaranteed Obligations, to proceed against, apply or exhaust any security held from the Guarantor or any other

- 4 -

Person for this Guarantee or to pursue any other remedy in the power of the Agent or any Creditor whatsoever;

(m)     any Applicable Law which provides that the obligation of a guarantor must neither be larger in amount nor in other respects more burdensome than that of the principal obligation or which reduces a guarantor's obligation in proportion to the principal obligation;

(n)     any defence arising by reason of any incapacity, lack of authority, or other defence of the Borrowers, any other Credit Party or any other Person, or by reason of any limitation, postponement, prohibition on the Agent's or any Creditor's right to receive payment of the Guaranteed Obligations or any part thereof, or by reason of the cessation from any cause whatsoever of the liability of the Borrowers, any other Credit Party or any other Person with respect to all or any part of the Guaranteed Obligations, or by reason of any act or omission of the Agent or any Creditor or others which directly or indirectly results in the discharge or release of the Borrowers, any other Credit Party or any other Person or all or any part of the Guaranteed Obligations or any security or guarantee therefor, whether by contract, operation of law or otherwise;

(o)     any defence arising by reason of any failure by the Agent or any Creditor to obtain, perfect or maintain a perfected or prior (or any) security interest in or Lien upon any property of the Borrowers, any other Credit Party or any other Person, or by reason of any interest of the Agent or any Creditor in any property, whether as owner thereof or the holder of a security interest therein or Lien thereon, being invalidated, voided, declared fraudulent or preferential or otherwise set aside, or by reason of any impairment by the Agent of any right to recourse or collateral;

(p)     any defence arising by reason of the failure of the Agent or any Creditor to marshal any assets;

(q)     any defence based upon any failure of the Agent or any Creditor to give to the Borrowers, any other Credit Party, the Guarantor or any other Person notice of any sale or other disposition of any property securing any or all of the Guaranteed Obligations or any guarantee thereof, or any defect in any notice that may be given in connection with any sale or other disposition of any such property, or any failure of the Agent or any Creditor to comply with any provision of Applicable Law in enforcing any Lien upon any such property, including any failure by the Agent or any Creditor to dispose of any such property in a commercially reasonable manner;

(r)     any dealing whatsoever with the Borrowers, any other Credit Party or other Person or any security, whether negligently or not, or any failure to do so;

(s)     any defence based upon or arising out of any bankruptcy, insolvency, reorganization, moratorium, arrangement, readjustment of debt, liquidation or dissolution proceeding commenced by or against the Borrowers, any other Credit

- 5 -

Party or any other Person, including any discharge of, or bar against collecting, any of the Guaranteed Obligations, in or as a result of any such proceeding; or

(t)     any other act or omission to act or delay of any kind by the Borrowers, any other Credit Party, the Agent, a Creditor or any other Person or any other circumstance whatsoever, whether similar or dissimilar to the foregoing, which might, but for the provisions of this Section 4, constitute a legal or equitable discharge, limitation or reduction of the Guarantor's obligations hereunder (other than the irrevocable and unconditional payment in full of all of the Guaranteed Obligations).

The foregoing provisions apply (and the foregoing waivers will be effective) even if the effect of any action (or failure to take action) by the Agent or any Creditor is to destroy or diminish the Guarantor's subrogation rights, the Guarantor's right to proceed against the Borrowers or any other Credit Party for reimbursement, the Guarantor's right to recover contribution from any other guarantor or any other right or remedy.

5.     **Release of Guaranteed Obligations**.  This Guarantee will remain in full force and effect until the Guaranteed Obligations are irrevocably and unconditionally performed and paid in full.

6.     **Validity of Agreements**.  The Guarantor will not contest or otherwise challenge the legality, validity or enforceability of any term, condition or other provision contained in the Loan Documents.  The Guarantor represents to the Agent for and on behalf of the Creditors that it is familiar with and consents to the terms and conditions of the Loan Documents.

7.     **Assumption of Authority**.  The Agent, for and on behalf of the Creditors, is entitled to assume, notwithstanding any investigation by or on behalf of the Agent or any Creditor, the power and authority of the officers, directors, agents or other Persons acting or purporting to act on behalf of the Borrowers, the Guarantor or the other Credit Parties, and any Guaranteed Obligations made or created in reliance upon the exercise of such power or authority will be guaranteed hereunder.

8.     **Recourse against Borrowers and Others**.  The Agent, for and on behalf of the Creditors, is not required to exhaust its recourse against the Borrowers, the other Credit Parties, any other guarantor or other Person or under any other security or other guarantee before being entitled to payment from the Guarantor under this Guarantee.

9.     **Settlement of Accounts**.  Any account settled or stated between the Agent, for and on behalf of the Creditors, and the Borrowers or the other Credit Parties will be accepted by the Guarantor as prima facie evidence, subject to manifest error, that the amount thereby appearing due by the Borrowers or the other Credit Parties to the Agent and the Creditors is so due.

10.    **No Waiver**.  No delay on the part of the Agent, for and on behalf of the Creditors, in exercising any of its options, powers or rights, or partial or single exercise thereof, will constitute a waiver thereof.  No waiver of any of the Agent's or any Creditor's rights

- 6 -

hereunder, and no modification or amendment of this Guarantee, will be deemed to be made by the Agent for and on behalf of the Creditors unless the same will be in writing, duly signed by the Agent, for and on behalf of the Creditors, and the Guarantor, and each such waiver, if any, will apply only with respect to the specific instance involved, and will in no way impair the rights of the Agent and the Creditors or the liabilities of the Guarantor to the Agent and the Creditors in any other respect at any other time.

11.     **Guarantee of all Credit Obtained; Indemnity**.  All moneys and credits in fact borrowed or obtained by the Borrowers or any other Credit Party from the Agent or any Creditor under the Loan Documents will be deemed to form part of the Guaranteed Obligations notwithstanding any incapacity, disability or lack or limitation of status or power of the Borrowers or any other Credit Party or of the directors, officers, employees, partners or agents thereof, or that the Borrowers or any other Credit Party may not be a legal entity, or any irregularity, defect or informality in the borrowing or obtaining of such moneys or credits.  If any amount in respect of the Guaranteed Obligations is not recoverable from the Guarantor hereunder on the basis of a guarantee, then, notwithstanding any other provision hereof, the Guarantor will, subject to Section 3 above, indemnify and save harmless the Agent and each Creditor and all of their respective directors, officers, shareholders and agents from and against any and all losses, damages, costs, expenses or liabilities suffered or incurred by the Agent or any Creditor or any of their respective directors, officers, shareholders and agents resulting or arising from or relating to any failure of the Borrowers or any other Credit Party to unconditionally and irrevocably pay in full or fully perform the Guaranteed Obligations as and when due provided that the amount of such indemnification shall not exceed the amount of such Guaranteed Obligations and any amounts due and owing hereunder.

12.     **Stay of Acceleration**.  If acceleration of the time for payment, or the liability of the Borrowers or any other Credit Party to make payment, of any amount specified to be payable by the Borrowers or any other Credit Party in respect of the Guaranteed Obligations is stayed, prohibited or otherwise affected upon the insolvency, bankruptcy, reorganization or winding-up of the Borrowers or any other Credit Party or any moratorium affecting the payment of the Guaranteed Obligations, all such amounts otherwise subject to acceleration or payment will nonetheless be deemed for all purposes of this Guarantee to be and to become due and payable by the Borrowers or any other Credit Party and will be payable by the Guarantor hereunder forthwith on demand by the Agent for and on behalf of the Creditors.

13.     **Reinstatement**.  If, at any time, all or any part of any payment previously applied by the Agent or any Creditor to any Guaranteed Obligation is or must be rescinded or returned by the Agent or any Creditor for any reason whatsoever (including the insolvency, bankruptcy, or reorganization of the Borrowers or any other Credit Party), such Guaranteed Obligation will, for the purpose of this Guarantee, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Agent or any such Creditor, and this Guarantee will continue to be effective or be reinstated, as the case may be, as to such Guaranteed Obligation, all as though such application by the Agent or any such Creditor had not been made.

- 7 -

14. **No Subrogation**.  Notwithstanding any payment made by the Guarantor under this Guarantee or any setoff or application of funds of the Guarantor by the Agent or any Creditor, the Guarantor will have no right of subrogation to, and waives, to the fullest extent permitted by Applicable Law, any right to enforce any remedy which the Agent now has or may hereafter have against the Borrowers or any other Credit Party, until all of the Guaranteed Obligations have been irrevocably and unconditionally paid in full; and until that time, the Guarantor waives any benefit of, and any right to participate in, any security, whether real or personal property, now or hereafter held by the Agent or any Creditor for the Guaranteed Obligations.

15. **Foreign Currency Guaranteed Obligations**.  The Guarantor will make payment relative to each Guaranteed Obligation in the currency (the "**Original Currency**") in which the Borrowers or any other Credit Party is required to pay such Guaranteed Obligation.  If the Guarantor makes payment relative to any Guaranteed Obligation to the Agent or any Creditor in a currency (the "**Other Currency**") other than the Original Currency (whether voluntarily or pursuant to an order or judgment of a court or tribunal of any jurisdiction), such payment will constitute a discharge of the liability of the Guarantor hereunder in respect of such Guaranteed Obligation only to the extent of the amount of the Original Currency which the Agent is able to purchase at Toronto, Ontario with the amount it receives on the date of receipt.  If the amount of the Original Currency which the Agent is able to purchase is less than the amount of such currency originally due to it in respect to the relevant Guaranteed Obligation, the Guarantor will indemnify and save the Agent and each Creditor harmless from and against any loss or damage arising as a result of such deficiency.  This indemnity will constitute an obligation separate and independent from the other obligations contained in this Guarantee, will give rise to a separate and independent cause of action, will apply irrespective of any indulgence granted by the Agent, for its own benefit and on behalf of the Creditors, and will continue in full force and effect notwithstanding any judgment or order in respect of any amount due hereunder or under any judgment or order.

16. **Taxes**.  All payments to be made by the Guarantor hereunder will be made without set-off or counterclaim and without deduction for any taxes, levies, duties, fees, deductions, withholdings, restrictions or conditions of any nature whatsoever.  If at any time any Applicable Law, regulation or international agreement requires the Guarantor to make any such deduction or withholding from any such payment, the sum due from the Guarantor with respect to such payment will be increased to the extent necessary to ensure that, after the making of such deduction or withholding, the Agent, for its own benefit and on behalf of the Creditors, receives a net sum equal to the sum which it would have received had no deduction or withholding been required.

17. **Payment of Expenses; Indemnification**.  The Guarantor will pay on demand during the occurrence and continuance of an Event of Default, and will indemnify and save the Agent and each Creditor harmless from, any and all liabilities, all reasonable costs and expenses (including reasonable out-of-pocket legal fees and expenses on a solicitor and his own client full indemnity basis and any sales, goods and services or other similar taxes payable to any Governmental Authority with respect to any such liabilities, costs and expenses) (a) incurred by the Agent for its own benefit and on behalf of the Creditors

- 8 -

in the administration or enforcement of this Guarantee, (b) with respect to, or resulting from, any failure or delay by the Guarantor in performing or observing any of its obligations under this Guarantee, or (c) incurred by the Agent in performing or observing any of the other covenants of the Guarantor under this Guarantee.

18. **Additional Security**. This Guarantee is in addition and without prejudice to any security of any kind (including other guarantees) now or hereafter held by or for the benefit of the Agent or the Creditors and any other rights or remedies that the Agent or the Creditors might have.

19. **Governing Law; Attornment**. This Guarantee will be governed by and construed in accordance with the laws of the Province of Alberta and the laws of Canada applicable therein, without giving effect to the conflict of law principles thereof. Without prejudice to the ability of the Agent or any Creditor to enforce this Guarantee in any other proper jurisdiction, the Guarantor irrevocably submits and attorns to the non-exclusive jurisdiction of the courts of the Province of Alberta, or any appellate court thereof, for the purposes of this Guarantee. To the extent legally permitted, the Guarantor waives any right it may have to, or to apply for, trial by jury in connection with any matter, action, proceeding, claim or counterclaim arising out of or relating to the Loan Documents or any of the transactions contemplated thereby.

20. **Successors and Assigns**. The provisions of this Guarantee will be binding upon and enure to the benefit of the Agent, the Creditors and their respective successors and assigns and will be binding upon the Guarantor and its successors. The Guarantor's obligations hereunder will not be assigned or delegated. The Agent or any Creditor may from time to time, and without notice to or the consent of the Guarantor, assign or transfer all or any of the Guaranteed Obligations or any interest therein in accordance with the Loan Documents and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, any such Guaranteed Obligation or part thereof so transferred or assigned will remain a "Guaranteed Obligation" for the purposes of this Guarantee and any immediate and successive permitted assignee or transferee of any Guaranteed Obligation or any interest therein will, to the extent of the interest so assigned or transferred, be entitled to the benefit of, and the right to enforce, this Guarantee.

21. **Time**. Time will be of the essence in this Guarantee.

22. **Severability**. If any portion of this Guarantee or the application thereof to any circumstance will be held invalid or unenforceable by a court of competent jurisdiction from which no further appeal has or is taken, to an extent that does not affect in a fundamental way the operation of this Guarantee, the remainder of the provision in question, or its application to any circumstance other than that to which it has been held invalid or unenforceable, and the remainder of this Guarantee will not be affected thereby and will be valid and enforceable to the fullest extent permitted by Applicable Laws.

23. **Notice**. All notices, requests and demands to or upon the Agent or the Guarantor under this Agreement shall be in writing and given as provided in Section 13.11 of the Credit

- 9 -

Agreement to the address (a) of the Agent set forth in the Credit Agreement and (b) of the Guarantor at the following address for notice:

By personal delivery:

Fluid Holding Corp.
c/o Palladium Notices Department
P.O. BOX 10424 Pacific Centre
1300 – 777 Dunsmuir Street
Vancouver BC V7Y 1K2
Canada

By mail:

Fluid Holding Corp.
c/o Palladium Notices Department
P.O. BOX 10424 Pacific Centre
1300 – 777 Dunsmuir Street
Vancouver BC V7Y 1K2
Canada

Attention:    Adam Shebitz
Fax No.:      (202) 218 - 5155

or in either case at such other address as shall be designated reasonably beforehand by such party in a written notice to each other party.

24.   **Credit Parties' Financial Condition**.  The Guarantor is fully aware of the financial condition of the Borrowers and the other Credit Parties.

25.   **Negotiated Document**.  This Guarantee is the result of negotiations between the Guarantor and the Agent and have been reviewed by counsel to the Guarantor and the Agent and is the product of both the Guarantor and the Agent.  Accordingly, this Guarantee is not to be construed against the Agent merely because of its involvement in this Guarantee's preparation.

26.   **Interpretation**.  The division of this Guarantee into sections and paragraphs, and the insertion of headings, is for convenience of reference only and will not affect the construction or interpretation of this Guarantee.  Unless the context otherwise requires, words importing the singular include the plural and vice versa, and words importing gender include all genders.  When used in this Guarantee, the word "including" (or includes) means "including (or includes) without limitation".

27.   **Receipt of Copy**.  The Guarantor acknowledges receipt of an executed copy of this Guarantee.  The Guarantor waives the right to receive any amount that it may now or hereafter be entitled to receive (whether by way of damages, fine, penalty or otherwise) by reason of the failure of the Agent to deliver to the Guarantor a copy of any financing

- 10 -

statement or any statement issued by any registry that confirms registration of a financing statement relating to this Guarantee.

28.   **Representations and Warranties**.

The Guarantor represents and warrants to the Agent for its own benefit and on behalf of the Creditors and acknowledges and confirms that each of the Creditors is relying upon such representations and warranties as follows:

(a)   as of the date hereof, it is the sole shareholder of the Canadian Borrower;

(b)   it has been duly incorporated and is a validly subsisting corporation under the Laws of its governing jurisdiction and has all necessary applicable authority, power and capacity required to carry on its business in each jurisdiction where it carries on business;

(c)   it has the necessary capacity, power, legal right and authority to guarantee payment to the Agent and the Creditors of the Guaranteed Obligations to perform its obligations under the Loan Documents to which it is a party and to provide the Security required to be provided by it;

(d)   the execution and delivery by the Guarantor of this Guarantee and the other Loan Documents to which it is a party and the performance of its respective obligations herein and therein have been duly authorized by all necessary action, requires no governmental authorization or action by or in respect of, or filing with, any Governmental Authority and does not contravene or constitute a default under any provision of Applicable Law, or any agreement or any judgment, injunction, order, decree or other instrument binding upon the Guarantor or result in the creation or imposition of any security interest on any asset of such Guarantor;

(e)   this Guarantee and the other Loan Documents to which it is a party constitute legal, valid and binding obligations of the Guarantor, enforceable against it in accordance with the terms and provisions thereof, subject to Laws of general application affecting creditors' rights and the discretion of the court in awarding equitable remedies; and

(f)   there are no provisions contained in the charter documents, or by laws of the Guarantor, shareholders' agreement, voting trust agreement or similar agreement relating thereto, which restrict or limit the Guarantor's powers to guarantee the payment or performance of the obligations of others or encumber all or any of its present and after acquired property; or which would be contravened by the execution and delivery of this Guarantee and the other Loan Documents to which the Guarantor is a party or the performance of its obligations thereunder and which contravention would reasonably be expected to result in a Material Adverse Effect.

29.   **Acknowledgement and Deemed Repetition**

- 11 -

The Guarantor acknowledges that the Agent and the other Creditors are relying upon the representations and warranties contained in Section 28 above and that such representations and warranties will be deemed to be restated in every respect effective on the date when such representations and warranties under the Credit Agreement are repeated or deemed to be repeated unless otherwise stated herein to be made as of the date hereof.

30.    **Survival of Representations and Warranties**

The Guarantor acknowledges that the Agent and the Creditors shall be entitled to rely upon the representations and warranties contained in Section 28 above. Notwithstanding any investigations which may be made by the Agent or the Creditors, the said representations and warranties shall survive the execution and delivery of this Guarantee and the other Loan Documents to which the Guarantor is a party until full and final payment and satisfaction of the Guaranteed Obligations and the termination of the Guarantee.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**THIS GUARANTEE** executed effective the date first written above.

<div align="center">

**FLUID HOLDING CORP.**

</div>

Per:

Name:   Mark Roberts

Title:     Authorized Signatory

THIS IS EXHIBIT " _13_ "
referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26th_

day of _May_ A.D. 20_20_

Jonathan Tomm
Barrister and Solicitor

**1356760 ALBERTA LTD.**

as Obligor

and

**HSBC BANK CANADA**

as Administrative Agent

---

**SECURITY AGREEMENT**

May 23, 2014

---

## SECURITY AGREEMENT

Security Agreement dated as of May 23, 2014 (the "**Agreement**") made by 1356760 Alberta Ltd. (the "**Obligor**"), to and in favour of HSBC Bank Canada, as Agent for the benefit of the Secured Creditors.

**WHEREAS**, pursuant to, and subject to the terms and conditions of, a Credit Agreement dated as of the date hereof (as amended, supplemented or restated from time to time, the "**Credit Agreement**") among Fluid Acquisition Corp. and Q'Max America Inc., as borrowers, HSBC Bank Canada and those other financial institutions who from time to time become parties thereto as lenders (collectively, the "**Lenders**") and HSBC Bank Canada, as administrative agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "**Agent**") the Lenders agreed to make certain credit facilities available to the Borrowers;

**AND WHEREAS**, the obligations of the Lenders to make available certain Advances pursuant to the Credit Agreement and the entry into Hedging Agreements by the Hedge Providers and the entry into the Banking Services Agreements by the Agent and the Affiliates of the Agent or a Lender from time to time are conditioned upon the execution and delivery by the Obligor of a security agreement in favour of the Agent, on behalf of the Secured Creditors, in the form hereof, to secure all of the Obligations;

**NOW, THEREFORE,** in consideration of the premises and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## INTERPRETATION

**Section 1.1     Defined Terms.**

As used in this Agreement, the following terms have the following meanings:

"**Agreement**" means this security agreement as may be amended, supplemented or otherwise modified from time to time.

"**CIPO**" means the Canadian Intellectual Property Office.

"**Collateral**" has the meaning specified in Section 2.1 of this Agreement.

"**Credit Agreement**" shall have the meaning attributed to such term in the Preamble of this Agreement.

"**Instruments**" means (i) a bill, note or cheque within the meaning of the *Bills of Exchange Act* (Canada) or any other writing that evidences a right to the payment of money and is of a type that in the ordinary course of business is transferred by delivery with any necessary endorsement or assignment, or (ii) a letter of credit and an advice of credit if the letter or advice states that it must be surrendered upon claiming payment thereunder, or (iii) chattel paper or any other writing that evidences both a monetary obligation and a security interest in or a lease of specific

- 2 -

goods, or (iv) documents of title or any other writing that purports to be issued by or addressed to a bailee and purports to cover such goods in the bailee's possession as are identified or fungible portions of an identified mass, and that in the ordinary course of business is treated as establishing that the Person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers, or (v) any document or writing commonly known as an instrument, but excludes investment property.

"**Intellectual Property**" means domestic and foreign: (i) patents, applications for patents and reissues, divisions, continuations, renewals, extensions and continuations-in-part of patents or patent applications; (ii) proprietary and nonpublic business information, including inventions (whether patentable or not), invention disclosures, improvements, discoveries, trade secrets, confidential information, know-how, methods, processes, designs, technology, technical data, schematics, formulae and customer lists, and documentation relating to any of the foregoing; (iii) copyrights, copyright registrations and applications for copyright registration; (iv) mask works, mask work registrations and applications for mask work registrations; (v) designs, design registrations, design registration applications and integrated circuit topographies; (vi) trade names, business names, corporate names, domain names, website names and world wide web addresses, common law trade-marks, service marks, certification marks, trade dress, logos, applications, registrations and renewals for any of the foregoing and the goodwill connected with the use of and symbolized by any of the foregoing; (vii) computer software and programs (both source code and object code form), all proprietary rights in the computer software and programs and all documentation and other materials related to the computer software and programs; (viii) any other intellectual property and industrial property; (ix) income, fees, royalties, damages, claims and payments for past, present, or future infringements, dilutions or other violations thereof; (x) rights corresponding thereto throughout the world; and (xi) rights to sue for past, present or future infringements, dilutions or other violations thereof.

"**Obligations**" means, in respect of the Obligor, the Obligations (as such term is defined in the Credit Agreement) of such Obligor.

"**Obligor**" shall have the meaning attributed to such term in the Preamble of this Agreement.

"**PPSA**" means the *Personal Property Security Act* (Alberta) and the regulations promulgated thereunder and other applicable personal property security legislation of the applicable Canadian province or provinces (including the Civil Code of Quebec and the regulations respecting the register of personal and movable real rights promulgated thereunder) as all such legislation now exists or may from time to time hereafter be amended, modified, recodified, supplemented or replaced, together with all rules, regulations and interpretations thereunder or related thereto.

"**Registrable Intellectual Property**" means any Intellectual Property in respect of which ownership, title, security interests, charges or encumbrances are capable of registration, recording or notation with any Governmental Authority pursuant to Applicable Laws.

"**Restricted Asset**" has the meaning specified in Section 2.4(1) of this Agreement.

"**Secured Creditors**" means, collectively, the Agent, the Lenders, the Hedge Providers and counterparties providing services pursuant to the Banking Services Agreements.

17101030.2

- 3 -

"**Secured Obligations**" has the meaning specified in Section 2.2 of this Agreement.

"**Securities**" means securities as defined in the *Securities Transfer Act* (Alberta).

"**Security Interest**" has the meaning specified in Section 2.2

## Section 1.2    Interpretation.

(1)    Capitalized terms used in this Agreement but not defined have the meanings given to them in the Credit Agreement. Terms defined in the PPSA and the *Securities Transfer Act* (Alberta) ("**STA**") and used but not otherwise defined in this Agreement have the same meanings. For greater certainty, the terms "**account**", "**chattel paper**", "**document of title**", "**equipment**", "**goods**", "**instrument**", "**intangible**", "**investment property**", "**money**", "**personal property**" and "**proceeds**" have the meanings given to them in the PPSA; and the terms "**certificated security**", "**control**", "**delivery**", "**entitlement holder**", "**financial asset**", "**securities account**", "**securities intermediary**", "**security entitlement**" and "**uncertificated security**" have the meanings given to them in the STA or the PPSA as applicable.

(2)    Any reference in any Credit Document to Permitted Liens and any right of the Obligor to create or suffer to exist Permitted Liens are not intended to and do not and will not subordinate the Security Interest to any such Permitted Lien or give priority to any Person over the Secured Creditors with respect to any such Permitted Lien.

(3)    The rules of interpretation specified in Article 1 of the Credit Agreement shall be applicable to this Agreement.

## ARTICLE 2
## ARTICLE 2 SECURITY

## Section 2.1    Grant of Security.

(1)    Subject to Section 2.4 and Section 2.5, the Obligor grants to the Agent, for the benefit of the Secured Creditors, a security interest in, and assigns, mortgages, charges, hypothecates and pledges to the Agent, for the benefit of the Secured Creditors, all of the property, assets, effects and undertaking of the Obligor whether now owned or hereafter acquired and all of the property, assets, effects and undertaking in which the Obligor now has or hereafter acquires any interest (collectively, the "**Personal Property Collateral**"), including all of the Obligor's:

(a)    present and after-acquired personal property including:

(i)    inventory including goods held for sale, lease or resale, goods furnished or to be furnished to third parties under contracts of lease, consignment or service, goods which are raw materials or work in process, goods used in or procured for packing and materials used or consumed in the businesses of the Obligor;

- 4 -

    (ii)    equipment, machinery, furniture, fixtures, plant, vehicles and other goods of every kind and description and all licences and other rights and all related records, files, charts, plans, drawings, specifications, manuals and documents;

    (iii)    accounts due or accruing and all related agreements, books, accounts, invoices, letters, documents and papers recording, evidencing or relating to them;

    (iv)    money, documents of title, chattel paper, financial assets and investment property;

    (v)    security accounts and all of the credit balances, securities entitlements, other financial assets and items or property (or their value) standing to the credit from time to time in such securities accounts;

    (vi)    Instruments and Securities; and

    (vii)    intangibles including all security interests, goodwill, choses in action, contracts, contract rights, licenses and other contractual benefits;

(b)    Intellectual Property including the Registrable Intellectual Property;

(c)    all substitutions and replacements of and increases, additions and, where applicable, accessions to the property described in Section 2.1(a) and Section 2.1(b); and

(d)    all proceeds in any form derived directly or indirectly from any dealing with all or any part of the property described in Section 2.1(a) and Section 2.1(c) inclusive, including the proceeds of such proceeds.

(2)    Subject to Section 2.4 and Section 2.5, the Obligor hereby charges as and by way of a floating charge in favour of the Agent for the benefit of the Secured Creditors all the presently owned or held and hereafter acquired property, assets, effects and undertaking of the Obligor of whatsoever nature and kind and wheresoever situate, other than such of the Obligor's property, assets, effects and undertakings of the Obligor as are validly and effectively subjected to the security interest granted to the Agent pursuant to Section 2.1(1) (all of which property, assets, effects and undertakings so charged by this Section 2.1(2) are herein collectively called the "**Other Collateral**", and together with the Personal Property Collateral the "**Collateral**") including, without limiting the generality of the foregoing, all presently owned or held and hereafter acquired right, title and interest of the Obligor in and to real and immovable and leasehold property and rights whether in fee or of a less estate and all interest in and rights relating to lands and all easements, rights of way, privilege, benefits, licences, improvements and rights whether connected therewith or appurtenant thereto or separately owned or held and all structures, buildings, plant, machinery, fixtures, apparatus and fixed assets and the charge created by this Section 2.1(2) shall be a floating charge such that the Obligor shall not have power without the prior written consent of the Agent to:

17101030.2

- 5 -

(a) create or permit to exist any Lien against any of the Other Collateral which ranks or could in any event rank in priority to or *pari passu* with the security constituted by this Agreement, save for those Liens that are Permitted Liens; or

(b) grant, sell, exchange, transfer, assign, lease or otherwise dispose of the Other Collateral, save for Permitted Dispositions.

**Section 2.2    Secured Obligations.**

The security interests, assignments, mortgages, charges, hypothecations and pledges granted by the Obligor under this Agreement (collectively, the "**Security Interest**") secure the payment and performance of the following (collectively, the "**Secured Obligations**"):

(a) the Obligations of the Obligor; and

(b) all expenses, costs and charges incurred by or on behalf of the Secured Creditors in connection with this Agreement, the Security Interest or the Collateral, including all reasonable legal fees, court costs, receiver's or agent's remuneration and other expenses of taking possession of, repairing, protecting, insuring, preparing for disposition, realizing, collecting, selling, transferring, delivering or obtaining payment for the Collateral, and of taking, defending or participating in any action or proceeding in connection with any of the foregoing matters or otherwise in connection with the Secured Creditors' interest in any Collateral, whether or not directly relating to the enforcement of this Agreement or any other Credit Document.

**Section 2.3    Attachment.**

The Obligor acknowledges that (i) value has been given, (ii) it has rights in the applicable Collateral or the power to transfer rights in the Collateral to the Agent (other than after-acquired Collateral), (iii) it has not agreed to postpone the time of attachment of the Security Interest, and (iv) it has received a copy of this Agreement.

**Section 2.4    Scope of Security Interest.**

(1) To the extent that an assignment of amounts payable and other proceeds arising under or in connection with, or the grant of a security interest in any agreement, licence, lease, permit, instrument or quota of the Obligor would constitute a default under, or a breach of, or would result in the termination of, such agreement, licence, lease, permit, instrument or quota (each, a "**Restricted Asset**"), the Security Interest with respect to each Restricted Asset will constitute a trust created in favour of the Agent, for the benefit of the Secured Creditors, pursuant to which the Obligor holds as trustee all proceeds arising under or in connection with the Restricted Asset in trust for the Agent, for the benefit of the Secured Creditors, on the following basis:

(a) subject to the Credit Agreement, until the Security Interest is enforceable, the Obligor is entitled to receive all such proceeds; and

- 6 -

(b)     whenever the Security Interest is enforceable, (i) all rights of the Obligor to receive such proceeds cease and all such proceeds will be immediately paid over to the Agent for the benefit of the Secured Creditors, and (ii) the Obligor will take all actions requested by the Agent to collect and enforce payment and other rights arising under the Restricted Asset.

(2)     The Security Interest with respect to trademarks constitutes a security interest in, and a charge, hypothecation and pledge of such Collateral in favour of the Agent for the benefit of the Secured Creditors, but does not constitute an assignment or mortgage of such Collateral to the Agent or any Secured Creditor.

(3)     Until the Security Interest is enforceable, the grant of the Security Interest in the Intellectual Property does not affect in any way the Obligor's rights to commercially exploit the Intellectual Property, defend it, enforce the Obligor's rights in it or with respect to it against third parties in any court or claim and be entitled to receive any damages with respect to any infringement of it.

(4)     The Security Interest does not extend to consumer goods.

(5)     The Security Interest does not extend or apply to the last day of the term of any lease or sublease of real property or any agreement for a lease or sublease of real property, now held or hereafter acquired by the Obligor, but the Obligor will stand possessed of any such last day upon trust to assign and dispose of it as the Agent may reasonably direct.

**Section 2.5    No Control Agreements.**

Notwithstanding anything to the contrary herein, in no event shall the Obligor or any Subsidiary thereof be required to execute control agreements to perfect the security interests granted hereunder, including in (i) any deposit, commodity or securities account (including, without limitation, securities entitlements and related assets) or (ii) other assets requiring perfection through control.

**Section 2.6    Grant of Licence to Use Intellectual Property.**

For the purpose of enabling the Agent, during an Event of Default which is continuing, to exercise rights and remedies hereunder, and for no other purposes, the Obligor hereby grants to the Agent an irrevocable, non-exclusive license, (exercisable without payments of royalty or other compensation to the Obligor) to use, assign, license or sub-license any of the Collateral of the Obligor consisting of Intellectual Property in which the Obligor now has or hereafter acquires rights, and wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof. The Agent covenants and agrees that it will not exercise its rights under the foregoing license except during the time that it shall be lawfully entitled to exercise its rights and remedies hereunder.

- 7 -

**Section 2.7    Care and Custody of Collateral.**

(1)    The Agent shall keep the Collateral in its possession identifiable in accordance with its customary practice for the Collateral of such type.

(2)    Without limiting any other rights or remedies under this Agreement, the Agent may upon the occurrence and during the continuance of an Event of Default, (i) notify any Person obligated on an Instrument, Security or account to make payments to the Agent, whether or not the Obligor was previously making collections on such accounts, chattel paper, instruments, and (ii) assume control of any proceeds arising from the Collateral.

(3)    The Agent has no obligation to collect dividends, distributions or interest payable on, or exercise any option or right in connection with, any Collateral.  The Agent has no obligation to protect or preserve any Collateral from depreciating in value or becoming worthless and is released from all responsibility for any loss of value. In the physical keeping of any Securities, the Agent is only obliged to exercise the same degree of care as it would exercise with respect to its own Securities kept at the same place.

(4)    The Agent may, upon the occurrence and during the continuance of any Event of Default, sell, transfer, use or otherwise deal with any investment property included in the Collateral over which the Agent has control, on such conditions and in such manner as the Agent in its sole discretion may determine.

**Section 2.8    Rights of the Obligor.**

(1)    Until the occurrence of an Event of Default which is continuing, the Obligor is entitled to vote the Securities and other financial assets that are part of the Collateral and to receive dividends and distributions on such Securities and financial assets, as may be permitted by the Credit Agreement. Upon the occurrence and during the continuance of an Event of Default, all rights of the Obligor to vote (under any proxy given by the Agent (or its nominee) or otherwise) or to receive distributions or dividends cease and all such rights become vested solely and absolutely in the Agent.

(2)    Any distributions or dividends received by the Obligor contrary to Section 2.8(1) or any other moneys or property received by the Obligor after the Security Interest is enforceable will be received as trustee for the Agent and the Secured Creditors and shall be immediately paid over to the Agent.

<div align="center">

**ARTICLE 3**
**ENFORCEMENT**

</div>

**Section 3.1    Enforcement.**

The Security Interest becomes and is enforceable against the Obligor upon the occurrence and during the continuance of an Event of Default.

- 8 -

**Section 3.2    Remedies.**

Whenever the Security Interest is enforceable, the Agent may realize upon the Collateral and enforce the rights of the Agent and the Secured Creditors by:

(a)    entry onto any premises where Collateral consisting of tangible personal property may be located;

(b)    entry into possession of the Collateral by any method permitted by law;

(c)    sale, grant of options to purchase, or lease of all or any part of the Collateral;

(d)    holding, storing and keeping idle or operating all or any part of the Collateral;

(e)    exercising and enforcing all rights and remedies of a holder of the Collateral as if the Agent were the absolute owner thereof (including, if necessary, causing the Collateral to be registered in the name of the Agent or its nominee if not already done);

(f)    collection of any proceeds arising in respect of the Collateral;

(g)    collection, realization or sale of, or other dealing with, accounts;

(h)    license or sublicense, whether on an exclusive or nonexclusive basis, of any Intellectual Property for such term and on such conditions and in such manner as the Agent in its sole judgment determines (taking into account such provisions as may be necessary to protect and preserve such Intellectual Property);

(i)    instruction to any bank to transfer all moneys constituting Collateral held by such bank to an account maintained with or by the Agent;

(j)    application of any moneys constituting Collateral or proceeds thereof in accordance with this Agreement;

(k)    appointment by instrument in writing of a receiver (which term as used in this Agreement includes a receiver and manager) or agent of all or any part of the Collateral and removal or replacement from time to time of any receiver or agent;

(l)    institution of proceedings in any court of competent jurisdiction for the appointment of a receiver of all or any part of the Collateral;

(m)    institution of proceedings in any court of competent jurisdiction for sale or foreclosure of all or any part of the Collateral;

(n)    filing of proofs of claim and other documents to establish claims to the Collateral in any proceeding relating to the Obligor; and

(o)    any other remedy or proceeding authorized or permitted under the PPSA or otherwise by law or equity.

- 9 -

**Section 3.3 Additional Rights.**

In addition to the remedies set forth in Section 3.2 and elsewhere in this Agreement, whenever the Security Interest is enforceable, the Agent may:

(a) require the Obligor, at the Obligor's expense, to assemble the Collateral at a place or places designated by notice in writing and the Obligor agrees to so assemble the Collateral promptly upon receipt of such notice;

(b) require the Obligor, by notice in writing, to disclose to the Agent the location or locations of the Collateral and the Obligor agrees to promptly make such disclosure when so required;

(c) repair, process, modify, complete or otherwise deal with the Collateral and prepare for the disposition of the Collateral, whether on the premises of the Obligor or otherwise;

(d) redeem any prior security interest against any Collateral, procure the transfer of such security interest to itself, or settle and pass the accounts of the prior mortgagee, chargee or encumbrancer (any accounts to be conclusive and binding on the Obligor absent manifest error and provided the Agent has exercised reasonable diligence in verifying such accounts);

(e) pay any liability secured by any Lien against any Collateral (all such payments to be added to the Obligations);

(f) carry on all or any part of the business of the Obligor and, to the exclusion of all others including the Obligor, enter upon, occupy and use all or any of the premises, buildings, and other property of or used by the Obligor for such time as the Agent sees fit, free of charge, and the Agent and the Secured Creditors are not liable to the Obligor for any act, omission or negligence (other than their own gross negligence or willful misconduct) in so doing or for any rent, charges, depreciation or damages incurred in connection with or resulting from such action;

(g) borrow for the purpose of carrying on any of the businesses of the Obligor or for the maintenance, preservation or protection of the Collateral and grant a security interest in the Collateral, whether or not in priority to the Security Interest, to secure repayment;

(h) commence, continue or defend any judicial or administrative proceedings for the purpose of protecting, seizing, collecting, realizing or obtaining possession or payment of the Collateral, and give good and valid receipts and discharges in respect of the Collateral and compromise or give time for the payment or performance of all or any part of the accounts or any other obligation of any third party to the Obligor; and

- 10 -

(i)     at any public sale, and to the extent permitted by law on any private sale, bid for and purchase any or all of the Collateral offered for sale and upon compliance with the terms of such sale, hold, retain and dispose of such Collateral without any further accountability to the Obligor or any other Person with respect to such holding, retention or disposition, except as required by law. In any such sale to the Agent, the Agent may, for the purpose of making payment for all or any part of the Collateral so purchased, use any claim for Secured Obligations then due and payable to it as a credit against the purchase price.

**Section 3.4     Exercise of Remedies.**

The remedies hereunder including under Section 3.2 and Section 3.3 may, subject to the Applicable Laws to the extent required thereby, be exercised from time to time separately or in combination and are in addition to, and not in substitution for, any other rights of the Agent and the Secured Creditors however arising or created. The Agent and the Secured Creditors are not bound to exercise any right or remedy, and the exercise of rights and remedies is without prejudice to the rights of the Agent and the Secured Creditors in respect of the Secured Obligations including the right to claim for any deficiency.

**Section 3.5     Receiver's Powers.**

(1)     Any receiver appointed by the Agent is vested with the rights and remedies which could have been exercised by the Agent in respect of the Obligor or the Collateral and such other powers and discretions as are granted in the instrument of appointment and any supplemental instruments. The identity of the receiver, its replacement and its remuneration are within the sole and unfettered discretion of the Agent, provided such remuneration is on commercially reasonable terms.

(2)     Any receiver appointed by the Agent will act as agent for the Agent for the purposes of taking possession of the Collateral, but otherwise and for all other purposes (except as provided below), as agent for the Obligor. The receiver may sell, lease, or otherwise dispose of Collateral as agent for the Obligor or as agent for the Agent as the Agent may determine in its discretion. The Obligor agrees to ratify and confirm all actions of the receiver acting as agent for the Obligor, and to release and indemnify the receiver in respect of all such actions.

(3)     The Agent, in appointing or refraining from appointing any receiver, does not incur liability to the receiver, the Obligor or otherwise and is not responsible for any misconduct or negligence of such receiver.

**Section 3.6     Appointment of Attorney.**

(1)     The Obligor hereby irrevocably constitutes and appoints the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Obligor and in the name of the Obligor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this

- 11 -

Agreement, and, without limiting the generality of the foregoing, the Obligor hereby gives the Agent the power and right, on behalf of the Obligor, without notice to or assent by the Obligor, to do any or all of the following:

(a)     in the name of the Obligor or its own name, or otherwise, take possession of and endorse and collect any cheques, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to any Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Agent for the purpose of collecting any and all such moneys due whenever payable;

(b)     in the case of any Intellectual Property, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as the Agent may request to evidence the Agent's and the Secured Creditors' Security Interest in such Intellectual Property and the goodwill and general intangibles of the Obligor relating thereto or represented thereby;

(c)     pay or discharge taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(d)     execute, in connection with any sale provided for in this Agreement, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

(e)     (1) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Agent or as the Agent shall direct; (2) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (3) sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5) defend any suit, action or proceeding brought against the Obligor with respect to any Collateral; (6) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Agent may deem appropriate; (7) assign any Intellectual Property (along with the goodwill of the business to which any such Intellectual Property pertains), throughout the world for such term or terms, on such conditions, and in such manner, as the Agent shall in its sole discretion determine; and (8) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Agent were the absolute owner thereof for all purposes, and do, at the Agent's option and the Obligor's expense, at any time, or from time to time, all acts and things which the Agent deems necessary to protect, preserve

- 12 -

or realize upon the Collateral and the Agent's and the Secured Creditors' Security Interests therein and to effect the intent of this Agreement, all as fully and effectively as the Obligor might do.

Notwithstanding anything to the contrary in this Section 3.6, the Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 3.6 unless an Event of Default shall have occurred and be continuing and the Agent shall have given the Obligor notice of its intent to exercise the rights under the power of attorney provided for in this Section 3.6.

(2)     If the Obligor fails to perform or comply with any of its agreements contained herein, the Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement.

(3)     The expenses of the Agent incurred in connection with actions undertaken as provided in this Section 3.6, together with interest thereon at a rate per annum equal to the highest rate per annum at which interest would then be payable on any category of past due Canadian Dollar Prime-Based Loans under the Credit Agreement, from the date of payment by the Agent to the date reimbursed by the Obligor, shall constitute Obligations and shall be payable by the Obligor to the Agent on demand.

(4)     The Obligor hereby ratifies all that said attorneys shall lawfully do or cause to be done in accordance with the terms hereof. And in accordance with this Section 3.6 all powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the Security Interests created hereby are released.

## Section 3.7     Dealing with the Collateral.

(1)     The Agent and the Secured Creditors are not obliged to exhaust their recourse against the Obligor or any other Person or against any other security they may hold in respect of the Secured Obligations before realizing upon or otherwise dealing with the Collateral in such manner as the Agent may consider desirable.

(2)     The Agent and the Secured Creditors may grant extensions or other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the Obligor and with other Persons, sureties or securities as they may see fit without prejudice to the Secured Obligations, the liability of the Obligor or the rights of the Agent and the Secured Creditors in respect of the Collateral.

(3)     Except as otherwise provided by law or this Agreement, the Agent and the Secured Creditors are not (i) liable or accountable for any failure to collect, realize or obtain payment in respect of the Collateral, (ii) bound to institute proceedings for the purpose of collecting, enforcing, realizing or obtaining payment of the Collateral or for the purpose of preserving any rights of any Persons in respect of the Collateral, (iii) responsible for any loss occasioned by any sale or other dealing with the Collateral in accordance with the terms hereof or by the retention of or failure to sell or otherwise deal with the Collateral, or (iv) bound to protect the Collateral from depreciating in value or becoming

- 13 -

worthless.  Notwithstanding the foregoing, the Agent and the Secured Creditors shall be responsible to the Obligor for gross negligence or willful misconduct.

**Section 3.8     Standards of Sale.**

Without prejudice to the ability of the Agent to dispose of the Collateral in any manner which is commercially reasonable, and subject always to the provisions of the PPSA, the Obligor acknowledges that:

      (a)    the Collateral may be disposed of in whole or in part;

      (b)    the Collateral may be disposed of by public auction, public tender or private contract, with or without advertising and without any other formality;

      (c)    any assignee of such Collateral may be the Agent, a Secured Creditor or a customer of any such Person;

      (d)    any sale conducted by the Agent will be at such time and place, on such notice and in accordance with such procedures as the Agent, in its sole discretion, may deem advantageous;

      (e)    the Collateral may be disposed of in any manner and on any terms necessary to avoid violation of Applicable Law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that the prospective bidders and purchasers have certain qualifications, and restrict the prospective bidders and purchasers to Persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of the Collateral) or in order to obtain any required approval of the disposition (or of the resulting purchase) by any governmental or regulatory authority or official;

      (f)    a disposition of the Collateral may be on such terms and conditions as to credit or otherwise as the Agent, in its sole discretion, may deem advantageous; and

      (g)    the Agent may establish an upset or reserve bid or price in respect of the Collateral.

**Section 3.9     Dealings by Third Parties.**

(1)    No Person dealing with the Agent, any of the Secured Creditors or an agent or receiver is required to determine (i) whether the Security Interest has become enforceable, (ii) whether the powers which such Person is purporting to exercise have become exercisable, (iii) whether any money remains due to the Agent or the Secured Creditors by the Obligor, (iv) the necessity or expediency of the stipulations and conditions subject to which any sale or lease of Collateral is made, (v) the propriety or regularity of any sale or other dealing by the Agent or any Secured Creditor with the Collateral, or (vi) how any money paid to the Agent or the Secured Creditors have been applied.

- 14 -

(2)     Any bona fide purchaser of all or any part of the Collateral from the Agent or any receiver or agent will hold the Collateral absolutely, free from any claim or right of whatever kind, including any equity of redemption, of the Obligor, which each the Obligor specifically waives (to the fullest extent permitted by law) as against any such purchaser together with all rights of redemption, stay or appraisal which the Obligor has or may have under any rule of law or statute now existing or hereafter adopted.

### Section 3.10   Proceeds to be Turned Over to Agent

If an Event of Default shall occur and be continuing, all proceeds received by the Obligor consisting of cash, cheques and other near-cash items shall be held by the Obligor in trust for the Agent and the Secured Creditors and shall, forthwith upon receipt by the Obligor, be turned over to the Agent in the exact form received by the Obligor (duly endorsed by the Obligor to the Agent, if required). All proceeds received by the Agent hereunder shall be held by the Agent in a collateral account maintained under its sole dominion and control. All proceeds while held by the Agent in a collateral account (or by the Obligor in trust for the Agent and the Secured Creditors) shall continue to be held as collateral security for all the Obligations and shall not constitute payment thereof until applied thereto as provided in Section 3.11.

### Section 3.11   Application of Proceeds

At such intervals as may be agreed upon by the Obligor and the Agent, or, if an Event of Default shall have occurred and be continuing, at any time at the Agent's election, the Agent may apply all or any part of proceeds constituting Collateral and any proceeds of and distribution in respect of Collateral in payment of the Obligations as provided in the Credit Agreement.

### ARTICLE 4
### REPRESENTATIONS, WARRANTIES AND COVENANTS

### Section 4.1     General Representations, Warranties and Covenants.

The Obligor represents and warrants and covenants and agrees, acknowledging and confirming that the Agent and each Secured Creditor is relying on such representations, warranties, covenants and agreements, that:

(a)     **Obligor's Legal Status.** On the date hereof, the Obligor's legal name, jurisdiction of organization or formation (as applicable), the location of the Obligor's chief executive office, the location of the Obligor's business and assets, as the case may be, are specified on Schedule A, as such Schedule may be amended, supplemented or modified from time to time. The Obligor has delivered to the Agent a certified charter, certificate of incorporation, partnership agreement or other organization document and good standing certificate (or equivalent thereto) as of a date which is recent to the date hereof.

(b)     **Title to Collateral.** Except for the Security Interest granted to the Agent for the benefit of the Secured Creditors pursuant to this Agreement and the other Permitted Liens, the Obligor owns each item of the Collateral free and clear of any and all Liens or claims of others excepting Permitted Liens. For the

- 15 -

avoidance of doubt, it is understood and agreed that the Obligor may, as part of its business, grant licenses to third parties to use Intellectual Property owned or developed by the Obligor to the extent permitted by the Credit Agreement. Each of the Agent and each Secured Creditor understands that any such licenses may be exclusive to the applicable licensees, and such exclusivity provisions may, to the extent such licenses are Permitted Liens, limit the ability of the Agent to utilize, license free of such license rights.

(c) **Validity of Security Interest**. The Security Interest (a) will constitute valid perfected Security Interests in respect of all Collateral in which the Security Interest may be perfected by filing, recording or registration in the province of Alberta, in each case in favor of the Agent, for the benefit of the Secured Creditors, as collateral security for the Obligor's Obligations, enforceable in accordance with the terms hereof against all creditors of the Obligor and any Persons purporting to purchase any Collateral from the Obligor and (b) are prior to all other Liens on the Collateral in existence on the date hereof except for (x) unrecorded Permitted Liens which have priority over the Liens on the Collateral by operation of law and (y) Liens expressly permitted by the Credit Agreement to be prior to the Security Interest granted pursuant to the terms hereof.

## ARTICLE 5
## COVENANTS

The Obligor covenants and agrees with the Agent, that, from and after the date of this Agreement until the Obligations shall have been paid in full:

### Section 5.1    Changes in Name, etc.

The Obligor will not, except upon 30 days' prior written notice to the Agent and delivery to the Agent of all additional financing statements and executed documents reasonably requested by the Agent to maintain the validity, perfection and priority of the Security Interests provided for herein, (i) change the location of its chief executive office or sole place of business or (ii) change its name.

### Section 5.2    Title to Collateral

The Obligor shall maintain the Security Interest created by this Agreement as a perfected Security Interest and shall defend such Security Interest against the claims and demands of all Persons whomsoever, subject to the rights of the Obligor under the Credit Agreement to dispose of the Collateral.

### Section 5.3    Other Action as to Collateral

(a) The Obligor will furnish to the Agent from time to time statements and schedules further identifying and describing the assets and property of the Obligor and such other reports in connection therewith as the Agent may reasonably request, all in reasonable detail,

- 16 -

(b)     without limiting the foregoing, within 15 days of a request therefor by the Agent and only during the continuance of a Default or Event of Default, the Obligor will furnish to the Agent (i) a listing of each of the "serial number goods" which form part of the Collateral (as defined in the PPSA) together with the location of such serial number goods and (ii) the legal descriptions of any Lands which form part of the Collateral.

(c)     At any time and from time to time, upon the written request of the Agent, and at the sole expense of the Obligor, the Obligor will promptly and duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as the Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, filing any financing or continuation statements under the PPSA (or other similar laws) in effect in any jurisdiction with respect to the Security Interests created hereby.

**Section 5.4     Intellectual Property**

(a)     Except with respect to any patent, trademark or copyright permitted to be abandoned under the Credit Agreement, the Obligor shall notify the Agent immediately if it knows or has reason to know that any application or registration relating to any material patent, trademark or copyright of the Obligor may become abandoned, or dedicated to the public domain, or of any adverse determination or development regarding the Obligor's ownership of any patent, trademark or copyright, its right to register the same, or to keep and maintain the same, except in each case, to the extent it would not reasonably be expected to result in a Material Adverse Effect.

(b)     Whenever the Obligor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of or acquire any interests in any material patent, trademark or copyright with CIPO or any similar office or agency of any jurisdiction, the Obligor shall report such filing to the Agent within ten (10) Business Days after the last day of the fiscal quarter in which such filing occurs, and, upon request of the Agent, the Obligor shall execute and deliver any and all agreements relating to patent, trademark or copyright as the Agent may request to evidence the Agent's Security Interest in such patent, trademark or copyright, and the general intangibles of the Obligor relating thereto or represented thereby. For the avoidance of doubt, the provisions hereof shall automatically apply to any such patent, trademark or copyright acquired after the date hereof and such patent, trademark or copyright shall automatically constitute Collateral as if such would have constituted Collateral at the time of execution hereof and be subject to the Lien and security interest created by this Agreement without further action by any party.

(c)     Except with respect to any copyright permitted to be abandoned under the Credit Agreement, the Obligor shall take all actions necessary or reasonably requested by the Agent to maintain and pursue each application, to obtain the relevant

- 17 -

registration and to maintain the registration of each material copyright, including the filing of applications for renewal.

(d)  Except with respect to any patent or trademark permitted to be abandoned under the Credit Agreement, the Obligor shall take all actions necessary or reasonably requested by the Agent to maintain and pursue each application, to obtain the relevant registration and to maintain the registration of each material patent or trademark, including the filing of applications for renewal, affidavits of use and affidavits of non-contestability and the payment of maintenance fees.

(e)  In the event that any material patents, trademarks or copyrights is infringed upon, or misappropriated, diluted or otherwise violated by a third party, the Obligor shall (i) notify the Agent promptly after the Obligor learns thereof and (ii) take such actions as the Obligor shall reasonably deem appropriate under the circumstances to protect such patent, trademark or copyright, stop the infringement and obtain damages.

(f)  Except with respect to any copyright, trademark or patent not required to be maintained or permitted to be abandoned under the Credit Agreement, the Obligor (either itself or through its permitted licensees) will not take or knowingly omit to take any action whereby any material copyright, trademark or patent could reasonably be expected to become abandoned, dedicated or invalidated or whereby the remedies in respect of such copyright, trademark or patent with respect to potential infringers could reasonably be expected to become weakened.

(g)  The Obligor (either itself or through licensee) will not knowingly do any act that uses any Intellectual Property to infringe the intellectual property rights of any other Person which would reasonably be likely to have a Material Adverse Effect.

**Section 5.5    Insurance.**

All property damage insurance maintained on any portion of the Collateral of the Obligor shall name the Agent as lender's loss payee, and all liability insurance maintained in respect of any portion of the Collateral of the Obligor shall name the Agent as an additional insured. The Obligor shall furnish the Agent with certificates of insurance evidencing compliance with the foregoing insurance provision.

**ARTICLE 6**
**GENERAL**

**Section 6.1    Notices.**

All notices, requests and demands to or upon the Agent or the Obligor under this Agreement shall be in writing and delivered to the addressee by prepaid private courier or sent by facsimile to the applicable address and to the attention of the officer of the addressee as follows:

- 18 -

To the Obligor:

1356760 Alberta Ltd.
407 2nd St. SW, Ste. 1700
Calgary, Alberta T2P 2Y3

Attention:     Mark Roberts, Chief Financial Officer
Fax No.:       (403) 269-2251

To the Agent:

HSBC Bank Canada, as Agent
7th Floor, 70 York Street
Toronto, Ontario  M5J 1S9

Attention:     Manager Agency
Fax No.:       (647) 788-2185

Any communication transmitted by prepaid private courier shall be deemed to have been validly and effectively given or delivered on the Business Day after which it is submitted for delivery. Any communication transmitted by facsimile shall be deemed to have been validly and effectively given or delivered on the day on which it is transmitted, if transmitted on a Business Day on or before 5:00 p.m. (local time of the intended recipient), and otherwise on the next following Business Day.  The Agent or the Obligor may change its respective address for service or other notices, including electronic communications, by notice given in the foregoing manner.

**Section 6.2     Discharge.**

The Security Interest will be discharged upon, but only upon, full and indefeasible payment and performance of the Secured Obligations. Upon the discharge of the Secured Obligations and at the request and expense of the Obligor, the Agent will execute and deliver to the Obligor such releases, discharges, financing statements and other documents or instruments as the Obligor may reasonably require and the Agent will promptly redeliver to the Obligor, or as the Obligor may otherwise direct the Agent, any Collateral in its possession.

If any of the Collateral shall be sold, transferred or otherwise disposed of by the Obligor in a transaction permitted by the Credit Agreement then the Agent, at the request and sole expense of the Obligor, shall promptly execute and deliver to the Obligor all releases or other documents necessary or reasonably desirable for the release of the Liens created by such Collateral.

**Section 6.3     No Merger.**

This Agreement does not operate by way of merger of any of the Secured Obligations and no judgment recovered by the Agent or any of the Secured Creditors will operate by way of merger of, or in any way affect, the Security Interest, which is in addition to, and not in substitution for, any other security now or hereafter held by the Agent and the Secured Creditors in respect of the Secured Obligations.  The representations, warranties and covenants of the

17101030.2

- 19 -

Obligor in this Agreement survive the execution and delivery of this Agreement and any advances under the Credit Agreement. Notwithstanding any investigation made by or on behalf of the Agent or the Secured Creditors these covenants, representations and warranties continue in full force and effect until this Agreement shall terminate (or thereafter to the extent provided therein).

**Section 6.4    Further Assurances.**

The Obligor will do all acts and things and execute and deliver, or cause to be executed and delivered, all agreements, documents and instruments that the Agent may reasonably require and take all further steps relating to the Collateral or any other property or assets of the Obligor that the Agent may reasonably require for (i) protecting the Collateral, (ii) perfecting, preserving and protecting the Security Interest, and (iii) exercising all powers, authorities and discretions conferred upon the Collateral Agent. Whenever the Security Interest is enforceable, the Obligor will do all acts and things and execute and deliver all documents and instruments that the Collateral Agent may reasonably require for facilitating the sale or other disposition of the Collateral in connection with its realization.

**Section 6.5    Supplemental Security.**

This Agreement is in addition to, without prejudice to and supplemental to all other security now held or which may hereafter be held by the Agent or the Secured Creditors.

**Section 6.6    Successors and Assigns.**

This Agreement is binding on the Obligor and its successors and permitted assigns, and enures to the benefit of the Agent, the Secured Creditors and their respective successors and permitted assigns. This Agreement may be assigned by the Agent in accordance with the Credit Agreement and, in such event, any such assignee will be entitled to all of the rights and remedies of the Agent as set forth in this Agreement or otherwise. In any action brought by an assignee to enforce any such right or remedy, the Obligor will not assert against the assignee any claim or defence which the Obligor now has or may have against the Agent or any of the Secured Creditors. The Obligor may not assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Agent which may be unreasonably withheld.

**Section 6.7    Enforcement Expenses; Indemnification**

(1)    The Obligor agrees to pay or reimburse each Secured Creditor and the Agent for all its costs and expenses incurred in enforcing or preserving any rights under this Agreement and the other Credit Documents to which the Obligor is a party, including, without limitation, the reasonable fees and disbursements of a single outside counsel to the Agent in each relevant jurisdiction.

(2)    The Obligor agrees to pay, and to save the Agent and the Secured Creditors harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions

- 20 -

contemplated by this Agreement, in each case to the extent the Obligor would be required to do so pursuant to the Credit Agreement.

(3)     The Obligor agrees to pay, and to save the Agent and the Secured Creditors harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement to the extent the Obligor would be required to do so pursuant the Credit Agreement.

(4)     The agreements in this Section 6.7 shall survive repayment of the Obligations and all other amounts payable under the Credit Agreement and the other Credit Documents.

**Section 6.8     Set-Off**

In addition to any rights and remedies of the Secured Creditors provided by law, each Secured Creditor shall have the right, without notice to the Obligor, any such notice being expressly waived by the Obligor to the extent permitted by Applicable Law, upon the Obligations becoming due and payable by the Obligor (whether at the stated maturity, by acceleration or otherwise), to apply to the payment of such Obligations, by setoff or otherwise, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Secured Creditor, any affiliate thereof or any of their respective branches or agencies to or for the credit or the account of the Obligor.  Each Secured Creditor agrees promptly to notify the Obligor and the Agent after any such application made by such Secured Creditor; <u>provided</u> that the failure to give such notice shall not affect the validity of such application.

**Section 6.9     Severability.**

If any court of competent jurisdiction from which no appeal exists or is taken, determines any provision of this Agreement to be illegal, invalid or unenforceable, that provision will be severed from this Agreement and the remaining provisions will remain in full force and effect.

**Section 6.10    Amendment.**

This Agreement may only be amended, supplemented or otherwise modified by written agreement executed by the Agent and the Obligor.

**Section 6.11    Waivers, etc.**

(1)     No consent or waiver by the Agent or the Secured Creditors in respect of this Agreement is binding unless made in writing and signed by an authorized officer of the Agent. Any consent or waiver given under this Agreement is effective only in the specific instance and for the specific purpose for which given. No waiver of any of the provisions of this Agreement constitutes a waiver of any other provision.

(2)     A failure or delay on the part of the Agent or the Secured Creditors in exercising a right under this Agreement does not operate as a waiver of, or impair, any right of the Agent or

- 21 -

the Secured Creditors however arising. A single or partial exercise of a right on the part of the Agent or the Secured Creditors does not preclude any other or further exercise of that right or the exercise of any other right by the Agent or the Secured Creditors.

**Section 6.12   Conflict.**

In the event of a direct conflict or inconsistency between the terms and provisions contained in this Agreement and the terms and provisions contained in the Credit Agreement, it is the intentions of the parties hereto that such terms and provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict or inconsistency that cannot be resolved as aforesaid, the terms and provisions of the Credit Agreement shall control and govern. In addition, to the extent that, under the Credit Agreement, the Obligor is permitted to undertake any act or granted any entitlement, the provisions of this Agreement shall be deemed to preserve such permission or entitlement notwithstanding anything to the contrary herein.

**Section 6.13   Governing Law.**

This Agreement will be governed by, interpreted and enforced in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

17101030.2

**IN WITNESS WHEREOF** the Obligor has executed this Agreement.

<div align="center">

**1356760 ALBERTA LTD.**

</div>

Per: _____
Name: Mark Roberts
Title:   Chief Financial Officer

## SCHEDULE "A"

| Legal Name | Jurisdiction of Incorporation or Formation | Location of Chief Executive Office | Location of Business and Assets |
|---|---|---|---|
| 1356760 Alberta Ltd. | Alberta | 407 2nd St. NW, Ste. 1700 Calgary, Alberta T2P 2Y3 | Alberta |

17101030.2

THIS IS EXHIBIT " _____14_____ "
referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26th_

day of _May_ A.D. 20 _20_

Jonathan Tomm
Barrister and Solicitor

**Q'MAX SOLUTIONS HOLDINGS INC.**

as Obligor

and

**HSBC BANK CANADA**

as Administrative Agent

---

**SECURITY AGREEMENT**

May 23, 2014

---

## SECURITY AGREEMENT

Security Agreement dated as of May 23, 2014 (the "**Agreement**") made by Q'Max Solutions Holdings Inc. (the "**Obligor**"), to and in favour of HSBC Bank Canada, as Agent for the benefit of the Secured Creditors.

**WHEREAS**, pursuant to, and subject to the terms and conditions of, a Credit Agreement dated as of the date hereof (as amended, supplemented or restated from time to time, the "**Credit Agreement**") among Fluid Acquisition Corp. and Q'Max America Inc., as borrowers, HSBC Bank Canada and those other financial institutions who from time to time become parties thereto as lenders (collectively, the "**Lenders**") and HSBC Bank Canada, as administrative agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "**Agent**") the Lenders agreed to make certain credit facilities available to the Borrowers;

**AND WHEREAS**, the obligations of the Lenders to make available certain Advances pursuant to the Credit Agreement and the entry into Hedging Agreements by the Hedge Providers and the entry into the Banking Services Agreements by the Agent and the Affiliates of the Agent or a Lender from time to time are conditioned upon the execution and delivery by the Obligor of a security agreement in favour of the Agent, on behalf of the Secured Creditors, in the form hereof, to secure all of the Obligations;

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## INTERPRETATION

**Section 1.1    Defined Terms.**

As used in this Agreement, the following terms have the following meanings:

"**Agreement**" means this security agreement as may be amended, supplemented or otherwise modified from time to time.

"**CIPO**" means the Canadian Intellectual Property Office.

"**Collateral**" has the meaning specified in Section 2.1 of this Agreement.

"**Credit Agreement**" shall have the meaning attributed to such term in the Preamble of this Agreement.

"**Instruments**" means (i) a bill, note or cheque within the meaning of the *Bills of Exchange Act* (Canada) or any other writing that evidences a right to the payment of money and is of a type that in the ordinary course of business is transferred by delivery with any necessary endorsement or assignment, or (ii) a letter of credit and an advice of credit if the letter or advice states that it must be surrendered upon claiming payment thereunder, or (iii) chattel paper or any other writing that evidences both a monetary obligation and a security interest in or a lease of specific

- 2 -

goods, or (iv) documents of title or any other writing that purports to be issued by or addressed to a bailee and purports to cover such goods in the bailee's possession as are identified or fungible portions of an identified mass, and that in the ordinary course of business is treated as establishing that the Person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers, or (v) any document or writing commonly known as an instrument, but excludes investment property.

"**Intellectual Property**" means domestic and foreign: (i) patents, applications for patents and reissues, divisions, continuations, renewals, extensions and continuations-in-part of patents or patent applications; (ii) proprietary and nonpublic business information, including inventions (whether patentable or not), invention disclosures, improvements, discoveries, trade secrets, confidential information, know-how, methods, processes, designs, technology, technical data, schematics, formulae and customer lists, and documentation relating to any of the foregoing; (iii) copyrights, copyright registrations and applications for copyright registration; (iv) mask works, mask work registrations and applications for mask work registrations; (v) designs, design registrations, design registration applications and integrated circuit topographies; (vi) trade names, business names, corporate names, domain names, website names and world wide web addresses, common law trade-marks, service marks, certification marks, trade dress, logos, applications, registrations and renewals for any of the foregoing and the goodwill connected with the use of and symbolized by any of the foregoing; (vii) computer software and programs (both source code and object code form), all proprietary rights in the computer software and programs and all documentation and other materials related to the computer software and programs; (viii) any other intellectual property and industrial property; (ix) income, fees, royalties, damages, claims and payments for past, present, or future infringements, dilutions or other violations thereof; (x) rights corresponding thereto throughout the world; and (xi) rights to sue for past, present or future infringements, dilutions or other violations thereof.

"**Obligations**" means, in respect of the Obligor, the Obligations (as such term is defined in the Credit Agreement) of such Obligor.

"**Obligor**" shall have the meaning attributed to such term in the Preamble of this Agreement.

"**PPSA**" means the *Personal Property Security Act* (Alberta) and the regulations promulgated thereunder and other applicable personal property security legislation of the applicable Canadian province or provinces (including the Civil Code of Quebec and the regulations respecting the register of personal and movable real rights promulgated thereunder) as all such legislation now exists or may from time to time hereafter be amended, modified, recodified, supplemented or replaced, together with all rules, regulations and interpretations thereunder or related thereto.

"**Registrable Intellectual Property**" means any Intellectual Property in respect of which ownership, title, security interests, charges or encumbrances are capable of registration, recording or notation with any Governmental Authority pursuant to Applicable Laws.

"**Restricted Asset**" has the meaning specified in Section 2.4(1) of this Agreement.

"**Secured Creditors**" means, collectively, the Agent, the Lenders, the Hedge Providers and counterparties providing services pursuant to the Banking Services Agreements.

17101266.2

- 3 -

"**Secured Obligations**" has the meaning specified in Section 2.2 of this Agreement.

"**Securities**" means securities as defined in the *Securities Transfer Act* (Alberta).

"**Security Interest**" has the meaning specified in Section 2.2

## Section 1.2    Interpretation.

(1)     Capitalized terms used in this Agreement but not defined have the meanings given to them in the Credit Agreement.  Terms defined in the PPSA and the *Securities Transfer Act* (Alberta) ("**STA**") and used but not otherwise defined in this Agreement have the same meanings. For greater certainty, the terms "**account**", "**chattel paper**", "**document of title**", "**equipment**", "**goods**", "**instrument**", "**intangible**", "**investment property**", "**money**", "**personal property**" and "**proceeds**" have the meanings given to them in the PPSA; and the terms "**certificated security**", "**control**", "**delivery**", "**entitlement holder**", "**financial asset**", "**securities account**", "**securities intermediary**", "**security entitlement**" and "**uncertificated security**" have the meanings given to them in the STA or the PPSA as applicable.

(2)     Any reference in any Credit Document to Permitted Liens and any right of the Obligor to create or suffer to exist Permitted Liens are not intended to and do not and will not subordinate the Security Interest to any such Permitted Lien or give priority to any Person over the Secured Creditors with respect to any such Permitted Lien.

(3)     The rules of interpretation specified in Article 1 of the Credit Agreement shall be applicable to this Agreement.

## ARTICLE 2
## ARTICLE 2 SECURITY

## Section 2.1    Grant of Security.

(1)     Subject to Section 2.4 and Section 2.5, the Obligor grants to the Agent, for the benefit of the Secured Creditors, a security interest in, and assigns, mortgages, charges, hypothecates and pledges to the Agent, for the benefit of the Secured Creditors, all of the property, assets, effects and undertaking of the Obligor whether now owned or hereafter acquired and all of the property, assets, effects and undertaking in which the Obligor now has or hereafter acquires any interest (collectively, the "**Personal Property Collateral**"), including all of the Obligor's:

    (a)     present and after-acquired personal property including:

        (i)     inventory including goods held for sale, lease or resale, goods furnished or to be furnished to third parties under contracts of lease, consignment or service, goods which are raw materials or work in process, goods used in or procured for packing and materials used or consumed in the businesses of the Obligor;

- 4 -

(ii) equipment, machinery, furniture, fixtures, plant, vehicles and other goods of every kind and description and all licences and other rights and all related records, files, charts, plans, drawings, specifications, manuals and documents;

(iii) accounts due or accruing and all related agreements, books, accounts, invoices, letters, documents and papers recording, evidencing or relating to them;

(iv) money, documents of title, chattel paper, financial assets and investment property;

(v) security accounts and all of the credit balances, securities entitlements, other financial assets and items or property (or their value) standing to the credit from time to time in such securities accounts;

(vi) Instruments and Securities; and

(vii) intangibles including all security interests, goodwill, choses in action, contracts, contract rights, licenses and other contractual benefits;

(b) Intellectual Property including the Registrable Intellectual Property;

(c) all substitutions and replacements of and increases, additions and, where applicable, accessions to the property described in Section 2.1(a) and Section 2.1(b); and

(d) all proceeds in any form derived directly or indirectly from any dealing with all or any part of the property described in Section 2.1(a) and Section 2.1(c) inclusive, including the proceeds of such proceeds.

(2) Subject to Section 2.4 and Section 2.5, the Obligor hereby charges as and by way of a floating charge in favour of the Agent for the benefit of the Secured Creditors all the presently owned or held and hereafter acquired property, assets, effects and undertaking of the Obligor of whatsoever nature and kind and wheresoever situate, other than such of the Obligor's property, assets, effects and undertakings of the Obligor as are validly and effectively subjected to the security interest granted to the Agent pursuant to Section 2.1(1) (all of which property, assets, effects and undertakings so charged by this Section 2.1(2) are herein collectively called the "**Other Collateral**", and together with the Personal Property Collateral the "**Collateral**") including, without limiting the generality of the foregoing, all presently owned or held and hereafter acquired right, title and interest of the Obligor in and to real and immovable and leasehold property and rights whether in fee or of a less estate and all interest in and rights relating to lands and all easements, rights of way, privilege, benefits, licences, improvements and rights whether connected therewith or appurtenant thereto or separately owned or held and all structures, buildings, plant, machinery, fixtures, apparatus and fixed assets and the charge created by this Section 2.1(2) shall be a floating charge such that the Obligor shall not have power without the prior written consent of the Agent to:

17101266.2

- 5 -

(a)     create or permit to exist any Lien against any of the Other Collateral which ranks or could in any event rank in priority to or *pari passu* with the security constituted by this Agreement, save for those Liens that are Permitted Liens; or

(b)     grant, sell, exchange, transfer, assign, lease or otherwise dispose of the Other Collateral, save for Permitted Dispositions.

**Section 2.2     Secured Obligations.**

The security interests, assignments, mortgages, charges, hypothecations and pledges granted by the Obligor under this Agreement (collectively, the "**Security Interest**") secure the payment and performance of the following (collectively, the "**Secured Obligations**"):

(a)     the Obligations of the Obligor; and

(b)     all expenses, costs and charges incurred by or on behalf of the Secured Creditors in connection with this Agreement, the Security Interest or the Collateral, including all reasonable legal fees, court costs, receiver's or agent's remuneration and other expenses of taking possession of, repairing, protecting, insuring, preparing for disposition, realizing, collecting, selling, transferring, delivering or obtaining payment for the Collateral, and of taking, defending or participating in any action or proceeding in connection with any of the foregoing matters or otherwise in connection with the Secured Creditors' interest in any Collateral, whether or not directly relating to the enforcement of this Agreement or any other Credit Document.

**Section 2.3     Attachment.**

The Obligor acknowledges that (i) value has been given, (ii) it has rights in the applicable Collateral or the power to transfer rights in the Collateral to the Agent (other than after-acquired Collateral), (iii) it has not agreed to postpone the time of attachment of the Security Interest, and (iv) it has received a copy of this Agreement.

**Section 2.4     Scope of Security Interest.**

(1)     To the extent that an assignment of amounts payable and other proceeds arising under or in connection with, or the grant of a security interest in any agreement, licence, lease, permit, instrument or quota of the Obligor would constitute a default under, or a breach of, or would result in the termination of, such agreement, licence, lease, permit, instrument or quota (each, a "**Restricted Asset**"), the Security Interest with respect to each Restricted Asset will constitute a trust created in favour of the Agent, for the benefit of the Secured Creditors, pursuant to which the Obligor holds as trustee all proceeds arising under or in connection with the Restricted Asset in trust for the Agent, for the benefit of the Secured Creditors, on the following basis:

(a)     subject to the Credit Agreement, until the Security Interest is enforceable, the Obligor is entitled to receive all such proceeds; and

17101266.2

- 6 -

(b)    whenever the Security Interest is enforceable, (i) all rights of the Obligor to receive such proceeds cease and all such proceeds will be immediately paid over to the Agent for the benefit of the Secured Creditors, and (ii) the Obligor will take all actions requested by the Agent to collect and enforce payment and other rights arising under the Restricted Asset.

(2)    The Security Interest with respect to trademarks constitutes a security interest in, and a charge, hypothecation and pledge of such Collateral in favour of the Agent for the benefit of the Secured Creditors, but does not constitute an assignment or mortgage of such Collateral to the Agent or any Secured Creditor.

(3)    Until the Security Interest is enforceable, the grant of the Security Interest in the Intellectual Property does not affect in any way the Obligor's rights to commercially exploit the Intellectual Property, defend it, enforce the Obligor's rights in it or with respect to it against third parties in any court or claim and be entitled to receive any damages with respect to any infringement of it.

(4)    The Security Interest does not extend to consumer goods.

(5)    The Security Interest does not extend or apply to the last day of the term of any lease or sublease of real property or any agreement for a lease or sublease of real property, now held or hereafter acquired by the Obligor, but the Obligor will stand possessed of any such last day upon trust to assign and dispose of it as the Agent may reasonably direct.

**Section 2.5     No Control Agreements.**

Notwithstanding anything to the contrary herein, in no event shall the Obligor or any Subsidiary thereof be required to execute control agreements to perfect the security interests granted hereunder, including in (i) any deposit, commodity or securities account (including, without limitation, securities entitlements and related assets) or (ii) other assets requiring perfection through control.

**Section 2.6     Grant of Licence to Use Intellectual Property.**

For the purpose of enabling the Agent, during an Event of Default which is continuing, to exercise rights and remedies hereunder, and for no other purposes, the Obligor hereby grants to the Agent an irrevocable, non-exclusive license, (exercisable without payments of royalty or other compensation to the Obligor) to use, assign, license or sub-license any of the Collateral of the Obligor consisting of Intellectual Property in which the Obligor now has or hereafter acquires rights, and wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.  The Agent covenants and agrees that it will not exercise its rights under the foregoing license except during the time that it shall be lawfully entitled to exercise its rights and remedies hereunder.

- 7 -

**Section 2.7    Care and Custody of Collateral.**

(1)    The Agent shall keep the Collateral in its possession identifiable in accordance with its customary practice for the Collateral of such type.

(2)    Without limiting any other rights or remedies under this Agreement, the Agent may upon the occurrence and during the continuance of an Event of Default, (i) notify any Person obligated on an Instrument, Security or account to make payments to the Agent, whether or not the Obligor was previously making collections on such accounts, chattel paper, instruments, and (ii) assume control of any proceeds arising from the Collateral.

(3)    The Agent has no obligation to collect dividends, distributions or interest payable on, or exercise any option or right in connection with, any Collateral.  The Agent has no obligation to protect or preserve any Collateral from depreciating in value or becoming worthless and is released from all responsibility for any loss of value. In the physical keeping of any Securities, the Agent is only obliged to exercise the same degree of care as it would exercise with respect to its own Securities kept at the same place.

(4)    The Agent may, upon the occurrence and during the continuance of any Event of Default, sell, transfer, use or otherwise deal with any investment property included in the Collateral over which the Agent has control, on such conditions and in such manner as the Agent in its sole discretion may determine.

**Section 2.8    Rights of the Obligor.**

(1)    Until the occurrence of an Event of Default which is continuing, the Obligor is entitled to vote the Securities and other financial assets that are part of the Collateral and to receive dividends and distributions on such Securities and financial assets, as may be permitted by the Credit Agreement. Upon the occurrence and during the continuance of an Event of Default, all rights of the Obligor to vote (under any proxy given by the Agent (or its nominee) or otherwise) or to receive distributions or dividends cease and all such rights become vested solely and absolutely in the Agent.

(2)    Any distributions or dividends received by the Obligor contrary to Section 2.8(1) or any other moneys or property received by the Obligor after the Security Interest is enforceable will be received as trustee for the Agent and the Secured Creditors and shall be immediately paid over to the Agent.

**ARTICLE 3**
**ENFORCEMENT**

**Section 3.1    Enforcement.**

The Security Interest becomes and is enforceable against the Obligor upon the occurrence and during the continuance of an Event of Default.

- 8 -

**Section 3.2   Remedies.**

Whenever the Security Interest is enforceable, the Agent may realize upon the Collateral and enforce the rights of the Agent and the Secured Creditors by:

(a)     entry onto any premises where Collateral consisting of tangible personal property may be located;

(b)     entry into possession of the Collateral by any method permitted by law;

(c)     sale, grant of options to purchase, or lease of all or any part of the Collateral;

(d)     holding, storing and keeping idle or operating all or any part of the Collateral;

(e)     exercising and enforcing all rights and remedies of a holder of the Collateral as if the Agent were the absolute owner thereof (including, if necessary, causing the Collateral to be registered in the name of the Agent or its nominee if not already done);

(f)     collection of any proceeds arising in respect of the Collateral;

(g)     collection, realization or sale of, or other dealing with, accounts;

(h)     license or sublicense, whether on an exclusive or nonexclusive basis, of any Intellectual Property for such term and on such conditions and in such manner as the Agent in its sole judgment determines (taking into account such provisions as may be necessary to protect and preserve such Intellectual Property);

(i)     instruction to any bank to transfer all moneys constituting Collateral held by such bank to an account maintained with or by the Agent;

(j)     application of any moneys constituting Collateral or proceeds thereof in accordance with this Agreement;

(k)     appointment by instrument in writing of a receiver (which term as used in this Agreement includes a receiver and manager) or agent of all or any part of the Collateral and removal or replacement from time to time of any receiver or agent;

(l)     institution of proceedings in any court of competent jurisdiction for the appointment of a receiver of all or any part of the Collateral;

(m)     institution of proceedings in any court of competent jurisdiction for sale or foreclosure of all or any part of the Collateral;

(n)     filing of proofs of claim and other documents to establish claims to the Collateral in any proceeding relating to the Obligor; and

(o)     any other remedy or proceeding authorized or permitted under the PPSA or otherwise by law or equity.

- 9 -

**Section 3.3    Additional Rights.**

In addition to the remedies set forth in Section 3.2 and elsewhere in this Agreement, whenever the Security Interest is enforceable, the Agent may:

(a)     require the Obligor, at the Obligor's expense, to assemble the Collateral at a place or places designated by notice in writing and the Obligor agrees to so assemble the Collateral promptly upon receipt of such notice;

(b)     require the Obligor, by notice in writing, to disclose to the Agent the location or locations of the Collateral and the Obligor agrees to promptly make such disclosure when so required;

(c)     repair, process, modify, complete or otherwise deal with the Collateral and prepare for the disposition of the Collateral, whether on the premises of the Obligor or otherwise;

(d)     redeem any prior security interest against any Collateral, procure the transfer of such security interest to itself, or settle and pass the accounts of the prior mortgagee, chargee or encumbrancer (any accounts to be conclusive and binding on the Obligor absent manifest error and provided the Agent has exercised reasonable diligence in verifying such accounts);

(e)     pay any liability secured by any Lien against any Collateral (all such payments to be added to the Obligations);

(f)     carry on all or any part of the business of the Obligor and, to the exclusion of all others including the Obligor, enter upon, occupy and use all or any of the premises, buildings, and other property of or used by the Obligor for such time as the Agent sees fit, free of charge, and the Agent and the Secured Creditors are not liable to the Obligor for any act, omission or negligence (other than their own gross negligence or willful misconduct) in so doing or for any rent, charges, depreciation or damages incurred in connection with or resulting from such action;

(g)     borrow for the purpose of carrying on any of the businesses of the Obligor or for the maintenance, preservation or protection of the Collateral and grant a security interest in the Collateral, whether or not in priority to the Security Interest, to secure repayment;

(h)     commence, continue or defend any judicial or administrative proceedings for the purpose of protecting, seizing, collecting, realizing or obtaining possession or payment of the Collateral, and give good and valid receipts and discharges in respect of the Collateral and compromise or give time for the payment or performance of all or any part of the accounts or any other obligation of any third party to the Obligor; and

- 10 -

    (i)      at any public sale, and to the extent permitted by law on any private sale, bid for and purchase any or all of the Collateral offered for sale and upon compliance with the terms of such sale, hold, retain and dispose of such Collateral without any further accountability to the Obligor or any other Person with respect to such holding, retention or disposition, except as required by law. In any such sale to the Agent, the Agent may, for the purpose of making payment for all or any part of the Collateral so purchased, use any claim for Secured Obligations then due and payable to it as a credit against the purchase price.

**Section 3.4**    **Exercise of Remedies.**

    The remedies hereunder including under Section 3.2 and Section 3.3 may; subject to the Applicable Laws to the extent required thereby, be exercised from time to time separately or in combination and are in addition to, and not in substitution for, any other rights of the Agent and the Secured Creditors however arising or created. The Agent and the Secured Creditors are not bound to exercise any right or remedy, and the exercise of rights and remedies is without prejudice to the rights of the Agent and the Secured Creditors in respect of the Secured Obligations including the right to claim for any deficiency.

**Section 3.5**    **Receiver's Powers.**

(1)    Any receiver appointed by the Agent is vested with the rights and remedies which could have been exercised by the Agent in respect of the Obligor or the Collateral and such other powers and discretions as are granted in the instrument of appointment and any supplemental instruments. The identity of the receiver, its replacement and its remuneration are within the sole and unfettered discretion of the Agent, provided such remuneration is on commercially reasonable terms.

(2)    Any receiver appointed by the Agent will act as agent for the Agent for the purposes of taking possession of the Collateral, but otherwise and for all other purposes (except as provided below), as agent for the Obligor. The receiver may sell, lease, or otherwise dispose of Collateral as agent for the Obligor or as agent for the Agent as the Agent may determine in its discretion. The Obligor agrees to ratify and confirm all actions of the receiver acting as agent for the Obligor, and to release and indemnify the receiver in respect of all such actions.

(3)    The Agent, in appointing or refraining from appointing any receiver, does not incur liability to the receiver, the Obligor or otherwise and is not responsible for any misconduct or negligence of such receiver.

**Section 3.6**    **Appointment of Attorney.**

(1)    The Obligor hereby irrevocably constitutes and appoints the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Obligor and in the name of the Obligor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this

- 11 -

Agreement, and, without limiting the generality of the foregoing, the Obligor hereby gives the Agent the power and right, on behalf of the Obligor, without notice to or assent by the Obligor, to do any or all of the following:

(a)     in the name of the Obligor or its own name, or otherwise, take possession of and endorse and collect any cheques, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to any Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Agent for the purpose of collecting any and all such moneys due whenever payable;

(b)     in the case of any Intellectual Property, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as the Agent may request to evidence the Agent's and the Secured Creditors' Security Interest in such Intellectual Property and the goodwill and general intangibles of the Obligor relating thereto or represented thereby;

(c)     pay or discharge taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(d)     execute, in connection with any sale provided for in this Agreement, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

(e)     (1) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Agent or as the Agent shall direct; (2) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (3) sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5) defend any suit, action or proceeding brought against the Obligor with respect to any Collateral; (6) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Agent may deem appropriate; (7) assign any Intellectual Property (along with the goodwill of the business to which any such Intellectual Property pertains), throughout the world for such term or terms, on such conditions, and in such manner, as the Agent shall in its sole discretion determine; and (8) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Agent were the absolute owner thereof for all purposes, and do, at the Agent's option and the Obligor's expense, at any time, or from time to time, all acts and things which the Agent deems necessary to protect, preserve

17101266.2

- 12 -

or realize upon the Collateral and the Agent's and the Secured Creditors' Security Interests therein and to effect the intent of this Agreement, all as fully and effectively as the Obligor might do.

Notwithstanding anything to the contrary in this Section 3.6, the Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 3.6 unless an Event of Default shall have occurred and be continuing and the Agent shall have given the Obligor notice of its intent to exercise the rights under the power of attorney provided for in this Section 3.6.

(2)     If the Obligor fails to perform or comply with any of its agreements contained herein, the Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement.

(3)     The expenses of the Agent incurred in connection with actions undertaken as provided in this Section 3.6, together with interest thereon at a rate per annum equal to the highest rate per annum at which interest would then be payable on any category of past due Canadian Dollar Prime-Based Loans under the Credit Agreement, from the date of payment by the Agent to the date reimbursed by the Obligor, shall constitute Obligations and shall be payable by the Obligor to the Agent on demand.

(4)     The Obligor hereby ratifies all that said attorneys shall lawfully do or cause to be done in accordance with the terms hereof. And in accordance with this Section 3.6 all powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the Security Interests created hereby are released.

**Section 3.7     Dealing with the Collateral.**

(1)     The Agent and the Secured Creditors are not obliged to exhaust their recourse against the Obligor or any other Person or against any other security they may hold in respect of the Secured Obligations before realizing upon or otherwise dealing with the Collateral in such manner as the Agent may consider desirable.

(2)     The Agent and the Secured Creditors may grant extensions or other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the Obligor and with other Persons, sureties or securities as they may see fit without prejudice to the Secured Obligations, the liability of the Obligor or the rights of the Agent and the Secured Creditors in respect of the Collateral.

(3)     Except as otherwise provided by law or this Agreement, the Agent and the Secured Creditors are not (i) liable or accountable for any failure to collect, realize or obtain payment in respect of the Collateral, (ii) bound to institute proceedings for the purpose of collecting, enforcing, realizing or obtaining payment of the Collateral or for the purpose of preserving any rights of any Persons in respect of the Collateral, (iii) responsible for any loss occasioned by any sale or other dealing with the Collateral in accordance with the terms hereof or by the retention of or failure to sell or otherwise deal with the Collateral, or (iv) bound to protect the Collateral from depreciating in value or becoming

- 13 -

worthless.  Notwithstanding the foregoing, the Agent and the Secured Creditors shall be responsible to the Obligor for gross negligence or willful misconduct.

**Section 3.8    Standards of Sale.**

Without prejudice to the ability of the Agent to dispose of the Collateral in any manner which is commercially reasonable, and subject always to the provisions of the PPSA, the Obligor acknowledges that:

(a)     the Collateral may be disposed of in whole or in part;

(b)     the Collateral may be disposed of by public auction, public tender or private contract, with or without advertising and without any other formality;

(c)     any assignee of such Collateral may be the Agent, a Secured Creditor or a customer of any such Person;

(d)     any sale conducted by the Agent will be at such time and place, on such notice and in accordance with such procedures as the Agent, in its sole discretion, may deem advantageous;

(e)     the Collateral may be disposed of in any manner and on any terms necessary to avoid violation of Applicable Law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that the prospective bidders and purchasers have certain qualifications, and restrict the prospective bidders and purchasers to Persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of the Collateral) or in order to obtain any required approval of the disposition (or of the resulting purchase) by any governmental or regulatory authority or official;

(f)     a disposition of the Collateral may be on such terms and conditions as to credit or otherwise as the Agent, in its sole discretion, may deem advantageous; and

(g)     the Agent may establish an upset or reserve bid or price in respect of the Collateral.

**Section 3.9    Dealings by Third Parties.**

(1)     No Person dealing with the Agent, any of the Secured Creditors or an agent or receiver is required to determine (i) whether the Security Interest has become enforceable, (ii) whether the powers which such Person is purporting to exercise have become exercisable, (iii) whether any money remains due to the Agent or the Secured Creditors by the Obligor, (iv) the necessity or expediency of the stipulations and conditions subject to which any sale or lease of Collateral is made, (v) the propriety or regularity of any sale or other dealing by the Agent or any Secured Creditor with the Collateral, or (vi) how any money paid to the Agent or the Secured Creditors have been applied.

- 14 -

(2)     Any bona fide purchaser of all or any part of the Collateral from the Agent or any receiver or agent will hold the Collateral absolutely, free from any claim or right of whatever kind, including any equity of redemption, of the Obligor, which each the Obligor specifically waives (to the fullest extent permitted by law) as against any such purchaser together with all rights of redemption, stay or appraisal which the Obligor has or may have under any rule of law or statute now existing or hereafter adopted.

**Section 3.10     Proceeds to be Turned Over to Agent**

If an Event of Default shall occur and be continuing, all proceeds received by the Obligor consisting of cash, cheques and other near-cash items shall be held by the Obligor in trust for the Agent and the Secured Creditors and shall, forthwith upon receipt by the Obligor, be turned over to the Agent in the exact form received by the Obligor (duly endorsed by the Obligor to the Agent, if required).  All proceeds received by the Agent hereunder shall be held by the Agent in a collateral account maintained under its sole dominion and control.  All proceeds while held by the Agent in a collateral account (or by the Obligor in trust for the Agent and the Secured Creditors) shall continue to be held as collateral security for all the Obligations and shall not constitute payment thereof until applied thereto as provided in Section 3.11.

**Section 3.11     Application of Proceeds**

At such intervals as may be agreed upon by the Obligor and the Agent, or, if an Event of Default shall have occurred and be continuing, at any time at the Agent's election, the Agent may apply all or any part of proceeds constituting Collateral and any proceeds of and distribution in respect of Collateral in payment of the Obligations as provided in the Credit Agreement.

**ARTICLE 4**
**REPRESENTATIONS, WARRANTIES AND COVENANTS**

**Section 4.1     General Representations, Warranties and Covenants.**

The Obligor represents and warrants and covenants and agrees, acknowledging and confirming that the Agent and each Secured Creditor is relying on such representations, warranties, covenants and agreements, that:

(a)     **Obligor's Legal Status**.  On the date hereof, the Obligor's legal name, jurisdiction of organization or formation (as applicable), the location of the Obligor's chief executive office, the location of the Obligor's business and assets, as the case may be, are specified on Schedule A, as such Schedule may be amended, supplemented or modified from time to time.  The Obligor has delivered to the Agent a certified charter, certificate of incorporation, partnership agreement or other organization document and good standing certificate (or equivalent thereto) as of a date which is recent to the date hereof.

(b)     **Title to Collateral**.  Except for the Security Interest granted to the Agent for the benefit of the Secured Creditors pursuant to this Agreement and the other Permitted Liens, the Obligor owns each item of the Collateral free and clear of any and all Liens or claims of others excepting Permitted Liens.  For the

- 15 -

avoidance of doubt, it is understood and agreed that the Obligor may, as part of its business, grant licenses to third parties to use Intellectual Property owned or developed by the Obligor to the extent permitted by the Credit Agreement. Each of the Agent and each Secured Creditor understands that any such licenses may be exclusive to the applicable licensees, and such exclusivity provisions may, to the extent such licenses are Permitted Liens, limit the ability of the Agent to utilize, license free of such license rights.

(c)     **Validity of Security Interest**.  The Security Interest (a) will constitute valid perfected Security Interests in respect of all Collateral in which the Security Interest may be perfected by filing, recording or registration in the province of Alberta, in each case in favor of the Agent, for the benefit of the Secured Creditors, as collateral security for the Obligor's Obligations, enforceable in accordance with the terms hereof against all creditors of the Obligor and any Persons purporting to purchase any Collateral from the Obligor and (b) are prior to all other Liens on the Collateral in existence on the date hereof except for (x) unrecorded Permitted Liens which have priority over the Liens on the Collateral by operation of law and (y) Liens expressly permitted by the Credit Agreement to be prior to the Security Interest granted pursuant to the terms hereof.

### ARTICLE 5
### COVENANTS

The Obligor covenants and agrees with the Agent, that, from and after the date of this Agreement until the Obligations shall have been paid in full:

### Section 5.1     Changes in Name, etc.

The Obligor will not, except upon 30 days' prior written notice to the Agent and delivery to the Agent of all additional financing statements and executed documents reasonably requested by the Agent to maintain the validity, perfection and priority of the Security Interests provided for herein, (i) change the location of its chief executive office or sole place of business or (ii) change its name.

### Section 5.2     Title to Collateral

The Obligor shall maintain the Security Interest created by this Agreement as a perfected Security Interest and shall defend such Security Interest against the claims and demands of all Persons whomsoever, subject to the rights of the Obligor under the Credit Agreement to dispose of the Collateral.

### Section 5.3     Other Action as to Collateral

(a)     The Obligor will furnish to the Agent from time to time statements and schedules further identifying and describing the assets and property of the Obligor and such other reports in connection therewith as the Agent may reasonably request, all in reasonable detail,

- 16 -

(b)     without limiting the foregoing, within 15 days of a request therefor by the Agent and only during the continuance of a Default or Event of Default, the Obligor will furnish to the Agent (i) a listing of each of the "serial number goods" which form part of the Collateral (as defined in the PPSA) together with the location of such serial number goods and (ii) the legal descriptions of any Lands which form part of the Collateral.

(c)     At any time and from time to time, upon the written request of the Agent, and at the sole expense of the Obligor, the Obligor will promptly and duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as the Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, filing any financing or continuation statements under the PPSA (or other similar laws) in effect in any jurisdiction with respect to the Security Interests created hereby.

**Section 5.4     Intellectual Property**

(a)     Except with respect to any patent, trademark or copyright permitted to be abandoned under the Credit Agreement, the Obligor shall notify the Agent immediately if it knows or has reason to know that any application or registration relating to any material patent, trademark or copyright of the Obligor may become abandoned, or dedicated to the public domain, or of any adverse determination or development regarding the Obligor's ownership of any patent, trademark or copyright, its right to register the same, or to keep and maintain the same, except in each case, to the extent it would not reasonably be expected to result in a Material Adverse Effect.

(b)     Whenever the Obligor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of or acquire any interests in any material patent, trademark or copyright with CIPO or any similar office or agency of any jurisdiction, the Obligor shall report such filing to the Agent within ten (10) Business Days after the last day of the fiscal quarter in which such filing occurs, and, upon request of the Agent, the Obligor shall execute and deliver any and all agreements relating to patent, trademark or copyright as the Agent may request to evidence the Agent's Security Interest in such patent, trademark or copyright, and the general intangibles of the Obligor relating thereto or represented thereby. For the avoidance of doubt, the provisions hereof shall automatically apply to any such patent, trademark or copyright acquired after the date hereof and such patent, trademark or copyright shall automatically constitute Collateral as if such would have constituted Collateral at the time of execution hereof and be subject to the Lien and security interest created by this Agreement without further action by any party.

(c)     Except with respect to any copyright permitted to be abandoned under the Credit Agreement, the Obligor shall take all actions necessary or reasonably requested by the Agent to maintain and pursue each application, to obtain the relevant

- 17 -

registration and to maintain the registration of each material copyright, including the filing of applications for renewal.

(d)    Except with respect to any patent or trademark permitted to be abandoned under the Credit Agreement, the Obligor shall take all actions necessary or reasonably requested by the Agent to maintain and pursue each application, to obtain the relevant registration and to maintain the registration of each material patent or trademark, including the filing of applications for renewal, affidavits of use and affidavits of non-contestability and the payment of maintenance fees.

(e)    In the event that any material patents, trademarks or copyrights is infringed upon, or misappropriated, diluted or otherwise violated by a third party, the Obligor shall (i) notify the Agent promptly after the Obligor learns thereof and (ii) take such actions as the Obligor shall reasonably deem appropriate under the circumstances to protect such patent, trademark or copyright, stop the infringement and obtain damages.

(f)    Except with respect to any copyright, trademark or patent not required to be maintained or permitted to be abandoned under the Credit Agreement, the Obligor (either itself or through its permitted licensees) will not take or knowingly omit to take any action whereby any material copyright, trademark or patent could reasonably be expected to become abandoned, dedicated or invalidated or whereby the remedies in respect of such copyright, trademark or patent with respect to potential infringers could reasonably be expected to become weakened.

(g)    The Obligor (either itself or through licensee) will not knowingly do any act that uses any Intellectual Property to infringe the intellectual property rights of any other Person which would reasonably be likely to have a Material Adverse Effect.

**Section 5.5    Insurance.**

All property damage insurance maintained on any portion of the Collateral of the Obligor shall name the Agent as lender's loss payee, and all liability insurance maintained in respect of any portion of the Collateral of the Obligor shall name the Agent as an additional insured. The Obligor shall furnish the Agent with certificates of insurance evidencing compliance with the foregoing insurance provision.

**ARTICLE 6**
**GENERAL**

**Section 6.1    Notices.**

All notices, requests and demands to or upon the Agent or the Obligor under this Agreement shall be in writing and delivered to the addressee by prepaid private courier or sent by facsimile to the applicable address and to the attention of the officer of the addressee as follows:

- 18 -

To the Obligor:

Q'Max Solutions Holdings Inc.
407 2nd St. SW, Ste. 1700
Calgary, Alberta T2P 2Y3

Attention:      Mark Roberts, Chief Financial Officer
Fax No.:        (403) 269-2251

To the Agent:

HSBC Bank Canada, as Agent
7th Floor, 70 York Street
Toronto, Ontario M5J 1S9

Attention:      Manager Agency
Fax No.:        (647) 788-2185

Any communication transmitted by prepaid private courier shall be deemed to have been validly and effectively given or delivered on the Business Day after which it is submitted for delivery. Any communication transmitted by facsimile shall be deemed to have been validly and effectively given or delivered on the day on which it is transmitted, if transmitted on a Business Day on or before 5:00 p.m. (local time of the intended recipient), and otherwise on the next following Business Day. The Agent or the Obligor may change its respective address for service or other notices, including electronic communications, by notice given in the foregoing manner.

**Section 6.2     Discharge.**

The Security Interest will be discharged upon, but only upon, full and indefeasible payment and performance of the Secured Obligations. Upon the discharge of the Secured Obligations and at the request and expense of the Obligor, the Agent will execute and deliver to the Obligor such releases, discharges, financing statements and other documents or instruments as the Obligor may reasonably require and the Agent will promptly redeliver to the Obligor, or as the Obligor may otherwise direct the Agent, any Collateral in its possession.

If any of the Collateral shall be sold, transferred or otherwise disposed of by the Obligor in a transaction permitted by the Credit Agreement then the Agent, at the request and sole expense of the Obligor, shall promptly execute and deliver to the Obligor all releases or other documents necessary or reasonably desirable for the release of the Liens created by such Collateral.

**Section 6.3     No Merger.**

This Agreement does not operate by way of merger of any of the Secured Obligations and no judgment recovered by the Agent or any of the Secured Creditors will operate by way of merger of, or in any way affect, the Security Interest, which is in addition to, and not in substitution for, any other security now or hereafter held by the Agent and the Secured Creditors in respect of the Secured Obligations. The representations, warranties and covenants of the

- 19 -

Obligor in this Agreement survive the execution and delivery of this Agreement and any advances under the Credit Agreement. Notwithstanding any investigation made by or on behalf of the Agent or the Secured Creditors these covenants, representations and warranties continue in full force and effect until this Agreement shall terminate (or thereafter to the extent provided therein).

**Section 6.4    Further Assurances.**

The Obligor will do all acts and things and execute and deliver, or cause to be executed and delivered, all agreements, documents and instruments that the Agent may reasonably require and take all further steps relating to the Collateral or any other property or assets of the Obligor that the Agent may reasonably require for (i) protecting the Collateral, (ii) perfecting, preserving and protecting the Security Interest, and (iii) exercising all powers, authorities and discretions conferred upon the Collateral Agent. Whenever the Security Interest is enforceable, the Obligor will do all acts and things and execute and deliver all documents and instruments that the Collateral Agent may reasonably require for facilitating the sale or other disposition of the Collateral in connection with its realization.

**Section 6.5    Supplemental Security.**

This Agreement is in addition to, without prejudice to and supplemental to all other security now held or which may hereafter be held by the Agent or the Secured Creditors.

**Section 6.6    Successors and Assigns.**

This Agreement is binding on the Obligor and its successors and permitted assigns, and enures to the benefit of the Agent, the Secured Creditors and their respective successors and permitted assigns. This Agreement may be assigned by the Agent in accordance with the Credit Agreement and, in such event, any such assignee will be entitled to all of the rights and remedies of the Agent as set forth in this Agreement or otherwise. In any action brought by an assignee to enforce any such right or remedy, the Obligor will not assert against the assignee any claim or defence which the Obligor now has or may have against the Agent or any of the Secured Creditors. The Obligor may not assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Agent which may be unreasonably withheld.

**Section 6.7    Enforcement Expenses; Indemnification**

(1)    The Obligor agrees to pay or reimburse each Secured Creditor and the Agent for all its costs and expenses incurred in enforcing or preserving any rights under this Agreement and the other Credit Documents to which the Obligor is a party, including, without limitation, the reasonable fees and disbursements of a single outside counsel to the Agent in each relevant jurisdiction.

(2)    The Obligor agrees to pay, and to save the Agent and the Secured Creditors harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions

- 20 -

contemplated by this Agreement, in each case to the extent the Obligor would be required to do so pursuant to the Credit Agreement.

(3)   The Obligor agrees to pay, and to save the Agent and the Secured Creditors harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement to the extent the Obligor would be required to do so pursuant the Credit Agreement.

(4)   The agreements in this Section 6.7 shall survive repayment of the Obligations and all other amounts payable under the Credit Agreement and the other Credit Documents.

**Section 6.8    Set-Off**

In addition to any rights and remedies of the Secured Creditors provided by law, each Secured Creditor shall have the right, without notice to the Obligor, any such notice being expressly waived by the Obligor to the extent permitted by Applicable Law, upon the Obligations becoming due and payable by the Obligor (whether at the stated maturity, by acceleration or otherwise), to apply to the payment of such Obligations, by setoff or otherwise, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Secured Creditor, any affiliate thereof or any of their respective branches or agencies to or for the credit or the account of the Obligor.  Each Secured Creditor agrees promptly to notify the Obligor and the Agent after any such application made by such Secured Creditor; provided that the failure to give such notice shall not affect the validity of such application.

**Section 6.9    Severability.**

If any court of competent jurisdiction from which no appeal exists or is taken, determines any provision of this Agreement to be illegal, invalid or unenforceable, that provision will be severed from this Agreement and the remaining provisions will remain in full force and effect.

**Section 6.10   Amendment.**

This Agreement may only be amended, supplemented or otherwise modified by written agreement executed by the Agent and the Obligor.

**Section 6.11   Waivers, etc.**

(1)   No consent or waiver by the Agent or the Secured Creditors in respect of this Agreement is binding unless made in writing and signed by an authorized officer of the Agent. Any consent or waiver given under this Agreement is effective only in the specific instance and for the specific purpose for which given. No waiver of any of the provisions of this Agreement constitutes a waiver of any other provision.

(2)   A failure or delay on the part of the Agent or the Secured Creditors in exercising a right under this Agreement does not operate as a waiver of, or impair, any right of the Agent or

17101266.2

- 21 -

the Secured Creditors however arising. A single or partial exercise of a right on the part of the Agent or the Secured Creditors does not preclude any other or further exercise of that right or the exercise of any other right by the Agent or the Secured Creditors.

**Section 6.12   Conflict.**

In the event of a direct conflict or inconsistency between the terms and provisions contained in this Agreement and the terms and provisions contained in the Credit Agreement, it is the intentions of the parties hereto that such terms and provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict or inconsistency that cannot be resolved as aforesaid, the terms and provisions of the Credit Agreement shall control and govern.  In addition, to the extent that, under the Credit Agreement, the Obligor is permitted to undertake any act or granted any entitlement, the provisions of this Agreement shall be deemed to preserve such permission or entitlement notwithstanding anything to the contrary herein.

**Section 6.13   Governing Law.**

This Agreement will be governed by, interpreted and enforced in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF** the Obligor has executed this Agreement.

**Q'MAX SOLUTIONS HOLDINGS INC.**

Per: _____

Name: Mark Roberts
Title:   Chief Financial Officer

## SCHEDULE "A"

| Legal Name | Jurisdiction of Incorporation or Formation | Location of Chief Executive Office | Location of Business and Assets |
|---|---|---|---|
| Q'Max Solutions Holdings Inc. | Alberta | 407 2nd St. NW, Ste. 1700 Calgary, Alberta T2P 2Y3 | Alberta |

THIS IS EXHIBIT "_____15_____"

referred to in the Affidavit of

Cameron Bailey

Sworn before me this 26th

day of _May_ A.D. 20 20

Jonathan Tomm
Barrister and Solicitor

**Q'MAX SOLUTIONS INC.**

as Obligor

and

**HSBC BANK CANADA**

as Administrative Agent

---

**SECURITY AGREEMENT**

May 23, 2014

---

## SECURITY AGREEMENT

Security Agreement dated as of May 23, 2014 (the "**Agreement**") made by Q'Max Solutions Inc. (the "**Obligor**"), to and in favour of HSBC Bank Canada, as Agent for the benefit of the Secured Creditors.

**WHEREAS**, pursuant to, and subject to the terms and conditions of, a Credit Agreement dated as of the date hereof (as amended, supplemented or restated from time to time, the "**Credit Agreement**") among Fluid Acquisition Corp. and Q'Max America Inc., as borrowers, HSBC Bank Canada and those other financial institutions who from time to time become parties thereto as lenders (collectively, the "**Lenders**") and HSBC Bank Canada, as administrative agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "**Agent**"), the Lenders agreed to make certain credit facilities available to the Borrowers;

**AND WHEREAS**, the obligations of the Lenders to make available certain Advances pursuant to the Credit Agreement and the entry into Hedging Agreements by the Hedge Providers and the entry into the Banking Services Agreements by the Agent and the Affiliates of the Agent or a Lender from time to time are conditioned upon the execution and delivery by the Obligor of a security agreement in favour of the Agent, on behalf of the Secured Creditors, in the form hereof, to secure all of the Obligations;

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## INTERPRETATION

**Section 1.1    Defined Terms.**

As used in this Agreement, the following terms have the following meanings:

"**Agreement**" means this security agreement as may be amended, supplemented or otherwise modified from time to time.

"**CIPO**" means the Canadian Intellectual Property Office.

"**Collateral**" has the meaning specified in Section 2.1 of this Agreement.

"**Credit Agreement**" shall have the meaning attributed to such term in the Preamble of this Agreement.

"**Instruments**" means (i) a bill, note or cheque within the meaning of the *Bills of Exchange Act* (Canada) or any other writing that evidences a right to the payment of money and is of a type that in the ordinary course of business is transferred by delivery with any necessary endorsement or assignment, or (ii) a letter of credit and an advice of credit if the letter or advice states that it must be surrendered upon claiming payment thereunder, or (iii) chattel paper or any other writing that evidences both a monetary obligation and a security interest in or a lease of specific

*[Signature Page to General Security Agreement – Q'Max Solutions Inc.]*

- 2 -

goods, or (iv) documents of title or any other writing that purports to be issued by or addressed to a bailee and purports to cover such goods in the bailee's possession as are identified or fungible portions of an identified mass, and that in the ordinary course of business is treated as establishing that the Person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers, or (v) any document or writing commonly known as an instrument, but excludes investment property.

"**Intellectual Property**" means domestic and foreign: (i) patents, applications for patents and reissues, divisions, continuations, renewals, extensions and continuations-in-part of patents or patent applications; (ii) proprietary and nonpublic business information, including inventions (whether patentable or not), invention disclosures, improvements, discoveries, trade secrets, confidential information, know-how, methods, processes, designs, technology, technical data, schematics, formulae and customer lists, and documentation relating to any of the foregoing; (iii) copyrights, copyright registrations and applications for copyright registration; (iv) mask works, mask work registrations and applications for mask work registrations; (v) designs, design registrations, design registration applications and integrated circuit topographies; (vi) trade names, business names, corporate names, domain names, website names and world wide web addresses, common law trade-marks, service marks, certification marks, trade dress, logos, applications, registrations and renewals for any of the foregoing and the goodwill connected with the use of and symbolized by any of the foregoing; (vii) computer software and programs (both source code and object code form), all proprietary rights in the computer software and programs and all documentation and other materials related to the computer software and programs; (viii) any other intellectual property and industrial property; (ix) income, fees, royalties, damages, claims and payments for past, present, or future infringements, dilutions or other violations thereof; (x) rights corresponding thereto throughout the world; and (xi) rights to sue for past, present or future infringements, dilutions or other violations thereof.

"**Obligations**" means, in respect of the Obligor, the Obligations (as such term is defined in the Credit Agreement) of such Obligor.

"**Obligor**" shall have the meaning attributed to such term in the Preamble of this Agreement.

"**PPSA**" means the *Personal Property Security Act* (Alberta) and the regulations promulgated thereunder and other applicable personal property security legislation of the applicable Canadian province or provinces (including the Civil Code of Quebec and the regulations respecting the register of personal and movable real rights promulgated thereunder) as all such legislation now exists or may from time to time hereafter be amended, modified, recodified, supplemented or replaced, together with all rules, regulations and interpretations thereunder or related thereto.

"**Registrable Intellectual Property**" means any Intellectual Property in respect of which ownership, title, security interests, charges or encumbrances are capable of registration, recording or notation with any Governmental Authority pursuant to Applicable Laws.

"**Restricted Asset**" has the meaning specified in Section 2.4(1) of this Agreement.

"**Secured Creditors**" means, collectively, the Agent, the Lenders, the Hedge Providers and counterparties providing services pursuant to the Banking Services Agreements.

- 3 -

"**Secured Obligations**" has the meaning specified in Section 2.2 of this Agreement.

"**Securities**" means securities as defined in the *Securities Transfer Act* (Alberta).

"**Security Interest**" has the meaning specified in Section 2.2

### Section 1.2    Interpretation.

(1)     Capitalized terms used in this Agreement but not defined have the meanings given to them in the Credit Agreement. Terms defined in the PPSA and the *Securities Transfer Act* (Alberta) ("**STA**") and used but not otherwise defined in this Agreement have the same meanings. For greater certainty, the terms "**account**", "**chattel paper**", "**document of title**", "**equipment**", "**goods**", "**instrument**", "**intangible**", "**investment property**", "**money**", "**personal property**" and "**proceeds**" have the meanings given to them in the PPSA; and the terms "**certificated security**", "**control**", "**delivery**", "**entitlement holder**", "**financial asset**", "**securities account**", "**securities intermediary**", "**security entitlement**" and "**uncertificated security**" have the meanings given to them in the STA or the PPSA as applicable.

(2)     Any reference in any Credit Document to Permitted Liens and any right of the Obligor to create or suffer to exist Permitted Liens are not intended to and do not and will not subordinate the Security Interest to any such Permitted Lien or give priority to any Person over the Secured Creditors with respect to any such Permitted Lien.

(3)     The rules of interpretation specified in Article 1 of the Credit Agreement shall be applicable to this Agreement.

### ARTICLE 2
### ARTICLE 2 SECURITY

### Section 2.1    Grant of Security.

(1)     Subject to Section 2.4 and Section 2.5, the Obligor grants to the Agent, for the benefit of the Secured Creditors, a security interest in, and assigns, mortgages, charges, hypothecates and pledges to the Agent, for the benefit of the Secured Creditors, all of the property, assets, effects and undertaking of the Obligor whether now owned or hereafter acquired and all of the property, assets, effects and undertaking in which the Obligor now has or hereafter acquires any interest (collectively, the "**Personal Property Collateral**"), including all of the Obligor's:

   (a)     present and after-acquired personal property including:

        (i)     inventory including goods held for sale, lease or resale, goods furnished or to be furnished to third parties under contracts of lease, consignment or service, goods which are raw materials or work in process, goods used in or procured for packing and materials used or consumed in the businesses of the Obligor;

- 4 -

    (ii)     equipment, machinery, furniture, fixtures, plant, vehicles and other goods of every kind and description and all licences and other rights and all related records, files, charts, plans, drawings, specifications, manuals and documents;

    (iii)    accounts due or accruing and all related agreements, books, accounts, invoices, letters, documents and papers recording, evidencing or relating to them;

    (iv)    money, documents of title, chattel paper, financial assets and investment property;

    (v)     security accounts and all of the credit balances, securities entitlements, other financial assets and items or property (or their value) standing to the credit from time to time in such securities accounts;

    (vi)    Instruments and Securities; and

    (vii)   intangibles including all security interests, goodwill, choses in action, contracts, contract rights, licenses and other contractual benefits;

(b)    Intellectual Property including the Registrable Intellectual Property;

(c)    all substitutions and replacements of and increases, additions and, where applicable, accessions to the property described in Section 2.1(a) and Section 2.1(b); and

(d)    all proceeds in any form derived directly or indirectly from any dealing with all or any part of the property described in Section 2.1(a) and Section 2.1(c) inclusive, including the proceeds of such proceeds.

(2)    Subject to Section 2.4 and Section 2.5, the Obligor hereby charges as and by way of a floating charge in favour of the Agent for the benefit of the Secured Creditors all the presently owned or held and hereafter acquired property, assets, effects and undertaking of the Obligor of whatsoever nature and kind and wheresoever situate, other than such of the Obligor's property, assets, effects and undertakings of the Obligor as are validly and effectively subjected to the security interest granted to the Agent pursuant to Section 2.1(1) (all of which property, assets, effects and undertakings so charged by this Section 2.1(2) are herein collectively called the "**Other Collateral**", and together with the Personal Property Collateral the "**Collateral**") including, without limiting the generality of the foregoing, all presently owned or held and hereafter acquired right, title and interest of the Obligor in and to real and immovable and leasehold property and rights whether in fee or of a less estate and all interest in and rights relating to lands and all easements, rights of way, privilege, benefits, licences, improvements and rights whether connected therewith or appurtenant thereto or separately owned or held and all structures, buildings, plant, machinery, fixtures, apparatus and fixed assets and the charge created by this Section 2.1(2) shall be a floating charge such that the Obligor shall not have power without the prior written consent of the Agent to:

17101040.2

- 5 -

(a) create or permit to exist any Lien against any of the Other Collateral which ranks or could in any event rank in priority to or *pari passu* with the security constituted by this Agreement, save for those Liens that are Permitted Liens; or

(b) grant, sell, exchange, transfer, assign, lease or otherwise dispose of the Other Collateral, save for Permitted Dispositions.

**Section 2.2   Secured Obligations.**

The security interests, assignments, mortgages, charges, hypothecations and pledges granted by the Obligor under this Agreement (collectively, the "**Security Interest**") secure the payment and performance of the following (collectively, the "**Secured Obligations**"):

(a) the Obligations of the Obligor; and

(b) all expenses, costs and charges incurred by or on behalf of the Secured Creditors in connection with this Agreement, the Security Interest or the Collateral, including all reasonable legal fees, court costs, receiver's or agent's remuneration and other expenses of taking possession of, repairing, protecting, insuring, preparing for disposition, realizing, collecting, selling, transferring, delivering or obtaining payment for the Collateral, and of taking, defending or participating in any action or proceeding in connection with any of the foregoing matters or otherwise in connection with the Secured Creditors' interest in any Collateral, whether or not directly relating to the enforcement of this Agreement or any other Credit Document.

**Section 2.3   Attachment.**

The Obligor acknowledges that (i) value has been given, (ii) it has rights in the applicable Collateral or the power to transfer rights in the Collateral to the Agent (other than after-acquired Collateral), (iii) it has not agreed to postpone the time of attachment of the Security Interest, and (iv) it has received a copy of this Agreement.

**Section 2.4   Scope of Security Interest.**

(1) To the extent that an assignment of amounts payable and other proceeds arising under or in connection with, or the grant of a security interest in any agreement, licence, lease, permit, instrument or quota of the Obligor would constitute a default under, or a breach of, or would result in the termination of, such agreement, licence, lease, permit, instrument or quota (each, a "**Restricted Asset**"), the Security Interest with respect to each Restricted Asset will constitute a trust created in favour of the Agent, for the benefit of the Secured Creditors, pursuant to which the Obligor holds as trustee all proceeds arising under or in connection with the Restricted Asset in trust for the Agent, for the benefit of the Secured Creditors, on the following basis:

(a) subject to the Credit Agreement, until the Security Interest is enforceable, the Obligor is entitled to receive all such proceeds; and

- 6 -

(b) whenever the Security Interest is enforceable, (i) all rights of the Obligor to receive such proceeds cease and all such proceeds will be immediately paid over to the Agent for the benefit of the Secured Creditors, and (ii) the Obligor will take all actions requested by the Agent to collect and enforce payment and other rights arising under the Restricted Asset.

(2) The Security Interest with respect to trademarks constitutes a security interest in, and a charge, hypothecation and pledge of such Collateral in favour of the Agent for the benefit of the Secured Creditors, but does not constitute an assignment or mortgage of such Collateral to the Agent or any Secured Creditor.

(3) Until the Security Interest is enforceable, the grant of the Security Interest in the Intellectual Property does not affect in any way the Obligor's rights to commercially exploit the Intellectual Property, defend it, enforce the Obligor's rights in it or with respect to it against third parties in any court or claim and be entitled to receive any damages with respect to any infringement of it.

(4) The Security Interest does not extend to consumer goods.

(5) The Security Interest does not extend or apply to the last day of the term of any lease or sublease of real property or any agreement for a lease or sublease of real property, now held or hereafter acquired by the Obligor, but the Obligor will stand possessed of any such last day upon trust to assign and dispose of it as the Agent may reasonably direct.

**Section 2.5    No Control Agreements.**

Notwithstanding anything to the contrary herein, in no event shall the Obligor or any Subsidiary thereof be required to execute control agreements to perfect the security interests granted hereunder, including in (i) any deposit, commodity or securities account (including, without limitation, securities entitlements and related assets) or (ii) other assets requiring perfection through control.

**Section 2.6    Grant of Licence to Use Intellectual Property.**

For the purpose of enabling the Agent, during an Event of Default which is continuing, to exercise rights and remedies hereunder, and for no other purposes, the Obligor hereby grants to the Agent an irrevocable, non-exclusive license, (exercisable without payments of royalty or other compensation to the Obligor) to use, assign, license or sub-license any of the Collateral of the Obligor consisting of Intellectual Property in which the Obligor now has or hereafter acquires rights, and wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof.  The Agent covenants and agrees that it will not exercise its rights under the foregoing license except during the time that it shall be lawfully entitled to exercise its rights and remedies hereunder.

- 7 -

**Section 2.7    Care and Custody of Collateral.**

(1)     The Agent shall keep the Collateral in its possession identifiable in accordance with its customary practice for the Collateral of such type.

(2)     Without limiting any other rights or remedies under this Agreement, the Agent may upon the occurrence and during the continuance of an Event of Default, (i) notify any Person obligated on an Instrument, Security or account to make payments to the Agent, whether or not the Obligor was previously making collections on such accounts, chattel paper, instruments, and (ii) assume control of any proceeds arising from the Collateral.

(3)     The Agent has no obligation to collect dividends, distributions or interest payable on, or exercise any option or right in connection with, any Collateral.  The Agent has no obligation to protect or preserve any Collateral from depreciating in value or becoming worthless and is released from all responsibility for any loss of value. In the physical keeping of any Securities, the Agent is only obliged to exercise the same degree of care as it would exercise with respect to its own Securities kept at the same place.

(4)     The Agent may, upon the occurrence and during the continuance of any Event of Default, sell, transfer, use or otherwise deal with any investment property included in the Collateral over which the Agent has control, on such conditions and in such manner as the Agent in its sole discretion may determine.

**Section 2.8    Rights of the Obligor.**

(1)     Until the occurrence of an Event of Default which is continuing, the Obligor is entitled to vote the Securities and other financial assets that are part of the Collateral and to receive dividends and distributions on such Securities and financial assets, as may be permitted by the Credit Agreement. Upon the occurrence and during the continuance of an Event of Default, all rights of the Obligor to vote (under any proxy given by the Agent (or its nominee) or otherwise) or to receive distributions or dividends cease and all such rights become vested solely and absolutely in the Agent.

(2)     Any distributions or dividends received by the Obligor contrary to Section 2.8(1) or any other moneys or property received by the Obligor after the Security Interest is enforceable will be received as trustee for the Agent and the Secured Creditors and shall be immediately paid over to the Agent.

**ARTICLE 3**
**ENFORCEMENT**

**Section 3.1    Enforcement.**

The Security Interest becomes and is enforceable against the Obligor upon the occurrence and during the continuance of an Event of Default.

17101040.2

- 8 -

**Section 3.2    Remedies.**

Whenever the Security Interest is enforceable, the Agent may realize upon the Collateral and enforce the rights of the Agent and the Secured Creditors by:

(a)    entry onto any premises where Collateral consisting of tangible personal property may be located;

(b)    entry into possession of the Collateral by any method permitted by law;

(c)    sale, grant of options to purchase, or lease of all or any part of the Collateral;

(d)    holding, storing and keeping idle or operating all or any part of the Collateral;

(e)    exercising and enforcing all rights and remedies of a holder of the Collateral as if the Agent were the absolute owner thereof (including, if necessary, causing the Collateral to be registered in the name of the Agent or its nominee if not already done);

(f)    collection of any proceeds arising in respect of the Collateral;

(g)    collection, realization or sale of, or other dealing with, accounts;

(h)    license or sublicense, whether on an exclusive or nonexclusive basis, of any Intellectual Property for such term and on such conditions and in such manner as the Agent in its sole judgment determines (taking into account such provisions as may be necessary to protect and preserve such Intellectual Property);

(i)    instruction to any bank to transfer all moneys constituting Collateral held by such bank to an account maintained with or by the Agent;

(j)    application of any moneys constituting Collateral or proceeds thereof in accordance with this Agreement;

(k)    appointment by instrument in writing of a receiver (which term as used in this Agreement includes a receiver and manager) or agent of all or any part of the Collateral and removal or replacement from time to time of any receiver or agent;

(l)    institution of proceedings in any court of competent jurisdiction for the appointment of a receiver of all or any part of the Collateral;

(m)    institution of proceedings in any court of competent jurisdiction for sale or foreclosure of all or any part of the Collateral;

(n)    filing of proofs of claim and other documents to establish claims to the Collateral in any proceeding relating to the Obligor; and

(o)    any other remedy or proceeding authorized or permitted under the PPSA or otherwise by law or equity.

- 9 -

**Section 3.3    Additional Rights.**

In addition to the remedies set forth in Section 3.2 and elsewhere in this Agreement, whenever the Security Interest is enforceable, the Agent may:

(a)    require the Obligor, at the Obligor's expense, to assemble the Collateral at a place or places designated by notice in writing and the Obligor agrees to so assemble the Collateral promptly upon receipt of such notice;

(b)    require the Obligor, by notice in writing, to disclose to the Agent the location or locations of the Collateral and the Obligor agrees to promptly make such disclosure when so required;

(c)    repair, process, modify, complete or otherwise deal with the Collateral and prepare for the disposition of the Collateral, whether on the premises of the Obligor or otherwise;

(d)    redeem any prior security interest against any Collateral, procure the transfer of such security interest to itself, or settle and pass the accounts of the prior mortgagee, chargee or encumbrancer (any accounts to be conclusive and binding on the Obligor absent manifest error and provided the Agent has exercised reasonable diligence in verifying such accounts);

(e)    pay any liability secured by any Lien against any Collateral (all such payments to be added to the Obligations);

(f)    carry on all or any part of the business of the Obligor and, to the exclusion of all others including the Obligor, enter upon, occupy and use all or any of the premises, buildings, and other property of or used by the Obligor for such time as the Agent sees fit, free of charge, and the Agent and the Secured Creditors are not liable to the Obligor for any act, omission or negligence (other than their own gross negligence or willful misconduct) in so doing or for any rent, charges, depreciation or damages incurred in connection with or resulting from such action;

(g)    borrow for the purpose of carrying on any of the businesses of the Obligor or for the maintenance, preservation or protection of the Collateral and grant a security interest in the Collateral, whether or not in priority to the Security Interest, to secure repayment;

(h)    commence, continue or defend any judicial or administrative proceedings for the purpose of protecting, seizing, collecting, realizing or obtaining possession or payment of the Collateral, and give good and valid receipts and discharges in respect of the Collateral and compromise or give time for the payment or performance of all or any part of the accounts or any other obligation of any third party to the Obligor; and

- 10 -

(i)    at any public sale, and to the extent permitted by law on any private sale, bid for and purchase any or all of the Collateral offered for sale and upon compliance with the terms of such sale, hold, retain and dispose of such Collateral without any further accountability to the Obligor or any other Person with respect to such holding, retention or disposition, except as required by law. In any such sale to the Agent, the Agent may, for the purpose of making payment for all or any part of the Collateral so purchased, use any claim for Secured Obligations then due and payable to it as a credit against the purchase price.

## Section 3.4    Exercise of Remedies.

The remedies hereunder including under Section 3.2 and Section 3.3 may, subject to the Applicable Laws to the extent required thereby, be exercised from time to time separately or in combination and are in addition to, and not in substitution for, any other rights of the Agent and the Secured Creditors however arising or created. The Agent and the Secured Creditors are not bound to exercise any right or remedy, and the exercise of rights and remedies is without prejudice to the rights of the Agent and the Secured Creditors in respect of the Secured Obligations including the right to claim for any deficiency.

## Section 3.5    Receiver's Powers.

(1)    Any receiver appointed by the Agent is vested with the rights and remedies which could have been exercised by the Agent in respect of the Obligor or the Collateral and such other powers and discretions as are granted in the instrument of appointment and any supplemental instruments. The identity of the receiver, its replacement and its remuneration are within the sole and unfettered discretion of the Agent, provided such remuneration is on commercially reasonable terms.

(2)    Any receiver appointed by the Agent will act as agent for the Agent for the purposes of taking possession of the Collateral, but otherwise and for all other purposes (except as provided below), as agent for the Obligor. The receiver may sell, lease, or otherwise dispose of Collateral as agent for the Obligor or as agent for the Agent as the Agent may determine in its discretion. The Obligor agrees to ratify and confirm all actions of the receiver acting as agent for the Obligor, and to release and indemnify the receiver in respect of all such actions.

(3)    The Agent, in appointing or refraining from appointing any receiver, does not incur liability to the receiver, the Obligor or otherwise and is not responsible for any misconduct or negligence of such receiver.

## Section 3.6    Appointment of Attorney.

(1)    The Obligor hereby irrevocably constitutes and appoints the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Obligor and in the name of the Obligor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this

- 11 -

Agreement, and, without limiting the generality of the foregoing, the Obligor hereby gives the Agent the power and right, on behalf of the Obligor, without notice to or assent by the Obligor, to do any or all of the following:

(a)     in the name of the Obligor or its own name, or otherwise, take possession of and endorse and collect any cheques, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to any Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Agent for the purpose of collecting any and all such moneys due whenever payable;

(b)     in the case of any Intellectual Property, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as the Agent may request to evidence the Agent's and the Secured Creditors' Security Interest in such Intellectual Property and the goodwill and general intangibles of the Obligor relating thereto or represented thereby;

(c)     pay or discharge taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(d)     execute, in connection with any sale provided for in this Agreement, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

(e)     (1) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Agent or as the Agent shall direct; (2) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (3) sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5) defend any suit, action or proceeding brought against the Obligor with respect to any Collateral; (6) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Agent may deem appropriate; (7) assign any Intellectual Property (along with the goodwill of the business to which any such Intellectual Property pertains), throughout the world for such term or terms, on such conditions, and in such manner, as the Agent shall in its sole discretion determine; and (8) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Agent were the absolute owner thereof for all purposes, and do, at the Agent's option and the Obligor's expense, at any time, or from time to time, all acts and things which the Agent deems necessary to protect, preserve

- 12 -

or realize upon the Collateral and the Agent's and the Secured Creditors' Security Interests therein and to effect the intent of this Agreement, all as fully and effectively as the Obligor might do.

Notwithstanding anything to the contrary in this Section 3.6, the Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 3.6 unless an Event of Default shall have occurred and be continuing and the Agent shall have given the Obligor notice of its intent to exercise the rights under the power of attorney provided for in this Section 3.6.

(2)     If the Obligor fails to perform or comply with any of its agreements contained herein, the Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement.

(3)     The expenses of the Agent incurred in connection with actions undertaken as provided in this Section 3.6, together with interest thereon at a rate per annum equal to the highest rate per annum at which interest would then be payable on any category of past due Canadian Dollar Prime-Based Loans under the Credit Agreement, from the date of payment by the Agent to the date reimbursed by the Obligor, shall constitute Obligations and shall be payable by the Obligor to the Agent on demand.

(4)     The Obligor hereby ratifies all that said attorneys shall lawfully do or cause to be done in accordance with the terms hereof.  And in accordance with this Section 3.6 all powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the Security Interests created hereby are released.

**Section 3.7     Dealing with the Collateral.**

(1)     The Agent and the Secured Creditors are not obliged to exhaust their recourse against the Obligor or any other Person or against any other security they may hold in respect of the Secured Obligations before realizing upon or otherwise dealing with the Collateral in such manner as the Agent may consider desirable.

(2)     The Agent and the Secured Creditors may grant extensions or other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the Obligor and with other Persons, sureties or securities as they may see fit without prejudice to the Secured Obligations, the liability of the Obligor or the rights of the Agent and the Secured Creditors in respect of the Collateral.

(3)     Except as otherwise provided by law or this Agreement, the Agent and the Secured Creditors are not (i) liable or accountable for any failure to collect, realize or obtain payment in respect of the Collateral, (ii) bound to institute proceedings for the purpose of collecting, enforcing, realizing or obtaining payment of the Collateral or for the purpose of preserving any rights of any Persons in respect of the Collateral, (iii) responsible for any loss occasioned by any sale or other dealing with the Collateral in accordance with the terms hereof or by the retention of or failure to sell or otherwise deal with the Collateral, or (iv) bound to protect the Collateral from depreciating in value or becoming

- 13 -

worthless.  Notwithstanding the foregoing, the Agent and the Secured Creditors shall be responsible to the Obligor for gross negligence or willful misconduct.

**Section 3.8    Standards of Sale.**

Without prejudice to the ability of the Agent to dispose of the Collateral in any manner which is commercially reasonable, and subject always to the provisions of the PPSA, the Obligor acknowledges that:

(a)    the Collateral may be disposed of in whole or in part;

(b)    the Collateral may be disposed of by public auction, public tender or private contract, with or without advertising and without any other formality;

(c)    any assignee of such Collateral may be the Agent, a Secured Creditor or a customer of any such Person;

(d)    any sale conducted by the Agent will be at such time and place, on such notice and in accordance with such procedures as the Agent, in its sole discretion, may deem advantageous;

(e)    the Collateral may be disposed of in any manner and on any terms necessary to avoid violation of Applicable Law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that the prospective bidders and purchasers have certain qualifications, and restrict the prospective bidders and purchasers to Persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of the Collateral) or in order to obtain any required approval of the disposition (or of the resulting purchase) by any governmental or regulatory authority or official;

(f)    a disposition of the Collateral may be on such terms and conditions as to credit or otherwise as the Agent, in its sole discretion, may deem advantageous; and

(g)    the Agent may establish an upset or reserve bid or price in respect of the Collateral.

**Section 3.9    Dealings by Third Parties.**

(1)    No Person dealing with the Agent, any of the Secured Creditors or an agent or receiver is required to determine (i) whether the Security Interest has become enforceable, (ii) whether the powers which such Person is purporting to exercise have become exercisable, (iii) whether any money remains due to the Agent or the Secured Creditors by the Obligor, (iv) the necessity or expediency of the stipulations and conditions subject to which any sale or lease of Collateral is made, (v) the propriety or regularity of any sale or other dealing by the Agent or any Secured Creditor with the Collateral, or (vi) how any money paid to the Agent or the Secured Creditors have been applied.

- 14 -

(2)     Any bona fide purchaser of all or any part of the Collateral from the Agent or any receiver or agent will hold the Collateral absolutely, free from any claim or right of whatever kind, including any equity of redemption, of the Obligor, which each the Obligor specifically waives (to the fullest extent permitted by law) as against any such purchaser together with all rights of redemption, stay or appraisal which the Obligor has or may have under any rule of law or statute now existing or hereafter adopted.

**Section 3.10    Proceeds to be Turned Over to Agent**

If an Event of Default shall occur and be continuing, all proceeds received by the Obligor consisting of cash, cheques and other near-cash items shall be held by the Obligor in trust for the Agent and the Secured Creditors and shall, forthwith upon receipt by the Obligor, be turned over to the Agent in the exact form received by the Obligor (duly endorsed by the Obligor to the Agent, if required).  All proceeds received by the Agent hereunder shall be held by the Agent in a collateral account maintained under its sole dominion and control.  All proceeds while held by the Agent in a collateral account (or by the Obligor in trust for the Agent and the Secured Creditors) shall continue to be held as collateral security for all the Obligations and shall not constitute payment thereof until applied thereto as provided in Section 3.11.

**Section 3.11    Application of Proceeds**

At such intervals as may be agreed upon by the Obligor and the Agent, or, if an Event of Default shall have occurred and be continuing, at any time at the Agent's election, the Agent may apply all or any part of proceeds constituting Collateral and any proceeds of and distribution in respect of Collateral in payment of the Obligations as provided in the Credit Agreement.

**ARTICLE 4**
**REPRESENTATIONS, WARRANTIES AND COVENANTS**

**Section 4.1    General Representations, Warranties and Covenants.**

The Obligor represents and warrants and covenants and agrees, acknowledging and confirming that the Agent and each Secured Creditor is relying on such representations, warranties, covenants and agreements, that:

(a)     **Obligor's Legal Status**.   On the date hereof, the Obligor's legal name, jurisdiction of organization or formation (as applicable), the location of the Obligor's chief executive office, the location of the Obligor's business and assets, as the case may be, are specified on Schedule A, as such Schedule may be amended, supplemented or modified from time to time.   The Obligor has delivered to the Agent a certified charter, certificate of incorporation, partnership agreement or other organization document and good standing certificate (or equivalent thereto) as of a date which is recent to the date hereof.

(b)     **Title to Collateral**.  Except for the Security Interest granted to the Agent for the benefit of the Secured Creditors pursuant to this Agreement and the other Permitted Liens, the Obligor owns each item of the Collateral free and clear of any and all Liens or claims of others excepting Permitted Liens.   For the

- 15 -

avoidance of doubt, it is understood and agreed that the Obligor may, as part of its business, grant licenses to third parties to use Intellectual Property owned or developed by the Obligor to the extent permitted by the Credit Agreement. Each of the Agent and each Secured Creditor understands that any such licenses may be exclusive to the applicable licensees, and such exclusivity provisions may, to the extent such licenses are Permitted Liens, limit the ability of the Agent to utilize, license free of such license rights.

(c) **Validity of Security Interest**. The Security Interest (a) will constitute valid perfected Security Interests in respect of all Collateral in which the Security Interest may be perfected by filing, recording or registration in the province of Alberta, in each case in favor of the Agent, for the benefit of the Secured Creditors, as collateral security for the Obligor's Obligations, enforceable in accordance with the terms hereof against all creditors of the Obligor and any Persons purporting to purchase any Collateral from the Obligor and (b) are prior to all other Liens on the Collateral in existence on the date hereof except for (x) unrecorded Permitted Liens which have priority over the Liens on the Collateral by operation of law and (y) Liens expressly permitted by the Credit Agreement to be prior to the Security Interest granted pursuant to the terms hereof.

### ARTICLE 5
### COVENANTS

The Obligor covenants and agrees with the Agent, that, from and after the date of this Agreement until the Obligations shall have been paid in full:

### Section 5.1    Changes in Name, etc.

The Obligor will not, except upon 30 days' prior written notice to the Agent and delivery to the Agent of all additional financing statements and executed documents reasonably requested by the Agent to maintain the validity, perfection and priority of the Security Interests provided for herein, (i) change the location of its chief executive office or sole place of business or (ii) change its name.

### Section 5.2    Title to Collateral

The Obligor shall maintain the Security Interest created by this Agreement as a perfected Security Interest and shall defend such Security Interest against the claims and demands of all Persons whomsoever, subject to the rights of the Obligor under the Credit Agreement to dispose of the Collateral.

### Section 5.3    Other Action as to Collateral

(a) The Obligor will furnish to the Agent from time to time statements and schedules further identifying and describing the assets and property of the Obligor and such other reports in connection therewith as the Agent may reasonably request, all in reasonable detail,

17101040.2

- 16 -

(b) without limiting the foregoing, within 15 days of a request therefor by the Agent and only during the continuance of a Default or Event of Default, the Obligor will furnish to the Agent (i) a listing of each of the "serial number goods" which form part of the Collateral (as defined in the PPSA) together with the location of such serial number goods and (ii) the legal descriptions of any Lands which form part of the Collateral.

(c) At any time and from time to time, upon the written request of the Agent, and at the sole expense of the Obligor, the Obligor will promptly and duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as the Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, filing any financing or continuation statements under the PPSA (or other similar laws) in effect in any jurisdiction with respect to the Security Interests created hereby.

**Section 5.4    Intellectual Property**

(a) Except with respect to any patent, trademark or copyright permitted to be abandoned under the Credit Agreement, the Obligor shall notify the Agent immediately if it knows or has reason to know that any application or registration relating to any material patent, trademark or copyright of the Obligor may become abandoned, or dedicated to the public domain, or of any adverse determination or development regarding the Obligor's ownership of any patent, trademark or copyright, its right to register the same, or to keep and maintain the same, except in each case, to the extent it would not reasonably be expected to result in a Material Adverse Effect.

(b) Whenever the Obligor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of or acquire any interests in any material patent, trademark or copyright with CIPO or any similar office or agency of any jurisdiction, the Obligor shall report such filing to the Agent within ten (10) Business Days after the last day of the fiscal quarter in which such filing occurs, and, upon request of the Agent, the Obligor shall execute and deliver any and all agreements relating to patent, trademark or copyright as the Agent may request to evidence the Agent's Security Interest in such patent, trademark or copyright, and the general intangibles of the Obligor relating thereto or represented thereby. For the avoidance of doubt, the provisions hereof shall automatically apply to any such patent, trademark or copyright acquired after the date hereof and such patent, trademark or copyright shall automatically constitute Collateral as if such would have constituted Collateral at the time of execution hereof and be subject to the Lien and security interest created by this Agreement without further action by any party.

(c) Except with respect to any copyright permitted to be abandoned under the Credit Agreement, the Obligor shall take all actions necessary or reasonably requested by the Agent to maintain and pursue each application, to obtain the relevant

- 17 -

registration and to maintain the registration of each material copyright, including the filing of applications for renewal.

(d)    Except with respect to any patent or trademark permitted to be abandoned under the Credit Agreement, the Obligor shall take all actions necessary or reasonably requested by the Agent to maintain and pursue each application, to obtain the relevant registration and to maintain the registration of each material patent or trademark, including the filing of applications for renewal, affidavits of use and affidavits of non-contestability and the payment of maintenance fees.

(e)    In the event that any material patents, trademarks or copyrights is infringed upon, or misappropriated, diluted or otherwise violated by a third party, the Obligor shall (i) notify the Agent promptly after the Obligor learns thereof and (ii) take such actions as the Obligor shall reasonably deem appropriate under the circumstances to protect such patent, trademark or copyright, stop the infringement and obtain damages.

(f)    Except with respect to any copyright, trademark or patent not required to be maintained or permitted to be abandoned under the Credit Agreement, the Obligor (either itself or through its permitted licensees) will not take or knowingly omit to take any action whereby any material copyright, trademark or patent could reasonably be expected to become abandoned, dedicated or invalidated or whereby the remedies in respect of such copyright, trademark or patent with respect to potential infringers could reasonably be expected to become weakened.

(g)    The Obligor (either itself or through licensee) will not knowingly do any act that uses any Intellectual Property to infringe the intellectual property rights of any other Person which would reasonably be likely to have a Material Adverse Effect.

**Section 5.5    Insurance.**

All property damage insurance maintained on any portion of the Collateral of the Obligor shall name the Agent as lender's loss payee, and all liability insurance maintained in respect of any portion of the Collateral of the Obligor shall name the Agent as an additional insured.  The Obligor shall furnish the Agent with certificates of insurance evidencing compliance with the foregoing insurance provision.

**ARTICLE 6**
**GENERAL**

**Section 6.1    Notices.**

All notices, requests and demands to or upon the Agent or the Obligor under this Agreement shall be in writing and delivered to the addressee by prepaid private courier or sent by facsimile to the applicable address and to the attention of the officer of the addressee as follows:

- 18 -

To the Obligor:

Q'Max Solutions Inc.
407 2nd St. SW, Ste. 1700
Calgary, Alberta T2P 2Y3

Attention:     Mark Roberts, Chief Financial Officer
Fax No.:       (403) 269-2251

To the Agent:

HSBC Bank Canada, as Agent
7th Floor, 70 York Street
Toronto, Ontario  M5J 1S9

Attention:     Manager Agency
Fax No.:       (647) 788-2185

Any communication transmitted by prepaid private courier shall be deemed to have been validly and effectively given or delivered on the Business Day after which it is submitted for delivery. Any communication transmitted by facsimile shall be deemed to have been validly and effectively given or delivered on the day on which it is transmitted, if transmitted on a Business Day on or before 5:00 p.m. (local time of the intended recipient), and otherwise on the next following Business Day.  The Agent or the Obligor may change its respective address for service or other notices, including electronic communications, by notice given in the foregoing manner.

**Section 6.2     Discharge.**

The Security Interest will be discharged upon, but only upon, full and indefeasible payment and performance of the Secured Obligations. Upon the discharge of the Secured Obligations and at the request and expense of the Obligor, the Agent will execute and deliver to the Obligor such releases, discharges, financing statements and other documents or instruments as the Obligor may reasonably require and the Agent will promptly redeliver to the Obligor, or as the Obligor may otherwise direct the Agent, any Collateral in its possession.

If any of the Collateral shall be sold, transferred or otherwise disposed of by the Obligor in a transaction permitted by the Credit Agreement then the Agent, at the request and sole expense of the Obligor, shall promptly execute and deliver to the Obligor all releases or other documents necessary or reasonably desirable for the release of the Liens created by such Collateral.

**Section 6.3     No Merger.**

This Agreement does not operate by way of merger of any of the Secured Obligations and no judgment recovered by the Agent or any of the Secured Creditors will operate by way of merger of, or in any way affect, the Security Interest, which is in addition to, and not in substitution for, any other security now or hereafter held by the Agent and the Secured Creditors in respect of the Secured Obligations.  The representations, warranties and covenants of the

- 19 -

Obligor in this Agreement survive the execution and delivery of this Agreement and any advances under the Credit Agreement. Notwithstanding any investigation made by or on behalf of the Agent or the Secured Creditors these covenants, representations and warranties continue in full force and effect until this Agreement shall terminate (or thereafter to the extent provided therein).

**Section 6.4    Further Assurances.**

The Obligor will do all acts and things and execute and deliver, or cause to be executed and delivered, all agreements, documents and instruments that the Agent may reasonably require and take all further steps relating to the Collateral or any other property or assets of the Obligor that the Agent may reasonably require for (i) protecting the Collateral, (ii) perfecting, preserving and protecting the Security Interest, and (iii) exercising all powers, authorities and discretions conferred upon the Collateral Agent. Whenever the Security Interest is enforceable, the Obligor will do all acts and things and execute and deliver all documents and instruments that the Collateral Agent may reasonably require for facilitating the sale or other disposition of the Collateral in connection with its realization.

**Section 6.5    Supplemental Security.**

This Agreement is in addition to, without prejudice to and supplemental to all other security now held or which may hereafter be held by the Agent or the Secured Creditors.

**Section 6.6    Successors and Assigns.**

This Agreement is binding on the Obligor and its successors and permitted assigns, and enures to the benefit of the Agent, the Secured Creditors and their respective successors and permitted assigns. This Agreement may be assigned by the Agent in accordance with the Credit Agreement and, in such event, any such assignee will be entitled to all of the rights and remedies of the Agent as set forth in this Agreement or otherwise. In any action brought by an assignee to enforce any such right or remedy, the Obligor will not assert against the assignee any claim or defence which the Obligor now has or may have against the Agent or any of the Secured Creditors. The Obligor may not assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Agent which may be unreasonably withheld.

**Section 6.7    Enforcement Expenses; Indemnification**

(1)     The Obligor agrees to pay or reimburse each Secured Creditor and the Agent for all its costs and expenses incurred in enforcing or preserving any rights under this Agreement and the other Credit Documents to which the Obligor is a party, including, without limitation, the reasonable fees and disbursements of a single outside counsel to the Agent in each relevant jurisdiction.

(2)     The Obligor agrees to pay, and to save the Agent and the Secured Creditors harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions

- 20 -

contemplated by this Agreement, in each case to the extent the Obligor would be required to do so pursuant to the Credit Agreement.

(3) The Obligor agrees to pay, and to save the Agent and the Secured Creditors harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement to the extent the Obligor would be required to do so pursuant the Credit Agreement.

(4) The agreements in this Section 6.7 shall survive repayment of the Obligations and all other amounts payable under the Credit Agreement and the other Credit Documents.

**Section 6.8    Set-Off**

In addition to any rights and remedies of the Secured Creditors provided by law, each Secured Creditor shall have the right, without notice to the Obligor, any such notice being expressly waived by the Obligor to the extent permitted by Applicable Law, upon the Obligations becoming due and payable by the Obligor (whether at the stated maturity, by acceleration or otherwise), to apply to the payment of such Obligations, by setoff or otherwise, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Secured Creditor, any affiliate thereof or any of their respective branches or agencies to or for the credit or the account of the Obligor.  Each Secured Creditor agrees promptly to notify the Obligor and the Agent after any such application made by such Secured Creditor; provided that the failure to give such notice shall not affect the validity of such application.

**Section 6.9    Severability.**

If any court of competent jurisdiction from which no appeal exists or is taken, determines any provision of this Agreement to be illegal, invalid or unenforceable, that provision will be severed from this Agreement and the remaining provisions will remain in full force and effect.

**Section 6.10    Amendment.**

This Agreement may only be amended, supplemented or otherwise modified by written agreement executed by the Agent and the Obligor.

**Section 6.11    Waivers, etc.**

(1) No consent or waiver by the Agent or the Secured Creditors in respect of this Agreement is binding unless made in writing and signed by an authorized officer of the Agent. Any consent or waiver given under this Agreement is effective only in the specific instance and for the specific purpose for which given. No waiver of any of the provisions of this Agreement constitutes a waiver of any other provision.

(2) A failure or delay on the part of the Agent or the Secured Creditors in exercising a right under this Agreement does not operate as a waiver of, or impair, any right of the Agent or

- 21 -

the Secured Creditors however arising. A single or partial exercise of a right on the part of the Agent or the Secured Creditors does not preclude any other or further exercise of that right or the exercise of any other right by the Agent or the Secured Creditors.

**Section 6.12   Conflict.**

In the event of a direct conflict or inconsistency between the terms and provisions contained in this Agreement and the terms and provisions contained in the Credit Agreement, it is the intentions of the parties hereto that such terms and provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict or inconsistency that cannot be resolved as aforesaid, the terms and provisions of the Credit Agreement shall control and govern.  In addition, to the extent that, under the Credit Agreement, the Obligor is permitted to undertake any act or granted any entitlement, the provisions of this Agreement shall be deemed to preserve such permission or entitlement notwithstanding anything to the contrary herein.

**Section 6.13   Governing Law.**

This Agreement will be governed by, interpreted and enforced in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF** the Obligor has executed this Agreement.

<div align="center">

**Q'MAX SOLUTIONS INC.**

</div>

Per: _____
      Name: Mark Roberts
      Title:   Chief Financial Officer

## SCHEDULE "A"

| Legal Name | Jurisdiction of Incorporation or Formation | Location of Chief Executive Office | Location of Business and Assets |
|---|---|---|---|
| Q'Max Solutions Inc. | Alberta | 407 2nd St. NW, Ste. 1700 Calgary, Alberta T2P 2Y3 | Alberta and India |

THIS IS EXHIBIT " _____16_____ "
referred to in the Affidavit of
_Cameron Bailey_
Sworn before me this _26th_
day of _May_ A.D. 20_20_
_____

Jonathan Tomm
Barrister and Solicitor

**QMAX CANADA OPERATIONS INC.**

as Obligor

and

**HSBC BANK CANADA**

as Administrative Agent

---

**SECURITY AGREEMENT**

September 1, 2016

---

## SECURITY AGREEMENT

Security Agreement dated as of September 1, 2016 (the "**Agreement**") made by QMax Canada Operations Inc. (the "**Obligor**"), to and in favour of HSBC Bank Canada, as Agent for the benefit of the Secured Creditors.

**WHEREAS**, pursuant to, and subject to the terms and conditions of, an Amended and Restated Credit Agreement dated as of January 30, 2015 (as amended by a first amending agreement dated as of September 3, 2015, and as further amended by a second amending agreement dated as of March 30, 2016, as may be further amended, restated, supplemented and/or modified from time to time, the "**Credit Agreement**"), among Q'Max Solutions Inc. and Q'Max America Inc., as borrowers, HSBC Bank Canada and those other financial institutions who from time to time become parties thereto as lenders (collectively, the "**Lenders**") and HSBC Bank Canada, as administrative agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "**Agent**"), the Lenders agreed to make certain credit facilities available to the Borrowers;

**AND WHEREAS**, the Obligor has agreed to execute this Agreement to become a Material Subsidiary and Credit Party under the Credit Agreement;

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## INTERPRETATION

### Section 1.1   Defined Terms.

As used in this Agreement, the following terms have the following meanings:

"**Agreement**" means this security agreement as may be amended, supplemented or otherwise modified from time to time.

"**CIPO**" means the Canadian Intellectual Property Office.

"**Collateral**" has the meaning specified in Section 2.1 of this Agreement.

"**Credit Agreement**" shall have the meaning attributed to such term in the Preamble of this Agreement.

"**Instruments**" means (i) a bill, note or cheque within the meaning of the *Bills of Exchange Act* (Canada) or any other writing that evidences a right to the payment of money and is of a type that in the ordinary course of business is transferred by delivery with any necessary endorsement or assignment, or (ii) a letter of credit and an advice of credit if the letter or advice states that it must be surrendered upon claiming payment thereunder, or (iii) chattel paper or any other writing that evidences both a monetary obligation and a security interest in or a lease of specific goods, or (iv) documents of title or any other writing that purports to be issued by or addressed to

- 2 -

a bailee and purports to cover such goods in the bailee's possession as are identified or fungible portions of an identified mass, and that in the ordinary course of business is treated as establishing that the Person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers, or (v) any document or writing commonly known as an instrument, but excludes investment property.

"**Intellectual Property**" means domestic and foreign: (i) patents, applications for patents and reissues, divisions, continuations, renewals, extensions and continuations-in-part of patents or patent applications; (ii) proprietary and nonpublic business information, including inventions (whether patentable or not), invention disclosures, improvements, discoveries, trade secrets, confidential information, know-how, methods, processes, designs, technology, technical data, schematics, formulae and customer lists, and documentation relating to any of the foregoing; (iii) copyrights, copyright registrations and applications for copyright registration; (iv) mask works, mask work registrations and applications for mask work registrations; (v) designs, design registrations, design registration applications and integrated circuit topographies; (vi) trade names, business names, corporate names, domain names, website names and world wide web addresses, common law trade-marks, service marks, certification marks, trade dress, logos, applications, registrations and renewals for any of the foregoing and the goodwill connected with the use of and symbolized by any of the foregoing; (vii) computer software and programs (both source code and object code form), all proprietary rights in the computer software and programs and all documentation and other materials related to the computer software and programs; (viii) any other intellectual property and industrial property; (ix) income, fees, royalties, damages, claims and payments for past, present, or future infringements, dilutions or other violations thereof; (x) rights corresponding thereto throughout the world; and (xi) rights to sue for past, present or future infringements, dilutions or other violations thereof.

"**Obligations**" means, in respect of the Obligor, the Obligations (as such term is defined in the Credit Agreement) of such Obligor.

"**Obligor**" shall have the meaning attributed to such term in the Preamble of this Agreement.

"**PPSA**" means the *Personal Property Security Act* (Alberta) and the regulations promulgated thereunder and other applicable personal property security legislation of the applicable Canadian province or provinces (including the Civil Code of Quebec and the regulations respecting the register of personal and movable real rights promulgated thereunder) as all such legislation now exists or may from time to time hereafter be amended, modified, recodified, supplemented or replaced, together with all rules, regulations and interpretations thereunder or related thereto.

"**Registrable Intellectual Property**" means any Intellectual Property in respect of which ownership, title, security interests, charges or encumbrances are capable of registration, recording or notation with any Governmental Authority pursuant to Applicable Laws.

"**Restricted Asset**" has the meaning specified in Section 2.4(1) of this Agreement.

"**Secured Creditors**" means, collectively, the Agent, the Lenders, the Hedge Providers and counterparties providing services pursuant to the Banking Services Agreements.

"**Secured Obligations**" has the meaning specified in Section 2.2 of this Agreement.

- 3 -

"**Securities**" means securities as defined in the *Securities Transfer Act* (Alberta).

"**Security Interest**" has the meaning specified in Section 2.2

### Section 1.2    Interpretation.

(1)    Capitalized terms used in this Agreement but not defined have the meanings given to them in the Credit Agreement. Terms defined in the PPSA and the *Securities Transfer Act* (Alberta) ("**STA**") and used but not otherwise defined in this Agreement have the same meanings. For greater certainty, the terms "**account**", "**chattel paper**", "**document of title**", "**equipment**", "**goods**", "**instrument**", "**intangible**", "**investment property**", "**money**", "**personal property**" and "**proceeds**" have the meanings given to them in the PPSA; and the terms "**certificated security**", "**control**", "**delivery**", "**entitlement holder**", "**financial asset**", "**securities account**", "**securities intermediary**", "**security entitlement**" and "**uncertificated security**" have the meanings given to them in the STA or the PPSA as applicable.

(2)    Any reference in any Credit Document to Permitted Liens and any right of the Obligor to create or suffer to exist Permitted Liens are not intended to and do not and will not subordinate the Security Interest to any such Permitted Lien or give priority to any Person over the Secured Creditors with respect to any such Permitted Lien.

(3)    The rules of interpretation specified in Article 1 of the Credit Agreement shall be applicable to this Agreement.

### ARTICLE 2
### ARTICLE 2 SECURITY

### Section 2.1    Grant of Security.

(1)    Subject to Section 2.4 and Section 2.5, the Obligor grants to the Agent, for the benefit of the Secured Creditors, a security interest in, and assigns, mortgages, charges, hypothecates and pledges to the Agent, for the benefit of the Secured Creditors, all of the property, assets, effects and undertaking of the Obligor whether now owned or hereafter acquired and all of the property, assets, effects and undertaking in which the Obligor now has or hereafter acquires any interest (collectively, the "**Personal Property Collateral**"), including all of the Obligor's:

(a)    present and after-acquired personal property including:

(i)    inventory including goods held for sale, lease or resale, goods furnished or to be furnished to third parties under contracts of lease, consignment or service, goods which are raw materials or work in process, goods used in or procured for packing and materials used or consumed in the businesses of the Obligor;

(ii)    equipment, machinery, furniture, fixtures, plant, vehicles and other goods of every kind and description and all licences and other rights and all

21947633.4

- 4 -

related records, files, charts, plans, drawings, specifications, manuals and documents;

(iii)    accounts due or accruing and all related agreements, books, accounts, invoices, letters, documents and papers recording, evidencing or relating to them;

(iv)    money, documents of title, chattel paper, financial assets and investment property;

(v)    security accounts and all of the credit balances, securities entitlements, other financial assets and items or property (or their value) standing to the credit from time to time in such securities accounts;

(vi)    Instruments and Securities; and

(vii)    intangibles including all security interests, goodwill, choses in action, contracts, contract rights, licenses and other contractual benefits;

(b)    Intellectual Property including the Registrable Intellectual Property;

(c)    all substitutions and replacements of and increases, additions and, where applicable, accessions to the property described in Section 2.1(a) and Section 2.1(b); and

(d)    all proceeds in any form derived directly or indirectly from any dealing with all or any part of the property described in Section 2.1(a) and Section 2.1(c) inclusive, including the proceeds of such proceeds.

(2)    Subject to Section 2.4 and Section 2.5, the Obligor hereby charges as and by way of a floating charge in favour of the Agent for the benefit of the Secured Creditors all the presently owned or held and hereafter acquired property, assets, effects and undertaking of the Obligor of whatsoever nature and kind and wheresoever situate, other than such of the Obligor's property, assets, effects and undertakings of the Obligor as are validly and effectively subjected to the security interest granted to the Agent pursuant to Section 2.1(1) (all of which property, assets, effects and undertakings so charged by this Section 2.1(2) are herein collectively called the "**Other Collateral**", and together with the Personal Property Collateral the "**Collateral**") including, without limiting the generality of the foregoing, all presently owned or held and hereafter acquired right, title and interest of the Obligor in and to real and immovable and leasehold property and rights whether in fee or of a less estate and all interest in and rights relating to lands and all easements, rights of way, privilege, benefits, licences, improvements and rights whether connected therewith or appurtenant thereto or separately owned or held and all structures, buildings, plant, machinery, fixtures, apparatus and fixed assets and the charge created by this Section 2.1(2) shall be a floating charge such that the Obligor shall not have power without the prior written consent of the Agent to:

- 5 -

(a)     create or permit to exist any Lien against any of the Other Collateral which ranks or could in any event rank in priority to or *pari passu* with the security constituted by this Agreement, save for those Liens that are Permitted Liens; or

(b)     grant, sell, exchange, transfer, assign, lease or otherwise dispose of the Other Collateral, save for Permitted Dispositions.

**Section 2.2     Secured Obligations.**

The security interests, assignments, mortgages, charges, hypothecations and pledges granted by the Obligor under this Agreement (collectively, the "**Security Interest**") secure the payment and performance of the following (collectively, the "**Secured Obligations**"):

(a)     the Obligations of the Obligor; and

(b)     all expenses, costs and charges incurred by or on behalf of the Secured Creditors in connection with this Agreement, the Security Interest or the Collateral, including all reasonable legal fees, court costs, receiver's or agent's remuneration and other expenses of taking possession of, repairing, protecting, insuring, preparing for disposition, realizing, collecting, selling, transferring, delivering or obtaining payment for the Collateral, and of taking, defending or participating in any action or proceeding in connection with any of the foregoing matters or otherwise in connection with the Secured Creditors' interest in any Collateral, whether or not directly relating to the enforcement of this Agreement or any other Credit Document.

**Section 2.3     Attachment.**

The Obligor acknowledges that (i) value has been given, (ii) it has rights in the applicable Collateral or the power to transfer rights in the Collateral to the Agent (other than after-acquired Collateral), (iii) it has not agreed to postpone the time of attachment of the Security Interest, and (iv) it has received a copy of this Agreement.

**Section 2.4     Scope of Security Interest.**

(1)     To the extent that an assignment of amounts payable and other proceeds arising under or in connection with, or the grant of a security interest in any agreement, licence, lease, permit, instrument or quota of the Obligor would constitute a default under, or a breach of, or would result in the termination of, such agreement, licence, lease, permit, instrument or quota (each, a "**Restricted Asset**"), the Security Interest with respect to each Restricted Asset will constitute a trust created in favour of the Agent, for the benefit of the Secured Creditors, pursuant to which the Obligor holds as trustee all proceeds arising under or in connection with the Restricted Asset in trust for the Agent, for the benefit of the Secured Creditors, on the following basis:

(a)     subject to the Credit Agreement, until the Security Interest is enforceable, the Obligor is entitled to receive all such proceeds; and

21947633.4

- 6 -

(b)    whenever the Security Interest is enforceable, (i) all rights of the Obligor to receive such proceeds cease and all such proceeds will be immediately paid over to the Agent for the benefit of the Secured Creditors, and (ii) the Obligor will take all actions requested by the Agent to collect and enforce payment and other rights arising under the Restricted Asset.

(2)    The Security Interest with respect to trademarks constitutes a security interest in, and a charge, hypothecation and pledge of such Collateral in favour of the Agent for the benefit of the Secured Creditors, but does not constitute an assignment or mortgage of such Collateral to the Agent or any Secured Creditor.

(3)    Until the Security Interest is enforceable, the grant of the Security Interest in the Intellectual Property does not affect in any way the Obligor's rights to commercially exploit the Intellectual Property, defend it, enforce the Obligor's rights in it or with respect to it against third parties in any court or claim and be entitled to receive any damages with respect to any infringement of it.

(4)    The Security Interest does not extend to consumer goods.

(5)    The Security Interest does not extend or apply to the last day of the term of any lease or sublease of real property or any agreement for a lease or sublease of real property, now held or hereafter acquired by the Obligor, but the Obligor will stand possessed of any such last day upon trust to assign and dispose of it as the Agent may reasonably direct.

**Section 2.5    No Control Agreements.**

Notwithstanding anything to the contrary herein, in no event shall the Obligor or any Subsidiary thereof be required to execute control agreements to perfect the security interests granted hereunder, including in (i) any deposit, commodity or securities account (including, without limitation, securities entitlements and related assets) or (ii) other assets requiring perfection through control.

**Section 2.6    Grant of Licence to Use Intellectual Property.**

For the purpose of enabling the Agent, during an Event of Default which is continuing, to exercise rights and remedies hereunder, and for no other purposes, the Obligor hereby grants to the Agent an irrevocable, non-exclusive license, (exercisable without payments of royalty or other compensation to the Obligor) to use, assign, license or sub-license any of the Collateral of the Obligor consisting of Intellectual Property in which the Obligor now has or hereafter acquires rights, and wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof. The Agent covenants and agrees that it will not exercise its rights under the foregoing license except during the time that it shall be lawfully entitled to exercise its rights and remedies hereunder.

- 7 -

**Section 2.7    Care and Custody of Collateral.**

(1)     The Agent shall keep the Collateral in its possession identifiable in accordance with its customary practice for the Collateral of such type.

(2)     Without limiting any other rights or remedies under this Agreement, the Agent may upon the occurrence and during the continuance of an Event of Default, (i) notify any Person obligated on an Instrument, Security or account to make payments to the Agent, whether or not the Obligor was previously making collections on such accounts, chattel paper, instruments, and (ii) assume control of any proceeds arising from the Collateral.

(3)     The Agent has no obligation to collect dividends, distributions or interest payable on, or exercise any option or right in connection with, any Collateral. The Agent has no obligation to protect or preserve any Collateral from depreciating in value or becoming worthless and is released from all responsibility for any loss of value. In the physical keeping of any Securities, the Agent is only obliged to exercise the same degree of care as it would exercise with respect to its own Securities kept at the same place.

(4)     The Agent may, upon the occurrence and during the continuance of any Event of Default, sell, transfer, use or otherwise deal with any investment property included in the Collateral over which the Agent has control, on such conditions and in such manner as the Agent in its sole discretion may determine.

**Section 2.8    Rights of the Obligor.**

(1)     Until the occurrence of an Event of Default which is continuing, the Obligor is entitled to vote the Securities and other financial assets that are part of the Collateral and to receive dividends and distributions on such Securities and financial assets, as may be permitted by the Credit Agreement. Upon the occurrence and during the continuance of an Event of Default, all rights of the Obligor to vote (under any proxy given by the Agent (or its nominee) or otherwise) or to receive distributions or dividends cease and all such rights become vested solely and absolutely in the Agent.

(2)     Any distributions or dividends received by the Obligor contrary to Section 2.8(1) or any other moneys or property received by the Obligor after the Security Interest is enforceable will be received as trustee for the Agent and the Secured Creditors and shall be immediately paid over to the Agent.

### ARTICLE 3
### ENFORCEMENT

**Section 3.1    Enforcement.**

The Security Interest becomes and is enforceable against the Obligor upon the occurrence and during the continuance of an Event of Default.

- 8 -

**Section 3.2    Remedies.**

Whenever the Security Interest is enforceable, the Agent may realize upon the Collateral and enforce the rights of the Agent and the Secured Creditors by:

(a)    entry onto any premises where Collateral consisting of tangible personal property may be located;

(b)    entry into possession of the Collateral by any method permitted by law;

(c)    sale, grant of options to purchase, or lease of all or any part of the Collateral;

(d)    holding, storing and keeping idle or operating all or any part of the Collateral;

(e)    exercising and enforcing all rights and remedies of a holder of the Collateral as if the Agent were the absolute owner thereof (including, if necessary, causing the Collateral to be registered in the name of the Agent or its nominee if not already done);

(f)    collection of any proceeds arising in respect of the Collateral;

(g)    collection, realization or sale of, or other dealing with, accounts;

(h)    license or sublicense, whether on an exclusive or nonexclusive basis, of any Intellectual Property for such term and on such conditions and in such manner as the Agent in its sole judgment determines (taking into account such provisions as may be necessary to protect and preserve such Intellectual Property);

(i)    instruction to any bank to transfer all moneys constituting Collateral held by such bank to an account maintained with or by the Agent;

(j)    application of any moneys constituting Collateral or proceeds thereof in accordance with this Agreement;

(k)    appointment by instrument in writing of a receiver (which term as used in this Agreement includes a receiver and manager) or agent of all or any part of the Collateral and removal or replacement from time to time of any receiver or agent;

(l)    institution of proceedings in any court of competent jurisdiction for the appointment of a receiver of all or any part of the Collateral;

(m)    institution of proceedings in any court of competent jurisdiction for sale or foreclosure of all or any part of the Collateral;

(n)    filing of proofs of claim and other documents to establish claims to the Collateral in any proceeding relating to the Obligor; and

(o)    any other remedy or proceeding authorized or permitted under the PPSA or otherwise by law or equity.

- 9 -

**Section 3.3    Additional Rights.**

In addition to the remedies set forth in Section 3.2 and elsewhere in this Agreement, whenever the Security Interest is enforceable, the Agent may:

(a)     require the Obligor, at the Obligor's expense, to assemble the Collateral at a place or places designated by notice in writing and the Obligor agrees to so assemble the Collateral promptly upon receipt of such notice;

(b)     require the Obligor, by notice in writing, to disclose to the Agent the location or locations of the Collateral and the Obligor agrees to promptly make such disclosure when so required;

(c)     repair, process, modify, complete or otherwise deal with the Collateral and prepare for the disposition of the Collateral, whether on the premises of the Obligor or otherwise;

(d)     redeem any prior security interest against any Collateral, procure the transfer of such security interest to itself, or settle and pass the accounts of the prior mortgagee, chargee or encumbrancer (any accounts to be conclusive and binding on the Obligor absent manifest error and provided the Agent has exercised reasonable diligence in verifying such accounts);

(e)     pay any liability secured by any Lien against any Collateral (all such payments to be added to the Obligations);

(f)     carry on all or any part of the business of the Obligor and, to the exclusion of all others including the Obligor, enter upon, occupy and use all or any of the premises, buildings, and other property of or used by the Obligor for such time as the Agent sees fit, free of charge, and the Agent and the Secured Creditors are not liable to the Obligor for any act, omission or negligence (other than their own gross negligence or willful misconduct) in so doing or for any rent, charges, depreciation or damages incurred in connection with or resulting from such action;

(g)     borrow for the purpose of carrying on any of the businesses of the Obligor or for the maintenance, preservation or protection of the Collateral and grant a security interest in the Collateral, whether or not in priority to the Security Interest, to secure repayment;

(h)     commence, continue or defend any judicial or administrative proceedings for the purpose of protecting, seizing, collecting, realizing or obtaining possession or payment of the Collateral, and give good and valid receipts and discharges in respect of the Collateral and compromise or give time for the payment or performance of all or any part of the accounts or any other obligation of any third party to the Obligor; and

- 10 -

(i)     at any public sale, and to the extent permitted by law on any private sale, bid for and purchase any or all of the Collateral offered for sale and upon compliance with the terms of such sale, hold, retain and dispose of such Collateral without any further accountability to the Obligor or any other Person with respect to such holding, retention or disposition, except as required by law. In any such sale to the Agent, the Agent may, for the purpose of making payment for all or any part of the Collateral so purchased, use any claim for Secured Obligations then due and payable to it as a credit against the purchase price.

**Section 3.4     Exercise of Remedies.**

The remedies hereunder including under Section 3.2 and Section 3.3 may, subject to the Applicable Laws to the extent required thereby, be exercised from time to time separately or in combination and are in addition to, and not in substitution for, any other rights of the Agent and the Secured Creditors however arising or created. The Agent and the Secured Creditors are not bound to exercise any right or remedy, and the exercise of rights and remedies is without prejudice to the rights of the Agent and the Secured Creditors in respect of the Secured Obligations including the right to claim for any deficiency.

**Section 3.5     Receiver's Powers.**

(1)     Any receiver appointed by the Agent is vested with the rights and remedies which could have been exercised by the Agent in respect of the Obligor or the Collateral and such other powers and discretions as are granted in the instrument of appointment and any supplemental instruments. The identity of the receiver, its replacement and its remuneration are within the sole and unfettered discretion of the Agent, provided such remuneration is on commercially reasonable terms.

(2)     Any receiver appointed by the Agent will act as agent for the Agent for the purposes of taking possession of the Collateral, but otherwise and for all other purposes (except as provided below), as agent for the Obligor. The receiver may sell, lease, or otherwise dispose of Collateral as agent for the Obligor or as agent for the Agent as the Agent may determine in its discretion. The Obligor agrees to ratify and confirm all actions of the receiver acting as agent for the Obligor, and to release and indemnify the receiver in respect of all such actions.

(3)     The Agent, in appointing or refraining from appointing any receiver, does not incur liability to the receiver, the Obligor or otherwise and is not responsible for any misconduct or negligence of such receiver.

**Section 3.6     Appointment of Attorney.**

(1)     The Obligor hereby irrevocably constitutes and appoints the Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Obligor and in the name of the Obligor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this

Agreement, and, without limiting the generality of the foregoing, the Obligor hereby gives the Agent the power and right, on behalf of the Obligor, without notice to or assent by the Obligor, to do any or all of the following:

(a)     in the name of the Obligor or its own name, or otherwise, take possession of and endorse and collect any cheques, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to any Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Agent for the purpose of collecting any and all such moneys due whenever payable;

(b)     in the case of any Intellectual Property, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as the Agent may request to evidence the Agent's and the Secured Creditors' Security Interest in such Intellectual Property and the goodwill and general intangibles of the Obligor relating thereto or represented thereby;

(c)     pay or discharge taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(d)     execute, in connection with any sale provided for in this Agreement, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

(e)     (1) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Agent or as the Agent shall direct; (2) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (3) sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5) defend any suit, action or proceeding brought against the Obligor with respect to any Collateral; (6) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Agent may deem appropriate; (7) assign any Intellectual Property (along with the goodwill of the business to which any such Intellectual Property pertains), throughout the world for such term or terms, on such conditions, and in such manner, as the Agent shall in its sole discretion determine; and (8) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Agent were the absolute owner thereof for all purposes, and do, at the Agent's option and the Obligor's expense, at any time, or from time to time, all acts and things which the Agent deems necessary to protect, preserve

- 12 -

or realize upon the Collateral and the Agent's and the Secured Creditors' Security Interests therein and to effect the intent of this Agreement, all as fully and effectively as the Obligor might do.

Notwithstanding anything to the contrary in this Section 3.6, the Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 3.6 unless an Event of Default shall have occurred and be continuing and the Agent shall have given the Obligor notice of its intent to exercise the rights under the power of attorney provided for in this Section 3.6.

(2)     If the Obligor fails to perform or comply with any of its agreements contained herein, the Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement.

(3)     The expenses of the Agent incurred in connection with actions undertaken as provided in this Section 3.6, together with interest thereon at a rate per annum equal to the highest rate per annum at which interest would then be payable on any category of past due Canadian Dollar Prime-Based Loans under the Credit Agreement, from the date of payment by the Agent to the date reimbursed by the Obligor, shall constitute Obligations and shall be payable by the Obligor to the Agent on demand.

(4)     The Obligor hereby ratifies all that said attorneys shall lawfully do or cause to be done in accordance with the terms hereof. And in accordance with this Section 3.6 all powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the Security Interests created hereby are released.

**Section 3.7    Dealing with the Collateral.**

(1)     The Agent and the Secured Creditors are not obliged to exhaust their recourse against the Obligor or any other Person or against any other security they may hold in respect of the Secured Obligations before realizing upon or otherwise dealing with the Collateral in such manner as the Agent may consider desirable.

(2)     The Agent and the Secured Creditors may grant extensions or other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the Obligor and with other Persons, sureties or securities as they may see fit without prejudice to the Secured Obligations, the liability of the Obligor or the rights of the Agent and the Secured Creditors in respect of the Collateral.

(3)     Except as otherwise provided by law or this Agreement, the Agent and the Secured Creditors are not (i) liable or accountable for any failure to collect, realize or obtain payment in respect of the Collateral, (ii) bound to institute proceedings for the purpose of collecting, enforcing, realizing or obtaining payment of the Collateral or for the purpose of preserving any rights of any Persons in respect of the Collateral, (iii) responsible for any loss occasioned by any sale or other dealing with the Collateral in accordance with the terms hereof or by the retention of or failure to sell or otherwise deal with the Collateral, or (iv) bound to protect the Collateral from depreciating in value or becoming

- 13 -

worthless. Notwithstanding the foregoing, the Agent and the Secured Creditors shall be responsible to the Obligor for gross negligence or willful misconduct.

**Section 3.8 Standards of Sale.**

Without prejudice to the ability of the Agent to dispose of the Collateral in any manner which is commercially reasonable, and subject always to the provisions of the PPSA, the Obligor acknowledges that:

(a) the Collateral may be disposed of in whole or in part;

(b) the Collateral may be disposed of by public auction, public tender or private contract, with or without advertising and without any other formality;

(c) any assignee of such Collateral may be the Agent, a Secured Creditor or a customer of any such Person;

(d) any sale conducted by the Agent will be at such time and place, on such notice and in accordance with such procedures as the Agent, in its sole discretion, may deem advantageous;

(e) the Collateral may be disposed of in any manner and on any terms necessary to avoid violation of Applicable Law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that the prospective bidders and purchasers have certain qualifications, and restrict the prospective bidders and purchasers to Persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of the Collateral) or in order to obtain any required approval of the disposition (or of the resulting purchase) by any governmental or regulatory authority or official;

(f) a disposition of the Collateral may be on such terms and conditions as to credit or otherwise as the Agent, in its sole discretion, may deem advantageous; and

(g) the Agent may establish an upset or reserve bid or price in respect of the Collateral.

**Section 3.9 Dealings by Third Parties.**

(1) No Person dealing with the Agent, any of the Secured Creditors or an agent or receiver is required to determine (i) whether the Security Interest has become enforceable, (ii) whether the powers which such Person is purporting to exercise have become exercisable, (iii) whether any money remains due to the Agent or the Secured Creditors by the Obligor, (iv) the necessity or expediency of the stipulations and conditions subject to which any sale or lease of Collateral is made, (v) the propriety or regularity of any sale or other dealing by the Agent or any Secured Creditor with the Collateral, or (vi) how any money paid to the Agent or the Secured Creditors have been applied.

- 14 -

(2) Any bona fide purchaser of all or any part of the Collateral from the Agent or any receiver or agent will hold the Collateral absolutely, free from any claim or right of whatever kind, including any equity of redemption, of the Obligor, which each the Obligor specifically waives (to the fullest extent permitted by law) as against any such purchaser together with all rights of redemption, stay or appraisal which the Obligor has or may have under any rule of law or statute now existing or hereafter adopted.

**Section 3.10   Proceeds to be Turned Over to Agent.**

If an Event of Default shall occur and be continuing, all proceeds received by the Obligor consisting of cash, cheques and other near-cash items shall be held by the Obligor in trust for the Agent and the Secured Creditors and shall, forthwith upon receipt by the Obligor, be turned over to the Agent in the exact form received by the Obligor (duly endorsed by the Obligor to the Agent, if required). All proceeds received by the Agent hereunder shall be held by the Agent in a collateral account maintained under its sole dominion and control. All proceeds while held by the Agent in a collateral account (or by the Obligor in trust for the Agent and the Secured Creditors) shall continue to be held as collateral security for all the Obligations and shall not constitute payment thereof until applied thereto as provided in Section 3.11.

**Section 3.11   Application of Proceeds.**

At such intervals as may be agreed upon by the Obligor and the Agent, or, if an Event of Default shall have occurred and be continuing, at any time at the Agent's election, the Agent may apply all or any part of proceeds constituting Collateral and any proceeds of and distribution in respect of Collateral in payment of the Obligations as provided in the Credit Agreement.

## ARTICLE 4
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 4.1   General Representations, Warranties and Covenants.**

The Obligor represents and warrants and covenants and agrees, acknowledging and confirming that the Agent and each Secured Creditor is relying on such representations, warranties, covenants and agreements, that:

(a) **Obligor's Legal Status**. On the date hereof, the Obligor's legal name, jurisdiction of organization or formation (as applicable), the location of the Obligor's chief executive office, the location of the Obligor's business and assets, as the case may be, are specified on Schedule A, as such Schedule may be amended, supplemented or modified from time to time. The Obligor has delivered to the Agent a certified charter, certificate of incorporation, partnership agreement or other organization document and good standing certificate (or equivalent thereto) as of a date which is recent to the date hereof.

(b) **Title to Collateral**. Except for the Security Interest granted to the Agent for the benefit of the Secured Creditors pursuant to this Agreement and the other Permitted Liens, the Obligor owns each item of the Collateral free and clear of any and all Liens or claims of others excepting Permitted Liens. For the avoidance

- 15 -

of doubt, it is understood and agreed that the Obligor may, as part of its business, grant licenses to third parties to use Intellectual Property owned or developed by the Obligor to the extent permitted by the Credit Agreement. Each of the Agent and each Secured Creditor understands that any such licenses may be exclusive to the applicable licensees, and such exclusivity provisions may, to the extent such licenses are Permitted Liens, limit the ability of the Agent to utilize, license free of such license rights.

(c)     **Validity of Security Interest**. The Security Interest (a) will constitute valid perfected Security Interests in respect of all Collateral in which the Security Interest may be perfected by filing, recording or registration in the province of Alberta, in each case in favor of the Agent, for the benefit of the Secured Creditors, as collateral security for the Obligor's Obligations, enforceable in accordance with the terms hereof against all creditors of the Obligor and any Persons purporting to purchase any Collateral from the Obligor and (b) are prior to all other Liens on the Collateral in existence on the date hereof except for (x) unrecorded Permitted Liens which have priority over the Liens on the Collateral by operation of law and (y) Liens expressly permitted by the Credit Agreement to be prior to the Security Interest granted pursuant to the terms hereof.

## ARTICLE 5
## COVENANTS

The Obligor covenants and agrees with the Agent, that, from and after the date of this Agreement until the Obligations shall have been paid in full:

### Section 5.1    Changes in Name, etc.

The Obligor will not, except upon 30 days' prior written notice to the Agent and delivery to the Agent of all additional financing statements and executed documents reasonably requested by the Agent to maintain the validity, perfection and priority of the Security Interests provided for herein, (i) change the location of its chief executive office or sole place of business or (ii) change its name.

### Section 5.2    Title to Collateral.

The Obligor shall maintain the Security Interest created by this Agreement as a perfected Security Interest and shall defend such Security Interest against the claims and demands of all Persons whomsoever, subject to the rights of the Obligor under the Credit Agreement to dispose of the Collateral.

### Section 5.3    Other Action as to Collateral.

(a)     The Obligor will furnish to the Agent from time to time statements and schedules further identifying and describing the assets and property of the Obligor and such other reports in connection therewith as the Agent may reasonably request, all in reasonable detail,

- 16 -

(b)     without limiting the foregoing, within 15 days of a request therefor by the Agent and only during the continuance of a Default or Event of Default, the Obligor will furnish to the Agent (i) a listing of each of the "serial number goods" which form part of the Collateral (as defined in the PPSA) together with the location of such serial number goods and (ii) the legal descriptions of any Lands which form part of the Collateral.

(c)     At any time and from time to time, upon the written request of the Agent, and at the sole expense of the Obligor, the Obligor will promptly and duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as the Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, filing any financing or continuation statements under the PPSA (or other similar laws) in effect in any jurisdiction with respect to the Security Interests created hereby.

**Section 5.4     Intellectual Property.**

(a)     Except with respect to any patent, trademark or copyright permitted to be abandoned under the Credit Agreement, the Obligor shall notify the Agent immediately if it knows or has reason to know that any application or registration relating to any material patent, trademark or copyright of the Obligor may become abandoned, or dedicated to the public domain, or of any adverse determination or development regarding the Obligor's ownership of any patent, trademark or copyright, its right to register the same, or to keep and maintain the same, except in each case, to the extent it would not reasonably be expected to result in a Material Adverse Effect.

(b)     Whenever the Obligor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of or acquire any interests in any material patent, trademark or copyright with CIPO or any similar office or agency of any jurisdiction, the Obligor shall report such filing to the Agent within ten (10) Business Days after the last day of the fiscal quarter in which such filing occurs, and, upon request of the Agent, the Obligor shall execute and deliver any and all agreements relating to patent, trademark or copyright as the Agent may request to evidence the Agent's Security Interest in such patent, trademark or copyright, and the general intangibles of the Obligor relating thereto or represented thereby. For the avoidance of doubt, the provisions hereof shall automatically apply to any such patent, trademark or copyright acquired after the date hereof and such patent, trademark or copyright shall automatically constitute Collateral as if such would have constituted Collateral at the time of execution hereof and be subject to the Lien and security interest created by this Agreement without further action by any party.

(c)     Except with respect to any copyright permitted to be abandoned under the Credit Agreement, the Obligor shall take all actions necessary or reasonably requested by the Agent to maintain and pursue each application, to obtain the relevant

- 17 -

registration and to maintain the registration of each material copyright, including the filing of applications for renewal.

(d)     Except with respect to any patent or trademark permitted to be abandoned under the Credit Agreement, the Obligor shall take all actions necessary or reasonably requested by the Agent to maintain and pursue each application, to obtain the relevant registration and to maintain the registration of each material patent or trademark, including the filing of applications for renewal, affidavits of use and affidavits of non-contestability and the payment of maintenance fees.

(e)     In the event that any material patents, trademarks or copyrights is infringed upon, or misappropriated, diluted or otherwise violated by a third party, the Obligor shall (i) notify the Agent promptly after the Obligor learns thereof and (ii) take such actions as the Obligor shall reasonably deem appropriate under the circumstances to protect such patent, trademark or copyright, stop the infringement and obtain damages.

(f)     Except with respect to any copyright, trademark or patent not required to be maintained or permitted to be abandoned under the Credit Agreement, the Obligor (either itself or through its permitted licensees) will not take or knowingly omit to take any action whereby any material copyright, trademark or patent could reasonably be expected to become abandoned, dedicated or invalidated or whereby the remedies in respect of such copyright, trademark or patent with respect to potential infringers could reasonably be expected to become weakened.

(g)     The Obligor (either itself or through licensee) will not knowingly do any act that uses any Intellectual Property to infringe the intellectual property rights of any other Person which would reasonably be likely to have a Material Adverse Effect.

**Section 5.5     Insurance.**

All property damage insurance maintained on any portion of the Collateral of the Obligor shall name the Agent as lender's loss payee, and all liability insurance maintained in respect of any portion of the Collateral of the Obligor shall name the Agent as an additional insured. The Obligor shall furnish the Agent with certificates of insurance evidencing compliance with the foregoing insurance provision.

## ARTICLE 6
## GENERAL

**Section 6.1     Notices.**

All notices, requests and demands to or upon the Agent or the Obligor under this Agreement shall be in writing and delivered to the addressee by prepaid private courier or sent by facsimile to the applicable address and to the attention of the officer of the addressee as follows:

- 18 -

To the Obligor:

QMax Canada Operations Inc.
11700 Katy Freeway
Suite 200
Houston, Texas 77079

Attention:     Legal Department
Fax No.:       (832) 201-8146

To the Agent:

HSBC Bank Canada, as Agent
7th Floor, 70 York Street
Toronto, Ontario M5J 1S9

Attention:     Manager Agency
Fax No.:       (647) 788-2185

Any communication transmitted by prepaid private courier shall be deemed to have been validly and effectively given or delivered on the Business Day after which it is submitted for delivery. Any communication transmitted by facsimile shall be deemed to have been validly and effectively given or delivered on the day on which it is transmitted, if transmitted on a Business Day on or before 5:00 p.m. (local time of the intended recipient), and otherwise on the next following Business Day. The Agent or the Obligor may change its respective address for service or other notices, including electronic communications, by notice given in the foregoing manner.

**Section 6.2     Discharge.**

The Security Interest will be discharged upon, but only upon, full and indefeasible payment and performance of the Secured Obligations. Upon the discharge of the Secured Obligations and at the request and expense of the Obligor, the Agent will execute and deliver to the Obligor such releases, discharges, financing statements and other documents or instruments as the Obligor may reasonably require and the Agent will promptly redeliver to the Obligor, or as the Obligor may otherwise direct the Agent, any Collateral in its possession.

If any of the Collateral shall be sold, transferred or otherwise disposed of by the Obligor in a transaction permitted by the Credit Agreement then the Agent, at the request and sole expense of the Obligor, shall promptly execute and deliver to the Obligor all releases or other documents necessary or reasonably desirable for the release of the Liens created by such Collateral.

**Section 6.3     No Merger.**

This Agreement does not operate by way of merger of any of the Secured Obligations and no judgment recovered by the Agent or any of the Secured Creditors will operate by way of merger of, or in any way affect, the Security Interest, which is in addition to, and not in substitution for, any other security now or hereafter held by the Agent and the Secured Creditors

21947633.4

- 19 -

in respect of the Secured Obligations. The representations, warranties and covenants of the Obligor in this Agreement survive the execution and delivery of this Agreement and any advances under the Credit Agreement. Notwithstanding any investigation made by or on behalf of the Agent or the Secured Creditors these covenants, representations and warranties continue in full force and effect until this Agreement shall terminate (or thereafter to the extent provided therein).

**Section 6.4    Further Assurances.**

The Obligor will do all acts and things and execute and deliver, or cause to be executed and delivered, all agreements, documents and instruments that the Agent may reasonably require and take all further steps relating to the Collateral or any other property or assets of the Obligor that the Agent may reasonably require for (i) protecting the Collateral, (ii) perfecting, preserving and protecting the Security Interest, and (iii) exercising all powers, authorities and discretions conferred upon the Collateral Agent. Whenever the Security Interest is enforceable, the Obligor will do all acts and things and execute and deliver all documents and instruments that the Collateral Agent may reasonably require for facilitating the sale or other disposition of the Collateral in connection with its realization.

**Section 6.5    Supplemental Security.**

This Agreement is in addition to, without prejudice to and supplemental to all other security now held or which may hereafter be held by the Agent or the Secured Creditors.

**Section 6.6    Successors and Assigns.**

This Agreement is binding on the Obligor and its successors and permitted assigns, and enures to the benefit of the Agent, the Secured Creditors and their respective successors and permitted assigns. This Agreement may be assigned by the Agent in accordance with the Credit Agreement and, in such event, any such assignee will be entitled to all of the rights and remedies of the Agent as set forth in this Agreement or otherwise. In any action brought by an assignee to enforce any such right or remedy, the Obligor will not assert against the assignee any claim or defence which the Obligor now has or may have against the Agent or any of the Secured Creditors. The Obligor may not assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Agent which may be unreasonably withheld.

**Section 6.7    Enforcement Expenses; Indemnification.**

(1)    The Obligor agrees to pay or reimburse each Secured Creditor and the Agent for all its costs and expenses incurred in enforcing or preserving any rights under this Agreement and the other Credit Documents to which the Obligor is a party, including, without limitation, the reasonable fees and disbursements of a single outside counsel to the Agent in each relevant jurisdiction.

(2)    The Obligor agrees to pay, and to save the Agent and the Secured Creditors harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable

- 20 -

with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement, in each case to the extent the Obligor would be required to do so pursuant to the Credit Agreement.

(3)     The Obligor agrees to pay, and to save the Agent and the Secured Creditors harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement to the extent the Obligor would be required to do so pursuant the Credit Agreement.

(4)     The agreements in this Section 6.7 shall survive repayment of the Obligations and all other amounts payable under the Credit Agreement and the other Credit Documents.

**Section 6.8     Set-Off.**

In addition to any rights and remedies of the Secured Creditors provided by law, each Secured Creditor shall have the right, without notice to the Obligor, any such notice being expressly waived by the Obligor to the extent permitted by Applicable Law, upon the Obligations becoming due and payable by the Obligor (whether at the stated maturity, by acceleration or otherwise), to apply to the payment of such Obligations, by setoff or otherwise, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Secured Creditor, any affiliate thereof or any of their respective branches or agencies to or for the credit or the account of the Obligor. Each Secured Creditor agrees promptly to notify the Obligor and the Agent after any such application made by such Secured Creditor; provided that the failure to give such notice shall not affect the validity of such application.

**Section 6.9     Severability.**

If any court of competent jurisdiction from which no appeal exists or is taken, determines any provision of this Agreement to be illegal, invalid or unenforceable, that provision will be severed from this Agreement and the remaining provisions will remain in full force and effect.

**Section 6.10     Amendment.**

This Agreement may only be amended, supplemented or otherwise modified by written agreement executed by the Agent and the Obligor.

**Section 6.11     Waivers, etc.**

(1)     No consent or waiver by the Agent or the Secured Creditors in respect of this Agreement is binding unless made in writing and signed by an authorized officer of the Agent. Any consent or waiver given under this Agreement is effective only in the specific instance and for the specific purpose for which given. No waiver of any of the provisions of this Agreement constitutes a waiver of any other provision.

- 21 -

(2)     A failure or delay on the part of the Agent or the Secured Creditors in exercising a right under this Agreement does not operate as a waiver of, or impair, any right of the Agent or the Secured Creditors however arising. A single or partial exercise of a right on the part of the Agent or the Secured Creditors does not preclude any other or further exercise of that right or the exercise of any other right by the Agent or the Secured Creditors.

**Section 6.12   Conflict.**

In the event of a direct conflict or inconsistency between the terms and provisions contained in this Agreement and the terms and provisions contained in the Credit Agreement, it is the intentions of the parties hereto that such terms and provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict or inconsistency that cannot be resolved as aforesaid, the terms and provisions of the Credit Agreement shall control and govern. In addition, to the extent that, under the Credit Agreement, the Obligor is permitted to undertake any act or granted any entitlement, the provisions of this Agreement shall be deemed to preserve such permission or entitlement notwithstanding anything to the contrary herein.

**Section 6.13   Governing Law.**

This Agreement will be governed by, interpreted and enforced in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.

**Section 6.14   Counterparts.**

This Agreement may be executed in any number of counterparts, and by the different parties hereto on separate counterpart signature pages, and all such counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile transmission or any electronic transmission shall be as effective as delivery of a manually executed counterpart hereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF** the Obligor has executed this Agreement.

**QMAX CANADA OPERATIONS INC.**

Per: _____
Name: Christopher Rivers
Title:   Director

Acknowledged and agreed as of the
date first set forth above:

**HSBC BANK CANADA,** as Agent

Per: _____
Name:  **John Schmidt**
Title:  Assistant Vice President
        Energy Financing

**Ryan Smith**
Assistant Vice President
Energy Financing

*[Signature Page to General Security Agreement* – QMax Canada Operations Inc.]

## SCHEDULE "A"

| Legal Name | Jurisdiction of Incorporation or Formation | Location of Chief Executive Office | Location of Business and Assets |
|---|---|---|---|
| QMax Canada Operations Inc. | British Columbia | c/o Q'Max Solutions Inc. 1210 585 8th Ave. SW Calgary, AB  T2P 1G1 | British Columbia Alberta |

21947633.4

THIS IS EXHIBIT " _17_ "

referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26th_

day of _May_ A.D. 20 _20_

Jonathan Tomm

Barrister and Solicitor

## SECURITIES PLEDGE AGREEMENT

This Securities Pledge Agreement is made as of May 23, 2014.

**TO:**    Name:    **HSBC BANK CANADA**, as Agent

        Address:    7th Floor, 70 York Street
                    Toronto, ON  M5J 1S9

        Attention:  Manager Agency
        Fax No.    (647) 788-2185

**RECITALS:**

A.    Pursuant to the terms of a credit agreement dated as of the date hereof among Fluid Acquisition Corp. and Q'Max America Inc. (collectively, the "**Borrowers**"), as borrowers, HSBC Bank Canada and those other financial institutions which are from time to time party thereto as lenders (collectively, the "**Lenders**") and HSBC Bank Canada, as administrative agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "**Agent**") (as amended, supplemented, restated or replaced from time to time, the "**Credit Agreement**"), the Borrowers is, or may become, indebted or liable to the Agent and the Lenders.

B.    Pursuant to a limited recourse guarantee dated as of the date hereof granted by Fluid Holding Corp. (the "**Debtor**") to the Agent, the Debtor is, or may become, indebted to the Agent, the Lenders, the Hedge Providers and the counterparties to the Banking Services Agreements (collectively, the "**Secured Creditors**").

C.    To secure the payment and performance of the Secured Liabilities, the Debtor has agreed to grant to the Agent, on behalf of the Secured Creditors, the Security Interests in respect of the Collateral in accordance with the terms of this Agreement.

For good and valuable consideration, the receipt and adequacy of which are acknowledged by the Debtor, the Debtor agrees with and in favour of the Agent, on behalf of the Secured Creditors, as follows:

1.    **Definitions**.  In this Agreement, capitalized terms used but not otherwise defined in this Agreement shall have the meanings given to them in the Credit Agreement, and the following terms have the following meanings:

"**Agent**" has the meaning set out in the recitals hereto.

"**Agreement**" means this securities pledge agreement, including the schedules and recitals to this agreement, as it or they may be amended, supplemented, restated or replaced from time to time, and the expressions "hereof", "herein", "hereto", "hereunder", "hereby" and similar expressions refer to this Agreement and not to any particular section or other portion of this Agreement.

- 2 -

"**Certificated Security**", "**Investment Property**", "**Proceeds**", "**Securities Account**", "**Securities Intermediary**" "**Security**", "**Security Certificate**", "**Security Entitlement**", and "**Uncertificated Security**" have the meanings given to them in the PPSA.

"**Collateral**" means:

    (a)     the Pledged Property;

    (b)     all certificates and instruments evidencing or representing the Pledged Property;

    (c)     all interest, dividends and distributions (whether in cash, kind or stock) received or receivable upon or in respect of any of the Pledged Property and all moneys or other property payable or paid on account of any return or repayment of capital in respect of any of the Pledged Property or otherwise distributed in respect thereof or which will in any way be charged to, or payable or paid out of, the capital of any Pledged Issuer on account of any such Pledged Property;

    (d)     all other property that may at any time be received or receivable by or otherwise distributed to the Debtor in respect of, or in substitution for, or in exchange or replacement for, any of the foregoing; and

    (e)     all Proceeds of any of the foregoing.

"**control**" means, in respect of a particular Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise. "**controlled**" has meanings correlative thereto.

"**Credit Agreement**" has the meaning set out in the recitals hereto.

"**Debtor**" has the meaning set out in the recitals hereto.

"**Event of Default**" means any "Event of Default" as defined in the Credit Agreement.

"**Issuer**" has the meaning given to that term in the STA.

"**Organizational Documents**" means, with respect to any Person, such Person's articles or other charter documents, by-laws, unanimous shareholder agreement, partnership agreement, limited partnership agreements or trust agreement, as applicable, and any and all other similar agreements, documents and instruments relative to such Person.

"**Pledged Certificated Securities**" means any and all Collateral that is a Certificated Security.

"**Pledged Property**" means all assets, property and undertaking described in Schedule A.

"**Pledged Issuer**" means, at any time, any Person which is at such time an Issuer with respect to any Pledged Securities or Pledged Security Entitlements.

- 3 -

"**Pledged Issuer's Jurisdiction**" means, with respect to any Pledged Issuer, its jurisdiction as determined under section 44 of the STA.

"**Pledged Securities**" means any and all Collateral that is a Security.

"**Pledged Securities Accounts**" means any and all Collateral that is a Securities Account.

"**Pledged Securities Intermediary**" means, at any time, any Person which is at such time is a Securities Intermediary at which a Pledged Securities Account is maintained.

"**Pledged Securities Intermediary's Jurisdiction**" means, with respect to any Securities Intermediary, its jurisdiction as determined under section 45(2) of the STA.

"**Pledged Security Certificates**" means any and all Security Certificates representing the Pledged Certificated Securities.

"**Pledged Security Entitlements**" means any and all Collateral that is a Security Entitlement.

"**Pledged Uncertificated Securities**" means any and all Collateral that is an Uncertificated Security.

"**PPSA**" means the *Personal Property Security Act* of the Province referred to in the "Governing Law" section of this Agreement, as such legislation may be amended, renamed or replaced from time to time, and includes all regulations from time to time made under such legislation.

"**Release Date**" means the date on which all the Secured Liabilities have been indefeasibly paid and discharged in full and the Secured Creditors have no further obligations to the Debtor pursuant to which further Secured Liabilities might arise and the Secured Liabilities have been unconditionally and irrevocably repaid in full.

"**Secured Creditors**" has the meaning set out in the recitals hereto.

"**Secured Liabilities**" means all present and future indebtedness, liabilities and obligations of any and every kind, nature and description (whether direct or indirect, joint or several, absolute or contingent, matured or unmatured) of the Debtor to the Secured Creditors under, in connection with or with respect to the Credit Agreement, the Loan Documents, the Hedging Agreements, the Banking Services Agreements and any unpaid balance thereof.

"**Security Interests**" means the Liens created by the Debtor in favour of the Secured Creditors under this Agreement.

"**STA**" means the *Securities Transfer Act* of the Province referred to in the "Governing Law" section of this Agreement, as such legislation may be amended, renamed or replaced from time to time, and includes all regulations from time to time made under such legislation.

2.    **Grant of Security Interests**.  As general and continuing collateral security for the due payment and performance of the Secured Liabilities, the Debtor pledges to the Agent, on

- 4 -

behalf of the Secured Creditors, and grants to the Agent, on behalf of the Secured Creditors, a security interest in, the Collateral.

3. **Attachment; No Obligation to Advance**. The Debtor confirms that value has been given by the Secured Creditors to the Debtor, that the Debtor has rights in the Collateral existing at the date of this Agreement and that the Debtor and the Secured Creditors have not agreed to postpone the time for attachment of the Security Interests to any of the Collateral. The Security Interests will have effect and be deemed to be effective whether or not the Secured Liabilities or any part thereof are owing or in existence before or after or upon the date of this Agreement. Neither the execution and delivery of this Agreement nor the provision of any financial accommodation by the Secured Creditors shall oblige the Secured Creditors to make any financial accommodation or further financial accommodation available to the Debtor or any other Person.

4. **Representations and Warranties**. The Debtor represents and warrants to the Secured Creditors that, as of the date of this Agreement:

   (a)   Debtor Information. All of the information set out in Schedule B is accurate and complete.

   (b)   Consents. Except for any consent that has been obtained and is in full force and effect, no consent of any Person is required, or is purported to be required, for the execution, delivery, performance and enforcement of this Agreement. For the purposes of complying with any transfer restrictions contained in the Organizational Documents of any Pledged Issuer, the Debtor hereby irrevocably consents to any transfer of the Pledged Securities of such Pledged Issuer.

   (c)   Due Authorization. The Pledged Securities have been duly authorized and validly issued and are fully paid and non-assessable.

   (d)   Warrants, Options, etc. There are no outstanding warrants, options or other rights to purchase, or other agreements outstanding with respect to, or property that is now or hereafter convertible into, or that requires the issuance or sale of, any Pledged Securities.

   (e)   No Required Disposition. There is no existing agreement, option, right or privilege capable of becoming an agreement or option pursuant to which the Debtor would be required to sell or otherwise dispose of any Pledged Securities or under which any Pledged Issuer thereof has any obligation to issue any Securities of such Pledged Issuer to any Person, except as may be required under that certain Employment Agreement with Christopher I. Rivers dated as of the date hereof.

5. **Survival of Representations and Warranties**. All representations and warranties made by the Debtor in this Agreement: (a) are material; (b) will be considered to have been relied on by the Secured Creditors; and (c) will survive the execution and delivery of this Agreement or any investigation made at any time by or on behalf of the Secured

- 5 -

Creditors and any disposition or payment of the Secured Liabilities until the Release Date.

6. **Covenants**.  The Debtor covenants and agrees with the Secured Creditors that:

(a) Further Documentation.  The Debtor will from time to time, at the expense of the Debtor, promptly and duly authorize, execute and deliver such further instruments and documents, and take such further action, as the Agent may reasonably request for the purpose of obtaining or preserving the full benefits of, and the rights and powers granted by, this Agreement (including the filing of any financing statements or financing change statements under any Applicable Laws with respect to the Security Interests).  The Debtor acknowledges that this Agreement has been prepared based on the existing Laws in the Province of Alberta and that a change in such Laws, or the Laws of other jurisdictions, may require the execution and delivery of different forms of security documentation. Accordingly, the Debtor agrees that the Agent will have the right to require that this Agreement be amended, supplemented, restated  or replaced, and that the Debtor will promptly on request by the Agent authorize, execute and deliver any such amendment, supplement, restatement or replacement: (i) to reflect any changes in such Laws, whether arising as a result of statutory amendments, court decisions or otherwise; (ii) to facilitate the creation and registration of appropriate security in all appropriate jurisdictions; or (iii) if the Debtor merges or amalgamates with any other Person or enters into any corporate reorganization, in each case in order to confer on the Secured Creditors Liens similar to, and having the same effect as, the Security Interests.

(b) Pledged Certificated Securities.  The Debtor will deliver to the Agent any and all Pledged Security Certificates and other materials as may be required from time to time to provide the Agent with control over all Pledged Certificated Securities in the manner provided under section 23 of the STA.  At the request of the Agent at any time after the occurrence and during the continuance of an Event of Default, the Debtor will cause all Pledged Security Certificates to be registered in the name of the Agent or its nominee.

(c) Pledged Uncertificated Securities.  The Debtor will deliver to the Agent any and all such documents, agreements and other materials as may be required from time to time to provide the Agent with control over all Pledged Uncertificated Securities in the manner provided under section 24 of the STA.

(d) Pledged Security Entitlements.  The Debtor will deliver to the Agent any and all such documents, agreements and other materials as may be required from time to time to provide the Agent with control over all Pledged Security Entitlements in the manner provided under section 25 or 26 of the STA.

(e) Transfer Restrictions.  If the constating documents of any Pledged Issuer restrict the transfer of the Securities of such Pledged Issuer, then the Debtor will deliver

- 6 -

to the Agent a certified copy of a resolution of the directors, shareholders, unitholders or partners of such Pledged Issuer, as applicable, consenting to the transfer(s) contemplated by this Agreement, including any prospective transfer of the Collateral by the Agent upon a realization on the Security Interests.

(f)     Notices. The Debtor will advise the Agent promptly, in reasonable detail, of any:

(i)      acquisition after the date of this Agreement of any right, title or interest in any Pledged Property, together with all applicable information set out in Schedule B with respect thereto;

(ii)     change to a Pledged Securities Intermediary's Jurisdiction or Pledged Issuer's Jurisdiction;

(iii)    change in the location of the jurisdiction of incorporation or amalgamation, chief executive office, or domicile of the Debtor;

(iv)    change in the name of the Debtor;

(v)     any merger, consolidation or amalgamation of the Debtor with any other Person;

(vi)    Lien (other than Permitted Liens) on, or material claim asserted against, any of the Collateral; or

(vii)   occurrence of any event, claim or occurrence that could reasonably be expected to have a material adverse effect on the value of the Collateral or on the Security Interests.

The Debtor will not effect or permit any of the changes referred to in clauses (ii) through (v) above unless all filings have been made and all other actions taken that are reasonably required in order for the Agent to continue at all times following such change to have a valid and perfected first priority Security Interest in respect of all of the Collateral.

7.     **Voting Rights**. Unless an Event of Default has occurred and is continuing, the Debtor will be entitled to exercise all voting power from time to time exercisable in respect of the Pledged Securities and Pledged Security Entitlements and give consents, waivers and ratifications in respect thereof; provided, however, that no vote will be cast or consent, waiver or ratification  given or action taken which would be, or would have a reasonably likelihood of being, materially prejudicial to the interests of the Secured Creditors or imposing any material restriction on the transferability of any of the Collateral.  Unless an Event of Default has occurred and is continuing the Agent shall, from time to time at the request and expense of the Debtor, execute or cause to be executed, in respect of all Pledged Securities that are registered in the name of the Agent or its nominee, valid proxies appointing the Debtor as its (or its nominee's) proxy to attend, vote and act for and on behalf of the Agent or such nominee, as the case may be, at any and all meetings

- 7 -

of the applicable Pledged Issuer's shareholders or debt holders, all Pledged Securities that are registered in the name of the Agent or such nominee, as the case may be, and to execute and deliver, consent to or approve or disapprove of or withhold consent to any resolutions in writing of shareholders or debt holders of the applicable Pledged Issuer for and on behalf of the Agent or such nominee, as the case may be. Immediately upon the occurrence and during the continuance of any Event of Default, all such rights of the Debtor to vote and give consents, waivers and ratifications will cease and the Agent or its nominee will be entitled to exercise all such voting rights and to give all such consents, waivers and ratifications.

8.   **Dividends; Interest**.  Unless an Event of Default has occurred and is continuing, the Debtor will be entitled to receive any and all cash dividends, partnership distributions interest, principal payments and other forms of cash distribution on the Pledged Securities or Pledged Security Entitlements which it is otherwise entitled to receive, but any and all stock and/or liquidating dividends, distributions of property (other than cash partnership distributions), returns of capital or other distributions made on or in respect of the Pledged Securities or Pledged Security Entitlements, whether resulting from a subdivision, combination or reclassification of the outstanding capital stock of any Pledged Issuer or received in exchange for the Pledged Securities, Pledged Security Entitlements or any part thereof or as a result of any amalgamation, merger, consolidation, acquisition or other exchange of property to which any Pledged Issuer may be a party or otherwise, and any and all cash and other property received in exchange for any Pledged Securities or Pledged Security Entitlements will be and become part of the Collateral subject to the Security Interests. If any Pledged Security Certificates are received by the Debtor, they will forthwith be delivered to the Agent or its nominee (accompanied, if appropriate, by proper instruments of assignment and/or stock powers of attorney executed by the Debtor in accordance with the Agent's instructions) to be held subject to the terms of this Agreement; and if any of the Pledged Security Certificates have been registered in the name of the Agent or its nominee, the Agent will execute and deliver (or cause to be executed and delivered) to the Debtor all such dividend orders and other instruments as the Debtor may request for the purpose of enabling the Debtor to receive the dividends, distributions or other payments which the Debtor is authorized to receive and retain pursuant to this Section. If an Event of Default has occurred and is continuing, all rights of the Debtor pursuant to this Section will cease and the Agent will have the sole and exclusive right and authority to receive and retain the cash dividends, interest, principal payments and other forms of cash distribution which the Debtor would otherwise be authorized to retain pursuant to this Section. Any money and other property paid over to or received by the Agent pursuant to the provisions of this Section will be retained by the Agent (on behalf of the Secured Creditors) as additional Collateral hereunder and be applied in accordance with the provisions of this Agreement.

9.   **Rights on Event of Default**. If an Event of Default has occurred and is continuing, then and in every such case the Security Interests shall become enforceable and the Agent, in addition to any rights now or hereafter existing under Applicable Laws may, personally or by agent, at such time or times as the Agent in its discretion may, subject to the

- 8 -

Applicable Laws to the extent required thereby, determine, do any one or more of the following:

(a) <u>Rights under PPSA, etc</u>.  Exercise all of the rights and remedies granted to secured parties under the PPSA and any other applicable statute, or otherwise available to the Secured Creditors by contract, at law or in equity.

(b) <u>Dispose of Collateral</u>.  Realize on any or all of the Collateral and sell, lease, assign, give options to purchase, or otherwise dispose of and deliver any or all of the Collateral (or contract to do any of the above), in one or more parcels at any public or private sale, at any exchange, broker's board or office of the Agent or elsewhere, with or without advertising or other formality, except as required by Applicable Laws, on such terms and conditions as the Agent may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery.

(c) <u>Court-Approved Disposition of Collateral</u>.  Obtain from any court of competent jurisdiction an order for the sale or foreclosure of any or all of the Collateral.

(d) <u>Purchase by Secured Creditor</u>.  At any public sale, and to the extent permitted by Law on any private sale, bid for and purchase any or all of the Collateral offered for sale and, upon compliance with the terms of such sale, hold, retain, sell or otherwise dispose of such Collateral without any further accountability to the Debtor or any other Person with respect to such holding, retention, sale or other disposition, except as required by Applicable Laws.  In any such sale to a Secured Creditor, such Secured Creditor may, for the purpose of making payment for all or any part of the Collateral so purchased, use any claim for any or all of the Secured Liabilities then due and payable to it as a credit against the purchase price.

(e) <u>Transfer of Collateral</u>.  Transfer any Collateral that is Investment Property into the name of the Agent or its nominee.

(f) <u>Voting</u>.  Vote any or all of the Pledged Securities (whether or not transferred to the Agent or its nominee) and Pledged Security Entitlements and give or withhold all consents, waivers and ratifications in respect thereof and otherwise act with respect thereto as though it were the outright owner thereof.

(g) <u>Exercise Other Rights</u>.  Exercise any and all rights, privileges, entitlements and options pertaining to any Collateral that is Investment Property as if the Agent were the absolute owner of such Investment Property.

The Agent may exercise any or all of the foregoing rights and remedies without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except as required by Applicable Laws) to or on the Debtor or any other Person, and the Debtor hereby waives each such demand, presentment, protest, advertisement and notice to the extent permitted by Applicable Laws.  None of the above rights or remedies will be exclusive of or dependent on or merge in any other right or remedy, and one or

- 9 -

more of such rights and remedies may be exercised independently or in combination from time to time. The Debtor acknowledges and agrees that any action taken by the Agent hereunder following the occurrence and during the continuance of an Event of Default shall not be rendered invalid or ineffective as a result of the subsequent curing of the Event of Default on which such action was based.

10. **Realization Standards**. To the extent that Applicable Law imposes duties on the Secured Creditors to exercise remedies in a commercially reasonable manner and without prejudice to the ability of the Secured Creditors to dispose of the Collateral in any such manner, the Debtor acknowledges and agrees that it is not commercially unreasonable for the Secured Creditors to (or not to): (a) to the extent deemed appropriate by the Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Secured Creditors in the collection or disposition of any of the Collateral; (b) dispose of Collateral in whole or in part; (c) dispose of Collateral to a customer of a Secured Creditor; and (d) establish an upset or reserve bid price in respect of Collateral.

11. **Securities Laws**. The Agent is authorized, in connection with any offer or sale of any Pledged Securities or Pledged Security Entitlements, to comply with any limitation or restriction as it may be advised by counsel is necessary to comply with Applicable Law, including compliance with procedures that may restrict the number of prospective bidders and purchasers, requiring that prospective bidders and purchasers have certain qualifications, and restricting prospective bidders and purchasers to Persons who will represent and agree that they are purchasing for their own account or investment and not with a view to the distribution or resale of such Securities. In addition to and without limiting Section 10, the Debtor further agrees that compliance with any such limitation or restriction will not result in a sale being considered or deemed not to have been made in a commercially reasonable manner, and the Secured Creditors will not be liable or accountable to the Debtor for any discount allowed by reason of the fact that such Pledged Securities or Pledged Security Entitlements are sold in compliance with any such limitation or restriction. If the Agent chooses to exercise its right to sell any or all Pledged Securities or Pledged Security Entitlements, upon written request, the Debtor will cause each applicable Pledged Issuer to furnish to the Agent all such information as the Agent may request in order to determine the number of shares and other instruments included in the Collateral which may be sold by the Agent in exempt transactions under any Laws governing securities, and the rules and regulations of any applicable securities regulatory body thereunder, as the same are from time to time in effect.

12. **Application of Proceeds**. All Proceeds of Collateral received by the Agent may be applied to discharge or satisfy any expenses (including expenses of enforcing the Secured Creditors' rights under this Agreement), Liens on the Collateral in favour of Persons other than the Secured Creditors, borrowings, taxes and other outgoings affecting the Collateral or which are considered advisable by the Agent to protect, preserve, repair, process, maintain or enhance the Collateral or prepare it for sale or other disposition, or to keep in good standing any Liens on the Collateral ranking in priority to any of the Security Interests, or to sell or otherwise dispose of the Collateral. The balance of such

- 10 -

Proceeds may, at the sole discretion of the Agent, be held as collateral security for the Secured Liabilities or be applied to such of the Secured Liabilities (whether or not the same are due and payable) in such manner and at such times as the Agent considers appropriate and thereafter will be accounted for as required by Law.

13. **Agent's Appointment as Attorney in Fact**.  Effective upon the occurrence and during the continuance of an Event of Default, the Debtor constitutes and appoints the Agent and any officer or agent of the Agent, with full power of substitution, as the Debtor's true and lawful attorney in fact with full power and authority in the place of the Debtor and in the name of the Debtor or in its own name, from time to time in the Agent's discretion, to take any and all appropriate action and to execute any and all documents and instruments as, in the opinion of such attorney, may be necessary or desirable to accomplish the purposes of this Agreement.  Without limiting the effect of this Section, the Debtor grants the Agent an irrevocable proxy to vote the Pledged Securities and Pledged Security Entitlements and to exercise all other rights, powers, privileges and remedies to which a holder thereof would be entitled (including giving or withholding written consents of shareholders, calling special meetings of shareholders and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Securities or Pledged Security Entitlements on the books and records of a Pledged Issuer or Pledged Securities Intermediary, as applicable, upon the occurrence of an Event of Default.  These powers are coupled with an interest and are irrevocable until the Release Date.  Nothing in this Section affects the right of the Agent as secured party or any other Person on any Secured Creditor's behalf, to sign and file or deliver (as applicable) all such financing statements, financing change statements, notices, verification statements and other documents relating to the Collateral and this Agreement as the Agent or such other Person considers appropriate.  The Debtor hereby ratifies and confirms, and agrees to ratify and confirm, whatever lawful acts the Agent or any of the Agent's sub-agents, nominees or attorneys do or purport to do in exercise of the power of attorney granted to the Agent pursuant to this Section.

14. **Performance by Secured Creditors of Debtor's Obligations**.  If the Debtor fails to perform or comply with any of the obligations of the Debtor under this Agreement, the Secured Creditors may, but need not, perform or otherwise cause the performance or compliance of such obligation, provided that such performance or compliance will not constitute a waiver, remedy or satisfaction of such failure.  The expenses of the Secured Creditors incurred in connection with any such performance or compliance will be payable by the Debtor to the Agent immediately on demand, and until paid, any such expenses will form part of the Secured Liabilities and will be secured by the Security Interests.

15. **Severability**.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and will be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

- 11 -

16.    **Rights of Secured Creditors; Limitations on Secured Creditors' Obligations.**

(a)    <u>Limitations on Secured Creditors' Liability</u>.  No Secured Creditor will be liable to the Debtor or any other Person for any failure or delay in exercising any of the rights of the Debtor under this Agreement (including any failure to take possession of, collect, sell, lease or otherwise dispose of any Collateral, or to preserve rights against prior parties).  No Secured Creditor nor any agent of any Secured Creditor (including, any sheriff) is required to take, or will have any liability for any failure to take or delay in taking, any steps necessary or advisable to preserve rights against other Persons under any Collateral in its possession.  No Secured Creditor nor any agent of any Secured Creditor will be liable for any, and the Debtor will bear the full risk of all, loss or damage to any and all of the Collateral (including any Collateral in the possession of any Secured Creditor or any agent thereof) caused for any reason other than the gross negligence or wilful misconduct of a Secured Creditor or such agent of such Secured Creditor.

(b)    <u>Use of Agents</u>.  The Agent may perform any of its rights or duties under this Agreement by or through agents.

17.    **Dealings by Secured Creditors.**  No Secured Creditor will be obliged to exhaust its recourse against the Debtor or any other Person or against any other security it may hold in respect of the Secured Liabilities or any part thereof before realizing upon or otherwise dealing with the Collateral in such manner as the Agent may consider desirable.  The Secured Creditors may grant extensions of time and other indulgences, take and give up security, accept compositions, grant releases and discharges and otherwise deal with the Debtor and any other Person, and with any or all of the Collateral, and with other security and sureties, as the Agent may see fit, all without prejudice to the Secured Liabilities or to the rights and remedies of the Secured Creditors under this Agreement.  The powers conferred on the Agent under this Agreement are solely to protect the interests of the Secured Creditors in the Collateral and will not impose any duty upon any Secured Creditor to exercise any such powers.

18.    **Communication**.  Any notice or other communication required or permitted to be given under this Agreement will be made in accordance with the terms of the Credit Agreement.

19.    **Release of Information**.  The Debtor authorizes the Agent to provide a copy of this Agreement and such other information as may be requested of the Agent: (a) to the extent necessary to enforce the Agent's rights, remedies and entitlements under this Agreement; (b) to any permitted assignee or prospective assignee of all or any part of the Secured Liabilities; and (c) as required by Applicable Laws.

20.    **Expenses; Indemnity; Waiver.**

(a)    The Debtor shall pay: (i) all reasonable out-of-pocket expenses incurred by the Agent, including the reasonable fees, charges and disbursements of counsel for

- 12 -

the Agent and all applicable taxes, in connection with the preparation and administration of this Agreement; (ii) all reasonable out-of-pocket expenses incurred by the Agent, including the reasonable fees, charges and disbursements of counsel for the Agent and applicable taxes, in connection with any amendments, modifications or waivers of the provisions hereof; and (iii) all out-of-pocket expenses incurred by the Agent, including the fees, charges and disbursements of any counsel for the Secured Creditors and all applicable taxes, in connection with the assessment, enforcement or protection of their rights in connection with this Agreement, including its rights under this Section, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Secured Liabilities.

(b)     The Debtor shall indemnify the Secured Creditors against, and hold each Secured Creditor harmless from, any and all losses, claims, cost recovery actions, damages, expenses and liabilities of whatsoever nature or kind and all reasonable out-of-pocket expenses and all applicable taxes to which the applicable Secured Creditor may become subject arising out of or in connection with: (i) the execution or delivery of this Agreement and the performance by the Debtor of its obligations hereunder; (ii) any actual or prospective claim, litigation, investigation or proceeding relating to this Agreement or the Secured Liabilities, whether based on contract, tort or any other theory and regardless of whether the applicable Secured Creditor is a party thereto; (iii) any other aspect of this Agreement; or (iv) the enforcement of the Secured Creditors' rights hereunder and any related investigation, defence, preparation of defence, litigation and enquiries; provided that such indemnity shall not, as to any Secured Creditor, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence (it being acknowledged that ordinary negligence does not necessarily constitute gross negligence) or wilful misconduct of or material breach of this Agreement by such Secured Creditor.

(c)     The Debtor shall not assert, and hereby waives (to the fullest extent permitted by Applicable Laws): (i) any claim against any Secured Creditor (or any director, officer or employee thereof), on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement; and (ii) all of the rights, benefits and protections given by any present or future statute that imposes limitations on the rights, powers or remedies of a secured party or on the methods of, or procedures for, realization of security, including any "seize or sue" or "anti-deficiency" statute or any similar provision of any other statute.

(d)     All amounts due under this Section shall be payable not later than thirty (30) days after written demand therefor.

(e)     The indemnifications set out in this Section will survive the Release Date and the release or extinguishment of the Security Interests.

- 13 -

21. **Release of Debtor**.  Upon the written request of the Debtor given at any time on or after the Release Date, the Agent shall at the expense of the Debtor, promptly release the Debtor and the Collateral from the Security Interests.  Upon such release, and at the request and expense of the Debtor, the Agent shall promptly execute and deliver to the Debtor such releases and discharges as the Debtor may reasonably request.

22. **Additional Security**.  This Agreement is in addition to, and not in substitution of, any and all other security previously or concurrently delivered by the Debtor or any other Person to the Secured Creditors, all of which other security shall remain in full force and effect.

23. **Alteration or Waiver**.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the Agent.  The Agent will not, by any act or delay, be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default or in any breach of any of the terms and conditions hereof.  No failure to exercise, nor any delay in exercising, on the part of the Agent, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder will preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by the Agent of any right or remedy hereunder on any one occasion will not be construed as a bar to any right or remedy which the Agent would otherwise have on any future occasion.  Neither the taking of any judgment nor the exercise of any power of seizure or sale will extinguish the liability of the Debtor to pay the Secured Liabilities, nor will the same operate as a merger of any covenant contained in this Agreement or of any other liability, nor will the acceptance of any payment or other security constitute or create any novation.

24. **Amalgamation**.  The Debtor acknowledges that if it amalgamates or merges with any other corporation or corporations, then: (a) the Collateral and the Security Interests will extend to and include all the property and assets of the successor corporation and to any property or assets of the successor corporation thereafter owned or acquired; (b) the term "Debtor", where used in this Agreement, will extend to and include the successor corporation; and (c) the term "Secured Liabilities", where used in this Agreement, will extend to and include the Secured Liabilities of the successor corporation.

25. **Governing Law; Attornment**.  This Agreement will be governed by and construed in accordance with the Laws of the Province of Alberta.  Without prejudice to the ability of the Secured Creditors to enforce this Agreement in any other proper jurisdiction, the Debtor irrevocably submits and attorns to the non-exclusive jurisdiction of the courts of such province.  To the extent permitted by Applicable Laws, the Debtor irrevocably waives any objection (including any claim of inconvenient forum) that it may now or hereafter have to the venue of any legal proceeding arising out of or relating to this Agreement in the courts of such Province.

26. **Interpretation**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall

- 14 -

include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". The word "or" is disjunctive; the word "and" is conjunctive. The word "shall" is mandatory; the word "may" is permissive. Unless the context requires otherwise: (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set out herein); (b) any reference herein to any statute or any section thereof shall, unless otherwise expressly stated, be deemed to be a reference to such statute or section as amended, restated or re-enacted from time to time; (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns; (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof; and (e) all references herein to Sections and Schedules shall be construed to refer to Sections and Schedules to, this Agreement, Section headings are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement. Any reference in this Agreement to a Permitted Lien is not intended to subordinate or postpone, and shall not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Security Interest to any Permitted Lien.

27. **Successors and Assigns**. This Agreement will enure to the benefit of, and be binding on, the Debtor and its successors and permitted assigns, and will enure to the benefit of, and be binding on, the Secured Creditors and their successors and assigns. The Debtor may not assign this Agreement or any of its rights or obligations under this Agreement. The Agent may assign this Agreement and any of its rights and obligations hereunder to any Person that replaces it in its capacity as such.

28. **Acknowledgment of Receipt/Waiver**. The Debtor acknowledges receipt of an executed copy of this Agreement and, to the extent permitted by Applicable Laws, waives the right to receive a copy of any financing statement or financing change statement registered in connection with this Agreement or any verification statement issued in respect of any such financing statement or financing change statement.

29. **Paramountcy**. If a conflict or inconsistency exists in or between a provision of this Agreement and a provision of the Credit Agreement or any part thereof, the provisions of the Credit Agreement shall prevail to the extent necessary to resolve such conflict or inconsistency.

30. **Electronic Signature**. Delivery of an executed signature page to this Agreement by the Debtor by facsimile, pdf or other electronic form of transmission shall be as effective as delivery by the Debtor of a manually executed copy of this Agreement by the Debtor.

*[Remainder of page intentionally left blank]*

17101021.2

**IN WITNESS WHEREOF** the undersigned has caused this Agreement to be duly executed as of the date first written above.

**FLUID HOLDING CORP.**

Per: _____

Name: Mark Roberts

Title:   Authorized Signatory

**SCHEDULE A**

**PLEDGED PROPERTY**

A.  The Securities Accounts described in Schedule B and all Securities Entitlements carried therein from time to time.

B.  All Securities and Security Entitlements of Fluid Acquisition Corp. (or any of its successors, including, for certainty, by way of amalgamation) in which the Debtor now or in the future has any right, title or interest whatsoever.

## SCHEDULE B

### DEBTOR & PLEDGED PROPERTY INFORMATION

**Full legal name:** Fluid Holding Corp.

**Jurisdiction of incorporation or organization:** British Columbia

**Address of chief executive office:**  Fluid Holding Corp.
P.O. BOX 10424 Pacific Centre
1300 – 777 Dunsmuir Street
Vancouver BC V7Y 1K2
Canada

**Pledged Uncertificated Securities:** Nil

**Pledged Securities Accounts:** Nil

**Pledged Certificated Securities:** See below

| Pledged Issuer | Securities Owned | % of issued and outstanding Securities of Pledged Issuer as of the date hereof | Security Certificate Numbers | Security Certificate Location |
|---|---|---|---|---|
| Fluid Acquisition Corp. | 1,658,600 | 100 | 2, 3 | Alberta |

THIS IS EXHIBIT " _18_ "

referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26th_

day of _May_ A.D. 20 _20_

Jonathan Tomm
Barrister and Solicitor

## SECURITIES PLEDGE AGREEMENT

This Securities Pledge Agreement is made as of May 23, 2014.

**TO:**   Name:      **HSBC BANK CANADA**, as Agent

   Address:   7th Floor, 70 York Street
   Toronto, ON  M5J 1S9

   Attention:  Manager Agency
   Fax No.    (647) 788-2185

**RECITALS:**

A.   Pursuant to the terms of a credit agreement dated as of the date hereof among Fluid Acquisition Corp. and Q'Max America Inc. (collectively, the "**Borrowers**"), as borrowers, HSBC Bank Canada and those other financial institutions which are from time to time party thereto as lenders (collectively, the "**Lenders**") and HSBC Bank Canada, as administrative agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "**Agent**") (as amended, supplemented, restated or replaced from time to time, the "**Credit Agreement**"), the Borrowers is, or may become, indebted or liable to the Agent and the Lenders.

B.   Pursuant to a guarantee dated as of the date hereof granted by Q'Max Solutions Inc. (the "**Debtor**") to the Agent, the Debtor is, or may become, indebted to the Agent, the Lenders, the Hedge Providers and the counterparties to the Banking Services Agreements (collectively, the "**Secured Creditors**").

C.   To secure the payment and performance of the Secured Liabilities, the Debtor has agreed to grant to the Agent, on behalf of the Secured Creditors, the Security Interests in respect of the Collateral in accordance with the terms of this Agreement.

   For good and valuable consideration, the receipt and adequacy of which are acknowledged by the Debtor, the Debtor agrees with and in favour of the Agent, on behalf of the Secured Creditors, as follows:

1.   **Definitions**.  In this Agreement, capitalized terms used but not otherwise defined in this Agreement shall have the meanings given to them in the Credit Agreement, and the following terms have the following meanings:

"**Agent**" has the meaning set out in the recitals hereto.

"**Agreement**" means this securities pledge agreement, including the schedules and recitals to this agreement, as it or they may be amended, supplemented, restated or replaced from time to time, and the expressions "hereof", "herein", "hereto", "hereunder", "hereby" and similar expressions refer to this Agreement and not to any particular section or other portion of this Agreement.

- 2 -

"**Certificated Security**", "**Investment Property**", "**Proceeds**", "**Securities Account**", "**Securities Intermediary**" "**Security**", "**Security Certificate**", "**Security Entitlement**", and "**Uncertificated Security**" have the meanings given to them in the PPSA.

"**Collateral**" means:

   (a)   the Pledged Property;

   (b)   all certificates and instruments evidencing or representing the Pledged Property;

   (c)   all interest, dividends and distributions (whether in cash, kind or stock) received or receivable upon or in respect of any of the Pledged Property and all moneys or other property payable or paid on account of any return or repayment of capital in respect of any of the Pledged Property or otherwise distributed in respect thereof or which will in any way be charged to, or payable or paid out of, the capital of any Pledged Issuer on account of any such Pledged Property;

   (d)   all other property that may at any time be received or receivable by or otherwise distributed to the Debtor in respect of, or in substitution for, or in exchange or replacement for, any of the foregoing; and

   (e)   all Proceeds of any of the foregoing.

"**control**" means, in respect of a particular Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise. "**controlled**" has meanings correlative thereto.

"**Credit Agreement**" has the meaning set out in the recitals hereto.

"**Debtor**" has the meaning set out in the recitals hereto.

"**Event of Default**" means any "Event of Default" as defined in the Credit Agreement.

"**Issuer**" has the meaning given to that term in the STA.

"**Organizational Documents**" means, with respect to any Person, such Person's articles or other charter documents, by-laws, unanimous shareholder agreement, partnership agreement, limited partnership agreements or trust agreement, as applicable, and any and all other similar agreements, documents and instruments relative to such Person.

"**Pledged Certificated Securities**" means any and all Collateral that is a Certificated Security.

"**Pledged Property**" means all assets, property and undertaking described in Schedule A.

"**Pledged Issuer**" means, at any time, any Person which is at such time an Issuer with respect to any Pledged Securities or Pledged Security Entitlements.

- 3 -

"**Pledged Issuer's Jurisdiction**" means, with respect to any Pledged Issuer, its jurisdiction as determined under section 44 of the STA.

"**Pledged Securities**" means any and all Collateral that is a Security.

"**Pledged Securities Accounts**" means any and all Collateral that is a Securities Account.

"**Pledged Securities Intermediary**" means, at any time, any Person which is at such time is a Securities Intermediary at which a Pledged Securities Account is maintained.

"**Pledged Securities Intermediary's Jurisdiction**" means, with respect to any Securities Intermediary, its jurisdiction as determined under section 45(2) of the STA.

"**Pledged Security Certificates**" means any and all Security Certificates representing the Pledged Certificated Securities.

"**Pledged Security Entitlements**" means any and all Collateral that is a Security Entitlement.

"**Pledged Uncertificated Securities**" means any and all Collateral that is an Uncertificated Security.

"**PPSA**" means the *Personal Property Security Act* of the Province referred to in the "Governing Law" section of this Agreement, as such legislation may be amended, renamed or replaced from time to time, and includes all regulations from time to time made under such legislation.

"**Release Date**" means the date on which all the Secured Liabilities have been indefeasibly paid and discharged in full and the Secured Creditors have no further obligations to the Debtor pursuant to which further Secured Liabilities might arise and the Secured Liabilities have been unconditionally and irrevocably repaid in full.

"**Secured Creditors**" has the meaning set out in the recitals hereto.

"**Secured Liabilities**" means all present and future indebtedness, liabilities and obligations of any and every kind, nature and description (whether direct or indirect, joint or several, absolute or contingent, matured or unmatured) of the Debtor to the Secured Creditors under, in connection with or with respect to the Credit Agreement, the Loan Documents, the Hedging Agreements, the Banking Services Agreements and any unpaid balance thereof.

"**Security Interests**" means the Liens created by the Debtor in favour of the Secured Creditors under this Agreement.

"**STA**" means the *Securities Transfer Act* of the Province referred to in the "Governing Law" section of this Agreement, as such legislation may be amended, renamed or replaced from time to time, and includes all regulations from time to time made under such legislation.

2.  **Grant of Security Interests**.  As general and continuing collateral security for the due payment and performance of the Secured Liabilities, the Debtor pledges to the Agent, on

- 4 -

behalf of the Secured Creditors, and grants to the Agent, on behalf of the Secured Creditors, a security interest in, the Collateral.

3.   **Attachment; No Obligation to Advance**.  The Debtor confirms that value has been given by the Secured Creditors to the Debtor, that the Debtor has rights in the Collateral existing at the date of this Agreement and that the Debtor and the Secured Creditors have not agreed to postpone the time for attachment of the Security Interests to any of the Collateral. The Security Interests will have effect and be deemed to be effective whether or not the Secured Liabilities or any part thereof are owing or in existence before or after or upon the date of this Agreement. Neither the execution and delivery of this Agreement nor the provision of any financial accommodation by the Secured Creditors shall oblige the Secured Creditors to make any financial accommodation or further financial accommodation available to the Debtor or any other Person.

4.   **Representations and Warranties**.  The Debtor represents and warrants to the Secured Creditors that, as of the date of this Agreement:

   (a)   Debtor Information.  All of the information set out in Schedule B is accurate and complete.

   (b)   Consents.  Except for any consent that has been obtained and is in full force and effect, no consent of any Person is required, or is purported to be required, for the execution, delivery, performance and enforcement of this Agreement. For the purposes of complying with any transfer restrictions contained in the Organizational Documents of any Pledged Issuer, the Debtor hereby irrevocably consents to any transfer of the Pledged Securities of such Pledged Issuer.

   (c)   Due Authorization.  The Pledged Securities have been duly authorized and validly issued and are fully paid and non-assessable.

   (d)   Warrants, Options, etc.  There are no outstanding warrants, options or other rights to purchase, or other agreements outstanding with respect to, or property that is now or hereafter convertible into, or that requires the issuance or sale of, any Pledged Securities.

   (e)   No Required Disposition.  There is no existing agreement, option, right or privilege capable of becoming an agreement or option pursuant to which the Debtor would be required to sell or otherwise dispose of any Pledged Securities or under which any Pledged Issuer thereof has any obligation to issue any Securities of such Pledged Issuer to any Person.

5.   **Survival of Representations and Warranties**.  All representations and warranties made by the Debtor in this Agreement: (a) are material; (b) will be considered to have been relied on by the Secured Creditors; and (c) will survive the execution and delivery of this Agreement or any investigation made at any time by or on behalf of the Secured Creditors and any disposition or payment of the Secured Liabilities until the Release Date.

- 5 -

6. **Covenants**. The Debtor covenants and agrees with the Secured Creditors that:

(a) Further Documentation.  The Debtor will from time to time, at the expense of the Debtor, promptly and duly authorize, execute and deliver such further instruments and documents, and take such further action, as the Agent may reasonably request for the purpose of obtaining or preserving the full benefits of, and the rights and powers granted by, this Agreement (including the filing of any financing statements or financing change statements under any Applicable Laws with respect to the Security Interests).  The Debtor acknowledges that this Agreement has been prepared based on the existing Laws in the Province of Alberta and that a change in such Laws, or the Laws of other jurisdictions, may require the execution and delivery of different forms of security documentation. Accordingly, the Debtor agrees that the Agent will have the right to require that this Agreement be amended, supplemented, restated or replaced, and that the Debtor will promptly on request by the Agent authorize, execute and deliver any such amendment, supplement, restatement or replacement: (i) to reflect any changes in such Laws, whether arising as a result of statutory amendments, court decisions or otherwise; (ii) to facilitate the creation and registration of appropriate security in all appropriate jurisdictions; or (iii) if the Debtor merges or amalgamates with any other Person or enters into any corporate reorganization, in each case in order to confer on the Secured Creditors Liens similar to, and having the same effect as, the Security Interests.

(b) Pledged Certificated Securities.  The Debtor will deliver to the Agent any and all Pledged Security Certificates and other materials as may be required from time to time to provide the Agent with control over all Pledged Certificated Securities in the manner provided under section 23 of the STA.  At the request of the Agent at any time after the occurrence and during the continuance of an Event of Default, the Debtor will cause all Pledged Security Certificates to be registered in the name of the Agent or its nominee.

(c) Pledged Uncertificated Securities.  The Debtor will deliver to the Agent any and all such documents, agreements and other materials as may be required from time to time to provide the Agent with control over all Pledged Uncertificated Securities in the manner provided under section 24 of the STA.

(d) Pledged Security Entitlements.  The Debtor will deliver to the Agent any and all such documents, agreements and other materials as may be required from time to time to provide the Agent with control over all Pledged Security Entitlements in the manner provided under section 25 or 26 of the STA.

(e) Transfer Restrictions.  If the constating documents of any Pledged Issuer restrict the transfer of the Securities of such Pledged Issuer, then the Debtor will deliver to the Agent a certified copy of a resolution of the directors, shareholders, unitholders or partners of such Pledged Issuer, as applicable, consenting to the

- 6 -

transfer(s) contemplated by this Agreement, including any prospective transfer of the Collateral by the Agent upon a realization on the Security Interests.

(f) <u>Notices</u>. The Debtor will advise the Agent promptly, in reasonable detail, of any:

    (i) acquisition after the date of this Agreement of any right, title or interest in any Pledged Property, together with all applicable information set out in Schedule B with respect thereto;

    (ii) change to a Pledged Securities Intermediary's Jurisdiction or Pledged Issuer's Jurisdiction;

    (iii) change in the location of the jurisdiction of incorporation or amalgamation, chief executive office, or domicile of the Debtor;

    (iv) change in the name of the Debtor;

    (v) any merger, consolidation or amalgamation of the Debtor with any other Person;

    (vi) Lien (other than Permitted Liens) on, or material claim asserted against, any of the Collateral; or

    (vii) occurrence of any event, claim or occurrence that could reasonably be expected to have a material adverse effect on the value of the Collateral or on the Security Interests.

The Debtor will not effect or permit any of the changes referred to in clauses (ii) through (v) above unless all filings have been made and all other actions taken that are reasonably required in order for the Agent to continue at all times following such change to have a valid and perfected first priority Security Interest in respect of all of the Collateral.

7. **Voting Rights**. Unless an Event of Default has occurred and is continuing, the Debtor will be entitled to exercise all voting power from time to time exercisable in respect of the Pledged Securities and Pledged Security Entitlements and give consents, waivers and ratifications in respect thereof; provided, however, that no vote will be cast or consent, waiver or ratification  given or action taken which would be, or would have a reasonably likelihood of being, materially prejudicial to the interests of the Secured Creditors or imposing any material restriction on the transferability of any of the Collateral. Unless an Event of Default has occurred and is continuing the Agent shall, from time to time at the request and expense of the Debtor, execute or cause to be executed, in respect of all Pledged Securities that are registered in the name of the Agent or its nominee, valid proxies appointing the Debtor as its (or its nominee's) proxy to attend, vote and act for and on behalf of the Agent or such nominee, as the case may be, at any and all meetings of the applicable Pledged Issuer's shareholders or debt holders, all Pledged Securities that are registered in the name of the Agent or such nominee, as the case may be, and to

- 7 -

execute and deliver, consent to or approve or disapprove of or withhold consent to any resolutions in writing of shareholders or debt holders of the applicable Pledged Issuer for and on behalf of the Agent or such nominee, as the case may be. Immediately upon the occurrence and during the continuance of any Event of Default, all such rights of the Debtor to vote and give consents, waivers and ratifications will cease and the Agent or its nominee will be entitled to exercise all such voting rights and to give all such consents, waivers and ratifications.

8.    **Dividends; Interest**.  Unless an Event of Default has occurred and is continuing, the Debtor will be entitled to receive any and all cash dividends, partnership distributions interest, principal payments and other forms of cash distribution on the Pledged Securities or Pledged Security Entitlements which it is otherwise entitled to receive, but any and all stock and/or liquidating dividends, distributions of property (other than cash partnership distributions), returns of capital or other distributions made on or in respect of the Pledged Securities or Pledged Security Entitlements, whether resulting from a subdivision, combination or reclassification of the outstanding capital stock of any Pledged Issuer or received in exchange for the Pledged Securities, Pledged Security Entitlements or any part thereof or as a result of any amalgamation, merger, consolidation, acquisition or other exchange of property to which any Pledged Issuer may be a party or otherwise, and any and all cash and other property received in exchange for any Pledged Securities or Pledged Security Entitlements will be and become part of the Collateral subject to the Security Interests. If any Pledged Security Certificates are received by the Debtor, they will forthwith be delivered to the Agent or its nominee (accompanied, if appropriate, by proper instruments of assignment and/or stock powers of attorney executed by the Debtor in accordance with the Agent's instructions) to be held subject to the terms of this Agreement; and if any of the Pledged Security Certificates have been registered in the name of the Agent or its nominee, the Agent will execute and deliver (or cause to be executed and delivered) to the Debtor all such dividend orders and other instruments as the Debtor may request for the purpose of enabling the Debtor to receive the dividends, distributions or other payments which the Debtor is authorized to receive and retain pursuant to this Section. If an Event of Default has occurred and is continuing, all rights of the Debtor pursuant to this Section will cease and the Agent will have the sole and exclusive right and authority to receive and retain the cash dividends, interest, principal payments and other forms of cash distribution which the Debtor would otherwise be authorized to retain pursuant to this Section. Any money and other property paid over to or received by the Agent pursuant to the provisions of this Section will be retained by the Agent (on behalf of the Secured Creditors) as additional Collateral hereunder and be applied in accordance with the provisions of this Agreement.

9.    **Rights on Event of Default**.  If an Event of Default has occurred and is continuing, then and in every such case the Security Interests shall become enforceable and the Agent, in addition to any rights now or hereafter existing under Applicable Laws may, personally or by agent, at such time or times as the Agent in its discretion may, subject to the Applicable Laws to the extent required thereby, determine, do any one or more of the following:

- 8 -

(a) <u>Rights under PPSA, etc</u>. Exercise all of the rights and remedies granted to secured parties under the PPSA and any other applicable statute, or otherwise available to the Secured Creditors by contract, at law or in equity.

(b) <u>Dispose of Collateral</u>. Realize on any or all of the Collateral and sell, lease, assign, give options to purchase, or otherwise dispose of and deliver any or all of the Collateral (or contract to do any of the above), in one or more parcels at any public or private sale, at any exchange, broker's board or office of the Agent or elsewhere, with or without advertising or other formality, except as required by Applicable Laws, on such terms and conditions as the Agent may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery.

(c) <u>Court-Approved Disposition of Collateral</u>. Obtain from any court of competent jurisdiction an order for the sale or foreclosure of any or all of the Collateral.

(d) <u>Purchase by Secured Creditor</u>. At any public sale, and to the extent permitted by Law on any private sale, bid for and purchase any or all of the Collateral offered for sale and, upon compliance with the terms of such sale, hold, retain, sell or otherwise dispose of such Collateral without any further accountability to the Debtor or any other Person with respect to such holding, retention, sale or other disposition, except as required by Applicable Laws. In any such sale to a Secured Creditor, such Secured Creditor may, for the purpose of making payment for all or any part of the Collateral so purchased, use any claim for any or all of the Secured Liabilities then due and payable to it as a credit against the purchase price.

(e) <u>Transfer of Collateral</u>. Transfer any Collateral that is Investment Property into the name of the Agent or its nominee.

(f) <u>Voting</u>. Vote any or all of the Pledged Securities (whether or not transferred to the Agent or its nominee) and Pledged Security Entitlements and give or withhold all consents, waivers and ratifications in respect thereof and otherwise act with respect thereto as though it were the outright owner thereof.

(g) <u>Exercise Other Rights</u>. Exercise any and all rights, privileges, entitlements and options pertaining to any Collateral that is Investment Property as if the Agent were the absolute owner of such Investment Property.

The Agent may exercise any or all of the foregoing rights and remedies without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except as required by Applicable Laws) to or on the Debtor or any other Person, and the Debtor hereby waives each such demand, presentment, protest, advertisement and notice to the extent permitted by Applicable Laws. None of the above rights or remedies will be exclusive of or dependent on or merge in any other right or remedy, and one or more of such rights and remedies may be exercised independently or in combination from time to time. The Debtor acknowledges and agrees that any action taken by the Agent

- 9 -

hereunder following the occurrence and during the continuance of an Event of Default shall not be rendered invalid or ineffective as a result of the subsequent curing of the Event of Default on which such action was based.

10. **Realization Standards**. To the extent that Applicable Law imposes duties on the Secured Creditors to exercise remedies in a commercially reasonable manner and without prejudice to the ability of the Secured Creditors to dispose of the Collateral in any such manner, the Debtor acknowledges and agrees that it is not commercially unreasonable for the Secured Creditors to (or not to): (a) to the extent deemed appropriate by the Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Secured Creditors in the collection or disposition of any of the Collateral; (b) dispose of Collateral in whole or in part; (c) dispose of Collateral to a customer of a Secured Creditor; and (d) establish an upset or reserve bid price in respect of Collateral.

11. **Securities Laws**. The Agent is authorized, in connection with any offer or sale of any Pledged Securities or Pledged Security Entitlements, to comply with any limitation or restriction as it may be advised by counsel is necessary to comply with Applicable Law, including compliance with procedures that may restrict the number of prospective bidders and purchasers, requiring that prospective bidders and purchasers have certain qualifications, and restricting prospective bidders and purchasers to Persons who will represent and agree that they are purchasing for their own account or investment and not with a view to the distribution or resale of such Securities. In addition to and without limiting Section 10, the Debtor further agrees that compliance with any such limitation or restriction will not result in a sale being considered or deemed not to have been made in a commercially reasonable manner, and the Secured Creditors will not be liable or accountable to the Debtor for any discount allowed by reason of the fact that such Pledged Securities or Pledged Security Entitlements are sold in compliance with any such limitation or restriction. If the Agent chooses to exercise its right to sell any or all Pledged Securities or Pledged Security Entitlements, upon written request, the Debtor will cause each applicable Pledged Issuer to furnish to the Agent all such information as the Agent may request in order to determine the number of shares and other instruments included in the Collateral which may be sold by the Agent in exempt transactions under any Laws governing securities, and the rules and regulations of any applicable securities regulatory body thereunder, as the same are from time to time in effect.

12. **Application of Proceeds**. All Proceeds of Collateral received by the Agent may be applied to discharge or satisfy any expenses (including expenses of enforcing the Secured Creditors' rights under this Agreement), Liens on the Collateral in favour of Persons other than the Secured Creditors, borrowings, taxes and other outgoings affecting the Collateral or which are considered advisable by the Agent to protect, preserve, repair, process, maintain or enhance the Collateral or prepare it for sale or other disposition, or to keep in good standing any Liens on the Collateral ranking in priority to any of the Security Interests, or to sell or otherwise dispose of the Collateral. The balance of such Proceeds may, at the sole discretion of the Agent, be held as collateral security for the Secured Liabilities or be applied to such of the Secured Liabilities (whether or not the

- 10 -

same are due and payable) in such manner and at such times as the Agent considers appropriate and thereafter will be accounted for as required by Law.

13. **Agent's Appointment as Attorney in Fact.** Effective upon the occurrence and during the continuance of an Event of Default, the Debtor constitutes and appoints the Agent and any officer or agent of the Agent, with full power of substitution, as the Debtor's true and lawful attorney in fact with full power and authority in the place of the Debtor and in the name of the Debtor or in its own name, from time to time in the Agent's discretion, to take any and all appropriate action and to execute any and all documents and instruments as, in the opinion of such attorney, may be necessary or desirable to accomplish the purposes of this Agreement. Without limiting the effect of this Section, the Debtor grants the Agent an irrevocable proxy to vote the Pledged Securities and Pledged Security Entitlements and to exercise all other rights, powers, privileges and remedies to which a holder thereof would be entitled (including giving or withholding written consents of shareholders, calling special meetings of shareholders and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Securities or Pledged Security Entitlements on the books and records of a Pledged Issuer or Pledged Securities Intermediary, as applicable, upon the occurrence of an Event of Default. These powers are coupled with an interest and are irrevocable until the Release Date. Nothing in this Section affects the right of the Agent as secured party or any other Person on any Secured Creditor's behalf, to sign and file or deliver (as applicable) all such financing statements, financing change statements, notices, verification statements and other documents relating to the Collateral and this Agreement as the Agent or such other Person considers appropriate. The Debtor hereby ratifies and confirms, and agrees to ratify and confirm, whatever lawful acts the Agent or any of the Agent's sub-agents, nominees or attorneys do or purport to do in exercise of the power of attorney granted to the Agent pursuant to this Section.

14. **Performance by Secured Creditors of Debtor's Obligations.** If the Debtor fails to perform or comply with any of the obligations of the Debtor under this Agreement, the Secured Creditors may, but need not, perform or otherwise cause the performance or compliance of such obligation, provided that such performance or compliance will not constitute a waiver, remedy or satisfaction of such failure. The expenses of the Secured Creditors incurred in connection with any such performance or compliance will be payable by the Debtor to the Agent immediately on demand, and until paid, any such expenses will form part of the Secured Liabilities and will be secured by the Security Interests.

15. **Severability.** Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and will be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

16. **Rights of Secured Creditors; Limitations on Secured Creditors' Obligations.**

- 11 -

(a) <u>Limitations on Secured Creditors' Liability</u>. No Secured Creditor will be liable to the Debtor or any other Person for any failure or delay in exercising any of the rights of the Debtor under this Agreement (including any failure to take possession of, collect, sell, lease or otherwise dispose of any Collateral, or to preserve rights against prior parties). No Secured Creditor nor any agent of any Secured Creditor (including, any sheriff) is required to take, or will have any liability for any failure to take or delay in taking, any steps necessary or advisable to preserve rights against other Persons under any Collateral in its possession. No Secured Creditor nor any agent of any Secured Creditor will be liable for any, and the Debtor will bear the full risk of all, loss or damage to any and all of the Collateral (including any Collateral in the possession of any Secured Creditor or any agent thereof) caused for any reason other than the gross negligence or wilful misconduct of a Secured Creditor or such agent of such Secured Creditor.

(b) <u>Use of Agents</u>. The Agent may perform any of its rights or duties under this Agreement by or through agents.

17. **Dealings by Secured Creditors**. No Secured Creditor will be obliged to exhaust its recourse against the Debtor or any other Person or against any other security it may hold in respect of the Secured Liabilities or any part thereof before realizing upon or otherwise dealing with the Collateral in such manner as the Agent may consider desirable. The Secured Creditors may grant extensions of time and other indulgences, take and give up security, accept compositions, grant releases and discharges and otherwise deal with the Debtor and any other Person, and with any or all of the Collateral, and with other security and sureties, as the Agent may see fit, all without prejudice to the Secured Liabilities or to the rights and remedies of the Secured Creditors under this Agreement. The powers conferred on the Agent under this Agreement are solely to protect the interests of the Secured Creditors in the Collateral and will not impose any duty upon any Secured Creditor to exercise any such powers.

18. **Communication**. Any notice or other communication required or permitted to be given under this Agreement will be made in accordance with the terms of the Credit Agreement.

19. **Release of Information**. The Debtor authorizes the Agent to provide a copy of this Agreement and such other information as may be requested of the Agent: (a) to the extent necessary to enforce the Agent's rights, remedies and entitlements under this Agreement; (b) to any permitted assignee or prospective assignee of all or any part of the Secured Liabilities; and (c) as required by Applicable Laws.

20. **Expenses; Indemnity; Waiver.**

(a) The Debtor shall pay: (i) all reasonable out-of-pocket expenses incurred by the Agent, including the reasonable fees, charges and disbursements of counsel for the Agent and all applicable taxes, in connection with the preparation and administration of this Agreement; (ii) all reasonable out-of-pocket expenses

- 12 -

incurred by the Agent, including the reasonable fees, charges and disbursements of counsel for the Agent and applicable taxes, in connection with any amendments, modifications or waivers of the provisions hereof; and (iii) all out-of-pocket expenses incurred by the Agent, including the fees, charges and disbursements of any counsel for the Secured Creditors and all applicable taxes, in connection with the assessment, enforcement or protection of their rights in connection with this Agreement, including its rights under this Section, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Secured Liabilities.

(b)     The Debtor shall indemnify the Secured Creditors against, and hold each Secured Creditor harmless from, any and all losses, claims, cost recovery actions, damages, expenses and liabilities of whatsoever nature or kind and all reasonable out-of-pocket expenses and all applicable taxes to which the applicable Secured Creditor may become subject arising out of or in connection with: (i) the execution or delivery of this Agreement and the performance by the Debtor of its obligations hereunder; (ii) any actual or prospective claim, litigation, investigation or proceeding relating to this Agreement or the Secured Liabilities, whether based on contract, tort or any other theory and regardless of whether the applicable Secured Creditor is a party thereto; (iii) any other aspect of this Agreement; or (iv) the enforcement of the Secured Creditors' rights hereunder and any related investigation, defence, preparation of defence, litigation and enquiries; provided that such indemnity shall not, as to any Secured Creditor, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence (it being acknowledged that ordinary negligence does not necessarily constitute gross negligence) or wilful misconduct of or material breach of this Agreement by such Secured Creditor.

(c)     The Debtor shall not assert, and hereby waives (to the fullest extent permitted by Applicable Laws): (i) any claim against any Secured Creditor (or any director, officer or employee thereof), on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement; and (ii) all of the rights, benefits and protections given by any present or future statute that imposes limitations on the rights, powers or remedies of a secured party or on the methods of, or procedures for, realization of security, including any "seize or sue" or "anti-deficiency" statute or any similar provision of any other statute.

(d)     All amounts due under this Section shall be payable not later than thirty (30) days after written demand therefor.

(e)     The indemnifications set out in this Section will survive the Release Date and the release or extinguishment of the Security Interests.

- 13 -

21. **Release of Debtor**. Upon the written request of the Debtor given at any time on or after the Release Date, the Agent shall at the expense of the Debtor, promptly release the Debtor and the Collateral from the Security Interests. Upon such release, and at the request and expense of the Debtor, the Agent shall promptly execute and deliver to the Debtor such releases and discharges as the Debtor may reasonably request.

22. **Additional Security**. This Agreement is in addition to, and not in substitution of, any and all other security previously or concurrently delivered by the Debtor or any other Person to the Secured Creditors, all of which other security shall remain in full force and effect.

23. **Alteration or Waiver**. None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the Agent. The Agent will not, by any act or delay, be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default or in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of the Agent, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder will preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by the Agent of any right or remedy hereunder on any one occasion will not be construed as a bar to any right or remedy which the Agent would otherwise have on any future occasion. Neither the taking of any judgment nor the exercise of any power of seizure or sale will extinguish the liability of the Debtor to pay the Secured Liabilities, nor will the same operate as a merger of any covenant contained in this Agreement or of any other liability, nor will the acceptance of any payment or other security constitute or create any novation.

24. **Amalgamation**. The Debtor acknowledges that if it amalgamates or merges with any other corporation or corporations, then: (a) the Collateral and the Security Interests will extend to and include all the property and assets of the successor corporation and to any property or assets of the successor corporation thereafter owned or acquired; (b) the term "Debtor", where used in this Agreement, will extend to and include the successor corporation; and (c) the term "Secured Liabilities", where used in this Agreement, will extend to and include the Secured Liabilities of the successor corporation.

25. **Governing Law; Attornment**. This Agreement will be governed by and construed in accordance with the Laws of the Province of Alberta. Without prejudice to the ability of the Secured Creditors to enforce this Agreement in any other proper jurisdiction, the Debtor irrevocably submits and attorns to the non-exclusive jurisdiction of the courts of such province. To the extent permitted by Applicable Laws, the Debtor irrevocably waives any objection (including any claim of inconvenient forum) that it may now or hereafter have to the venue of any legal proceeding arising out of or relating to this Agreement in the courts of such Province.

26. **Interpretation**. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall

- 14 -

include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". The word "or" is disjunctive; the word "and" is conjunctive. The word "shall" is mandatory; the word "may" is permissive. Unless the context requires otherwise: (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set out herein); (b) any reference herein to any statute or any section thereof shall, unless otherwise expressly stated, be deemed to be a reference to such statute or section as amended, restated or re-enacted from time to time; (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns; (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof; and (e) all references herein to Sections and Schedules shall be construed to refer to Sections and Schedules to, this Agreement, Section headings are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement. Any reference in this Agreement to a Permitted Lien is not intended to subordinate or postpone, and shall not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Security Interest to any Permitted Lien.

27. **Successors and Assigns**. This Agreement will enure to the benefit of, and be binding on, the Debtor and its successors and permitted assigns, and will enure to the benefit of, and be binding on, the Secured Creditors and their successors and assigns. The Debtor may not assign this Agreement or any of its rights or obligations under this Agreement. The Agent may assign this Agreement and any of its rights and obligations hereunder to any Person that replaces it in its capacity as such.

28. **Acknowledgment of Receipt/Waiver**. The Debtor acknowledges receipt of an executed copy of this Agreement and, to the extent permitted by Applicable Laws, waives the right to receive a copy of any financing statement or financing change statement registered in connection with this Agreement or any verification statement issued in respect of any such financing statement or financing change statement.

29. **Paramountcy**. If a conflict or inconsistency exists in or between a provision of this Agreement and a provision of the Credit Agreement or any part thereof, the provisions of the Credit Agreement shall prevail to the extent necessary to resolve such conflict or inconsistency.

30. **Electronic Signature**. Delivery of an executed signature page to this Agreement by the Debtor by facsimile, pdf or other electronic form of transmission shall be as effective as delivery by the Debtor of a manually executed copy of this Agreement by the Debtor.

*[Remainder of page intentionally left blank]*

- 15 -

**IN WITNESS WHEREOF** the undersigned has caused this Agreement to be duly executed as of the date first written above.

**Q'MAX SOLUTIONS INC.**

Per: _____

Name:  Mark Roberts
Title:  Chief Financial Officer

**SCHEDULE A**

**PLEDGED PROPERTY**

A.    The Securities Accounts described in Schedule B and all Securities Entitlements carried therein from time to time.

B.    All Securities and Security Entitlements of Q'Max Solutions Holdings Inc. and 1356760 Alberta Ltd. (or any of their successors, including, for certainty, by way of amalgamation) in which the Debtor now or in the future has any right, title or interest whatsoever.

## SCHEDULE B

## DEBTOR & PLEDGED PROPERTY INFORMATION

**Full legal name:** Q'Max Solutions Inc.

**Jurisdiction of incorporation or organization:** Alberta

**Address of chief executive office:**   Q'Max Solutions Inc.
407 2nd St. SW, Ste. 1700
Calgary, Alberta T2P 2Y3
Canada

**Pledged Uncertificated Securities:** Nil

**Pledged Securities Accounts:** Nil

**Pledged Certificated Securities:** See below

| Pledged Issuer | Securities Owned | % of issued and outstanding Securities of Pledged Issuer as of the date hereof | Security Certificate Numbers | Security Certificate Location |
|---|---|---|---|---|
| Q'Max Solutions Holdings Inc. | 100 Class "A" Common Shares | 0.2 | A-1 | Alberta |
| Q'Max Solutions Holdings Inc. | 60,000 Class "C" Preferred Shares | 99.8 | C-1 | Alberta |
| 1356760 Alberta Ltd. | 2,984,800 Class "A" Common Shares | 100 | A-1, A-2 | Alberta |

THIS IS EXHIBIT "___19___"
referred to in the Affidavit of
___Cameron Bailey___
Sworn before me this __26 th__
day of __May__ A.D. 20__20__
_____

Jonathan Tomm
Barrister and Solicitor

This PLEDGE AGREEMENT dated as of May 23, 2014 (together with all amendments, if any, from time to time hereto, this "Agreement"), is made by and between **Q'MAX SOLUTIONS INC.** (the "Pledgor") and **HSBC BANK CANADA**, as administrative agent for the Lenders (as defined below) (in such capacity, together with its successors and permitted assigns, the "Agent" and, collectively with the Lenders, the Hedge Providers and the Agent and its Affiliates as counterparties to the Banking Services Agreements, the "Secured Parties" and each, a "Secured Party").

## W I T N E S S E T H:

A.      Pursuant to that certain Credit Agreement dated as of the date hereof (as amended, supplemented or restated from time to time, the "Credit Agreement"), by and among Fluid Acquisition Corp. and Q'Max America Inc. (collectively, the "Borrowers"), HSBC Bank Canada and the other Lenders from time to time party to the Credit Agreement (collectively, the "Lenders") and the Agent, the Lenders have agreed to make available to the Borrowers certain Loans.

B.      The obligation of the Lenders to continue to make Loans available to the Borrowers pursuant to the Credit Agreement, the entry into Hedging Agreements by the Hedge Providers from time to time and the entry into Banking Services Agreements by the Agent and its Affiliates, from time to time are conditioned upon the execution and delivery by the Pledgor of this Agreement to secure the Obligations.

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained, in order to induce the Lenders to make Advances under the Credit Agreement and to induce the Hedge Providers to enter into Hedging Agreements from time to time and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto hereby agree as follows:

Section 1.      *Terms Defined in Credit Agreement.*  Except as otherwise provided in this Agreement, all capitalized terms used herein without definition shall have the same meanings herein as such terms have in the Credit Agreement.

Section 2.      *Grant of Security Interest in the Collateral.*  To secure the prompt and complete payment, performance and observance of all of the Obligations of the Pledgor (collectively, the "Secured Obligations"), the Pledgor hereby grants to the Agent for the benefit of the Secured Parties a lien on and security interest in, and acknowledges and agrees that the Agent has and shall continue to have for the benefit of the Secured Parties a continuing lien on and security interest in, all right, title, and interest of the Pledgor in (a) (i) all shares of the capital stock of Q'Max America Inc. (the "Issuer"), whether now owned or hereafter formed or acquired (those shares as of the date hereof being listed and described on Schedule A attached hereto), and all substitutions and additions to such shares (herein, the "Pledged Securities"), (ii) all dividends, distributions, and sums distributable or payable from, upon or in respect of the Pledged Securities, and (iii) all other rights and privileges incident to the Pledged Securities (all of the foregoing being hereinafter referred to collectively as the "Stock Collateral") and (b) all proceeds of the foregoing; all of the foregoing being herein sometimes referred to as the "Collateral".

Section 3.      *Covenants, Agreements, Representations and Warranties.*  The Pledgor hereby covenants and agrees with, and represents and warrants to, the Secured Parties that:

(a)      The Pledgor is the sole and lawful owner of its Collateral.

(b)     None of the Collateral constitutes margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System).

(c)     The Pledgor shall warrant and defend the Collateral against any claims and demands of all persons (other than holders of Permitted Liens) at any time claiming the same or any interest in the Collateral adverse to the Secured Parties.

(d)     The Pledgor agrees to execute and deliver to the Agent such further agreements, assignments, instruments, and documents, and to do all such other things, as the Agent may deem necessary or appropriate to assure the Agent its lien and security interest hereunder, including, without limitation, such assignments, acknowledgments, stock powers, financing statements, instruments, and documents as the Agent may from time to time require in order to comply with the Uniform Commercial Code of the State of New York as in effect from time to time ("UCC") . The Pledgor hereby authorizes the Agent to file any and all financing statements covering the Collateral or any part thereof as the Agent may require.

(e)     If, as and when the Pledgor acquires any Pledged Securities in addition to those listed on Schedule A hereto, the Pledgor shall furnish to the Agent a supplement to the relevant Schedule reflecting the additional Collateral subject to this Agreement (provided the Pledgor's failure to do so shall not impair the Agent's security interest therein).

(f)     On failure of the Pledgor to perform any of the covenants and agreements herein contained, the Agent may, at its option, perform the same and in so doing may expend such sums as the Agent deems advisable in the performance thereof, including, without limitation, the payment of any insurance premiums, the payment of any taxes, liens, and encumbrances, expenditures made in defending against any adverse claims, and all other expenditures which the Agent may be compelled to make by operation of law or which the Agent may make by agreement or otherwise for the protection of the security hereof. All such sums and amounts so expended shall be repayable by the Pledgor upon demand, shall constitute additional Secured Obligations secured hereunder. No such performance of any covenant or agreement by the Agent on behalf of the Pledgor, and no such advancement or expenditure therefor, shall relieve the Pledgor of any default under the terms of this Agreement or in any way obligate any Secured Party to take any further or future action with respect thereto. The Agent, in making any payment hereby authorized, may do so according to any bill, statement or estimate procured from the appropriate public office or holder of the claim to be discharged without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax assessment, sale, forfeiture, tax lien or title or claim.

*Section 4.     Special Provisions Re: Stock Collateral.*

(a)     The Pledgor has the right to vote the Pledged Securities and there are no restrictions upon the voting rights associated with, or the transfer of, any of the Pledged Securities, except as provided by federal and state laws applicable to the sale of securities generally and the terms of this Agreement.

- 2 -

(b)     The certificates for all shares of the Pledged Securities shall be delivered by the Pledgor to the Agent duly endorsed in blank for transfer or accompanied by an appropriate assignment or assignments or an appropriate undated stock power or powers, in every case sufficient to transfer title thereto. The Agent may, at any time after the occurrence of any Event of Default, cause to be transferred into its name or into the name of its nominee or nominees any and all of the Pledged Securities. If an Event of Default shall have occurred and be continuing, the Agent shall have the right to exchange the certificates representing the Pledged Securities for certificates of smaller or larger denominations.

(c)     The Pledged Securities have been validly issued and, except as described on Schedule A, are fully paid and non-assessable. Except as set forth on Schedule A, there are no outstanding commitments or other obligations of the issuers of any of the Pledged Securities to issue, and no options, warrants or other rights of any individual or entity to acquire, any share of any class or series of capital stock of such issuers. The Pledged Securities listed and described on Schedule A attached hereto constitute the percentage of the issued and outstanding capital stock of each series and class of the issuers thereof as set forth thereon owned by the relevant Pledgor. The Pledgor agrees that in the event any such issuer shall issue any additional capital stock of any series or class (whether or not entitled to vote) to the Pledgor or otherwise on account of its ownership interest therein, the Pledgor will forthwith pledge and deposit hereunder, or cause to be pledged and deposited hereunder, all such additional shares of such capital stock.

*Section 5.     Voting Rights and Dividends.*   Unless and until an Event of Default hereunder has occurred and is continuing and thereafter until notified by the Agent pursuant to Section 7(c) hereof:

(a)     The Pledgor shall be entitled to exercise all voting and/or consensual powers pertaining to the Collateral of the Pledgor, or any part thereof, for all purposes not inconsistent with the terms of this Agreement or any other document evidencing or otherwise relating to any of the Secured Obligations.

(b)     The Pledgor shall be entitled to receive and retain all dividends and distributions in respect of the Collateral; *provided, however,* that any non-cash dividends and distributions upon or in respect of the Pledged Securities or any part thereof or resulting from a split-up, revision or reclassification of the Pledged Securities or any part thereof or received in addition to, in substitution of or in exchange for the Pledged Securities or any part thereof as a result of a merger, consolidation or otherwise that would constitute Pledged Securities shall be delivered or transferred, as appropriate, directly to the Agent promptly upon the receipt thereof by the Pledgor and shall be held by the Agent pursuant hereto as part of the Collateral pledged under and subject to the terms of this Agreement.

(c)     In order to permit the Pledgor to exercise such voting and/or consensual powers which it is entitled to exercise under subsection (a) above and to receive such distributions which the Pledgor is entitled to receive and retain under subsection (b)

above, the Agent will, if necessary, upon the written request of the Pledgor and at the expense of the Pledgor, from time to time execute and deliver to the Pledgor appropriate proxies and dividend orders.

Section 6.      Power of Attorney.   In addition to any other powers of attorney contained herein, the Pledgor hereby appoints the Agent, its nominee, or any other person whom the Agent may designate as the Pledgor's attorney-in-fact, with full power and authority upon the occurrence and during the continuation of any Event of Default to ask, demand, collect, receive, receipt for, sue for, compound and give acquittance for any and all sums or properties which may be or become due, payable or distributable in respect of the Collateral or any part thereof, with full power to settle, adjust or compromise any claim thereunder or therefor as fully as the Pledgor could itself do, to endorse or sign the Pledgor's name on any assignments, stock powers or other instruments of transfer and on any checks, notes, acceptances, money orders, drafts, and any other forms of payment or security that may come into the Agent's possession and on all documents of satisfaction, discharge or receipt required or requested in connection therewith, and, in its discretion, to file any claim or take any other action or proceeding, either in its own name or in the name of the Pledgor, or otherwise, which the Agent deems necessary or appropriate to collect or otherwise realize upon all or any part of the Collateral, or effect a transfer thereof, or which may be necessary or appropriate to protect and preserve the right, title, and interest of the Agent in and to such Collateral and the security intended to be afforded hereby.  The Pledgor hereby ratifies and approves all acts of any such attorney and agrees that neither the Agent nor any such attorney will be liable for any such acts or omissions nor for any error of judgment or mistake of fact or law other than such person's gross negligence or willful misconduct.  The Agent may file one or more financing statements disclosing its security interest in all or any part of the Collateral without the Pledgor's signature appearing thereon, and the Pledgor also hereby grants the Agent a power of attorney to execute any such financing statements, and any amendments or supplements thereto, on behalf of the Pledgor without notice thereof to the Pledgor.  The foregoing powers of attorney, being coupled with an interest, are irrevocable until the Secured Obligations (other than unasserted contingent indemnification obligations not due and payable) have been fully satisfied and all commitments of the Lenders to extend credit to or for the account of the Borrowers, or any of them, under the Credit Agreement have expired or otherwise terminated.

Section 7.      Defaults and Remedies.   (a) The occurrence of any event or the existence of any condition specified as an "Event of Default" under the Credit Agreement shall constitute an "Event of Default" hereunder.

(b)      Upon the occurrence and during the continuation of any Event of Default, the Agent shall have, in addition to all other rights provided herein or by law, the rights and remedies of a secured party under the UCC (regardless of whether the UCC is the law of the jurisdiction where the rights or remedies are asserted and regardless of whether the UCC applies to the affected Collateral), and further the Agent may, without demand and, to the extent permitted by applicable law, without advertisement, notice, hearing or process of law, all of which the Pledgor hereby waives to the extent permitted by applicable law, at any time or times, sell and deliver any or all of the Collateral held by or for it at public or private sale, at any securities exchange or broker's board or at the Agent's office or elsewhere, for cash, upon credit or otherwise, at such prices and upon such terms as the Agent deems advisable, in its reasonable

- 4 -

discretion. In the exercise of any such remedies, the Agent may sell the Collateral as a unit even though the sales price thereof may be in excess of the amount remaining unpaid on the Secured Obligations. In addition to all other sums due any Secured Party hereunder, the Pledgor shall pay the Secured Parties all costs and expenses incurred by the Secured Parties, including reasonable and documented out-of-pocket attorneys' fees and court costs, in obtaining, liquidating or enforcing payment of Collateral or the Secured Obligations or in the prosecution or defense of any action or proceeding by or against any Secured Party or the Pledgor concerning any matter arising out of or connected with this Agreement or the Collateral or the Secured Obligations, including, without limitation, any of the foregoing arising in, arising under or related to a case under the United States Bankruptcy Code (or any successor statute). Any requirement of reasonable notice shall be met if such notice is personally served on or mailed, postage prepaid, to the Pledgor in accordance with Section 11(b) hereof at least 10 days before the time of sale or other event giving rise to the requirement of such notice; *provided, however,* no notification need be given to the Pledgor if the Pledgor has signed, after an Event of Default has occurred, a statement renouncing any right to notification of sale or other intended disposition. The Agent shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. Any Secured Party may be the purchaser at any such sale. The Pledgor hereby waives all of its rights of redemption from any such sale. The Agent may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, be made at the time and place to which the sale was postponed or the Agent may further postpone such sale by announcement made at such time and place. The Agent may sell or otherwise dispose of the Collateral without giving any warranties as to the Collateral or any part thereof, including disclaimers of any warranties of title or the like, and the Pledgor acknowledges and agrees that the absence of such warranties shall not render the disposition commercially unreasonable.

THE PLEDGOR AGREES THAT IF ANY PART OF THE COLLATERAL IS SOLD AT ANY PUBLIC OR PRIVATE SALE, THE AGENT MAY ELECT TO SELL ONLY TO A BUYER WHO WILL GIVE FURTHER ASSURANCES, SATISFACTORY IN FORM AND SUBSTANCE TO THE AGENT, RESPECTING COMPLIANCE WITH THE REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, AND A SALE SUBJECT TO SUCH CONDITION SHALL BE DEEMED COMMERCIALLY REASONABLE.

THE PLEDGOR FURTHER AGREES THAT IN ANY SALE OF ANY PART OF THE COLLATERAL, THE AGENT IS HEREBY AUTHORIZED TO COMPLY WITH ANY LIMITATION OR RESTRICTION IN CONNECTION WITH SUCH SALE AS IT MAY BE ADVISED BY COUNSEL IS NECESSARY IN ORDER TO AVOID ANY VIOLATION OF APPLICABLE LAW (INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH SUCH PROCEDURES AS MAY RESTRICT THE NUMBER OF PROSPECTIVE BIDDERS AND PURCHASERS AND/OR FURTHER RESTRICT SUCH PROSPECTIVE BIDDERS OR PURCHASERS TO PERSONS WHO WILL REPRESENT AND AGREE THAT THEY ARE PURCHASING FOR THEIR OWN ACCOUNT FOR INVESTMENT AND NOT WITH A VIEW TO THE DISTRIBUTION OR RESALE OF SUCH COLLATERAL), OR IN ORDER TO OBTAIN ANY REQUIRED APPROVAL OF THE SALE OR OF THE PURCHASER BY ANY GOVERNMENTAL REGULATORY AUTHORITY OR OFFICIAL, AND THE PLEDGOR FURTHER AGREES THAT SUCH COMPLIANCE SHALL NOT RESULT IN SUCH SALE BEING CONSIDERED OR DEEMED NOT TO HAVE BEEN MADE IN A COMMERCIALLY REASONABLE MANNER, NOR SHALL THE AGENT BE LIABLE

OR ACCOUNTABLE TO THE PLEDGOR FOR ANY DISCOUNT ALLOWED BY REASON OF THE FACT THAT SUCH COLLATERAL IS SOLD IN COMPLIANCE WITH ANY SUCH LIMITATION OR RESTRICTION.

(c)     Without in any way limiting the foregoing, upon the occurrence and during the continuation of any Event of Default, all rights of the Pledgor to receive and retain the distributions which they are entitled to receive and retain pursuant to Section 5(b) hereof shall, at the option of the Agent, cease and thereupon become vested in the Agent which, in addition to all other rights provided herein or by law, shall then be entitled solely and exclusively to receive and retain the distributions which the Pledgor would otherwise have been authorized to retain pursuant to Section 5(b) hereof and all rights of the Pledgor to exercise the voting and/or consensual powers which they are entitled to exercise pursuant to Section 5(a) hereof shall, at the option of the Agent, cease and thereupon become vested in the Agent which, in addition to all other rights provided herein or by law, shall then be entitled solely and exclusively to exercise all voting and other consensual powers pertaining to the Collateral and to exercise any and all rights of conversion, exchange or subscription and any other rights, privileges or options pertaining thereto as if the Agent were the absolute owner thereof, including, without limitation, the right to exchange, at its discretion, the Collateral or any part thereof upon the merger, consolidation, reorganization, recapitalization or other readjustment of the respective issuer thereof or upon the exercise by or on behalf of any such issuer or the Agent of any right, privilege or option pertaining to the Collateral or any part thereof and, in connection therewith, to deposit and deliver the Collateral or any part thereof with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Agent may determine.  In the event the Agent in good faith believes any of the Collateral constitutes restricted securities within the meaning of any applicable securities laws, any disposition thereof in compliance with such laws shall not render the disposition commercially unreasonable.

(d)     The powers conferred upon the Secured Parties hereunder are solely to protect their interest in the Collateral and shall not impose on them any duty to exercise such powers. The Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession or control if such Collateral is accorded treatment substantially equivalent to that which the Agent accords its own property, consisting of similar type assets, it being understood, however, that the Agent shall have no responsibility for (i) ascertaining or taking any action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Agent has or is deemed to have knowledge of such matters, (ii) taking any necessary steps to preserve rights against any parties with respect to any Collateral, or (iii) initiating any action to protect the Collateral or any part thereof against the possibility of a decline in market value.  This Agreement constitutes an assignment of rights only and not an assignment of any duties or obligations of the Pledgor in any way related to the Collateral, and the Agent shall have no duty or obligation to discharge any such duty or obligation.  Neither any Secured Party nor any party acting as attorney for any Secured Party shall be liable hereunder for any acts or omissions or for any error of judgment or mistake of fact or law other than such person's gross negligence or willful misconduct.

(e)     Failure by the Agent to exercise any right, remedy or option under this Agreement or any other agreement between the Pledgor and the Agent or provided by law, or delay by the Agent in exercising the same, shall not operate as a waiver; and no waiver shall be effective unless it is in writing, signed by the party against whom such waiver is sought to be enforced and

- 6 -

then only to the extent specifically stated. The rights and remedies of the Secured Parties under this Agreement shall be cumulative and not exclusive of any other right or remedy which any Secured Party may have. For purposes of this Agreement, an Event of Default shall be construed as continuing after its occurrence until the same is waived in writing by the Agent or cured.

Section 8.    *Application of Proceeds.* The proceeds and avails of the Collateral at any time received by the Agent upon the occurrence and during the continuation of any Event of Default shall, when received by the Agent in cash or its equivalent, be applied by the Agent in reduction of, or held as security for, the Secured Obligations in accordance with the terms of the Credit Agreement. The Pledgor shall remain liable to the Secured Parties for any deficiency. Any surplus remaining after the full payment and satisfaction of the Secured Obligations shall be returned to the Pledgor or paid to whomsoever the Agent reasonably determines is lawfully entitled thereto.

Section 9.    *Continuing Agreement.* This Agreement shall be a continuing agreement in every respect and shall remain in full force and effect until all of the Secured Obligations (other than unasserted contingent indemnification obligations not due and payable), including all principal and interest, have been fully paid and satisfied and the commitments of the Lenders to extend credit to or for the account of the Borrowers under the Credit Agreement shall have expired or otherwise terminated. Upon such termination of this Agreement, the Agent shall, upon the request and at the expense of the Pledgor, forthwith release all its liens and security interests hereunder. In connection with any termination pursuant to this Section 9, the Agent shall execute and deliver to the Pledgor all documents that the Pledgor shall reasonably request to evidence such termination (including Uniform Commercial Code termination statements), and will duly assign and transfer to the Pledgor, such of the Collateral that may be in the possession of the Agent and has not theretofore been sold or otherwise applied or released pursuant to this Agreement. [NTD: Plegor's rights to file UCC-3s and take any other actions arise by law under the UCC and don't need to be addressed here, consistent with the US Security Agreement.]

Section 10.    *Reinstatement.* This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against the Pledgor for liquidation or reorganization, should the Pledgor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of the Pledgor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

Section 11.    *The Agent.* In acting under or by virtue of this Agreement, the Agent shall be entitled to all the rights, authority, privileges, and immunities provided in the Credit Agreement, all of which provisions of said Credit Agreement are incorporated by reference herein with the same force and effect as if set forth herein in their entirety. The Agent hereby disclaims any representation or warranty to the Secured Parties or any other holders of the

- 7 -

Secured Obligations concerning the perfection of the liens and security interests granted hereunder or in the value of any of the Collateral.

    *Section 12.    Miscellaneous.*   (a) This Agreement cannot be changed or terminated orally.  This Agreement shall create a continuing lien on and security interest in the Collateral and shall be binding upon the Pledgor and its successors and permitted assigns, and shall inure, together with the rights and remedies of the Secured Parties hereunder, to the benefit of the Secured Parties and their successors and assigns; *provided, however,* that the Pledgor may not assign its rights or delegate its duties hereunder without the Agent's prior written consent.

    (b)    Except as otherwise specified herein, all notices hereunder shall be given in the manner, and to the address, provided for in the Credit Agreement.

    (c)    In the event and to the extent that any provision hereof shall be deemed to be invalid or unenforceable by reason of the operation of any law or by reason of the interpretation placed thereon by any court, this Agreement shall to such extent be construed as not containing such provision, but only as to such jurisdictions where such law or interpretation is operative, and the invalidity or unenforceability of such provision shall not affect the validity of any remaining provisions hereof, and any and all other provisions hereof which are otherwise lawful and valid shall remain in full force and effect.

    (d)    The lien and security interest herein created and provided for stand as direct and primary security for all Secured Obligations.  No application of any sums received by the Secured Parties in respect of the Collateral or any disposition thereof to the reduction of the Secured Obligations or any part thereof shall in any manner entitle the Pledgor to any right, title or interest in or to the Secured Obligations or any security therefor, whether by subrogation or otherwise, unless and until all Secured Obligations have been fully paid and satisfied and all commitments to extend credit to or for the account of the Borrowers under the Credit Agreement have expired or otherwise terminated.  The Pledgor acknowledges and agrees that the lien and security interest hereby created and provided for are absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever of any Secured Party or any other holder of any of the Secured Obligations, and without limiting the generality of the foregoing, the lien and security interest hereof shall not be impaired by any acceptance by any Secured Party or any other holder of any of the Secured Obligations of any other security for or guaranty of any Secured Obligations or by any failure, neglect or omission on the part of any Secured Party or any other holder of any of the Secured Obligations to realize upon or protect any of the Secured Obligations or any security therefor.  The lien and security interest hereof shall not in any manner be impaired or affected by (and the Secured Parties, without notice to anyone, are hereby authorized to make from time to time) any sale, pledge, surrender, compromise, settlement, release, renewal, extension, indulgence, alteration, substitution, exchange, change in, modification or disposition of any of the Secured Obligations or of any security therefor, or of any guaranty thereof, or of any instrument or agreement setting forth the terms and conditions pertaining to any of the foregoing.  The Secured Parties may at their discretion at any time grant credit to the Borrowers without notice to the Pledgor in such amounts and on such terms as the Secured Parties may elect without in any manner impairing the lien and security interest hereby created and provided for.  In order to realize hereon and to exercise the rights granted the Secured Parties hereunder and under applicable law, there shall be

- 8 -

no obligation on the part of any Secured Party or any other holder of any of the Secured Obligations at any time to first resort for payment to the Borrowers or any other pledgor or to any guaranty of the Secured Obligations or any portion thereof or to resort to any other security, property, liens or any other rights or remedies whatsoever, and the Secured Parties shall have the right to enforce this Agreement against the Pledgor or any of its Collateral irrespective of whether or not other proceedings or steps seeking resort to or realization upon or from any of the foregoing are pending.

(e)     This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterpart signature pages, each constituting an original, but all together one and the same instrument. The Pledgor acknowledges that this Agreement is and shall be effective upon its execution and delivery by the Pledgor to the Agent, and it shall not be necessary for the Agent to execute this Agreement or any other acceptance hereof or otherwise to signify or express its acceptance hereof.

(f)     This Agreement shall be deemed to have been made in the State of New York and shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to principles of conflicts of law (other than New York General Obligations Laws 5-1401 and 5-1402). The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning of any provision hereof.

(g)     The Pledgor hereby submits to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York and of any New York state court sitting in the City of New York, Borough of Manhattan, for purposes of all legal proceedings arising out of or relating to this Agreement or the transactions contemplated hereby. The Pledgor irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient form. THE PLEDGOR AND, BY ACCEPTING THE BENEFITS OF THIS AGREEMENT, EACH SECURED PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(h)     In the event of any direct conflict between this Agreement and the Credit Agreement such that it would be impossible to comply with the provisions of each of this Agreement and the Credit Agreement, the provisions of the Credit Agreement shall control and be paramount to the provisions of this Agreement.

[SIGNATURE PAGES TO FOLLOW]

98040-1238 17092133.2

IN WITNESS WHEREOF, the Pledgor has caused this Pledge Agreement to be duly executed and delivered as of the date first above written.

PLEDGOR

Q'MAX SOLUTIONS INC.

By: _____

| Name | Mark Roberts |
| Title | Chief Financial Officer |

Acknowledged and agreed to as of the date first above written.

HSBC BANK CANADA, as Agent

By: _____

| Name | |
| Title | |

*[Signature Page to Pledge Agreement – Q'Max Solutions Inc. (U.S.)]*

IN WITNESS WHEREOF, the Pledgor has caused this Pledge Agreement to be duly executed and delivered as of the date first above written.

PLEDGOR

Q'MAX SOLUTIONS INC.

By: _____
    Name  _____
    Title  _____

Acknowledged and agreed to as of the date first above written.

HSBC BANK CANADA, as Agent

By: _____
    Name  _____  **Lyndsay Thompson**
    Title  _____  **Assistant Vice President**
                                       **Debt Finance Origination**

**Amber Bansal**
**Vice President**
**National Head**
**Debt Finance Origination**
**HSBC Bank Canada**

- 10 -

*[Signature Page to Pledge Agreement – Q'Max America Inc.]*

## SCHEDULE A TO PLEDGE AGREEMENT

### THE PLEDGED SECURITIES

| NAME OF PLEDGOR | NAME OF ISSUER | JURISDICTION OF INCORPORATION | NO. OF SHARES | CERTIFICATE NO. | PERCENTAGE OF ISSUER'S STOCK |
|---|---|---|---|---|---|
| Q'MAX SOLUTIONS INC. | Q'MAX AMERICA INC. | DELAWARE | 1 | CS-1 | 100% |

98040-1238 17092133.2

THIS IS EXHIBIT "_____20_____"

referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26th_

day of _May_ A.D. 20_20_

Jonathan Tomm
Barrister and Solicitor

## Q'MAX SOLUTIONS INC.

### AMENDMENT TO SECURITIES PLEDGE AGREEMENT

**THIS AMENDING AGREEMENT** is made as of the 1st day of September, 2016;

**BETWEEN:**

> **Q'MAX SOLUTIONS INC.**
>
> (the "**Debtor**")
>
> - and -
>
> **HSBC BANK CANDA, as Agent**
>
> (the "**Agent**")

**WHEREAS** the Debtor and the Agent entered into a Securities Pledge Agreement dated as of May 23, 2014 (as amended, supplemented or otherwise modified prior to the date hereof, the "**Securities Pledge Agreement**");

**AND WHEREAS** the Debtor and the Agent wish to amend the Securities Pledge Agreement on the terms set out herein;

**AND WHEREAS** all capitalized terms used in this Amending Agreement and not defined in this Amending Agreement shall have the meaning ascribed thereto in the Securities Pledge Agreement;

**NOW THEREFORE:**

1. Schedule A to the Securities Pledge Agreement is hereby deleted in its entirety and replaced with "Exhibit 1" hereto.

2. Schedule B to the Securities Pledge Agreement is hereby deleted in its entirety and replaced with "Exhibit 2" hereto.

3. Except as amended above, the Securities Pledge Agreement shall remain in full force and effect, unaltered. This Amending Agreement and the Securities Pledge Agreement constitute a single agreement and to the extent possible shall be read together as one instrument.

4. The Debtor hereby represents and warrants to and in favour of the Agent that this Amending Agreement has been duly authorized, executed and delivered by the Debtor and constitutes a legal, valid and binding obligation of the Debtor, enforceable in accordance with its terms, except as enforceability thereof may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium or other similar laws affecting creditors' rights generally and general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

21985193.2

- 2 -

5.    The Debtor shall do all such further acts and things and execute all such further documents as shall be reasonably required in order to properly perform and carry out the terms of this Amending Agreement.

6.    This Amending Agreement shall be governed by and construed in accordance with the laws of the Province of Alberta and the laws of Canada applicable therein.

7.    This Amending Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute one and the same instrument.   Delivery of an executed signature page of this Amending Agreement by facsimile transmission or any electronic transmission shall be as effective as delivery of a manually executed counterpart hereof.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF** the parties hereto have executed this Amending Agreement as of the date first written above.

**Q'MAX SOLUTIONS INC.,** as Debtor

By: _____

Name:  Christopher Rivers
Title:  Director

**Ryan Smith**
Assistant Vice President,
Energy Financing

**HSBC BANK CANDA**, as Agent

By: _____

Name: **John Schmidt**

Title: Assistant Vice President
Energy Financing

[Signature page to Pledge Amendment]

## EXHIBIT 1

## SCHEDULE A

### PLEDGED PROPERTY

1.  The Securities Accounts described in Schedule B and all Securities Entitlements carried therein from time to time.

2.  All Securities and Security Entitlements of Q'Max Solutions Holdings Inc., 1356760 Alberta Ltd. and QMax Canada Operations Inc. (or any of their successors, including, for certainty, by way of amalgamation) in which the Debtor now or in the future has any right, title or interest whatsoever.

**EXHIBIT 2**

**SCHEDULE B**

**DEBTOR & PLEDGED PROPERTY INFORMATION**

**Full legal name:** Q'Max Solutions Inc.

**Jurisdiction of incorporation or organization:** British Columbia

**Address of chief executive office:**  Q'Max Solutions Inc.
11700 Katy Freeway, Suite 200
Houston, TX 77079

**Pledged Uncertificated Securities:** Nil

**Pledged Securities Accounts:** Nil

**Pledged Certificated Securities:** See below

| Pledged Issuer | Securities Owned | % of issued and outstanding Securities of Pledged Issuer as of the date hereof | Security Certificate Numbers | Security Certificate Location |
|---|---|---|---|---|
| Q'Max Solutions Holdings Inc. | 100 Class "A" Common Shares | 0.2 | A-1 | Alberta |
| Q'Max Solutions Holdings Inc. | 60,000 Class "C" Preferred Shares | 99.8 | C-1 | Alberta |
| 1356760 Alberta Ltd. | 2,984,800 Class "A" Common Shares | 100 | A-1, A-2 | Alberta |
| QMax Canada Operations Inc. | 372 Common Shares | 100 | C-1 | Alberta |

THIS IS EXHIBIT " _21_ "

referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26th_

day of _May_ A.D. 20 _20_

Jonathan Tomm
Barrister and Solicitor

*Execution Version*

INTERCREDITOR AGREEMENT

by and among

ENCINA BUSINESS CREDIT, LLC,
as ABL Agent,

and

HSBC BANK CANADA,
as Parent Facility Agent

Dated as of September 6, 2019

Table of Contents

Page

ARTICLE 1 Definitions..............................................................................................1

    Section 1.1 UCC Definitions ...................................................................................1
    Section 1.2 Other Definitions .................................................................................2
    Section 1.3 Rules of Construction ........................................................................16

ARTICLE 2 Lien Priority .........................................................................................16

    Section 2.1 Agreement to Subordinate .................................................................16
    Section 2.2 Waiver of Right to Contest Liens ......................................................18
    Section 2.3 Remedies Standstill............................................................................19
    Section 2.4 Exercise of Rights..............................................................................20
    Section 2.5 No New Liens .....................................................................................23
    Section 2.6 Waiver of Marshalling .......................................................................24

ARTICLE 3 Actions of the Parties ..........................................................................24

    Section 3.1 Certain Actions Permitted..................................................................24
    Section 3.2 Bailee for Perfection ..........................................................................25
    Section 3.3 Inspection and Access Rights ............................................................26
    Section 3.4 Insurance ............................................................................................28
    Section 3.5 No Additional Rights For the Credit Parties Hereunder .....................29
    Section 3.6 Payments Over ...................................................................................29
    Section 3.7 Agent Discretion ................................................................................30

ARTICLE 4 Application of Proceeds........................................................................30

    Section 4.1 Application of Proceeds ......................................................................30
    Section 4.2 Specific Performance .........................................................................33
    Section 4.3 Sale of Collateral Comprising Both ABL Priority Collateral and Parent
               Facility Priority Collateral; Certain Proceeds of Capital Stock .......................33
    Section 4.4 Priorities in Proceeds .........................................................................33

ARTICLE 5 Intercreditor Acknowledgements and Waivers .......................................34

    Section 5.1 Notice of Acceptance and Other Waivers...........................................34
    Section 5.2 Modifications to ABL Documents and Parent Facility Documents ....36
    Section 5.3 Reinstatement and Continuation of Agreement..................................38

ARTICLE 6 Insolvency Proceedings........................................................................39

    Section 6.1 DIP Financing ....................................................................................39
    Section 6.2 Relief From Stay ................................................................................40
    Section 6.3 No Contest .........................................................................................40

Error! Unknown document property name.

Table of Contents
(continued)

Section 6.4 Asset Sales ........................................................................................................41
Section 6.5 Separate Grants of Security and Separate Classification ................................41
Section 6.6 Enforceability ..................................................................................................42
Section 6.7 ABL Obligations Unconditional .....................................................................42
Section 6.8 Parent Facility Obligations Unconditional......................................................42
Section 6.9 **[Reserved]** ...................................................................................................43
Section 6.10 Adequate Protection .......................................................................................43
Section 6.11 Plan of Reorganization ...................................................................................43
Section 6.12 Section 1111(b) of the Bankruptcy Code........................................................44

ARTICLE 7 Miscellaneous .....................................................................................................44

Section 7.1 Rights of Subrogation .....................................................................................44
Section 7.2 Further Assurances..........................................................................................45
Section 7.3 Representations ................................................................................................45
Section 7.4 Amendments ....................................................................................................45
Section 7.5 Addresses for Notices .....................................................................................46
Section 7.6 No Waiver, Remedies ......................................................................................47
Section 7.7 Continuing Agreement, Transfer of Secured Obligations ...............................47
Section 7.8 Governing Law:  Entire Agreement.................................................................47
Section 7.9 Counterparts ....................................................................................................48
Section 7.10 No Third Party Beneficiaries ..........................................................................48
Section 7.11 Provisions Solely to Define Relative Rights...................................................48
Section 7.12 Headings .........................................................................................................48
Section 7.13 Severability .....................................................................................................48
Section 7.14 Agents .............................................................................................................48
Section 7.15 VENUE; JURY TRIAL WAIVER ..................................................................48
Section 7.16 Intercreditor Agreement ..................................................................................49
Section 7.17 No Warranties or Liability ...............................................................................50
Section 7.18 Conflicts ..........................................................................................................50
Section 7.19 Information Concerning Financial Condition of the Credit Parties...................50

**Error! Unknown document property name.**

<u>INTERCREDITOR AGREEMENT</u>

THIS INTERCREDITOR AGREEMENT (as amended, restated, supplemented, waived or otherwise modified from time to time pursuant to the terms hereof, this "<u>Agreement</u>") is entered into as of September 6, 2019 by and among Encina Business Credit, LLC, in its capacity as agent (together with its successors and assigns in such capacity from time to time, and as further defined herein, the "<u>ABL Agent</u>") for the ABL Secured Parties, HSBC Bank Canada, in its capacity as agent (together with its successors and assigns in such capacity from time to time, and as further defined herein, the "<u>Parent Facility Agent</u>") for the Parent Facility Secured Parties, and acknowledged by each Credit Party (as defined below).  Capitalized terms defined in Article 1 hereof are used in this Agreement as so defined.

<u>RECITALS</u>

A.     Pursuant to the Original ABL Credit Agreement, (i) the ABL Credit Agreement Lenders have agreed to make certain loans and other financial accommodations to or for the benefit of the ABL Borrowers and (ii) the ABL Guarantors have agreed to guarantee the payment and performance of the ABL Borrowers' obligations under the ABL Documents.

B.     As a condition to the effectiveness of the Original ABL Credit Agreement and to secure the obligations of the ABL Credit Parties under and in connection with the ABL Documents, the ABL Credit Parties have granted to the ABL Agent (for the benefit of the ABL Secured Parties) Liens on the Collateral.

C.     Pursuant to the Original Parent Facility Credit Agreement, (i) the Parent Facility Credit Agreement Lenders have agreed to make certain loans to or for the benefit of the Parent Facility Borrowers and (ii)  the Credit Parties have agreed to guarantee the payment and performance of the Parent Facility Borrowers' obligations under the Parent Facility Documents.

D.     To secure the obligations of the applicable Borrowers under and in connection with the Parent Facility Documents, the Credit Parties have granted to the Parent Facility Agent (for the benefit of the Parent Facility Secured Parties) Liens on the Collateral.

E.     Each of the ABL Agent (on behalf of the ABL Secured Parties) and the Parent Facility Agent (on behalf of the Parent Facility Secured Parties) and, by their acknowledgment hereof, the Credit Parties desire to agree to the relative priority of Liens on the Collateral and certain other rights, priorities and interests as provided herein.

Accordingly**,** in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE 1

<u>Definitions</u>

Section 1.1 <u>UCC Definitions</u>.   The following terms which are defined in the Uniform Commercial Code are used herein as so defined:  Chattel Paper, Commercial Tort

Claims, Commodity Accounts, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Financial Assets, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter-of-Credit Rights, Money, Payment Intangibles, Promissory Notes, Records, Security, Securities Accounts, Security Entitlements, Supporting Obligations and Tangible Chattel Paper.

Section 1.2 <u>Other Definitions</u>.  As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>ABL Agent</u>" shall mean Encina Business Credit, LLC, in its capacity as agent under the ABL Credit Agreement, together with its successors and assigns in such capacity from time to time, whether under the Original ABL Credit Agreement or any subsequent ABL Credit Agreement, as well as any Person designated as the "Agent" or "Collateral Agent" under any subsequent ABL Credit Agreement.

"<u>ABL Amount</u>" shall have the meaning set forth in <u>Section 4.3</u>.

"<u>ABL Borrowers</u>" shall mean, collectively, Anchor Drilling (together with its successors and assigns), along with each direct and indirect Subsidiary thereof that at any time is a "Borrower" under (and as defined in) the ABL Credit Agreement and any other Person who, with Parent Facility Agent's consent (unless otherwise permitted under the Parent Facility Documents), becomes a "Borrower" under the ABL Credit Agreement.

"<u>ABL Cap</u>" means $65,000,000 plus, in the case of a DIP Financing, the DIP Amount.

"<u>ABL Collateral Documents</u>" shall mean the ABL Credit Agreement and each of the security agreements and other instruments and documents (including, without limitation, all mortgages, guaranties, and pledge agreements) executed and delivered by any Credit Party for purposes of providing collateral security for the ABL Obligations, in each case as the same may be amended, restated, supplemented, waived or modified from time to time, in each case in accordance with the terms hereof.

"<u>ABL Credit Agreement</u>" shall mean the Original Credit Agreement and shall include any other agreement extending the maturity of, consolidating, restructuring, refunding, replacing, or refinancing all or any portion of the ABL Obligations, whether by the same or any other agent, lender or group of lenders (including, without limitation, under any agreement with respect to a DIP Financing provided by any or all of the ABL Secured Parties), in each case in accordance with the terms hereof and so long as the holders of such indebtedness (or an agent on their behalf) shall have agreed to be bound by this Agreement and no such holder is a Credit Party, a Parent Facility Credit Party or an Affiliate of any such Person.

"<u>ABL Credit Agreement Lenders</u>" shall mean the lenders, debtholders and other creditors party from time to time to the ABL Credit Agreement, together with their successors, assigns and transferees.

"<u>ABL Credit Parties</u>" shall mean the ABL Borrowers and the Loan Parties (as defined in the ABL Credit Agreement), including the ABL Guarantors, and each other direct or

indirect Subsidiary of Parent that, with Parent Facility Agent's consent (unless otherwise permitted under the Parent Facility Documents), is now or hereafter becomes a party to any ABL Document.

"ABL Documents" shall mean (a) the ABL Credit Agreement and the other Loan Documents (as defined in the ABL Credit Agreement) or the applicable definition designated by the ABL Agent as being its equivalent in any subsequent ABL Credit Agreement, (b) each Hedging Agreement or other such agreement pursuant to which "Obligations" (as defined in the ABL Credit Agreement) arise and (c) each Bank Product Agreement or other such agreement pursuant to which "Obligations" (as defined in the ABL Credit Agreement) arise, in each case as amended, restated, supplemented, waived or otherwise modified from time to time, in each case in accordance with the terms hereof.

"ABL Guarantors" shall mean, collectively, the ABL Borrowers, each direct and indirect Subsidiary of Anchor Drilling (together with its successors and assigns) that at any time is a guarantor under the ABL Credit Agreement and any other Person who, with Parent Facility Agent's consent (unless otherwise permitted under the Parent Facility Documents), becomes a guarantor under the ABL Credit Agreement or provides any guarantees of any ABL Obligations in favor of any ABL Secured Party.

"ABL Obligations" means all obligations of every nature of each Credit Party from time to time owed to the ABL Secured Parties, or any of them, under any ABL Document, including, without limitation, all "Obligations" of each Credit Party or similar term as defined in the ABL Credit Agreement, whether for principal, interest, reimbursement of amounts drawn under letters of credit, payments for early termination of swap contracts, fees, expenses, indemnification or otherwise, and all other amounts owing or due under the terms of the ABL Documents (including interest, fees, indemnification payments, expense reimbursements and other amounts which, but for the filing of an Insolvency Proceeding with respect to such Credit Party, would have accrued on or been payable with respect to any ABL Obligation, whether or not a claim is allowed against such Credit Party for such interest, fees, indemnification payments, expense reimbursements and other amounts in the related Insolvency Proceeding), as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time in accordance with the terms hereof and thereof.

"ABL Priority Collateral" shall mean all Collateral (other than the Parent Facility Priority Collateral), including the following :

(1)    all Receivables (other than Receivables identifiable as Proceeds of Parent Facility Priority Collateral but expressly including Receivables constituting ABL Priority Inventory Proceeds);

(2)    all ABL Priority Inventory Proceeds;

(3)    all Capital Stock of the Company and of any direct or indirect Subsidiaries of the Company;

(4)    all Intellectual Property, other than the Specified Intellectual Property;

(5)      (x) all Deposit Accounts and Securities Accounts (and all Money, cash, Cash Equivalents, checks, other negotiable instruments, funds and other evidences of payments, Securities and Security Entitlements, in each case, credited thereto or deposited therein), and (y) all cash and Cash Equivalents, in each case other than (i) the Asset Sales Proceeds Account and all cash, checks and other property held therein or credited thereto, and (ii) except as otherwise provided in Sections 4.3 and 4.4, Proceeds of Parent Facility Priority Collateral;

(6)      all Chattel Paper (including Tangible Chattel Paper and Electronic Chattel Paper), all Documents, General Intangibles (including data processing software, Instruments (including Promissory Notes), Letter of Credit Rights and Commercial Tort Claims, except to the extent any of the foregoing also relates to Parent Facility Priority Collateral, only that portion related to the items referred to in the preceding clauses (1) through (5) shall be included in the ABL Priority Collateral;

(7)      all Supporting Obligations; except to the extent any of the foregoing relates to or constitutes Parent Facility Priority Collateral only that portion related to the items referred to in the preceding clauses (1) through (6) shall be included in the ABL Priority Collateral;

(8)      all claims under policies of business interruption insurance and all proceeds of business interruption insurance;

(9)      all rights under the ABL Documents and to the proceeds of the advances thereunder;

(10)     all books and Records (including all books, databases, customer lists, credit files, computer files and Records, whether tangible or electronic), except to the extent any of the foregoing also relates to Parent Facility Priority Collateral, only that portion related to the items referred to in the preceding clauses (1) through (9) shall be included in the ABL Priority Collateral; and

(11)     all accessions to, substitutions for and replacements of the foregoing, and all Proceeds of the foregoing, including cash, Cash Equivalents, Money, instruments, securities, financial assets, Investment Property, insurance proceeds and Deposit Accounts and Securities Accounts directly received as Proceeds of any ABL Priority Collateral described in the preceding clauses (1) through (10) (such Proceeds, "ABL Priority Proceeds"); provided, however, that no Proceeds of ABL Priority Proceeds will constitute ABL Priority Collateral unless such Proceeds of ABL Priority Proceeds would otherwise constitute ABL Priority Collateral.

"ABL Priority Inventory Proceeds" shall mean all Proceeds of Inventory (including Receivables and Proceeds thereof) arising:

(i)      prior to the third Business Day following ABL Agent's receipt of an Inventory Proceeds Priority Notice delivered by Parent Facility Agent after the occurrence of an Inventory Proceeds Trigger Event;

(ii)     after an Inventory Proceeds Priority Rescission Event; or

(iii)     at any time while a DIP Financing provided by any or all of the ABL Secured Parties and secured by Proceeds of Inventory is in effect and any obligations thereunder remain outstanding, in an amount not to exceed at any time the aggregate amount outstanding under such DIP Financing (subject to the ABL Cap).

"ABL Priority Proceeds" shall have the meaning set forth in the definition of "ABL Priority Collateral" in this Agreement.

"ABL Recovery" shall have the meaning set forth in Section 5.3(a).

"ABL Secured Parties" shall mean the ABL Credit Agreement Lenders, the ABL Agent and any other secured parties under the ABL Documents (including affiliates of ABL Credit Agreement Lenders that provide cash management services, hedges or other bank products to Credit Parties).

"Affiliate" shall mean, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  For the purposes of this definition, "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise; and "Controlling" and "Controlled" have meanings correlative thereto.

"Agent" shall mean the ABL Agent and the Parent Facility Agent, as applicable.

"Agreement" shall mean this Intercreditor Agreement, as the same may be amended, restated, supplemented, waived or otherwise modified from time to time pursuant to the terms hereof.

"Anchor Drilling" shall mean Anchor Drilling Fluids USA, LLC.

"Asset Sales Proceeds Account" shall mean one or more Deposit Accounts or Securities Accounts holding only the proceeds of any sale or disposition of any Parent Facility Priority Collateral and the Proceeds of investment thereof.

"Bank Products Agreement" shall mean any agreement pursuant to which a bank or other financial institution agrees to provide composite accounting or other cash pooling arrangements and netting, overdraft protection, employee credit card programs, automatic clearing house arrangements and other arrangements with any bank arising under standard business terms of such bank.

"Bankruptcy Code" shall mean title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Bankruptcy Law" shall mean the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

5

"Borrower" shall mean any of the ABL Borrowers and the Parent Facility Borrowers.

"Business Day" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in Illinois or New York are authorized or required by law to close.

"Capital Stock" of any Person shall mean any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, member interests, participation or other equivalents of or interests in equity of such Person whether voting or non-voting, including common stock, preferred stock, convertible securities or any other equity security.

"Cash Collateral" shall mean any Collateral consisting of Money or Cash Equivalents, any Security Entitlement and any Financial Assets.

"Cash Equivalents" shall have the meaning assigned to such term in the Original ABL Credit Agreement as in effect on the date hereof, and any other cash equivalents similar to such "Cash Equivalents" described therein.

"Collateral" shall mean all Property now owned or hereafter acquired by any Credit Party in or upon which a Lien is granted or purported to be granted to the ABL Agent or the Parent Facility Agent under any of the ABL Collateral Documents, or the Parent Facility Collateral Documents, together with all rents, issues, profits, products, and Proceeds thereof to the extent a Lien is granted or purported to be granted therein to the applicable Agent by such applicable documents (including for the avoidance of doubt, any such Property that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision of any Bankruptcy Laws), would be Collateral).

"Collateral Documents" shall mean the ABL Collateral Documents and the Parent Facility Collateral Documents.

"Company" shall mean Anchor Drilling Fluids LLC, a Delaware limited liability company, and any successor in interest thereto.

"Control Collateral" shall mean any Collateral consisting of any Certificated Security, Investment Property, Securities Account, Deposit Account, Instruments, Chattel Paper and any other Collateral as to which a Lien may be perfected through possession or control by the secured party, or any agent therefor.

"Copyrights" shall mean all (a) copyright rights in any work subject to the copyright laws of the United States or any other jurisdiction, whether registered or unregistered and whether published or unpublished, including copyrights in computer software and the content thereof, and internet web sites and the content thereof, (b) all derivative works, renewals, extensions, reversions or restorations associated with such copyrights, now or hereafter provided by law, regardless of the tangible medium of fixation, (c) registrations, recordings and applications for registration of any such copyright rights in the United States or any other jurisdiction, including registrations, recordings, supplemental registrations and pending

applications for registration in the United States Copyright Office or in a foreign equivalent, and (d) rights to obtain all renewals thereof.

"Credit Documents" shall mean the ABL Documents and the Parent Facility Documents.

"Credit Parties" shall mean each Person who constitutes an ABL Credit Party, including, as applicable, in such Person's capacity Parent Facility Credit Party.  For the avoidance of doubt, "Credit Parties" shall not include any Parent Facility Credit Party that is not an ABL Credit Party.

"Declining Agent" shall have the meaning set forth in Section 2.5(c).

"DIP Amount" means, after the commencement of an Insolvency Proceeding, the greater of (i) $7,800,000 and (b) 15% of the lesser of (x) the maximum revolving commitment amount under the ABL Credit Agreement as in effect immediately prior to the commencement of such Insolvency Proceeding and (y) the ABL Cap (calculated without giving effect to the addition of the DIP Amount as set forth in the definition thereof).

"DIP Financing" shall have the meaning assigned to it in Section 6.1(a).

"Discharge of ABL Obligations" shall mean, subject to Section 5.3:

(a)     the payment in full in cash of the Indebtedness under the ABL Credit Agreement (including interest accruing during the pendency of any Insolvency Proceeding, regardless of whether allowed or allowable in such Insolvency Proceeding) and all other ABL Obligations (other than obligations under any ABL Document that is a Hedging Agreement or a Bank Products Agreement) that are outstanding and unpaid at the time all such Indebtedness under the applicable ABL Credit Agreement is paid in full in cash, (i) including (if applicable), with respect to amounts available to be drawn under outstanding letters of credit issued thereunder at such time (or indemnities or other undertakings issued pursuant thereto in respect of outstanding letters of credit at such time), delivery or provision of cash or backstop letters of credit in respect thereof in compliance with the terms of any such ABL Credit Agreement (which shall not exceed an amount equal to 105% of the aggregate undrawn amount of such letters of credit) but (ii) excluding unasserted contingent indemnification obligations under the applicable ABL Credit Agreement at such time;

(b)     the termination of all then outstanding commitments to extend credit or issue Letters of Credit under the ABL Documents at such time; and

(c)     the payment in full in cash of all other ABL Obligations that are outstanding and unpaid at such time (or, with respect to any obligations under any ABL Document that is a Hedging Agreement or a Bank Products Agreement, termination of such agreements and payment in cash of amount due in respect thereof, or cash collateralization or other arrangements satisfactory to the applicable counterparty).

For the avoidance of doubt, the Discharge of ABL Obligations shall not be deemed to have occurred in connection with a refinancing of the then existing ABL Credit Agreement with a subsequent ABL Credit Agreement.

"Discharge of Parent Facility Obligations" shall mean, subject to Section 5.3:

(a) the payment in full in cash of the Indebtedness under the Parent Facility Credit Agreement (including interest accruing during the pendency of any Insolvency Proceeding, regardless of whether allowed or allowable in such Insolvency Proceeding) and all other Parent Facility Obligations (other than obligations under any Parent Facility Document that is a Hedging Agreement or a Bank Products Agreement) that are outstanding and unpaid at the time all such Indebtedness under the Parent Facility Credit Agreement is paid in full in cash, but excluding unasserted contingent indemnification obligations under the Parent Facility Credit Agreement at such time;

(b) the termination of all then outstanding commitments under the Parent Facility Documents at such time; and

(c) the payment in full in cash of all other Parent Facility Obligations that are outstanding and unpaid at such time (or, with respect to any obligations under any Parent Facility Document that is a Hedging Agreement or a Bank Products Agreement, termination of such agreements and payment in cash of amount due in respect thereof, or cash collateralization or other arrangements satisfactory to the applicable counterparty).

For the avoidance of doubt, the Discharge of Parent Facility Obligations shall not be deemed to have occurred in connection with a refinancing of the then existing Parent Facility Credit Agreement with a subsequent Parent Facility Credit Agreement.

"Disposition" shall mean any sale, issuance, conveyance, transfer, lease, license or other disposition.

"Event of Default" shall mean an Event of Default under any ABL Credit Agreement or any Parent Facility Credit Agreement.

"Exercise Any Secured Creditor Remedies" or "Exercise of Secured Creditor Remedies" shall mean:

(a) the taking of any action to enforce or realize upon any Lien on Collateral, including the institution of any foreclosure proceedings or the noticing of any public or private sale pursuant to Article 9 of the Uniform Commercial Code, or taking any action to enforce any right or power to repossess, replevy, attach, garnish, levy upon or collect the Proceeds of any Lien on Collateral;

(b) the exercise of any right or remedy provided to a secured creditor on account of a Lien on Collateral under any of the Credit Documents, under applicable law, by self-help repossession, by notification to account obligors of any Grantor, in an Insolvency Proceeding or otherwise, including the election to retain any of the Collateral in satisfaction of a Lien on Collateral;

(c)     the taking of any action or the exercise of any right or remedy in respect of the collection on, set-off against, marshalling of, injunction respecting or foreclosure on the Collateral or the Proceeds thereof;

(d)     the appointment of a receiver, receiver and manager or interim receiver of all or part of the Collateral;

(e)     the sale, lease, license, or other disposition by an Agent or any Secured Party of all or any portion of the Collateral by private or public sale or any other means permissible under applicable law or, during an Event of Default, the applicable Agent's or Requisite Holder's consenting to any such sale, lease license or other disposition conducted by a Credit Party and not otherwise permitted under the applicable Credit Documents;

(f)     the exercise of any other right of a secured creditor under Part 6 of Article 9 of the Uniform Commercial Code in respect of a Credit Party or the Collateral;

(g)     the exercise by an Agent or any Secured Party of any voting rights relating to any Capital Stock included in the Collateral; and

(h)     the delivery by an Agent or any Secured Party of any notice, claim or demand relating to the Collateral to any Person (including any securities intermediary, depository bank or landlord) in possession or control of any Collateral,

provided that (i) filing a proof of claim or statement of interest in any Insolvency Proceeding, (ii) the acceleration of the ABL Obligations or the Parent Facility Obligations, (iii) the establishment or change of borrowing base and/or availability reserves, collateral or Receivables or Inventory ineligibles, or other conditions for advances, (iv) the changing of advance rates or advance sub-limits, (v) the imposition of a default rate or late fee, (vi) the collection and application (including pursuant to "cash dominion" provisions) of Receivables or other monies deposited from time to time in Commodity Accounts, Deposit Accounts or Securities Accounts, in each case, against the ABL Obligations pursuant to the provisions of the ABL Credit Agreement (including the notification of account debtors, depositary institutions or any other Person to deliver proceeds of ABL Priority Collateral to the ABL Agent), (vii) the cessation of lending or termination of commitments pursuant to the provisions of the ABL Documents or the Parent Facility Documents, (viii) the consent by the ABL Agent to disposition by any Grantor of any of the ABL Priority Collateral or the consent by the Parent Facility Agent to disposition by any Grantor of any of the Parent Facility Priority Collateral or (ix) seeking adequate protection subject to the other provisions hereof shall, in each case, not be deemed to be an Exercise of Secured Creditor Remedies.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including the European Union.

"Grantor" shall mean any Credit Party that has granted or purported to grant security under a Collateral Document.

"<u>Hedging Agreement</u>" shall mean any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest, currency exchange rate or commodity price hedging arrangement.

"<u>Indebtedness</u>" shall have the meaning provided in the Original ABL Credit Agreement on the date thereof.

"<u>Insolvency Proceeding</u>" shall mean (a) any case commenced by or against any Grantor under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of any Grantor, any receivership or administration of any Grantor or assignment, compromise or arrangement with or for the benefit of creditors relating to any Grantor or any similar case, action or proceeding relative to any Grantor or its creditors, as such, in each case whether or not voluntary; (2) any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to any Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or (3) any other proceeding of any type or nature in which substantially all claims of creditors of any Grantor are determined and any payment or distribution is or may be made on account of such claims.

"<u>Intellectual Property</u>" shall mean, with respect to any Credit Party, the collective reference to such Credit Party's Trade Secrets, Copyrights, Patents, Trademarks and the IP Agreements, all rights therein, and all rights to sue at law or in equity for any past, present or future infringement, misappropriation, violation, misuse or other impairment thereof, including the right to receive injunctive relief and all Proceeds and damages therefrom.

"<u>Inventory Proceeds Priority Notice</u>" shall mean a written notice delivered to the ABL Agent by the Parent Facility Agent after the occurrence of an Inventory Proceeds Priority Trigger Event (and before the occurrence of an Inventory Proceeds Priority Rescission Event), stating that an Inventory Proceeds Priority Trigger Event has occurred.

"<u>Inventory Proceeds Priority Rescission Event</u>" shall mean the occurrence of all of the following events, after the occurrence of an Inventory Proceeds Priority Trigger Event: (i) any acceleration of the Parent Facility Obligations has been rescinded, (ii) the Parent Facility Agent has ceased any Exercise of Secured Creditor Remedies, (iii) any pending Insolvency Proceeding has been dismissed and (iv) no Event of Default exists.

"<u>Inventory Proceeds Priority Trigger Event</u>" shall mean the occurrence of one or more of the following events: (i) acceleration of the Parent Facility Obligations, (ii) commencement by the Parent Facility Agent of any Exercise of Secured Creditor Remedies or (iii) the commencement of an Insolvency Proceeding.

"<u>IP Agreements</u>" shall mean any and all written agreements, now or hereafter in effect, relating to the license, development, use, manufacture, distribution, sale or disclosure of any Copyrights, Patents, Trademarks, Trade Secrets or other Intellectual Property to which any Grantor, now or hereafter, is a party.

"<u>Lien</u>" shall mean, with respect to any asset, (a) any mortgage, trust declared for the purpose of creating a security interest in an asset, lien, pledge, encumbrance, charge or

security interest in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing).

"Lien Priority" shall mean, with respect to any Lien of the ABL Agent, the ABL Secured Parties, the Parent Facility Agent and the Parent Facility Secured Parties in the Collateral, the order of priority of such Lien as specified in Section 2.1.

"Original ABL Credit Agreement" shall mean that certain Loan and Security Agreement dated as of September 6, 2019 by and among the ABL Borrowers, the ABL Credit Agreement Lenders and the ABL Agent, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms hereof.

"Original Parent Facility Credit Agreement" shall mean that certain Credit Agreement dated as of January 30, 2015 by and among the Parent Facility Borrowers, the Parent Facility Credit Agreement Lenders and the Parent Facility Agent, as amended to the date hereof and as may be further amended, restated, supplemented, waived or otherwise modified from time to time in accordance with terms hereof.

"Parent Facility Agent" shall mean HSBC Bank Canada, in its capacity as collateral agent under the Original Parent Facility Credit Agreement, together with its successors and assigns in such capacity from time to time, whether under the Original Parent Facility Credit Agreement or any subsequent Parent Facility Credit Agreement, as well as any Person designated as the "Agent" or "Collateral Agent" under any Parent Facility Credit Agreement.

"Parent Facility Borrowers" shall have the meaning assigned to the term "Borrowers" in the Parent Facility Credit Agreement.

"Parent Facility Collateral Documents" shall mean the Security (as defined in the Parent Facility Credit Agreement) and each of the security agreements and other instruments and documents executed and delivered by any Credit Party for purposes of providing collateral security for the Parent Facility Obligations, in each case as the same may be amended, supplemented, waived or modified from time to time, in each case in accordance with the terms hereof.

"Parent Facility Credit Agreement" shall mean the Original Parent Facility Credit and shall include any other agreement extending the maturity of, consolidating, restructuring, refunding, replacing or refinancing all or any portion of the Parent Facility Obligations, whether by the same or any other agent, lender or group of lenders, in each case as the same may be amended, restated, supplemental, waived or modified from time to time, in each case in accordance with the terms hereof and so long as the holders of such indebtedness (or an agent on their behalf) shall have agreed to be bound by this Agreement and no such holder is a Credit Party, a Parent Facility Credit Party or an Affiliate of any such Person.

"Parent Facility Credit Agreement Lenders" shall mean the lenders, debtholders, and other creditors party from time to time to the Parent Facility Credit Agreement, together with their successors, assigns and transferees.

"<u>Parent Facility Credit Parties</u>" shall mean the Parent Facility Borrowers, the Parent Facility Guarantors, and each other Person that is now or hereafter becomes a party to the Parent Facility Documents.

"<u>Parent Facility Documents</u>" shall mean (a) the Parent Facility Credit Agreement and the other Loan Documents (as defined in the Parent Facility Credit Agreement) or the applicable definition designated by the Parent Facility Agent as being its equivalent in any subsequent Parent Facility Credit Agreement, (b) each Hedging Agreement or other agreement pursuant to which Hedging Liabilities (as defined in the Parent Facility Credit Agreement) arise and (c) each Bank Product Agreement or similar agreement pursuant to which Banking Services Liabilities (as defined in the Parent Facility Credit Agreement) arise (in each case as amended, restated, supplemented, waived or otherwise modified from time to time, in each case in accordance with the terms hereof.

"<u>Parent Facility Guarantors</u>" shall mean, collectively, the Parent Facility Borrowers and any other Person who becomes a guarantor under the Parent Facility Credit Agreement or provides any guarantees of any Parent Facility Obligations of any Parent Facility Credit Party in favor of any Parent Facility Secured Party.

"<u>Parent Facility Obligations</u>" means all obligations of every nature of each Credit Party from time to time owed to the Parent Facility Secured Parties, or any of them, under any Parent Facility Document, including, without limitation, all "Obligations" of each Credit Party or similar term as defined in the Parent Facility Credit Agreement, whether for principal, interest, fees, expenses, indemnification or otherwise, and all other amounts owing or due under the terms of the Parent Facility Documents (including interest, fees, indemnification payments, expense reimbursements and other amounts which, but for the filing of an Insolvency Proceeding with respect to such Credit Party, would have accrued on or been payable with respect to any Parent Facility Obligation, whether or not a claim is allowed against such Credit Party for such interest, fees, indemnification payments, expense reimbursements and other amounts in the related Insolvency Proceeding), as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time in accordance with the terms hereof and thereof.

"<u>Parent Facility Priority Collateral</u>" shall mean all Collateral consisting of the following:

(1)     Real Property;

(2)     Equipment;

(3)     Inventory;

(4)     the Specified Intellectual Property;

(5)     to the extent involving or governing any of the items referred to in the preceding clauses (1) through (4), all Chattel Paper (including Tangible Chattel Paper and Electronic Chattel Paper), all Documents, General Intangibles (including data processing software but excluding Intellectual Property and Capital Stock of the Company and direct and indirect Subsidiaries of the Company), Instruments (including Promissory Notes), Letter of

Credit Rights and Commercial Tort Claims, provided that to the extent any of the foregoing also relates to ABL Loan Priority Collateral, only that portion related to the items referred to in the preceding clauses (1) through (4) shall be included in the Parent Facility Priority Collateral;

(6)     to the extent involving or governing any of the items referred to in the preceding clauses (1) through (5), all Supporting Obligations; provided that to the extent any of the foregoing also relates to ABL Loan Priority Collateral only that portion related to the items referred to in the preceding clauses (1) through (5) shall be included in the Parent Facility Priority Collateral;

(7)     all books and Records relating to the foregoing (including all books, databases, customer lists, credit files, computer files and Records, whether tangible or electronic, which contain any information relating to any of the foregoing), except to the extent any of the foregoing also relates to ABL Priority Collateral, only that portion related to the items referred to in the preceding clauses (1) through (6) shall be included in the Parent Facility Priority Collateral;

(8)     all accessions to, substitutions for and replacements of the foregoing, and all Proceeds (other than ABL Priority Inventory Proceeds) of the foregoing, including cash, Cash Equivalents, Money, instruments, securities (other than Capital Stock of the Company and direct and indirect Subsidiaries of the Company), financial assets, Investment Property (other than Capital Stock of the Company and direct and indirect Subsidiaries of the Company), insurance proceeds and Deposit Accounts and Securities Accounts directly received as Proceeds of any Parent Facility Priority Collateral described in the preceding clauses (1) through (5) (such Proceeds, "Parent Facility Priority Proceeds"); provided, however, that no Proceeds of Parent Facility Priority Proceeds will constitute Parent Facility Priority Collateral unless such Proceeds of Parent Facility  Priority Proceeds would otherwise constitute Parent Facility Priority Collateral.

Under no circumstance shall ABL Priority Inventory Proceeds, or the Proceeds thereof, constitute Parent Facility Priority Collateral or Parent Facility Priority Proceeds.

"Parent Facility Priority Proceeds" shall have the meaning set forth in the definition of "Parent Facility Priority Collateral."

"Parent Facility Recovery" shall have the meaning set forth in Section 5.3(b).

"Parent Facility Secured Parties" shall mean the Agent, Lenders and Hedge Providers (in each case, as defined in the Original Parent Facility Credit Agreement) or the definition designated by the Parent Facility Agent as being its equivalent in any subsequent Parent Facility Credit Agreement.

"Party" shall mean, at any time, the ABL Agent or the Parent Facility Agent, and "Parties" shall mean all of the ABL Agent and the Parent Facility Agent.

"Patents" shall mean (a) all letters patent of the United States or any other jurisdiction, all registrations, recordings and extensions thereof, and all applications for letters patent of the United States or any other jurisdiction, including patent registrations, statutory

invention registrations, utility models, recordings and pending applications in the United States Patent and Trademark Office or a foreign equivalent, and (b) all reissues, continuations, divisions, continuations-in-part, renewals or extensions thereof, and in the case of (a) and (b), all the inventions disclosed or claimed therein and all improvements thereto, including the right to make, use and/or sell the inventions disclosed or claimed therein.

"Payment Collateral" shall mean all Receivables, Instruments, Chattel Paper, Letter-Of-Credit Rights, Deposit Accounts (other than the Asset Sales Proceeds Account), Securities Accounts, and Payment Intangibles, together with all Supporting Obligations, in each case composing a portion of the Collateral.

"Person" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Pledged Securities" shall mean all equity interests of any Credit Party that are required to be pledged to the Parent Facility Agent under the Parent Facility Documents or shall have the meaning assigned to the term "Pledged Equity" in the ABL Credit Agreement, as the context requires.

"Priority Collateral" shall mean the ABL Priority Collateral or the Parent Facility Priority Collateral.

"Proceeds" shall mean (a) all "proceeds" as such term is defined in Article 9 of the Uniform Commercial Code, with respect to the Collateral, (b) whatever is recoverable or recovered when any Collateral is sold, exchanged, collected, or disposed of, whether voluntarily or involuntarily and (c) in the case of Proceeds of Pledged Securities, all dividends or other income from the Pledged Securities, collections thereon or distributions or payments with respect thereto.

"Property" shall mean any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"Real Property" shall mean any right, title or interest in and to real property, including any fee interest, leasehold interest, easement, or license and any other right to use or occupy real property.

"Receivable" shall have the meaning assigned to the term "Account" in the Original ABL Credit Agreement as in effect on the date hereof, for the avoidance of doubt, shall include Receivables without regard to whether the any amount thereof has been invoiced or billed.

"Requisite ABL Holders" shall mean those ABL Secured Parties necessary to validly consent to the requested action in accordance with the ABL Collateral Documents.

"Requisite Parent Facility Holders" shall mean those Parent Facility Secured Parties necessary to validly consent to the requested action in accordance with the Parent Facility Collateral Documents.

"Secured Parties" shall mean the ABL Secured Parties and the Parent Facility Secured Parties.

"Specified Intellectual Property" shall mean the Intellectual Property identified in Annex I hereto.

"Subsidiary" of a Person shall mean a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.

"Trade Secrets" shall mean (a) all trademarks, service marks, domain names, trade names, corporate names, company names, business names, fictitious business names, trade dress, logos, slogans, other source or business identifiers, now existing or hereafter adopted or acquired, whether registered or unregistered, in each case arising under the laws of the United States or any state thereof or any other jurisdiction, and all registrations, recordings and applications for registration filed in connection with the foregoing, including registrations, recordings and applications for registration in the United States Patent and Trademark Office or any similar offices in any State of the United States or any foreign jurisdiction and all common-law rights related thereto, (b) all goodwill associated therewith or symbolized thereby and (c) all extensions or renewals thereof.

"Trademarks" shall mean all confidential and proprietary information, including know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, databases and data, in each case arising under the laws of the United States or any State thereof or any foreign jurisdiction, including, without limitation, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information.

"Uniform Commercial Code" shall mean the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided that to the extent that the Uniform Commercial Code is used to define any term in any security document and such term is defined differently in differing Articles of the Uniform Commercial Code, the definition of such term contained in Article 9 shall govern; provided, further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, publication or priority of, or remedies with respect to, Liens of any Party is governed by the Uniform Commercial Code or foreign personal property security laws as enacted and in effect in a jurisdiction other than the State of New York, the term "Uniform Commercial Code" will mean the Uniform Commercial Code or such foreign personal property security laws as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"United States" shall mean the United States of America.

"Use Period" means the period commencing on the date that the ABL Agent commences the liquidation and sale of the ABL Priority Collateral and ending 90 days thereafter; provided that if any stay or other order that prohibits any of the ABL Agent, the other ABL Secured Parties, or any Credit Party (with the consent of the ABL Agent) from commencing and continuing to Exercise Any Secured Creditor Remedies or to liquidate and sell the ABL Priority Collateral has been entered by a court of competent jurisdiction, such 90-day period shall be tolled during the pendency of any such stay or other order and the Use Period shall be so extended.

Section 1.3 <u>Rules of Construction</u>.  Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof", "herein", "hereby", "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.  Article, section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders and supplements thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders and supplements set forth herein).  Any reference herein to any Person shall be construed to include such Person's successors and assigns.  Any reference herein to the repayment in full of an obligation shall mean the payment in full in cash of such obligation, or in such other manner as may be approved in writing by the holder of the obligation at such holder's sole option.

ARTICLE 2

Lien Priority

Section 2.1 <u>Agreement to Subordinate</u>.  (a) Notwithstanding (<u>i</u>) the date, time, method, manner, or order of grant, attachment, or perfection (including any defect or deficiency or alleged defect or deficiency in any of the foregoing) of any Liens granted to the ABL Agent or the ABL Secured Parties in respect of all or any portion of the Collateral, or of any Liens granted to the Parent Facility Agent or the Parent Facility Secured Parties in respect of all or any portion of the Collateral, and regardless of how any such Lien was acquired (whether by grant, statute, operation of law, subrogation or otherwise), (<u>ii</u>) the order or time of filing or recordation of any document or instrument for perfecting the Liens in favor of the ABL Agent or the Parent Facility Agent (or the ABL Secured Parties or the Parent Facility Secured Parties) in any Collateral, (<u>iii</u>) any provision of the Uniform Commercial Code, the Bankruptcy Code or any other applicable law, or of the ABL Documents or the Parent Facility Documents, (<u>iv</u>) whether the ABL Agent or the Parent Facility Agent, in each case, either directly or through agents, holds possession of, or has control over, all or any part of the Collateral, (<u>v</u>) the fact that any such Liens in favor of the ABL Agent or the ABL Secured Parties or the Parent Facility Agent or the Parent Facility Secured Parties securing any of the ABL Obligations or the Parent Facility Obligations respectively, are (<u>x</u>) subordinated to any Lien securing any obligation of any Credit Party other than the Parent Facility Obligations (in the case of the ABL Obligations) or the ABL Obligations

(in the case of the Parent Facility Obligations), respectively, or (y) otherwise subordinated, voided, avoided, invalidated or lapsed or (vi) any other circumstance of any kind or nature whatsoever, the ABL Agent, on behalf of itself and the ABL Secured Parties and the Parent Facility Agent, on behalf of itself and the Parent Facility Secured Parties represented thereby, hereby agree that:

(1)     any Lien in respect of all or any portion of the ABL Priority Collateral now or hereafter held by or on behalf of the Parent Facility Agent or any Parent Facility Secured Party that secures all or any portion of the Parent Facility Obligations, shall in all respects be junior and subordinate to all Liens granted to the ABL Agent and the ABL Secured Parties in the ABL Priority Collateral to secure all or any portion of the ABL Obligations;

(2)     any Lien in respect of all or any portion of the ABL Priority Collateral now or hereafter held by or on behalf of the ABL Agent or any ABL Secured Party that secures all or any portion of the ABL Obligations shall in all respects be senior and prior to all Liens granted to the Parent Facility Agent or any Parent Facility Secured Party in the ABL Priority Collateral to secure all or any portion of the Parent Facility Obligations;

(3)     any Lien in respect of all or any portion of the Parent Facility Priority Collateral now or hereafter held by or on behalf of the ABL Agent or any ABL Secured Party that secures all or any portion of the ABL Obligations shall in all respects be junior and subordinate to all Liens granted to the Parent Facility Agent and the Parent Facility Secured Parties in the Parent Facility Priority Collateral to secure all or any portion of the Parent Facility Obligations; and

(4)     any Lien in respect of all or any portion of the Parent Facility Priority Collateral now or hereafter held by or on behalf of the Parent Facility Agent or any Parent Facility Secured Party that secures all or any portion of the Parent Facility Obligations shall in all respects be senior and prior to all Liens granted to the ABL Agent or any ABL Secured Party in the Parent Facility Priority Collateral to secure all or any portion of the ABL Obligations.

(b)     Notwithstanding any failure by any ABL Secured Party or Parent Facility Secured Party to perfect its security interests in the Collateral or any avoidance, invalidation, priming or subordination by any third party or court of competent jurisdiction of the security interests in the Collateral granted to the ABL Secured Parties or the Parent Facility Secured Parties, the priority and rights as between the ABL Secured Parties, on the one hand, and the Parent Facility Secured Parties, on the other hand, with respect to the Collateral shall be as set forth herein.

(c)     The Parent Facility Agent, for and on behalf of itself and the Parent Facility Secured Parties, acknowledges and agrees that the ABL Agent, for the benefit of itself and the ABL Secured Parties, has been granted Liens upon all of the Collateral in which the Parent Facility Agent has been granted Liens and the Parent Facility Agent hereby consents thereto. The ABL Agent, for and on behalf of itself and the ABL Secured Parties, acknowledges and agrees that the Parent Facility Agent, for the benefit of itself and the Parent Facility Secured

Parties, has been granted Liens upon all of the Collateral in which the ABL Agent has been granted Liens and the ABL Agent hereby consents thereto.  The subordination of Liens by the Parent Facility Agent in favor of the ABL Agent, by the ABL Agent in favor of the Parent Facility Agent and in each case as set forth herein, shall not be deemed to subordinate the Liens of the Parent Facility Agent or the ABL Agent to the Liens of any other Person.

(d)     Lien priority as between the ABL Obligations, on the one hand, and the Parent Facility Obligations, on the other hand, with respect to any Collateral will be governed solely by this Agreement, except as may be separately otherwise agreed in writing by or among any applicable Parties.

Section 2.2   Waiver of Right to Contest Liens.

(a) The Parent Facility Agent, for and on behalf of itself and the Parent Facility Secured Parties, agrees that it and they shall not (and hereby waives any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the extent, validity, attachment, priority, enforceability or perfection of the Liens of the ABL Agent and the ABL Secured Parties in respect of the Collateral or the provisions of this Agreement.  Except to the extent expressly set forth in this Agreement, the Parent Facility Agent, for itself and on behalf of the Parent Facility Secured Parties, agrees that none of the Parent Facility Agent or the Parent Facility Secured Parties will take any action that would interfere with any Exercise of Secured Creditor Remedies undertaken by the ABL Agent or any ABL Secured Party under the ABL Documents with respect to the ABL Priority Collateral.  Except to the extent expressly set forth in this Agreement, the Parent Facility Agent, for itself and on behalf of the Parent Facility Secured Parties, hereby waives any and all rights it or the Parent Facility Secured Parties may have as a junior lien creditor or otherwise to contest, protest, object to, or interfere with the manner in which the ABL Agent or any ABL Secured Party seeks to enforce its Liens in any ABL Priority Collateral.

(b)     The ABL Agent, for and on behalf of itself and the ABL Secured Parties, agrees that it and they shall not (and hereby waives any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the extent, validity, attachment, priority, enforceability or perfection of the Liens of any Parent Facility Agent and any Parent Facility Secured Parties in respect of the Collateral or the provisions of this Agreement.  Except to the extent expressly set forth in this Agreement, the ABL Agent, for itself and on behalf of the ABL Secured Parties, agrees that none of the ABL Agent or the ABL Secured Parties will take any action that would interfere with any Exercise of Secured Creditor Remedies undertaken by the Parent Facility Agent or any Parent Facility Secured Party under the Parent Facility Documents, with respect to the Parent Facility Priority Collateral.  Except to the extent expressly set forth in this Agreement, the ABL Agent, for itself and on behalf of the ABL Secured Parties, hereby waives any and all rights it or the ABL Secured Parties may have as a junior lien creditor or otherwise to contest, protest, object to, or interfere with the manner in which the Parent Facility Agent or any Parent Facility Secured Party seeks to enforce its Liens in any Parent Facility Priority Collateral.

(c)      For the avoidance of doubt, the assertion of priority rights established under the terms of this Agreement or in any separate writing between any of the parties hereto shall not be considered a challenge to the Lien priority of any Party prohibited by this Section 2.2.

Section 2.3  Remedies Standstill.

(a) The Parent Facility Agent, on behalf of itself and the Parent Facility Secured Parties, agrees that, until the Discharge of ABL Obligations, neither the Parent Facility Agent nor any Parent Facility Secured Party will, or will seek to, Exercise Any Secured Creditor Remedies (or institute or join in any action or proceeding with respect to the Exercise of Secured Creditor Remedies) with respect to any of the ABL Priority Collateral without the written consent of the ABL Agent and, subject to Sections 4.3 and 4.4, will not knowingly take, receive or accept any Proceeds of ABL Priority Collateral, it being understood and agreed that the temporary deposit of Proceeds of ABL Priority Collateral in a Deposit Account controlled by the Parent Facility Agent, if any, shall not constitute a breach of this Agreement so long as such Proceeds are promptly (but in no event later than five (5) Business Days after the Parent Facility Agent's actual knowledge of its receipt thereof) remitted to the ABL Agent. From and after the date upon which the Discharge of ABL Obligations shall have occurred, the Parent Facility Agent or any Parent Facility Secured Party may Exercise Any Secured Creditor Remedies under the Parent Facility Documents or applicable law as to any ABL Priority Collateral; provided, however, that any Exercise of Secured Creditor Remedies with respect to any Collateral by the Parent Facility Agent or any Parent Facility Secured Party is at all times subject to the provisions of this Agreement.

(b)      The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that until the Discharge of Parent Facility Obligations, neither the ABL Agent nor any ABL Secured Party will, or will seek to, Exercise Any Secured Creditor Remedies (or institute or join in any action or proceeding with respect to the Exercise of Secured Creditor Remedies) with respect to the Parent Facility Priority Collateral without the written consent of the Parent Facility Agent and, subject to Sections 4.3 and 4.4, will not knowingly take, receive or accept any Proceeds of the Parent Facility Priority Collateral (other than to the extent constituting ABL Priority Collateral), it being understood and agreed that (i) the temporary deposit of Proceeds of Parent Facility Priority Collateral in a Deposit Account controlled by the ABL Agent shall not constitute a breach of this Agreement so long as, if ABL Agent receives written notice from Parent Facility Agent that such Proceeds constitute identifiable Proceeds of Parent Facility Priority Collateral prior to the deposit thereof in such Deposit Account, such Proceeds are promptly (but in no event later than five (5) Business Days after the ABL Agent's actual knowledge of its receipt thereof) remitted to the Parent Facility Agent, and (ii) notwithstanding the foregoing, ABL Agent may manufacture, package and sell Inventory during a Use Period as contemplated by (and subject to the terms of) Section 3.3.  From and after the date upon which the Discharge of Parent Facility Obligations shall have occurred, the ABL Administrative Agent or any ABL Secured Party may Exercise Any Secured Creditor Remedies under the ABL Documents or applicable law as to any Parent Facility Priority Collateral; provided, however, that any Exercise of Secured Creditor Remedies with respect to any Collateral by the Parent Facility Agent or any Parent Facility Secured Party is at all times subject to the provisions of this Agreement.

Section 2.4  <u>Exercise of Rights</u>.

(a)  <u>Notice of ABL Agent's Lien</u>.  Without limiting <u>Section 2.3</u> hereof, and subject to <u>Section 2.4(d)</u>, the Parent Facility Agent, for and on behalf of itself and the Parent Facility Secured Parties, hereby agrees that, until the Discharge of ABL Obligations, in connection with any Exercise of Secured Creditor Remedies by the Parent Facility Agent or any Parent Facility Secured Party with respect to any ABL Priority Collateral, the Parent Facility Agent or such Parent Facility Secured Party, as applicable, shall advise any purchaser or transferee of any ABL Priority Collateral in writing that the sale (whether public, private, by foreclosure, or otherwise) or other transfer of such ABL Priority Collateral is subject to the Liens of the ABL Agent and the ABL Secured Parties, unless the ABL Agent otherwise consents in writing.  In addition, the Parent Facility Agent agrees, for and on behalf of itself and the Parent Facility Secured Parties, that, until the Discharge of ABL Obligations, any notice of any proposed foreclosure or sale of any ABL Priority Collateral and any other notice in connection with the Exercise of Secured Creditor Remedies with respect thereto shall state prominently and clearly that the sale is subject to the ABL Agent's and the ABL Secured Parties' prior Liens and that such Liens shall continue as against the ABL Priority Collateral to be sold, unless the ABL Agent otherwise consents in writing.

(b)  <u>Notice of Parent Facility Agent's Lien</u>.  Without limiting <u>Section 2.3</u> hereof, and subject to <u>Section 2.4(d)</u>, the ABL Agent, for and on behalf of itself and the ABL Secured Parties, hereby agrees that, until the Discharge of Parent Facility Obligations, in connection with any Exercise of Secured Creditor Remedies by the ABL Agent or any ABL Secured Party with respect to the Parent Facility Priority Collateral, the ABL Agent or such ABL Secured Party, as applicable, shall advise any purchaser or transferee of any Parent Facility Priority Collateral in writing that the sale (whether public, private, by foreclosure, or otherwise) or other transfer of such Parent Facility Priority Collateral is subject to the Liens of the Parent Facility Agent and the Parent Facility Secured Parties, unless the Parent Facility Agent otherwise consents in writing.  In addition, the ABL Agent agrees, for and on behalf of itself and the ABL Secured Parties, that, until the Discharge of Parent Facility Obligations, any notice of any proposed foreclosure or sale of any Parent Facility Priority Collateral and any other notice in connection with the Exercise of Secured Creditor Remedies with respect thereto shall state prominently and clearly that the sale is subject to the Parent Facility Agent's and the Parent Facility Secured Parties' prior Liens and that such Liens shall continue as against the Parent Facility Priority Collateral to be sold, unless the Parent Facility Agent otherwise consents in writing.

(c)  <u>No Other Restrictions</u>.

(i)  Except as expressly set forth in this Agreement, each of the Parent Facility Agent, the Parent Facility Secured Parties, the ABL Agent and the ABL Secured Parties shall have any and all rights and remedies it may have as a creditor under applicable law, including the right to the Exercise of Secured Creditor Remedies (except as may be separately otherwise agreed in writing by and between or among any applicable Parties, solely as among such Parties and the Secured Parties represented thereby); <u>provided</u>, <u>however</u>, that the Exercise of Secured Creditor Remedies with respect to the Collateral shall be subject to the Lien Priority and to the provisions of this Agreement, including <u>Sections 2.3</u> and <u>4.1</u> hereof.  The ABL Agent may

enforce the provisions of the ABL Documents and the Parent Facility Agent may enforce the provisions of the Parent Facility Documents, all in such order and in such manner as each may determine in the exercise of its sole discretion, consistent with the terms of this Agreement and mandatory provisions of applicable law (except as may be separately otherwise agreed in writing by and between or among any applicable Parties, solely as among such Parties and the Secured Parties represented thereby); provided, however, that each of the ABL Agent and the Parent Facility Agent agrees to provide to each other such Party (x) prior written notice of the commencement of any Exercise of Secured Creditor Remedies and (y) copies of any notices that it is required under applicable law to deliver to any Credit Party; provided, further, however, that the ABL Agent's failure to provide any such copies to any other such Party (other than the notice described in the preceding clause (x)) shall not impair any of the ABL Agent's rights hereunder or under any of the ABL Documents, and the Parent Facility Agent's failure to provide any such copies to any other such Party (other than the notice described in the preceding clause (x)) shall not impair any of the Parent Facility Agent's rights hereunder or under any of the Parent Facility Documents.

(ii)     The Parent Facility Agent, on behalf of itself and the Parent Facility Secured Parties, agrees that it will not institute or join in any suit, Insolvency Proceeding or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim against the ABL Agent or any other ABL Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to, any action taken or omitted to be taken by such Person with respect to the Collateral that is consistent with the terms of this Agreement, and none of such Persons shall be liable for any such action taken or omitted to be taken.

(iii)     The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that it will not institute or join in any suit, Insolvency Proceeding or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim against the Parent Facility Agent or any other Parent Facility Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to, any action taken or omitted to be taken by such Person with respect to the Collateral that is consistent with the terms of this Agreement, and none of such Persons shall be liable for any such action taken or omitted to be taken.

(d)     Release of Liens.

(i)     In the event of (A) any private or public sale of all or any portion of the ABL Priority Collateral in connection with any Exercise of Secured Creditor Remedies by or with the consent of the ABL Agent, (B) any sale, transfer or other disposition of all or any portion of the ABL Priority Collateral (including upon termination or discharge of a subsidiary guarantee), so long as such sale, transfer or other disposition (or release or discharge) is then permitted by the ABL Credit Agreement and, if no Event of Default exists, the Parent Facility Credit Agreement, or (C) the release of the ABL Collateral Secured Parties' Lien on all or any portion of the ABL Priority Collateral, which release under clause (C) shall have been approved by the Requisite ABL Holders and, if no Event of Default exists, the Requisite Parent Facility Holders, in the case of clauses (B) and (C), only to the extent occurring prior to the Discharge of ABL Obligations (without regard to clause (c) of the definition thereof) and not in connection

with a Discharge of ABL Obligations (without regard to clause (c) of the definition thereof), the Parent Facility Agent agrees, on behalf of itself and the Parent Facility Secured Parties, that (so long as, if applicable, the net cash proceeds of any such sale, if any, described in clause (A) above are applied as provided in Section 4.1 hereof and there is a corresponding release of the Liens securing the ABL Obligations) such sale, transfer, disposition or release will be free and clear of the Liens on such ABL Priority Collateral securing the Parent Facility Obligations, and the Parent Facility Agent's and the Parent Facility Secured Parties' Liens with respect to the ABL Priority Collateral so sold, transferred, disposed or released shall terminate and be automatically, unconditionally, and simultaneously released without further action.    In furtherance of, and subject to, the foregoing, the Parent Facility Agent agrees that it will execute any and all Lien releases or other documents reasonably requested by the ABL Agent in connection therewith.  Parent Facility Agent hereby appoints the ABL Agent and any officer or duly authorized person of the ABL Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of such Party and in the name of such Party or in the ABL Agent's own name, from time to time, in the ABL Agent sole discretion, for the purposes of carrying out the terms of this paragraph, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this paragraph, including any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

(ii)    In the event of (A) any private or public sale of all or any portion of the Parent Facility Priority Collateral in connection with any Exercise of Secured Creditor Remedies by or with the consent of the Parent Facility Agent, (B) any sale, transfer or other disposition of all or any portion of the Parent Facility Priority Collateral (including upon termination or discharge of a subsidiary guarantee), so long as such sale, transfer or other disposition (or release or discharge) is then permitted by the Parent Facility Credit Agreement and, if no Event of Default exists, the ABL Credit Agreement, or (C) the release of the Parent Facility Secured Parties' Liens on all or any portion of the Parent Facility Priority Collateral, which release under clause (C) shall have been approved by the Requisite Parent Facility Holders and, if no Event of Default exists, the Requisite ABL Holders, in the case of clauses (B) and (C), only to the extent occurring prior to the Discharge of Parent Facility Obligations (without regard to clause (c) in each of the definition of Discharge of Parent Facility Obligations) and not in connection with a Discharge of Parent Facility Obligations (without regard to clause (c) in each of the definition of Discharge of Parent Facility Obligations), the ABL Agent agrees, on behalf of itself and the ABL Secured Parties, that (so long as, if applicable, the net cash proceeds of any such sale, if any, described in clause (A) above are applied as provided in Section 4.1 hereof and there is a corresponding release of the Liens securing the Parent Facility Obligations) such sale, transfer, disposition or release will be free and clear of the Liens on such Parent Facility Priority Collateral securing the ABL Obligations and the ABL Agent's and the ABL Secured Parties' Liens with respect to the Parent Facility Priority Collateral so sold, transferred, disposed or released shall terminate and be automatically, unconditionally and simultaneously released without further action.  In furtherance of, and subject to, the foregoing, the ABL Agent agrees that it will execute any and all Lien releases or other documents reasonably requested by the Parent Facility Agent in connection therewith.  The ABL Agent hereby appoints the Parent Facility Agent and any officer or duly authorized person of the Parent Facility Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of

attorney in the place and stead of such Party and in the name of such Party or in the Parent Facility Agent's own name, from time to time, in the Parent Facility Agent's sole discretion, for the purposes of carrying out the terms of this paragraph, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this paragraph, including any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

Section 2.5  No New Liens.

(a) Until the Discharge of ABL Obligations, the parties hereto agree that (except as may be separately otherwise agreed in writing by and between the relevant Agents, each on behalf of itself and the Secured Parties represented thereby), no Parent Facility Secured Party shall knowingly acquire or hold (x) any guarantee of the Parent Facility Obligations by any Credit Party unless such Credit Party also provides a guarantee of the ABL Obligations or (y) any Lien on any assets of any Credit Party securing any Parent Facility Obligation which assets are not also subject to the Lien of the ABL Agent under the ABL Collateral Documents (other than to the extent the ABL Agent is a Declining Agent with respect to such guarantee or assets), subject to the Lien Priority set forth herein.  If any Parent Facility Secured Party shall nonetheless acquire or hold any guarantee of the Parent Facility Obligations by any Credit Party who does not provide a guarantee of the ABL Obligations or any Lien on any assets of any Credit Party securing any Parent Facility Obligation which assets are not also subject to the Lien of the ABL Agent under the ABL Collateral Documents (other than to the extent the ABL Agent is a Declining Agent with respect to such guarantee or assets), subject to the Lien Priority set forth herein, then the Parent Facility Agent (or the relevant Parent Facility Secured Party) shall, without the need for any further consent of any other Parent Facility Secured Party and notwithstanding anything to the contrary in any other Parent Facility Document, be deemed to also hold and have held such Lien for the benefit of the ABL Agent as security for the ABL Obligations (subject to the Lien Priority and other terms hereof) and shall promptly notify the ABL Agent in writing of the existence of such guarantee or Lien.

(b)     Until the Discharge of Parent Facility Obligations, the parties hereto agree that (except as may be separately otherwise agreed in writing by and between the relevant Agents, each on behalf of itself and the Secured Parties represented thereby), no ABL Secured Party shall knowingly acquire or hold (x) any guarantee of ABL Obligations by any Person unless such Person also provides a guarantee of the Parent Facility Obligations, or (y) any Lien on any assets of any Credit Party securing any ABL Obligation which assets are not also subject to the Lien of the Parent Facility Agent under the Parent Facility Collateral Documents (other than to the extent the Parent Facility Agent is a Declining Agent with respect to such guarantee or assets), subject to the Lien Priority set forth herein.  If any ABL Secured Party shall nonetheless acquire or hold any guarantee of the ABL Obligations by any Person who does not provide a guarantee of the Parent Facility Obligations any Lien on any assets of any Credit Party securing any ABL Obligations which assets are not also subject to the Lien of the Parent Facility Agent under the Parent Facility Collateral Documents (other than to the extent the Parent Facility Agent is a Declining Agent with respect to such guarantee or assets), subject to the Lien Priority set forth herein, then the ABL Agent (or the relevant ABL Secured Party) shall, without the need for any further consent of any other ABL Secured Party and notwithstanding anything to the

contrary in any other ABL Document be deemed to also hold and have held such Lien for the benefit of the Parent Facility Agent as security for the Parent Facility Obligations (subject to the Lien Priority and other terms hereof) and shall promptly notify the Parent Facility Agent in writing of the existence of such guarantee or Lien.

(c)     No Agent shall be deemed to be in breach of this Section 2.5 as a result of any other Agent (a "<u>Declining Agent</u>") expressly declining, in writing after being offered the applicable guarantee or grant of a Lien on the applicable asset by the applicable Person or Credit Party, or failing to respond to such offer within 30 days thereof, in which case such Declining Agent shall be deemed to have declined to accept such guarantee or Lien on such asset.

(d)     Notwithstanding anything in this Agreement or any other ABL Document or Parent Facility Document, collateral consisting of cash and cash equivalents pledged to secure ABL Obligations or Parent Facility Obligations consisting of reimbursement obligations in respect of letters of credit shall be applied as specified in the applicable ABL Document or Parent Facility Document and shall not constitute "Collateral" for purposes of this Section 2.5, except to the extent any amounts remain after such letters of credit are terminated after satisfaction of any reimbursement obligations with respect thereto.

Section 2.6  <u>Waiver of Marshalling</u>.  Until the Discharge of ABL Obligations and the Parent Facility Agent, on behalf of itself and the Parent Facility Secured Parties, agrees not to assert, and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the ABL Priority Collateral or any other similar rights a junior secured creditor may have under applicable law.

Until the Discharge of Parent Facility Obligations, the ABL Agent, on behalf of itself and the ABL Secured Parties, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Parent Facility Priority Collateral or any other similar rights a junior secured creditor may have under applicable law.

ARTICLE 3

<u>Actions of the Parties</u>

Section 3.1  <u>Certain Actions Permitted</u>.  Notwithstanding anything herein to the contrary:

(a)     the Parent Facility Agent and the ABL Agent may make such demands or file such claims in respect of the Parent Facility Obligations or the ABL Obligations, as applicable, as are necessary to prevent the waiver or bar of such claims under applicable statutes of limitations or other statutes, court orders, or rules of procedure at any time;

(b)     in any Insolvency Proceeding commenced by or against any Credit Party, each Parent Facility Secured Party and ABL Secured Party may file a proof of claim or statement

of interest with respect to its respective Parent Facility Obligations and ABL Obligations, as applicable;

(c)     each Parent Facility Secured Party and ABL Secured Party shall be entitled to file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of such Parent Facility Secured Party or ABL Secured Party, as applicable, including, without limitation, any claims secured by the Collateral, if any, in each case if not directly or indirectly inconsistent with the terms of this Agreement;

(d)     each Parent Facility Secured Party and ABL Secured Party shall be entitled to file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Credit Parties arising under either the Bankruptcy Law or applicable non-bankruptcy law, in each case if not directly or indirectly inconsistent with the terms of this Agreement and provided that any judgment Lien obtained in connection therewith shall be subject to the relative Lien priorities set forth in this Agreement; and

(e)     each Parent Facility Secured Party and ABL Secured Party shall be entitled to file any proof of claim and other filings and make any arguments and motions (including in support of or opposition to the confirmation or approval of any plan of reorganization) in order to preserve or protect its Liens on the Collateral that are, in each case, not directly or indirectly inconsistent with the terms of this Agreement, with respect to the Parent Facility Obligations, the ABL Obligations and the Collateral.

Section 3.2  Bailee for Perfection.

(a)     The ABL Agent, for and on behalf of itself and each ABL Secured Party and the Parent Facility Agent, for and on behalf of each Parent Facility Secured Party, each agree to hold all Control Collateral and Cash Collateral that is part of the Collateral in their respective possession, custody, or control (or in the possession, custody, or control of agents or bailees for either) as non-fiduciary, gratuitous bailee and agent for the benefit of each other (such bailment being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-313(c) of the Uniform Commercial Code) solely for the purpose of perfecting the security interest granted to each in such Control Collateral or Cash Collateral, subject to the terms and conditions of this Section 3.2.  Each of the ABL Agent and the Parent Facility Agent hereby accepts such appointments pursuant to this Section 3.2 and acknowledges and agrees that it shall hold and control, as applicable, the Control Collateral for the benefit of the other Secured Parties with respect to any Control Collateral and that any proceeds received thereby under any Control Collateral shall be applied in accordance with Section 4.  For purposes of this Section 3.2, "control" shall be deemed to also be defined as set forth in the Uniform Commercial Code.

(b)     None of the ABL Agent, the ABL Secured Parties, the Parent Facility Agent, or the Parent Facility Secured Parties, as applicable, shall have any obligation whatsoever to the others to assure that the Control Collateral or the Cash Collateral is genuine or owned by any Credit Party or any other Person or to preserve rights or benefits of any Person.  The duties or responsibilities of the ABL Agent and the Parent Facility Agent under this Section 3.2 are and

shall be limited solely to holding or maintaining control of the Control Collateral and the Cash Collateral as agent for the other Parties for purposes of perfecting the Lien held by the Parent Facility Agent or the ABL Agent, as applicable.  The ABL Agent is not and shall not be deemed to be a fiduciary of any kind for the Parent Facility Agent, the Parent Facility Secured Parties, or any other Person.  The Parent Facility Agent is not and shall not be deemed to be a fiduciary of any kind for the ABL Agent, the ABL Secured Parties, or any other Person.

(c)     Each Credit Party shall deliver all Control Collateral and all Cash Collateral required to be delivered pursuant to the Credit Documents (i) in the case of ABL Priority Collateral or Proceeds thereof, to the ABL Agent, or (ii) in the case of Parent Facility Priority Collateral or Proceeds thereof, to the Parent Facility Agent.

Section 3.3  Inspection and Access Rights.

(a)     Without limiting any rights the ABL Agent or any other ABL Secured Party may otherwise have under applicable law or by agreement, in the event of any liquidation of the ABL Priority Collateral (or any other Exercise of Any Secured Creditor Remedies by the ABL Agent) and whether or not the Parent Facility Agent or any other Parent Facility Secured Party has commenced and is continuing to Exercise Any Secured Creditor Remedies of the Parent Facility Agent, the ABL Agent or any other Person (including any Credit Party) acting with the consent, or on behalf, of the ABL Agent, shall have the right (1) during the Use Period in connection with the conducting of audits and appraisals in the ordinary course, during normal business hours on any Business Day, to access ABL Priority Collateral that (i) is stored or located in or on, or (ii) has become an accession with respect to (within the meaning of Section 9-335 of the Uniform Commercial Code), or (iii) has been commingled with (within the meaning of Section 9-336 of the Uniform Commercial Code), Parent Facility Priority Collateral, and (2) during the Use Period, shall have an irrevocable, non-exclusive right and a royalty-free and rent-free license and right to use any Parent Facility Priority Collateral, each of the foregoing in order to collect or otherwise realize upon all Receivables or other amounts owing under Instruments or Chattel Paper or otherwise in respect of ABL Priority Collateral, (i) to inspect, copy, use or preserve any and all information relating to any of the Collateral (and to download or remove any such information relating to any of the ABL Priority Collateral), to take action to perfect its Liens on, take possession of, move, prepare and advertise for sale, sell (by public auction, private sale or otherwise), store or otherwise deal with the ABL Priority Collateral, and (ii) during the first thirty (30) days of such Use Period only (to the extent ABL Agent reasonably deems necessary or desirable in order to realize upon ABL Priority Collateral) to manufacture (or complete the manufacture), package and sell any current runs of Inventory; provided, however, that the royalty free, rent free license and lease granted in the this clause (a) with respect to Parent Facility Priority Collateral shall immediately expire upon the sale, lease, transfer or other disposition of such Parent Facility Priority Collateral, provided that the Parent Facility Agent shall have provided the ABL Agent with at least ten (10) days' notice prior to such sale, lease, transfer or disposition.

(b)     During the period of actual occupation, use and/or control by the ABL Secured Parties and/or the ABL Agent (or their respective employees, agents, advisers and representatives) of any Parent Facility Priority Collateral, the ABL Secured Parties and the ABL Agent shall be obligated to repair at their expense any physical damage (but not any other

diminution in value) to such Parent Facility Priority Collateral resulting from such occupancy, use or control, and to leave such Parent Facility Priority Collateral in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted. Notwithstanding the foregoing, in no event shall the ABL Secured Parties or the ABL Agent have any liability to the Parent Facility Secured Parties and/or to the Parent Facility Agent pursuant to this Section 3.3 as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Parent Facility Priority Collateral existing prior to the date of the exercise by the ABL Secured Parties (or the ABL Agent, as the case may be) of their rights under this Section 3.3 and the ABL Secured Parties shall have no duty or liability to maintain the Parent Facility Priority Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the ABL Secured Parties, or for any diminution in the value of the Parent Facility Priority Collateral that results from ordinary wear and tear resulting from the use of the Parent Facility Priority Collateral by the ABL Secured Parties in the manner and for the time periods specified under this Section 3.3. Without limiting the rights granted in this Section 3.3, the ABL Secured Parties and the ABL Agent shall cooperate with the Parent Facility Secured Parties and/or the Parent Facility Agent in connection with any efforts made by the Parent Facility Secured Parties and/or the Parent Facility Agent to sell the Parent Facility Priority Collateral.

(c)     **[Reserved.]**

(d)     Except as provided in clauses (b) and (e) of this Section 3.3, the ABL Agent and the other ABL Secured Parties shall not be obligated to pay any amounts to the Parent Facility Agent or the Parent Facility Secured Parties (or any person claiming by, through or under the Parent Facility Secured Parties, including any purchaser of the Parent Facility Priority Collateral) or to the Credit Parties, for or in respect of the use by the ABL Agent and the other ABL Secured Parties of the Parent Facility Priority Collateral.

(e)     The ABL Secured Parties shall (i) use the Parent Facility Priority Collateral in accordance with applicable law, (ii) insure for damage to property and liability to persons, including property and liability insurance for the benefit of the Parent Facility Secured Parties and (iii) indemnify the Parent Facility Secured Parties from any claim, loss, damage, cost or liability made by any third party (other than any Credit Party) arising from the ABL Secured Parties' use of the Parent Facility Priority Collateral (except for those arising from the gross negligence or willful misconduct of any Parent Facility Secured Party).

(f)     The Parent Facility Agent and the other Parent Facility Secured Parties (i) will use commercially reasonable efforts to cooperate with the ABL Agent and the other ABL Secured Parties in exercising its rights pursuant to this Section 3.3, (ii) will not hinder or restrict in any respect the ABL Agent from exercising the rights described in this Section 3.3 and (iii) will, subject to the rights of any landlords under real estate leases, permit the ABL Agent, its employees, agents, advisers and representatives to exercise the rights described in this Section 3.3.

(g)     In furtherance of the foregoing in this Section 3.3, the Parent Facility Agent and the other Parent Facility Secured Parties, in their capacity as a secured party (or as a purchaser, assignee or transferee, as applicable), and to the extent of its interest therein, hereby

grants to the ABL Agent and the other ABL Secured Parties during the Use Period a nonexclusive, irrevocable, royalty-free, worldwide license to use, license or sublicense any and all Intellectual Property now owned or hereafter acquired included as part of the Parent Facility Priority Collateral (and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof) as is or may be necessary or advisable in the ABL Agent's reasonable judgment for the ABL Agent in order to collect or otherwise realize upon all Receivables or other amounts owing under Instruments or Chattel Paper or otherwise in respect of ABL Priority Collateral, (i) to inspect, copy, use or preserve any and all information relating to any of the Collateral (and to download or remove any such information relating to any of the ABL Priority Collateral), store or otherwise deal with the ABL Priority Collateral, and (ii) during the first thirty (30) days of such Use Period only (to the extent ABL Agent reasonably deems necessary or desirable in order to realize upon ABL Priority Collateral) to manufacture (or complete the manufacture), package and sell any current runs of Inventory; provided that (i) any such license shall terminate upon the sale of the applicable ABL Priority Collateral and shall not extend or transfer to the purchaser of such ABL Priority Collateral, (ii) the ABL Agent's use of such Intellectual Property shall be reasonable and lawful, and (iii) any such license is granted on an "AS IS" basis, without any representation or warranty whatsoever. Furthermore, the Parent Facility Agent agrees that, in connection with any Exercise of Secured Creditor Remedies conducted by the Parent Facility Agent in respect of Parent Facility Priority Collateral, the Parent Facility shall provide written notice to any purchaser, assignee or transferee of Intellectual Property pursuant to an Exercise of Secured Creditor Remedies that the applicable Intellectual Property is subject to such license.

(h)     In the event that the ABL Agent shall, in the exercise of its rights under the ABL Collateral Documents or otherwise, receive possession or control of any books and records of any Credit Party which contain information identifying or pertaining to the Parent Facility Priority Collateral, the ABL Agent shall either make available to the Parent Facility Agent such books and records for inspection and duplication or provide to the Parent Facility Agent copies thereof. In the event that the Parent Facility Agent shall, in the exercise of its rights under the Parent Facility Security Documents or otherwise, receive possession or control of any books and records of any Credit Party which contain information identifying or pertaining to any of the ABL Priority Collateral, the Parent Facility Agent shall either make available to the ABL Agent such books and records for inspection and duplication or provide the ABL Agent copies thereof.

Section 3.4 Insurance.  Proceeds of Collateral include insurance proceeds and, therefore, the Lien Priority shall govern the ultimate disposition of casualty insurance proceeds. The ABL Agent shall be named as additional insured or loss payee, as applicable, with respect to all insurance policies relating to the Collateral and the Parent Facility Agent shall also be named as additional insured or loss payee, as applicable, with respect to all insurance policies relating to the Collateral. Until the Discharge of ABL Obligations, the ABL Agent shall have the sole and exclusive right, as against any Secured Party, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of ABL Priority Collateral. Until the Discharge of Parent Facility Obligations, the Parent Facility Agent shall have the sole and exclusive right, as against any Secured Party, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of Parent Facility Priority Collateral.  To the extent that an insured claim

covers both ABL Priority Collateral and Parent Facility Priority Collateral, then the ABL Agent and the Parent Facility Agent will work jointly and in good faith to collect, adjust and/or settle under the insurance policy, as applicable, in accordance with Section 4.3. All proceeds of such insurance shall be remitted to the ABL Agent or to the Parent Facility Agent, as the case may be, and each of the Parent Facility Agent and the ABL Agent shall cooperate (if necessary) in a reasonable manner in effecting the payment of insurance proceeds in accordance with Section 4.1 hereof.

Section 3.5 No Additional Rights For the Credit Parties Hereunder. Except as provided in Section 3.6, if any ABL Secured Party or Parent Facility Secured Party shall enforce its rights or remedies in violation of the terms of this Agreement, the Credit Parties shall not be entitled to use such violation as a defense to any action by any ABL Secured Party or Parent Facility Secured Party, nor to assert such violation as a counterclaim or basis for set off or recoupment against any ABL Secured Party or Parent Facility Secured Party.

Section 3.6 Payments Over.

(a)     So long as the Discharge of ABL Obligations has not occurred, any ABL Priority Collateral or Proceeds thereof not constituting Parent Facility Priority Collateral received by the Parent Facility Agent or any Parent Facility Secured Parties (i) in connection with the exercise of any right or remedy (including set off) relating to the ABL Priority Collateral in contravention of this Agreement or (ii) as proceeds of any assignment or transfer of any portion of the Parent Facility Obligations to a Credit Party, a Parent Facility Credit Party or an Affiliate of any such Person, shall be segregated and held in trust and forthwith paid over to the ABL Agent for the benefit of the ABL Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The ABL Agent is hereby authorized to make any such endorsements as agent for the Parent Facility Agent or any such Parent Facility Secured Parties. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

(b)     So long as the Discharge of Parent Facility Obligations has not occurred, any Parent Facility Priority Collateral or Proceeds thereof not constituting ABL Priority Collateral received by the ABL Agent or any other ABL Secured Party (i) in connection with the exercise of any right or remedy (including set off) relating to the Parent Facility Priority Collateral in contravention of this Agreement or (ii) as proceeds of any assignment or transfer of any portion of the ABL Facility Obligations to a Credit Party, a Parent Facility Credit Party or an Affiliate of any such Person, shall be segregated and held in trust and forthwith paid over to the Parent Facility Agent for the benefit of the Parent Facility Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The Parent Facility Agent is hereby authorized to make any such endorsements as agent for the ABL Agent or any such other ABL Secured Parties. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

(c)     Nothing in this Agreement shall prohibit the receipt by the ABL Agent or the Parent Facility Agent or any Secured Party of payments of interest, principal and other amounts owed in respect of the ABL Obligations or the Parent Facility Obligations, so long as

such receipt is not (i) the direct or indirect result of the Exercise of Any Secured Creditor Remedies by the ABL Agent or the Parent Facility Agent or any Secured Party in contravention of this Agreement with respect to any Lien held by any of them, or (ii) as proceeds of any assignment or transfer of any portion of the ABL Facility Obligations or the Parent Facility Obligations to a Credit Party, a Parent Facility Credit Party or an Affiliate of any such Person.

Section 3.7 <u>Agent Discretion</u>.   The Parent Facility Agent and the ABL Agent hereby agree that notwithstanding any provision to the contrary under any Parent Facility Document or ABL Document, as applicable, the ABL Agent shall have sole discretion (in consultation with the Company, if applicable) with respect to any determination concerning ABL Priority Collateral as to which such Agent would have authority to exercise under any Parent Facility Document or ABL Document, as applicable.   The Parent Facility Agent and the ABL Agent hereby agree that notwithstanding any provision to the contrary under any Parent Facility Document or ABL Document, as applicable, the Parent Facility Agent shall have sole discretion (in consultation with the Company, if applicable) with respect to any determination concerning Parent Facility Priority Collateral as to which such Agent would have authority to exercise under any Parent Facility Document or ABL Document, as applicable.

ARTICLE 4

Application of Proceeds

Section 4.1  <u>Application of Proceeds</u>.

(a)      <u>Revolving Nature of Obligations</u>.

(i)      The Parent Facility Agent, for and on behalf of itself and the Parent Facility Secured Parties, expressly acknowledges and agrees that (<u>i</u>) the Original ABL Credit Agreement includes a revolving commitment and any other ABL Credit Agreement may include a revolving commitment and in the ordinary course of business the ABL Agent and the ABL Secured Parties will apply payments and make advances thereunder, and no application of any Payment Collateral or Cash Collateral or the release of any Lien by the ABL Agent upon any portion of the Collateral in connection with a permitted disposition under any ABL Credit Agreement shall constitute the Exercise of Secured Creditor Remedies under this Agreement; (<u>ii</u>) the amount of the ABL Obligations that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, the terms of the ABL Obligations may be modified, extended or amended from time to time, and the aggregate amount of the ABL Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Parent Facility Secured Parties and without affecting the provisions hereof; and (<u>iii</u>) all Payment Collateral or Cash Collateral received by the ABL Agent may be applied, reversed, reapplied, credited, or reborrowed, in whole or in part, to the ABL Obligations at any time; <u>provided</u>, <u>however</u>, that from and after the date on which the ABL Agent (or any ABL Secured Party) commences the Exercise of Secured Creditor Remedies, all amounts received by the ABL Agent or any ABL Secured Party as a result of such Exercise of Secured Creditor Remedies shall be applied as otherwise specified in this <u>Section 4.1</u>.  The Lien Priority shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment,

reborrowing, increase, replacement, renewal, restatement or refinancing of the ABL Obligations, the Parent Facility Obligations, or any portion thereof.

(ii)     The ABL Agent, for and on behalf of itself and the ABL Secured Parties, expressly acknowledges and agrees that (i) the Original Parent Facility Credit Agreement includes a revolving commitment and any other Parent Facility Credit Agreement may include a revolving commitment and in the ordinary course of business the Parent Facility Agent and the Parent Facility Secured Parties will apply payments and make advances thereunder, and no application of any Payment Collateral or Cash Collateral or the release of any Lien by the Parent Facility Agent upon any portion of the Collateral in connection with a permitted disposition under any Parent Facility Credit Agreement shall constitute the Exercise of Secured Creditor Remedies under this Agreement; (ii) the amount of the Parent Facility Obligations that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, the terms of the Parent Facility Obligations may be modified, extended or amended from time to time, and the aggregate amount of the Parent Facility Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the ABL Secured Parties and without affecting the provisions hereof; and (iii) all Payment Collateral or Cash Collateral received by the Parent Facility Agent may be applied, reversed, reapplied, credited, or reborrowed, in whole or in part, to the Parent Facility Obligations at any time; provided, however, that from and after the date on which the Parent Facility Agent (or any Parent Facility Secured Party) commences the Exercise of Secured Creditor Remedies, all amounts received by the Parent Facility Agent or any Parent Facility Secured Party as a result of such Exercise of Secured Creditor Remedies shall be applied as otherwise specified in this Section 4.1.  The Lien Priority shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of the Parent Facility Obligations, the ABL Obligations, or any portion thereof.

(b)     Application of Proceeds of ABL Priority Collateral.  The ABL Agent and the Parent Facility Agent hereby agree that all ABL Priority Collateral, and, subject to Sections 4.3 and 4.4, all Proceeds thereof, received by any of them in connection with (x) any Exercise of Secured Creditor Remedies or (y) any Insolvency Proceeding (but excluding in connection with a DIP Financing complying with the terms of Section 6.1(a) hereof) shall be applied,

first, to the payment of costs and expenses of the ABL Agent in connection with such Exercise of Secured Creditor Remedies to the extent provided in the ABL Documents,

second, to the payment of the ABL Obligations in accordance with the ABL Credit Agreement until the Discharge of ABL Obligations,

third, by the Parent Facility Agent to the payment of the Parent Facility Obligations in accordance with the Parent Facility Credit Agreement until the Discharge of Parent Facility Obligations, and

fourth, the balance, if any, to the Credit Parties or to whomsoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

Each ABL Agent and Parent Facility Agent shall provide the ABL Agent and the Parent Facility Agent with such information about the ABL Obligations or Parent Facility Obligations represented by it as they may reasonably request in order to carry out the purposes of this <u>Section 4.1</u>.

(c)     <u>Application of Proceeds of Parent Facility Priority Collateral</u>.  The ABL Agent and the Parent Facility Agent hereby agree that all Parent Facility Priority Collateral, and, subject to Sections 4.3 and 4.4, all Proceeds thereof, received by any of them in connection with (x) any Exercise of Secured Creditor Remedies or (y) any Insolvency Proceeding shall be applied,

<u>first</u>, to the payment of costs and expenses of the Parent Facility Agent in connection with such Exercise of Secured Creditor Remedies to the extent provided in the Parent Facility Documents,

<u>second</u>, by the Parent Facility Agent to the payment of the Parent Facility Obligations until the Discharge of Parent Facility Obligations,

<u>third</u>, to the payment of the ABL Obligations in accordance with the ABL Credit Agreement until the Discharge of ABL Obligations, and

<u>fourth</u>, the balance, if any, to the Credit Parties or to whomsoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

Each ABL Agent, and Parent Facility Agent shall provide the ABL Agent and the Parent Facility Agent with such information about the ABL Obligations or Parent Facility Collateral Obligations represented by it as they may reasonably request in order to carry out the purposes of this <u>Section 4.1</u>.

(d)     <u>Limited Obligation or Liability</u>.  In exercising remedies, whether as a secured creditor or otherwise, no Party shall have any obligation or liability to the other Party or any Parent Facility Secured Party or ABL Secured Party regarding the adequacy of any Proceeds or for any action or omission, save and except solely for an action or omission that breaches the express obligations undertaken by each Party under the terms of this Agreement.

(e)     <u>Turnover of Cash Collateral After Discharge</u>.  Upon the Discharge of ABL Obligations, the ABL Agent shall deliver to the Parent Facility Agent or shall execute such documents as the Company or the Parent Facility Agent may reasonably request to enable the Parent Facility Agent to have control over any Control Collateral or Cash Collateral still in the ABL Agent's possession, custody, or control in the same form as received with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  Upon the Discharge of Parent Facility Obligations, the Parent Facility Agent shall deliver to the ABL Agent or shall execute such documents as the Company or the ABL Agent may reasonably request to enable the ABL Agent to have control over any Control Collateral or Cash Collateral still in the Parent Facility Agent's possession, custody or control in the same form as received with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct subject to the reinstatement provision of Section 5.3.

Section 4.2  <u>Specific Performance</u>.  Each of the ABL Agent and the Parent Facility Agent is hereby authorized to demand specific performance of this Agreement, whether or not any Credit Party shall have complied with any of the provisions of any of the Credit Documents, at any time when any other Party shall have failed to comply with any of the provisions of this Agreement applicable to it.  Each of the ABL Agent, for and on behalf of itself and the ABL Secured Parties, and the Parent Facility Agent, for and on behalf of itself and the Parent Facility Secured Parties, hereby irrevocably waives any defense based on the adequacy of a remedy at law that might be asserted as a bar to such remedy of specific performance.

Section 4.3  <u>Sale of Collateral Comprising Both ABL Priority Collateral and Parent Facility Priority Collateral; Certain Proceeds of Capital Stock</u> .  In the event that prior to the Discharge of ABL Obligations, proceeds of the Collateral are received in connection with a Disposition, loss, condemnation or other disposition (whether voluntary or involuntary) of Collateral that involves both ABL Priority Collateral and Parent Facility Priority Collateral, for the purposes of this Agreement with respect to such Disposition, loss, condemnation or other disposition, the ABL Agent and the Parent Facility Agent shall use commercially reasonable efforts in good faith to allocate the Proceeds received in connection with such Disposition, loss, condemnation or other disposition of such Collateral to the ABL Priority Collateral and the Parent Facility Priority Collateral.  In the event that Proceeds are received in connection with a Disposition of all or substantially all of the Capital Stock issued by any Grantor or any amounts are received in respect of Capital Stock of any Grantor in an Insolvency Proceeding such amounts shall be deemed to be proceeds received from a Disposition of ABL Priority Collateral and Parent Facility Priority Collateral (in proportion to ABL Priority Collateral and Parent Facility Priority Collateral owned at such time by the Grantor) and shall be applied as provided in the preceding sentence.

Section 4.4  <u>Priorities in Proceeds</u>.

(a)      Until the Discharge of ABL Obligations (unless any Credit Party shall become subject to any Insolvency Proceeding), prior to the Exercise of Secured Creditor Remedies by the ABL Agent, the ABL Agent is hereby permitted to deem all collections and payments deposited in any Deposit Account controlled by the ABL Agent to be ABL Priority Collateral (or Proceeds of ABL Priority Collateral) and the Parent Facility Agent, on behalf of itself and the other Parent Facility Secured Parties, consents to the application of such funds to the ABL Obligations, and no such funds credited to any such Deposit Account shall be subject to disgorgement or be deemed to be held in trust by the ABL Agent for the benefit of the Parent Facility Agent, or the Parent Facility Secured Parties (and all claims of such Persons to such amounts are hereby waived); <u>provided</u>, <u>however</u>, that the provisions of this Section 4.4(a) shall not be applicable to any Proceeds of Parent Facility Priority Collateral (other than Proceeds of Inventory in the form of Receivables)  so deposited into any Deposit Account if prior to such deposit the applicable Credit Party or any Secured Party shall have notified the ABL Agent in writing of such Proceeds to be deposited and reasonably identifying the amount of such Proceeds and specifying the origin thereof.

(b)      Except as otherwise provided in Section 4.4(a) above, the ABL Agent, on behalf of itself and the ABL Secured Parties represented by it, and Parent Facility Agent, on behalf of itself and the Parent Facility Secured Parties, represented by it, agrees that after any the

Exercise of any Secured Credit Remedies by the ABL Agent or the Parent Facility Agent, each such Person shall cooperate in good faith to identify the proceeds of the ABL Priority Collateral and the Parent Facility Priority Collateral, as the case may be (it being agreed that after any Exercise of Secured Credit Remedies, unless the ABL Agent has actual knowledge to the contrary, all funds deposited to a Deposit Account controlled by the ABL Agent and then applied to the ABL Obligation shall be presumed to be ABL Priority Collateral (a presumption that can be rebutted by any Parent Facility Agent)); provided, however, that no Secured Party shall be liable or in any way responsible for any claims or damages from conversion of the ABL Priority Collateral or Parent Facility Priority Collateral, as the case may be (it being understood and agreed that (A) the only obligation of any ABL Secured Party is to pay over to the Parent Facility Agent, in the same form as received, with any necessary endorsements, all proceeds that such ABL Secured Party received that have been properly identified as proceeds of the Parent Facility Priority Collateral and (B) the only obligation of the applicable Parent Facility Secured Party is to pay over to the ABL Agent, in the same form as received, with any necessary endorsements, all proceeds that such Parent Facility Secured Party received that have been properly identified as proceeds of the ABL Priority Collateral).  The Agents may request from the other Agents an accounting of the identification of the Proceeds of Collateral (and the other Agent upon which such request is made shall use commercially reasonable efforts to deliver such accounting reasonably promptly after such request is made).  Notwithstanding anything to the contrary in this Agreement, Proceeds of Inventory in the form of Receivables shall constitute ABL Priority Collateral for all purposes of this Agreement, including under Sections 2.1 and 4.1.

## ARTICLE 5

### Intercreditor Acknowledgements and Waivers

Section 5.1  Notice of Acceptance and Other Waivers.  (a) All ABL Obligations at any time made or incurred by any Credit Party shall be deemed to have been made or incurred in reliance upon this Agreement, and the Parent Facility Agent, on behalf of itself and the Parent Facility Secured Parties, represented thereby, hereby waives notice of acceptance of, or proof of reliance by the ABL Agent or any ABL Secured Party on, this Agreement, and notice of the existence, increase, renewal, extension, accrual, creation, or non-payment of all or any part of the ABL Obligations.  All Parent Facility Obligations at any time made or incurred by any Credit Party shall be deemed to have been made or incurred in reliance upon this Agreement, and the ABL Agent, on behalf of itself and the ABL Secured Parties, hereby waives notice of acceptance, or proof of reliance, by the Parent Facility Agent or any Parent Facility Secured Party of this Agreement, and notice of the existence, increase, renewal, extension, accrual, creation, or non-payment of all or any part of the Parent Facility Obligations.

(b)     None of the ABL Agent, any ABL Secured Party, or any of their respective Affiliates, directors, officers, employees, or agents shall be liable to the Parent Facility Agent or any Parent Facility Secured Party for failure to demand, collect, or realize upon any of the Collateral or any Proceeds, or for any delay in doing so, or shall be under any obligation to sell or otherwise dispose of any Collateral or Proceeds thereof or to take any other action whatsoever with regard to the Collateral or any part or Proceeds thereof, except as specifically provided in this Agreement.  If the ABL Agent or any ABL Secured Party honors (or fails to honor) a request by any Borrower for an extension of credit pursuant to any ABL Credit

Agreement or any of the other ABL Documents, whether the ABL Agent or any ABL Secured Party has knowledge that the honoring of (or failure to honor) any such request would constitute a default under the terms of any Parent Facility Credit Agreement or any other Parent Facility Document (but not a default under this Agreement) or an act, condition, or event that, with the giving of notice or the passage of time, or both, would constitute such a default, or if the ABL Agent or any ABL Secured Party otherwise should exercise any of its contractual rights or remedies under any ABL Documents (subject to the express terms and conditions hereof), neither the ABL Agent nor any ABL Secured Party shall have any liability whatsoever to the Parent Facility Agent or any Parent Facility Secured Party as a result of such action, omission, or exercise (so long as any such exercise does not breach the express terms and provisions of this Agreement). The ABL Agent and the ABL Secured Parties shall be entitled to manage and supervise their loans and extensions of credit under the ABL Credit Agreement and any of the other ABL Documents as they may, in their sole discretion, deem appropriate, and may manage their loans and extensions of credit without regard to any rights or interests that the Parent Facility Agent or any Parent Facility Secured Party has in the Collateral, except as otherwise expressly set forth in this Agreement. The Parent Facility Agent, on behalf of itself and the Parent Facility Secured Parties, agrees that neither the ABL Agent nor any ABL Secured Party shall incur any liability as a result of a sale, lease, license, application, or other disposition of all or any portion of the Collateral or Proceeds thereof, pursuant to the ABL Documents, so long as such disposition is conducted in accordance with mandatory provisions of applicable law and does not breach the provisions of this Agreement.

(c)     None of the Parent Facility Agent, the Parent Facility Secured Parties or any of their respective Affiliates, directors, officers, employees, or agents shall be liable to the ABL Agent or any ABL Secured Party for failure to demand, collect, or realize upon any of the Collateral or any Proceeds, or for any delay in doing so, or shall be under any obligation to sell or otherwise dispose of any Collateral or Proceeds thereof or to take any other action whatsoever with regard to the Collateral or any part or Proceeds thereof, except as specifically provided in this Agreement. If the Parent Facility Agent or any Parent Facility Secured Party honors (or fails to honor) a request by any Borrower for an extension of credit pursuant to any Parent Facility Credit Agreement or any of the other Parent Facility Documents, whether the Parent Facility Agent or any Parent Facility Secured Party has knowledge that the honoring of (or failure to honor) any such request would constitute a default under the terms of any ABL Credit Agreement or any other ABL Document (but not a default under this Agreement) or an act, condition, or event that, with the giving of notice or the passage of time, or both, would constitute such a default, or if the Parent Facility Agent or any Parent Facility Secured Party otherwise should exercise any of its contractual rights or remedies under the Parent Facility Documents (subject to the express terms and conditions hereof), neither the Parent Facility Agent nor any Parent Facility Secured Party shall have any liability whatsoever to the ABL Agent or any ABL Secured Party as a result of such action, omission, or exercise (so long as any such exercise does not breach the express terms and provisions of this Agreement). The Parent Facility Agent and the Parent Facility Secured Parties shall be entitled to manage and supervise their loans and extensions of credit under the Parent Facility Documents as they may, in their sole discretion, deem appropriate, and may manage their loans and extensions of credit without regard to any rights or interests that the ABL Agent or any ABL Secured Party has in the Collateral, except as otherwise expressly set forth in this Agreement. The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that none of the Parent Facility Agent or the Parent

Facility Secured Parties shall incur any liability as a result of a sale, lease, license, application, or other disposition of all or any portion of the Collateral or any Proceeds thereof, pursuant to the Parent Facility Documents, so long as such disposition is conducted in accordance with mandatory provisions of applicable law and does not breach the provisions of this Agreement.

Section 5.2 <u>Modifications to ABL Documents and Parent Facility Documents</u>. (a) The Parent Facility Agent, on behalf of itself and the Parent Facility Secured Parties, hereby agrees that, without affecting the obligations of the Parent Facility Agent and the Parent Facility Secured Parties hereunder, the ABL Agent and the ABL Secured Parties may, at any time and from time to time, in their sole discretion without the consent of or notice to the Parent Facility Agent or any Parent Facility Secured Party (except to the extent such notice or consent is required pursuant to the express provisions of this Agreement), and without incurring any liability to the Parent Facility Agent or any Parent Facility Secured Party or impairing or releasing the subordination provided for herein, amend, restate, supplement, replace, refinance, extend, consolidate, restructure, or otherwise modify any of the ABL Documents in any manner whatsoever, other than in a manner which would have the effect of contravening the terms of this Agreement, and in addition, absent the prior written consent of Parent Facility Agent, no ABL Secured Party shall consent to any amendment, modification or waiver to the ABL Documents (or to any refinancing thereof permitted herein) that:

(i) increases the "Applicable Margin" or similar component of the interest rate under the ABL Documents in a manner that would result in the total yield on the ABL Obligations to exceed by more than three percent (3.00%) the total yield on the ABL Obligations as in effect on the date of the ABL Credit Agreement (excluding (A) increases resulting from the accrual of interest at the default rate, (B) increases resulting from a change in the applicable pricing level on the pricing grid as set forth in the definition of "Applicable Margin" in the ABL Credit Agreement (as in effect on the date hereof) and (C) any increases from the accrual of any payment in kind interest applicable to the ABL Obligations),

(ii) except as permitted under the ABL Documents (as in effect on the date hereof) or as contemplated by Section 6 for a DIP Financing, contractually subordinates the Liens of the ABL Secured Parties in the ABL Priority Collateral to any other secured obligations of Grantors secured by Liens in the ABL Priority Collateral,

(iii) changes to earlier dates any scheduled dates (including the maturity date) for the payment of principal or interest with respect to the ABL Obligations (from that in effect on the date hereof), other than as a result of the acceleration of the ABL Obligations in accordance with the terms of the ABL Documents, or

(iv) result in the aggregate principal amount of revolving loans under the ABL Documents exceeding the ABL Cap.

(b) The ABL Agent, on behalf of itself and the ABL Secured Parties, hereby agrees that, without affecting the obligations of the ABL Agent and the ABL Secured Parties hereunder, the Parent Facility Agent and the Parent Facility Secured Parties may, at any time and from time to time, in their sole discretion without the consent of or notice to the ABL Agent or any ABL Secured Party (except to the extent such notice or consent is required pursuant to the

express provisions of this Agreement), and without incurring any liability to the ABL Agent or any ABL Secured Party or impairing or releasing the subordination provided for herein, amend, restate, supplement, replace, refinance, extend, consolidate, restructure, or otherwise modify any of the Parent Facility Documents in any manner whatsoever, other than in a manner which would have the effect of contravening the terms of this Agreement and in addition, absent the prior written consent of ABL Agent, no Parent Facility Secured Party shall consent to any amendment, modification or waiver to the Parent Facility Documents (or to any refinancing thereof permitted herein) that:

(i)     except as permitted under the Parent Facility Documents (as in effect on the date hereof), contractually subordinates the Liens of the Parent Facility Secured Parties in the Parent Facility Priority Collateral to any other secured obligations of Grantors secured by Liens in the Parent Facility Priority Collateral, or

(ii)     changes to earlier dates any scheduled dates (including the maturity date) for the payment of principal or interest with respect to the Parent Facility Obligations (from that in effect on the date hereof), other than as a result of the acceleration of the Parent Facility Obligations in accordance with the terms of the Parent Facility Documents.

(c)     In addition, each ABL Agent, for and on behalf of itself and the ABL Secured Parties and each Parent Facility Agent, for and on behalf of itself and the Parent Facility Secured Parties, agrees that each ABL Collateral Document and/or each Parent Facility Collateral Document, as applicable, consisting of a mortgage covering any Collateral consisting of real estate shall contain language appropriate to reflect the subordination of such ABL Collateral Document and/or Parent Facility Collateral Document, as applicable, covering such Collateral.

(d)     Subject to Sections 5.2(a) and 5.2(b), the ABL Obligations and, the Parent Facility Obligations may be refunded, replaced or refinanced, in whole or in part, in each case, without notice to, or the consent (except to the extent a consent is required to permit the refunding, replacement or refinancing transaction under any ABL Document or any Parent Facility Document) of the ABL Agent, the ABL Secured Parties, the Parent Facility Agent or the Parent Facility Secured Parties, as the case may be, all without affecting the Lien Priorities provided for herein or the other provisions hereof; provided, however, that the holders of such new, amended, restructured or refinancing indebtedness (or an authorized agent or trustee on their behalf) bind themselves in writing to the terms of this Agreement pursuant to such documents or agreements (including amendments or supplements to this Agreement) as the ABL Agent or the Parent Facility Agent, as the case may be, shall reasonably request and in form and substance reasonably acceptable to the ABL Agent or the Parent Facility Agent, as the case may be, and any such increase, restatement, amendment and restatement, supplement, modification, replacement, restructuring, amendment or refinancing transaction shall be in accordance with any applicable provisions of both the ABL Documents and the Parent Facility Documents (to the extent such documents survive such increase, restatement, amendment and restatement, supplement, modification, replacement, restructuring, amendment or refinancing).  ABL Agent and Parent Facility Agent each (i) will use its commercially reasonable efforts to notify the other parties of any written amendment or modification to any ABL Document or any Parent Facility Document, as applicable, but the failure to do so will not create a cause of action against the

party failing to give such notice or create any claim or right on behalf of any third party or impact the effectiveness of any such amendment or modification, and (ii) will, upon request of the other party, provide copies of all such modifications or amendments and copies of all other relevant documentation to the other Persons.

Section 5.3  <u>Reinstatement and Continuation of Agreement</u>.  (a) If the ABL Agent or any ABL Secured Party is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of any Credit Party (or any trustee, receiver or similar person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (an "<u>ABL Recovery</u>"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, then as among the parties hereto the ABL Obligations shall be deemed to be reinstated to the extent of such ABL Recovery and to be outstanding as if such payment had not occurred and the ABL Secured Parties shall be entitled, to the extent they are entitled hereunder, to a Discharge of ABL Obligations with respect to all such recovered amounts and shall have all rights hereunder until such time.  If this Agreement shall have been terminated prior to such ABL Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. All rights, interests, agreements, and obligations of the ABL Agent, the Parent Facility Agent, the ABL Secured Parties and, the Parent Facility Secured Parties under this Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of, any Insolvency Proceeding by or against any Credit Party or any other circumstance which otherwise might constitute a defense available to, or a discharge of any Credit Party in respect of the ABL Obligations, or the Parent Facility Obligations.  No priority or right of the ABL Agent or any ABL Secured Party shall at any time be prejudiced or impaired in any way by any act or failure to act on the part of any Credit Party or by the noncompliance by any Person with the terms, provisions, or covenants of any of the ABL Documents, regardless of any knowledge thereof which the ABL Agent or any ABL Secured Party may have.

(b)     If the Parent Facility Agent or any Parent Facility Secured Party is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of any Credit Party (or any trustee, receiver or similar person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "<u>Parent Facility Recovery</u>"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, then as among the parties hereto the Parent Facility Obligations shall be deemed to be reinstated to the extent of such Parent Facility Recovery and to be outstanding as if such payment had not occurred and the Parent Facility Secured Parties shall be entitled to a Discharge of Parent Facility Obligations with respect to all such recovered amounts and shall have all rights hereunder until such time.  If this Agreement shall have been terminated prior to such Parent Facility Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.  All rights, interests, agreements, and obligations of the ABL Agent, the Parent Facility Agent, the ABL Secured Parties, and the Parent Facility Secured Parties under this Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of, any Insolvency Proceeding by or against any Credit

Party or any other circumstance which otherwise might constitute a defense available to, or a discharge of any Credit Party in respect of the ABL Obligations, or the Parent Facility Obligations.  No priority or right of the Parent Facility Agent or any Parent Facility Secured Party shall at any time be prejudiced or impaired in any way by any act or failure to act on the part of any Credit Party or by the noncompliance by any Person with the terms, provisions, or covenants of any of the Parent Facility Documents, regardless of any knowledge thereof which the Parent Facility Agent or any Parent Facility Secured Party may have.

ARTICLE 6

Insolvency Proceedings

Section 6.1 DIP Financing.  (a) If any Credit Party shall be subject to any Insolvency Proceeding at any time prior to the Discharge of ABL Obligations, and the ABL Agent or any ABL Credit Agreement Lenders shall agree to provide any Credit Party with, or consent to a third party providing any Credit Party with, any financing under Section 364 of the Bankruptcy Code or consent to any order for the use of cash collateral constituting ABL Priority Collateral under Section 363 of the Bankruptcy Code ("DIP Financing"), with such DIP Financing to be secured by all or any portion of the Collateral (including assets that, but for the application of Section 552 of the Bankruptcy Code would be Collateral), then the Parent Facility Agent, on behalf of itself and the Parent Facility Secured Parties, agrees that it will raise no objection, and will not directly or indirectly support or act in concert with any other party in raising an objection, to such DIP Financing or to the Liens securing the same on the grounds of a failure to provide "adequate protection" for the Liens of the Parent Facility Agent securing the Parent Facility Obligations or on any other grounds (and will not request any adequate protection solely as a result of such DIP Financing), will subordinate its Liens in the ABL Priority Collateral and in any other assets (other than Parent Facility Priority Collateral) of the Credit Parties that may serve as collateral (including avoidance actions or the proceeds thereof) for such DIP Financing (including any carveouts for US Trustee or professional fees or adequate protection liens granted in connection therewith, in each case, approved by a court of competent jurisdiction) to the Liens securing such DIP Financing, so long as (i) the Parent Facility Agent retains its Lien on the Collateral to secure the Parent Facility Obligations (in each case, including Proceeds thereof arising after the commencement of the case under the Bankruptcy Code) and, as to the Parent Facility Priority Collateral only, such Lien has the same priority as existed prior to the commencement of the case under the Bankruptcy Code and any Lien securing such DIP Financing is junior and subordinate to the Lien of the Parent Facility Agent on the Parent Facility Priority Collateral, (ii) all Liens on ABL Priority Collateral securing any such DIP Financing shall be senior to or on a parity with the Liens of the ABL Agent and the ABL Secured Parties securing the ABL Obligations on ABL Priority Collateral, (iii) the sum of the principal amount (and any related commitments therefor) of such DIP Financing plus the principal amount of loans outstanding under the ABL Credit Agreement does not exceed the ABL Cap, and (iv) if the ABL Agent and/or any ABL Secured Party receives an adequate protection Lien on post-petition assets of the debtor to secure the ABL Obligations, the Parent Facility Agent also receives an adequate protection Lien on such post-petition assets of the debtor to secure the Parent Facility Obligations; provided that (x) such Liens in favor of the ABL Agent and the Parent Facility Agent shall be subject to the provisions of Section 6.1(b) hereof and (y) the foregoing provisions of this Section 6.1(a) shall not prevent the Parent Facility Agent and the Parent Facility Secured

Parties from objecting to any provision in any DIP Financing relating to any provision or content of a plan of reorganization.

(b)     All Liens granted to the ABL Agent or the Parent Facility Agent in any Insolvency Proceeding, whether as adequate protection or otherwise, are intended by the Parties to be and shall be deemed to be subject to the Lien Priority and the other terms and conditions of this Agreement; provided, however, that the foregoing shall not alter the super-priority of any Liens securing any DIP Financing in accordance with this Section 6.1.

Section 6.2  Relief From Stay.  Until the Discharge of ABL Obligations, the Parent Facility Agent, on behalf of itself and the Parent Facility Secured Parties, represented thereby, agrees not to seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of any portion of the ABL Priority Collateral without the ABL Agent's express written consent.  Until the Discharge of Parent Facility Obligations, the ABL Agent, on behalf of itself and the ABL Secured Parties, agrees not to seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of any portion of the Parent Facility Priority Collateral without the Parent Facility Agent's express written consent.

Section 6.3  No Contest.  (a) The Parent Facility Agent, on behalf of itself and the Parent Facility Secured Parties, agrees that, prior to the Discharge of ABL Obligations, none of them shall contest (or directly or indirectly support any other Person contesting) (i) any request by the ABL Agent or any ABL Secured Party for adequate protection of its interest in the Collateral (unless in contravention of Section 6.1) or (ii) any objection by the ABL Agent or any ABL Secured Party to any motion, relief, action or proceeding based on a claim by the ABL Agent or any ABL Secured Party that its interests in the Collateral (unless in contravention of Section 6.1) are not adequately protected (or any other similar request under any law applicable to an Insolvency Proceeding), so long as (x) any Liens granted to the ABL Agent as adequate protection of its interests are subject to this Agreement and (y) any post-petition interest, fees or expenses as a result of any interest in the Collateral are not paid from the proceeds of Parent Facility Priority Collateral.

(b)     The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that, prior to the Discharge of Parent Facility Obligations, none of them shall contest (or directly or indirectly support any other Person contesting) (i) any request by the Parent Facility Agent or any Parent Facility Secured Party for adequate protection of its interest in the Collateral as long as (x) the ABL Agent retains its Lien on the Collateral to secure the ABL Obligations (in each case, including Proceeds thereof arising after the commencement of the case under the Bankruptcy Code) and, as to the ABL Priority Collateral only, such Lien has the same priority as existed prior to the commencement of the case under the Bankruptcy Code or similar Bankruptcy Law and (y) if the Parent Facility Agent and/or any Parent Facility Secured Party receives an adequate protection Lien on post-petition assets of the debtor to secure the Parent Facility Obligations, the ABL Agent also receives an adequate protection Lien on such post-petition assets of the debtor to secure the ABL Obligations; provided that such Liens in favor of the ABL Agent and the Parent Facility Agent shall be subject to the provisions of Section 6.1(b) hereof or (ii) any objection by the Parent Facility Agent or any Parent Facility Secured Party to any motion, relief, action or proceeding based on a claim by the Parent Facility Agent or any Parent Facility Secured Party that its interests in the Collateral (unless in contravention of clauses (i)(x)

and (i)(y) above) are not adequately protected (or any other similar request under any law applicable to an Insolvency Proceeding), so long as (x) any Liens granted to the Parent Facility Agent as adequate protection of its interests are subject to this Agreement and (y) any post-petition interest, fees or expenses as a result of any interest in the Collateral are not paid from the proceeds of ABL Priority Collateral.

Section 6.4  Asset Sales.  The Parent Facility Agent agrees, on behalf of itself and the Parent Facility Secured Parties, represented thereby, that it will not oppose any sale consented to by the ABL Agent of any ABL Priority Collateral pursuant to Section 363(f) of the Bankruptcy Code (or any similar provision under the law applicable to any Insolvency Proceeding) so long  the Liens of the parties attach to the proceeds of such sale consistent with the Lien Priority on the assets sold and as the proceeds of such sale are otherwise applied in accordance with this Agreement.  The ABL Agent agrees, on behalf of itself and the ABL Secured Parties, that it will not oppose any sale consented to by the Parent Facility Agent, of any Parent Facility Priority Collateral pursuant to Section 363(f) of the Bankruptcy Code (or any similar provision under the law applicable to any Insolvency Proceeding) so long (i) the Liens of the parties attach to the proceeds of such sale consistent with the Lien Priority on the assets sold and as the proceeds of such sale are otherwise applied in accordance with this Agreement and (ii) the purchaser assumes and agrees to the provisions of Section 3.3.

Section 6.5  Separate Grants of Security and Separate Classification.  Each Parent Facility Secured Party and the Parent Facility Agent on the one hand, and each ABL Secured Party and the ABL Agent, on the other hand, acknowledges and agrees that (i) the grants of Liens pursuant to the ABL Collateral Documents and the Parent Facility Collateral Documents constitute separate and distinct grants of Liens and (ii) because of, among other things, their differing rights in the Collateral and, the Parent Facility Obligations are fundamentally different from the ABL Obligations and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency Proceeding.  To further effectuate the intent of the Parties as provided in the immediately preceding sentence, if it is held that the claims of the ABL Secured Parties and, on the one hand, and the Parent Facility Secured Parties, on the other hand, in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the ABL Secured Parties, the Parent Facility Secured Parties hereby acknowledge and agree that all distributions shall be made as if there were separate classes of ABL Obligation claims and Parent Facility Obligation claims against the Credit Parties (with the effect being that, to the extent the aggregate value of the ABL Priority Collateral or the Parent Facility Priority Collateral is sufficient (for this purpose ignoring all claims held by the other Secured Parties), the ABL Secured Parties or the Parent Facility Secured Parties respectively, shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest that is available from each pool of Priority Collateral for each of the ABL Secured Parties, on the one hand, and the Parent Facility Secured Parties, on the other hand, before any distribution is made from the applicable pool of Priority Collateral in respect of the claims held by the other Secured Parties, with the other Secured Parties hereby acknowledging and agreeing to turn over to the respective other Secured Parties amounts otherwise received or receivable by them from the applicable pool of Priority Collateral to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the aggregate recoveries).

Section 6.6  <u>Enforceability</u>.  The provisions of this Agreement are intended to be and shall be enforceable under Section 510(a) of the Bankruptcy Code.

Section 6.7  <u>ABL Obligations Unconditional</u>.  All rights of the ABL Agent hereunder, and all agreements and obligations of the Parent Facility Agent, and the Credit Parties (to the extent applicable) hereunder, shall remain in full force and effect irrespective of:

(i)  any lack of validity or enforceability of any ABL Document;

(ii)  any change in the time, place or manner of payment of, or in any other term of, all or any portion of the ABL Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any ABL Document (but solely to the extent permitted pursuant to Section 5.2(a));

(iii)  any exchange, release, voiding, avoidance or non-perfection of any security interest in any Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding, restatement or increase of all or any portion of the ABL Obligations or any guarantee thereof;

(iv)  the commencement of any Insolvency Proceeding in respect of any Borrower or any Credit Party; or

(v)  any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Credit Party in respect of the ABL Obligations, or of any of the Parent Facility Agent or any Credit Party, to the extent applicable, in respect of this Agreement.

Section 6.8  <u>Parent Facility Obligations Unconditional</u>.  All rights of the Parent Facility Agent hereunder, and all agreements and obligations of the ABL Agent, and the Credit Parties (to the extent applicable) hereunder, shall remain in full force and effect irrespective of:

(i)  any lack of validity or enforceability of any Parent Facility Document;

(ii)  any change in the time, place or manner of payment of, or in any other term of, all or any portion of the Parent Facility Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any Parent Facility Document (but solely to the extent permitted pursuant to Section 5.2(b));

(iii)  any exchange, release, voiding, avoidance or non-perfection of any security interest in any Collateral, or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding, restatement or increase of all or any portion of the Parent Facility Obligations or any guarantee thereof;

(iv)     the commencement of any Insolvency Proceeding in respect of any Borrower or any Credit Party; or

(v)     any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Credit Party in respect of the Parent Facility Obligations, or of any of the ABL Agent or any Credit Party, to the extent applicable, in respect of this Agreement.

Section 6.9   **[Reserved]**.

Section 6.10  Adequate Protection.   Except to the extent expressly provided in Section 6.1, Section 6.3, and this Section 6.10, nothing in this Agreement shall limit the rights of (x) the ABL Agent and the ABL Secured Parties or (y) the Parent Facility Agent and the Parent Facility Secured Parties, respectively, from seeking or requesting adequate protection with respect to their interests in the Collateral in any Insolvency Proceeding, including adequate protection in the form of a cash payment, periodic cash payments, cash payments of interest, additional collateral or otherwise; provided that:

(a)     in the event that the ABL Agent, on behalf of itself or any of the ABL Secured Parties, seeks or requests adequate protection in respect of the ABL Obligations and such adequate protection is granted in the form of a Lien on additional collateral comprising assets of the type of assets that constitute Parent Facility Priority Collateral, then the ABL Agent, on behalf of itself and each of the ABL Secured Parties, agrees that the Parent Facility Agent shall also be granted a senior Lien on such collateral as security for the Parent Facility Obligations and that any Lien on such collateral securing the ABL Obligations shall be subordinate to any Lien on such collateral securing the Parent Facility Obligations, and

(b)     in the event that the Parent Facility Agent, on behalf of itself or any of the Parent Facility Secured Parties, seeks or requests adequate protection in respect of the Parent Facility Obligations and such adequate protection is granted in the form of a Lien on additional collateral comprising assets of the type of assets that constitute ABL Priority Collateral, then the Parent Facility Agent, on behalf of itself and each of the Parent Facility Secured Parties, agrees that the ABL Agent shall also be granted a senior Lien on such collateral as security for the ABL Obligations and that any Lien on such collateral securing the Parent Facility Obligations shall be subordinate to the Lien on such collateral securing the ABL Obligations.

Section 6.11  Plan of Reorganization.

(a)     If, in any Insolvency Proceeding, debt obligations of any reorganized Grantor secured by Liens upon any property of the reorganized Grantor are distributed or reinstated (in whole or in part) pursuant to a plan of reorganization, both on account of the ABL Obligations and on account of the Parent Facility Obligations, then, to the extent the debt obligations distributed on account of the ABL Obligations and on account of the Parent Facility Obligations are secured by Liens upon the same property, the relative Lien priorities and other provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan of reorganization and will apply with like effect to the Liens securing such debt obligations.

(b)     The ABL Agent, for itself and on behalf of the other ABL Secured Parties, and the Parent Facility Agent, for itself and on behalf of the other Parent Facility Secured Parties, agrees that neither it nor its related Secured Parties shall (i) take or support any other Person in taking any action that is inconsistent with the relative Lien priorities or other provisions of this Agreement or (ii) without the written consent of each other Agent, propose, vote for, or otherwise support directly or indirectly any plan of organization or liquidation (or similar plan in an Insolvency Proceeding) whose provisions are inconsistent with, or in contravention of, the relative Lien priorities or other provisions of this Agreement, including Sections 2.1, 4.1 and 6.1 (and, in the event of any such proposal, vote or other support of an inconsistent or contravening plan of reorganization or liquidation (or similar plan) by any class of Secured Parties, the Agent representing any other class of Secured Parties shall be entitled to have any such proposal, vote or support changed or withdrawn).

Section 6.12  Section 1111(b) of the Bankruptcy Code.

(a)     The ABL Agent, for itself and on behalf of the ABL Secured Parties, agrees that neither it nor the ABL Secured Parties shall object to or oppose (or support any other Person objecting to or opposing), or take any other action to impede, in any Insolvency Proceeding, the right of any Parent Facility Secured Party to make an election under Section 1111(b)(2) of the Bankruptcy Code with respect to the Parent Facility Priority Collateral.  The ABL Agent, for itself and the other ABL Secured Parties waives any claim it or the ABL Secured Parties may hereafter have against any Parent Facility Secured Party arising out of (a) the election by such Parent Facility Secured Party of the application of Section 1111(b)(2) of the Bankruptcy Code or (b) any cash collateral or financing arrangement, and any related grant of a security interest in the Parent Facility Priority Collateral, made in accordance with Section 6.1 in any Insolvency Proceeding.

(b)     The Parent Facility Agent, for itself and on behalf of the Parent Facility Secured Parties, each agrees that neither it nor the Secured Parties it represents shall object to or oppose (or support any other Person objecting to or opposing), or take any other action to impede, in any Insolvency Proceeding, the right of any ABL Secured Party to make an election under Section 1111(b)(2) of the Bankruptcy Code with respect to the ABL Priority Collateral. The Parent Facility Agent, for itself and the other Parent Facility Secured Parties, waives any claim it or the Secured Parties it represents may hereafter have against any ABL Secured Party arising out of (a) the election by such ABL Secured Party of the application of Section 1111(b)(2) of the Bankruptcy Code or (b) any cash collateral or financing arrangement, and any related grant of a security interest in the Parent Facility Priority Collateral, made in accordance with Section 6.1 in any Insolvency Proceeding.

ARTICLE 7

Miscellaneous

Section 7.1  Rights of Subrogation.  The Parent Facility Agent, for and on behalf of itself and the Parent Facility Secured Parties, agrees that no payment by the Parent Facility Agent or any Parent Facility Secured Party to the ABL Agent or any ABL Secured Party pursuant to the provisions of this Agreement shall entitle the Parent Facility Agent or any Parent

Facility Secured Party to exercise any rights of subrogation in respect thereof until the Discharge of ABL Obligations shall have occurred.  Following the Discharge of ABL Obligations, the ABL Agent agrees to execute such documents, agreements, and instruments as the Parent Facility Agent or any Parent Facility Secured Party may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the ABL Obligations resulting from payments to the ABL Agent by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by the ABL Agent are paid by such Person upon request for payment thereof.

The ABL Agent, for and on behalf of itself and the ABL Secured Parties, agrees that no payment by the ABL Agent or any ABL Secured Party to the Parent Facility Agent or any Parent Facility Secured Party pursuant to the provisions of this Agreement shall entitle the ABL Agent or any ABL Secured Party to exercise any rights of subrogation in respect thereof until the Discharge of Parent Facility Obligations shall have occurred.  Following the Discharge of Parent Facility Obligations, the Parent Facility Agent agrees to execute such documents, agreements, and instruments as the ABL Agent or any ABL Secured Party may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the Parent Facility Obligations resulting from payments to the Parent Facility Agent by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by the Parent Facility Agent are paid by such Person upon request for payment thereof.

Section 7.2  <u>Further Assurances</u>.  The Parties will, at their own expense and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that any Party may reasonably request, in order to protect any right or interest granted or purported to be granted hereby or to enable such Party to exercise and enforce its rights and remedies hereunder; <u>provided</u>, <u>however</u>, that no Party shall be required to pay over any payment or distribution, execute any instruments or documents, or take any other action referred to in this <u>Section 7.2</u>, to the extent that such action would contravene any law, order or other legal requirement or any of the terms or provisions of this Agreement, and in the event of a controversy or dispute, such Party may interplead any payment or distribution in any court of competent jurisdiction, without further responsibility in respect of such payment or distribution under this <u>Section 7.2</u>.

Section 7.3  <u>Representations</u>.  The Parent Facility Agent represents and warrants to the ABL Agent that it has the requisite power and authority under the Parent Facility Documents to enter into, execute, deliver, and carry out the terms of this Agreement on behalf of itself and the Parent Facility Secured Parties.  The ABL Agent represents and warrants to the Parent Facility Agent that it has the requisite power and authority under the ABL Documents to enter into, execute, deliver, and carry out the terms of this Agreement on behalf of itself and the ABL Secured Parties.

Section 7.4  <u>Amendments</u>.  (a) No amendment, modification or waiver of any provision of this Agreement, and no consent to any departure by any Party hereto, shall be effective unless it is in a written agreement executed by (<u>i</u>) prior to the Discharge of Parent Facility Obligations, the Parent Facility Agent, and (<u>ii</u>) prior to the Discharge of ABL Obligations, the ABL Agent. Any amendment, modification or waiver of any provision of this

Agreement that would have the effect, directly or indirectly, through any reference in any Credit Document to this Agreement or otherwise, of waiving, amending, supplementing or otherwise modifying any Credit Document, or any term or provision thereof, or any right or obligation of the Company or any other Credit Party thereunder or in respect thereof, shall not be given such effect except pursuant to a written instrument executed by the Company and each other affected Credit Party.

(b)     In the event that the ABL Agent enters into any amendment, waiver or consent in respect of or replacing any ABL Collateral Document for the purpose of adding to or waiving or consenting to any departure from any provisions of, any ABL Collateral Document relating to the ABL Priority Collateral or changing in any manner the rights of the ABL Agent, the ABL Secured Parties, or any Credit Party with respect to the ABL Priority Collateral, then such amendment, waiver or consent shall apply automatically to any comparable provision of each Parent Facility Collateral Document, in each case without the consent of, or any action by, any Parent Facility Agent or any Parent Facility Secured Party, as applicable; provided, that such amendment, waiver or consent does not adversely affect the rights of the Parent Facility Secured Parties, or the interests of the Parent Facility Secured Parties, in the Parent Facility Priority Collateral or release the Liens securing the Parent Facility Obligations in the ABL Priority Collateral other than as set forth in Section 2.4(d).  The ABL Agent shall give written notice of such amendment, waiver or consent to the Parent Facility Agent; provided that the failure to give such notice shall not affect the effectiveness of such amendment, waiver or consent with respect to the provisions of any Parent Facility Collateral Document as set forth in this Section 7.4(b).

(c)     In the event that the Parent Facility Agent enters into any amendment, waiver or consent in respect of or replacing any Parent Facility Collateral Document for the purpose of adding to or waiving or consenting to any departures from any provisions of, any Parent Facility Collateral Document relating to the Parent Facility Priority Collateral or changing in any manner the rights of the Parent Facility Agent, the Parent Facility Secured Parties, or any Credit Party with respect to the Parent Facility Priority Collateral, then such amendment, waiver or consent shall apply automatically to any comparable provision of each ABL Collateral Document without the consent of, or any action by, the ABL Agent or any ABL Secured Party; provided, that such amendment, waiver or consent does not adversely affect the rights or interests of the ABL Secured Parties in the ABL Priority Collateral or release the Liens securing the ABL Obligations in the Parent Facility Priority Collateral other than as set forth in Section 2.4(d).  The Parent Facility Agent shall give written notice of such amendment, waiver or consent to the ABL Agent; provided that the failure to give such notice shall not affect the effectiveness of such amendment, waiver or consent with respect to the provisions of any ABL Collateral Document as set forth in this Section 7.4(c).

Section 7.5  Addresses for Notices.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, faxed, sent by electronic mail or sent by overnight express courier service or United States mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a facsimile or, in the case of an electronic mail, when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient) or five (5) days after deposit in the United States mail (certified, with postage prepaid and properly addressed).

For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section) shall be as set forth below or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

| | |
|---|---|
| ABL Agent: | Encina Business Credit, LLC |
| | 123 N. Wacker Drive, Suite 2400 |
| | Chicago, Illinois 60606 |
| | Attention:  Account Manager |
| | E-mail:  tsullivan@encinabc.com |
| | |
| Parent Facility Agent: | HSBC Bank Canada |
| | 5th Floor, 70 York Street |
| | Toronto, Ontario |
| | M5J 1S9 |
| | Attention: Director |
| | E-mail: |

Section 7.6  No Waiver, Remedies.  No failure on the part of any Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 7.7  Continuing Agreement, Transfer of Secured Obligations.  This Agreement is a continuing agreement and shall (a) remain in full force and effect until the earlier to occur of (i) the Discharge of ABL Obligations and (ii) the Discharge of Parent Facility Obligations, (b) be binding upon the Parties and their successors and assigns, and (c) inure to the benefit of and be enforceable by the Parties and their respective successors, permitted transferees and permitted assigns.  Nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Collateral, subject to Section 7.10 hereof.  All references to any Credit Party shall include any Credit Party as debtor-in-possession and any receiver or trustee for such Credit Party in any Insolvency Proceeding.  The ABL Agent, any ABL Secured Party, the Parent Facility Agent, or any Parent Facility Secured Party, may assign or otherwise transfer all or any portion of the ABL Obligations or, the Parent Facility Obligations, as applicable, to any other Person (other than a Credit Party, a Parent Facility Credit Party or an Affiliate of any such Person), and such other Person shall thereupon become vested with all the rights and obligations in respect thereof granted to the ABL Agent, the Parent Facility Agent, such ABL Secured Party or, such Parent Facility Secured Party, as the case may be, herein or otherwise.  No such assignment or transfer may be made to a Credit Party, and Parent Facility Credit Party or an Affiliate of any such Person, and any such assignment or transfer shall be void.  The ABL Secured Parties and, the Parent Facility Secured Parties may continue, at any time and without notice to the other Parties hereto, to extend credit and other financial accommodations, lend monies and provide indebtedness to, or for the benefit of, any Credit Party on the faith hereof.

Section 7.8  Governing Law:  Entire Agreement.  The validity, performance, and enforcement of this Agreement shall be governed by, and construed in accordance with, the laws

of the State of New York.  This Agreement constitutes the entire agreement and understanding among the Parties with respect to the subject matter hereof and supersedes any prior agreements, written or oral, with respect thereto.

Section 7.9  Counterparts.  This Agreement may be executed in any number of counterparts (including by telecopy and other electronic transmission), and it is not necessary that the signatures of all Parties be contained on any one counterpart hereof, each counterpart will be deemed to be an original, and all together shall constitute one and the same document.

Section 7.10  No Third Party Beneficiaries.  This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the ABL Agent, the ABL Secured Parties, the Parent Facility Agent, the Parent Facility Secured Parties, and, with respect to Sections 2.4(d), 5.2 and 7.4, the Company and the other Credit Parties.  No other Person shall have or be entitled to assert rights or benefits hereunder.

Section 7.11  Provisions Solely to Define Relative Rights.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the ABL Secured Parties, on the one hand, and the Parent Facility Secured Parties, on the other hand. Nothing in this Agreement is intended to or shall impair the rights of the Company or any other Credit Party, or the obligations of the Company or any other Credit Party to pay the ABL Obligations, the Parent Facility Obligations as and when the same shall become due and payable in accordance with their terms (such obligations to pay being absolute and unconditional).

Section 7.12  Headings.  The headings of the articles and sections of this Agreement are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof.

Section 7.13  Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not (i) invalidate or render unenforceable such provision in any other jurisdiction or (ii) invalidate the Lien Priority or the application of Proceeds and other priorities set forth in this Agreement.

Section 7.14  Agents.  It is understood and agreed that (i) Encina Business Credit, LLC is entering into this Agreement in its capacity as agent under the ABL Credit Agreement and the provisions of the ABL Credit Agreement applicable to Encina Business Credit, LLC as collateral agent thereunder shall also apply to Encina Business Credit, LLC, as the ABL Agent hereunder, and (ii) HSBC Bank Canada, is entering into this Agreement in its capacity as agent under the Parent Facility Credit Agreement and the provisions of the Parent Facility Credit Agreement applicable to HSBC Bank Canada, as collateral agent thereunder shall also apply to HSBC Bank Canada, as the Parent Facility Agent hereunder.

Section 7.15  VENUE; JURY TRIAL WAIVER.  (a) EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS

AGREEMENT TO THE EXCLUSIVE GENERAL JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK FOR THE COUNTY OF NEW YORK (THE "NEW YORK SUPREME COURT"), AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (THE "FEDERAL DISTRICT COURT," AND TOGETHER WITH THE NEW YORK SUPREME COURT, THE "NEW YORK COURTS") AND APPELLATE COURTS FROM EITHER OF THEM; PROVIDED THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE (I) ANY PARTY FROM BRINGING ANY LEGAL ACTION OR PROCEEDING IN ANY JURISDICTION FOR THE RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT, (II) IF ALL SUCH NEW YORK COURTS DECLINE JURISDICTION OVER ANY PERSON, OR DECLINE (OR IN THE CASE OF THE FEDERAL DISTRICT COURT, LACK) JURISDICTION OVER ANY SUBJECT MATTER OF SUCH ACTION OR PROCEEDING, A LEGAL ACTION OR PROCEEDING MAY BE BROUGHT WITH RESPECT THERETO IN ANOTHER COURT HAVING JURISDICTION AND (III) IN THE EVENT A LEGAL ACTION OR PROCEEDING IS BROUGHT AGAINST ANY PARTY HERETO OR INVOLVING ANY OF ITS ASSETS OR PROPERTY IN ANOTHER COURT (WITHOUT ANY COLLUSIVE ASSISTANCE BY SUCH PARTY OR ANY OF ITS SUBSIDIARIES OR AFFILIATES), SUCH PARTY FROM ASSERTING A CLAIM OR DEFENSE (INCLUDING ANY CLAIM OR DEFENSE THAT THIS SECTION 7.17(a) WOULD OTHERWISE REQUIRE TO BE ASSERTED IN A LEGAL PROCEEDING IN A NEW YORK COURT) IN ANY SUCH ACTION OR PROCEEDING.

(b) EACH PARTY HERETO HEREBY (I) WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS, (II) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (III) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.17(b).  EACH PARTY HERETO FURTHER REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.   IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(c) EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 7.5.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

      Section 7.16 Intercreditor Agreement.   This Agreement is the "Intercreditor Agreement" referred to in the ABL Credit Agreement and, the "Intercreditor Agreement" referred to in the Parent Facility Credit Agreement.  Nothing in this Agreement shall be deemed

to subordinate the right of any ABL Secured Party to receive payment to the right of any Parent Facility Secured Party to receive payment or of any Parent Facility Secured Party to receive payment to the right of any ABL Secured Party to receive payment (whether before or after the occurrence of an Insolvency Proceeding), it being the intent of the Parties that this Agreement shall effectuate a subordination of Liens as between the ABL Secured Parties, on the one hand, and the Parent Facility Secured Parties, on the other hand, but not a subordination of Indebtedness.

Section 7.17  No Warranties or Liability.  The Parent Facility Agent and, the ABL Agent each acknowledges and agrees that none of the other Parties has made any representation or warranty with respect to the execution, validity, legality, completeness, collectability or enforceability of any other ABL Document or, any other Parent Facility Document.  Except as otherwise provided in this Agreement, the Parent Facility Agent, the ABL Agent will be entitled to manage and supervise their respective extensions of credit to any Credit Party in accordance with law and their usual practices, modified from time to time as they deem appropriate.

Section 7.18  Conflicts.  In the event of any conflict between the provisions of this Agreement and the provisions of any ABL Document or, any Parent Facility Document, the provisions of this Agreement shall govern.  The parties hereto acknowledge that the terms of this Agreement are not intended to negate any specific rights granted to, or obligations of, the Company or any other Credit Party in the Parent Facility Documents or, the ABL Documents.

Section 7.19  Information Concerning Financial Condition of the Credit Parties.  Neither the Parent Facility Agent nor the ABL Agent has any responsibility for keeping any other Party informed of the financial condition of the Credit Parties or of other circumstances bearing upon the risk of non-payment of the ABL Obligations or, the Parent Facility Obligations.  The Parent Facility Agent and, the ABL Agent hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances.  In the event the Parent Facility Agent or the ABL Agent, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, it shall be under no obligation (A) to provide any such information to such other party or any other party on any subsequent occasion, (B) to undertake any investigation not a part of its regular business routine, or (C) to disclose any other information.

[Signature pages follow]

IN WITNESS WHEREOF, the ABL Agent, for and on behalf of itself and the ABL Secured Parties, and the Parent Facility Agent, for and on behalf of itself and the Parent Facility Secured Parties, have caused this Agreement to be duly executed and delivered as of the date first above written.

**ENCINA BUSINESS CREDIT, LLC**, in its
capacity as the ABL Agent

By: _____

Name: TRACY SALYERS

Title: AUTHORIZED SIGNATORY

**HSBC BANK CANADA**, in its capacity as the
Parent Facility Agent

By: _____

Name: Christine Sham

Title: Authorized Signatory

ACKNOWLEDGMENT

Acknowledged and agreed in its capacity as "Bank" under that certain Amended and Restated Security Agreement, dated as of September 5, 2019, by and among Q'Max America Inc., Anchor Drilling Fluids USA, LLC and Bank of Montreal, solely with respect Section 3.3 hereof.

**BANK OF MONTREAL**

By: _____
Name:
Title:

Connor Irving
Director

ACKNOWLEDGMENT

Each Credit Party hereby acknowledges that it has received a copy of this Agreement and consents thereto, agrees to recognize all rights granted thereby to the ABL Agent, the ABL Secured Parties, the Parent Facility Agent, and the Parent Facility Secured Parties, and will not do any act or perform any obligation which would be contrary to the express agreements set forth in this Agreement, including the granting of Liens in contravention of Section 2.5. Each Credit Party further acknowledges and agrees that it is not an intended beneficiary or third party beneficiary under this Agreement, except as expressly provided therein.

**CREDIT PARTIES**:

**ANCHOR DRILLING FLUIDS, LLC**

By: _____

Name:  Christopher Rivers
Title:  President and Chief Executive Officer

<u>Annex I</u>

Specified Intellectual Property

| Owner/Registrant | Patent Name | Patent Registration Number | Registration Date | Patent Application Number |
|---|---|---|---|---|
| Anchor Drilling Fluids USA, LLC | Apparatus, Methods and Systems for Removing Particulate Impurities from Above a Shale Shaker | 9352264 | 5/31/2016 | 13/896317 |

THIS IS EXHIBIT " _22_ "

referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26th_

day of _May_ A.D. 20 _20_

Jonathan Tomm
Barrister and Solicitor



# QMax Update Materials

February 2020

STRICTLY PRIVATE & CONFIDENTIAL

STRICTLY PRIVATE & CONFIDENTIAL

QMAX

2

# Table of Contents

1. **Situation Update**

2. Oilfield Services Market Update

3. Revised Proposal

STRICTLY PRIVATE & CONFIDENTIAL

# Executive Summary

- QMax is making the tough but necessary decisions to navigate through a continued deterioration of the U.S. market, significant collections issues from PEMEX in Mexico and political instability in Eastern Hemisphere

  – Brought on new independent directors and executive leadership with significant restructuring expertise

  – Targeting removal of up to 50% of corporate leaders, and promoting individuals internally to assume the responsibilities

  – Exploring potential sale of Mexican operations

  – Eliminating any cash assistance from Corporate to unprofitable regions / basins globally

  – Reinvigorating vendor management program to develop payment schedules for key vendors

- QMax continues to remain EBITDA positive and long term prospects remain strong, however the business needs financial support to maximize value given current conditions

- Palladium Equity Partners IV, L.P. (along with its affiliates, "Palladium") cannot continue to invest in the business absent a material restructuring and comprehensive long-term solution from the Company's lenders

- QMax management and Board of Directors have developed a revised recapitalization alternative into which Palladium could invest, aimed at stabilizing the business and providing flexibility for management to operate out of the current market downturn



STRICTLY PRIVATE & CONFIDENTIAL

# U.S. Commodities Update

## Natural Gas



- Natural gas prices down 43% and natural gas rigs down 43% from Jan-19, driven by significant increase in supply
- Lower prices have resulted in more favorable economics for transporting natural gas volumes from Northeast to other regional demand markets
- Colder weather could increase overall demand for natural gas

## Oil



- Significant reduction in demand from China due to Coronavirus has led to fall-off in oil prices
- Recent attempts by OPEC to cut oil production to stabilize prices have been rejected by Russia
- Oil rig decline driven by reduced spending by independent E&Ps as they focus on capital discipline

(1) Represents market rig count and oil prices as of 2/7.



# Mexico Collections Update

STRICTLY PRIVATE & CONFIDENTIAL

## Mexico Receipts: November Forecast vs. Actuals (11/1 – 1/31)

($ in millions)



- November BoD forecast anticipated ~$24.3M of Mexico receipts from 11/1 through 1/31, versus actual receipts of ~$11.6mm

- PEMEX has had numerous internal issues that have impacted its ability to pay customers; industry-wide, QMax and its competitors have eroded liquidity due to lack of collections from PEMEX

- Procedural issues have also delayed collections; the Company has a significant amount of past due A/R from contracts that have expired as of 12/31/19, which has made invoicing difficult as PEMEX contract supervisors see the contracts as "inactive" on the system

## Continued Ramp in Mexico Activity





STRICTLY PRIVATE & CONFIDENTIAL

# Net Working Capital Update





---

STRICTLY PRIVATE & CONFIDENTIAL

# Table of Contents

1.  Situation Update

2.  Oilfield Services Market Update

3.  Revised Proposal

QMAX

STRICTLY PRIVATE & CONFIDENTIAL

# Table of Contents

1.  **Situation Update**

2.  **Oilfield Services Market Update**

3.  **Revised Proposal**



STRICTLY PRIVATE & CONFIDENTIAL

# Steps Taken in Last 12 Months

1. **Equity Commitment** – In the last 12 months, Palladium invested $50M to assist the business in navigating through collections issues in Mexico and a deterioration of the U.S. market.

2. **Bond offering** – In Spring 2019, QMax spent $6.5M to pursue a global refinancing that intended to provide ample liquidity for its growth prospects. Fall-off in oil prices in May 2019 was a key driver of the unsuccessful outcome.

3. **PwC "Swat" Team** – In June 2019, the Company brought in the PwC "swat" team to enhance the Company's cash conversion cycle by reducing DSOs, repositioning inventory and implementing a vendor management program.

4. **Cost Savings Program** – In August 2019, the Company brought in the Alvarez & Marsal to implement a rapid cost reduction program in the U.S. and Corporate. The Company has since taken out $11M of annualized costs from the business.

5. **13 Week Cash Forecast** – In August 2019, Alvarez & Marsal worked with the Company to develop a robust 13 week cash forecast, providing significant visibility for liquidity management.

6. **U.S. ABL Refinancing** – In August 2019, the Company replaced its Wells Fargo facility with Encina, providing a higher advance rate on U.S. A/R and thus enhancing the liquidity of the Company.

7. **Explored Preferred Equity Raise** – In September 2019, the Company worked with Houlihan Lokey to pursue a preferred equity offering to third-party investors, which was unsuccessful.

8. **Explored Regional Divestitures** – In Fall 2019, the Company explored sales of its Colombia and Middle East operations. The Company did not receive any offers for the Colombia business, and a negligible amount for its Middle East business ($5M).

9. **Explored Winding Down Mexico** – In Fall 2019, the Company explored the idea of shutting down work in Mexico due to the significant working capital requirements of operating in the country. However, held off given costs associated with stopping work.

10. **Engaged Houlihan Lokey for Strategic Alternatives** – In July 2019, the Company engaged Houlihan Lokey to pursue strategic. Based on guidance from Houlihan Lokey, and recent conversations with Lazard, Simmons and Morgan Stanley, the opportunity for capital raises, refinancings and M&A is very limited in the oilfield services space.

11. **Executive Leadership Augmentation** – Since August 2019, the Company has significantly enhanced its leadership with the additions of Rafael Diaz-Granados (President), Kris Radhakrishnan (CFO), Grant Lyon (Independent BoD) and Mick McNulty (Independent BoD).



10

# Strong Financial Sponsor Support

## Equity Capital Invested and HSBC Facility Size 2014 - Current



($M)

| Year | Equity Committed to QMax (cumulative) | HSBC Facility Size |
|------|---------------------------------------|--------------------|
| 2014 | $166 | $190 |
| 2015 | $206 | $239 |
| 2016 | $231 | $170 |
| 2017 | $261 | $170 |
| 2018 | $281 | $138 |
| 2019 | $326 | $145 |
| YTD 2020 | $331 | $145 |



11

STRICTLY PRIVATE & CONFIDENTIAL

STRICTLY PRIVATE & CONFIDENTIAL

# Revised Proposal Summary

*QMax has established a revised recapitalization alternative into which Palladium could invest, aimed at stabilizing the business and providing flexibility for management to navigate out of current market downturn*

## Proposal Highlights

- Increase and fund existing facility limit by $63.0M from $144.7M to $207.7M

- No maintenance financial covenants: Net Leverage Ratio and Fixed Charge Coverage Ratio removed for duration of facility term

- Elimination of repayments of the credit facility of $1.195M on quarterly basis for duration of facility term

- Amend and extend facility by 2 years from May-21 to Dec-23

- Palladium to invest $7M of equity

QMAX

12



THIS IS EXHIBIT " _23_ "
referred to in the Affidavit of
_Cameron Bailey_
Sworn before me this _26th_
day of _May_ A.D. 20_20_

Jonathan Tomm
Barrister and Solicitor

**Qmax Solutions - Global Liquidity Summary**
Illustrative 13WCF, Updated for Actuals 3/27 — DRAFT FOR DISCUSSION ONLY — 04/15/20

Forecast Does Not Reflect Any HSBC Principal, Interest, or Borrowing Base True-up Payments

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 14 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/3 |
| *(All $'s in thousands)* | | | | | | | | | | | | | | | |
| Beginning Free Liquidity[1] | 13,009 | 11,454 | 12,778 | 8,437 | 5,635 | 1,740 | 611 | (1,046) | (1,456) | (3,188) | (4,242) | (5,584) | (6,267) | (10,534) | 13,009 |
| Beginning Total Liquidity[2] | 15,404 | 14,161 | 15,380 | 10,731 | 7,642 | 4,629 | 3,128 | 1,599 | 820 | (1,153) | (2,236) | (3,711) | (5,077) | (9,705) | 15,404 |
| Operating Cash Receipts | 7,217 | 7,437 | 6,203 | 6,002 | 6,568 | 5,495 | 5,811 | 7,042 | 6,159 | 5,840 | 5,848 | 5,821 | 5,379 | 4,763 | 85,587 |
| Priority | (2,550) | (1,635) | (5,396) | (3,952) | (4,048) | (2,039) | (3,010) | (3,451) | (3,901) | (2,431) | (2,165) | (3,064) | (5,919) | (2,310) | (45,872) |
| Vendors | (5,028) | (4,240) | (5,174) | (4,755) | (4,541) | (4,781) | (3,868) | (3,457) | (3,719) | (3,718) | (3,165) | (3,139) | (3,269) | (2,958) | (55,810) |
| Operating Disbursements | (7,577) | (5,875) | (10,570) | (8,707) | (8,589) | (6,820) | (6,878) | (6,908) | (7,620) | (6,149) | (5,330) | (6,203) | (9,189) | (5,268) | (101,683) |
| Net Operating Cash Flow | (361) | 1,562 | (4,367) | (2,705) | (2,020) | (1,325) | (1,067) | 134 | (1,461) | (309) | 518 | (382) | (3,809) | (505) | (16,096) |
| Mandatory Financing | (1,104) | (571) | (301) | (607) | (1,203) | (176) | (462) | (964) | (782) | (878) | (1,993) | (983) | (1,041) | (959) | (12,024) |
| Non-Operating Cash Disbursements | (1,104) | (571) | (301) | (607) | (1,203) | (176) | (462) | (964) | (782) | (878) | (1,993) | (983) | (1,041) | (959) | (12,024) |
| Net Operating Cash Flow Before Voluntary Financing | (1,465) | 992 | (4,668) | (3,311) | (3,224) | (1,501) | (1,529) | (830) | (2,243) | (1,187) | (1,475) | (1,365) | (4,850) | (1,464) | (28,120) |
| Voluntary Financing | 370 | (1,716) | 797 | 1,842 | 3,588 | 20 | 62 | (260) | (390) | (99) | (726) | 133 | 71 | 527 | 4,218 |
| Net Cash Flow | (1,095) | (724) | (3,872) | (1,470) | 365 | (1,481) | (1,467) | (1,090) | (2,632) | (1,286) | (2,201) | (1,233) | (4,780) | (937) | (23,901) |
| Ending Free Liquidity[1] | 11,454 | 12,778 | 8,437 | 5,635 | 1,740 | 611 | (1,046) | (1,456) | (3,188) | (4,242) | (5,584) | (6,267) | (10,534) | (12,042) | (12,042) |
| Ending Total Liquidity[2] | 14,161 | 15,380 | 10,731 | 7,642 | 4,629 | 3,128 | 1,599 | 820 | (1,153) | (2,236) | (3,711) | (5,077) | (9,705) | (11,168) | (11,168) |

**Current Forecast**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASK FROM HSBC - In Week (No Excess AP Catch-Up) | 0 | 0 | 0 | 0 | 3,260 | 1,129 | 1,656 | 410 | 1,732 | 1,055 | 1,342 | 683 | 4,267 | 1,508 | 17,042 |
| ASK FROM HSBC - Cum (No Excess AP Catch-Up) | 0 | 0 | 0 | 0 | 3,260 | 4,389 | 6,046 | 6,456 | 8,188 | 9,242 | 10,584 | 11,267 | 15,534 | 17,042 | 17,042 |

**Prior Forecast: w/e 3.20 to w/e 6.12**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASK FROM HSBC - In Week (No Excess AP Catch-Up) | 0 | 0 | 0 | 932 | 5,995 | 757 | 1,572 | 509 | 2,291 | 958 | 852 | | | | 13,866 |
| ASK FROM HSBC - Cum (No Excess AP Catch-Up) | 0 | 0 | 0 | 932 | 6,926 | 7,683 | 9,255 | 9,764 | 12,056 | 13,014 | 13,866 | | | | |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative Ask: Better / (Worse) | 0 | 0 | 0 | 932 | 3,666 | 3,294 | 3,210 | 3,309 | 3,868 | 3,772 | 3,282 | | | | |

**Qmax Solutions - Global Liquidity Summary**  —  DRAFT FOR DISCUSSION ONLY
Illustrative 13WCF, Updated for Actuals 3/27  —  04/15/20
Forecast Does Not Reflect Any HSBC Principal, Interest, or Borrowing Base True-up Payments

*(All $'s in thousands)*

| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/3 |
| **Global Liquidity** | | | | | | | | | | | | | | | |
| Beginning Cash | 10,888 | 9,792 | 9,068 | 5,197 | 3,727 | 4,092 | 2,611 | 1,144 | 54 | (2,578) | (3,864) | (6,065) | (7,298) | (12,077) | 10,888 |
| **Net Operating Cash Flow** | | | | | | | | | | | | | | | |
| USA | (1,231) | (99) | (2,860) | (1,966) | (1,979) | (383) | (1,243) | (341) | (341) | (806) | (800) | (7) | (3,645) | (143) | (16,438) |
| Mexico | 698 | 865 | (778) | (278) | (502) | (88) | 246 | 470 | 722 | 840 | 937 | 144 | 159 | (228) | 3,207 |
| MEA | 893 | 210 | (177) | (499) | 345 | (85) | (281) | 87 | (327) | (311) | (158) | 89 | (370) | (104) | (689) |
| Canada | 132 | (2) | 194 | 6 | (65) | (377) | (74) | 0 | (83) | (3) | (8) | (58) | (8) | (4) | (350) |
| Colombia | (512) | 977 | (423) | 385 | 876 | (110) | 558 | 283 | 277 | 314 | 215 | (206) | 326 | 297 | 3,255 |
| **Total Net Operating Cash Flow** | (21) | 1,950 | (4,045) | (2,353) | (1,325) | (1,043) | (795) | 500 | (1,067) | 35 | 906 | (38) | (3,537) | (183) | (11,014) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| USA | (261) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (300) | (3,661) |
| Mexico | 0 | (116) | 0 | 0 | 0 | 0 | (94) | (72) | (72) | (22) | (116) | (22) | 0 | 0 | (441) |
| MEA | 3 | 0 | 0 | 0 | 0 | 0 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 53 |
| Canada | (82) | (22) | (72) | (22) | (396) | (32) | (72) | (22) | (72) | (22) | (22) | (72) | (22) | (22) | (953) |
| Colombia | 0 | 0 | 0 | (80) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (80) |
| **Total Non-Operating Disbursements** | (340) | (388) | (322) | (352) | (696) | (282) | (272) | (366) | (394) | (344) | (388) | (344) | (272) | (322) | (5,082) |
| **Cash Flow from Financing - Mandatory(1)** | | | | | | | | | | | | | | | |
| USA | (1,002) | 0 | (167) | (440) | (490) | (175) | (448) | (393) | (688) | (765) | (1,959) | (575) | (881) | (924) | (8,909) |
| Mexico | 0 | 0 | 0 | 0 | (214) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (214) |
| MEA | 0 | (170) | (21) | (54) | (217) | 0 | (2) | (130) | (51) | (113) | (23) | 0 | 0 | 0 | (781) |
| Canada | (102) | (102) | (102) | (102) | (237) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (644) |
| Colombia | 0 | (299) | (11) | (11) | (45) | (1) | (11) | (441) | (42) | 0 | (11) | (408) | (160) | (34) | (1,476) |
| **Total Cash Flow from Financing** | (1,104) | (571) | (301) | (607) | (1,203) | (176) | (462) | (964) | (782) | (878) | (1,993) | (983) | (1,041) | (959) | (12,024) |
| (1) - Mandatory Financing - interest, amortization, and borrowing-base true-ups | | | | | | | | | | | | | | | |
| **Inter Company Transfers** | | | | | | | | | | | | | | | |
| USA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MEA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Canada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colombia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Inter Company Transfers** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Net Cash Flow** | | | | | | | | | | | | | | | |
| USA | (2,495) | (349) | (3,277) | (2,656) | (2,769) | (808) | (1,942) | (983) | (2,594) | (1,871) | (2,289) | (832) | (4,776) | (1,368) | (29,008) |
| Mexico | 698 | 749 | (778) | (278) | (716) | (88) | 246 | 377 | 650 | 819 | 821 | 122 | 159 | (228) | 2,552 |
| MEA | 896 | 40 | (198) | (553) | 128 | (85) | (233) | (43) | (378) | (424) | (181) | 89 | (370) | (104) | (1,416) |
| Canada | (52) | (126) | 20 | (118) | (698) | (410) | (146) | (22) | (155) | (25) | (30) | (130) | (30) | (27) | (1,947) |
| Colombia | (512) | 677 | (435) | 294 | 831 | (111) | 547 | (158) | 234 | 314 | 204 | (614) | 166 | 263 | 1,699 |
| **Net Cash Flow** | (1,465) | 992 | (4,668) | (3,311) | (3,224) | (1,501) | (1,529) | (830) | (2,243) | (1,187) | (1,475) | (1,365) | (4,850) | (1,464) | (28,120) |
| **Cash Flow from Financing - Voluntary(2)** | | | | | | | | | | | | | | | |
| Plus: Encina Line - Draw / (Repay) | 4 | 87 | 18 | 1,564 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 4,679 |
| Plus: HSBC Swingline - Draw / (Repay) | 270 | (1,802) | 778 | 278 | 1,025 | 0 | 0 | (260) | (390) | (321) | (791) | 8 | (129) | 255 | (1,079) |
| Plus: In-Country Financing - Draw / (Repay) | 96 | 0 | 0 | 0 | 0 | 20 | 62 | 0 | 0 | 0 | 65 | 125 | 200 | 50 | 618 |
| **Ending Cash** | 9,792 | 9,068 | 5,197 | 3,727 | 4,092 | 2,611 | 1,144 | 54 | (2,578) | (3,864) | (6,065) | (7,298) | (12,077) | (13,014) | (13,014) |
| (2) Voluntary Financing - draws on facilites to meet liquidity needs | | | | | | | | | | | | | | | |
| Plus Encina Availability | 3,947 | 3,922 | 3,904 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 0 | 0 |
| Plus HSBC Swingline Availability | 280 | 2,082 | 1,304 | 1,025 | (0) | (0) | (0) | 260 | 650 | 971 | 1,762 | 1,754 | 1,883 | 1,628 | 1,628 |
| Plus: FHC Availability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plus: In-Country Availability (ITAU, BdB, BBVA, Scotia) | 142 | 308 | 327 | 327 | 537 | 517 | 455 | 506 | 553 | 657 | 592 | 467 | 267 | 217 | 217 |
| **Total Liquidity** | 14,161 | 15,380 | 10,731 | 7,642 | 4,629 | 3,128 | 1,599 | 820 | (1,153) | (2,236) | (3,711) | (5,077) | (9,705) | (11,168) | (11,168) |
| Less: Minimum Operating Cash - US | (3,947) | (3,922) | (3,904) | (3,866) | (3,840) | (3,773) | (3,714) | (3,660) | (3,588) | (3,294) | (3,208) | (3,124) | (3,021) | (3,000) | (3,000) |
| Less: Minimum Operating Cash - Mexico | (7,730) | (7,589) | (7,638) | (7,687) | (7,725) | (7,661) | (7,867) | (8,073) | (8,275) | (8,442) | (8,574) | (8,823) | (9,068) | (9,196) | (9,196) |
| Less: Minimum Operating Cash - MEA | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) |
| Less: Minimum Operating Cash - Canada | (445) | (213) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) |
| Less: Minimum Operating Cash - Colombia | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) |
| **Operating Liquidity** | 1,668 | 3,286 | (1,331) | (4,431) | (7,457) | (8,827) | (10,502) | (11,433) | (13,536) | (14,492) | (16,013) | (17,544) | (22,313) | (23,884) | (23,884) |

**Qmax Solutions - Global Liquidity Summary** | **DRAFT FOR DISCUSSION ONLY**
**Illustrative 13WCF, Updated for Actuals 3/27** | **04/15/20**

**X** | **USA Operations (Anchor, Corp & CPI)**

*(All $'s in thousands)*

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 14 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/3 |
| | | | | | | | | | | | | | | | |
| R Customer Receipts: Anchor | 2,863 | 2,704 | 2,652 | 2,674 | 2,670 | 2,719 | 2,657 | 2,622 | 2,635 | 2,669 | 2,668 | 2,654 | 2,677 | 2,382 | 37,244 |
| **Total Receipts** | **2,863** | **2,704** | **2,652** | **2,674** | **2,670** | **2,719** | **2,657** | **2,622** | **2,635** | **2,669** | **2,668** | **2,654** | **2,677** | **2,382** | **37,244** |
| | | | | | | | | | | | | | | | |
| **Disbursements: Operating** | | | | | | | | | | | | | | | |
| V Anchor: Mud | (1,377) | (1,140) | (1,398) | (1,004) | (936) | (803) | (1,050) | (1,048) | (1,000) | (1,073) | (879) | (860) | (860) | (860) | (14,289) |
| V Anchor: Spec Chem | (147) | (28) | (75) | (123) | (84) | (150) | (100) | (99) | (125) | (96) | (68) | (78) | (78) | (78) | (1,327) |
| V Anchor: Logistics | (317) | (417) | (372) | (259) | (271) | (265) | (213) | (220) | (213) | (228) | (187) | (188) | (188) | (188) | (3,526) |
| V Anchor: Comm Chem | (388) | (233) | (292) | (221) | (243) | (394) | (221) | (234) | (226) | (238) | (145) | (154) | (154) | (154) | (3,296) |
| V Anchor: Screens & Equip | (85) | (96) | (117) | (87) | (93) | (118) | (66) | (83) | (75) | (79) | (49) | (44) | (44) | (44) | (1,081) |
| V Anchor: Other | (179) | (206) | (79) | (382) | (327) | (69) | (152) | (117) | (161) | (86) | (72) | (76) | (76) | (76) | (2,057) |
| V Corp: Recurring | (47) | (106) | (106) | (106) | (107) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (1,553) |
| V CPI: Recurring | (352) | (391) | (370) | (387) | (351) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (3,290) |
| P Wages: Anchor & Corp | (745) | 0 | (1,818) | (745) | (1,568) | (572) | (1,030) | (572) | (1,030) | (529) | (933) | 0 | (1,462) | 0 | (11,004) |
| P Benefits: Anchor & Corp | (175) | 0 | 0 | (675) | 0 | (175) | 0 | (175) | (500) | (175) | 0 | (175) | (500) | (175) | (2,725) |
| P Sales Tax & Other Auto-Debits: Anchor | (281) | (186) | (885) | (650) | (670) | (275) | (790) | (135) | (680) | (690) | (135) | (806) | (154) | 0 | (9,534) |
| M Acquisition Debt: Calumet | (328) | 0 | 0 | (319) | 0 | 0 | 0 | 0 | (328) | 0 | 0 | 0 | (321) | 0 | (1,296) |
| **Disbursements: Operating** | **(4,422)** | **(2,803)** | **(5,512)** | **(4,959)** | **(4,649)** | **(3,101)** | **(3,900)** | **(2,962)** | **(4,618)** | **(3,474)** | **(2,748)** | **(2,661)** | **(6,643)** | **(2,525)** | **(54,978)** |
| | | | | | | | | | | | | | | | |
| **Net Operating Cash Flows** | **(1,559)** | **(99)** | **(2,860)** | **(2,285)** | **(1,979)** | **(383)** | **(1,243)** | **(341)** | **(1,983)** | **(806)** | **(80)** | **(7)** | **(3,966)** | **(143)** | **(17,734)** |
| | | | | | | | | | | | | | | | |
| **Disbursements: Non-Operating** | | | | | | | | | | | | | | | |
| M Cash Interest on New Credit Facility | (135) | 0 | 0 | 0 | (128) | 0 | 0 | 0 | 0 | (173) | 0 | 0 | 0 | (126) | (562) |
| P Other Corp: Non-Recurring (Legal, Insurance, Pros, etc.) | (261) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (300) | (3,661) |
| **Disbursements: Non-Operating** | **(396)** | **(250)** | **(250)** | **(250)** | **(428)** | **(250)** | **(250)** | **(250)** | **(250)** | **(473)** | **(250)** | **(250)** | **(250)** | **(426)** | **(4,223)** |
| | | | | | | | | | | | | | | | |
| **Net Cash Flow Before Borrowing Base True-Up** | **(1,955)** | **(349)** | **(3,110)** | **(2,535)** | **(2,407)** | **(633)** | **(1,493)** | **(591)** | **(2,233)** | **(1,278)** | **(330)** | **(257)** | **(4,216)** | **(570)** | **(21,957)** |
| M Plus/Minus: Borrowing Base True-Up | (540) | 62 | (167) | (121) | (362) | (175) | (448) | (393) | (361) | (592) | (1,959) | (575) | (560) | (798) | (6,989) |
| **Net Cash Flow USA** | **(2,495)** | **(287)** | **(3,277)** | **(2,656)** | **(2,769)** | **(808)** | **(1,942)** | **(983)** | **(2,594)** | **(1,871)** | **(2,289)** | **(832)** | **(4,776)** | **(1,368)** | **(28,946)** |
| | | | | | | | | | | | | | | | |
| **Beginning Cash** | 7,105 | 4,614 | 4,352 | 1,093 | 0 | 0 | (1,014) | (2,956) | (3,939) | (6,533) | (8,181) | (10,470) | (11,303) | (16,078) | 7,105 |
| Less: Net Cash Flow USA | (2,495) | (287) | (3,277) | (2,656) | (2,769) | (808) | (1,942) | (983) | (2,594) | (1,871) | (2,289) | (832) | (4,776) | (1,368) | (28,946) |
| Plus: Draws / (Repayments) from Barbados | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plus: Draws / (Repayments) on HSBC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Ending Cash** | **4,611** | **4,327** | **1,075** | **(1,564)** | **(2,769)** | **(1,014)** | **(2,956)** | **(3,939)** | **(6,533)** | **(8,403)** | **(10,470)** | **(11,303)** | **(16,078)** | **(17,446)** | **(21,841)** |
| Plus: Draws / (Repayments) on Encina | 4 | 25 | 18 | 1,564 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 4,618 |
| **Ending Cash, After Other Sources** | **4,614** | **4,352** | **1,093** | **0** | **(206)** | **(1,014)** | **(2,956)** | **(3,939)** | **(6,533)** | **(8,181)** | **(10,470)** | **(11,303)** | **(16,078)** | **(17,223)** | **(17,223)** |
| Plus: Illustrative Net Availability | 3,947 | 3,922 | 3,904 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 0 | 0 |
| **Total Liquidity** | **8,561** | **8,274** | **4,997** | **2,563** | **(206)** | **(1,014)** | **(2,956)** | **(3,939)** | **(6,310)** | **(8,181)** | **(10,470)** | **(11,303)** | **(15,856)** | **(17,223)** | **(17,223)** |

| Qmax Solutions - Global Liquidity Summary | | | | | | | | | | | | | | DRAFT FOR DISCUSSION ONLY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Illustrative 13WCF, Updated for Actuals 3/27** | | | | | | | | | | | | | | **04/15/20** |

**X USA Operations (Anchor, Corp & CPI)**

*(All $'s in thousands)*

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 14 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/3 |

**X Standalone: Anchor Ops, Corporate & CPI**

| USA: Anchor Ops | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Receipts | 2,863 | 2,704 | 2,652 | 2,674 | 2,670 | 2,719 | 2,657 | 2,622 | 2,635 | 2,669 | 2,668 | 2,654 | 2,677 | 2,382 | 37,244 |
| Anchor: Mud | (1,377) | (1,140) | (1,398) | (1,004) | (936) | (803) | (1,050) | (1,048) | (1,000) | (1,073) | (879) | (860) | (860) | (860) | (14,289) |
| Anchor: Spec Chem | (147) | (28) | (75) | (123) | (84) | (150) | (100) | (99) | (125) | (96) | (68) | (78) | (78) | (78) | (1,327) |
| Anchor: Logistics | (317) | (417) | (372) | (259) | (271) | (265) | (213) | (220) | (213) | (228) | (187) | (188) | (188) | (188) | (3,526) |
| Anchor: Comm Chem | (388) | (233) | (292) | (221) | (243) | (394) | (221) | (234) | (226) | (238) | (145) | (154) | (154) | (154) | (3,296) |
| Anchor: Screens & Equip | (85) | (96) | (117) | (87) | (93) | (118) | (66) | (83) | (75) | (79) | (49) | (44) | (44) | (44) | (1,081) |
| Anchor: Other | (179) | (206) | (79) | (382) | (327) | (69) | (152) | (117) | (161) | (86) | (72) | (76) | (76) | (76) | (2,057) |
| Payroll & Contractors | (670) | 0 | (1,195) | (670) | (1,195) | (497) | (729) | (497) | (729) | (454) | (702) | 0 | (1,156) | 0 | (8,493) |
| Severance | 0 | 0 | (160) | 0 | (35) | 0 | (26) | 0 | (26) | 0 | (14) | 0 | (14) | 0 | (275) |
| Benefits | (137) | 0 | 0 | (529) | 0 | (137) | 0 | (137) | (392) | (137) | 0 | (137) | (392) | (137) | (2,137) |
| Sales Tax/Other: Recurring | (140) | (105) | (585) | (555) | (440) | (30) | (460) | (30) | (480) | (440) | (30) | (460) | (480) | (440) | (4,676) |
| Sales Tax/Other: Non-Recurring | 0 | 0 | 0 | 0 | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (1,050) |
| **USA: Anchor Ops** | **(578)** | **479** | **(1,621)** | **(1,157)** | **(1,059)** | **150** | **(464)** | **53** | **(897)** | **(268)** | **417** | **552** | **(870)** | **300** | **(4,964)** |
| Cash Interest on New Credit Facility | (135) | 0 | 0 | (128) | 0 | 0 | 0 | 0 | 0 | (173) | 0 | 0 | 0 | (126) | (562) |
| Plus/Minus: Borrowing Base True-Up | (540) | 62 | (167) | (121) | (362) | (175) | (448) | (393) | (361) | (592) | (1,959) | (575) | (560) | (798) | (6,989) |
| Plus: Draws / (Repayments) on Encina | 4 | 25 | 18 | 1,564 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 4,618 |
| **Anchor Ops + Encina** | **(1,250)** | **566** | **(1,770)** | **285** | **1,014** | **(25)** | **(912)** | **(340)** | **(1,258)** | **(811)** | **(1,543)** | **(23)** | **(1,429)** | **(402)** | **(7,898)** |

| USA: Corporate | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Corp: Recurring | (47) | (106) | (106) | (106) | (107) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (1,553) |
| Corp: Non-Recurring | (261) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (300) | (3,661) |
| Payroll & Contractors | (75) | 0 | (449) | (75) | (324) | (75) | (235) | (75) | (235) | (75) | (185) | 0 | (260) | 0 | (2,063) |
| Severance | 0 | 0 | (14) | 0 | (14) | 0 | (40) | 0 | (40) | 0 | (32) | 0 | (32) | 0 | (172) |
| Benefits | (38) | 0 | 0 | (146) | 0 | (38) | 0 | (38) | (108) | (38) | 0 | (38) | (108) | (38) | (588) |
| Sales Tax/Other: Recurring | (469) | (16) | (250) | (319) | 0 | 0 | (225) | 0 | (328) | 0 | 0 | (191) | (321) | 0 | (2,119) |
| Current Forecast | 0 | (65) | (50) | (95) | (125) | (140) | 0 | 0 | (95) | (145) | 0 | (50) | (2,095) | (125) | (2,985) |
| **USA: Corporate** | **(890)** | **(437)** | **(1,119)** | **(991)** | **(870)** | **(622)** | **(870)** | **(483)** | **(1,176)** | **(678)** | **(587)** | **(649)** | **(3,186)** | **(583)** | **(13,141)** |
| Plus: Draws / (Repayments) from Barbados | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plus: Draws / (Repayments) on HSBC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **USA: Corporate + External Funding** | **(890)** | **(437)** | **(1,119)** | **(991)** | **(870)** | **(622)** | **(870)** | **(483)** | **(1,176)** | **(678)** | **(587)** | **(649)** | **(3,186)** | **(583)** | **(13,141)** |

| USA: CPI | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CPI: Recurring | (352) | (391) | (370) | (387) | (351) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (3,290) |
| **USA: CPI** | **(352)** | **(391)** | **(370)** | **(387)** | **(351)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(3,290)** |

**Qmax Solutions - Global Liquidity Summary**  **DRAFT FOR DISCUSSION ONLY**
Illustrative 13WCF, Updated for Actuals 3/27  04/15/20

X **Mexico Operations**

*(All $'s in thousands)*

| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Status | | | | | | | | | | | | | | | | |
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | | 14 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | | 7/3 |
| | | | | | | | | | | | | | | | | |
| Customer Receipts: Pemex | 523 | 2,001 | 793 | 689 | 477 | 768 | 758 | 838 | 670 | 844 | 843 | 870 | 859 | 947 | | 11,881 |
| Customer Receipts: Perfolat | 1,400 | 0 | 432 | 432 | 432 | 432 | 993 | 1,332 | 1,432 | 1,132 | 1,132 | 1,132 | 432 | 432 | | 11,150 |
| Customer Receipts: Other Customers | 0 | 218 | 436 | 195 | 312 | 62 | 0 | 45 | 163 | 14 | 41 | 2 | 87 | 2 | | 1,577 |
| **Total Receipts** | **1,923** | **2,219** | **1,662** | **1,317** | **1,222** | **1,262** | **1,751** | **2,215** | **2,266** | **1,990** | **2,017** | **2,004** | **1,378** | **1,382** | | **24,608** |
| | | | | | | | | | | | | | | | | |
| Disbursements: Operating | | | | | | | | | | | | | | | | |
| Total Vendor Spend | (775) | (1,200) | (1,200) | (1,200) | (1,200) | (1,200) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | | (14,775) |
| Rent - Facilities only | 0 | (74) | 0 | 0 | (4) | (70) | 0 | 0 | (4) | (70) | 0 | 0 | (4) | (70) | | (296) |
| Community Vendors | 0 | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | | (1,040) |
| Payroll | (400) | 0 | (960) | 0 | (440) | 0 | (420) | 0 | (460) | 0 | 0 | (420) | 0 | (460) | | (3,560) |
| VAT Taxes | 0 | 0 | 0 | (135) | 0 | 0 | 0 | (135) | 0 | 0 | 0 | 0 | (135) | 0 | | (405) |
| Non-VAT Taxes | (50) | 0 | (200) | (180) | 0 | 0 | (5) | (530) | 0 | 0 | 0 | (360) | 0 | 0 | | (1,325) |
| **Disbursements: Operating** | **(1,225)** | **(1,354)** | **(2,440)** | **(1,595)** | **(1,724)** | **(1,350)** | **(1,505)** | **(1,745)** | **(1,544)** | **(1,150)** | **(1,080)** | **(1,860)** | **(1,219)** | **(1,610)** | | **(21,401)** |
| | | | | | | | | | | | | | | | | |
| **Net Operating Cash Flows** | **698** | **865** | **(778)** | **(278)** | **(502)** | **(88)** | **246** | **470** | **722** | **840** | **937** | **144** | **159** | **(228)** | | **3,207** |
| | | | | | | | | | | | | | | | | |
| Disbursements: Non-Operating | | | | | | | | | | | | | | | | |
| Cash Interest - Perfolat Loan | 0 | 0 | 0 | 0 | (214) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | (214) |
| Cash Amortization - Perfolat Loan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Capex | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (94) | (72) | (22) | 0 | (22) | 0 | 0 | | (209) |
| Other Non-Recurring (FX, Legal, Insurance, Pros, etc.) | 0 | (116) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (116) | 0 | 0 | 0 | | (232) |
| **Disbursements: Non-Operating** | **0** | **(116)** | **0** | **0** | **(214)** | **0** | **0** | **(94)** | **(72)** | **(22)** | **(116)** | **(22)** | **0** | **0** | | **(655)** |
| | | | | | | | | | | | | | | | | |
| **Net Cash Flow Mexico** | **698** | **749** | **(778)** | **(278)** | **(716)** | **(88)** | **246** | **377** | **650** | **819** | **821** | **122** | **159** | **(228)** | | **2,552** |
| | | | | | | | | | | | | | | | | |
| Beginning Cash | 185 | 1,154 | 100 | 100 | 100 | (175) | (263) | (17) | 100 | 100 | 100 | 100 | 100 | 100 | | 185 |
| Less: Net Cash Flow Mexico | 698 | 749 | (778) | (278) | (716) | (88) | 246 | 377 | 650 | 819 | 821 | 122 | 159 | (228) | | 2,552 |
| Plus: HSBC Swingline - Draw / (Repay) | 270 | (1,802) | 778 | 278 | 441 | 0 | 0 | (260) | (650) | (819) | (821) | (122) | (159) | 228 | | (2,637) |
| **Ending Cash, After Other Sources** | **1,154** | **100** | **100** | **100** | **(175)** | **(263)** | **(17)** | **100** | **100** | **100** | **100** | **100** | **100** | **100** | | **100** |

**Qmax Solutions - Global Liquidity Summary**     **DRAFT FOR DISCUSSION ONLY**
**Illustrative 13WCF, Updated for Actuals 3/27**     **04/15/20**

**X | Colombia Operations**

(All $'s in thousands)

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 14 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/3 |
| | | | | | | | | | | | | | | | |
| Customer Receipts: Ecopetrol | 184 | 1,649 | 86 | 244 | 872 | 214 | 563 | 662 | 439 | 68 | 475 | 475 | 475 | 348 | 6,752 |
| Other Customer Receipts | 165 | 139 | 650 | 997 | 760 | 617 | 631 | 1,109 | 324 | 927 | 332 | 220 | 422 | 420 | 7,713 |
| Income Tax Refund | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Receipts** | **349** | **1,788** | **736** | **1,241** | **1,632** | **831** | **1,194** | **1,771** | **763** | **995** | **806** | **695** | **897** | **768** | **14,465** |
| | | | | | | | | | | | | | | | |
| Less: Receipts Collected in Barbados | (71) | (989) | (211) | (28) | (288) | (175) | (186) | (218) | (145) | (22) | (157) | (157) | (157) | (115) | (2,917) |
| **Net Colombian Receipts: In-Country** | **278** | **799** | **526** | **1,213** | **1,344** | **656** | **1,008** | **1,553** | **618** | **972** | **650** | **538** | **740** | **653** | **11,548** |
| | | | | | | | | | | | | | | | |
| **Disbursements: Operating** | | | | | | | | | | | | | | | |
| Vendors | (600) | (100) | (300) | (200) | (400) | (400) | (400) | (200) | (200) | (200) | (250) | (250) | (160) | (150) | (3,810) |
| Community Vendors | (200) | (280) | (270) | (250) | (250) | (200) | (180) | (180) | (180) | (200) | (210) | (220) | (220) | (220) | (3,060) |
| Bank Service Charges | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (14) |
| Rent - Facilities only | 0 | (70) | 0 | 0 | 0 | (70) | 0 | 0 | 0 | 0 | 0 | (70) | 0 | 0 | (210) |
| Other Recurring Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payroll | (60) | (310) | (370) | (400) | (100) | (200) | (50) | (440) | (100) | (200) | (50) | (430) | (50) | (100) | (2,860) |
| VAT Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (548) | 0 | 0 | 0 | 0 | 0 | 0 | (548) |
| Non-VAT Taxes | 0 | (50) | (219) | (5) | (5) | (70) | (5) | (120) | (5) | (80) | (10) | 0 | (140) | 0 | (708) |
| **Disbursements: Operating** | **(861)** | **(811)** | **(1,160)** | **(856)** | **(756)** | **(941)** | **(636)** | **(1,488)** | **(486)** | **(681)** | **(591)** | **(901)** | **(571)** | **(471)** | **(11,210)** |
| | | | | | | | | | | | | | | | |
| **Net Operating Cash Flows** | **(583)** | **(12)** | **(634)** | **357** | **588** | **(285)** | **372** | **65** | **132** | **291** | **59** | **(363)** | **169** | **182** | **339** |
| | | | | | | | | | | | | | | | |
| **Disbursements: Non-Operating** | | | | | | | | | | | | | | | |
| Cash Interest | 0 | (8) | (3) | (11) | (10) | (1) | (11) | (8) | (8) | 0 | (11) | (37) | (8) | 0 | (118) |
| Amortization | 0 | (291) | (8) | 0 | (34) | 0 | 0 | (433) | (34) | 0 | 0 | (371) | (152) | (34) | (1,359) |
| New Debt Issuance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Capex | 0 | 0 | 0 | (80) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (80) |
| Other Non-Recurring (FX, Legal, Insurance, Pros, etc.) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Disbursements: Non-Operating** | **0** | **(299)** | **(11)** | **(91)** | **(45)** | **(1)** | **(11)** | **(441)** | **(42)** | **0** | **(11)** | **(408)** | **(160)** | **(34)** | **(1,556)** |
| | | | | | | | | | | | | | | | |
| **Net Cash Flow Colombia** | **(583)** | **(311)** | **(645)** | **266** | **544** | **(287)** | **361** | **(377)** | **89** | **291** | **48** | **(771)** | **9** | **148** | **(1,218)** |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | 1,024 | 441 | 130 | 0 | 266 | 810 | 523 | 884 | 507 | 596 | 888 | 935 | 164 | 173 | 1,024 |
| Less: Net Cash Flow Colombia | (583) | (311) | (645) | 266 | 544 | (287) | 361 | (377) | 89 | 291 | 48 | (771) | 9 | 148 | (1,218) |
| Plus: Barbados Cash Transfer | 0 | 0 | 516 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 516 |
| **Ending Cash After Other Sources** | **441** | **130** | **0** | **266** | **810** | **523** | **884** | **507** | **596** | **888** | **935** | **164** | **173** | **321** | **321** |
| Plus: Illustrative Net Availability - Barbados | 1,122 | 2,111 | 1,806 | 1,834 | 2,122 | 2,297 | 2,483 | 2,701 | 2,846 | 2,868 | 3,025 | 3,182 | 3,338 | 3,453 | 3,453 |
| Plus: In-Country Availability (ITAU, BdB, BBVA, Scotia) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Liquidity** | **1,563** | **2,241** | **1,806** | **2,100** | **2,931** | **2,820** | **3,367** | **3,208** | **3,442** | **3,756** | **3,960** | **3,346** | **3,512** | **3,774** | **3,774** |

| Qmax Solutions - Global Liquidity Summary | | | | | | | | | | | | | | | DRAFT FOR DISCUSSION ONLY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Illustrative 13WCF, Updated for Actuals 3/27 | | | | | | | | | | | | | | | 04/15/20 |

**X MEA Operations**

*(All $'s in thousands)*

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 14 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/3 |
| | | | | | | | | | | | | | | | |
| Customer Receipts | 1,268 | 421 | 653 | 265 | 603 | 553 | 153 | 377 | 440 | 133 | 304 | 415 | 374 | 50 | 6,009 |
| **Total Receipts** | **1,268** | **421** | **653** | **265** | **603** | **553** | **153** | **377** | **440** | **133** | **304** | **415** | **374** | **50** | **6,009** |
| | | | | | | | | | | | | | | | |
| **Disbursements: Operating** | | | | | | | | | | | | | | | |
| Vendor Payments - Inventory | (186) | 0 | (248) | (206) | (49) | (33) | (206) | (70) | (127) | (234) | (120) | (150) | (43) | (20) | (1,692) |
| Vendor Payments - Freight | (2) | 0 | (34) | (2) | 0 | 0 | 0 | (2) | (5) | 0 | (1) | 0 | (5) | 0 | (51) |
| Vendor Payments - Direct Expenses | (65) | (5) | (191) | (79) | (162) | (349) | (43) | (45) | (108) | (171) | (57) | (18) | (326) | (61) | (1,680) |
| Vendor Payments - Administrative (G&A) | (7) | (14) | (7) | (4) | (11) | (16) | (13) | (1) | 1 | (1) | (11) | (1) | (5) | (7) | (97) |
| Vendor Payments - Other | 0 | (4) | 0 | (10) | 0 | (4) | (76) | (10) | 0 | 0 | (6) | 0 | (10) | 0 | (120) |
| Vendor payments - Direct Expenses - Other | 0 | 0 | (200) | 0 | 0 | (200) | 0 | 0 | (200) | 0 | 0 | 0 | 0 | 0 | (600) |
| Rent - Facilities only | (21) | 0 | (29) | 0 | (17) | (16) | (5) | 0 | (2) | 0 | (19) | (2) | 0 | (53) | (163) |
| Other Recurring Expenses | (28) | (20) | (17) | (8) | (8) | (8) | (17) | (8) | (8) | (8) | (17) | (8) | 0 | 0 | (155) |
| Payroll | (61) | (157) | (55) | (421) | (10) | (6) | (45) | (124) | (311) | 0 | (45) | (88) | (348) | (13) | (1,684) |
| Free Zone Levy | 0 | 0 | 0 | (5) | 0 | 0 | 0 | 0 | (5) | 0 | 0 | 0 | (5) | 0 | (15) |
| VAT Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Non-VAT Taxes | 0 | (6) | (43) | (28) | 0 | (6) | (18) | (30) | 0 | (30) | (186) | (48) | 0 | 0 | (395) |
| Bank Service Charges | (6) | (5) | (6) | (1) | (2) | 0 | (11) | 0 | (2) | 0 | 0 | (11) | (2) | 0 | (46) |
| **Disbursements: Operating** | **(376)** | **(211)** | **(830)** | **(764)** | **(258)** | **(638)** | **(434)** | **(290)** | **(767)** | **(444)** | **(462)** | **(326)** | **(744)** | **(154)** | **(6,698)** |
| | | | | | | | | | | | | | | | |
| **Net Operating Cash Flows** | **893** | **210** | **(177)** | **(499)** | **345** | **(85)** | **(281)** | **87** | **(327)** | **(311)** | **(158)** | **89** | **(370)** | **(104)** | **(689)** |
| | | | | | | | | | | | | | | | |
| **Disbursements: Non-Operating** | | | | | | | | | | | | | | | |
| Capex - IDEC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Capex - Egypt | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Capex - Kuwait JV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Capex - Algeria | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Saudi Consulting Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Corplease - Egypt | 0 | 0 | 0 | (54) | 0 | 0 | 0 | (78) | 0 | 0 | 0 | (21) | 0 | 0 | (153) |
| Import Line - Draw / (Repayment) | 96 | (166) | (19) | 0 | (210) | 20 | 62 | (51) | (47) | (104) | 65 | 125 | 200 | 50 | 21 |
| Other Non-Recurring (FX, Legal, Insurance, Pros, etc.) | 3 | 0 | 0 | 0 | 0 | 0 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 53 |
| Interest | 0 | (4) | (2) | 0 | (7) | 0 | (2) | (1) | (4) | (9) | (2) | 0 | 0 | 0 | (31) |
| **Disbursements: Non-Operating** | **99** | **(170)** | **(21)** | **(54)** | **(217)** | **20** | **110** | **(130)** | **(51)** | **(113)** | **42** | **125** | **200** | **50** | **(110)** |
| | | | | | | | | | | | | | | | |
| **Net Cash Flow MEA** | **992** | **40** | **(198)** | **(553)** | **128** | **(65)** | **(171)** | **(43)** | **(378)** | **(424)** | **(116)** | **214** | **(170)** | **(54)** | **(798)** |
| | | | | | | | | | | | | | | | |
| Beginning Cash | 1,133 | 2,125 | 2,165 | 1,967 | 1,414 | 1,542 | 1,477 | 1,306 | 1,263 | 885 | 461 | 345 | 559 | 389 | 1,133 |
| Less: Net Cash Flow MEA | 992 | 40 | (198) | (553) | 128 | (65) | (171) | (43) | (378) | (424) | (116) | 214 | (170) | (54) | (798) |
| Plus: UOP - Kuwait JV Debt Draw / (Repay) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plus: HSBC Swingline - Draw / (Repay) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Cash, After Other Sources | 2,125 | 2,165 | 1,967 | 1,414 | 1,542 | 1,477 | 1,306 | 1,263 | 885 | 461 | 345 | 559 | 389 | 335 | 335 |
| Plus: In-Country Availability | 142 | 308 | 327 | 327 | 537 | 517 | 455 | 506 | 553 | 657 | 592 | 467 | 267 | 217 | 217 |
| **Total Liquidity** | **2,267** | **2,473** | **2,294** | **1,741** | **2,079** | **1,994** | **1,761** | **1,769** | **1,438** | **1,118** | **937** | **1,026** | **656** | **552** | **552** |

**Qmax Solutions - Global Liquidity Summary**
**Illustrative 13WCF, Updated for Actuals 3/27**
**Forecast Does Not Reflect Any HSBC Principal, Interest, or Borrowing Base True-up Payments**

DRAFT FOR DISCUSSION ONLY
04/15/20

**X Canada Operations**

*(All $'s in thousands)*

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | | 14 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | | 7/3 |
| | | | | | | | | | | | | | | | | |
| Customer Receipts | 814 | 306 | 500 | 506 | 441 | 131 | 56 | 56 | 56 | 53 | 53 | 53 | 53 | 182 | | 3,261 |
| **Total Receipts** | **814** | **306** | **500** | **506** | **441** | **131** | **56** | **56** | **56** | **53** | **53** | **53** | **53** | **182** | | **3,261** |
| | | | | | | | | | | | | | | | | |
| **Disbursements: Operating** | | | | | | | | | | | | | | | | |
| Vendor Payments | (500) | (300) | (185) | (484) | (308) | (500) | (50) | (48) | 0 | (31) | (40) | (40) | (40) | (40) | | (2,566) |
| Bank Service Charges | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | | (14) |
| Rent - Facilities only | (17) | 0 | 0 | 0 | (17) | 0 | 0 | 0 | 0 | (17) | 0 | 0 | 0 | (17) | | (68) |
| Other Recurring Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Payroll | (104) | (7) | (120) | (7) | (80) | (7) | (80) | (7) | (80) | (7) | (20) | (70) | (20) | (70) | | (679) |
| VAT Taxes | (60) | 0 | 0 | 0 | (100) | 0 | 0 | 0 | (50) | 0 | 0 | 0 | 0 | (50) | | (260) |
| Non-VAT Taxes | 0 | 0 | 0 | (8) | 0 | 0 | 0 | 0 | (8) | 0 | 0 | 0 | 0 | (8) | | (24) |
| **Disbursements: Operating** | **(682)** | **(308)** | **(306)** | **(500)** | **(506)** | **(508)** | **(131)** | **(56)** | **(139)** | **(56)** | **(61)** | **(111)** | **(61)** | **(186)** | | **(3,611)** |
| | | | | | | | | | | | | | | | | |
| **Net Operating Cash Flows** | **132** | **(2)** | **194** | **6** | **(65)** | **(377)** | **(74)** | **0** | **(83)** | **(3)** | **(8)** | **(58)** | **(8)** | **(4)** | | **(350)** |
| | | | | | | | | | | | | | | | | |
| **Disbursements: Non-Operating** | | | | | | | | | | | | | | | | |
| HSBC - Interest Payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| HSBC - Amortization | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Terra - Acquisition Debt - P&I | (102) | (102) | (102) | (102) | (102) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | (508) |
| Tarek Acquisition Debt - P&I | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Funding: India, Brazil, & Ecuador | 0 | 0 | (50) | 0 | 0 | 0 | (50) | 0 | 0 | 0 | 0 | (50) | 0 | 0 | | (150) |
| Asset Sale | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Microsoft Lease | 0 | 0 | 0 | 0 | (136) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | (136) |
| Other Non-Recurring (FX, Legal, Insurance, Pros, LCs, etc.) | (82) | (22) | (22) | (22) | (396) | (32) | (22) | (22) | (72) | (22) | (22) | (22) | (22) | (22) | | (803) |
| **Disbursements: Non-Operating** | **(184)** | **(124)** | **(174)** | **(124)** | **(633)** | **(32)** | **(72)** | **(22)** | **(72)** | **(22)** | **(22)** | **(72)** | **(22)** | **(22)** | | **(1,597)** |
| | | | | | | | | | | | | | | | | |
| **Net Cash Flow Before True-up** | **(52)** | **(126)** | **20** | **(118)** | **(698)** | **(410)** | **146** | **22** | **(155)** | **(25)** | **(30)** | **(130)** | **(30)** | **(27)** | | **(1,947)** |
| Plus/Minus: Borrowing Base True-Up | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| **Net Cash Flow Canada** | **(52)** | **(126)** | **20** | **(118)** | **(698)** | **(410)** | **146** | **22** | **(155)** | **(25)** | **(30)** | **(130)** | **(30)** | **(27)** | | **(1,947)** |
| | | | | | | | | | | | | | | | | |
| Beginning Cash | 388 | 336 | 210 | 231 | 113 | 0 | (410) | (556) | (578) | (473) | 0 | 0 | 0 | 0 | | 388 |
| Less: Net Cash Flow Before True-up | (52) | (126) | 20 | (118) | (698) | (410) | 146 | 22 | (155) | (25) | (30) | (130) | (30) | (27) | | (1,947) |
| Plus: HSBC Swingline - Draw / (Repay) | 0 | 0 | 0 | 0 | 584 | 0 | 0 | 0 | 260 | 498 | 30 | 130 | 30 | 27 | | 1,558 |
| **Ending Cash, After Other Sources** | **336** | **210** | **231** | **113** | **0** | **(410)** | **(556)** | **(578)** | **(473)** | **0** | **0** | **0** | **0** | **0** | | **0** |
| Plus: Illustrative Net Availability | 280 | 2,082 | 1,304 | 1,025 | 0 | 0 | 0 | 260 | 650 | 971 | 1,762 | 1,754 | 1,883 | 1,628 | | 1,628 |
| Plus: FHC Availability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| **Total Liquidity** | **616** | **2,292** | **1,534** | **1,139** | **0** | **(410)** | **(556)** | **(318)** | **177** | **971** | **1,762** | **1,754** | **1,883** | **1,628** | | **1,628** |

**Qmax Solutions - Global Liquidity Summary** — DRAFT FOR DISCUSSION ONLY
Illustrative 13WCF, Updated for Actuals 3/27 — 04/15/20

Forecast Does Not Reflect Any HSBC Principal, Interest, or Borrowing Base True-up Payments

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 14 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/3 |

*(All $'s in thousands)*

**Cash Flow**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Inflows | 7,287 | 8,426 | 6,414 | 6,030 | 6,856 | 5,671 | 5,997 | 7,260 | 6,304 | 5,862 | 6,005 | 5,978 | 5,536 | 4,878 | 88,503 |
| Less: Cash Outflows | (8,382) | (9,150) | (10,285) | (7,500) | (6,491) | (7,152) | (7,464) | (8,350) | (8,937) | (7,148) | (8,205) | (7,210) | (10,315) | (5,815) | (112,405) |
| **Net Cash Flow** | **(1,095)** | **(724)** | **(3,872)** | **(1,470)** | **365** | **(1,481)** | **(1,467)** | **(1,090)** | **(2,632)** | **(1,286)** | **(2,201)** | **(1,233)** | **(4,780)** | **(937)** | **(23,901)** |
| Beginning Cash Balance | 10,888 | 9,792 | 9,068 | 5,197 | 3,727 | 4,092 | 2,611 | 1,144 | 54 | (2,578) | (3,864) | (6,065) | (7,298) | (12,077) | 10,888 |
| Plus / (Minus): Net Cash Flow | (1,095) | (724) | (3,872) | (1,470) | 365 | (1,481) | (1,467) | (1,090) | (2,632) | (1,286) | (2,201) | (1,233) | (4,780) | (937) | (23,901) |
| **Ending Cash Balance** | **9,792** | **9,068** | **5,197** | **3,727** | **4,092** | **2,611** | **1,144** | **54** | **(2,578)** | **(3,864)** | **(6,065)** | **(7,298)** | **(12,077)** | **(13,014)** | **(13,014)** |

**Liquidity Calculation**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Availability on HSBC Facility | 280 | 2,082 | 1,304 | 1,025 | 0 | 0 | 0 | 260 | 650 | 971 | 1,762 | 1,754 | 1,883 | 1,628 | 1,628 |
| Plus: Availability on Encina Facility | 3,947 | 3,922 | 3,904 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 0 | 0 |
| Plus: Marginable Cash | 7,227 | 6,774 | 3,230 | 2,047 | 1,740 | 611 | (1,046) | (1,716) | (4,060) | (5,213) | (7,345) | (8,021) | (12,640) | (13,670) | (13,670) |
| Plus: FHC Availability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Free Liquidity** | **11,454** | **12,778** | **8,437** | **5,635** | **1,740** | **611** | **(1,046)** | **(1,456)** | **(3,188)** | **(4,242)** | **(5,584)** | **(6,267)** | **(10,534)** | **(12,042)** | **(12,042)** |
| Plus: Non-Marginable Cash | 2,566 | 2,295 | 1,967 | 1,680 | 2,352 | 2,000 | 2,190 | 1,770 | 1,481 | 1,349 | 1,280 | 723 | 563 | 657 | 657 |
| Plus: In-Country Availability | 142 | 308 | 327 | 327 | 537 | 517 | 455 | 506 | 553 | 657 | 592 | 467 | 267 | 217 | 217 |
| Plus: 1st National Capex Availability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Liquidity** | **14,161** | **15,380** | **10,731** | **7,642** | **4,629** | **3,128** | **1,599** | **820** | **(1,153)** | **(2,236)** | **(3,711)** | **(5,077)** | **(9,705)** | **(11,168)** | **(11,168)** |

**Debt / Capitalization**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Encina (Revolving & Term Loan) | 22,368 | 22,226 | 22,123 | 23,214 | 25,602 | 25,153 | 24,761 | 24,400 | 23,696 | 21,959 | 21,384 | 20,825 | 19,916 | 19,822 | 19,822 |
| HSBC | 144,467 | 142,665 | 143,443 | 143,721 | 144,747 | 144,747 | 144,747 | 144,487 | 144,097 | 143,776 | 142,985 | 142,993 | 142,864 | 143,118 | 143,118 |
| **Senior Secured Debt** | **166,836** | **164,891** | **165,566** | **166,935** | **170,349** | **169,900** | **169,508** | **168,887** | **167,794** | **165,735** | **164,370** | **163,818** | **162,779** | **162,940** | **162,940** |
| MEX: Perforial Debt | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 |
| COL: BBVA | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,113 | 1,113 | 1,113 | 1,113 |
| COL: Banco de Bogota | 3,181 | 2,890 | 2,881 | 2,881 | 2,847 | 2,847 | 2,847 | 2,847 | 2,812 | 2,812 | 2,812 | 2,812 | 2,660 | 2,626 | 2,626 |
| COL: ITAU | 1,395 | 1,395 | 1,395 | 1,395 | 1,395 | 1,395 | 1,395 | 962 | 962 | 962 | 962 | 962 | 962 | 962 | 962 |
| IDEC: Import Line | 1,758 | 1,592 | 1,573 | 1,573 | 1,363 | 1,383 | 1,445 | 1,394 | 1,347 | 1,243 | 1,308 | 1,433 | 1,633 | 1,683 | 1,683 |
| EGY: Corplease | 313 | 313 | 313 | 259 | 259 | 259 | 259 | 181 | 181 | 181 | 160 | 160 | 160 | 160 | 160 |
| USA: 1st National Capex Line | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Debt** | **182,327** | **179,925** | **180,573** | **181,888** | **185,057** | **184,628** | **184,298** | **183,115** | **181,941** | **179,778** | **178,457** | **177,659** | **176,669** | **176,845** | **176,845** |

THIS IS EXHIBIT " 24 "

referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this 26th

day of May A.D. 20 20

Jonathan Tomm
Barrister and Solicitor

**Qmax Solutions - Global Liquidity Summary** — DRAFT FOR DISCUSSION ONLY
Illustrative 13WCF, Updated for Actuals 3/27 — 04/22/20
Forecast Does Not Reflect Any HSBC Principal, Interest, or Borrowing Base True-up Payments

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 15 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/10 |
| *(All $'s in thousands)* | | | | | | | | | | | | | | | | |
| Beginning Free Liquidity[1] | 13,009 | 11,454 | 12,778 | 8,437 | 5,635 | 1,740 | 611 | (1,046) | (1,456) | (3,188) | (4,242) | (5,584) | (6,267) | (10,534) | (12,042) | 13,009 |
| Beginning Total Liquidity[2] | 15,404 | 14,161 | 15,380 | 10,731 | 7,642 | 4,629 | 3,128 | 1,599 | 820 | (1,153) | (2,236) | (3,711) | (5,077) | (9,705) | (11,168) | 15,404 |
| Operating Cash Receipts | 7,217 | 7,437 | 6,203 | 6,002 | 6,568 | 5,495 | 5,811 | 7,042 | 6,159 | 5,840 | 5,848 | 5,821 | 5,379 | 4,763 | 5,500 | 91,086 |
| Priority | (2,550) | (1,635) | (5,396) | (3,952) | (4,048) | (2,039) | (3,010) | (3,451) | (3,901) | (2,431) | (2,165) | (3,064) | (5,919) | (2,310) | (1,568) | (47,440) |
| Vendors | (5,028) | (4,240) | (5,174) | (4,755) | (4,541) | (4,781) | (3,868) | (3,457) | (3,719) | (3,718) | (3,165) | (3,139) | (3,269) | (2,958) | (2,974) | (58,784) |
| Operating Disbursements | (7,577) | (5,875) | (10,570) | (8,707) | (8,589) | (6,820) | (6,878) | (6,908) | (7,620) | (6,149) | (5,330) | (6,203) | (9,189) | (5,268) | (4,541) | (106,224) |
| Net Operating Cash Flow | (361) | 1,562 | (4,367) | (2,705) | (2,020) | (1,325) | (1,067) | 134 | (1,461) | (309) | 518 | (382) | (3,809) | (505) | 958 | (15,138) |
| Mandatory Financing | (1,104) | (571) | (301) | (607) | (1,203) | (176) | (462) | (964) | (782) | (878) | (1,993) | (983) | (1,041) | (959) | (626) | (12,650) |
| Non-Operating Cash Disbursements | (1,104) | (571) | (301) | (607) | (1,203) | (176) | (462) | (964) | (782) | (878) | (1,993) | (983) | (1,041) | (959) | (626) | (12,650) |
| Net Operating Cash Flow Before Voluntary Financing | (1,465) | 992 | (4,668) | (3,311) | (3,224) | (1,501) | (1,529) | (830) | (2,243) | (1,187) | (1,475) | (1,365) | (4,850) | (1,464) | 333 | (27,787) |
| Voluntary Financing | 370 | (1,716) | 797 | 1,842 | 3,588 | 20 | 62 | (260) | (390) | 99 | (726) | 133 | 71 | 527 | (1,436) | 2,783 |
| Net Cash Flow | (1,095) | (724) | (3,872) | (1,470) | 365 | (1,481) | (1,467) | (1,090) | (2,632) | (1,286) | (2,201) | (1,233) | (4,780) | (937) | (1,103) | (25,005) |
| Ending Free Liquidity[1] | 11,454 | 12,778 | 8,437 | 5,635 | 1,740 | 611 | (1,046) | (1,456) | (3,188) | (4,242) | (5,584) | (6,267) | (10,534) | (12,042) | (11,314) | (11,314) |
| Ending Total Liquidity[2] | 14,161 | 15,380 | 10,731 | 7,642 | 4,629 | 3,128 | 1,599 | 820 | (1,153) | (2,236) | (3,711) | (5,077) | (9,705) | (11,168) | (10,836) | (10,836) |
| **Current Forecast** | | | | | | | | | | | | | | | | |
| ASK FROM HSBC - In Week (No Excess AP Catch-Up) | 0 | 0 | 0 | 0 | 3,260 | 1,129 | 1,656 | 410 | 1,732 | 1,055 | 1,342 | 683 | 4,267 | 1,508 | (728) | 16,314 |
| ASK FROM HSBC - Cum (No Excess AP Catch-Up) | 0 | 0 | 0 | 0 | 3,260 | 4,389 | 6,046 | 6,456 | 8,188 | 9,242 | 10,584 | 11,267 | 15,534 | 17,042 | 16,314 | 16,314 |
| **Prior Forecast: w/e 3.20 to w/e 6.12** | | | | | | | | | | | | | | | | |
| ASK FROM HSBC - In Week (No Excess AP Catch-Up) | 0 | 0 | 0 | 932 | 5,995 | 757 | 1,572 | 509 | 2,291 | 958 | 852 | | | | | 13,866 |
| ASK FROM HSBC - Cum (No Excess AP Catch-Up) | 0 | 0 | 0 | 932 | 6,926 | 7,683 | 9,255 | 9,764 | 12,056 | 13,014 | 13,866 | | | | | 13,866 |
| Cumulative Ask: Better / (Worse) | 0 | 0 | 0 | 932 | 3,666 | 3,294 | 3,210 | 3,309 | 3,868 | 3,772 | 3,282 | | | | | |

Qmax Solutions - Global Liquidity Summary  
Illustrative 13WCF, Updated for Actuals 3/27  
DRAFT FOR DISCUSSION ONLY  
04/22/20  

**Forecast Does Not Reflect Any HSBC Principal, Interest, or Borrowing Base True-up Payments**

*(All $'s in thousands)*

| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Status | | | | | | | | | | | | | | | | |
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 15 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/10 |

**Global Liquidity**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | 10,888 | 9,792 | 9,068 | 5,197 | 3,727 | 4,092 | 2,611 | 1,144 | 54 | (2,578) | (3,864) | (6,065) | (7,298) | (12,077) | (13,014) | 10,888 |
| **Net Operating Cash Flow** | | | | | | | | | | | | | | | | |
| USA | (1,231) | (99) | (2,860) | (1,966) | (1,979) | (383) | (1,243) | (341) | (1,655) | (806) | (80) | (7) | (3,645) | (143) | (167) | (16,605) |
| Mexico | 698 | 865 | (778) | (278) | (502) | (88) | 246 | 470 | 722 | 840 | 937 | 144 | 159 | (228) | 1,436 | 4,642 |
| MEA | 893 | 210 | (177) | (499) | 345 | (85) | (281) | 87 | (327) | (311) | (158) | 89 | (370) | (104) | (60) | (749) |
| Canada | 132 | (2) | 194 | 6 | (65) | (377) | (74) | 0 | (83) | (3) | (8) | (58) | (8) | (4) | 112 | (238) |
| Colombia | (512) | 977 | (423) | 385 | 876 | (110) | 558 | 283 | 277 | 314 | 215 | (206) | 326 | 297 | (90) | 3,165 |
| **Total Net Operating Cash Flow** | (21) | 1,950 | (4,045) | (2,353) | (1,325) | (1,043) | (795) | 500 | (1,067) | 35 | 906 | (38) | (3,537) | (183) | 1,230 | (9,784) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | | |
| USA | (261) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (300) | (250) | (3,911) |
| Mexico | 0 | (116) | 0 | 0 | 0 | 0 | 0 | (94) | (72) | (22) | (116) | (22) | 0 | 0 | 0 | (441) |
| MEA | 3 | 0 | 0 | 0 | 0 | 0 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 53 |
| Canada | (82) | (22) | (72) | (22) | (396) | (32) | (72) | (22) | (72) | (22) | (22) | (72) | (22) | (22) | (22) | (975) |
| Colombia | 0 | 0 | 0 | (80) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (80) |
| **Total Non-Operating Disbursements** | (340) | (388) | (322) | (352) | (696) | (282) | (272) | (366) | (394) | (344) | (388) | (344) | (272) | (322) | (272) | (5,354) |
| **Cash Flow from Financing - Mandatory**[1] | | | | | | | | | | | | | | | | |
| USA | (1,002) | 0 | (167) | (440) | (490) | (175) | (448) | (393) | (688) | (765) | (1,959) | (575) | (881) | (924) | (316) | (9,225) |
| Mexico | 0 | 0 | 0 | 0 | (214) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (214) |
| MEA | 0 | (170) | (21) | (54) | (217) | 0 | (2) | (130) | (51) | (113) | (23) | 0 | 0 | 0 | (14) | (795) |
| Canada | (102) | (102) | (102) | (102) | (237) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (644) |
| Colombia | 0 | (299) | (11) | (11) | (45) | (1) | (11) | (441) | (42) | 0 | (11) | (408) | (160) | (34) | (295) | (1,772) |
| **Total Cash Flow from Financing** | (1,104) | (571) | (301) | (607) | (1,203) | (176) | (462) | (964) | (782) | (878) | (1,993) | (983) | (1,041) | (959) | (626) | (12,650) |

(1) - Mandatory Financing - interest, amortization, and borrowing-base true-ups

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Inter Company Transfers** | | | | | | | | | | | | | | | | |
| USA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MEA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Canada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colombia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Inter Company Transfers** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Net Cash Flow** | | | | | | | | | | | | | | | | |
| USA | (2,495) | (349) | (3,277) | (2,656) | (2,769) | (808) | (1,942) | (983) | (2,594) | (1,871) | (2,289) | (832) | (4,776) | (1,368) | (734) | (29,742) |
| Mexico | 698 | 749 | (778) | (278) | (716) | (88) | 246 | 377 | 650 | 819 | 821 | 122 | 159 | (228) | 1,436 | 3,988 |
| MEA | 896 | 40 | (198) | (553) | 128 | (85) | (233) | (43) | (378) | (424) | (181) | 89 | (370) | (104) | (74) | (1,490) |
| Canada | (52) | (126) | 20 | (118) | (698) | (410) | (146) | (22) | (155) | (25) | (30) | (130) | (30) | (27) | 90 | (1,857) |
| Colombia | (512) | 677 | (435) | 294 | 831 | (111) | 547 | (158) | 234 | 314 | 204 | (614) | 166 | 263 | (385) | 1,314 |
| **Net Cash Flow** | (1,465) | 992 | (4,668) | (3,311) | (3,224) | (1,501) | (1,529) | (830) | (2,243) | (1,187) | (1,475) | (1,365) | (4,850) | (1,464) | 333 | (27,787) |
| **Cash Flow from Financing - Voluntary**[2] | | | | | | | | | | | | | | | | |
| Plus: Encina Line - Draw / (Repay) | 4 | 87 | 18 | 1,564 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 0 | 4,679 |
| Plus: HSBC Swingline - Draw / (Repay) | 270 | (1,802) | 778 | 278 | 1,025 | 0 | 0 | (260) | (390) | (321) | (791) | 8 | (129) | 255 | (1,436) | (2,514) |
| Plus: In-Country Financing - Draw / (Repay) | 96 | 0 | 0 | 0 | 0 | 20 | 62 | 0 | 0 | 0 | 0 | 65 | 125 | 200 | 50 | 618 |
| **Ending Cash** | 9,792 | 9,068 | 5,197 | 3,727 | 4,092 | 2,611 | 1,144 | 54 | (2,578) | (3,864) | (6,065) | (7,298) | (12,077) | (13,014) | (14,117) | (14,117) |

(2) Voluntary Financing - draws on facilities to meet liquidity needs

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Plus Encina Availability | 3,947 | 3,922 | 3,904 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 0 | 0 | 3,064 |
| Plus HSBC Swingline Availability | 280 | 2,082 | 1,304 | 1,025 | (0) | (0) | (0) | 260 | 650 | 971 | 1,762 | 1,754 | 1,883 | 1,628 | 3,064 | 3,064 |
| Plus FHC Availability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plus: In-Country Availability (ITAU, BdB, BBVA, Scotia) | 142 | 308 | 327 | 327 | 537 | 517 | 455 | 506 | 553 | 657 | 592 | 467 | 267 | 217 | 217 | 217 |
| **Total Liquidity** | 14,161 | 15,380 | 10,731 | 7,642 | 4,629 | 3,128 | 1,599 | 820 | (1,153) | (2,236) | (3,711) | (5,077) | (9,705) | (11,168) | (10,836) | (10,836) |
| Less: Minimum Operating Cash - US | (3,947) | (3,922) | (3,904) | (3,866) | (3,840) | (3,773) | (3,714) | (3,660) | (3,588) | (3,294) | (3,208) | (3,124) | (3,021) | (3,000) | (3,000) | (3,000) |
| Less: Minimum Operating Cash - Mexico | (7,730) | (7,589) | (7,638) | (7,687) | (7,725) | (7,661) | (7,867) | (8,073) | (8,275) | (8,442) | (8,574) | (8,823) | (9,068) | (9,196) | (9,325) | (9,325) |
| Less: Minimum Operating Cash - MEA | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) |
| Less: Minimum Operating Cash - Canada | (445) | (213) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) |
| Less: Minimum Operating Cash - Colombia | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) |
| **Operating Liquidity** | 1,668 | 3,286 | (1,331) | (4,431) | (7,457) | (8,827) | (10,502) | (11,433) | (13,536) | (14,492) | (16,013) | (17,544) | (22,313) | (23,884) | (23,681) | (23,681) |

| Qmax Solutions - Global Liquidity Summary | | | | | | | | | | | | | | | | DRAFT FOR DISCUSSION ONLY |
| Illustrative 13WCF, Updated for Actuals 3/27 | | | | | | | | | | | | | | | | 04/22/20 |

**X  USA Operations (Anchor, Corp & CPI)**

*(All $'s in thousands)*

| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 15 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/10 |
| R Customer Receipts: Anchor | 2,863 | 2,704 | 2,652 | 2,674 | 2,670 | 2,719 | 2,657 | 2,622 | 2,635 | 2,669 | 2,668 | 2,654 | 2,677 | 2,382 | 2,116 | 39,360 |
| **Total Receipts** | **2,863** | **2,704** | **2,652** | **2,674** | **2,670** | **2,719** | **2,657** | **2,622** | **2,635** | **2,669** | **2,668** | **2,654** | **2,677** | **2,382** | **2,116** | **39,360** |
| **Disbursements: Operating** | | | | | | | | | | | | | | | | |
| V Anchor: Mud | (1,377) | (1,140) | (1,398) | (1,004) | (936) | (803) | (1,050) | (1,048) | (1,000) | (1,073) | (879) | (860) | (860) | (860) | (867) | (15,155) |
| V Anchor: Spec Chem | (147) | (28) | (75) | (123) | (84) | (150) | (100) | (99) | (125) | (96) | (68) | (78) | (78) | (78) | (75) | (1,402) |
| V Anchor: Logistics | (317) | (417) | (372) | (259) | (271) | (265) | (213) | (220) | (213) | (228) | (187) | (188) | (188) | (188) | (190) | (3,716) |
| V Anchor: Comm Chem | (388) | (233) | (292) | (221) | (243) | (394) | (221) | (234) | (226) | (238) | (145) | (154) | (154) | (154) | (149) | (3,446) |
| V Anchor: Screens & Equip | (85) | (96) | (117) | (87) | (93) | (118) | (66) | (83) | (75) | (79) | (49) | (44) | (44) | (44) | (43) | (1,124) |
| V Anchor: Other | (179) | (206) | (79) | (382) | (327) | (69) | (152) | (117) | (161) | (86) | (72) | (76) | (76) | (76) | (77) | (2,134) |
| V Corp: Recurring | (47) | (106) | (106) | (106) | (107) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (1,674) |
| V CPI: Recurring | (352) | (391) | (370) | (387) | (351) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (3,449) |
| P Wages: Anchor & Corp | (745) | 0 | (1,818) | (745) | (1,568) | (572) | (1,030) | (572) | (1,030) | (529) | (933) | 0 | (1,462) | 0 | (467) | (11,471) |
| P Benefits: Anchor & Corp | (175) | 0 | 0 | (675) | 0 | (175) | 0 | (175) | (500) | (175) | 0 | (175) | (500) | (175) | 0 | (2,725) |
| P Sales Tax & Other Auto-Debits: Anchor | (281) | (186) | (885) | (650) | (670) | (275) | (790) | (135) | (680) | (690) | (135) | (806) | (2,680) | (670) | (135) | (9,669) |
| M Acquisition Debt: Calumet | (328) | 0 | 0 | (319) | 0 | 0 | 0 | 0 | (328) | 0 | 0 | 0 | (321) | 0 | 0 | (1,296) |
| **Disbursements: Operating** | **(4,422)** | **(2,803)** | **(5,512)** | **(4,959)** | **(4,649)** | **(3,101)** | **(3,900)** | **(2,962)** | **(4,618)** | **(3,474)** | **(2,748)** | **(2,661)** | **(6,643)** | **(2,525)** | **(2,283)** | **(57,261)** |
| **Net Operating Cash Flows** | **(1,559)** | **(99)** | **(2,860)** | **(2,285)** | **(1,979)** | **(383)** | **(1,243)** | **(341)** | **(1,983)** | **(806)** | **(80)** | **(7)** | **(3,966)** | **(143)** | **(167)** | **(17,901)** |
| **Disbursements: Non-Operating** | | | | | | | | | | | | | | | | |
| M Cash Interest on New Credit Facility | (135) | 0 | 0 | 0 | (128) | 0 | 0 | 0 | 0 | (173) | 0 | 0 | 0 | (126) | 0 | (562) |
| P Other Corp: Non-Recurring (Legal, Insurance, Pros, etc.) | (261) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (300) | (250) | (3,911) |
| **Disbursements: Non-Operating** | **(396)** | **(250)** | **(250)** | **(250)** | **(428)** | **(250)** | **(250)** | **(250)** | **(250)** | **(473)** | **(250)** | **(250)** | **(250)** | **(426)** | **(250)** | **(4,473)** |
| **Net Cash Flow Before Borrowing Base True-Up** | **(1,955)** | **(349)** | **(3,110)** | **(2,535)** | **(2,407)** | **(633)** | **(1,493)** | **(591)** | **(2,233)** | **(1,278)** | **(330)** | **(257)** | **(4,216)** | **(570)** | **(417)** | **(22,374)** |
| M Plus/Minus: Borrowing Base True-Up | (540) | 62 | (167) | (121) | (362) | (175) | (448) | (393) | (361) | (592) | (1,959) | (575) | (560) | (798) | (316) | (7,306) |
| **Net Cash Flow USA** | **(2,495)** | **(287)** | **(3,277)** | **(2,656)** | **(2,769)** | **(808)** | **(1,942)** | **(983)** | **(2,594)** | **(1,871)** | **(2,289)** | **(832)** | **(4,776)** | **(1,368)** | **(734)** | **(29,680)** |
| Beginning Cash | 7,105 | 4,614 | 4,352 | 1,093 | 0 | (206) | (1,014) | (2,956) | (3,939) | (6,533) | (8,181) | (10,470) | (11,303) | (16,078) | (17,223) | 7,105 |
| Less: Net Cash Flow USA | (2,495) | (287) | (3,277) | (2,656) | (2,769) | (808) | (1,942) | (983) | (2,594) | (1,871) | (2,289) | (832) | (4,776) | (1,368) | (734) | (29,680) |
| Plus: Draws / (Repayments) from Barbados | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plus: Draws / (Repayments) on HSBC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Ending Cash** | **4,611** | **4,327** | **1,075** | **(1,564)** | **(2,769)** | **(1,014)** | **(2,956)** | **(3,939)** | **(6,533)** | **(8,403)** | **(10,470)** | **(11,303)** | **(16,078)** | **(17,446)** | **(17,957)** | **(22,575)** |
| Plus: Draws / (Repayments) on Encina | 4 | 25 | 18 | 1,564 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 0 | 4,618 |
| **Ending Cash, After Other Sources** | **4,614** | **4,352** | **1,093** | **0** | **(206)** | **(1,014)** | **(2,956)** | **(3,939)** | **(6,533)** | **(8,181)** | **(10,470)** | **(11,303)** | **(16,078)** | **(17,223)** | **(17,957)** | **(17,957)** |
| Plus: Illustrative Net Availability | 3,947 | 3,922 | 3,904 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 0 | 0 | 0 |
| **Total Liquidity** | **8,561** | **8,274** | **4,997** | **2,563** | **(206)** | **(1,014)** | **(2,956)** | **(3,939)** | **(6,310)** | **(8,181)** | **(10,470)** | **(11,303)** | **(15,856)** | **(17,223)** | **(17,957)** | **(17,957)** |

| Qmax Solutions - Global Liquidity Summary | | | | | | | | | | | | | | | DRAFT FOR DISCUSSION ONLY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Illustrative 13WCF, Updated for Actuals 3/27 | | | | | | | | | | | | | | | 04/22/20 |

**X   USA Operations (Anchor, Corp & CPI)**

*(All $'s in thousands)*

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 15 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/10 |

**X   Standalone: Anchor Ops, Corporate & CPI**

| USA: Anchor Ops | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Receipts | 2,863 | 2,704 | 2,652 | 2,674 | 2,670 | 2,719 | 2,657 | 2,622 | 2,635 | 2,669 | 2,668 | 2,654 | 2,677 | 2,382 | 2,116 | 39,360 |
| Anchor: Mud | (1,377) | (1,140) | (1,398) | (1,004) | (936) | (803) | (1,050) | (1,048) | (1,000) | (1,073) | (879) | (860) | (860) | (860) | (867) | (15,155) |
| Anchor: Spec Chem | (147) | (28) | (75) | (123) | (84) | (150) | (100) | (99) | (125) | (96) | (68) | (78) | (78) | (78) | (75) | (1,402) |
| Anchor: Logistics | (317) | (417) | (372) | (259) | (271) | (265) | (213) | (220) | (213) | (228) | (187) | (188) | (188) | (188) | (190) | (3,716) |
| Anchor: Comm Chem | (388) | (233) | (292) | (221) | (243) | (394) | (421) | (234) | (226) | (238) | (145) | (154) | (154) | (149) | (149) | (3,446) |
| Anchor: Screens & Equip | (85) | (96) | (117) | (87) | (93) | (118) | (66) | (83) | (75) | (79) | (49) | (44) | (44) | (44) | (43) | (1,124) |
| Anchor: Other | (179) | (206) | (79) | (382) | (327) | (69) | (152) | (117) | (161) | (86) | (72) | (76) | (76) | (77) | (77) | (2,134) |
| Payroll & Contractors | (670) | 0 | (1,195) | (670) | (1,195) | (497) | (729) | (497) | (729) | (454) | (702) | 0 | (1,156) | 0 | (392) | (8,886) |
| Severance | 0 | 0 | (160) | 0 | (35) | 0 | (26) | 0 | (26) | 0 | (14) | 0 | (14) | 0 | 0 | (275) |
| Benefits | (137) | 0 | 0 | (529) | 0 | (137) | 0 | (137) | (392) | (137) | 0 | (137) | (392) | (137) | 0 | (2,137) |
| Sales Tax/Other: Recurring | (140) | (105) | (585) | (555) | (440) | (30) | (460) | (30) | (480) | (440) | (30) | (460) | (480) | (440) | (30) | (4,706) |
| Sales Tax/Other: Non-Recurring | 0 | 0 | 0 | 0 | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (1,155) |
| **USA: Anchor Ops** | **(578)** | **479** | **(1,621)** | **(1,157)** | **(1,059)** | **150** | **(464)** | **53** | **(897)** | **(268)** | **417** | **552** | **(870)** | **300** | **188** | **(4,776)** |
| Cash Interest on New Credit Facility | (135) | 0 | 0 | 0 | (128) | 0 | 0 | 0 | 0 | (173) | 0 | 0 | 0 | 0 | 0 | (562) |
| Plus/Minus: Borrowing Base True-Up | (540) | 62 | (167) | (121) | (362) | (175) | (448) | (393) | (361) | (592) | (1,959) | (575) | (560) | (798) | (316) | (7,306) |
| Plus: Draws / (Repayments) on Encina | 4 | 25 | 18 | 1,564 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 0 | 4,618 |
| **Anchor Ops + Encina** | **(1,250)** | **566** | **(1,770)** | **285** | **1,014** | **(25)** | **(912)** | **(340)** | **(1,258)** | **(811)** | **(1,543)** | **(23)** | **(1,429)** | **(402)** | **(129)** | **(8,027)** |

| USA: Corporate | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Corp: Recurring | (47) | (106) | (106) | (106) | (107) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (1,674) |
| Corp: Non-Recurring | (261) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (300) | (250) | (3,911) |
| Payroll & Contractors | (75) | 0 | (449) | (75) | (324) | (75) | (235) | (75) | (235) | (75) | (185) | 0 | (260) | 0 | (75) | (2,138) |
| Severance | 0 | 0 | (14) | 0 | (14) | 0 | (40) | 0 | (40) | 0 | (32) | 0 | (32) | 0 | 0 | (172) |
| Benefits | (38) | 0 | 0 | (146) | 0 | (38) | 0 | (38) | (108) | (38) | 0 | (38) | (108) | (38) | 0 | (588) |
| Sales Tax/Other: Recurring | 0 | (65) | (50) | (95) | (125) | (140) | 0 | 0 | (95) | (145) | 0 | (50) | (2,095) | (125) | 0 | (2,985) |
| Current Forecast | (469) | (16) | (250) | (319) | 0 | 0 | (225) | 0 | (328) | 0 | 0 | (191) | (321) | 0 | 0 | (2,119) |
| **USA: Corporate** | **(890)** | **(437)** | **(1,119)** | **(991)** | **(870)** | **(622)** | **(870)** | **(483)** | **(1,176)** | **(678)** | **(587)** | **(649)** | **(3,186)** | **(583)** | **(445)** | **(13,587)** |
| Plus: Draws / (Repayments) from Barbados | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plus: Draws / (Repayments) on HSBC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **USA: Corporate + External Funding** | **(890)** | **(437)** | **(1,119)** | **(991)** | **(870)** | **(622)** | **(870)** | **(483)** | **(1,176)** | **(678)** | **(587)** | **(649)** | **(3,186)** | **(583)** | **(445)** | **(13,587)** |

| USA: CPI | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CPI: Recurring | (352) | (391) | (370) | (387) | (351) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (3,449) |
| **USA: CPI** | **(352)** | **(391)** | **(370)** | **(387)** | **(351)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(3,449)** |

**Qmax Solutions - Global Liquidity Summary**  **DRAFT FOR DISCUSSION ONLY**
Illustrative 13WCF, Updated for Actuals 3/27  04/22/20

**X  Mexico Operations**

*(All $'s in thousands)*

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | | 15 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | | 7/10 |
| Customer Receipts: Pemex | 523 | 2,001 | 793 | 689 | 477 | 768 | 758 | 838 | 670 | 844 | 843 | 870 | 859 | 947 | 932 | | 12,812 |
| Customer Receipts: Perfolat | 1,400 | 0 | 432 | 432 | 432 | 432 | 993 | 1,332 | 1,432 | 1,132 | 1,132 | 1,132 | 432 | 432 | 1,583 | | 12,732 |
| Customer Receipts: Other Customers | 0 | 218 | 436 | 195 | 312 | 62 | 0 | 45 | 163 | 14 | 41 | 2 | 87 | 2 | 1 | | 1,579 |
| **Total Receipts** | **1,923** | **2,219** | **1,662** | **1,317** | **1,222** | **1,262** | **1,751** | **2,215** | **2,266** | **1,990** | **2,017** | **2,004** | **1,378** | **1,382** | **2,516** | | **27,123** |
| **Disbursements: Operating** | | | | | | | | | | | | | | | | | |
| Total Vendor Spend | (775) | (1,200) | (1,200) | (1,200) | (1,200) | (1,200) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | | (15,775) |
| Rent - Facilities only | 0 | (74) | 0 | 0 | (4) | (70) | 0 | 0 | (4) | (70) | 0 | 0 | (4) | (70) | 0 | | (296) |
| Community Vendors | 0 | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | | (1,120) |
| Payroll | (400) | 0 | (960) | 0 | (440) | 0 | (420) | 0 | (460) | 0 | 0 | (420) | 0 | (460) | 0 | | (3,560) |
| VAT Taxes | 0 | 0 | 0 | (135) | 0 | 0 | 0 | (135) | 0 | 0 | 0 | 0 | (135) | 0 | 0 | | (405) |
| Non-VAT Taxes | (50) | 0 | (200) | (180) | 0 | 0 | (5) | (530) | 0 | 0 | 0 | (360) | 0 | 0 | 0 | | (1,325) |
| **Disbursements: Operating** | **(1,225)** | **(1,354)** | **(2,440)** | **(1,595)** | **(1,724)** | **(1,350)** | **(1,505)** | **(1,745)** | **(1,544)** | **(1,150)** | **(1,080)** | **(1,860)** | **(1,219)** | **(1,610)** | **(1,080)** | | **(22,481)** |
| **Net Operating Cash Flows** | **698** | **865** | **(778)** | **(278)** | **(502)** | **(88)** | **246** | **470** | **722** | **840** | **937** | **144** | **159** | **(228)** | **1,436** | | **4,642** |
| **Disbursements: Non-Operating** | | | | | | | | | | | | | | | | | |
| Cash Interest - Perfolat Loan | 0 | 0 | 0 | 0 | (214) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | (214) |
| Cash Amortization - Perfolat Loan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Capex | 0 | 0 | 0 | 0 | 0 | 0 | (94) | (72) | (22) | 0 | (22) | 0 | 0 | 0 | 0 | | (209) |
| Other Non-Recurring (FX, Legal, Insurance, Pros, etc.) | 0 | (116) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (116) | 0 | 0 | 0 | 0 | 0 | | (232) |
| **Disbursements: Non-Operating** | **0** | **(116)** | **0** | **0** | **(214)** | **0** | **0** | **(94)** | **(72)** | **(22)** | **(116)** | **(22)** | **0** | **0** | **0** | | **(655)** |
| **Net Cash Flow Mexico** | **698** | **749** | **(778)** | **(278)** | **(716)** | **(88)** | **246** | **377** | **650** | **819** | **821** | **122** | **159** | **(228)** | **1,436** | | **3,988** |
| **Beginning Cash** | 185 | 1,154 | 100 | 100 | 100 | (175) | (263) | (17) | 100 | 100 | 100 | 100 | 100 | 100 | 100 | | 185 |
| Less: Net Cash Flow Mexico | 698 | 749 | (778) | (278) | (716) | (88) | 246 | 377 | 650 | 819 | 821 | 122 | 159 | (228) | 1,436 | | 3,988 |
| Plus: HSBC Swingline - Draw / (Repay) | 270 | (1,802) | 778 | 278 | 441 | 0 | 0 | (260) | (650) | (819) | (821) | (122) | (159) | 228 | (1,436) | | (4,073) |
| **Ending Cash, After Other Sources** | **1,154** | **100** | **100** | **100** | **(175)** | **(263)** | **(17)** | **100** | **100** | **100** | **100** | **100** | **100** | **100** | **100** | | **100** |

**Qmax Solutions - Global Liquidity Summary**
**Illustrative 13WCF, Updated for Actuals 3/27**

DRAFT FOR DISCUSSION ONLY
04/22/20

**X** Colombia Operations

(All $'s in thousands)

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 15 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/10 |
| | | | | | | | | | | | | | | | | |
| Customer Receipts: Ecopetrol | 184 | 1,649 | 86 | 244 | 872 | 214 | 563 | 662 | 439 | 68 | 475 | 475 | 475 | 348 | 178 | 6,931 |
| Other Customer Receipts | 165 | 139 | 650 | 997 | 760 | 617 | 631 | 1,109 | 324 | 927 | 332 | 220 | 422 | 420 | 413 | 8,125 |
| Income Tax Refund | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Receipts** | **349** | **1,788** | **736** | **1,241** | **1,632** | **831** | **1,194** | **1,771** | **763** | **995** | **806** | **695** | **897** | **768** | **591** | **15,056** |
| | | | | | | | | | | | | | | | | |
| Less: Receipts Collected in Barbados | (71) | (989) | (211) | (28) | (288) | (175) | (186) | (218) | (145) | (22) | (157) | (157) | (157) | (115) | (59) | (2,976) |
| **Net Colombian Receipts: In-Country** | **278** | **799** | **526** | **1,213** | **1,344** | **656** | **1,008** | **1,553** | **618** | **972** | **650** | **538** | **740** | **653** | **532** | **12,080** |
| | | | | | | | | | | | | | | | | |
| Disbursements: Operating | | | | | | | | | | | | | | | | |
| Vendors | (600) | (100) | (300) | (200) | (400) | (400) | (400) | (200) | (200) | (200) | (250) | (250) | (160) | (150) | (100) | (3,910) |
| Community Vendors | (200) | (280) | (270) | (250) | (250) | (200) | (180) | (180) | (200) | (210) | (220) | (220) | (220) | (220) | (220) | (3,280) |
| Bank Service Charges | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (15) |
| Rent - Facilities only | 0 | (70) | 0 | 0 | 0 | (70) | 0 | 0 | 0 | 0 | (70) | 0 | 0 | 0 | (70) | (280) |
| Other Recurring Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payroll | (60) | (310) | (370) | (400) | (100) | (200) | (50) | (440) | (100) | (200) | (50) | (430) | (50) | (100) | (200) | (3,060) |
| VAT Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (548) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (548) |
| Non-VAT Taxes | 0 | (50) | (219) | (5) | (5) | (70) | (5) | (120) | (5) | (80) | (10) | 0 | (140) | 0 | (90) | (798) |
| **Disbursements: Operating** | **(861)** | **(811)** | **(1,160)** | **(856)** | **(756)** | **(941)** | **(636)** | **(1,488)** | **(486)** | **(681)** | **(591)** | **(901)** | **(571)** | **(471)** | **(681)** | **(11,891)** |
| | | | | | | | | | | | | | | | | |
| Net Operating Cash Flows | (583) | (12) | (634) | 357 | 588 | (285) | 372 | 65 | 132 | 291 | 59 | (363) | 169 | 182 | (149) | 190 |
| | | | | | | | | | | | | | | | | |
| Disbursements: Non-Operating | | | | | | | | | | | | | | | | |
| Cash Interest | 0 | (8) | (3) | (11) | (10) | (1) | (11) | (8) | (8) | 0 | (11) | (37) | (8) | 0 | (4) | (122) |
| Amortization | 0 | (291) | (8) | 0 | (34) | 0 | 0 | (433) | (34) | 0 | 0 | (371) | (152) | (34) | (291) | (1,650) |
| New Debt Issuance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Capex | 0 | 0 | 0 | (80) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (80) |
| Other Non-Recurring (FX, Legal, Insurance, Pros, etc.) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Disbursements: Non-Operating** | **0** | **(299)** | **(11)** | **(91)** | **(45)** | **(1)** | **(11)** | **(441)** | **(42)** | **0** | **(11)** | **(408)** | **(160)** | **(34)** | **(295)** | **(1,852)** |
| | | | | | | | | | | | | | | | | |
| **Net Cash Flow Colombia** | **(583)** | **(311)** | **(645)** | **266** | **544** | **(287)** | **361** | **(377)** | **89** | **291** | **48** | **(771)** | **9** | **148** | **(444)** | **(1,662)** |
| | | | | | | | | | | | | | | | | |
| Beginning Cash | 1,024 | 441 | 130 | 0 | 266 | 810 | 523 | 884 | 507 | 596 | 888 | 935 | 164 | 173 | 321 | 1,024 |
| Less: Net Cash Flow Colombia | (583) | (311) | (645) | 266 | 544 | (287) | 361 | (377) | 89 | 291 | 48 | (771) | 9 | 148 | (444) | (1,662) |
| Plus: Barbados Cash Transfer | 0 | 0 | 516 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 123 | 638 |
| **Ending Cash After Other Sources** | **441** | **130** | **0** | **266** | **810** | **523** | **884** | **507** | **596** | **888** | **935** | **164** | **173** | **321** | **0** | **(0)** |
| Plus: Illustrative Net Availability - Barbados | 1,122 | 2,111 | 1,806 | 1,834 | 2,122 | 2,297 | 2,483 | 2,701 | 2,846 | 2,868 | 3,025 | 3,182 | 3,338 | 3,453 | 3,389 | 3,389 |
| Plus: In-Country Availability (ITAU, BdB, BBVA, Scotia) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Liquidity** | **1,563** | **2,241** | **1,806** | **2,100** | **2,931** | **2,820** | **3,367** | **3,208** | **3,442** | **3,756** | **3,960** | **3,346** | **3,512** | **3,774** | **3,389** | **3,389** |
| Less: Greater of Vendor Stretch & Minimum Operating Cash | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) |
| **Operating Liquidity** | **1,413** | **2,091** | **1,656** | **1,950** | **2,781** | **2,670** | **3,217** | **3,058** | **3,292** | **3,606** | **3,810** | **3,196** | **3,362** | **3,624** | **3,239** | **3,239** |

**Qmax Solutions - Global Liquidity Summary** — **DRAFT FOR DISCUSSION ONLY**
Illustrative 13WCF, Updated for Actuals 3/27 — 04/22/20

**X** **MEA Operations**

*(All $'s in thousands)*

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | | 15 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/12 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | | 7/10 |
| | | | | | | | | | | | | | | | | | |
| Customer Receipts | 1,268 | 421 | 653 | 265 | 603 | 553 | 153 | 377 | 440 | 133 | 304 | 415 | 374 | 50 | 44 | | 6,053 |
| **Total Receipts** | **1,268** | **421** | **653** | **265** | **603** | **553** | **153** | **377** | **440** | **133** | **304** | **415** | **374** | **50** | **44** | | **6,053** |
| **Disbursements: Operating** | | | | | | | | | | | | | | | | | |
| Vendor Payments - Inventory | (186) | 0 | (248) | (206) | (49) | (33) | (206) | (70) | (127) | (234) | (120) | (150) | (43) | (20) | (38) | | (1,730) |
| Vendor Payments - Freight | (2) | 0 | (34) | (2) | 0 | 0 | 0 | (2) | (5) | 0 | (1) | 0 | (5) | 0 | (2) | | (53) |
| Vendor Payments - Direct Expenses | (65) | (5) | (191) | (79) | (162) | (349) | (43) | (45) | (108) | (171) | (57) | (18) | (326) | (61) | (38) | | (1,718) |
| Vendor Payments - Administrative (G&A) | (7) | (14) | (7) | (4) | (11) | (16) | (13) | (1) | 1 | (1) | (11) | (1) | (5) | (7) | (10) | | (107) |
| Vendor Payments - Other | 0 | (4) | 0 | (10) | 0 | (4) | (76) | (10) | 0 | 0 | 0 | (6) | 0 | 0 | (5) | | (125) |
| Vendor payments - Direct Expenses - Other | 0 | 0 | (200) | 0 | 0 | (200) | 0 | 0 | (200) | 0 | 0 | 0 | 0 | 0 | 0 | | (600) |
| Rent - Facilities only | (21) | 0 | (29) | 0 | (17) | (16) | (5) | 0 | (2) | 0 | (19) | (2) | 0 | (53) | 0 | | (163) |
| Other Recurring Expenses | (28) | (20) | (17) | (8) | (8) | (8) | (17) | (8) | (8) | (8) | (17) | (8) | 0 | 0 | 0 | | (155) |
| Payroll | (61) | (157) | (55) | (421) | (10) | (6) | (45) | (124) | (311) | 0 | (45) | (88) | (348) | (13) | 0 | | (1,684) |
| Free Zone Levy | 0 | 0 | 0 | (5) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (5) | 0 | 0 | | (15) |
| VAT Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Non-VAT Taxes | 0 | (6) | (43) | (28) | 0 | (6) | (18) | (30) | 0 | (30) | (186) | (48) | 0 | 0 | (6) | | (401) |
| Bank Service Charges | (6) | (5) | (6) | (1) | (2) | 0 | (11) | 0 | (2) | 0 | 0 | (11) | (2) | 0 | (5) | | (51) |
| **Disbursements: Operating** | **(376)** | **(211)** | **(830)** | **(764)** | **(258)** | **(638)** | **(434)** | **(290)** | **(767)** | **(444)** | **(462)** | **(326)** | **(744)** | **(154)** | **(104)** | | **(6,802)** |
| | | | | | | | | | | | | | | | | | |
| **Net Operating Cash Flows** | **893** | **210** | **(177)** | **(499)** | **345** | **(85)** | **(281)** | **87** | **(327)** | **(311)** | **(158)** | **89** | **(370)** | **(104)** | **(60)** | | **(749)** |
| **Disbursements: Non-Operating** | | | | | | | | | | | | | | | | | |
| Capex - IDEC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Capex - Egypt | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Capex - Kuwait JV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Capex - Algeria | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Saudi Consulting Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Corplease - Egypt | 0 | 0 | 0 | (54) | 0 | 0 | 0 | (78) | 0 | 0 | (21) | 0 | 0 | 0 | (14) | | (167) |
| Import Line - Draw / (Repayment) | 96 | (166) | (19) | 0 | (210) | 20 | 62 | (51) | (47) | (104) | 65 | 125 | 200 | 50 | 0 | | 21 |
| Other Non-Recurring (FX, Legal, Insurance, Pros, etc.) | 3 | 0 | 0 | 0 | 0 | 0 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 53 |
| Interest | 0 | (4) | (2) | 0 | (7) | 0 | (2) | (1) | (4) | (9) | (2) | 0 | 0 | 0 | 0 | | (31) |
| **Disbursements: Non-Operating** | **99** | **(170)** | **(21)** | **(54)** | **(217)** | **20** | **110** | **(130)** | **(51)** | **(113)** | **42** | **125** | **200** | **50** | **(14)** | | **(124)** |
| | | | | | | | | | | | | | | | | | |
| **Net Cash Flow MEA** | **992** | **40** | **(198)** | **(553)** | **128** | **(65)** | **(171)** | **(43)** | **(378)** | **(424)** | **(116)** | **214** | **(170)** | **(54)** | **(74)** | | **(872)** |
| | | | | | | | | | | | | | | | | | |
| Beginning Cash | 1,133 | 2,125 | 2,165 | 1,967 | 1,414 | 1,542 | 1,477 | 1,306 | 1,263 | 885 | 461 | 345 | 559 | 389 | 335 | | 1,133 |
| Less: Net Cash Flow MEA | 992 | 40 | (198) | (553) | 128 | (65) | (171) | (43) | (378) | (424) | (116) | 214 | (170) | (54) | (74) | | (872) |
| Plus: UOP - Kuwait JV Debt Draw / (Repay) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Plus: HSBC Swingline - Draw / (Repay) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| **Ending Cash, After Other Sources** | **2,125** | **2,165** | **1,967** | **1,414** | **1,542** | **1,477** | **1,306** | **1,263** | **885** | **461** | **345** | **559** | **389** | **335** | **261** | | **261** |
| Plus: In-Country Availability | 142 | 308 | 327 | 327 | 537 | 517 | 455 | 506 | 553 | 657 | 592 | 467 | 267 | 217 | 217 | | 217 |
| **Total Liquidity** | **2,267** | **2,473** | **2,294** | **1,741** | **2,079** | **1,994** | **1,761** | **1,769** | **1,438** | **1,118** | **937** | **1,026** | **656** | **552** | **478** | | **478** |

**Qmax Solutions - Global Liquidity Summary**
**Illustrative 13WCF, Updated for Actuals 3/27**
**Forecast Does Not Reflect Any HSBC Principal, Interest, or Borrowing Base True-up Payments**

**DRAFT FOR DISCUSSION ONLY**
**04/22/20**

**X Canada Operations**

*(All $'s in thousands)*

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 15 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/10 |
| Customer Receipts | 814 | 306 | 500 | 506 | 441 | 131 | 56 | 56 | 56 | 53 | 53 | 53 | 53 | 182 | 233 | 3,494 |
| **Total Receipts** | **814** | **306** | **500** | **506** | **441** | **131** | **56** | **56** | **56** | **53** | **53** | **53** | **53** | **182** | **233** | **3,494** |
| **Disbursements: Operating** | | | | | | | | | | | | | | | | |
| Vendor Payments | (500) | (300) | (185) | (484) | (308) | (500) | (50) | (48) | 0 | (31) | (40) | (40) | (40) | (40) | (100) | (2,666) |
| Bank Service Charges | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (15) |
| Rent - Facilities only | (17) | 0 | 0 | 0 | (17) | 0 | 0 | 0 | 0 | (17) | 0 | 0 | 0 | (17) | 0 | (68) |
| Other Recurring Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payroll | (104) | (7) | (120) | (7) | (80) | (7) | (80) | (7) | (80) | (7) | (20) | (70) | (20) | (70) | (20) | (699) |
| VAT Taxes | (60) | 0 | 0 | 0 | (100) | 0 | 0 | 0 | (50) | 0 | 0 | 0 | 0 | (50) | 0 | (260) |
| Non-VAT Taxes | 0 | 0 | 0 | (8) | 0 | 0 | 0 | 0 | (8) | 0 | 0 | 0 | 0 | (8) | 0 | (24) |
| Disbursements: Operating | (682) | (308) | (306) | (500) | (506) | (508) | (131) | (56) | (139) | (56) | (61) | (111) | (61) | (186) | (121) | (3,732) |
| **Net Operating Cash Flows** | **132** | **(2)** | **194** | **6** | **(65)** | **(377)** | **(74)** | **0** | **(83)** | **(3)** | **(8)** | **(58)** | **(8)** | **(4)** | **112** | **(238)** |
| **Disbursements: Non-Operating** | | | | | | | | | | | | | | | | |
| HSBC - Interest Payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HSBC - Amortization | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Terra - Acquisition Debt - P&I | (102) | (102) | (102) | (102) | (102) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (508) |
| Tarek Acquisition Debt - P&I | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Funding: India, Brazil, & Ecuador | 0 | 0 | (50) | 0 | 0 | (50) | 0 | 0 | 0 | 0 | 0 | (50) | 0 | 0 | 0 | (150) |
| Asset Sale | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Microsoft Lease | 0 | 0 | 0 | 0 | (136) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (136) |
| Other Non-Recurring (FX, Legal, Insurance, Pros, LCs, etc.) | (82) | (22) | (22) | (22) | (396) | (32) | (22) | (22) | (72) | (22) | (22) | (22) | (22) | (22) | (22) | (825) |
| Disbursements: Non-Operating | (184) | (124) | (174) | (124) | (633) | (32) | (22) | (22) | (72) | (22) | (22) | (72) | (22) | (22) | (22) | (1,619) |
| **Net Cash Flow Before True-up** | **(52)** | **(126)** | **20** | **(118)** | **(698)** | **(410)** | **(146)** | **(22)** | **(155)** | **(25)** | **(30)** | **(130)** | **(30)** | **(27)** | **90** | **(1,857)** |
| Plus/Minus: Borrowing Base True-Up | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Net Cash Flow Canada** | **(52)** | **(126)** | **20** | **(118)** | **(698)** | **(410)** | **(146)** | **(22)** | **(155)** | **(25)** | **(30)** | **(130)** | **(30)** | **(27)** | **90** | **(1,857)** |
| Beginning Cash | 388 | 336 | 210 | 231 | 113 | 0 | (410) | (556) | (578) | (473) | 0 | 0 | 0 | 0 | 0 | 388 |
| Less: Net Cash Flow Before True-up | (52) | (126) | 20 | (118) | (698) | (410) | (146) | (22) | (155) | (25) | (30) | (130) | (30) | (27) | 90 | (1,857) |
| Plus: HSBC Swingline - Draw / (Repay) | 0 | 0 | 0 | 0 | 584 | 0 | 0 | 0 | 260 | 498 | 30 | 130 | 30 | 27 | 0 | 1,558 |
| **Ending Cash, After Other Sources** | **336** | **210** | **231** | **113** | **0** | **(410)** | **(556)** | **(578)** | **(473)** | **0** | **0** | **0** | **0** | **0** | **90** | **90** |
| Plus: Illustrative Net Availability | 280 | 2,082 | 1,304 | 1,025 | 0 | 0 | 0 | 260 | 650 | 971 | 1,762 | 1,754 | 1,883 | 1,628 | 3,064 | 3,064 |
| Plus: FHC Availability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Liquidity** | **616** | **2,292** | **1,534** | **1,139** | **0** | **(410)** | **(556)** | **(318)** | **177** | **971** | **1,762** | **1,754** | **1,883** | **1,628** | **3,154** | **3,154** |

| Qmax Solutions - Global Liquidity Summary | | | | | | | | | | | | | | | DRAFT FOR DISCUSSION ONLY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Illustrative 13WCF, Updated for Actuals 3/27 | | | | | | | | | | | | | | | 04/22/20 | |

Forecast Does Not Reflect Any HSBC Principal, Interest, or Borrowing Base True-up Payments

| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Status | | | | | | | | | | | | | | | | | |
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | | 15 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | | 7/10 |

*(All $'s in thousands)*

**Cash Flow**

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Inflows | 7,287 | 8,426 | 6,414 | 6,030 | 6,856 | 5,671 | 5,997 | 7,260 | 6,304 | 5,862 | 6,005 | 5,978 | 5,536 | 4,878 | 5,558 | | 94,062 |
| Less: Cash Outflows | (8,382) | (9,150) | (10,285) | (7,500) | (6,491) | (7,152) | (7,464) | (8,350) | (8,937) | (7,148) | (8,205) | (7,210) | (10,315) | (5,815) | (6,661) | | (119,066) |
| **Net Cash Flow** | **(1,095)** | **(724)** | **(3,872)** | **(1,470)** | **365** | **(1,481)** | **(1,467)** | **(1,090)** | **(2,632)** | **(1,286)** | **(2,201)** | **(1,233)** | **(4,780)** | **(937)** | **(1,103)** | | **(25,005)** |
| | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 10,888 | 9,792 | 9,068 | 5,197 | 3,727 | 4,092 | 2,611 | 1,144 | 54 | (2,578) | (3,864) | (6,065) | (7,298) | (12,077) | (13,014) | | 10,888 |
| Plus / (Minus): Net Cash Flow | (1,095) | (724) | (3,872) | (1,470) | 365 | (1,481) | (1,467) | (1,090) | (2,632) | (1,286) | (2,201) | (1,233) | (4,780) | (937) | (1,103) | | (25,005) |
| **Ending Cash Balance** | **9,792** | **9,068** | **5,197** | **3,727** | **4,092** | **2,611** | **1,144** | **54** | **(2,578)** | **(3,864)** | **(6,065)** | **(7,298)** | **(12,077)** | **(13,014)** | **(14,117)** | | **(14,117)** |

**Liquidity Calculation**

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Availability on HSBC Facility | 280 | 2,082 | 1,304 | 1,025 | 0 | 0 | 0 | 260 | 650 | 971 | 1,762 | 1,754 | 1,883 | 1,628 | 3,064 | | 3,064 |
| Plus: Availability on Encina Facility | 3,947 | 3,922 | 3,904 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 0 | 0 | | 0 |
| Plus: Marginable Cash | 7,227 | 6,774 | 3,230 | 2,047 | 1,740 | 611 | (1,046) | (1,716) | (4,060) | (5,213) | (7,345) | (8,021) | (12,640) | (13,670) | (14,378) | | (14,378) |
| Plus: FHC Availability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| **Free Liquidity** | **11,454** | **12,778** | **8,437** | **5,635** | **1,740** | **611** | **(1,046)** | **(1,456)** | **(3,188)** | **(4,242)** | **(5,584)** | **(6,267)** | **(10,534)** | **(12,042)** | **(11,314)** | | **(11,314)** |
| Plus: Non-Marginable Cash | 2,566 | 2,295 | 1,967 | 1,680 | 2,352 | 2,000 | 2,190 | 1,770 | 1,481 | 1,349 | 1,280 | 723 | 563 | 657 | 261 | | 261 |
| Plus: In-Country Availability | 142 | 308 | 327 | 327 | 537 | 517 | 455 | 506 | 553 | 657 | 592 | 467 | 267 | 217 | 217 | | 217 |
| Plus: 1st National Capex Availability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| **Total Liquidity** | **14,161** | **15,380** | **10,731** | **7,642** | **4,629** | **3,128** | **1,599** | **820** | **(1,153)** | **(2,236)** | **(3,711)** | **(5,077)** | **(9,705)** | **(11,168)** | **(10,836)** | | **(10,836)** |

**Debt / Capitalization**

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Encina (Revolving & Term Loan) | 22,368 | 22,226 | 22,123 | 23,214 | 25,602 | 25,153 | 24,761 | 24,400 | 23,696 | 21,959 | 21,384 | 20,825 | 19,916 | 19,822 | 19,740 | | 19,740 |
| HSBC | 144,467 | 142,665 | 143,443 | 143,721 | 144,747 | 144,747 | 144,747 | 144,487 | 144,097 | 143,776 | 142,985 | 142,993 | 142,864 | 143,118 | 141,683 | | 141,683 |
| **Senior Secured Debt** | **166,836** | **164,891** | **165,566** | **166,935** | **170,349** | **169,900** | **169,508** | **168,887** | **167,794** | **165,735** | **164,370** | **163,818** | **162,779** | **162,940** | **161,423** | | **161,423** |
| MEX: Perfolat Debt | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | | 7,360 |
| COL: BBVA | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,113 | 1,113 | 1,113 | 1,113 | | 1,113 |
| COL: Banco de Bogota | 3,181 | 2,890 | 2,881 | 2,881 | 2,847 | 2,847 | 2,847 | 2,847 | 2,812 | 2,812 | 2,812 | 2,812 | 2,660 | 2,626 | 2,335 | | 2,335 |
| COL: ITAU | 1,395 | 1,395 | 1,395 | 1,395 | 1,395 | 1,395 | 1,395 | 962 | 962 | 962 | 962 | 962 | 962 | 962 | 962 | | 962 |
| IDEC: Import Line | 1,758 | 1,592 | 1,573 | 1,573 | 1,363 | 1,383 | 1,445 | 1,394 | 1,347 | 1,243 | 1,308 | 1,433 | 1,633 | 1,683 | 1,683 | | 1,683 |
| EGY: Corplease | 313 | 313 | 313 | 259 | 259 | 259 | 259 | 181 | 181 | 181 | 160 | 160 | 160 | 160 | 147 | | 147 |
| USA: 1st National Capex Line | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| **Total Debt** | **182,327** | **179,925** | **180,573** | **181,888** | **185,057** | **184,628** | **184,298** | **183,115** | **181,941** | **179,778** | **178,457** | **177,659** | **176,669** | **176,845** | **175,023** | | **175,023** |

THIS IS EXHIBIT " 25 "

referred to in the Affidavit of

Cameron Bailey

Sworn before me this 26th

day of May A.D. 20 20

Jonathan Tomm
Barrister and Solicitor

| Qmax Solutions - Global Liquidity Summary | | | | | | | | | | | | | | | | DRAFT FOR DISCUSSION ONLY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Illustrative 13WCF, Updated for Actuals 3/27 | | | | | | | | | | | | | | | | 04/29/20 |
| Forecast Does Not Reflect Any HSBC Principal, Interest, or Borrowing Base True-up Payments | | | | | | | | | | | | | | | | |

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | | 16 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | | 7/17 |
| *(All $'s in thousands)* | | | | | | | | | | | | | | | | | | |
| Beginning Free Liquidity[1] | 13,009 | 11,454 | 12,778 | 8,437 | 5,635 | 1,740 | 611 | (1,046) | (1,456) | (3,188) | (4,242) | (5,584) | (6,267) | (10,534) | (12,042) | (11,314) | | 13,009 |
| Beginning Total Liquidity[2] | 15,404 | 14,161 | 15,380 | 10,731 | 7,642 | 4,629 | 3,128 | 1,599 | 820 | (1,153) | (2,236) | (3,711) | (5,077) | (9,705) | (11,168) | (10,836) | | 15,404 |
| Operating Cash Receipts | 7,217 | 7,437 | 6,203 | 6,002 | 6,568 | 5,495 | 5,811 | 7,042 | 6,159 | 5,840 | 5,848 | 5,821 | 5,379 | 4,763 | 5,500 | 5,499 | | 96,585 |
| Priority | (2,550) | (1,635) | (5,396) | (3,952) | (4,048) | (2,039) | (3,010) | (3,451) | (3,901) | (2,431) | (2,165) | (3,064) | (5,919) | (2,310) | (1,568) | (3,334) | | (50,774) |
| Vendors | (5,028) | (4,240) | (5,174) | (4,755) | (4,541) | (4,781) | (3,868) | (3,457) | (3,719) | (3,718) | (3,165) | (3,139) | (3,269) | (2,958) | (2,974) | (2,886) | | (61,670) |
| Operating Disbursements | (7,577) | (5,875) | (10,570) | (8,707) | (8,589) | (6,820) | (6,878) | (6,908) | (7,620) | (6,149) | (5,330) | (6,203) | (9,189) | (5,268) | (4,541) | (6,221) | | (112,445) |
| Net Operating Cash Flow | (361) | 1,562 | (4,367) | (2,705) | (2,020) | (1,325) | (1,067) | 134 | (1,461) | (309) | 518 | (382) | (3,809) | (505) | 958 | (722) | | (15,860) |
| Mandatory Financing | (1,104) | (571) | (301) | (607) | (1,203) | (176) | (462) | (964) | (782) | (878) | (1,993) | (983) | (1,041) | (959) | (626) | (88) | | (12,738) |
| Non-Operating Cash Disbursements | (1,465) | 992 | (4,668) | (3,311) | (3,224) | (1,501) | (1,529) | (830) | (2,243) | (1,187) | (1,475) | (1,365) | (4,850) | (1,464) | 333 | (810) | | (28,598) |
| Net Operating Cash Flow Before Voluntary Financing | (1,465) | 992 | (4,668) | (3,311) | (3,224) | (1,501) | (1,529) | (830) | (2,243) | (1,187) | (1,475) | (1,365) | (4,850) | (1,464) | 333 | (810) | | (28,598) |
| Voluntary Financing | 370 | (1,716) | 797 | 1,842 | 3,588 | 20 | 62 | (260) | (390) | (99) | (726) | 133 | 71 | 527 | (1,436) | (692) | | 2,091 |
| Net Cash Flow | (1,095) | (724) | (3,872) | (1,470) | 365 | (1,481) | (1,467) | (1,090) | (2,632) | (1,286) | (2,201) | (1,233) | (4,780) | (937) | (1,103) | (1,502) | | (26,507) |
| Ending Free Liquidity[1] | 11,454 | 12,778 | 8,437 | 5,635 | 1,740 | 611 | (1,046) | (1,456) | (3,188) | (4,242) | (5,584) | (6,267) | (10,534) | (12,042) | (11,314) | (12,161) | | (12,161) |
| Ending Total Liquidity[2] | 14,161 | 15,380 | 10,731 | 7,642 | 4,629 | 3,128 | 1,599 | 820 | (1,153) | (2,236) | (3,711) | (5,077) | (9,705) | (11,168) | (10,836) | (11,646) | | (11,646) |
| | | | | | | | | | | | | | | | | | | |
| Current Forecast | | | | | | | | | | | | | | | | | | |
| ASK FROM HSBC - In Week (No Excess AP Catch-Up) | 0 | 0 | 0 | 0 | 3,260 | 1,129 | 1,656 | 410 | 1,732 | 1,055 | 1,342 | 683 | 4,267 | 1,508 | (728) | 846 | | 17,161 |
| ASK FROM HSBC - Cum (No Excess AP Catch-Up) | 0 | 0 | 0 | 0 | 3,260 | 4,389 | 6,046 | 6,456 | 8,188 | 9,242 | 10,584 | 11,267 | 15,534 | 17,042 | 16,314 | 17,161 | | 17,161 |
| | | | | | | | | | | | | | | | | | | |
| Prior Forecast: w/e 3.20 to w/e 6.12 | | | | | | | | | | | | | | | | | | |
| ASK FROM HSBC - In Week (No Excess AP Catch-Up) | 0 | 0 | 0 | 932 | 5,995 | 757 | 1,572 | 509 | 2,291 | 958 | 852 | | | | | | | 13,866 |
| ASK FROM HSBC - Cum (No Excess AP Catch-Up) | 0 | 0 | 0 | 932 | 6,926 | 7,683 | 9,255 | 9,764 | 12,056 | 13,014 | 13,866 | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| Cumulative Ask: Better / (Worse) | | | | 0 | 932 | 3,666 | 3,294 | 3,210 | 3,309 | 3,868 | 3,772 | 3,282 | | | | | | |

**Qmax Solutions - Global Liquidity Summary**  —  DRAFT FOR DISCUSSION ONLY
Illustrative 13WCF, Updated for Actuals 3/27  —  04/29/20
Forecast Does Not Reflect Any HSBC Principal, Interest, or Borrowing Base True-up Payments

*(All $'s in thousands)*

| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **13 Week Period** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 16 |
| **Week Ending Date** | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | 7/17 |
| **Global Liquidity** | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| **Beginning Cash** | 10,888 | 9,792 | 9,068 | 5,197 | 3,727 | 4,092 | 2,611 | 1,144 | 54 | (2,578) | (3,864) | (6,065) | (7,298) | (12,077) | (13,014) | (14,117) | 10,888 |
| **Net Operating Cash Flow** | | | | | | | | | | | | | | | | | |
| USA | (1,231) | (99) | (2,860) | (1,966) | (1,979) | (383) | (1,243) | (341) | (1,655) | (806) | (30) | (7) | (3,645) | (143) | (167) | (787) | (17,392) |
| Mexico | 698 | 865 | (778) | (278) | (502) | (88) | 246 | 470 | 722 | 840 | 937 | 144 | 159 | (228) | 1,436 | 742 | 5,384 |
| MEA | 893 | 210 | (177) | (499) | 345 | (85) | (281) | 87 | (327) | (311) | (158) | 89 | (370) | (104) | (60) | 36 | (713) |
| Canada | 132 | (2) | 194 | 6 | (65) | (377) | (74) | 0 | (83) | (3) | (8) | (58) | (8) | (4) | 112 | 12 | (226) |
| Colombia | (512) | 977 | (423) | 385 | 876 | (110) | 558 | 283 | 277 | 314 | 215 | (206) | 326 | 297 | (90) | (403) | 2,762 |
| **Total Net Operating Cash Flow** | (21) | 1,950 | (4,046) | (2,353) | (1,325) | (1,043) | (795) | 500 | (1,067) | 35 | 906 | (38) | (3,537) | (183) | 1,230 | (400) | (10,184) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | | | |
| USA | (261) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (300) | (250) | (250) | (4,161) |
| Mexico | 0 | (116) | 0 | 0 | 0 | 0 | 0 | (94) | (72) | (22) | (116) | (22) | 0 | 0 | 0 | 0 | (441) |
| MEA | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 53 |
| Canada | (82) | (22) | (72) | (22) | (396) | (32) | (72) | (22) | (72) | (22) | (22) | (72) | (22) | (22) | (22) | (72) | (1,047) |
| Colombia | 0 | 0 | 0 | (80) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (80) |
| **Total Non-Operating Disbursements** | (340) | (388) | (322) | (352) | (696) | (282) | (272) | (366) | (394) | (344) | (388) | (344) | (272) | (322) | (272) | (322) | (5,676) |
| **Cash Flow from Financing - Mandatory[1]** | | | | | | | | | | | | | | | | | |
| USA | (1,002) | 0 | (167) | (440) | (490) | (175) | (448) | (393) | (688) | (765) | (1,959) | (575) | (881) | (924) | (316) | (81) | (9,306) |
| Mexico | 0 | 0 | 0 | 0 | (214) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (214) |
| MEA | 0 | (170) | (21) | (54) | (217) | 0 | (2) | (130) | (51) | (113) | (23) | 0 | 0 | 0 | (14) | 0 | (795) |
| Canada | (102) | (102) | (102) | (102) | (237) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (644) |
| Colombia | 0 | (299) | (11) | (11) | (45) | (1) | (11) | (441) | (42) | 0 | (11) | (408) | (160) | (34) | (295) | (7) | (1,779) |
| **Total Cash Flow from Financing** | (1,104) | (571) | (301) | (607) | (1,203) | (176) | (462) | (964) | (782) | (878) | (1,993) | (983) | (1,041) | (959) | (626) | (88) | (12,738) |
| (1) - Mandatory Financing - interest, amortization, and borrowing-base true-ups | | | | | | | | | | | | | | | | | |
| **Inter Company Transfers** | | | | | | | | | | | | | | | | | |
| USA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MEA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Canada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colombia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Inter Company Transfers** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Net Cash Flow** | | | | | | | | | | | | | | | | | |
| USA | (2,495) | (349) | (3,277) | (2,656) | (2,769) | (808) | (1,942) | (983) | (2,594) | (1,871) | (2,289) | (832) | (4,776) | (1,368) | (734) | (1,118) | (30,860) |
| Mexico | 698 | 749 | (778) | (278) | (716) | (88) | 246 | 377 | 650 | 819 | 821 | 122 | 159 | (228) | 1,436 | 742 | 4,730 |
| MEA | 896 | 40 | (198) | (553) | 128 | (85) | (233) | (43) | (378) | (424) | (181) | 89 | (370) | (104) | (74) | 36 | (1,454) |
| Canada | (52) | (126) | 20 | (118) | (698) | (410) | (146) | (22) | (155) | (25) | (30) | (130) | (30) | (27) | 90 | (60) | (1,917) |
| Colombia | (512) | 677 | (435) | 294 | 831 | (111) | 547 | (158) | 234 | 314 | 204 | (614) | 166 | 263 | (385) | (410) | 903 |
| **Net Cash Flow** | (1,465) | 992 | (4,668) | (3,311) | (3,224) | (1,501) | (1,529) | (830) | (2,243) | (1,187) | (1,475) | (1,365) | (4,850) | (1,464) | 333 | (810) | (28,598) |
| **Cash Flow from Financing - Voluntary[2]** | | | | | | | | | | | | | | | | | |
| Plus: Encina Line - Draw / (Repay) | 4 | 87 | 18 | 1,564 | 2,563 | 0 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 222 | 0 | 0 | 4,679 |
| Plus: HSBC Swingline - Draw / (Repay) | 270 | (1,802) | 778 | 278 | 1,025 | 0 | 0 | (260) | (390) | (321) | (791) | 8 | (129) | 255 | (1,436) | (742) | (3,256) |
| Plus: In-Country Financing - Draw / (Repay) | 96 | 0 | 0 | 0 | 0 | 20 | 62 | 0 | 0 | 0 | 0 | 65 | 125 | 200 | 50 | 0 | 668 |
| **Ending Cash** | 9,792 | 9,068 | 5,197 | 3,727 | 4,092 | 2,611 | 1,144 | 54 | (2,578) | (3,864) | (6,065) | (7,298) | (12,077) | (13,014) | (14,117) | (15,619) | (15,619) |
| (2) Voluntary Financing - draws on facilites to meet liquidity needs | | | | | | | | | | | | | | | | | |
| Plus Encina Availability | 3,947 | 3,922 | 3,904 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 0 |
| Plus HSBC Swingline Availability | 280 | 2,082 | 1,304 | 1,025 | (0) | (0) | (0) | 260 | 650 | 971 | 1,762 | 1,754 | 1,883 | 1,628 | 3,064 | 3,806 | 3,806 |
| Plus: FHC Availability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plus: In-Country Availability (ITAU, BdB, BBVA, Scotia) | 142 | 308 | 327 | 327 | 537 | 517 | 455 | 506 | 553 | 657 | 592 | 467 | 267 | 217 | 217 | 167 | 167 |
| **Total Liquidity** | 14,161 | 15,380 | 10,731 | 7,642 | 4,629 | 3,128 | 1,599 | 820 | (1,153) | (2,236) | (3,711) | (5,077) | (9,705) | (11,168) | (10,836) | (11,646) | (11,646) |
| Less: Minimum Operating Cash - US | (3,947) | (3,922) | (3,904) | (3,866) | (3,840) | (3,773) | (3,714) | (3,660) | (3,588) | (3,294) | (3,208) | (3,124) | (3,021) | (3,000) | (3,000) | (3,000) | (3,000) |
| Less: Minimum Operating Cash - Mexico | (7,730) | (7,589) | (7,638) | (7,687) | (7,725) | (7,661) | (7,867) | (8,073) | (8,275) | (8,442) | (8,574) | (8,823) | (9,068) | (9,196) | (9,325) | (9,454) | (9,454) |
| Less: Minimum Operating Cash - MEA | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) | (220) |
| Less: Minimum Operating Cash - Canada | (445) | (213) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) |
| Less: Minimum Operating Cash - Colombia | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) |
| **Operating Liquidity** | 1,668 | 3,286 | (1,331) | (4,431) | (7,457) | (8,827) | (10,502) | (11,433) | (13,536) | (14,492) | (16,013) | (17,544) | (22,313) | (23,884) | (23,681) | (24,621) | (24,621) |

**Qmax Solutions - Global Liquidity Summary**  
Illustrative 13WCF, Updated for Actuals 3/27

**DRAFT FOR DISCUSSION ONLY**  
04/29/20

**X  USA Operations (Anchor, Corp & CPI)**

*(All $'s in thousands)*

| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **13 Week Period** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 16 |
| **Week Ending Date** | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | 7/17 |
| R Customer Receipts: Anchor | 2,863 | 2,704 | 2,652 | 2,674 | 2,670 | 2,719 | 2,657 | 2,622 | 2,635 | 2,669 | 2,668 | 2,654 | 2,677 | 2,382 | 2,116 | 2,264 | 41,624 |
| **Total Receipts** | 2,863 | 2,704 | 2,652 | 2,674 | 2,670 | 2,719 | 2,657 | 2,622 | 2,635 | 2,669 | 2,668 | 2,654 | 2,677 | 2,382 | 2,116 | 2,264 | 41,624 |
| **Disbursements: Operating** | | | | | | | | | | | | | | | | | |
| V Anchor: Mud | (1,377) | (1,140) | (1,398) | (1,004) | (936) | (803) | (1,050) | (1,048) | (1,000) | (1,073) | (879) | (860) | (860) | (860) | (867) | (738) | (15,894) |
| V Anchor: Spec Chem | (147) | (28) | (75) | (123) | (84) | (150) | (100) | (99) | (125) | (96) | (68) | (78) | (78) | (78) | (75) | (65) | (1,468) |
| V Anchor: Logistics | (317) | (417) | (372) | (259) | (271) | (265) | (213) | (220) | (213) | (228) | (187) | (188) | (188) | (188) | (190) | (163) | (3,878) |
| V Anchor: Comm Chem | (388) | (233) | (292) | (221) | (243) | (394) | (221) | (234) | (226) | (238) | (145) | (154) | (154) | (154) | (149) | (130) | (3,575) |
| V Anchor: Screens & Equip | (85) | (96) | (117) | (87) | (93) | (118) | (66) | (83) | (75) | (79) | (49) | (44) | (44) | (44) | (43) | (37) | (1,162) |
| V Anchor: Other | (179) | (206) | (79) | (382) | (327) | (69) | (152) | (117) | (161) | (86) | (72) | (76) | (76) | (76) | (77) | (67) | (2,201) |
| V Corp: Recurring | (47) | (106) | (106) | (106) | (107) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (130) | (1,804) |
| V CPI: Recurring | (352) | (391) | (370) | (387) | (351) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (3,609) |
| P Wages: Anchor & Corp | (745) | 0 | (1,818) | (745) | (1,568) | (572) | (1,030) | (572) | (1,030) | (529) | (933) | 0 | (1,462) | 0 | (467) | (904) | (12,375) |
| P Benefits: Anchor & Corp | (175) | 0 | 0 | (675) | 0 | (175) | 0 | (175) | (500) | (175) | 0 | (175) | (500) | (175) | 0 | 0 | (2,725) |
| P Sales Tax & Other Auto-Debits: Anchor | (281) | (186) | (885) | (650) | (670) | (275) | (790) | (135) | (680) | (690) | (135) | (806) | (2,680) | (670) | (135) | (656) | (10,325) |
| M Acquisition Debt: Calumet | (328) | 0 | 0 | (319) | 0 | 0 | 0 | 0 | (328) | 0 | 0 | 0 | (321) | 0 | 0 | 0 | (1,296) |
| **Disbursements: Operating** | (4,422) | (2,803) | (5,512) | (4,959) | (4,649) | (3,101) | (3,900) | (2,962) | (4,618) | (3,474) | (2,748) | (2,661) | (6,643) | (2,525) | (2,283) | (3,051) | (60,312) |
| **Net Operating Cash Flows** | (1,559) | (99) | (2,860) | (2,285) | (1,979) | (383) | (1,243) | (341) | (1,983) | (806) | (80) | (7) | (3,966) | (143) | (167) | (787) | (18,688) |
| **Disbursements: Non-Operating** | | | | | | | | | | | | | | | | | |
| M Cash Interest on New Credit Facility | (135) | 0 | 0 | 0 | (128) | 0 | 0 | 0 | 0 | 0 | (173) | 0 | 0 | 0 | (126) | 0 | (562) |
| P Other Corp: Non-Recurring (Legal, Insurance, Pros, etc.) | (261) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (300) | (250) | (250) | (4,161) |
| **Disbursements: Non-Operating** | (396) | (250) | (250) | (250) | (428) | (250) | (250) | (250) | (250) | (300) | (473) | (250) | (250) | (426) | (250) | (250) | (4,723) |
| **Net Cash Flow Before Borrowing Base True-Up** | (1,955) | (349) | (3,110) | (2,535) | (2,407) | (633) | (1,493) | (591) | (2,233) | (1,278) | (330) | (257) | (4,216) | (570) | (417) | (1,037) | (23,411) |
| M Plus/Minus: Borrowing Base True-Up | (540) | 62 | (167) | (121) | (362) | (175) | (448) | (392) | (361) | (592) | (1,959) | (575) | (560) | (798) | (316) | (81) | (7,387) |
| **Net Cash Flow USA** | (2,495) | (287) | (3,277) | (2,656) | (2,769) | (808) | (1,942) | (983) | (2,594) | (1,871) | (2,289) | (832) | (4,776) | (1,368) | (734) | (1,118) | (30,798) |
| | | | | | | | | | | | | | | | | | |
| **Beginning Cash** | 7,105 | 4,614 | 4,352 | 1,093 | 0 | (206) | (1,014) | (2,956) | (3,939) | (6,533) | (8,181) | (10,470) | (11,303) | (16,078) | (17,223) | (17,957) | 7,105 |
| Less: Net Cash Flow USA | (2,495) | (287) | (3,277) | (2,656) | (2,769) | (808) | (1,942) | (983) | (2,594) | (1,871) | (2,289) | (832) | (4,776) | (1,368) | (734) | (1,118) | (30,798) |
| Plus: Draws / (Repayments) from Barbados | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plus: Draws / (Repayments) on HSBC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Ending Cash** | 4,611 | 4,327 | 1,075 | (1,564) | (2,769) | (1,014) | (2,956) | (3,939) | (6,533) | (8,403) | (10,470) | (11,303) | (16,078) | (17,446) | (17,957) | (19,075) | (23,683) |
| Plus: Draws / (Repayments) on Encina | 4 | 25 | 18 | 1,564 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 0 | 0 | 4,618 |
| Ending Cash, After Other Sources | 4,614 | 4,352 | 1,093 | 0 | (206) | (1,014) | (2,956) | (3,939) | (6,533) | (8,181) | (10,470) | (11,303) | (16,078) | (17,223) | (17,957) | (19,075) | (19,075) |
| Plus: Illustrative Net Availability | 3,947 | 3,922 | 3,904 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 0 |
| **Total Liquidity** | 8,561 | 8,274 | 4,997 | 2,563 | (206) | (1,014) | (2,956) | (3,939) | (6,310) | (8,181) | (10,470) | (11,303) | (15,856) | (17,223) | (17,957) | (19,075) | (19,075) |

**Qmax Solutions - Global Liquidity Summary**
Illustrative 13WCF, Updated for Actuals 3/27

DRAFT FOR DISCUSSION ONLY
04/29/20

**X  USA Operations (Anchor, Corp & CPI)**

*(All $'s in thousands)*

| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **13 Week Period** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 16 |
| **Week Ending Date** | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | 7/17 |

**X  Standalone: Anchor Ops, Corporate & CPI**

| USA: Anchor Ops | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | Fcst 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Receipts | 2,863 | 2,704 | 2,652 | 2,674 | 2,670 | 2,719 | 2,657 | 2,622 | 2,635 | 2,669 | 2,668 | 2,654 | 2,677 | 2,382 | 2,116 | 2,264 | 41,624 |
| Anchor: Mud | (1,377) | (1,140) | (1,398) | (1,004) | (936) | (803) | (1,050) | (1,048) | (1,000) | (1,073) | (879) | (860) | (860) | (860) | (867) | (738) | (15,894) |
| Anchor: Spec Chem | (147) | (28) | (75) | (123) | (84) | (150) | (100) | (99) | (125) | (96) | (68) | (78) | (78) | (78) | (75) | (65) | (1,468) |
| Anchor: Logistics | (317) | (417) | (372) | (259) | (271) | (265) | (213) | (220) | (213) | (228) | (187) | (188) | (188) | (188) | (190) | (163) | (3,878) |
| Anchor: Comm Chem | (388) | (233) | (292) | (221) | (243) | (394) | (221) | (234) | (226) | (238) | (145) | (154) | (154) | (154) | (149) | (130) | (3,575) |
| Anchor: Screens & Equip | (85) | (96) | (117) | (87) | (93) | (118) | (66) | (152) | (117) | (161) | (79) | (49) | (44) | (44) | (43) | (37) | (1,162) |
| Anchor: Other | (179) | (206) | (79) | (382) | (327) | (69) | (152) | (117) | (161) | (86) | (72) | (76) | (76) | (76) | (77) | (67) | (2,201) |
| Payroll & Contractors | (670) | 0 | (1,195) | (670) | (1,195) | (497) | (729) | (497) | (729) | (454) | (702) | 0 | (1,156) | 0 | (392) | (671) | (9,556) |
| Severance | 0 | 0 | (160) | 0 | (35) | 0 | (26) | 0 | (40) | 0 | 0 | (14) | 0 | 0 | 0 | (14) | (289) |
| Benefits | (137) | 0 | 0 | (529) | 0 | (137) | 0 | (137) | (392) | (137) | 0 | (137) | (392) | (137) | 0 | 0 | (2,137) |
| Sales Tax/Other: Recurring | (140) | (105) | (585) | (555) | (440) | (30) | (460) | (30) | (480) | (30) | (460) | (480) | (440) | (440) | (30) | (460) | (5,166) |
| Sales Tax/Other: Non-Recurring | 0 | 0 | 0 | 0 | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (105) | (1,260) |
| **USA: Anchor Ops** | **(578)** | **479** | **(1,621)** | **(1,157)** | **(1,059)** | **150** | **(464)** | **53** | **(897)** | **(268)** | **417** | **552** | **(870)** | **300** | **188** | **(186)** | **(4,962)** |
| Cash Interest on New Credit Facility | (135) | 0 | 0 | 0 | (128) | 0 | 0 | 0 | 0 | (173) | 0 | 0 | 0 | (126) | 0 | 0 | (562) |
| Plus/Minus: Borrowing Base True-Up | (540) | 62 | (167) | (121) | (362) | (175) | (448) | (393) | (361) | (592) | (1,959) | (575) | (560) | (798) | (316) | (81) | (7,387) |
| Plus: Draws / (Repayments) on Encina | 4 | 25 | 18 | 1,564 | 2,563 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 222 | 0 | 0 | 0 | 4,618 |
| **Anchor Ops + Encina** | **(1,250)** | **566** | **(1,770)** | **285** | **1,014** | **(25)** | **(912)** | **(340)** | **(1,258)** | **(811)** | **(1,543)** | **(23)** | **(1,429)** | **(402)** | **(129)** | **(267)** | **(8,294)** |

| USA: Corporate | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | Fcst 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Corp: Recurring | (47) | (106) | (106) | (106) | (107) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (120) | (130) | (1,804) |
| Corp: Non-Recurring | (261) | (250) | (250) | (250) | (300) | (250) | (250) | (250) | (250) | (300) | (250) | (250) | (300) | (250) | (250) | (250) | (4,161) |
| Payroll & Contractors | (75) | 0 | (449) | (75) | (324) | (75) | (235) | (75) | (235) | (75) | (185) | 0 | (260) | 0 | (75) | (188) | (2,326) |
| Severance | 0 | 0 | (14) | 0 | (14) | 0 | (40) | 0 | (40) | 0 | (32) | 0 | (32) | 0 | 0 | (32) | (204) |
| Benefits | (38) | 0 | 0 | (146) | 0 | (38) | 0 | (38) | (108) | (38) | 0 | (108) | (38) | 0 | 0 | 0 | (588) |
| Sales Tax/Other: Recurring | 0 | (65) | (50) | (95) | (125) | (140) | 0 | 0 | (95) | (145) | 0 | (50) | (2,095) | (125) | 0 | 0 | (2,985) |
| Current Forecast | (469) | (16) | (250) | (319) | 0 | 0 | 0 | (225) | 0 | (328) | 0 | (191) | (321) | 0 | 0 | (91) | (2,210) |
| **USA: Corporate** | **(890)** | **(437)** | **(1,119)** | **(991)** | **(870)** | **(622)** | **(870)** | **(483)** | **(1,176)** | **(678)** | **(587)** | **(649)** | **(3,186)** | **(583)** | **(445)** | **(691)** | **(14,278)** |
| Plus: Draws / (Repayments) from Barbados | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plus: Draws / (Repayments) on HSBC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **USA: Corporate + External Funding** | **(890)** | **(437)** | **(1,119)** | **(991)** | **(870)** | **(622)** | **(870)** | **(483)** | **(1,176)** | **(678)** | **(587)** | **(649)** | **(3,186)** | **(583)** | **(445)** | **(691)** | **(14,278)** |

| USA: CPI | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CPI: Recurring | (352) | (391) | (370) | (387) | (351) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (160) | (3,609) |
| **USA: CPI** | **(352)** | **(391)** | **(370)** | **(387)** | **(351)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(160)** | **(3,609)** |

**Qmax Solutions - Global Liquidity Summary**
**Illustrative 13WCF, Updated for Actuals 3/27**

DRAFT FOR DISCUSSION ONLY
04/29/20

X **Mexico Operations**

*(All $'s in thousands)*

| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | | Fcst |
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | | 16 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | | 7/17 |
| | | | | | | | | | | | | | | | | | | |
| Customer Receipts: Pemex | 523 | 2,001 | 793 | 689 | 477 | 768 | 758 | 838 | 670 | 844 | 843 | 870 | 859 | 947 | 932 | 866 | | 13,678 |
| Customer Receipts: Perfolat | 1,400 | 0 | 432 | 432 | 432 | 432 | 993 | 1,332 | 1,432 | 1,132 | 1,132 | 1,132 | 432 | 432 | 1,583 | 1,232 | | 13,965 |
| Customer Receipts: Other Customers | 0 | 218 | 436 | 195 | 312 | 62 | 0 | 45 | 163 | 14 | 41 | 2 | 87 | 2 | 1 | 124 | | 1,702 |
| **Total Receipts** | **1,923** | **2,219** | **1,662** | **1,317** | **1,222** | **1,262** | **1,751** | **2,215** | **2,266** | **1,990** | **2,017** | **2,004** | **1,378** | **1,382** | **2,516** | **2,222** | | **29,345** |
| | | | | | | | | | | | | | | | | | | |
| Disbursements: Operating | | | | | | | | | | | | | | | | | | |
| Total Vendor Spend | (775) | (1,200) | (1,200) | (1,200) | (1,200) | (1,200) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | | (16,775) |
| Rent - Facilities only | 0 | (74) | 0 | 0 | (4) | (70) | 0 | 0 | (4) | (70) | 0 | 0 | (4) | (70) | 0 | 0 | | (296) |
| Community Vendors | 0 | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | | (1,200) |
| Payroll | (400) | 0 | (960) | 0 | (440) | 0 | (420) | 0 | (460) | 0 | 0 | (420) | 0 | (460) | 0 | (400) | | (3,960) |
| VAT Taxes | 0 | 0 | 0 | (135) | 0 | 0 | 0 | (135) | 0 | 0 | 0 | 0 | (135) | 0 | 0 | 0 | | (405) |
| Non-VAT Taxes | (50) | 0 | (200) | (180) | 0 | 0 | (5) | (530) | 0 | 0 | 0 | (360) | 0 | 0 | 0 | 0 | | (1,325) |
| **Disbursements: Operating** | **(1,225)** | **(1,354)** | **(2,440)** | **(1,595)** | **(1,724)** | **(1,350)** | **(1,505)** | **(1,745)** | **(1,544)** | **(1,150)** | **(1,080)** | **(1,860)** | **(1,219)** | **(1,610)** | **(1,080)** | **(1,480)** | | **(23,961)** |
| | | | | | | | | | | | | | | | | | | |
| Net Operating Cash Flows | 698 | 865 | (778) | (278) | (502) | (88) | 246 | 470 | 722 | 840 | 937 | 144 | 159 | (228) | 1,436 | 742 | | 5,384 |
| | | | | | | | | | | | | | | | | | | |
| Disbursements: Non-Operating | | | | | | | | | | | | | | | | | | |
| Cash Interest - Perfolat Loan | 0 | 0 | 0 | 0 | (214) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | (214) |
| Cash Amortization - Perfolat Loan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Capex | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (94) | (72) | (22) | 0 | (22) | 0 | 0 | 0 | 0 | | (209) |
| Other Non-Recurring (FX, Legal, Insurance, Pros, etc.) | 0 | (116) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (116) | 0 | 0 | 0 | 0 | 0 | | (232) |
| **Disbursements: Non-Operating** | **0** | **(116)** | **0** | **0** | **(214)** | **0** | **0** | **(94)** | **(72)** | **(22)** | **(116)** | **(22)** | **0** | **0** | **0** | **0** | | **(655)** |
| | | | | | | | | | | | | | | | | | | |
| Net Cash Flow Mexico | 698 | 749 | (778) | (278) | (716) | (88) | 246 | 377 | 650 | 819 | 821 | 122 | 159 | (228) | 1,436 | 742 | | 4,730 |
| | | | | | | | | | | | | | | | | | | |
| Beginning Cash | 185 | 1,154 | 100 | 100 | 100 | (175) | (263) | (17) | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | | 185 |
| Less: Net Cash Flow Mexico | 698 | 749 | (778) | (278) | (716) | (88) | 246 | 377 | 650 | 819 | 821 | 122 | 159 | (228) | 1,436 | 742 | | 4,730 |
| Plus: HSBC Swingline - Draw / (Repay) | 270 | (1,802) | 778 | 278 | 441 | 0 | 0 | (260) | (650) | (819) | (821) | (122) | (159) | 228 | (1,436) | (742) | | (4,815) |
| **Ending Cash, After Other Sources** | **1,154** | **100** | **100** | **100** | **(175)** | **(263)** | **(17)** | **100** | **100** | **100** | **100** | **100** | **100** | **100** | **100** | **100** | | **100** |

Qmax Solutions - Global Liquidity Summary     DRAFT FOR DISCUSSION ONLY
Illustrative 13WCF, Updated for Actuals 3/27     04/29/20

**X Colombia Operations**

(All $'s in thousands)

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 16 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | 7/17 |
| Customer Receipts: Ecopetrol | 184 | 1,649 | 86 | 244 | 872 | 214 | 563 | 662 | 439 | 68 | 475 | 475 | 475 | 348 | 178 | 178 | 7,109 |
| Other Customer Receipts | 165 | 139 | 650 | 997 | 760 | 617 | 631 | 1,109 | 324 | 927 | 332 | 220 | 422 | 420 | 413 | 342 | 8,467 |
| Income Tax Refund | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Receipts** | **349** | **1,788** | **736** | **1,241** | **1,632** | **831** | **1,194** | **1,771** | **763** | **995** | **806** | **695** | **897** | **768** | **591** | **520** | **15,576** |
| Less: Receipts Collected in Barbados | (71) | (989) | (211) | (28) | (288) | (175) | (186) | (218) | (145) | (22) | (157) | (157) | (157) | (115) | (59) | (59) | (3,034) |
| **Net Colombian Receipts: In-Country** | **278** | **799** | **526** | **1,213** | **1,344** | **656** | **1,008** | **1,553** | **618** | **972** | **650** | **538** | **740** | **653** | **532** | **461** | **12,542** |
| **Disbursements: Operating** | | | | | | | | | | | | | | | | | |
| Vendors | (600) | (100) | (300) | (200) | (400) | (400) | (400) | (200) | (200) | (200) | (250) | (250) | (160) | (150) | (100) | (150) | (4,060) |
| Community Vendors | (200) | (280) | (270) | (250) | (250) | (200) | (180) | (180) | (180) | (200) | (210) | (220) | (220) | (220) | (220) | (220) | (3,500) |
| Bank Service Charges | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (16) |
| Rent - Facilities only | 0 | (70) | 0 | 0 | 0 | (70) | 0 | 0 | 0 | 0 | 0 | (70) | 0 | 0 | 0 | (70) | (280) |
| Other Recurring Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payroll | (60) | (310) | (370) | (400) | (100) | (200) | (50) | (440) | (100) | (200) | (50) | (430) | (50) | (100) | (200) | (50) | (3,110) |
| VAT Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (548) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (502) | (1,050) |
| Non-VAT Taxes | 0 | (50) | (219) | (5) | (5) | (70) | (5) | (120) | (5) | (80) | (10) | 0 | (140) | 0 | 0 | (90) | (798) |
| **Disbursements: Operating** | **(861)** | **(811)** | **(1,160)** | **(856)** | **(756)** | **(941)** | **(636)** | **(1,488)** | **(486)** | **(681)** | **(591)** | **(901)** | **(571)** | **(471)** | **(681)** | **(923)** | **(12,814)** |
| **Net Operating Cash Flows** | **(583)** | **(12)** | **(634)** | **357** | **588** | **(285)** | **372** | **65** | **132** | **291** | **59** | **(363)** | **169** | **182** | **(149)** | **(462)** | **(272)** |
| **Disbursements: Non-Operating** | | | | | | | | | | | | | | | | | |
| Cash Interest | 0 | (8) | (3) | (11) | (10) | (1) | (11) | (8) | (8) | 0 | (11) | (37) | (8) | 0 | (4) | (7) | (129) |
| Amortization | 0 | (291) | (8) | 0 | (34) | 0 | 0 | (433) | (34) | 0 | 0 | (371) | (152) | (34) | (291) | 0 | (1,650) |
| New Debt Issuance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Capex | 0 | 0 | 0 | (80) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (80) |
| Other Non-Recurring (FX, Legal, Insurance, Pros, etc.) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Disbursements: Non-Operating** | **0** | **(299)** | **(11)** | **(91)** | **(45)** | **(1)** | **(11)** | **(441)** | **(42)** | **0** | **(11)** | **(408)** | **(160)** | **(34)** | **(295)** | **(7)** | **(1,859)** |
| **Net Cash Flow Colombia** | **(583)** | **(311)** | **(645)** | **266** | **544** | **(287)** | **361** | **(377)** | **89** | **291** | **48** | **(771)** | **9** | **148** | **(444)** | **(469)** | **(2,131)** |
| Beginning Cash | 1,024 | 441 | 130 | 0 | 266 | 810 | 523 | 884 | 507 | 596 | 888 | 935 | 164 | 173 | 321 | 0 | 1,024 |
| Less: Net Cash Flow Colombia | (583) | (311) | (645) | 266 | 544 | (287) | 361 | (377) | 89 | 291 | 48 | (771) | 9 | 148 | (444) | (469) | (2,131) |
| Plus: Barbados Cash Transfer | 0 | 0 | 516 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 123 | 469 | 1,108 |
| Ending Cash After Other Sources | 441 | 130 | 0 | 266 | 810 | 523 | 884 | 507 | 596 | 888 | 935 | 164 | 173 | 321 | 0 | 0 | 0 |
| Plus: Illustrative Net Availability - Barbados | 1,122 | 2,111 | 1,806 | 1,834 | 2,122 | 2,297 | 2,483 | 2,701 | 2,846 | 2,868 | 3,025 | 3,182 | 3,338 | 3,453 | 3,389 | 2,979 | 2,979 |
| Plus: In-Country Availability (ITAU, BdB, BBVA, Scotia) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Liquidity** | **1,563** | **2,241** | **1,806** | **2,100** | **2,931** | **2,820** | **3,367** | **3,208** | **3,442** | **3,756** | **3,960** | **3,346** | **3,512** | **3,774** | **3,389** | **2,979** | **2,979** |
| Less: Greater of Vendor Stretch & Minimum Operating Cash | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) |
| **Operating Liquidity** | **1,413** | **2,091** | **1,656** | **1,950** | **2,781** | **2,670** | **3,217** | **3,058** | **3,292** | **3,606** | **3,810** | **3,196** | **3,362** | **3,624** | **3,239** | **2,829** | **2,829** |

**Qmax Solutions - Global Liquidity Summary**
Illustrative 13WCF, Updated for Actuals 3/27

**DRAFT FOR DISCUSSION ONLY**
04/29/20

**X | MEA Operations**

*(All $'s in thousands)*

| | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | | Fcst |
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | | 16 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | | 7/17 |
| Customer Receipts | 1,268 | 421 | 653 | 265 | 603 | 553 | 153 | 377 | 440 | 133 | 304 | 415 | 374 | 50 | 44 | 259 | | 6,312 |
| **Total Receipts** | 1,268 | 421 | 653 | 265 | 603 | 553 | 153 | 377 | 440 | 133 | 304 | 415 | 374 | 50 | 44 | 259 | | 6,312 |
| **Disbursements: Operating** | | | | | | | | | | | | | | | | | | |
| Vendor Payments - Inventory | (186) | 0 | (248) | (206) | (49) | (33) | (206) | (70) | (127) | (234) | (120) | (150) | (43) | (20) | (38) | (60) | | (1,790) |
| Vendor Payments - Freight | (2) | 0 | (34) | (2) | 0 | 0 | 0 | (2) | (5) | 0 | (1) | 0 | (5) | 0 | (2) | 0 | | (53) |
| Vendor Payments - Direct Expenses | (65) | (5) | (191) | (79) | (162) | (349) | (43) | (45) | (108) | (171) | (57) | (18) | (326) | (61) | (38) | (35) | | (1,753) |
| Vendor Payments - Administrative (G&A) | (7) | (14) | (7) | (4) | (11) | (16) | (13) | (1) | 1 | (1) | (11) | (1) | (5) | (7) | (10) | (1) | | (108) |
| Vendor payments - Other | 0 | (4) | 0 | (10) | 0 | (4) | (76) | (10) | 0 | 0 | (6) | 0 | (10) | 0 | (5) | 0 | | (125) |
| Vendor payments - Direct Expenses - Other | 0 | 0 | (200) | 0 | 0 | (200) | 0 | 0 | (200) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | (600) |
| Rent - Facilities only | (21) | 0 | (29) | 0 | (17) | (16) | (5) | 0 | (2) | 0 | (19) | (2) | 0 | (53) | 0 | (2) | | (165) |
| Other Recurring Expenses | (28) | (20) | (17) | (8) | (8) | (8) | (17) | (8) | (8) | (8) | (17) | (8) | 0 | 0 | 0 | 0 | | (155) |
| Payroll | (61) | (157) | (55) | (421) | (10) | (6) | (45) | (124) | (311) | 0 | (45) | (88) | (348) | (13) | 0 | (74) | | (1,758) |
| Free Zone Levy | 0 | 0 | 0 | (5) | 0 | 0 | 0 | 0 | (5) | 0 | 0 | 0 | (5) | 0 | 0 | 0 | | (15) |
| VAT Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Non-VAT Taxes | 0 | 0 | (43) | (28) | 0 | (6) | (18) | (30) | 0 | (30) | (186) | (48) | 0 | 0 | (6) | (51) | | (452) |
| Bank Service Charges | (6) | (5) | (6) | (1) | (2) | 0 | (11) | 0 | (2) | 0 | 0 | (11) | (2) | 0 | (5) | 0 | | (51) |
| **Disbursements: Operating** | (376) | (211) | (830) | (764) | (258) | (638) | (434) | (290) | (767) | (444) | (462) | (326) | (744) | (154) | (104) | (223) | | (7,025) |
| **Net Operating Cash Flows** | 893 | 210 | (177) | (499) | 345 | (85) | (281) | 87 | (327) | (311) | (158) | 89 | (370) | (104) | (60) | 36 | | (713) |
| **Disbursements: Non-Operating** | | | | | | | | | | | | | | | | | | |
| Capex - IDEC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Capex - Egypt | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Capex - Kuwait JV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Capex - Algeria | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Saudi Consulting Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Coprlease - Egypt | 0 | 0 | 0 | (54) | 0 | 0 | 0 | (78) | 0 | 0 | (21) | 0 | 0 | 0 | (14) | 0 | | (167) |
| Import Line - Draw / (Repayment) | 96 | (186) | (19) | 0 | (210) | 20 | 62 | (51) | (47) | (104) | 65 | 125 | 200 | 50 | 0 | 50 | | 71 |
| Other Non-Recurring (FX, Legal, Insurance, Pros, etc.) | 3 | 0 | 0 | 0 | 0 | 0 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 53 |
| Interest | 0 | (4) | (2) | 0 | (7) | 0 | (2) | (1) | (4) | (9) | (2) | 0 | 0 | 0 | 0 | 0 | | (31) |
| **Disbursements: Non-Operating** | 99 | (170) | (21) | (54) | (217) | 20 | 110 | (130) | (51) | (113) | 42 | 125 | 200 | 50 | (14) | 50 | | (74) |
| **Net Cash Flow MEA** | 992 | 40 | (198) | (553) | 128 | (65) | (171) | (43) | (378) | (424) | (116) | 214 | (170) | (54) | (74) | 86 | | (786) |
| Beginning Cash | 1,133 | 2,125 | 2,165 | 1,967 | 1,414 | 1,542 | 1,477 | 1,306 | 1,263 | 885 | 461 | 345 | 559 | 389 | 335 | 261 | | 1,133 |
| Less: Net Cash Flow MEA | 992 | 40 | (198) | (553) | 128 | (65) | (171) | (43) | (378) | (424) | (116) | 214 | (170) | (54) | (74) | 86 | | (786) |
| Plus: UOP - Kuwait JV Debt Draw / (Repay) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Plus: HSBC Swingline - Draw / (Repay) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| **Ending Cash, After Other Sources** | 2,125 | 2,165 | 1,967 | 1,414 | 1,542 | 1,477 | 1,306 | 1,263 | 885 | 461 | 345 | 559 | 389 | 335 | 261 | 347 | | 347 |
| Plus: In-Country Availability | 142 | 308 | 327 | 327 | 537 | 517 | 455 | 506 | 553 | 657 | 592 | 467 | 267 | 217 | 217 | 167 | | 167 |
| **Total Liquidity** | 2,267 | 2,473 | 2,294 | 1,741 | 2,079 | 1,994 | 1,761 | 1,769 | 1,438 | 1,118 | 937 | 1,026 | 656 | 552 | 478 | 514 | | 514 |

**Qmax Solutions - Global Liquidity Summary**  **DRAFT FOR DISCUSSION ONLY**
**Illustrative 13WCF, Updated for Actuals 3/27**  **04/29/20**
**Forecast Does Not Reflect Any HSBC Principal, Interest, or Borrowing Base True-up Payments**

**X Canada Operations**

*(All $'s in thousands)*

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | | 16 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | | 7/17 |
| | | | | | | | | | | | | | | | | | | |
| Customer Receipts | 814 | 306 | 500 | 506 | 441 | 131 | 56 | 56 | 56 | 53 | 53 | 53 | 53 | 182 | 233 | 233 | | 3,727 |
| Total Receipts | 814 | 306 | 500 | 506 | 441 | 131 | 56 | 56 | 56 | 53 | 53 | 53 | 53 | 182 | 233 | 233 | | 3,727 |
| | | | | | | | | | | | | | | | | | | |
| **Disbursements: Operating** | | | | | | | | | | | | | | | | | | |
| Vendor Payments | (500) | (300) | (185) | (484) | (308) | (500) | (50) | (48) | 0 | (31) | (40) | (40) | (40) | (40) | (100) | (150) | | (2,816) |
| Bank Service Charges | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | | (16) |
| Rent - Facilities only | (17) | 0 | 0 | 0 | (17) | 0 | 0 | 0 | 0 | (17) | 0 | 0 | 0 | (17) | 0 | 0 | | (68) |
| Other Recurring Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Payroll | (104) | (7) | (120) | (7) | (80) | (7) | (80) | (7) | (80) | (7) | (20) | (70) | (20) | (70) | (20) | (70) | | (769) |
| VAT Taxes | (60) | 0 | 0 | 0 | (100) | 0 | 0 | 0 | (50) | 0 | 0 | 0 | 0 | (50) | 0 | 0 | | (260) |
| Non-VAT Taxes | 0 | 0 | 0 | (8) | 0 | 0 | 0 | 0 | (8) | 0 | 0 | 0 | 0 | (8) | 0 | 0 | | (24) |
| Disbursements: Operating | (682) | (308) | (306) | (500) | (506) | (508) | (131) | (56) | (139) | (56) | (61) | (111) | (61) | (186) | (121) | (221) | | (3,953) |
| | | | | | | | | | | | | | | | | | | |
| **Net Operating Cash Flows** | 132 | (2) | 194 | 6 | (65) | (377) | (74) | 0 | (83) | (3) | (8) | (58) | (8) | (4) | 112 | 12 | | (226) |
| | | | | | | | | | | | | | | | | | | |
| **Disbursements: Non-Operating** | | | | | | | | | | | | | | | | | | |
| HSBC - Interest Payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| HSBC - Amortization | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Terra - Acquisition Debt - P&I | (102) | (102) | (102) | (102) | (102) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | (508) |
| Tarek Acquisition Debt - P&I | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Funding: India, Brazil, & Ecuador | 0 | 0 | (50) | 0 | 0 | 0 | (50) | 0 | 0 | 0 | (50) | 0 | 0 | 0 | (50) | 0 | | (200) |
| Asset Sale | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Microsoft Lease | 0 | 0 | 0 | 0 | (136) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | (136) |
| Other Non-Recurring (FX, Legal, Insurance, Pros, LCs, etc.) | (82) | (22) | (22) | (22) | (396) | (32) | (22) | (22) | (72) | (22) | (22) | (72) | (22) | (22) | (22) | (72) | | (847) |
| Disbursements: Non-Operating | (184) | (124) | (174) | (124) | (633) | (32) | (72) | (22) | (72) | (22) | (22) | (72) | (22) | (22) | (22) | (72) | | (1,691) |
| | | | | | | | | | | | | | | | | | | |
| **Net Cash Flow Before True-up** | (52) | (126) | 20 | (118) | (698) | (410) | (146) | (22) | (155) | (25) | (30) | (130) | (30) | (27) | 90 | (60) | | (1,917) |
| Plus/Minus: Borrowing Base True-Up | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| Net Cash Flow Canada | (52) | (126) | 20 | (118) | (698) | (410) | (146) | (22) | (155) | (25) | (30) | (130) | (30) | (27) | 90 | (60) | | (1,917) |
| | | | | | | | | | | | | | | | | | | |
| Beginning Cash | 388 | 336 | 210 | 231 | 113 | 0 | (410) | (556) | (578) | (473) | 0 | 0 | 0 | 0 | 0 | 90 | | 388 |
| Less: Net Cash Flow Before True-up | (52) | (126) | 20 | (118) | (698) | (410) | (146) | (22) | (155) | (25) | (30) | (130) | (30) | (27) | 90 | (60) | | (1,917) |
| Plus: HSBC Swingline - Draw / (Repay) | 0 | 0 | 0 | 0 | 584 | 0 | 0 | 0 | 260 | 498 | 30 | 130 | 30 | 27 | 0 | 0 | | 1,558 |
| Ending Cash, After Other Sources | 336 | 210 | 231 | 113 | 0 | (410) | (556) | (578) | (473) | 0 | 0 | 0 | 0 | 0 | 0 | 90 | | 30 |
| Plus: Illustrative Net Availability | 280 | 2,082 | 1,304 | 1,025 | 0 | 0 | 0 | 260 | 650 | 971 | 1,762 | 1,754 | 1,883 | 1,628 | 3,064 | 3,806 | | 3,806 |
| Plus: FHC Availability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| **Total Liquidity** | 616 | 2,292 | 1,534 | 1,139 | 0 | (410) | (556) | (318) | 177 | 971 | 1,762 | 1,754 | 1,883 | 1,628 | 3,154 | 3,836 | | 3,836 |

| Qmax Solutions - Global Liquidity Summary | | | | | | | | | | | | | | | | DRAFT FOR DISCUSSION ONLY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Illustrative 13WCF, Updated for Actuals 3/27 | | | | | | | | | | | | | | | | 04/29/20 |

Forecast Does Not Reflect Any HSBC Principal, Interest, or Borrowing Base True-up Payments

| Forecast Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 16 |
| Week Ending Date | 4/3 | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 | 7/10 | 7/17 | 7/17 |

*(All $'s in thousands)*

### Cash Flow

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Inflows | 7,287 | 8,426 | 6,414 | 6,030 | 6,856 | 5,671 | 5,997 | 7,260 | 6,304 | 5,862 | 6,005 | 5,978 | 5,536 | 4,878 | 5,558 | 5,557 | 99,619 |
| Less: Cash Outflows | (8,382) | (9,150) | (10,285) | (7,500) | (6,491) | (7,152) | (7,464) | (8,350) | (8,937) | (7,148) | (8,205) | (7,210) | (10,315) | (5,815) | (6,661) | (7,060) | (126,126) |
| **Net Cash Flow** | **(1,095)** | **(724)** | **(3,872)** | **(1,470)** | **365** | **(1,481)** | **(1,467)** | **(1,090)** | **(2,632)** | **(1,286)** | **(2,201)** | **(1,233)** | **(4,780)** | **(937)** | **(1,103)** | **(1,502)** | **(26,507)** |
| Beginning Cash Balance | 10,888 | 9,792 | 9,068 | 5,197 | 3,727 | 4,092 | 2,611 | 1,144 | 54 | (2,578) | (3,864) | (6,065) | (7,298) | (12,077) | (13,014) | (14,117) | 10,888 |
| Plus / (Minus): Net Cash Flow | (1,095) | (724) | (3,872) | (1,470) | 365 | (1,481) | (1,467) | (1,090) | (2,632) | (1,286) | (2,201) | (1,233) | (4,780) | (937) | (1,103) | (1,502) | (26,507) |
| **Ending Cash Balance** | **9,792** | **9,068** | **5,197** | **3,727** | **4,092** | **2,611** | **1,144** | **54** | **(2,578)** | **(3,864)** | **(6,065)** | **(7,298)** | **(12,077)** | **(13,014)** | **(14,117)** | **(15,619)** | **(15,619)** |

### Liquidity Calculation

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Availability on HSBC Facility | 280 | 2,082 | 1,304 | 1,025 | 0 | 0 | 0 | 260 | 650 | 971 | 1,762 | 1,754 | 1,883 | 1,628 | 3,064 | 3,806 | 3,806 |
| Plus: Availability on Encina Facility | 3,947 | 3,922 | 3,904 | 2,563 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 0 | 222 | 0 | 0 | 0 | 0 |
| Plus: Marginable Cash | 7,227 | 6,774 | 3,230 | 2,047 | 1,740 | 611 | (1,046) | (1,716) | (4,060) | (5,213) | (7,345) | (8,021) | (12,640) | (13,670) | (14,378) | (15,967) | (15,967) |
| Plus: FHC Availability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Free Liquidity** | **11,454** | **12,778** | **8,437** | **5,635** | **1,740** | **611** | **(1,046)** | **(1,456)** | **(3,188)** | **(4,242)** | **(5,584)** | **(6,267)** | **(10,534)** | **(12,042)** | **(11,314)** | **(12,161)** | **(12,161)** |
| Plus: Non-Marginable Cash | 2,566 | 2,295 | 1,967 | 1,680 | 2,352 | 2,000 | 2,190 | 1,770 | 1,481 | 1,349 | 1,280 | 723 | 563 | 657 | 261 | 347 | 347 |
| Plus: In-Country Availability | 142 | 308 | 327 | 327 | 537 | 517 | 455 | 506 | 553 | 657 | 592 | 467 | 267 | 217 | 217 | 167 | 167 |
| Plus: 1st National Capex Availability | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Liquidity** | **14,161** | **15,380** | **10,731** | **7,642** | **4,629** | **3,128** | **1,599** | **820** | **(1,153)** | **(2,236)** | **(3,711)** | **(5,077)** | **(9,705)** | **(11,168)** | **(10,836)** | **(11,646)** | **(11,646)** |

### Debt / Capitalization

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Encina (Revolving & Term Loan) | 22,368 | 22,226 | 22,123 | 23,214 | 25,602 | 25,153 | 24,761 | 24,400 | 23,696 | 21,959 | 21,384 | 20,825 | 19,916 | 19,822 | 19,740 | 19,475 | 19,475 |
| HSBC | 144,467 | 142,665 | 143,443 | 143,721 | 144,747 | 144,747 | 144,747 | 144,487 | 144,097 | 143,776 | 142,985 | 142,993 | 142,864 | 143,118 | 141,683 | 140,941 | 140,941 |
| **Senior Secured Debt** | **166,836** | **164,891** | **165,566** | **166,935** | **170,349** | **169,900** | **169,508** | **168,887** | **167,794** | **165,735** | **164,370** | **163,818** | **162,779** | **162,940** | **161,423** | **160,416** | **160,416** |
| MEX: Perforlat Debt | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 | 7,360 |
| COL: BBVA | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,484 | 1,113 | 1,113 | 1,113 | 1,113 | 1,113 | 1,113 |
| COL: Banco de Bogota | 3,181 | 2,890 | 2,881 | 2,881 | 2,847 | 2,847 | 2,847 | 2,847 | 2,812 | 2,812 | 2,812 | 2,812 | 2,660 | 2,626 | 2,335 | 2,335 | 2,335 |
| COL: ITAU | 1,395 | 1,395 | 1,395 | 1,395 | 1,395 | 1,395 | 1,395 | 962 | 962 | 962 | 962 | 962 | 962 | 962 | 962 | 962 | 962 |
| IDEC: Import Line | 1,758 | 1,592 | 1,573 | 1,573 | 1,363 | 1,383 | 1,445 | 1,394 | 1,347 | 1,243 | 1,308 | 1,433 | 1,633 | 1,683 | 1,683 | 1,733 | 1,733 |
| EGY: Corplease | 313 | 313 | 313 | 259 | 259 | 259 | 259 | 181 | 181 | 181 | 160 | 160 | 160 | 160 | 147 | 147 | 147 |
| USA: 1st National Capex Line | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Debt** | **182,327** | **179,925** | **180,573** | **181,888** | **185,057** | **184,628** | **184,298** | **183,115** | **181,941** | **179,778** | **178,457** | **177,659** | **176,669** | **176,845** | **175,023** | **174,065** | **174,065** |

THIS IS EXHIBIT " 26 "
referred to in the Affidavit of

Cameron Bailey

Sworn before me this 26th

day of May A.D. 20 20

Jonathan Tomm
Barrister and Solicitor

**ENCINA BUSINESS CREDIT, LLC**
**123 N. Wacker Drive, Suite 2400**
**Chicago, Illinois 60606**


May 22, 2020


**VIA E-MAIL (paul.irving@hsbc.ca)**
HSBC Bank Canada
5th Floor, 70 York Street
Toronto, Ontario
M5J 1S9
Attention: Director

      Re:    Anchor Drilling Fluids USA, LLC

Ladies and Gentlemen:

      Reference is made to that certain Credit Agreement dated as of September 6, 2019 (the "**Credit Agreement**") entered into by and among (i) Encina Business Credit, LLC, as Agent ("**Encina**") and as a Lender, (ii) Q'Max America Inc.; (iii) Anchor Drilling Fluids USA, LLC (the "**Borrower**"), (iv) the Guarantors, and (v) and the other Lenders party thereto.

      Reference is further made to that certain Intercreditor Agreement dated as of September 6, 2019 (the "**Intercreditor Agreement**") entered into by and between Encina, as ABL Agent, and HSBC Bank Canada, as Parent Facility Agent ("**HSBC**").  (Capitalized terms used in this letter and not otherwise defined shall have the meanings as defined in the Intercreditor Agreement).

      Further reference is made to (i) that certain notice of demand for payment of all Outstanding Amounts (as defined therein) dated May 12, 2020 from counsel to HSBC to, among others, the Borrower, and (ii) that certain Notice of Intention to Enforce Security dated May 12, 2020 from HSBC to the Borrower (collectively, the "**Notices**").

      The Notices constitute the Exercise of Secured Creditor Remedies and violate the terms and conditions of the Intercreditor Agreement in that:

      (a)    HSBC failed to provide copies of the Notices to Encina;

      (b)    The Notices failed to state that HSBC's Exercise of Secured Creditor Remedies is subject to Encina's paramount rights and interests in all ABL Priority Collateral; and

      (c)    HSBC's stated intention to commence the Exercise of Secured Creditor Remedies breaches the "Remedies Standstill" contained in the Intercreditor Agreement.

PLEASE TAKE NOTICE that HSBC is hereby advised and directed to immediately cease and desist any further Exercise of Secured Creditor Remedies in violation of the terms and conditions of the Intercreditor Agreement.  HSBC is hereby notified that HSBC shall be liable to Encina for any and all damages caused by HSBC's knowing and willful breach of the terms and conditions of the Intercreditor Agreement.

Encina hereby expressly reserves all rights, remedies, powers, and privileges under the Credit Agreement and the Intercreditor Agreement. Nothing herein or in any other communication with Encina shall be deemed an agreement by Encina to forbear from exercising any and all of its rights, remedies, powers, and privileges.  Encina hereby reserves the right to take such actions and to exercise its rights, remedies, powers, and privileges as entitled pursuant to the Credit Agreement, the Intercreditor Agreement, and applicable law at such times as it, in its sole and exclusive discretion, deems appropriate or necessary.

Very truly yours,

**ENCINA BUSINESS CREDIT, LLC, Agent**

By:_____
Name:  Jeffrey W. Linstrom
Title:   General Counsel

cc:   Howard Gorman, Esquire (howard.gorman@nortonrosefulbright.com)
       Walker MacLeod, Esquire (wmacleod@mccarthy.ca)
       Ken Kattner, Esquire (kenric.kattner@haynesandboone.com)
       Donald E. Rothman, Esquire (drothman@riemerlaw.com)
       Claire Zikovsky, Esquire (czikovsky@stikeman.com)

2618568.1

THIS IS EXHIBIT " _27_ "
referred to in the Affidavit of
_Cameron Bailey_
Sworn before me this _26th_
day of _May_ A.D. 20_20_

Jonathan Tomm
Barrister and Solicitor

**ENCINA BUSINESS CREDIT, LLC**
**123 N. Wacker Drive, Suite 2400**
**Chicago, Illinois 60606**

May 22, 2020

**VIA E-MAIL (Celina.carter@qmax.com)**
Q'Max America Inc.
11700 Katy Freeway, Suite 200
Houston, TX 77079

Re:      Anchor Drilling Fluids USA, LLC

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of September 6, 2019 (the "**Credit Agreement**"), entered into by and among (i) Encina Business Credit, LLC, as Agent ("**Encina**") and as a Lender, (ii) Q'Max America Inc., (iii) Anchor Drilling Fluids USA, LLC (the "**Borrower**"), (iv) the Guarantors, and (v) and the other Lenders party thereto.  Reference is further made to that certain Pledge Agreement, dated as of September 6, 2019 (the "**Pledge Agreement**"), entered into by and between Encina and Q'Max America Inc. ("**Q'Max**").

Please be advised that one or more Events of Default have occurred under the Credit Agreement, which constitute one or more Events of Default under the Pledge Agreement. Accordingly, Q'Max is hereby notified that, EFFECTIVE IMMEDIATELY:

1.      Encina hereby exercises its rights as proxy and attorney in fact pursuant to the Pledge Agreement, and discharges and terminates Q'Max as Managing Member of the Borrower;

2.      Encina hereby appoints CR3 Partners, LLC ("**CR3**") as the interim manager of the Borrower with all the rights specified in the Second Amended and Restated Limited Liability Company Agreement of the Borrower as specified for the Member-Manager.

3.      Encina hereby exercises its rights as proxy and attorney in fact pursuant to the Pledge Agreement, and discharges and terminates the following officers of the Borrower Rafael Andres Diaz-Granados, Eric Glover, Chris Rivers, Brad Billon, Mark Margavio, Celina Carter and Jocelyn Rivera; and

4.      Encina hereby adopts and ratifies the Engagement Agreement, dated May 21, 2020, entered into by and among Q'Max, the Borrower, and CR3, and hereby confirms the appointment of James Katchadurian of CR3 as the Chief Restructuring Officer of the Borrower.

PLEASE TAKE NOTICE that any and all actions taken or purported to be taken by Q'Max as the former Managing Member of the Borrower, or any former officer of the Borrower, from and after the service of this notice shall in each case be NULL AND VOID *ab initio* and of no force or effect.  CR3 has and shall have sole and exclusive authority over the management of the business and assets of the Borrower.

Encina hereby expressly reserves all rights, remedies, powers, and privileges under the Credit Agreement and the Pledge Agreement. Nothing herein or in any other communication with Encina, oral or written, shall be deemed an agreement by Encina to forbear from exercising any or all of its rights, remedies, powers, and privileges.  Encina hereby reserves the right to take such actions and to exercise its rights, remedies, powers, and privileges to which it may be entitled pursuant to the Credit Agreement, the Pledge Agreement, and applicable law at such times as it, in its sole and exclusive discretion, deems necessary or appropriate.

Very truly yours,

**ENCINA BUSINESS CREDIT, LLC, Agent**

By: _____
Name:  Jeffrey W. Linstrom
Title: General Counsel

cc:     Howard Gorman, Esquire (howard.gorman@nortonrosefulbright.com)
        Walker MacLeod, Esquire (wmacleod@mccarthy.ca)
        Ken Kattner, Esquire (kenric.kattner@haynesandboone.com)
        Donald E. Rothman, Esquire (drothman@riemerlaw.com)
        Claire Zikovsky, Esquire (czikovsky@stikeman.com)

2618578.2

THIS IS EXHIBIT " _28_ "
referred to in the Affidavit of
_Cameron Bailey_
Sworn before me this _26th_
day of _May_ A.D. 20 _20_

Jonathan Tomm
Barrister and Solicitor

# NORTON ROSE FULBRIGHT

May 22, 2020

**Sent By Email**

Encina Business Credit, LLC
123 N. Wacker Drive, Suite 2400
Chicago Illinois 60606
USA

**Attention:  Jeffrey W. Linstrom**
            **General Counsel**

Norton Rose Fulbright Canada LLP
400 3rd Avenue SW, Suite 3700
Calgary, Alberta  T2P 4H2 Canada

F: +1 403.264.5973
**nortonrosefulbright.com**

**Howard Gorman, Q.C.**
+1 403.267.8144
howard.gorman@nortonrosefulbright.com

Assistant
+1 403.267.9580
joanna.vanham@nortonrosefulbright.com

Your reference            Our reference
                          1001115678

Dear Sir:

## Anchor Drilling Fluids USA, LLC

We are in receipt of your two letters on behalf of Encina, both dated May 22, 2020, to Mr. Irving from HSBC and Ms. Carter from Q'Max America Inc. ("**Q'Max America**", and collectively with the broader Q'Max entity group, the "**Q'Max Group**"), each of which were copied to my attention.

Capitalized terms not otherwise defined herein are as defined in your letters or the Intercreditor Agreement, as applicable.

In response to your letter to Mr. Irving, we note the following:

(a)    Encina clearly received copies of the Notices, which were prepared in conjunction with the Q'Max Group's proposed but since adjourned and perhaps abandoned creditor protection application under the *Companies' Creditors Arrangement Act*. Encina and the Lenders were both in constant communication with the Q'Max Group as senior secured creditors and potential priority DIP lenders. In any event, the Intercreditor Agreement provides that any failure by HSBC to provide Encina with notices that are required under applicable law (such as the Notices) will not impair HSBC's rights;

(b)    the Intercreditor Agreement only requires HSBC to provide a notice about the ABL Priority Collateral in the context of a foreclosure or sale, however, the Notices were not delivered by HSBC in respect of a foreclosure or sale. They are 10-day notices of a potential future intention to enforce security required under Canadian law;

(c)    the terms of the Intercreditor Agreement restrict HSBC from exercising remedies against the ABL Priority Collateral; however, HSBC's intention is to apply for the appointment of a receiver and manager over all of HSBC's security in Canada and the United States, expressly excluding the ABL Priority Collateral, in accordance with the terms of the Intercreditor Agreement; and

(d)    similarly Encina is required under the Intercreditor Agreement to provide Notice of an intended foreclosure or sale and is prohibited from exercising remedies as against HSBC's Parent Facility

CAN_DMS: \133566183\1

Norton Rose Fulbright Canada LLP is a limited liability partnership established in Canada.

Norton Rose Fulbright Canada LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright South Africa Inc and Norton Rose Fulbright US LLP are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are at nortonrosefulbright.com.

Jeffrey W. Linstrom
May 22, 2020



Priority Collateral, which would include Anchor Drilling Fluid USA, LLC's ("**Anchor**") assets, equipment, inventory, goodwill and all Anchor assets and attributes other than its share capital, receivables and certain other property constituting the ABL Priority Collateral.

Somewhat remarkably, mere hours after reminding HSBC of its obligations under the Intercreditor Agreement, we received your May 22, 2020 correspondence to Q'Max America. There, you confirmed, *inter alia*, the appointment of a Chief Restructuring Officer ("CRO") pursuant to an Engagement Agreement dated May 21, 2020 (the "**Engagement**"). A copy of this Engagement was not enclosed and we request a copy be delivered forthwith.

Such is of some significant concern to HSBC because you state "CR3 [the CRO] has and shall have sole and exclusive authority over the management and business and assets of the Borrower."

The assets of the Borrower include valuable assets that are subject to the priority of the Agent, contrary to the terms of the Intercreditor Agreement. Any dissipation, destruction, conversion, sale or use of the Agent's Parent Facility Priority Collateral is at the risk, expense and account of Encina and its appointed CRO.

As you are no doubt aware, the Intercreditor Agreement prevents Encina from the Exercise of Any Secured Creditor Remedies unilaterally, to the detriment of the Parent Facility Priority Collateral of HSBC and the lenders in HSBC's syndicate. We trust that Encina is not taking and will not take any steps to enforce, or to exercise any secured creditor remedies, against any Parent Facility Priority Collateral (as defined in the Intercreditor Agreement).

As requested above,  please provide a copy of such Engagement to me immediately so the impact of same on HSBC and the Parent Facility Priority Collateral and its compliance or contravention of the terms of the Intercreditor Agreement can be evaluated.

HSBC expressly reserves all rights, remedies, powers, and privileges under the Intercreditor Agreement as against Encina.

Yours truly,

Norton Rose Fulbright Canada LLP
Per:

Howard Gorman, Q.C.
Senior Partner

HG/jv

Copy to:          Paul Irving (paul.irving@hsbc.ca)
                  Celina Carter (celina.carter@qmax.com)
                  Walker Macleod (wmacleod@mccarthy.ca)
                  Ken Kattner (kenric.kattner@haynesandboone.com)
                  Donald Rothman (drothman@riemerlaw.com)
                  Claire Zikovsky (czikovsky@stikeman.com)

THIS IS EXHIBIT " _29_ "
referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26th_

day of _May_ A.D. 20 _20_

Jonathan Tomm
Barrister and Solicitor

**ENCINA BUSINESS CREDIT, LLC**
**123 N. Wacker Drive, Suite 2400**
**Chicago, Illinois 60606**

May 22, 2020

**VIA E-MAIL (Celina.carter@qmax.com)**
Q'Max America Inc.
11700 Katy Freeway, Suite 200
Houston, TX 77079

Re:   Anchor Drilling Fluids USA, LLC

Ladies and Gentlemen:

Reference is hereby made to that certain letter dated May 22, 2020 (the "**Notice**"), from Encina Business Credit, LLC, in its capacity as Agent ("**Encina**"), to Q'Max America Inc. ("**Q'Max**"), a copy of which is annexed hereto marked Exhibit "A". Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Notice.

Please be advised that, notwithstanding anything to the contrary contained in the Notice, the effectiveness of the Notice is hereby suspended through Sunday, May 24, 2020 at 11:59 p.m. prevailing eastern time, at which time, in the event that the Borrower has not theretofore filed a voluntary petition for relief under chapter 7 in the United States Bankruptcy Court for the Southern District of Texas (Victoria Division), the Notice shall automatically and without further action immediately become effective.

Encina hereby expressly reserves all rights, remedies, powers, and privileges under the Credit Agreement and the Pledge Agreement. Nothing herein or in any other communication with Encina, oral or written, shall be deemed an agreement by Encina to forbear from exercising any or all of its rights, remedies, powers, and privileges.  Encina hereby reserves the right to take such actions and to exercise its rights, remedies, powers, and privileges to which it may be

[remainder of page intentionally left blank]

entitled pursuant to the Credit Agreement, the Pledge Agreement, and applicable law at such times as it, in its sole and exclusive discretion, deems necessary or appropriate.

Very truly yours,

**ENCINA BUSINESS CREDIT, LLC,**
**Agent**

By: _____
Name:  Jeffrey W. Linstrom
Title:    General Counsel


cc:     Howard Gorman, Esquire (howard.gorman@nortonrosefulbright.com)
         Walker MacLeod, Esquire (wmacleod@mccarthy.ca)
         Ken Kattner, Esquire (kenric.kattner@haynesandboone.com)
         Donald E. Rothman, Esquire (drothman@riemerlaw.com)
         Claire Zikovsky, Esquire (czikovsky@stikeman.com)

EXHIBIT A
(see attached)

2618739.2

**ENCINA BUSINESS CREDIT, LLC**
**123 N. Wacker Drive, Suite 2400**
**Chicago, Illinois 60606**

May 22, 2020

**VIA E-MAIL (Celina.carter@qmax.com)**
Q'Max America Inc.
11700 Katy Freeway, Suite 200
Houston, TX 77079

Re:    Anchor Drilling Fluids USA, LLC

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of September 6, 2019 (the "**Credit Agreement**"), entered into by and among (i) Encina Business Credit, LLC, as Agent ("**Encina**") and as a Lender, (ii) Q'Max America Inc., (iii) Anchor Drilling Fluids USA, LLC (the "**Borrower**"), (iv) the Guarantors, and (v) and the other Lenders party thereto.  Reference is further made to that certain Pledge Agreement, dated as of September 6, 2019 (the "**Pledge Agreement**"), entered into by and between Encina and Q'Max America Inc. ("**Q'Max**").

Please be advised that one or more Events of Default have occurred under the Credit Agreement, which constitute one or more Events of Default under the Pledge Agreement. Accordingly, Q'Max is hereby notified that, EFFECTIVE IMMEDIATELY:

1.      Encina hereby exercises its rights as proxy and attorney in fact pursuant to the Pledge Agreement, and discharges and terminates Q'Max as Managing Member of the Borrower;

2.      Encina hereby appoints CR3 Partners, LLC ("**CR3**") as the interim manager of the Borrower with all the rights specified in the Second Amended and Restated Limited Liability Company Agreement of the Borrower as specified for the Member-Manager.

3.      Encina hereby exercises its rights as proxy and attorney in fact pursuant to the Pledge Agreement, and discharges and terminates the following officers of the Borrower Rafael Andres Diaz-Granados, Eric Glover, Chris Rivers, Brad Billon, Mark Margavio, Celina Carter and Jocelyn Rivera; and

4.      Encina hereby adopts and ratifies the Engagement Agreement, dated May 21, 2020, entered into by and among Q'Max, the Borrower, and CR3, and hereby confirms the appointment of James Katchadurian of CR3 as the Chief Restructuring Officer of the Borrower.

PLEASE TAKE NOTICE that any and all actions taken or purported to be taken by Q'Max as the former Managing Member of the Borrower, or any former officer of the Borrower, from and after the service of this notice shall in each case be NULL AND VOID *ab initio* and of no force or effect.  CR3 has and shall have sole and exclusive authority over the management of the business and assets of the Borrower.

Encina hereby expressly reserves all rights, remedies, powers, and privileges under the Credit Agreement and the Pledge Agreement. Nothing herein or in any other communication with Encina, oral or written, shall be deemed an agreement by Encina to forbear from exercising any or all of its rights, remedies, powers, and privileges.  Encina hereby reserves the right to take such actions and to exercise its rights, remedies, powers, and privileges to which it may be entitled pursuant to the Credit Agreement, the Pledge Agreement, and applicable law at such times as it, in its sole and exclusive discretion, deems necessary or appropriate.

Very truly yours,

**ENCINA BUSINESS CREDIT, LLC,**
**Agent**

By:_____
Name:  Jeffrey W. Linstrom
Title: General Counsel

cc:    Howard Gorman, Esquire (howard.gorman@nortonrosefulbright.com)
       Walker MacLeod, Esquire (wmacleod@mccarthy.ca)
       Ken Kattner, Esquire (kenric.kattner@haynesandboone.com)
       Donald E. Rothman, Esquire (drothman@riemerlaw.com)
       Claire Zikovsky, Esquire (czikovsky@stikeman.com)

2618578.2

THIS IS EXHIBIT " _30_ "

referred to in the Affidavit of

_Cameron Bailey_

Sworn before me this _26th_

day of _May_ A.D. 20 _20_

Jonathan Tomm
Barrister and Solicitor

| Fill in this information to identify the case: |
| --- |

United States Bankruptcy Court for the:

Southern _____ District of __Texas_____
                         (State)

Case number (*if known*): _____ Chapter __7__

☐ Check if this is an amended filing

## Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy   04/20

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

1. **Debtor's name**

   Anchor Drilling Fluids USA, LLC

2. **All other names debtor used in the last 8 years**

   Include any assumed names, trade names, and *doing business as* names

3. **Debtor's federal Employer Identification Number** (EIN)

   7   3  –  1   2   1   5   3   9   5

4. **Debtor's address**

   **Principal place of business**

   11700 Katy Fwy., Suite 200
   Number     Street

   Houston, TX  77079
   City          State     ZIP Code

   Harris
   County

   **Mailing address, if different from principal place of business**

   Number     Street

   P.O. Box

   City          State     ZIP Code

   **Location of principal assets, if different from principal place of business**

   Number     Street

   City          State     ZIP Code

5. **Debtor's website** (URL)   https://anchorusa.com/

| Debtor | Anchor Drilling Fluids USA, LLC | Case number (if known) | |
|---|---|---|---|
| | Name | | |

**6. Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☑ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

<u>2</u> <u>1</u> <u>1</u> <u>1</u>

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of the chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☑ Chapter 7

☐ Chapter 9

☐ Chapter 11. *Check all that apply*:

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,725,625. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11**. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☑ No

☐ Yes. District _____ When _____ Case number _____
MM / DD / YYYY

District _____ When _____ Case number _____
MM / DD / YYYY

| Debtor | Anchor Drilling Fluids USA, LLC | Case number (if known) | |
|---|---|---|---|
| | Name | | |

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☐ No

☑ Yes.    Debtor   See Attached       Relationship _____

District _____   When _____
                                                        MM / DD / YYYY

Case number, if known _____

---

**11. Why is the case filed in this district?**

*Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

---

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

     **Why does the property need immediate attention?** (*Check all that apply.*)

     ☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

         What is the hazard? _____

     ☐ It needs to be physically secured or protected from the weather.

     ☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

     ☐ Other _____

     **Where is the property?** _____
                                  Number       Street

                                   _____

                                   City                        State ZIP Code

     **Is the property insured?**

     ☐ No

     ☐ Yes. Insurance agency _____

         Contact name _____

         Phone _____

---

## Statistical and administrative information

**13. Debtor's estimation of available funds**

*Check one:*

☐ Funds will be available for distribution to unsecured creditors.

☑ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

---

**14. Estimated number of creditors**

☐ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☑ 1,000-5,000
☐ 5,001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than 100,000

---

| Debtor | Anchor Drilling Fluids USA, LLC | | Case number (if known) | |
|---|---|---|---|---|
| | Name | | | |

| **15. Estimated assets** | ☐ $0-$50,000<br>☐ $50,001-$100,000<br>☐ $100,001-$500,000<br>☐ $500,001-$1 million | ☐ $1,000,001-$10 million<br>☐ $10,000,001-$50 million<br>☐ $50,000,001-$100 million<br>☑ $100,000,001-$500 million | ☐ $500,000,001-$1 billion<br>☐ $1,000,000,001-$10 billion<br>☐ $10,000,000,001-$50 billion<br>☐ More than $50 billion |
|---|---|---|---|
| **16. Estimated liabilities** | ☐ $0-$50,000<br>☐ $50,001-$100,000<br>☐ $100,001-$500,000<br>☐ $500,001-$1 million | ☐ $1,000,001-$10 million<br>☐ $10,000,001-$50 million<br>☐ $50,000,001-$100 million<br>☑ $100,000,001-$500 million | ☐ $500,000,001-$1 billion<br>☐ $1,000,000,001-$10 billion<br>☐ $10,000,000,001-$50 billion<br>☐ More than $50 billion |

---

### Request for Relief, Declaration, and Signatures

**WARNING —** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

| **17. Declaration and signature of authorized representative of debtor** | The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition. |
|---|---|
| | I have been authorized to file this petition on behalf of the debtor. |
| | I have examined the information in this petition and have a reasonable belief that the information is true and correct. |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___05/24/2020___
            MM / DD / YYYY

**✘** _____
Signature of authorized representative of debtor

Rafael Andres Diaz-Granados
Printed name

Title _President_____

---

| **18. Signature of attorney** | **✘** /s/ John F. Higgins_____ | Date | ___05/24/2020___ |
|---|---|---|---|
| | Signature of attorney for debtor | | MM / DD / YYYY |

  John F. Higgins_____
Printed name

  Porter Hedges LLP_____
Firm name

  1000 Main St 36th floor_____
Number    Street

Houston_____    TX   77002_____
City                                 State    ZIP Code

(713) 226-6000_____    jhiggins@porterhedges.com
Contact phone                          Email address

  09597500_____    TX_____
Bar number                            State

---

**ATTACHMENT TO PETITION OF**
**ANCHOR DRILLING FLUIDS USA, LLC**

**Question No. 10 – Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

| Debtor | Relationship | District | When | Case No. |
|---|---|---|---|---|
| Q'MAX America, Inc. | Debtor Affiliate | SD Texas | Concurrently | 20-60030 |

**WRITTEN CONSENT**
**OF THE SOLE MEMBER OF**
**ANCHOR DRILLING FLUIDS USA, LLC**

May 24, 2020

The undersigned, being the sole member of Anchor Drilling Fluids USA, LLC, a member-managed Delaware limited liability company (the "***Company***"), does hereby adopt, vote for, consent to and approve the following resolutions:

WHEREAS, since 2019, the Company and its affiliates have been focused on a permanent and comprehensive solution to its challenged fiscal circumstances to improve its capital structure, reduce its debt levels, improve liquidity and strengthen its financial position in order to be able to achieve its business objectives and maximize value for all stakeholders; and

WHEREAS, despite the Company's and its affiliates' efforts to navigate prolonged difficult industry conditions and improve its capital structure, the Company has continued to be negatively impacted by continued and further reductions in rig activity levels, significant decreases in operating receipts and collection challenges with a major Mexican customer; and

WHEREAS, in late April 2020, it became apparent that the Company and its affiliates would not be in a position to continue operating as a going-concern without access to immediate additional liquidity. The Company and its affiliates began discussions with the HSBC Lending Syndicate in February 2020 and entered into various credit agreement amendments that relieve or modify covenants to address financial pressure; and

WHEREAS, as a result, the Company and its affiliates determined to commence a restructuring plan (the "***Restructuring Plan***"). The Restructuring Plan was developed in consultation with the Company's and its affiliates' professional and financial advisors and would be implemented through a proceeding filed under the Companies' Creditors Arrangement Act in Canada along with a case under chapter 15 of the United States Bankruptcy Code (collectively, the "***Proceedings***"); and

WHEREAS, in order for the Restructuring Plan to be successful, the Company and its affiliates began negotiating with the HSBC Lending Syndicate and Encina Business Credit, LLC ("***Encina***") for additional loans to fund the Restructuring Plan in the Proceedings; and

WHEREAS, during April through May 2020, the Company and its affiliates and their professional advisors undertook a significant number of negotiations and term sheet drafts among the Company, the HSBC Lending Syndicate and Encina for additional liquidity to fund the Restructuring Plan in the Proceedings. These negotiations were difficult and protracted; and

WHEREAS, on May 17, 2020, the HSBC Lending Syndicate advised that they would not provide any funding for the Restructuring Plan in the Proceedings and would object to the Company and its affiliates commencing the Proceedings; and.

WHEREAS, consequently, the Company and its affiliates continued negotiations with Encina to fund debtor-in-possession financing in a chapter 11 case under the United States Bankruptcy Code for the Company, Central Procurement Inc. ("*Central*") and Q"Max America Inc. ("*Q'Max America*" and collectively with the Company, the "*U.S. Subsidiaries*"). Negotiations continued with Encina under the chapter 11 option during the month of May. One of the purposes of the chapter 11 proceeding was to implement a sale process to consummate an asset purchase transaction pursuant to which Palladium Equity Partners IV, L.P., an affiliate of certain stockholders of the Company ("*Palladium*") would sponsor a new entity ("*PurchaseCo*") to make a stalking horse bid to acquire certain of the assets and ongoing business of the U.S. Subsidiaries ("*ProfitCo*") (such sale, the "*Sale Transaction*"); and

WHEREAS, as an additional benefit of continuing the business of ProfitCo as going concern, the Sale Transaction would preserve the jobs of more than 100 employees in Texas, Ohio, Pennsylvania and New York and such employees would continue as employees of ProfitCo; and

WHEREAS, ultimately, on May 19, 2020 Encina indicated it was unwilling to fund a chapter 11 case to support the process for the Sale Transaction because of insufficient borrowing base under their ABL facility; and

WHEREAS, at the time of Encina's decision not to fund a chapter 11 case, the liquidity position of the U.S. Subsidiaries would not allow them to operate any further; and

WHEREAS, as a result, the U.S. Subsidiaries have explored every option to restructure their financial affairs, but without additional liquidity from the HSBC Lending Syndicate and/or Encina no viable options are available; and

WHEREAS, Palladium has indicated it would be willing to provide additional liquidity and pursue the Sale Transaction in Chapter 7 proceedings of the U.S. Subsidiaries if the Chapter 7 trustee were willing to continue operations until the Sale Transaction could be approved and consummated; and

WHEREAS, in the judgment of the sole member of the Company, it is desirable and in the best interest of the U.S. Subsidiaries to cause a petition to be filed by each of the U.S. Subsidiaries seeking relief under the provisions of chapter 7 of title 11, United States Code (the "*Bankruptcy Code*"), and for the Chapter 7 trustee to pursue a sale of ProfitCo to PurchaseCo or an alternative bidder through the chapter 7 process in accordance with the provisions of the Bankruptcy Code and other applicable law.

NOW, THEREFORE, BE IT

## Filing and Prosecution of Bankruptcy Case

RESOLVED, that it is desirable and in the best interest of the Company and its creditors, stockholders, and other interested parties to authorize the Company to cause a petition to be filed in the name of the Company (the "***Chapter 7 Petition***") seeking relief under the provisions of chapter 7 of the Bankruptcy Code; and it is further

RESOLVED, that the President, any Vice President, or such other officer(s) of the Company as they shall from time to time designate (each, an "***Authorized Officer***") be, and each hereby is, authorized and directed to execute and verify the Chapter 7 Petition and to cause the same to be filed in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***"), in such form and at such time as such Authorized Officers shall determine; and it is further

RESOLVED, that the Authorized Officers be, and each hereby is, authorized to execute and file (or direct others to do so on behalf of the Company as provided herein) all necessary documents, including, without limitation, all petitions, affidavits, schedules, motions, lists, applications, pleadings and other papers, and in connection therewith, to employ and retain all assistance by legal counsel, accountants or other professionals and to take any and all action which they deem necessary and proper in connection with the chapter 7 case; and it is further

## Employment of Professionals

RESOLVED, that the law firm of Porter Hedges, LLP be, and hereby is, employed under general retainer as bankruptcy counsel for the Company to prepare and file the chapter 7 case, and the Authorized Officers of the Company are hereby authorized and directed to execute appropriate retention agreements and pay appropriate retainers; and it is further

RESOLVED, that the Authorized Officers of the Company be, and they hereby are, authorized and directed to employ any other firm as professionals, appraisers or consultants to the Company as are deemed necessary to represent and assist the Company in carrying out its duties under the Bankruptcy Code and, in connection therewith, the Authorized Officers of the Company are hereby authorized and directed to execute appropriate retention agreements and pay appropriate retainers; and it is further

RESOLVED, that all acts lawfully done or actions lawfully taken by any Authorized Officers to seek relief under chapter 7 of the Bankruptcy Code or in connection with the chapter 7 case, or any matter related thereto, be, and hereby are, adopted, ratified, confirmed and approved in all respects; and it is further

**Operational Actions**

RESOLVED, that the Authorized Officers are authorized to take such actions as they deem necessary in connection with the preparation for filing of the chapter 7 case, including without limitation, paying final payrolls and related payroll taxes, sales taxes and other trust fund taxes prior to such filings, terminating the employment of such employees as such members, directors and Authorized Officers determine to be appropriate, terminating the 401k plan of the Company and pursuing the sale of all its assets other than those included in ProfitCo (the "***Other Asset Sales***"); and it is further

**Sale of ProfitCo**

RESOLVED, that the Authorized Officers are authorized to pursue negotiations for the sale of the assets comprising ProfitCo to PurchaseCo and to enter into an Asset Purchase Agreement on the terms and conditions for such sale set forth in the Asset Purchase Agreement attached hereto as <u>Exhibit A</u>, with such changes therein as the Authorized Officers may approve, such approval to be evidenced by their execution thereof; and it is further

**General Authorizing Resolutions**

RESOLVED, that the Authorized Officers be, and each of them, hereby is authorized to make, enter into, execute, deliver and file any and all other or further agreements, documents, certificates, materials and instruments, and to take or cause to be taken any and all other actions as any such Authorized Officers deem to be necessary, appropriate or advisable to carry out the purposes of the foregoing resolutions and the transactions contemplated thereunder or to successfully complete the filing of the chapter 7 case and the sale of ProfitCo and the Other Asset Sales; and it is further

RESOLVED, that all authorized acts, transactions, or agreements undertaken prior to the adoption of these resolutions by any such Authorized Officers in connection with the foregoing matters are hereby authorized, approved, ratified and confirmed.

*[Signature on Following Page]*

4842-5953-3245 v.3

4

IN WITNESS WHEREOF, the undersigned has executed this consent effective as of the date first above written.

Q'Max America Inc.,
Its sole member

By: _____

Rafael Diaz-Granados, President

**Execution**

# ASSET PURCHASE AGREEMENT

dated as of May 24, 2020

by and among

QMAX ACQUISITION CORP.

as Buyer,

and

Q'MAX AMERICA INC.,

and

ANCHOR DRILLING FLUIDS USA, LLC

as Sellers

## TABLE OF CONTENTS

**ASSET PURCHASE AGREEMENT**................................................................................1

**ARTICLE 1 DEFINITIONS**.......................................................................................1
    1.1    Defined Terms ................................................................................1
    1.2    Interpretation ................................................................................12

**ARTICLE 2 ACQUIRED ASSETS AND ASSUMPTION OF LIABILITIES** ...................13
    2.1    Assets to be Acquired .....................................................................13
    2.2    Excluded Assets ............................................................................16
    2.3    Liabilities to be Assumed by Buyer .....................................................16
    2.4    Assignment and Assumption of Contracts............................................17
    2.5    Excluded Liabilities .......................................................................18
    2.6    Withholding .................................................................................20

**ARTICLE 3 CLOSING; CASH PURCHASE PRICE** ....................................................20
    3.1    Closing; Transfer of Possession; Certain Deliveries ...............................20
    3.2    Consideration ...............................................................................22
    3.3    Deposit .......................................................................................22
    3.4    Allocation of Purchase Price.............................................................23

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES REGARDING
    SELLERS**..............................................................................................23
    4.1    Organization.................................................................................23
    4.2    Litigation; Orders ..........................................................................24
    4.3    Compliance with Laws; Permits ........................................................24
    4.4    Real Property. ...............................................................................24
    4.5    Environmental Matters ....................................................................25
    4.6    Suppliers; Customers. .....................................................................25
    4.7    RESERVED..................................................................................26
    4.8    Contracts......................................................................................26
    4.9    Taxes..........................................................................................26
    4.10   Brokers' Fees and Commissions........................................................27

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER** .............................28
    5.1    Organization.................................................................................28
    5.2    Due Authorization, Execution and Delivery; Enforceability....................28
    5.3    Governmental Approvals .................................................................28
    5.4    No Conflicts .................................................................................28
    5.5    Sufficiency of Funds ......................................................................29
    5.6    Condition of Business......................................................................29

**ARTICLE 6 COVENANTS OF THE PARTIES**............................................................29
    6.1    Conduct Pending the Closing............................................................29

| | | |
|---|---|---|
| 6.2 | Access | 29 |
| 6.3 | Physical Inventory. | 30 |
| 6.4 | Tax Matters | 30 |
| 6.5 | Approvals; Commercially Reasonable Efforts; Notification; Consent | 30 |
| 6.6 | Further Assurances | 31 |
| 6.7 | Bankruptcy Actions and Court Filings | 31 |
| 6.8 | Expense Reimbursement | 32 |
| 6.9 | Preservation of Books and Records | 32 |
| 6.10 | Notification of Certain Matters | 32 |
| 6.11 | Confidentiality | 33 |
| 6.12 | Contractors. | 33 |

**ARTICLE 7 CONDITIONS TO OBLIGATIONS OF THE PARTIES** .......................... **33**

| | | |
|---|---|---|
| 7.1 | Conditions Precedent to Obligations of Buyer | 33 |
| 7.2 | Conditions Precedent to the Obligations of the Sellers | 35 |
| 7.3 | Frustration of Conditions Precedent | 35 |

**ARTICLE 8 TERMINATION** ................................................................ **35**

| | | |
|---|---|---|
| 8.1 | Termination of Agreement | 35 |
| 8.2 | Consequences of Termination | 37 |

**ARTICLE 9 MISCELLANEOUS** ........................................................... **37**

| | | |
|---|---|---|
| 9.1 | Expenses | 37 |
| 9.2 | Assignment | 38 |
| 9.3 | Parties in Interest | 38 |
| 9.4 | Notices | 38 |
| 9.5 | Choice of Law | 39 |
| 9.6 | Entire Agreement; Amendments and Waivers | 39 |
| 9.7 | Counterparts; Electronic Signatures | 39 |
| 9.8 | Severability | 39 |
| 9.9 | Headings | 40 |
| 9.10 | Exclusive Jurisdiction and Specific Performance | 40 |
| 9.11 | WAIVER OF RIGHT TO TRIAL BY JURY | 40 |
| 9.12 | Survival | 40 |
| 9.13 | Time of Essence | 41 |
| 9.14 | Non-Recourse | 41 |
| 9.15 | Disclosure Schedules | 41 |
| 9.16 | Mutual Drafting | 41 |

-ii-

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of May 24, 2020, (the "Agreement Date"), by and among Q'Max America Inc., a company incorporated under the laws of Delaware ("Q'Max"), and Anchor Drilling Fluids USA, LLC, a Delaware limited liability company ("Anchor Drilling" and, together with Q'Max, "Sellers" and each, a "Seller") and QMax Acquisition Corp., a Delaware corporation ("Buyer"). Each Seller and Buyer are referred to herein individually as a "Party" and collectively as the "Parties".

## WITNESSETH:

**WHEREAS**, Sellers have agreed to sell to Buyer, and Buyer has agreed to purchase, the Acquired Assets as of the Closing, and Buyer is willing to assume from Sellers the Assumed Liabilities as of the Closing upon terms and subject to the conditions set forth hereinafter.

**NOW**, **THEREFORE**, in consideration of the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Defined Terms.  As used herein, the terms below shall have the following respective meanings:

"ABL Facility" shall mean the credit agreement (as amended, restated, supplemented or otherwise modified from time to time) dated as of September 6, 2019, by and among Anchor Drilling Fluids USA, LLC, Q'Max America Inc., the lenders party thereto and Encina Business Credit, LLC as agent on behalf of such lenders.

"Accounts Receivable" shall have the meaning specified in Section 2.1(a).

"Acquired Assets" shall have the meaning specified in Section 2.1.

"Affiliate" shall, with respect to any Person, mean any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise. For purposes of this Agreement, Q'Max Solutions Inc. and each of its Subsidiaries (including each of the Sellers), on the one hand, and the Buyer and its Affiliates, on the other hand, shall not be deemed to be Affiliates of each other.

"Agreement" shall mean this Asset Purchase Agreement, together with the exhibits and Disclosure Schedules hereto, in each case as amended, restated, supplemented or otherwise modified from time to time.

"Agreement Date" shall have the meaning specified in the preamble.

"Allocation" shall have the meaning specified in Section 3.4.

"Alternative Transaction" shall mean (i) any investment in, financing of, capital contribution or loan to, or restructuring or recapitalization of the Sellers, (ii) any merger, consolidation, share exchange or other similar transaction to which a Seller or any of its Affiliates is a party that has the effect of transferring, directly or indirectly, all or any portion of the Acquired Assets, or any issuance, sale or transfer of equity interests in, the Sellers, (iii) any direct or indirect sale of all or any portion of the Acquired Assets, (iv) any issuance, sale or transfer of equity interests in, the Sellers or any of their Subsidiaries or (v) any other transaction (other than a liquidation or a plan of liquidation), including a reorganization (in any jurisdiction, whether domestic, foreign, international or otherwise), that transfers or vests ownership of, economic rights to, or benefits in all or a portion of the Acquired Assets, to any party other than Buyer or any of its Affiliates, in each instance, whether or not such transaction is entered into in connection with any bankruptcy, insolvency, arrangement, proposal, receivership or similar Proceedings.

"Anchor Drilling" shall have the meaning specified in the preamble.

"Assignment and Assumption Agreement" means an assignment and assumption agreement, in a form mutually agreed to by the Parties, evidencing the assignment to the Buyer of the Sellers' rights, benefits and interests in, to and under the Assumed Contracts and the assumption by the Buyer of the Assumed Liabilities under the Assumed Contracts.

"Assumed Contracts" means those Leases and Executory Contracts that have been designated by Buyer for assumption and assignment to Buyer by Seller pursuant to Section 2.4 and with respect to which an order has been entered by the Bankruptcy Court (which may be the Sale Order) authorizing the assumption and assignment of the Lease or Executory Contract and an Assumption Notice has been delivered and filed with the Bankruptcy Court. For the avoidance of doubt, "Assumed Contracts" shall not include any Executory Contract or Lease that is excluded and rejected pursuant to Section 2.4.

"Assumed Liabilities" shall have the meaning specified in Section 2.3.

"Assumption Notice" has the meaning set forth in Section 2.4(b).

"Avoidance Actions" means all avoidance claims, causes of action, or rights of recovery under Chapter 5 of the Bankruptcy Code or similar state Laws.

"Bankruptcy Cases" shall mean the jointly administered bankruptcy cases commenced by the Sellers.

"Bankruptcy Code" shall mean title 11 of the United States Code, 11 U.S.C. §101 et seq.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of Texas.

-2-

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the City of New York are not required to open.

"Buyer" shall have the meaning specified in the preamble.

"Buyer's Conditions Certificate" shall have the meaning specified in Section 7.2(d).

"Capital Lease" shall mean, for any Person, a lease of any interest in any kind of property (whether real, personal or mixed) or asset by such Person as lessee that is, should be or should have been recorded as a "capital lease" on the balance sheet of such Person in accordance with GAAP.

"Cash Purchase Price" shall have the meaning specified in Section 3.2(a).

"Chapter 7" means Chapter 7 of the Bankruptcy Code.

"Claim" shall mean all actions, claims, counterclaims, suits, Proceedings, rights of action, causes of action, Liabilities, obligations, losses, damages, remedies, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of investigation, interest, demands and actions of any nature or any kind whatsoever, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract or otherwise, including any "claim" as defined in the Bankruptcy Code.

"Closing" shall have the meaning specified in Section 3.1(a).

"Closing Date" shall have the meaning specified in Section 3.1(a).

"Closing Date Inventory" shall mean the carrying value of the Inventory as of the Closing Date calculated as such Inventory would be recorded on a balance sheet of the Sellers in accordance with GAAP and consistent with past practice.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Conditions Certificate" shall have the meaning specified in Section 7.2(d).

"Consent" shall have the meaning set forth in Section 2.4(e).

"Contract" shall mean any contract, agreement, indenture, note, bond, loan, instrument, lease (including Capital Lease), conditional sales contract, purchase order, mortgage, license, franchise, insurance policy, letter of credit, commitment or other binding arrangement or commitment, whether or not in written form, that is binding upon a Person or any of its property.

"Cure Amounts" has the meaning set forth in Section 2.4(c).

"C&A Grinding Equity Interests" shall have the meaning specified in Section 2.1(x).

"C&A Grinding" shall mean C&A Grinding, LLC, a Georgia limited liability company.

-3-

"Continuing Employees" means those employees set forth on Schedule 1.1(a).

"Designated Contracts" has the meaning set forth in Section 2.4(b).

"Designation Deadline" means 5:00 p.m. (prevailing Eastern time) on the date that is ten (10) days after the Petition Date.

"Disclosure Schedules" shall mean the disclosure schedules, delivered by Sellers and Buyer concurrently with the execution and delivery of this Agreement, as amended from time to time in accordance with and subject to the terms hereof.

"Encina" means Encina Business Credit, LLC.

"Encina Exit Financing Commitment Letter" shall mean an executed commitment letter, in form and substance acceptable to Buyer, pursuant to which Encina shall have agreed to lend at the Closing the amounts set forth therein to Buyer in order to fund, subject to the terms and conditions thereunder, the Regional Business and refinance (or assume on amended terms) the ABL Facility and the financing provided in the New Money Financing Agreement.

"Environmental Law" means any Law relating to pollution, the protection of human health and safety (with respect to exposure to hazardous materials), the environment, natural resources or the release, manufacture, processing, treatment, storage, disposal or handling of, or exposure to, hazardous materials.

"Environmental Liabilities and Obligations" means all Liabilities arising from any impairment, impact or damage to the environment, health or safety, or any failure to comply with Environmental Law, including Liabilities related to: (a) the transportation, storage, use, arrangement for disposal or disposal of, or exposure to, Hazardous Materials; (b) the Release of Hazardous Materials, including migration onto or from the Owned Real Property and Leased Real Property that are Acquired Assets; (c) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (d) any other obligations imposed under Environmental Law including pursuant to any applicable Permits issued pursuant to under any Environmental Law; (e) Orders, notices to comply, notices of violation, alleged non-compliance and inspection reports with respect to any Liabilities pursuant to Environmental Law; and (f) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable Environmental Law.

"ERISA Affiliate" means .any trade or business, whether or not incorporated, that together with the Sellers would be deemed a "single employer" within the meaning of Section 4001(b)(i) of ERISA.

"Excluded Assets" shall have the meaning specified in Section 2.2.

"Excluded Contract" has the meaning set forth in Section 2.4(b).

"Excluded Liabilities" shall have the meaning specified in Section 2.5.

-4-

"Executory Contract" means a Contract to which one or more of the Sellers are party that is subject to assumption or rejection under sections 365 of the Bankruptcy Code, other than the Leases.

"Expense Reimbursement" shall mean the documented actual out-of-pocket costs, fees and expenses incurred by Buyer or its Affiliates in connection with the negotiation, documentation and implementation of this Agreement, the Transaction Documents, and the transactions contemplated thereby.

"GAAP" shall mean generally accepted accounting principles as in effect from time to time in the United States.

"Governmental Entity" shall mean any federal, state, provincial, local, municipal, domestic, foreign, multinational, international or other (a) government, (b) governmental or quasi-governmental authority of any nature (including any governmental agency, ministry, branch, department, official, or entity and any court or other tribunal), or (c) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, prosecutorial, police, regulatory, or Tax Authority or power of any nature, including any arbitration tribunal or stock exchange.

"Guarantee" by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing, or having the economic effect of guaranteeing, any Indebtedness of any other Person (the "Primary Obligor") in any manner, whether directly or indirectly, and including, without limitation, any obligation of such Person: (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness; (ii) to purchase property, securities or services for the purpose of assuring the holder of such Indebtedness of the payment of such Indebtedness; or (iii) to maintain working capital, equity capital or other financial statement condition or liquidity of the Primary Obligor so as to enable the Primary Obligor to pay such Indebtedness (and "Guaranteed," "Guaranteeing" and "Guarantor" shall have meanings correlative to the foregoing).

"Hazardous Material" means any substance, material or waste which is regulated by any Governmental Entity, including petroleum and its by-products, asbestos, polychlorinated biphenyls and any material, waste or substance which is defined or identified as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under or subject to any provision of Environmental Law.

"Horseheads Warehouse" shall mean that certain warehouse leased by the Sellers located at 124 Wygant Road, Building B, Horseheads, New York 14845.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by (or which customarily would be evidenced by) bonds, debentures, notes or similar instruments, (c) all reimbursement obligations of such Person with respect to letters of credit and similar instruments, (d) all obligations of such Person under conditional sale or other

OMM_US:77874592.25

title retention agreements relating to property or assets purchased by such Person, (e) all obligations of such Person incurred, issued or assumed as the deferred purchase price of property other than accounts payable incurred and paid on terms customary in the business of such Person (it being understood that the "deferred purchase price" in connection with any purchase of property or assets shall include only that portion of the purchase price which shall be deferred beyond the date on which the purchase is actually consummated), (f) all obligations secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all obligations of such Person under forward sales, futures, options and other similar hedging arrangements (including interest rate hedging or protection agreements), (h) all obligations of such Person to purchase or otherwise pay for merchandise, materials, supplies, services or other property under an arrangement which provides that payment for such merchandise, materials, supplies, services or other property shall be made regardless of whether delivery of such merchandise, materials, supplies, services or other property is ever made or tendered, (i) all guaranties by such Person of obligations of others, (j) all Capital Lease obligations of such Person and (k) any obligations of such Person Guaranteeing or intended to Guarantee (whether directly or indirectly Guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness of such other Person under any of clauses (a) through (j) above.

"Interim Period" shall have the meaning specified in Section 6.1.

"Intellectual Property" means all intellectual property and industrial property, throughout the world, whether or not registerable, patentable or otherwise formally protectable, and whether or not registered, patented, otherwise formally protected or the subject of a pending application for registration, patent or any other formal protection, including all (i) trade-marks, corporate names and business names currently or formerly used in connection with the Regional Business, including, the "Q'Max America" and "Anchor Drilling Fluids" names and brands, (ii) inventions, (iii) works and subject matter in which copyright, neighboring rights or moral rights subsist, (iv) industrial designs, product designs, patents and design rights (v) know-how, trade secrets, proprietary information, confidential information and information of a sensitive nature that have value to the Regional Business or relate to business opportunities for the Regional Business, in whatever form communicated, maintained or stored, (vi) telephone numbers and facsimile numbers, (vii) registered domain names, and (viii) social media usernames and other internet identities and all account information relating thereto.

"Inventory" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts), stock-in-trade and merchandise related to the Regional Business maintained or held by, stored by or on behalf of, or in transit to, any Seller.

"Knowledge" shall mean, with respect to any Seller, the actual knowledge of Rafael Andres Diaz-Granados, Chris Pennington, Celina Carter and Eric Glover after reasonable and due inquiry.

"Law" shall mean any federal, state, provincial, municipal, local, foreign, international or multinational constitution, statute, law, ordinance, regulation, rule, code, by-law, Order, principle

-6-

of common law or equity, or decree enacted, promulgated, issued, enforced or entered by any Governmental Entity, or court of competent jurisdiction, or other requirement or rule of law.

"Lease" shall have the meaning set forth in Section 4.4(a).

"Leased Real Property" means all of the real property leased, subleased, used or occupied by any Seller, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Regional Business.

"Leetsdale Warehouse" shall mean that certain warehouse and office building leased by the Sellers located at 545 W. Park Road, Leetsdale, Pennsylvania 15056.

"Liabilities" shall mean, as to any Person, all debts, adverse Claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether accrued or unaccrued, vested or otherwise, liquidated or unliquidated, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"License Agreement" shall mean that certain Exclusive License Agreement by and between Q'Max Solutions Inc. and Q'Max, dated May 22, 2020 pursuant to which Q'Max was granted a license to certain Intellectual Property Rights as set forth thereunder.

"Licensor" shall mean Q'Max Solutions Inc.

"Lien" shall mean (i) any claim, Liability, prior claim, right of retention, lien, security interest, floating charge, mortgage, pledge option, deed assignments, conditional sale, warrant, adverse claim, charge (including court-ordered charge), easement, right-of-way, encroachment, defect of title, hypothec, trust debenture, deemed trust (statutory or otherwise), judgment, writ of seizure or execution, notice of sale, restriction on transfer, contractual right (including purchase option, right of first refusal, rights of first offer or any other pre-emptive contractual right), restriction on use or encumbrance, whether imposed by agreement, law, equity or otherwise and whether or not registered, published or filed and whether secured, unsecured or otherwise, and (ii) without limiting the foregoing clause (i), "Lien", as such term is defined pursuant to section 101(37) of the Bankruptcy Code.

"Material Contracts" means, collectively, those contracts that are in the opinion of the Buyer, necessary and essential to the operation of the Regional Business as listed and specified as "Material Contracts" on Schedule 2.4(b)(i).

"Midland Drilling Fluids Business" means the drilling and completion fluids, chemical additives, and fluid engineering services provided by Sellers in the Permian basin. For the avoidance of doubt, the Midland Solid Control Warehouse and the assets located at, and the operations conducted at, the Midland Solid Control Warehouse shall not be deemed to be included in this definition of Midland Drilling Fluids Business.

-7-

"Midland Solid Control Warehouse" shall mean that certain warehouse leased by the Sellers located at 2106 East Country Road 120, Midland, Texas 79706.

"New Money Financing Agreement" means a senior secured superpriority credit agreement or note and any documents or instruments related thereto, to be entered into by Sellers and Encina and/or any other Post-Petition Lenders (including Palladium Fund IV or its Affiliates), in each case, in form and substance satisfactory to Buyer.

"Newcomerstown Warehouse" shall mean those certain warehouses and buildings leased by the Sellers located at 1122 West State Street, Newcomerstown, Ohio 43832 and 200 Enterprise Drive, Newcomerstown, Ohio 43832.

"Notices" shall have the meaning specified in Section 9.4.

"Officer's Certificate" shall have the meaning specified in Section 7.1(e).

"Operating Order" shall mean an order granting Trustee's emergency motion to approve the Trustee's authority to continue to operate the Regional Business, in form and substance acceptable to Buyer.

"Order" shall mean any judgment, order, injunction, writ, ruling, decree, stipulation, determination, decision, verdict, or award of any Governmental Entity.

"Ordinary Course of Business" shall mean that an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if that action is taken in the ordinary course of business of such Person, consistent with past practices.

"Owned Real Property" shall have the meaning set forth in Section 4.4(b).

"Party" or "Parties" shall have the meaning specified in the preamble.

"Permits" shall mean permits, licenses, registrations, certificates of occupancy, approvals, consents, clearances, directives, orders, variances, registrations, rights, privileges, concessions and other authorizations issued, granted, conferred or otherwise created by any Governmental Entity.

"Permitted Liens" shall mean: (a) Liens for Taxes not yet due and payable or which are being contested in good faith by appropriate Proceedings and for which an adequate reserve has been established by Sellers; (b) statutory liens of landlords, carriers, warehousemen, mechanics, and materialmen incurred in the Ordinary Course of Business for sums not yet due; (c) liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security; or (d) liens or encumbrances that arise solely by reason of acts of Buyer or its successors and assigns or otherwise consented to by Buyer in accordance with the terms of this Agreement.

"Person" shall mean an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

-8-

"Petition Date" shall mean the date the Bankruptcy Cases are commenced by the Sellers.

"Phase I Reports" shall have the meaning specified in Section 7.1(h).

"Post-Closing Covenant" shall have the meaning specified in Section 9.12.

"Post-Petition Financing Order" shall mean interim and final orders granting a motion by the Trustee pursuant to U.S.C. §§ 105, 361 and 364 and Federal Bankruptcy Rules 2002, 4001 and 994 seeking authorization for the Trustee to incur post-petition secured Indebtedness and approving the New Money Financing Agreement which shall be in form and substance acceptable to Buyer.

"Post-Petition Lenders" means Encina and any other lender under the New Money Financing Agreement.

"Post-Petition Trade Payables" shall mean the amount of Trade Payables of the Sellers relating to the Regional Business that were incurred from and after the Petition Date that are outstanding as of the Closing Date.

"Pre-Closing Taxes" means any Liability for any Tax of or owed with respect to the Acquired Assets allocable for a taxable period (or portion thereof) ending on or before the Closing Date. In the case of any Taxes imposed on the Acquired Assets for a taxable period that begins before and ends after the Closing Date, Pre-Closing Taxes shall equal (i) in the case of any Taxes other than the Taxes based upon or related to income or receipts, the amount of such Tax for the entire Tax period multiplied by a fraction the numerator of which is the number of days in the Tax period ending on the Closing Date and the denominator of which is the number of days in the entire Tax period; and (ii) in the case of any Tax based upon or related to income or receipts be deemed equal to the amount which would be payable if the relevant Tax period ended on the Closing Date.

"Previously Omitted Contract" shall have the meaning specified in Section 2.4(b)(i).

 "Proceeding" shall mean any action, arbitration, audit, known investigation (including a notice of preliminary investigation or formal investigation), notice of violation, hearing, litigation or suit (whether civil, criminal or administrative), other than the Bankruptcy Case, commenced, brought, conducted or heard by or before any Governmental Entity, including but not limited to any and all such actions related to restitution or remission in criminal proceedings and civil forfeiture and confiscation proceedings under the Law of any jurisdiction.

"Property and Casualty Insurance Policies" shall mean the policies set forth in Schedule 1.1(b).

"Property Tax Holdback Amount" means $380,000 (Three Hundred Eighty Thousand Dollars).

Property Taxes" shall mean all personal property Taxes and similar ad valorem Taxes.

-9-

"Purchase Price" shall have the meaning specified in Section 3.2(b).

"Q'Max" shall have the meaning specified in the preamble.

"Regional Business" shall have the meaning specified in Section 2.1.

"Regional Business Warehouses" means, collectively, the Midland Solid Control Warehouse, the Wellsville Warehouse, the Horseheads Warehouse, the Leetsdale Warehouse and the Newcomerstown Warehouse.

"Release" means any actual or threatened release, spill, emission, leaking, pumping, pouring, emptying, dumping, injection, deposit, disposal, discharge, dispersal or leaching into the indoor or outdoor environment, or including migration to or from a property, including but not limited to any Owned Real Property or Leased Real Property.

"Remedial Action" means all actions to (a) investigate, clean up, remove, treat or in any other way address any Hazardous Material; (b) prevent the Release of any Hazardous Material; (c) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (d) to correct or abate a condition of noncompliance with Environmental Laws.

"Representative" shall mean, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, consultant, other advisor, agent, representative or expert retained by or acting on behalf of such Person or its Subsidiaries).

"Sale Motion" shall mean a motion, in form and substance acceptable to the Buyer, seeking entry of an order approving this Agreement and the Transactions.

"Sale Order" shall mean an Order of the Bankruptcy Court approving the Sale Motion, which Order shall be in form and substance acceptable to Buyer.

"Seller" or "Sellers" shall have the meaning specified in the preamble and shall include any Trustee appointed to act on behalf of Sellers.

"Subsidiary" shall mean, with respect to any Person (a) a corporation, a majority of whose capital stock with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such Person, by a subsidiary of such Person, or by such Person and one or more subsidiaries of such Person, (b) a partnership in which such Person or a subsidiary of such Person is, at the date of determination, a general partner of such partnership, or (c) any other Person (other than a corporation) in which such Person, a subsidiary of such Person or such Person and one or more subsidiaries of such Person, directly or indirectly, at the date of determination thereof, has (i) at least a majority ownership interest thereof or (ii) the power to elect or direct the election of a majority of the directors or other governing body of such Person.

"Target Inventory" shall mean $9,000,000 (Nine Million Dollars).

-10-

"Tax" or "Taxes" shall mean (a) any and all taxes, assessments, levies, duties or other governmental charge imposed by any Governmental Entity, including any income, alternative or add-on minimum, accumulated earnings, franchise, capital stock, unclaimed property or escheatment, environmental, profits, windfall profits, gross receipts, sales, use, value added, transfer, registration, stamp, premium, excise, customs duties, severance, real property, personal property, ad valorem, occupancy, license, occupation, employment, payroll, social security, disability, unemployment, withholding, corporation, inheritance, value added, stamp duty reserve, estimated or other tax, assessment, levy, duty (including duties of customs and excise) or other governmental charge of any kind whatsoever, including any payments in lieu of taxes or other similar payments, chargeable by any Tax Authority together with all penalties, interest and additions thereto, whether disputed or not and (b) any liability in respect of any of the items described in clause (a) payable under a tax sharing allocation, indemnity or similar agreement or by reason of successor, transferee, or other liability, by contract, operation of law, or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereto or any analogous or similar provision of state, local or foreign Law).

"Tax Authority" shall mean any taxing or other authority (whether within or outside the U.S.) competent to impose Tax.

"Tax Escrow Amount" shall mean $11,000 (Eleven Thousand Dollars).

"Tax Return" shall mean any and all returns, declarations, reports, documents, Claims for refund, or information returns, statements or filings which are supplied or required to be supplied to any Tax Authority or any other Person, including any schedule or attachment thereto, and including any amendments thereof.

"Top Customers" shall have the meaning specified in Section 4.6(b)(i).

"Top Suppliers" shall have the meaning specified in Section 4.6(a)(i)

"Trade Payables" shall mean those accounts payable owned to the Sellers' vendors for Inventory-related goods.

"Transaction Documents" shall mean this Agreement and any agreement, instrument or other document entered into pursuant to the terms hereof, including the Assignment and Assumption Agreement.

"Transactions" shall mean the transactions contemplated by this Agreement, including the purchase and sale of the Acquired Assets as provided for in this Agreement.

"Transfer Tax" or "Transfer Taxes" shall mean any sales, use, transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

-11-

"Trustee" shall mean the trustee appointed by the United States Trustee in the Bankruptcy Cases.

"Trustee's Conditions Certificate" shall have the meaning set forth in Section 7.1(d).

"Trustee's Operation Orders" shall mean the Post-Petition Financing Order and the Operating Order.

"WARN Act" means the United States Worker Adjustment and Retraining Notification Act, and the rules and regulations promulgated thereunder.

"Wellsville Warehouse" shall mean that certain warehouse leased by the Sellers located at 2400 Clark Avenue, Wellsville, Ohio 43968.

1.2    Interpretation.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)    Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(c)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(d)    A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(e)    All references to "$" and dollars shall be deemed to refer to United States currency.

(f)    All references to any financial or accounting terms shall be defined in accordance with GAAP.

(g)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Disclosure Schedule and exhibit references are to this Agreement unless otherwise specified. All article, section, paragraph, schedule and exhibit references used in this Agreement are to articles, sections and paragraphs of, and schedules and exhibits to, this Agreement unless otherwise specified.

(h)    The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the

-12-

reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day. All references herein to time are references to New York City time, unless otherwise specified herein.

(j)     If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

(k)     A reference to any agreement or document (including a reference to this Agreement) is to the agreement or document as amended or supplemented, except to the extent prohibited by this Agreement or that other agreement or document.

(l)     Exhibits, Schedules and Annexes to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

## ARTICLE 2
## ACQUIRED ASSETS AND ASSUMPTION OF LIABILITIES

2.1     <u>Assets to be Acquired</u>. Subject to the granting of the Sale Order, and the terms and conditions of this Agreement and the Sale Order, at the Closing, the Sellers shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase and acquire from the Sellers, all of Sellers' right, title and interest, free and clear of all Liens (except for Liens supporting the Assumed Liabilities described in <u>Section 2.3(a)</u> and other Permitted Liens expressly set forth in the Sale Order), in each and all of the assets, properties and rights of Sellers used in the Sellers' business of (i) providing drilling and completion fluids, chemical additives, solids control services and equipment, waste management services and equipment, fluid engineering services and other products and services in the northeastern United States and (ii) providing solids control services and equipment in the Permian basin, in support of oil and gas drilling (the "<u>Regional Business</u>"), including, without limitation, all assets located at or used in the operations of the Sellers at the Regional Business Warehouses, and the following as of the Closing but excluding the Excluded Assets (collectively, the "<u>Acquired Assets</u>"):

(a)     all accounts receivable, notes receivable, bill receivables, trade accounts, hold backs, retention, book debts, insurance claims, negotiable instruments, chattel paper (including without limitation, completed work which has not yet been billed) and other receivables (including, without limitation, in respect of goods shipped, products sold, licenses granted, services rendered or otherwise and all amounts that may be returned or returnable with respect to letters of credit or other financial collateral drawn down prior to the closing of the transaction) from third parties, together with any unpaid financing charges accrued thereon, in each instance, of the Sellers (whether or not related to the Regional Business) (collectively, the "<u>Accounts Receivable</u>");

(b)     all Intellectual Property used in the Regional Business (provided that, with respect to the Intellectual Property rights granted to Q'Max under the License Agreement, only to the extent such Intellectual Property Rights were granted to Q'Max under the License Agreement) including, without limitation, the Intellectual Property set forth on <u>Schedule 2.1(b)</u>;

-13-

(c)     all tangible assets, including all equipment, machinery, industrial and motor vehicles, trailers, fixtures, furniture and other tangible property, including all such property that is damaged and all attachments, appliances, fittings, gas and oil burners, chemical products, motors, pumps, tanks, tools, manifolds, systems, blowers, molds, dies, tooling, lighting fixtures, signs, doors, cabinets, partitions, mantels, screens, plumbing, heating, air conditioning, refrigerators, freezers, refrigerating and cooling systems, waste disposal and storing, wiring, electrical systems, telephones, televisions, monitors, security systems, racks, ovens, stoves, carpets, floor coverings, wall coverings, office equipment, kitchen appliances, computers (including point-of-sale terminals and systems), software, registers and safes, trash containers, meters and scales, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements, in each instance, used in the operation of the Regional Business;

(d)     all Inventory and goods related to the Regional Business now owned or hereinafter acquired, wherever located, including raw materials, work in process, finished goods, supplies, parts, subassemblies or material used or consumed in the operation of the Regional Business maintained or held by, stored by or on behalf of, or in transit to, any of the Sellers;

(e)     all goodwill, payment intangibles and general intangible assets and rights of Sellers to the extent associated with the Regional Business or the Acquired Assets;

(f)     all cash and cash equivalents relating to the Regional Business other than the Cash Purchase Price;

(g)     all deposits (including, without limitation, customer deposits and security deposits (whether held in trust or otherwise) for rent, electricity, telephone or otherwise), advances, prepayments, rights in respect of promotional allowances, vendor rebates and other refunds, Claims, causes of action, rights of recovery, rights under warranties and guaranties, rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), and the right to receive and retain mail, accounts receivable payments and other communications of the Sellers, in each instance, relating to the Regional Business;

(h)     all customer lists, data, and information (including all lists of current and past customers of each Seller), and any and all information relating thereto (including personal information, such as name, address, telephone number, email address, website and any other database information), and customer purchase history of the Regional Business;

(i)     all right of publicity and all similar rights, including, all commercial merchandising rights used in the Regional Business;

(j)     all real estate leased by either of the Sellers as a lessee, sub-lessee or assignee and covered by an Assumed Contract or owned by either of the Sellers, in each case together with all interests in and to all improvements and fixtures located thereon or attached thereto (including all warehouses, offices and plants and other tangible and intangible property located thereon), and other appurtenances thereto, and rights in respect thereof, in each case, used in the operation of the Regional Business, including the properties listed on Schedule 2.1(j);

-14-

(k)     all Assumed Contracts;

(l)     all of Sellers' deposits, advances or prepaid expenses relating to any of the Assumed Contracts;

(m)     all documents (including books and records) of the Regional Business, including all financial, marketing and business data, pricing and cost information, business and marketing plans and other information, files, correspondence, records, data, plans, engineering, reports and recorded knowledge, historical trademark files, prosecution files of the Sellers in whatever media retained or stored, including computer programs and disks, in each case of the Regional Business; including files in the possession of Sellers, in each case, to the extent reasonably available, not subject to claims of solicitor-client or attorney-client privilege, and otherwise permitted by applicable Law;

(n)     to the extent applicable, all certificates of title and other documentation necessary to convey or otherwise evidence title to the equipment included in the Acquired Assets;

(o)     all personnel files for Continuing Employees except as prohibited by Law;

(p)     all Permits used in the operation of the Regional Business to the extent transferable;

(q)     all rights under or arising out of all insurance policies relating to the Regional Business (including, without limitation, returns and refunds of any premiums paid, or other amounts due back to the Sellers, with respect to cancelled policies, all proceeds received on or after closing and all proceeds received prior to closing in connection with casualty events involving tangible Acquired Assets);

(r)     any claim, right or interest in and to all (or the benefit of all to the extent not assignable) Tax refunds, rebates, abatements, credits and similar items received in or relating to any period, or portion of any period, beginning on or after the Closing Date or any Tax Return, relating to the Regional Business received after the Closing Date;

(s)     causes of action, lawsuits, judgments, Claims and demands of any nature, whether arising by way of counterclaim or otherwise, in each case to the extent arising from the Acquired Assets or the Assumed Liabilities;

(t)     all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of the Sellers or with third parties relating to the Regional Business;

(u)     all rights under or pursuant to all warranties, representations and guarantees made by vendors, suppliers, manufacturers, contractors and any other Person to the extent relating to products sold, or services provided, to the Sellers in connection with the Regional Business or to the extent affecting any Acquired Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

-15-

(v)     all sales and promotional materials, catalogues and advertising literature used in the Regional Business;

(w)     all of Sellers' equity interests, or securities convertible into, exchangeable or exercisable for equity interests, in C&A Grinding and all related rights of Sellers with respect thereto (the "C&A Grinding Equity Interests");

(x)     all Avoidance Actions available to Sellers related to the Regional Business and all Claims and causes of action of Sellers as of the Petition Date and as of Closing against any insider (as such term is defined in section 101(31) of the Bankruptcy Code (regardless of whether or not such claims and causes of action have been asserted by Sellers) including rights of set-off and rights of recoupment, refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Sellers against any equityholders or officers, managers, directors or employees of Sellers; and

(y)     all other assets, properties, interests, privileges and rights used in the Regional Business wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP (including any assets acquired by Sellers after the date hereof but prior to Closing).

2.2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, assign, transfer or deliver to Buyer, and in no event will Buyer be deemed to purchase and acquire from Sellers the following assets, properties, interests and rights of Sellers (collectively, the "Excluded Assets"):

(a)     assets, properties, interests and rights of Sellers exclusively used in the Midland Drilling Fluids Business;

(b)     Sellers' rights under the Transaction Documents;

(c)     all benefit plans and collective bargaining agreements, if any;

(d)     other than the C&A Grinding Equity Interests, all shares of capital stock or other equity interests issued by any Seller or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests;

(e)     all books and records of Sellers that are not related to the Regional Business;

(f)     all Tax Returns, received before the Closing Date and relating to a period ending prior to the Closing Date; and

(g)     any Contract to which any Seller or Subsidiary of any Seller is party or is otherwise bound that are not Assumed Contracts.

2.3     Liabilities to be Assumed by Buyer.  Subject to the granting of the Sale Order, and the terms and conditions of this Agreement and the Sale Order, at the Closing, the Sellers shall assign to Buyer, and Buyer shall assume from the Sellers and pay when due, perform and

-16-

discharge, in due course, without duplication, only the Assumed Liabilities.  "Assumed Liabilities" shall mean solely the following Liabilities:

(a)     all Liabilities of the Sellers under the ABL Facility and the New Money Financing Agreement on the terms and conditions set forth in the Encina Exit Financing Commitment Letter;

(b)     any Cure Amounts under Assumed Contracts; and

(c)     all Liabilities first arising from or after the Closing (i) as a direct result of the ownership or operation of any of the Acquired Assets, and (ii) under the Assumed Contracts as a result of the assumption by the Buyer of such Assumed Contracts.

2.4     Assignment and Assumption of Contracts.

(a)     The Sale Order shall provide for the assumption by Sellers, and the assignment to the extent legally capable of being assigned by Sellers to Buyer, of the Designated Contracts pursuant to section 365 of the Bankruptcy Code on the terms and conditions set forth in the remainder of this Section 2.4.  At Buyer's request, and at Buyer's sole cost and expense, Sellers shall reasonably cooperate from the date hereof forward with Buyer as reasonably requested by Buyer (i) to allow Buyer to enter into an amendment of any Lease upon assumption of such Lease by Buyer (and Sellers shall reasonably cooperate with Buyer to the extent reasonably requested by Buyer in negotiations with the landlords thereof), or (ii) to otherwise amend any Lease to the extent such amendments would not adversely affect any Seller; provided that Sellers shall not be required to enter into any such amendment if such amendment would result in an assumption by any Seller of such Lease, unless such Lease will be assigned to Buyer at the time of such assumption.

(b)     Attached hereto as Schedule 2.4(b) is a list, which list may be changed by the Buyer in its sole discretion by adding or removing Executory Contracts or Leases or moving Executory Contracts or Leases between subpart (i) and subpart (ii), from time to time, prior to the Designation Deadline, identifying the Executory Contracts and Leases that Buyer has decided will be assumed and assigned to Buyer on the Closing Date (the Executory Contracts and Leases listed as of the Designation Deadline, the "Designated Contracts").  Subpart (i) of Schedule 2.4(b) identifies Material Contracts that are also Designated Contracts and subpart (ii) of Schedule 2.4(b) identifies Designated Contracts other than Material Contracts.  In connection with the serving of the Sale Motion, the applicable Seller shall file with the Bankruptcy Court and serve notice by first class mail on all non-debtor counterparties to all Designated Contracts (such notice, an "Assumption Notice"), and provide a copy of the same to Buyer, and at the Closing shall assume and assign to, and Buyer shall accept the assignment of and assume such Executory Contract or Lease. In connection with the serving of the Sale Motion, the applicable Seller shall file a notice of rejection as of the Closing Date of every Executory Contract and Lease that is not a Designated Contract ("Excluded Contracts").  The Assumption Notice and the notice of rejection of Excluded Contracts shall be in form and substance acceptable to the Buyer.

(c)     In connection with the assumption and assignment to Buyer of any Designated Contract that is executory pursuant to this Section 2.4, the cure amounts, as determined

-17-

by the Bankruptcy Court, if any (such amounts, the "Cure Amounts"), necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Designated Contracts, including any amounts payable to any landlord under any Lease that is a Designated Contract that relates to the period prior to the delivery of an Assumption Notice with respect thereto, shall be paid by Buyer within ten (10) Business Days after the Closing.

(d)     Sellers shall use their respective reasonable best efforts to obtain one or more orders of the Bankruptcy Court, which order(s) shall be in form and substance reasonably acceptable to Buyer, and shall reflect the terms and conditions set forth herein, to assume and assign the Designated Contracts to Buyer on the terms set forth in this Section 2.4.

(e)     The Parties shall use their commercially reasonable efforts, and cooperate with each other to obtain any counterparty or third party consent ("Consent") that is required to assume and assign to Buyer any Designated Contract; provided, however, that none of the Parties or any of their respective Affiliates shall be required to pay any consideration therefor other than filing, recordation or similar fees, which shall be borne by Buyer. To the extent that any such Consent is not obtained by the Closing Date, the applicable Seller so long as it is in existence, shall use reasonable best efforts (at Buyer's sole cost) during the term of such Designated Contract to (i) provide to Buyer the benefits under such Designated Contract, (ii) cooperate in any reasonable and lawful arrangement, including holding such Designated Contract in trust for Buyer pending receipt of the required Consent, designed to provide such benefits to Buyer and (iii) enforce for the account of Buyer any rights of such Seller under such Designated Contract, including the right to elect to terminate such Designated Contract in accordance with the terms thereof upon the written direction of Buyer. Buyer shall reasonably cooperate with Sellers in order to enable Sellers to provide to Buyer the benefits contemplated by this Section 2.4(e).

(f)     Notwithstanding the foregoing, a Contract shall not be a Designated Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller in accordance with the terms hereof, deemed rejected under Section 365 of the Bankruptcy Code, or terminated by the other party thereto or terminates or expires in accordance with its terms on or prior to the Designation Deadline and is not continued or otherwise extended prior to or upon assumption and assignment, or (ii) requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the assumption and assignment by Seller to Buyer of such Contract pursuant to Section 365 of the Bankruptcy Code, and no such Consent has been obtained prior to the Closing. In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

2.5     Excluded Liabilities.  Notwithstanding anything in this Agreement to the contrary, Buyer shall not and does not assume, and shall be deemed not to have assumed and shall not be obligated to pay, perform, discharge or in any other manner be liable or responsible for any Liabilities of the Sellers or any predecessors of Sellers that are not Assumed Liabilities, whether existing on the Closing Date or arising thereafter, whether absolute, accrued, contingent or otherwise, whether due or to become due, known or unknown, matured or unmatured, direct or

-18-

indirect, and Sellers shall be solely and exclusively liable for any and all such Liabilities, including, without limitation, Liabilities relating to or arising out of any of the following (collectively, the "Excluded Liabilities"):

(a)     all Liabilities arising with respect to or relating to any of the Excluded Assets, whether before, on or after the Closing;

(b)     all Liabilities of Sellers for Indebtedness (including any intercompany Indebtedness among the Sellers and their Affiliates) except as expressly set forth in Section 2.3(a);

(c)     any Liability for (i) Taxes of Sellers or their Affiliates; (ii) any Pre-Closing Taxes, including all Liabilities related to Property Taxes imposed upon or assessed directly against the Acquired Assets attributable to the period before the Closing Date; (iii) Taxes relating to the Excluded Assets or any other Excluded Liability, in each instance, for any period; and (iv) any Transfer Taxes;

(d)     all Liabilities of Sellers in respect of or relating to any Contract to which any Seller is party or is otherwise bound that are not Assumed Contracts and all Liabilities arising out of the rejection of any Excluded Contracts by Sellers;

(e)     all Liabilities incurred or to be incurred by Sellers in connection with negotiation, entry into and consummation of the transactions contemplated by the Transaction Documents, including the consummation of the Transactions and any "success" fees, change of control payments and any other payment obligations of Sellers payable as a result of the consummation of the Transactions and the documents delivered in connection herewith;

(f)     all Liabilities of Sellers to its equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise, and any liability of Sellers pursuant to any Contract with an Affiliate of Sellers;

(g)     all Liabilities arising out of or relating to any business or property formerly owned or operated by any of the Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by any of the Sellers;

(h)     all Liabilities relating to Claims, actions, suits, arbitrations, litigation matters, Proceedings or investigations (in each case whether involving private parties, Governmental Entities, or otherwise) involving, against, or affecting any Seller, Acquired Asset, the Regional Business, or any assets or properties of Sellers;

(i)     all Liabilities arising under Environmental Laws;

(j)     all accounts payable Liabilities;

(k)     Liabilities with respect to employment or other provision of services, compensation, severance, benefits or payments of any nature owed to any current or former employee, officer, director, member, partner or independent contractor of any Seller or any ERISA Affiliate (or any beneficiary or dependent of any such individual), whether or not employed by

-19-

Buyer or any of its Affiliates after the Closing, that (i) arises out of or relates to the employment, service provider or other relationship between any Seller or ERISA Affiliate and any such individual, including but not limited to the termination of such relationship, (ii) arises out of or relates to any benefit plan or (iii) arises out of or relates to events or conditions occurring on or before the Closing Date;

(l)     all Liabilities with respect to any terminated employees with respect to sections 601 through 608 of ERISA and section 4980B of the IRC (also known as "COBRA");

(m)     all Liabilities (x) related to the WARN Act, to the extent applicable, with respect to the termination of employment of Sellers' employees and (y) with respect to the termination of employment of the company "insiders" (as such term is defined under the Bankruptcy Code);

(n)     all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Sellers or any other Person in connection with this Agreement or the administration of the Bankruptcy Case (including all fees and expenses of professionals engaged by the Sellers or any of their Affiliates) and administrative expenses and priority Claims accrued through the Closing Date and all post-closing administrative wind-down expenses of the Sellers pursuant to the Bankruptcy Code;

(o)     drafts or checks outstanding at the Closing that have been issued by the Sellers;

(p)     all Liabilities under any futures contracts, options on futures, swap agreements or forward sale agreements;

(q)     all Liabilities to any broker, investment banker, sale advisor, finder or agent or similar intermediary for any broker's fee, finders' fee or similar fee or commission relating to the Transactions; and

(r)     any and all other Liabilities, other than the Assumed Liabilities.

2.6     <u>Withholding</u>.  Buyer and its Affiliates shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement such amounts as they reasonably determine that they are required to deduct and withhold with respect to the making of such payment under the Code and any provision of state, local or non-U.S. Tax Laws. To the extent that amounts are so withheld and paid over to the applicable Tax Authorities, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person entitled to receipt of such payment.

## ARTICLE 3
## CLOSING; CASH PURCHASE PRICE

3.1     <u>Closing; Transfer of Possession; Certain Deliveries</u>.

(a)     The consummation of the Transactions (the "Closing") shall take place on the second Business Day after the satisfaction of all of the conditions set forth in Article 7 (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or the waiver thereof at the Closing by the Party entitled to waive that condition) or on such other date as the Parties hereto shall mutually agree.  The Closing shall be held by electronic exchange of executed documents.  The actual date of the Closing is herein called the "Closing Date".

(b)     At the Closing, Sellers shall deliver, or cause to be delivered to Buyer:

(i)     the Trustee's Conditions Certificate;

(ii)     the Officer's Certificate;

(iii)     a duly executed bill of sale, in a form mutually agreed to by the Parties, transferring the Acquired Assets to Buyer;

(iv)     one or more Assignment and Assumption Agreements in form and substance mutually acceptable to the Parties;

(v)     a copy of each Sale Order;

(vi)     such other assignments and other instruments of transfer or conveyance as Buyer may reasonably request or as may otherwise be necessary to evidence and effect sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer and assumption of Assumed Liabilities by Buyer; and

(vii)     an affidavit prepared in accordance with Treasury Regulations Sections 1.1445-2 and dated as of the Closing Date attesting that each Seller is not a foreign person, provided, however, that if Buyer does not receive a properly executed affidavit, as described above, from any Seller then Buyer shall be permitted to withhold from any payments to be made pursuant to this Agreement to such Seller any required withholding Tax under Section 1445 of the Code as determined by Buyer and any such amounts withheld shall be treated for all purposes of this Agreement as having been paid to Seller.

(c)     At the Closing, Buyer shall deliver to Sellers:

(i)     a cash payment by wire transfer of immediately available funds to an account set forth by Sellers of an aggregate amount equal to (A) the Cash Purchase Price minus (B) the Deposit minus (C) the Tax Escrow Amount minus (D) the Property Tax Holdback Amount;

(ii)     to the extent payable on Closing, evidence that Cure Amounts (if any) in respect of each Assumed Contract have been paid in accordance with the consent of the applicable counterparty or as otherwise agreed upon by the Buyer and such counterparty;

(iii)     the Buyer's Conditions Certificate;

-21-

(iv) a duly executed Assignment and Assumption Agreement; and

(v) such other assignments and other instruments of transfer or conveyance as Sellers may reasonably request or as may otherwise be necessary to evidence and effect the sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer and assumption of Assumed Liabilities by Buyer.

(d) At the Closing, Buyer shall deliver to the Trustee the Tax Escrow Amount to be held in trust for the payment of any Transfer Taxes payable in connection with the Transactions. If any funds remain in the Tax Escrow Amount following the full satisfaction of the obligations set forth in the immediately preceding sentence, such amounts shall be released by the Trustee to the Sellers.

(e) At the Closing, Buyer shall deliver to each Continuing Employee an offer letter offering such Continuing Employee employment with the Buyer or one of its Affiliates.

(f) At the Closing, Buyer shall deliver to Encina a duly executed waiver letter, waiving any Claims Buyer may have acquired pursuant to Section 2.1(x) to the extent such Claims are against Encina.

(g) At the Closing, Buyer shall deduct from the Cash Purchase Price and hold in trust the Property Tax Holdback Amount, pursuant to Section 3.1(c)(i), for the payment by the Buyer of any accrued and unpaid Property Taxes imposed upon or assessed directly against the Acquired Assets allocable for a taxable period (or portion thereof) ending on or before the Closing Date. If any portion of the Property Tax Holdback Amount remains following the full payment of the obligations set forth in the immediately preceding sentence, such remaining portion shall be delivered by the Buyer to the Trustee by wire transfer of immediately available funds to an account designated by the Trustee.

3.2    Consideration.

(a) Cash Purchase Price. The aggregate cash consideration for the Acquired Assets (the "Cash Purchase Price") shall be $1,250,000 (One Million Two Hundred and Fifty Thousand Dollars).

(b) Purchase Price. The total consideration for the Acquired Assets payable by the Buyer to the Sellers (the "Purchase Price") shall be the aggregate of (i) the Cash Purchase Price, (ii) the Cure Amounts (if any), and (iii) the value of the Assumed Liabilities.

3.3    Deposit. By no later than two (2) Business Days after the date that the Trustee files the Sale Motion, and provided the Trustee's Operation Orders have been entered into and are not subject to stay, Buyer shall pay the Trustee, a deposit in the aggregate amount of $125,000 (One Hundred Twenty-Five Thousand Dollars) (the "Deposit"), to be held by the Trustee in trust. The Deposit (together with all accrued investment income thereon) shall be released by the Trustee to either Buyer or Sellers, as applicable, as follows:

(a)     if the Closing shall occur, the Deposit and all accrued investment income thereon shall be transferred by the Trustee to the Sellers;

(b)     if this Agreement is terminated by Sellers pursuant to Section 8.1(h), the Deposit, together with all accrued investment income thereon, shall be released by Trustee to Sellers within five (5) Business Days of such termination; or

(c)     if this Agreement is terminated for any reason (other than a termination pursuant to Section 8.1(h)), the Deposit, together with all accrued investment income thereon, shall be returned by Trustee to Buyer within five (5) Business Days of such termination.

3.4     Allocation of Purchase Price.  (i) The Purchase Price shall be allocated among Sellers and (ii) the amount allocated to the Acquired Assets sold by each such Seller shall be further allocated among such Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder or any similar provision of state, local or foreign Law as applicable (the "Allocation"). The Allocation shall be delivered by Buyer to the Sellers within ninety (90) days after the Closing.  The Sellers will have the right to deliver reasonable objections to the Allocation within thirty (30) days after Buyer's delivery thereof, which objections shall be set forth in writing by the Sellers in reasonable detail. Buyer shall consider any such objections in good faith. Buyer and the Sellers shall file all Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) consistent with the Allocation (taking into account any revisions made by Buyer in response to comments by the Sellers) absent a change in Law. Neither Buyer nor the Sellers shall take any position or permit any of its Affiliates to take any position inconsistent with the final Allocation in the preparation of financial statements or in the course of any audit by any Tax Authority, Tax review or Tax proceeding related to any Tax Returns, unless, and then only to the extent, otherwise required by applicable Law, provided, however, that nothing contained herein shall prevent Buyer or the Sellers from settling any proposed deficiency or adjustment by any Tax Authority based upon or arising out of the Allocation, and neither Buyer nor the Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Tax Authority challenging such Allocation. Buyer and the Sellers shall promptly notify and provide the other with reasonable assistance in the event of an examination, audit, or other proceeding relating to Taxes regarding the Allocation of the Purchase Price and the amount of the Assumed Liabilities pursuant to this Section 3.4. Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation.

# ARTICLE 4
## REPRESENTATIONS AND WARRANTIES REGARDING SELLERS

Except as set forth in the Disclosure Schedules, Sellers jointly and severally hereby represent and warrant to Buyer, as of the Agreement Date as follows:

4.1     Organization; Authority; Consents; Conflicts.

(a)     Each Seller is duly organized, validly existing, and in good standing under the Laws of the State of its formation.

-23-

(b)     Each Seller has all requisite corporate or limited liability company power and authority, as applicable, to own, lease and operate its assets and to carry on the Regional Business as currently conducted.

(c)     Subject to the Sale Order having been entered into by the Bankruptcy Court, the execution, delivery and performance by each Seller of any Transaction Document to which such Seller is (or will become at Closing) a party, and the consummation of the Transactions, does not and will not (i) conflict with or result in any breach of any provision of its certificate of incorporation or bylaws or comparable governing documents or (ii) result in a violation of any Law or Order applicable to it.

4.2     <u>Litigation; Orders</u>.  Except for the Bankruptcy Case and any adversary proceedings or contested motions commenced in connection therewith, or as set forth on <u>Schedule 4.2</u>, there is, no Claim, Proceeding or Order pending, outstanding or, to Sellers' Knowledge, threatened against either Sellers, the Acquired Assets or the Assumed Liabilities  that, if adversely determined, would be material to the Regional Business, the Acquired Assets or the Assumed Liabilities or that would materially impair Sellers' ability to consummate the Transactions.

4.3     <u>Compliance with Laws; Permits</u>.  Sellers are in compliance with all applicable Laws related to the Acquired Assets in all material respects, and the Sellers have not received any written notice of any alleged material violation of applicable Law from any Governmental Entity or other Person.  The Sellers hold all material Permits necessary or required pursuant to applicable Law for the operation of the Acquired Assets as presently conducted and for the ownership or operation of the Acquired Assets.   The Sellers have not received written notice of any material default under any Permit related to the Acquired Assets and no material violations exist in respect of such Permits.

4.4     <u>Real Property</u>.

(a)     <u>Schedule 4.4(a)</u> contains a list and brief description of all Leased Real Property held or used for, or necessary to the operation of the Regional Business.  Sellers have made available true and complete copies of all leases with respect to such Leased Real Property (individually, a "<u>Lease</u>" and collectively, the "<u>Leases</u>") to Buyer.  Other than as set forth on <u>Schedule 4.4(a)</u>, Sellers are not in breach of any material term or in "default" under any Lease and, to Sellers' Knowledge, no party to any Lease has given Sellers written notice of or made a claim with respect to any breach or default thereunder.  To Sellers' Knowledge, there are no conditions that currently exist or with the passage of time will (i) result in a default or breach of any material term by any party to a Lease or (ii) give rise to the right of the lessor to accelerate the obligations thereunder or modify the terms thereof.   To Sellers' Knowledge, other than as noted on <u>Schedule 4.4(a)</u>, none of the Leased Real Property is subject to any sublease or grant to any Person of any right to the use, occupancy or enjoyment of the Leased Real Property or any portion thereof that would materially impair the use of the Leased Real Property in the operation of the Regional Business.  The Leased Real Property is not subject to any Liens (other than Permitted Liens).  The Leased Real Property is not subject to any use restrictions, exceptions, reservations or limitations which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business.   There are no pending or, to Sellers' Knowledge, threatened

-24-

condemnation proceedings or other Claims relating to any of the Leased Real Property. The Leases that are Acquired Assets will continue to be legal, valid, binding, enforceable and in full force and effect on the same material terms immediately following the consummation of the Transactions.

(b)     Schedule 4.4(b) sets forth a true, correct and complete list of all Owned Real Property, specifying the street address, the current owner and the current use of each parcel of Owned Real Property in which any Seller has any title interest and which is related to, used, useful or held for use in the conduct of the Regional Business (the "Owned Real Property"). Except for Permitted Liens, Sellers have good and marketable title in the Owned Real Property set forth on Schedule 4.4(b). To Sellers' Knowledge, other than as noted on Schedule 4.4(b), none of the Owned Real Property is subject to any lease or grant to any Person of any right to the use, purchase, occupancy or enjoyment of such Owned Real Property or any portion thereof required to conduct the Regional Business. Except for Permitted Liens, the Owned Real Property is not subject to any Liens or to any use restrictions, exceptions, reservations or limitations, which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business and in the same manner after the Closing as conducted by Sellers in the twelve months prior to Closing. There are no pending or, to Sellers' Knowledge, threatened condemnation proceedings or other Claims relating to any of the Owned Real Property.

4.5     Environmental Matters. Except as set forth on Schedule 4.5, (a) with respect to the Regional Business and the Acquired Assets, there is no pending or, to Sellers' Knowledge, threatened suit, verbal or written notice, investigation, claim, litigation, proceeding or other Claim by any Governmental Entity or any other Person that could reasonably be expected to result in any material Environmental Liabilities and Obligations, and no Seller is subject to, or in default of, any Order applicable to the Regional Business or the Acquired Assets and issued under or pursuant to any Environmental Law, (b) there has been no Release of Hazardous Materials in connection with the Regional Business, or at, from, on or under the Owned Real Property or the Leased Real Property that could reasonably be expected to result in any material Environmental Liabilities and Obligations, or require any material Remedial Action pursuant to any Environmental Law, (c) Sellers have obtained and are in compliance with and, to the extent applicable, have filed timely applications to renew, all material Permits that are required pursuant to any Environmental Law for the operation of the Acquired Assets and all such Permits are valid and in full force and effect, and no Claim is pending or, to the Knowledge of Sellers, threatened, which seeks to revoke, limit or otherwise affect any such Permit; (d) none of the Sellers has any material financial assurance, escrow, bonding or similar obligation under or pursuant to any Environmental Law, and (e) Sellers have delivered or made available to Buyer copies of the following non-privileged records in Sellers' or its representatives' possession, custody or control: (i) all material Permits issued pursuant to any Environmental Law for the Regional Business or the operation of the Acquired Assets; (ii) all material documents with respect to any pending or threatened material action, litigation, proceeding or other Claim relating to or bearing on the Regional Business or the Acquired Assets and arising under or relating to any Environmental Law, or with respect to any Environmental Liabilities and Obligations; and (iii) all material written environmental reports, audits and assessments (including Phase I environmental site assessment reports) for the Regional Business and the Acquired Assets (including the Owned Real Property and Leased Real Property).

4.6     Suppliers; Customers.

-25-

(a)    Suppliers.

(i)    Schedule 4.6(a) sets forth a complete and accurate list of (A) the top ten (10) suppliers (excluding utilities) of the Sellers that accounted for the most expenses of the Regional Business for the twelve month period ended April 30, 2020 (the "Top Suppliers") and (B) with respect to each such Top Supplier the aggregate amount of such expenses.

(ii)    Since April 1, 2020, (A) no Top Supplier has terminated or adversely modified the amount, frequency or terms of the business such Top Supplier conducts with the Sellers and (B) the Sellers have not received any notice, nor do the Sellers have any Knowledge, that any Top Supplier intends to terminate or adversely modify the amount, frequency or terms of the business such Top Supplier conducts with the Sellers. The Sellers do not have any outstanding material disputes concerning the products and/or services provided by any Top Supplier, and the Sellers have no Knowledge of any material dissatisfaction on the part of any Top Supplier.

(b)    Customers.

(i)    Schedule 4.6(b) sets forth a complete and accurate list of (A) the top ten (10) customers of the Sellers that accounted for the most revenues of the Regional Business for the twelve month period ended April 30, 2020 (the "Top Customers") and (B) with respect to each such Top Customer the aggregate amount of such revenues.

(ii)    Since April 1, 2020, (A) no Top Customer  has terminated or adversely modified the amount, frequency or terms of the business such Top Customer conducts with the Sellers and (B) the Sellers have not received any notice, nor do the Sellers have any Knowledge, that any Top Customer intends to terminate or adversely modify the amount, frequency or terms of the business such Top Customer conducts with the Sellers. The Sellers do not have any outstanding material disputes concerning the products and/or services provided by any Top Customer, and the Sellers have no Knowledge of any material dissatisfaction on the part of any Top Customer.

4.7    RESERVED.

4.8    Contracts.  Schedule 4.8 sets forth a complete list, as of the date hereof, of (i) all Contracts to which either Seller is a party and that are used in or related to the Regional Business or the Acquired Assets, and (ii) the estimated Cure Amounts for each such Contract (and such other commercial information related to the Contracts listed thereon as shall be reasonably requested by Buyer), and each of the Contracts set forth on Schedule 4.8 is in full force and effect and is a valid and binding obligation as to Seller and, to the knowledge of Seller, the other parties thereto, unamended by oral or written agreement, in each case except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other laws (whether statutory, regulatory or decisional), now or hereafter in effect, relating to or affecting the rights of creditors generally or by equitable principles (regardless of whether considered in a proceeding at law or in equity).

4.9    Taxes.

-26-

(a)     All Tax Returns required to be filed by Sellers in respect of the Acquired Assets have been duly filed on a timely basis or within valid and appropriate extensions of time, and all such Tax Returns were when filed, and continue to be, correct and complete in all material respects.  All Taxes (whether or not shown on any Tax Return) owed by Sellers relating to the Acquired Assets have been timely paid.  There are no Liens with respect to Taxes imposed on the Acquired Assets other than Permitted Liens.

(b)     Sellers have complied with all Laws applicable to the Acquired Assets relating to the payment and withholding of Taxes, and have duly and timely withheld and paid over to the appropriate Tax Authority all amounts required to be so withheld and paid under all such Laws.  Sellers have not given nor requested extensions, waived or requested to waive any statute of limitations in respect of Taxes associated with the Acquired Assets which waiver is currently in effect.  Sellers have not deferred payment of Sellers' portion of payroll taxes otherwise required to be deposited and paid for the period beginning March 27, 2020 through the Closing Date under section 2302 of the Coronavirus, Aid, Relief and Economic Security Act (P.L. 116-136).

(c)     There is no Proceeding pending or threatened against Sellers in respect of the Acquired Assets by any Tax Authority, including for the assessment or collection of Taxes.  No deficiencies for any Taxes have been proposed, asserted, threatened or assessed against Sellers in respect of the Acquired Assets by any Tax Authority that have not been paid, resolved or settled, and Sellers have not agreed to any requests for waivers of the time to assess or collect any such Taxes.  No Tax Authority with which Sellers do not file a particular Tax Return or to which Sellers do not pay Taxes, in each case in respect of the Acquired Assets, has claimed that Sellers are or may be subject to taxation by that Tax Authority.  No issue has been raised by a Tax Authority in any prior examination of Sellers relating to the Acquired Assets, which, by application of the same or similar principles, could reasonably be expected to result in a material proposed deficiency for any subsequent taxable period.

(d)     Schedule 4.9 lists: (i) all jurisdictions in which Sellers pay Taxes and/or have a duty to file Tax Returns, in each case in respect of the Acquired Assets; and (ii) all types of Tax Returns filed by or on behalf of Sellers that relate in whole or in part to the Acquired Assets.

(e)     Sellers have collected all sales, use, value-added, and similar Taxes in respect of the Acquired Assets required to be collected, and has remitted, or will remit, on a timely basis such amounts to the appropriate Tax Authority.  Sellers have properly requested, received and retained all necessary exemption certificates and other documentation supporting any claimed exemption or waiver of Taxes in respect of the Acquired Assets on sales or similar transactions as to which it would otherwise have been obligated to collect or withhold such Taxes.

4.10     Brokers' Fees and Commissions.  No Seller nor any of its Affiliates, members, managers, directors, officers, employees or agents has employed or has an liability to any investment banker, broker, finder, agent or similar intermediary in connection with this Agreement, the other Transaction Documents, or the Transactions contemplated hereby, and no broker, finder, agent or similar intermediary is entitled to any broker's fee, finder's fee, or similar fee or commission for which Buyer could become liable or obligated to pay.

-27-

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth on the Disclosure Schedules, Buyer hereby represents and warrants to Sellers, as of the Agreement Date, and as of the Closing Date, as follows:

5.1     Organization.  Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Buyer has all necessary corporate power and authority to own and operate its properties, to lease the property it operates under lease and to conduct its business.

5.2     Due Authorization, Execution and Delivery; Enforceability.  Buyer has all requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and to perform its obligations hereunder and thereunder (subject to, in the case of the obligation to consummate the Transactions, to the granting of the Sale Order).  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action on the part of Buyer and no other corporate action on the part of Buyer is necessary to authorize this Agreement and such other Transaction Documents and to consummate the Transactions (subject, in the case of the obligation to consummate the Transactions, to the granting of the Sale Order).  This Agreement and the other Transaction Documents to which Buyer is (or will become at Closing) party have been (or will be) duly and validly executed and delivered by Buyer and (assuming the due authorization, execution and delivery by all parties hereto and thereto, other than Buyer) constitute (or will constitute) valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms (subject to, in the case of the obligation to consummate the Transactions, to the granting of the Sale Order), in each case except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

5.3     Governmental Approvals.  No notice to, consent, approval or authorization of or designation, declaration or filing with any Governmental Entity is required by Buyer with respect to Buyer's execution and delivery of any Transaction Document to which it is (or will become at Closing) a party or the consummation of the Transactions, except (a) the Sale Order having been entered into by the Bankruptcy Court and (b) any consent, approval or authorization of or designation, declaration or filing with any Governmental Entity the failure of which to be made or obtained would not, individually or in the aggregate, materially affect the ability of the Buyer to consummate the Transactions.

5.4     No Conflicts.  The execution, delivery and performance by Buyer of any Transaction Document to which Buyer is (or will become at Closing) a party and the consummation of the Transactions, does not and will not (a) conflict with or result in any breach of any provision of its certificate of incorporation or bylaws or comparable governing documents, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any material Contract of

-28-

Buyer, or (c) result in a violation of any Law or Order applicable to it, except, in the case of clauses (b) and (c), as would not, individually or in the aggregate, materially affect the ability of the Buyer to consummate the Transactions.

5.5     Sufficiency of Funds.  Buyer has sufficient funds to enable it to make payment of the Cash Purchase Price and consummate the transactions contemplated by this Agreement.

5.6     Condition of Business.  Buyer hereby acknowledges and agrees that notwithstanding anything expressed or implied herein to the contrary, except as expressly set forth in Article 4 of this Agreement, Sellers, including each of their directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants or and other representatives, including the Trustee, make no express or implied representations or warranties whatsoever, including any representation or warranty as to physical condition or value of any of the Acquired Assets or the future profitability or future earnings performance of the Regional Business. Buyer will accept the Acquired Assets at the Closing and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS".

# ARTICLE 6
# COVENANTS OF THE PARTIES

6.1     Conduct Pending the Closing.  During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement in accordance with its terms and the Closing (the "Interim Period"), except for the filing of the Bankruptcy Cases and subject to the provisions of the New Money Financing Agreement, the Sellers shall use commercially reasonable efforts to (x) operate the Regional Business in the Ordinary Course of Business and (y) (A) preserve intact their respective business organizations, (B) maintain the Regional Business and the Acquired Assets (normal wear and tear excepted), (C) keep available the services of their respective officers and employees, (D) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers, vendors and others having business relationships with Sellers in connection with the operation of the Regional Business, (E) continue to operate the Regional Business and Acquired Assets in all material respects in compliance with all Laws applicable to the Regional Business and Sellers and (F) not remove or permit to be removed from any building, facility, or real property that constitute Acquired Assets any asset, equipment, machinery or any Inventory (other than in connection with the sale of Inventory in the Ordinary Course of Business or the removal of equipment to drill sites in the Ordinary Course of Business).

6.2     Access.  Subject to applicable Law, during the Interim Period, the Sellers, (a) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other Representatives, books and records of the Sellers to the extent relating to the Acquired Assets, as Buyer reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement, (b) shall furnish to Buyer and its Representatives such financial, operating and property data to the extent relating to the Regional Business and other information as Buyer and its Representatives reasonably request and (c) shall cooperate reasonably with Buyer in its investigation of the Acquired Assets.  Buyer agrees that any on-site inspections of any leased real property shall be

-29-

conducted in the presence of the Sellers or their Representatives. All inspections shall be conducted so as not to interfere unreasonably with the use of any of the leased real property by the Sellers.

6.3     Physical Inventory.  Without limiting Section 6.2, the Sellers (a) shall give Buyer and its Representatives reasonable access to the offices, properties, plants, warehouses, employees, accountants and auditors of the Sellers in order to conduct a physical inventory of the Inventory, Owned Real Property and Leased Real Property prior to the Closing Date and (b) shall cooperate reasonably with Buyer in its investigation of the Inventory, Owned Real Property and Leased Real Property.

6.4     Tax Matters.

(a)     All Transfer Taxes arising out of the transfer of the Acquired Assets pursuant to this Agreement shall be borne by the Sellers. The Sellers shall file all necessary documentation and returns with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Taxes to Buyer.  Sellers shall pay all such Transfer Taxes when due.

(b)     Each of Buyer, on the one hand, and Sellers, on the other hand, shall cooperate fully, as and to the extent reasonably requested, in connection with the preparation and filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes and shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for filing of all Tax Returns, including any Claim for exemption or exclusion from the application or imposition of any Taxes, the preparation for any audit by any Tax Authority and the prosecution or defense of any Proceeding relating to any Tax Return.

6.5     Approvals; Commercially Reasonable Efforts; Notification; Consent.

(a)     Subject to the terms and conditions of this Agreement, each Party shall use its commercially reasonably efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable under applicable Law to consummate and make effective the Transactions.  Without limiting the generality of the foregoing, the Parties will use their respective commercially reasonable efforts to (i) take all actions necessary to transfer the Acquired Assets, (ii) take all actions necessary to cause all conditions set forth in Article 7 to be satisfied as soon as practicable, (iii) lift or rescind any existing Order preventing, prohibiting or delaying the consummation of the Transactions, (iv) effect all necessary registration, applications, notices and other filings required by applicable Law, including, as applicable to Sellers, under the Bankruptcy Code, and (v) execute and deliver any additional instruments necessary to fully carry out the purposes of this Agreement; provided, however, that nothing in this Agreement, including this Section 6.5 shall require Buyer to (A) consent to any material condition or material concession required by any Governmental Entity or third party; (B) consent to any divestitures of any material Subsidiary or material assets of Buyer or its Affiliates or accept any material limitation on or material condition on the manner in which any of the foregoing conducts their business; (C) pay any material amounts

-30-

required or requested by any Governmental Entity; or (D) accept an agreement to hold separate any material portion of any business or of any material assets of any material Subsidiary of Buyer or its Affiliates. Buyer and the Sellers shall not, and shall cause their respective Affiliates not to, take any action that would reasonably be expected to prevent or materially delay the approval of any Governmental Entity of any of the filings referred to in this Section 6.5(a).

(b)     Each Party shall (i) respond as promptly as reasonably practicable to any inquiries or requests for additional information and documentary material received from any Governmental Entity relating to the matters described in Section 6.5(a) and (ii) not enter into any agreement with the any Governmental Entity pursuant to which such Party agrees not to consummate the Transactions.

(c)     In connection with and without limiting the foregoing, each Party shall, subject to applicable Law and except as prohibited by any applicable representative of any applicable Governmental Entity: (i) promptly notify the other Parties of any material written communication to that Party from any Governmental Entity concerning this Agreement or the Transactions, and permit the other Parties to review in advance (and to consider any comments made by the other Parties in relation to) any proposed written communication to any of the foregoing; (ii) not participate in or agree to participate in any substantive meeting, telephone call or discussion with any Governmental Entity in respect of any filings, investigation or inquiry concerning this Agreement or the Transactions unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Entity, gives the other Parties the opportunity to attend and participate in such meeting, telephone call or discussion; and (iii) subject to the solicitor-client or attorney-client and similar applicable privileges, furnish outside legal counsel for the other Parties with copies of all correspondence, filings, and written communications (and memoranda setting forth the substance thereof) between such Party and its Affiliates and their respective Representatives, on the one hand, and any Governmental Entity or its members or their respective staffs, on the other hand, with respect to this Agreement and the Transactions; provided, however, that any such Party may limit the disclosure of filings to protect confidential information, including limiting dissemination of filings to an "outside counsel only" basis.

6.6     Further Assurances. The Parties agree to (i) furnish upon request to each other such further information, (ii) execute, acknowledge and deliver to each other such other documents and (iii) do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction Documents.

6.7     Bankruptcy Actions and Court Filings.

(a)     Sellers shall file motions, which shall be in form and substance acceptable to Buyer, seeking entry of the (i) the Operating Order and (ii) the Post-Petition Financing Order within two (2) Business Days following the Petition Date.

(b)     Buyer and Sellers acknowledge that this Agreement and the Transactions contemplated hereby are subject to the Trustee agreeing to pursue the consummation of the Transaction, including the filing of the Sale Motion and the entry of the Sale Order. In the event

-31-

of any discrepancy between this Agreement and the Sale Motion and the Sale Order, the Sale Motion and the Sale Order shall govern.

(c)     The Sellers shall, within seven (7) days following the Petition Date, file with the Bankruptcy Court the Sale Motion and otherwise use their commercially reasonable efforts to have the Bankruptcy Court enter the Sale Order as promptly as practicable.

6.8     Expense Reimbursement.  If this Agreement is (a) terminated pursuant to Section 8.1(b)(ii), Section 8.1(b)(iii), Section 8.1(c), Section 8.1(d), Section 8.1(e), Section 8.1(f), Section 8.1(g), Section 8.1(i), Section 8.1(k), Section 8.1(l), Section 8.1(m), Section 8.1(n) or Section 8.1(o) and (b) at any time thereafter, an Alternative Transaction is consummated, then Buyer shall be deemed to have earned the Expense Reimbursement, which shall be paid in cash by wire transfer of immediately available funds to an account designated by Buyer, out of the proceeds of such Alternative Transaction, without further order of the Bankruptcy Court, contemporaneously with or as soon as reasonably practicable following the consummation of such Alternative Transaction. For greater certainty, the payment of the Expense Reimbursement to the Buyer shall be in addition to the return of the Deposit in accordance with Section 3.3(c).

6.9     Preservation of Books and Records.  During the pendency of the Bankruptcy Case, Buyer and (if applicable) Sellers and the Trustee shall provide to Sellers and their respective Affiliates and Representatives (after reasonable notice and during normal business hours and without undue interference to the business operations of Buyer, and at the Sellers sole cost and expense) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Acquired Assets, to the extent necessary to permit the Sellers to determine any matter relating to its rights and obligations hereunder or to any period ending on or before the Closing Date (for example, for purposes of any Tax or accounting audit or any claim or litigation matter, but not for any dispute or claim between Buyer and Sellers in connection with this Agreement, the Transaction Documents or otherwise), for periods prior to the Closing and shall preserve such books and records until the earlier of (i) such period as shall be consistent with Buyer's records retention policy in effect from time to time, (ii) the retention period required by applicable Law or (iii) the termination of the Bankruptcy Case.  Such access shall include access to any information in electronic form to the extent reasonably available.  Buyer acknowledges that Sellers have the right to retain originals or copies of all of books and records included in or related to the Acquired Assets for periods prior to the Closing.

6.10     Notification of Certain Matters.  Sellers will promptly notify Buyer of: (i) any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions (including with respect to the transfer of personal information); (ii) any written notice or other communication from any Governmental Entity (other than the Bankruptcy Case) related to or in connection with the Transactions; and (iii) promptly upon discovery thereof, any material variances from, or the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause any of the representations and warranties contained in Article 4 to be untrue or inaccurate in a manner that would reasonably be expected to cause the conditions set forth in Section 7.1 not to be satisfied.

OMM_US:77874592.25

6.11 <u>Confidentiality</u>. Upon and for a period of one (1) year following the Closing (or indefinitely in the case of trade secrets), Sellers shall use commercially reasonable efforts to keep confidential all non-public information regarding the Acquired Assets, except and to the extent such public disclosure as Sellers and their counsel may reasonably determine to be required under any applicable Law or Order (<u>provided</u> that Sellers will provide Buyer with prior written notice of any such disclosure to the extent permitted by applicable Law or Order).

6.12 <u>Contractors</u>. Sellers shall use commercially reasonable efforts to cause the contractors set forth on <u>Schedule 6.12</u> to continue to support the Regional Business, consistent with past practice, from and after the Agreement Date until the Closing.

<div align="center">

**ARTICLE 7**
**CONDITIONS TO OBLIGATIONS OF THE PARTIES**

</div>

7.1 <u>Conditions Precedent to Obligations of Buyer</u>. The obligation of Buyer to consummate the Transactions is subject to the satisfaction (or written waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a) <u>No Order</u>. No court or other Governmental Entity has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the Transactions.

(b) <u>Accuracy of Representations and Warranties</u>. The representations and warranties of Sellers set forth in <u>Article 4</u> shall be true and correct (disregarding all qualifications or limitations as to "materiality" and words of similar import set forth therein) in all material respects as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(c) <u>Sellers Performance of Obligations</u>. Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date.

(d) <u>Trustee's Conditions Certificate</u>. Buyer shall have received from the Trustee a certificate (the "<u>Trustee's Conditions Certificate</u>"), dated the Closing Date, certifying that all of the conditions specified in this <u>Section 7.1</u> (other than the condition set forth in <u>Section 7.1(b)</u>) have been fulfilled and/or waived.

(e) <u>Officer's Certificate</u>. Buyer shall have received from the Sellers a certificate, dated the Closing Date, of an executive officer of each Seller to the effect that, to the best of such officer's knowledge, all of the conditions specified in <u>Section 7.1(b)</u> been fulfilled and/or waived (the "<u>Officer's Certificate</u>").

(f) <u>Inventory</u>. The Closing Date Inventory shall not be less than 90% of the Target Inventory.

<div align="center">-33-</div>

(g)     Post-Petition Trade Payables. All Post-Petition Trade Payables shall have arisen in the Ordinary Course of Business, and no such Post-Petition Trade Payables shall be delinquent in its payment in accordance with its terms.

(h)     Environmental Studies. The Buyer shall have received Phase I environmental site assessment reports with respect to each of the Regional Business Warehouses (the "Phase I Reports") and such Phase I Reports shall have been completed within three (3) weeks of the Agreement Date and be satisfactory to Buyer in its sole discretion.

(i)     ABL Facility and New Money Financing Agreement Advances. Aggregate advances under the ABL Facility and New Money Financing Agreement immediately prior to the Closing (and taking into any account any amounts to be funded at the Closing) are not greater than 85% of the Eligible Accounts Receivable (as such term is defined in the ABL Facility and/or the New Money Financing Agreement, as applicable) inclusive of any amounts funded or committed to be funded by the Buyer thereunder.

(j)     Agreement of the Trustee. The Trustee shall have agreed to undertake and perform in all material respects all obligations and agreements contained in this Agreement (including the obligations set forth in Section 6.8) required to be performed by the Sellers or the Trustee no later than two (2) Business Days following the Petition Date.

(k)     Sale Order. The Sale Order shall have been entered and shall not be subject to a stay pending appeal.

(l)     Material Contracts. All consents necessary to assign the Material Contracts to the Buyer shall have been obtained and all Material Contracts shall have been assumed and assigned to Buyer at Closing.

(m)     Cure Amounts.  The aggregate Cure Amounts related to the Material Contracts on the Closing Date shall not exceed $1,000,0000 (One Million Dollars).

(n)     Northeast Rig Count.  There shall be no less than thirteen (13) drilling rigs actively servicing well sites that are operated by the Regional Business (excluding the portion of the Regional Business conducting operations out of the Midland Solid Control Warehouse) on the Closing Date.

(o)     Midland Solid Control Rig Count.  There shall be no less than eight (8) solid control rigs actively servicing well sites that are operated by the Regional Business out of the Midland Solid Control Warehouse on the Closing Date.

(p)     Trustee's Operation Orders.  The Bankruptcy Court shall have entered the Trustee's Operation Orders no later than five (5) days following the Petition Date.

(q)     Property and Casualty Insurance.  On or before June 1, 2020, the Property and Casualty Insurance Policies shall have been renewed and extended beyond June 1, 2020, in form and substance acceptable to Buyer.

-34-

(r)  Encina Exit Financing.  Buyer shall have received the financing on the terms set forth in the Encina Exit Financing Commitment Letter, provided that the condition forth in this Section 7.1(r) shall only apply so long as Buyer shall have performed in all material respects its obligations under such financing.

7.2  Conditions Precedent to the Obligations of the Sellers.  The obligation of the Sellers to consummate the Transactions is subject to the satisfaction (or written waiver by the Sellers) at or prior to the Closing Date of each of the following conditions:

(a)  No Order.  No court or other Governmental Entity has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement.

(b)  Accuracy of Representations and Warranties.  The representations and warranties of Buyer set forth in Article 5 shall be true and correct (disregarding all qualifications or limitations as to "materiality" and words of similar import set forth therein) in all material respects as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(c)  Performance of Obligations.  Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(d)  Officer's Certificate.  The Sellers shall have received a certificate, dated the Closing Date, of an executive officer of Buyer to the effect that all of the conditions specified in this Section 7.2 been fulfilled and/or waived (the "Buyer's Conditions Certificate" and together with the Trustee's Conditions Certificate and the Officer's Certificate, the "Conditions Certificates").

7.3  Frustration of Conditions Precedent.  Neither Buyer nor the Sellers may rely on the failure of any condition set forth in this Article 7, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its commercially reasonable efforts to consummate the Transactions contemplated hereby.

## ARTICLE 8
## TERMINATION

8.1  Termination of Agreement.  This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

(a)  by written agreement of the Sellers and Buyer;

(b)  by either the Sellers or Buyer:

-35-

(i)      if there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining Buyer or Sellers from consummating the Transactions is entered and such Order shall become final, provided, however, that no termination may be made by a Party under this <u>Section 8.1(b)(i)</u> if the issuance of such Order was caused by the breach or action or inaction of such Party;

(ii)      upon the filing of a motion by any of the Sellers to approve an Alternative Transaction or the Bankruptcy Court's granting an order approving an Alternative Transaction;

(iii)      upon the Sellers' entry into an Alternative Transaction;

(c)      by Buyer, if there shall have been a breach by either Seller of any of their representations, warranties, covenants or agreements contained in this Agreement or any other event or condition shall result in either Seller being incapable of satisfying one or more of their representations, warranties, covenants or agreements set forth herein, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within three (3) days after written Notice thereof shall have been received by Sellers;

(d)      by Buyer, if (i) either of the Operating Order or the interim Post-Petition Financing Order shall not have been entered by the Bankruptcy Court within five (5) days after the Petition Date, (ii) the Sale Motion shall not have been filed by the Trustee with the Bankruptcy Court on or prior to seven (7) days following the Petition Date, (iii) the final Post-Petition Financing Order shall not have been entered by the Bankruptcy Court within twenty-six (26) days after the Petition Date, (iv) the Sale Order shall not have been entered by the Bankruptcy Court on or prior to twenty-eight (28) days following the Agreement Date, or (v) the Closing shall not have occurred on or prior to thirty-five (35) days following the Agreement Date; provided, however, that with respect to the foregoing subclause (v) only, Buyer may not terminate the Agreement if the failure of the Closing to occur is due to a breach of this Agreement by the Buyer;

(e)      by Buyer, at any time after the occurrence of an "Event of Default" under the New Money Financing Agreement in the Bankruptcy Case;

(f)      by Buyer or the Sellers, if the Trustee does not agree that the Sellers can proceed with this Agreement and undertake and perform in all material respects all obligations and agreements contained in this Agreement by the filing of the Sale Motion;

(g)      by Buyer or the Sellers, if the Trustee repudiates or seeks to reject this Agreement;

(h)      by the Sellers, if there shall have been a material breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement that, shall not have been cured within twenty (20) days after written Notice thereof shall have been received by Buyer; provided that as of such date, the Sellers are not in breach of this Agreement;

-36-

(i)     by Buyer, at any time, if any of the conditions set forth in Sections 7.1(m), 7.1(n) or 7.1(o) are reasonably determined by Buyer to be incapable of being satisfied;

(j)     by Buyer, if the Buyer has not received a duly executed Encina Exit Financing Commitment Letter in form and substance acceptable to Buyer on or before the date that is seven (7) following the Petition Date;

(k)     by Buyer, on or after June 2, 2020, if the condition set forth in Section 7.1(q) has not been satisfied;

(l)     by Buyer, if either of the Trustee's Operation Orders or the New Money Financing Agreement are modified, amended, vacated or overturned, as applicable, without the Buyer's express prior written consent prior to Closing;

(m)     by Buyer, if the Trustee files a motion with the Bankruptcy Court seeking any post-Petition Date financing in the Bankruptcy Cases (other than the New Money Financing Agreement);

(n)     by Buyer, if any party seeks entry of an order pursuant to section 362 Bankruptcy Code or any other similar provisions to lift the automatic stay or seeks similar relief with respect to any Acquired Assets; or

(o)     by Buyer, if any party seeks to assert control over either of the Sellers, the Regional Business or any Acquired Asset in any court, other than the Bankruptcy Court.

8.2     Consequences of Termination.  In the event of any termination of this Agreement by either or both of Buyer and the Sellers pursuant to Section 8.1, written Notice thereof shall be given by the terminating Party to the other Parties hereto, specifying the provision hereof pursuant to which such termination is made, this Agreement shall thereupon terminate and become void and of no further force and effect (other than Section 3.3 (*Deposit*), Section 6.8 (*Expense Reimbursement*), this Section 8.2 (*Consequences of Termination*) and Article 9 (*Miscellaneous*) and to the extent applicable in respect of such Sections and Article, Article 1 (*Definitions*)), and the Transactions shall be abandoned without further action or Liability of any of the Parties hereto (other than with respect to the sections set forth in this Agreement that shall continue in full force and effect in accordance with this Section 8.2 following such termination), except that such termination shall not relieve any Party of any Liability for fraud or willful breach of this Agreement.

## ARTICLE 9
## MISCELLANEOUS

9.1     Expenses.  Except as set forth in this Agreement and whether or not the Transactions are consummated, each Party hereto shall bear all costs and expenses incurred or to be incurred by such Party in connection with the negotiation and entry into the Transaction Documents and the consummation of the Transactions.

-37-

9.2     Assignment.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Sellers without the prior written consent of Buyer, or by Buyer without the prior written consent of the Sellers; provided that Buyer may, without the consent of any other party, assign this Agreement and its rights and obligations hereunder in whole or in part to (a) any Affiliate; provided that Buyer shall remain jointly liable with such Affiliates for Buyer's obligations hereunder or (b) following the Closing, to any successor or purchaser of all or part of the business of Buyer or any of its Subsidiaries.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns including the Trustee, any trustee in bankruptcy, receiver, liquidating trustee, responsible Person or similar representative for Sellers appointed in connection with the Bankruptcy Cases or any other Proceeding.

9.3     Parties in Interest.  This Agreement shall be binding upon and inure solely to the benefit of Sellers (and their estate), Buyer and their respective successors or permitted assigns (including any bankruptcy trustee or receiver appointed in respect thereof), and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein.

9.4     Notices.   All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be transmitted by electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice.  Notice shall be deemed given on the date of service or transmission; provided that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m. New York time, notice shall be deemed given on the next Business Day:

|  |  |
|---|---|
| If to any Seller: | Q'Max America Inc. |
| | 11700 Katy Freeway, Suite 200 |
| | Houston, TX 77079 |
| | Attention: Rafael Andres Diaz-Granados |
| | Email: radg@qmax.com |
| | |
| With copies to: | Porter Hedges LLP |
| | 1000 Main St., 36th Floor |
| | Houston, TX 77002 |
| | Attention: John F. Higgins |
| | Email:  jhiggins@porterhedges.com |
| | |
| If to Buyer: | QMax Acquisition Corp. |
| | C/O |
| | Palladium Equity Partners |
| | 1270 Avenue of The Americas, Suite 31 |
| | New York, NY 10020 |
| | Attention:     Caleb Clark and Scott Kirschner |

-38-

Email:        cclark@palladiumequity.com /
skirschner@palladiumequity.com

With copies to:    O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Attention: Nancy Mitchell, Esq. / Matthew Hinker, Esq. / David
Schultz, Esq.
Email: nmitchell@omm.com / mhinker@omm.com /
dschultz@omm.com

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed e-mail address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

9.5    <u>Choice of Law</u>.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Laws of the State of Delaware, without giving effect to any provision thereof that would require or permit the application of the substantive laws of any other jurisdiction.

9.6    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement and all Transaction Documents and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties. This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only in writing by Buyer and Sellers (which may be by way of e-mail), or in the case of a waiver, by the Party waiving compliance.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

9.7    <u>Counterparts; Electronic Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Counterparts to this Agreement may be delivered via electronic mail.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

9.8    <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

9.9     Headings.  The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

9.10    Exclusive Jurisdiction and Specific Performance.

(a)     Subject to Section 9.10(b), without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby irrevocably and unconditionally consent to, attorn to and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in Section 9.4.  For the avoidance of doubt, this Section 9.10 shall not apply to any Claims that Buyer or its Affiliates may have against any third party following the Closing.

(b)     Notwithstanding anything herein to the contrary, in the event the Bankruptcy Case is terminated, the Parties hereby agree that all Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, shall be heard and determined exclusively in any federal court sitting in the Borough of Manhattan in the City of New York or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York (and, in each case, any appellate court thereof), and the Parties hereby consent to and submit to the jurisdiction and venue of such courts.

9.11    WAIVER OF RIGHT TO TRIAL BY JURY.  SELLERS AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  FOR THE AVOIDANCE OF DOUBT, THIS SECTION 9.11 SHALL NOT APPLY TO ANY CLAIMS THAT BUYER OR ITS AFFILIATES MAY HAVE AGAINST ANY THIRD PARTY FOLLOWING THE CLOSING.

9.12    Survival.  Each and every representation and warranty contained in this Agreement shall expire and be of no further force and effect as of the Closing.  Each and every covenant and agreement contained in this Agreement (other than the covenants contained in this Agreement which by their terms are to be performed (in whole or in part) by the Parties following the Closing (each, a "Post-Closing Covenant")) shall expire and be of no further force and effect as of the Closing. Each Post-Closing Covenant shall survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or, (b) (i) if time for performance of such Post-Closing Covenant is specified in this Agreement, ninety (90) days following the full performance of such covenant and the expiration of the time period for such performance or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, ninety (90) days following the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such Post-Closing Covenant; provided that if a

-40-

written notice of any claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-Closing Covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

9.13    Time of Essence.  Time is of the essence of this Agreement.

9.14    Non-Recourse.  No past, present or future director, manager, officer, employee, incorporator, member, partner or equity holder of Buyer or Sellers shall have any Liability for any Liabilities of Buyer or Sellers, respectively, under this Agreement or for any Claim based on, in respect of, or by reason of the Transactions.  This Agreement may only be enforced against, and any Claim, action, suit, Proceeding or investigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.

9.15    Disclosure Schedules.  Except as set forth in this Agreement, the inclusion of any information (including dollar amounts) in Disclosure Schedules shall not be deemed to be an admission or acknowledgment by any Party that such information is required to be listed on such section of the relevant schedule or is material to or outside the Ordinary Course of Business of any Person.  The information contained in this Agreement, the exhibits hereto and the Disclosure Schedules is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any Party to any third party of any matter whatsoever (including any violation of any Law or breach of contract).  Unless the context otherwise requires, all capitalized terms used in the Disclosure Schedules shall have the respective meanings assigned in this Agreement.  The Disclosure Schedules set forth items of disclosure with specific reference to the particular Section or subsection of this Agreement to which the information in the Disclosure Schedules relates.

9.16    Mutual Drafting.  This Agreement is the result of the joint efforts of Buyer and Sellers, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties and there is to be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Sellers and Buyer as of the date first above written.

BUYER:

QMAX ACQUISITION CORP.

By: _____

    Name:  Caleb Clark
    Title:  Chief Executive Officer


SELLERS

Q'MAX AMERICA INC.


By: _____

    Name:
    Title:


ANCHOR DRILLING FLUIDS USA, LLC


By: _____

    Name:
    Title:

[SIGNATURE PAGE TO APA]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Sellers and Buyer as of the date first above written.

BUYER:

QMAX ACQUISITION CORP.

By: _____
    Name:
    Title:


SELLERS:

Q'MAX AMERICA INC.


By: _____
    Name:  Rafael Diaz-Granados
    Title:  President & CEO


ANCHOR DRILLING FLUIDS USA, LLC


By: _____
    Name:  Rafael Diaz-Granados
    Title:  President & CEO

[SIGNATURE PAGE TO APA]

# DISCLOSURE SCHEDULE

This Disclosure Schedule, including the exhibits and attachments hereto (collectively, this "Disclosure Schedule"), is being furnished in connection with the execution and delivery of that certain Asset Purchase Agreement, entered into on and dated as of May 24, 2020 (the "Agreement"), by and among Q'Max America Inc., a company incorporated under the laws of Delaware ("Q'Max"), and Anchor Drilling Fluids USA, LLC, a Delaware limited liability company ("Anchor Drilling" and, together with Q'Max, "Sellers" and each, a "Seller") and QMax Acquisition Corp., a Delaware corporation ("Buyer"). Unless otherwise defined herein, all capitalized terms used in this Disclosure Schedule shall have the respective meanings given such terms in the Agreement.

## SCHEDULE 1.1(a)

## CONTINUING EMPLOYEES

| # | Payroll Name | Position ID | Home Department Description | Job Title Description |
|---|---|---|---|---|
| 1 | Adams, Brandon | B1E000076 | Wellsville - Warehouse - Direct | Warehouseman |
| 2 | Alsip, Brent | B1E000605 | Newcomerstown-Solids Control-DIR | Solids Control Supervisor |
| 3 | Anderson, Zachary | B1E000433 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 4 | Baker, Kyle Andrew | B1E000819 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 5 | Bell, Todd | B1E000314 | Newcomerstown - QHSE - IND | Safety Specialist |
| 6 | Bostic, John | B1E000190 | Leetsdale-Drilling Fluids-DIR | Engineering Manager |
| 7 | Bradford, Brian | B1E000083 | Newcomerstown-Solids Control-DIR | Solids Control Supervisor |
| 8 | Breaux, Jonathan | B1E000896 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 9 | Bridges, Roy | B1E000282 | Newcomerstown - Warehouse - Direct | Warehouse Manager |
| 10 | Brignac, Chase Michael | B1E000636 | Wexford - Sales - Indirect | Technical Sales Engineer |
| 11 | Bryant, Jason | B1E000170 | Wellsville - Engineer - Direct | Drilling Fluids Engineer Supervisor |
| 12 | Bryarley, Thomas | B1E000350 | Wellsville - Warehouse - Direct | Warehouse Supervisor I |
| 13 | Burkhorne, Robert Roy | B1E000273 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 14 | Burris, Kenneth | B1E000222 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 15 | Burrows, Gregory | B1E000870 | Wellsville - Warehouse - Direct | Warehouseman |
| 16 | Bush, Jason | B1E000171 | Newcomerstown - Management | Area Operations Manager |
| 17 | Camacho, Juan J | B1E000642 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 18 | Campbell, Marc | 1J1000070 | Headquarters - IT | Network Support Technician |
| 19 | Chilson, Dale | B1E000111 | Horseheads - Warehouse - Direct | Warehouse Manager |
| 20 | Collier, David | B1E000803 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 21 | Conlon, Michael | B1E000246 | Newcomerstown - Warehouse - Direct | Assistant Mud Plant Attendant |
| 22 | Contreras, Gabriel Ivan | B1E000698 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 23 | Davis, Fred Allen | B1E000888 | Wellsville - Trucking - Direct | Transportation Specialist I |
| 24 | Dawson, Jesse | B1E000184 | Wellsville - Warehouse - Direct | Warehouse Supervisor II |
| 25 | Deramo, Amy Jeanette | B1E000687 | HQ - Anchor - Finance Accounting | Payables Specialist |
| 26 | DiLoreto, Rocco Steven | B1E000944 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 27 | Drayer, Douglas Alan | B1E000529 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 28 | Dugas, Justin | B1E000215 | Newcomerstown - Sales - Indirect | Sales Manager |

| 29 | Duty, Donald James | B1E000688 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
|----|---|---|---|---|
| 30 | Enke, Eugene Harold | B1E000141 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 31 | Escobar, Romeo | B1E000432 | Midland SC-Solids Control-DIR | Solids Control Service Tech |
| 32 | Evans, James | B1E000165 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 33 | Farrell, Patricia N. | B1E000708 | Leetsdale-Administration-IND | Area Billing Specialist |
| 34 | Faulkenberry, Tony T | B1E000374 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 35 | Fiveash, Daniel H | B1E000904 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 36 | Flowers, Charles | B1E000951 | Wellsville - Trucking - Direct | Transportation Specialist I |
| 37 | Fofi, John | B1E000608 | Newcomerstown-Solids Control-DIR | Solids Control Supervisor |
| 38 | Fonzo, Anthony | B1E000534 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 39 | Fore, Gregg Anthony | B1E000835 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 40 | Gilbert, Jessica | B1E000185 | Leetsdale-Administration-IND | Administrative Assistant |
| 41 | Giotto, David | B1E000122 | Leetsdale - Warehouse - Direct | Warehouse Manager |
| 42 | Goldsmith, Tara | B1E000635 | HQ Anchor - Sales - Indirect | Business Development Manager |
| 43 | Gomez, Jorge A | B1E000443 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 44 | Gonzalez-Torres, Felix Santos | B1E000415 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 45 | Haggerty, Joshua | B1E000207 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 46 | Hagy, Javin | B1E000174 | Newcomerstown-Solids Control-DIR | Shop Mechanic |
| 47 | Hallmark, Joshua D. | B1E000675 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 48 | Hanlon, Dale | B1E000855 | Wellsville - Warehouse - Direct | Assistant Mud Plant Attendant |
| 49 | Harris, Galen Paul | B1E000438 | Midland SC-Solids Control-DIR | Solids Control Service Tech |
| 50 | Herrington, James | B1E000162 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 51 | Hicks, Samantha Jean | B1E000876 | HQ - Anchor - Finance Accounting | Assistant Controller |
| 52 | Holpp, Virgil | B1E000330 | Newcomerstown-Solids Control-DIR | Welder |
| 53 | Hursey, Andrew | B1E000057 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 54 | Hutchins, Keven | B1E000224 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 55 | Jacob, Gary | B1E000146 | Leetsdale - Trucking - Direct | Transportation Specialist I |
| 56 | Karonka, Michael | B1E000251 | Anchor - Management | Area Manager - Texas |
| 57 | Kelly, Adam | B1E000850 | Leetsdale - Trucking - Direct | Transportation Specialist I |
| 58 | Lambes, Jamie | B1E000167 | Newcomerstown-Administration-IND | Area Billing Specialist |
| 59 | Lasko, Trent | B1E000317 | Newcomerstown-Solids Control-DIR | Shop Mechanic |
| 60 | Lattanzio Jr., Ralph | B1E000695 | Wellsville - Trucking - Direct | Transportation Specialist I |
| 61 | Laws, Terry | B1E000401 | Midland SC-Solids Control-DIR | Solids Control Service Tech |
| 62 | Lewis, Jacob | B1E000161 | Wellsville - Trucking - Direct | Transportation Specialist I |
| 63 | Lewis, James | B1E000163 | Wellsville - Trucking - Direct | Transportation Specialist I |
| 64 | Lilly, Jason | B1E000172 | HQ Anchor - Supply Chain - IND | Supply Chain Manager |
| 65 | Lira, Antonio | B1E000856 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 66 | Looney, Diane | B1E000125 | Tulsa - Human Resources | Human Resources Representative |
| 67 | Lott, Victor | B1E000328 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 68 | Lower, Larry | B1E000231 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 69 | Lowman, Christopher | B1E000554 | Leetsdale-Drilling Fluids-DIR | Engineering Manager |
| 70 | LUCAS, BOBBIE L | B1E000073 | Wellsville-Administration-IND | Administrative Assistant |

| 71 | Lucien II, Gary J. | B1E000722 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
|---|---|---|---|---|
| 72 | Mann, Chad | B1E000091 | Newcomerstown-Solids Control-DIR | Maintenance Supervisor |
| 73 | Mann, Robbie | B1E000269 | Newcomerstown-Solids Control-DIR | Operations Manager - Solids Control |
| 74 | Maple, Shea | B1E000297 | Newcomerstown - QHSE - IND | QHSE Specialist |
| 75 | McClelland, Joseph | B1E000200 | Newcomerstown-Solids Control-DIR | Solids Control Technician |
| 76 | McClelland, Joseph W. | B1E000201 | Newcomerstown - Warehouse - Direct | Assistant Mud Plant Attendant |
| 77 | Mckain, Tyler | B1E000321 | Wellsville-Drilling Fluids-DIR | Drilling Fluids Engineer Supervisor |
| 78 | Medina, Yery Jose | B1E000834 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 79 | Mirra, Michael | B1E000345 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 80 | Montano, Carlos Carrasco | B1E000556 | Midland SC-Solids Control-DIR | Solids Control Supervisor |
| 81 | Mount, Daniel | B1E000114 | Newcomerstown - Sales - Indirect | Sales Rep / Account Manager |
| 82 | Moyer, Edward Franklin | B1E000840 | Newcomerstown - Sales - Indirect | Technical Sales Engineer |
| 83 | Mullens, Christopher L. | B1E000769 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 84 | Naramore, Jodie | B1E000830 | Midland SC-Solids Control-DIR | Solids Control Service Tech |
| 85 | Naramore, Paul | B1E000719 | Midland SC-Solids Control-DIR | Solids Control Service Tech |
| 86 | Nolan, Charles | B1E000094 | Newcomerstown-Solids Control-DIR | Solids Control Technician |
| 87 | Nowlin, Thomas Matthew | B1E000913 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 88 | Ochoa, Gardiel | B1E000616 | Midland SC-Solids Control-DIR | Welder |
| 89 | Orr, Brent | B1E000081 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 90 | Orr, Darrel Dean | B1E000828 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 91 | Pennington, Christopher | B1E000101 | HQ - Anchor - Executive | Vice President of Operations - US |
| 92 | Peno, Robert | B1E000274 | Leetsdale-Drilling Fluids-DIR | Drilling Fluids Engineer Supervisor |
| 93 | Ponath, Brandon Wayne | B1E000798 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 94 | Pulliam, Justin | B1E000480 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 95 | Redmon, Jeff | B1E000536 | Midland SC-Solids Control-DIR | Operations Manager - Solids Control |
| 96 | Reyes, Juan | B1E000918 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 97 | Rivera, Tommy Aranda | B1E000651 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 98 | Roman, Chris | B1E000537 | Midland SC-Solids Control-DIR | Service Manager |
| 99 | Ross, Joshua | B1E000206 | Newcomerstown - Trucking - Direct | Transportation Specialist I |
| 100 | Russen, John | B1E000187 | Horseheads - Trucking - Direct | Transportation Specialist I |
| 101 | Salazar, Ramon | B1E000447 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 102 | Schockman, Bradley Alan | B1E000943 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 103 | Schraeder, Kelby | B1E000426 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 104 | Sellers, Nathen | B1E000257 | Wellsville - Warehouse - Direct | Plant Manager |
| 105 | Shankles, Steven A | B1E000783 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 106 | Sharier Jr, Frank | B1E000143 | Newcomerstown-Solids Control-DIR | Shop Mechanic |
| 107 | Skinner, Ryan | B1E000351 | Wellsville - Warehouse - Direct | Assistant Mud Plant Attendant |
| 108 | Smith, Joseph William | B1E000821 | Midland SC - Engineer, SC - Direct | Solids Control Technician Trainee |
| 109 | Spicer, Nicholas | B1E000957 | Horseheads - Warehouse - Direct | Warehouse Supervisor II |
| 110 | Stahl, Bryan | B1E000088 | Newcomerstown-Solids Control-DIR | Solids Control Technician |
| 111 | Stang, Calvin | B1E000924 | Midland SC - Engineer, SC - Direct | Solids Control Technician |

| 112 | Stephens, Daniel | B1E000116 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
|-----|------------------|-----------|-------------------------------|---------------------------|
| 113 | Stone, Jeff | B1E000518 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 114 | Talkington, Brion | B1E000085 | Newcomerstown-Solids Control-DIR | Solids Control Supervisor |
| 115 | Tennant, Gary | B1E000147 | Newcomerstown - Warehouse - Direct | Assistant Mud Plant Attendant |
| 116 | Watson, Corodon Surea | B1E000406 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 117 | Welch, Timothy P. | B1E000852 | Horseheads - Trucking - Direct | Transportation Specialist I |
| 118 | Whatley, Dirk Edward | B1E000866 | Wellsville - Trucking - Direct | Transportation Specialist I |
| 119 | White, Stacy | B1E000298 | Leetsdale-Drilling Fluids-DIR | Drilling Fluids Engineer Supervisor |
| 120 | Willett, Harold | B1E000150 | Wellsville - Warehouse - Direct | Warehouse Manager |
| 121 | Williams, Brandon | B1E000449 | Midland SC-Solids Control-DIR | Solids Control Supervisor |
| 122 | Williams, Dacia | B1E000109 | Tulsa - Trucking - Direct | DOT / Fleet Administrator |
| 123 | Wise, Jeremy | B1E000519 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 124 | Witherow, Anthony D. | B1E000734 | Wellsville - Warehouse - Direct | Assistant Mud Plant Attendant |
| 125 | Yates, Isaiah | B1E000445 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 126 | Zimmermann, Demi Jenee | B1E000599 | HQ - Anchor - Finance Accounting | Revenue Accounting Manager |

SCHEDULE 1.1(b)

INSURANCE

| Coverage | Policy Number | Effective Date | Expiration Date | Carrier | Coverage Description |
|---|---|---|---|---|---|
| **General Liability/ Pollution Legal Liability** | 4076500 | 6/1/2019 | 6/1/2020 | Ironshore Specialty Insurance Company | **Limits**<br>General Aggregate — $ 2,000,000<br>Products-Completed Operations Aggregate — $ 2,000,000<br>General Liability — $ 1,000,000<br>Products-Completed Operations Aggregate — $ 1,000,000<br>Damages to Premises Rented To You — $ 500,000<br>Medical Expenses — $ 25,000<br>Site Pollution Legal Liability — $ 1,000,000<br>Contractors Pollution Liability — $ 1,000,000<br><br>**Deductible**<br>Liability — NIL<br>Each Pollution Occurrence — $ 25,000 |
| **Commercial Auto** | AS2-641-445252-029 | 6/1/2019 | 6/1/2020 | Liberty Mutual Fire Insurance Co. | **Limits**<br>Combined Single Limit - Symbol 1 - $ 2,000,000<br>Uninsured/Underinsured Motorist - Symbol 2 — Statutory<br>Personal Injury Protection — Statutory<br>Comprehensive - Symbol 2<br>Collision - Symbol 2<br><br>**Deductible**<br>Liability — NIL |
| **Workers Compensation/ Employers Liability** | WC6-641-445252-019 | 6/1/2019 | 6/1/2020 | The First Liberty Insurance Corporation | **Limits**<br>Statutory -<br>*Employers Liability*<br>Bodily Injury by Accident — $ 1,000,000<br>Policy Limit For Bodily Injury by Disease — 1,000,000 |

OMM_US:78066313.8

| Coverage | Policy No. | Effective | Expiration | Insurer | Terms | Amount |
|---|---|---|---|---|---|---|
| **$30M Umbrella Liability** | 004076600 | 6/1/2019 | 6/1/2020 | Ironshore Specialty Insurance Company | Bodily Injury by Disease | $ 1,000,000 |
| | | | | | **Deductible** | **NIL** |
| | | | | | **Limits** | |
| | | | | | General Aggregate | $ 30,000,000 |
| | | | | | Each Occurrence | $ 30,000,000 |
| | | | | | Products-Completed Operations | $ 30,000,000 |
| | | | | | *Umbrella limits are shared with Canada | - |
| | | | | | **Deductible** | **NIL** |
| **Property** | GBP00229718 | 6/1/2019 | 6/1/2020 | Allianz Global Corporate & Specialty SE | **Limits** | - |
| | | | | | General Aggregate | $ 25,000,000 |
| | | | | | * Sublimits: Various | |
| | | | | | **Deductible** | |
| | | | | | Each Occurrence | $ 25,000 |
| | | | | | Additional Deductibles as listed on policy | |

OMM_US:78066313.8

SCHEDULE 2.1

ASSETS TO BE ACQUIRED

(b)   Intellectual Property

Patents

| File No. | Title | Matter Type | Country | Status | Date Filed | Application No. | Patent No. | Grant Date | Owner |
|---|---|---|---|---|---|---|---|---|---|
| 22P12PR3 | DEHYDRATOR SYSTEM AND METHODS OF USING THE SAME | Prov | United States of America | Pending | Aug 30, 2019 | 62894512 | | | Q'Max America, Inc. |
| 22P13US | APPARATUS, METHODS AND SYSTEMS FOR REMOVING PARTICULATE IMPURITIES FROM ABOVE A SHALE SHAKER | Utility | United States of America | Issued | May 16, 2013 | 13896317 | 9352264 | May 31, 2016 | Anchor Drilling Fluids USA, LLC |

Trademarks

| MARK | FILE NUMBER | COUNTRY | STATUS | APPLICATION NO. | DATE FILED | REGISTRA TION NO. | REGISTRAT ION DATE | GOODS AND SERVICES DESCRIPTION | OWNER |
|---|---|---|---|---|---|---|---|---|---|
| Q-ENVIRO | 22M25MX1 | Mexico | Registed | 2085963 | Aug 8, 2018 | 1936224 | Aug 8, 2018 | Waste treatment apparatus for chemical treatment, oil removal, water separation and recycling, sedimentation, filtration, and flocculation of wastes from oil and gas drilling processes, shale gas drilling and fracking operations, and oil production and refinery processes; Waste water treatment apparatus for wastes in the nature of drill cuttings, oily slop wastes, water, solids and sludge including oil removal, solids removal, solids filtration and water separation and recycling; Apparatus for segregating liquid wastes from drilling cuttings; Apparatus for mud separation processes; Apparatus for solidification and stabilization of wet drilling cuttings; apparatus for dewatering sludge, waste, solids, drill cuttings, and drilling mud, and recycling waste water from oil and gas drilling operations. | Q'Max America, Inc. |
| Q-ENVIRO | 22M25MX2 | Mexico | Registed | 2085969 | Aug 8, 2018 | 1936227 | Aug 8, 2018 | Waste treatment in the nature oil removal, solids removal, solids filtration and water separation and recycling of drill cuttings, oily slop wastes, water, solids and sludge from oil and gas drilling and fracking processes; Chemical treatment of drilling wastes from oil and gas drilling operations including chemical flocculation; dewatering wastes from oil and gas drilling processes, fracking operations, and oil and gas production and refinery processes; Segregating liquid wastes from dry cuttings; collection and recycling of waste water from oil and gas drilling processes and fracking operations; Solids control and mud separation processes; Consulting services in the field of waste treatments including technical consulting in the field of solid waste management, waste water removal | Q'Max America, Inc. |

OMM_US:78066313.8

| Mark | Code | Country | Status | Number | Date | Reg. No. | Reg. Date | Goods/Services | Owner |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | and recycling of water from oil and gas drilling process and fracking operations. | |
| ANCHOR | 22M28US | United States of America | Registered | 85749071 | Oct 9, 2012 | 4839121 | Oct 27, 2015 | Chemical additives for drilling muds; chemical additives for oil well drilling fluid; chemical preparations for use in industry, namely, the oil well drilling industry; chemicals for use in the field of oil exploration and production; chemicals used in industry, namely, the oil well drilling industry; chemicals used in oil drilling all the foregoing not for use in processes related to the separation of oil/gas from water | Anchor Drilling Fluids USA, LLC |
| ANCHOR | 22M29US | United States of America | Registered | 85983278 | Oct 9, 2012 | 4737380 | May 19, 2015 | Well-site equipment rental, namely, rental of oil well drilling tools | Anchor Drilling Fluids USA, LLC |
| ANCHOR DRILLING FLUIDS | 22M30US | United States of America | Registered | 85539883 | Feb 10, 2012 | 4735566 | May 12, 2015 | Chemical additives for drilling muds; chemical additives for oil well drilling fluid; chemical preparations for use in industry; chemicals for use in the field of oil exploration and production; chemicals used in industry; chemicals used in oil drilling | Anchor Drilling Fluids USA, LLC |
| ALL. IN. EVERY WELL. | 22M31US | United States of America | Registered | 86141675 | Dec 12, 2013 | 4879290 | Jan 5, 2016 | Providing oilfield services to the oil and natural gas industry, namely, oil and gas well drilling on oil and gas wells, the rental of oil well drilling tools and equipment for the oil and gas wells and drilling waste-water treatment and/or disposable services, namely, hazardous waste disposal services to the oil and natural gas industry | Anchor Drilling Fluids USA, LLC |
| CLEARPL EX COMPLETE | 22M32US | United States of America | Registered | 86141722 | Dec 12, 2013 | 4822825 | Sep 29, 2015 | Chemicals for use in the drilling industry, namely, anionic polymers, or a blend of two or more anionic polymers and water | Anchor Drilling Fluids USA, LLC |
| CLEARPL EX I | 22M33US | United States of America | Registered | 86141700 | Dec 12, 2013 | 4822823 | Sep 29, 2015 | Chemicals for use in the drilling industry, namely, anionic polymers; anionic polymers used to coat solid materials in dewatering applications to aid in the mechanical separation of solids | Anchor Drilling Fluids USA, LLC |
| CLEARPL EX II | 22M34US | United States of America | Registered | 86141705 | Dec 12, 2013 | 4822824 | Sep 29, 2015 | Chemicals for use in the drilling industry, namely, anionic polymers; anionic polymers used to coat solid materials in dewatering applications to aid in the mechanical separation of solids | Anchor Drilling Fluids USA, LLC |

(j)    Real Estate

1.    Midland Solids Control Warehouse.

2.    Leetsdale Warehouse.

3.    Wellsville Warehouse.

OMM_US:78056313.8

4.  Horseheads Warehouse.

5.  Newcomerstown Warehouse.

6.  45,000 square feet of vacant land in Wellsville, Ohio, located across from the Wellsville Warehouse.

7.  Employee housing located at 1122 West State Street, Newcomerstown, Ohio 43832.

8.  Employee housing located at 2303 North Mulberry Lane Hobbs, New Mexico, 88240.

9.  Employee housing located at 5001 W. Wadley, Midland, Texas, Apartment No. P112.

SCHEDULE 2.4(b)

DESIGNATED CONTRACTS

(i) MATERIAL CONTRACTS

1. ABL Facility.

2. New Money Financing Agreement.

3. Amended and Restated Supply Agreement by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, LLC dated April 1, 2018 (the "Cimbar Supply Agreement").

4. Amendment No. 1 to Amended and Restated Supply Agreement by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, LLC dated January 1, 2020 (the "Amended Cimbar Supply Agreement").

5. Operating Agreement of C&A Grinding, L.L.C. by and between Cimbar Performance Minerals, Inc. and Anchor Drilling Fluids USA, Inc. dated January 1, 2012.

6. Amendment No. 1 to Operating Agreement of C&A Grinding, L.L.C. by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, LLC dated April 1, 2018.

7. Amendment No. 2 to Operating Agreement of C&A Grinding, L.L.C. by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, LLC dated March 3, 2020.

8. Sublease Agreement by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, Inc. dated December 2011 ("Cimbar Sublease").

9. Amended Sublease Agreement by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, Inc. dated April 1, 2018 ("Cimbar Amended Sublease").

10. Residential Rental Agreement by and between The Phoenix Property Management and Q'Max dated July 1, 2010 for housing located at 2303 Mulberry Lane, Hobbs, NM 88240 (the "Hobbs Housing Lease").

11. Lease Agreement by and between Penny Clark of Sarah Viola Grewell Memorial Scholarship Fund and Anchor Drilling dated November 1, 2019 for housing located at 1122 West State Street Newcomerstown, Ohio 43832 (the "Newcomerstown Housing Lease").

12. Commercial Lease by and between BMS Enterprises, LLC and Anchor Drilling dated June 1, 2017 (the "Newcomerstown Warehouse Lease").

13. Addendum to Lease Between Anchor Drilling and BMS Enterprises, LLC dated April 27, 2020 (the "Newcomerstown Warehouse Rent Deferral Agreement").

14. Lease by and between Horseheads Sand & Transloading Terminal, LLC and Anchor Drilling (the "Horseheads Warehouse Lease").

15. Lease by and between Montevallo, Inc. and Q'Max dated April 4, 2014 (the "<u>Midland Solids Control Warehouse Lease</u>").

16. Lease by and between The Port Authority for Columbiana County, Ohio and Anchor Drilling for property described as 45,000 square feet of land in Wellsville, Ohio dated July 11, 2013 (the "<u>Wellsville Yard Lease</u>").

17. Lease by and between Metroplaza Partners LLC and Patriot Drilling Fluids, a Division of Q'Max America Inc. (the "<u>Leetsdale Warehouse Lease</u>").

18. Apartment Lease Contract by and between Le Mirage and Qmax LLC for Apartment No. P112 at 5001 W. Wadley, Midland, Texas (the "<u>Midland Apartment Lease</u>").

19. Amended and Restated Equipment Lease With Option, by and between C&A Grinding, LLC, Cimbar Performance Minerals, Inc. and Anchor Drilling dated December 17, 2018.

20. Letter Agreement with respect to Amended and Restated Equipment Lease With Option, by and between C&A Grinding, LLC, Cimbar Performance Minerals, Inc. and Anchor Drilling dated December 19, 2018.

21. Letter Agreement, by and between Cimbar Performance Minerals and Anchor Drilling, dated April 3, 2020.

(ii) OTHER DESIGNATED CONTRACTS

1. Master Rental Service Agreement by and between Apache Corporation and Q'Max dated March 26, 2015.

2. Master Service Agreement by and between Callon Petroleum Company and Q'Max dated January 26, 2016.

3. Master Service Agreement by and between Diamondback E&P LLC and Anchor Drilling dated February 28, 2017.

4. Master Service Agreement by and between Grenadier Energy Partners II, LLC and Anchor Drilling dated May 8, 2019.

5. Amended and Restated Master Service/Sales Agreement by and between Pioneer Natural Resources USA, Inc. dated January 9, 2017.

6. Master Service Agreement by and between Solaris Water Midstream, LLC and Anchor Drilling dated October 4, 2018.

7. Master Service Agreement by and between XTO Energy Inc. and Anchor Drilling dated January 15, 2007.

8.   Master Service Agreement by and between Matador Production Company and Anchor Drilling dated April 29, 2019.

9.   Master Service Agreement by and between Patriot Resources, Inc. and Q'Max dated May 12, 2015.

10.  Master Service Agreement by and between CrownQuest Operating, LLC and Anchor Drilling dated October 16, 2015.

11.  Master Service Agreement by and between Halcon Operating Co., Inc. and Q'Max March 8, 2017.

12.  Master Service Agreement by and between Murphy Exploration & Production Company – USA and Anchor Drilling dated September 10, 2018.

13.  Master Service Agreement by and between Parsley Energy Operations, LLC and Anchor Drilling dated February 13, 2017.

14.  Master Service Agreement by and between XTO Energy Inc. and Anchor Drilling dated March 7, 2008.

15.  Master Service Agreement by and between Southwestern Energy Production Company and SEECO, Inc. and Anchor Drilling dated September 1, 2009.

16.  Master Service Agreement by and between Ascent Resources – Utica, LLC and Anchor Drilling dated June 26, 2019.

17.  Master Service Agreement by and between EQT Production Company and Anchor Drilling dated August 12, 2010.

18.  Master Service Agreement by and between Antero Resources Company and Anchor Drilling dated May 30, 2014.

19.  Master Service Agreement by and between Gulfport Energy Corporation and Anchor Drilling dated May 24, 2012.

20.  Master Service Agreement by and between Gulfport Energy Corporation and Q'Max dated September 8, 2014.

21.  Master Service Agreement by and between Utica Resource Operating, LLC and Anchor Drilling dated November 13, 2018.

22.  Master Service Agreement with National Fuel Gas Supply Corporation and Anchor Drilling dated March 5, 2015.

23.  Master Service Agreement by and between TransCanada Operations USA Inc. and Anchor Drilling dated April 1, 2018.

24. Master Purchase Agreement No. MPA-18-0005 by and between American Refining Group, Inc. and Anchor Drilling dated June 15, 2018.

25. Service Agreement No. MSA-19-0006 by and between American Refining Group, Inc. and Anchor Drilling dated July 8, 2019.

26. Master Lease Agreement by and between Dell Financial Services L.L.C. and Q'Max America Inc. dated November 17, 2014.

27. Master Equipment Lease Agreement by and between First National Capital, LLC, Q'Max and Anchor Drilling dated February 6, 2019.

28. Open Ended Master Lease Agreement by and between Merchants Fleet Management and Anchor Drilling dated June 27, 2018 (the "Merchants Lease").

29. Consulting Agreement by and between Landwise Consulting LLC and Anchor Drilling dated June 18, 2018.

30. Consulting Agreement by and between Wayne Munn, LLC and Anchor Drilling dated May 9, 2019.

31. Consulting Agreement by and between Spencer Ogden and Anchor Drilling dated July 12, 2018.

32. Consulting Agreement by and between Stephen Wilbourn and Anchor Drilling dated April 7, 2020.

33. Consulting Agreement by and between 1st Magnitude LLC and Anchor Drilling dated August 5, 2019.

34. Consulting Agreement by and between Team Teller, LLC and Anchor Drilling dated August 1, 2019.

35. Consulting Agreement by and between Nauset Consulting Inc. and Anchor Drilling dated July 22, 2019.

36. Consulting Agreement by and between KSKunz Consulting LLC and Anchor Drilling dated May 14, 2019.

37. Consulting Agreement by and between J Hibley Consulting LLC and Anchor Drilling dated May 20, 2019.

38. Consulting Agreement by and between BKD Consulting LLC and Anchor Drilling dated August 1, 2018.

39. Consulting Agreement by and between Rusco Operating, LLC and Anchor Drilling dated April 3, 2018.

40. Exclusive License Agreement by and between Q'Max Solutions Inc. and Q'Max dated May 22, 2020 (the "License Agreement").

41.  Office Lease Agreement, by and between GCM SO, L.L.C. and Anchor Drilling dated October 28, 2019.

42.  Master Service Agreement by and between Snyder Brothers, Inc. and Anchor Drilling dated May 22, 2020.

43.  Master Purchase Agreement by and between American Refining, Inc. and Anchor Drilling dated June 15, 2018.

44.  Master Service and Supply Agreement for Exploration and Production by and between Devon Energy Production Company, L.P. and Anchor Drilling dated May 18, 2016.

45.  Master Service Agreement by and between EAP Operating, LLC and Anchor Drilling dated October 30, 2018.

46.  Master Service Agreement by and between Jay-Bee Oil & Gas, Inc. and Anchor Drilling dated December 22, 2015.

47.  Vehicle Master Lease Agreement by and between Mobilease, Inc. and Terra Oilfield Solutions, LLC dated August 7, 2017.

SCHEDULE 4.2

LITIGATION; ORDERS

1. Kapolka v. Anchor Drilling Fluids USA, LLC and Q'Max America Inc., Civil Action No. 2:18-cv-10007 in the United States District Court for the Western District of Pennsylvania – Pittsburgh Division, alleging violations of the Fair Labor Standards Act.

## SCHEDULE 4.4

## REAL PROPERTY

(a)

1.   The Midland Solids Control Warehouse consisting of a storage warehouse and office space. Q'Max currently owes approximately $37,000.00 for unpaid rent on the Midland Solids Control Warehouse Lease.

2.   The Leetsdale Warehouse consisting of a mud plant and warehouse. Q'Max is currently not in default of the Leetsdale Warehouse Lease.

3.   The Wellsville Warehouse consisting of a mobile office, warehouse, and blending facility. The Wellsville Warehouse is subleased by Anchor Drilling pursuant to a sublease with Cimbar Performance Minerals WV, LLC. Cimbar Performance WV, LLC leases the Wellsville Warehouse directly from Cimbar Performance Minerals, OH. Anchor Drilling currently owes approximately $29,700.00 for unpaid rent on the Cimbar Sublease.

4.   45,000 square feet of vacant land in Wellsville, Ohio, located across from the Wellsville Warehouse. Anchor currently owes approximately $2,500.00 for unpaid rent on the Wellsville Yard Lease.

5.   The Horseheads Warehouse. Anchor is currently not in default of the Horseheads Warehouse Lease.

6.   The Newcomerstown Warehouse consisting of a storage warehouse and mud plant. Anchor is currently not in default of the Newcomerstown Warehouse Lease. Anchor has continued to make rent payments per the Newcomerstown Warehouse Rent Deferral Agreement.

7.   Employee housing located at 1122 West State Street, Newcomerstown, Ohio 43832. Anchor currently owes approximately $3,000.00 for unpaid rent on Newcomerstown Housing Lease.

8.   Employee housing located at 2303 North Mulberry Lane Hobbs, New Mexico, 88240. Anchor is currently not in default of the Hobbs, NM Housing Lease.

9.   Employee housing located at 5001 W. Wadley, Midland, Texas, Apartment No. P112. Anchor is currently not in default of the Midland Apartment Lease.

(b)

2984 North Wingate Avenue, Odessa, Texas 79764. Owned by Anchor Drilling. The premises contain an abandoned warehouse and a storage yard for solids control assets owned by Anchor Drilling.

SCHEDULE 4.5

ENVIRONMENTAL MATTERS

(a)     None.

(b)     On October 10, 2017, a release of diesel fuel (estimated to be less than 550 gallons) occurred at Anchor Drilling's facility in Wellsville, Ohio. The diesel fuel was released to a storm sewer and entered the Ohio River. The release was reported to the local, regional and federal authorities. The release was contained by the deployment of primary and secondary booms. Anchor Drilling immediately hired environmental remediation contractors to address the release.

(c)     None.

(d)     None.

SCHEDULE 4.6

SUPPLIERS; CUSTOMERS

(a)

| Supplier | LTM Spend ending 4/30/20 |
|---|---|
| 1. Cimbar WV | $13,000,821 |
| 2. American Refining Group, Inc. | $5,001,634 |
| 3. Ingevity Corporation | $2,592,210 |
| 4. Synthex Organics, LLC | $1,346,471 |
| 5. Abilene Rental Center, LLC | $1,304,626 |
| 6. Myers Well Service Inc. | $1,236,658 |
| 7. Coyle Transport Services, Inc. | $440,309 |
| 8. United Centrifuge Manufacturing Inc. | $437,348 |
| 9. Tetra Specialty Chemicals | $428,341 |
| 10. Greer Industries, Inc. | $326,233 |

(b)

| Customer | LTM Revenue ending 4/30/20 |
|---|---|
| 1. Southwestern Energy | $22,720,231 |
| 2 Ascent Resources | $14,411,356 |
| 3. Devon Energy | $8,715,197 |
| 4. EAP Operating, LLC | $5,733,569 |
| 5. EQT Production Company | $3,353,506 |
| 6. Columbia Gas Transmission LLC | $3,156,421 |
| 7. Antero Resources Corporation | $2,456,065 |
| 8. XTO Energy, Inc. | $2,180,700 |
| 9. Tribune Resources, LLC | $2,063,300 |
| 10. Jay Bee Oil and Gas | $1,756,930 |

SCHEDULE 4.8

EXISTING CONTRACTS

| | Contract | Cure Amount |
|---|---|---|
| 1. | Cimbar Supply Agreement. | $2,610,796 |
| 2. | Amended Cimbar Supply Agreement. | Same as #1 above |
| 3. | Operating Agreement of C&A Grinding, L.L.C. by and between Cimbar Performance Minerals, Inc. and Anchor Drilling Fluids USA, Inc. dated January 1, 2012. | None |
| 4. | Amendment No. 1 to Operating Agreement of C&A Grinding, L.L.C. by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, LLC dated April 1, 2018. | None |
| 5. | Amendment No. 2 to Operating Agreement of C&A Grinding, L.L.C. by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, LLC dated March 3, 2020. | None |
| 6. | Cimbar Sublease. | $29,700 |
| 7. | Cimbar Amended Sublease. | Same as #1 above |
| 8. | Amended and Restated Equipment Lease With Option, by and between C&A Grinding, LLC, Cimbar Performance Minerals, Inc. and Anchor Drilling dated December 17, 2018. | None (Cimbar owes the JV $30,000 for rent) |
| 9. | Letter Agreement with respect to Amended and Restated Equipment Lease With Option, by and between C&A Grinding, LLC, Cimbar Performance Minerals, Inc. and Anchor Drilling dated December 19, 2018. | None |
| 10. | Settlement Agreement and Release, by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling, dated January 10, 2019. | None |
| 11. | Letter Agreement, by and between Cimbar Performance Minerals and Anchor Drilling, dated April 3, 2020. | Same as # 1 above |
| 12. | Master Rental Service Agreement by and between Apache Corporation and Q'Max dated March 26, 2015. | None |
| 13. | Master Service Agreement by and between Callon Petroleum Company and Q'Max dated January 26, 2016. | None |
| 14. | Master Service Agreement by and between Diamondback E&P LLC and Anchor Drilling dated February 28, 2017. | None |
| 15. | Master Service Agreement by and between Grenadier Energy Partners II, LLC and Anchor Drilling dated May 8, 2019. | None |
| 16. | Amended and Restated Master Service/Sales Agreement by and between Pioneer Natural Resources USA, Inc. dated January 9, 2017. | None |
| 17. | Master Service Agreement by and between Solaris Water Midstream, LLC and Anchor Drilling dated October 4, 2018. | None |
| 18. | Master Service Agreement by and between XTO Energy Inc. and Anchor Drilling dated January 15, 2007. | None |
| 19. | Master Service Agreement by and between Matador Production Company and Anchor Drilling dated April 29, 2019. | None |
| 20. | Master Service Agreement by and between Patriot Resources, Inc. and Q'Max dated May 12, 2015. | None |
| 21. | Master Service Agreement by and between CrownQuest Operating, LLC and Anchor Drilling dated October 16, 2015. | None |
| 22. | Master Service Agreement by and between Halcon Operating Co., Inc. and Q'Max March 8, 2017. | None |
| 23. | Master Service Agreement by and between Murphy Exploration & Production Company – USA and Anchor Drilling dated September 10, 2018. | None |

**WRITTEN CONSENT**
**OF THE SOLE MEMBER OF**
**ANCHOR DRILLING FLUIDS USA, LLC**

May 22, 2020

The undersigned, being the sole member of Anchor Drilling Fluids USA, LLC, a member-managed Delaware limited liability company (the "***Company***"), does hereby adopt, vote for, consent to and approve the following resolution:

RESOLVED, that James Katchadurian is hereby appointed and elected to serve as the Chief Restructuring Officer of the Company effective as of the date hereof and until his resignation, death or removal.

.
IN WITNESS WHEREOF, the undersigned has executed this consent effective as of the date first above written.

Q'Max America Inc.,
Its sole member

By: _____
　　　Rafael Diaz-Granados, President

THIS IS EXHIBIT " __31__ "
referred to in the Affidavit of
__Cameron Bailey__
Sworn before me this __26th__
day of __May__ A.D. 20__20__

Jonathan Tomm
Barrister and Solicitor

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

```
------------------------------------------------------------------ x
                                          :
In re:                                    :      Chapter 11
                                          :
Anchor Drilling Fluids USA, LLC,          :      Case No. 20-60031 (CML)
                                          :
                         Debtor.          :
                                          :
------------------------------------------------------------------ x
```

## CORPORATE OWNERSHIP STATEMENT

Pursuant to rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the following are corporations, other than a governmental unit, that directly or indirectly own 10% or more of any class of the Debtor's equity interests:

| Shareholder | Approximate Percentage of Shares Held |
| --- | --- |
| Q'Max America Inc. | 100% |
| Central Procurement Inc. | Owns 100% of shares of Q'Max America Inc. |
| Q'Max Solutions Inc. | Owns 100% of shares of Central Procurement Inc. |
| Fluid Holding Corp | Owns 100% of shares of Q'Max Solutions Inc. |

THIS IS EXHIBIT " _____32_____ "

referred to in the Affidavit of

_____Cameron Bailey_____

Sworn before me this _____26th_____

day of _____May_____ A.D. 20_20_

_____

Jonathan Tomm
Barrister and Solicitor

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

__Southern__ District of __Texas__
                                    (State)

Case number (*if known*): _____ Chapter __7__

☐ Check if this is an
   amended filing

## Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    04/20

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

1. **Debtor's name**

   Q'MAX America, Inc.

2. **All other names debtor used in the last 8 years**

   Include any assumed names, trade names, and *doing business as* names

3. **Debtor's federal Employer Identification Number (EIN)**

   9  8  –  0  5  4  2  3  1  9

4. **Debtor's address**

   **Principal place of business**

   11700 Katy Fwy., Suite 200
   Number     Street

   Houston, TX  77079
   City          State    ZIP Code

   Harris
   County

   **Mailing address, if different from principal place of business**

   Number     Street

   P.O. Box

   City          State    ZIP Code

   **Location of principal assets, if different from principal place of business**

   Number     Street

   City          State    ZIP Code

5. **Debtor's website (URL)**

   https://qmax.com

Debtor   Q'MAX America, Inc.
          Name

Case number (if known) _____

---

**6. Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

---

**7. Describe debtor's business**

A. Check one:

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☑ None of the above

B. Check all that apply:

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

2   1   1   1

---

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of the chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

Check one:

☑ Chapter 7

☐ Chapter 9

☐ Chapter 11. Check all that apply:

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,725,625. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11**. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

---

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☑ No

☐ Yes.  District _____  When _____  Case number _____
                                          MM / DD / YYYY

          District _____  When _____  Case number _____
                                          MM / DD / YYYY

---

Debtor    Q'MAX America, Inc._____    Case number (if known)_____
                    Name

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

☐ No

☑ Yes.    Debtor    See Attached_____    Relationship _____

          District _____    When    _____
                                                               MM / DD / YYYY

          Case number, if known _____

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?**_____
                         Number      Street

                         _____

                         _____    _____
                         City                            State ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

      Contact name _____

      Phone _____

---

**Statistical and administrative information**

---

**13. Debtor's estimation of available funds**

*Check one:*

☐ Funds will be available for distribution to unsecured creditors.

☑ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

☐ 1-49          ☐ 1,000-5,000       ☐ 25,001-50,000
☐ 50-99         ☐ 5,001-10,000      ☐ 50,001-100,000
☐ 100-199       ☐ 10,001-25,000     ☐ More than 100,000
☑ 200-999

---

Official Form 201        Voluntary Petition for Non-Individuals Filing for Bankruptcy        page **3**

Debtor  Q'MAX America, Inc.
         Name

Case number (if known) _____

| | | |
|---|---|---|
| **15. Estimated assets** | ☑ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| | ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| | ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| | ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |
| **16. Estimated liabilities** | ☐ $0-$50,000 | ☑ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| | ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| | ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| | ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

### Request for Relief, Declaration, and Signatures

**WARNING —** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   05/24/2020
              MM / DD / YYYY

✖ _____
Signature of authorized representative of debtor

Rafael Andres Diaz-Granados
Printed name

Title President and CEO

**18. Signature of attorney**

✖ /s/ John F. Higgins
Signature of attorney for debtor

Date   05/24/2020
       MM / DD / YYYY

John F. Higgins
Printed name

Porter Hedges LLP
Firm name

1000 Main St 36th floor
Number    Street

Houston                                    TX      77002
City                                       State   ZIP Code

713.226.6000                               jhiggins@porterhedges.com
Contact phone                              Email address

09597500                                   TX
Bar number                                 State

**ATTACHMENT TO PETITION OF**
**Q'MAX AMERICA, INC.**

**Question No. 10 – Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

| Debtor | Relationship | District | When | Case No. |
|---|---|---|---|---|
| Anchor Drilling Fluids USA, LLC | Debtor Affiliate | SD Texas | Concurrently | |

**WRITTEN CONSENT**
**OF THE SOLE DIRECTOR OF**
**Q'MAX AMERICA INC.**

May 24, 2020

The undersigned, being the sole director of Q'Max America Inc., a Delaware corporation (the "***Company***"), does hereby adopt, vote for, consent to and approve the following resolutions:

WHEREAS, since 2019, the Company and its affiliates have been focused on a permanent and comprehensive solution to its challenged fiscal circumstances to improve its capital structure, reduce its debt levels, improve liquidity and strengthen its financial position in order to be able to achieve its business objectives and maximize value for all stakeholders; and

WHEREAS, despite the Company's and its affiliates' efforts to navigate prolonged difficult industry conditions and improve its capital structure, the Company has continued to be negatively impacted by continued and further reductions in rig activity levels, significant decreases in operating receipts and collection challenges with a major Mexican customer; and

WHEREAS, in late April 2020, it became apparent that the Company and its affiliates would not be in a position to continue operating as a going-concern without access to immediate additional liquidity. The Company and its affiliates began discussions with the HSBC Lending Syndicate in February 2020 and entered into various credit agreement amendments that relieve or modify covenants to address financial pressure; and

WHEREAS, as a result, the Company and its affiliates determined to commence a restructuring plan (the "***Restructuring Plan***"). The Restructuring Plan was developed in consultation with the Company's and its affiliates' professional and financial advisors and would be implemented through a proceeding filed under the Companies' Creditors Arrangement Act in Canada along with a case under chapter 15 of the United States Bankruptcy Code (collectively, the "***Proceedings***"); and

WHEREAS, in order for the Restructuring Plan to be successful, the Company and its affiliates began negotiating with the HSBC Lending Syndicate and Encina Business Credit, LLC ("***Encina***") for additional loans to fund the Restructuring Plan in the Proceedings; and

WHEREAS, during April through May 2020, the Company and its affiliates and their professional advisors undertook a significant number of negotiations and term sheet drafts among the Company, the HSBC Lending Syndicate and Encina for additional liquidity to fund the Restructuring Plan in the Proceedings. These negotiations were difficult and protracted; and

WHEREAS, on May 17, 2020, the HSBC Lending Syndicate advised that they would not provide any funding for the Restructuring Plan in the Proceedings and would object to the Company and its affiliates commencing the Proceedings; and.

WHEREAS, consequently, the Company and its affiliates continued negotiations with Encina to fund debtor-in-possession financing in a chapter 11 case under the United States Bankruptcy Code for the Company, Central Procurement Inc. ("***Central***") and Anchor Drilling Fluids USA LLC ("***Anchor***" and collectively with the Company, the "***U.S. Subsidiaries***").  Negotiations continued with Encina under the chapter 11 option during the month of May. One of the purposes of the chapter 11 proceeding was to implement a sale process to consummate an asset purchase transaction pursuant to which Palladium Equity Partners IV, L.P., an affiliate of certain stockholders of the Company ("***Palladium***") would sponsor a new entity ("***PurchaseCo***") to make a stalking horse bid to acquire certain of the assets and ongoing business of the U.S. Subsidiaries ("***ProfitCo***") (such sale, the "***Sale Transaction***"); and

WHEREAS, as an additional benefit of continuing the business of ProfitCo as going concern, the Sale Transaction would preserve the jobs of more than 100 employees in Texas, Ohio, Pennsylvania and New York and such employees would continue as employees of ProfitCo; and

WHEREAS, ultimately, on May 19, 2020 Encina indicated it was unwilling to fund a chapter 11 case to support the process for the Sale Transaction because of insufficient borrowing base under their ABL facility; and

WHEREAS, at the time of Encina's decision not to fund a chapter 11 case, the liquidity position of the U.S. Subsidiaries would not allow them to operate any further; and

WHEREAS, as a result, the U.S. Subsidiaries have explored every option to restructure their financial affairs, but without additional liquidity from the HSBC Lending Syndicate and/or Encina no viable options are available; and

WHEREAS, Palladium has indicated it would be willing to provide additional liquidity and pursue the Sale Transaction in Chapter 7 proceedings of the U.S. Subsidiaries if the Chapter 7 trustee were willing to continue operations until the Sale Transaction could be approved and consummated; and

WHEREAS, in the judgment of the sole director of the Company, it is desirable and in the best interest of the U.S. Subsidiaries to cause a petition to be filed by each of the U.S. Subsidiaries seeking relief under the provisions of chapter 7 of title 11, United States Code (the "***Bankruptcy Code***"), and for the Chapter 7 trustee to pursue a sale of ProfitCo to PurchaseCo or an alternative bidder through the chapter 7 process in accordance with the provisions of the Bankruptcy Code and other applicable law.

NOW, THEREFORE, BE IT

**Filing and Prosecution of Bankruptcy Case**

RESOLVED, that it is desirable and in the best interest of the US Subsidiaries and their creditors, stockholders, and other interested parties to authorize the US Subsidiaries, their members, directors and officers, to cause a petition to be filed in the name of each of the US Subsidiaries (the "*Chapter 7 Petitions*") seeking relief under the provisions of chapter 7 of the Bankruptcy Code; and it is further

RESOLVED, that the members, directors and the President, any Vice President, or such other officer(s) of the US Subsidiaries as they shall from time to time designate (each, an "*Authorized Officer*") be, and each hereby is, authorized and directed to execute and verify the Chapter 7 Petitions and to cause the same to be filed in the United States Bankruptcy Court for the Southern District of Texas (the "*Bankruptcy Court*"), in such form and at such time as such members, directors and Authorized Officers shall determine; and it is further

RESOLVED, that such members, directors and Authorized Officers be, and each hereby is, authorized to execute and file (or direct others to do so on behalf of the Company as provided herein) all necessary documents, including, without limitation, all petitions, affidavits, schedules, motions, lists, applications, pleadings and other papers, and in connection therewith, to employ and retain all assistance by legal counsel, accountants or other professionals and to take any and all action which they deem necessary and proper in connection with the chapter 7 cases; and it is further

**Employment of Professionals**

RESOLVED, that the law firm of Porter Hedges, LLP be, and hereby is, employed under general retainer as bankruptcy counsel for the Company to prepare and file the chapter 7 case, and the Authorized Officers of the Company are hereby authorized and directed to execute appropriate retention agreements and pay appropriate retainers; and it is further

RESOLVED, that the Authorized Officers of the Company be, and they hereby are, authorized and directed to employ any other firm as professionals, appraisers or consultants to the Company as are deemed necessary to represent and assist the Company in carrying out its duties under the Bankruptcy Code and, in connection therewith, the Authorized Officers of the Company are hereby authorized and directed to execute appropriate retention agreements and pay appropriate retainers; and it is further

RESOLVED, that all acts lawfully done or actions lawfully taken by any Authorized Officers to seek relief under chapter 7 of the Bankruptcy Code or in connection with the chapter 7 case, or any matter related thereto, be, and hereby are, adopted, ratified, confirmed and approved in all respects; and it is further

**Operational Actions**

RESOLVED, that the members, directors and Authorized Officers of the US Subsidiaries are authorized to take such actions as they deem necessary in connection with the preparation for filing of the chapter 7 cases, including without limitation, paying final payrolls and related payroll taxes, sales taxes and other trust fund taxes prior to such filings, terminating the employment of such employees as such members, directors and Authorized Officers determine to be appropriate, terminating the 401k plan of Anchor and pursuing the sale of all their assets other than those included in ProfitCo (the "***Other Asset Sales***"); and it is further

**Sale of ProfitCo**

RESOLVED, that the members, directors and Authorized Officers of the Company and Anchor are authorized to pursue negotiations for the sale of the assets comprising ProfitCo to PurchaseCo and to enter into an Asset Purchase Agreement on the terms and conditions for such sale set forth in the Asset Purchase Agreement attached hereto as Exhibit A, with such changes therein as the Authorized Officers may approve, such approval to be evidenced by their execution thereof; and it is further

**General Authorizing Resolutions**

RESOLVED, that the members, directors and Authorized Officers of the US Subsidiaries be, and each of them, hereby is authorized to make, enter into, execute, deliver and file any and all other or further agreements, documents, certificates, materials and instruments, and to take or cause to be taken any and all other actions as any such members, directors and Authorized Officers deem to be necessary, appropriate or advisable to carry out the purposes of the foregoing resolutions and the transactions contemplated thereunder or to successfully complete the filing of the chapter 7 cases and the sale of ProfitCo and the Other Asset Sales; and it is further

RESOLVED, that all authorized acts, transactions, or agreements undertaken prior to the adoption of these resolutions by any such members, directors and Authorized Officers in connection with the foregoing matters are hereby authorized, approved, ratified and confirmed.

*[Signature on Following Page]*

IN WITNESS WHEREOF, the undersigned has executed this consent effective as of the date first above written.

_____

Rafael Diaz-Granados

**Execution**

# ASSET PURCHASE AGREEMENT

dated as of May 24, 2020

by and among

QMAX ACQUISITION CORP.

as Buyer,

and

Q'MAX AMERICA INC.,

and

ANCHOR DRILLING FLUIDS USA, LLC

as Sellers

## TABLE OF CONTENTS

**ASSET PURCHASE AGREEMENT**................................................................................1

**ARTICLE 1 DEFINITIONS**.....................................................................................1
    1.1    Defined Terms ...................................................................................1
    1.2    Interpretation ....................................................................................12

**ARTICLE 2 ACQUIRED ASSETS AND ASSUMPTION OF LIABILITIES** ...................13
    2.1    Assets to be Acquired ......................................................................13
    2.2    Excluded Assets ...............................................................................16
    2.3    Liabilities to be Assumed by Buyer ...................................................16
    2.4    Assignment and Assumption of Contracts............................................17
    2.5    Excluded Liabilities ..........................................................................18
    2.6    Withholding .....................................................................................20

**ARTICLE 3 CLOSING; CASH PURCHASE PRICE** ..............................................20
    3.1    Closing; Transfer of Possession; Certain Deliveries ............................20
    3.2    Consideration ...................................................................................22
    3.3    Deposit ...........................................................................................22
    3.4    Allocation of Purchase Price .............................................................23

**ARTICLE 4 REPRESENTATIONS AND WARRANTIES REGARDING
SELLERS**.................................................................................................23
    4.1    Organization....................................................................................23
    4.2    Litigation; Orders ............................................................................24
    4.3    Compliance with Laws; Permits ........................................................24
    4.4    Real Property. ..................................................................................24
    4.5    Environmental Matters......................................................................25
    4.6    Suppliers; Customers. ......................................................................25
    4.7    RESERVED. ....................................................................................26
    4.8    Contracts.. ......................................................................................26
    4.9    Taxes. ............................................................................................26
    4.10    Brokers' Fees and Commissions.........................................................27

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER** ..........................28
    5.1    Organization....................................................................................28
    5.2    Due Authorization, Execution and Delivery; Enforceability..................28
    5.3    Governmental Approvals ...................................................................28
    5.4    No Conflicts ....................................................................................28
    5.5    Sufficiency of Funds ........................................................................29
    5.6    Condition of Business. ......................................................................29

**ARTICLE 6 COVENANTS OF THE PARTIES** ....................................................29
    6.1    Conduct Pending the Closing.............................................................29

OMM_US:77874592.25

| | | |
|---|---|---|
| 6.2 | Access | 29 |
| 6.3 | Physical Inventory. | 30 |
| 6.4 | Tax Matters | 30 |
| 6.5 | Approvals; Commercially Reasonable Efforts; Notification; Consent | 30 |
| 6.6 | Further Assurances. | 31 |
| 6.7 | Bankruptcy Actions and Court Filings | 31 |
| 6.8 | Expense Reimbursement. | 32 |
| 6.9 | Preservation of Books and Records | 32 |
| 6.10 | Notification of Certain Matters | 32 |
| 6.11 | Confidentiality | 33 |
| 6.12 | Contractors. | 33 |

**ARTICLE 7 CONDITIONS TO OBLIGATIONS OF THE PARTIES ... 33**

| | | |
|---|---|---|
| 7.1 | Conditions Precedent to Obligations of Buyer | 33 |
| 7.2 | Conditions Precedent to the Obligations of the Sellers | 35 |
| 7.3 | Frustration of Conditions Precedent | 35 |

**ARTICLE 8 TERMINATION ... 35**

| | | |
|---|---|---|
| 8.1 | Termination of Agreement | 35 |
| 8.2 | Consequences of Termination | 37 |

**ARTICLE 9 MISCELLANEOUS ... 37**

| | | |
|---|---|---|
| 9.1 | Expenses | 37 |
| 9.2 | Assignment | 38 |
| 9.3 | Parties in Interest | 38 |
| 9.4 | Notices | 38 |
| 9.5 | Choice of Law | 39 |
| 9.6 | Entire Agreement; Amendments and Waivers | 39 |
| 9.7 | Counterparts; Electronic Signatures | 39 |
| 9.8 | Severability | 39 |
| 9.9 | Headings | 40 |
| 9.10 | Exclusive Jurisdiction and Specific Performance | 40 |
| 9.11 | WAIVER OF RIGHT TO TRIAL BY JURY | 40 |
| 9.12 | Survival | 40 |
| 9.13 | Time of Essence | 41 |
| 9.14 | Non-Recourse | 41 |
| 9.15 | Disclosure Schedules | 41 |
| 9.16 | Mutual Drafting | 41 |

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of May 24, 2020, (the "Agreement Date"), by and among Q'Max America Inc., a company incorporated under the laws of Delaware ("Q'Max"), and Anchor Drilling Fluids USA, LLC, a Delaware limited liability company ("Anchor Drilling" and, together with Q'Max, "Sellers" and each, a "Seller") and QMax Acquisition Corp., a Delaware corporation ("Buyer"). Each Seller and Buyer are referred to herein individually as a "Party" and collectively as the "Parties".

## WITNESSETH:

**WHEREAS**, Sellers have agreed to sell to Buyer, and Buyer has agreed to purchase, the Acquired Assets as of the Closing, and Buyer is willing to assume from Sellers the Assumed Liabilities as of the Closing upon terms and subject to the conditions set forth hereinafter.

**NOW**, **THEREFORE**, in consideration of the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     Defined Terms.  As used herein, the terms below shall have the following respective meanings:

"ABL Facility" shall mean the credit agreement (as amended, restated, supplemented or otherwise modified from time to time) dated as of September 6, 2019, by and among Anchor Drilling Fluids USA, LLC, Q'Max America Inc., the lenders party thereto and Encina Business Credit, LLC as agent on behalf of such lenders.

"Accounts Receivable" shall have the meaning specified in Section 2.1(a).

"Acquired Assets" shall have the meaning specified in Section 2.1.

"Affiliate" shall, with respect to any Person, mean any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.  For purposes of this Agreement, Q'Max Solutions Inc. and each of its Subsidiaries (including each of the Sellers), on the one hand, and the Buyer and its Affiliates, on the other hand, shall not be deemed to be Affiliates of each other.

"Agreement" shall mean this Asset Purchase Agreement, together with the exhibits and Disclosure Schedules hereto, in each case as amended, restated, supplemented or otherwise modified from time to time.

"Agreement Date" shall have the meaning specified in the preamble.

"Allocation" shall have the meaning specified in Section 3.4.

"Alternative Transaction" shall mean (i) any investment in, financing of, capital contribution or loan to, or restructuring or recapitalization of the Sellers, (ii) any merger, consolidation, share exchange or other similar transaction to which a Seller or any of its Affiliates is a party that has the effect of transferring, directly or indirectly, all or any portion of the Acquired Assets, or any issuance, sale or transfer of equity interests in, the Sellers, (iii) any direct or indirect sale of all or any portion of the Acquired Assets, (iv) any issuance, sale or transfer of equity interests in, the Sellers or any of their Subsidiaries or (v) any other transaction (other than a liquidation or a plan of liquidation), including a reorganization (in any jurisdiction, whether domestic, foreign, international or otherwise), that transfers or vests ownership of, economic rights to, or benefits in all or a portion of the Acquired Assets, to any party other than Buyer or any of its Affiliates, in each instance, whether or not such transaction is entered into in connection with any bankruptcy, insolvency, arrangement, proposal, receivership or similar Proceedings.

"Anchor Drilling" shall have the meaning specified in the preamble.

"Assignment and Assumption Agreement" means an assignment and assumption agreement, in a form mutually agreed to by the Parties, evidencing the assignment to the Buyer of the Sellers' rights, benefits and interests in, to and under the Assumed Contracts and the assumption by the Buyer of the Assumed Liabilities under the Assumed Contracts.

"Assumed Contracts" means those Leases and Executory Contracts that have been designated by Buyer for assumption and assignment to Buyer by Seller pursuant to Section 2.4 and with respect to which an order has been entered by the Bankruptcy Court (which may be the Sale Order) authorizing the assumption and assignment of the Lease or Executory Contract and an Assumption Notice has been delivered and filed with the Bankruptcy Court. For the avoidance of doubt, "Assumed Contracts" shall not include any Executory Contract or Lease that is excluded and rejected pursuant to Section 2.4.

"Assumed Liabilities" shall have the meaning specified in Section 2.3.

"Assumption Notice" has the meaning set forth in Section 2.4(b).

"Avoidance Actions" means all avoidance claims, causes of action, or rights of recovery under Chapter 5 of the Bankruptcy Code or similar state Laws.

"Bankruptcy Cases" shall mean the jointly administered bankruptcy cases commenced by the Sellers.

"Bankruptcy Code" shall mean title 11 of the United States Code, 11 U.S.C. §101 et seq.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of Texas.

-2-

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the City of New York are not required to open.

"Buyer" shall have the meaning specified in the preamble.

"Buyer's Conditions Certificate" shall have the meaning specified in Section 7.2(d).

"Capital Lease" shall mean, for any Person, a lease of any interest in any kind of property (whether real, personal or mixed) or asset by such Person as lessee that is, should be or should have been recorded as a "capital lease" on the balance sheet of such Person in accordance with GAAP.

"Cash Purchase Price" shall have the meaning specified in Section 3.2(a).

"Chapter 7" means Chapter 7 of the Bankruptcy Code.

"Claim" shall mean all actions, claims, counterclaims, suits, Proceedings, rights of action, causes of action, Liabilities, obligations, losses, damages, remedies, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of investigation, interest, demands and actions of any nature or any kind whatsoever, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract or otherwise, including any "claim" as defined in the Bankruptcy Code.

"Closing" shall have the meaning specified in Section 3.1(a).

"Closing Date" shall have the meaning specified in Section 3.1(a).

"Closing Date Inventory" shall mean the carrying value of the Inventory as of the Closing Date calculated as such Inventory would be recorded on a balance sheet of the Sellers in accordance with GAAP and consistent with past practice.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Conditions Certificate" shall have the meaning specified in Section 7.2(d).

"Consent" shall have the meaning set forth in Section 2.4(e).

"Contract" shall mean any contract, agreement, indenture, note, bond, loan, instrument, lease (including Capital Lease), conditional sales contract, purchase order, mortgage, license, franchise, insurance policy, letter of credit, commitment or other binding arrangement or commitment, whether or not in written form, that is binding upon a Person or any of its property.

"Cure Amounts" has the meaning set forth in Section 2.4(c).

"C&A Grinding Equity Interests" shall have the meaning specified in Section 2.1(x).

"C&A Grinding" shall mean C&A Grinding, LLC, a Georgia limited liability company.

-3-

"Continuing Employees" means those employees set forth on Schedule 1.1(a).

"Designated Contracts" has the meaning set forth in Section 2.4(b).

"Designation Deadline" means 5:00 p.m. (prevailing Eastern time) on the date that is ten (10) days after the Petition Date.

"Disclosure Schedules" shall mean the disclosure schedules, delivered by Sellers and Buyer concurrently with the execution and delivery of this Agreement, as amended from time to time in accordance with and subject to the terms hereof.

"Encina" means Encina Business Credit, LLC.

"Encina Exit Financing Commitment Letter" shall mean an executed commitment letter, in form and substance acceptable to Buyer, pursuant to which Encina shall have agreed to lend at the Closing the amounts set forth therein to Buyer in order to fund, subject to the terms and conditions thereunder, the Regional Business and refinance (or assume on amended terms) the ABL Facility and the financing provided in the New Money Financing Agreement.

"Environmental Law" means any Law relating to pollution, the protection of human health and safety (with respect to exposure to hazardous materials), the environment, natural resources or the release, manufacture, processing, treatment, storage, disposal or handling of, or exposure to, hazardous materials.

"Environmental Liabilities and Obligations" means all Liabilities arising from any impairment, impact or damage to the environment, health or safety, or any failure to comply with Environmental Law, including Liabilities related to: (a) the transportation, storage, use, arrangement for disposal or disposal of, or exposure to, Hazardous Materials; (b) the Release of Hazardous Materials, including migration onto or from the Owned Real Property and Leased Real Property that are Acquired Assets; (c) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (d) any other obligations imposed under Environmental Law including pursuant to any applicable Permits issued pursuant to under any Environmental Law; (e) Orders, notices to comply, notices of violation, alleged non-compliance and inspection reports with respect to any Liabilities pursuant to Environmental Law; and (f) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable Environmental Law.

"ERISA Affiliate" means .any trade or business, whether or not incorporated, that together with the Sellers would be deemed a "single employer" within the meaning of Section 4001(b)(i) of ERISA.

"Excluded Assets" shall have the meaning specified in Section 2.2.

"Excluded Contract" has the meaning set forth in Section 2.4(b).

"Excluded Liabilities" shall have the meaning specified in Section 2.5.

-4-

"Executory Contract" means a Contract to which one or more of the Sellers are party that is subject to assumption or rejection under sections 365 of the Bankruptcy Code, other than the Leases.

"Expense Reimbursement" shall mean the documented actual out-of-pocket costs, fees and expenses  incurred by Buyer or its Affiliates in connection with the negotiation, documentation and implementation of this Agreement, the Transaction Documents, and the transactions contemplated thereby.

 "GAAP" shall mean generally accepted accounting principles as in effect from time to time in the United States.

"Governmental Entity" shall mean any federal, state, provincial, local, municipal, domestic, foreign, multinational, international or other (a) government, (b) governmental or quasi-governmental authority of any nature (including any governmental agency, ministry, branch, department, official, or entity and any court or other tribunal), or (c) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, prosecutorial, police, regulatory, or Tax Authority or power of any nature, including any arbitration tribunal or stock exchange.

"Guarantee" by any Person shall mean any obligation, contingent or otherwise, of such Person guaranteeing, or having the economic effect of guaranteeing, any Indebtedness of any other Person (the "Primary Obligor") in any manner, whether directly or indirectly, and including, without limitation, any obligation of such Person: (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness; (ii) to purchase property, securities or services for the purpose of assuring the holder of such Indebtedness of the payment of such Indebtedness; or (iii) to maintain working capital, equity capital or other financial statement condition or liquidity of the Primary Obligor so as to enable the Primary Obligor to pay such Indebtedness (and "Guaranteed," "Guaranteeing" and "Guarantor" shall have meanings correlative to the foregoing).

"Hazardous Material" means any substance, material or waste which is regulated by any Governmental Entity, including petroleum and its by-products, asbestos, polychlorinated biphenyls and any material, waste or substance which is defined or identified as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under or subject to any provision of Environmental Law.

"Horseheads Warehouse" shall mean that certain warehouse leased by the Sellers located at 124 Wygant Road, Building B, Horseheads, New York 14845.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by (or which customarily would be evidenced by) bonds, debentures, notes or similar instruments, (c) all reimbursement obligations of such Person with respect to letters of credit and similar instruments, (d) all obligations of such Person under conditional sale or other

-5-

title retention agreements relating to property or assets purchased by such Person, (e) all obligations of such Person incurred, issued or assumed as the deferred purchase price of property other than accounts payable incurred and paid on terms customary in the business of such Person (it being understood that the "deferred purchase price" in connection with any purchase of property or assets shall include only that portion of the purchase price which shall be deferred beyond the date on which the purchase is actually consummated), (f) all obligations secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all obligations of such Person under forward sales, futures, options and other similar hedging arrangements (including interest rate hedging or protection agreements), (h) all obligations of such Person to purchase or otherwise pay for merchandise, materials, supplies, services or other property under an arrangement which provides that payment for such merchandise, materials, supplies, services or other property shall be made regardless of whether delivery of such merchandise, materials, supplies, services or other property is ever made or tendered, (i) all guaranties by such Person of obligations of others, (j) all Capital Lease obligations of such Person and (k) any obligations of such Person Guaranteeing or intended to Guarantee (whether directly or indirectly Guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness of such other Person under any of clauses (a) through (j) above.

"Interim Period" shall have the meaning specified in Section 6.1.

"Intellectual Property" means all intellectual property and industrial property, throughout the world, whether or not registerable, patentable or otherwise formally protectable, and whether or not registered, patented, otherwise formally protected or the subject of a pending application for registration, patent or any other formal protection, including all (i) trade-marks, corporate names and business names currently or formerly used in connection with the Regional Business, including, the "Q'Max America" and "Anchor Drilling Fluids" names and brands, (ii) inventions, (iii) works and subject matter in which copyright, neighboring rights or moral rights subsist, (iv) industrial designs, product designs, patents and design rights (v) know-how, trade secrets, proprietary information, confidential information and information of a sensitive nature that have value to the Regional Business or relate to business opportunities for the Regional Business, in whatever form communicated, maintained or stored, (vi) telephone numbers and facsimile numbers, (vii) registered domain names, and (viii) social media usernames and other internet identities and all account information relating thereto.

"Inventory" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts), stock-in-trade and merchandise related to the Regional Business maintained or held by, stored by or on behalf of, or in transit to, any Seller.

"Knowledge" shall mean, with respect to any Seller, the actual knowledge of Rafael Andres Diaz-Granados, Chris Pennington, Celina Carter and Eric Glover after reasonable and due inquiry.

"Law" shall mean any federal, state, provincial, municipal, local, foreign, international or multinational constitution, statute, law, ordinance, regulation, rule, code, by-law, Order, principle

-6-

of common law or equity, or decree enacted, promulgated, issued, enforced or entered by any Governmental Entity, or court of competent jurisdiction, or other requirement or rule of law.

"<u>Lease</u>" shall have the meaning set forth in <u>Section 4.4(a)</u>.

"<u>Leased Real Property</u>" means all of the real property leased, subleased, used or occupied by any Seller, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Regional Business.

"<u>Leetsdale Warehouse</u>" shall mean that certain warehouse and office building leased by the Sellers located at 545 W. Park Road, Leetsdale, Pennsylvania 15056.

"<u>Liabilities</u>" shall mean, as to any Person, all debts, adverse Claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether accrued or unaccrued, vested or otherwise, liquidated or unliquidated, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"<u>License Agreement</u>" shall mean that certain Exclusive License Agreement by and between Q'Max Solutions Inc. and Q'Max, dated May 22, 2020 pursuant to which Q'Max was granted a license to certain Intellectual Property Rights as set forth thereunder.

"<u>Licensor</u>" shall mean Q'Max Solutions Inc.

"<u>Lien</u>" shall mean (i) any claim, Liability, prior claim, right of retention, lien, security interest, floating charge, mortgage, pledge option, deed assignments, conditional sale, warrant, adverse claim, charge (including court-ordered charge), easement, right-of-way, encroachment, defect of title, hypothec, trust debenture, deemed trust (statutory or otherwise), judgment, writ of seizure or execution, notice of sale, restriction on transfer, contractual right (including purchase option, right of first refusal, rights of first offer or any other pre-emptive contractual right), restriction on use or encumbrance, whether imposed by agreement, law, equity or otherwise and whether or not registered, published or filed and whether secured, unsecured or otherwise, and (ii) without limiting the foregoing clause (i), "Lien", as such term is defined pursuant to section 101(37) of the Bankruptcy Code.

"<u>Material Contracts</u>" means, collectively, those contracts that are in the opinion of the Buyer, necessary and essential to the operation of the Regional Business as listed and specified as "Material Contracts" on <u>Schedule 2.4(b)(i)</u>.

"<u>Midland Drilling Fluids Business</u>" means the drilling and completion fluids, chemical additives, and fluid engineering services provided by Sellers in the Permian basin. For the avoidance of doubt, the Midland Solid Control Warehouse and the assets located at, and the operations conducted at, the Midland Solid Control Warehouse shall not be deemed to be included in this definition of Midland Drilling Fluids Business.

"Midland Solid Control Warehouse" shall mean that certain warehouse leased by the Sellers located at 2106 East Country Road 120, Midland, Texas 79706.

"New Money Financing Agreement" means a senior secured superpriority credit agreement or note and any documents or instruments related thereto, to be entered into by Sellers and Encina and/or any other Post-Petition Lenders (including Palladium Fund IV or its Affiliates), in each case, in form and substance satisfactory to Buyer.

"Newcomerstown Warehouse" shall mean those certain warehouses and buildings leased by the Sellers located at 1122 West State Street, Newcomerstown, Ohio 43832 and 200 Enterprise Drive, Newcomerstown, Ohio 43832.

"Notices" shall have the meaning specified in Section 9.4.

"Officer's Certificate" shall have the meaning specified in Section 7.1(e).

"Operating Order" shall mean an order granting Trustee's emergency motion to approve the Trustee's authority to continue to operate the Regional Business, in form and substance acceptable to Buyer.

"Order" shall mean any judgment, order, injunction, writ, ruling, decree, stipulation, determination, decision, verdict, or award of any Governmental Entity.

"Ordinary Course of Business" shall mean that an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if that action is taken in the ordinary course of business of such Person, consistent with past practices.

"Owned Real Property" shall have the meaning set forth in Section 4.4(b).

"Party" or "Parties" shall have the meaning specified in the preamble.

"Permits" shall mean permits, licenses, registrations, certificates of occupancy, approvals, consents, clearances, directives, orders, variances, registrations, rights, privileges, concessions and other authorizations issued, granted, conferred or otherwise created by any Governmental Entity.

"Permitted Liens" shall mean: (a) Liens for Taxes not yet due and payable or which are being contested in good faith by appropriate Proceedings and for which an adequate reserve has been established by Sellers; (b) statutory liens of landlords, carriers, warehousemen, mechanics, and materialmen incurred in the Ordinary Course of Business for sums not yet due; (c) liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security; or (d) liens or encumbrances that arise solely by reason of acts of Buyer or its successors and assigns or otherwise consented to by Buyer in accordance with the terms of this Agreement.

"Person" shall mean an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

-8-

"Petition Date" shall mean the date the Bankruptcy Cases are commenced by the Sellers.

"Phase I Reports" shall have the meaning specified in Section 7.1(h).

"Post-Closing Covenant" shall have the meaning specified in Section 9.12.

"Post-Petition Financing Order" shall mean interim and final orders granting a motion by the Trustee pursuant to U.S.C. §§ 105, 361 and 364 and Federal Bankruptcy Rules 2002, 4001 and 994 seeking authorization for the Trustee to incur post-petition secured Indebtedness and approving the New Money Financing Agreement which shall be in form and substance acceptable to Buyer.

"Post-Petition Lenders" means Encina and any other lender under the New Money Financing Agreement.

"Post-Petition Trade Payables" shall mean the amount of Trade Payables of the Sellers relating to the Regional Business that were incurred from and after the Petition Date that are outstanding as of the Closing Date.

"Pre-Closing Taxes" means any Liability for any Tax of or owed with respect to the Acquired Assets allocable for a taxable period (or portion thereof) ending on or before the Closing Date. In the case of any Taxes imposed on the Acquired Assets for a taxable period that begins before and ends after the Closing Date, Pre-Closing Taxes shall equal (i) in the case of any Taxes other than the Taxes based upon or related to income or receipts, the amount of such Tax for the entire Tax period multiplied by a fraction the numerator of which is the number of days in the Tax period ending on the Closing Date and the denominator of which is the number of days in the entire Tax period; and (ii) in the case of any Tax based upon or related to income or receipts be deemed equal to the amount which would be payable if the relevant Tax period ended on the Closing Date.

"Previously Omitted Contract" shall have the meaning specified in Section 2.4(b)(i).

"Proceeding" shall mean any action, arbitration, audit, known investigation (including a notice of preliminary investigation or formal investigation), notice of violation, hearing, litigation or suit (whether civil, criminal or administrative), other than the Bankruptcy Case, commenced, brought, conducted or heard by or before any Governmental Entity, including but not limited to any and all such actions related to restitution or remission in criminal proceedings and civil forfeiture and confiscation proceedings under the Law of any jurisdiction.

"Property and Casualty Insurance Policies" shall mean the policies set forth in Schedule 1.1(b).

"Property Tax Holdback Amount" means $380,000 (Three Hundred Eighty Thousand Dollars).

Property Taxes" shall mean all personal property Taxes and similar ad valorem Taxes.

-9-

"Purchase Price" shall have the meaning specified in Section 3.2(b).

"Q'Max" shall have the meaning specified in the preamble.

"Regional Business" shall have the meaning specified in Section 2.1.

"Regional Business Warehouses" means, collectively, the Midland Solid Control Warehouse, the Wellsville Warehouse, the Horseheads Warehouse, the Leetsdale Warehouse and the Newcomerstown Warehouse.

"Release" means any actual or threatened release, spill, emission, leaking, pumping, pouring, emptying, dumping, injection, deposit, disposal, discharge, dispersal or leaching into the indoor or outdoor environment, or including migration to or from a property, including but not limited to any Owned Real Property or Leased Real Property.

"Remedial Action" means all actions to (a) investigate, clean up, remove, treat or in any other way address any Hazardous Material; (b) prevent the Release of any Hazardous Material; (c) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (d) to correct or abate a condition of noncompliance with Environmental Laws.

"Representative" shall mean, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, consultant, other advisor, agent, representative or expert retained by or acting on behalf of such Person or its Subsidiaries).

"Sale Motion" shall mean a motion, in form and substance acceptable to the Buyer, seeking entry of an order approving this Agreement and the Transactions.

"Sale Order" shall mean an Order of the Bankruptcy Court approving the Sale Motion, which Order shall be in form and substance acceptable to Buyer.

"Seller" or "Sellers" shall have the meaning specified in the preamble and shall include any Trustee appointed to act on behalf of Sellers.

"Subsidiary" shall mean, with respect to any Person (a) a corporation, a majority of whose capital stock with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such Person, by a subsidiary of such Person, or by such Person and one or more subsidiaries of such Person, (b) a partnership in which such Person or a subsidiary of such Person is, at the date of determination, a general partner of such partnership, or (c) any other Person (other than a corporation) in which such Person, a subsidiary of such Person or such Person and one or more subsidiaries of such Person, directly or indirectly, at the date of determination thereof, has (i) at least a majority ownership interest thereof or (ii) the power to elect or direct the election of a majority of the directors or other governing body of such Person.

"Target Inventory" shall mean $9,000,000 (Nine Million Dollars).

-10-

"Tax" or "Taxes" shall mean (a) any and all taxes, assessments, levies, duties or other governmental charge imposed by any Governmental Entity, including any income, alternative or add-on minimum, accumulated earnings, franchise, capital stock, unclaimed property or escheatment, environmental, profits, windfall profits, gross receipts, sales, use, value added, transfer, registration, stamp, premium, excise, customs duties, severance, real property, personal property, ad valorem, occupancy, license, occupation, employment, payroll, social security, disability, unemployment, withholding, corporation, inheritance, value added, stamp duty reserve, estimated or other tax, assessment, levy, duty (including duties of customs and excise) or other governmental charge of any kind whatsoever, including any payments in lieu of taxes or other similar payments, chargeable by any Tax Authority together with all penalties, interest and additions thereto, whether disputed or not and (b) any liability in respect of any of the items described in clause (a) payable under a tax sharing allocation, indemnity or similar agreement or by reason of successor, transferee, or other liability, by contract, operation of law, or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereto or any analogous or similar provision of state, local or foreign Law).

"Tax Authority" shall mean any taxing or other authority (whether within or outside the U.S.) competent to impose Tax.

"Tax Escrow Amount"  shall mean $11,000 (Eleven Thousand Dollars).

"Tax Return" shall mean any and all returns, declarations, reports, documents, Claims for refund, or information returns, statements or filings which are supplied or required to be supplied to any Tax Authority or any other Person, including any schedule or attachment thereto, and including any amendments thereof.

"Top Customers" shall have the meaning specified in Section 4.6(b)(i).

"Top Suppliers" shall have the meaning specified in Section 4.6(a)(i)

"Trade Payables" shall mean those accounts payable owned to the Sellers' vendors for Inventory-related goods.

"Transaction Documents" shall mean this Agreement and any agreement, instrument or other document entered into pursuant to the terms hereof, including the Assignment and Assumption Agreement.

"Transactions" shall mean the transactions contemplated by this Agreement, including the purchase and sale of the Acquired Assets as provided for in this Agreement.

"Transfer Tax" or "Transfer Taxes" shall mean any sales, use, transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

-11-

"Trustee" shall mean the trustee appointed by the United States Trustee in the Bankruptcy Cases.

"Trustee's Conditions Certificate" shall have the meaning set forth in Section 7.1(d).

"Trustee's Operation Orders" shall mean the Post-Petition Financing Order and the Operating Order.

"WARN Act" means the United States Worker Adjustment and Retraining Notification Act, and the rules and regulations promulgated thereunder.

"Wellsville Warehouse" shall mean that certain warehouse leased by the Sellers located at 2400 Clark Avenue, Wellsville, Ohio 43968.

1.2    Interpretation.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)    Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(c)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(d)    A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(e)    All references to "$" and dollars shall be deemed to refer to United States currency.

(f)    All references to any financial or accounting terms shall be defined in accordance with GAAP.

(g)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Disclosure Schedule and exhibit references are to this Agreement unless otherwise specified. All article, section, paragraph, schedule and exhibit references used in this Agreement are to articles, sections and paragraphs of, and schedules and exhibits to, this Agreement unless otherwise specified.

(h)    The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the

-12-

reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day. All references herein to time are references to New York City time, unless otherwise specified herein.

(j)      If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

(k)      A reference to any agreement or document (including a reference to this Agreement) is to the agreement or document as amended or supplemented, except to the extent prohibited by this Agreement or that other agreement or document.

(l)      Exhibits, Schedules and Annexes to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

## ARTICLE 2
## ACQUIRED ASSETS AND ASSUMPTION OF LIABILITIES

2.1     <u>Assets to be Acquired</u>. Subject to the granting of the Sale Order, and the terms and conditions of this Agreement and the Sale Order, at the Closing, the Sellers shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase and acquire from the Sellers, all of Sellers' right, title and interest, free and clear of all Liens (except for Liens supporting the Assumed Liabilities described in <u>Section 2.3(a)</u> and other Permitted Liens expressly set forth in the Sale Order), in each and all of the assets, properties and rights of Sellers used in the Sellers' business of (i) providing drilling and completion fluids, chemical additives, solids control services and equipment, waste management services and equipment, fluid engineering services and other products and services in the northeastern United States and (ii) providing solids control services and equipment in the Permian basin, in support of oil and gas drilling (the "<u>Regional Business</u>"), including, without limitation, all assets located at or used in the operations of the Sellers at the Regional Business Warehouses, and the following as of the Closing but excluding the Excluded Assets (collectively, the "<u>Acquired Assets</u>"):

(a)     all accounts receivable, notes receivable, bill receivables, trade accounts, hold backs, retention, book debts, insurance claims, negotiable instruments, chattel paper (including without limitation, completed work which has not yet been billed) and other receivables (including, without limitation, in respect of goods shipped, products sold, licenses granted, services rendered or otherwise and all amounts that may be returned or returnable with respect to letters of credit or other financial collateral drawn down prior to the closing of the transaction) from third parties, together with any unpaid financing charges accrued thereon, in each instance, of the Sellers (whether or not related to the Regional Business) (collectively, the "<u>Accounts Receivable</u>");

(b)     all Intellectual Property used in the Regional Business (provided that, with respect to the Intellectual Property rights granted to Q'Max under the License Agreement, only to the extent such Intellectual Property Rights were granted to Q'Max under the License Agreement) including, without limitation, the Intellectual Property set forth on <u>Schedule 2.1(b)</u>;

-13-

(c)      all tangible assets, including all equipment, machinery, industrial and motor vehicles, trailers, fixtures, furniture and other tangible property, including all such property that is damaged and all attachments, appliances, fittings, gas and oil burners, chemical products, motors, pumps, tanks, tools, manifolds, systems, blowers, molds, dies, tooling, lighting fixtures, signs, doors, cabinets, partitions, mantels, screens, plumbing, heating, air conditioning, refrigerators, freezers, refrigerating and cooling systems, waste disposal and storing, wiring, electrical systems, telephones, televisions, monitors, security systems, racks, ovens, stoves, carpets, floor coverings, wall coverings, office equipment, kitchen appliances, computers (including point-of-sale terminals and systems), software, registers and safes, trash containers, meters and scales, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements, in each instance, used in the operation of the Regional Business;

(d)      all Inventory and goods related to the Regional Business now owned or hereinafter acquired, wherever located, including raw materials, work in process, finished goods, supplies, parts, subassemblies or material used or consumed in the operation of the Regional Business maintained or held by, stored by or on behalf of, or in transit to, any of the Sellers;

(e)      all goodwill, payment intangibles and general intangible assets and rights of Sellers to the extent associated with the Regional Business or the Acquired Assets;

(f)      all cash and cash equivalents relating to the Regional Business other than the Cash Purchase Price;

(g)      all deposits (including, without limitation, customer deposits and security deposits (whether held in trust or otherwise) for rent, electricity, telephone or otherwise), advances, prepayments, rights in respect of promotional allowances, vendor rebates and other refunds, Claims, causes of action, rights of recovery, rights under warranties and guaranties, rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), and the right to receive and retain mail, accounts receivable payments and other communications of the Sellers, in each instance, relating to the Regional Business;

(h)      all customer lists, data, and information (including all lists of current and past customers of each Seller), and any and all information relating thereto (including personal information, such as name, address, telephone number, email address, website and any other database information), and customer purchase history of the Regional Business;

(i)      all right of publicity and all similar rights, including, all commercial merchandising rights used in the Regional Business;

(j)      all real estate leased by either of the Sellers as a lessee, sub-lessee or assignee and covered by an Assumed Contract or owned by either of the Sellers, in each case together with all interests in and to all improvements and fixtures located thereon or attached thereto (including all warehouses, offices and plants and other tangible and intangible property located thereon), and other appurtenances thereto, and rights in respect thereof, in each case, used in the operation of the Regional Business, including the properties listed on Schedule 2.1(j);

-14-

(k)     all Assumed Contracts;

(l)     all of Sellers' deposits, advances or prepaid expenses relating to any of the Assumed Contracts;

(m)     all documents (including books and records) of the Regional Business, including all financial, marketing and business data, pricing and cost information, business and marketing plans and other information, files, correspondence, records, data, plans, engineering, reports and recorded knowledge, historical trademark files, prosecution files of the Sellers in whatever media retained or stored, including computer programs and disks, in each case of the Regional Business; including files in the possession of Sellers, in each case, to the extent reasonably available, not subject to claims of solicitor-client or attorney-client privilege, and otherwise permitted by applicable Law;

(n)     to the extent applicable, all certificates of title and other documentation necessary to convey or otherwise evidence title to the equipment included in the Acquired Assets;

(o)     all personnel files for Continuing Employees except as prohibited by Law;

(p)     all Permits used in the operation of the Regional Business to the extent transferable;

(q)     all rights under or arising out of all insurance policies relating to the Regional Business (including, without limitation, returns and refunds of any premiums paid, or other amounts due back to the Sellers, with respect to cancelled policies, all proceeds received on or after closing and all proceeds received prior to closing in connection with casualty events involving tangible Acquired Assets);

(r)     any claim, right or interest in and to all (or the benefit of all to the extent not assignable) Tax refunds, rebates, abatements, credits and similar items received in or relating to any period, or portion of any period, beginning on or after the Closing Date or any Tax Return, relating to the Regional Business received after the Closing Date;

(s)     causes of action, lawsuits, judgments, Claims and demands of any nature, whether arising by way of counterclaim or otherwise, in each case to the extent arising from the Acquired Assets or the Assumed Liabilities;

(t)     all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of the Sellers or with third parties relating to the Regional Business;

(u)     all rights under or pursuant to all warranties, representations and guarantees made by vendors, suppliers, manufacturers, contractors and any other Person to the extent relating to products sold, or services provided, to the Sellers in connection with the Regional Business or to the extent affecting any Acquired Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

-15-

(v)     all sales and promotional materials, catalogues and advertising literature used in the Regional Business;

(w)     all of Sellers' equity interests, or securities convertible into, exchangeable or exercisable for equity interests, in C&A Grinding and all related rights of Sellers with respect thereto (the "C&A Grinding Equity Interests");

(x)     all Avoidance Actions available to Sellers related to the Regional Business and all Claims and causes of action of Sellers as of the Petition Date and as of Closing against any insider (as such term is defined in section 101(31) of the Bankruptcy Code (regardless of whether or not such claims and causes of action have been asserted by Sellers) including rights of set-off and rights of recoupment, refunds, claims, counterclaims, demands, causes of action and rights to collect damages of Sellers against any equityholders or officers, managers, directors or employees of Sellers; and

(y)     all other assets, properties, interests, privileges and rights used in the Regional Business wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP (including any assets acquired by Sellers after the date hereof but prior to Closing).

2.2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, assign, transfer or deliver to Buyer, and in no event will Buyer be deemed to purchase and acquire from Sellers the following assets, properties, interests and rights of Sellers (collectively, the "Excluded Assets"):

(a)     assets, properties, interests and rights of Sellers exclusively used in the Midland Drilling Fluids Business;

(b)     Sellers' rights under the Transaction Documents;

(c)     all benefit plans and collective bargaining agreements, if any;

(d)     other than the C&A Grinding Equity Interests, all shares of capital stock or other equity interests issued by any Seller or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests;

(e)     all books and records of Sellers that are not related to the Regional Business;

(f)     all Tax Returns, received before the Closing Date and relating to a period ending prior to the Closing Date; and

(g)     any Contract to which any Seller or Subsidiary of any Seller is party or is otherwise bound that are not Assumed Contracts.

2.3     Liabilities to be Assumed by Buyer.  Subject to the granting of the Sale Order, and the terms and conditions of this Agreement and the Sale Order, at the Closing, the Sellers shall assign to Buyer, and Buyer shall assume from the Sellers and pay when due, perform and

-16-

discharge, in due course, without duplication, only the Assumed Liabilities. "Assumed Liabilities" shall mean solely the following Liabilities:

(a)     all Liabilities of the Sellers under the ABL Facility and the New Money Financing Agreement on the terms and conditions set forth in the Encina Exit Financing Commitment Letter;

(b)     any Cure Amounts under Assumed Contracts; and

(c)     all Liabilities first arising from or after the Closing (i) as a direct result of the ownership or operation of any of the Acquired Assets, and (ii) under the Assumed Contracts as a result of the assumption by the Buyer of such Assumed Contracts.

2.4     Assignment and Assumption of Contracts.

(a)     The Sale Order shall provide for the assumption by Sellers, and the assignment to the extent legally capable of being assigned by Sellers to Buyer, of the Designated Contracts pursuant to section 365 of the Bankruptcy Code on the terms and conditions set forth in the remainder of this Section 2.4. At Buyer's request, and at Buyer's sole cost and expense, Sellers shall reasonably cooperate from the date hereof forward with Buyer as reasonably requested by Buyer (i) to allow Buyer to enter into an amendment of any Lease upon assumption of such Lease by Buyer (and Sellers shall reasonably cooperate with Buyer to the extent reasonably requested by Buyer in negotiations with the landlords thereof), or (ii) to otherwise amend any Lease to the extent such amendments would not adversely affect any Seller; provided that Sellers shall not be required to enter into any such amendment if such amendment would result in an assumption by any Seller of such Lease, unless such Lease will be assigned to Buyer at the time of such assumption.

(b)     Attached hereto as Schedule 2.4(b) is a list, which list may be changed by the Buyer in its sole discretion by adding or removing Executory Contracts or Leases or moving Executory Contracts or Leases between subpart (i) and subpart (ii), from time to time, prior to the Designation Deadline, identifying the Executory Contracts and Leases that Buyer has decided will be assumed and assigned to Buyer on the Closing Date (the Executory Contracts and Leases listed as of the Designation Deadline, the "Designated Contracts"). Subpart (i) of Schedule 2.4(b) identifies Material Contracts that are also Designated Contracts and subpart (ii) of Schedule 2.4(b) identifies Designated Contracts other than Material Contracts. In connection with the serving of the Sale Motion, the applicable Seller shall file with the Bankruptcy Court and serve notice by first class mail on all non-debtor counterparties to all Designated Contracts (such notice, an "Assumption Notice"), and provide a copy of the same to Buyer, and at the Closing shall assume and assign to, and Buyer shall accept the assignment of and assume such Executory Contract or Lease. In connection with the serving of the Sale Motion, the applicable Seller shall file a notice of rejection as of the Closing Date of every Executory Contract and Lease that is not a Designated Contract ("Excluded Contracts"). The Assumption Notice and the notice of rejection of Excluded Contracts shall be in form and substance acceptable to the Buyer.

(c)     In connection with the assumption and assignment to Buyer of any Designated Contract that is executory pursuant to this Section 2.4, the cure amounts, as determined

-17-

by the Bankruptcy Court, if any (such amounts, the "Cure Amounts"), necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Designated Contracts, including any amounts payable to any landlord under any Lease that is a Designated Contract that relates to the period prior to the delivery of an Assumption Notice with respect thereto, shall be paid by Buyer within ten (10) Business Days after the Closing.

(d)     Sellers shall use their respective reasonable best efforts to obtain one or more orders of the Bankruptcy Court, which order(s) shall be in form and substance reasonably acceptable to Buyer, and shall reflect the terms and conditions set forth herein, to assume and assign the Designated Contracts to Buyer on the terms set forth in this Section 2.4.

(e)     The Parties shall use their commercially reasonable efforts, and cooperate with each other to obtain any counterparty or third party consent ("Consent") that is required to assume and assign to Buyer any Designated Contract; provided, however, that none of the Parties or any of their respective Affiliates shall be required to pay any consideration therefor other than filing, recordation or similar fees, which shall be borne by Buyer. To the extent that any such Consent is not obtained by the Closing Date, the applicable Seller so long as it is in existence, shall use reasonable best efforts (at Buyer's sole cost) during the term of such Designated Contract to (i) provide to Buyer the benefits under such Designated Contract, (ii) cooperate in any reasonable and lawful arrangement, including holding such Designated Contract in trust for Buyer pending receipt of the required Consent, designed to provide such benefits to Buyer and (iii) enforce for the account of Buyer any rights of such Seller under such Designated Contract, including the right to elect to terminate such Designated Contract in accordance with the terms thereof upon the written direction of Buyer. Buyer shall reasonably cooperate with Sellers in order to enable Sellers to provide to Buyer the benefits contemplated by this Section 2.4(e).

(f)     Notwithstanding the foregoing, a Contract shall not be a Designated Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller in accordance with the terms hereof, deemed rejected under Section 365 of the Bankruptcy Code, or terminated by the other party thereto or terminates or expires in accordance with its terms on or prior to the Designation Deadline and is not continued or otherwise extended prior to or upon assumption and assignment, or (ii) requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the assumption and assignment by Seller to Buyer of such Contract pursuant to Section 365 of the Bankruptcy Code, and no such Consent has been obtained prior to the Closing. In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

2.5     Excluded Liabilities.  Notwithstanding anything in this Agreement to the contrary, Buyer shall not and does not assume, and shall be deemed not to have assumed and shall not be obligated to pay, perform, discharge or in any other manner be liable or responsible for any Liabilities of the Sellers or any predecessors of Sellers that are not Assumed Liabilities, whether existing on the Closing Date or arising thereafter, whether absolute, accrued, contingent or otherwise, whether due or to become due, known or unknown, matured or unmatured, direct or

-18-

indirect, and Sellers shall be solely and exclusively liable for any and all such Liabilities, including, without limitation, Liabilities relating to or arising out of any of the following (collectively, the "Excluded Liabilities"):

(a)    all Liabilities arising with respect to or relating to any of the Excluded Assets, whether before, on or after the Closing;

(b)    all Liabilities of Sellers for Indebtedness (including any intercompany Indebtedness among the Sellers and their Affiliates) except as expressly set forth in Section 2.3(a);

(c)    any Liability for (i) Taxes of Sellers or their Affiliates; (ii) any Pre-Closing Taxes, including all Liabilities related to Property Taxes imposed upon or assessed directly against the Acquired Assets attributable to the period before the Closing Date; (iii) Taxes relating to the Excluded Assets or any other Excluded Liability, in each instance, for any period; and (iv) any Transfer Taxes;

(d)    all Liabilities of Sellers in respect of or relating to any Contract to which any Seller is party or is otherwise bound that are not Assumed Contracts and all Liabilities arising out of the rejection of any Excluded Contracts by Sellers;

(e)    all Liabilities incurred or to be incurred by Sellers in connection with negotiation, entry into and consummation of the transactions contemplated by the Transaction Documents, including the consummation of the Transactions and any "success" fees, change of control payments and any other payment obligations of Sellers payable as a result of the consummation of the Transactions and the documents delivered in connection herewith;

(f)    all Liabilities of Sellers to its equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise, and any liability of Sellers pursuant to any Contract with an Affiliate of Sellers;

(g)    all Liabilities arising out of or relating to any business or property formerly owned or operated by any of the Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by any of the Sellers;

(h)    all Liabilities relating to Claims, actions, suits, arbitrations, litigation matters, Proceedings or investigations (in each case whether involving private parties, Governmental Entities, or otherwise) involving, against, or affecting any Seller, Acquired Asset, the Regional Business, or any assets or properties of Sellers;

(i)    all Liabilities arising under Environmental Laws;

(j)    all accounts payable Liabilities;

(k)    Liabilities with respect to employment or other provision of services, compensation, severance, benefits or payments of any nature owed to any current or former employee, officer, director, member, partner or independent contractor of any Seller or any ERISA Affiliate (or any beneficiary or dependent of any such individual), whether or not employed by

-19-

Buyer or any of its Affiliates after the Closing, that (i) arises out of or relates to the employment, service provider or other relationship between any Seller or ERISA Affiliate and any such individual, including but not limited to the termination of such relationship, (ii) arises out of or relates to any benefit plan or (iii) arises out of or relates to events or conditions occurring on or before the Closing Date;

(l)     all Liabilities with respect to any terminated employees with respect to sections 601 through 608 of ERISA and section 4980B of the IRC (also known as "COBRA");

(m)    all Liabilities (x) related to the WARN Act, to the extent applicable, with respect to the termination of employment of Sellers' employees and (y) with respect to the termination of employment of the company "insiders" (as such term is defined under the Bankruptcy Code);

(n)     all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Sellers or any other Person in connection with this Agreement or the administration of the Bankruptcy Case (including all fees and expenses of professionals engaged by the Sellers or any of their Affiliates) and administrative expenses and priority Claims accrued through the Closing Date and all post-closing administrative wind-down expenses of the Sellers pursuant to the Bankruptcy Code;

(o)     drafts or checks outstanding at the Closing that have been issued by the Sellers;

(p)     all Liabilities under any futures contracts, options on futures, swap agreements or forward sale agreements;

(q)     all Liabilities to any broker, investment banker, sale advisor, finder or agent or similar intermediary for any broker's fee, finders' fee or similar fee or commission relating to the Transactions; and

(r)     any and all other Liabilities, other than the Assumed Liabilities.

2.6     <u>Withholding</u>.  Buyer and its Affiliates shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement such amounts as they reasonably determine that they are required to deduct and withhold with respect to the making of such payment under the Code and any provision of state, local or non-U.S. Tax Laws. To the extent that amounts are so withheld and paid over to the applicable Tax Authorities, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person entitled to receipt of such payment.

## ARTICLE 3
## CLOSING; CASH PURCHASE PRICE

3.1     <u>Closing; Transfer of Possession; Certain Deliveries</u>.

-20-

(a)     The consummation of the Transactions (the "Closing") shall take place on the second Business Day after the satisfaction of all of the conditions set forth in Article 7 (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or the waiver thereof at the Closing by the Party entitled to waive that condition) or on such other date as the Parties hereto shall mutually agree.  The Closing shall be held by electronic exchange of executed documents.  The actual date of the Closing is herein called the "Closing Date".

(b)     At the Closing, Sellers shall deliver, or cause to be delivered to Buyer:

(i)     the Trustee's Conditions Certificate;

(ii)     the Officer's Certificate;

(iii)     a duly executed bill of sale, in a form mutually agreed to by the Parties, transferring the Acquired Assets to Buyer;

(iv)     one or more Assignment and Assumption Agreements in form and substance mutually acceptable to the Parties;

(v)     a copy of each Sale Order;

(vi)     such other assignments and other instruments of transfer or conveyance as Buyer may reasonably request or as may otherwise be necessary to evidence and effect sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer and assumption of Assumed Liabilities by Buyer; and

(vii)     an affidavit prepared in accordance with Treasury Regulations Sections 1.1445-2 and dated as of the Closing Date attesting that each Seller is not a foreign person, provided, however, that if Buyer does not receive a properly executed affidavit, as described above, from any Seller then Buyer shall be permitted to withhold from any payments to be made pursuant to this Agreement to such Seller any required withholding Tax under Section 1445 of the Code as determined by Buyer and any such amounts withheld shall be treated for all purposes of this Agreement as having been paid to Seller.

(c)     At the Closing, Buyer shall deliver to Sellers:

(i)     a cash payment by wire transfer of immediately available funds to an account set forth by Sellers of an aggregate amount equal to (A) the Cash Purchase Price minus (B) the Deposit minus (C) the Tax Escrow Amount minus (D) the Property Tax Holdback Amount;

(ii)     to the extent payable on Closing, evidence that Cure Amounts (if any) in respect of each Assumed Contract have been paid in accordance with the consent of the applicable counterparty or as otherwise agreed upon by the Buyer and such counterparty;

(iii)     the Buyer's Conditions Certificate;

-21-

(iv) a duly executed Assignment and Assumption Agreement; and

(v) such other assignments and other instruments of transfer or conveyance as Sellers may reasonably request or as may otherwise be necessary to evidence and effect the sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer and assumption of Assumed Liabilities by Buyer.

(d) At the Closing, Buyer shall deliver to the Trustee the Tax Escrow Amount to be held in trust for the payment of any Transfer Taxes payable in connection with the Transactions. If any funds remain in the Tax Escrow Amount following the full satisfaction of the obligations set forth in the immediately preceding sentence, such amounts shall be released by the Trustee to the Sellers.

(e) At the Closing, Buyer shall deliver to each Continuing Employee an offer letter offering such Continuing Employee employment with the Buyer or one of its Affiliates.

(f) At the Closing, Buyer shall deliver to Encina a duly executed waiver letter, waiving any Claims Buyer may have acquired pursuant to Section 2.1(x) to the extent such Claims are against Encina.

(g) At the Closing, Buyer shall deduct from the Cash Purchase Price and hold in trust the Property Tax Holdback Amount, pursuant to Section 3.1(c)(i), for the payment by the Buyer of any accrued and unpaid Property Taxes imposed upon or assessed directly against the Acquired Assets allocable for a taxable period (or portion thereof) ending on or before the Closing Date. If any portion of the Property Tax Holdback Amount remains following the full payment of the obligations set forth in the immediately preceding sentence, such remaining portion shall be delivered by the Buyer to the Trustee by wire transfer of immediately available funds to an account designated by the Trustee.

3.2 <u>Consideration</u>.

(a) <u>Cash Purchase Price</u>. The aggregate cash consideration for the Acquired Assets (the "<u>Cash Purchase Price</u>") shall be $1,250,000 (One Million Two Hundred and Fifty Thousand Dollars).

(b) <u>Purchase Price</u>. The total consideration for the Acquired Assets payable by the Buyer to the Sellers (the "<u>Purchase Price</u>") shall be the aggregate of (i) the Cash Purchase Price, (ii) the Cure Amounts (if any), and (iii) the value of the Assumed Liabilities.

3.3 <u>Deposit</u>. By no later than two (2) Business Days after the date that the Trustee files the Sale Motion, and provided the Trustee's Operation Orders have been entered into and are not subject to stay, Buyer shall pay the Trustee, a deposit in the aggregate amount of $125,000 (One Hundred Twenty-Five Thousand Dollars) (the "<u>Deposit</u>"), to be held by the Trustee in trust. The Deposit (together with all accrued investment income thereon) shall be released by the Trustee to either Buyer or Sellers, as applicable, as follows:

-22-

(a)      if the Closing shall occur, the Deposit and all accrued investment income thereon shall be transferred by the Trustee to the Sellers;

(b)      if this Agreement is terminated by Sellers pursuant to Section 8.1(h), the Deposit, together with all accrued investment income thereon, shall be released by Trustee to Sellers within five (5) Business Days of such termination; or

(c)      if this Agreement is terminated for any reason (other than a termination pursuant to Section 8.1(h)), the Deposit, together with all accrued investment income thereon, shall be returned by Trustee to Buyer within five (5) Business Days of such termination.

3.4      Allocation of Purchase Price.  (i) The Purchase Price shall be allocated among Sellers and (ii) the amount allocated to the Acquired Assets sold by each such Seller shall be further allocated among such Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder or any similar provision of state, local or foreign Law as applicable (the "Allocation"). The Allocation shall be delivered by Buyer to the Sellers within ninety (90) days after the Closing.  The Sellers will have the right to deliver reasonable objections to the Allocation within thirty (30) days after Buyer's delivery thereof, which objections shall be set forth in writing by the Sellers in reasonable detail. Buyer shall consider any such objections in good faith. Buyer and the Sellers shall file all Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) consistent with the Allocation (taking into account any revisions made by Buyer in response to comments by the Sellers) absent a change in Law. Neither Buyer nor the Sellers shall take any position or permit any of its Affiliates to take any position inconsistent with the final Allocation in the preparation of financial statements or in the course of any audit by any Tax Authority, Tax review or Tax proceeding related to any Tax Returns, unless, and then only to the extent, otherwise required by applicable Law, provided, however, that nothing contained herein shall prevent Buyer or the Sellers from settling any proposed deficiency or adjustment by any Tax Authority based upon or arising out of the Allocation, and neither Buyer nor the Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Tax Authority challenging such Allocation. Buyer and the Sellers shall promptly notify and provide the other with reasonable assistance in the event of an examination, audit, or other proceeding relating to Taxes regarding the Allocation of the Purchase Price and the amount of the Assumed Liabilities pursuant to this Section 3.4. Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation.

# ARTICLE 4
## REPRESENTATIONS AND WARRANTIES REGARDING SELLERS

Except as set forth in the Disclosure Schedules, Sellers jointly and severally hereby represent and warrant to Buyer, as of the Agreement Date as follows:

4.1      Organization; Authority; Consents; Conflicts.

(a)      Each Seller is duly organized, validly existing, and in good standing under the Laws of the State of its formation.

-23-

(b)     Each Seller has all requisite corporate or limited liability company power and authority, as applicable, to own, lease and operate its assets and to carry on the Regional Business as currently conducted.

(c)     Subject to the Sale Order having been entered into by the Bankruptcy Court, the execution, delivery and performance by each Seller of any Transaction Document to which such Seller is (or will become at Closing) a party, and the consummation of the Transactions, does not and will not (i) conflict with or result in any breach of any provision of its certificate of incorporation or bylaws or comparable governing documents or (ii) result in a violation of any Law or Order applicable to it.

4.2     <u>Litigation; Orders</u>.  Except for the Bankruptcy Case and any adversary proceedings or contested motions commenced in connection therewith, or as set forth on <u>Schedule 4.2</u>, there is, no Claim, Proceeding or Order pending, outstanding or, to Sellers' Knowledge, threatened against either Sellers, the Acquired Assets or the Assumed Liabilities  that, if adversely determined, would be material to the Regional Business, the Acquired Assets or the Assumed Liabilities or that would materially impair Sellers' ability to consummate the Transactions.

4.3     <u>Compliance with Laws; Permits</u>.  Sellers are in compliance with all applicable Laws related to the Acquired Assets in all material respects, and the Sellers have not received any written notice of any alleged material violation of applicable Law from any Governmental Entity or other Person.  The Sellers hold all material Permits necessary or required pursuant to applicable Law for the operation of the Acquired Assets as presently conducted and for the ownership or operation of the Acquired Assets.   The Sellers have not received written notice of any material default under any Permit related to the Acquired Assets and no material violations exist in respect of such Permits.

4.4     <u>Real Property</u>.

(a)     <u>Schedule 4.4(a)</u> contains a list and brief description of all Leased Real Property held or used for, or necessary to the operation of the Regional Business.  Sellers have made available true and complete copies of all leases with respect to such Leased Real Property (individually, a "<u>Lease</u>" and collectively, the "<u>Leases</u>") to Buyer.  Other than as set forth on <u>Schedule 4.4(a)</u>, Sellers are not in breach of any material term or in "default" under any Lease and, to Sellers' Knowledge, no party to any Lease has given Sellers written notice of or made a claim with respect to any breach or default thereunder.  To Sellers' Knowledge, there are no conditions that currently exist or with the passage of time will (i) result in a default or breach of any material term by any party to a Lease or (ii) give rise to the right of the lessor to accelerate the obligations thereunder or modify the terms thereof.   To Sellers' Knowledge, other than as noted on <u>Schedule 4.4(a)</u>, none of the Leased Real Property is subject to any sublease or grant to any Person of any right to the use, occupancy or enjoyment of the Leased Real Property or any portion thereof that would materially impair the use of the Leased Real Property in the operation of the Regional Business.  The Leased Real Property is not subject to any Liens (other than Permitted Liens).  The Leased Real Property is not subject to any use restrictions, exceptions, reservations or limitations which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business.   There are no pending or, to Sellers' Knowledge, threatened

-24-

condemnation proceedings or other Claims relating to any of the Leased Real Property. The Leases that are Acquired Assets will continue to be legal, valid, binding, enforceable and in full force and effect on the same material terms immediately following the consummation of the Transactions.

(b)  Schedule 4.4(b) sets forth a true, correct and complete list of all Owned Real Property, specifying the street address, the current owner and the current use of each parcel of Owned Real Property in which any Seller has any title interest and which is related to, used, useful or held for use in the conduct of the Regional Business (the "Owned Real Property"). Except for Permitted Liens, Sellers have good and marketable title in the Owned Real Property set forth on Schedule 4.4(b). To Sellers' Knowledge, other than as noted on Schedule 4.4(b), none of the Owned Real Property is subject to any lease or grant to any Person of any right to the use, purchase, occupancy or enjoyment of such Owned Real Property or any portion thereof required to conduct the Regional Business. Except for Permitted Liens, the Owned Real Property is not subject to any Liens or to any use restrictions, exceptions, reservations or limitations, which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business and in the same manner after the Closing as conducted by Sellers in the twelve months prior to Closing. There are no pending or, to Sellers' Knowledge, threatened condemnation proceedings or other Claims relating to any of the Owned Real Property.

4.5  Environmental Matters. Except as set forth on Schedule 4.5, (a) with respect to the Regional Business and the Acquired Assets, there is no pending or, to Sellers' Knowledge, threatened suit, verbal or written notice, investigation, claim, litigation, proceeding or other Claim by any Governmental Entity or any other Person that could reasonably be expected to result in any material Environmental Liabilities and Obligations, and no Seller is subject to, or in default of, any Order applicable to the Regional Business or the Acquired Assets and issued under or pursuant to any Environmental Law, (b) there has been no Release of Hazardous Materials in connection with the Regional Business, or at, from, on or under the Owned Real Property or the Leased Real Property that could reasonably be expected to result in any material Environmental Liabilities and Obligations, or require any material Remedial Action pursuant to any Environmental Law, (c) Sellers have obtained and are in compliance with and, to the extent applicable, have filed timely applications to renew, all material Permits that are required pursuant to any Environmental Law for the operation of the Acquired Assets and all such Permits are valid and in full force and effect, and no Claim is pending or, to the Knowledge of Sellers, threatened, which seeks to revoke, limit or otherwise affect any such Permit; (d) none of the Sellers has any material financial assurance, escrow, bonding or similar obligation under or pursuant to any Environmental Law, and (e) Sellers have delivered or made available to Buyer copies of the following non-privileged records in Sellers' or its representatives' possession, custody or control: (i) all material Permits issued pursuant to any Environmental Law for the Regional Business or the operation of the Acquired Assets; (ii) all material documents with respect to any pending or threatened material action, litigation, proceeding or other Claim relating to or bearing on the Regional Business or the Acquired Assets and arising under or relating to any Environmental Law, or with respect to any Environmental Liabilities and Obligations; and (iii) all material written environmental reports, audits and assessments (including Phase I environmental site assessment reports) for the Regional Business and the Acquired Assets (including the Owned Real Property and Leased Real Property).

4.6  Suppliers; Customers.

-25-

(a)  Suppliers.

(i)  Schedule 4.6(a) sets forth a complete and accurate list of (A) the top ten (10) suppliers (excluding utilities) of the Sellers that accounted for the most expenses of the Regional Business for the twelve month period ended April 30, 2020 (the "Top Suppliers") and (B) with respect to each such Top Supplier the aggregate amount of such expenses.

(ii)  Since April 1, 2020, (A) no Top Supplier has terminated or adversely modified the amount, frequency or terms of the business such Top Supplier conducts with the Sellers and (B) the Sellers have not received any notice, nor do the Sellers have any Knowledge, that any Top Supplier intends to terminate or adversely modify the amount, frequency or terms of the business such Top Supplier conducts with the Sellers. The Sellers do not have any outstanding material disputes concerning the products and/or services provided by any Top Supplier, and the Sellers have no Knowledge of any material dissatisfaction on the part of any Top Supplier.

(b)  Customers.

(i)  Schedule 4.6(b) sets forth a complete and accurate list of (A) the top ten (10) customers of the Sellers that accounted for the most revenues of the Regional Business for the twelve month period ended April 30, 2020 (the "Top Customers") and (B) with respect to each such Top Customer the aggregate amount of such revenues.

(ii)  Since April 1, 2020, (A) no Top Customer  has terminated or adversely modified the amount, frequency or terms of the business such Top Customer conducts with the Sellers and (B) the Sellers have not received any notice, nor do the Sellers have any Knowledge, that any Top Customer intends to terminate or adversely modify the amount, frequency or terms of the business such Top Customer conducts with the Sellers. The Sellers do not have any outstanding material disputes concerning the products and/or services provided by any Top Customer, and the Sellers have no Knowledge of any material dissatisfaction on the part of any Top Customer.

4.7  RESERVED.

4.8  Contracts.  Schedule 4.8 sets forth a complete list, as of the date hereof, of (i) all Contracts to which either Seller is a party and that are used in or related to the Regional Business or the Acquired Assets, and (ii) the estimated Cure Amounts for each such Contract (and such other commercial information related to the Contracts listed thereon as shall be reasonably requested by Buyer), and each of the Contracts set forth on Schedule 4.8 is in full force and effect and is a valid and binding obligation as to Seller and, to the knowledge of Seller, the other parties thereto, unamended by oral or written agreement, in each case except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other laws (whether statutory, regulatory or decisional), now or hereafter in effect, relating to or affecting the rights of creditors generally or by equitable principles (regardless of whether considered in a proceeding at law or in equity).

4.9  Taxes.

-26-

(a)     All Tax Returns required to be filed by Sellers in respect of the Acquired Assets have been duly filed on a timely basis or within valid and appropriate extensions of time, and all such Tax Returns were when filed, and continue to be, correct and complete in all material respects.  All Taxes (whether or not shown on any Tax Return) owed by Sellers relating to the Acquired Assets have been timely paid.  There are no Liens with respect to Taxes imposed on the Acquired Assets other than Permitted Liens.

(b)     Sellers have complied with all Laws applicable to the Acquired Assets relating to the payment and withholding of Taxes, and have duly and timely withheld and paid over to the appropriate Tax Authority all amounts required to be so withheld and paid under all such Laws.  Sellers have not given nor requested extensions, waived or requested to waive any statute of limitations in respect of Taxes associated with the Acquired Assets which waiver is currently in effect.  Sellers have not deferred payment of Sellers' portion of payroll taxes otherwise required to be deposited and paid for the period beginning March 27, 2020 through the Closing Date under section 2302 of the Coronavirus, Aid, Relief and Economic Security Act (P.L. 116-136).

(c)     There is no Proceeding pending or threatened against Sellers in respect of the Acquired Assets by any Tax Authority, including for the assessment or collection of Taxes.  No deficiencies for any Taxes have been proposed, asserted, threatened or assessed against Sellers in respect of the Acquired Assets by any Tax Authority that have not been paid, resolved or settled, and Sellers have not agreed to any requests for waivers of the time to assess or collect any such Taxes.  No Tax Authority with which Sellers do not file a particular Tax Return or to which Sellers do not pay Taxes, in each case in respect of the Acquired Assets, has claimed that Sellers are or may be subject to taxation by that Tax Authority.  No issue has been raised by a Tax Authority in any prior examination of Sellers relating to the Acquired Assets, which, by application of the same or similar principles, could reasonably be expected to result in a material proposed deficiency for any subsequent taxable period.

(d)     Schedule 4.9 lists: (i) all jurisdictions in which Sellers pay Taxes and/or have a duty to file Tax Returns, in each case in respect of the Acquired Assets; and (ii) all types of Tax Returns filed by or on behalf of Sellers that relate in whole or in part to the Acquired Assets.

(e)     Sellers have collected all sales, use, value-added, and similar Taxes in respect of the Acquired Assets required to be collected, and has remitted, or will remit, on a timely basis such amounts to the appropriate Tax Authority.  Sellers have properly requested, received and retained all necessary exemption certificates and other documentation supporting any claimed exemption or waiver of Taxes in respect of the Acquired Assets on sales or similar transactions as to which it would otherwise have been obligated to collect or withhold such Taxes.

4.10    Brokers' Fees and Commissions.  No Seller nor any of its Affiliates, members, managers, directors, officers, employees or agents has employed or has an liability to any investment banker, broker, finder, agent or similar intermediary in connection with this Agreement, the other Transaction Documents, or the Transactions contemplated hereby, and no broker, finder, agent or similar intermediary is entitled to any broker's fee, finder's fee, or similar fee or commission for which Buyer could become liable or obligated to pay.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth on the Disclosure Schedules, Buyer hereby represents and warrants to Sellers, as of the Agreement Date, and as of the Closing Date, as follows:

5.1    Organization.  Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Buyer has all necessary corporate power and authority to own and operate its properties, to lease the property it operates under lease and to conduct its business.

5.2    Due Authorization, Execution and Delivery; Enforceability.  Buyer has all requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and to perform its obligations hereunder and thereunder (subject to, in the case of the obligation to consummate the Transactions, to the granting of the Sale Order).  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action on the part of Buyer and no other corporate action on the part of Buyer is necessary to authorize this Agreement and such other Transaction Documents and to consummate the Transactions (subject, in the case of the obligation to consummate the Transactions, to the granting of the Sale Order).  This Agreement and the other Transaction Documents to which Buyer is (or will become at Closing) party have been (or will be) duly and validly executed and delivered by Buyer and (assuming the due authorization, execution and delivery by all parties hereto and thereto, other than Buyer) constitute (or will constitute) valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms (subject to, in the case of the obligation to consummate the Transactions, to the granting of the Sale Order), in each case except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

5.3    Governmental Approvals.  No notice to, consent, approval or authorization of or designation, declaration or filing with any Governmental Entity is required by Buyer with respect to Buyer's execution and delivery of any Transaction Document to which it is (or will become at Closing) a party or the consummation of the Transactions, except (a) the Sale Order having been entered into by the Bankruptcy Court and (b) any consent, approval or authorization of or designation, declaration or filing with any Governmental Entity the failure of which to be made or obtained would not, individually or in the aggregate, materially affect the ability of the Buyer to consummate the Transactions.

5.4    No Conflicts.  The execution, delivery and performance by Buyer of any Transaction Document to which Buyer is (or will become at Closing) a party and the consummation of the Transactions, does not and will not (a) conflict with or result in any breach of any provision of its certificate of incorporation or bylaws or comparable governing documents, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any material Contract of

-28-

Buyer, or (c) result in a violation of any Law or Order applicable to it, except, in the case of clauses (b) and (c), as would not, individually or in the aggregate, materially affect the ability of the Buyer to consummate the Transactions.

5.5    Sufficiency of Funds.  Buyer has sufficient funds to enable it to make payment of the Cash Purchase Price and consummate the transactions contemplated by this Agreement.

5.6    Condition of Business.  Buyer hereby acknowledges and agrees that notwithstanding anything expressed or implied herein to the contrary, except as expressly set forth in Article 4 of this Agreement, Sellers, including each of their directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants or and other representatives, including the Trustee, make no express or implied representations or warranties whatsoever, including any representation or warranty as to physical condition or value of any of the Acquired Assets or the future profitability or future earnings performance of the Regional Business. Buyer will accept the Acquired Assets at the Closing and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS".

# ARTICLE 6
## COVENANTS OF THE PARTIES

6.1    Conduct Pending the Closing.  During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement in accordance with its terms and the Closing (the "Interim Period"), except for the filing of the Bankruptcy Cases and subject to the provisions of the New Money Financing Agreement, the Sellers shall use commercially reasonable efforts to (x) operate the Regional Business in the Ordinary Course of Business and (y) (A) preserve intact their respective business organizations, (B) maintain the Regional Business and the Acquired Assets (normal wear and tear excepted), (C) keep available the services of their respective officers and employees, (D) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers, vendors and others having business relationships with Sellers in connection with the operation of the Regional Business, (E) continue to operate the Regional Business and Acquired Assets in all material respects in compliance with all Laws applicable to the Regional Business and Sellers and (F) not remove or permit to be removed from any building, facility, or real property that constitute Acquired Assets any asset, equipment, machinery or any Inventory (other than in connection with the sale of Inventory in the Ordinary Course of Business or the removal of equipment to drill sites in the Ordinary Course of Business).

6.2    Access.  Subject to applicable Law, during the Interim Period, the Sellers, (a) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other Representatives, books and records of the Sellers to the extent relating to the Acquired Assets, as Buyer reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement, (b) shall furnish to Buyer and its Representatives such financial, operating and property data to the extent relating to the Regional Business and other information as Buyer and its Representatives reasonably request and (c) shall cooperate reasonably with Buyer in its investigation of the Acquired Assets.  Buyer agrees that any on-site inspections of any leased real property shall be

-29-

conducted in the presence of the Sellers or their Representatives. All inspections shall be conducted so as not to interfere unreasonably with the use of any of the leased real property by the Sellers.

6.3    Physical Inventory.  Without limiting Section 6.2, the Sellers (a) shall give Buyer and its Representatives reasonable access to the offices, properties, plants, warehouses, employees, accountants and auditors of the Sellers in order to conduct a physical inventory of the Inventory, Owned Real Property and Leased Real Property prior to the Closing Date and (b) shall cooperate reasonably with Buyer in its investigation of the Inventory, Owned Real Property and Leased Real Property.

6.4    Tax Matters.

(a)    All Transfer Taxes arising out of the transfer of the Acquired Assets pursuant to this Agreement shall be borne by the Sellers. The Sellers shall file all necessary documentation and returns with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Taxes to Buyer.  Sellers shall pay all such Transfer Taxes when due.

(b)    Each of Buyer, on the one hand, and Sellers, on the other hand, shall cooperate fully, as and to the extent reasonably requested, in connection with the preparation and filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes and shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for filing of all Tax Returns, including any Claim for exemption or exclusion from the application or imposition of any Taxes, the preparation for any audit by any Tax Authority and the prosecution or defense of any Proceeding relating to any Tax Return.

6.5    Approvals; Commercially Reasonable Efforts; Notification; Consent.

(a)    Subject to the terms and conditions of this Agreement, each Party shall use its commercially reasonably efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable under applicable Law to consummate and make effective the Transactions.  Without limiting the generality of the foregoing, the Parties will use their respective commercially reasonable efforts to (i) take all actions necessary to transfer the Acquired Assets, (ii) take all actions necessary to cause all conditions set forth in Article 7 to be satisfied as soon as practicable, (iii) lift or rescind any existing Order preventing, prohibiting or delaying the consummation of the Transactions, (iv) effect all necessary registration, applications, notices and other filings required by applicable Law, including, as applicable to Sellers, under the Bankruptcy Code, and (v) execute and deliver any additional instruments necessary to fully carry out the purposes of this Agreement; provided, however, that nothing in this Agreement, including this Section 6.5 shall require Buyer to (A) consent to any material condition or material concession required by any Governmental Entity or third party; (B) consent to any divestitures of any material Subsidiary or material assets of Buyer or its Affiliates or accept any material limitation on or material condition on the manner in which any of the foregoing conducts their business; (C) pay any material amounts

-30-

required or requested by any Governmental Entity; or (D) accept an agreement to hold separate any material portion of any business or of any material assets of any material Subsidiary of Buyer or its Affiliates. Buyer and the Sellers shall not, and shall cause their respective Affiliates not to, take any action that would reasonably be expected to prevent or materially delay the approval of any Governmental Entity of any of the filings referred to in this Section 6.5(a).

(b)    Each Party shall (i) respond as promptly as reasonably practicable to any inquiries or requests for additional information and documentary material received from any Governmental Entity relating to the matters described in Section 6.5(a) and (ii) not enter into any agreement with the any Governmental Entity pursuant to which such Party agrees not to consummate the Transactions.

(c)    In connection with and without limiting the foregoing, each Party shall, subject to applicable Law and except as prohibited by any applicable representative of any applicable Governmental Entity: (i) promptly notify the other Parties of any material written communication to that Party from any Governmental Entity concerning this Agreement or the Transactions, and permit the other Parties to review in advance (and to consider any comments made by the other Parties in relation to) any proposed written communication to any of the foregoing; (ii) not participate in or agree to participate in any substantive meeting, telephone call or discussion with any Governmental Entity in respect of any filings, investigation or inquiry concerning this Agreement or the Transactions unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Entity, gives the other Parties the opportunity to attend and participate in such meeting, telephone call or discussion; and (iii) subject to the solicitor-client or attorney-client and similar applicable privileges, furnish outside legal counsel for the other Parties with copies of all correspondence, filings, and written communications (and memoranda setting forth the substance thereof) between such Party and its Affiliates and their respective Representatives, on the one hand, and any Governmental Entity or its members or their respective staffs, on the other hand, with respect to this Agreement and the Transactions; provided, however, that any such Party may limit the disclosure of filings to protect confidential information, including limiting dissemination of filings to an "outside counsel only" basis.

6.6    Further Assurances. The Parties agree to (i) furnish upon request to each other such further information, (ii) execute, acknowledge and deliver to each other such other documents and (iii) do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction Documents.

6.7    Bankruptcy Actions and Court Filings.

(a)    Sellers shall file motions, which shall be in form and substance acceptable to Buyer, seeking entry of the (i) the Operating Order and (ii) the Post-Petition Financing Order within two (2) Business Days following the Petition Date.

(b)    Buyer and Sellers acknowledge that this Agreement and the Transactions contemplated hereby are subject to the Trustee agreeing to pursue the consummation of the Transaction, including the filing of the Sale Motion and the entry of the Sale Order. In the event

-31-

of any discrepancy between this Agreement and the Sale Motion and the Sale Order, the Sale Motion and the Sale Order shall govern.

(c)     The Sellers shall, within seven (7) days following the Petition Date, file with the Bankruptcy Court the Sale Motion and otherwise use their commercially reasonable efforts to have the Bankruptcy Court enter the Sale Order as promptly as practicable.

6.8     <u>Expense Reimbursement</u>.  If this Agreement is (a) terminated pursuant to <u>Section 8.1(b)(ii)</u>, <u>Section 8.1(b)(iii)</u>, <u>Section 8.1(c)</u>, <u>Section 8.1(d)</u>, <u>Section 8.1(e)</u>, <u>Section 8.1(f)</u>, <u>Section 8.1(g)</u>, <u>Section 8.1(i)</u>, <u>Section 8.1(k)</u>, <u>Section 8.1(l)</u>, <u>Section 8.1(m)</u>, <u>Section 8.1(n)</u> or <u>Section 8.1(o)</u> and (b) at any time thereafter, an Alternative Transaction is consummated, then Buyer shall be deemed to have earned the Expense Reimbursement, which shall be paid in cash by wire transfer of immediately available funds to an account designated by Buyer, out of the proceeds of such Alternative Transaction, without further order of the Bankruptcy Court, contemporaneously with or as soon as reasonably practicable following the consummation of such Alternative Transaction. For greater certainty, the payment of the Expense Reimbursement to the Buyer shall be in addition to the return of the Deposit in accordance with <u>Section 3.3(c)</u>.

6.9     <u>Preservation of Books and Records</u>.  During the pendency of the Bankruptcy Case, Buyer and (if applicable) Sellers and the Trustee shall provide to Sellers and their respective Affiliates and Representatives (after reasonable notice and during normal business hours and without undue interference to the business operations of Buyer, and at the Sellers sole cost and expense) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Acquired Assets, to the extent necessary to permit the Sellers to determine any matter relating to its rights and obligations hereunder or to any period ending on or before the Closing Date (for example, for purposes of any Tax or accounting audit or any claim or litigation matter, but not for any dispute or claim between Buyer and Sellers in connection with this Agreement, the Transaction Documents or otherwise), for periods prior to the Closing and shall preserve such books and records until the earlier of (i) such period as shall be consistent with Buyer's records retention policy in effect from time to time, (ii) the retention period required by applicable Law or (iii) the termination of the Bankruptcy Case.  Such access shall include access to any information in electronic form to the extent reasonably available.  Buyer acknowledges that Sellers have the right to retain originals or copies of all of books and records included in or related to the Acquired Assets for periods prior to the Closing.

6.10     <u>Notification of Certain Matters</u>.  Sellers will promptly notify Buyer of: (i) any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Transactions (including with respect to the transfer of personal information); (ii) any written notice or other communication from any Governmental Entity (other than the Bankruptcy Case) related to or in connection with the Transactions; and (iii) promptly upon discovery thereof, any material variances from, or the existence or occurrence of any event, fact or circumstance arising after the execution of this Agreement that would reasonably be expected to cause any of the representations and warranties contained in <u>Article 4</u> to be untrue or inaccurate in a manner that would reasonably be expected to cause the conditions set forth in <u>Section 7.1</u> not to be satisfied.

-32-

6.11    Confidentiality.  Upon and for a period of one (1) year following the Closing (or indefinitely in the case of trade secrets), Sellers shall use commercially reasonable efforts to keep confidential all non-public information regarding the Acquired Assets, except and to the extent such public disclosure as Sellers and their counsel may reasonably determine to be required under any applicable Law or Order (provided that Sellers will provide Buyer with prior written notice of any such disclosure to the extent permitted by applicable Law or Order).

6.12    Contractors.  Sellers shall use commercially reasonable efforts to cause the contractors set forth on Schedule 6.12 to continue to support the Regional Business, consistent with past practice, from and after the Agreement Date until the Closing.

# ARTICLE 7
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

7.1    Conditions Precedent to Obligations of Buyer.  The obligation of Buyer to consummate the Transactions is subject to the satisfaction (or written waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)    No Order.  No court or other Governmental Entity has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the Transactions.

(b)    Accuracy of Representations and Warranties.  The representations and warranties of Sellers set forth in Article 4 shall be true and correct (disregarding all qualifications or limitations as to "materiality" and words of similar import set forth therein) in all material respects as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(c)    Sellers Performance of Obligations.  Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date.

(d)    Trustee's Conditions Certificate.  Buyer shall have received from the Trustee a certificate (the "Trustee's Conditions Certificate"), dated the Closing Date, certifying that all of the conditions specified in this Section 7.1 (other than the condition set forth in Section 7.1(b)) have been fulfilled and/or waived.

(e)    Officer's Certificate.  Buyer shall have received from the Sellers a certificate, dated the Closing Date, of an executive officer of each Seller to the effect that, to the best of such officer's knowledge, all of the conditions specified in Section 7.1(b) been fulfilled and/or waived (the "Officer's Certificate").

(f)    Inventory.  The Closing Date Inventory shall not be less than 90% of the Target Inventory.

-33-

(g) <u>Post-Petition Trade Payables</u>. All Post-Petition Trade Payables shall have arisen in the Ordinary Course of Business, and no such Post-Petition Trade Payables shall be delinquent in its payment in accordance with its terms.

(h) <u>Environmental Studies</u>. The Buyer shall have received Phase I environmental site assessment reports with respect to each of the Regional Business Warehouses (the "<u>Phase I Reports</u>") and such Phase I Reports shall have been completed within three (3) weeks of the Agreement Date and be satisfactory to Buyer in its sole discretion.

(i) <u>ABL Facility and New Money Financing Agreement Advances</u>. Aggregate advances under the ABL Facility and New Money Financing Agreement immediately prior to the Closing (and taking into any account any amounts to be funded at the Closing) are not greater than 85% of the Eligible Accounts Receivable (as such term is defined in the ABL Facility and/or the New Money Financing Agreement, as applicable) inclusive of any amounts funded or committed to be funded by the Buyer thereunder.

(j) <u>Agreement of the Trustee</u>. The Trustee shall have agreed to undertake and perform in all material respects all obligations and agreements contained in this Agreement (including the obligations set forth in <u>Section 6.8</u>) required to be performed by the Sellers or the Trustee no later than two (2) Business Days following the Petition Date.

(k) <u>Sale Order</u>. The Sale Order shall have been entered and shall not be subject to a stay pending appeal.

(l) <u>Material Contracts</u>. All consents necessary to assign the Material Contracts to the Buyer shall have been obtained and all Material Contracts shall have been assumed and assigned to Buyer at Closing.

(m) <u>Cure Amounts</u>. The aggregate Cure Amounts related to the Material Contracts on the Closing Date shall not exceed $1,000,0000 (One Million Dollars).

(n) <u>Northeast Rig Count</u>. There shall be no less than thirteen (13) drilling rigs actively servicing well sites that are operated by the Regional Business (excluding the portion of the Regional Business conducting operations out of the Midland Solid Control Warehouse) on the Closing Date.

(o) <u>Midland Solid Control Rig Count</u>. There shall be no less than eight (8) solid control rigs actively servicing well sites that are operated by the Regional Business out of the Midland Solid Control Warehouse on the Closing Date.

(p) <u>Trustee's Operation Orders</u>. The Bankruptcy Court shall have entered the Trustee's Operation Orders no later than five (5) days following the Petition Date.

(q) <u>Property and Casualty Insurance</u>. On or before June 1, 2020, the Property and Casualty Insurance Policies shall have been renewed and extended beyond June 1, 2020, in form and substance acceptable to Buyer.

-34-

(r)     Encina Exit Financing.  Buyer shall have received the financing on the terms set forth in the Encina Exit Financing Commitment Letter, provided that the condition forth in this Section 7.1(r) shall only apply so long as Buyer shall have performed in all material respects its obligations under such financing.

7.2     Conditions Precedent to the Obligations of the Sellers.  The obligation of the Sellers to consummate the Transactions is subject to the satisfaction (or written waiver by the Sellers) at or prior to the Closing Date of each of the following conditions:

(a)     No Order.  No court or other Governmental Entity has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement.

(b)     Accuracy of Representations and Warranties.  The representations and warranties of Buyer set forth in Article 5 shall be true and correct (disregarding all qualifications or limitations as to "materiality" and words of similar import set forth therein) in all material respects as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(c)     Performance of Obligations.  Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(d)     Officer's Certificate.  The Sellers shall have received a certificate, dated the Closing Date, of an executive officer of Buyer to the effect that all of the conditions specified in this Section 7.2 been fulfilled and/or waived (the "Buyer's Conditions Certificate" and together with the Trustee's Conditions Certificate and the Officer's Certificate, the "Conditions Certificates").

7.3     Frustration of Conditions Precedent.  Neither Buyer nor the Sellers may rely on the failure of any condition set forth in this Article 7, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its commercially reasonable efforts to consummate the Transactions contemplated hereby.

**ARTICLE 8**
**TERMINATION**

8.1     Termination of Agreement.  This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

(a)     by written agreement of the Sellers and Buyer;

(b)     by either the Sellers or Buyer:

-35-

(i)      if there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining Buyer or Sellers from consummating the Transactions is entered and such Order shall become final, provided, however, that no termination may be made by a Party under this <u>Section 8.1(b)(i)</u> if the issuance of such Order was caused by the breach or action or inaction of such Party;

(ii)      upon the filing of a motion by any of the Sellers to approve an Alternative Transaction or the Bankruptcy Court's granting an order approving an Alternative Transaction;

(iii)      upon the Sellers' entry into an Alternative Transaction;

(c)      by Buyer, if there shall have been a breach by either Seller of any of their representations, warranties, covenants or agreements contained in this Agreement or any other event or condition shall result in either Seller being incapable of satisfying one or more of their representations, warranties, covenants or agreements set forth herein, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within three (3) days after written Notice thereof shall have been received by Sellers;

(d)      by Buyer, if (i) either of the Operating Order or the interim Post-Petition Financing Order shall not have been entered by the Bankruptcy Court within five (5) days after the Petition Date, (ii) the Sale Motion shall not have been filed by the Trustee with the Bankruptcy Court on or prior to seven (7) days following the Petition Date, (iii) the final Post-Petition Financing Order shall not have been entered by the Bankruptcy Court within twenty-six (26) days after the Petition Date, (iv) the Sale Order shall not have been entered by the Bankruptcy Court on or prior to twenty-eight (28) days following the Agreement Date, or (v) the Closing shall not have occurred on or prior to thirty-five (35) days following the Agreement Date; provided, however, that with respect to the foregoing subclause (v) only, Buyer may not terminate the Agreement if the failure of the Closing to occur is due to a breach of this Agreement by the Buyer;

(e)      by Buyer, at any time after the occurrence of an "Event of Default" under the New Money Financing Agreement in the Bankruptcy Case;

(f)      by Buyer or the Sellers, if the Trustee does not agree that the Sellers can proceed with this Agreement and undertake and perform in all material respects all obligations and agreements contained in this Agreement by the filing of the Sale Motion;

(g)      by Buyer or the Sellers, if the Trustee repudiates or seeks to reject this Agreement;

(h)      by the Sellers, if there shall have been a material breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement that, shall not have been cured within twenty (20) days after written Notice thereof shall have been received by Buyer; provided that as of such date, the Sellers are not in breach of this Agreement;

-36-

(i)     by Buyer, at any time, if any of the conditions set forth in <u>Sections 7.1(m)</u>, <u>7.1(n)</u> or <u>7.1(o)</u> are reasonably determined by Buyer to be incapable of being satisfied;

(j)     by Buyer, if the Buyer has not received a duly executed Encina Exit Financing Commitment Letter in form and substance acceptable to Buyer on or before the date that is seven (7) following the Petition Date;

(k)     by Buyer, on or after June 2, 2020, if the condition set forth in <u>Section 7.1(q)</u> has not been satisfied;

(l)     by Buyer, if either of the Trustee's Operation Orders or the New Money Financing Agreement are modified, amended, vacated or overturned, as applicable, without the Buyer's express prior written consent prior to Closing;

(m)     by Buyer, if the Trustee files a motion with the Bankruptcy Court seeking any post-Petition Date financing in the Bankruptcy Cases (other than the New Money Financing Agreement);

(n)     by Buyer, if any party seeks entry of an order pursuant to section 362 Bankruptcy Code or any other similar provisions to lift the automatic stay or seeks similar relief with respect to any Acquired Assets; or

(o)     by Buyer, if any party seeks to assert control over either of the Sellers, the Regional Business or any Acquired Asset in any court, other than the Bankruptcy Court.

8.2     <u>Consequences of Termination</u>.  In the event of any termination of this Agreement by either or both of Buyer and the Sellers pursuant to <u>Section 8.1</u>, written Notice thereof shall be given by the terminating Party to the other Parties hereto, specifying the provision hereof pursuant to which such termination is made, this Agreement shall thereupon terminate and become void and of no further force and effect (other than <u>Section 3.3</u> (*Deposit*), <u>Section 6.8</u> (*Expense Reimbursement*), this <u>Section 8.2</u> (*Consequences of Termination*) and <u>Article 9</u> (*Miscellaneous*) and to the extent applicable in respect of such Sections and Article, <u>Article 1</u> (*Definitions*)), and the Transactions shall be abandoned without further action or Liability of any of the Parties hereto (other than with respect to the sections set forth in this Agreement that shall continue in full force and effect in accordance with this <u>Section 8.2</u> following such termination), except that such termination shall not relieve any Party of any Liability for fraud or willful breach of this Agreement.

<div align="center">

**ARTICLE 9**
**MISCELLANEOUS**

</div>

9.1     <u>Expenses</u>.   Except as set forth in this Agreement and whether or not the Transactions are consummated, each Party hereto shall bear all costs and expenses incurred or to be incurred by such Party in connection with the negotiation and entry into the Transaction Documents and the consummation of the Transactions.

<div align="center">-37-</div>

9.2     Assignment.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Sellers without the prior written consent of Buyer, or by Buyer without the prior written consent of the Sellers; provided that Buyer may, without the consent of any other party, assign this Agreement and its rights and obligations hereunder in whole or in part to (a) any Affiliate; provided that Buyer shall remain jointly liable with such Affiliates for Buyer's obligations hereunder or (b) following the Closing, to any successor or purchaser of all or part of the business of Buyer or any of its Subsidiaries.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns including the Trustee, any trustee in bankruptcy, receiver, liquidating trustee, responsible Person or similar representative for Sellers appointed in connection with the Bankruptcy Cases or any other Proceeding.

9.3     Parties in Interest.  This Agreement shall be binding upon and inure solely to the benefit of Sellers (and their estate), Buyer and their respective successors or permitted assigns (including any bankruptcy trustee or receiver appointed in respect thereof), and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein.

9.4     Notices.    All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be transmitted by electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice.  Notice shall be deemed given on the date of service or transmission; provided that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m. New York time, notice shall be deemed given on the next Business Day:

|  |  |
|---|---|
| If to any Seller: | Q'Max America Inc. |
|  | 11700 Katy Freeway, Suite 200 |
|  | Houston, TX 77079 |
|  | Attention: Rafael Andres Diaz-Granados |
|  | Email: radg@qmax.com |
|  |  |
| With copies to: | Porter Hedges LLP |
|  | 1000 Main St., 36th Floor |
|  | Houston, TX 77002 |
|  | Attention: John F. Higgins |
|  | Email:  jhiggins@porterhedges.com |
|  |  |
| If to Buyer: | QMax Acquisition Corp. |
|  | C/O |
|  | Palladium Equity Partners |
|  | 1270 Avenue of The Americas, Suite 31 |
|  | New York, NY 10020 |
|  | Attention:     Caleb Clark and Scott Kirschner |

-38-

Email: cclark@palladiumequity.com /
skirschner@palladiumequity.com

With copies to:    O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Attention: Nancy Mitchell, Esq. / Matthew Hinker, Esq. / David
Schultz, Esq.
Email: nmitchell@omm.com / mhinker@omm.com /
dschultz@omm.com

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed e-mail address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

9.5    <u>Choice of Law</u>.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Laws of the State of Delaware, without giving effect to any provision thereof that would require or permit the application of the substantive laws of any other jurisdiction.

9.6    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement and all Transaction Documents and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties. This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only in writing by Buyer and Sellers (which may be by way of e-mail), or in the case of a waiver, by the Party waiving compliance.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

9.7    <u>Counterparts; Electronic Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Counterparts to this Agreement may be delivered via electronic mail.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

9.8    <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

-39-

9.9     Headings.  The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

9.10    Exclusive Jurisdiction and Specific Performance.

(a)     Subject to Section 9.10(b), without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby irrevocably and unconditionally consent to, attorn to and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in Section 9.4.  For the avoidance of doubt, this Section 9.10 shall not apply to any Claims that Buyer or its Affiliates may have against any third party following the Closing.

(b)     Notwithstanding anything herein to the contrary, in the event the Bankruptcy Case is terminated, the Parties hereby agree that all Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, shall be heard and determined exclusively in any federal court sitting in the Borough of Manhattan in the City of New York or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York (and, in each case, any appellate court thereof), and the Parties hereby consent to and submit to the jurisdiction and venue of such courts.

9.11    WAIVER OF RIGHT TO TRIAL BY JURY.  SELLERS AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  FOR THE AVOIDANCE OF DOUBT, THIS SECTION 9.11 SHALL NOT APPLY TO ANY CLAIMS THAT BUYER OR ITS AFFILIATES MAY HAVE AGAINST ANY THIRD PARTY FOLLOWING THE CLOSING.

9.12    Survival.  Each and every representation and warranty contained in this Agreement shall expire and be of no further force and effect as of the Closing.  Each and every covenant and agreement contained in this Agreement (other than the covenants contained in this Agreement which by their terms are to be performed (in whole or in part) by the Parties following the Closing (each, a "Post-Closing Covenant")) shall expire and be of no further force and effect as of the Closing.  Each Post-Closing Covenant shall survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or, (b) (i) if time for performance of such Post-Closing Covenant is specified in this Agreement, ninety (90) days following the full performance of such covenant and the expiration of the time period for such performance or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, ninety (90) days following the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such Post-Closing Covenant; provided that if a

-40-

written notice of any claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-Closing Covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

9.13    Time of Essence.  Time is of the essence of this Agreement.

9.14    Non-Recourse.  No past, present or future director, manager, officer, employee, incorporator, member, partner or equity holder of Buyer or Sellers shall have any Liability for any Liabilities of Buyer or Sellers, respectively, under this Agreement or for any Claim based on, in respect of, or by reason of the Transactions.  This Agreement may only be enforced against, and any Claim, action, suit, Proceeding or investigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.

9.15    Disclosure Schedules.  Except as set forth in this Agreement, the inclusion of any information (including dollar amounts) in Disclosure Schedules shall not be deemed to be an admission or acknowledgment by any Party that such information is required to be listed on such section of the relevant schedule or is material to or outside the Ordinary Course of Business of any Person.  The information contained in this Agreement, the exhibits hereto and the Disclosure Schedules is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any Party to any third party of any matter whatsoever (including any violation of any Law or breach of contract).  Unless the context otherwise requires, all capitalized terms used in the Disclosure Schedules shall have the respective meanings assigned in this Agreement.  The Disclosure Schedules set forth items of disclosure with specific reference to the particular Section or subsection of this Agreement to which the information in the Disclosure Schedules relates.

9.16    Mutual Drafting.  This Agreement is the result of the joint efforts of Buyer and Sellers, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties and there is to be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Sellers and Buyer as of the date first above written.

BUYER:

QMAX ACQUISITION CORP.

By: _____

    Name:  Caleb Clark
    Title:  Chief Executive Officer


SELLERS:

Q'MAX AMERICA INC.


By: _____

    Name:
    Title:


ANCHOR DRILLING FLUIDS USA, LLC


By: _____

    Name:
    Title:

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Sellers and Buyer as of the date first above written.

BUYER:

QMAX ACQUISITION CORP.

By: _____
    Name:
    Title:

SELLERS:

Q'MAX AMERICA INC.

By: _____
    Name:  Rafael Diaz-Granados
    Title:  President & CEO

ANCHOR DRILLING FLUIDS USA, LLC

By: _____
    Name:  Rafael Diaz-Granados
    Title:  President & CEO

[SIGNATURE PAGE TO APA]

# DISCLOSURE SCHEDULE

This Disclosure Schedule, including the exhibits and attachments hereto (collectively, this "Disclosure Schedule"), is being furnished in connection with the execution and delivery of that certain Asset Purchase Agreement, entered into on and dated as of May 24, 2020 (the "Agreement"), by and among Q'Max America Inc., a company incorporated under the laws of Delaware ("Q'Max"), and Anchor Drilling Fluids USA, LLC, a Delaware limited liability company ("Anchor Drilling" and, together with Q'Max, "Sellers" and each, a "Seller") and QMax Acquisition Corp., a Delaware corporation ("Buyer"). Unless otherwise defined herein, all capitalized terms used in this Disclosure Schedule shall have the respective meanings given such terms in the Agreement.

## SCHEDULE 1.1(a)

## CONTINUING EMPLOYEES

| # | Payroll Name | Position ID | Home Department Description | Job Title Description |
|---|---|---|---|---|
| 1 | Adams, Brandon | B1E000076 | Wellsville - Warehouse - Direct | Warehouseman |
| 2 | Alsip, Brent | B1E000605 | Newcomerstown-Solids Control-DIR | Solids Control Supervisor |
| 3 | Anderson, Zachary | B1E000433 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 4 | Baker, Kyle Andrew | B1E000819 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 5 | Bell, Todd | B1E000314 | Newcomerstown - QHSE - IND | Safety Specialist |
| 6 | Bostic, John | B1E000190 | Leetsdale-Drilling Fluids-DIR | Engineering Manager |
| 7 | Bradford, Brian | B1E000083 | Newcomerstown-Solids Control-DIR | Solids Control Supervisor |
| 8 | Breaux, Jonathan | B1E000896 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 9 | Bridges, Roy | B1E000282 | Newcomerstown - Warehouse - Direct | Warehouse Manager |
| 10 | Brignac, Chase Michael | B1E000636 | Wexford - Sales - Indirect | Technical Sales Engineer |
| 11 | Bryant, Jason | B1E000170 | Wellsville - Engineer - Direct | Drilling Fluids Engineer Supervisor |
| 12 | Bryarley, Thomas | B1E000350 | Wellsville - Warehouse - Direct | Warehouse Supervisor I |
| 13 | Burkhouse, Robert Roy | B1E000273 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 14 | Burris, Kenneth | B1E000222 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 15 | Burrows, Gregory | B1E000870 | Wellsville - Warehouse - Direct | Warehouseman |
| 16 | Bush, Jason | B1E000171 | Newcomerstown - Management | Area Operations Manager |
| 17 | Camacho, Juan J | B1E000642 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 18 | Campbell, Marc | 1J1000070 | Headquarters - IT | Network Support Technician |
| 19 | Chilson, Dale | B1E000111 | Horseheads - Warehouse - Direct | Warehouse Manager |
| 20 | Collier, David | B1E000803 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 21 | Conlon, Michael | B1E000246 | Newcomerstown - Warehouse - Direct | Assistant Mud Plant Attendant |
| 22 | Contreras, Gabriel Ivan | B1E000698 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 23 | Davis, Fred Allen | B1E000888 | Wellsville - Trucking - Direct | Transportation Specialist I |
| 24 | Dawson, Jesse | B1E000184 | Wellsville - Warehouse - Direct | Warehouse Supervisor II |
| 25 | Deramo, Amy Jeanette | B1E000687 | HQ - Anchor - Finance Accounting | Payables Specialist |
| 26 | DiLoreto, Rocco Steven | B1E000944 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 27 | Drayer, Douglas Alan | B1E000529 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 28 | Dugas, Justin | B1E000215 | Newcomerstown - Sales - Indirect | Sales Manager |

| 29 | Duty, Donald James | B1E000688 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
|---|---|---|---|---|
| 30 | Enke, Eugene Harold | B1E000141 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 31 | Escobar, Romeo | B1E000432 | Midland SC-Solids Control-DIR | Solids Control Service Tech |
| 32 | Evans, James | B1E000165 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 33 | Farrell, Patricia N. | B1E000708 | Leetsdale-Administration-IND | Area Billing Specialist |
| 34 | Faulkenberry, Tony T | B1E000374 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 35 | Fiveash, Daniel H | B1E000904 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 36 | Flowers, Charles | B1E000951 | Wellsville - Trucking - Direct | Transportation Specialist I |
| 37 | Fofi, John | B1E000608 | Newcomerstown-Solids Control-DIR | Solids Control Supervisor |
| 38 | Fonzo, Anthony | B1E000534 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 39 | Fore, Gregg Anthony | B1E000835 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 40 | Gilbert, Jessica | B1E000185 | Leetsdale-Administration-IND | Administrative Assistant |
| 41 | Giotto, David | B1E000122 | Leetsdale - Warehouse - Direct | Warehouse Manager |
| 42 | Goldsmith, Tara | B1E000635 | HQ Anchor - Sales - Indirect | Business Development Manager |
| 43 | Gomez, Jorge A | B1E000443 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 44 | Gonzalez-Torres, Felix Santos | B1E000415 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 45 | Haggerty, Joshua | B1E000207 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 46 | Hagy, Javin | B1E000174 | Newcomerstown-Solids Control-DIR | Shop Mechanic |
| 47 | Hallmark, Joshua D. | B1E000675 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 48 | Hanlon, Dale | B1E000855 | Wellsville - Warehouse - Direct | Assistant Mud Plant Attendant |
| 49 | Harris, Galen Paul | B1E000438 | Midland SC-Solids Control-DIR | Solids Control Service Tech |
| 50 | Herrington, James | B1E000162 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 51 | Hicks, Samantha Jean | B1E000876 | HQ - Anchor - Finance Accounting | Assistant Controller |
| 52 | Holpp, Virgil | B1E000330 | Newcomerstown-Solids Control-DIR | Welder |
| 53 | Hursey, Andrew | B1E000057 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 54 | Hutchins, Keven | B1E000224 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 55 | Jacob, Gary | B1E000146 | Leetsdale - Trucking - Direct | Transportation Specialist I |
| 56 | Karonka, Michael | B1E000251 | Anchor - Management | Area Manager - Texas |
| 57 | Kelly, Adam | B1E000850 | Leetsdale - Trucking - Direct | Transportation Specialist I |
| 58 | Lambes, Jamie | B1E000167 | Newcomerstown-Administration-IND | Area Billing Specialist |
| 59 | Lasko, Trent | B1E000317 | Newcomerstown-Solids Control-DIR | Shop Mechanic |
| 60 | Lattanzio Jr., Ralph | B1E000695 | Wellsville - Trucking - Direct | Transportation Specialist I |
| 61 | Laws, Terry | B1E000401 | Midland SC-Solids Control-DIR | Solids Control Service Tech |
| 62 | Lewis, Jacob | B1E000161 | Wellsville - Trucking - Direct | Transportation Specialist I |
| 63 | Lewis, James | B1E000163 | Wellsville - Trucking - Direct | Transportation Specialist I |
| 64 | Lilly, Jason | B1E000172 | HQ Anchor - Supply Chain - IND | Supply Chain Manager |
| 65 | Lira, Antonio | B1E000856 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 66 | Looney, Diane | B1E000125 | Tulsa - Human Resources | Human Resources Representative |
| 67 | Lott, Victor | B1E000328 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 68 | Lower, Larry | B1E000231 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 69 | Lowman, Christopher | B1E000554 | Leetsdale-Drilling Fluids-DIR | Engineering Manager |
| 70 | LUCAS, BOBBIE L | B1E000073 | Wellsville-Administration-IND | Administrative Assistant |

| 71 | Lucien II, Gary J. | B1E000722 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
|---|---|---|---|---|
| 72 | Mann, Chad | B1E000091 | Newcomerstown-Solids Control-DIR | Maintenance Supervisor |
| 73 | Mann, Robbie | B1E000269 | Newcomerstown-Solids Control-DIR | Operations Manager - Solids Control |
| 74 | Maple, Shea | B1E000297 | Newcomerstown - QHSE - IND | QHSE Specialist |
| 75 | McClelland, Joseph | B1E000200 | Newcomerstown-Solids Control-DIR | Solids Control Technician |
| 76 | McClelland, Joseph W. | B1E000201 | Newcomerstown - Warehouse - Direct | Assistant Mud Plant Attendant |
| 77 | Mckain, Tyler | B1E000321 | Wellsville-Drilling Fluids-DIR | Drilling Fluids Engineer Supervisor |
| 78 | Medina, Yery Jose | B1E000834 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 79 | Mirra, Michael | B1E000345 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 80 | Montano, Carlos Carrasco | B1E000556 | Midland SC-Solids Control-DIR | Solids Control Supervisor |
| 81 | Mount, Daniel | B1E000114 | Newcomerstown - Sales - Indirect | Sales Rep / Account Manager |
| 82 | Moyer, Edward Franklin | B1E000840 | Newcomerstown - Sales - Indirect | Technical Sales Engineer |
| 83 | Mullens, Christopher L. | B1E000769 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 84 | Naramore, Jodie | B1E000830 | Midland SC-Solids Control-DIR | Solids Control Service Tech |
| 85 | Naramore, Paul | B1E000719 | Midland SC-Solids Control-DIR | Solids Control Service Tech |
| 86 | Nolan, Charles | B1E000094 | Newcomerstown-Solids Control-DIR | Solids Control Technician |
| 87 | Nowlin, Thomas Matthew | B1E000913 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 88 | Ochoa, Gardiel | B1E000616 | Midland SC-Solids Control-DIR | Welder |
| 89 | Orr, Brent | B1E000081 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 90 | Orr, Darrel Dean | B1E000828 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 91 | Pennington, Christopher | B1E000101 | HQ - Anchor - Executive | Vice President of Operations - US |
| 92 | Peno, Robert | B1E000274 | Leetsdale-Drilling Fluids-DIR | Drilling Fluids Engineer Supervisor |
| 93 | Ponath, Brandon Wayne | B1E000798 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 94 | Pulliam, Justin | B1E000480 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 95 | Redmon, Jeff | B1E000536 | Midland SC-Solids Control-DIR | Operations Manager - Solids Control |
| 96 | Reyes, Juan | B1E000918 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 97 | Rivera, Tommy Aranda | B1E000651 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 98 | Roman, Chris | B1E000537 | Midland SC-Solids Control-DIR | Service Manager |
| 99 | Ross, Joshua | B1E000206 | Newcomerstown - Trucking - Direct | Transportation Specialist I |
| 100 | Russen, John | B1E000187 | Horseheads - Trucking - Direct | Transportation Specialist I |
| 101 | Salazar, Ramon | B1E000447 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 102 | Schockman, Bradley Alan | B1E000943 | Wellsville - Engineer - Direct | Drilling Fluids Engineer |
| 103 | Schraeder, Kelby | B1E000426 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 104 | Sellers, Nathen | B1E000257 | Wellsville - Warehouse - Direct | Plant Manager |
| 105 | Shankles, Steven A | B1E000783 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 106 | Sharier Jr, Frank | B1E000143 | Newcomerstown-Solids Control-DIR | Shop Mechanic |
| 107 | Skinner, Ryan | B1E000351 | Wellsville - Warehouse - Direct | Assistant Mud Plant Attendant |
| 108 | Smith, Joseph William | B1E000821 | Midland SC - Engineer, SC - Direct | Solids Control Technician Trainee |
| 109 | Spicer, Nicholas | B1E000957 | Horseheads - Warehouse - Direct | Warehouse Supervisor II |
| 110 | Stahl, Bryan | B1E000088 | Newcomerstown-Solids Control-DIR | Solids Control Technician |
| 111 | Stang, Calvin | B1E000924 | Midland SC - Engineer, SC - Direct | Solids Control Technician |

| 112 | Stephens, Daniel | B1E000116 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
|-----|------------------|-----------|-------------------------------|---------------------------|
| 113 | Stone, Jeff | B1E000518 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 114 | Talkington, Brion | B1E000085 | Newcomerstown-Solids Control-DIR | Solids Control Supervisor |
| 115 | Tennant, Gary | B1E000147 | Newcomerstown - Warehouse - Direct | Assistant Mud Plant Attendant |
| 116 | Watson, Corodon Surea | B1E000406 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 117 | Welch, Timothy P. | B1E000852 | Horseheads - Trucking - Direct | Transportation Specialist I |
| 118 | Whatley, Dirk Edward | B1E000866 | Wellsville - Trucking - Direct | Transportation Specialist I |
| 119 | White, Stacy | B1E000298 | Leetsdale-Drilling Fluids-DIR | Drilling Fluids Engineer Supervisor |
| 120 | Willett, Harold | B1E000150 | Wellsville - Warehouse - Direct | Warehouse Manager |
| 121 | Williams, Brandon | B1E000449 | Midland SC-Solids Control-DIR | Solids Control Supervisor |
| 122 | Williams, Dacia | B1E000109 | Tulsa - Trucking - Direct | DOT / Fleet Administrator |
| 123 | Wise, Jeremy | B1E000519 | Newcomerstown-Engineer-SC-DIR | Solids Control Technician |
| 124 | Witherow, Anthony D. | B1E000734 | Wellsville - Warehouse - Direct | Assistant Mud Plant Attendant |
| 125 | Yates, Isaiah | B1E000445 | Midland SC - Engineer, SC - Direct | Solids Control Technician |
| 126 | Zimmermann, Demi Jenee | B1E000599 | HQ - Anchor - Finance Accounting | Revenue Accounting Manager |

SCHEDULE 1.1(b)

INSURANCE

| Coverage | Policy Number | Effective Date | Expiration Date | Carrier | Coverage Description |
|---|---|---|---|---|---|
| **General Liability/ Pollution Legal Liability** | 4076500 | 6/1/2019 | 6/1/2020 | Ironshore Specialty Insurance Company | **Limits** |
| | | | | | General Aggregate $ 2,000,000 |
| | | | | | Products-Completed Operations Aggregate $ 2,000,000 |
| | | | | | General Liability $ 1,000,000 |
| | | | | | Products-Completed Operations Aggregate $ 1,000,000 |
| | | | | | Damages to Premises Rented To You $ 500,000 |
| | | | | | Medical Expenses $ 25,000 |
| | | | | | Site Pollution Legal Liability $ 1,000,000 |
| | | | | | Contractors Pollution Liability $ 1,000,000 |
| | | | | | **Deductible** |
| | | | | | Liability NIL |
| | | | | | Each Pollution Occurrence $ 25,000 |
| **Commercial Auto** | AS2-641-445252-029 | 6/1/2019 | 6/1/2020 | Liberty Mutual Fire Insurance Co. | **Limits** |
| | | | | | Combined Single Limit - Symbol 1 $ 2,000,000 |
| | | | | | Uninsured/Underinsured Motorist - Symbol 2 Statutory |
| | | | | | Personal Injury Protection Statutory |
| | | | | | Comprehensive - Symbol 2 |
| | | | | | Collision - Symbol 2 |
| | | | | | **Deductible** |
| | | | | | Liability NIL |
| **Workers Compensation/ Employers Liability** | WC6-641-445252-019 | 6/1/2019 | 6/1/2020 | The First Liberty Insurance Corporation | **Limits** |
| | | | | | Statutory – |
| | | | | | *Employers Liability* |
| | | | | | Bodily Injury by Accident $ 1,000,000 |
| | | | | | Policy Limit For Bodily Injury by Disease $ 1,000,000 |

| | | | | | |
|---|---|---|---|---|---|
| **$30M Umbrella Liability** | 004076600 | 6/1/2019 | 6/1/2020 | Ironshore Specialty Insurance Company | Bodily Injury by Disease $ 1,000,000<br>**Deductible** NIL<br>**Limits**<br>General Aggregate $ 30,000,000<br>Each Occurrence $ 30,000,000<br>Products-Completed Operations $ 30,000,000<br>*Umbrella limits are shared with Canada<br>**Deductible** – NIL |
| **Property** | GBP00229718 | 6/1/2019 | 6/1/2020 | Allianz Global Corporate & Specialty SE | **Limits**<br>General Aggregate $ 25,000,000<br>*Sublimits: Various<br>**Deductible**<br>Each Occurrence $ 25,000<br>Additional Deductibles as listed on policy |

SCHEDULE 2.1

ASSETS TO BE ACQUIRED

(b)   Intellectual Property

Patents

| File No. | Title | Matter Type | Country | Status | Date Filed | Application No. | Patent No. | Grant Date | Owner |
|---|---|---|---|---|---|---|---|---|---|
| 22P12PR3 | DEHYDRATOR SYSTEM AND METHODS OF USING THE SAME | Prov | United States of America | Pending | Aug 30, 2019 | 62894512 | | | Q'Max America, Inc. |
| 22P13US | APPARATUS, METHODS AND SYSTEMS FOR REMOVING PARTICULATE IMPURITIES FROM ABOVE A SHALE SHAKER | Utility | United States of America | Issued | May 16, 2013 | 13896317 | 9352264 | May 31, 2016 | Anchor Drilling Fluids USA, LLC |

Trademarks

| MARK | FILE NUMBER | COUNTRY | STATUS | APPLICATION NO. | DATE FILED | REGISTRA TION NO. | REGISTRAT ION DATE | GOODS AND SERVICES DESCRIPTION | OWNER |
|---|---|---|---|---|---|---|---|---|---|
| Q-ENVIRO | 22M25MX1 | Mexico | Registed | 2085963 | Aug 8, 2018 | 1936224 | Aug 8, 2018 | Waste treatment apparatus for chemical treatment, oil removal, water separation and recycling, sedimentation, filtration, and flocculation of wastes from oil and gas drilling processes, shale gas drilling and fracking operations, and oil production and refinery processes; Waste water treatment apparatus for wastes in the nature of drill cuttings, oily slop wastes, water, solids and sludge including oil removal, solids removal, solids filtration and water separation and recycling; Apparatus for segregating liquid wastes from drilling cuttings; Apparatus for mud separation processes; Apparatus for solidification and stabilization of wet drilling cuttings; apparatus for dewatering sludge, waste, solids, drill cuttings, and drilling mud, and recycling waste water from oil and gas drilling operations. | Q'Max America, Inc. |
| Q-ENVIRO | 22M25MX2 | Mexico | Registed | 2085969 | Aug 8, 2018 | 1936227 | Aug 8, 2018 | Waste treatment in the nature oil removal, solids removal, solids filtration and water separation and recycling of drill cuttings, oily slop wastes, water, solids and sludge from oil and gas drilling and fracking processes; Chemical treatment of drilling wastes from oil and gas drilling operations including chemical flocculation; dewatering wastes from oil and gas drilling processes, fracking operations, and oil and gas production and refinery processes; Segregating liquid wastes from dry cuttings; collection and recycling of waste water from oil and gas drilling processes and fracking operations; Solids control and mud separation processes; Consulting services in the field of waste treatments including technical consulting in the field of solid waste management, waste water removal | Q'Max America, Inc. |

Case 20-60030   Document 1   Filed in TXSB on 05/24/20   Page 64 of 80

| Mark | ID | Country | Status | Appl. No. | Appl. Date | Reg. No. | Reg. Date | Goods/Services | Owner |
|---|---|---|---|---|---|---|---|---|---|
| ANCHOR | 22M28US | United States of America | Registered | 85749071 | Oct 9, 2012 | 4839121 | Oct 27, 2015 | Chemical additives for drilling muds; chemical additives for oil well drilling fluid; chemical preparations for use in industry, namely, the oil well drilling industry; chemicals for use in the field of oil exploration and production; chemicals used in industry, namely, the oil well drilling industry; chemicals used in oil drilling all the foregoing not for use in processes related to the separation of oil/gas from water and recycling of water from oil and gas drilling process and fracking operations. | Anchor Drilling Fluids USA, LLC |
| ANCHOR | 22M29US | United States of America | Registered | 85983278 | Oct 9, 2012 | 4737380 | May 19, 2015 | Well-site equipment rental, namely, rental of oil well drilling tools | Anchor Drilling Fluids USA, LLC |
| ANCHOR DRILLING FLUIDS | 22M30US | United States of America | Registered | 85539883 | Feb 10, 2012 | 4735566 | May 12, 2015 | Chemical additives for drilling muds; chemical additives for oil well drilling fluid; chemical preparations for use in industry; chemicals for use in the field of oil exploration and production; chemicals used in industry; chemicals used in oil drilling | Anchor Drilling Fluids USA, LLC |
| ALL IN. EVERY WELL. | 22M31US | United States of America | Registered | 86141675 | Dec 12, 2013 | 4879290 | Jan 5, 2016 | Providing oilfield services to the oil and natural gas industry, namely, oil and gas well drilling on oil and gas wells, the rental of oil well drilling tools and equipment for the oil and gas wells and drilling waste-water treatment and/or disposable services, namely, hazardous waste disposal services to the oil and natural gas industry | Anchor Drilling Fluids USA, LLC |
| CLEARPL EX COMPLETE | 22M32US | United States of America | Registered | 86141722 | Dec 12, 2013 | 4822825 | Sep 29, 2015 | Chemicals for use in the drilling industry, namely, anionic polymers, or a blend of two or more anionic polymers and water | Anchor Drilling Fluids USA, LLC |
| CLEARPL EX1 | 22M33US | United States of America | Registered | 86141700 | Dec 12, 2013 | 4822823 | Sep 29, 2015 | Chemicals for use in the drilling industry, namely, anionic polymers; anionic polymers used to coat solid materials in dewatering applications to aid in the mechanical separation of solids | Anchor Drilling Fluids USA, LLC |
| CLEARPL EX II | 22M34US | United States of America | Registered | 86141705 | Dec 12, 2013 | 4822824 | Sep 29, 2015 | Chemicals for use in the drilling industry, namely, anionic polymers; anionic polymers used to coat solid materials in dewatering applications to aid in the mechanical separation of solids | Anchor Drilling Fluids USA, LLC |

(j)   Real Estate

1.   Midland Solids Control Warehouse.

2.   Leetsdale Warehouse.

3.   Wellsville  Warehouse.

OMM_US:78056313.8

4.    Horseheads Warehouse.

5.    Newcomerstown Warehouse.

6.    45,000 square feet of vacant land in Wellsville, Ohio, located across from the Wellsville Warehouse.

7.    Employee housing located at 1122 West State Street, Newcomerstown, Ohio 43832.

8.    Employee housing located at 2303 North Mulberry Lane Hobbs, New Mexico, 88240.

9.    Employee housing located at 5001 W. Wadley, Midland, Texas, Apartment No. P112.

OMM_US:78066313.8

SCHEDULE 2.4(b)

DESIGNATED CONTRACTS

(i) MATERIAL CONTRACTS

1.  ABL Facility.

2.  New Money Financing Agreement.

3.  Amended and Restated Supply Agreement by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, LLC dated April 1, 2018 (the "Cimbar Supply Agreement").

4.  Amendment No. 1 to Amended and Restated Supply Agreement by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, LLC dated January 1, 2020 (the "Amended Cimbar Supply Agreement").

5.  Operating Agreement of C&A Grinding, L.L.C. by and between Cimbar Performance Minerals, Inc. and Anchor Drilling Fluids USA, Inc. dated January 1, 2012.

6.  Amendment No. 1 to Operating Agreement of C&A Grinding, L.L.C. by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, LLC dated April 1, 2018.

7.  Amendment No. 2 to Operating Agreement of C&A Grinding, L.L.C. by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, LLC dated March 3, 2020.

8.  Sublease Agreement by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, Inc. dated December 2011 ("Cimbar Sublease").

9.  Amended Sublease Agreement by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, Inc. dated April 1, 2018 ("Cimbar Amended Sublease").

10. Residential Rental Agreement by and between The Phoenix Property Management and Q'Max dated July 1, 2010 for housing located at 2303 Mulberry Lane, Hobbs, NM 88240 (the "Hobbs Housing Lease").

11. Lease Agreement by and between Penny Clark of Sarah Viola Grewell Memorial Scholarship Fund and Anchor Drilling dated November 1, 2019 for housing located at 1122 West State Street Newcomerstown, Ohio 43832 (the "Newcomerstown Housing Lease").

12. Commercial Lease by and between BMS Enterprises, LLC and Anchor Drilling dated June 1, 2017 (the "Newcomerstown Warehouse Lease").

13. Addendum to Lease Between Anchor Drilling and BMS Enterprises, LLC dated April 27, 2020 (the "Newcomerstown Warehouse Rent Deferral Agreement").

14. Lease by and between Horseheads Sand & Transloading Terminal, LLC and Anchor Drilling (the "Horseheads Warehouse Lease").

15. Lease by and between Montevallo, Inc. and Q'Max dated April 4, 2014 (the "<u>Midland Solids Control Warehouse Lease</u>").

16. Lease by and between The Port Authority for Columbiana County, Ohio and Anchor Drilling for property described as 45,000 square feet of land in Wellsville, Ohio dated July 11, 2013 (the "<u>Wellsville Yard Lease</u>").

17. Lease by and between Metroplaza Partners LLC and Patriot Drilling Fluids, a Division of Q'Max America Inc. (the "<u>Leetsdale Warehouse Lease</u>").

18. Apartment Lease Contract by and between Le Mirage and Qmax LLC for Apartment No. P112 at 5001 W. Wadley, Midland, Texas (the "<u>Midland Apartment Lease</u>").

19. Amended and Restated Equipment Lease With Option, by and between C&A Grinding, LLC, Cimbar Performance Minerals, Inc. and Anchor Drilling dated December 17, 2018.

20. Letter Agreement with respect to Amended and Restated Equipment Lease With Option, by and between C&A Grinding, LLC, Cimbar Performance Minerals, Inc. and Anchor Drilling dated December 19, 2018.

21. Letter Agreement, by and between Cimbar Performance Minerals and Anchor Drilling, dated April 3, 2020.

(ii) OTHER DESIGNATED CONTRACTS

1. Master Rental Service Agreement by and between Apache Corporation and Q'Max dated March 26, 2015.

2. Master Service Agreement by and between Callon Petroleum Company and Q'Max dated January 26, 2016.

3. Master Service Agreement by and between Diamondback E&P LLC and Anchor Drilling dated February 28, 2017.

4. Master Service Agreement by and between Grenadier Energy Partners II, LLC and Anchor Drilling dated May 8, 2019.

5. Amended and Restated Master Service/Sales Agreement by and between Pioneer Natural Resources USA, Inc. dated January 9, 2017.

6. Master Service Agreement by and between Solaris Water Midstream, LLC and Anchor Drilling dated October 4, 2018.

7. Master Service Agreement by and between XTO Energy Inc. and Anchor Drilling dated January 15, 2007.

OMM_US:78066313.8

8.   Master Service Agreement by and between Matador Production Company and Anchor Drilling dated April 29, 2019.

9.   Master Service Agreement by and between Patriot Resources, Inc. and Q'Max dated May 12, 2015.

10.  Master Service Agreement by and between CrownQuest Operating, LLC and Anchor Drilling dated October 16, 2015.

11.  Master Service Agreement by and between Halcon Operating Co., Inc. and Q'Max March 8, 2017.

12.  Master Service Agreement by and between Murphy Exploration & Production Company – USA and Anchor Drilling dated September 10, 2018.

13.  Master Service Agreement by and between Parsley Energy Operations, LLC and Anchor Drilling dated February 13, 2017.

14.  Master Service Agreement by and between XTO Energy Inc. and Anchor Drilling dated March 7, 2008.

15.  Master Service Agreement by and between Southwestern Energy Production Company and SEECO, Inc. and Anchor Drilling dated September 1, 2009.

16.  Master Service Agreement by and between Ascent Resources – Utica, LLC and Anchor Drilling dated June 26, 2019.

17.  Master Service Agreement by and between EQT Production Company and Anchor Drilling dated August 12, 2010.

18.  Master Service Agreement by and between Antero Resources Company and Anchor Drilling dated May 30, 2014.

19.  Master Service Agreement by and between Gulfport Energy Corporation and Anchor Drilling dated May 24, 2012.

20.  Master Service Agreement by and between Gulfport Energy Corporation and Q'Max dated September 8, 2014.

21.  Master Service Agreement by and between Utica Resource Operating, LLC and Anchor Drilling dated November 13, 2018.

22.  Master Service Agreement with National Fuel Gas Supply Corporation and Anchor Drilling dated March 5, 2015.

23.  Master Service Agreement by and between TransCanada Operations USA Inc. and Anchor Drilling dated April 1, 2018.

24.    Master Purchase Agreement No. MPA-18-0005 by and between American Refining Group, Inc. and Anchor Drilling dated June 15, 2018.

25.    Service Agreement No. MSA-19-0006 by and between American Refining Group, Inc. and Anchor Drilling dated July 8, 2019.

26.    Master Lease Agreement by and between Dell Financial Services L.L.C. and Q'Max America Inc. dated November 17, 2014.

27.    Master Equipment Lease Agreement by and between First National Capital, LLC, Q'Max and Anchor Drilling dated February 6, 2019.

28.    Open Ended Master Lease Agreement by and between Merchants Fleet Management and Anchor Drilling dated June 27, 2018 (the "Merchants Lease").

29.    Consulting Agreement by and between Landwise Consulting LLC and Anchor Drilling dated June 18, 2018.

30.    Consulting Agreement by and between Wayne Munn, LLC and Anchor Drilling dated May 9, 2019.

31.    Consulting Agreement by and between Spencer Ogden and Anchor Drilling dated July 12, 2018.

32.    Consulting Agreement by and between Stephen Wilbourn and Anchor Drilling dated April 7, 2020.

33.    Consulting Agreement by and between 1st Magnitude LLC and Anchor Drilling dated August 5, 2019.

34.    Consulting Agreement by and between Team Teller, LLC and Anchor Drilling dated August 1, 2019.

35.    Consulting Agreement by and between Nauset Consulting Inc. and Anchor Drilling dated July 22, 2019.

36.    Consulting Agreement by and between KSKunz Consulting LLC and Anchor Drilling dated May 14, 2019.

37.    Consulting Agreement by and between J Hibley Consulting LLC and Anchor Drilling dated May 20, 2019.

38.    Consulting Agreement by and between BKD Consulting LLC and Anchor Drilling dated August 1, 2018.

39.    Consulting Agreement by and between Rusco Operating, LLC and Anchor Drilling dated April 3, 2018.

40.    Exclusive License Agreement by and between Q'Max Solutions Inc. and Q'Max dated May 22, 2020 (the "License Agreement").

41. Office Lease Agreement, by and between GCM SO, L.L.C. and Anchor Drilling dated October 28, 2019.

42. Master Service Agreement by and between Snyder Brothers, Inc. and Anchor Drilling dated May 22, 2020.

43. Master Purchase Agreement by and between American Refining, Inc. and Anchor Drilling dated June 15, 2018.

44. Master Service and Supply Agreement for Exploration and Production by and between Devon Energy Production Company, L.P. and Anchor Drilling dated May 18, 2016.

45. Master Service Agreement by and between EAP Operating, LLC and Anchor Drilling dated October 30, 2018.

46. Master Service Agreement by and between Jay-Bee Oil & Gas, Inc. and Anchor Drilling dated December 22, 2015.

47. Vehicle Master Lease Agreement by and between Mobilease, Inc. and Terra Oilfield Solutions, LLC dated August 7, 2017.

SCHEDULE 4.2

LITIGATION; ORDERS

1. Kapolka v. Anchor Drilling Fluids USA, LLC and Q'Max America Inc., Civil Action No. 2:18-cv-10007 in the United States District Court for the Western District of Pennsylvania – Pittsburgh Division, alleging violations of the Fair Labor Standards Act.

## SCHEDULE 4.4

## REAL PROPERTY

(a)

1.  The Midland Solids Control Warehouse consisting of a storage warehouse and office space. Q'Max currently owes approximately $37,000.00 for unpaid rent on the Midland Solids Control Warehouse Lease.

2.  The Leetsdale Warehouse consisting of a mud plant and warehouse. Q'Max is currently not in default of the Leetsdale Warehouse Lease.

3.  The Wellsville Warehouse consisting of a mobile office, warehouse, and blending facility. The Wellsville Warehouse is subleased by Anchor Drilling pursuant to a sublease with Cimbar Performance Minerals WV, LLC. Cimbar Performance WV, LLC leases the Wellsville Warehouse directly from Cimbar Performance Minerals, OH. Anchor Drilling currently owes approximately $29,700.00 for unpaid rent on the Cimbar Sublease.

4.  45,000 square feet of vacant land in Wellsville, Ohio, located across from the Wellsville Warehouse. Anchor currently owes approximately $2,500.00 for unpaid rent on the Wellsville Yard Lease.

5.  The Horseheads Warehouse. Anchor is currently not in default of the Horseheads Warehouse Lease.

6.  The Newcomerstown Warehouse consisting of a storage warehouse and mud plant. Anchor is currently not in default of the Newcomerstown Warehouse Lease. Anchor has continued to make rent payments per the Newcomerstown Warehouse Rent Deferral Agreement.

7.  Employee housing located at 1122 West State Street, Newcomerstown, Ohio 43832. Anchor currently owes approximately $3,000.00 for unpaid rent on Newcomerstown Housing Lease.

8.  Employee housing located at 2303 North Mulberry Lane Hobbs, New Mexico, 88240. Anchor is currently not in default of the Hobbs, NM Housing Lease.

9.  Employee housing located at 5001 W. Wadley, Midland, Texas, Apartment No. P112. Anchor is currently not in default of the Midland Apartment Lease.

(b)

2984 North Wingate Avenue, Odessa, Texas 79764. Owned by Anchor Drilling. The premises contain an abandoned warehouse and a storage yard for solids control assets owned by Anchor Drilling.

SCHEDULE 4.5

ENVIRONMENTAL MATTERS

(a)     None.

(b)     On October 10, 2017, a release of diesel fuel (estimated to be less than 550 gallons) occurred at Anchor Drilling's facility in Wellsville, Ohio. The diesel fuel was released to a storm sewer and entered the Ohio River. The release was reported to the local, regional and federal authorities. The release was contained by the deployment of primary and secondary booms. Anchor Drilling immediately hired environmental remediation contractors to address the release.

(c)     None.

(d)     None.

SCHEDULE 4.6

SUPPLIERS; CUSTOMERS

(a)

| Supplier | LTM Spend ending 4/30/20 |
|----------|--------------------------|
| 1. Cimbar WV | $13,000,821 |
| 2. American Refining Group, Inc. | $5,001,634 |
| 3. Ingevity Corporation | $2,592,210 |
| 4. Synthex Organics, LLC | $1,346,471 |
| 5. Abilene Rental Center, LLC | $1,304,626 |
| 6. Myers Well Service Inc. | $1,236,658 |
| 7. Coyle Transport Services, Inc. | $440,309 |
| 8. United Centrifuge Manufacturing Inc. | $437,348 |
| 9. Tetra Specialty Chemicals | $428,341 |
| 10. Greer Industries, Inc. | $326,233 |

(b)

| Customer | LTM Revenue ending 4/30/20 |
|----------|----------------------------|
| 1. Southwestern Energy | $22,720,231 |
| 2 Ascent Resources | $14,411,356 |
| 3. Devon Energy | $8,715,197 |
| 4. EAP Operating, LLC | $5,733,569 |
| 5. EQT Production Company | $3,353,506 |
| 6. Columbia Gas Transmission LLC | $3,156,421 |
| 7. Antero Resources Corporation | $2,456,065 |
| 8. XTO Energy, Inc. | $2,180,700 |
| 9. Tribune Resources, LLC | $2,063,300 |
| 10. Jay Bee Oil and Gas | $1,756,930 |

SCHEDULE 4.8

EXISTING CONTRACTS

| Contract | Cure Amount |
|---|---|
| 1. Cimbar Supply Agreement. | $2,610,796 |
| 2. Amended Cimbar Supply Agreement. | Same as #1 above |
| 3. Operating Agreement of C&A Grinding, L.L.C. by and between Cimbar Performance Minerals, Inc. and Anchor Drilling Fluids USA, Inc. dated January 1, 2012. | None |
| 4. Amendment No. 1 to Operating Agreement of C&A Grinding, L.L.C. by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, LLC dated April 1, 2018. | None |
| 5. Amendment No. 2 to Operating Agreement of C&A Grinding, L.L.C. by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling Fluids USA, LLC dated March 3, 2020. | None |
| 6. Cimbar Sublease. | $29,700 |
| 7. Cimbar Amended Sublease. | Same as #1 above |
| 8. Amended and Restated Equipment Lease With Option, by and between C&A Grinding, LLC, Cimbar Performance Minerals, Inc. and Anchor Drilling dated December 17, 2018. | None (Cimbar owes the JV $30,000 for rent) |
| 9. Letter Agreement with respect to Amended and Restated Equipment Lease With Option, by and between C&A Grinding, LLC, Cimbar Performance Minerals, Inc. and Anchor Drilling dated December 19, 2018. | None |
| 10. Settlement Agreement and Release, by and between Cimbar Performance Minerals WV, LLC and Anchor Drilling, dated January 10, 2019. | None |
| 11. Letter Agreement, by and between Cimbar Performance Minerals and Anchor Drilling, dated April 3, 2020. | Same as # 1 above |
| 12. Master Rental Service Agreement by and between Apache Corporation and Q'Max dated March 26, 2015. | None |
| 13. Master Service Agreement by and between Callon Petroleum Company and Q'Max dated January 26, 2016. | None |
| 14. Master Service Agreement by and between Diamondback E&P LLC and Anchor Drilling dated February 28, 2017. | None |
| 15. Master Service Agreement by and between Grenadier Energy Partners II, LLC and Anchor Drilling dated May 8, 2019. | None |
| 16. Amended and Restated Master Service/Sales Agreement by and between Pioneer Natural Resources USA, Inc. dated January 9, 2017. | None |
| 17. Master Service Agreement by and between Solaris Water Midstream, LLC and Anchor Drilling dated October 4, 2018. | None |
| 18. Master Service Agreement by and between XTO Energy Inc. and Anchor Drilling dated January 15, 2007. | None |
| 19. Master Service Agreement by and between Matador Production Company and Anchor Drilling dated April 29, 2019. | None |
| 20. Master Service Agreement by and between Patriot Resources, Inc. and Q'Max dated May 12, 2015. | None |
| 21. Master Service Agreement by and between CrownQuest Operating, LLC and Anchor Drilling dated October 16, 2015. | None |
| 22. Master Service Agreement by and between Halcon Operating Co., Inc. and Q'Max March 8, 2017. | None |
| 23. Master Service Agreement by and between Murphy Exploration & Production Company – USA and Anchor Drilling dated September 10, 2018. | None |

**WRITTEN CONSENT**
**OF THE SOLE DIRECTOR OF**
**Q'MAX AMERICA INC.**

May 22, 2020

The undersigned, being the sole director of Q'Max America Inc., a Delaware corporation (the "**Company**"), does hereby adopt, vote for, consent to and approve the following resolutions:

RESOLVED, that James Katchadurian is hereby appointed and elected to serve as the Chief Restructuring Officer of the Company effective as of the date hereof and until his resignation, death or removal.

IN WITNESS WHEREOF, the undersigned has executed this consent effective as of the date first above written.

_____
Rafael Diaz-Granados

THIS IS EXHIBIT " _____33_____ "

referred to in the Affidavit of

_____Cameron Bailey_____

Sworn before me this _____26th_____

day of _____May_____ A.D. 20 _20_

_____

Jonathan Tomm
Barrister and Solicitor

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

```
----------------------------------------------------------------- x
                                        :
In re:                                  :    Chapter 11
                                        :
Q'Max America Inc.,                     :    Case No. 20-60030 (CML)
                                        :
                    Debtor.             :
                                        :
                                        :
----------------------------------------------------------------- x
```

## <u>CORPORATE OWNERSHIP STATEMENT</u>

     Pursuant to rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the following are corporations, other than a governmental unit, that directly or indirectly own 10% or more of any class of the Debtor's equity interests:

| **Shareholder** | **Approximate Percentage of Shares Held** |
|---|---|
| Central Procurement Inc. | 100% |
| Q'Max Solutions Inc. | Owns 100% of shares of Central Procurement Inc. |
| Fluid Holding Corp. | Owns 100% of shares of Q'Max Solutions Inc. |

**Fill in this information to identify the case and this filing:**

Debtor Name __Q'Max America Inc.__

United States Bankruptcy Court for the: __Southern__ District of __Texas__
(State)

Case number (If known): __20-60030 (CML)__

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐  *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐  *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐  *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐  *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐  *Schedule H: Codebtors* (Official Form 206H)

☐  *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐  Amended *Schedule* _____

☐  *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☑  Other document that requires a declaration  __Corporate Ownership Statement__

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __05/24/2020__            ✗ _____
MM / DD / YYYY                           Signature of individual signing on behalf of debtor

__Rafael Andres Diaz-Granados__
Printed name

__President and CEO__
Position or relationship to debtor

THIS IS EXHIBIT " _____34_____ "

referred to in the Affidavit of

_____Cameron Bailey_____

Sworn before me this _____26th_____

day of _____May_____ A.D. 20 _20_

**Jonathan Tomm**
**Barrister and Solicitor**

| From: | MacLeod, Walker W. <wmacleod@mccarthy.ca> |
| Sent: | May 12, 2020 10:34 AM |
| To: | Stephenson, Aaron |
| Cc: | Gorman, Howard A. |
| Subject: | RE: [EXT] QMax | Demands and Notices of Intention to Enforce |

Aaron, thanks, we acknowledge receipt and accept service on behalf of both the Borrowers and Guarantors (as defined in your letter).



**Walker MacLeod**
Partner | Associé
Bankruptcy and Restructuring | Faillite et restructuration
T: 403-260-3710
C: 403-463-1207
F: 403-260-3501
E: wmacleod@mccarthy.ca

**McCarthy Tétrault LLP**
Suite 4000
421 - 7th Avenue SW
Calgary AB T2P 4K9

Please, think of the environment before printing this message.

Click here to visit our dedicated **COVID-19 Hub**, delivering daily updates, industry insights and legal perspectives to help business leaders navigate the global impact of COVID-19.

 

---

**From:** Stephenson, Aaron <aaron.stephenson@nortonrosefulbright.com>
**Sent:** Tuesday, May 12, 2020 9:19 AM
**To:** MacLeod, Walker W. <wmacleod@mccarthy.ca>
**Cc:** Gorman, Howard A. <howard.gorman@nortonrosefulbright.com>
**Subject:** RE: [EXT] QMax | Demands and Notices of Intention to Enforce

Good morning Walker,

A demand and notices under BIA, s. 244 are attached.  Please confirm your receipt and acceptance of same by reply email.

Thanks.

**Aaron Stephenson**
Of Counsel

Norton Rose Fulbright Canada LLP / S.E.N.C.R.L., s.r.l.
400 3rd Avenue SW, Suite 3700, Calgary Alberta T2P 4H2 Canada
T: +1 403.267.8290  |  F: +1 403.264.5973

1

aaron.stephenson@nortonrosefulbright.com

## NORTON ROSE FULBRIGHT

---

**From:** MacLeod, Walker W. <wmacleod@mccarthy.ca>
**Sent:** May 11, 2020 6:58 PM
**To:** Stephenson, Aaron <aaron.stephenson@nortonrosefulbright.com>
**Cc:** Gorman, Howard A. <howard.gorman@nortonrosefulbright.com>
**Subject:** RE: [EXT] QMax | Demands and Notices of Intention to Enforce

We are instructed to accept service of demands / 244's on behalf of all of your loan parties (filing and non-filing).  Service by email is good – thanks, wwm.

 

**Walker MacLeod**
Partner | Associé
Bankruptcy and Restructuring | Faillite et restructuration
T: 403-260-3710
C: 403-463-1207
F: 403-260-3501
E: wmacleod@mccarthy.ca
**McCarthy Tétrault LLP**
Suite 4000
421 - 7th Avenue SW
Calgary AB T2P 4K9

Please, think of the environment before printing this message.

Click here to visit our dedicated **COVID-19 Hub**, delivering daily updates, industry insights and legal perspectives to help business leaders navigate the global impact of COVID-19.

---

**From:** Stephenson, Aaron <aaron.stephenson@nortonrosefulbright.com>
**Sent:** Monday, May 11, 2020 6:00 PM
**To:** MacLeod, Walker W. <wmacleod@mccarthy.ca>
**Cc:** Gorman, Howard A. <howard.gorman@nortonrosefulbright.com>
**Subject:** [EXT] QMax | Demands and Notices of Intention to Enforce

Walker – I forgot to mention when we just spoke; did you get instructions to accept our demand and 244 notices by email to your attention?  Thanks.

**Aaron Stephenson**
Of Counsel

Norton Rose Fulbright Canada LLP / S.E.N.C.R.L., s.r.l.
400 3rd Avenue SW, Suite 3700, Calgary Alberta T2P 4H2 Canada
T: +1 403.267.8290  |  F: +1 403.264.5973
aaron.stephenson@nortonrosefulbright.com

## NORTON ROSE FULBRIGHT

Law around the world
nortonrosefulbright.com

*Understanding the legal implications of the global pandemic*
*Click here for key insights, resources by sector, and interactive sessions with our senior lawyers*

*Confidentiality notice*
*This email is confidential and may be privileged. If you are not the intended recipient please notify the sender immediately and delete it.*

> **External Email:** Exercise caution before clicking links or opening attachments | **Courriel externe:** Soyez prudent avant de cliquer sur des liens ou d'ouvrir des pièces jointes

This e-mail may contain information that is privileged, confidential and/or exempt from disclosure. No waiver whatsoever is intended by sending this e-mail which is intended only for the named recipient(s). Unauthorized use, dissemination or copying is prohibited. If you receive this email in error, please notify the sender and destroy all copies of this e-mail. Our privacy policy is available at {www.mccarthy.ca}. Click here to unsubscribe from commercial electronic messages. Please note that you will continue to receive non-commercial electronic messages, such as account statements, invoices, client communications, and other similar factual electronic communications. Suite 5300, TD Bank Tower, Box 48, 66 Wellington Street West, Toronto, ON M5K 1E6

Law around the world
nortonrosefulbright.com

*Understanding the legal implications of the global pandemic*
*Click here for key insights, resources by sector, and interactive sessions with our senior lawyers*

*Confidentiality notice*
*This email is confidential and may be privileged. If you are not the intended recipient please notify the sender immediately and delete it.*
This e-mail may contain information that is privileged, confidential and/or exempt from disclosure. No waiver whatsoever is intended by sending this e-mail which is intended only for the named recipient(s). Unauthorized use, dissemination or copying is prohibited. If you receive this email in error, please notify the sender and destroy all copies of this e-mail. Our privacy policy is available at {www.mccarthy.ca}. Click here to unsubscribe from commercial electronic messages. Please note that you will continue to receive non-commercial electronic messages, such as account statements, invoices, client communications, and other similar factual electronic communications. Suite 5300, TD Bank Tower, Box 48, 66 Wellington Street West, Toronto, ON M5K 1E6

**NORTON ROSE FULBRIGHT**

May 12, 2020

**Sent By E-mail**
**(c/o scollins@mccarthy.ca; wmacleod@mccarthy.ca)**

**Q'Max Solutions Inc.** (f/k/a Fluid Acquisition Corp.)
**Q'Max Solutions Holdings Inc.**
**1356760 Alberta Ltd.** (f/k/a 1356760 Alberta Inc.)
**Fluid Holding Corp.**
**QMax Canada Operations Inc.** (f/k/a QMax Solutions EE
Operations Inc.)
**Central Procurement Inc.**[1] (f/k/a Q'Max Solutions
(Barbados) Inc.)
**Central Procurement Inc.**
**Q'Max America Inc.**
**Anchor Drilling Fluids USA, LLC** (f/k/a Anchor Drilling
Fluids USA, Inc.)
**QMax Mexico, S.A. de C.V.**
**QMax Solutions Colombia** (branch of Central Procurement Inc. f/k/a Q'Max Solutions (Barbabos) Inc.)
**Environmental Solutions for Petroleum Services – Free Zone – S.A.E.**
**SARL Environmental Solutions Algeria**
**QMax Ecuador S.A.**

Norton Rose Fulbright Canada LLP
400 3rd Avenue SW, Suite 3700
Calgary, Alberta  T2P 4H2 Canada

F: +1 403.264.5973
**nortonrosefulbright.com**

**Howard Gorman, Q.C.**
+1 403.267.8144
howard.gorman@nortonrosefulbright.com

Your reference

Our reference
1001022899

Dear Sirs:

**Indebtedness of Q'Max Solutions Inc., Q'Max America Inc. and Q'Max Canada Operations Inc., as borrowers (the Borrowers), and Q'Max Solutions Inc., Q'Max Solutions Holdings Inc., 1356760 Alberta Ltd., Fluid Holding Corp., Q'Max Canada Operations Inc., Q'Max America Inc., Anchor Drilling Fluids USA, LLC, Central Procurement Inc., Central Procurement Inc., QMax Mexico, S.A. de C.V., QMax Ecuador S.A. and Environmental Solutions for Petroleum Services – Free Zone – S.A.E., as guarantors (the Guarantors), to HSBC Bank Canada, as Administrative Agent to the Lenders from time to time party to the Credit Agreement (the Agent), and Bank of Montreal, Business Development Bank of Canada, Export Development Canada, HSBC Bank Canada and HSBC Bank USA, as lenders (the Lenders)**

Thank you for agreeing through your legal counsel, Walker Macleod of McCarthy Tetrault LLP, to accept delivery of this demand and the enclosed notices in respect of the above-referenced entities by email to wmacleod@mccarthy.ca.

As you know, our offices are the solicitors who act on behalf of the Agent and in connection with amounts owing to the Agent and the Lenders pursuant to various loans and advances made to the Borrowers by the Agent and the Lenders pursuant to the terms of, *inter alia*, a Second Amended and Restated Credit Agreement dated July 31, 2018 between the Borrowers, the Agent, and the Lenders (as amended from time to time, the **Credit Agreement**), and guaranteed pursuant to, *inter alia*, (i) Guarantee dated May 23, 2014 granted by Q'Max Solutions Holdings Inc. in favour of the Agent, (ii) Guarantee dated May 23, 2014 granted by 1356760 Alberta Ltd. in favour of the Agent, (iii) Limited Recourse Guarantee dated May 23, 2014 granted by Fluid Holding Corp.

---

[1] Governing jurisdiction: Barbados

Norton Rose Fulbright Canada LLP is a limited liability partnership established in Canada.

Norton Rose Fulbright Canada LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright South Africa Inc and Norton Rose Fulbright US LLP are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are at nortonrosefulbright.com.

May 12, 2020

**NORTON ROSE FULBRIGHT**

in favour of the Agent, (iv) Guarantee dated September 1, 2016 granted by QMax Canada Operations Inc. in favour of the Agent, (v) Guarantee dated May 23, 2014 granted by Q'Max America Inc. in favour of the Agent, (vi) Guarantee dated November 21, 2017 granted by Anchor Drilling Fluids USA, LLC in favour of the Agent, (vii) Guarantee dated May 23, 2014 granted by Central Procurement Inc. (as Q'Max Solutions (Barbados) Inc.) in favour of the Agent, (viii) Guarantee dated May 23, 2014 granted by QMax Mexico, S.A. de C.V. in favour of the Agent, (ix) Corporate Guarantee Agreement dated as of July 31, 2014 granted by QMax Ecuador S.A. in favour of the Agent and (x) Guarantee Agreement granted by Environmental Solutions for Petroleum Services – Free Zone – S.A.E. in favour of the Agent, all as may have been amended from time to time (all such guarantees are collectively referred to as the **Guarantees**).

The Credit Agreement and the Guarantees are, as applicable, secured by, *inter alia*, the following security documents (collectively, the **Security Documents**):

(i)     Security Agreement dated May 23, 2014 granted by Q'Max Solutions Inc. in favour of the Agent;

(ii)    Security Agreement dated May 23, 2014 granted by Fluid Acquisition Corp. in favour of the Agent;

(iii)   Securities Pledge Agreement dated May 23, 2014 granted by Q'Max Solutions Inc. in favour of the Agent in respect of the shares of Q'Max Solutions Holdings Inc., 1356760 Alberta Ltd. and QMax Canada Operations Inc. held by Q'Max Solutions Inc., as amended by an Amendment to Securities Pledge Agreement dated September 1, 2016 between Q'Max Solutions Inc. and the Agent;

(iv)    Security Agreement dated May 23, 2014 granted by Q'Max Solutions Holdings Inc. in favour of the Agent;

(v)     Security Agreement dated May 23, 2014 granted by 1356760 Alberta Ltd. in favour of the Agent;

(vi)    Securities Pledge Agreement dated May 23, 2014 granted by Fluid Holding Corp. in favour of the Agent in respect of the shares of Q'Max Solutions Inc. (as Fluid Acquisition Corp.) held by Fluid Holding Corp.;

(vii)   Security Agreement dated September 1, 2016 between QMax Canada Operations Inc. and the Agent;

(viii)  Security Agreement dated as of May 23, 2014 granted by Q'Max America Inc. in favour of the Agent;

(ix)    Security Agreement dated November 21, 2017 between Anchor Drilling Fluids USA, LLC in favour of the Agent, as amended by an Amendment No. 1 to Security agreement dated July 31, 2018;

(x)     Account Security Deed dated 2014 (day and month not specified) between Central Procurement Inc. in favour of the Agent;

(xi)    Debenture dated 2014 (day and month not specified) granted by Central Procurement Inc. in favour of the Agent;

(xii)   Shares Charge dated 2014 (day and month not specified) between Q'Max Solutions Inc. and the Agent, as security agent in respect of the shares in Central Procurement Inc. held by Q'Max Solutions Inc.;

(xiii)  Management and Guarantee Commercial Trust Agreement made on July 31, 2014 between Central Procurement Inc. through its branch office QMax Solutions Colombia, Helm Fiduciaria S.A., HSBC Bank Canada, HSBC Bank USA, Bank of Montreal, Export Development Canada and The Bank of Nova Scotia;

(xiv)   Promissory Note No. 01B dated August 22, 2018 issued by Central Procurement Inc. in favour of Business Development Bank of Canada;

May 12, 2020

**NORTON ROSE FULBRIGHT**

(xv)     Promissory Note No. 02B dated August 22, 2018 issued by Central Procurement Inc. in favour of HSBC Bank USA, N.A.;

(xvi)    Promissory Note No. 03B dated August 22, 2018 issued by Central Procurement Inc. in favour of HSBC Bank Canada;

(xvii)   Promissory Note No. 04B dated August 22, 2018 issued by Central Procurement Inc. in favour of Bank of Montreal;

(xviii)  Promissory Note No. 05B dated August 22, 2018 issued by Central Procurement Inc. in favour of Export Development Canada;

(xix)    Contrato De Prenda Sobre Acciones dated July 31, 2014 between Q'Max Solutions Holdings Inc., 1356768 Alberta Ltd. and the Agent in respect of the shares in Q'Max Mexico, S.A. de C.V. held by Q'Max Solutions Holdings Inc. and 1356768 Alberta Ltd.;

(xx)     Contrato De Prenda Sin Transmision De Posesion dated July 31, 2014 between Q'Max Mexico, S.A. de C.V. and the Agent.

(xxi)    Convenio Modificatorio Del Contrato De Prenda Sin Transmision De Posesion dated July 31, 2014 between Q'Max Mexico, S.A. de C.V. and the Agent;

(xxii)   Convenio Modificatoria Del Contrato De Prenda Sobre Acciones dated July 31, 2014 between Q'Max Solutions Holdings Inc., 1356760 Alberta Ltd. and the Agent;

(xxiii)  Encargo Fiduciario Que Otorga: QMax Ecuador S.A. A Favor De Fiducia S.A. Administradora De Fondos Y Fideicomisos Mercantiles Cuantia Indeterminada dated May 17, 2014 among QMax Ecuador S.A., the Agent and Administradora De Fondos Y Fideicomisos Mercantiles;

(xxiv)   Share Pledge granted by Q'Max Solutions Inc., 1356760 Alberta Ltd., Q'Max Solutions Holdings Inc. in favour of the Agent in respect of the shares of Environmental Solutions for Petroleum Services – Free Zone – S.A.E, held by Q'Max Solutions Inc., 1356760 Alberta Ltd. and Q'Max Solutions Holdings Inc.;

(xxv)    Assignment Agreement between Environmental Solutions for Petroleum Services – Free Zone – S.A.E., as assignor, and the Agent, as assignee, assigning to the Agent all current and future insurance policies of Environmental Solutions for Petroleum Services – Free Zone – S.A.E.; and

(xxvi)   Share Pledge Agreement granted by Environmental Solutions for Petroleum Services – Free Zone – S.A.E. in favour of the Lenders in respect of the shares of SARL Environmental Solutions Algeria held by Environmental Solutions for Petroleum Services – Free Zone – S.A.E.

Capitalized words used herein and not defined shall have the meanings assigned to them in the Credit Agreement.

It is the position of the Agent and the Lenders that the Borrower and the Guarantors are in default of the Credit Agreement, the Guarantees, the Security Documents and the other above listed agreements, as applicable, for, among other things, failing to meet certain financial covenants set out in the Credit Agreement.

As at May 5, 2020, the amounts outstanding and owing to the Agent and the Lenders pursuant to and in connection with the Credit Agreement, inclusive of interest, is USD $145,381,623.21 plus CDN $1,228,668.47 as well as outstanding letters of credit in the amounts of USD $3,916,296.42 and CDN $1,161,408.79 and outstanding credit card balances, plus accrued and accruing costs and disbursements, and interest continuing to accrue per diem (collectively, the **Outstanding Amounts**).

May 12, 2020



In addition to the per diem interest, the amounts owing will be increased by any costs incurred by the Agent and the Lenders in connection with the collection of the Outstanding Amounts and the enforcement of the Agent and the Lenders' security interests under the Security Documents.

Demand is hereby made upon the Borrowers and the Guarantors for payment in full of the Outstanding Amounts together with any accrued interest and other legal fees or charges that may arise. In the event that payment is not made in full by close of business on **May 22, 2020**, or the Agent and the Lenders determine that their collateral is at risk, the Agent and the Lenders will take such steps as they may consider necessary to protect their position.

Also enclosed for service upon you are Notices of Intention to Enforce Security provided in accordance with the provisions of the *Bankruptcy and Insolvency Act*. If you consent to the Agent and the Lenders taking earlier enforcement, please return the consent executed by a duly executed officer of each of the Borrower and the Guarantors.

Notwithstanding delivery of this demand and the enclosed Notices, the Lenders are supportive of ongoing marketing efforts to facilitate sales of various assets, division and/or subsidiaries within the Q'Max enterprise, including in relation to Q'Max's operations in Mexico, Colombia and the Middle East / Northern Africa.

Yours very truly,

Norton Rose Fulbright Canada LLP
Per:

**Howard Gorman, Q.C.**
Senior Partner

Copies to:     HSBC Bank Canada, as Agent, and HSBC Bank USA (via email)
               Neil Honess (KPMG) (via email)
               Aaron Stephenson and Craig Hickey (Norton Rose Fulbright Canada LLP) (via email)
               Sean Collins and Walker Macleod (via email)

**NOTICE OF INTENTION TO ENFORCE SECURITY**
**(Subsection 244(1))**

To:     Q'Max Solutions Inc.

Take notice that:

1.      HSBC Bank Canada, as administrative agent (the **Agent**) to Bank of Montreal, Business Development Bank of Canada, Export Development Canada, HSBC Bank Canada and HSBC Bank USA (the **Lenders**) under the Second Amended and Restated Credit Agreement dated July 31, 2018 between, *inter alios*, Q'Max Solutions Inc., Q'Max America Inc. and QMax Canada Operations Inc., as borrowers, the Agent, and the Lenders intends as a secured creditor to enforce its security on the property of the above insolvent person which encompasses all of their property and assets;

2.      The security that is to be enforced includes security granted by the insolvent person in favour of the Agent is set out in **Schedule "A"**, attached hereto;

3.      The total amount of the indebtedness secured by the security, as at May 5, 2020, is USD $145,381,623.21 plus CDN $1,228,668.47 as well as outstanding letters of credit in the amounts of USD $3,916,296.42 and CDN $1,161,408.79 and outstanding credit card balances, plus accrued and accruing costs, disbursements and interest accruing from the date of this notice; and

4.      The Agent will not have the right to enforce the security until after the expiry of the 10 day period following the sending of this notice unless the insolvent person consents to an earlier enforcement.

Dated at Calgary, Alberta, this 12th day of May, 2020.

HSBC Bank Canada, as Administrative Agent
by its solicitors and agents, Norton Rose Fulbright Canada LLP

Per:    _____
        Howard Gorman, Q.C.

Q'Max Solutions Inc. hereby:

(a)     consents to the immediate enforcement by the Agent as a secured party of the security described in paragraph 2 above pursuant to Section 244(2) of the *Bankruptcy and Insolvency Act* (Canada);

(b)     consents to the secured party's (the Agent's) disposition of any or all collateral subject to the secured party's (the Agent's) security immediately or otherwise as the secured party may determine in its sole discretion, without notice as required by the *Personal Property Security Act* (Alberta); and

(c)     consents to the secured party's (the Agent's) immediate appointment of a Receiver, or a Receiver-Manager, in accordance with the provisions of the above noted security.


Per:     _____   c/s
         Q'Max Solutions Inc.
         By its authorized signatory

         NAME:
         TITLE:

**SCHEDULE "A"**

- Second Amended and Restated Credit Agreement dated July 31, 2018 between Q'Max Solutions Inc., Q'Max America Inc. and QMax Canada Operations Inc., as borrowers, the Agent, as administrative agent for the Lenders, and those financial institutions who from time to time become lenders thereunder (collectively, the **Lenders**), as amended by amending agreements dated May 13, 2019, July 22, 2019, September 6, 2019 and March 31, 2020.

- Guarantee dated May 23, 2014 granted by Q'Max Solutions Inc. in favour of the Agent.

- Security Agreement dated May 23, 2014 granted by Q'Max Solutions Inc. in favour of the Agent.

- Securities Pledge Agreement dated May 23, 2014 granted by Q'Max Solutions Inc. in favour of the Agent in respect of the shares of Q'Max Solutions Holdings Inc., 1356760 Alberta Ltd. and QMax Canada Operations Inc. held by Q'Max Solutions Inc., as amended by an Amendment to Securities Pledge Agreement dated September 1, 2016 between Q'Max Solutions Inc. and the Agent.

- Shares Charge dated 2014 (day and month not specified) between Q'Max Solutions Inc. and the Agent, as security agent in respect of the shares in Central Procurement Inc, (as Q'Max Solutions (Barabdos) Inc.) held by Q'Max Solutions Inc..

- Share Pledge granted by Q'Max Solutions Inc., 1356760 Alberta Ltd., Q'Max Solutions Holdings Inc. in favour of the Agent in respect of the shares of Environmental Solutions for Petroleum Services – Free Zone – S.A.E, held by Q'Max Solutions Inc., 1356760 Alberta Ltd. and Q'Max Solutions Holdings Inc.

- Such further and other security documents, agreements, certificates and other documents as may have been entered into by Q'Max Solutions Inc. from time to time pursuant to or in connection with the Second Amended and Restated Credit Agreement and indebtedness owing to the Agent and the Lenders.

**NOTICE OF INTENTION TO ENFORCE SECURITY**
**(Subsection 244(1))**

To:     Q'Max Solutions Holdings Inc.

Take notice that:

1.      HSBC Bank Canada, as administrative agent (the **Agent**) to Bank of Montreal, Business Development Bank of Canada, Export Development Canada, HSBC Bank Canada and HSBC Bank USA (the **Lenders**) under the Second Amended and Restated Credit Agreement dated July 31, 2018 between, *inter alios*, Q'Max Solutions Inc., Q'Max America Inc. and QMax Canada Operations Inc., as borrowers, the Agent, and the Lenders intends as a secured creditor to enforce its security on the property of the above insolvent person which encompasses all of their property and assets;

2.      The security that is to be enforced includes security granted by the insolvent person in favour of the Agent is set out in **Schedule "B"**, attached hereto;

3.      The total amount of the indebtedness secured by the security, as at May 5, 2020, is USD $145,381,623.21 plus CDN $1,228,668.47 as well as outstanding letters of credit in the amounts of USD $3,916,296.42 and CDN $1,161,408.79 and outstanding credit card balances, plus accrued and accruing costs, disbursements and interest accruing from the date of this notice; and

4.      The Agent will not have the right to enforce the security until after the expiry of the 10 day period following the sending of this notice unless the insolvent person consents to an earlier enforcement.

Dated at Calgary, Alberta, this 12th day of May, 2020.

HSBC Bank Canada, as Administrative Agent
by its solicitors and agents, Norton Rose Fulbright Canada LLP

Per:    _____
        Howard Gorman, Q.C.

Q'Max Solutions Holdings Inc. hereby:

(a)     consents to the immediate enforcement by the Agent as a secured party of the security described in paragraph 2 above pursuant to Section 244(2) of the *Bankruptcy and Insolvency Act* (Canada);

(b)     consents to the secured party's (the Agent's) disposition of any or all collateral subject to the secured party's (the Agent's) security immediately or otherwise as the secured party may determine in its sole discretion, without notice as required by the *Personal Property Security Act* (Alberta); and

(c)     consents to the secured party's (the Agent's) immediate appointment of a Receiver, or a Receiver-Manager, in accordance with the provisions of the above noted security.

Per:     _____  c/s
         Q'Max Solutions Holdings Inc.
         By its authorized signatory

         NAME:
         TITLE:

**SCHEDULE "B"**

- Guarantee dated May 23, 2014 granted by Q'Max Solutions Holdings Inc. in favour of the Agent.

- Security Agreement dated May 23, 2014 granted by Q'Max Solutions Holdings Inc. in favour of the Agent.

- Contrato De Prenda Sobre Acciones dated July 31, 2014 between Q'Max Solutions Holdings Inc., 1356768 Alberta Ltd. and the Agent in respect of the shares in Q'Max Mexico, S.A. de C.V. held by Q'Max Solutions Holdings Inc. and 1356768 Alberta Ltd.

- Convenio Modificatoria Del Contrato De Prenda Sobre Acciones dated July 31, 2014 between Q'Max Solutions Holdings Inc., 1356760 Alberta Ltd. and the Agent.

- Share Pledge granted by Q'Max Solutions Inc., 1356760 Alberta Ltd., Q'Max Solutions Holdings Inc. in favour of the Agent in respect of the shares of Environmental Solutions for Petroleum Services – Free Zone – S.A.E, held by Q'Max Solutions Inc., 1356760 Alberta Ltd. and Q'Max Solutions Holdings Inc.

- Such further and other security documents, agreements, certificates and other documents as may have been entered into by Q'Max Solutions Holdings Inc. from time to time pursuant to or in connection with the Guarantee and indebtedness owing to the Agent and the Lenders.

**NOTICE OF INTENTION TO ENFORCE SECURITY**
**(Subsection 244(1))**

To:    1356760 Alberta Ltd.

Take notice that:

1.    HSBC Bank Canada, as administrative agent (the **Agent**) to Bank of Montreal, Business Development Bank of Canada, Export Development Canada, HSBC Bank Canada and HSBC Bank USA (the **Lenders**) under the Second Amended and Restated Credit Agreement dated July 31, 2018 between, *inter alios*, Q'Max Solutions Inc., Q'Max America Inc. and QMax Canada Operations Inc., as borrowers, the Agent, and the Lenders intends as a secured creditor to enforce its security on the property of the above insolvent person which encompasses all of their property and assets;

2.    The security that is to be enforced includes security granted by the insolvent person in favour of the Agent is set out in **Schedule "C"**, attached hereto;

3.    The total amount of the indebtedness secured by the security, as at May 5, 2020, is USD $145,381,623.21 plus CDN $1,228,668.47 as well as outstanding letters of credit in the amounts of USD $3,916,296.42 and CDN $1,161,408.79 and outstanding credit card balances, plus accrued and accruing costs, disbursements and interest accruing from the date of this notice; and

4.    The Agent will not have the right to enforce the security until after the expiry of the 10 day period following the sending of this notice unless the insolvent person consents to an earlier enforcement.

Dated at Calgary, Alberta, this 12th day of May, 2020.

HSBC Bank Canada, as Administrative Agent
by its solicitors and agents, Norton Rose Fulbright Canada LLP

Per:    _____
        Howard Gorman, Q.C.

1356760 Alberta Ltd. hereby:

(a)     consents to the immediate enforcement by the Agent as a secured party of the security described in paragraph 2 above pursuant to Section 244(2) of the *Bankruptcy and Insolvency Act* (Canada);

(b)     consents to the secured party's (the Agent's) disposition of any or all collateral subject to the secured party's (the Agent's and HSBC US's) security immediately or otherwise as the secured party may determine in its sole discretion, without notice as required by the Personal *Property Security Act* (Alberta); and

(c)     consents to the secured party's (the Agent's) immediate appointment of a Receiver, or a Receiver-Manager, in accordance with the provisions of the above noted security.


Per:    _____    c/s
        1356760 Alberta Ltd.
        By its authorized signatory

        NAME:
        TITLE:

**SCHEDULE "C"**

- Guarantee dated May 23, 2014 granted by 1356760 Alberta Ltd. in favour of the Agent.

- Security Agreement dated May 23, 2014 granted by 1356760 Alberta Ltd. in favour of the Agent.

- Contrato De Prenda Sobre Acciones dated July 31, 2014 between Q'Max Solutions Holdings Inc., 1356768 Alberta Ltd. and the Agent in respect of the shares in Q'Max Mexico, S.A. de C.V. held by Q'Max Solutions Holdings Inc. and 1356768 Alberta Ltd.

- Convenio Modificatoria Del Contrato De Prenda Sobre Acciones dated July 31, 2014 between Q'Max Solutions Holdings Inc., 1356760 Alberta Ltd. and the Agent.

- Share Pledge granted by Q'Max Solutions Inc., 1356760 Alberta Ltd., Q'Max Solutions Holdings Inc. in favour of the Agent in respect of the shares of Environmental Solutions for Petroleum Services – Free Zone – S.A.E, held by Q'Max Solutions Inc., 1356760 Alberta Ltd. and Q'Max Solutions Holdings Inc.

- Such further and other security documents, agreements, certificates and other documents as may have been entered into by 1356760 Alberta Ltd. from time to time pursuant to or in connection with the Guarantee and indebtedness owing to the Agent and the Lenders.

**NOTICE OF INTENTION TO ENFORCE SECURITY**
**(Subsection 244(1))**

To:     Fluid Holding Corp.

Take notice that:

1.     HSBC Bank Canada, as administrative agent (the **Agent**) to Bank of Montreal, Business Development Bank of Canada, Export Development Canada, HSBC Bank Canada and HSBC Bank USA (the **Lenders**) under the Second Amended and Restated Credit Agreement dated July 31, 2018 between, *inter alios*, Q'Max Solutions Inc., Q'Max America Inc. and QMax Canada Operations Inc., as borrowers, the Agent, and the Lenders intends as a secured creditor to enforce its security on the property of the above insolvent person which encompasses all of their property and assets;

2.     The security that is to be enforced includes security granted by the insolvent person in favour of the Agent is set out in **Schedule "D"**, attached hereto;

3.     The total amount of the indebtedness secured by the security, as at May 5, 2020, is USD $145,381,623.21 plus CDN $1,228,668.47 as well as outstanding letters of credit in the amounts of USD $3,916,296.42 and CDN $1,161,408.79 and outstanding credit card balances, plus accrued and accruing costs, disbursements and interest accruing from the date of this notice; and

4.     The Agent will not have the right to enforce the security until after the expiry of the 10 day period following the sending of this notice unless the insolvent person consents to an earlier enforcement.

Dated at Calgary, Alberta, this 12th day of May, 2020.

HSBC Bank Canada, as Administrative Agent
by its solicitors and agents, Norton Rose Fulbright Canada LLP

Per:   _____
       Howard Gorman, Q.C.

Fluid Holding Corp. hereby:

(a)     consents to the immediate enforcement by the Agent as a secured party of the security described in paragraph 2 above pursuant to Section 244(2) of the *Bankruptcy and Insolvency Act* (Canada);

(b)     consents to the secured party's (the Agent's) disposition of any or all collateral subject to the secured party's (the Agent's) security immediately or otherwise as the secured party may determine in its sole discretion, without notice as required by the *Personal Property Security Act* (Alberta); and

(c)     consents to the secured party's (the Agent's) immediate appointment of a Receiver, or a Receiver-Manager, in accordance with the provisions of the above noted security.

Per:     _____  c/s
         Fluid Holding Corp.
         By its authorized signatory

         NAME:
         TITLE:

**SCHEDULE "D"**

- Limited Recourse Guarantee dated May 23, 2014 granted by Fluid Holding Corp. in favour of the Agent.

- Securities Pledge Agreement dated May 23, 2014 granted by Fluid Holding Corp. in favour of the Agent in respect of the shares of Fluid Acquisition Corp. held by Fluid Holding Corp.

- Such further and other security documents, agreements, certificates and other documents as may have been entered into by Fluid Holding Corp. from time to time pursuant to or in connection with the Limited Recourse Guarantee and indebtedness owing to the Agent and the Lenders.

**NOTICE OF INTENTION TO ENFORCE SECURITY**
**(Subsection 244(1))**

To:      QMax Canada Operations Inc.

Take notice that:

1.      HSBC Bank Canada, as administrative agent (the **Agent**) to Bank of Montreal, Business Development Bank of Canada, Export Development Canada, HSBC Bank Canada and HSBC Bank USA (the **Lenders**) under the Second Amended and Restated Credit Agreement dated July 31, 2018 between, *inter alios*, Q'Max Solutions Inc., Q'Max America Inc. and QMax Canada Operations Inc., as borrowers, the Agent, and the Lenders intends as a secured creditor to enforce its security on the property of the above insolvent person which encompasses all of their property and assets;

2.      The security that is to be enforced includes security granted by the insolvent person in favour of the Agent is set out in **Schedule "E"**, attached hereto;

3.      The total amount of the indebtedness secured by the security, as at May 5, 2020, is USD $145,381,623.21 plus CDN $1,228,668.47 as well as outstanding letters of credit in the amounts of USD $3,916,296.42 and CDN $1,161,408.79 and outstanding credit card balances, plus accrued and accruing costs, disbursements and interest accruing from the date of this notice; and

4.      The Agent will not have the right to enforce the security until after the expiry of the 10 day period following the sending of this notice unless the insolvent person consents to an earlier enforcement.

Dated at Calgary, Alberta, this 12th day of May, 2020.

HSBC Bank Canada, as Administrative Agent
by its solicitors and agents, Norton Rose Fulbright Canada LLP

Per:      _____
          Howard Gorman, Q.C.

QMax Canada Operations Inc. hereby:

(a)     consents to the immediate enforcement by the Agent as a secured party of the security described in paragraph 2 above pursuant to Section 244(2) of the *Bankruptcy and Insolvency Act* (Canada);

(b)     consents to the secured party's (the Agent's) disposition of any or all collateral subject to the secured party's (the Agent's) security immediately or otherwise as the secured party may determine in its sole discretion, without notice as required by the Personal *Property Security Act* (Alberta); and

(c)     consents to the secured party's (the Agent's) immediate appointment of a Receiver, or a Receiver-Manager, in accordance with the provisions of the above noted security.

Per:   _____   c/s
       QMax Canada Operations Inc.
       By its authorized signatory

       NAME:
       TITLE:

**SCHEDULE "E"**

- Second Amended and Restated Credit Agreement dated July 31, 2018 between Q'Max Solutions Inc., Q'Max America Inc., QMax Canada Operations Inc., as specified Canadian swingline borrower, the Agent, as administrative agent for the Lenders, and those financial institutions who from time to time become lenders thereunder (collectively, the **Lenders**), as amended by amending agreements dated May 13, 2019, July 22, 2019, September 6, 2019 and March 31, 2020.

- Security Agreement dated September 1, 2016 between QMax Canada Operations Inc. and the Agent.

- Guarantee dated September 1, 2016 granted by QMax Canada Operations Inc. in favour of the Agent.

- Such further and other security documents, agreements, certificates and other documents as may have been entered into by Q'Max Canada Operations Inc. from time to time pursuant to or in connection with the Second Amended and Restated Credit Agreement, the Guarantee and indebtedness owing to the Agent and the Lenders.

**NOTICE OF INTENTION TO ENFORCE SECURITY**
**(Subsection 244(1))**

To:     Central Procurement Inc. (f/k/a Q'Max Solutions (Barbados) Inc.)

Take notice that:

1.     HSBC Bank Canada, as administrative agent (the **Agent**) to Bank of Montreal, Business Development Bank of Canada, Export Development Canada, HSBC Bank Canada and HSBC Bank USA (the **Lenders**) under the Second Amended and Restated Credit Agreement dated July 31, 2018 between, *inter alios*, Q'Max Solutions Inc., Q'Max America Inc. and QMax Canada Operations Inc., as borrowers, the Agent, and the Lenders intends as a secured creditor to enforce its security on the property of the above insolvent person which encompasses all of their property and assets;

2.     The security that is to be enforced includes security granted by the insolvent person in favour of the Agent is set out in **Schedule "F"**, attached hereto;

3.     The total amount of the indebtedness secured by the security, as at May 5, 2020, is USD $145,381,623.21 plus CDN $1,228,668.47 as well as outstanding letters of credit in the amounts of USD $3,916,296.42 and CDN $1,161,408.79 and outstanding credit card balances, plus accrued and accruing costs, disbursements and interest accruing from the date of this notice; and

4.     The Agent will not have the right to enforce the security until after the expiry of the 10 day period following the sending of this notice unless the insolvent person consents to an earlier enforcement.

Dated at Calgary, Alberta, this 12th day of May, 2020.

HSBC Bank Canada, as Administrative Agent
by its solicitors and agents, Norton Rose Fulbright Canada LLP

Per:     _____
         Howard Gorman, Q.C.

Central Procurement Inc. hereby:

(a)     consents to the immediate enforcement by the Agent as a secured party of the security described in paragraph 2 above pursuant to Section 244(2) of the *Bankruptcy and Insolvency Act* (Canada);

(b)     consents to the secured party's (the Agent's) disposition of any or all collateral subject to the secured party's (the Agent's) security immediately or otherwise as the secured party may determine in its sole discretion, without notice as required by the Personal *Property Security Act* (Alberta); and

(c)     consents to the secured party's (the Agent's) immediate appointment of a Receiver, or a Receiver-Manager, in accordance with the provisions of the above noted security.

Per:    _____    c/s
        Central Procurement Inc.
        By its authorized signatory

        NAME:
        TITLE:

**SCHEDULE "F"**

- Guarantee dated May 23, 2014 granted by Central Procurement Inc. (as Q'Max Solutions (Barbados) Inc.) in favour of the Agent.

- Account Security Deed dated 2014 (day and month not specified) between Central Procurement Inc, (as Q'Max Solutions (Barabdos) Inc.) in favour of the Agent.

- Debenture dated 2014 (day and month not specified) granted by Central Procurement Inc, (as Q'Max Solutions (Barabdos) Inc.) in favour of the Agent.

- Management and Guarantee Commercial Trust Agreement made on July 31, 2014 between Central Procurement Inc. (as Q'Max Solutions (Barabdos) Inc.) through its branch office QMax Solutions Colombia, Helm Fiduciaria S.A., HSBC Bank Canada, HSBC Bank USA, Bank of Montreal, Export Development Canada and The Bank of Nova Scotia.

- Promissory Note No. 01B dated August 22, 2018 issued by Central Procurement Inc. in favour of Business Development Bank of Canada.

- Promissory Note No. 02B dated August 22, 2018 issued by Central Procurement Inc. in favour of HSBC Bank USA, N.A.

- Promissory Note No. 03B dated August 22, 2018 issued by Central Procurement Inc. in favour of HSBC Bank Canada.

- Promissory Note No. 04B dated August 22, 2018 issued by Central Procurement Inc. in favour of Bank of Montreal.

- Promissory Note No. 05B dated August 22, 2018 issued by Central Procurement Inc. in favour of Export Development Canada.

- Such security documents, agreements, certificates and other documents as may have been entered into by Central Procurement Inc. from time to time pursuant to or in connection with indebtedness owing to the Agent and the Lenders.

**NOTICE OF INTENTION TO ENFORCE SECURITY**
**(Subsection 244(1))**

To:     Q'Max America Inc.

Take notice that:

1.      HSBC Bank Canada, as administrative agent (the **Agent**) to Bank of Montreal, Business Development Bank of Canada, Export Development Canada, HSBC Bank Canada and HSBC Bank USA (the **Lenders**) under the Second Amended and Restated Credit Agreement dated July 31, 2018 between, *inter alios*, Q'Max Solutions Inc., Q'Max America Inc. and QMax Canada Operations Inc., as borrowers, the Agent, and the Lenders intends as a secured creditor to enforce its security on the property of the above insolvent person which encompasses all of their property and assets;

2.      The security that is to be enforced includes security granted by the insolvent person in favour of the Agent is set out in **Schedule "G"**, attached hereto;

3.      The total amount of the indebtedness secured by the security, as at May 5, 2020, is USD $145,381,623.21 plus CDN $1,228,668.47 as well as outstanding letters of credit in the amounts of USD $3,916,296.42 and CDN $1,161,408.79 and outstanding credit card balances, plus accrued and accruing costs, disbursements and interest accruing from the date of this notice; and

4.      The Agent will not have the right to enforce the security until after the expiry of the 10 day period following the sending of this notice unless the insolvent person consents to an earlier enforcement.

Dated at Calgary, Alberta, this 12th day of May, 2020.

HSBC Bank Canada, as Administrative Agent
by its solicitors and agents, Norton Rose Fulbright Canada LLP

Per:    _____
        Howard Gorman, Q.C.

Q'Max America Inc. hereby:

(a)     consents to the immediate enforcement by the Agent as a secured party of the security described in paragraph 2 above pursuant to Section 244(2) of the Bankruptcy and Insolvency Act (Canada);

(b)     consents to the secured party's (the Agent's) disposition of any or all collateral subject to the secured party's (the Agent's) security immediately or otherwise as the secured party may determine in its sole discretion, without notice as required by the Personal Property Security Act (Alberta); and

(c)     consents to the secured party's (the Agent's) immediate appointment of a Receiver, or a Receiver-Manager, in accordance with the provisions of the above noted security.

Per:   _____   c/s
       Q'Max America Inc.
       By its authorized signatory

       NAME:
       TITLE:

**SCHEDULE "G"**

- Second Amended and Restated Credit Agreement dated July 31, 2018 between Q'Max Solutions Inc. and Q'Max America Inc., as borrowers, QMax Canada Operations Inc., as specified Canadian swingline borrower, the Agent, as administrative agent for the Lenders, and those financial institutions who from time to time become lenders thereunder (collectively, the **Lenders**), as amended by amending agreements dated May 13, 2019, July 22, 2019, September 6, 2019 and March 31, 2020.

- Guarantee dated May 23, 2014 granted by Q'Max America Inc. in favour of the Agent.

- Security Agreement dated as of May 23, 2014 granted by Q'Max America Inc. in favour of the Agent.

- Such further and other security documents, agreements, certificates and other documents as may have been entered into by Q'Max America Inc. from time to time pursuant to or in connection with the Second Amended and Restated Credit Agreement and indebtedness owing to the Agent and the Lenders.

**NOTICE OF INTENTION TO ENFORCE SECURITY**
**(Subsection 244(1))**

To:    Anchor Drilling Fluids USA, LLC

Take notice that:

1.    HSBC Bank Canada, as administrative agent (the **Agent**) to Bank of Montreal, Business Development Bank of Canada, Export Development Canada, HSBC Bank Canada and HSBC Bank USA (the **Lenders**) under the Second Amended and Restated Credit Agreement dated July 31, 2018 between, *inter alios*, Q'Max Solutions Inc., Q'Max America Inc. and QMax Canada Operations Inc., as borrowers, the Agent, and the Lenders intends as a secured creditor to enforce its security on the property of the above insolvent person which encompasses all of their property and assets;

2.    The security that is to be enforced includes security granted by the insolvent person in favour of the Agent is set out in **Schedule "H"**, attached hereto;

3.    The total amount of the indebtedness secured by the security, as at May 5, 2020, is USD $145,381,623.21 plus CDN $1,228,668.47 as well as outstanding letters of credit in the amounts of USD $3,916,296.42 and CDN $1,161,408.79 and outstanding credit card balances, plus accrued and accruing costs, disbursements and interest accruing from the date of this notice; and

4.    The Agent will not have the right to enforce the security until after the expiry of the 10 day period following the sending of this notice unless the insolvent person consents to an earlier enforcement.

Dated at Calgary, Alberta, this 12th day of May, 2020.

HSBC Bank Canada, as Administrative Agent
by its solicitors and agents, Norton Rose Fulbright Canada LLP

Per:    _____
        Howard Gorman, Q.C.

Anchor Drilling Fluids USA, LLC hereby:

(a)     consents to the immediate enforcement by the Agent as a secured party of the security described in paragraph 2 above pursuant to Section 244(2) of the Bankruptcy and Insolvency Act (Canada);

(b)     consents to the secured party's (the Agent's) disposition of any or all collateral subject to the secured party's (the Agent's) security immediately or otherwise as the secured party may determine in its sole discretion, without notice as required by the Personal Property Security Act (Alberta); and

(c)     consents to the secured party's (the Agent's) immediate appointment of a Receiver, or a Receiver-Manager, in accordance with the provisions of the above noted security.

Per:  _____   c/s
      Anchor Drilling Fluids USA, LLC
      By its authorized signatory

      NAME:
      TITLE:

**SCHEDULE "H"**

- Guarantee dated November 21, 2017 granted by Anchor Drilling Fluids USA, LLC in favour of the Agent.

- Security Agreement dated November 21, 2017 between Anchor Drilling Fluids USA, LLC in favour of the Agent, as amended by an amending agreement dated July 31, 2018.

- Such further and other security documents, agreements, certificates and other documents as may have been entered into by Anchor Drilling Fluids USA, LLC from time to time pursuant to or in connection with the Guarantee and indebtedness owing to the Agent and the Lenders.

**NOTICE OF INTENTION TO ENFORCE SECURITY**
**(Subsection 244(1))**


To:      QMax Mexico, S.A. de C.V.


Take notice that:

1.      HSBC Bank Canada, as administrative agent (the **Agent**) to Bank of Montreal, Business Development Bank of Canada, Export Development Canada, HSBC Bank Canada and HSBC Bank USA (the **Lenders**) under the Second Amended and Restated Credit Agreement dated July 31, 2018 between, *inter alios*, Q'Max Solutions Inc., Q'Max America Inc. and QMax Canada Operations Inc., as borrowers, the Agent, and the Lenders intends as a secured creditor to enforce its security on the property of the above insolvent person which encompasses all of their property and assets;

2.      The security that is to be enforced includes security granted by the insolvent person in favour of the Agent is set out in **Schedule "I"**, attached hereto;

3.      The total amount of the indebtedness secured by the security, as at May 5, 2020, is USD $145,381,623.21 plus CDN $1,228,668.47 as well as outstanding letters of credit in the amounts of USD $3,916,296.42 and CDN $1,161,408.79 and outstanding credit card balances, plus accrued and accruing costs, disbursements and interest accruing from the date of this notice; and

4.      The Agent will not have the right to enforce the security until after the expiry of the 10 day period following the sending of this notice unless the insolvent person consents to an earlier enforcement.


Dated at Calgary, Alberta, this 12th day of May, 2020.


HSBC Bank Canada, as Administrative Agent
by its solicitors and agents, Norton Rose Fulbright Canada LLP

Per:      _____
          Howard Gorman, Q.C.

QMax Mexico, S.A. de C.V. hereby:

(a)     consents to the immediate enforcement by the Agent as a secured party of the security described in paragraph 2 above pursuant to Section 244(2) of the *Bankruptcy and Insolvency Act* (Canada);

(b)     consents to the secured party's (the Agent's) disposition of any or all collateral subject to the secured party's (the Agent's) security immediately or otherwise as the secured party may determine in its sole discretion, without notice as required by the Personal *Property Security Act* (Alberta); and

(c)     consents to the secured party's (the Agent's) immediate appointment of a Receiver, or a Receiver-Manager, in accordance with the provisions of the above noted security.

Per: _____   c/s
      QMax Mexico, S.A. de C.V.
      By its authorized signatory

      NAME:
      TITLE:

**SCHEDULE "I"**

- Guarantee dated May 23, 2014 granted by QMax Mexico, S.A. de C.V. in favour of the Agent.

- Contrato De Prenda Sin Transmision De Posesion dated July 31, 2014 between Q'Max Mexico, S.A. de C.V. and the Agent.

- Convenio Modificatorio Del Contrato De Prenda Sin Transmision De Posesion dated July 31, 2014 between Q'Max Mexico, S.A. de C.V. and the Agent.

- Such further and other security documents, agreements, certificates and other documents as may have been entered into by QMax Mexico, S.A. de C.V. from time to time pursuant to or in connection with the Guarantee and indebtedness owing to the Agent and the Lenders.

**NOTICE OF INTENTION TO ENFORCE SECURITY**
**(Subsection 244(1))**

To:     Environmental Solutions for Petroleum Services – Free Zone – S.A.E.

Take notice that:

1.      HSBC Bank Canada, as administrative agent (the **Agent**) to Bank of Montreal, Business Development Bank of Canada, Export Development Canada, HSBC Bank Canada and HSBC Bank USA (the **Lenders**) under the Second Amended and Restated Credit Agreement dated July 31, 2018 between, *inter alios*, Q'Max Solutions Inc., Q'Max America Inc. and QMax Canada Operations Inc., as borrowers, the Agent, and the Lenders intends as a secured creditor to enforce its security on the property of the above insolvent person which encompasses all of their property and assets;

2.      The security that is to be enforced includes security granted by the insolvent person in favour of the Agent is set out in **Schedule "J"**, attached hereto;

3.      The total amount of the indebtedness secured by the security, as at May 5, 2020, is USD $145,381,623.21 plus CDN $1,228,668.47 as well as outstanding letters of credit in the amounts of USD $3,916,296.42 and CDN $1,161,408.79 and outstanding credit card balances, plus accrued and accruing costs, disbursements and interest accruing from the date of this notice; and

4.      The Agent will not have the right to enforce the security until after the expiry of the 10 day period following the sending of this notice unless the insolvent person consents to an earlier enforcement.

Dated at Calgary, Alberta, this 12th day of May, 2020.

HSBC Bank Canada, as Administrative Agent
by its solicitors and agents, Norton Rose Fulbright Canada LLP

Per:     _____
         Howard Gorman, Q.C.

Environmental Solutions for Petroleum Services – Free Zone – S.A.E. hereby:

(a)     consents to the immediate enforcement by the Agent as a secured party of the security described in paragraph 2 above pursuant to Section 244(2) of the *Bankruptcy and Insolvency Act* (Canada);

(b)     consents to the secured party's (the Agent's) disposition of any or all collateral subject to the secured party's (the Agent's) security immediately or otherwise as the secured party may determine in its sole discretion, without notice as required by the Personal Property Security Act (Alberta); and

(c)     consents to the secured party's (the Agent's) immediate appointment of a Receiver, or a Receiver-Manager, in accordance with the provisions of the above noted security.

Per: _____ c/s
Environmental Solutions for Petroleum Services – Free Zone – S.A.E.
By its authorized signatory

NAME:
TITLE:

**SCHEDULE "J"**

- Guarantee Agreement granted by Environmental Solutions for Petroleum Services – Free Zone – S.A.E.

- Share Pledge Agreement granted by Environmental Solutions for Petroleum Services – Free Zone – S.A.E. in favour of the Lenders in respect of the shares of SARL Environmental Solutions Algeria held by Environmental Solutions for Petroleum Services – Free Zone – S.A.E.

- Assignment Agreement between Environmental Solutions for Petroleum Services – Free Zone – S.A.E., as assignor, and the Agent, as assignee, assigning to the Agent all current and future insurance policies of Environmental Solutions for Petroleum Services – Free Zone – S.A.E.

- Such further and other security documents, agreements, certificates and other documents as may have been entered into by Environmental Solutions for Petroleum Services – Free Zone – S.A.E. from time to time pursuant to or in connection with the Guarantee and indebtedness owing to the Agent and the Lenders.

**NOTICE OF INTENTION TO ENFORCE SECURITY**
**(Subsection 244(1))**

To:      QMax Ecuador S.A.

Take notice that:

1.       HSBC Bank Canada, as administrative agent (the **Agent**) to Bank of Montreal, Business Development Bank of Canada, Export Development Canada, HSBC Bank Canada and HSBC Bank USA (the **Lenders**) under the Second Amended and Restated Credit Agreement dated July 31, 2018 between, *inter alios*, Q'Max Solutions Inc., Q'Max America Inc. and QMax Canada Operations Inc., as borrowers, the Agent, and the Lenders intends as a secured creditor to enforce its security on the property of the above insolvent person which encompasses all of their property and assets;

2.       The security that is to be enforced includes security granted by the insolvent person in favour of the Agent is set out in **Schedule "K"**, attached hereto;

3.       The total amount of the indebtedness secured by the security, as at May 5, 2020, is USD $145,381,623.21 plus CDN $1,228,668.47 as well as outstanding letters of credit in the amounts of USD $3,916,296.42 and CDN $1,161,408.79 and outstanding credit card balances, plus accrued and accruing costs, disbursements and interest accruing from the date of this notice; and

4.       The Agent will not have the right to enforce the security until after the expiry of the 10 day period following the sending of this notice unless the insolvent person consents to an earlier enforcement.

Dated at Calgary, Alberta, this 12th day of May, 2020.

HSBC Bank Canada, as Administrative Agent
by its solicitors and agents, Norton Rose Fulbright Canada LLP

Per:     _____
         Howard Gorman, Q.C.

QMax Ecuador S.A. hereby:

(a)     consents to the immediate enforcement by the Agent as a secured party of the security described in paragraph 2 above pursuant to Section 244(2) of the *Bankruptcy and Insolvency Act* (Canada);

(b)     consents to the secured party's (the Agent's and HSBC US's) disposition of any or all collateral subject to the secured party's (the Agent's and HSBC US's) security immediately or otherwise as the secured party may determine in its sole discretion, without notice as required by the Personal *Property Security Act* (Alberta); and

(c)     consents to the secured party's (the Agent's) immediate appointment of a Receiver, or a Receiver-Manager, in accordance with the provisions of the above noted security.

Per:  _____   c/s
        QMax Ecuador S.A.
        By its authorized signatory

        NAME:
        TITLE:

**SCHEDULE "K"**

- Corporate Guarantee Agreement dated as of July 31, 2014 granted by QMax Ecuador S.A. in favour of the Agent.

- Encargo Fiduciario Que Otorga: QMax Ecuador S.A. A Favor De Fiducia S.A. Administradora De Fondos Y Fideicomisos Mercantiles Cuantia Indeterminada dated May 17, 2014 among QMax Ecuador S.A., the Agent and Administradora De Fondos Y Fideicomisos Mercantiles.

- Such further and other security documents, agreements, certificates and other documents as may have been entered into by QMax Ecuador S.A. from time to time pursuant to or in connection with the Guarantee and indebtedness owing to the Agent and the Lenders.

**NOTICE OF INTENTION TO ENFORCE SECURITY**
**(Subsection 244(1))**

To:     Central Procurement Inc.

Take notice that:

1.      HSBC Bank Canada, as administrative agent (the **Agent**) to Bank of Montreal, Business Development Bank of Canada, Export Development Canada, HSBC Bank Canada and HSBC Bank USA (the **Lenders**) under the Second Amended and Restated Credit Agreement dated July 31, 2018 between, *inter alios*, Q'Max Solutions Inc., Q'Max America Inc. and QMax Canada Operations Inc., as borrowers, the Agent, and the Lenders intends as a secured creditor to enforce its security on the property of the above insolvent person which encompasses all of their property and assets;

2.      The security that is to be enforced includes security granted by the insolvent person in favour of the Agent is set out in **Schedule "L"**, attached hereto;

3.      The total amount of the indebtedness secured by the security, as at May 5, 2020, is USD $145,381,623.21 plus CDN $1,228,668.47 as well as outstanding letters of credit in the amounts of USD $3,916,296.42 and CDN $1,161,408.79 and outstanding credit card balances, plus accrued and accruing costs, disbursements and interest accruing from the date of this notice; and

4.      The Agent will not have the right to enforce the security until after the expiry of the 10 day period following the sending of this notice unless the insolvent person consents to an earlier enforcement.

Dated at Calgary, Alberta, this 12th day of May, 2020.

HSBC Bank Canada, as Administrative Agent
by its solicitors and agents, Norton Rose Fulbright Canada LLP

Per:    _____
        Howard Gorman, Q.C.

Central Procurement Inc. hereby:

(a)     consents to the immediate enforcement by the Agent as a secured party of the security described in paragraph 2 above pursuant to Section 244(2) of the *Bankruptcy and Insolvency Act* (Canada);

(b)     consents to the secured party's (the Agent's) disposition of any or all collateral subject to the secured party's (the Agent's) security immediately or otherwise as the secured party may determine in its sole discretion, without notice as required by the Personal *Property Security Act* (Alberta); and

(c)     consents to the secured party's (the Agent's) immediate appointment of a Receiver, or a Receiver-Manager, in accordance with the provisions of the above noted security.

Per:   _____   c/s
        Central Procurement Inc.
        By its authorized signatory

        NAME:
        TITLE:

## SCHEDULE "L"

- Guarantee dated May 23, 2014 granted by Central Procurement Inc. in favour of the Agent.

- Account Security Deed dated 2014 (day and month not specified) between Central Procurement Inc. in favour of the Agent.

- Debenture dated 2014 (day and month not specified) granted by Central Procurement Inc. in favour of the Agent.

- Management and Guarantee Commercial Trust Agreement made on July 31, 2014 between Central Procurement Inc. through its branch office QMax Solutions Colombia, Helm Fiduciaria S.A., HSBC Bank Canada, HSBC Bank USA, Bank of Montreal, Export Development Canada and The Bank of Nova Scotia.

- Promissory Note No. 01B dated August 22, 2018 issued by Central Procurement Inc. in favour of Business Development Bank of Canada.

- Promissory Note No. 02B dated August 22, 2018 issued by Central Procurement Inc. in favour of HSBC Bank USA, N.A.

- Promissory Note No. 03B dated August 22, 2018 issued by Central Procurement Inc. in favour of HSBC Bank Canada.

- Promissory Note No. 04B dated August 22, 2018 issued by Central Procurement Inc. in favour of Bank of Montreal.

- Promissory Note No. 05B dated August 22, 2018 issued by Central Procurement Inc. in favour of Export Development Canada.

- Such security documents, agreements, certificates and other documents as may have been entered into by Central Procurement Inc. from time to time pursuant to or in connection with indebtedness owing to the Agent and the Lenders.